## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KITCHEN WINNERS NY INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ROCK FINTEK LLC, ) | |
| ) | |
| Defendant, ) | |
| ) | Civil Action No. 22-cv-05276-PAE |
| ROCK FINTEK LLC, ) | |
| ) | |
| Counterclaim and Third- ) | |
| Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| KITCHEN WINNERS NY INC, ) | |
| ) | |
| Counterclaim Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ADORAMA INC., HERSHEY WEINER, ) | |
| JOSEPH MENDLOWITZ, JNS CAPITAL ) | |
| HOLDINGS LLC and JOEL STERN, ) | |
| ) | |
| Third-Party Defendants. ) | |

# TABLE OF CONTENTS

Introduction.................................................................................................................... 1

Relevant Facts................................................................................................................. 3

Discussion ..................................................................................................................... 10

    I.     ADORAMA BREACHED THE CONTRACT AS A "SELLER"
          UNDER THE SPA...........................................................................................11

    II.    ROCK FINTEK HAS ALLEGED EXTRA-CONTRACTUAL CONDUCT THAT
          CONSTITUTES A BREACH OF GOOD FAITH AND FAIR DEALING.............. 14

    III.   ADORAMA, KITCHEN WINNERS, WEINER AND MENDLOWITZ HAVE
          DEFRAUDED ROCK FINTEK. ................................................................... 15

        A.  Rock Fintek Has Adequately Alleged Fraud with Respect to MedCare Glove
            Sales under the Special Facts Doctrine.................................................. 15

        B.  Rock Fintek Has Stated a Fraud Claim with Respect to LevMed Gloves. ........... 18

        C.  Rock Fintek Has Alleged Facts Giving Rise to a Strong Inference of Scienter. .. 18

        D.  Rock Fintek Justifiably Relied on the Misrepresentations and Omissions........... 19

    IV.   SELLERS HAVE TORTIOUSLY INTERFERED WITH ROCK FINTEK'S
          RELATIONSHIP WITH ASCENSION. .................................................... 21

    V.    ROCK FINTEK ALLEGED UNJUST ENRICHMENT AGAINST ADORAMA. .. 23

    VI.   ROCK FINTEK HAS ALLEGED A CONSPIRACY AMONG THE SELLERS..... 24

    VII.  ROCK FINTEK STATED A WARRANTY CLAIM AGAINST THE SELLERS... 25

Conclusion .................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144 (2002) ............................. 14

*Abrams v. Gen. Motors Corp.*, 120 Misc. 2d 371 (Sup. Ct. 1983) ........................................ 15, 16

*Acad. Orthotic & Prosthetic Assocs. IPA, Inc. v. Fitango Health, Inc.*, 2020 WL 6135762
   (S.D.N.Y. Oct. 16, 2020)........................................................................................... 15

*Ace Am. Ins. Co. v. Monaco Coach Corp.*, 2008 WL 11449302 (E.D.N.Y. Sept. 16, 2008)....... 21

*Albany Molecular Rsch., Inc. v. Schloemer*, 2010 WL 5168890
   (N.D.N.Y. Dec. 14, 2010). ................................................................................... 22, 23

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332 (S.D.N.Y. 2017) ....................... 17

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388 (S.D.N.Y. 2015)..... 13

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 F. App'x 23 (2d Cir. 2017) ............. 13

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141 (S.D.N.Y. 2018)......... 21

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (1991)................................................ 15

*Arben Corp. v. Durastone, LLC*, 186 A.D.3d 599 (2d Dep't 2020) ........................................... 13

*Arons v. Lalime*, 3 F. Supp. 2d 314 (W.D.N.Y. 1998).................................................................. 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................... 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 11

*Bonacasa Realty Co., LLC v. Salvatore*, 109 A.D.3d 946 (2d Dep't 2013) ............................... 13

*Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177 (E.D.N.Y. 2009) .... 13

*Brown v. AXA RE*, 2004 WL 941959 (S.D.N.Y. May 3, 2004)............................................. 22, 23

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751 (S.D.N.Y. 2003) .......................... 13

*Chiomenti Studio Legale, L.L.C. v. Prodos Cap. Mgmt. LLC*, 140 A.D.3d 635
   (1st Dep't 2016) .................................................................................................... 14

*DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc.*, 2005 WL 2848939 (S.D.N.Y. Oct.
   28, 2005)................................................................................................................. 12

*District Council No. 9 v. APC Painting, Inc.*, 272 F. Supp. 2d 229 (S.D.N.Y. 2003)................. 12

*Dweck Law Firm, L.L.P. v Mann*, 340 F Supp. 2d 353 (S.D.N.Y. 2004)................................... 14

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187
   (2d Cir. 2009) ........................................................................................................ 19

*EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508 (S.D.N.Y. 2005) ........... 13

*Gonzalez v. Caballero*, 572 F. Supp. 2d 463 (S.D.N.Y. 2008)................................................... 10

*Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000)........................................ 21

ii

*Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 1998 WL 704112 (E.D.N.Y. Oct. 7, 1998) ................... 22

*JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc.*, 295 F.
   Supp. 2d 366 (S.D.N.Y. 2003) ............................................................................ 12

*Kelly Masonry Corp. v. Presbyt. Hosp. in City of New York*, 160 A.D.2d 192
   (1st Dep't 1990) ...................................................................................... 17

*Liani v. Baker*, 2010 WL 2653392 (E.D.N.Y. June 28, 2010) ..................................... 20

*Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993) ....................... 19

*Miele v. Am. Tobacco Co.*, 2 A.D.3d 799, (2d Dep't 2003); ....................................... 15

*Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135 (1993), ..................... 12, 13

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, 2004 WL 112948
   (S.D.N.Y. Jan. 22, 2004) ......................................................................... 13

*Pfizer, Inc. v. Stryker Corp.*, 2003 WL 21660339 (S.D.N.Y. July 15, 2003) ................. 17

*Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398 (S.D.N.Y. 2012) ............. 23

*Rolls–Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117 (S.D.N.Y. 1996) ............. 12

*Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, 2013 WL 1334271
   (E.D.N.Y. Mar. 28, 2013) ......................................................................... 13

*Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322 (S.D.N.Y. 2010) ................... 11

*Sheridan Broad. Corp. v. Small*, 19 A.D.3d 331 (1st Dep't 2005) ............................. 13

*Solomon Cap., LLC v. Lion Biotechnologies, Inc.*, 171 A.D.3d 467 (1st Dep't 2019) ...... 16, 20

*Speedfit LLC v. Woodway USA, Inc.*, 53 F. Supp. 3d 561 (E.D.N.Y. 2014) ................. 24

*Sprint Sols., Inc. v. Sam*, 206 F. Supp. 3d 755 (E.D.N.Y. 2016) ............................ 22

*TIAA Glob. Invs., LLC v. One Astoria Square LLC*, 127 A.D.3d 75 (1st Dep't 2015) ...... 12, 16

*TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335 (1998) ................................ 25

*Trodale Holdings LLC v. Bristol Healthcare Inv'rs, L.P.*, 2017 WL 5905574
   (S.D.N.Y. Nov. 29, 2017) ......................................................................... 27

*Trump Intern. Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302 (S.D.N.Y. 2007) ..... 25

*U.S. Network Services, Inc. v. Frontier Communications of W., Inc.*, 115 F. Supp. 2d 353
   (W.D.N.Y. 2000) .................................................................................... 25

*Vladeck, Waldman, Elias & Engelhard, P.C. v. Paramount Leasehold, L.P.*,
   46 Misc. 3d 1225(A) (N.Y. Sup. 2015) ....................................................... 16

*Xcellence, Inc. v. Arkin Kaplan Rice LLP*, 2011 WL 1002419 (S.D.N.Y. Mar. 15, 2011). ..... 15

**Rules**

Rule 12(b)(6) ............................................................................................. 10, 13

**COMBINED OPPOSITION TO MOTIONS TO DISMISS**

Defendant and third-party/counterclaim plaintiff Rock Fintek LLC respectfully submits this combined Opposition to the motions to dismiss certain Counts[1] of Rock Fintek's First Amended Counterclaim and Third-Party Complaint (the "FAC") submitted by Kitchen Winners NY Inc. ("Kitchen Winners"), Adorama, Inc. ("Adorama"), Hershey Weiner and Joseph Mendlowitz (together "Adorama Sellers") (ECF No. 46), and JNS Capital Holdings LLC ("JNS") and Joel Stern ("JNS Sellers" and, together with Adorama Sellers, "Sellers") (ECF No. 53).

**Introduction**

Between in or about March and June 2021, amid personal protective equipment shortages brought on by the global COVID-19 pandemic, the Adorama Sellers and JNS Sellers sold to Rock Fintek more than $19 million worth of what the Adorama Sellers and JNS Sellers represented and warranted to be MedCare brand medical grade Nitrile/NBR Examination grade gloves, bearing an FDA 510(k) certification and complying with certain American Society for Testing and Materials ("ASTM") standards. The Sellers knew, because Rock Fintek told them, that Rock Fintek would be delivering those gloves to its client – Ascension, a major hospital group in the United States – to be used by medical providers. At all times, Sellers had special knowledge and superior and exclusive access to the information about the true nature of gloves that were being sold to Rock Fintek and in fact possessed the right from the glove manufacturers to package and repackage the gloves. As the Sellers also knew, Rock Fintek's representatives were prohibited by COVID-19 safety protocols from physically inspecting the products in the sealed pallets before they were

---

[1] The Notice of Motion filed by the Adorama Sellers (ECF No. 46) purports to seek dismissal of the entire FAC, but the supporting memorandum does not even purport to address Rock Fintek's contract claims against Kitchen Winners. The Stern Sellers' motion (ECF No. 53) does not move on the fraud and contract claims against them and only seeks dismissal of Counts Four (good faith and fair dealing), Six (negligent misrepresentation), Eight (tortious interference), Nine (conspiracy) and Ten (breach of warranties) as to those parties on the same grounds as the Adorama parties.

loaded onto trucks and shipped directly to Ascension's warehouses. The Sellers thus had a duty of honest and full disclose to Rock Fintek, which had no choice but to rely on the Sellers to faithfully provide MedCare brand medical grade Nitrile Examination gloves with proper specifications.

As alleged in the FAC, the Sellers breached their contractual and other legal duties to Rock Fintek in numerous ways. Not only was the contractual performance riddled with delays, inaccurate glove counts, and extortionate hidden charges to Rock Fintek, but Rock Fintek has discovered that Rock Fintek and Ascension were victims of a fraudulent scheme because a substantial number of gloves were not the required "Examination" gloves but were less expensive "Protection" gloves that are not designed for medical use; certain gloves were not MedCare brand gloves but fake knockoffs; all or a substantial number of gloves did not bear the required FDA 510(k) certification; most or all of the gloves failed to comply with the ASTM D6319 standards, contrary to representations, and, more egregiously, chemical testing has revealed that the gloves at issue were not "Nitrile/NBR" examination gloves, but instead cheaper polyvinylchloride gloves with no detectible levels of nitrogen.

In apparent anticipation of legal action, Kitchen Winners filed a preemptive lawsuit in state court, seeking to recover a portion of the contract price that Rock Fintek allegedly did not pay (after it had discovered the fraud). Rock Fintek removed to this Court and filed the FAC seeking damages for breaches of pertinent contracts (Counts One, Two and Three); breach of the covenant of good faith and fair dealing (Count Four); fraud in the inducement (Count Five); negligent misrepresentation (Count Six); unjust enrichment (Count Seven); tortious interference (Count Eight); conspiracy (Count Nine); and breach of warranty (Count Ten). This motion followed.

As detailed below, the Sellers' arguments are largely premised on a selective reading of the FAC and overstatement or misapplication of caselaw. Adorama cannot escape liability under

a contract to which it is an express signatory as a "Seller" of gloves. The good faith and fair dealing claim is not duplicative of the contract claim because it is premised on extracontractual conduct including extortionate efforts to condition performance of existing obligations on future concessions. The fraud claims and negligent misrepresentation claims survive because they are based on 1) omissions that are actionable under the special facts doctrine and 2) delivery of the non-contracted for "LevMed" gloves, which Adorama Sellers tried to substantiate with falsified documentation. The tortious interference claims survive because the Sellers' conduct was knowingly directed towards Ascension, Rock Fintek's client that Sellers knew would be receiving the gloves at issue for use by medical professionals during an ongoing COVID-19 pandemic. Unjust enrichment and warranty claims survive because Rock Fintek is entitled to plead alternative relief, particularly where Adorama denies being a party to a contract with Rock Fintek. Finally, the conspiracy claim survives because the factual allegations of the FAC give a plausible inference to an actionable combination between the Sellers.

Accordingly, the Sellers' motions to dismiss should be denied entirely.

### Relevant Facts

*The Genesis of the Parties' Relationship*

In early 2021, Rock Fintek, a trading company that had been in the business of buying and selling medical supplies, including personal protective equipment ("PPE"), was introduced to Stern (the sole member and principal of JNS), Weiner, Mendlowitz and other representatives of Adorama and Kitchen Winners, including their employee Mendel Banon. FAC ¶¶ 15, 25, 26. Adorama is a New York company that historically had sold cameras and electronic equipment, routinely facing litigation and regulatory action for selling unauthorized knock-off products. *Id.* ¶ 16. During the COVID-19 pandemic when demand and prices for PPE skyrocketed, Adorama

formed Kitchen Winners for the purpose of engaging in the PPE business and shielding Adorama from liability for fraudulent PPE transactions. *Id.* ¶ 18.

Kitchen Winners is an alter-ego of Adorama. Adorama dominates and controls Kitchen Winners to engage in wrongful PPE transactions while seeking to shield from creditors funds received in those transactions, which flow directly to Adorama. *Id.* ¶ 19-20. Adorama and Kitchen Winners commingle funds, fail to observe corporate formalities, share officers, directors and office space. *Id.* ¶¶ 20-24. ***All*** payments for the transactions with the Adorama Sellers were made by Rock Fintek directly *to Adorama* or its attorney even when Kitchen Winners appeared as the invoicing party. *Id.* ¶ 21. At pertinent times, Kitchen Winners did not have a separate bank account. *Id.* A written document that Mendlowitz provided to Rock Fintek explained that Kitchen Winners was "authorized to act on our ***[Adorama's]*** behalf to procure ***Nitrile*** gloves" **not** the other way around. *Id.* ¶ 22. Mendlowitz's representation as to gloves being "Nitrile" was false.[2] *Id.* At all times, the parties and their representative routinely referred in written and oral communications to "Adorama" as the seller of the gloves at issue. *Id.* ¶ 23.

In February 2021, Stern, Weiner, Mendlowitz and Banon each told Rock Fintek that Adorama and Kitchen Winners had a connection to a new manufacturer in China that manufactured "MedCare" brand medical grade Nitrile (also referred to as NBR) Examination gloves. *Id.* ¶ 27. "*Examination*" glove is an industry term of art that carries specific chemical and use specifications, which render such gloves fit for medical purposes as opposed to what are known as *Protection* gloves, which are of a different composition, lower cost and typically used for household and other non-medical purposes. *Id.* ¶¶ 27-28. From the outset, Rock Fintek explained orally and in writing

---

[2] To the extent that Adorama can be heard to complain that Rock Fintek has not alleged a specific date for this document (which Mendlowitz authored), Rock Fintek would be prepared to amend the FAC to clarify the date on which this statement occurred.

to each Seller that all gloves that Rock Fintek would purchase from them would be immediately sold and delivered to Ascension Health, Rock Fintek's hospital group client in the United States for use by medical professionals. *Id.* ¶ 29. Rock Fintek told Stern, Weiner, Mendlowitz, Banon, and a consultant Arik Maimon that Ascension required only *Examination* gloves that were FDA 510(k) certified and complied with ASTM D6319. *Id.* Prior to each transaction, Stern, Weiner, and Banon represented orally and in writing that the gloves that they sold to Rock Fintek were in fact Nitrile/NBR Examination gloves with FDA 510(k) and ASTM D6319 certifications. *Id.* ¶ 29.

To induce Rock Fintek to buy gloves from JNS, Adorama and Kitchen Winners, Stern and Banon provided to Rock Fintek various written materials purporting to describe the MedCare Examination gloves, including an 84-page MedCare product presentation (March 2021), an FDA 510(k) approval letter (February 9, 2021), testing reports (February 2, 2021 & March 19, 2021) and other materials specifying that the gloves met ASTM D6319 (and other) specifications. *Id.* ¶¶ 30-38. The written materials identified the glove manufacturer in China as Dongguan Grinvald Technology Co., Ltd. *Id.* ¶ 34. The FDA 501(k) letters specifically pertained to "MedCare Nitrile Examination" gloves that met ASTM D6319 specifications, which was material to Rock Fintek's decision to enter into the SPA, but which Adorama, Kitchen Winners and Stern did not include as a specification in their pertinent contracts. *Id.* ¶ 37. In other words, the Sellers expressly falsely represented that the gloves were fit for medical examination, diagnostic or therapeutic interventions, and for work with infectious materials. *Id.* ¶ 40. The written materials included photographs of boxes displaying "Nitra Force | NBR Nitrile Examination Gloves." *Id.* ¶ 36.

At all times, Adorama, Kitchen Winners, Mendlowitz, Weiner, Stern, and JNS and their agents had superior and special knowledge about the source and nature of the gloves and had exclusive access to Global Tooling Service ("GTS"), the owner of the MedCare brand, and to the

MedCare manufacturers in China. *Id.* ¶ 41. The Sellers knew that Rock Fintek did not have such access and that Rock Fintek was relying on the Sellers to provide accurate information about the gloves. *Id.* Each of the Sellers knew that due to COVID-19 safety restrictions, Rock Fintek could not unseal the pallets of gloves and could not open and inspect the packaging or contents of the boxes of gloves prior to the gloves being shipped to Ascension warehouses. *Id.* ¶ 42. Through documents that they provided to Rock Fintek, Kitchen Winners and Adorama held themselves out as being authorized by GTS and by MedCare to package or re-package the gloves. *Id.* ¶ 43.

***The Adorama/Kitchen Winners Transactions***

In March 2021, Rock Fintek purchased from Adorama Sellers lots of gloves in one-off transactions that the packing slips and invoices described as "Nitrile examination gloves as specs." Banon instructed Rock Fintek to wire payment to *Adorama's* attorney. *Id.* ¶¶ 58-60.

On April 7, 2021, Rock Fintek entered into the SPA, pursuant to which Kitchen Winners and Adorama agreed to sell to Rock Fintek 1,500,000 boxes (150,000,000 units) for $11.50/box, of: "Nitrile Gloves (Box 100) Color: Blue, Medical exam grade with FDA 510k Brand: MedCare, examination glove." *Id.* ¶ 62; *see also* SPA (ECF No. 47-4). As a condition of entering into the SPA, Rock Fintek required Adorama to be a signatory to the SPA and to guarantee the performance of Kitchen Winners. *Id.* ¶ 63. Adorama is in fact a signatory to the SPA as a "Seller" and ***all*** payments, not just the initial deposit, were made directly *to Adorama* as a "Seller" and not to Kitchen Winners. *Id.* Section 8 of the SPA required a rebate of approximately $750,000 to Rock Fintek at the end of the contract term. *Id.* ¶¶ 64, 65.

***Intentional Breaches of the SPA by Adorama***

Upon arrival of gloves at the port, the Sellers' agents loaded sealed pallets onto trucks provided by Rock Fintek, but Rock Fintek was not permitted to inspect the merchandise due to

COVID-19 restrictions. *Id*. ¶ 69. Rock Fintek prepaid by wire transfer to Adorama in amounts requested based its representations of specific amounts of gloves included in each delivery. *Id.* ¶ 70. Under the SPA, Rock Fintek paid approximately $19,190,000 to Adorama. *Id.* ¶ 71.

Performance problems such as faulty glove counts and improper charges began to surface after the parties signed the SPA, and Rock Fintek was already committed to deliver the product to Ascension and began transferring significant sums of money to Adorama. *Id.* ¶¶ 72-74. In early July 2021, when reconciling the transactions between the parties under the SPA, Rock Fintek discovered that it had been overcharged by approximately $1,035,000. *Id.* ¶ 75. Rock Fintek also discovered that Adorama billed it $242,245 for 25,510 boxes of gloves that were never delivered. *Id.* ¶ 76. In addition, Adorama delivered approximately 178,270 boxes of gloves to Rock Fintek that Rock Fintek did not contract for but for which it unwittingly paid more than $2 million. *Id.* ¶ 77. Adorama and Kitchen Winners still owe to Rock Fintek the $750,000 rebate. *Id.* ¶ 78.

At first, Adorama agreed in writing to refund the $1,035,000 overcharge and to pay the contractually required rebate. *Id.* ¶ 79. In July 2021, Adorama reneged and sought to extort additional funds from Rock Fintek by conditioning the return of overcharges and payment of the rebate on Rock Fintek buying an additional 2 million boxes of gloves for $18 million. *Id*. In addition, Adorama and Kitchen Winners unilaterally invoiced Rock Fintek for several hundred thousand dollars of previously undisclosed and *unagreed-upon* expenses, such as insurance for the benefit of Kitchen Winners and Adorama; insurance for a logistics company, Logic Imports, that had no apparent connection to the parties' contractual relationship; and for trucking bills, while refusing to send invoices from trucking companies to support those bills. *Id.* ¶ 80. When Rock Fintek challenged those expenses and sought supporting information, Adorama refused to provide it and conditioned continued delivery of contracted-for gloves on Rock Fintek paying for those

improper expenses. *Id*. As the Sellers knew, Rock Fintek had no choice but to comply with the extortionate demands because it had committed to deliver gloves to Ascension. *Id.* ¶ 81.

***The Sellers Possessed Special Knowledge of Facts that they Withheld in Order to Fraudulently Induce Rock Fintek into a Contract to Buy Non-Conforming Fake Products***

At all times, Adorama, Kitchen Winners, Stern, Weiner and Mendlowitz had superior and exclusive access to the information about the true nature of gloves that were being sold to Rock Fintek and in fact possessed the right from GTS and/or the glove manufacturers to package and repackage the gloves. *Id.* ¶ 87. When trying to push wrong gloves, Stern even offered that "we" would change the packaging on the Protection gloves, and later took steps to fraudulently conceal the nature of the gloves by placing "Examination" stickers on certain boxes. *Id*. Sellers knew and failed to disclose prior to each transaction at issue that a substantial number of gloves sold to Rock Fintek were not Nitrile/NBR medical grade Examination gloves required by the SPA, but the cheaper Protection gloves and that most or all of the gloves were not even Nitrile/NBR gloves but were cheaper polyvinylchloride gloves. *Id*. Sellers knew that Rock Fintek could not verify the nature of the gloves in sealed pallets and intended for Rock Fintek to rely on their representations and omissions on which Rock Fintek in fact reasonably relied to its detriment. *Id.* ¶ 88.

In July 2021, Rock Fintek first learned from Ascension that medical care providers that tried using the MedCare gloves from Adorama, Kitchen Winners and JNS/Stern were experiencing tearing and other unexpected performance issues. *Id.* ¶ 82. Rock Fintek immediately communicated those complaints and photographs of failing gloves to Sellers. *Id.*

In fact, more than half of the gloves that the Adorama Sellers and JNS Sellers sold to Rock Fintek were non-conforming less expensive household use *Protection* gloves. *Id.* ¶ 83. A substantial number of boxes listed unapproved manufacturers, including "AnHui ABeiXiong Medical Technology Co., Ltd." which MedCare has identified as an *unauthorized* fake

manufacturer of MedCare gloves on its website. *Id.* ¶ 84. Even worse, subsequent chemical testing by Ascension revealed that the gloves were not NBR/Nitrile gloves but less expensive *polyvinylchloride* gloves. *Id.* ¶ 94. Sellers had superior knowledge of the unauthorized gloves manufacturers and the true chemical composition yet concealed those facts. *Id.* ¶¶ 84, 87, 88, 93.

Rock Fintek promptly brought these issues to the attention of Weiner, Banon and Stern and requested documentation to determine if Protection gloves were comparable to the correct gloves. *Id.* ¶ 85. Weiner refused to provide documentation unless Rock Fintek purchased an additional *2 million boxes* of gloves from Adorama. Rock Fintek demanded that Sellers take back the gloves, but Sellers refused. *Id.* ¶ 86. On a late July 2021 telephone call when Rock Fintek again raised overpayments and quality issues, Weiner became belligerent and threatened that he would go to one of Rock Fintek's representatives' house with a "big fucking dump truck to bury him." *Id.* ¶ 89.

**The LevMed Fraud**

In April 2021, Kitchen Winners and Adorama shipped a container with 90,000 boxes (3 million units) of gloves that were not MedCare brand but were identified on their boxes as "LevMed" – a brand unknown to Rock Fintek. *Id.* ¶ 95. Banon personally instructed the warehouse staff to load the LevMed gloves onto Rock Fintek's trucks along with MedCare gloves. *Id.* ¶ 96. Upon seeing LevMed gloves in its warehouses, Ascension demanded to see paperwork regarding the origin and quality of the LevMed gloves and refused to pay Rock Fintek for the order. *Id.* ¶ 98.

On April 27, 2021, Banon falsely claimed that the LevMed gloves did not come from the Adorama Sellers and blamed the warehouse employees. *Id.* ¶ 99. On April 29, 2021, Rock Fintek again requested documentation for the LevMed gloves, so that Rock Fintek could present that documentation to Ascension to try and mitigate the situation. *Id.* ¶ 101. On April 29, 2021, at approximately 7 p.m., Banon emailed Rock Fintek and others an image purporting to be a product

specification sheet bearing the LevMed logo and a link to purported FDA documentation, knowing that Rock Fintek would rely on that information in dealing with its client. *Id.* ¶ 102. On April 30, 2021, Banon sent what purported to be a complete version of the LevMed product specification sheet, a product brochure, as well as pictures of what purported to be inner and outer boxes of the LevMed gloves, falsely representing that among other things those gloves contained an FDA 510(k) certification. *Id.* ¶ 103. In fact, these documents were fraudulent, consisting of an altered MedCare/GTS document, apparently manipulated to create an appearance that the LevMed gloves were of the same quality and specifications as required MedCare gloves. *Id.* ¶ 104. MedCare has confirmed in writing that the LevMed documentation was an altered MedCare document. *Id.*

***Co-Conspirators Have Interfered with Rock Fintek's Relationship with Ascension***

The Sellers knew, because Rock Fintek told them in writing and orally, that the gloves were being delivered directly to Ascension with whom Rock Fintek had a preexisting business relationship and a contract for delivery of MedCare medical grade nitrile/NBR Examination gloves with FDA 510(k) certification and meeting ASTM D6319 standards for use by medical professionals in the midst of an ongoing global COVID-19 pandemic. *Id.* ¶¶ 108-111.

Rock Fintek had an ongoing profitable business relationship with Ascension predating the purchases of gloves at issue, which Rock Fintek reasonably expected to continue. *Id.* ¶ 112. As a result of the fake gloves provided by the Sellers to Ascension, Ascension has refused to do further business with Rock Fintek, costing Rock Fintek significant lost revenues and profits. *Id.* ¶ 114.

**Discussion**

On a Rule 12(b)(6) motion to dismiss, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008). Plaintiff does not need to make detailed factual allegations,

but must provide the grounds of his entitlement to relief with more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When factual allegations are enough to raise a right to relief above the speculative level, a claim may be supported by showing any set of facts consistent with the allegations in the complaint. *See id.* at 563. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (ruling on a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

## I.      ADORAMA BREACHED THE CONTRACT AS A "SELLER" UNDER THE SPA.

In a weak effort to distance itself from the SPA, Adorama selectively relies in its motion on the preamble to the SPA, but ignores the signature page that unequivocally shows Adorama ***as a signatory to the SPA as a "Seller"*** including because as a condition of entering into the SPA, Rock Fintek required Adorama to be a party and to guarantee the performance of Kitchen Winners. FAC ¶ 63; *see also* SPA (ECF No. 47-4) at p. 5. Adorama ignores that *all* payments, not just the initial deposit, were made directly to Adorama as a "Seller" and *not* to Kitchen Winners even when Kitchen Winners appeared on invoices. FAC ¶ 63. Moreover, the parties and their agents routinely and without objection referred to *Adorama* as the seller. *Id.* ¶ 23. These allegations are more than enough to reject Adorama's revisionist explanation of why it signed the SPA. To the extent that Adorama's *mis*interpretation of the SPA might suggest an ambiguity, it is black letter law that ambiguities must be resolved in Rock Fintek's favor on a motion to dismiss. *See Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010) (on a motion to dismiss the Court "must resolve all ambiguities in the contract in Plaintiffs' favor."). Thus, the Court need not reach Adorama's flawed effort to challenge alter-ego allegations to sustain the contract claim.

In any event, Adorama cannot raise at the motion to dismiss stage an argument that alter-ego allegations are "not supported by any evidence." Motion (ECF No. 48) at 16. Rock Fintek has

sufficiently plead that Adorama is an alter-ego of Kitchen Winners. The FAC alleges in no uncertain terms that Adorama formed Kitchen Winners for the purpose of shielding it from liability for fraudulent PPE transactions; that Adorama dominates and controls Kitchen Winners; Adorama and Kitchen Winners commingle funds, fail to observe corporate formalities, share officers, directors and office space; Adorama received *all* payments even when Kitchen Winners appeared on invoices; Kitchen Winners did not have a separate bank account; Kitchen Winners was expressly authorized to act *on Adorama's behalf* when procuring the gloves at issue; and the participants in the transactions interchangeably referred in written and oral communications to "Adorama" as the seller. FAC ¶¶ 19-23. On a motion to dismiss, these allegations more than suffice. *See JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 379 (S.D.N.Y. 2003) (plaintiff alleged veil piercing where defendants "exercised ... complete domination to abuse the corporate form in a manner that resulted in injury to the plaintiff, namely by using assets for personal rather than corporate purposes and by placing assets beyond the reach of creditors"); *District Council No. 9 v. APC Painting, Inc.*, 272 F. Supp. 2d 229, 241 (S.D.N.Y. 2003) (plaintiff stated a veil piercing claim where it alleged that defendant used his companies to avoid the obligations under certain arbitration awards); *Rolls–Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 122 (S.D.N.Y. 1996) (plaintiff stated a veil piercing claim where it alleged that defendants used their control over corporate entities to hide assets from creditors); *TIAA Glob. Invs., LLC v. One Astoria Square LLC*, 127 A.D.3d 75, 90 (1st Dep't 2015) (party abused the corporate form by failing to reserve funds for affiliate's contingent liability and failing to follow corporate formalities); *DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc.*, No. 99 CIV. 2231 (HBP), 2005 WL 2848939, at *8 (S.D.N.Y. Oct. 28, 2005) ("Whether the corporate veil should be pierced requires a fact specific inquiry; there are no bright-line rules.").

Adorama misapplies and overstates the caselaw cited in its motion. For example, in *Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135 (1993), the Court of Appeals reviewed findings on a fully developed record, not allegations, and expressly recognized that "[b]ecause a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised." *Id.*, 82 N.Y.2d at 141. *Morris* is also distinguishable. Unlike allegations here that Adorama received *all* funds from the PPE transactions, while seeking to misuse an affiliate to shield itself from liability for those transactions, the factfinder in *Morris* had expressly found "no evidence of an intent to defraud by using the corporation as a tax shield." *Id.*, 82 N.Y.2d at 143.

The cases on which Adorama relies are inapposite. *See EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 513 (S.D.N.Y. 2005) (no nexus between the poor construction of a yacht at issue and the alleged undercapitalization of a guarantor); *Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 197 (E.D.N.Y. 2009) (plaintiffs "failed to specify… which individual defendant took funds from which corporation"); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 CIV.0613 GBD, 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004) (vague claim of an "affiliate relationship" and no factual allegations of control insufficient to plead veil piercing); *Sheridan Broad. Corp. v. Small*, 19 A.D.3d 331, 332 (1st Dep't 2005) (affirming dismissal without discussion of facts).[3]

---

[3] Other cases cited by Adorama are inapplicable on a Rule 12(b)(6) motion and should be disregarded. *See TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998) (*evidentiary record* did not support a motion to compel parent to abide by subsidiary's arbitration agreement); *Arben Corp. v. Durastone, LLC*, 186 A.D.3d 599, 600 (2d Dep't 2020) (summary enforcement petition did not support veil piercing because "[u]nlike a complaint in a plenary action, a petition in a special proceeding must be accompanied by competent evidence"); *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 F. App'x 23, 25 (2d Cir. 2017) (affirming findings after a bench trial); *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751, 759 (S.D.N.Y. 2003) (ruling on a motion in limine); *Bonacasa Realty Co., LLC v. Salvatore*, 109 A.D.3d 946, 947 (2d Dep't 2013) (affirming summary judgment

As explained above, the Court does not need to reach veil piercing analysis to sustain Rock Fintek's breach of contract claim against Adorama because Adorama is an express signatory as a "Seller" and guarantor in the SPA that received *all* of the funds paid by Rock Fintek. If the Court were to consider Adorama's veil piercing arguments, however, the FAC alleges sufficient facts to hold Adorama responsible for Kitchen Winners' breach of the SPA and other misconduct.

## II.   ROCK FINTEK HAS ALLEGED EXTRA-CONTRACTUAL CONDUCT THAT CONSTITUTES A BREACH OF GOOD FAITH AND FAIR DEALING.

In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) ("neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). "For a complaint to state a cause of action alleging breach of the covenant, plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Dweck Law Firm, L.L.P. v Mann,* 340 F Supp. 2d 353, 358-59 (S.D.N.Y. 2004).

Far from entirely duplicative of the breach of contract claim, Count Four is expressly <u>not</u> premised on the Sellers' breach of the SPA, but is based on extra-contractual extortionate conduct, including conditioning delivery of contracted-for gloves on Rock Fintek paying improper transportation and insurance costs and conditioning contractually required return of overcharges and payment of a rebate on Rock Fintek buying 2 million more boxes of gloves from Adorama and Kitchen Winners for an additional $18 million. FAC ¶¶ 3, 79, 80, 136. In other words, over and above breaching the SPA, Adorama and Kitchen Winners withheld the benefits expected by

---

ruling); *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 411 (S.D.N.Y. 2015) (affirming bench trial ruling that *evidence* did not support veil piercing); *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 KAM RLM, 2013 WL 1334271, at *1 (E.D.N.Y. Mar. 28, 2013) (veil-piercing survived summary judgment); *Chiomenti Studio Legale, L.L.C. v. Prodos Cap. Mgmt. LLC*, 140 A.D.3d 635, 636 (1st Dep't 2016) (summary judgment proper where mere breach of contract was not sufficient).

Rock Fintek from its contractual performance in an effort to use existing obligations to obtain additional concessions from Rock Fintek. *See Acad. Orthotic & Prosthetic Assocs. IPA, Inc. v. Fitango Health, Inc.*, No. 19-CV-10203 (JPO), 2020 WL 6135762, at *8 (S.D.N.Y. Oct. 16, 2020) (allowing good faith and fair dealing claim because "[a]lthough the contract nowhere states that its termination provision shall not be abused by one party to extort the other, such an expectation is implicit."); *see also Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1991) (withholding performance under existing contract and trying to force financial concessions in an effort to "sweeten the deal" constituted a breach of the covenant).

With respect to JNS Sellers, the FAC alleges misconduct designed to deprive Rock Fintek of benefits of transactions beyond mere breaches, including Stern's discretionary selection of gloves from a different inventory (FAC ¶ 50) and placing stickers over the cheaper "Protection" boxes to pass them off as "Examination" boxes. *Id.* ¶¶ 54-55.

## III. ADORAMA, KITCHEN WINNERS, WEINER AND MENDLOWITZ HAVE DEFRAUDED ROCK FINTEK.[4]

### A. Rock Fintek Has Adequately Alleged Fraud with Respect to MedCare Glove Sales under the Special Facts Doctrine.

Under New York law, in order to prove fraudulent inducement, plaintiff must allege that (i) the defendant made a material false representation, (ii) intending to defraud the plaintiff, (iii) who reasonably relied upon the representation, and (iv) suffered damages. *Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10 CIV. 3304 (HB), 2011 WL 1002419, at *4 (S.D.N.Y. Mar. 15, 2011). In their motion, Sellers ignore that "New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." *Miele v.*

---

[4] Stern and JSN have not moved to dismiss the fraud claims against them.

*Am. Tobacco Co.*, 2 A.D.3d 799, 803 (2d Dep't 2003); *see also Abrams v. Gen. Motors Corp.*, 120

Misc. 2d 371, 374 (Sup. Ct. 1983) ("If one party has superior knowledge or has means of

knowledge not available to both parties, then he is under a legal obligation to speak and the silence

would constitute fraud."); *TIAA Glob. Invs., LLC*, 127 A.D.3d at 86-87 (under the "special facts"

doctrine, a duty to disclose arises where one party's superior knowledge of essential facts renders

a transaction without disclosure inherently unfair). The "special facts" doctrine applies when the

undisclosed material fact was peculiarly within the sellers' knowledge and the information could

not have been discovered by plaintiffs through the exercise of ordinary intelligence. *Vladeck,*

*Waldman, Elias & Engelhard, P.C. v. Paramount Leasehold, L.P.*, 46 Misc. 3d 1225(A) (N.Y.

Sup. 2015) (whether plaintiff exercised ordinary intelligence sufficient to rely on the special facts

doctrine is a question of fact for the jury).

In the context of applying the special facts doctrine, the First Department aptly explained

in a similar situation that material omissions that induce a party into a contractual relationship are

not "merely redundant" of a "parallel" contract claim:

> However, as plaintiff points out, it has alleged fraud arising not merely from
> contractual promises to perform at a later date, but rather actionable
> misrepresentations of "then-present facts," such as the status of the air infiltration
> issue as expressed in Khan's email and in the MSI letter, each of which is alleged
> to have fraudulently induced plaintiff, on the very day of closing, to proceed …
> ***Where "allegations of intentional fraud, though parallel in many respects to the***
> ***breach of contract claim, include claims of fraudulent misrepresentations made***
> ***by defendants which induced them to enter into the contract and close on the***
> ***property, they are not merely redundant of the breach of contract claim*** ... [and
> a] fraud cause of action is sustainable"

*TIAA Glob. Invs., LLC*, 127 A.D.3d at 86-87 (emphasis added; internal citation omitted); *see also*

*Solomon Cap., LLC v. Lion Biotechnologies, Inc.*, 171 A.D.3d 467, 468 (1st Dep't 2019) ("Sharbat

asserted that he had investors lined up and ready to go, when in fact he had none. Since plaintiffs

were retained by defendant to bring investors in, these statements constitute misrepresentations of material facts for purposes of the fraudulent inducement counterclaim.").

Here, the FAC alleges that each of Adorama, Kitchen Winners, Weiner and Mendlowitz exclusively possessed knowledge about the sources and nature of the gloves to be sold to Rock Fintek. FAC ¶¶ 84, 87, 88, 93. The FAC alleges that this information could not have been discovered by Rock Fintek through the exercise of ordinary intelligence because COVID-19 safety protocols prevented Rock Fintek from examining the contents of the pallets that would be shipped directly to Ascension's warehouses. *Id.* These allegations are sufficient to state a fraud claim. *See Pfizer, Inc. v. Stryker Corp.*, No. 02 CIV.8613 LAK, 2003 WL 21660339, at *1 (S.D.N.Y. July 15, 2003) ("Where, as here, a party warrants and represents a present existing fact, there simply is no reason why it should not have a remedy in contract for breach of the warranty and a remedy in tort for deliberate, fraudulent misrepresentation, assuming the facts otherwise justify such relief.").

In addition, fraudulent statements and omissions by Weiner and Mendlowitz cannot be duplicative of the contract claims, because neither of those individuals was a party to the SPA or any of the one-off transactions. *See Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 339-40 (S.D.N.Y. 2017) (a claim for fraudulent inducement is sufficiently distinct from a breach of contract claim where a plaintiff alleges a legal duty separate from the duty to perform under the contract; or alleges a fraudulent misrepresentation collateral or extraneous to the contract; or seeks special damages that are caused by the misrepresentation and unrecoverable as contract damages).

Finally, Adorama Sellers' argument that allegations of an agency relationship between Banon and Adorama are "conclusory" cannot withstand a plain reading of the FAC. Banon is an *employee* of Adorama who communicated, provided documentation, and made payment instructions on behalf of Adorama (FAC ¶¶ 23, 32, 33, 58, 59, 61, 85, 89). Such allegations are

more than sufficient to attribute Banon's misrepresentations and omissions to Adorama. *See, e.g., Kelly Masonry Corp. v. Presbyt. Hosp. in City of New York*, 160 A.D.2d 192, 193 (1st Dep't 1990) (allegation that hospital "employed" an individual was sufficient to allege agency relationship).

### B.   Rock Fintek Has Stated a Fraud Claim with Respect to LevMed Gloves.

The Adorama Sellers' motion does not even address that aspect of Rock Fintek's fraud claim that is premised on the approximately 3 million "LevMed" gloves that *were not subject to the SPA*, but that the Adorama Sellers fraudulently foisted on Rock Fintek to be delivered to Ascension. Adorama Parties' arguments that fraud claims are duplicative of contract claims does not apply to the LevMed fraud on its face because LevMed gloves were not governed by the parties' contractual relationship and are not alleged as contractual breaches in the existing FAC.

As set forth above, the FAC pleads in detail how Adorama and Kitchen Winners defrauded Rock Fintek with respect to the LevMed gloves not only by deliberately sending wrong gloves to Rock Fintek, but also by providing altered fake documentation for those gloves on which Rock Fintek relied to its detriment. *See* FAC ¶¶ 95-107.

### C.   Rock Fintek Has Alleged Facts Giving Rise to a Strong Inference of Scienter.

Adorama Sellers' argument that the FAC fails to adequately allege facts giving rise to a strong inference that they knew of the falsity of their statements and omission also falls flat. Far from "conclusory" allegations, the FAC alleges that Adorama Sellers exclusively knew and concealed at the time of each one-off transaction, at the time that they entered into the SPA and at the time of each delivery that a substantial number of gloves sold to Rock Fintek were the cheaper Protection gloves; that the Adorama Sellers illegally profited at Rock Fintek's expense from those transactions; that the Sellers had special knowledge regarding the nature of the gloves knowing that Rock Fintek would be unable to independently verify the nature of the gloves in sealed pallets; that Sellers held themselves out has having the right to package and repackage the gloves, while

18

knowing that Rock Fintek would not be allowed to inspect the same; that Banon expressly instructed warehouse employees to load "LevMed" gloves into Rock Fintek's trucks and then provided falsified documentation about those gloves; and, when confronted by the wrongdoing, Weiner sought to extort future concessions from Rock Fintek and made threats of violence.

None of the caselaw that Adorama Sellers cite comes close to supporting dismissal of such factual allegations on scienter grounds. *See Arons v. Lalime*, 3 F. Supp. 2d 314, 325 (W.D.N.Y. 1998) (allegation that defendants knew representations were false because they converted rather than invested plaintiffs' funds were sufficient to plead mail and wire fraud); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (where the alleged misstatements were made several years apart from the acquisition as to which plaintiff ascribed motive, such motive allegations were insufficient). To the contrary, the facts detailed above easily provide at least strong circumstantial evidence of conscious misbehavior or recklessness from which the Sellers illegally and directly profited, having received tens of millions of dollars in payments for fake non-conforming products that they knowingly sold to Rock Fintek.

### D.    Rock Fintek Justifiably Relied on the Misrepresentations and Omissions.

Finally, Adorama argues in passing that the language in the SPA concerning the *timing* of payments for the gloves somehow constitutes a sufficient disclaimer to waive reliance. In relevant part, the SPA provides that the *payment* "for each box of gloves delivered shall be paid to Seller upon Buyer's inspection of the products at Seller's warehouse in Los Angeles, California prior to Buyer's collection of the delivered Products." *See* SPA (ECF 47-4). First, Adorama's own caselaw confirms that such a payment timing clause cannot operate as a reliance disclaimer, and certainly not the kind that courts have held sufficient to preclude fraud claims. *Compare Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) ("in order to be considered sufficiently

specific to bar a defense of fraudulent inducement … a guarantee must contain ***explicit disclaimers*** of the particular representations that form the basis of the fraud-in-the-inducement claim" (emphasis added)); *Liani v. Baker*, No. 09-CV-2651 (ILG), 2010 WL 2653392, at *5 (E.D.N.Y. June 28, 2010) (reliance precluded by "explicit warning against relying on the information in the packet, directing prospective purchasers to instead conduct their own inspections of the property").

Second, the term "inspection" in the SPA on which Adorama relies is not defined and entirely vague in terms of what level of "inspection" the parties intended to trigger payment obligations. Indeed, since all parties *knew* that Rock Fintek would be *unable to inspect* the gloves in sealed pallets, it is much more plausible to interpret the language in the SPA as merely requiring confirmation of existence of products before payment would be made. On a motion to dismiss, any ambiguities must be interpreted in Rock Fintek's favor.

## IV.   NEGLIGENT MISREPRESENTATION CLAIMS AGAINST ALL SELLERS SURVIVE UNDER THE "SPECIAL FACTS" DOCTRINE.

When arguing for dismissal of the negligent misrepresentation claim in Count Six for lack of a "special relationship" between the parties, the Sellers again ignore detailed allegations that they possessed superior and exclusive knowledge and access to the information about the gloves. *E.g.,* FAC ¶ 154. It is fundamental that such omissions are sufficient to state a claim for negligent misrepresentation under New York law even in the absence of a fiduciary relationship. *See Solomon Cap., LLC v. Lion Biotechnologies, Inc.*, 171 A.D.3d 467, 470 (1st Dep't 2019) (counterclaim allegations that plaintiffs negligently misrepresented that they were able to represent defendants it in obtaining investors and facilitate the issuance of securities to raise capital for it, that they were skilled in obtaining financing from "high-value investors," and that they "had qualified, high-value investors who were to invest in defendant" were sufficient to state a negligent misrepresentation counterclaim under the "special facts" doctrine).

Sellers[5] similarly misplace reliance on the economic loss rule, which generally precludes products liability and tort recovery against a manufacturer of a product where the claimed losses flow from damage to the property that is the subject of the contract, and personal injury or other property damages is not claimed. *Ace Am. Ins. Co. v. Monaco Coach Corp.*, No. CV-07-3341(SJF)(MLO), 2008 WL 11449302, at *3 (E.D.N.Y. Sept. 16, 2008); *see also Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) ("the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful"). The rule is inapplicable where, as here, the breach at issue is not only contractual in nature but is independently tortious. *See Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000). Rock Fintek does not claim that the Sellers negligently performed under the SPA, but claims, in the alternative to fraud that the Sellers at the very least should have known and had a duty to disclose the true nature of the gloves based on their special unique access to the glove manufacturers. Under those circumstances, the economic loss rule has no application. *See Ambac Assurance Corp.*, 328 F. Supp. 3d at 160 (economic loss rule inapplicable where plaintiff alleged it was harmed as the result of the breach of a legal duty independent of the breach of a contractual obligation). In other words, the duty breached here is not merely one of contract, but one created by Sellers' special access to information about the products at issue.

## V.   SELLERS HAVE TORTIOUSLY INTERFERED WITH ROCK FINTEK'S RELATIONSHIP WITH ASCENSION.

In Count Ten, Rock Fintek alleges tortious interference with Rock Fintek's existing and prospective business relations with Ascension. A claim for tortious interference with prospective business relations requires (1) the existence of business relations with a third party; (2) defendant's

---

[5] Since Rock Fintek has not at this time alleged any contractual claims against Weiner and Mendlowitz, individually, they cannot raise the economic loss rule as a defense to the tort claims against them.

interference with those business relations; (3) using dishonest, unfair or improper means; and (4) injury to the business relationship. *Brown v. AXA RE*, No. 02 CIV. 10138(LTS)AJ, 2004 WL 941959, at *7 (S.D.N.Y. May 3, 2004); *Albany Molecular Rsch., Inc. v. Schloemer*, No. 1:10-CV-210 LEK DRH, 2010 WL 5168890, at *6 (N.D.N.Y. Dec. 14, 2010). Tortious interference with an *existing* contract requires (1) a valid contract between plaintiff and a third party, (2) defendant's knowledge of the contract, (3) defendant's intentional inducement of the third party to breach the contract, and (4) damages. *Id.*; *Brown*, 2004 WL 941959, at *6 ("Dishonesty and unfair means are sufficient to show wrongful means.") (quoting *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, No. 95–CV–0508, 1998 WL 704112, at * 16 (E.D.N.Y. Oct. 7, 1998) (internal editing omitted)) (denying motion to dismiss where plaintiffs alleged that defendants knew that contractual commitments made by other parties were contingent on defendants' reinsurance commitment).

In addition, the defendant must target some activities directed toward the third party and cause the third party not to enter into a business relationship with the plaintiff. *See Sprint Sols., Inc. v. Sam*, 206 F. Supp. 3d 755, 763 (E.D.N.Y. 2016) ("The Complaint further alleges the deceptive acts and advertisements by Defendant were directed at consumers, were misleading in a substantial and material way, and caused injury to Plaintiffs and their consumers."). In *Brown*, under similar circumstances, this Court explained that

> Plaintiffs have alleged that they had business relations with a number of third parties in connection with the Linden project, that AXA's actions interfered with those relations by **causing the financial backing of the Linden project to crumble, which, in turn, prevented Plaintiffs from making their movie, and that their business relationships with third parties collapsed as a result**. Such allegations are sufficient to satisfy elements one, two and four. As to the third element …. Plaintiff may still satisfy this element even absent a showing of malice, however, by showing that Defendant used **dishonest, unfair or improper means**. … Plaintiffs have alleged facts sufficient to meet that standard and thus have stated a claim of tortious interference with prospective contractual or business relations…

*Id.*, 2004 WL 941959, at *7 (emphasis added); *see also Albany Molecular Rsch., Inc. v. Schloemer*, No. 1:10-CV-210 LEK DRH, 2010 WL 5168890, at *6 (N.D.N.Y. Dec. 14, 2010) (allegations that Defendant purposefully directed plaintiff to produce deficient batches of a drug, knowing of the deficiency, and knowing that the product would hinder the interests of a party with whom plaintiff had an existing and prospective supplier relationship were sufficient to allege tortious interference).

The caselaw on which the Sellers rely is inapposite. *E.g., Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 402–03 (S.D.N.Y. 2012) (dismissing tortious inference claim where plaintiff failed to identify any specific business relationships or customers or any actions by defendant directed towards such unidentified customers, nor plead any tortious conduct). Nor do the Sellers cite any authority for their bald argument that Rock Fintek must have alleged that Sellers "contacted or intimidated" Ascension in order to direct their conduct towards Ascension.

Here, Sellers directed their conduct towards Ascension because they knew exactly what type of gloves the hospital required from Rock Fintek, knew that *all* of the gloves at issue would be immediately sold and delivered to Ascension for use by medical professionals in the midst of the COVID-19 pandemic, and were informed of the complaints by Ascension during the course of the parties' relationship, including with respect to LevMed fraud. FAC ¶¶ 1, 29, 60, 98-99. As detailed above, the FAC alleges dishonest and fraudulent conduct against the Sellers, which is sufficiently distinct from the breach of contract claim to state a tortious interference claim.

## VI.   ROCK FINTEK ALLEGED UNJUST ENRICHMENT AGAINST ADORAMA.

Adorama seeks dismissal of Count Seven on the same grounds as the contract claims, arguing that Adorama was not a Seller under the SPA. For the reasons set forth in Point I, *supra*, this argument fails. Moreover, Adorama's position lack logic. If Adorama, the recipient of all of

the payments for the gloves, could successfully argue a lack of a contractual relationship with Rock

Fintek, then a *quasi*-contract theory would be the proper way for Rock Fintek to proceed. *See*

*Speedfit LLC v. Woodway USA, Inc.*, 53 F. Supp. 3d 561, 580 (E.D.N.Y. 2014) (holding that

plaintiffs may plead both unjust enrichment and contract theories of liability at the motion-to-

dismiss stage because the defendant disputes the existence of an agreement).[6]

Accordingly, the unjust enrichment count survives.

## VII.   ROCK FINTEK HAS ALLEGED A CONSPIRACY AMONG THE SELLERS.

Without rehashing the familiar standards for alleging a conspiracy claim under New York

law, the FAC alleges sufficient facts to maintain a conspiracy claim in order to impose common

liability on the Sellers for each other's tortious conduct and for conduct of alleged non-party co-

conspirator manufacturer of gloves, that Sellers directed at Rock Fintek. Far beyond an ordinary

"business relationship" the FAC alleges that:

> Adorama, Kitchen Winners, JNS, Stern, Weiner and Mendlowitz, directly and
> through their agents including Banon, engaged in overt acts in furtherance of the
> conspiracy by, among other things, knowingly selling and delivering gloves to
> Rock Fintek that these parties knew would not pass a nitrogen content test for
> nitrile/NBR gloves, by knowingly selling and delivering a significant portion of
> gloves that lacked an FDA 510(k) certification, by knowingly delivering to Rock
> Fintek a significant amount of Protection gloves, by knowingly delivering a
> shipment of approximately 3 million "LevMed" gloves with fraudulently altered
> documentation, by taking steps to conceal their misconduct by refusing to provide
> information when requested regarding these products, and by making extortionate
> demands and threats of violence when confronted  with their wrongdoing.

FAC ¶ 173.

Although certain details of the conspiracy and the communications among the co-

conspirators are uniquely in the Sellers' possession pre-discovery, the allegations of the FAC are

sufficient to warrant discovery on the conspiracy claims, including the allegations that Stern told

---

[6] The unjust enrichment claim in Count Seven is not directed at JNS or Stern.

Rock Fintek that gloves were sourced through "my people at adorama"; that Stern referred to him and Adorama collectively when suggesting that the "Protection" designation was just a packaging issue; and that during pertinent times, Adorama, Kitchen Winners and their constituents were in routine contact with Stern about the transactions and coordinated their intentional efforts to provide fraudulent products to Rock Fintek. FAC ¶¶ 44, 46, 56, 57.

## VIII.  ROCK FINTEK STATED A WARRANTY CLAIM AGAINST THE SELLERS.

The Sellers turn a blind eye to their alleged written and oral representations regarding the origin, nature and quality of the gloves beyond those contained in the SPA or pertinent invoices, including presentations, testing reports and FDA 510(k) letters. *See* FAC ¶¶ 27, 29-40. These allegations alone dispense with the Sellers' argument that they somehow did not make warranties.

In addition, the Sellers simply ignore controlling caselaw from this Court holding that breach of contract and breach of warranty claims may proceed together, particularly at the pleading stage. *Trodale Holdings LLC v. Bristol Healthcare Inv'rs, L.P.*, 16 CIV. 4254 (KPF), 2017 WL 5905574, at *13 (S.D.N.Y. Nov. 29, 2017) ("The Court is unaware of any rule under New York law that breach-of-contract and breach-of-express-warranty claims cannot stand together….."); *U.S. Network Services, Inc. v. Frontier Communications of W., Inc.*, 115 F. Supp. 2d 353, 358 (W.D.N.Y. 2000) ("Although plaintiff clearly cannot obtain duplicative damage awards, I see no basis to force plaintiff to elect one theory of recovery over the other at this time."); *Trump Intern. Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 313–14 (S.D.N.Y. 2007) (allowing contract and warranty claims to proceed because "New York law entitles a plaintiff to assert alternative theories of liability.").

### Conclusion

Based on the foregoing, Sellers' motions should be denied in their entirety.

25

Dated:   September 30, 2022                    Respectfully submitted,

                                          /s/Phillip Rakhunov
                                          Phillip Rakhunov
                                          Lauren Riddle (*pro hac vice*)
                                          POLLACK SOLOMON DUFFY LLP
                                          485 Madison Avenue, Suite 1301
                                          New York, NY 10022
                                          Telephone: (212) 493-3100
                                          Facsimile: (212) 434-0109
                                          prakhunov@psdfirm.com
                                          lriddle@psdfirm.com

26

**<u>Certificate of Service</u>**

The undersigned certifies that this document is being served on counsel on all parties via ECF on September 30, 2022.

<u>/s/ Phillip Rakhunov</u>