UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

KITCHEN WINNERS NY INC.,

                                        Plaintiff,

                    -v-

ROCK FINTEK LLC,

                                        Defendant.

―――――――――――――――――――――――

ROCK FINTEK LLC,

                              Third-Party Plaintiff and
                              Counterclaimant,

                    -v-

KITCHEN WINNERS NY INC.,

                              Counterclaim Defendant,

JNS CAPITAL HOLDINGS LLC, JOEL STERN,
HERSHEY WEINER, JOSEPH MENDLOWITZ,
ADORAMA, INC.,

                              Third-Party Defendants.

―――――――――――――――――――――――

22 Civ. 5276 (PAE)

<u>OPINION & ORDER</u>

**PAUL A. ENGELMAYER, District Judge:**

    Plaintiff and counterclaim defendant Kitchen Winners NY Inc. ("Kitchen Winners")

brought claims in state court against defendant and counterclaimant Rock Fintek LLC ("Rock

Fintek"), arising out of the parties' Sales and Purchase Agreement ("SPA") for the purchase of

gloves during the COVID-19 pandemic.  Dkt. 1-1 ("Compl.").  After removing the case to this

Court, Rock Fintek asserted counterclaims against Kitchen Winners and filed a third-party

complaint against third-party defendants JNS Capital Holdings LLC ("JNS") and Joel Stern

(together, the "JNS parties"), and Adorama, Inc. ("Adorama"), Hershey Weiner, and Joseph

Mendlowitz (together with Kitchen Winners, the "Adorama parties").  Dkt. 43 ("First Amended

Third-Party Complaint" or "FATC").  The FATC alleges that Kitchen Winners and the third-

party defendants engaged in an "elaborate fraudulent scheme" to induce Rock Fintek into buying

gloves that were below the quality standards required by its hospital client, notwithstanding their

knowledge that Rock Fintek could not, under COVID-19 protocols, inspect the gloves before

they were delivered to the client.  *Id.* ¶¶ 1–2.  This scheme, the FATC alleges, caused Rock

Fintek to incur tens of millions of dollars in damages.  *Id.* ¶ 4.

Now before the Court are two motions: the Adorama parties' motion to dismiss the

claims against them in the FATC and the JNS parties' motion to dismiss in part the claims

against them in the FATC.  For the following reasons, the Court grants in part and denies in part

both motions.

## I.       Background

### A.       Factual Background[1]

#### 1.       The Parties

Rock Fintek is a limited liability company organized under Delaware law, with its

principal place of business in Florida.  *Id.* ¶ 1; Compl. ¶ 2.  Rock Fintek is a "trading company"

---

[1] The facts are drawn from Kitchen Winners's complaint, Dkt. 1-1 ("Compl."), and Rock
Fintek's First Amended Third-Party Complaint, Dkt. 43 ("FATC").  For the purpose of resolving
the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable
inferences in favor of the nonmoving party.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145
(2d Cir. 2012); *see also Taupita Inv., Ltd. v. Benny Ping Wing Leung*, No. 14 Civ. 9739 (PAE),
2017 WL 3600422, at *1 n.1 (S.D.N.Y. Aug. 17, 2017) (applying same standard to resolve
motions to dismiss counterclaims and third-party claims).

"[D]istrict courts may 'permissibly consider documents other than the complaint' for the truth of
their contents if they 'are attached to the complaint or incorporated in it by reference,'" and "[a]
document that is integral to the complaint and partially quoted therein may be incorporated by
reference in full."  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3

that, *inter alia*, buys and sells to medical providers hospital and medical supplies, including personal protective equipment ("PPE").  FATC ¶ 15.  One of Rock Fintek's clients is Ascension, a "major hospital group in the United States."[2]  *Id.* ¶ 165.

Adorama is a corporation organized under New York law, with its principal place of business in New York.  *Id.* ¶ 6.  Adorama historically was in the business of selling cameras and electronic equipment online and at its New York City store.  *Id.* ¶ 16.  The FATC states, without further support, that Adorama "has routinely faced litigation and regulatory action for selling unauthorized knock off products, including electronics."  *Id.* ¶ 17.

Kitchen Winners is a corporation organized under New York law, with its principal place of business in New York.  *Id.* ¶ 7; Compl. ¶ 1.  The FATC alleges that Kitchen Winners is an "affiliate" and "alter-ego" of Adorama.  FATC ¶¶ 19–20.  By Rock Fintek's account, Kitchen Winners is a "mere shell" created by Adorama in order to "shield Adorama and its principals from liability for fraudulent PPE transactions."  *Id.* ¶ 24.  Adorama and its principals, the FATC states, "dominate and control Kitchen Winners for the purposes of engaging in fraudulent PPE transactions" while "seeking to shield[] from creditors funds received in the transactions."  *Id.* ¶ 20.  Further, the FATC alleges, Adorama and Kitchen Winners "commingle funds, fail to observe corporate formalities, [and] share officers, directors and office space."  *Id.*

---

(2d Cir. 2022) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).  Neither Kitchen Winners nor Rock Fintek attached the SPA to their complaints, but Kitchen Winners attached the SPA to its motion to dismiss.  *See* Dkt. 47-4 ("SPA").  As the FATC incorporates the SPA by reference, the Court considers the SPA in deciding the motions to dismiss.

[2] The FATC identifies Ascension as the hospital group client to which Rock Fintek delivered the gloves at issue.  FATC ¶ 1.  At various points, however, the FATC refers to the client that received the gloves at issue as Rock Fintek's "client" or "hospital group client," rather than by name.  *See, e.g.*, *id.* ¶¶ 29, 45, 60.  As the FATC does not refer to any other client by name or suggest that Rock Fintek sold the gloves to multiple clients, the Court assumes that any client referenced in the FATC is Ascension.

3

Weiner and Mendlowitz, both New York residents, are representatives of Adorama and Kitchen Winners.  *Id.* ¶¶ 8–9, 25.

JNS is a limited liability company organized under New York law, with its principal place of business in New York.  *Id.* ¶ 10.  Stern, a New York resident, is the sole member and principal of JNS.  *Id.* ¶¶ 11, 26.  Neither JNS nor Stern is a corporate affiliate of Adorama or Kitchen Winners.  *Id.* ¶ 26.  The FATC alleges that they have, however, "acted as agents" of Adorama and Kitchen Winners in representing themselves as the reseller of gloves provided by Adorama.  *Id.*  The FATC states that "[a]t all pertinent times when Stern, Adorama and Kitchen Winners were delivering non-conforming fraudulent product to Rock Fintek either under the SPA or under the one-off transactions," Adorama, Kitchen Winners, and their "constituents" were in "routine contact" with Stern and "coordinated their intentional efforts to provide fraudulent products."  *Id.* ¶ 56.  The FATC also alleges that Stern "held himself out as having superior access to 'my people' at Adorama and at times even told Rock Fintek that he knew 'what you're paying Adorama.'"  *Id.* ¶ 26.

### 2.      Medical Grade Gloves

"The designation of a glove as a medical grade Examination glove is an industry term of art that carries specific chemical and use specifications, which render such gloves fit for medical examination purposes."  *Id.* ¶ 28.  Examination grade gloves differ from Protection grade gloves, which have a "different composition," sell at a lower cost, and are "typically used for household and other non-medical purposes."  *Id.*

Section 510(k) of the Federal Food, Drug and Cosmetic Act requires that manufacturers give the Food and Drug Administration ("FDA") at least 90 days' notice of their intent to market a medical device, including Examination grade gloves.  *Id.* ¶¶ 1, 39.  "A section 510(k) pre-

market submission is typically made to the FDA to demonstrate that a particular device would be marketed as safe and effective." *Id.* ¶ 39.

Medical grade gloves may also be described in terms of their compliance with certain American Society for Testing and Materials ("ASTM") standards. *Id.* ¶ 1.

### 3.     The Parties' Interactions Prior to the Glove Transactions

In early 2021, Rock Fintek "was introduced" to Stern, Weiner, Mendlowitz, and other representatives of Adorama and Kitchen Winners, including Mendel Banon, an employee and agent of Adorama and Kitchen Winners. *Id.* ¶¶ 25–26.  Weiner, Mendlowitz, Banon, and Stern told Rock Fintek that Adorama and Kitchen Winners had a "connection" to a new, China-based nitrile-glove manufacturer that produced MedCare brand Examination grade gloves. *Id.* ¶ 27.

From the beginning of its dealings with Weiner, Mendlowitz, Banon, and Stern, Rock Fintek explained orally and in writing that it would "immediately" resell the purchased gloves to its U.S.–based hospital client for use by medical professionals. *Id.* ¶ 29.  Rock Fintek told them this client required that the gloves be medical Examination grade and comply with ASTM D6319 standards. *Id.*

Weiner, Banon, and Stern represented—orally, in writing, and through written materials—that the gloves to be sold would be nitrile/NBR medical Examination grade gloves with an FDA 510(k) certification. *Id.*  In February 2021, Stern provided, "through a broker," various materials to Rock Fintek: first, on February 2, 2021, written materials, including testing reports describing the gloves that the JNS parties planned to sell to Rock Fintek, and second, on February 9, 2021, an FDA 510(k) approval letter for Zhonghong Pulin Medical Products Co., Ltd. ("Zhonghong"), "another potential MedCare glove manufacturer," which stated that the gloves produced by that manufacturer satisfied ASTM D6319 specifications. *Id.* ¶¶ 30–31. Adorama and Kitchen Winners provided to Rock Fintek the same FDA 510(k) approval letter.

*Id.* ¶ 37.  In March 2021, Banon also sent Rock Fintek written materials: an 84-page MedCare product presentation that described the gloves that Adorama and Kitchen Winners planned to sell to Rock Fintek and identified China-based Dongguan Grinvald Technology Co., Ltd. ("Dongguan") as the manufacturer of the gloves, and testing reports "to substantiate the purported quality of the gloves that Rock Fintek believed were being sold."  *Id.* ¶¶ 32–34.  The written materials shared by the Adorama parties and the JNS parties stated that the "MedCare Nitra Force Nitrile Examination Gloves" satisfied ASTM standards, carried FDA 501(k) certifications, and were suitable for performing medical examinations, conducting diagnostic and therapeutic interventions, working with infectious materials, and guarding against contamination of the user or patient.  *Id.* ¶¶ 34–35.  The materials included photographs of boxes of the gloves that "clearly" displayed the phrase "Nitra Force | NBR Nitrile Examination Gloves."  *Id.* ¶ 36.  None of these written materials were attached to the FATC.

In Rock Fintek's view, the Adorama parties and the JNS parties "knew" that: (1) Rock Fintek planned to immediately resell any purchased gloves to Ascension, a hospital group; (2) Rock Fintek's contract with Ascension required the delivery of MedCare brand, medical grade nitrile/NBR Examination grade gloves bearing an FDA 510(k) certification and complying with ASTM D6319 standards; and (3) the gloves would be used by medical professionals during the COVID-19 pandemic.  *Id.* ¶¶ 39, 67, 108–11.  Adorama and Kitchen Winners represented that they would sell MedCare gloves that complied with ASTM D6319 specifications and were manufactured by Dongguan, Zhonghong, or another approved MedCare manufacturer with an FDA 510(k) certification.  *Id.* ¶ 40.  They also represented that they had been authorized by MedCare glove manufacturers and Global Tooling Service ("GTS")—the owner of the MedCare brand—to package and re-package the gloves that would be resold to Rock Fintek.  *Id.* ¶¶ 41, 43.

Furthermore, the FATC alleges, Adorama, Kitchen Winners, the JNS parties, and their agents had "superior and special knowledge" about the origin and quality of the gloves and "exclusive access" to GTS and the MedCare manufacturers from whom they sourced the gloves.  *Id.* ¶ 41. These parties also "knew" that Rock Fintek lacked access to GTS and the Chinese MedCare manufacturers, that Rock Fintek relied on them for accurate information about the gloves, and that Rock Fintek, along with its contracted logistics providers and truck drivers, was not allowed to unseal or inspect the gloves before they would be shipped to Ascension warehouses.  *Id.* ¶¶ 41–42.  Rock Fintek notes that the "pertinent contracts" between Rock Fintek and the Adorama parties and JNS parties did not include a specification that the gloves satisfied ASTM D6319 standards, but that fulfillment of those standards was "material" to its purchasing decisions.  *Id.* ¶¶ 31, 37.

At an unspecified time before Rock Fintek and Kitchen Winners entered into the SPA, Mendlowitz, "acting on behalf of Adorama," provided a document to Rock Fintek that stated: "Kitchen Winners NY, Inc. are authorized to act on our [Adorama's] behalf to procure Nitrile gloves as discussed subject to contract."  *Id.* ¶ 22 (alteration in original).  According to Rock Fintek, the document stated that, upon execution of the SPA, Adorama would "fully fund and execute payments" on the transactions.  *Id.*  The document also stated that the gloves sold under the contract would be "Nitrile."  *Id.*  The document was not attached to the FATC.

### 4.    One-Off Transactions Between Rock Fintek and the Adorama Parties And Delivery of LevMed Gloves

In March 2021, Rock Fintek made two purchases of gloves from Adorama and Kitchen Winners.  First, on or about March 5, 2021, Rock Fintek purchased gloves described in the packing slip and invoice as "Nitrile examination gloves" for $420,000, with a $50,000 deposit for the next purchase.  *Id.* ¶ 58.  Second, on or about March 18, 2021, Rock Fintek purchased

3,000 boxes of gloves described in the packing slip and invoice as "Nitrile examination gloves," for $420,000.  *Id.* ¶ 59.  Banon directed that Rock Fintek wire the payment for both purchases to Adorama's attorney, Mark Nussbaum.  *Id.* ¶¶ 58–59.  Rock Fintek was not permitted to examine the purchased gloves, which were delivered directly to its client's warehouses for use by medical professionals.  *Id.* ¶ 60.

Around the time of these transactions, Banon wrote to Rock Fintek that the gloves were certified both under certain ASTM standards, including D6319, and as chemotherapy grade gloves.  *Id.* ¶ 61.  The chemotherapy certification was not included in the invoices for the one-off transactions or the SPA.  *Id.*  The gloves were not, in fact, fit for chemotherapy use.  *Id.*

Separately, in or about late April 2021, Kitchen Winners and Adorama shipped to Rock Fintek a container with 90,000 boxes of gloves identified as "LevMed" brand gloves.[3]  *Id.* ¶ 95.  Banon "personally" directed warehouse staff to load the LevMed gloves, which were not MedCare brand, onto Rock Fintek's trucks alongside the MedCare gloves.  *Id.* ¶¶ 95–96.  The FATC alleges that Estern Banon, an "apparent family member of Adorama's agent Mendel Banon," is the CEO and founder of Perle Technologies—an affiliate of an Adorama party or its agent—and represents herself on LinkedIn as a "Founder of LevMed."  *Id.* ¶ 97.

After discovering LevMed gloves in its warehouse, Rock Fintek's client—presumably, Ascension—"demanded" paperwork about the origin and quality of the LevMed gloves and refused to pay Rock Fintek for the gloves.  *Id.* ¶ 98.  On April 27, 2021, Rock Fintek "immediately" raised questions about the LevMed gloves to the Adorama parties.  *Id.* ¶ 99.

---

[3] The FATC leaves unclear whether the sale of the LevMed gloves was conducted pursuant to the SPA or a one-off transaction between Rock Fintek and the Adorama parties.  Allegations regarding "The LevMed Fraud" follow the bulk of the FATC's allegations regarding the SPA and one-off transactions between the parties.

Banon "falsely" claimed that the LevMed gloves did not come from the Adorama parties, and "falsely" blamed the "mix up" on warehouse employees. *Id.* The FATC alleges, however, that the Adorama parties had sold LevMed gloves to other clients "all along" and "intentionally and knowingly" shipped LevMed gloves to Rock Fintek's client. *Id.* ¶ 100. Two days later, on April 29, 2021, Rock Fintek followed up with Adorama by email, requesting FDA 510(k) certification and testing documentation for the LevMed gloves to pass along to its client. *Id.* ¶ 101. That day, Banon emailed Rock Fintek and "others" an image "purporting to be" the product specification sheet for the gloves, including a LevMed logo and link to "purported" FDA documentation. *Id.* ¶ 102. On April 30, 2021, Banon resent what "purported to be" a complete product specification sheet, product brochure, and photos of the inner and outer boxes of the LevMed gloves. *Id.* ¶ 103.

The FATC alleges that the specification sheet was an altered MedCare/GTS document "apparently manipulated to create an appearance that the LevMed gloves were of the same quality and specifications as MedCare medical grade NBR/nitrile examination gloves" contracted for under the SPA. *Id.* ¶ 104. MedCare, the FATC states, later confirmed to Rock Fintek, Weiner, and Banon, in writing, that the document was an altered MedCare document. *Id.* The FATC further alleges that the brochure fraudulently represented that the LevMed gloves had an FDA 510(k) certification, through a letter from a glove manufacturing facility in China and a certification stamp stating, "We Manufacture the Levmed Brand under our secondary factory named : Qingdao Zhongyang Medical Equipment Co., LTD Which is being manufactured all under our 510K # K152712." *Id.* ¶ 105. This FDA 510(k) number, the FATC alleges, in fact belonged to Zhonghong, an authorized manufacturer of MedCare brand gloves that has no connection to the LevMed gloves at issue. *Id.* ¶ 106.

###### 5.    One-Off Transactions Between Rock Fintek and the JNS Parties

On or about April 6, 2021, Rock Fintek engaged in negotiations to purchase gloves from the JNS parties.  *Id.* ¶ 45.  When Stern provided materials indicating that the gloves to be sold were Protection grade gloves, Rock Fintek "expressly" stated that it would not buy those gloves. *Id.* ¶¶ 45–46.  In response, Stern "falsely" wrote to Rock Fintek that "this one is the same good gloves, inspection and test reports showing examination but not printed on the box . . . give me an offer and we will correct the boxes for you" and that "[i]t's the same gloves just different packaging."  *Id.* ¶ 46 (emphasis omitted).  Stern attempted to sell the Protection grade gloves at a lower price than the price of the Examination grade gloves.  *Id.*  Rock Fintek refused.  *Id.* ¶ 47.

By April 15, 2021, Rock Fintek and Stern finalized a deal for Rock Fintek to purchase MedCare Nitrile Examination grade gloves for $11.50 per box.[4]  *Id.*  On or about April 16, 2021, Stern "appeared to renege" on the agreement, "vaguely" telling Rock Fintek that he had a "serious problem here" and was "in a situation here that I can't really describe," and that the gloves intended for Rock Fintek had been sold to someone else due to a "lack of communication."  *Id.* ¶ 48.  Stern offered to replace the gloves with his "goods in LA," which he represented to be the "same specification."  *Id.* ¶ 49.  In Rock Fintek's view, Stern "knew" that Rock Fintek relied on Stern's representation that any replacement gloves were MedCare Nitrile Examination grade gloves, given that it had expressly told Stern that it lacked approval to purchase Protection grade gloves and ultimately agreed to purchase the replacement gloves at the same $11.50-per-box price negotiated for the Examination grade gloves.  *Id.* ¶ 50.

---

[4] The FATC states that the parties negotiated the deal on "April 15, 2022."  FATC ¶ 47.  The Court assumes, based on the surrounding allegations, that the alleged event took place on April 15, 2021.

Between April 16, 2021 and May 2, 2021, Rock Fintek purchased at least approximately $2.654 million worth of gloves from the JNS parties. *Id.* ¶ 44. Stern represented that the gloves were MedCare Nitrile medical Examination grade gloves sourced through "my people at [A]dorama." *Id.* On April 16, 2021, before Rock Fintek wired $1.035 million for 90,000 boxes of gloves, Rock Fintek's representative wrote to Stern: "Joel we are trusting you." *Id.* ¶ 50. Stern had directed that the $1.035 million be wired to a Capital One account of an entity named Blink Capital Holdings LLC ("Blink"). *Id.* ¶ 51. The FATC alleges that the New York Department of State, Division of Corporations website lists Blink as having been formed on January 13, 2021, with the "same defunct" registered agent address as that of JNS. *Id.* The FATC further alleges that Stern "knew" that the replacement gloves sold on or about April 16, 2021 were actually Protection grade gloves and placed stickers with the word "Examination" on the boxes of the gloves to "cover up and conceal the true nature of those gloves." *Id.* ¶¶ 53–54. "By" April 23, 2021, Stern continued to attempt to sell Protection grade gloves to Rock Fintek, and Rock Fintek again refused. *Id.* ¶ 55.

On April 30, 2021, Stern wrote to Rock Fintek: "I'm sorry to ask . . . but please confirm Adorama is being taken care of because i can't compete with him. Thanks." *Id.* ¶ 57. In other communications, Stern told Rock Fintek that he "kn[ew] what you're paying Adorama" and attempted to persuade Rock Fintek to use a credit card "at Adorama" to pay for gloves sold by the JNS parties. *Id.*

Rock Fintek was not permitted to examine any of the purchased gloves, which were delivered directly to its client's warehouses for use by medical professionals. *Id.* ¶ 60.

### 6.     Transactions under the SPA

#### *a.*     *Terms of the SPA*

On April 7, 2021, Rock Fintek entered into the SPA, under which Kitchen Winners
agreed to sell, and Rock Fintek agreed to buy, 1.5 million boxes of gloves at a price of $11.50
per box, for a purchase price of $17.25 million before rebate.  FATC ¶¶ 62–63; Compl. ¶¶ 5–6;
SPA at 1.  The SPA described the gloves as "Nitrile Gloves (Box 100) Color: Blue, Medical
exam grade with FDA 510k," and the brand as "Medcare, examination glove."  SPA ¶ 1; FATC
¶ 62.

Under the SPA, Kitchen Winners was designated the "Seller" and Rock Fintek was
designated the "Buyer."  SPA at 1.  The signature page of the SPA includes two signatures under
the header "Seller": Weiner's, on behalf of Kitchen Winners, and Mendlowitz's, on behalf of
Adorama, and one signature under the header "Buyer": Bradley Gilling's, on behalf of Rock
Fintek.  SPA at 4; *see also* FATC ¶ 63.

The FATC alleges that Rock Fintek "required Adorama to be a party to the SPA and to
guarantee the performance of Kitchen Winners."  FATC ¶ 63.  Furthermore, during the
negotiations of the SPA and the transactions required under the SPA, "various individuals,"
including Weiner, Stern, Banon, and Arik Maimon—a consultant working with Rock Fintek and
the Adorama parties—"routinely referred in written and oral communications to 'Adorama' as
the seller of the gloves."  *Id.* ¶ 23.  None of the Adorama or Kitchen Winners agents or principals
"ever corrected or disagreed with" Rock Fintek representatives' references in oral and written
communications to Adorama as the seller of the gloves.  *Id.*

The payment terms called for Rock Fintek to wire, to an account designated by Kitchen
Winners, a two-part "Deposit": $1.25 million on the date of the SPA, and $0.6 million on April
26, 2021.  SPA ¶ 2(a).  The SPA stated that the "Deposit shall be paid to Adorama Inc." at an

account named "Adorama Inc.," and that the Deposit would be applied as payment for the last set of containers purchased. *Id.* ¶ 2(a)–(b). Schedule A of the SPA set out eight tranches of deliveries, beginning the week of April 17, 2021 and ending the week of June 6, 2021, for a total of 50 containers. *Id.* at 5.

Under the SPA, after payment of the second part of the Deposit and provided that all payments were timely made, Kitchen Winners would give Rock Fintek a rebate of $0.50 per box for the first 150,000 boxes sold, for a total rebate of $0.075 million, and the remaining boxes would be sold for $11.00 per box, for an ultimate total purchase price of $16.5 million. *Id.* ¶ 8; FATC ¶¶ 64–65. The parties "expected that the approximately $750,000 reduction in price would be paid by Adorama and Kitchen Winners to Rock Fintek at the end of the contract term." FATC ¶ 65. Kitchen Winners was to pay all taxes and duties on the gloves, which would be shipped to Long Beach, California, and Rock Fintek was to arrange for and pay the cost of ground transportation of the gloves. SPA ¶ 5; Compl. ¶ 7. The SPA provided that "[a]ny payment of the Purchase Price payable for each box of gloves delivered shall be paid to Seller upon Buyer's inspection of the products at Seller's warehouse in Los Angeles, California prior to Buyer's collection of the delivered Products." SPA ¶ 2(d). The SPA required wire confirmation of payments within 48 hours of the gloves becoming available at Kitchen Winners's warehouse. *Id.*

The SPA included a "Manufacturing Disclaimer" that stated: "Seller is merely a reseller of the Products and not the manufacturer, as such Seller does not make any warranties as to the Products except that they conform the specifications provided." *Id.* ¶ 6. The SPA permitted a "variance in packing quantities" of up to 10%. *Id.* ¶ 7.

### b.   Execution of the SPA

When the gloves sold under the SPA arrived at Long Beach, Adorama and Kitchen Winners' agents loaded sealed pallets of the gloves onto trucks provided by Rock Fintek.  FATC ¶ 69.  Rock Fintek arranged for the gloves to be delivered "directly" to its hospital client, and, due to COVID-19 protocols, could not inspect the gloves before delivery.  *Id.* ¶¶ 68–69.

For "most" of the gloves delivered under the SPA, Rock Fintek prepaid, by wire transfer to Adorama, amounts requested based on Adorama and Kitchen Winners' representations of the size of the delivery.  *Id.* ¶ 70.  Between April 8 and June 14, 2021, Rock Fintek paid to Adorama by wire transfer a total of $19.19 million over 19 separate payments, with individual payments ranging from $0.345 million to $2.07 million.[5]  *Id.* ¶ 71.  The FATC alleges that "*all* payments for the transactions involving Kitchen Winners and Adorama . . . were made by Rock Fintek directly to Adorama or its attorney even when Kitchen Winners appeared as the invoicing party."  *Id.* ¶ 21 (emphasis in original).  At the time, Kitchen Winners did not have a "separate" bank account.  *Id.*  In Rock Fintek's view, "Adorama sought to put the funds paid for the defective products beyond the reach of Kitchen Winners' creditors."  *Id.*

Various performance issues and misconduct arose in the execution of the SPA.  On "multiple occasions," Adorama and Kitchen Winners provided inaccurate quantity estimates, with discrepancies discovered only after the gloves had been delivered to Rock Fintek's client.  *Id.* ¶¶ 73–74, 77.  They also "unilaterally" overcharged Rock Fintek for deliveries above the quantity required by the SPA.  *Id.* ¶ 74.  In or about early July 2021, Rock Fintek discovered that Adorama had overcharged, and Rock Fintek had paid, $1.035 million, and additionally charged Rock Fintek for $242,245 worth of gloves that were never delivered.  *Id.* ¶¶ 75–76.  The

---

[5] The FATC indicates that the total amount paid was $19.19 million, though the sum of the individual payments listed is $18.5 million.  FATC ¶ 71.

Adorama parties also delivered approximately 178,270 boxes of gloves above the quantity required by the SPA, for which Rock Fintek paid more than $2 million. *Id.* ¶ 77.  As of July 2021, Adorama and Kitchen Winners had not paid the more than $0.75 million rebate. *Id.* ¶ 78.

In July 2021, Adorama and Kitchen Winners "reneged" on their "apparent[]" agreement to refund the $1.035 million overcharge and pay the contractually required rebate, conditioning those payments on Rock Fintek's purchase of an additional two million boxes of gloves for more than $18 million. *Id.* ¶ 79.  Adorama and Kitchen Winners "unilaterally" invoiced Rock Fintek for "several hundred thousand dollars" of undisclosed, unconsented-to expenses, including insurance for Adorama and Kitchen Winners, insurance for a logistics company that had "no apparent connection" to the SPA, and trucking bills. *Id.* ¶ 80.  Rock Fintek disputed the charges and requested additional information to substantiate them. *Id.*  Adorama and Kitchen Winners refused to provide such information and "engaged in further extortionate conduct" by stating that the continued delivery of gloves pursuant to the SPA would take place only if Rock Fintek covered the additional expenses. *Id.*  The FATC alleges that Rock Fintek "had no choice but to comply with their extortionate demands, or risk damaging the relationship with its hospital client to whom it was contractually bound to deliver conforming gloves." *Id.* ¶ 81.

### 7.      Complaints from Ascension Regarding Glove Quality

In July 2021, Rock Fintek began receiving complaints from Ascension that medical care providers using the gloves procured through Adorama, Kitchen Winners, and the JNS parties had encountered tearing and performance issues "that would not be expected from the gloves that the sellers were required to deliver." *Id.* ¶ 82.  Rock Fintek "immediately" sent the complaints and photographs of the allegedly deficient gloves to Adorama and Kitchen Winners and contacted Stern to understand the source of the problems. *Id.*

Upon investigation, Rock Fintek found that more than half of the 200 million gloves that Adorama, Kitchen Winners, and the JNS parties had sold to Rock Fintek were not the requisite NBR/Nitrile medical Examination grade gloves with FDA 510(k) certification and ASTM D6319 compliance. *Id.* ¶ 83; *see also id.* ¶¶ 1–2. These instead were less expensive Protection grade gloves, and a "substantial number" of the boxes of Protection grade gloves listed as their manufacturer AnHui ABeiXiong Medical Technology Co., Ltd. ("AnHui")—a manufacturer identified by GTS, the owner of the MedCare brand, on its website as an "unauthorized fake manufacturer" of MedCare gloves. *Id.* ¶¶ 83–84 (emphasis omitted). The FATC alleges that Adorama, Kitchen Winners, the JNS parties, and their "constituents" had "superior and special knowledge" of the manufacturers identified on the packaging, as Rock Fintek could not inspect the boxes or gloves after the packaging was sealed while the sellers, by contrast, stated that they had the right from GTS and the glove manufacturers to package and repackage the gloves. *Id.* ¶¶ 84, 87 (alleging Stern offered that "we" would change packaging on Protection grade gloves), 93. The sellers, the FATC alleges, "intentionally concealed" and "failed to disclose" the material fact that a "substantial number" of the gloves were associated with an "unauthorized manufacturer." *Id.* ¶¶ 84, 87. In addition, they knew that Rock Fintek relied on their representations. *Id.* ¶ 88.

After the investigation, Rock Fintek "promptly" raised the quality issues with Weiner, Stern, and Banon, requesting documentation about the Protection grade gloves. *Id.* ¶ 85. Weiner stated that he would not provide the requested documentation unless Rock Fintek purchased an additional two million boxes of gloves from Adorama. *Id.* Adorama, Kitchen Winners, and Stern refused to take back gloves sold to Rock Fintek. *Id.* ¶ 86.

In or about late July 2021, Rock Fintek raised the issues of overpayment and delivery of Protection grade gloves on a phone call with Weiner, Banon, and Maimon.  *Id.* ¶ 89.  Weiner became "belligerent" and "threatened" one of Rock Fintek's representatives, stating "in substance that he would be coming over to his house with a 'big fucking dump truck to bury him.'"  *Id.*  When Rock Fintek contacted Stern about the return and replacement of the allegedly fake gloves, Stern ignored its written communications and "instead complained about Rock Fintek to Adorama and Weiner."  *Id.* ¶ 90.

After those communications, Rock Fintek and Ascension continued to investigate the gloves, and learned that a "substantial number" of the gloves had been manufactured by factories without the requisite FDA 510(k) certification and failed to comply with ASTM D6319 standards.  *Id.* ¶¶ 91–93; *see also id.* ¶¶ 1–2.  Ascension provided to Rock Fintek reports, through independent, third-party chemical tests of random samples of the gloves, that the gloves were not Nitrile/NBR gloves, but rather less expensive polyvinylchloride gloves with no detectible levels of nitrogen.  *Id.* ¶ 94; *see also id.* ¶¶ 1–2.

Rock Fintek states, without citing support, that is "not the only victim of the Adorama [parties'] fraudulent glove sales."  *Id.* ¶ 107.  Although Rock Fintek had "an ongoing and profitable business relationship with Ascension that predated Rock Fintek's purchases of gloves from Adorama, Kitchen Winners, Stern and JNS" and "reasonably expected" that relationship to continue, Ascension refused to do further business with Rock Fintek as a result of the conduct of the Adorama parties and JNS parties.  *Id.* ¶¶ 112, 114.  The loss of the relationship with Ascension has cost Rock Fintek "significant lost revenues and profits."  *Id.* ¶ 114.

## B.    Procedural History

On May 17, 2022, Kitchen Winners sued Rock Fintek in New York State Supreme Court in Manhattan, asserting claims of breach of contract and unjust enrichment.  Dkt. 1-1.  On June

22, 2022, Rock Fintek removed the case to this Court.  Dkt. 1.  On June 24, 2022, Rock Fintek

filed its answer, counterclaim against Kitchen Winners, and third-party complaint against JNS,

Stern, Weiner, Mendlowitz, and Adorama.  Dkt. 5.[6]

On July 15, 2022, the Adorama parties moved to dismiss Rock Fintek's counterclaim and

third-party complaint.  Dkts. 31–33.  On August 5, 2022, Rock Fintek filed the FATC.  Dkt. 43.

On August 26, 2022, the Adorama parties moved to dismiss the FATC.  Dkts. 46–48 ("Adorama

Mot.").

On August 31, 2022, Rock Fintek asked that the Court schedule an emergency

conference, to ensure preservation of the gloves at issue, which Rock Fintek stated were in the

possession of Ascension and subject to "imminent" disposal.  Dkt. 49.  That day, the Court

ordered the parties to submit a joint letter setting out their positions on this issue and to solicit

Ascension to share its views and direct it to preserve the gloves at issue.  Dkt. 50.  On September

6, 2022, the parties filed the joint letter, in which Rock Fintek proposed a "balanced approach for

preservation and sampling" of the gloves on "an expedited basis"; the Adorama parties stated

that they lacked sufficient information as to the "origin and chain of custody of th[e] gloves" so

as to support Rock Fintek's proposed course of action; and the JNS parties likewise argued that

Rock Fintek's proposal was "premature."  Dkt. 51.  Ascension did not state a position.  *Id.*  On

September 7, 2022, the Court found good cause to preserve at least a subset of the gloves to

enable inspection and discovery and directed the parties to propose a court order for such

preservation.  Dkt. 56.

---

[6] On July 5, 2022, Rock Fintek filed a letter concerning the removal of the case and the grounds
for diversity jurisdiction, stating that it is a Delaware limited liability company whose sole
member is a citizen of Florida, and that Kitchen Winners and all third-party defendants are either
individuals or corporations that are residents of New York.  Dkt. 27.

Also on September 7, 2022, the JNS parties moved to dismiss five FATC counts: those alleging breach of the covenant of good faith and fair dealing, negligent misrepresentation, tortious interference, conspiracy, and breach of warranties under New York law.  Dkts. 53, 54 ("JNS Mot.").

On September 30, 2022, the parties submitted a joint order for the preservation, inspection, and storage of the gloves at issue, *see* Dkt. 60, which the Court approved, *see* Dkt. 62.  The same day, Rock Fintek filed its combined opposition to the motions to dismiss.  Dkt. 61 ("Opp.").  On October 19, 2022, and October 28, 2022, the JNS parties and the Adorama parties, respectively, filed their replies.  Dkts. 65 ("JNS Reply"), 66 ("Adorama Reply").

## II.     Applicable Legal Standards

"A motion to dismiss a counterclaim, third-party claim, and cross-claim is evaluated under the same standard as a motion to dismiss a complaint."  *Cityside Archives, Ltd. v. Weiss*, No. 18 Civ. 5077 (GHW), 2020 WL 3972310, at *3 (S.D.N.Y. July 13, 2020) (citation omitted); *see also, e.g.*, *Taupita Inv., Ltd. v. Benny Ping Wing Leung*, No. 14 Civ. 9739 (PAE), 2017 WL 3600422, at *6 (S.D.N.Y. Aug. 17, 2017).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable

inferences in the plaintiff's favor, *see Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

The SPA provides, and all parties stipulate, that New York law applies.  *See* Adorama Mot. at 5 (stating New York law applies); JNS Mot. at 3 (same); Opp. at 15 (applying New York law), 20 (same), 24–25 (same); SPA ¶ 10(b) ("The Parties agree that the internal laws of the state of New York shall govern any matter or dispute relating to or arising out of this Agreement.").

## III.   Discussion

The FATC brings 10 claims: for (1) breach of contract, as to the SPA, against Kitchen Winners and Adorama, FATC ¶ 115–20; (2) breach of contract, as to one-off transactions between Adorama, Kitchen Winners, and Rock Fintek, *id.* ¶¶ 121–26; (3) breach of contract, as to one-off transactions between the JNS parties and Rock Fintek, *id.* ¶¶ 127–32; (4) breach of the covenant of good faith and fair dealing (the "covenant claim"), as to Adorama, Kitchen Winners, and the JNS parties, *id.* ¶¶ 133–38; (5) fraud in the inducement (the "fraud claim"), as to Kitchen Winners and all third-party defendants, *id.* ¶¶ 139–49; (6) negligent misrepresentation, as to Kitchen Winners and all third-party defendants, *id.* ¶¶ 150–59; (7) unjust enrichment, as to Adorama and Kitchen Winners, *id.* ¶¶ 160–63; (8) tortious interference with existing and prospective business relations, as to Kitchen Winners and all third-party defendants, *id.* ¶¶ 164–70; (9) conspiracy, as to Kitchen Winners and all third-party defendants, *id.* ¶¶ 171–77; and (10) breach of warranties under N.Y. U.C.C. Law § 2-313 and New York common law, as to Kitchen Winners and all third-party defendants, *id.* ¶¶ 178–81.

The Adorama parties move to dismiss the breach of contract and unjust enrichment claims, as to Adorama; the covenant, negligent misrepresentation, tortious interference, conspiracy, and breach of warranties claims as duplicative of the breach of contract claim and deficient in other respects; and the fraud claim for failure to meet heightened pleading

requirements.  *See* Adorama Mot. at 1–2.  The JNS parties, which adopt "in full by reference" the Adorama parties' arguments, move to dismiss the covenant, negligent misrepresentation, tortious interference, conspiracy, and breach of warranties claims as duplicative of the breach of contract claim and deficient in other respects.[7]  *See* JNS Mot. at 1–2.  They argue that Rock Fintek conflates actions by Stern—who "had no special relationship with Kitchen Winners" and sold to Rock Fintek gloves that he had "sourced from Kitchen Winners"—with the conduct of the Adorama parties.  JNS Reply at 1.

For the following reasons, the Court grants in part and denies in part both motions.

### A.  Breach of Contract Claims Against Adorama

The Adorama parties move to dismiss Rock Fintek's breach of contract claims against Adorama, claiming that "Adorama had no contractual obligations under the parties' agreement." Adorama Mot. at 5; *see id.* at 1, 5–6; Adorama Reply at 1–3.  They also argue that Rock Fintek fails to adequately allege that Kitchen Winners is Adorama's alter ego, so as to "pierce the corporate veil" and hold Adorama liable under the SPA.  Adorama Mot. at 7–11.

The Court finds that Rock Fintek's FATC plausibly alleges Adorama's liability for a breach of contract claim as to the SPA.  To state a breach of contract under New York law, a complaint must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the [party], (3) breach of contract by the [other party], and (4) damages."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted).  "In general, under New York law, a breach of contract action may only be

---

[7] The JNS parties also move to dismiss the unjust enrichment claim, asserting that an unjust enrichment action cannot lie where the parties have a contract or as a catch-all cause of action in the event that other claims fail.  JNS Mot. at 5.  Rock Fintek, however, does not assert an unjust enrichment claim against the JNS parties.  *See* FATC ¶¶ 160–63; Opp. at 24 n.6.  The Court thus does not consider this argument.

maintained against a party to the contract." *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (citation and alteration omitted); *see also, e.g.*, *Martell Strategic Funding LLC v. Am. Hosp. Acad.*, No. 12 Civ. 627 (VSB), 2019 WL 632364, at *4 (S.D.N.Y. Feb. 14, 2019). And "a party who is not a signatory to a contract generally cannot be held liable for breaches of that contract." *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, No. 15 Civ. 3371 (SAS), 2015 WL 4461769, at *3 (S.D.N.Y. July 21, 2015).

In certain cases, however, an entity may be liable for a breach of the contract even where it is not a formal party or signatory to the contract. For example, a contract may bind a party that did not sign the contract where "the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." *Malmsteen v. Univ. Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) (citation omitted). A parent corporation can be held liable for the breach of a contract signed by its subsidiary if (1) its intent to be bound by the contract were "inferable from the parent's participation in the negotiation of the contract," (2) "if the subsidiary is a dummy for the parent," or (3) "if the subsidiary is controlled by the parent for the parent's own purposes." *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (quoting *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997)); *see CityR Grp. Holdings LLC v. Foresite Realty Mgmt., LLC*, No. 17 Civ. 7850 (RJS), 2019 WL 1437519, at *3 (S.D.N.Y. Mar. 29, 2019). In determining whether to "pierce the corporate veil" and allow suit against a non-party parent as an alter ego of a signatory, a court assesses whether (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 34 (S.D.N.Y. 2018). "[I]t is well-established

that an ordinary breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil." *Id.* at 35 (citation omitted).

Importantly, "New York courts recognize that a non-signatory can be liable for a contract by manifesting an intent to be bound without being an alter ego of a signatory to the contract." *MBIA Ins. Corp.*, 706 F. Supp. 2d at 397; *see also, e.g.*, *Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*, No. 20 Civ. 3638 (VM), 2020 WL 6151491, at *3 (S.D.N.Y. Oct. 20, 2020). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Peterson v. Regina*, 935 F. Supp. 2d 628, 635 (S.D.N.Y. 2013) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)). Therefore, an enforceable contract exists where a party's "overall conduct reflects its intent to be bound," even where the party did not sign the offer. *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 271 n.6 (S.D.N.Y. 2022); *see Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 80 (S.D.N.Y. 2010) (citing *Horsehead Indus.*, 657 N.Y.S.2d at 633). Moreover, "nonsignatories may be held liable for breach of contract, without being 'alter egos,' if their actions show that they are in privity of contract or that they assumed obligations under the contract." *MBIA Ins. Corp.*, 706 F. Supp. 2d at 397 (citing cases). "Such an inference is based on the totality of a party's expressed words and deeds." *Jennings*, 367 F. Supp. 3d at 71 (citation and brackets omitted).

Here, as the Adorama parties concede, *see* Adorama Reply at 1, Adorama itself *signed* the SPA—albeit under circumstances that leaves its status as a "party" to the SPA somewhat unclear. The SPA refers to a "Seller," identified on its first page as Kitchen Winners, and "Buyer," identified on the first page as Rock Fintek, and designates "each a '*Party*' and, collectively, the '*Parties*.'" SPA at 1 (emphasis in original). The SPA further prohibits any

Party from assigning, selling, leasing, or otherwise transferring the rights granted under the SPA "without the express written consent of the other party." *Id.* ¶ 10(c). Adorama is not identified as a Party. It is referenced first in the Payment Terms section, as the owner of the account to which the deposit shall be paid. *Id.* ¶ 2(b). However, notably, two signatures appear on the final page of the SPA, below the phrase, "The foregoing Agreement is read and agreed by," and the header "Seller": Weiner's signature, on behalf of Kitchen Winners, and Mendlowitz's signature, on behalf of Adorama. *Id.* at 4.

The Court finds that, at the pleading stage, Adorama's signature on the SPA sufficiently manifests an "intent to be bound," *Volt*, 586 F. Supp. 3d at 271 n.6, so as to sustain as plausible the breach of contract claim against it. To be sure, the SPA names only Kitchen Winners as a "Party" and the "Seller." SPA at 1. Yet the inclusion of Adorama's signature—under the "Seller" heading and following the phrase "[t]he foregoing Agreement is read and *agreed* by," SPA at 4 (emphasis added)—plausibly supports that Adorama "assumed obligations under the contract," *MBIA Ins. Corp.*, 706 F. Supp. 2d at 397. *See, e.g.*, *CityR Grp.*, 2019 WL 1437519, at *3–4 (finding non-signatory party liable for contractual obligations of subsidiaries where contracts "explicitly identified" non-signatory as manager of subsidiary signatories and "the structure of the signature blocks support[ed] a plausible inference that [the non-signatory party]—which was otherwise an unnecessary party to these contracts between two distinct legal entities—intended to be bound by the contracts" (alterations and citation omitted)). The Court has not found apposite cases—outside the context of agents signing on behalf of principals—in which a court held that a *signatory* to a contract could not be liable for breaches of that contract. *Cf., e.g.*, *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20 Civ. 967 (LJL), 2021 WL 918556, at *9 (S.D.N.Y. Mar. 10, 2021) (citing cases regarding liability implications of corporate

representative's signature in corporate capacity and individual capacity).  Adorama's signature on the SPA thus distinguishes this case from many others in which courts have held a defendant not liable for a breach of contract.  *See, e.g.*, *RCC Ventures, LLC v. Am. DG Energy, Inc.*, No. 17 Civ. 3007 (AJN), 2018 WL 1415219, at *4–5 (S.D.N.Y. Mar. 19, 2018) (finding defendant was not party to contract where, *inter alia*, it did not sign contract and was not listed as borrower).

The Adorama parties contend that Adorama was a signatory to the SPA "not as a seller, but rather as the party to whom it was agreed that the funds were to be paid."  Adorama Mot. at 8.  They argue that the "sole reason" Adorama signed the SPA was that Adorama loaned Kitchen Winners the capital needed to purchase the gloves and thus required direct repayment of the loan "as security."  *Id.*  For two reasons, this argument fails to warrant the dismissal of the contract claim against Adorama.  First, Adorama's signature appears below the words "[t]he foregoing Agreement is . . . agreed by."  SPA at 4.  This suggests that Adorama itself was agreeing to the terms of the SPA, not that it was simply "the party to whom it was agreed that the funds were to be paid."  Adorama Mot. at 8.  Even more, Adorama's signature and its status as a recipient of payments made under the SPA sufficiently supports Adorama's "privity of contract," *MBIA Ins. Corp.*, 706 F. Supp. 2d at 397, enabling Adorama to be held liable for breaches of the SPA.  Second, the FATC alleges that, "[a]s a condition of entering into the SPA," Rock Fintek "required Adorama to be a party to the SPA and to guarantee the performance of Kitchen Winners under the SPA."  FATC ¶ 63.  The FATC also states that Mendlowitz, "acting on behalf of Adorama," provided a document to Rock Fintek stating that "Kitchen Winners NY, Inc. are authorized to act on our [Adorama's] behalf to procure Nitrile gloves as discussed subject to contract" and that, on execution of the contract, Adorama would "fully fund and execute payments" on the transactions.  *Id.* ¶ 22 (alteration in original).  Accepting as true the FATC's

well-pled allegations, as the Court must on a motion to dismiss, *see Steginsky*, 741 F.3d at 368, there is no basis on which the Court can credit Adorama's account about its relationship with Kitchen Winners and the reason it signed the SPA over that of Rock Fintek.  Factfinding as to the reason Adorama signed the SPA must await the completion of discovery.

The FATC's allegations as to Adorama's conduct with respect to the SPA reinforce the plausibility of inferring Adorama's "intent to be bound by the contract," *Travelers*, 735 F. Supp. 2d at 80 (citation omitted), and not simply its interest in "security" for its loan to Kitchen Winners, Adorama Mot. at 8.  As alleged, Adorama and Mendlowitz, who signed the SPA on behalf of Adorama, interacted with Rock Fintek starting in early 2021, discussing their "connection" to MedCare glove manufacturers, FATC ¶ 27, sending an FDA 510(k) approval letter and other written materials regarding the gloves, *id.* ¶¶ 34–35, 37, and representing that they would sell gloves with specifications requested by Rock Fintek, *id.* ¶¶ 40–41.  During negotiations of the SPA and the ensuing transactions, "various individuals" allegedly "routinely referred in written and oral communications to 'Adorama' as the seller of the gloves"; none of the Adorama or Kitchen Winners agents or principals "ever corrected or disagreed with" Rock Fintek representatives' references to Adorama as the seller of the gloves.  *Id.* ¶ 23.  "[A]*ll* payments" were made "directly to Adorama or its attorney even when Kitchen Winners appeared as the invoicing party."  *Id.* ¶ 21 (emphasis in original).  And, when disputes arose as to overcharging and the payment of the rebate, both Adorama and Kitchen Winners are alleged to have been involved in responding to Rock Fintek.  *See, e.g.*, *id.* ¶¶ 79–80.

Thus, considering "the totality of [Adorama's] expressed words and deeds," *Jennings*, 367 F. Supp. 3d at 71 (citation omitted), the Court finds that the FATC plausibly alleges that Adorama "assumed obligations under the contract," *MBIA Ins. Corp.*, 706 F. Supp. 2d at 397,

and can thus be held liable for breaches of the SPA.  *See, e.g.*, *Powerbox*, 2020 WL 6151491, at *3 (finding sufficient allegations that defendant "intended to be bound by the contract" where it was "involved in negotiating" orders and "continued communicating with [the plaintiff] to revise aspects of the order"); *see also, e.g.*, *TransformaCon*, 2015 WL 4461769, at *5 (finding parent company liable under contract where it "participated in the negotiation" and "was intimately involved in and would benefit from the contract"); *Jennings*, 367 F. Supp. 3d at 71–72 (finding non-signatory parent company liable for breach of contract where complaint pled that, *inter alia*, signatory was parent company's "wholly owned subsidiary" and parent company was involved in negotiations and "prepared to provide . . . whatever resources . . . needed" under contract).

Finding Adorama's signature and alleged conduct as to the SPA adequate to maintain Rock Fintek's breach of contract claim against it, the Court has no occasion to reach the parties' arguments regarding alternative bases for Adorama's liability, including as an alter ego of Kitchen Winners.  To the extent the Adorama parties seek to dismiss, as to Adorama, the breach of contract claim regarding one-off transactions with Rock Fintek, the Court denies the motion. The FATC alleges Adorama's involvement in the sale of gloves to Rock Fintek outside of the terms of the SPA, both through sales made on March 5, 2021, FATC ¶ 58, and March 18, 2021, *id.* ¶ 59, and through the provision of the LevMed gloves in April 2021, *id.* ¶¶ 95–96, 101–02. Although the FATC does not provide specificity as to the respective roles of Kitchen Winners and Adorama in these transactions, its allegations are sufficient at the pleading stage to establish Adorama's liability for breach of contract in those transactions.  And Adorama's arguments for dismissal appear to pertain almost entirely to its status under the SPA.  Accordingly, the Court sustains both breach of contract claims as to Adorama.

**B.      Breach of the Covenant of Good Faith and Fair Dealing**

Both the Adorama parties and the JNS parties move to dismiss the covenant claim as duplicative of the breach of contract claims.  *See* Adorama Mot. at 1, 11; Adorama Reply at 3–4; JNS Mot. at 1, 3–4.  Rock Fintek counters that its claim is not premised on performance under the SPA, but rather on extra-contractual conduct.  Opp. at 3, 14–15.

The Court sustains the covenant claim as to Adorama and Kitchen Winners and dismisses it as to the JNS parties.  Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (citation omitted).  "The implied covenant does not include any term inconsistent with the terms of the contractual relationship, or create duties which are not fairly inferable from the express terms of that contract."  *Quintanilla v. WW Int'l Inc.*, 541 F. Supp. 3d 331, 351 (S.D.N.Y. 2021) (citation omitted).  Nor can it "be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."  *Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 252 (S.D.N.Y. 2019) (citation omitted).  The elements of a covenant claim are akin to those of claims for breaches of duties of care, requiring the existence of a duty, breach, causation, and damages.  *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017).

"Because the duties imposed by the implied covenant of good faith and fair dealing arise as a result of the formation of a contractual relationship between the parties, a claim for breach of the implied covenant of good faith and fair dealing must be dismissed when there is no valid and enforceable contract between the parties."  *Id.*  And where a claim for breach of the implied covenant is duplicative of a claim for breach of contract, the former must be dismissed.  "Under

New York law, claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'"  *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010)); *see also, e.g.*, *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022).

The claim against Adorama and Kitchen Winners rests on both their "fraudulent omissions and misrepresentations about the nature and quantity of the gloves sold" and on the "extortionate efforts to impose unbargained-for expenses and to condition performance under the SPA on Rock Fintek agreeing to buy additional gloves."  FATC ¶ 136.  To the extent the claim is based on alleged misrepresentations as to the gloves, such a claim is "intrinsically tied to the damages allegedly resulting from a breach of the contract," *Deer Park Enters., LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712 (N.Y. App. Div. 2008) (citation omitted), given that Rock Fintek's contract claim seeks damages for the same alleged breaches as to the quantity and quality of the gloves delivered pursuant to the SPA, *see* FATC ¶ 119.  Because a covenant claim based on these breaches "arises from the same facts and seeks the same remedy," *Deutsche Bank*, 810 F.3d at 869, as Rock Fintek's contract claim, such a claim must be dismissed.

However, the covenant claim survives to the extent that it seeks recovery based on Adorama and Kitchen Winners' allegedly "extortionate conduct," including their conditioning (1) the refund of an overcharge and payment of the rebate on Rock Fintek's purchase of an additional two million boxes of gloves, and (2) the continued delivery of contracted-for gloves on the payment of additional, allegedly out-of-contract expenses, *see* FATC ¶¶ 79–80, 136.  As alleged, such conduct endangered Rock Fintek's right "to receive the fruits of the contract," *Thyroff*, 460 F.3d at 407 (citation omitted), by requiring Rock Fintek to perform unexpected,

uncontracted-for actions in order to receive the goods and rebate owed to it under the SPA. "Although the [SPA] nowhere states that its . . . provision[s] shall not be abused by one party to extort the other, such an expectation is implicit." *Acad. Orthotic & Prosthetic Assocs. IPA, Inc. v. Fitango Health, Inc.*, No. 19 Civ. 10203 (JPO), 2020 WL 6135762, at *8 (S.D.N.Y. Oct. 16, 2020) (upholding covenant claim based on defendant's "hard bargaining tactics" that "defied any expectation that the explicitly agreed-upon method would be honored"). And any recovery for such extortionate conduct, which allegedly left Rock Fintek with "no choice but to comply with their extortionate demands, or risk damaging the relationship with its hospital client," FATC ¶ 81, would be separate and in addition to its recovery for the Adorama parties' alleged failure to deliver the gloves contracted for under the SPA. Even if Adorama and Kitchen Winners ultimately prove that these alleged conditional payments and delivery were in fact contractually obligated under the SPA, the FATC's allegations are sufficient to sustain the claim at this stage. *See, e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205–06 (2d Cir. 2018) (reversing dismissal of covenant claim where plaintiffs plausibly alleged that defendant's licensing of "complimentary and unfettered use" of their photographs deprived them of "fruits" of their agreements, in part because parties disputed "meaning of the contract's express terms").

Rock Fintek grounds its claim against the JNS parties on their "fraudulent omissions and misrepresentations about the nature and quantity of the gloves sold" and the "fraudulent use of stickers to conceal the true nature of the gloves being delivered to Rock Fintek's hospital client." FATC ¶ 137. Unlike the claim as to Adorama and Kitchen Winners' extortionate conduct, this claim "clearly rest[s] on the same alleged deceptive practices" underlying the contract claim against the JNS parties, thus requiring dismissal. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (upholding dismissal of "redundant" covenant claim). As alleged, the

placement of stickers on the gloves did not independently "injur[e] the right of [Rock Fintek] to receive the fruits," *Thyroff*, 460 F.3d at 407 (citation omitted), of its contract with the JNS parties so as to warrant damages beyond those sought by the breach of contract claim, which asserts that the JNS parties improperly delivered Protection grade gloves, *see* FATC ¶ 131.  *See, e.g.*, *JN Contemp. Art LLC*, 29 F.4th at 128 (upholding dismissal of covenant claim where damages sought were identical to those sought for breach of contract, even though claims had "different factual basis"); *Quintanilla*, 541 F. Supp. 3d at 352–53 (dismissing covenant claim where, *inter alia*, plaintiff made only conclusory allegations as to defendant's duty and breach and relied on same factual allegations as those supporting contract claim).  Rock Fintek's covenant claim against the JNS parties is thus dismissed.

### C.     Fraud in the Inducement

The Adorama parties move to dismiss the fraud claim.  Adorama Mot. at 2.  They argue that the FATC lacks actionable allegations of misrepresentations or omissions, *id.* at 12–16, and that Rock Fintek waived its claim of justifiable reliance by signing the SPA, which provided for payment upon inspection of the gloves, *id.* at 16–17.  They also assert that Rock Fintek failed to adequately plead why, as a sophisticated buyer, it remained ignorant about the quality of the gloves over the course of the parties' dealings and which law, regulation, or contract provision prohibited its inspection of the gloves.  Adorama Reply at 4–6.  Rock Fintek counters, *inter alia*, that the special facts doctrine renders the alleged omissions actionable and that the SPA's inspection clause does not detract from its reliance on the sellers' statements.  Opp. at 3, 15–20.

To state a claim of fraud under New York law, a complaint must allege facts showing that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Eternity Glob. Master Fund*, 375

31

F.3d at 186–87 (citation omitted); *see also, e.g.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005).  In assessing reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

A fraud claim in federal court must also satisfy Federal Rule of Civil Procedure 9(b), which requires the complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frei v. Taro Pharms. U.S.A., Inc.*, 443 F. Supp. 3d 456, 470 (S.D.N.Y. 2020) (citation omitted), *aff'd*, 844 F. App'x 444 (2d Cir. 2021) (summary order); *see also, e.g.*, *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016).  A complaint must plead "the manner in which [the plaintiff] was damaged . . . by a misrepresentation or omission." *Frei*, 443 F. Supp. 3d at 470–71.  Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), the complaint must "allege facts that give rise to a strong inference of fraudulent intent," *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (citation omitted).

A fraudulent omission claim must allege the usual elements of fraud—including a material omission of fact, intent to induce reliance, reasonable reliance by the plaintiff on the omission, and damages, *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d

160, 170 (2d Cir. 2015)—and "that the defendant had a duty to disclose the material

information," *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 497

(S.D.N.Y. 2003).  "A duty to disclose arises in one of three circumstances: [1] where the parties

are in a fiduciary relationship; [2] under the special facts doctrine, where one party possesses

superior knowledge, not readily available to the other, and knows that the other is acting on the

basis of mistaken knowledge; or [3] where a party has made a partial or ambiguous statement,

whose full meaning will only be made clear after complete disclosure." *Aetna Cas. & Sur. Co.*,

404 F.3d at 582 (citations omitted).  Such claims "must pass muster under Rule 9(b)." *Id.*

      Under New York law, only misrepresentations of a "material existing fact" can provide

the basis for a fraud claim.  *Urstadt Biddle Props., Inc. v. Excelsior Realty Corp.*, 65 A.D.3d

1135, 1137 (N.Y. App. Div. 2d Dep't 2009).  To maintain a claim for fraud separate from a

breach of contract claim, a complaint must "(i) demonstrate a legal duty separate from the duty

to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or

extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation

and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,*

*Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted).  Fraud may not be pleaded in the

alternative to a breach of contract claim, as "[i]t is well settled under New York law that a party

cannot maintain overlapping fraud and breach of contract claims . . . regardless of whether the

alleged contract is unenforceable." *Maricultura Del Norte v. World Bus. Cap., Inc.*, 159 F. Supp.

3d 368, 377 (S.D.N.Y. 2015) (alteration and citation omitted).

      The Court finds the FATC's allegations inadequate to support a fraud claim against the

Adorama parties.  The bulk of the alleged misrepresentations and omissions lack the requisite

particularity as to, *inter alia*, the time, place, manner, and speaker of the alleged statements.  *See,*

*e.g.*, FATC ¶ 22 (provision by Mendlowitz, by unspecified means and at some point before parties entered SPA, of document that stated gloves were "Nitrile"); *id.* ¶ 27 (representation, at unspecified time and place, by Weiner, Mendlowitz, and Banon that Adorama and Kitchen Winners had "connection" to MedCare glove manufacturer); *id.* ¶ 32 (Banon's provision of written materials some time "in March 2021"); *id.* ¶ 37 (Adorama and Kitchen Winners' provision of FDA 510(k) approval letter at unspecified time before glove purchase); *id.* ¶¶ 35–40 (general allegations about contents of written materials shared by Adorama parties); *id.* ¶ 84 (general allegation that Adorama parties "intentionally concealed and failed to disclose" that substantial number of delivered gloves were from unauthorized manufacturer); *id.* ¶ 87 (general allegation that Adorama parties "knew and sought to conceal" nature of gloves at the time of each one-off transaction and delivery under the SPA). A complaint must provide more specificity to satisfy Rule 9(b)'s particularity requirements as to when, how, and who made allegedly fraudulent statements or omissions. *See, e.g., Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, No. 22 Civ. 57 (PAE), 2022 WL 2905368, at *14 (S.D.N.Y. July 22, 2022) (allegation of representation made in year "prior to" payment too broad); *Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578, 586 (S.D.N.Y. 2011) (claims that "do not allege where the misstatements were made, and only once . . . allege an approximate time frame" fail under Rule 9(b)); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12 Civ. 5354 (KAM) (RLM), 2014 WL 1311979, at *5 (E.D.N.Y. Mar. 28, 2014) ("at some point between May and June of 2011" insufficient to satisfy Rule 9(b)); *see also Aetna Cas. & Sur. Co.*, 404 F.3d at 580 (finding insufficient "broad allegations" about alleged misrepresentations with no "clear connection" to actionable conduct); *HSM Holdings*, 2021 WL 918556, at *17 ("'[T]he plaintiff must inform each defendant of the nature of his alleged participation in the fraud,' rather than

conflating defendants in vague collective allegations." (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

The following allegations in the FATC as to certain alleged misstatements and omissions by the Adorama parties, although more specific, are also deficient.

The FATC alleges that, on March 19, 2021, Banon provided testing reports indicating that the gloves to be sold met the specifications required by Rock Fintek, FATC ¶¶ 33–34, but that the gloves delivered ultimately did not carry those specifications, *see id.* ¶ 92. Although the FATC provides sufficient specificity as to the timing of Banon's alleged provision of the testing reports, it fails to plausibly allege that Banon "intended to defraud," *Eternity Glob. Master Fund*, 375 F.3d at 186 (citation omitted), Rock Fintek by providing these materials. Rock Fintek argues, in opposing dismissal, that the special facts doctrine offers grounds to uphold its fraud claim, especially in light of its inability to inspect the gloves. Opp. at 15–17. Yet the FATC noticeably lacks nonconclusory allegations that Banon had knowledge of the veracity of the testing reports or the quality of the gloves at issue or knew, at the time that he provided the testing reports, that the gloves to be sold would not in fact meet the specifications indicated in the reports. *See, e.g.*, *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 638 (S.D.N.Y. 2014) (finding special facts doctrine inapplicable); *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 499–500 (S.D.N.Y. 2004) (same); *cf. Aetna Cas. & Sur. Co.*, 404 F.3d at 583 ("The mere assertion that the moving defendants provided these documents, by itself, does not indicate the nature of their fraudulent conduct."). That Banon— and the Adorama parties more broadly—was the seller of the gloves at issue may suggest that he had "superior knowledge" of the gloves, but, without further allegations, the Court cannot plausibly infer that, as a result, Banon knew both that the testing reports misrepresented the

quality of the gloves to be sold and that Rock Fintek was "acting on the basis of mistaken knowledge." *Aetna Cas. & Sur. Co.*, 404 F.3d at 582 (citations omitted). The FATC does not contains allegations suggesting, for instance, that the Adorama parties were the manufacturers of the gloves or themselves conducted the tests of the gloves, so as to plausibly permit the inference that they knew, at the time of Banon's representation, that the testing reports did not accurately reflect the quality of the gloves to be sold. *Contra Spinelli*, 903 F.3d at 210 (fraud claim plausibly pled where defendant was alleged to have known "at the time" of statement that it would not keep promise). Such is inadequate to state a fraud claim.

The FATC also alleges that, "around the time of the[] one-off transactions"—which took place on March 5, 2021 and March 18, 2021—Banon falsely stated "in writing" that the gloves were certified as chemotherapy gloves. FATC ¶ 61. Assuming *arguendo* that the FATC has sufficiently alleged the timing of this representation, the statement is nonetheless not actionable. Beyond the FATC's conclusory allegation that Banon made this representation "in order to induce Rock Fintek into entering into an agreement for a larger glove quantity," *id.*, the FATC fails to plausibly allege that Rock Fintek "relied on the misrepresentation" and "suffered damages as a result," *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). The FATC itself states that chemotherapy grade was "not a part of the specifications in the SPA or the one-off invoices," *id.*, suggesting that Rock Fintek did not have reason to rely on this representation in deciding whether to purchase gloves from the Adorama parties.

And to the extent that the FATC alleges that the packing slips and invoices for gloves delivered in one-off transactions on March 5, 2021 and March 18, 2021 constituted misrepresentations, *see* FATC ¶¶ 58–59 (alleging invoices and packing slips stated that gloves were Nitrile Examination gloves), the FATC does not plead independent reliance on these

documents, as Rock Fintek received them presumably only after it had entered agreements to

order the gloves, and the FATC does not allege that Rock Fintek relied, let alone reasonably, on

the description of the gloves on the packing slips and invoices in participating in these

transactions. *See, e.g.*, *Antifun*, 2022 WL 2905368, at *15; *Tuosto v. Philip Morris USA Inc.*,

No. 05 Civ. 9384 (PKL), 2007 WL 2398507, at *9 (S.D.N.Y. Aug. 21, 2007).

Moreover, any claim based on the Adorama parties' misstatements or omissions with

respect to gloves to be sold under the SPA or one-off transactions is "impermissibly duplicative,"

*Hadami*, 272 F. Supp. 3d at 601, of the breach of contract claims against Adorama and Kitchen

Winners. Such representations are not plausibly alleged to implicate a "material existing fact,"

*Urstadt Biddle Props.*, 65 A.D.3d at 1137, or a fact "collateral or extraneous to the contract,"

*Bridgestone/Firestone Inc.*, 98 F.3d at 20, so as to support a freestanding fraud claim. Likewise,

the FATC fails to allege the existence of a separate duty or special damages arising from these

alleged misrepresentations that would not be covered by the contract claim. Although the FATC

alleges that the gloves were used by health providers during the COVID-19 pandemic, it lacks

sufficient allegations to permit the inference that any misrepresentations "implicated a significant

public interest" and thus may "give rise to an independent legal duty under New York law."

*MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615, 617 (2d Cir. 2019) (citation

omitted). "Where a plaintiff alleges . . . that the defendant simply misrepresented its intent to

perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring

an action for breach of contract." *Spinelli*, 903 F.3d at 209. This principle applies here, as the

FATC alleges that the Adorama parties misrepresented the quality of the gloves to be sold, and

Rock Fintek now seeks to recover damages for breaches of the contracts under which it bought

those gloves. *See, e.g.*, *ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, No 19 Civ.

7800 (MKV), 2021 WL 1177532, at *22 (S.D.N.Y. Mar. 29, 2021) (finding fraud claim based on representation that party "intended to fulfill his obligations" under contract duplicative of contract claim); *M-101, LLC v. iN Demand L.L.C.*, No. 06 Civ. 12938 (DLC), 2007 WL 4258191, at *3 (S.D.N.Y. Dec. 3, 2007) ("New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and *a misrepresentation of a present fact* that gives rise to a separate cause of action for fraudulent inducement.").

Rock Fintek argues that its fraud claim should survive the motion to dismiss as to the LevMed gloves, which were "not governed by the parties' contractual relationship." Opp. at 18. Rock Fintek is correct that any claim based on the LevMed gloves would not be duplicative of the breach of contract claims, but the FATC fails to plausibly allege actionable misstatements or omissions regarding the LevMed gloves so as to uphold the fraud claim.

The FATC alleges that, on April 29, 2021, at approximately 7 p.m., and on April 30, 2021, Banon emailed Rock Fintek an allegedly "altered" specification sheet and product brochure for the LevMed gloves—both of which falsely represented that the LevMed gloves carried FDA 510(k) certification. FATC ¶¶ 102–03; *see also id.* ¶¶ 104–06. These allegations provide sufficient specificity as to the timing and means of these allegedly false representations and permit the plausible inference that Banon, in providing a doctored specification sheet, intended to defraud Rock Fintek. However, the FATC lacks allegations plausibly supporting that Rock Fintek actually relied on this representation to its detriment. The FATC leaves unclear whether Rock Fintek ever paid for the LevMed gloves, which Rock Fintek states were "foisted" upon it, Opp. at 18, and which Banon allegedly initially stated "did not come from the Adorama sellers," FATC ¶ 99. Even accepting the allegations that Banon "personally instructed"

warehouse staff to load the LevMed gloves onto Rock Fintek's trucks, FATC ¶ 96, and subsequently provided a doctored specification sheet, *id.* ¶¶ 104–05, the FATC does not provide a basis on which the Court can plausibly infer that Banon's representations as to the LevMed gloves—made *after* the gloves were allegedly delivered to Ascension—induced any action or reliance on the part of Rock Fintek. In fact, the FATC states that Rock Fintek "immediately" raised questions about the quality of the LevMed gloves, *id.* ¶ 99, after Ascension refused to pay Rock Fintek for the order, and further investigated the gloves, *see id.* ¶¶ 101–04, suggesting that it did not take any action in reliance on the representation that the gloves met the required specifications. *Cf. HSM Holdings*, 2021 WL 918556, at *19 (finding non-actionable statements alleged to have been made after plaintiff requested return of investment, where plaintiff failed to allege that "it changed its conduct in reliance" on statements). The FATC also does not plausibly allege any damages resulting from Banon's representation.

Accordingly, the Court—without considering the Adorama parties' arguments as to Rock Fintek's obligations, if any, to inspect the gloves, *see* Adorama Mot. at 16–17; Adorama Reply at 4–6—dismisses the fraud claim against the Adorama parties.

### D.   Negligent Misrepresentation

The Adorama parties move to dismiss the negligent misrepresentation claim as duplicative of the contract claims and barred under New York's economic loss rule. Adorama Mot. at 1, 18. They also argue that Rock Fintek failed to plausibly allege the existence of a special relationship between the parties. *Id.* at 2, 18; *see* Adorama Reply at 7. The JNS parties move to dismiss on the same grounds. JNS Mot. at 1, 4–5; JNS Reply at 3 (arguing that JNS parties, as resellers, had no special knowledge or special relationship with Rock Fintek).

To state a claim for negligent misrepresentation under New York law, the complaint must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct

information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).  "New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity." *Id.* (citation omitted).  Reasonable or justifiable reliance is assessed by the same factors considered in deciding a fraud claim, including "the entire context of the transaction," "the sophistication of the parties," and "the content of any agreements between them." *Emergent Cap.*, 343 F.3d at 195.  Negligent misrepresentation claims "must be pled in accordance with the specificity criteria of Rule 9(b)." *Aetna Cas. & Sur. Co.*, 404 F.3d at 583; *see also HSM Holdings*, 2021 WL 918556, at *19 (noting split of authority as to whether negligent representation claims are subject to Rule 9(b), and that "majority of courts in the Circuit have applied the heightened pleading standard," with courts that "have expressed uncertainty as to whether the 9(b) heightened pleading standard applies in all instances" finding the standard to apply where claims "sound in fraud").

A body of New York decisions addresses the "borderland between tort and contract"— commonly, involving circumstances where "the parties' relationship initially is formed by contract, but there is a claim that the contract was performed negligently." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 550–51 (1992).  Under the "economic loss" rule, "damages that arise from the failure of a party to perform pursuant to a bargained-for agreement are recoverable in contract, and not in tort, unless a legal duty independent of the contract itself has been

violated." *E.g.*, *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 415–16

(S.D.N.Y. 2013) (citing *Bellevue S. Assocs. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 294–95

(1991)).  As with fraud claims, a plaintiff may distinguish its negligence claim from its contract

claim by "seek[ing] special damages that are caused by the misrepresentation and unrecoverable

as contract damages."  *Bridgestone/Firestone, Inc.*, 98 F.3d at 20.

Because Rock Fintek's negligent representation claims "sound in fraud," *HSM Holdings*,

2021 WL 918556, at *19, the Court assesses them under Rule 9(b)'s heightened pleading

standard.  The Court grants the Adorama parties' motion to dismiss the negligent

misrepresentation claims against them, largely for the reasons stated with respect to the fraud

claims.  Even assuming the parties had a "special relationship," *Anschultz Corp.*, 690 F.3d at 114

(citation omitted), the majority of the alleged misrepresentations in the FATC lack the requisite

particularity under Rule 9(b).  And as for the sufficiently specific allegations: those as to Banon's

provision of testing reports lack sufficient facts indicating that he "should have known," *id.*, that

the contents of the report did not accurately reflect the gloves to be sold; and those as to Banon's

representations about the LevMed gloves do not plausibly suggest that Rock Fintek "reasonably

relied on [them] to [its] detriment," *id.*  Furthermore, any claims based on misrepresentations or

omissions stemming from the SPA or one-off transactions, at least with respect to those made by

Adorama and Kitchen Winners, duplicate Rock Fintek's breach of contract claims and thus are

barred under the economic loss rule.  *See, e.g.*, *MVP Health Plan*, 765 F. App'x at 617

(upholding dismissal of tort claims that "merely assert violations of duties indivisible from the

contractual obligations"); *Volt*, 586 F. Supp. 3d at 298 (dismissing negligence claims where

"alleged conduct underlying . . . contract and tort claims is identical, or virtually so").  *Contra

Hydro Invs.*, 227 F.3d at 17 (finding that economic loss rule did not apply to professional

malpractice claim arising from "harm distinct from th[e] contracts"); *Waverly Props., LLC v. KMG Waverly, LLC*, 824 F. Supp. 2d 547, 565 (S.D.N.Y. 2011) (sustaining claim where plaintiff alleged defendants had "independent legal duty," separate from contractual obligation, to comply with municipal codes).

For similar reasons, the Court grants the JNS parties' motion to dismiss the negligent misrepresentation claims against them. The FATC contains three specific allegations[8] as to misrepresentations or omissions made by Stern on behalf of the JNS parties: that on February 2, 2021, Stern, "through a broker," provided written materials, including testing reports, that falsely described the gloves they intended to sell, FATC ¶ 30; on February 9, 2021, Stern, "through a broker," provided an FDA 510(k) approval letter that falsely stated that the gloves satisfied certain ASTM D6319 standards, *id.* ¶ 31; and on April 16, 2021, Stern falsely represented that he would sell gloves meeting Rock Fintek's criteria and later put "Examination" stickers on boxes of those gloves, *id.* ¶¶ 49, 53–54. The FATC notes that the requirement that the gloves satisfy ASTM D6319 standards, while not included in any contracts or orders, was "material" to Rock Fintek's decision to buy gloves from Stern. *Id.* ¶ 31.

Unlike the allegations with respect to the Adorama parties, the FATC provides more of a basis on which to infer that Stern "should have known" that his representations of the gloves as compliant with Rock Fintek's specifications was "incorrect," *Anschultz Corp.*, 690 F.3d at 114 (citation omitted). He engaged in conversations with Rock Fintek regarding the gloves' quality, and he is alleged to have placed "Examination" stickers on the boxes "to cover up and conceal the true nature of those gloves." FATC ¶ 54. However, because Rock Fintek's breach of

---

[8] Stern's alleged statement on April 6, 2021 that certain Protection grade gloves were in fact Examination grade gloves, FATC ¶ 46—while false—is not actionable, because Rock Fintek "refused to purchase" those gloves, *id.* ¶ 47, and thus did not rely on this misrepresentation.

contract claim against the JNS parties arises from the same failure to provide the contracted-for gloves, and because the FATC does not allege any "special damages," *Bridgestone/Firestone, Inc.*, 98 F.3d at 20, sought for the alleged negligent misrepresentations, the economic loss rule bars the negligent misrepresentation claim. And although Stern's promise regarding the gloves' compliance with ASTM D6319 standards was not formally included in the "pertinent contracts," FATC ¶ 31, and thus may have imposed a legal duty independent of the contract, the damages sought for the breach of that duty appear to be coextensive with those sought under the breach of contract claim.

Thus, because Rock Fintek's negligent misrepresentation claim seeks little, if anything, more than the benefit of its bargain with the Adorama parties and JNS parties, the Court dismisses these claims.

### E.    Unjust Enrichment

The Adorama parties move to dismiss the unjust enrichment claim as to Adorama because "Adorama had no responsibilities under the SPA." Adorama Mot. at 1, 18–19. Rock Fintek counters that, at the pleading stage, it is entitled to pursue relief under a quasi-contract theory given that Adorama disputes its status as a party to the contract. Opp. at 3, 23–24.

The Court sustains the unjust enrichment claim. To state a claim for unjust enrichment under New York law, a complaint must allege: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (citation omitted). "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Ga. Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (2012) (citation, internal quotation marks, and alteration omitted). "[T]he existence of a valid and enforceable written contract governing a

particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 120 (S.D.N.Y. 2020) (citation omitted); *see also Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016).  An unjust enrichment claim thus cannot survive if it simply duplicates a contract claim.  *See, e.g.*, *Quintanilla*, 541 F. Supp. 3d at 353; *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 430 (S.D.N.Y. 2021).  "However, this rule does not require dismissal of quasi-contract claims that are pled in the alternative to contract-based claims, *i.e.*, that expressly are triggered only if no valid and enforceable contract resolves the dispute." *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016) (citing cases); *see also* Fed. R. Civ. P. 8.

Although the Adorama parties do not appear to contest the validity of the SPA itself, they do contest Adorama's liability for breach of contract under the SPA.  *See* Adorama Mot. at 5. And the Court has sustained the contract claims, which will proceed to discovery.  Therefore, with the fate of the contract claim as to Adorama uncertain, Rock Fintek is entitled to pursue the unjust enrichment claim in the alternative.  *See, e.g.*, *TransformaCon*, 2015 WL 4461769, at *6 (upholding unjust enrichment claim as to party disputing that it is bound by contract, but dismissing claim as to party that undisputedly entered valid and binding contract); *Antifun*, 2022 WL 2905368, at *16 (sustaining unjust enrichment claim where parties disputed existence of contract, and citing cases in support).  Indeed, the FATC expressly pleads unjust enrichment in the alternative, seeking recovery "[t]o the extent that Adorama's and Kitchen Winners' surreptitious deliveries of gloves above the quantities called for by the SPA are deemed to fall outside of the SPA."  FATC ¶ 162.  This provides further reason to sustain the unjust enrichment claim against both Adorama and Kitchen Winners, as the claim does not seek "to recover the

44

same payments" as the breach of contract claim.  *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180,

198 (S.D.N.Y. 2021); *see also ADYB Engineered for Life*, 2021 WL 1177532, at *23 (upholding

unjust enrichment claim as to payments not alleged to fall within scope of valid, enforceable

contract).

### F.    Tortious Interference with Existing and Prospective Business Relations

The Adorama parties move to dismiss the tortious interference claim as duplicative of the

contract claim.  Adorama Mot. at 1, 20.  They also argue that Rock Fintek has not plausibly

alleged certain elements of the claim, including that they directed their conduct at Ascension or

Rock Fintek's other clients.  *Id.* at 2, 19–20; Adorama Reply at 7–8.  The JNS parties move to

dismiss on the same grounds, as well as for Rock Fintek's failure to plead the identity of the

third-party with whom it was doing business.  JNS Mot. at 1, 5–7; JNS Reply at 3–5.

A claim under New York law for tortious interference with an existing contract requires:

"[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's

knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of

the contract without justification, [4] actual breach of the contract, and [5] damages resulting

therefrom."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting

*Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (1996)).  "The New York Court

of Appeals and the Second Circuit . . . have consistently emphasized the necessity of an *actual

breach* by the third party."  *ADYB Engineered for Life*, 2021 WL 1177532, at *19 (citing cases).

A plaintiff suing under New York law for tortious interference with prospective business

relations must prove that "(1) there is a business relationship between the plaintiff and a third

party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the

defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses

dishonest, unfair, or improper means; and (4) the relationship is injured."  *Goldhirsh Grp., Inc. v.*

*Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997).  A claim of tortious interference with prospective business relations carries a higher burden than a claim of interference with an existing contract, as the complaint must show "more culpable conduct on the part of the defendant."  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (1996).  The requirement that a defendant acted with a wrongful purpose or used improper means therefore has a "high bar."  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015).  "When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'"  *Id.* (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (2004)).  Instead, the use of wrongful or improper means generally requires conduct "that amount[s] to a crime or an independent tort."  *Carvel*, 818 N.E.2d at 1103.  Moreover, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Id.* at 1104.

Even assuming all well-pled facts to be true and drawing all reasonable inferences in favor of Rock Fintek, *see Koch*, 699 F.3d at 145, the FATC fails to plausibly allege tortious interference with existing or prospective business relations.  First, as to the claim of interference with Rock Fintek's existing contract with Ascension, the FATC fails to sufficiently plead that Ascension or another third-party Rock Fintek client breached its contract with Rock Fintek, or that the Adorama parties and JNS parties intentionally procured such a breach.  *See, e.g.*, *ADYB Engineered for Life*, 2021 WL 1177532, at *19 (dismissing tortious interference claims where plaintiffs failed to allege third-party breach of the contract).  The FATC is devoid of allegations that the Adorama parties or JNS parties communicated with or contemplated any contact with

one of Rock Fintek's clients, let alone intended to interfere with the client's contract with Rock Fintek.

For similar reasons, the FATC also fails to plausibly allege interference with Rock Fintek's prospective business relations. Rock Fintek argues that the Adorama parties and JNS parties are pled to have "directed" their conduct at Ascension, by virtue of the allegation that they "knew" the type of gloves required by Ascension and that the gloves would be delivered immediately to Ascension, and were informed of Ascension's complaints about glove quality. Opp. at 3, 22–23. Yet these parties' mere awareness of Rock Fintek's contract with Ascension and Ascension's glove requirements does not satisfy the requirement that they "directed" their conduct at Ascension so as to "convince [Ascension] not to enter into a business relationship with [Rock Fintek]." *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (citation omitted). Indeed, the FATC conspicuously lacks any allegations suggesting that the Adorama parties and JNS parties acted with any motive other than "normal economic self-interest," *Carvel*, 818 N.E.2d at 1103. *See, e.g.*, *Hadami*, 272 F. Supp. 3d at 602 (dismissing claim where plaintiff did "not allege any wrongful conduct by [defendant] directed at any third party" or that defendant "was motivated to harm [plaintiff] in these relationships"); *TransformaCon*, 2015 WL 4461769, at *7 ("Without pleading additional facts alleging how [defendant's] actions were nefarious and not rational business decisions, [plaintiff] does not state a plausible claim."). These factual pleadings fall short alleging tortious interference.

Accordingly, the Court dismisses the tortious interference claims.

## G.     Conspiracy

The Adorama parties move to dismiss the conspiracy claim as duplicative of the contract claim and because the FATC fails to plausibly allege a conspiracy. Adorama Mot. at 1–2, 21–

23; Adorama Reply at 9.  The JNS parties move to dismiss on similar grounds.  JNS Mot. at 1,

7–10; JNS Reply at 5.

"It is a well-settled and often repeated principle of New York law that no cause of action

lies for civil conspiracy." *Aetna Cas. & Sur. Co.*, 404 F.3d at 591; *see, e.g.*, *Alexander &*

*Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).  A conspiracy may be alleged "for

the purpose of showing that a wrong was committed jointly by the conspirators and that, because

of their common purpose and interest, the acts of one may be imputed to the others." *Aetna Cas.*

*& Sur. Co.*, 404 F.3d at 591 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir.

1981)).  "To state a claim for civil conspiracy, a plaintiff must demonstrate the primary tort, plus

the following four elements: (1) an agreement between two or more parties; (2) an overt act in

furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan

or purpose; and (4) resulting damage or injury." *Uni-World Cap., L.P. v. Preferred Fragrance,*

*Inc.*, 43 F. Supp. 3d 236, 251 (S.D.N.Y. 2014) (citation omitted).  "Where the acts underlying a

claim of conspiracy are the same as those underlying other claims alleged in the complaint, the

conspiracy claim is dismissed as duplicative." *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F.

Supp. 2d 199, 232 (S.D.N.Y. 2008) (citation omitted).

The Court has dismissed, as to the Adorama parties, the fraud, negligent

misrepresentation, and tortious interference claims, and, as to the JNS parties, the covenant,

negligent misrepresentation, and tortious interference claims.  Accordingly, as "there cannot be

any cause of action for conspiracy to breach [a] contract," *Spagnola v. Chubb Corp.*, 264 F.R.D.

76, 85 n.9 (S.D.N.Y. 2010) (quoting *Smith v. Fitzsimmons*, 180 A.D.2d 177, 178 (4th Dep't

1992)), the only remaining predicate for a conspiracy is the fraud claim against the JNS parties,

which was not subject to a motion to dismiss. *See Grocery Haulers, Inc. v. C & S Wholesale*

*Grocers, Inc.*, No. 11 Civ. 3130 (DLC), 2011 WL 4031203, at *3–4 (S.D.N.Y. Sept. 12, 2011) (civil conspiracy claim fails where underlying tort claim fails). The FATC—although containing facts suggesting Stern had a business relationship with the Adorama parties and understood aspects of their business, *see* FATC ¶¶ 26, 37, 57, 90—does not contain any non-conclusory allegations that the Adorama parties and JNS parties had the requisite "agreement" or acted "in the furtherance of a plan or purpose" to commit any wrong, *Uni-World Cap., L.P.*, 43 F. Supp. 3d at 251. Instead, it largely recites the elements of a conspiracy and the acts underlying the FATC's other claims, naming the parties and certain unidentified "non-party manufacturers and suppliers of gloves." FATC ¶ 172; *see also id.* ¶¶ 173–77. Because this is insufficient to state a conspiracy, the Court dismisses the claim.

### H.   Breach of Warranties under New York U.C.C. § 2-313 and New York Common Law

The Adorama parties move to dismiss the breach of warranties claim, to the extent it asserts the breach of express warranties in the SPA, as duplicative of the contract claim, Adorama Mot. at 1, 24–25; Adorama Reply at 10. They also argue that the claim should be dismissed as to Adorama, Weiner, and Mendlowitz, who are not alleged to have made representations under the SPA. Adorama Mot. at 2, 23–25; Adorama Reply at 10. Likewise, the JNS parties move to dismiss the breach of warranties claim on the basis that JNS and Stern did not make any express written warranties. JNS Mot. at 2, 10–12; JNS Reply at 5. Rock Fintek opposes dismissal, pointing to various alleged written and oral representations about the gloves, including presentations, testing reports, and FDA 510(k) certification letters. Opp. at 3, 25.

Under N.Y. U.C.C. § 2-313, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "[a]ny

description of the goods which is made part of the basis of the bargain creates an express

warranty that the goods shall conform to the description."  N.Y. U.C.C. § 2-313(1).  An express

warranty "is as much a part of the contract as any other term."  *Capital v. First Nat'l Bank of*

*Waverly*, 146 A.D.3d 741, 743 (N.Y. App. Div. 2017).  To state a claim for breach of an express

warranty, a complaint must allege: "(1) the existence of a material statement amounting to a

warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate

seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach."  *Housey v.*

*Procter & Gamble Co.*, No. 21 Civ. 2286 (NRB), 2022 WL 874731, at *3 (S.D.N.Y. Mar. 24,

2022). "Generalized or vague allegations that defendant made express warranties are insufficient;

plaintiff must plead some affirmative statement of fact that forms the basis of the warranty."

*Tears v. Bos. Sci. Corp.*, 344 F. Supp. 3d 500, 512 (S.D.N.Y. 2018) (citation omitted).  As to

reliance, "[t]he critical question is not whether the buyer believed in the truth of the warranted

information, . . . but whether it believed it was purchasing the seller's promise as to its truth."

*CBS Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1000–01 (N.Y. Ct. App. 1990) (citation and

brackets omitted).  "This view of 'reliance'—*i.e.*, as requiring no more than reliance on the

express warranty as being a part of the bargain between the parties—reflects the prevailing

perception of an action for breach of express warranty as one that is no longer grounded in tort,

but essentially in contract."  *Id.* at 1001.

     As summarized above in connection with the fraud and negligent misrepresentation

claims, *see supra*, the FATC contains various allegations of representations—by Adorama and

Kitchen Winners, either directly or through their agents Banon and Mendlowitz, and by the JNS

parties, in writing and through written materials—that the gloves at issue met the specifications

required by Rock Fintek.  *See, e.g.*, FATC ¶ 22 (Mendlowitz providing document stating that

gloves would be "Nitrile"); ¶¶ 30–31 (Stern providing written materials, including testing reports

and FDA 510(k) approval letter, on February 2 and 9, 2021); *id.* ¶¶ 32–33 (Banon providing

written materials, including 84-page MedCare product presentation and testing reports, in March

2021); *id.* ¶ 37 (Adorama and Kitchen Winners providing FDA 510(k) approval letter); *id.* ¶ 46

(Stern stating in writing that gloves were Examination grade gloves, on April 6, 2021); *id.* ¶ 61

(Banon stating in writing that gloves met ASTM D6319 standards and were chemotherapy grade,

around March 2021); *id.* ¶¶ 62, 66 (gloves specifications in SPA, signed April 7, 2021).  Such

written materials, in the context of the alleged discussions, amount to an express warranty.  *Cf.*

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y.

2014) ("[A]n express warranty may include specific representations made by a manufacturer in

its sales brochures or advertisements." (citation omitted)); *Jesmer v. Retail Magic, Inc.*, 55

A.D.3d 171, 184 (N.Y. App. Div. 2008) ("An express warranty can arise from the literature

published about a product." (citation omitted)).  And since the Rule 9(b) particularity

requirement does not apply to express warranty claims, these alleged representations, even those

not specific enough to form the basis of a fraud or negligent misrepresentation claim, are

actionable.  Moreover, while Adorama's motion to dismiss focuses primarily on warranties made

as to the SPA, the FATC alleges the existence of contracts beyond the SPA and thus may rest its

express warranty claim on representations made as to the one-off transactions between the

parties.

  As for the remaining elements, the FATC plausibly alleges that: Rock Fintek relied on

these representations in entering into contracts with the Adorama parties and JNS parties, these

representations were ultimately untrue, and Rock Fintek suffered injuries as a result.  None of the

moving parties challenge the timeliness and sufficiency of Rock Fintek's notice of the alleged breach.  *See, e.g.*, *Cooper v. Anheuser-Busch LLC*, 553 F. Supp. 3d 83, 112–13 (S.D.N.Y. 2021).

Accordingly, the Court sustains the breach of express warranty claim against Adorama, Kitchen Winners, Mendlowitz, and the JNS parties.  The Court notes, however, that the FATC lacks sufficient allegations of express warranties made by Weiner, *see* FATC ¶ 29 (alleging generally that Weiner "represented orally and in writing" that gloves met specifications), and thus dismisses the claim as to him.  As to the argument that the warranty claim is impermissibly duplicative of the contract claim, "although [Rock Fintek] cannot recover twice for the same injuries, New York law entitles a plaintiff to assert alternative theories of liability."  *Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 314 (S.D.N.Y. 2007) (noting that remedies differ under warranty claim, which provides for repair or replacement of defective items, and contract claim, which provides for consequential damages); *see also Trodale Holdings, LLC v. Bristol Healthcare Invs., L.P.*, No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *13 (S.D.N.Y. Nov. 29, 2017) ("The Court is unaware of any rule under New York law that breach-of-contract and breach-of-express-warranty claims cannot stand together, and courts in this District have permitted the two to proceed together.") (citing cases).

## CONCLUSION

For the foregoing reasons, the Court grants the Adorama parties' motion to dismiss as to the fraud, negligent misrepresentation, tortious interference, and conspiracy claims, and denies the motion to dismiss as to the breach of contract, covenant, unjust enrichment, and, except with respect to Weiner, breach of warranty claims.  The Court grants the JNS parties' motion to dismiss as to the covenant, negligent misrepresentation, tortious interference, and conspiracy claims, and denies the motion as to the breach of warranty claim.

The Clerk of Court is respectfully directed to terminate all pending motions.  This litigation will proceed on the surviving counts.  The parties are directed to file, by April 10, 2023, a joint case management plan in accordance with the Court's Individual Rules and Practices.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated:  March 31, 2023
New York, New York