**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KITCHEN WINNERS NY INC.,

*Plaintiff*,

-against-

ROCK FINTEK LLC,

*Defendant*.

Civil Action No. 22-cv-05276-PAE

ROCK FINTEK LLC,

*Counterclaim and Third-Party Plaintiff,*

-against-

KITCHEN WINNERS NY INC.,

*Counterclaim Defendant,*

and

ADORAMA INC., HERSHEY WEINER,
JOSEPH MENDLOWITZ, JNS CAPITAL
HOLDINGS LLC and JOEL STERN

*Third-Party Defendants.*

## STATEMENT OF UNDISPUTED MATERIAL FACTS

JNS Capital Holdings LLC ("JNS"), and Joel Stern ("Stern"; together with JNS, the "JNS Parties"), respectfully submit the following statement of undisputed material facts, to supplement the facts set forth in the parties' joint statement of undisputed facts, which is incorporated herein by reference (ECF #135).

1

1. JNS sold Medcare gloves, and was introduced to Rock Fintek indirectly through Ms. Chunron Li and Bruno Azra.  Frisch Exh. 6 at p. 31 et seq. (see chat transcript from 2/2/21, 8:41:08 PM forward).

2. Mr. Stern never met Ms. Chunron Li, and did not deal with her.  Stern Decl ¶2.

3. He had never heard her name until this lawsuit was commenced. Stern Decl ¶2.

4. Apparently, she was a contact of Bruno Azra and working for Rock Fintek to locate supplies of gloves to fulfill their obligations to Ascension.  Stern Decl ¶2.

5. Mr. Stern gave some documents to Bruno Azra to help acquire customers.  Stern Decl ¶3.

6. Those documents were given to Mr. Stern by Kitchen Winners, who had told him the documents were obtained from Medcare.  Stern Decl ¶3.

7. As far as Mr. Stern is aware, those documents were accurate and obtained from Medcare. Stern Decl ¶4.

8. The documents were sent by Ms. Li over whatsapp chat to Rock Fintek.  Frisch Exh. 6  at P. 41 [2/9/21, 1:12:22 PM]; Frisch Exh 7-8.

9. At the time of the negotiation of the initial contract, Rock Fintek was represented by counsel  Frisch Exh. 1 at 296:8-15; Frisch Exh. 2 at 47:5-11.

10. Ms. Li assisted Rock Fintek in locating suppliers and was asked to inspect the gloves prior to the initial purchase from JNS.  Frisch Exh. 1 at 245:8 – 246:10.

11. This inspection was recorded on video and sent to Rock Fintek via video.  Ibid. and JSF ¶31.

12. Ms. Li approved the gloves.  Frisch Exh. 1 at 245:8 – 246:10.

13. Ms. Li worked on behalf of Rock Fintek. JSF ¶28.

14. Mr. Stern never made any representations or provided any written documents to Rock Fintek in regard to the characteristics or quality of the Medcare gloves.  Stern Decl. ¶5; Frisch Exh. 6 (chat demonstrating that the discussions occurred between Mr. Azra and Ms. Li); Frisch Exh. 9 (Joel Stern/Rock Fintek Chat demonstrating no discussion of the specifications of the gloves).

15. Bruno Azra worked independently to drum up business to earn a commission on my sales.  Anything he provided to Rock Fintek was his decision.  Stern Decl ¶5.

16. JNS never purchased any gloves from Kitchen Winners that were not intended to be Nitrile Examination Gloves.  Stern Decl. ¶6; JSF ¶117 and Exh R (contracts between JNS and Kitchen Winners).

17. JNS had contracted with Kitchen Winners for the gloves, and they were to be Medcare Nitrile Examination Gloves.  Stern Decl. ¶7, JSF Exh. R.

18. The gloves were delivered from China directly to warehouse space that JNS rented and were promptly picked up by Kitchen Winners.  Stern Decl. ¶7.

19.  Mr. Stern had limited opportunity to inspect, and if any issue appeared with the gloves, he reached out to Mr. Wiener who promised that the gloves were correct.  Stern Decl. ¶7.

20. He was never aware of any issue with the gloves that were supplied to Rock Fintek, but there was a shipment here and there where the gloves were labeled as Protection Gloves. When he checked with Mr. Wiener, he told me that the paperwork was incorrect or the gloves would be replaced.  Stern Decl. ¶8.

21. It is without a doubt that the goods were shipped from Medcare to JNS' warehouses. Stern Decl. ¶9

22. At no point to did Rock Fintek inform Stern that Ascension was their customer.  Stern Decl. ¶10.; Frisch Exh. 2 at 93:18-21.

23. In February 2021, JNS was selling to Rock Fintek at 15.00 a box, and in April and May 2021, JNS was selling to Rock Fintek at 11.50 a box.  Stern Decl. ¶11.

24. JNS' total sales to Rock Fintek were approximately $3.5 million.  Stern Decl. ¶12.

25. Mr. Stern never had notice that Rock Fintek had a customer for $37,000,000, the exact nature of that customer or anything else that would put him or JNS on notice of a claim for over $100 million in lost profits.  Stern Decl. ¶12.

26. Thomas Kato explicitly stated that "[4/21/21, 8:20:15 PM] Tommy H. Kato: I would never introduce anyone to any of my clients."  Frisch Exh. 9 at P.10.

27. The transactions between JNS and Rock Fintek were initiated through text messages and simple purchase orders.  They had no discussion of potential consequential damages.  JSF Exh. J; Frisch Exh. 9.

28. Mr. Kato could not establish what portion of the damages were specifically caused by JNS.  Frisch Exh. 2 at 65:9-69:9.

29. Rock Fintek blamed these identical losses on the Hunton Andrews Kurth law firm in an action in Florida.  Frisch Exh 17 at ¶¶38-39.

30. The transactions occurred from February 2021 - May 9, 2021.  Stern Decl. ¶13.

31. At one point, a supplier other than Kitchen Winners offered JNS  boxes of gloves with misprinted boxes that had stickers applied to correct the misprint.  Mr. Stern offered these gloves to Rock Fintek (on behalf of JNS) at a lower price, as he was able to obtain them at a lower price.  Stern Decl. ¶14; Frisch Exh 9 at 4-5.

32. When Rock Fintek rejected the gloves, JNS did not purchase them from the other supplier, and certainly never shipped any such gloves to Rock Fintek.  Stern Decl. ¶14.

33. At no point did Mr. Stern cause any stickers to be applied to any boxes of gloves.  Stern Decl. ¶15.

34. He had no reason to do so, and did not have the manpower to undertake such a task on hundreds of thousands of boxes.  Stern Decl. ¶15.

35. Rock Fintek never returned any gloves to JNS.  Frisch Exh. 2 at 139:4-8.

36. Rock Fintek made one request to return gloves via Whatsapp in July 2021 to Mr. Stern. The request was for Mr. Stern to identify the gloves with stickers on the boxes and remove them from the warehouses that Ascension had placed them in.  The request specifically stated that rock Fintek would orchestrate the return.  Rock Fintek never did any such thing.  Frisch Exh. 9 at p. 30.

37. Mr. Kato testified that all of the damages alleged arose from the boxes with stickers on them, for which he blamed JNS.  Frisch Exh. 2 at 65:9-69:9

38. Mr. Kato could not provide a basis for the number of boxes of gloves he claimed had stickers.  Frisch Exh 2 at 76:8-77:20.

39. Mr. Kato also said he assumed that Mr. Stern sold him 9 million boxes with stickers on them because that is what he understood Mr. Stern had available.  Frisch Exh 2 at 77:14-20.

40. Mr. Kato testified that it was possible that the boxes were simply misprinted and the gloves were the correct gloves.  Frisch Exh. 2 at 158:8-159:21.

41. There are photos from testing of gloves in China showing the boxes with stickers placed on them in China.  Frisch Exh. 10 at P. 12-19; 23; 27; 40-44; 47; 51; 55.

42. Mr. Stern formed JNS for the purpose of selling PPE during the pandemic, seeing this as a strong business opportunity (which it turned out not to be).  Stern Decl. ¶16.

43. Stern obtained investors from his Hassidic community to purchase product and resell it. Stern Decl. ¶16

44. As can be seen from the JNS bank statements, the business was well capitalized and operating well during the time frame of the transactions at issue in this case.  Stern Decl. ¶17; JSF Exh. K.

45. Rock Fintek alleged that the lost business relationship was the fault of the Hunton law firm that it had engaged for due diligence on another transaction that resulted in over $6 million being stolen.  Frisch Decl. Exh. 17.

46. Rock Fintek went out of business after the conclusion of the deal with Ascension at issue in this action.  Frisch Exh. 2 at 27:19-29:13.

47. starting in mid-June 2021, Ascension was working to "burn down" its supply of Medcare gloves.  Frisch Exh. 15

48. Ascension testified that in the short term it might have requested that Rock Fintek help resolve supply chain issues that arose during the COVID Pandemic.  Frisch Exh. 5 37:6-41:9.

49. By June 15, 2021, Ascension was seeking to reduce its supply of Medcare gloves in a "burn down".  Frisch Exh. 15.

50. Rock Fintek was a supplier retained for the COVID period, and for that period some additional business might have been solicited for temporary supply issues. Frisch Exh. 5 37:6-41:9.

51. Rock Fintek's supposed expert, Mr. Kato, could provide no factual basis for any calculation of damages.  Frisch Exh. 3 (in its entirety).

52. Ascension would have considered long term contracts with Rock Fintek if it could obtain FDA approval and compete on price with "ginormous companies."  Frisch Exh. 5 at 40:17-21.

53. Mr. Kato admitted that he could not estimate the specific profit from future glove contracts.  Frisch Exh. 2 at 61:13-23.

54. Kitchen Winners purchased the gloves from Medcare.  Frisch Exh. 18 at p. 23.

55. Rock Fintek alleged that "From the outset of their dealings, Rock Fintek expressly explained orally and in writing to Stern, Weiner, Mendlowitz and Banon that all gloves that Rock Fintek would purchase from the Adorama Seller and JNS Sellers would be immediately sold to Rock Fintek's hospital group client in the United States for use by medical professionals. Rock Fintek expressly told Stern, Weiner, Mendlowitz, Banon, and the consultant Maimon that its hospital client required that all gloves had to be medical Examination grade and had to comply with ASTM D6319 standards. Prior to each transaction at issue, Stern, Weiner, and Banon represented orally and in writing that the gloves that they were sourcing to sell to Rock Fintek were in fact nitrile/NBR medical grade Examination gloves bearing FDA 510(k) certification and provided written materials purporting to substantiate that representation." FATC ¶29.

56. There is no evidence of any such written communication with Mr. Stern or JNS.  Stern Decl. at ¶5; Frisch Decl. at Exh. 6 (Ms. Li Chat); Exh. 9 (Stern Chats).

57. Rock Fintek never tested the gloves that were the subject of the testing report provided by Ms. Li.  Frisch Exh. 7 (Testing Report); Frisch Exh. 13 (Testing Report of Jason Poulton).

58. No evidence was provided that anything in the specific report was false.  Frisch Exh. 13 (Testing Report of Jason Poulton).

59. Similarly, the 510(k) certification was provided by Medcare, and there is no evidence that any component of that document is false.  Frisch Exh. 8 (510(k) certification); Frisch Exh. 13.

60. Mr. Stern never made any representation to Rock Fintek about "ASTM International Certifications" as alleged in ¶34 of the FATC.  See Frisch Decl. at Exh. 6(Ms. Li Chat); Exh. 9 (Stern Chats).

61. Similarly, there is no written statement from Mr. Stern that the gloves were fit for a particular purpose.  Ibid.

62. Rock Fintek assumed that all of the gloves delivered to Ascension were equally defective, regardless of the supplier  or the contract in which it occurred.  Frisch Exh. 2 at 253:1-17.

63. Yet, the reality of the situation is that JNS sold goods in several distinct orders (and not pursuant to any master agreement) beginning in February 2021 and ending in May 2021. Frisch Exh. 6 (Ms. Li Chat); JSF Exh. J; JSF Exh. K; Frisch Exh. 9 (Stern Chat).

64. No complaints were received by Rock Fintek from Ascension until July 2021.  Frisch Exh. 9(Stern Chat).

65. Thomas Kato noted in multiple communications with Ascension that they had been satisfied with the gloves until approximately July 2021.  JSF Exh. P-Q.

66. the issues with the gloves only arose when Ascension made a concerted effort to use up gloves it was paying to store as the PPE market returned to pre-pandemic conditions. Frisch Exh. 15.

67. It appears that after the gloves were largely maintained as an emergency stockpile, Ascension decided to perform a "burn down" in June 2021, to reduce its stockpile from a six month supply to a three month supply.  Ibid.

68. It was at this time that complaints about quality began to appear, with anecdotal reports coming into Ascension's purchasing department.  Frisch Exh. 16.

69. Rock Fintek only conducted testing on 14 glove samples from the entire universe of gloves, Frisch Exh. 13.

70. Rock fintek's statistical expert declared that they must test at least 1160 gloves to reach any statistically meaningful conclusions.  Frisch Exh. 14.

71. Rock Fintek never issued a formal notice of rejection or revocation of acceptance of the goods.  Frisch Exh. 9 at P.30.

72. Rock Fintek had opportunities to inspect goods at the warehouses where JNS was holding the goods, and in fact did so at least on some occasions (JSF at ¶31; Frisch Exh 2 at 271:5-14).

73. It had the opportunity to inspect once its trucking company took possession of the goods, and that it had the opportunity to ask its buyer to timely inspect the goods once they reached the Medline warehouses.  Frisch Exh. 4  at Part I, 42:4-43:18; Part II 62:18-63:16 (Alex King Deposition).

Dated: Hackensack, New Jersey
          February 16, 2024

**THE LAW OFFICE OF AVRAM E. FRISCH LLC**
*Attorneys Third-Party Defendants JNS Capital Holdings LLC, and Joel Stern*

By: _____

Avram E. Frisch, Esq.
1 University Plaza, Suite 119
Hackensack, NJ 07601
201-289-5352
frischa@avifrischlaw.com

10