Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KITCHEN WINNERS NY INC.,        )
        Plaintiff,              )
        vs.                     ) Case No.:
                                ) 1:22-cv-05276-PAE
ROCK FINTEK LLC,                )
        Defendant.              )
_____ )
                                )
ROCK FINTEK LLC,                )
        Counterclaimant and     )
        Third-Party Plaintiff   )
        vs.                     )
                                )
KITCHEN WINNERS NY INC.,        )
        Counterdefendant.       )
                                )
and                             )
                                )
ADORAMA INC., HERSHEY           )
WEINER, JOSEPH MENDLOWITZ,      )
JNS CAPITAL HOLDINGS LLC        )
and JOEL STERN,                 )
        Third-Party Defendants. )
_____ )


REMOTE DEPOSITION OF THOMAS KATO
As (30(b)(6) Representative of Rock Fintek LLC
Tuesday, October 3, 2023


STENOGRAPHICALLY REPORTED BY:
RHONDA HALL-BREUWET, RDR, CRR, CSR, CCR, LCR, FPR
JOB NO. 1812

---

Page 2

1
2
3
4                   October 3, 2023
5                   10:13 a.m. Eastern
6
7
8           Deposition of THOMAS KATO, as
9    (30(b)(6) Representative of Rock Fintek LLC,
10   held remotely before Rhonda Hall-Breuwet,
11   Registered Diplomate Reporter, Certified
12   Realtime Reporter, Certified Shorthand
13   Reporter (CA and TX), Licensed Court Reporter
14   (TN), Certified Court Reporter (GA, LA, NJ,
15   NM, NV, and WA), Florida Professional
16   Reporter, and Notary Public of the State of
17   Florida.
18
19
20
21
22
23
24
25

---

Page 3

1    A P P E A R A N C E S:
2    ATTORNEYS FOR KITCHEN WINNERS NY, ADORAMA,
3    INC., AND JOSEPH MENDLOWITZ:
4           LIPSIUS-BENHAIM LAW, LLP
5           80-02 Kew Gardens Road
6           Suite 1030
7           Kew Gardens, New York 11415
8           (212) 981-8449
9           BY:  ALEXANDER JARED SPERBER, ESQUIRE
10          EMAIL:  asperber@lipsiuslaw.com
11
12   ATTORNEYS FOR ROCK FINTEK LLC:
13          POLLACK SOLOMON DUFFY LLP
14          43 West 43rd Street
15          Suite 174
16          New York, New York  10036
17          (617) 960-3118
18          BY:  PHILLIP RAKHUNOV, ESQUIRE
19               LAUREN A. RIDDLE, ESQUIRE
20          EMAIL:  prakhunov@psdfirm.com
21               lriddle@psdfirm.com
22
23
24
25   (Continued)

---

Page 4

1    ATTORNEYS FOR JNS CAPITAL HOLDINGS LLC AND
2    JOEL STERN:
3           AVRAM E. FRISCH LLC
4           1372 Milford Terrace
5           Teaneck, New Jersey 07666
6           (201) 289-5352
7           BY:  AVRAM ELIEZER FRISCH, ESQUIRE
8           EMAIL:  frischa@avifrischlaw.com
9
10   ALSO PRESENT:
11          HERSHEY WEINER
12          BRAD GILLING
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

I N D E X

|  |  | PAGE |
|---|---|---|
| Examination By Mr. Frisch |  | 9 |
| Examination By Mr. Sperber |  | 173 |
| Examination By Mr. Frisch |  | 336 |
| Examination By Mr. Sperber |  | 359 |
| Examination By Mr. Rakhunov |  | 366 |
| Certificate of Oath |  | 368 |
| Certificate of Stenographer |  | 369 |
| Errata Sheet |  | 370 |

Page 7

E X H I B I T S

| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| JNS M | Photograph IMG_0578 | 345 |
| JNS N | Photograph IMG_8201 | 347 |
| JNS O | Email from Leah Lax to 9070854@gmail.com | 349 |
| JNS P | Email Chain, Bates-stamped RF_003483 - 3486 | 352 |
| JNS Q | Photograph IMG_8428 | 338 |
| KWA-Kato 1 | Purchase Order dated 8/13/20, Bates-stamped RF_001166 - 1167 | 178 |
| KWA-Kato 2 | Purchase Order dated 8/13/20, Bates-stamped RF_001171 - 1177 | 182 |
| KWA-Kato 3 | Purchase Order dated 12/7/20, Bates-stamped RF_001284 - 1285 | 183 |
| KWA-Kato 4 | Email Chain, Bates-stamped RF_000443 - 446 | 225 |
| KWA-Kato 5 | Sales and Purchase Agreement | 227 |
| KWA-Kato 6 | Rock Fintek LLC's Amended Initial Disclosures | 243 |
| KWA-Kato 7 | Rock Fintek Invoice 283299000000870083 | 247 |
| KWA-Kato 8 | Letter of Intent, Bates-stamped RF_000962 - 963 | 264 |

Page 6

E X H I B I T S

| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| JNS A | Letter from Winthrop B. Reed, III, to Tommy Kato d/b/a Rock Fintek, dated 3/16/22, Bates-stamped RF_001153 - 1154 | 21 |
| JNS B | Escrow Agreement, Bates-stamped RF_000660 - 667 | 47 |
| JNS C | Irrevocable Corporate Purchase Order from Rock Fintek to JNS Capital, dated 2/2/21 | 49 |
| JNS D | "NY Gloves" Chat, Started 3/26/21 | 106 |
| JNS E | First Amended Counterclaim and Third-Party Complaint | 110 |
| JNS F | Email from Thomas Kato to Dewayne Rader, dated 9/10/21, Bates-stamped RF_001034 - 1035 | 116 |
| JNS G | Email Chain, Bates-stamped RF_001345 - 1347 | 121 |
| JNS H | Email Chain, Bates-stamped RF_001042 - 1044 | 133 |
| JNS I | Chat Started 8/9/21 | 169 |
| JNS J | Photograph IMG_8429 | 339 |
| JNS K | Photograph IMG_8369 | 341 |
| JNS L | Photograph IMG_8348 | 343 |

Page 8

E X H I B I T S

| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| KWA-Kato 9 | Chart Created by Alexander Sperber | 279 |
| KWA-Kato 10 | Chat started 3/4/21 | 334 |

Page 9

1           CERTIFIED STENOGRAPHER:  Raise your
2    right hand, please.
3           Mr. Kato, can you raise your right
4    hand.
5           Do you solemnly swear the testimony
6    you are about to give will be the truth,
7    the whole truth, and nothing but the truth?
8           THE WITNESS: Yes, I do.
9               THOMAS KATO,
10   as 30(b)(6) representative of Rock Fintek LLC,
11   acknowledged having been duly sworn to tell the
12   truth and testified upon his oath as follows:
13              EXAMINATION
14   BY MR. FRISCH:
15       Q.   Good morning, Mr. Kato.  My name is
16   Avram Frisch.  I am the attorney for
17   third-party defendants Joel Stern and
18   JNS Holdings.  We're here to talk about your
19   case with them.
20          You are testifying here today on
21   behalf of Rock Fintek LLC; correct?
22       A.   Yes, I am.
23       Q.   Okay.  I believe Mr. Sperber will
24   have questions for you when I am done, on
25   behalf of his clients.

Page 10

1           Can you state your name and address
2    for the record, please.
3        A.   Thomas Kato.
4           MR. RAKHUNOV:  Before you answer --
5    he can give his business address rather
6    than his home address; correct?
7           MR. FRISCH:  I'm fine with that.
8           MR. RAKHUNOV:  Okay.
9           THE WITNESS:  Thomas Kato, 1680
10   Michigan Avenue, Suite 800, Miami Beach,
11   Florida 33139.
12          (Stenographer requests
13   clarification.)
14          (Comments off the record.)
15   BY MR. FRISCH:
16       Q.   All right.  Have you ever testified
17   at a deposition before?
18       A.   Yes, I have.
19       Q.   What was the circumstances of that
20   deposition, or those depositions?
21       A.   Other lawsuits.
22       Q.   In regard to Rock Fintek?
23       A.   Yes.
24       Q.   What were the -- what were the
25   circumstances of the cases that you testified

Page 11

1    in?
2        A.   Circumstances?  One of them, I was
3    suing the broker for a noncompete agreement.
4        Q.   And the others?
5        A.   Not recently, no.  And nothing
6    related to Rock Fintek.
7        Q.   Okay.  We'll go over the procedure
8    for the deposition, even though you probably
9    are aware.
10          I'm going to be asking you
11   questions.  You're answering them under oath,
12   as you know.  If you don't understand any of
13   the questions, please let me know, and I will
14   repeat or rephrase the question, however, to
15   help you.  If you don't ask me to clarify, I'll
16   assume you understood it.
17          Is that clear to you?
18       A.   Understood.
19       Q.   And obviously if you don't hear me,
20   just ask me to speak up.
21          Also, please speak all your answers
22   aloud so the stenographer can take it down.
23   Don't say uh-huh or huh-uh or shake your head.
24   You know, say yes or no if it's a yes-or-no
25   question.

Page 12

1           And also obviously, as she already
2    noted, try to speak as loud as you can because
3    it is a little quiet.
4           You are -- this is a
5    videoconference, but it's the same as if you
6    were testifying in court or in person, and you
7    are under oath.
8        A.   (Indiscernible.)
9        Q.   Sorry?
10       A.   Try to put this on.
11       Q.   Are you able to hear me now?  I
12   don't think your AirPods are working.
13          MR. RAKHUNOV:  Thomas, you might
14   need to -- can you hear me?
15          MR. FRISCH:  I don't think he can
16   hear us.
17          MR. RAKHUNOV:  He might need to do
18   what I did with the options, the sound
19   options.
20          MR. FRISCH:  We can't hear you.
21          CERTIFIED STENOGRAPHER:  Do we want
22   to go off the record?
23          MR. FRISCH:  Yeah, let's go off.
24          MR. RAKHUNOV:  Let's go off the
25   record, and let's get him --

Page 13

1      MR. FRISCH:  Yeah.
2      (Break taken from 10:18 a.m. to
3  10:21 a.m.)
4  BY MR. FRISCH:
5      Q.   As I think I was saying, please
6  speak up your answers so the court reporter can
7  hear you, and be aware that you're under oath;
8  and even though you're in a videoconference,
9  it's the same as testifying in court.
10      Is there anyone in the room with you
11  right now?
12      A.   No.
13      Q.   Nobody's allowed -- you're not
14  allowed to communicate with anybody in regard
15  to answering the questions.  No texting.  Even
16  your counsel is not allowed to (indiscernible)
17  questions.
18      A.   Understood.
19      (Stenographer requests
20  clarification.)
21      (Comments off the record.)
22  BY MR. FRISCH:
23      Q.   Nobody can assist you in answering
24  the questions.  You have to answer them
25  yourselves.

Page 14

1      If you need a break, just ask.  As
2  long as there's no pending question, we're
3  happy to take a break for whatever you need.
4  Just answer whatever question is pending.
5      Other than with your attorney, have
6  you discussed your testimony today with any
7  individual?
8      A.   I had a discussion with my COO and
9  my attorney yesterday.
10      Q.   Okay.  Was the discussion with your
11  COO with your attorney present --
12      A.   Yes.
13      Q.   -- or was that --
14      A.   Yes.
15      Q.   Did you review any documents for
16  today?
17      A.   Yes, we did.
18      Q.   What documents did you review?
19      A.   The complaint, some bank statements,
20  some purchase orders.
21      Q.   Right.  And all those have been
22  given to us by your attorney?
23      A.   He could answer that.  I'm not sure.
24      Q.   Okay.  Are you currently taking any
25  medications or on other substances that would

Page 15

1  affect your ability to testify truthfully
2  today?
3      A.   No.
4      Q.   All right.  Let's just go through
5  your background.
6      What's your highest level of
7  education?
8      A.   Highest level, I did an executive
9  MBA at Harvard Business School.
10      Q.   Okay.  When did you graduate from
11  there?
12      A.   2011 or '12.
13      Q.   Where did you go to college?
14      A.   I went to San Diego State for a
15  little bit, but I didn't ever complete it.
16      Q.   Where did you graduate from high
17  school?
18      A.   Saint Mary's Orchard Lake.
19      Q.   Where is that?
20      A.   West Bloomfield, Michigan.
21      Q.   Is that how you know Mr. Gilling?
22      A.   Yeah.  We're -- we've known each
23  other from Michigan for decades.
24      Q.   Okay.  Since 2011, when you
25  graduated from the Harvard Business School

Page 16

1  program, what is your employment history?
2      A.   My employment history?  I'm
3  self-employed.
4      Q.   And what businesses have you been
5  in?
6      A.   Merchant Hub, my payment processing
7  company; Rock Fintek; and a holding company
8  that just varied with different sort of
9  reconciling accounts.
10      Q.   Okay.  What's the name of the
11  holding company?
12      A.   MHub Holdings and MHub Miami LLC.
13      Q.   And did you begin these activities
14  prior to your attendance at Harvard Business
15  School?
16      A.   Yes, some of them.
17      Q.   When did you form Rock Fintek LLC?
18      A.   I believe it was in 2018.
19      Q.   And at that time what was the
20  purpose of that entity?
21      A.   To buy and sell goods from China to
22  the US.
23      Q.   Was it specifically personal
24  protective equipment or anything?
25      A.   No.  No.  Anything.

Page 17

1    Q.   What state did you form it in?
2    A.   Delaware.
3    Q.   Who are the members of Rock Fintek
4  LLC?
5    A.   Only me.
6    Q.   Has that always been the case?
7    A.   Yes.
8    Q.   Is Rock Fintek LLC authorized to do
9  business in the state of New York?
10   A.   I believe so.
11   Q.   Do you know when it became so
12 authorized?
13   A.   No, I don't.
14   Q.   Is the entity currently in good
15 standing in the state of Delaware?
16   A.   I believe it is.
17   Q.   Do you know what business you
18 conduct in New York state?
19   A.   I was selling PPE to the City of
20 New York and buying from Adorama.
21        (Stenographer requests
22 clarification.)
23 BY MR. FRISCH:
24   Q.   All right.  Did you also pick up and
25 deliver goods in New York?

Page 18

1        MR. RAKHUNOV:  Objection.
2        THE WITNESS:  I believe we did.
3        (Stenographer requests
4  clarification.)
5        THE WITNESS:  I believe we did.  I'm
6  not positive.  I would have to ask my COO,
7  but I believe we did in New York.
8  BY MR. FRISCH:
9    Q.   Did you have sales -- did you have
10 sales representatives working in New York?
11   A.   No.
12        MR. RAKHUNOV:  Objection.
13        (Stenographer requests
14 clarification.)
15        (Comments off the record.)
16 BY MR. FRISCH:
17   Q.   What about Alex King and the Dimerco
18 company?  Were they based in New York?
19        MR. RAKHUNOV:  Objection.
20        THE WITNESS:  I'm not sure where
21 they're based.
22 BY MR. FRISCH:
23   Q.   Do you know where they -- where Alex
24 King works out of?
25   A.   I'm not sure.

Page 19

1    Q.   Okay.
2        MR. RAKHUNOV:  I just want to make
3  sure.  Rhonda, you did hear my objection --
4  right? -- to the question of where is
5  Dimerco based out of?
6        CERTIFIED STENOGRAPHER:  Yes, I did
7  hear that one.
8        MR. RAKHUNOV:  Okay.  Good.  I
9  wanted to make sure.
10 BY MR. FRISCH:
11   Q.   When did you first begin being
12 engaged in the sale of personal protective
13 equipment?  Or as I will -- I will abbreviate
14 it PPE going forward, if that's okay with you.
15   A.   Yes, it is.  2020.
16   Q.   During COVID -- at the beginning of
17 COVID or before COVID?
18   A.   At the beginning of COVID.
19   Q.   Okay.  Did you use any other
20 entities in that business?
21   A.   I don't think I did, no.
22   Q.   Okay.  Is there a Rock Fintek LLC
23 currently existing in the state of -- that was
24 formed in the state of Florida?
25   A.   Yes, there is.

Page 20

1    Q.   What is -- what was the purpose of
2  that LLC?
3    A.   When we opened up the bank account,
4  the bank said they needed a Florida entity.
5  Instead of registering it with Sunbiz.org or
6  something, my office just went ahead and formed
7  a new entity.
8    Q.   Okay.  And which is the entity
9  currently operating?  Is it the Delaware or the
10 Florida?
11   A.   It was always the Delaware.
12   Q.   Okay.  So the entity that conducted
13 business with JNS was the Delaware entity?
14   A.   Was the what?
15   Q.   The Delaware entity?
16   A.   Yes, it was.
17   Q.   And the one that did business with
18 Kitchen Winners and Adorama was the Delaware
19 entity?
20   A.   Yes.
21   Q.   And the business that -- the
22 business that was done with Ascension was done
23 through the Delaware entity?
24   A.   Correct.
25   Q.   We are going to go to our first

Page 21

1  exhibit. I'm just trying to figure out which
2  one it was. Oh, there it is. Okay.
3       Can you see the exhibit I just
4  shared?
5    A.  It's very small.
6    Q.  Okay. I think you can control
7  the -- I think you can zoom in on the --
8  there's a zoom-in button. I'm going to stamp
9  this as -- I'm going to define it as JNS
10  Exhibit A. We'll make ours red. Hold on. I
11  didn't do it right. So let me do that again.
12  JNS Exhibit A.
13       (Exhibit Number JNS A, Letter from
14       Winthrop B. Reed, III, to Tommy Kato d/b/a
15       Rock Fintek, dated 3/16/22, Bates-stamped
16       RF_001153 - 1154, was marked for
17       identification.)
18  BY MR. FRISCH:
19    Q.  Okay. Can you see it now?
20    A.  Yeah. I'm trying to zoom it in.
21    Q.  Okay. I'm going to direct you to
22  the Footnote 1.
23    A.  Hold on. I'm trying to --
24    Q.  At the bottom of the first page. So
25  when you have a chance -- you should be able to

Page 22

1  scroll independently.
2    A.  So at the very bottom you're telling
3  me to look?
4    Q.  Yes, where it says, "It is our
5  understanding."
6    A.  Okay. "It is our understanding."
7    Q.  Yeah. Can you -- you can read that
8  to yourself, and then I'll ask my question on
9  it.
10    A.  (Reviewing document.)
11       Okay.
12    Q.  Why did Ascension believe they were
13  doing business with the Miami LLC that was
14  formed in May 2021?
15       MR. RAKHUNOV: Objection.
16       THE WITNESS: I don't believe they
17  did.
18  BY MR. FRISCH:
19    Q.  So do you -- why did they believe
20  that Rock Fintek LLC was only formed on
21  May 1st, 2021?
22       MR. RAKHUNOV: Objection.
23       THE WITNESS: I don't know why
24  they -- you think they might think that or
25  if they think that.

Page 23

1  BY MR. FRISCH:
2    Q.  Okay. Do you know of any reason --
3  anything you may have communicated to them in
4  regard to the name or formation of the LLC that
5  would have led them to that understanding?
6    A.  Absolutely not.
7       MR. RAKHUNOV: Objection.
8  BY MR. FRISCH:
9    Q.  And as far as you're concerned, it
10  was the Delaware LLC that was doing business
11  with Ascension all along?
12    A.  Correct.
13    Q.  And that LLC had been formed prior
14  to May 1st, 2021?
15    A.  Correct.
16    Q.  Okay.
17       MR. RAKHUNOV: Sorry, Avi. Before
18  you go next, as a matter of -- is it
19  possible to pop out the exhibit into a
20  separate browser? Is that functionality
21  available?
22       MR. FRISCH: I don't know.
23       MR. RAKHUNOV: Okay. Well, we can
24  -- maybe we'll ask during a break.
25       MR. FRISCH: I know there is

Page 24

1  somebody -- you know, I know you can -- you
2  can ask somebody. So I don't know if it --
3  if you make your screen bigger -- I think
4  you can make the panel bigger or something.
5  I don't know.
6       MR. RAKHUNOV: You can make the
7  witness face pop out but not the --
8       MR. FRISCH: Okay. I don't know.
9  There is a download button, but it doesn't
10  seem to be enabled. I'm trying to figure
11  it out. I don't know.
12       Like I said, this is my first time
13  using this. I just -- you know, anyway,
14  we're done with it for the moment. So we
15  can --
16       MR. RAKHUNOV: We're fine.
17  BY MR. FRISCH:
18    Q.  Okay. Prior to getting into the PPE
19  business, what -- did you have any experience
20  selling PPE?
21    A.  No.
22    Q.  So what made you get into -- into
23  selling PPE?
24    A.  I started selling products for --
25  other products, and then when COVID hit, the

Page 25

1  demand for those products weren't working.  And
2  I had relationships -- strong relationships in
3  China that I could buy products from; so I
4  wanted to see if anybody needed those products.
5       Q.   So did you -- how did you -- how did
6  you get -- strike that.
7            You say you had relationships for
8  products.  Were those PPE products you had
9  relationships for at the beginning of COVID?
10      A.   A lot of the warehouses that were
11 selling other products started manufacturing
12 masks and other products.
13      Q.   And you -- you had direct sources of
14 supply from China on those items?
15      A.   Yes.
16      Q.   Did you ever have a direct source of
17 supply for nitrile gloves?
18      A.   I don't know what "direct" means.  I
19 mean --
20      Q.   Direct from the manufacturer.
21      A.   I never bought anything directly
22 from any manufacturers.  It was always
23 intermediaries involved.
24      Q.   How about directly from China?
25           (Stenographer requests

Page 26

1  clarification.)
2            THE WITNESS:  You don't -- I never
3       spoke with the manufacturer when I was
4       buying a product from them.
5  BY MR. FRISCH:
6       Q.   What about directly from a warehouse
7  in China?  Did you have any source of nitrile
8  gloves?
9            MR. RAKHUNOV:  Object.
10           THE WITNESS:  I don't believe so.
11 BY MR. FRISCH:
12      Q.   How did you get introduced to
13 Ascension?
14      A.   I got introduced from an
15 acquaintance in St. Louis who I believe did
16 real estate for them, the group did.  I'm not
17 sure of the person's name.
18           They asked me, "Do you have any
19 connections with any type of this product in
20 China?"
21           I said I can ask people I was buying
22 other products from if they have it.  I asked.
23 They did, and then they -- that was it.
24      Q.   And why did they think you would
25 have connections to this type of material in

Page 27

1  China?
2       A.   Well, they knew I was selling other
3  products from China.
4       Q.   Got it.
5            Was Ascension your first PPE
6  customer, or were there others products before
7  Ascension?
8       A.   Ascension, I believe, was the first.
9       Q.   What other companies did you have --
10 what other customers did you have for PPE
11 products?
12      A.   City of New York, Prisma Health,
13 Delta Airlines, sheriff's department.  I think
14 Bell Tire.  Next level was a couple dental
15 distributors.
16      Q.   Did any of those customers buy
17 nitrile gloves from you?
18      A.   I don't believe so.
19      Q.   Are any of those currently your
20 customer, any of those entities?
21      A.   No.
22      Q.   Why not?
23      A.   Because I was too busy trying to
24 salvage or clean up the mess with Ascension.
25      Q.   All right.  When you say "the mess

Page 28

1  with Ascension," what are you referring to?
2       A.   I am referring to the fake gloves
3  that I sold them.
4       Q.   So you went out of business because
5  you had a problem with Ascension?  Is that your
6  testimony?
7            MR. RAKHUNOV:  Objection.
8            THE WITNESS:  We went out of
9       business -- I think it's a -- multiple
10      reasons, but all to do with the gloves we
11      purchased from Adorama.
12 BY MR. FRISCH:
13      Q.   Can you explain that in detail, all
14 the reasons.
15      A.   All the reasons.  I -- I bought
16 products which I believed were real, sold them
17 to a company who I sold other product to and
18 believed I was selling real products, and then
19 they said they were fake products, and that was
20 it.
21           So I'm trying to mitigate damages
22 and not -- don't have the funds nor the other
23 clients to sell products to.
24      Q.   When did those other clients stop
25 buying product from you?

Page 29

1     A.   Stopped soliciting other customers
2  around the time of the summer, when all those
3  problems happened with Ascension.
4     Q.   So around July 2021?  Is that your
5  testimony?
6     A.   I would say July or August, yes.
7     Q.   And you stopped soliciting customers
8  because?
9     A.   I was trying to do damage control
10 with Ascension.
11    Q.   Was Ascension's contract with you
12 substantially larger than all the other ones?
13    A.   Yes, I'd say it was.
14    Q.   Did the end of COVID have any impact
15 on your business?
16    A.   The end of COVID would have made the
17 business even stronger.
18    Q.   How so?
19    A.   We were making our own test kits to
20 sell to Ascension and to other hospital
21 systems.  And without anything from Ascension,
22 then dealing with the fraud, we had to stop
23 everything.
24    Q.   Can you explain what test kits
25 you're referring to?

Page 30

1     A.   Test kits to see if you have COVID,
2  the ones you buy in the pharmacy.
3     Q.   And you were manufacturing those?
4     A.   I was going to manufacture them as a
5  partner with a manufacturer in China.
6     Q.   And were those approved by the FDA?
7     A.   We hired FDA attorneys who were
8  speaking to the FDA to get them approved.
9     Q.   And why didn't you continue with
10 that business?
11    A.   Because I had to deal with the fraud
12 with Adorama.  So I didn't have time or the
13 resources to do it.
14    Q.   And so you -- you're saying that you
15 no longer had time because of what happened
16 with the gloves at issue in this case?  You no
17 longer had time to --
18    A.   I'm saying I gave all my time to try
19 to resolve or mitigate the problem for
20 Ascension Health.
21    Q.   Did Rock Fintek ever return to its
22 other pre-COVID businesses?
23    A.   Rock Fintek went out of business
24 after this.  It didn't have the opportunity.
25    Q.   And how do you make a living today,

Page 31

1  sir?
2     A.   My payment processing company called
3  Merchant Hub.  It's been around for 15 years.
4     Q.   Is there a reason why Ascension
5  referred to you on many of their correspondence
6  as MHub?
7         MR. RAKHUNOV:  Objection.
8         THE WITNESS:  I have an email
9     address that says MHub on it.  So sometimes
10    they say MHub.  Sometimes I responded with
11    a Rock Fintek email.  But --
12 BY MR. FRISCH:
13    Q.   Okay.  But did they know you as MHub
14 when they started dealing with you?
15    A.   They knew I had two companies, and
16 MHub was not the company that was working with
17 them.  So they said MHub a couple times, and I
18 said, "It's Rock Fintek."
19    Q.   Okay.  When did you first purchase
20 gloves from JNS?
21    A.   I'm not exactly sure of the date,
22 but it was, I believe, December of 2020 or
23 January of 2021.
24    Q.   Okay.  And how were you introduced
25 to JNS?

Page 32

1     A.   I believe it was a broker.
2     Q.   Do you recall the name of the
3  broker?
4     A.   I'm not positive, but it might be
5  Ms. Lee.
6     Q.   And Ms. Lee was working for you?
7     A.   No.  She was a broker.  She was an
8  outside party that -- I'm not sure exactly how
9  we came to meet her.  I'd have to ask Bradley
10 Gilling.
11    Q.   And --
12    A.   But she just got compensated for --
13 as a broker for whatever sales she did.
14    Q.   Did she find you any other deals
15 over the course of time?
16    A.   I don't think we did any other
17 business since then.
18    Q.   Okay.  Is there a reason for that?
19    A.   Again, because of -- stopped doing
20 business with everything else, just trying to
21 deal with Ascension.
22    Q.   Do you know how Ms. Lee knew JNS?
23    A.   No.
24    Q.   Do you know if you purchased MedCare
25 gloves from any other vendor?

Page 33

1    A.   I believe it was JNS and
2  Kitchen Winners and Adorama, which I think are
3  the same.  I don't believe we got any from
4  anybody else.  I would have to ask Bradley
5  Gilling, again.
6       Q.   Now, so you know -- you got gloves
7  from JNS and you got gloves from
8  Adorama/Kitchen Winners, as you described them.
9       How did you keep track of which
10 gloves were from whom?
11      A.   Actually, I also bought gloves from
12 Joel Stern directly himself.  Sometimes he used
13 his business; sometimes he used his personal
14 name to sell me gloves.
15      Q.   When did he sell you gloves
16 personally?
17      A.   I'm not sure.  Somewhere in the same
18 time, within that time frame, I bought products
19 from him.
20      Q.   Do you know of any purchase orders
21 or other documents that show you purchasing
22 directly from Mr. Stern?
23      A.   My lawyer might have some documents.
24      Q.   Can you tell me where I'd find
25 those?

Page 34

1      A.   You could ask him.
2      Q.   I'm asking you.
3      A.   I don't know where he would have
4  them.
5      Q.   Do you know what the document --
6  what document -- what the document said?
7      A.   I know some of the documents might
8  be from Medline that came from Joel Stern.
9  This other guy, David Horowitz or something, it
10 had his name on there with some deliveries.
11 And bank accounts, I would have to ask Brad
12 Gilling on that maybe.
13      Q.   Okay.  Well, I mean, I would -- I
14 don't think I've seen any such documents.
15 So --
16      A.   Okay.
17      Q.   -- I'm going to ask them to be
18 produced.
19      A.   Okay.
20      Q.   I'm going to take a note.
21      Do you know if there was any
22 purchase orders directed to Mr. Stern
23 personally?
24      A.   Possibly, but not off the top of my
25 head.  I would have to ask Brad.

Page 35

1      Q.   Do you know if Mr. Stern --
2      (Simultaneous speaking.)
3  BY MR. FRISCH:
4      Q.   I'm sorry?  You can finish.
5      A.   What was that?
6      Q.   I think you -- I talked over you by
7  accident.  So you can just repeat what you
8  said.
9      MR. RAKHUNOV:  It sounded like
10 feedback.
11      THE WITNESS:  I said I could ask
12 Brad Gilling.  I'm not positive who
13 was COO.
14 BY MR. FRISCH:
15      Q.   Do you know if Mr. Stern personally
16 issued any invoices to you or if JNS issued the
17 invoices?
18      MR. RAKHUNOV:  Objection.
19      THE WITNESS:  He may have.  I'm not
20 positive.  I would have to ask.
21 BY MR. FRISCH:
22      Q.   All right.  Well, I'll call for
23 production of any such invoices, because I
24 don't -- do not have them.
25      Okay.  And your testimony is that

Page 36

1  you didn't purchase any MedCare gloves from any
2  other vendors; is that correct?
3      A.   Right.  That's correct.
4      Q.   Did you purchase any other gloves
5  from any other vendors?
6      A.   Yes.
7      Q.   What gloves were those?
8      A.   We purchased Ingco gloves, and I
9  believe we purchased -- I'm not sure what the
10 other brands were called.  Maybe Safeko.  I
11 have to check.  I would have to ask Bradley
12 Gilling.
13      Q.   So when you entered into the
14 contract with Ascension to provide them gloves,
15 did you have gloves sourced to fulfill that
16 contract?
17      A.   Did we have gloves sourced?  I told
18 them we would procure the gloves for them.
19      Q.   But at the time that you entered
20 into the contract, you did not have any gloves?
21      A.   No.  Only dialogue.
22      Q.   And your contract with Ascension
23 called for providing how many gloves?
24      A.   Two -- 150 to 200 million.
25      Q.   And the gloves you purchased from

Page 37

1  JNS or that you allege you purchased from
2  Mr. Stern, were those used to satisfy that
3  contract in part?
4      A.   Yes, in part.
5      Q.   And were those gloves, in fact,
6  delivered to Ascension?
7      A.   They were delivered to Medline.
8      Q.   Who was -- who was processing them
9  and storing them on behalf of Ascension?
10     A.   Correct.
11     Q.   When you got the gloves from the
12  different vendors in this case, did you track
13  which gloves came from which entity?
14         MR. RAKHUNOV:  Objection.
15         THE WITNESS:  Medline kept a record
16     of who delivered what.  And when we paid
17     somebody, we had the payment of the
18     shipment and then the truck arriving within
19     days of that payment.
20  BY MR. FRISCH:
21     Q.   So do you -- could -- could you tell
22  me which glove and which warehouse was
23  delivered by JNS, for example?
24     A.   Yes.  If you get that report from
25  Medline, you can have it very accurately.

Page 38

1      Q.   So Medline is the one that would
2  have that information?
3      A.   Correct.
4      Q.   Do you know if Medline stored all of
5  the MedCare gloves together?
6      A.   No, they did not.
7      Q.   Did you ever inspect the gloves that
8  you received?
9          MR. RAKHUNOV:  Objection.
10         THE WITNESS:  I -- I did not inspect
11     them before I purchased them.
12  BY MR. FRISCH:
13     Q.   Did you inspect them after you
14  purchased them?
15     A.   I inspected them after I was
16  notified that there was a problem with them.
17     Q.   So when was that?
18     A.   I was notified in July that there
19  was a problem with them.
20     Q.   Did you ever request Alex King to
21  have them inspected?
22     A.   Tried to.  They said he's not
23  allowed to -- his drivers are not allowed to
24  inspect the gloves, open the gloves, touch the
25  gloves or any of the product.

Page 39

1      Q.   Did Medline do any inspections?
2          MR. RAKHUNOV:  Objection.
3          THE WITNESS:  I'm not sure what
4     Medline did or didn't do.
5  BY MR. FRISCH:
6      Q.   Do you know if Ascension did any
7  inspections?
8          MR. RAKHUNOV:  Objection.
9          THE WITNESS:  Ascension did, to
10     my -- I believe they did, from what I
11     recall.
12  BY MR. FRISCH:
13     Q.   Did anybody open the boxes when they
14  arrived to ensure that the contents of the
15  boxes were what was being claimed?
16     A.   I wouldn't know that.  I wasn't
17  allowed to be there.  I wasn't allowed to look
18  at them.  My drivers were not allowed to look
19  at them either.
20     Q.   All right.  You didn't have any
21  drivers.  The drivers were employed by Dimerco;
22  correct?
23         MR. RAKHUNOV:  Objection.
24         THE WITNESS:  Yeah.  The drivers
25     were -- I don't know who they were employed

Page 40

1  by, but yes.
2  BY MR. FRISCH:
3      Q.   Dimerco arranged the drivers?
4      A.   Dimerco and -- yeah.
5      Q.   So you got hundreds of -- you know,
6  millions of gloves; right?  Nobody ever opened
7  a single box until there were problems to
8  determine that the gloves that came in those
9  boxes were the gloves that you expected to
10  receive?
11         MR. RAKHUNOV:  Objection.
12         THE WITNESS:  I believe so.
13  BY MR. FRISCH:
14     Q.   Did Medline not have a team to make
15  sure the items being delivered were the correct
16  item?
17     A.   You'd have to ask Medline that.
18     Q.   Do you know if the boxes -- the
19  exterior boxes indicate the contents of what's
20  inside the boxes?
21     A.   I would expect that the exterior of
22  the box would describe what's inside the
23  package of any product.
24     Q.   Did anybody check those markings to
25  see if they matched up with what was expected?

Page 41

1      MR. RAKHUNOV:  Objection.
2      THE WITNESS:  I don't know what you
3   mean by "markings."
4   BY MR. FRISCH:
5      Q.   If the boxes were marked
6   "Examination Gloves," if the cartons that
7   kept -- my understanding is that these were
8   packed as follows.  Maybe I'm wrong.  Let's
9   step back.  Okay?
10      My understanding is you would get it
11   in pallets with cartons -- you know, brown
12   cartons that included the individual boxes of
13   100 gloves inside them; is that correct?
14      A.   That's the general idea of how many
15   were supposed to be in there, yes.
16      Q.   Okay.  Now, did anybody check those
17   cartons to see what was indicated on them when
18   you received them?
19      MR. RAKHUNOV:  Objection.
20      THE WITNESS:  I don't know what
21   Medline did when they received them.
22   BY MR. FRISCH:
23      Q.   Now, how many of the gloves were
24   marked as protection gloves?
25      MR. RAKHUNOV:  Objection.

Page 42

1      THE WITNESS:  I'm not sure of the
2   exact amount.  If I were to guess, I would
3   say half.
4   BY MR. FRISCH:
5      Q.   How do you know that?
6      A.   I went and visited warehouses with
7   Bradley Gilling, I think seven of them, and
8   from Medline walking us, showing us around,
9   about half of them were protection.
10      Q.   And how do you know that they were
11   protection?
12      A.   Has "protection" on the carton
13   outside or on the box itself.  The pallets
14   (indiscernible) --
15      (Stenographer requests
16   clarification.)
17      THE WITNESS:  The box itself, it
18   would say "Protection" or "Examination" or
19   some type of variation from examination so
20   you know there was a difference, or on the
21   carton itself.
22   BY MR. FRISCH:
23      Q.   And how many of those gloves that
24   said "Protection," according to you, came from
25   JNS or Mr. Stern?

Page 43

1      A.   My lawyer should have that exact
2   amount.  I looked at the documents, but I don't
3   have a photographic memory.
4      Q.   So as far as you know, it could have
5   been zero?
6      MR. RAKHUNOV:  Objection.
7      THE WITNESS:  No.  Medline had told
8   us it was close to half.  They had given us
9   some sort of a report.
10   BY MR. FRISCH:
11      Q.   Do you know if Medline opened every
12   single carton to do that report?
13      A.   I'm not sure what Medline did.
14      Q.   Were they paid to -- were they --
15   were they paid to do this work?
16      A.   I did not pay Medline to do this.
17      Q.   Do you know the names of the
18   employees at Medline who did the counting?
19      A.   No.
20      Q.   Do you know how long the count took?
21      A.   No.
22      Q.   Do you know if they took the pallets
23   down off the racks and actually -- and actually
24   opened the pallets and ensured --
25      A.   No.

Page 44

1      Q.   -- that their count was accurate?
2      A.   I don't know what Medline did.
3      Q.   Okay.  So you just know Medline told
4   you that it was close to 50 percent protection
5   gloves?
6      A.   Correct.
7      Q.   And that count was done at the
8   request of Ascension?
9      A.   I believe it was Ascension, and
10   maybe us too at the same time.
11      Q.   And were the other 50 percent of
12   gloves used by Ascension that were not
13   protection gloves?
14      A.   No, they were not.
15      Q.   Why not?
16      A.   Because none of the gloves had any
17   nitrile on them, or only small traces of
18   nitrile.  So they were not the specification of
19   glove that they asked for.
20      Q.   Meaning -- are you aware of whether
21   or not the gloves were sourced from MedCare?
22      MR. RAKHUNOV:  Objection.
23      THE WITNESS:  I believe they were
24   sourced from MedCare.  That's what I was
25   told.

Page 45

BY MR. FRISCH:

1  BY MR. FRISCH:
2     Q.   So you're not alleging that my
3  clients or the Adorama parties sourced fake
4  gloves that were not purchased from MedCare; is
5  that correct?
6     A.   I'm not understanding the question.
7     Q.   My question is, is your allegation
8  that the gloves were not really MedCare, or are
9  the gloves MedCare and that MedCare shipped
10 gloves that were not up to spec?
11        MR. RAKHUNOV:  Objection.
12        THE WITNESS:  I don't know what
13     MedCare sent to Adorama, Kitchen Winners,
14     JNS, and Joel Stern.  I know that they told
15     me that they were dealing directly with
16     MedCare.  And if it's true or not true and
17     where they got them from, I can't -- I'm
18     not sure about that.
19 BY MR. FRISCH:
20    Q.   But you have no reason to believe,
21 sitting here today, that they were not dealing
22 directly with MedCare?
23    A.   No, I do not.
24    Q.   Did you have conversations with
25 MedCare?

Page 46

1     A.   I had conversations with MedCare
2  after we had the problems with the gloves.
3     Q.   And when you had those conversations
4  with MedCare, what did they tell you?
5     A.   They said -- she had sent us testing
6  reports of everything that Adorama had bought
7  from them directly.  So it was JNS in lieu of
8  MedCare.  She said half of the products that
9  she sold to Adorama were protection gloves.
10    Q.   Do you know how many gloves she sold
11 to Adorama?
12    A.   No, I don't.
13    Q.   So you don't know how many gloves
14 would be half protection gloves, do you?
15    A.   I do not.
16    Q.   So there's no -- you have no basis
17 to conclude that Adorama did not have
18 sufficient examination gloves to fulfill your
19 contract with them; correct?
20        MR. RAKHUNOV:  Objection.
21        THE WITNESS:  I do not have exact
22     numbers of what Adorama purchased from
23     MedCare, but I'm sure we can request it.
24 BY MR. FRISCH:
25    Q.   From whom could you request it?

Page 47

1     A.   Could request it from Adorama's
2  attorney.  Could request it from Adorama.  That
3  should give you an exact count of what they
4  purchased.
5     Q.   When you entered into the purchase
6  arrangement with JNS, did you have an attorney?
7     A.   I don't believe we used an attorney
8  to get into an agreement with them.
9     Q.   Okay.
10    A.   I'm not positive, though; so I would
11 have to go back to Brad Gilling and ask.
12        (Exhibit Number JNS B, Escrow
13     Agreement, Bates-stamped RF_000660 - 667,
14     was marked for identification.)
15 BY MR. FRISCH:
16    Q.   Do you recall the agreement I've
17 called up and labeled as JNS Exhibit B?
18    A.   I can't really see it.  So you're
19 going to have to try to play with the zoom
20 here.
21    Q.   You can zoom in.
22    A.   Yeah, I'm trying.  150 -- okay.
23 Escrow agreement.
24        Okay.  What about this agreement you
25 were asking?

Page 48

1     Q.   Can you please scroll first to
2  page 7.
3     A.   7.  Okay.
4     Q.   Is that your signature over your
5  name?
6     A.   Yes.
7     Q.   So did you, in fact, sign this
8  agreement?
9     A.   Appears that I did.
10    Q.   Was Gunster Yoakley & Stewart
11 representing you in regard to this?
12        MR. RAKHUNOV:  Objection.
13        THE WITNESS:  Very possible.
14 BY MR. FRISCH:
15    Q.   Do you know if Gunster Yoakley &
16 Stewart ever executed this agreement?
17    A.   I'm not positive.
18    Q.   Did you ever fund the escrow account
19 contemplated under this agreement?
20    A.   What escrow account?  I'm not
21 positive on that.  I would have to ask Brad
22 Gilling.
23    Q.   So you don't recall, looking at this
24 agreement, whether or not this agreement was
25 ever acted upon?

Page 49

1    A.   I looked at a lot of agreements, and
2  I don't have a photographic memory from two
3  years ago of what I signed and didn't sign and
4  what I funded and didn't fund or deposit.
5       Q.   But you have no reason, sitting here
6  today, to think that you didn't sign this
7  agreement?
8       MR. RAKHUNOV:  Objection.
9       THE WITNESS:  I don't think so, but
10      I -- I would have to ask my lawyer to look.
11      If he has the document and I signed it,
12      then I signed it.
13 BY MR. FRISCH:
14      Q.   Do you recall if you issued purchase
15 orders to Mr. Stern or JNS at that time when
16 you entered into an agreement?
17      MR. RAKHUNOV:  Objection.
18      THE WITNESS:  I'd have to refer to
19      Brad Gilling.
20      MR. FRISCH:  Okay.  Does this -- I
21      am going to now label this as JNS
22      Exhibit C.
23      (Exhibit Number JNS C, Irrevocable
24      Corporate Purchase Order from Rock Fintek
25      to JNS Capital, dated 2/2/21, was marked

Page 50

1      for identification.)
2       THE WITNESS:  The signature didn't
3      look 100 percent like mine on that
4      document, also.
5  BY MR. FRISCH:
6       Q.   But do you recall this document?
7       A.   This document or the previous
8  document?  No.  This one, let me try to -- I've
9  got to zoom in on it.  Give me a moment.  Okay.
10      (Reviewing document.)
11      What about this document?
12      Q.   Do you recall signing this document?
13      A.   No, I do.
14      Q.   Is that your signature at the
15 bottom?
16      A.   Does not appear to be.
17      Q.   Is it possible that somebody else
18 who had authority signed your name on it?
19      A.   No.
20      Q.   Like Mr. Gilling?
21      A.   No.  He would have signed his own
22 name.
23      Q.   Do you recall issuing this type of
24 document, irrevocable corporate purchase order,
25 under the Rock Fintek letterhead?

Page 51

1    A.   No.
2       Q.   Do you recall issuing any document
3  to Mr. Stern or JNS ordering any product?
4       A.   All the documents that I got that I
5  had, I got them from Brad Gilling, sent them to
6  our attorney, and he should have copies of
7  them -- records of them and can send them to
8  you.
9       Q.   Okay.  So sitting here today, do you
10 believe this is not an accurate document, or
11 you think --
12      A.   It's not my signature.  That's for
13 sure.
14      Q.   Do you recall if there ever was a
15 document between you and JNS indicating the
16 quality of the gloves that you were purchasing?
17      A.   Phillip should have that if it
18 exists.  I don't -- again, I looked at a lot of
19 documents with Phillip yesterday.  I don't
20 recall all of them.
21      Q.   Okay.  Don't tell me what you
22 discussed with Phillip.
23      MR. RAKHUNOV:  Yeah, let's not go
24      there.
25      ///

Page 52

1  BY MR. FRISCH:
2       Q.   But do you recall any document
3  that -- with --
4       MR. FRISCH:  Can you guys give me 30
5      seconds?  Apparently my cleaning ladies are
6      here.
7       MR. RAKHUNOV:  You know, let's take
8      just a quick two-minute break.
9       MR. FRISCH:  Let's take a two-minute
10     break.
11      (Break taken from 11:03 a.m. to
12      11:09 a.m.)
13 BY MR. FRISCH:
14      Q.   How many agreements did you enter
15 into with Ascension?
16      A.   How many agreements did I enter into
17 with Ascension?  I had multiple agreements with
18 Ascension.  Well, with Resource Group.
19      Q.   And how many -- and what did those
20 agreements cover?
21      A.   Different products.  Nitrile gloves,
22 masks, gowns.
23      Q.   And how many of those -- how many
24 gloves -- when was the first time you entered
25 into a contract with Ascension for

Page 53

1  (indiscernible) --
2        CERTIFIED STENOGRAPHER:  I'm sorry?
3        MR. RAKHUNOV:  Yeah, we lost you,
4  Avi.
5        (Comments off the record.)
6  BY MR. FRISCH:
7     Q.   All right.  How many -- I'm sorry.
8  I lost my train of thought.
9        How many contracts for nitrile
10  gloves did you have with Ascension?
11    A.   How many contracts?
12    Q.   Uh-huh.
13    A.   I believe I had two.
14    Q.   When was the first one?
15    A.   Around September 2020 or 2021.
16    Q.   And what gloves did you supply for
17  that contract?
18    A.   I don't remember the exact brand.
19    Q.   Was it MedCare?
20    A.   No.
21    Q.   And then the contract that led to
22  the purchases at issue in this case, when was
23  that executed?
24    A.   I believe that was executed in
25  December, same year.

Page 54

1     Q.   And at that time were you planning
2  on supplying MedCare gloves, or was it any
3  nitrile examination gloves you could get your
4  hands on?
5     A.   No.  Nitrile gloves only.
6     Q.   But was it MedCare, or was it any
7  brand?
8     A.   It was any brand.
9     Q.   Is that when you entered into a
10  transaction with somebody in Thailand or
11  something where they stole your money and did
12  not provide gloves?
13    A.   That was one instance we tried to
14  procure some gloves, but we had also procured
15  other ones.
16    Q.   And you said it was January 2020
17  when you met -- when you were introduced to
18  JNS?
19    A.   I don't remember exactly when.  It
20  was toward the end of that year or the
21  beginning of 2020 -- 2021.
22    Q.   Did you request any financial
23  information from Mr. Stern or JNS when you
24  entered into the transaction with them?
25    A.   My lawyer, Scott Coffey, had started

Page 55

1  working on some stuff for us with them, but I
2  don't think if we ever used any of those
3  documents to fund an escrow or to do anything.
4        (Stenographer requests
5  clarification.)
6        THE WITNESS:  To fund an escrow or
7  use the documents that he had produced.  I
8  don't believe we ended up using any of
9  them.  We just ended up paying him
10  directly.
11  BY MR. FRISCH:
12    Q.   Did you get any financial statements
13  from him?
14    A.   I don't believe I did.
15    Q.   Did you ask for them?
16    A.   I believe I asked about his company
17  and the strength of it, and that was about it.
18    Q.   And what were you told?
19    A.   He was an accountant and he was
20  working with some real estate guys that are
21  colleagues of his and they were able to secure
22  the gloves.
23    Q.   And that was sufficient for you to
24  do business with him?
25    A.   Yeah.  Yes, it was at the time.

Page 56

1  Seemed like an honest man.
2     Q.   I agree.
3        How many gloves did you ultimately
4  purchase from JNS or Mr. Stern, as you allege?
5     A.   I don't remember exactly.  I'd have
6  to look at the document again.
7     Q.   Do you recall how much you paid him?
8     A.   I do not know off the top of my
9  mind.
10    Q.   Do you know offhand how many gloves
11  you purchased from Adorama or Kitchen Winners?
12    A.   I purchased over the 200 million
13  quantity I had a contract for.
14    Q.   How much did you pay JNS for the
15  gloves?
16    A.   I'd have to look at the contract,
17  and I can verify it.
18    Q.   And what price did you resell them
19  to Ascension at?
20    A.   I'd have to look at their contract
21  and then confirm it with you, what the exact
22  amount is.
23    Q.   Is it fair to say that you resold
24  them at a profit?
25    A.   I sold gloves at a loss in the

OCTOBER 03, 2023                                                  Pages 57..60

Page 57

1  beginning that I purchased from him and
2  Adorama.
3      Q.   You sold the gloves for less than
4  you purchased them at?
5      A.   Correct.
6      Q.   But that isn't because of JNS; is
7  that correct?
8      A.   Has nothing to do with JNS.  It's
9  just what I was willing to pay, and I was
10  willing to take a loss.
11     Q.   Ultimately, how much did you collect
12  from Ascension for the nitrile gloves that you
13  sold them?
14     A.   Approximately 34, 35 million.
15     Q.   And how much -- these are the gloves
16  pursuant to the December 2020 or November 2020
17  contract?
18     A.   Pursuant to --
19     Q.   Or does that include the September
20  deliveries as well?
21     A.   No, it's for that contract, I
22  believe.
23     Q.   In total, how much did you pay to
24  JNS and Kitchen Winners and Adorama for the
25  gloves that you sold under that contract?

Page 58

1      A.   Between them and logistics costs, I
2  believe I paid more than I received.
3      Q.   I didn't ask you about logistics
4  costs.  Just how much did you pay them?
5      A.   I don't have that number memorized.
6      Q.   Do you have an idea?
7      A.   No.  I could verify it.
8      Q.   How do you know that it was with
9  the -- well, how much did you pay the logistics
10  company?
11     A.   I believe logistics, it was around 7
12  million, 6 million, 5 million.  5 to 7 million.
13  Maybe 8.  So minus the difference of that,
14  minor operational cost.
15     Q.   Okay.  And did you -- you don't
16  recall how much you paid for the gloves to the
17  sellers of the gloves?
18     A.   I believe I paid Adorama 19 and a
19  half million.
20     Q.   Okay.
21     A.   And I'm not exactly sure the amount
22  that I paid JNS.  Just Adorama and
23  Kitchen Winners was around 19, 20 million.  I'm
24  not sure for JNS.
25     Q.   It was under $7 million; correct?

Page 59

1      A.   I'd have to see a document to verify
2  it.
3      Q.   Was you it around two and a half
4  million?
5      A.   I don't have the number in my mind.
6  I'd need to look at something.
7      Q.   When did complaints begin about the
8  gloves?
9          MR. RAKHUNOV:  Objection.
10         THE WITNESS:  I believe the first
11  written notification we got was sometime in
12  July.
13  BY MR. FRISCH:
14     Q.   Did you have any oral notifications
15  prior to July?
16     A.   I don't recollect that, no.  First
17  time I believe hearing something was that.  The
18  only thing that happened before would have been
19  the LevMed situation, the wrong brand gloves
20  given.
21     Q.   I'm sure Alex will discuss LevMed
22  with you.  I don't think that has anything to
23  do with JNS; correct?
24     A.   Correct.
25     Q.   All right.  So sitting here today,

Page 60

1  what damages were caused by JNS?
2      A.   The loss of my relationship and
3  goodwill that I built up with Ascension.
4      Q.   Well, what -- what did you -- what
5  further business were you expecting from
6  Ascension?
7      A.   I had an opportunity to bid on a
8  billion glove order with them and an
9  opportunity to sell them additional masks.  I
10  had a large opportunity to sell them testing
11  kits that would have been FDA-approved and we
12  would have manufactured and sold to them.
13     Q.   Now, those testing kits were
14  never -- you testified earlier, those testing
15  kits were never produced; correct?
16     A.   We started to make them.  We made
17  prototypes.
18     Q.   You never got them FDA-approved;
19  correct?
20     A.   We stopped the process that I spent
21  the legal funds on starting.
22     Q.   Okay.  But it never -- it never
23  actually happened?
24         MR. RAKHUNOV:  Objection.
25         THE WITNESS:  No, it did not happen.

Page 61

1   BY MR. FRISCH:
2       Q.   When they -- when you say you had an
3   opportunity to bid, who gave you that
4   opportunity?
5       A.   Resource Group said, "We'll give you
6   an opportunity to bid."
7       Q.   Who specifically at Resource Group?
8       A.   Dewayne Rader.
9       Q.   And who is Dewayne Rader?  What is
10  his position there?
11      A.   He's the vice president at Resource
12  Group.  I'm not sure of the exact title.
13      Q.   And the billion gloves was over what
14  period of time?
15      A.   Would have been annually.  Would
16  have been a two- or three-year contract.
17      Q.   And your profit on that contract
18  would have been what?
19      A.   I don't have the exact numbers
20  because we would have been buying the gloves
21  post-pandemic.  So it would have been -- the
22  margins would have been smaller, but it would
23  have been significant because of the quantity.
24      Q.   Were you the only bidder?
25      A.   No, I was not the only bidder.  I

Page 62

1   would not have been the only bidder.  I can't
2   imagine that.
3       Q.   Ultimately, do you know who was
4   awarded that contract?
5       A.   No, I don't.
6       Q.   Did you ever submit a bid for that
7   contract?
8       A.   No.  I did not have the opportunity.
9       Q.   Well, did you ever prepare the bid
10  for that contract?
11      A.   We had discussions about it and had
12  a face-to-face meeting about it.
13      Q.   Do you know how many other bidders
14  there were?
15      A.   I do not.
16      Q.   So you have no idea how likely you
17  were or weren't to get that contract; correct?
18      A.   I was told that we delivered
19  everything on time, and they would want to
20  continue a relationship with us.
21      Q.   Do you know the criteria they were
22  using to review bids at that time?
23      A.   I -- what criteria they were using?
24  They were going with proven vendors, I believe,
25  but I'm not sure what their criteria is.  You'd

Page 63

1   have to ask them.
2       Q.   Okay.  So you don't really know,
3   sitting here today, how likely you were or
4   weren't to actually get the contract?
5       A.   I believe I would have got it.  I
6   was already established with them.  Already did
7   60, $70 million in sales with them.  So I was
8   pretty optimistic about it.
9       Q.   And in terms of the test kit
10  business, how far along was that contract?
11      A.   They said, "If you have a test kit
12  that you're going to have it FDA-approved" --
13  which I could have used my own which I was
14  making, or I could have bought an existing one
15  and sold it to them that was already
16  approved -- they would be happy to buy it.
17          But when the gloves issue arose,
18  they didn't want to do any business at all with
19  us.
20      Q.   So what -- can you
21  (indiscernible) on the lost business that
22  you're claiming --
23          (Stenographer requests
24      clarification.)
25          ///

Page 64

1   BY MR. FRISCH:
2       Q.   Can you put a number on the amount
3   of lost business you believe you had?
4       A.   I was selling -- if you go by the
5   past, I did about 70 million a year with them.
6   So if you take that for the next few years, I
7   don't know, 200 -- $200 million.
8       Q.   That's revenue.  What about your --
9   what would your profits have been?
10      A.   Out of 200 million?  I don't know.
11  You'd say at least 15, 20 percent.
12      Q.   But you told me that you lost money
13  on the $35 million that you had sold the gloves
14  to Ascension at.
15          That was your testimony a few
16  minutes ago; correct?
17          MR. RAKHUNOV:  Objection.
18          THE WITNESS:  We were buying the
19      gloves for more than we were selling them
20      for in the beginning.
21  BY MR. FRISCH:
22      Q.   So you told me you lost money on the
23  $35 million you were paid through Ascension.
24  Is that a correct understanding of your prior
25  testimony?

Page 65

1        MR. RAKHUNOV:  Objection.
2        THE WITNESS:  I believe so.
3    BY MR. FRISCH:
4        Q.   Okay.  So what makes you think that
5    the future contracts would have been
6    profitable?
7        A.   Because the other $40 million I did
8    with them was profitable.
9        Q.   Now, how much of the loss -- of this
10   lost -- supposedly lost business is
11   apportionable to JNS?
12        MR. RAKHUNOV:  Objection.
13        THE WITNESS:  I don't know that
14    exact amount.  I'd have to look at the
15    documents I gave Phillip.
16   BY MR. FRISCH:
17        Q.   Approximately what -- I mean, JNS
18   sold you a much smaller share of gloves than
19   Adorama; correct?
20        A.   Yes.
21        Q.   So are you going to say the damages
22   from JNS are only, let's say, 10 percent of the
23   damages that Adorama caused, or how do you
24   calculate that?
25        MR. RAKHUNOV:  Objection.

Page 66

1        THE WITNESS:  I believe whatever the
2    quantity is, you can see it, and then
3    that's -- however you want to calculate
4    loss.  I don't know.  I'd have to ask an
5    accountant.
6    BY MR. FRISCH:
7        Q.   Meaning -- I've been told by your
8    attorney that you are going to testify as an
9    expert in this case as to your lost profits.
10   So I think it is reasonable to ask you how you
11   tie particular profits to a particular
12   defendant here, and I'm asking if you have that
13   calculation.
14        A.   I --
15        MR. RAKHUNOV:  Hold on.  Hold on.
16    Just on the record --
17        THE WITNESS:  Hold on.  I've got to
18    get power for my computer.  So --
19        MR. FRISCH:  Okay.  We can take a
20    two-minute break.
21        THE WITNESS:  You can just leave it
22    on.  I've just got to get the power.
23        MR. RAKHUNOV:  Are we still on the
24    record?
25        MR. FRISCH:  Looks like we are, but

Page 67

1    if you want to go on the off the record we
2    can go to a breakout room.
3        MR. RAKHUNOV:  Yeah, let's just go
4    off the record.  I'm not going to go
5    anywhere.
6        (Break taken from 11:24 a.m. to
7    11:25 p.m.)
8        THE WITNESS:  Okay.  All right.  I
9    have power on the computer.
10        MR. FRISCH:  All right.
11        MR. RAKHUNOV:  So let me -- let me
12    just put my objection on the record.
13        You know, this is the deposition --
14    it's a fact witness deposition of Mr. Kato
15    individually and as the corporate
16    representative.  We haven't had expert
17    disclosures yet, and we're not into expert
18    discovery.  If Mr. Kato is, in fact,
19    disclosed as an expert in the value of the
20    losses for Rock Fintek, he will be made
21    available for an expert deposition at that
22    time.
23        So feel free to ask him questions.
24    I just want to be clear that, you know,
25    this is not going -- he's not being

Page 68

1    presented right now as an expert witness.
2    So, you know, this is without prejudice to
3    him providing complete expert testimony in
4    the future if he --
5        MR. FRISCH:  Well --
6        MR. RAKHUNOV:  -- if he does so.
7        MR. FRISCH:  Okay.  Well,
8    gamesmanship aside, he's here supposably
9    both on behalf of the company, and
10    supposably he's going to be an expert in
11    what they've lost.  And, so far, I'm not
12    hearing any numbers, any basis for any of
13    these claims.
14        So you can put your objection, but I
15    don't -- I don't go in for gamesmanship, as
16    you know.  He's supposed to testify.
17        MR. RAKHUNOV:  There's no
18    gamesmanship here.  There is a different
19    procedure for expert testimony than there
20    is for fact witness.
21        So go ahead and ask your questions,
22    and we'll go from there.
23        MR. FRISCH:  Okay.  So let's go
24    back.
25    ///

BY MR. FRISCH:
**Q. I think I was trying to break down with you how much of the loss you would attribute to JNS.**
A. Well, I would say JNS torpedoed the relationship.
**Q. How is that?**
A. By putting stickers on the gloves saying that they were examination.
**Q. Well, how do you know JNS did that?**
A. He called me and he asked me -- or wanted to sell me those exact gloves for half the price, 4 or $5 less a box, or $6 less a box, and I told him absolutely not.
He's like, "I can repackage them and I can do that."
And he says, "No." So -- and I said, "No."
And then pallets -- when I visited the pallets at Medline, those pallets had Joel Stern's name written on them.
And then we took out the boxes. There was a sticker of examination just as he described on the box that I did not want to purchase. So it had Joel Stern, JNS, and David



Horowitz or somebody on the --
**Q. Do you know who put those labels on?**
A. Joel Stern had somebody put them on. It came out exactly the way he described it.
**Q. So you don't know, meaning -- if he was asking you to buy them at a lower price, why would he just stick them on a truck for you?**
MR. RAKHUNOV: Objection.
THE WITNESS: Because he was -- I don't know why he'd want to do something criminal, but he did.
BY MR. FRISCH:
**Q. This, frankly, makes no sense; right? He was trying to sell them to you at a different price, and now you're saying, "I said, 'No.' So he just stuck them on a truck." That's your -- that's your allegation. You have no evidence of that allegation; correct?**
A. Yes, I do.
**Q. Yeah? What's the evidence?**
A. His truck driver delivered to Medline; Medline received those gloves.
**Q. How do you know it was his truck driver who delivered those items?**



A. You can get the documentation from Medline to back it up.
**Q. I'm asking you for how you link it up, because you're saying that there's some label on the boxes -- let me finish my question.**
**You just said there was a label on the boxes that said "JNS" or "Joel Stern"; right? Who put that on the -- who put that on the panel?**
A. His drivers must have.
**Q. So you don't know who put them on?**
A. I know Medline didn't do it.
**Q. How do you know that?**
A. Because Medline said that's the way they received them.
**Q. Well, who at Medline told you that?**
A. Whoever were in the warehouse.
**Q. Okay. So you don't know. You personally have no knowledge of who put that label on the pallet; correct?**
A. I don't know who Joel Stern hired or if he --
**Q. I'm not talking about the stickers. I'm talking about the piece of paper that is on**



**some of the pallets saying "Joel Stern," or some say "Kitchen Winners."**
A. Medline --
**Q. You don't know who put that on; correct?**
A. I know Medline didn't put it on, and they arrived like that.
**Q. But you don't know Medline didn't put it on. You know Medline told you they didn't.**
A. Medline told me they did not; so I believe them.
**Q. Okay. Well, if Joel Stern told you he did not, would you believe him?**
A. No, I would not.
**Q. Why not?**
A. I don't believe the man.
**Q. Okay.**
A. Anymore.
**Q. Well, so you have no personal knowledge of this fact either way; correct?**
MR. RAKHUNOV: Objection.
BY MR. FRISCH:
**Q. You can answer.**
A. He offered to sell gloves with a

Page 73

1  description, which I turned down, and then they
2  arrived just as he described, the way I had
3  turned them down.
4      Q.   Except you don't know that he was
5  the one who sent them.
6      A.   You do know that he sent them
7  because you know when his trucks arrived.
8      Q.   But you don't know which gloves at
9  the warehouse are his.  You can't tell me --
10  you can't look at a spreadsheet today --
11     A.   They were shipped and received and
12  identified in the warehouse.
13     Q.   Can you tell me -- I happen to know
14  for a fact that Medline did not track it to the
15  level of detail that you're saying they did,
16  because I know Medline's told us.
17          MR. RAKHUNOV:  Objection.  Are you
18     testifying?
19          MR. FRISCH:  But -- I'm setting up
20     my question.  Right?  Because he keeps on
21     insisting that there is this information.
22  BY MR. FRISCH:
23     Q.   I don't have any information from
24  you guys as to how it would be tracked, which
25  pallet came from which seller.  So how would I

Page 74

1  figure it out?  Like, show me a -- tell me
2  which document I look at and which piece of
3  information will tell me which gloves are those
4  gloves that you say have these stickers on
5  them -- right? -- and how --
6      A.   They arrived, and they were wrapped
7  with JNS or Joel Stern's name wrapped on them.
8  The trucks arrived when Joel Stern said his
9  trucks would be arriving.
10         If you go back to his messages and
11  when he was paid, it's the same time that
12  the -- those trucks arrived.  They were
13  wrapped.  There's no question that those
14  Arik Maimon boxes are from JNS, Joel Stern, or
15  David Horowitz, without a question.
16     Q.   If I go to the Grayslake
17  warehouse -- I don't even know if the gloves
18  are still there, but if they still there --
19  right? --there's like 100 million gloves;
20  right?
21         How would I go and find that
22  pallet -- the question I've been asking from
23  the very beginning of this case:  How would I
24  go and find the pallets you are claiming have
25  these stickers?  How would I track that?

Page 75

1      A.   You can just go around and look at
2  all their gloves.  You're going to see stickers
3  on most of the pallets.
4      Q.   I'm not -- I'm not asking you to --
5  meaning you're saying that all the gloves from
6  Joel Stern had these stickers?  I know that's
7  not true.  So I don't think that's what you're
8  saying.  Is it?
9      A.   The majority of them.  The majority
10  of them.  Not in the beginning.  Until --
11     Q.   How many gloves had the stickers on
12  them?  Let's get a straight answer.  How many
13  gloves have the stickers on them?
14     A.   I don't have the exact count.
15     Q.   Who would?
16     A.   You should probably have it in our
17  purchase order.  Joel would.  You can ask Joel.
18  He'll tell you how many he stickered.
19     Q.   I --
20     A.   He should know exactly how many he
21  stickered.  Maybe he's got --
22     Q.   Trust me, you don't -- he will not
23  give the same answer as you.
24         CERTIFIED STENOGRAPHER:  You guys
25     have got to stop talking at the same time,

Page 76

1  because I can only take one of you at a
2  time.
3          MR. FRISCH:  I'm sorry.  I'm sorry.
4          THE WITNESS:  All right.  Well, just
5     ask clear questions.  I'm happy to give
6     clear answers.
7  BY MR. FRISCH:
8      Q.   The clear question is, to your
9  knowledge, you have been claiming all along
10  that you have gotten boxes with stickers from
11  Joel Stern.  How many boxes of gloves arrived
12  from Joel Stern with stickers on them?  I want
13  a number.  Not 50 percent, not 40 percent.  I
14  want a number.  I want an exact count of how
15  many boxes had those stickers on them.
16         MR. RAKHUNOV:  Objection.
17         MR. FRISCH:  He's here on behalf of
18     the company.  This is a crucial claim that
19     you've made.
20         THE WITNESS:  I don't have a
21     photographic memory to answer that.
22  BY MR. FRISCH:
23     Q.   So who would have the answer?  Where
24  would I look to get the answer?  Was it marked
25  anywhere in your records?

Page 77

1     A.   You can ask my lawyer if he as the
2   exact documents to get you that exact account.
3   I -- I would assume myself -- if I were to
4   throw a number out there, I would guess 9
5   million.
6        Q.   I'm not asking you -- I'm not asking
7   you to guess.
8        A.   If you want a number, I mean, that's
9   what -- that's --
10       Q.   No, I want the -- I want the
11   accurate number.
12       A.   That's all I have.  I have -- 9
13   million is my guess.  Guesstimate.
14       Q.   What's that guess based on?
15       A.   That's about how many I believe he
16   gave me, out of all the ones he sent.  That's
17   what Joel said he had.  That's the amount that
18   he was trying to sticker, and then he did it.
19   So that's the amount I would guess that was
20   stickered.  9 million.
21       Q.   So because Joel tried to sell you
22   something that he -- that you told him you
23   didn't want, that he says he never sold you,
24   now you're assuming that every glove of the --
25   but you've never gone and counted those

Page 78

1   gloves -- correct? -- to check how many were
2   stickered?
3        A.   I believe I was -- when I was there,
4   I looked at the pallets, and we started
5   counting a lot of the pallets and how many of
6   them were, and I believe it was around 9
7   million.
8        Q.   You personally counted 9 million
9   boxes of gloves -- 9 million gloves?
10       A.   I believe I did.
11       Q.   How long were you in the warehouses
12   for?
13       A.   I was in the warehouses for almost a
14   week.
15       Q.   And did MedCare -- did Medline take
16   down every single pallet for you?
17       A.   The ones they didn't take down, they
18   pulled down at the time, and they said, "These
19   are all the same."
20            And then we saw them with the same
21   sticker; so a lot of them were brought down.
22       Q.   How would you see the stickers if
23   they didn't take them down?
24       A.   A lot of them, they brought down.
25   So maybe 9 million they brought down.

Page 79

1        Q.   How many gloves did they bring down
2   for you in each warehouse?
3        A.   Maybe 9 million total.
4        Q.   Do you have a recollection of the
5   gloves they brought down?  How many warehouses
6   did you visit?
7        A.   Seven.
8        Q.   Which -- can you name them?
9        A.   No, I cannot.  Grayslake is one.
10   Jefferson, Romulus.  I don't know -- I can't
11   remember the names of the other ones.
12       Q.   Okay.  How many gloves in total were
13   stored in Grayslake?
14       A.   I don't know.
15       Q.   How many gloves in total did you
16   visit -- did you inspect personally in
17   Grayslake?
18       A.   I inspected millions of gloves
19   between the various warehouses.
20       Q.   And how many of those gloves have
21   these stickers on the boxes?
22       A.   Every one that was wrapped that said
23   "Joel Stern" or "JNS."
24       Q.   Every single box?  That's your
25   testimony?

Page 80

1        A.   Approximately 9 million.
2        Q.   But you -- so you had access to
3   these pallets; correct?
4        A.   I had access to the pallets when I
5   was at Medline.
6        Q.   So you could have printed out the
7   paper that said "JNS" and put it on the pallet;
8   isn't that correct?
9            MR. RAKHUNOV:  Objection.
10           THE WITNESS:  No, I could not.
11   BY MR. FRISCH:
12       Q.   Yes, you could have.  You were
13   standing in front of a pallet, and you could
14   have put pieces of paper on them, could you not
15   have?
16           MR. RAKHUNOV:  Objection.
17           THE WITNESS:  No.  They were
18   shrinkwrapped.
19   BY MR. FRISCH:
20       Q.   So you could open the shrinkwrap and
21   reshrinkwrap them.
22       A.   No.  I was --
23           MR. RAKHUNOV:  Okay.  Okay.  Stop.
24           MR. FRISCH:  I'm accusing him of
25   lying to me because --

Page 81

1       MR. RAKHUNOV:  You're accusing him
2  of --
3       MR. FRISCH:  I'll let him answer --
4       (Simultaneous speaking.)
5       CERTIFIED STENOGRAPHER:  Excuse me.
6  I am not getting this.
7       MR. FRISCH:  Okay.  This is off --
8  okay.  I am going to continue my
9  questioning, and you're not going
10  to interrupt.
11      MR. RAKHUNOV:  You're not asking
12  questions.  You're accusing him of --
13      MR. FRISCH:  I am asking him a
14  question.
15  BY MR. FRISCH:
16   Q.   Was it not possible for you to take
17  these pieces of paper that said "JNS" on them,
18  print them up on your printer, and stick them
19  on the pallets?
20   A.   No, it's not possible.
21   Q.   Yes or no?
22   A.   Impossible.  No.
23   Q.   Why is it not possible?
24   A.   I didn't have access to a printer to
25  print them and put them on there, and I was

Page 82

1  being watched by Medline.  I would -- and I'm
2  not a criminal to do that.  As I --
3   Q.   Whether or not you're a criminal is
4  a side question.
5       You are saying that somebody -- that
6  somehow -- the only person here who's ever had
7  access to these pallets is you.
8       MR. RAKHUNOV:  Objection.
9  BY MR. FRISCH:
10   Q.   So isn't it most likely that you're
11  the one who labeled them?
12   A.   No, it's not.
13      MR. RAKHUNOV:  Objection.
14      THE WITNESS:  You do the math.  He
15  tried to sell them to me, and they showed
16  up exact way that he described.
17  BY MR. FRISCH:
18   Q.   Why -- okay.  So let me ask another
19  question.
20      Why would he try to sell them to you
21  that way --
22   A.   Because he was -- he said he was
23  going to --
24   Q.   I didn't finish my question.
25   A.   Okay.

Page 83

1   Q.   Why would he try to sell them to you
2  at a discount when he could just fraudulently
3  put them on the truck and get them at twice the
4  price?
5   A.   Because he wanted to split the
6  profits without being --
7   Q.   With who?
8   A.   He wanted to split the profit
9  margins:  "I'll sell them to you for less now.
10  You'll make more profit.  I'll make more
11  profit."
12      I said, "Absolutely not."
13      And then he did it anyways, and he
14  kept 100 percent of the profit of the fake
15  gloves.
16   Q.   Okay.  So, again, you're claiming
17  there are 9 million fake gloves.  I want a
18  listing of every single one of them that you
19  counted, and I want to see -- I want to see how
20  you track those back to Joel Stern's trucks.
21      You keep saying that this
22  information exists.  We're now almost a year
23  and a half into this litigation, and nobody has
24  ever seen this level of detail that you're
25  claiming you have today.

Page 84

1       So I'm asking you, where is that
2  detail?  Like, where is --
3       (Simultaneous speaking.)
4  BY MR. FRISCH:
5   Q.   Is there a file somewhere I can look
6  at?
7       MR. RAKHUNOV:  Objection.
8  Objection.
9       Counsel, this is -- I know this is
10  going to be a long day, but just to
11  shortcut some of this, as you know, there's
12  a statistician expert that's going to
13  testify.
14      MR. FRISCH:  This isn't a
15  statistician question.  That's the point.
16  I'm not asking you for a statistician.
17      MR. RAKHUNOV:  200 million gloves,
18  Avi --
19      MR. FRISCH:  You don't get to
20  interrupt my questions, Phil.  I get to ask
21  the questions I want.
22      MR. RAKHUNOV:  I get to interrupt
23  this harassment.
24      MR. FRISCH:  You don't get to answer
25  --

Page 85

1    CERTIFIED STENOGRAPHER:  Excuse me.
2 Stop.
3    MR. FRISCH:  This is off the record.
4    Phil, you don't get to interrupt my
5 questions --
6    MR. RAKHUNOV:  No, no.  Please stay
7 on the record.
8    CERTIFIED STENOGRAPHER:  I can't
9 stay on the record if you guys are talking
10 at the same time.  I can only hear one
11 person at once.
12    MR. RAKHUNOV:  All right.
13    Go ahead, Avi.
14    But please stay on the record.  I
15 want this all on the record.
16    MR. FRISCH:  There's nothing on the
17 record.  You don't have any right to be on
18 the record.  You don't have any right to
19 tell me to ask different questions.
20    So, no, you do not get to interrupt
21 my questions to say I should ask different
22 questions or that my theory of the case is
23 not the same as yours.  I don't care that
24 there are 200 million gloves.  For one
25 thing, my client didn't sell --

Page 86

1    THE WITNESS:  I'm going to get
2 another coffee while you guys are arguing.
3    MR. FRISCH:  We can go off the
4 record.  What time is it?  11:40?  What
5 time are we doing lunch?
6    MR. RAKHUNOV:  That's really up to
7 the court reporter.  I -- I don't think
8 we're ready for lunch yet.
9    MR. FRISCH:  No, take two minutes.
10 Go.
11    (Break taken from 11:40 a.m. to
12 11:46 a.m.)
13    MR. FRISCH:  For the record, Phil,
14 you don't get to short-circuit my
15 examination.  You're free to ask whatever
16 questions you want at the end and make any
17 objections, but you don't get to
18 short-circuit me and say it's taking too
19 long.  It's not your place, and I'm not
20 going to accept that.
21    MR. RAKHUNOV:  To --
22    MR. FRISCH:  I am going to -- go
23 ahead.
24    MR. RAKHUNOV:  No, no, no, I'm going
25 to respond to that, if you're making a

Page 87

1 statement like that.
2    I'm not shortcutting your questions.
3 You're free to ask your questions, but at
4 some point when you start yelling at my
5 client and ranting about your theories of
6 the case on the record, I find that to be
7 unacceptable, and I'm going to object to
8 that and interrupt that.
9    So if you want to go on in a civil
10 way, you can ask whatever questions you
11 need to ask.
12    MR. FRISCH:  Okay.  Let's go on.
13 BY MR. FRISCH:
14    Q.   All right.  So when you did this
15 supposed review of the 9 million gloves you
16 claim you saw, is that 9 million in total or 9
17 million sold by Joel Stern and JNS?
18    MR. RAKHUNOV:  Objection.
19    THE WITNESS:  From JNS.
20 BY MR. FRISCH:
21    Q.   And how many gloves from Adorama did
22 you see on that review?
23    A.   With stickers on them?
24    Q.   How many gloves in total did you see
25 on that review from Adorama?

Page 88

1    A.   What do you mean, "in that review"?
2    Q.   You said you went to seven
3 warehouses and spent a week.  How many gloves
4 did you personally see?
5    A.   Tens of millions.
6    Q.   Tens of millions.  Okay.
7    Did you keep any notes as to what
8 you saw?
9    A.   I took videos and photographs, and I
10 gave them to my attorney, who should have given
11 them to you.
12    Q.   Did you keep a spreadsheet of
13 every -- of every pallet of what you saw?
14    A.   I think we had some notes we wrote
15 down.  That's how we came up with the
16 quantities.
17    Q.   Who took those notes?
18    A.   Bradley and I.
19    Q.   Okay.  Were those handwritten notes
20 or computerized?
21    A.   Handwritten, I believe.
22    Q.   I have not seen those.  I'm going to
23 call for their production.
24    The -- I'll just take a -- and you
25 said you went to seven warehouses.  Do you have

Page 89

1  it -- do you have it --
2      A.   I believe it was seven.  Maybe it
3  was six.
4      Q.   Do you have it written down
5  somewhere which warehouses you went to?
6      A.   No, I don't.
7      Q.   Do you know how many of them had
8  labels -- the white paper labels saying who
9  delivered them?
10      A.   Not all of them.
11      Q.   Do you know approximately how many?
12      A.   No.
13      Q.   Was it the majority or the minority
14  of them?
15      A.   I would say majority.
16      Q.   Now, when you took them down -- when
17  they were taken down for you, how did you go
18  about getting Medline to bring them down for
19  you?  Were they done in advance, or was it done
20  while you were sitting there?
21      A.   A lot of them were done in advance,
22  and some were done while we were there.
23      Q.   And was there any rhyme or reason to
24  which ones were selected to be brought down?
25      A.   No.  Just randomly picking them.

Page 90

1      Q.   Did Medline choose to bring them
2  down, or did you choose which ones to bring
3  down?
4      A.   Medline pulled out whatever they
5  wanted to pull out before we arrived.
6      Q.   So you don't know who directed
7  Medline to pull those particular pallets that
8  they pulled?
9      A.   No.
10      Q.   Was it somebody at Ascension, by any
11  chance?
12      A.   I would not know who directed
13  Medline.
14      Q.   Did Ascension ever sue Rock Fintek
15  for the gloves that supposedly were not up to
16  contract?
17      A.   Not yet.
18      Q.   What are they waiting for, if you
19  know?
20           MR. RAKHUNOV:  Objection.
21           THE WITNESS:  I'm not sure.
22  BY MR. FRISCH:
23      Q.   Didn't you also promise to Anna at
24  Medline that they could make a huge profit on
25  the sale of 1 billion gloves to Ascension if

Page 91

1  they helped you in this matter with protecting
2  them?
3           MR. RAKHUNOV:  Objection.  Anna at
4  Medline?
5           MR. FRISCH:  Anna at MedCare.
6           THE WITNESS:  The CEO of MedCare?
7  BY MR. FRISCH:
8      Q.   Yes.
9      A.   I told the CEO of MedCare that
10  there's an opportunity, if we correct the
11  wrong, to get awarded a billion-glove contract
12  for multi years, and she said she can make the
13  glove in any way -- any specifications they
14  like.  And I delivered that message to
15  Ascension, and Ascension was happy to hear
16  that.  However, we were not able to correct the
17  wrong.
18      Q.   Well, what have you done over the
19  past several years to supposedly mitigate the
20  damages?  You said that's what you've been
21  doing.  What have you done?  What steps have
22  you taken to mitigate the damages?
23      A.   One, I filed a lawsuit against the
24  criminals that caused these problems.  Two, I
25  put together all the documentation I could of

Page 92

1  it and then went over it with my attorney.
2      Q.   Did you -- did you replace any of
3  the gloves?
4      A.   No, we did not replace the gloves.
5      Q.   Why not?
6      A.   There's no additional funds to
7  purchase more gloves.
8      Q.   When did you notify Ascension you
9  were not going to be able to replace the
10  gloves?
11      A.   When they asked for us to replace
12  the gloves.
13      Q.   When was that?
14      A.   I believe July or August of that
15  summer after they were delivered.
16      Q.   When Ascension began complaining
17  about the quality of the gloves, did you make
18  any -- did you attempt to push back that the
19  gloves --
20      A.   Yes, I did.
21      Q.   -- were not --
22           What did you tell them?
23      A.   I said, "I have all the
24  documentation and all the reports that I was
25  given from Adorama, JNS, Joel Stern, and

Page 93

1   Kitchen Winners, and here it is.  These are
2   real gloves, real nitrile.  So you must be
3   mistaken."
4        Q.   And what was their response?
5        A.   "No.  You're mistaken."
6        Q.   And how did they prove that to you,
7   if they did?
8        A.   They sent videos from their nurses
9   or staff in some of their different hospitals
10  and a list of messages or emails from several
11  different people from different hospitals
12  talking about the poor quality of them and that
13  they can't be nitrile gloves.
14       Q.   When -- was JNS or Mr. Stern aware
15  of the existence of Ascension at any point in
16  time prior to this lawsuit?
17       A.   Was who?
18       Q.   Was Mr. Stern or JNS made aware of
19  the existence of Ascension as your customer
20  prior to this lawsuit?
21       A.   They were not made aware by me.
22  They found out themselves by asking their truck
23  driver to see who they delivered to and then
24  asking them who the client -- end client was,
25  is what they told me.

Page 94

1        Q.   Who told you that?
2        A.   Joel Stern and Hershey Weiner --
3   Weiner.
4        Q.   So it's your testimony that they
5   told you they were aware of Ascension?
6        A.   They were aware of Ascension, and
7   they could try to sell to them directly and
8   without me, better we keep working together.
9        Q.   Did Mr. Stern have any basis to know
10  your potential for future business with
11  Ascension?
12       A.   He knew that there was an
13  opportunity for long-term contracts and selling
14  them other products.
15       Q.   How did he know that?
16       A.   I had told him.
17       Q.   You told him it was with Ascension?
18       A.   I told him it's one of the largest
19  hospital systems in the United States.
20       Q.   So he's supposed to know it's with
21  Ascension?
22       MR. RAKHUNOV:  Objection.
23       THE WITNESS:  He went ahead and
24       found out it was Ascension on his own.
25       ///

Page 95

1   BY MR. FRISCH:
2        Q.   So you believe?
3        A.   So he told me.
4        Q.   And did -- was there -- when -- when
5   were you expecting to bid on the new contract?
6        A.   We would have bid on the new
7   contract probably that same year, whenever it
8   came up.  It was coming up that year or the
9   following year.  I think it was coming up that
10  year.  But more than that, it was also those
11  testing kits and the referral business.
12       They had referred us business to
13  Australia, which was sister group of Resource
14  Group, which I'm not claiming any lost revenue
15  from, but it did cost lost revenue and a lost
16  relationship in Australia.
17       Q.   I'm just trying to understand this;
18  right?
19       So you're saying that there was
20  lost -- that you had all these other
21  opportunities.  Why didn't you continue to
22  pursue them?
23       A.   Didn't have the funds anymore.  They
24  put us out of business.
25       Q.   Now, the testing kit business, was

Page 96

1   that a bid also, or was that a contract that
2   had already been signed?
3        A.   That would have been a contract to
4   sign.  It was not a bid.  It would have been
5   just like ordering masks or gloves, not an RFP.
6        Q.   Okay.  So did they sign that
7   contract with you?
8        A.   No, they did not.
9        Q.   How do you know they would have?
10       A.   They had told me that we had built
11  up solid goodwill and delivered when a lot of
12  people couldn't deliver to them.
13       Q.   Okay.
14       A.   They said 2,000 people they
15  interviewed, 30 they bought products from, and
16  we were in the top three that delivered quality
17  product on time, until we purchased from JNS,
18  Joel Stern, Kitchen Winners, and Adorama.
19       Q.   Okay.  Have you filed a lawsuit in
20  Florida against the law firm that represented
21  you?
22       MR. RAKHUNOV:  Objection.
23       THE WITNESS:  Nope.
24       MR. RAKHUNOV:  I think there might
25       have been some confusion on the time.

Page 97

1    You're not talking about --
2        THE WITNESS: Gunster?
3        MR. RAKHUNOV: Yeah. You're not
4    talking about the law firm you talked about
5    earlier today.
6        MR. FRISCH: No.
7        MR. RAKHUNOV: This is a new topic.
8        THE WITNESS: Oh, no. Then I didn't
9    file any lawsuit against Gunster.
10   BY MR. FRISCH:
11       Q.   Did you file a lawsuit against
12   anybody else?
13       A.   I filed a lawsuit against -- I
14   believe it's called Hunton Williams or
15   Hunton Andrew Kurth now.
16       Q.   Okay. What's the basis of that
17   lawsuit?
18       A.   Wire fraud. They had me sent
19   6.2 million to a company that really had no
20   assets, didn't exist.
21       Q.   Are you claiming in that lawsuit
22   that that firm is responsible for your loss of
23   business with Ascension?
24       MR. RAKHUNOV: Objection.
25       THE WITNESS: Am I claiming that I

Page 98

1    have loss of business? They triggered the
2    loss. Then I had to go to the Adorama,
3    Joel Stern, JNS, and Kitchen Winners to
4    purchase gloves as -- just to try to find
5    an immediate solution.
6    BY MR. FRISCH:
7        Q.   So how do you apportion the damages
8    between now three groups of parties who
9    supposedly caused the loss of your business
10   with Ascension?
11       MR. RAKHUNOV: Objection.
12       THE WITNESS: I'll have to ask my
13   lawyer on the Hunton case that question.
14   BY MR. FRISCH:
15       Q.   Okay. You want to report back to
16   us?
17       MR. RAKHUNOV: Objection.
18       THE WITNESS: So no.
19   BY MR. FRISCH:
20       Q.   But sitting here today, you don't
21   actually know how you would apportion the
22   various causes that you ascribe your loss --
23   the various causes that you claim caused the
24   loss of your business with Ascension?
25       A.   Well, I have 100 percent loss of

Page 99

1    $6.2 million which I wired to --
2        Q.   I'm not asking about the
3    6.2 million.
4        A.   Well, that's -- that's -- you're
5    asking me how I would apportion it.
6        If I were to say something off the
7    top of my head, it's $6.2 million immediately.
8        Q.   Aside from the $6.2 million, aren't
9    you alleging in that case that they caused the
10   loss of business with Ascension?
11       A.   Yes, they did.
12       Q.   Okay. So how much of the loss of
13   business with Ascension should be blamed on
14   them?
15       A.   As of now, 6.2 million of the money
16   I sent. And the deterioration of the
17   relationship, I don't know. You have to ask
18   the lawyer, maybe win the case.
19       Q.   Meaning -- now that COVID's ended,
20   why would Ascension continue to do business
21   with an intermediary like Rock Fintek? Like,
22   what did you bring to the table that they
23   couldn't -- couldn't they just buy from Medline
24   directly?
25       MR. RAKHUNOV: Objection.

Page 100

1    BY MR. FRISCH:
2        Q.   Like, what are you --
3        A.   That's your opinion.
4        MR. RAKHUNOV: Objection. Which
5    question -- which question do you want him
6    to answer?
7        MR. FRISCH: All of them.
8        MR. RAKHUNOV: Objection.
9        THE WITNESS: Resource Group was
10   happy to work with us because during a time
11   of unknown circumstances, they were able to
12   procure quality products on time from us.
13       And they said they would like to
14   keep a company like that working with them,
15   along with its current companies they
16   worked with, just in case something like
17   this happened again.
18   BY MR. FRISCH:
19       Q.   So your contract would have been
20   for --
21       A.   There's no contract. Purchase
22   agreements.
23       Q.   Your agreements with them would have
24   been for something contingent on another sort
25   of worldwide pandemic?

Page 101

1    A.    No.  There was the post-pandemic
2  testing kits, which they're still using now,
3  heavily.  The whole world is.
4        Q.    Do you know if Ascension ever used
5  any of the gloves that they -- any of the
6  MedCare gloves they purchased from you?
7        A.    I believe they might have used 10,
8  20 million of them.
9        Q.    And --
10        A.    Or at least distributed them.
11        Q.    And were they ever -- did they ever
12  tell you they were happy with those gloves?
13        A.    When they first got the order, they
14  said they were happy with them, and later they
15  said they stayed in the warehouse for three
16  months before they got out, and that's why they
17  told us later that they found out -- they got
18  reports from everybody about the quality.
19        Q.    But the first 10 or 20 million they
20  were happy with?
21        A.    No.  That's what they used.  You
22  said how many did they use.  I said I believe
23  they distributed 10 to 20 million of them.
24        Q.    Who -- who sold you the Yanimed
25  gloves in April 2021?

Page 102

1        A.    I'm not sure.
2        Q.    Did you use those gloves to -- it
3  wasn't Mr. Stern; correct?
4        A.    I don't -- I'm not sure.  I don't
5  think so.
6        Q.    Do you know how you determined that
7  those gloves were fake?
8        A.    I'm not sure.
9        Q.    And didn't discovery of the fake
10  gloves cause you to run back to Mr. Stern for
11  more gloves?
12        A.    Discovery of fake gloves?
13        Q.    Of the fake Yanimed gloves in
14  April 2021.  You know which gloves I'm talking
15  about; correct?
16        A.    I remember the name, but I can't
17  remember the order.
18        Q.    Okay.  Can you recall any precise
19  statements Mr. Stern ever made to you about the
20  gloves?
21            MR. RAKHUNOV:  Objection.
22            THE WITNESS:  No.
23  BY MR. FRISCH:
24        Q.    Did he ever make any representations
25  to you about the quality of the gloves?

Page 103

1        A.    About the quality?
2        Q.    Uh-huh.
3        A.    He said they were excellent.
4            (Stenographer requests
5  clarification.)
6  BY MR. FRISCH:
7        Q.    When did he say that?
8        A.    Multiple times.
9            And it was safe to buy gloves from
10  him.
11        Q.    When did he say that?
12        A.    Throughout the year that I was
13  purchasing.
14        Q.    Did he -- I'm sorry.  I think I'm
15  echoing for a second.
16            Did he ever represent to you that
17  the gloves were 510(k) certified?
18        A.    Yes.
19        Q.    When?
20        A.    Every time we made an order.  He
21  knows that's the only gloves that we were
22  purchasing.
23        Q.    I didn't ask if he knew that those
24  are the gloves you were purchasing.  I'm asking
25  if he ever told you they were 510(k) certified.

Page 104

1        A.    Yes, he did.
2        Q.    Where did he say that?
3        A.    He said it on all the phone calls
4  that we had, or most of them.
5        Q.    Did he ever say it to you in
6  writing?
7        A.    I'd have to look at the purchase
8  order, see what he wrote down.
9        Q.    Did he ever say to you that they
10  were ASTM D6319?
11        A.    Yes, he did.
12        Q.    Where did he say that to you?
13        A.    On the phone and I'm sure on the
14  purchase orders too.
15        Q.    I already showed you one purchase
16  order.  In fact, it's still up on the screen.
17            Where does it say --
18        A.    That's not my signature on that
19  purchase order at all.
20        Q.    But he doesn't -- let me ask you
21  another question.
22        A.    That could be a document that he
23  forged and wrote some -- scribbled some
24  signature on, just like the last.  Both
25  signatures I looked at don't look like my

Page 105

1  signature.
2      Q.   Okay.  Now, he doesn't issue
3  purchase orders to you; you issued purchase
4  orders to him, did you not?
5      A.   I'd have to ask Brad Gilling.
6      Q.   Okay.  So when you issued a purchase
7  order, did it include those terms that you say
8  you needed to have on every glove order?
9      A.   It should, yes.
10     Q.   So where is the document that
11 actually says that?
12         THE WITNESS:  Do you have it,
13     Phillip?
14         MR. RAKHUNOV:  No, no, no. I was
15     going to say if you want to show him a
16     document with --
17         MR. FRISCH:  Well, I don't think
18     such a document exists.  That's the
19     problem.  That's what I'm asking him for.
20     If he knows of a document, I would ask him
21     to point to it.  I have not found that
22     document.
23         Phillip, do you know of a document
24     that says something different?  I'm happy
25     to look at that too.

Page 106

1  BY MR. FRISCH:
2      Q.   Okay.  Now, do you believe, sitting
3  here today, that Mr. Stern was aware of
4  whatever quality issues Ascension ultimately
5  found with the gloves?
6      A.   Is he aware of the -- of what?
7      Q.   Was he aware, when he sold you the
8  gloves, of whatever these quality issues were
9  that caused Ascension to be unhappy with the
10 gloves?
11     A.   Yes, he knew he was giving me fake
12 gloves.  They were not what they said on the
13 box.  He was well aware of it.
14     Q.   Why do you think he was well aware
15 of it?
16     A.   Because he asked me to buy them and
17 try to trick my client with them.  I refused.
18 Then he did it to me.
19     Q.   That's not actually what he said to
20 you, but is --
21     A.   It is exactly what he said to me.
22     Q.   All right.  Well, let's see what he
23 said to you.
24         (Exhibit Number JNS D, "NY Gloves"
25     Chat, Started 3/26/21, was marked for

Page 107

1      identification.)
2  BY MR. FRISCH:
3      Q.   All right.  This is the group chat
4  you and Brad Gilling had with -- had with
5  Mr. Stern.  You're free to scroll through this.
6         Tell me where in here he told you to
7  cheat your customer.
8      A.   He said it on the phone multiple
9  times, begging us to do it.
10     Q.   And tell me -- go through this chat
11 and tell me where he said it in this chat,
12 because this is discussed in the chat; correct?
13     A.   I'm not sure what chat you just put
14 up. I'm going to read it now.
15     Q.   Okay.  It's 30 pages long.
16     A.   Well, then I need some time to read
17 it, if you want me to read it.
18     Q.   I don't -- I don't need you to read
19 every word of it.  I'm going to try to point --
20     A.   Highlight what you want me to read.
21     Q.   I'm going to point you to where I
22 want you to go.  Give me a second to find
23 exactly where I want you to go.
24         If you look at April 23rd -- it's
25 on -- it looks like -- I don't know what page

Page 108

1  it is. It's April 23rd, '21.  There's a
2  conversation between Joel -- it looks like you
3  and Bradley are on it, starting at 3:08 p.m.
4         Do you see that?
5      A.   I'm scrolling to look for it.
6      Q.   Thank you.
7         MR. RAKHUNOV:  I think it's page 12
8      of the exhibit document.
9         MR. FRISCH:  Thank you.
10         THE WITNESS:  April 23rd when?
11 BY MR. FRISCH:
12     Q.   '21 at 3:08 p.m.
13     A.   JNS service -- "Hi." Okay.
14         (Reviewing document.)
15         Okay.  What's the question?
16     Q.   All right.  So on that, does that
17 refresh your recollection about the discussion
18 of the boxes that were going to be remarked?
19     A.   That was some of it.  That
20 discussion -- the discussion was over the
21 phone.
22     Q.   Okay.  And there, he doesn't --
23 nobody talks there, at least in this writing,
24 about cheating anybody; is that correct?
25     A.   Nope.

Page 109

1    Q.   And this is actually after he had
2  delivered gloves to you.  Isn't that also
3  correct?
4    A.   Other gloves, not the ones with the
5  stickers.
6    Q.   Well, how do you know when the ones
7  with the stickers were delivered?
8    A.   Those came out at a different time,
9  I think, when we went to Medline.
10   Q.   So when were those delivered?
11  That's what we're trying to get down to here.
12   A.   You'll have to ask Medline.  Medline
13  can give you the exact date, and you can
14  correlate it to this April 23 date.
15   Q.   Okay.
16   A.   Says right here, there's no
17  protection approved.
18   Q.   Okay.  So how do you know that he
19  sold them to you anyway?  Because you say so?
20   A.   Because they came wrapped with his
21  name on it.  I took photos and videos of it and
22  gave it to my attorney.  He said it on the
23  phone, and then he did exactly the way he
24  described they showed up.
25   Q.   Again, but isn't it illogical for

Page 110

1  him to ask you about it if he was just going to
2  cheat you?
3         MR. RAKHUNOV:  Objection.
4         THE WITNESS:  You would think so.
5     But I'm not a criminal like him; so I don't
6     know.
7  BY MR. FRISCH:
8    Q.   All right.
9    A.   There's a clear record of trucks
10  that arrived and when they are -- and where
11  they are racked.  So it should correlate with
12  this message that you have here.
13       (Exhibit Number JNS E, First Amended
14       Counterclaim and Third-Party Complaint, was
15       marked for identification.)
16  BY MR. FRISCH:
17   Q.   All right.  I'm going to -- I'm
18  going to share now with you -- this is the --
19  this document is the -- I think the -- this
20  document is your amended counterclaim and
21  third-party complaint.  I'm going to direct you
22  to paragraph 53.
23   A.   What page is that on?
24   Q.   Should be page 14.
25   A.   I've got to zoom this.

Page 111

1    Q.   Oh, no.  Page 13.  I'm sorry.
2    A.   Page 13.  Let's see.
3         Page 13, which paragraph?
4    Q.   Paragraph -- beginning of
5  paragraph 53.
6    A.   53.  Hold on.
7    Q.   I want you to read through
8  paragraph 55.
9    A.   Okay.  Give me a moment.
10   Q.   I'm just going to run to the men's
11  room while you read it.  I'll be right back.
12       MR. RAKHUNOV:  He said paragraph 55.
13       THE WITNESS:  (Reviewing document.)
14  BY MR. FRISCH:
15   Q.   Are you ready?
16   A.   No.  Still reading.
17       (Reviewing document.)
18       Okay.  I read it.
19   Q.   All right.  So here it says that the
20  supposedly fake gloves were delivered in -- on
21  April 16th.  You just told me that they were
22  delivered later.  Which one is it?
23   A.   I told you to check when they were
24  delivered with Medline.  It'll correlate
25  exactly where they were delivered and when.

Page 112

1    Q.   But in your own complaint, it says
2  that they were sold on April 16th.  And then on
3  April 23rd, it says he kept calling you to sell
4  you more of them; is that correct?
5    A.   Maybe he shipped them and they
6  hadn't arrived yet and we haven't discovered he
7  was trying to ship us what we didn't want.
8    Q.   But if he already knew he could get
9  away with it by April 16th, why by April 23rd
10  would he be asking to give you a cheaper price
11  on it?
12       MR. RAKHUNOV:  Objection.
13       THE WITNESS:  I'm not sure if your
14     dates make sense.  Medline can identify
15     those dates, and then I can answer the
16     question.
17  BY MR. FRISCH:
18   Q.   It's not my dates.  It's your dates.
19   A.   It's not my dates.
20   Q.   These are dates you alleged in your
21  complaint.
22   A.   No.  No.  I don't know what day
23  those trucks arrived and when they were written
24  down and documented by Medline.
25       The ones that had the stickers on

Page 113

1 them -- okay? -- they have it documented when
2 they came.
3        Even Adorama and Kitchen Winners
4 told me that Joel Stern is not selling me real
5 products. Multiple times we were -- I was told
6 that.
7    **Q.   When did they tell you that?**
8    A.   Mendel and Hershey Weiner said that
9 to me, I believe, in April and May, and to be
10 careful the products we're purchasing from
11 Joel Stern because he's not getting all of them
12 from them.
13   **Q.   Why would he -- you have to be**
14 **careful if he wasn't getting it from them?**
15   A.   Because they are -- I think they
16 were onto what he was doing with the stickers.
17   **Q.   So you think that.  They didn't tell**
18 **you that?**
19   A.   They told me not to trust him.
20   **Q.   Told you not to trust them.  Okay.**
21 **But you don't know why they told you not to**
22 **trust them.  Was it just to get you to buy**
23 **directly from them?**
24       MR. RAKHUNOV:  Objection.
25       THE WITNESS:  I'm not sure why they

Page 114

1    told me, but that's what they told me.
2 BY MR. FRISCH:
3    **Q.   And isn't it true that they cut him**
4 **out, and you guys went direct to him to cut**
5 **Joel Stern out of the transaction?**
6    A.   I'm buying gloves from whoever was
7 supplying them.  I was not cutting or not
8 cutting someone out.  If Medline cut him out
9 and he was buying from them -- I mean Adorama
10 and Kitchen Winners cut him out, that's
11 something between them two.
12   **Q.   Okay.  Do you recall the dates of**
13 **those conversations?**
14   A.   April or May, I believe.
15   **Q.   How were those conversations held?**
16   A.   Over the phone.
17   **Q.   All right.  Who was on the phone?**
18   A.   I was on the phone.  I believe
19 Hershey Weiner was on the phone.  Mendel was on
20 the phone.  Brad Gilling was probably on the
21 phone.  He heard it with me.
22   **Q.   And why were you on the phone with**
23 **them?  What was the purpose of the phone call?**
24   A.   I think we were just discussing a
25 current order.

Page 115

1    **Q.   So why was Mr. Stern being**
2 **discussed?**
3    A.   Why was he being discussed?
4    **Q.   Uh-huh.**
5    A.   They wanted to warn me that he was a
6 criminal.
7    **Q.   Did they use the words "a criminal"?**
8    A.   Not to be trusted; we were going to
9 be getting product that's not reliable, and
10 fake.
11   **Q.   So now you -- so are the only fake**
12 **gloves you got from Joel Stern, or did you also**
13 **get fake gloves from Hershey Weiner and Mendel**
14 **Banon?**
15   A.   All the gloves we got are not
16 nitrile, not certified correct gloves.  None of
17 them.
18   **Q.   So not a single glove was good is**
19 **your testimony?**
20   A.   No, it was not.  Not to the
21 specifications of an expert.
22   **Q.   Weren't, according to your own**
23 **count -- you said you had Medline conduct a**
24 **count; correct?  Weren't 50 percent of the**
25 **gloves at least nitrile examination gloves?**

Page 116

1       MR. RAKHUNOV:  Objection.
2       THE WITNESS:  No.  They said
3    "Examination" on the box is all.
4 BY MR. FRISCH:
5    **Q.   Meaning, is there any requirement**
6 **that to be an examination glove it has to be**
7 **nitrile?**
8    A.   It has to be nitrile.  There was a
9 specific specification that it has to follow.
10   **Q.   Well, there's a specification for**
11 **nitrile examination gloves, but does that mean**
12 **that's the only type of examination glove?**
13   A.   I'm not a glove expert; so I don't
14 know.
15   **Q.   Didn't you write to Ascension about**
16 **how good the gloves -- how they liked the**
17 **gloves?**
18   A.   Yes, I did.
19   **Q.   Okay.**
20       (Exhibit Number JNS F, Email from
21    Thomas Kato to Dewayne Rader, dated
22    9/10/21, Bates-stamped RF_001034 - 1035,
23    was marked for identification.)
24 BY MR. FRISCH:
25   **Q.   Is this the email I'm calling up?**

Page 117

1  I've labeled this -- hold on.  Let me see what
2  we're up to.
3           MR. RAKHUNOV:  Did you mark the
4       complaint as an exhibit?
5           MR. FRISCH:  I did.  I think that
6       was E.  So now I'm up to F.
7  BY MR. FRISCH:
8       Q.   Okay.  So when Vince -- you wrote in
9  this email that Vince told you not to switch
10  the gloves:
11           "He said MedCare gloves are in all
12  the hospitals and they are very happy with
13  them, and it's more work to input a new
14  product?"
15           Do you recall saying that?
16      A.   I do.
17      Q.   When did that conversation with
18  Vince occur?
19      A.   If I were to guess I'd say March or
20  April.
21      Q.   Okay.  And who is Vince?
22      A.   Vince is part of the procurement
23  team.
24      Q.   So you -- when did you -- who else
25  did you buy MedCare gloves from in January?

Page 118

1       A.   A few other -- they call them "spot
2  buys."
3       Q.   So you did buy from other parties?
4       A.   Not MedCare.
5       Q.   Okay.  But you had MedCare gloves by
6  January?
7       A.   We had MedCare gloves -- I'm not
8  exactly sure when the first MedCare gloves came
9  in, but we only bought MedCare from Joel Stern,
10  JNS, Adorama, and Kitchen Winners.
11      Q.   Okay.  So they were happy enough
12  with the gloves to tell you it wasn't worth the
13  effort of inputting new products into their
14  database; correct?
15      A.   Correct.
16      Q.   How many of the gloves that they got
17  were used when they were happy with them?
18      A.   I'm not sure.  I would guess around
19  20 million.  Maybe 20.
20           MR. RAKHUNOV:  No need to guess.
21           THE WITNESS:  I don't know that.  I
22       have no idea what Ascension does with their
23       hospitals and their gloves.
24  BY MR. FRISCH:
25      Q.   Okay.  But they were happy enough

Page 119

1  that you were willing to sign the contract with
2  Adorama in April.  That's what you wrote to
3  Mr. Rader in September 2021; correct?
4       A.   Correct.
5       Q.   So I'm trying to understand here;
6  right?  You say all the gloves were bad, but at
7  some point Ascension was happy with the gloves.
8       A.   Yeah, they were happy with them in
9  the beginning.
10      Q.   Okay.  So we know that they were
11  happy with some of the gloves.
12      A.   No, they were not happy with any of
13  the gloves.  They were happy with the gloves in
14  the beginning.
15      Q.   Okay.  So how many gloves did they
16  use when they were happy with them?
17      A.   I don't believe they -- they said
18  they didn't use them.  They just had them
19  delivered to their hospitals and weren't being
20  used yet.  That's why there was a three-month
21  delay.
22      Q.   But that's not what you said here.
23  Here, it says they were all in the hospital and
24  that they were satisfied and approved.
25      A.   That's what I believed, and they

Page 120

1  told me to the contrary.  They were not all in
2  the hospital.  They were all in --
3       Q.   "Vince told us not to.  He said
4  MedCare gloves are all in" -- "are in all the
5  hospitals, and they are very happy with them."
6       A.   That's what I was told, yes.
7       Q.   Okay.  That's what Vince told you?
8       A.   That's what Vince had told me.
9       Q.   Okay.  And you have no reason to
10  assume Vince wasn't telling the truth; correct?
11      A.   Correct.
12      Q.   So as far as you knew, at least some
13  of the MedCare gloves were satisfactory; is
14  that correct?
15      A.   No, they were not.  They were not.
16  They were tested later, and found out none of
17  them met the specifications, not a one.
18      Q.   But they didn't test every carton;
19  correct?
20      A.   Did a random test of them.
21      Q.   Well, if they used -- let's say the
22  first shipment from JNS, if those were used in
23  the hospital, they would not be available to
24  test at that point after their use; correct?
25      A.   There is lot numbers that they

Page 121

1  documented them with, and with those lot
2  numbers, they did some random testing. And we
3  did testing later. None of the gloves meet
4  specifications. Most of the gloves don't have
5  any nitrile in them. And if they do, they have
6  very light traces of nitrile.
7      Q.   Were you aware that MedCare says
8  that there's a specific method to test their
9  gloves for its nitrogen composition?
10     A.   Yes.
11     Q.   And do you not believe that to be?
12     A.   I passed that information on. And
13  as I went over it, I thought it could be true.
14  Found out it's not. It's not a -- didn't meet
15  the specifications of a D6319.
16     Q.   All right. So you're saying none of
17  the gloves were ever consumed in the hospital.
18  Is that your testimony?
19     A.   No, that's not what I said.
20     Q.   Okay.
21     A.   I said I presume -- was told they
22  delivered 10 to 20 million of them to the
23  hospital.
24     Q.   Okay.
25         (Exhibit Number JNS G, Email Chain,

Page 122

1      Bates-stamped RF_001345 - 1347, was marked
2      for identification.)
3  BY MR. FRISCH:
4      Q.   I'm going to show you now -- I think
5  we're up to Exhibit G.
6      A.   Want to highlight what you want me
7  to read?
8      Q.   Here it says -- right at the top,
9  Dewayne Rader writes, "We have deployed only 13
10  of 187 million," as of August --
11     A.   As I said, I don't see what you're
12  reading.
13     Q.   Right at the top.
14         MR. RAKHUNOV: Can you control it,
15     the document, Thomas?
16         MR. FRISCH: I cannot.
17         THE WITNESS: Right here, where it
18     says, "Yep I get it, Brad"?
19  BY MR. FRISCH:
20     Q.   Yeah, that top email.
21     A.   What?
22         MR. RAKHUNOV: Just read that whole
23     email, that email up top.
24  BY MR. FRISCH:
25     Q.   Read that top email.

Page 123

1      A.   That email at the very top? Okay.
2      Q.   Uh-huh.
3      A.   (Reviewing document.)
4          Okay. So they said -- 10 to 20
5  million. They said they deployed 13 million of
6  the 187 million.
7      Q.   All right. Now, in the email from
8  Brad Gilling that is below there, do you know
9  who he was -- who's DMC? Do you know?
10     A.   DMC would be the Detroit Medical
11  Center.
12     Q.   And you sold -- you sold them
13  gloves, or is that part of Ascension?
14     A.   I don't believe we sold them gloves.
15  "Concealed [sic] with Patterson, DMC" -- maybe
16  we sold them gloves. I would have to ask.
17     Q.   The individual Brad Gilling -- do
18  you know the identity of the individual Brad
19  Gilling is referring to here?
20     A.   No.
21     Q.   But you see that Brad said, "We
22  reviewed multiple boxes with this individual
23  and lots of gloves, and he said that they were
24  as good as any other glove he uses"?
25     A.   Yep. That's what Brad and I thought

Page 124

1  too when we tried them and put them on.
2  Unfortunately, we're not glove experts.
3      Q.   No. Neither are nurses in a
4  hospital, actually.
5      A.   I guess they have a better feel.
6      Q.   All right. Let's go on. Okay.
7          So did you speak to the testing lab
8  about MedCare's suggestions about how to test
9  the gloves?
10     A.   Did -- say that again.
11     Q.   We discussed MedCare told you that
12  to test their gloves, you needed a different
13  procedure; correct?
14     A.   Correct.
15     Q.   Did you discuss that with the
16  testing lab?
17     A.   Yes, we did.
18     Q.   And what did they tell you?
19     A.   It was nonsense.
20     Q.   It was nonsense.
21         Did you buy gloves from an
22  individual named Avi?
23     A.   Have I bought gloves from another
24  individual named Avi? Yes.
25     Q.   Not from me. I know that.

Page 125

1      The -- and what type of gloves did
2  you buy from him?
3      A.  I believe they were called Medgluvs.
4      Q.  And what about an individual named
5  Ito?  Did you buy gloves from him?
6      A.  Yes.
7      Q.  And what gloves did you buy from
8  him?
9      A.  I believe Ingco.
10     Q.  Did either one of them sell you
11  MedCare gloves?
12     A.  No.
13     Q.  Go back to Exhibit A to look more at
14  the overall letter.  Did your purchase order
15  and documentation with Ascension specify 510(k)
16  M -- D639 -- D6319 ratings?
17     A.  Yes.
18     Q.  Why didn't you ensure that those
19  were in all your contracts when you purchased
20  the gloves?
21         MR. RAKHUNOV:  Objection.
22         THE WITNESS:  That's what we said we
23     needed.
24  BY MR. FRISCH:
25     Q.  But was it in any written contract

Page 126

1  you've had?
2      A.  I'm sure it was.
3      Q.  Did you -- when Ascension sent you
4  various correspondence about the gloves, did
5  you object that they had waited too long to --
6      A.  Yes.
7      Q.  And what was their response to that?
8         MR. RAKHUNOV:  Objection.
9         THE WITNESS:  They had told me that
10     they don't distribute them for a few
11     months; so they started getting the calls
12     after they started doing the distribution.
13         (Stenographer requests
14     clarification.)
15         THE WITNESS:  They're getting them
16     every few months.
17  BY MR. FRISCH:
18     Q.  Now, he says that Ascension paid you
19  $37 million to provide 200 million gloves.  Did
20  they, in fact, pay you $37 million for the
21  gloves?
22         MR. RAKHUNOV:  Objection.
23         THE WITNESS:  I believe they paid
24     34, 35.
25         ///

Page 127

1  BY MR. FRISCH:
2      Q.  So why does Mr. Reed think that they
3  paid 37 million?
4      A.  I'm not sure.
5      Q.  How would I figure out what you paid
6  to Ascension?
7      A.  How would you what?
8      Q.  How would I figure out exactly what
9  you paid to Ascension?
10     A.  That I paid to Ascension?
11     Q.  What Ascension paid to you.  My
12  apologies.
13     A.  It's in the bank statements.
14     Q.  Okay.  Do we have complete copies of
15  all your bank statements?
16     A.  Yes, you do.
17     Q.  I don't believe that's true.  I
18  believe they were promised.
19         MR. RAKHUNOV:  I can tell you I've
20     gone back after our discussion, and I
21     believe you have complete bank statements
22     that involve any transactions at issue.
23         If there's something specific,
24     Counsel, that you think is missing, please
25     bring it to my attention.  I will look

Page 128

1     right away.  But as I've told you before,
2     we're not just giving you all of
3     Rock Fintek's bank statements but the ones
4     that involved action relevant to this case.
5  BY MR. FRISCH:
6      Q.  Well, you said you made, like,
7  another $40 million from Ascension; correct?
8         MR. RAKHUNOV:  I'm not sure what
9     that means.
10         MR. FRISCH:  Mr. Kato, I'm asking.
11         THE WITNESS:  Revenue.
12  BY MR. FRISCH:
13     Q.  You made another -- so when I look
14  at the bank statements, there's going to be way
15  more revenue than relates specifically to this
16  transaction.  How would I distinguish which
17  ones have to do with this transaction?
18         MR. RAKHUNOV:  I'm not sure --
19     objection.
20         THE WITNESS:  Yeah, I'm not sure how
21     you're going to do that.
22         MR. FRISCH:  Okay.
23         MR. RAKHUNOV:  I'm not sure I
24     understand the question because if -- if
25     it's a document-related question, we can

Page 129

1    talk about it off --
2        MR. FRISCH:  No, no, no.  It's a
3    question of -- he said I'm going to see it
4    on the bank statement.  So I'm asking him,
5    how do I distinguish between the
6    transactions relevant to this case and the
7    ones that have nothing to do with this
8    case?  That's all.
9        THE WITNESS:  Maybe to do with the
10   date.
11   BY MR. FRISCH:
12   Q.   Okay.  You're saying once this
13   contract started, there were no other payments
14   from Ascension?
15   A.   Correct.
16   Q.   Okay.  Did you maintain a general
17   ledger on behalf of Rock Fintek?
18   A.   Yes.  Anything that we maintained,
19   I've already given to my lawyer.
20   Q.   Okay.  So did you have, like, a
21   QuickBooks or anything like that?
22   A.   I think a spreadsheet.
23   Q.   So there's a spreadsheet showing
24   your profit and loss and account balances?
25   A.   Yes, it should have that.

Page 130

1    Q.   Would that spreadsheet show
2    specifically what you sold to Rock Fintek and
3    what your profit was -- I'm sorry -- to
4    Ascension and your profit on that?
5    A.   It should, yes, or loss.
6    Q.   I don't think I've seen that
7    spreadsheet.  Do you know, is that -- was that
8    produced to us in Excel format?
9    A.   I'm not positive.
10       MR. FRISCH:  Phil, I'm going to ask
11   for that in its original format, if that
12   exists.
13       MR. RAKHUNOV:  I'll go back and --
14       MR. FRISCH:  Because I'm guessing
15   that, I need to be able to, you know,
16   manipulate.
17       MR. RAKHUNOV:  I'll have a
18   conversation with my client after we're
19   done.  I'm not sure --
20       MR. FRISCH:  Okay.
21       MR. RAKHUNOV:  -- exactly what he's
22   referring to, frankly.  So . . .
23       MR. FRISCH:  Me neither.  But if it
24   does exist, I would want it in Excel
25   format.

Page 131

1        THE WITNESS:  I had everything that
2    I had sent over to Phillip.  So --
3    BY MR. FRISCH:
4    Q.   Okay.
5    A.   -- how they did it, I'm not sure.
6    Q.   That's fine.  Okay.
7        But Resource Group never -- never
8    made any -- never sued you, you said; right?
9    A.   Not yet, I said.
10   Q.   Right.
11       Do you have any agreements with them
12   going forward?  Like, are they going to get any
13   recovery that you get in this lawsuit?
14   A.   No.  Nope.
15   Q.   Did you ever give them any refunds
16   of the $37 million?
17   A.   No.
18       MR. RAKHUNOV:  Objection.
19   BY MR. FRISCH:
20   Q.   Did you ever formally respond to
21   this letter?
22   A.   I believe my attorney did.
23   Q.   Was that Attorney Phil or somebody
24   else?
25       THE WITNESS:  Phil, did you respond

Page 132

1    to this letter?
2        MR. RAKHUNOV:  I believe there was a
3    response.  And, Counsel, I think it's been
4    produced.
5        MR. FRISCH:  It's possible.  You
6    know, there's a lot of stuff been produced
7    that's --
8        MR. RAKHUNOV:  I'm almost -- I mean,
9    look, things can fall through the cracks,
10   but I'm fairly certain that you have my
11   response to Ascension.
12   BY MR. FRISCH:
13   Q.   Meaning -- your testimony is that
14   other than these gloves, Ascension/Resource
15   Group was happy with your -- with your
16   services; is that correct?
17   A.   Yeah, they were extremely happy.
18       MR. FRISCH:  What number are we up
19   to?  I think we're up to G.
20       MR. RAKHUNOV:  H.
21       MR. FRISCH:  H or G?  What are we up
22   to?
23       MR. RAKHUNOV:  H.  G was another
24   email.
25       MR. FRISCH:  That's the only problem

Page 133

1   handling it myself.  I have to remember.
2         MR. RAKHUNOV:  There's a tab right
3   next to that exhibit that actually shows.
4         MR. FRISCH:  I know, but it's --
5   okay.  Yeah.
6         MR. RAKHUNOV:  I like that feature.
7         MR. FRISCH:  That's why I'm using
8   this, because that way, when I dump
9   something in my list in the middle like I
10  did, I can --
11        MR. RAKHUNOV:  It would be nice if
12  we could pop it out into a new window.
13        MR. FRISCH:  Yeah.  I'll let them
14  know.  Because I don't -- let me share
15  this.  Oh, no, no.  I just changed the -- I
16  messed that up.  Hold on.  I changed the
17  wrong one.  Give me a second.  This is
18  Exhibit G.  Now I'm going to close this one
19  and go to the other Exhibit G, and let me
20  stamp this one.  H.  Okay.
21        (Exhibit Number JNS H, Email Chain,
22  Bates-stamped RF_001042 - 1044, was marked
23  for identification.)
24  BY MR. FRISCH:
25     Q.   Meaning, here's a -- an email from

Page 134

1   before you ever were involved with my clients.
2         Do you recall the email that's on
3   your screen?
4      A.   I don't see anything.
5         MR. RAKHUNOV:  There's nothing on
6   the screen.
7         MR. FRISCH:  Oh, I didn't share it
8   yet.  I apologize.
9   BY MR. FRISCH:
10     Q.   Now do you see it?
11     A.   You have to highlight what you want
12  me to look at.  It's very small.
13     Q.   I don't know if you can -- can you
14  see my highlighting?
15     A.   No.
16     Q.   Now you should be able to see it.
17  Can you see it now?
18     A.   Yeah.  The whole document, you
19  highlighted.
20        MR. RAKHUNOV:  Yeah, take your --
21  review this email, and I note for the
22  record it's a three-page document.  So --
23        MR. FRISCH:  We'll start with the
24  top one.
25        THE WITNESS:  (Reviewing document.)

Page 135

1   BY MR. FRISCH:
2      Q.   Let me know when you're ready.
3      A.   I'm still reading it.
4         (Reviewing document.)
5         Okay.  I read the email.
6      Q.   All right.  Do you recall the
7   subject matter of this -- of this email?
8      A.   Yes, trying to sell the gowns.
9      Q.   Okay.  And they were upset that you
10  delivered the gowns without authorization; is
11  that correct?
12     A.   No, I don't think so.
13     Q.   So what were you apologizing for?
14     A.   What was I apologizing for?  I
15  don't see anything to do with apologizing
16  for --
17     Q.   "Sorry if there was any
18  misunderstanding."
19     A.   Misunderstanding --
20     Q.   "Sorry for long email, but" --
21     A.   Highlight specifically where I'm
22  apologizing, and I'll read it again and answer
23  the question.
24     Q.   Sure.  What were you apologizing for
25  there?

Page 136

1      A.   "Sorry if there was" -- okay.
2         (Reviewing document.)
3         I don't know what's the
4   misunderstanding about.
5      Q.   It was your email.  I was just
6   asking you if you know what it meant.
7         What did you mean by -- in this
8   paragraph?  I'm highlighting a paragraph for
9   your review here.
10        What did you mean by this?
11     A.   "The reason I bring this up is
12  because I believed Resource Group . . ."
13        What's the question?
14     Q.   What did you mean by that paragraph?
15  What were you expecting Resource Group to do
16  for you?
17     A.   To purchase those gowns.
18     Q.   Why would they purchase gowns they
19  didn't need?
20     A.   They wanted gowns.  They asked for
21  gowns.  I got the gowns.
22     Q.   So why were they upset about the
23  delivery of the gowns?
24     A.   Someone asked for them, and I think
25  Brad might have just shipped them to them

Page 137

1 without them confirming that they wanted to
2 take them.
3    Q.   And then the next email that you --
4    A.   Do you want me to read something
5 else?
6    Q.   Sorry?
7    A.   Do you want me to read something
8 else?
9    Q.   I highlighted . . .
10   A.   (Reviewing document.)
11   Q.   How many times did you tell
12 Ascension you couldn't deliver?
13   A.   That I could not deliver?
14   Q.   Uh-huh.
15   A.   I never said that.
16   Q.   So why here did you say that you --
17 you say, "sorry I cannot deliver"?
18   A.   "I come through for all my clients a
19 lot of times when others cannot.  I
20 understand . . ."
21       (Reviewing document.)
22       I didn't say I can't deliver.  I
23 said I don't come back to you with excuses and
24 say I can't deliver.
25   Q.   That's how you read that?  Okay.

Page 138

1       Now, finally --
2    A.   That's how I wrote it.
3    Q.   Sorry?
4    A.   That's how I wrote it, not how I
5 read it.
6    Q.   Well, we'll agree to disagree.
7       I was looking for one more, one here
8 that I want to ask you about.
9       Okay.  I highlighted another line
10 here: "How many isolation gowns is MHub
11 attempting to ship to The Resource Group?"
12      Why did he believe MHub was shipping
13 to The Resource Group?
14   A.   Again, because sometimes they see my
15 emails, the long reply email, when I'm using
16 Rock Fintek.
17   Q.   Meaning, did you ever inform
18 Mr. Stern or anybody affiliated with JNS that
19 you were not able to inspect the gloves?
20   A.   They were aware of that.
21   Q.   I'm sorry?
22   A.   They were aware of that.
23   Q.   How were they aware of that?
24   A.   They knew we couldn't inspect them.
25 I told them.  They were also aware of it

Page 139

1 themselves.
2    Q.   Why were they aware of it
3 themselves?
4    A.   The gloves that were delivered to
5 Medline, the truck drivers couldn't get out of
6 the trucks to examine them.  There was other
7 trucks that would deliver to a warehouse in
8 New York or New Jersey, and we purchased from a
9 broker, Mrs. Lee from Joel Stern or JNS.  Those
10 gloves, Mrs. Lee was able to inspect.
11   Q.   Correct.  And was she satisfied with
12 them?
13   A.   What was that?
14   Q.   Was she satisfied with her
15 inspection of those gloves?
16   A.   Yes, she was.
17   Q.   Did she have any expertise to rely
18 on her inspection?
19   A.   No.
20   Q.   We have a video of her inspecting
21 them; correct?
22   A.   Yes.
23   Q.   And in that video, she stretches
24 them and they don't break?
25   A.   I believe so.

Page 140

1    Q.   And it was on the basis of that
2 video that you bought the gloves, isn't it?
3    A.   Yes.
4    Q.   Mrs. Lee did not work for
5 Joel Stern; correct?
6       MR. RAKHUNOV:  Objection.
7       THE WITNESS:  I don't know who she
8    worked for.
9 BY MR. FRISCH:
10   Q.   Didn't you pay her for finding the
11 connection to Joel Stern?
12   A.   I paid her a commission.  I don't
13 know if he paid her a commission also.
14   Q.   Didn't Medline, in fact, inspect
15 some of the boxes?
16      MR. RAKHUNOV:  Objection.
17      THE WITNESS:  I don't know what
18   Medline did or did not do.
19 BY MR. FRISCH:
20   Q.   Weren't some boxes reported as
21 damaged?
22   A.   Yes.
23   Q.   Weren't there some boxes -- didn't
24 somebody open the boxes and determine the
25 counts of which types of gloves were shipped?

Page 141

1    A.   No.

2    Q.   Didn't Mr. Gilling complain on
3 several occasions to Mr. Stern about the number
4 of -- the sizes of the gloves that were
5 delivered and the counts of each size?

6    A.   The sizes were incorrect, as we were
7 told.  The sizes were incorrect in the boxes.

8    Q.   How would you know, if you didn't
9 inspect the boxes?

10    A.   The hospital told us.

11    (Stenographer requests
12    clarification.)

13 BY MR. FRISCH:

14    Q.   And how would the hospital know, if
15 they didn't inspect them?

16    A.   They were delivered to the hospital.
17 The hospital complained about them.

18    Q.   So the hospital did inspect them
19 shortly after they were delivered.  Is that not
20 correct?

21    MR. RAKHUNOV:  Objection.

22    THE WITNESS:  They were delivered to
23    Medline, then delivered to the hospital.

24 BY MR. FRISCH:

25    Q.   But the complaints about the sizing

Page 142

1 happened within days of the delivery, did it
2 not?

3    A.   Somebody in the hospital looked at
4 them and said the sizing's wrong.

5    Q.   Okay.  So why couldn't they also
6 check to make sure the boxes didn't say
7 "Protection" on them?

8    A.   As you mentioned, they're not
9 experts.

10    Q.   Well, if the box says "Protection"
11 or "Examination," that seems to be something
12 that doesn't require experts.

13    A.   Yes, I do.  If I ask a random person
14 if it's a protection or examination box,
15 they're not going to know what that has to do
16 with anything.

17    Q.   I don't know what it is either, but
18 I know how to read.  I know how to read.  So
19 they just needed somebody who knows how to
20 read? is my question for you.

21    MR. RAKHUNOV:  Objection.

22    THE WITNESS:  They have somebody in
23    the hospital that knows how to read.

24 BY MR. FRISCH:

25    Q.   I would hope so.  So why couldn't

Page 143

1 they go look at the boxes and see what was in
2 them?

3    MR. RAKHUNOV:  Objection.

4    THE WITNESS:  You can call the
5    hospital and ask the nurses why didn't they
6    go look at them.

7 BY MR. FRISCH:

8    Q.   I am asking you if you know why
9 Resource Group --

10    A.   I'm not psychic.  I am not psychic.
11 I don't know why.  I don't read minds.

12    Q.   All right.

13    A.   You can ask me did I know for
14 myself.  I'm happy to answer.

15    Q.   How many gloves did you test?

16    MR. RAKHUNOV:  Objection.

17    THE WITNESS:  I'm not positive how
18    many we tested.  I gave Phillip all the
19    documentation.

20 BY MR. FRISCH:

21    Q.   Okay.  And the ones you tested, were
22 they all gloves obtained from Mr. Stern and
23 Adorama, or were some of them obtained directly
24 from MedCare?

25    A.   They were obtained from Joel Stern,

Page 144

1 JNS, Kitchen Winners, and Adorama only.

2    Q.   Didn't you obtain some directly from
3 MedCare for potential replacements and have
4 those tested?

5    A.   MedCare might have sent us a sample
6 box or case.

7    MR. RAKHUNOV:  Hold on.  Listen to
8    the question.

9    Sorry.  Are you asking about the
10    gloves that were actually sold, or are you
11    talking about potential replacements after?

12    MR. FRISCH:  I'm trying to get the
13    context of the testing and how many tests
14    were actually done.

15    THE WITNESS:  Testing, I'm talking
16    about MedCare sending in August after
17    everything, trying to replace the damaged
18    ones with a new product they could make to
19    get the billion-dollar-a-year order.

20 BY MR. FRISCH:

21    Q.   So meaning -- some of the complaints
22 the hospital made is more that they just didn't
23 like the gloves they purchased; isn't that
24 correct?

25    A.   I don't believe so.

30(b)(6)
THOMAS KATO

Page 145

1    Q.   Meaning, they ordered MedCare
2  nitrile gloves, but -- the boxes were bought
3  from MedCare, who delivered them directly to a
4  warehouse, and then they were picked up by
5  your -- by you -- by your shipping.
6    A.   With no -- with no -- not nitrile in
7  them.  No nitrile and not meeting the
8  specifications.
9    Q.   Okay.  But you keep claiming that
10  there's fraud on the part of Mr. Stern and
11  fraud on the part of Adorama; but, really,
12  these gloves came straight from MedCare, and
13  they are MedCare gloves.
14         Is that not correct?
15    A.   I bought gloves from Adorama,
16  Joel Stern, JNS, and Kitchen Winners only.
17    Q.   I understand who you purchased them
18  from, but I'm asking you -- you're alleging
19  fraud.  You keep saying you were -- they were
20  fake and that the gloves were fraudulent.
21    A.   Yes.  They committed fraud.
22    Q.   But it's only fraud if they misled
23  you intentionally; right?  And you keep saying
24  that --
25    A.   They did.

Page 146

1    Q.   -- these gloves -- you don't
2  actually think that they bought gloves that
3  weren't from MedCare; you just don't like the
4  gloves that you got from MedCare.  Correct?
5         MR. RAKHUNOV:  Objection.
6  Objection.  That's -- there are, like,
7  legal elements in that question.  There
8  are -- there's a lot in there.  So --
9         MR. FRISCH:  I'll rephrase it.
10        MR. RAKHUNOV:  I think that would be
11  helpful.  Thank you.
12        MR. FRISCH:  I will rephrase it.
13  BY MR. FRISCH:
14    Q.   Which shipments of gloves do you
15  believe were fake gloves; i.e., not from
16  MedCare as a manufacturer, if any?
17    A.   All the gloves were fake.
18    Q.   That's not what I asked you.  I'll
19  define "fake" for you.  Fake is not
20  manufactured by MedCare.  Which gloves were not
21  manufactured by MedCare?
22        MR. RAKHUNOV:  Objection.  I'm going
23  to object to the definition of "fake," but
24  if you want to ask him whether he contends
25  that any of the gloves weren't labeled as

Page 147

1  MedCare gloves, that --
2         MR. FRISCH:  That's not what I'm
3  asking him.  I'm asking him under my
4  definition of "fake."  He doesn't have to
5  adopt my definition; he just has to answer
6  it for the purposes of this question.
7  BY MR. FRISCH:
8    Q.   Which gloves do you believe were
9  delivered to you as saying MedCare but were not
10  manufactured by MedCare?
11    A.   I purchased gloves from Adorama,
12  Kitchen Winners, Joel Stern, and JNS.  That's
13  what I did.  That's the people I purchased
14  from.  That's who I sent funds to.
15        Where they got them, I don't know
16  where they got them.  They manufactured them in
17  New Jersey.  Maybe they did that.  Now that I
18  know that they're all a bunch of fraudulent
19  gloves with no nitrile in them, I have no idea.
20    Q.   Okay.  So you did not answer the
21  question.  I'm asking you, because you --
22    A.   The only thing I believe that --
23    Q.   -- contend the gloves were not
24  manufactured by MedCare.  On what basis are you
25  making that claim?

Page 148

1    A.   That there were or were not --
2    Q.   That they were not manufactured by
3  MedCare.
4         MR. RAKHUNOV:  I'm not sure we're
5  making that claim.  So just -- okay.
6         MR. FRISCH:  You have made that
7  claim.  That's what I'm trying to -- let me
8  find where you say it.  Give me a second.
9  I'm going to pull it up in your complaint.
10        MR. RAKHUNOV:  That actually would
11  be helpful.
12        MR. FRISCH:  Give me a second to
13  find it.  I just need to search because I
14  actually . . .
15        Right in paragraph 2, "certain
16  gloves were non-MedCare brand gloves but
17  fake knockoffs."
18        THE WITNESS:  So I believe when we
19  spoke to the CEO, Anna, at MedCare, we gave
20  her some of the lot numbers of the boxes at
21  Medline.  She said she never created those
22  lot numbers ever.  And those were the
23  Joel Stern/JNS boxes, I believe.
24  BY MR. FRISCH:
25    Q.   Okay.  Did she -- do you have a

30(b)(6)
THOMAS KATO

Page 149

1  listing of --
2      A.   Which was in alignment with Henry
3  [sic] Weiner telling me not to trust
4  Joel Stern.
5      Q.   Do you have a listing of the
6  supposed lot numbers that you asked her about?
7          THE WITNESS:  Phillip, do you have
8      that?
9          MR. RAKHUNOV:  It would be reflected
10     in the communications that have been
11     produced in this case.
12         MR. FRISCH:  Well, it's not
13     reflected in any communications I've seen.
14         THE WITNESS:  Should be in the
15     messages.
16  BY MR. FRISCH:
17     Q.   And do you -- that was in the text
18  messages, in the WhatsApps --
19     A.   Should be in the WhatsApp message
20  somewhere.
21     Q.   Okay.  And do you have -- do you
22  have that response from her?  Was that in
23  writing, or was that in a phone call?
24     A.   That response, then they have LevMed
25  gloves that she also responded that her MedCare

Page 150

1  numbers and FDA numbers was used on a LevMed
2  box, Photoshopped.  She said that directly.
3      Q.   So your allegation in paragraph 84
4  and -- asking about -- I mean, I'm not even
5  going to try.  I'm going to highlight it for
6  you.  I'm not even going to try to pronounce
7  that.  Last time I got in a lot of trouble
8  trying to pronounce Chinese.
9      A.   What page?
10     Q.   It's paragraph 84.  It's on
11  page 20 -- 20.
12     A.   20.  Okay.  At the very bottom.
13         (Reviewing document.)
14         Okay.  What's the question?
15     Q.   Which shipments had those boxes on
16  it?
17     A.   Some of the shipments.
18     Q.   How will I find them?
19     A.   I don't know.  You can call Medline
20  and ask them.  They're there.
21     Q.   They're not easygoing about giving
22  us answers.  So that's why I'm asking you.
23  It's your claim.
24     A.   I had the --
25     Q.   How did you -- how did you find

Page 151

1  these boxes that supposedly have this
2  manufacturer on them?
3      A.   I believe we took photos and videos
4  of them and gave them to Phillip of boxes we
5  found.  I believe these specifically had a
6  gentleman's name, David Horowitz, on the paper
7  that was labeled on there.
8      Q.   And who's David -- and who's David
9  Horowitz?
10     A.   From an email that I saw from the
11  discovery, it looks like it's someone that
12  Joel Stern was working with, asking to
13  repackage the boxes.
14     Q.   Which email was that?
15     A.   You'd have to ask Phillip that.  He
16  must have submitted it.
17         MR. RAKHUNOV:  You'll see it next
18     Friday.  I promise you.  I have plenty of
19     questions to Mr. Stern about that one.
20         MR. FRISCH:  Well, we'll worry about
21     that next Friday.
22  BY MR. FRISCH:
23     Q.   So how many -- I think I asked you.
24  How many gloves -- you don't recall how many
25  gloves you had tested?

Page 152

1      A.   No.
2      Q.   Do you know what testing -- do you
3  know what testing you did?
4      A.   We sent them to Akron, the same
5  place that MedCare sent them -- I mean Resource
6  Sent them.
7      Q.   Okay.  And so --
8      A.   For nitrile.
9      Q.   Okay.  But some of them were tested
10  for nitrile; some of them were tested for other
11  things.  Correct?
12     A.   Everything was tested to be D6319,
13  and they failed all the testing.
14         (Stenographer requests
15     clarification.)
16         THE WITNESS:  There was zero to just
17     traces of nitrile in any of them that we
18     tested and that the hospital told us they
19     tested.
20  BY MR. FRISCH:
21     Q.   Paragraph 27 of the exhibit that's
22  up -- that's on page 7 --
23     A.   Do you have a question for me?
24     Q.   Yeah.  When did Stern tell you
25  what's alleged in paragraph 27?

Page 153

1    A.   What page is that on?
2    Q.   Page 7 to 8.
3    A.   The pages don't move up as you click
4  on them.  I have to click them myself.
5    Q.   No, I understand.
6    A.   7 to 8, you want to highlight where
7  you're talking about or which paragraph?
8    Q.   I'll highlight it.
9         MR. RAKHUNOV:  Numbered
10    paragraph 27.
11 BY MR. FRISCH:
12    Q.   It's paragraph -- but the paragraphs
13 are numbered.  It's paragraph 27.
14    A.   27.  Okay.
15    Q.   I will highlight it for you.
16    A.   27, 28 -- okay.  Perfect.
17         Wait.  What's the question?
18    Q.   When did Mr. Stern tell you this?
19 Not somebody else.  When did Mr. Stern tell you
20 this?
21    A.   I'm not sure of the exact date.
22    Q.   And by what method did he tell you
23 this?
24    A.   Most of our conversations were on
25 the phone.  A lot of them messages, text, but

Page 154

1  mostly phone.
2    Q.   Okay.  But these precise words, that
3  they "had a connection to a new nitrile glove
4  manufacturer in China that manufactured
5  'MedCare' brand medical grade nitrile
6  Examination gloves," when did he specifically
7  tell you this, if he did?
8    A.   I believe towards the beginning of
9  the year, when our relationship first was
10 getting started.
11    Q.   Okay.
12    A.   But I'm not positive.
13    Q.   Okay.  In paragraph 30 -- I'm going
14 to scroll down to paragraph 30.
15         What is the identity of the broker
16 referenced in that paragraph?
17    A.   (Reviewing document.)
18         So what's the question for this?
19    Q.   Who was the broker that's being
20 referred to in that paragraph 30?
21    A.   I believe this could be Miss Lee.
22    Q.   And how do you know Miss Lee -- if
23 she is the broker, how do you know that Stern
24 provided it to her?
25    A.   I don't know how -- communication

Page 155

1  between themselves.  I'm not positive.
2    Q.   Okay.  So you allege something to
3  have happened, but you don't actually know if
4  it happened?
5    A.   So Miss Lee was in communication
6  with Joel Stern.  She told me she got this
7  information from Joel Stern.  She passed it on
8  to me, and that's how we started the
9  relationship.  She --
10    Q.   So Miss Lee got it, and she told
11 you.  Okay.
12    A.   Correct.
13    Q.   Now, the gloves that were delivered
14 in February 2021, how do you know that they
15 were, in fact, not compliant with the paperwork
16 that you received?
17    A.   None of the gloves were D6319
18 compliant.
19    Q.   But where -- how do you know that?
20    A.   Because I had them tested.  The
21 hospital had them tested.
22    Q.   How do you know that those gloves in
23 particular were tested?  That's the first
24 90,000 gloves you bought, supposedly.  So how
25 do you know that you had those gloves tested?

Page 156

1    A.   They said everything was the same.
2  The lot numbers were similar to the gloves we
3  purchased.
4    Q.   Who said?
5    A.   Joel Stern, Kitchen Winners,
6  Adorama, and JNS.
7    Q.   So you don't -- you don't know.  Is
8  that your testimony?  You personally don't
9  know --
10    A.   I just told you.
11    Q.   -- which ones you tested?
12    A.   There's lot numbers.  So if you have
13 a lot number in February, you've got a lot
14 number in May.  It's the same lot number.
15    Q.   Who made the lot numbers?
16    A.   MedCare.
17    Q.   So how do you know what those lot
18 numbers mean?
19    A.   How do I know what they mean?
20    Q.   Yeah.
21    A.   They're to identify a batch of
22 gloves.
23    Q.   Okay.  But isn't it better to
24 identify a batch of gloves by the ones you
25 actually received and tested?  Just because

Page 157

1 somebody put a number on a box, how do we know
2 which gloves you were testing?
3     MR. RAKHUNOV: Objection.
4     THE WITNESS: That's how they
5 identified them.
6 BY MR. FRISCH:
7     Q.   So you don't know if you test -- if
8 you tested a single glove from that initial
9 February shipment; is that correct?
10     A.   No, I do.  No, that's not correct.
11 I said I tested the same lot numbers February,
12 April, May.
13     Q.   So is your testimony that you went
14 to the shipment of gloves that was received in
15 February 2021 and tested one of those gloves,
16 or is your testimony that you tested similar
17 lot numbers that may or may not have been from
18 that shipment?
19     A.   Not similar lot numbers.  Exact.  We
20 have --
21     Q.   That may or may not have been from
22 that shipment.
23     A.   We have all lot numbers and when
24 they were delivered, when they were received.
25     Q.   Where are these lot numbers on the

Page 158

1 boxes?
2     A.   Written on the box.
3     Q.   What format are they in?
4     A.   Numbers and letters.
5     Q.   Okay.  So -- whatever.  I think
6 we've beaten this to death, and I want to get
7 done.
8         Do you have any reason to assume
9 that the gloves labeled "Protection" were, in
10 fact, not just mislabeled but wrongly printed
11 boxes?
12     A.   Say that one more time, the
13 question.
14     Q.   Do you have any basis to assert --
15 your assertion that Mr. Stern's claim that the
16 boxes were simply misprinted and that the
17 gloves were the same gloves -- do you have any
18 basis to conclude that isn't true?
19     A.   The boxes have to say "Exam" on
20 them.  Same -- so if they don't say "Exam" --
21 or they should say "Non-Nitrile Glove."
22     Q.   Okay.  I don't really understand
23 what that answer is, but okay.  We'll just try
24 again.
25         Do you have any basis to conclude

Page 159

1 that it wasn't an error in the printing of the
2 boxes by the manufacturer?
3     A.   No.  They need to say "Nitrile
4 Glove," and they have to test for it.
5     Q.   Okay.  So is it possible that the
6 manufacturer printed the wrong boxes and put
7 them in the wrong boxes?
8     MR. RAKHUNOV: Objection.
9     THE WITNESS: I don't believe so.
10 BY MR. FRISCH:
11     Q.   Why not?
12     A.   I believe Joel Stern did what he
13 said he was going to do to the gloves and the
14 boxes and --
15     Q.   That's not what I asked you.  I
16 asked you if it's possible.
17     MR. RAKHUNOV: Objection.
18     THE WITNESS: Possible I win the
19 lottery today also, but not probable.
20 BY MR. FRISCH:
21     Q.   Good luck.
22         Okay.  In paragraph 44, you state
23 that the purchases with Stern were between
24 April 16th and May 2nd.
25     A.   What page is it?

Page 160

1     Q.   Page 11.
2     A.   Page 11, 44.  Okay.  What's the
3 question now?
4     Q.   Were -- are you not complaining
5 about the gloves delivered in February?
6     A.   I was complaining about all the
7 gloves delivered.
8     Q.   Okay.  So you're -- so it's an error
9 in the complaint.  Is that accurate?  I just
10 want to make sure I understand the scope of
11 what you're claiming.
12     A.   "Between on or about April . . ."
13         (Reviewing document.)
14         I'm not -- I'm not following the
15 error, what you're talking about is an error.
16     Q.   Wasn't the first purchase from
17 Mr. Stern in February?
18     A.   It was early in that year.
19     Q.   Yeah.  So why is it -- why is your
20 complaint only talking about the transactions
21 from April 16th and May 2nd?  That's what I'm
22 asking you.
23     A.   I think we should ask Phillip that.
24     Q.   Okay.  Paragraph 52, "Because of
25 Stern's shuffling between using various

Page 161

1  entities, and directing payment to one entity
2  while purporting to operate under another
3  entity, Stern was simply using these entities
4  as his personal shells and commingling funds
5  among his entities and not observing corporate
6  formalities."
7       What is the basis of your
8  allegations here?  What is the factual basis
9  for those?
10     A.  He told me he was an accountant.  He
11 does accounting work.
12     Q.  Okay.
13     A.  He doesn't buy and sell products.
14     Q.  Okay.  How does that -- how does
15 that justify the claims made in paragraph 52?
16     A.  So he said, more or less, he was
17 acting as a straw man for his real estate
18 investors.  They were getting the lion's share
19 of it and putting up all the money for it.  He
20 was making a small part.
21     Q.  Do you have any evidence to sit --
22 to substantiate your claim that Mr. Stern
23 placed the stickers on the boxes?
24     A.  They were placed exactly as he
25 described and -- and wanted me to present them

Page 162

1  to the hospital.
2       Q.  Did you present them to the
3  hospital?
4       A.  I had them -- they were delivered to
5  the hospital.
6       Q.  No, no.  I asked you, when he
7  proposed it to you, did you ask the hospital
8  about it?
9       A.  I don't understand the question.
10      Q.  Did you propose to the hospital that
11 you would sell them those gloves at a cheaper
12 price?
13      A.  No.  Absolutely -- I didn't even
14 offer it to the hospital.
15      Q.  Why not?
16      A.  Why would I offer to sell them fake
17 gloves with the --
18      Q.  Who said they were fake?
19      A.  He said he's putting a fake label on
20 top of a box, a real label on top of a fraud --
21      Q.  He said he was correcting the box.
22      A.  No, he didn't say --
23      Q.  That's what it says, correcting the
24 box.
25      A.  No.

Page 163

1       Q.  Did you suggest to the hospital you
2  could get them cheaper gloves because of the
3  incorrectly printed boxes?
4       A.  No.  I said -- "No way" is what I
5  said.
6       Q.  Did Stern complain about Rock Fintek
7  to Adorama and Weiner?
8       A.  I don't know what he says to them.
9       Q.  Sorry?
10      A.  I don't know what he says to them
11 about --
12      Q.  Well, then, go to paragraph 90 on
13 page 22.
14      A.  Page what?
15      Q.  22.
16      A.  22.  What paragraph?  90?
17      Q.  Yeah.
18      A.  "Rock Fintek similarly reached out
19 to Stern in writing to notify him about the
20 discovery of the fake gloves and to seek . . ."
21      (Reviewing document.)
22      I don't -- what's the question?
23      Q.  How did you know about the complaint
24 of Stern to Adorama and Weiner that you allege
25 here?

Page 164

1       A.  I'm not sure.
2       Q.  Okay.
3       A.  I don't recollect.
4       Q.  Okay.
5       MR. RAKHUNOV:  It's in the messages,
6  Avi.  It's there in writing.
7       MR. FRISCH:  I'm asking him.
8       MR. RAKHUNOV:  I know.  I'm --
9       THE WITNESS:  I don't have a
10 photographic memory.  So I don't have that.
11 BY MR. FRISCH:
12      Q.  We rely on that.
13      Did you stiff Alex King the lasting
14 $45,000 of his money?
15      MR. RAKHUNOV:  Objection.
16      THE WITNESS:  No.
17 BY MR. FRISCH:
18      Q.  So why didn't you pay him his final
19 bills?
20      A.  I believe he owes me money.
21      Q.  Why do you think that?
22      A.  Because he miscounted the
23 deliveries.
24      Q.  Did you sue him?
25      A.  Nope.

Page 165

1    Q.   Why not?
2    A.   Why not?
3         MR. RAKHUNOV:  Objection.
4         THE WITNESS:  I'm going to sue the
5    criminals instead.
6         MR. RAKHUNOV:  To the extent that
7    anything you might answer involves
8    conversations with lawyers, I'm instructing
9    you not to answer.  But otherwise, you're
10   free to answer.
11        THE WITNESS:  I have not sued them
12   yet.
13   BY MR. FRISCH:
14   Q.   Okay.  Did you boast to Stern that
15   you had other suppliers for MedCare gloves?
16   A.   The supplier meaning Adorama,
17   Kitchen --
18   Q.   Other than Adorama and
19   Kitchen Winners.
20   A.   No, I don't believe so.
21   Q.   Well, then why did you say -- I
22   have -- I'm going to highlight it for you on
23   this thing.  I believe -- this exhibit's
24   already been marked.  This is the chats with
25   Joel Stern.  I'm going to highlight for you.

Page 166

1         Tommy Kato:  "Your order has nothing
2    to do with them.  We have another Group" --
3    A.   What page?  I can't see.
4    Q.   Oh, that's right.  You can't see it.
5    The page number is 16.
6         I'm almost done.  I'm trying to get
7    finished so we can take a break before Alex
8    goes.
9    A.   I don't need a break.  I'm good.
10   Q.   Yeah, but I'm sure Rhonda does.
11        MR. RAKHUNOV:  The court reporter
12   will certainly need a break.
13        MR. FRISCH:  Yeah.
14        THE WITNESS:  Oh.
15        MR. FRISCH:  I think I'm five
16   minutes left though, five to ten minutes.
17        THE WITNESS:  (Reviewing document.)
18        Okay.  And the question was?
19   BY MR. FRISCH:
20   Q.   Who are the other people that you
21   are referring to there?
22   A.   Might be that David Horowitz that
23   Joel Stern was working with, I think.  He was
24   selling to another -- some other brokers out
25   there in California.

Page 167

1    Q.   And who did you buy from before
2    Adorama?
3    A.   Joel Stern, JNS.
4    Q.   But that's not who you're referring
5    to here because you're talking to Joel Stern.
6    So who are you referring to when you say, "We
7    have other people that we bought from before
8    Adorama"?
9    A.   Avi, the gentleman you mentioned in
10   Miami.
11   Q.   Did you buy MedCare from him?
12   A.   No.  Didn't buy MedCare from anybody
13   else.
14   Q.   But you say "will buy LA MedCare
15   gloves."  So you're saying that this is not
16   referring to MedCare gloves; this is referring
17   to other gloves?
18   A.   I'm saying I did not buy MedCare
19   gloves from anybody else.
20   Q.   Despite your statements to the
21   contrary.  Got it.
22        MR. RAKHUNOV:  Objection.
23        THE WITNESS:  There's a broker in
24   LA.
25        (Simultaneous speaking.)

Page 168

1         CERTIFIED STENOGRAPHER:  Excuse me.
2    You guys are both talking at the same time.
3         MR. RAKHUNOV:  Thomas, you're being
4    asked about the specific message, which I'm
5    seeing two separate messages there, one
6    about MedCare, the other about something
7    else.  So . . .
8    BY MR. FRISCH:
9    Q.   All right.  Whatever you were just
10   saying, can you repeat it?
11   A.   There was brokers in LA that said
12   they had access to the same MedCare gloves, but
13   we never made any purchases to them -- from
14   them.
15   Q.   Thank you.
16        Did you have communications with
17   MedCare directly --
18   A.   They were never verified.
19   Q.   -- about the gloves?
20   A.   And they were never verified.
21   Q.   Did you -- did you have
22   communications with MedCare about the gloves?
23   A.   After the -- after we got the
24   complaints.
25   Q.   Did -- did you ask MedCare to

Page 169

1  replace the gloves?
2      A.   Yes.
3      Q.   Did they offer to replace some
4  number of them?
5      A.   Yes.
6      Q.   Did they ever claim the gloves you
7  received were fake?
8      A.   I don't believe so.
9      Q.   Did MedCare ever tell you that their
10  protection and their examination gloves are the
11  same thing?
12      A.   They said they're different
13  completely.
14      Q.   Did MedCare ever tell you that they
15  were the same?
16      A.   I don't believe so.  I'd have to
17  check my communication.
18      Q.   Let me go to one more exhibit.  I
19  think this might actually be the last one I
20  use.
21          MR. FRISCH:  Anybody remember --
22      what are we up to?  The last one we did was
23      H.
24          (Exhibit Number JNS I, Chat Started
25      8/9/21, was marked for identification.)

Page 170

1  BY MR. FRISCH:
2      Q.   Okay.  This chat is -- it's labeled
3  in -- I have it as the -- your chats with --
4  with MedCare, and it looks like you have it
5  with an individual named Danny Lee China Man
6  and Anna Grinwald [sic] -- well, you write
7  Geinwald, but I think it's Anna Grinwald,
8  MedCare CEO; correct?
9          Do you recognize these chats?
10      A.   You've got to tell me what page.
11      Q.   No, I'm just asking you if you
12  recognize this document.
13      A.   I don't see the document.
14      Q.   You don't see it on your screen?
15      A.   I just see the same 25-page
16  messages.  Or this is a new message?
17      Q.   Okay.  Yes.  So these -- in general.
18  This is a different set of messages.
19      A.   Okay.  I've got to zoom it up, look
20  at it.  MedCare messages . . .
21          (Reviewing document.)
22          So -- okay.  So what about these
23  messages?
24      Q.   I want to know, do you recall
25  this -- these conversations with Anna of

Page 171

1  MedCare and the other parts of the MedCare
2  team?
3      A.   Yeah.
4      Q.   Can you go to page 13, please.  I'm
5  going to highlight something for you.
6      A.   Okay.
7          MR. RAKHUNOV:  Sorry.  What page?
8          MR. FRISCH:  13.  You should see it
9      highlighted.  I have been deleting the
10      highlights after I show it to him.
11          MR. RAKHUNOV:  Okay.
12          MR. FRISCH:  So they don't stay on
13      the final exhibits.
14          THE WITNESS:  (Reviewing document.)
15  BY MR. FRISCH:
16      Q.   Have you read the highlighted
17  portion?
18      A.   Hold on.
19          (Reviewing document.)
20          Yes.
21      Q.   They also told you themselves that
22  they go through about 1 billion gloves a year
23  and would entertain letting you bid that
24  contract.
25          Is that MedCare would bid directly

Page 172

1  to the hospital for the contract?
2      A.   MedCare would -- no.  We would -- we
3  would go through Rock Fintek.
4      Q.   And how much profits -- how much
5  would the profits have been on that contract?
6          MR. RAKHUNOV:  Objection.
7          THE WITNESS:  Maybe a billion
8      dollars.  I don't know.  I didn't get the
9      contract.  We didn't get into the numbers.
10  BY MR. FRISCH:
11      Q.   Okay.  Did you ever resell any of
12  the gloves?
13      A.   Nope.  We did not.
14      Q.   Did you ever get the three
15  containers MedCare promised you?
16      A.   Nope.
17      Q.   Does the spreadsheet you mentioned
18  earlier demonstrate how much Ascension
19  withheld?
20          MR. RAKHUNOV:  Objection.
21          THE WITNESS:  Does the spreadsheet
22      what?
23  BY MR. FRISCH:
24      Q.   You said you have a spreadsheet
25  ledger for the company; right?

Page 173

1    A.   I said I gave all my documentation
2  to -- if I have a sheet, we produced a
3  spreadsheet and gave him a spreadsheet. I
4  don't know in which fashion that it --
5    Q.   I don't really care what format it's
6  in. I'll take that up with him afterwards.
7         But do you have any sort of ledger,
8  just general ledger --
9    A.   I'm not sure.
10   Q.   -- for the business?
11   A.   I'm not sure. Whatever I gave
12 him -- whatever I have, I gave to Phillip. I'm
13 not sure what it is, what ledger, what format.
14        MR. FRISCH: Okay. That's all I've
15 got.
16        THE WITNESS: Okay.
17        MR. FRISCH: So I would suggest we
18 take a lunch break until, like, 2:00, and
19 then come back and Alex will grill you.
20        THE WITNESS: Sure.
21        (Luncheon recess from 1:26 p.m. to
22 2:04 p.m.)
23        EXAMINATION
24 BY MR. SPERBER:
25   Q.   Good afternoon, Mr. Kato. My name

Page 174

1  is Alexander Sperber. I am the attorney in
2  this matter for Kitchen Winners, for Adorama,
3  and for Joseph Mendlowitz.
4         I'm going to do my best to try and
5  not repeat too much of what Mr. Frisch went
6  over earlier, but let me just as a general
7  matter start off.
8         Do you understand that you're under
9  the same oath that you would be as if you were
10 in a courtroom?
11   A.   Yes, I am.
12   Q.   And you understand even though
13 you're testifying remotely today at a
14 deposition that the testimony you give under
15 oath here is subject to the same penalty of
16 perjury as though you were testifying in court
17 of law?
18   A.   Yes, I do.
19   Q.   Okay. If you don't understand one
20 of my questions, please let me know. Unless
21 you tell me otherwise, I'm going to assume that
22 you understood the question.
23        Is that all right?
24   A.   Correct. Thank you. Understood.
25   Q.   And, again, just as earlier, if you

Page 175

1  need a break during the deposition, as long as
2  there's no question pending, we're happy to
3  accommodate.
4    A.   Sounds good.
5    Q.   All right. Mr. Kato, am I correct
6  that you testified earlier that Rock Fintek was
7  formed in 2018?
8    A.   Yes.
9    Q.   I'm sorry?
10   A.   Yes.
11   Q.   And Rock Fintek got into the
12 personal protective equipment business around
13 2020?
14   A.   Correct.
15   Q.   Okay. And if I refer to personal
16 protective equipment as "PPE," is that all
17 right?
18   A.   Yes, it is.
19   Q.   What was Rock Fintek doing between
20 2018 and 2020 when Rock Fintek got into the PPE
21 business?
22   A.   Selling other products.
23   Q.   What products?
24   A.   A variety of products, from pots and
25 pans to different types of plastic products,

Page 176

1  USB sticks. You know, the same person that we
2  started buying gloves from was a company called
3  Multilaser in Brazil, a publicly traded
4  company, and they had about 5,000 SKUs of
5  products we were selling.
6    Q.   Okay.
7    A.   So when COVID hit, nobody was buying
8  their products, and they were able to supply
9  PPE instead of the other products.
10   Q.   And what kind of PPE did you buy
11 from them?
12   A.   Masks. Masks and -- I think just
13 masks.
14   Q.   Okay. Do you know when you --
15   A.   I think we also bought some
16 bouffants and booties.
17        (Stenographer requests
18 clarification.)
19 BY MR. SPERBER:
20   Q.   Do you know when Rock Fintek first
21 came into contact with Ascension?
22   A.   I would say around March 2020,
23 February or March. Probably March.
24   Q.   And who was -- who made that
25 connection?

Page 177

1    A.   Who made the connection?  A
2  gentleman, Nick Sansone.
3    Q.   Okay.  And who did he connect you
4  with at Ascension?
5    A.   He connected me with a gentleman --
6  I believe it was Todd Adams, Dewayne Rader, and
7  a few people.  I'm not sure everybody that was
8  on the initial call.
9    Q.   And when you had that initial call
10  with Ascension, what did Ascension tell you
11  they were looking for, if anything?
12    A.   Masks.
13    Q.   Okay.  And were -- was Rock Fintek
14  able to procure masks for Ascension?
15    A.   Yes.
16    Q.   Okay.  And that was around, again,
17  February or March 2020?
18    A.   Or March, yes.
19    Q.   Did there come a time when
20  Rock Fintek -- excuse me -- when Ascension
21  asked Rock Fintek if it could procure gloves
22  for Ascension?
23    A.   Say that one more time.
24    Q.   Did there come a time when Ascension
25  asked Rock Fintek if it could procure gloves

Page 178

1  for them?
2    A.   Yes.
3    Q.   And when was that?
4    A.   Around the fall of 2020.
5    Q.   When you were doing business with
6  Ascension, how did Ascension document its
7  agreements with Rock Fintek?
8    A.   There were just purchase orders.
9    Q.   So there was no contract beyond the
10  purchase order?
11    A.   No.
12    Q.   Okay.  I'm going to try and show you
13  an exhibit, and we'll see if this works.
14       Can you see a document in front of
15  you?
16    A.   I can see it.  I can enlarge it.
17  Okay.
18    Q.   I'm going to stamp this as --
19       MR. RAKHUNOV:  Tom, make sure you
20    can see the details of the document well
21    enough to read it, because there's a lot of
22    small text here.
23       (Exhibit Number KWA-Kato 1, Purchase
24    Order dated 8/13/20, Bates-stamped
25    RF_001166 - 1167, was marked for

Page 179

1    identification.)
2  BY MR. SPERBER:
3    Q.   Mr. Kato, do you see a document in
4  front of you that I've marked as KWA-Kato A
5  [sic]?
6    A.   Where does it say that?
7    Q.   In the red box on the bottom
8  right-hand corner.
9    A.   Red box, bottom corner.
10    Q.   There's a stamp.
11    A.   Yes, I see it.
12    Q.   Okay.
13       MR. FRISCH:  Just so you know, you
14    can move the box over so it doesn't block
15    the -- it doesn't block the Bates number if
16    you want.
17       MR. SPERBER:  Okay.
18  BY MR. SPERBER:
19    Q.   The document appears to be labeled a
20  purchase order.  It's from Ascension, and it
21  seems, if I zoom in on the -- the top right
22  corner, it says it is dated August 13, 2020.
23    A.   Yes.
24    Q.   Do you see where I am?
25    A.   I see that.

Page 180

1    Q.   Do you recognize this document?
2    A.   Let me review it.
3       (Reviewing document.)
4       I can't say I recognize it, but I
5  understand it.
6    Q.   What is this document?
7    A.   Seems to be a purchase order or the
8  reconciliation on it of what was paid and not
9  paid.
10    Q.   And was Rock Fintek selling gloves
11  to Ascension in August -- in or around
12  August 2020?
13    A.   Yes.  Or the fall, yeah.  That
14  August or September.
15    Q.   So do you recall -- which brand
16  gloves did Rock Fintek procure to meet this
17  purchase order?
18    A.   I believe we had Medgluv and Ingco,
19  maybe Safeko.  I'm not sure if I can remember
20  all the brands.
21    Q.   Okay.  Was one of the brands
22  MedCare?
23    A.   No.
24    Q.   And did Rock Fintek procure the
25  gloves for this purchase order from either

Page 181

1    Kitchen Winners, Adorama, JNS, or Stern?
2        A.   No.
3        Q.   Okay.  Was Ascension happy with the
4    gloves that Rock Fintek procured pursuant to
5    that purchase order?
6        A.   They seemed to be.  They didn't --
7        Q.   Was there a reason why in the
8    future, when you were procuring additional
9    gloves for Ascension, that you did not go
10   forward with those suppliers?
11       A.   We had another supplier we found in
12   Thailand that Hunton vetted for us.  And it was
13   a slightly better price, about 15 percent, and
14   we went with that one.
15            By the time we wanted -- that one
16   fell through -- to go back to this supplier it
17   was more complicated, and then it seemed more
18   comfortable to deal with a US company instead
19   of an overseas company, after the mishap in
20   Thailand.
21       Q.   And your suppliers for the purchase
22   order in front of you, those were -- the
23   suppliers were overseas companies?
24       A.   Yes.
25       Q.   I'm going to share another document

Page 182

1    with you which I'm going to stamp KWA --
2            (Exhibit Number KWA-Kato 2, Purchase
3            Order dated 8/13/20, Bates-stamped
4            RF_001171 - 1177, was marked for
5            identification.)
6    BY MR. SPERBER:
7        Q.   Okay.  Mr. Kato, do you see in front
8    of you a document that I stamped Exhibit
9    KWA-Kato 2?
10       A.   Yes.
11       Q.   All right.  It appears to be a
12   purchase order with a date of August 13, 2020.
13            You see where I am over there?
14       A.   Yes.
15       Q.   I can just tell you that the
16   previous purchase order ended -- the last two
17   digits on the purchase order were 83 -- oh, did
18   I do this twice?  The previous one ended on 82,
19   and this one ends 83.  So it appears that there
20   were two purchase orders.
21            Does this ring a bell with you?
22       A.   No.
23       Q.   Would this have been part of the
24   same transaction that you were discussing
25   earlier with Ascension?

Page 183

1        A.   Correct.
2        Q.   Okay.  All right.  I'm going to
3    share with you another document.
4            (Exhibit Number KWA-Kato 3, Purchase
5            Order dated 12/7/20, Bates-stamped
6            RF_001284 - 1285, was marked for
7            identification.)
8    BY MR. SPERBER:
9        Q.   Okay.  I'm showing you a document
10   that I have labeled Exhibit KWA-Kato 3.
11       A.   Okay.
12       Q.   Do you see it in front of you?
13       A.   Yes, I do.
14       Q.   This is -- also appears to be a
15   purchase order with the date of December 7th,
16   2020.
17            Do you see where I am?
18       A.   Yes.
19       Q.   Do you recognize this document?
20       A.   Yeah.  Yes.
21       Q.   What is this document?
22       A.   It's a purchase order from
23   Ascension.
24       Q.   And how many gloves is this purchase
25   order for?

Page 184

1        A.   I've got to see where it says it.
2    "Quantity, 15000 CSA [sic]."  Maybe it's 150
3    million.  It says 150, 15,000.  I don't know
4    how it's written.  This -- cases, cartons.  The
5    "CA" maybe stands for carton.  I'm not
6    positive.
7        Q.   Besides these three purchase orders
8    that we've looked at, did Ascension give any
9    other purchase orders to Rock Fintek for
10   gloves?
11       A.   I don't believe so.
12       Q.   Okay.
13       A.   But I recollected the number was 200
14   million total.
15       Q.   Okay.
16       A.   This 150, and the other one I
17   remember the number.
18       Q.   When you say "total," you mean
19   between all three purchase orders or for --
20       A.   Correct.
21       Q.   So when Rock Fintek claims that it
22   sold 200 million gloves to Ascension, the claim
23   is not that Rock Fintek was buying all those
24   gloves from Kitchen Winners, Adorama, JNS, and
25   Joel Stern; correct?

Page 185

1      MR. RAKHUNOV:  Objection.
2      THE WITNESS:  We bought this last
3   purchase order from them and a couple other
4   suppliers, not the first one you showed me.
5  BY MR. SPERBER:
6      Q.   Okay.  How many total gloves did
7   Rock Fintek purchase from JNS or Stern?
8      A.   Between JNS and Stern versus
9   Adorama, you mean, or --
10      Q.   Yeah.  How many gloves did
11   Rock Fintek purchase directly from JNS or
12   Stern?
13      A.   I don't remember off the top of my
14   head.  I looked at it, but I can't remember the
15   numbers.
16      Q.   What did Rock Fintek do with the
17   gloves that it purchased from JNS or Stern?
18      A.   They were all delivered to Medline
19   for -- to go to Ascension.
20      Q.   Okay.  How many gloves did -- did
21   Rock Fintek purchase from Adorama or
22   Kitchen Winners?
23      A.   I don't remember the exact amount.
24      Q.   Approximately.
25      A.   I would say 180 to 200 million.

Page 186

1      Q.   Okay.  And what did Rock Fintek do
2   with those gloves?
3      A.   Delivered them all to Medline.
4      Q.   Okay.  Did Rock Fintek fulfill all
5   three of the purchase orders that it received
6   from Ascension?
7      A.   I don't believe it filled the first
8   two.  Actually, we ended up delivering more
9   than the quantity that they wanted.
10      Q.   Okay.  So you delivered more than
11   200 million gloves to Ascension?
12      A.   Yes.
13      Q.   Okay.
14      A.   Because of the miscount.
15      Q.   Did Ascension pay Rock Fintek the
16   full price for each of the purchase orders?
17      A.   No.
18      Q.   Okay.  Which -- which of the
19   purchase orders did it not fully pay for?
20      A.   The last one was not fully paid for.
21   The first one was not fully filled because they
22   wanted to make a larger order while they were
23   still being delivered.
24      Q.   Okay.  So this last purchase order,
25   how much did -- how much of the purchase price

Page 187

1   did Rock Fintek -- did Ascension pay
2   Rock Fintek?
3      A.   They paid about 34 or 35 million.
4      Q.   Okay.  If I wanted to know the exact
5   number, where can I find that?
6      A.   Phillip should have it.
7      Q.   Which document (indiscernible) --
8      MR. RAKHUNOV:  Sorry.  You just cut
9   out.
10  BY MR. SPERBER:
11      Q.   Which documents could I look at to
12   figure that out?
13      MR. RAKHUNOV:  Sorry, Alex.  Can you
14   go back to your underlying question?
15      MR. SPERBER:  Yeah.
16  BY MR. SPERBER:
17      Q.   My question is if I want to figure
18   out how much Ascension paid Rock Fintek
19   pursuant to the purchase order ending in 0075
20   with a date of December 7, 2020, how would I go
21   about doing this?
22      A.   Are you asking me or Phillip?
23      Q.   I'm asking you, Mr. Kato.
24      MR. RAKHUNOV:  I'm not --
25      THE WITNESS:  I think -- can you

Page 188

1   repeat the question, please?
2  BY MR. SPERBER:
3      Q.   Yeah.  I want to figure out how much
4   money Ascension paid Rock Fintek pursuant to
5   purchase order ending 0075 with the date of
6   December 7, 2020.
7      How would I go about figuring that
8   out?
9      A.   I believe you can look at the bank
10   statements that came in, the funds that came
11   from Ascension.
12      Q.   How would I distinguish those funds
13   from other funds that Ascension paid to
14   Rock Fintek?
15      A.   Anything done December and on was
16   only for this order.
17      Q.   Okay.
18      A.   Is there a third lawyer here, Lauren
19   Riddle?
20      MS. RIDDLE:  Yeah.  That's me,
21   Thomas.
22      THE WITNESS:  Oh, okay.
23  BY MR. SPERBER:
24      Q.   How large of a deposit did -- did
25   Ascension give to Rock Fintek in connection

Page 189

1  with the purchase order in front of you?
2      A.   Let's see.  Shows 2.75 million here,
3  and it says -- I don't know.  It's hard for me
4  to read this document.  I don't understand.
5      Q.   Did Ascension give you a deposit in
6  connection with this purchase order?
7      A.   Yes, they did.
8      Q.   Okay.  At the time that Ascension
9  gave you this purchase order, did Rock Fintek
10 have suppliers lined up to provide the gloves
11 it was going to be selling to Ascension?
12     A.   Yes.
13     Q.   Who were those -- who were those
14 suppliers?
15     A.   SkyMed.
16     Q.   I'm sorry?
17     A.   SkyMed.
18     Q.   Okay.  Anyone else?
19     A.   No.
20     Q.   Okay.  Did Ascension ultimately use
21 SkyMed to fulfill this purchase order?
22     A.   Rock Fintek did not ultimately use
23 SkyMed to fill the order, no.
24     Q.   Why not?
25     A.   SkyMed ended up being a fraudulent

Page 190

1  company that didn't have any gloves.
2      Q.   Okay.  So what did Rock Fintek do
3  instead?
4      A.   It looked to source other gloves.
5      Q.   And where did it source gloves from?
6      A.   Adorama, Kitchen Winners,
7  Joel Stern, JNS, a container or two from this
8  gentleman in Miami, Avi.  Maybe -- that might
9  be it.
10     Q.   The gloves that Rock Fintek used to
11 fulfill this purchase order, were they all
12 MedCare gloves?
13     A.   Yes.
14     Q.   Okay.
15     A.   No.  We gave some LevMed gloves
16 also.
17     Q.   Okay.
18     A.   And I believe everything else was
19 MedCare.  We might have gave some Safeko or
20 Ingco gloves also.  I don't know if that was
21 before this purchase or after this purchase
22 agreement.
23     Q.   How would I figure that out?
24     A.   I'm not sure.  I'd have to . . .
25     Q.   Did Rock Fintek maintain

Page 191

1  documentation about -- concerning the products
2  it was providing to Ascension?
3      A.   Yeah.  It provided that, you know,
4  D6319 510(k) ASTM gloves.
5      Q.   What I'm asking is did you keep a
6  ledger, for example, that would document how
7  many gloves you provided to Ascension and where
8  you got them from?
9      A.   We used more of the logistics
10 company they gave us or supported and
11 delivered, thought that to be accurate.
12         (Stenographer requests
13 clarification.)
14 BY MR. SPERBER:
15     Q.   What was that?
16     A.   We used what the logistics company
17 gave us for what was delivered, and we thought
18 that to be accurate.
19     Q.   And was it accurate?
20     A.   No.
21     Q.   Was that logistics company Dimerco?
22     A.   That was Dimerco.
23     Q.   Your contact over there was Alex
24 King?
25     A.   Yes.

Page 192

1      Q.   How did you figure out that
2  Dimerco's records were not accurate?
3      A.   When Ascension did a count and told
4  us we delivered more gloves than they had
5  wanted and they weren't willing to pay for
6  them.
7      Q.   Let me back up a little bit.  You're
8  familiar with a company by the name of Adorama?
9      A.   I am now, yes.
10     Q.   Are you familiar with the name
11 Kitchen Winners NY Inc.?
12     A.   Yes.
13     Q.   How did you first become familiar
14 with those two companies?
15     A.   I believe I saw the name
16 Kitchen Winners on a purchase order that I got
17 from Miss Lee or Joel Stern.  Then I tried to
18 find them because the price we were paying for
19 the gloves was more than we were selling them
20 for, but I wanted just to at least keep
21 delivering gloves.
22         So, in the meantime, I was trying to
23 find more of the source to the MedCare gloves.
24     Q.   So you (indiscernible)?
25         (Stenographer requests

Page 193

1    clarification.)
2    BY MR. SPERBER:
3        Q.   So you reached out to
4    Kitchen Winners?
5        A.   Yes.
6        Q.   Who at Kitchen Winners did you speak
7    with?
8        A.   Mendel Banon.
9        Q.   How did you find Mr. Banon's name?
10       A.   He was on a purchase -- oh, I just
11   looked up the company.
12       Q.   Online?
13       A.   Yeah, a simple Google Search.
14       Q.   So you reached out to Mr. Banon, and
15   what did you discuss with him?
16       A.   Told him I had purchased these
17   gloves already.  At the price I was buying
18   them, I wouldn't continue -- I wouldn't be able
19   to continue to buy them at a loss delivering to
20   my clients.  "I can buy larger quantities if
21   you can get me a better pricing."
22       Q.   And what did Mr. Banon tell you?
23       A.   "We can slowly do that."
24            So I kept -- so I started -- began
25   purchasing from him at a loss still.  But at a

Page 194

1    less of a loss.
2        Q.   Okay.  Did there come a point in
3    time when you entered into a contract with
4    Kitchen Winners?
5        A.   I don't know if we ever had any
6    contract or just purchase agreements.  I don't
7    recollect.
8        Q.   Okay.  How about a company by the
9    name Adorama?  How did you first become aware
10   of them?
11       A.   From Mendel Banon.
12       Q.   What did Mr. Banon tell you?
13       A.   He said that he's their partner,
14   works with them in distribution.  They were in
15   charge of manufacturing or procuring.
16       Q.   Are you familiar with someone by the
17   name of Hershey Weiner?
18       A.   Yes, I am.
19       Q.   Okay.  Have you ever met Mr. Weiner?
20       A.   No.
21       Q.   Have you ever spoken with him?
22       A.   Yes.
23       Q.   How many times?
24       A.   Several.
25       Q.   That was by telephone?

Page 195

1        A.   Correct.
2        Q.   Who was on those phone calls when
3    you had them?
4        A.   Multiple people.  Sometimes
5    Mendlowitz and sometimes Mendel Banon.
6    Sometimes Joel -- no, I don't think Joel Stern
7    was on there.  Brad Gilling for sure.
8            Various people that were involved in
9    whatever transactions.  Arik Maimon.
10       Q.   Is that Arik Maimon?
11       A.   Maimon.  Maimon, yeah.
12            (Stenographer requests
13       clarification.)
14   BY MR. SPERBER:
15       Q.   You mentioned Mendlowitz.  Is that
16   Joseph Mendlowitz?
17       A.   Yes.
18       Q.   Who is that?
19       A.   I believe he's the owner of Adorama.
20       Q.   Okay.  Have you ever spoken with
21   him?
22       A.   Couple times.
23       Q.   Have you ever met him?
24       A.   No.
25       Q.   Have you ever emailed him?

Page 196

1        A.   I believe he's on emails that I'm
2    on, in the communication with some of them.
3        Q.   Did he ever email you?
4        A.   I don't recollect.
5        Q.   Did he ever text you?
6        A.   No.
7        Q.   Did he ever WhatsApp with you?
8        A.   I don't believe so.
9        Q.   Did he ever send emails to anyone
10   else at Rock Fintek?
11       A.   No, I don't believe so.
12       Q.   Did he ever text anyone else at
13   Rock Fintek?
14       A.   I don't believe so.
15       Q.   Did he ever -- was he ever involved
16   with WhatsApp communications with anyone else
17   at Rock Fintek?
18       A.   I don't believe so.  He might have
19   been.  I don't recollect, but I don't believe
20   so.
21       Q.   You mentioned that you were on
22   some -- some phone calls with him.  What did he
23   say on those phone calls, if anything?
24       A.   We were going to purchase -- make a
25   large purchase order with Adorama that had to

Page 197

1  be directly with him at Adorama, their bank
2  account, their attorneys, and not via
3  Kitchen Winners, even though we were looking at
4  them as one and the same.  It was with Adorama.
5      I said, "We just got stung by a
6  company in Thailand who ended up being bogus.
7  So if we do a deal, we want to do a deal with a
8  company that's credible and can back the
9  product they're giving us."
10     Q.  Why did you believe Adorama was that
11  kind of a company?
12     A.  Did some research online.  They
13  seemed to be a legitimate large company, been
14  around since the '70s, at the first impression
15  when you look.
16     Q.  I thought you had said you reached
17  out to Kitchen Winners originally.  How did
18  Adorama get involved with this?
19     A.  I told you Mendel Banon introduced
20  us.
21     Q.  You were willing to do business with
22  Kitchen Winners; correct?
23     A.  Kitchen Winners -- I was willing to
24  do business with Kitchen Winners on a
25  truck-by-truck basis.  To do a large purchase

Page 198

1  order, I was not going to send Kitchen Winners
2  any large amounts of money.
3      Q.  Okay.  At any point in time --
4      A.  Mendel Banon had a record of a
5  default and a judgment from a bank or a default
6  from a bank for one and a half million that he
7  was still trying to -- I don't know what was
8  going on with it.  So I was like, "I will not
9  send you any large number" -- "amounts of
10  funds."
11     Q.  At any point in time did -- during
12  the relationship between Rock Fintek,
13  Kitchen Winners, and Adorama, did -- did
14  Rock Fintek give a large prepayment in advance
15  of receiving goods?
16     A.  Did we give a large -- did
17  Rock Fintek give a large prepayment for goods?
18     Q.  Yeah.
19     A.  Yes, to Adorama.
20     Q.  What was the date of that?
21     A.  I don't know.  I don't recollect.
22     Q.  Who owns Kitchen Winners?
23     A.  Who what?
24         MR. RAKHUNOV:  Objection.
25         ///

Page 199

1  BY MR. SPERBER:
2      Q.  Who owns Kitchen Winners?
3      A.  I'm not sure the legal entity it was
4  owned by.
5      Q.  What is Mendel Banon's relationship
6  with Kitchen Winners?
7      A.  I believe he's a director, employee,
8  member of the entity.
9      Q.  Okay.  What is Mendel Banon's
10  relationship with Adorama?
11     A.  Partner, salesperson, employee.  I'm
12  not exactly sure.
13     Q.  What are you basing that on?
14     A.  Well, he said he was distribution
15  and they were procurement.  Sounds like
16  partners.
17     Q.  Okay.
18     A.  He said he gets all his products
19  from them.  He works exclusively with them.
20     Q.  Besides Joseph Mendlowitz, did you
21  ever speak with anyone else at Adorama?
22         MR. RAKHUNOV:  Objection.
23         THE WITNESS:  I don't believe so,
24      but if I did, it should be in my WhatsApp
25      or emails.

Page 200

1  BY MR. SPERBER:
2      Q.  Okay.  How about, you know,
3  anyone -- did you ever communicate with anyone
4  else at Adorama?
5      A.  No, I don't believe so.
6      Q.  Did Mendlowitz ever tell you
7  anything about Adorama's relationship with
8  Banon?
9      A.  Besides on the phone call that time,
10  saying that they were working together or he's
11  going to get the gloves and he's distributing
12  them?  No.
13     Q.  Okay.
14     A.  I just made it really clear to him
15  that I won't send money if it wasn't to him and
16  his company that's been around since the '70s.
17     Q.  Was Arik Maimon on that phone call?
18     A.  He was on some phone calls.  Not all
19  the phone calls.
20     Q.  Who is Arik Maimon?  What's his
21  relationship to this transaction?
22     A.  Another broker.
23     Q.  Who hired him?
24     A.  I don't know.  That's hard to say.
25  He would have made a commission from us, but he

30(b)(6)
THOMAS KATO

Page 201

1  got paid, from what he told me, 200,000 from
2  Adorama as a loan for something else from a
3  company that he didn't seem to know before.  So
4  to me looked like he had a prepayment.
5      Q.   Was Arik Maimon on the phone calls
6  with Joseph Mendlowitz?
7      A.   I don't recall.  He was on a lot of
8  phone calls.  I don't know which ones he was
9  on.
10     Q.   Okay.  I'm going to show you a
11 document that was previously marked by
12 Mr. Frisch.
13     A.   By who?
14     Q.   Avi Frisch, the attorney who was
15 speaking to you earlier.
16          Can you see in front of you a
17 document that was marked Exhibit -- JNS
18 Exhibit E?
19     A.   Yes.
20     Q.   This, I believe, was the First
21 Amended Counterclaim and Third-Party Complaint
22 that Rock Fintek filed.
23     A.   I'm looking at page 1.
24     Q.   Okay.  If you can go to page 5.
25     A.   Okay.

Page 202

1      Q.   Go to page 6.  Look at paragraph 19.
2  It says, "Kitchen Winners is an affiliate of
3  Adorama that Adorama formed, upon information
4  and belief, for the purpose of engaging in the
5  PPE business and shielding Adorama from
6  liability for fraudulent PPE transactions."
7          Do you see where I am?
8      A.   Yes.
9      Q.   Okay.  What information do you have
10 to support the allegations in that paragraph?
11     A.   Well, he told me they were partners.
12     Q.   Does that mean that Adorama formed
13 Kitchen Winners?
14     A.   I don't know the legal way that they
15 were formed.  You can ask that question to the
16 lawyer, this legality.  I just know he said
17 they were partners, and that's how I took it.
18 They're one and the same.
19     Q.   So you have no -- no information to
20 support the idea that Adorama actually formed
21 Kitchen Winners?
22     A.   I do not, no.
23     Q.   Okay.  If you go to paragraph 20, it
24 says, "Kitchen Winners is an alter ego of
25 Adorama."

Page 203

1          Do you see where I am?
2      A.   Yes.
3      Q.   Okay.  What information do you have
4  to support that assertion?
5      A.   I don't know what that means.
6      Q.   Okay.  It goes on to say, "Adorama
7  and its principles dominate and control
8  Kitchen Winners for the purposes of engaging
9  fraudulent PPE transactions."
10         Do you see where I am over there?
11     A.   Yes.
12     Q.   What information do you have to
13 support that assertion?
14     A.   "Adorama and its principals dominate
15 and control" --
16         MR. RAKHUNOV:  Note my objection.
17         THE WITNESS:  I don't understand the
18 language written here.
19 BY MR. SPERBER:
20     Q.   Do you have any information to
21 support the idea that Adorama is in control of
22 Kitchen Winners?
23     A.   Yes.
24     Q.   What information do you have?
25     A.   Joseph was Mendel's boss.

Page 204

1      Q.   Anything else?
2      A.   He had to make all the decisions for
3  them.  Him and Hershey had to run everything by
4  Joseph.  Nothing was done unless Joseph agreed.
5  They were not making any decisions on their
6  own.
7      Q.   What are you basing that on?
8      A.   Conversations, messages, "I'll get
9  back to you."
10         They had no authority to do anything
11 without his authorization.
12     Q.   When someone says, "I'll get back to
13 you," does that mean they don't have authority,
14 or could it just mean that they want to
15 consider it?
16     A.   They said, "Let me see if I can get
17 this approved."
18     Q.   Okay.  Do you know who they would
19 have asked?
20     A.   Joseph.
21     Q.   How do you know?
22     A.   They said it.
23     Q.   Is there any documentation of this
24 anywhere?
25     A.   My lawyer has all the text messages.

Page 205

1  Might be in there somewhere or --
2      Q.   Okay.
3      A.   -- multiple times.  Should be
4  somewhere provided.
5      Q.   But you can't recall where?
6      A.   No, I can't recall where in hundreds
7  of pages of messages.
8      Q.   So we should just believe you, this
9  is what happened?
10         MR. RAKHUNOV:  Objection.
11         THE WITNESS:  That's exactly what
12  happened.
13  BY MR. SPERBER:
14     Q.   I'm sorry?
15     A.   Yes.  That's exactly what happened.
16     Q.   Okay.  It says in paragraph 20,
17  "Adorama and Kitchen Winners commingled funds."
18         What information do you have to
19  support that assertion?
20     A.   I don't know the legal terms of your
21  commingling.
22     Q.   Do they share bank accounts?
23     A.   They might.  I send money to
24  Adorama.  If they have a shared account, then
25  maybe they have it.  I don't know.

Page 206

1      Q.   So you don't know?
2      A.   If they have an account with each
3  other, I'm not aware.
4      Q.   Do Adorama and Kitchen Winners have
5  the same officers?
6      A.   I'm not aware of the officers of
7  either company.
8      Q.   Do they have the same directors?
9      A.   I'm not aware of the directors of
10  either company.
11     Q.   Do they share office space?
12     A.   Yes.  He was in the Adorama office
13  all the time, him and Hershey Weiner.
14     Q.   Does that mean that have -- that
15  they don't have separate offices?
16     A.   They said that's where they worked
17  out of.  That's where they worked.  It was one
18  and the same.
19     Q.   Take a look at --
20     A.   Multiple calls or all the calls
21  originated from that office.
22     Q.   Take a look at paragraph 22.  Read
23  it to yourself.
24     A.   Okay.
25         (Reviewing document.)

Page 207

1      Okay.
2      Q.   In what way did Mendlowitz provide
3  Rock Fintek with the document referenced in
4  paragraph 22 of the counterclaim?
5      A.   You mean did he hand-deliver it,
6  email it?
7      Q.   Yeah.
8      A.   I don't recollect.
9      Q.   I think you mentioned earlier that
10  you didn't communicate with him -- he never
11  emailed you directly; correct?
12     A.   Joseph Mendlowitz?
13     Q.   Yeah.
14     A.   I don't believe so, but if you check
15  whatever we submitted, all the emails, if it's
16  on there, then he did.  But I don't recollect
17  him doing that.
18     Q.   So how did he provide this document
19  to you?
20         MR. RAKHUNOV:  Objection.
21         THE WITNESS:  I don't know.  It's
22  more legal terms.  I don't understand it.
23  BY MR. SPERBER:
24     Q.   So you don't know?
25     A.   (Reviewing document.)

Page 208

1      I mean, this is a bunch of legal
2  mumbo-jumbo for me.  So I don't -- I don't
3  know.  If you ask me a clear question, I'll
4  answer it.
5      Q.   Did Mendlowitz provide a document to
6  Rock Fintek which said that Kitchen Winners is
7  authorized to act on Adorama's behalf to
8  procure nitrile gloves?
9      A.   I believe we may have a document
10  that came from him or saying that.
11     Q.   Did he -- again, did he give you a
12  document that said that?
13     A.   I don't know what email it came
14  from, it came from him or it came from who.
15  Maybe it did come from him.  Maybe I was cc'd
16  on it.  Maybe he was cc'd on it and Mendel sent
17  it on his behalf or he sent it.  I'm not sure.
18  I don't recollect.  It was two years ago.
19         I looked at the whole case yesterday
20  and a bunch of documents.  That's not one of
21  the documents I saw.
22     Q.   This is Rock Fintek's complaint;
23  correct?
24     A.   I saw the complaint.  I didn't see
25  that email.

Page 209

1    Q.   Is it -- this allegation in
2  paragraph 22, is it true?
3         MR. RAKHUNOV:  Objection.
4         THE WITNESS:  If we put it there,
5   it's true.  It's a fact.
6  BY MR. SPERBER:
7    Q.   So I'm asking you for the -- to
8  explain to me.
9    A.   And it's a fact.
10    Q.   So how did -- how did Mendlowitz
11  provide you the document?
12    A.   I answered already.  I don't
13  recollect.
14    Q.   Well, to the extent that any
15  document exists showing how Mendlowitz provided
16  the document referenced in paragraph 22, I'm
17  calling for its production if it's not in the
18  existing production from Rock Fintek.
19         MR. RAKHUNOV:  It's in there.
20  BY MR. SPERBER:
21    Q.   Did Rock Fintek ever tell
22  Kitchen Winners who its customer was?
23    A.   No.
24    Q.   Did Rock Fintek ever tell --
25    A.   Well, after -- at the end, after all

Page 210

1  the problems we had, yes.
2    Q.   But before that, it did not?
3    A.   No.  No.
4    Q.   Did Rock Fintek ever tell Adorama
5  who Rock Fintek's customer was?
6    A.   Did -- say that one more time.
7    Q.   Did Rock Fintek ever tell Adorama
8  who Rock Fintek's customer was?
9         MR. RAKHUNOV:  Objection.
10         THE WITNESS:  Not in the beginning,
11   until we had the problems.
12  BY MR. SPERBER:
13    Q.   Okay.  At the end when you started
14  to have problems, did -- did Rock Fintek ever
15  provide any kind of notice of breach to
16  Adorama?
17    A.   We might have emailed them.  We
18  definitely called and told them.
19    Q.   What date did you call and tell them
20  on?
21    A.   July, when we got notification from
22  the hospital.
23    Q.   Did -- did Rock Fintek ever provide
24  notice of breach to Joseph Mendlowitz?
25    A.   Yeah.  It would have been to

Page 211

1  everybody.
2    Q.   So you would have emailed Joseph
3  Mendlowitz?
4         MR. RAKHUNOV:  Objection.  I don't
5   understand the question.
6  BY MR. SPERBER:
7    Q.   Did Rock Fintek ever notify
8  Mr. Mendlowitz that it was claiming that he had
9  breached some sort of a warranty that he
10  provided to Rock Fintek?
11    A.   Yes.
12    Q.   Okay.  When was that?
13    A.   Adorama knew in July, July or
14  August.
15    Q.   Again --
16    A.   We called him, emailed them, to
17  return the gloves.
18    Q.   So there's an email out there from
19  Rock Fintek to Mr. Mendlowitz?
20    A.   There's an email out there to
21  Adorama and to Kitchen Winners and everyone in
22  the conversation that we want to return these
23  products.  They are not what we asked for.
24    Q.   Okay.  Well, I'm calling for the
25  production of that email.

Page 212

1         MR. RAKHUNOV:  I think it's an email
2   from your client to Joseph Mendlowitz, but,
3   you know, you know that better than I do.
4         MR. SPERBER:  Again, your client
5   just testified that Rock Fintek sent an
6   email.  So I'm calling for its production.
7         THE WITNESS:  I said we called or
8   sent an email, one or the other.  I don't
9   recollect what we did two years ago exactly
10   to communicate it.
11  BY MR. SPERBER:
12    Q.   And you can't recall the date?
13    A.   It would be after I was contacted
14  from Ascension Health.
15    Q.   If it was a phone call, who would
16  have been on that phone call besides yourself?
17    A.   God could have been on the phone
18  call.  I don't know who could have been on the
19  phone call.  I don't remember.  If I knew, then
20  I'd tell you specifically.
21    Q.   Okay.
22    A.   Only -- most phone calls was Brad
23  Gilling and I.
24    Q.   How many boxes of MedCare gloves did
25  Rock Fintek purchase in total?

Page 213

1    A.   I think we had over 200 million
2  gloves.  I don't know how you count it into
3  boxes.  Maybe it's 2 million boxes plus or 2
4  million cartons, million cartons.  I'm not
5  sure.  We were always going to glove count
6  mostly.  Around, like, 1.9 million.
7    Q.   **Explain to me how the relationship**
8  **between Rock Fintek and Kitchen Winners or**
9  **Adorama worked; meaning, how did Rock Fintek**
10 **get the gloves from either Adorama or**
11 **Kitchen Winners or both?**
12   A.   I would wire them money.  We would
13 wire them funds, and then they would start the
14 delivery of a shipment of gloves.
15   Q.   **How did delivery of a shipment work?**
16   A.   They were delivered to Medline.
17 When Medline received them, they in turn gave
18 them to Ascension.  Ascension paid us, and we
19 paid them again for another shipment.
20   Q.   **So you're saying that**
21 **Kitchen Winners and/or Adorama would send the**
22 **gloves to Medline?**
23   A.   All the gloves were delivered to
24 Medline.
25   Q.   **It was my understanding -- maybe I'm**

Page 214

1  **wrong here -- that Dimerco arranged for**
2  **truckers to pick the gloves up from -- from the**
3  **warehouse where Kitchen Winners and/or Adorama**
4  **were housing them.**
5        **Is that not correct?**
6    A.   Dimerco did some, and they delivered
7  some directly themselves because they said they
8  can do it cheaper.
9    Q.   **Okay.  How many times did**
10 **Kitchen Winners and/or Adorama deliver the**
11 **gloves directly to Medline?**
12   A.   I don't recollect the exact amount.
13   Q.   **Which shipments did Kitchen Winners**
14 **and/or Adorama directly deliver to Medline?**
15   A.   All the shipments.  Either they
16 delivered directly or Dimerco delivered, one or
17 the other.
18   Q.   **Right.  So which ones did they**
19 **deliver themselves, not through Dimerco?**
20   A.   I don't know.  We'd have to check
21 what was delivered to Medline, what dates and
22 who, go through the messages and emails.
23   Q.   **Where would I get this?**
24   A.   I wasn't in charge of shipping.  So
25 I don't know who delivered what and when

Page 215

1  exactly.
2    Q.   **Who was in charge?**
3    A.   Brad Gilling did a lot of the
4  shipping, and -- I would say Brad Gilling and
5  Dimerco.  And who else did shipping?  That's
6  it.  And then -- then Mendel Banon or
7  Hershey Weiner.  I don't know.  I don't know
8  who -- I don't think Hershey was in charge of
9  shipping.
10   Q.   **You were not prepared to testify**
11 **today about the shipping between --**
12       (Simultaneous speaking.)
13       CERTIFIED STENOGRAPHER:  Excuse me.
14   You guys were talking at the same time.
15   "Shipping between" . . .
16       MR. RAKHUNOV:  Let him finish the
17   question.
18 BY MR. SPERBER:
19   Q.   **Kitchen Winners on the one hand and**
20 **Ascension on the other.**
21   A.   I'm prepared to testify telling you
22 that the shipments were done between either
23 Dimerco or Adorama only.
24   Q.   **Yeah, but I want to know which**
25 **ones -- you know, how --**

Page 216

1    A.   I don't know specifically out of
2  the -- I don't know how -- how many shipments
3  was each one.
4    Q.   **Do you have invoices from Dimerco?**
5    A.   Yes, we do.
6    Q.   **Do you have invoices from the**
7  **shippers?**
8    A.   Yes.
9    Q.   **Have they been produced?**
10       MR. RAKHUNOV:  Objection.
11       THE WITNESS:  Ask my lawyer that.
12 BY MR. SPERBER:
13   Q.   **Okay.  Well, I'm going to call for**
14 **the production of all shipping invoices.**
15       **How much money did Rock Fintek spend**
16 **on shipping?**
17   A.   We were supposed to get invoices
18 from Hershey Weiner.  He refused to give them
19 to us; so I don't have those invoices.  I can
20 -- I'm sure Phillip could get Dimerco's
21 invoices.
22       Because Hershey was supposed to be
23 getting them cheaper than we were shipping
24 them, and we were supposed to be saving money
25 there; hence, that never happened, and I never

Page 217

1  got a copy of one invoice from any of his
2  shipments that he had delivered.
3      Q.   Yeah, but out of pocket, how much
4  money did Rock Fintek spend on shipping?
5      A.   I'd say approximately, if I were to
6  have a good guess, 6 to 7 million.
7          MR. RAKHUNOV:  Pretty good guess.
8          MR. SPERBER:  Sorry?
9          MR. RAKHUNOV:  I said that's a
10  pretty good guess.
11          MR. SPERBER:  Again, we're calling
12  for the production of every invoice that
13  documents those -- those numbers.
14          THE WITNESS:  Then your client
15  Hershey Weiner should give us the other
16  invoices because he never gave them to us,
17  and we still don't have them.  And I've
18  asked them for them multiple times.
19          MR. RAKHUNOV:  Yeah, your -- Tommy,
20  that's fine.  Yeah, Counsel, your request
21  is noted.  I mean, I think we can talk
22  about it later.  I'm pretty sure you have
23  that information, but we can -- we can talk
24  about it.
25          MR. SPERBER:  Okay.

Page 218

1  BY MR. SPERBER:
2      Q.   I think you testified earlier that
3  Dimerco was not able to examine the shipment it
4  was picking up; is that correct?
5      A.   That's correct.
6      Q.   What prevented it from doing that?
7      A.   COVID.
8      Q.   Okay.  So if it weren't for COVID,
9  they would have allowed to look at -- you know,
10  open up the boxes and see what was inside?
11      A.   Correct.
12      Q.   Okay.  What about COVID stopped
13  them?
14      A.   They were not allowed to exit their
15  vehicles even when they were being unloaded or
16  loaded, the drivers.
17      Q.   Not allowed by what?
18      A.   What?
19      Q.   Not allowed by what?
20      A.   Because of COVID protocols.
21      Q.   Which protocols?
22      A.   Whatever COVID protocol that doesn't
23  allow other people to come in contact with each
24  other.  You can look up what happened during
25  COVID if you don't remember.

Page 219

1          People were not allowed to really
2  meet with each other.  Drivers were not allowed
3  to go inside Medline and possibly contaminate
4  or kill somebody if they had COVID, with the
5  infection of COVID disease.  So they were --
6      Q.   So these are laws?
7      A.   I don't know if there were laws.
8  You're the lawyer.  You would know if there's
9  laws.
10      Q.   I'm trying to understand.
11      A.   I'm telling -- I answered your
12  question.  I gave you a fact.  You want to ask
13  it ten more times, go ahead.
14          They were not allowed to see the
15  product, period.  I told you because of COVID.
16  If you want to look into it, research it.
17      Q.   Was it keeping them from pulling the
18  truck over to the side of the road, going in
19  the back and looking at what they had?
20      A.   That would be illegal.
21      Q.   Under what law?
22      A.   I'm not sure what law, but they told
23  me they were not allowed to do that.
24      Q.   Okay.
25      A.   They were sealed by the loading

Page 220

1  warehouse, and they were unsealed when they got
2  there.  So . . .
3      Q.   Okay.
4      A.   You're trying to talk about a
5  trucker.  I don't know what the rules are for
6  truckers opening shipments that they have in
7  the back or not.
8      Q.   When the gloves arrived at the
9  Medline warehouse, was someone there looking at
10  the gloves?
11      A.   I don't know what Medline did when
12  they got the gloves.
13      Q.   Was someone there counting the
14  gloves that were received?
15      A.   I don't know what Medline did when
16  they received the gloves.  You can ask Medline.
17      Q.   Was there a time when Adorama or
18  Kitchen Winners, or both, delivered to
19  Rock Fintek LevMed gloves instead of MedCare
20  gloves?
21      A.   Did they deliver LevMed instead of
22  MedCare?  Is that what you said?
23      Q.   Yes.
24      A.   Yes, they did.
25      Q.   How Rock Fintek learn that the

Page 221

1  gloves were LevMed and not MedCare?
2      A.   I believe within some weeks later,
3  we got notified with photos of these LevMed
4  gloves.
5      Q.   Notified by whom?
6      A.   From Ascension.
7      Q.   So, presumably, someone at Ascension
8  was looking at the gloves that were coming in;
9  correct?
10     A.   They must have -- Medline must have
11  sent them to Ascension, and that's what
12  happened.
13     Q.   So, again, someone was looking at
14  the gloves; right?
15     A.   Well, Medline counted the cartons
16  that were arrived and delivered.  They don't
17  open up the boxes of the gloves and open up the
18  glove.
19     Q.   Can you tell by looking at the
20  outside of the carton what kind of gloves are
21  inside it?
22     A.   The carton?  Yeah.  It said "LevMed"
23  on the box or it says "MedCare," I believe.
24     Q.   Let me back up just to define my
25  terms here.

Page 222

1          Rock Fintek was purchasing pallets
2  of gloves; correct?
3      A.   Correct.
4      Q.   And on the pallets, there were
5  cartons, and in the cartons there were boxes of
6  gloves.
7          Is that accurate?
8      A.   Correct.
9      Q.   Okay.  On the cartons, was it
10  labeled the kind of gloves that were being
11  contained therein?
12     A.   Yes.
13         MR. RAKHUNOV:  Objection.
14         THE WITNESS:  I believe so.
15  BY MR. SPERBER:
16     Q.   So you can tell by looking at the
17  carton what's inside, LevMed or MedCare?
18     A.   We have photos that we submitted of
19  the pictures that we got that were delivered to
20  us, and I don't remember if the box or the
21  carton both said LevMed.  I believe so, but
22  there's -- the photos will show you.
23     Q.   Can you see by looking at the carton
24  whether the gloves inside are protection or
25  examination?

Page 223

1          MR. RAKHUNOV:  Objection.
2          THE WITNESS:  I don't recollect
3      that.
4  BY MR. SPERBER:
5      Q.   Okay.  How many LevMed gloves did
6  Adorama and/or Kitchen Winners provide to
7  Rock Fintek?
8      A.   I don't recollect the exact amount,
9  but I do recollect that they admitted sending
10  us LevMed gloves by accident.  They said they
11  were for another customer.
12         It's whatever was in one truck's
13  load.  So whatever one truckload, maybe it's
14  9,000, maybe 9 million, 9,000 cartons, 9
15  million gloves possibly.
16     Q.   Did -- did Rock Fintek pay Adorama
17  and/or Kitchen Winners for the LevMed gloves?
18     A.   We -- I believe they did pay us.  We
19  got paid for them, and then we paid them for
20  them, because we asked for supporting
21  documentation to give to the hospital about
22  them.  The hospital accepted the documentation,
23  which later we were told by MedCare that they
24  were fake documents using their old FDA
25  numbers.

Page 224

1      Q.   Did Ascension ever complain to
2  Rock Fintek about the LevMed gloves?  Let me
3  rephrase.  About the quality of the LevMed
4  gloves.
5      A.   Did Ascension complain about the
6  quality?
7      Q.   Yeah.
8      A.   They complained about the quality
9  later.  The bigger problem is it delayed our
10  payments for delivering a product that they
11  didn't have the SKU for.
12     Q.   Okay.  Were there complaints that
13  the LevMed gloves were ripping?
14     A.   They're what?
15     Q.   Were there complaints that the
16  LevMed gloves were ripping or tearing?
17     A.   Yes.  Yes.  Yes.
18     Q.   Is that in writing somewhere?
19     A.   I'm sure it is.  I can't recollect
20  exactly, but they were complaining about it.
21     Q.   Okay.
22     A.   The LevMed were just as fake as the
23  other ones.
24     Q.   Am I correct that Adorama and/or
25  Kitchen Winners offered to take the LevMed

30(b)(6)
THOMAS KATO

Page 225

1  gloves back?
2      A.  I don't recollect.  Possibly.
3      Q.  I'm going to show you a document.
4  One second.  I'll mark this as KWA-Kato 4.
5          (Exhibit Number KWA-Kato 4, Email
6      Chain, Bates-stamped RF_000443 - 446, was
7      marked for identification.)
8  BY MR. SPERBER:
9      Q.  Do you see in front of you a
10  document, the top email that says it's from
11  Bradley Gilling to Thomas Kato with the date of
12  August 24, 2021?
13      A.  Yes.
14      Q.  Feel free to just scan through this
15  and confirm this is an email chain that you
16  were on.
17      A.  It wasn't a chain that I was already
18  on?
19      Q.  No.  I'm asking, do you recall this
20  email chain?
21          MR. RAKHUNOV:  Scroll through it.
22          THE WITNESS:  I've got a zoom that
23      goes in and out fast.  Let me . . .
24          (Reviewing document.)
25          Okay.  What was your question?

Page 226

1  BY MR. SPERBER:
2      Q.  Do you recall this email chain?
3      A.  I do.
4      Q.  Okay.  Is this an accurate -- you
5  know, is this a real email chain that you were
6  on?
7      A.  I was -- I don't see myself on
8  there.  I see it being forwarded to me.
9      Q.  Okay.  Take a look at the bottom
10  right-hand corner of most of these pages.
11  You'll see a number, RF_, and then there are
12  some -- a bunch of digits.
13      A.  Where?
14      Q.  The bottom right-hand corner.  If
15  you go to page 2, for example, you'll see --
16      A.  Okay.
17      Q.  -- RF_000444.
18      A.  Yeah.
19      Q.  You see where I am?
20      A.  Yes.
21      Q.  This does indicate they came from
22  Rock Fintek's production.
23      A.  Yes.
24      Q.  Is this a real email that
25  Rock Fintek was part of?

Page 227

1      A.  Yes.
2      Q.  If you'll scroll down, do you see
3  discussion in this email chain about LevMed
4  gloves?
5      A.  Yes, I do.
6      Q.  Do you see that Rock -- that
7  Kitchen Winners offered to take the gloves
8  back?
9      A.  I do.
10      Q.  Okay.  And what was the response
11  from Rock Fintek?
12      A.  Just says -- the email says if the
13  hospital will accept them, we'll counter part
14  of the order.  If they don't, we'll take them
15  back.
16      Q.  And did the hospital accept them?
17      A.  And after we gave them this
18  documentation, the hospital accepted it.  And
19  after we gave it to MedCare, she said this was
20  a fake documentation.  This delayed us at least
21  one or two weeks.
22      Q.  I'm going to show you a document.
23  I'm marking this document that's in front of
24  you, KWA-Kato 5.
25          (Exhibit Number KWA-Kato 5, Sales

Page 228

1      and Purchase Agreement, was marked for
2      identification.)
3  BY MR. SPERBER:
4      Q.  Do you see a document in front of
5  you that's labeled "Sales and Purchase
6  Agreement"?
7      A.  Yes, I do.
8      Q.  Are you familiar with this document?
9      A.  Yes.
10      Q.  Did you answer?  I'm sorry.
11      A.  Yes, I said.
12      Q.  Oh, okay.
13          You've seen it -- you've seen this
14  before?
15      A.  Yes.  It looks like -- it looks like
16  our -- our purchase order.
17      Q.  Okay.  How many boxes of gloves did
18  Rock Fintek agree under this contract to
19  purchase from Kitchen Winners?
20      A.  It should say somewhere on the
21  agreement.  100 -- 1.5 million boxes.
22      Q.  Okay.  And how many boxes of gloves
23  did Rock Fintek actually take from
24  Kitchen Winners?
25      A.  About 1.7.

Page 229

1    Q.   Okay.  What did Rock Fintek do with
2    those 200,000 boxes of gloves in excess of the
3    number on this contract?
4    A.   We delivered them to the hospital.
5    Q.   Okay.
6    A.   And didn't get paid for them.
7    Q.   For any -- for any of them?
8    A.   Didn't get paid for the overage.
9    Q.   What was the overage?
10   A.   200,000.
11   Q.   So you had a contract for 200
12   million gloves with Ascension; correct?
13   A.   Correct.
14   Q.   How many gloves did you get from JNS
15   or Stern?
16   A.   We were buying gloves from them
17   already before to fill the 500,000.
18   Q.   I'm sorry?
19   A.   Before, we were already buying
20   gloves to fill the 500,000 cap.
21   Q.   Okay.  So how many gloves had you
22   purchased before you went entered into this
23   contract on April 7, 2021?
24   A.   Maybe 30 million, 20 or 30, I
25   reckon.

Page 230

1    Q.   Where would I go to find that out?
2    A.   Where can you go to find that out?
3    I guess Medline's reports will show you what we
4    had delivered.  They have all the quantities
5    and times.
6    Q.   So Rock Fintek has no documentation
7    that would tell me how many gloves it purchased
8    for its purchase order with Ascension prior to
9    April 7, 2021?
10   A.   You could look at JNS's invoices.
11   You can look at Adorama Kitchen Winners'
12   invoices.
13   Q.   Okay.  And that would come up with
14   the answer?
15   A.   Should.
16   Q.   But you don't know the answer?
17   A.   I don't recollect.
18   Q.   Why did Rock Fintek take more than
19   the number of gloves listed on the contract?
20   MR. RAKHUNOV:  Objection.
21   THE WITNESS:  Because Adorama,
22   Kitchen Winners, and JNS were always lying
23   to us about the quantity they were
24   delivering.
25   ///

Page 231

1    BY MR. SPERBER:
2    Q.   Can you explain that?
3    A.   They were delivering gloves beyond
4    our contract just so they can keep getting more
5    checks, and they counted on COVID for us not to
6    be able to get there and get an accurate count
7    until after the fact.  They were delivered, and
8    Medline counted them.
9    Q.   I'm confused.  Rock Fintek have a
10   contract with Ascension for 200 million gloves;
11   correct?
12   A.   Correct.
13   Q.   And it was Rock Fintek's job to
14   procure those gloves for Ascension; right?
15   A.   Correct.
16   Q.   So didn't Rock Fintek know how many
17   gloves it was delivering to Ascension?
18   A.   We couldn't get a final exact count
19   until they were delivered, which was week one
20   to two weeks or so after.
21   Q.   So when you say that Adorama and
22   Kitchen Winners were lying to Rock Fintek, what
23   are you referring to specifically?
24   A.   The quantity of gloves that they
25   were sending us.  They were not exactly as we

Page 232

1    were paying for.
2    Q.   How much were they off?
3    A.   I don't know exactly because Hershey
4    refused to give us any of the truckers'
5    invoices to contact anybody to check anything,
6    but I would guess about 20 million off, more.
7    20 million more.
8    Q.   What is that number based upon?
9    A.   The number that Ascension gave us,
10   that Medline gave to Ascension for what we
11   delivered.
12   Q.   If you go to paragraph 7 of this
13   contract, on page 2?
14   A.   Okay.
15   Q.   It says, "Seller shall be allowed a
16   variance in packing quantities of up to
17   10 percent."
18   Do you see that?
19   A.   No.  Where are you reading?
20   Q.   Paragraph 7.
21   A.   Do you want to highlight it?  I
22   don't know what you're reading.  I'm on page 2.
23   MR. RAKHUNOV:  Page 2, Number 7.
24   BY MR. SPERBER:
25   Q.   Can you see the highlight?

Page 233

1     A.   Page 2, Number 7.  "Manufacturing
2  Variance"?
3     Q.   Yes.
4     A.   "Seller shall be allowed a variance
5  in packing quantities of up to 10 percent."
6        So 10 percent.
7     Q.   Do you know whether this variance
8  that you're referring to was greater or less
9  than 10 percent?
10     A.   It was above 10 percent.
11     Q.   Okay.  And, again, what documents
12  could I look at to figure that out?
13     A.   Medline has an accurate count.  You
14  can get the document from them on what they
15  received.
16     Q.   Okay.  But as I understand,
17  Rock Fintek was picking up these gloves from --
18     A.   Hershey Weiner delivered gloves
19  himself also with his own trucking company and
20  refused on multiple occasions to give us the
21  invoices for the trucking.
22        So the only -- because
23  Hershey Weiner refused to give us those
24  documents, if you want documents, you have to
25  ask Medline for the documents of what was

Page 234

1  received in their warehouses.
2     Q.   Okay.
3     A.   You'll have an accurate count with
4  the date.
5     Q.   But, I mean, Medline hasn't given me
6  those documents yet; so that's why I'm asking
7  you.
8     A.   Hershey Weiner hasn't given me the
9  documents yet either.  So what can I tell you?
10     Q.   Again, Rock Fintek is suing my
11  clients here.
12     A.   If he gives them to me, I can give
13  them to you.  That's it.
14        MR. RAKHUNOV:  Just focus on the
15     questions, Thomas.
16        THE WITNESS:  Okay.
17  BY MR. SPERBER:
18     Q.   If I was standing in a Medline
19  warehouse looking at a pallet of gloves, how
20  would I know who sold those gloves to
21  Rock Fintek?
22        MR. RAKHUNOV:  Objection.
23        THE WITNESS:  You can ask Medline
24     that question, how they identify them.
25        ///

Page 235

1  BY MR. SPERBER:
2     Q.   So you don't know?
3     A.   I don't operate their warehouse.  I
4  don't know how they -- what their system is.
5     Q.   So you're not aware of any way I
6  could, by looking at the pallet, figure out who
7  the seller was?
8     A.   They know exactly what pallet was
9  delivered when, where, and where it was moved
10  to.  And if it was moved to another rack, they
11  know it was moved to another rack.  Medline has
12  a very accurate reporting system of everything.
13  It's meticulous.
14     Q.   But you don't know?
15     A.   I don't know how they do it, no.
16  I'm not in their business.
17     Q.   Do you know how I'd figure out, by
18  looking at a pallet, when it was delivered to
19  Medline?
20     A.   No.
21     Q.   You said earlier there was a time
22  that you went to the Medline warehouses to look
23  at the gloves; is that correct?
24     A.   That I went to what?
25     Q.   Medline warehouses to look at the

Page 236

1  gloves.
2     A.   Yes.  Yes, I did.
3     Q.   Was that before over after Medline
4  had done its count of the gloves?
5     A.   After.
6     Q.   When you got there, were -- the
7  cartons of gloves, had they all been opened?
8     A.   No.
9     Q.   So how did Medline count the gloves
10  if it hadn't opened the cartons?
11        MR. RAKHUNOV:  Objection.
12        THE WITNESS:  They had ten boxes in
13     a carton.
14  BY MR. SPERBER:
15     Q.   How do they know what's inside the
16  carton?
17     A.   Maybe they opened up one box.  I
18  don't know how Medline does it.  You can ask
19  them.
20     Q.   So you just don't know?
21     A.   I don't know how Medline does
22  things.  Anything you want to ask about
23  Medline, ask Medline.  I'm not going to guess
24  what Medline does and how they do it.
25     Q.   Is it your understanding that

Page 237

1  **Rock Fintek claims that it overpaid Adorama**
2  **and/or Kitchen Winners for 5,963 cartons of**
3  **gloves?**
4      A.   Is it my understanding of this?
5      **Q.   Is it -- is it it -- is that correct?**
6  **Is that something that Rock Fintek is claiming?**
7      A.   Is it in the complaint?
8      **Q.   I'm asking you.  You're Rock Fintek.**
9      A.   I looked at the complaint.  I think
10 I remember seeing that exact amount in the
11 complaint.  If that's the exact amount I read,
12 then yes, that's correct.
13     **Q.   Okay.  What did Rock Fintek**
14 **ultimately do with those gloves that it**
15 **purchased?**
16     A.   We delivered them all to Medline.
17     **Q.   Okay.  And was it paid for them?**
18     A.   We paid for them.
19     **Q.   I'm sorry?**
20     A.   Did we pay for the gloves?
21     **Q.   No, no.  Did Rock Fintek get paid**
22 **for them?**
23     A.   Did Rock Fintek pay for them?
24         MR. RAKHUNOV:  No, get paid for
25     them.

Page 238

1  BY MR. SPERBER:
2      **Q.   Did Rock Fintek get paid for them?**
3      A.   Get paid for them?  Yes, we got paid
4  for them.
5      **Q.   Okay.**
6      A.   Not in full, but we got paid.
7      **Q.   Okay.  So how much were you paid for**
8  **those gloves?**
9      A.   34 or 35 million for all --
10     **Q.   No, I'm talking about the --**
11 **Rock Fintek is claiming that it overpaid my**
12 **clients for 5,963 cartons of gloves.**
13     A.   We did not get paid for those.
14     **Q.   Okay.  So did it get those gloves**
15 **back from Medline?**
16     A.   No, we did not.
17     **Q.   Why not?**
18     A.   Because they had discrepancies with
19 all the gloves and didn't want any of them.
20     **Q.   You delivered gloves which they**
21 **didn't pay you for; correct?**
22     A.   Correct.
23     **Q.   So why didn't you take them back?**
24     A.   Because the gloves -- all the gloves
25 we delivered did not meet the criteria of what

Page 239

1  they requested and what we purchased.  We tried
2  to send them back all to Adorama and
3  Kitchen Winners, and they refused.
4      **Q.   Why didn't you just return them?**
5      A.   (Stenographer requests
6  clarification.)
7         THE WITNESS:  They refused to allow
8  --
9  BY MR. SPERBER:
10     **Q.   Why didn't you just return them?**
11     A.   We tried to.  They refused to take
12 them.
13     **Q.   You didn't just put them on a truck**
14 **and bring them back?**
15     A.   I don't know which warehouses they
16 came from.  Remember, Hershey never gave us any
17 of their trucking invoices.
18     **Q.   You don't know where Adorama's**
19 **located at?  You can't go onto their website**
20 **and find an address?**
21     A.   No, didn't do that.
22     **Q.   Did you try and sell those gloves to**
23 **somebody else?**
24     A.   Yes.
25     **Q.   And?**

Page 240

1      A.   It was unsuccessful.
2      **Q.   How many potential customers did you**
3  **approach?**
4      A.   Dozens.
5      **Q.   And what did they all -- why did --**
6  **no one wanted to buy gloves from you at any**
7  **price?**
8      A.   They said, "These gloves are
9  horrible.  We're not buying them."
10        The quality was so bad that nobody
11 would buy them.  We couldn't even sell them for
12 $0.20.
13     **Q.   Why did Rock Fintek buy them?**
14     A.   Because we believed we were doing
15 business with a credible company, not somebody
16 giving us something that we didn't order.
17     **Q.   Did Rock Fintek at any point in time**
18 **look at the gloves before it purchased them?**
19     A.   No.  We could not.
20     **Q.   You never took one box of gloves --**
21 **one carton of gloves to look at?**
22     A.   We might have had a box given.  I
23 don't recollect, though, exactly.
24     **Q.   Didn't Rock Fintek contractually**
25 **agree that it could look at the gloves before**

Page 241

1  it purchased them?
2        MR. RAKHUNOV:  Objection.
3        THE WITNESS:  I don't know about
4  that, but might have been given -- we might
5  have been given a couple boxes to look at
6  before.
7  BY MR. SPERBER:
8     Q.   Take a look at the top of page 2 of
9  the exhibit in front of you.
10    A.   Top of page 2.
11    Q.   It's paragraph 2.d., the first
12  paragraph on page 2.
13    A.   Okay.
14    Q.   It says, "Any payment of the
15  Purchase Price payable for each box of gloves
16  delivered shall be paid to Seller upon Buyer's
17  inspection of the products at Seller's
18  warehouse in Los Angeles, California, prior to
19  Buyer's collection of the delivered Products."
20        Do you see where I am over there?
21    A.   Yes.
22    Q.   Didn't Rock Fintek agree it was
23  going to inspect the gloves before it picked
24  them up?
25        MR. RAKHUNOV:  Objection.

Page 242

1        THE WITNESS:  We weren't allowed to.
2  We weren't allowed to inspect anything.
3  BY MR. SPERBER:
4     Q.   Again, who was stopping you?
5        MR. RAKHUNOV:  Objection.
6        THE WITNESS:  The warehouse.
7  Everyone around.  Couldn't get on a plane
8  to get there.
9  BY MR. SPERBER:
10    Q.   Did Rock Fintek try to send someone
11  to the warehouse to look at the gloves?
12    A.   They said we're not allowed.
13    Q.   Who said that?
14    A.   The warehouse.  The same people.
15    Q.   Who at the warehouse told you that?
16    A.   I don't remember the exact names.
17  We're not allowed to look at anything.  We're
18  not allowed to enter these warehouses.
19    Q.   Do you have a document that says you
20  weren't allowed in?
21        MR. RAKHUNOV:  Objection.
22        THE WITNESS:  Hershey says we
23  weren't allowed.  Mendel says we're not
24  allowed.  They said it on the phone.
25        ///

Page 243

1  BY MR. SPERBER:
2     Q.   I mean, didn't they put in their own
3  contract that you were going to do this?
4        MR. RAKHUNOV:  Objection.
5        THE WITNESS:  They put it, but then
6  it wasn't allowed.
7  BY MR. SPERBER:
8     Q.   Again, do you have anything anywhere
9  documenting that someone from either Adorama or
10  Kitchen Winners or the warehouse told you that
11  you were not allowed to go to the warehouse --
12        MR. RAKHUNOV:  Objection.
13  BY MR. SPERBER:
14    Q.   -- and look at the goods?
15    A.   Yes, on the phone, they told me
16  multiple times.
17    Q.   And that's it?
18    A.   Yes.
19    Q.   And you never said, "Well, in our
20  contract you agreed we could do this before we
21  pay you"?
22    A.   They lied about a lot of things.
23  This was just another.
24        (Exhibit Number KWA-Kato 6, Rock
25  Fintek LLC's Amended Initial Disclosures,

Page 244

1  was marked for identification.)
2  BY MR. SPERBER:
3     Q.   I'm showing you another document I'm
4  labeling KWA-Kato 6.
5        Do you see a document in front of
6  you labeled "Rock Fintek LLC's Amended Initial
7  Disclosures"?
8     A.   Yes.
9     Q.   Scroll down to page 3.
10    A.   Okay.
11    Q.   And the section that's involved, it
12  says "Unpaid Amounts by Ascension and Rebates
13  Owed by Adorama."
14        Do you see where I am?
15    A.   Yes.
16    Q.   Read that full paragraph at the
17  bottom of page 3.
18    A.   (Reviewing document.)
19        Okay.
20    Q.   Exactly how much money does
21  Ascension owe to Rock Fintek under the POs --
22  the purchase orders between the two of you?
23    A.   There's 2 million -- approximately
24  $2 million that was not paid.
25    Q.   I see where it says approximately,

Page 245

1  but I want to figure out what's the exact
2  number.
3      A.   I don't know the exact number.
4      Q.   You see at the very end of that
5  paragraph where it refers to Rock Fintek's
6  invoice to Ascension?
7      A.   Okay.
8      Q.   Did Rock Fintek give invoices to
9  Ascension?
10     A.   It's like that order that you had
11 saw before.  They gave us one; we gave them
12 one.
13     Q.   So would you give invoices to them
14 contemporaneous with the purchase order, or
15 would you give invoice them when you delivered
16 gloves to them?
17     A.   I believe we gave them an invoice in
18 the beginning of the order.  And then we tried
19 to collect on this at the end, and that's where
20 they stopped paying us.
21     Q.   I mean, I'll just tell you, I've
22 gone through Rock Fintek's production.  I found
23 a couple invoices from Rock Fintek to
24 Ascension, but nothing in the amount of the,
25 you know, approximately $37 million that I

Page 246

1  understood was the purchase price for the
2  200 million dollars [sic].
3           Can you shed some light to me on
4  what invoice I should be looking for here?
5      A.   I believe when we were closing this
6  order out, that's in July, and that's when they
7  started to complain about the gloves and they
8  weren't happy with the quality, and the 2
9  million was a moot point because they wanted to
10 return all the gloves.
11     Q.   I'm sorry.  I'm not following what
12 you're saying.  Can you repeat that?
13     A.   When they sent a complaint about the
14 gloves in July, that's around the time we
15 wanted to get paid in full and wrap this up,
16 and they, at the time, wanted to return all the
17 gloves.  So there was no discussion about
18 paying us 2 million.  They wanted to return
19 everything, and we did not pursue them to pay
20 us.
21          MR. RAKHUNOV:  Can we go off the
22     record -- can we go off the record for one
23     second?
24          MR. SPERBER:  Sure.
25          (Break taken from 3:29 p.m. to

Page 247

1      3:40 p.m.)
2  BY MR. SPERBER:
3      Q.   Okay.  I apologize, Mr. Kato.  I
4  don't recall exactly where we left off, but let
5  me do it this way.
6           Okay.  Mr. Kato, I'm going to show
7  you a document I'm going to mark as KWA-Kato 7.
8           (Exhibit Number KWA-Kato 7, Rock
9      Fintek Invoice 283299000000870083, was
10     marked for identification.)
11 BY MR. SPERBER:
12     Q.   Do you see an invoice in front of
13 you?
14     A.   Yes.
15     Q.   Is this an invoice that Rock Fintek
16 sent to Ascension?
17     A.   (Reviewing document.)
18          I believe so, yes.
19     Q.   Okay.  This invoice is dated
20 December 7, 2020; right?
21     A.   Correct.
22     Q.   Is that the same date as the
23 purchase order from Ascension?  I can show it
24 to you again, if you like.
25     A.   So where is the date on this one?

Page 248

1  December 7.  Okay.
2      Q.   Let me -- can you see a PO in front
3  of you?  No, I've got to click "Share."
4           Do you see a purchase order in front
5  of you?
6      A.   Yes.  Looks like the same date.
7      Q.   Okay.  Can you explain to me, why
8  was Ascension -- excuse me.  Why was
9  Rock Fintek sending an invoice to Ascension on
10 the same date as the PO?
11     A.   For deposit.
12     Q.   So you were asking for a $37 million
13 deposit?
14     A.   No.  We were asking for a
15 $7-9 million deposit.  I believe it ended up
16 being nine, is what we agreed to.
17     Q.   Now, to go back to the invoice, it's
18 for the full amount; right?
19     A.   No.  It doesn't say full amount.
20     Q.   Here's the invoice again.  Why don't
21 you -- oh, I see.  Amount due upon order is
22 9,250,000?
23     A.   Correct.
24     Q.   Did Ascension send follow-up
25 invoices as it got paid for delivering gloves?

Page 249

1    A.   I believe so, and I believe we
2  provided them.
3      Q.   Now, when Rock Fintek would deliver
4  gloves to Ascension, would Ascension provide
5  any documentation -- you know, receipts, for
6  example -- saying "gloves received"?
7      A.   Would Rock Fintek sent a closed
8  receipt.
9      Q.   I'm sorry.  Would Ascension provide
10 Rock Fintek with receipts of some sort?
11     A.   No.
12     Q.   They would just wire money to your
13 account?
14     A.   They would send something like this
15 document, like the document that --
16         MR. RAKHUNOV:  Objection.  This is
17     not an Ascension document.  You used a
18     previous exhibit; right?
19 BY MR. SPERBER:
20     Q.   Like the purchase order?
21     A.   Yes.  They would send us something
22 similar to this that they were paying, made a
23 payment.
24     Q.   To the extent those haven't been
25 produced, I'm going to call for them to be

Page 250

1  produced.
2         Now, the invoice that we looked at a
3  few minutes ago was for $37 million; correct?
4  That was the total amount?
5      A.   Correct.
6      Q.   And that was for 200 million gloves?
7      A.   Correct.
8      Q.   I'll show it to you again just to be
9  clear.  Right?  It's $37 million, and the total
10 quantity was 200 million?
11     A.   Correct.
12     Q.   Now, Ascension had sent a letter to
13 Rock Fintek when things started to fall apart.
14 I believe Avi showed it to you earlier.  I'm
15 going to display it now.  This was previously
16 marked as JNS Exhibit A.
17         Do you recall this letter?
18         MR. RAKHUNOV:  Just note my
19     objection to form.
20         THE WITNESS:  Yes, I remember the
21     letter.
22 BY MR. SPERBER:
23     Q.   If you go to page 2 at the very top,
24 they say, "Resource Group paid Supplier
25 approximately $37 million to provide 200

Page 251

1  million nitrile ASTM FDA 510(k) D6319 rated
2  gloves."
3         Do you see that?
4      A.   Yes.
5      Q.   So they're saying here that they
6  paid you the $37 million, or approximately
7  $37 million.
8      A.   Correct.
9      Q.   So did they pay this purchase order
10 in full -- or this invoice in full?
11     A.   No.
12     Q.   So they're wrong, is your take?
13     A.   Oh, if you want to say
14 approximately.  I wouldn't say it's not in
15 full.  They held $2 million, which you could
16 see in the bank records also that you have.
17     Q.   Oh, I could if they weren't heavily
18 redacted.
19     A.   Everything that came in from
20 Ascension is on there.
21     Q.   Again, did Ascension ever return to
22 Rock Fintek the gloves for which it had been
23 paid?
24     A.   No, it did not.
25     Q.   Why not?

Page 252

1         MR. RAKHUNOV:  Objection.  Let me --
2  before you answer that, I want to caution
3  you that if anything you might say comes
4  from discussions with me about what you
5  might think or what -- what I might think,
6  I don't want you to answer that.
7         But if you actually have a factual
8  answer that doesn't come from deliberations
9  of counsel, then you can go ahead.
10        THE WITNESS:  I don't know what
11    Ascension does and would do and not do and
12    why they would do or not do something.  I
13    can't say what their actions are going to
14    be.  I just speak of my own.
15 BY MR. SPERBER:
16     Q.   If I wanted to find those specific
17 gloves that Rock Fintek was not paid for, those
18 specific ones, where would I go and find them?
19     A.   I would look at the last shipments
20 that came in to Medline, ask them what rack or
21 pallet or shelf they put them on, and then you
22 can go look at them.
23     Q.   Do you know where they are?
24     A.   I do not know where Medline's
25 keeping them.

Page 253

1    Q.   Have you tested those specific
2 gloves?
3    A.   I randomly went and took gloves from
4 various warehouses and various pallets, various
5 lots, and tested.
6    Q.   Do you specifically know if there
7 are any problems with the gloves that Ascension
8 did not pay Rock Fintek for?
9    A.   I believe they were all the same.
10   Q.   What do you base that upon?
11   A.   The testing report I got from Akron.
12   Q.   And that tells you that every glove
13 that was -- all 200 million gloves were exactly
14 the same?
15   A.   Every glove had almost no nitrile in
16 it.  If not, it had traces of nitrile.  That's
17 what we were told.
18   Q.   Uh-huh.
19   A.   And then when confronting the
20 manufacturer after the fact, tried to tell us a
21 different way to do testing, that everything
22 was consistent, all the same formula.
23   Q.   Is part of Rock Fintek's claim here
24 that some of the gloves were protection gloves
25 and some of them were examination gloves?

Page 254

1    A.   Yes, it is.
2    Q.   So not all of those were the same;
3 correct?
4    A.   They were not the same.  It was half
5 and half, approximately.
6    Q.   Okay.  How do you know that?
7    A.   That's what we were told by Medline.
8    Q.   So you're relying upon Medline for
9 that?
10   A.   We relied on Medline for that.
11   Q.   Who at Medline made that
12 determination?
13   A.   Who at Medline?  I don't know who
14 made the determination, but -- one moment.
15 I've got to charge the computer again.
16       I don't know any specific person at
17 Medline that made that.
18   Q.   What is the difference between a
19 protection glove and an examination glove from
20 MedCare?
21       MR. RAKHUNOV:  Objection.
22       THE WITNESS:  I'm not an expert on
23   what the difference is.  I just know both
24   gloves didn't have any nitrile on them, and
25   both gloves are not D6319 like we ordered

Page 255

1    per our contract.
2 BY MR. SPERBER:
3    Q.   To your knowledge, is there a
4 material difference between a MedCare
5 examination glove and a MedCare protection
6 glove?
7    A.   Yes.
8    Q.   Again, what is that difference?
9    A.   Again, I'm not the expert in it,
10 what it would be, but there's significant lower
11 quality, not to be used for examination
12 protection.
13   Q.   And how do you know that?
14   A.   It's what I was told from Anna from
15 MedCare.
16   Q.   Okay.  Anything else?
17   A.   No.
18   Q.   How did -- how did MedCare figure
19 out which boxes contained protection gloves and
20 which ones contained examination gloves?
21   A.   I believe a lot of them are on the
22 outside of the carton.
23   Q.   And you're --
24   A.   Pallets came wrapped protection or
25 wrapped for examination.  So if you look at the

Page 256

1 cartons and they're examination, that pallet's
2 examination.  Otherwise, that pallet's
3 protection.
4    Q.   And would that have been something
5 that you could see just looking at the pallet
6 when standing there?
7        MR. RAKHUNOV:  Objection.
8        THE WITNESS:  I believe so.  We took
9    a lot of photos, and we submitted them.  So
10   I guess you can look at the photos, and it
11   should show that.
12 BY MR. SPERBER:
13   Q.   So, presumably, Medline, when it
14 received these gloves, could see immediately
15 whether they were protection or examination
16 gloves; correct?
17       MR. RAKHUNOV:  Objection.
18       THE WITNESS:  Medline was doing a
19   count of gloves, boxes, cartons.
20 BY MR. SPERBER:
21   Q.   They noticed when you sent LevMed
22 gloves; right?
23   A.   Because it wasn't the name, MedCare.
24 But they didn't have the SKU number for it.  So
25 all the protection and examination all said

Page 257

1 MedCare on them.  LevMed was a new SKU, new
2 name.
3      Q.   Who figured out there was an issue
4 with the examination or protection -- you know,
5 whether -- that they were mixed together?
6      A.   We identified that, Brad and I, when
7 we went to the warehouse.  We identified a
8 large quantity of protection on there.
9      Q.   So did Medline ever -- excuse me.
10 Did Ascension ever complain to you that you had
11 sold them protection gloves and not examination
12 gloves?
13      A.   They complained that they didn't get
14 D6319 510(k) gloves.
15      Q.   Did your contract with
16 Kitchen Winners and/or Adorama -- did it
17 require them to sell you gloves that conformed
18 with ASTM D6319?
19           MR. RAKHUNOV:  Objection.
20           Go ahead.
21           THE WITNESS:  Yes.
22 BY MR. SPERBER:
23      Q.   It did.  Okay.
24           Let me show you that contract again.
25           MR. SPERBER:  Off the record for a

Page 258

1      second.
2           (Off the record from 3:54 p.m. to
3      3:55 p.m.)
4 BY MR. SPERBER:
5      Q.   Do you see in front of you
6 KWA-Kato 5?
7      A.   Yes.
8      Q.   The sales and purchase agreement?
9      A.   Yes.
10      Q.   Where in this document did Adorama
11 and/or Kitchen Winners agree to sell gloves
12 that met the requirements of ASTM D6319?
13      A.   It says right there, FDA 510(k)s.
14      Q.   Is that the same thing?
15      A.   I believe it's a very similar glove.
16      Q.   Does every 510(k) certified glove
17 comply with D6319?
18           MR. RAKHUNOV:  Objection.
19           THE WITNESS:  I'm not positive.  I
20      would have to ask an expert.
21 BY MR. SPERBER:
22      Q.   What does FDA 510(k) mean?
23           MR. RAKHUNOV:  Objection.
24           THE WITNESS:  Don't recall exactly.
25      ///

Page 259

1 BY MR. SPERBER:
2      Q.   Okay.  Besides in this agreement,
3 was there somewhere else where Adorama and/or
4 Kitchen Winners agreed to provide gloves that
5 complied with the requirements of D6319?
6           MR. RAKHUNOV:  Objection.
7           THE WITNESS:  I would have to ask
8      Bradley, ask him.  That's what we talked
9      about the whole time.
10 BY MR. SPERBER:
11      Q.   All right.  Are you claiming that
12 the gloves here were not FDA 510(k) certified?
13      A.   I don't know what the definition of
14 that is, but I don't believe they are.
15      Q.   And what is (indiscernible) --
16           CERTIFIED STENOGRAPHER:  I'm sorry?
17           THE WITNESS:  There was no nitrile
18      on the glove.
19 BY MR. SPERBER:
20      Q.   Hold on.  Wait.  Let me back up.
21           The question was, and what was the
22 basis for that?
23      A.   You want me to find FDA 510(k), and
24 I'll tell you.
25      Q.   I believe you said earlier that

Page 260

1 Kitchen Winners and/or Adorama delivered gloves
2 to Medline.
3           Was that correct?
4      A.   Yes.
5      Q.   Do you have any documentation to
6 back up that assertion?
7      A.   I told you earlier, Hershey Weiner
8 would not give me the documentation.  The only
9 thing he gave me was a schedule.  He didn't
10 give me the actual documentation of the
11 truckers.  He gave me a schedule, all of the
12 deliveries that they had made, but not
13 invoices.
14      Q.   So you don't have documentation to
15 show that Kitchen Winners delivered products to
16 Medline?
17      A.   I have a detailed report from
18 Hershey Weiner of what was delivered, which is
19 submitted into this complaint or into your
20 documents that you have somewhere.  I just do
21 not have his trucking reports.  But I have a
22 detailed report that he sent of what he
23 delivered and when he delivered it.
24      Q.   Did he say where he delivered it to?
25      A.   If you pull up the document, you'll

Page 261

1  see it.
2      Q.   I'm asking you.  Did he tell you
3  where he delivered the gloves?
4      A.   I don't recollect.  Pull up the
5  document and read it.  You'll see where it is,
6  what it says.
7      Q.   So you have no independent
8  recollection as to whether or not --
9      A.   Pull up the document and I'll read
10  it and I'll tell you.
11      MR. RAKHUNOV:  Tommy, let him finish
12      the question.
13  BY MR. SPERBER:
14      Q.   Let me ask the question.
15      A.   I heard the question.
16      Q.   You have no independent recollection
17  as to whether or not Kitchen Winners and/or
18  Adorama delivered gloves to Medline; correct?
19      A.   They 100 percent delivered all the
20  gloves to Medline.
21      Q.   You told me earlier, Dimerco
22  delivered some of them.
23      A.   They delivered between Dimerco and
24  Adorama and Kitchen Winners and Joel Stern and
25  JNS.

Page 262

1      Is that better?
2      Q.   I don't understand what you're
3  saying.  I'll be honest.
4      A.   JNS, Joel Stern, Adorama,
5  Kitchen Winners, delivered all the gloves
6  for -- to Medline.
7      Q.   So they're the ones who hired the
8  ship -- the trucking companies to deliver the
9  gloves to Medline?
10      A.   They delivered them or Dimerco
11  delivered them.  There's only two groups of
12  people:  everyone that gave me fraud stuff,
13  fake stuff, or not what I ordered; and then
14  this truck -- shipping company.  Two groups
15  delivered all the gloves.
16      Q.   So I'm asking, what evidence do you
17  have to support your assertion that Adorama or
18  Kitchen Winners delivered gloves to Medline?
19      And when I say "delivered," I mean
20  they are the ones who arranged the shipping as
21  to opposed to Dimerco or Rock Fintek arranging
22  the shipping.
23      A.   I'm sure there's messages with
24  Hershey Weiner and Mendel Banon with the
25  trucking companies they hired to deliver them.

Page 263

1      Q.   You can't point me to any of them?
2      A.   He wouldn't give them to me.
3      Q.   So you don't have them?
4      A.   He wouldn't give them to me.  He
5  sent me a schedule of what he supplied.
6      Q.   You said earlier that Joseph
7  Mendlowitz was copied on emails to you; is that
8  correct?
9      A.   I believe he was on some emails,
10  yes.
11      Q.   I'm going to call for production of
12  those emails.
13      MR. RAKHUNOV:  Wait.  Say that --
14      sorry.  Repeat that.  What emails are
15      you asking for?
16      MR. SPERBER:  Emails from Adorama or
17      Kitchen Winners to Rock Fintek on which
18      Joseph Mendlowitz is copied.
19  BY MR. SPERBER:
20      Q.   Did Joseph Mendlowitz ever email you
21  directly or Rock Fintek directly?
22      A.   I don't believe so.
23      Q.   We discussed a little bit earlier
24  someone by the name Arik Maimon.  I just want
25  to go a little further in that direction.

Page 264

1      How did Mr. Maimon become involved
2  in this transaction?
3      A.   He said he could help broker the
4  deal and make sure that we didn't get screwed,
5  is what he said.
6      Q.   You had testified earlier that you
7  approached Kitchen Winners; right?
8      A.   Correct.
9      Q.   How did Arik Maimon get involved in
10  the whole thing?
11      A.   Arik Maimon said that he knew
12  somebody at Kitchen Winners or Adorama or on
13  the board or somebody that said we should have
14  him involved in the deal and have all
15  communication go through him to make sure
16  everything's going to be legitimate.
17      Q.   I'm going to share a document with
18  you.  I'm going to mark this as KWA-Kato 8.
19      (Exhibit Number KWA-Kato 8, Letter
20      of Intent, Bates-stamped RF_000962 - 963,
21      was marked for identification.)
22  BY MR. SPERBER:
23      Q.   Do you see a document in front of
24  you labeled "Letter of Intent"?
25      A.   Yes.

Page 265

1    Q.   Have you ever seen this before?
2    A.   Let's see.
3         (Reviewing document.)
4         Yes.
5    Q.   Okay.  What is the nature of this
6    document?
7    A.   It's like a broker agreement with
8    Arik Maimon.
9    Q.   Would it be correct to say that
10   Rock Fintek was hiring Arik Maimon to act as a
11   broker?
12        MR. RAKHUNOV:  Objection.
13        THE WITNESS:  I don't know if you
14   want to say that, but he was paid by
15   Adorama, not by me.
16   BY MR. SPERBER:
17   Q.   Well, is that what it says here?
18   A.   It doesn't say here, but if you
19   check the bank accounts and records, I paid him
20   nothing.  They paid him 200,000.
21   Q.   When you say they paid him, I mean,
22   paid him for what?
23   A.   I don't know.  They loaned him money
24   for something else.  They gave him 200,000 as a
25   gift.  They sent him $200,000, when they never

Page 266

1    knew who he was before.
2    Q.   How do you know they didn't know who
3    he was?
4    A.   Well, maybe they were cousins and
5    they grew up together.  I presume they didn't
6    know each other very well.
7    Q.   What do you base that on?
8    A.   What do I base it on?
9    Q.   Yep.
10        MR. RAKHUNOV:  Which part?
11        MR. SPERBER:  He just testified that
12   he presumes they didn't know each other; so
13   I'm just trying to understand where that
14   came from.
15        THE WITNESS:  I don't believe that
16   he ever spoke to them before.  I told him
17   who they were.
18   BY MR. SPERBER:
19   Q.   So why did Rock Fintek hire him to
20   act as a broker in this transaction if he
21   didn't even know them?
22   A.   He said he could help with the deal
23   and make sure it's going to be safe and secure.
24   And because we have a very large client and we
25   have a very delicate -- not delicate but strong

Page 267

1    relationship with, we wanted to make sure
2    nothing went wrong with the relationship and
3    were willing to pay extra expenses to make sure
4    everything went smoothly.
5    Q.   So what services was he provided to
6    Rock Fintek?
7    A.   To make sure that there was no fraud
8    or any wrongdoing done to us from Adorama or
9    Kitchen Winners.
10   Q.   Again, what was he going to do?
11   A.   He was just going to be
12   communicating with them and making sure that we
13   got everything they said they were going to
14   give us.
15        And there was a lot of communication
16   problems.
17   Q.   That came around after you hired
18   him; right?
19   A.   That was to be safe.  And then
20   after, he ended up doing more communication,
21   actually, than safety control, I'd say.
22   Q.   What -- why didn't Rock Fintek pay
23   him?
24   A.   Because all the product we bought
25   was not the product we paid for.

Page 268

1    Q.   Did -- did this letter of intent lay
2    out Rock Fintek's understanding of the
3    transaction with Adorama and Kitchen Winners?
4        MR. RAKHUNOV:  Objection.
5        THE WITNESS:  No.  This transaction
6    was made -- this document was made by Arik
7    Maimon and was given to us and he just
8    said, "Just sign it.  Just sign it so I
9    have something in writing."
10   BY MR. SPERBER:
11   Q.   So -- okay.  So Rock Fintek did sign
12   it?
13   A.   Yes.  It appears to be Bradley
14   Gilling's signature.
15   Q.   Okay.  When is the last time you
16   spoke with Mr. Maimon?
17   A.   Beginning of this year, last year.
18   Q.   What did you speak about?
19   A.   What was that?
20   Q.   What did you speak about?
21   A.   What did we speak about?
22   Q.   Yes.
23   A.   Getting together, having dinner,
24   starting to talk more.
25   Q.   You wanted to do business with him

Page 269

1  again?
2      A.   Absolutely not.
3      Q.   So what was the purpose of getting
4  dinner?
5      A.   I bumped into him at a restaurant.
6  I didn't call him.  The conversation was,
7  "Let's get together and have dinner."  I said
8  no.
9      Q.   How do you know Arik Maimon?
10     A.   I met him through a dinner I was
11  invited to with him and his wife, with a group
12  of people -- with a large --
13     Q.   Have you ever done business with him
14  before?
15     A.   Nope.
16     Q.   This is the only transaction you
17  ever did business with him on?
18     A.   Correct.
19     Q.   When did you inform Adorama or
20  Kitchen Winners that Rock Fintek's
21  representatives were prohibited by COVID-19
22  protocols from physically inspecting the
23  products that it was purchasing?
24     A.   When did we inform Ascension?
25     Q.   When did you tell Adorama or

Page 270

1  Kitchen Winners?
2      A.   Well, they knew we couldn't examine
3  the products.
4      Q.   Well, they had agreed in the
5  contract to let you inspect them before picking
6  them up.  So do --
7      A.   They wrote a lot of things in the
8  contract that they didn't follow.
9      Q.   So then why didn't you walk away
10  from the deal?
11     A.   I didn't realize that till later.
12     Q.   Wasn't it right there in the
13  contract, you had this right?
14     A.   Yeah, it was, but I didn't have much
15  choice but to buy gloves from them and trust
16  that they were giving me the proper gloves.
17     Q.   You bought, what, $20 million from
18  them, little less?
19     A.   Yes, sir.
20     Q.   And you never once thought to take a
21  look at what you were buying?
22     A.   We were not allowed to during COVID.
23  You don't -- do you remember what happened
24  during COVID?
25     Q.   Did you ever --

Page 271

1      A.   People weren't allowed outside their
2  house.  They had to get a pass sometimes, in
3  some cities, just to walk the dog.  You don't
4  remember that?
5      Q.   Did Rock Fintek ever make a request
6  to Adorama or Kitchen Winners to let them look
7  at the gloves before picking them up?
8      A.   To look at the gloves?
9      Q.   Yes.
10     A.   We tried to, yes.  I think the one
11  time, we had a representative, Mrs. Lee,
12  examine them.  And then in LA at their
13  warehouse, I think we tried to get someone to
14  look at them.  I don't think we ever did.
15     Q.   Is there a request in writing
16  somewhere or email, for example, saying, "We
17  want to look at the gloves before we pick them
18  up"?
19     A.   I'm sure it's in -- it was on phone
20  calls.  Maybe it's on some documentation that
21  Phillip submitted, in text messages, SMSes.
22     Q.   Mrs. Lee examined whose gloves?
23  Kitchen Winners or JNS?
24     A.   I think it's only JNS.  I don't
25  think she examined any others, but they're all

Page 272

1  MedCare.  They were all the same type of glove,
2  more or less, minus the ones with the stickered
3  boxes.
4      Q.   You're saying some of them were
5  protection and some were examination; right?
6      A.   Half the gloves came in were
7  protection.  Half were examination.
8      Q.   Wouldn't you have known that if
9  you --
10     A.   Nothing -- no, I would not have
11  known that.
12     Q.   Why not?
13     A.   Because I don't know what an
14  examination glove is going to look and feel
15  like.  I'm not a glove expert.
16     Q.   I think you said earlier, it says on
17  the box; right?
18     A.   It says on the box.  That doesn't
19  mean that's what's in the box, as you can look
20  up Adorama and all their lawsuits that they
21  have selling fake Nokia cameras, accused of all
22  those.  They sell things in boxes that are not
23  what's in the box.
24     Q.   So it's possible that inside the
25  protection boxes, they're actually examination

30(b)(6)
THOMAS KATO

Page 273

1  gloves?
2      MR. RAKHUNOV: Objection.
3      THE WITNESS: There was no
4  examination gloves in any of the boxes
5  where any of them were tested. None of the
6  gloves had nitrile.
7  BY MR. SPERBER:
8      Q.   What kind of instructions did you
9  give the trucking companies regarding examining
10 the gloves when they were picking them up?
11 Anything?
12     A.   I asked them to count them, to check
13 them. They said they're not allowed to.
14 Dimerco said no. Hershey Weiner wouldn't give
15 me his trucking companies.
16     Q.   Did you ever think of arranging with
17 another warehouse midway, so to speak, where
18 you could access the gloves?
19     A.   You're not allowed to. They were
20 sealed, and when they got -- they arrived, they
21 broke the seal.
22     Q.   Weren't you the buyer?
23     A.   I was buying them and delivering
24 them to somebody else. I cannot break the
25 seal.

Page 274

1      Q.   According to who?
2      A.   According to me. I bought a glove
3  from somebody. It's being delivered in seal to
4  somebody else.
5      Q.   You're saying you chose not to look
6  at the gloves?
7      MR. RAKHUNOV: Objection.
8      THE WITNESS: No. I could not look
9  at the gloves because of COVID protocols.
10 BY MR. SPERBER:
11     Q.   What would -- again, what would have
12 stopped you from --
13     A.   COVID protocols.
14     Q.   -- having the truck deliver them to
15 an independent warehouse and looking at them --
16     A.   COVID protocols -- COVID
17 protocols -- you're asking the same question
18 100 times.
19     MR. RAKHUNOV: Thomas, let him
20 finish the question, and I'll object.
21     THE WITNESS: He's asking the same
22 stupid question. We've only got two hours
23 and 20 minutes left. So -- well, two hours
24 and 34 minutes left. So if he wants to ask
25 the same stupid question over and over

Page 275

1  again, that's fine.
2      MR. RAKHUNOV: All right. Let's
3  take -- can we take a two-minute break?
4      MR. SPERBER: Sure.
5      THE WITNESS: I don't need a break.
6      MR. RAKHUNOV: No, no, no. I do.
7      THE WITNESS: Fine.
8      MR. RAKHUNOV: I do. Off the
9  record.
10     (Break taken from 4:13 p.m. to
11 4:19 p.m.)
12     MR. RAKHUNOV: All right. Let's
13 move on.
14     MR. SPERBER: Okay. Back on the
15 record.
16 BY MR. SPERBER:
17     Q.   Mr. Kato, I'm showing you again what
18 was previously marked KWA-Kato 6, which are
19 Rock Fintek's amended disclosures. Scroll down
20 to page 4 out of 5?
21     A.   Okay.
22     Q.   Read that top paragraph there.
23     A.   "The Adorama Parties"?
24     Q.   Yeah.
25     A.   (Reviewing document.)

Page 276

1      Okay.
2      Q.   Can you explain to me Rock Fintek's
3  claim for a rebate?
4      A.   Because we purchased everything like
5  we said we were going to and make payments like
6  we said we were going to.
7      Q.   And that, you think, entitles you to
8  a rebate?
9      A.   Yes, per -- the price was originally
10 $11. They switched it and added $0.50 to us
11 and said they'll give it back to us as a rebate
12 later.
13     Q.   I'm going to show you what was
14 previously marked as KWA-Kato 5, which is the
15 Sales and Purchase Agreement.
16     If you take a look on page 2 at the
17 bottom, the last paragraph is titled "Rebate."
18     Do you see where that is?
19     A.   Yes.
20     Q.   Can you just read through that to
21 yourself.
22     A.   (Reviewing document.)
23     Okay.
24     Q.   So am I correct that in order to be
25 entitled to a rebate, Rock Fintek had to make

Page 277

1  the payments due under the contract timely?
2      A.  Correct.
3      Q.  Okay.  If you look on -- at the top
4  paragraph on that same page, starts with the
5  letter "d.," and then the last sentence over
6  there says, "Payments are considered timely if
7  wire confirmation is made within 48 hours
8  (excluding Saturday and Sunday) from product
9  availability at Seller's Los Angeles
10  warehouse."
11          Do you see where that is?
12     A.  Yes.
13     Q.  Did Rock Fintek make the payments
14  timely hereunder?
15     A.  Yes, it did.
16     Q.  Okay.
17     A.  Except when they gave us LevMed
18  gloves, which they gave us the wrong gloves,
19  which delayed our payments of accepting
20  payment, which we explained --
21     Q.  Rock Fintek --
22     A.  -- which we explained to them and
23  they accepted.
24     Q.  Rock Fintek agreed, though, that it
25  was going to count the LevMed gloves towards

Page 278

1  the total in the contract; right?
2      A.  This was in the beginning of it, of
3  the order.  And when they sent us LevMed
4  gloves, we said, "Because of the LevMed, it's
5  delaying us from receiving a payment from our
6  hospital client, which in return, because of
7  your mistake, is causing a delay in this."
8      Q.  So if you look on page 1 under
9  "Payment Terms" -- you see where that is?
10     A.  Payment -- under 1?
11     Q.  Yeah.  Page 1, paragraph 2.
12     A.  Okay.
13     Q.  2.a. says:  "On the date hereof,
14  Buyer shall wire to an account designated by
15  Seller the sum of $1.25 million (the 'First
16  Deposit')"?
17     A.  Yes.
18     Q.  Did Rock Fintek do that?
19     A.  I have to check the dates when we
20  sent.
21     Q.  Then it says:  "On April 26, 2021,
22  and prior to the Shipment of any Products in
23  Tranche 3, Buyer shall wire to an account
24  designated by the Seller the sum of $600,000."
25          Did Rock Fintek do that?

Page 279

1      A.  I would have to check the statements
2  on what dates we sent funds and exact amount.
3      Q.  That deposit, that was going to go
4  to the last 5.6 containers; right?  That's what
5  it says at the bottom of that paragraph?
6      A.  "The Deposit shall be applied as
7  payment in full for the last approximately 5.6
8  containers," correct.
9      Q.  So I'm going to show you -- I
10  created a chart.  This is my creation; so take
11  that for what it is, but it's going through
12  payments back and forth.  I'm going to share it
13  with you.
14          And what are we up to?  I think
15  we're on Number 9.  Make this KWA-Kato 9.
16          (Exhibit Number KWA-Kato 9, Chart
17     Created by Alexander Sperber, was marked
18     for identification.)
19  BY MR. SPERBER:
20     Q.  This is a chart that I created to
21  try and keep track of the balance.  And as far
22  as I can tell, Rock Fintek was routinely and,
23  you know, in a growing sense, behind on its
24  payments to Kitchen Winners and/or Adorama.
25          What am I missing here?

Page 280

1      A.  Adorama delivered and
2  Kitchen Winners delivered LevMed gloves, which
3  delayed our entire process and all of our
4  orders.
5      Q.  If you look, the numbers in the
6  negative column keep growing; right?  You know,
7  May 26 you're, what, four and a half million
8  dollars behind?
9      A.  From your numbers, I owe them
10  2.2 million, if you look at the very bottom.
11          MR. RAKHUNOV:  Yeah, and, you know,
12     note my objection to -- obviously to the
13     use of this summary exhibit that, you know,
14     we haven't had a chance to vet or confirm
15     the accuracy of, but --
16          MR. SPERBER:  That's fine.  I just
17     want to say -- I'll be very upfront.  I
18     created this.
19          MR. RAKHUNOV:  No, understood.  I
20     appreciate that.  Go ahead.
21          MR. SPERBER:  Yeah.
22  BY MR. SPERBER:
23     Q.  So I'm not going to make you take my
24  numbers as anything because it's very
25  possible -- maybe I made a mistake.  So I'm not

Page 281

1  going to tell you that you have to take this on
2  its face.
3        But let me ask you straight up,
4  would you agree that if Rock Fintek was not
5  timely in its payments, it was not entitled to
6  a rebate under the contract?
7        MR. RAKHUNOV:  Objection.
8        THE WITNESS:  If it was not timely
9     because of something that Adorama or
10    Kitchen Winners did, then, yes, I would
11    agree to that.
12 BY MR. SPERBER:
13    Q.   How do I know, you know, which of
14 your late payments are as a result of the
15 LevMed issue?
16    A.   We told them that this caused a
17 problem.
18    Q.   It delayed you?
19    A.   It delayed it significantly.
20    Q.   So how did that alter your cash
21 flow?
22    A.   Delayed us by weeks of collecting
23 payments.  And every shipment after that,
24 everything was delayed.
25    Q.   Okay.  But --

Page 282

1    A.   Back up my order.
2    Q.   Weren't you paying Adorama and/or
3  Kitchen Winners when you were picking -- right
4  until you picked up gloves?
5    A.   I was paying them partial payment
6  and then getting other payment from Ascension
7  and paying them.
8    Q.   Is it true that the money that you
9  would owe to Adorama and Kitchen Winners, that
10 number would grow when you'd pick up more
11 gloves; correct?
12   A.   Correct.
13   Q.   Then it would decrease as you'd pay
14 for the gloves you picked up?
15   A.   Correct.
16   Q.   So your -- other than the deposits,
17 your responsibility to pay only kicked in when
18 you picked up gloves; right?
19   A.   I don't understand the question.
20   Q.   I'm trying to understand.  How did
21 the LevMed issue cause you to be behind on
22 payments?
23   A.   It delayed us collecting payments
24 from Ascension.
25   Q.   For which shipments?

Page 283

1    A.   All of them.  All the following
2  shipments after that.
3    Q.   Why?  Explain that to me.
4    A.   Because they had the wrong product
5  with the wrong SKU, and they stopped paying us
6  for other shipments that were already on the
7  way that we already paid for.
8    Q.   So Ascension stopped paying you on
9  time --
10   A.   Correct.
11   Q.   -- forever --
12   A.   Until --
13   Q.   -- because he delivered the wrong
14 thing?
15   A.   Nope.  Until we got the
16 documentation, the LevMed documentation, and
17 they were going to accept or reject them
18 formally, then things continued.  But -- they
19 continued, but everything was behind.
20       If the LevMed incident didn't
21 happen, we would have never been late.
22   Q.   Oy any of the payments?
23   A.   On any of the payments.
24   Q.   You have to explain that to me.  I
25 don't understand how the LevMed incident caused

Page 284

1  you to be late on entirely unrelated shipments.
2    A.   It delayed every shipment after that
3  we were sending.
4    Q.   Why did you pick up gloves if you
5  couldn't afford to pay for them on time?
6    A.   We picked up gloves and delivered
7  them.  As we delivered, we'd get paid.  As we'd
8  get paid, we'd pay them.
9    Q.   You had a contract where you agree
10 that you would pay within a certain amount of
11 time of picking up gloves; correct?
12   A.   We had a contract to pick up nitrile
13 gloves.  We got no nitrile gloves.  We had an
14 agreed contract for MedCare gloves, and we got
15 LevMed gloves.
16   Q.   Were you paying on time before the
17 LevMed issue?
18   A.   Before the LevMed issue, everything
19 was right on schedule.  It was right in the
20 beginning.
21   Q.   So you're saying you were on time
22 for the first -- I don't know -- five
23 shipments, let's say?
24   A.   What day does it say in your record
25 that I paid, and what day does it say we're

Page 285

1  supposed to pay?  Then we can see what it says.
2  And everything in the very beginning was
3  discussed with Kitchen Winners and with
4  Adorama.  And it was accepted, and we were
5  still getting a rebate.
6      Q.   I'm sorry.  Could you explain that?
7      A.   Everything was discussed with
8  Adorama and Kitchen Winners from the incident
9  that happened, and we were still supposed to be
10 collecting a rebate.
11     Q.   Is that in writing somewhere?
12     A.   That's -- might be in some messages.
13 For sure was on several phone calls.
14     Q.   Can you point me to a document where
15 Adorama and/or Kitchen Winners agreed that even
16 though you were late in payments they would
17 still give you a rebate?
18     A.   Because of what they did with
19 LevMed.  They said this is what caused this,
20 and it was acceptable.
21     Q.   But you can't point me to a specific
22 document?
23     A.   No.  I don't have an exact document.
24     Q.   Who was on those calls?
25     A.   Brad Gilling and I.

Page 286

1      Q.   And who else?
2      A.   Either Henry -- either Hershey
3  Weiner or Mendel.
4      Q.   Mendel Banon?
5      A.   Yeah, Mendel Banon.
6          MR. RAKHUNOV:  Before we keep going,
7      can -- I think Mr. Gilling's trying to get
8      in, and it's not letting him in.
9          MR. SPERBER:  Should we keep going,
10     or are we waiting?
11         MR. RAKHUNOV:  I just wanted to let
12     the court reporter know if -- I don't know
13     if there's something that needs to be done.
14         (Comments off the record.)
15         MR. RAKHUNOV:  Let's keep going.
16     I'll give -- I have the support number for
17     him.  He can do that himself.
18         MR. SPERBER:  Okay.
19 BY MR. SPERBER:
20     Q.   Was there ever a time when
21 Rock Fintek delivered gloves to Medline and
22 Medline refused to accept them?
23     A.   I don't think so.  They refused
24 to -- they refused one set of gloves, I believe
25 back in January, because they were damaged,

Page 287

1  completely damaged.
2      Q.   How many of the pallets were labeled
3  with the name of the seller on it?
4      A.   How many?  Most of them had some
5  type of a sticker on them, sticker or piece of
6  paper on them.
7      Q.   But not all of them?
8      A.   I believe all of them had something
9  on them, some type of QR code or bar code with
10 the name on it.
11     Q.   That said the name of the seller?
12     A.   There was nothing that was just
13 wrapped in plastic without anything.
14     Q.   Sorry?
15     A.   There was nothing that was just
16 wrapped in plastic without anything on it.
17     Q.   So in -- when things started to fall
18 apart with Ascension, I think you were saying
19 earlier that was taking up all your time trying
20 to resolve the issue; is that correct?
21     A.   Yes.
22     Q.   So what were you spending your time
23 doing?
24     A.   Trying to get MedCare to replace the
25 gloves, trying to get Adorama and

Page 288

1  Kitchen Winners to give us the specifications
2  for all the gloves.  They wouldn't give them to
3  us.
4      Q.   Let me back up.
5          What did you do to try and get
6  MedCare to replace the gloves?
7      A.   Asked MedCare to return the gloves.
8  These are for hospitals.  They need real
9  examination gloves with nitrile in them.
10         And they said they're not -- we're
11 not their customer.  Their customer was
12 Kitchen Winners/Adorama.  So we have to deal
13 with them.
14         But then later they said maybe
15 they'll help us and send us a container, which
16 they never did.
17     Q.   Okay.  And what did you do vis-à-vis
18 Adorama?
19     A.   What was that?
20     Q.   What did you do with -- you know,
21 with regard to Adorama after the thing fell
22 apart?
23     A.   What did I do with Adorama?
24     Q.   Yeah.  Did you reach out to them?
25     A.   Yeah.  I told them, "Return all the

Page 289

1  gloves. I want to return all the gloves to
2  you."
3      Q.    Who did you tell that to?
4      A.    I don't remember. Hershey and
5  Mendel.
6      Q.    And what did they say in return?
7      A.    I believe Hershey Weiner threatened
8  to come kill Bradley or bury his body in his
9  front lawn or something. I don't remember the
10  words that he used, but it was a threat which
11  Brad took very serious.
12      Q.    Okay.
13      A.    He threatened his life.
14      Q.    Did anyone from Adorama make any
15  kind of demands like that or threats?
16      A.    Hershey was from Adorama.
17      Q.    Did anyone else besides Hershey?
18      A.    No. I believe it was just Hershey
19  to Brad. And, again, Brad was scared for his
20  life, said, "If something happens to me,
21  Hershey's threatening to do something, and now
22  I'm scared."
23      Q.    What makes you think that Hershey
24  worked for Adorama?
25      A.    He said he did. He was out at the

Page 290

1  office there all the time working there,
2  calling.
3      Q.    Did anyone from Adorama tell you he
4  worked for Adorama?
5      A.    He said -- yeah, like, he was a
6  salesman, broker, partner. I don't know what
7  he was, but he represented himself as --
8      Q.    Did anyone else at Adorama tell you
9  that Hershey Weiner was a sales rep for them?
10      A.    The only people I spoke to was
11  Mendlowitz and Banon, and I didn't think he
12  could be -- you know, it is what it is. A man
13  that works for Adorama, Adorama's saying
14  they're going to bury somebody in their own
15  front yard, you know, like a gangster. Brad
16  said, "Maybe the guy's a real gangster. He's
17  going to come bury me in my front lawn."
18      Q.    What specifically did Mendlowitz
19  tell you about Kitchen Winners?
20      A.    Mendlowitz said specifically? I
21  believe it was they were a distribution; he was
22  a supplier and a source. He said that the
23  money -- we would wire money. We were doing
24  the deal directly with Adorama, and that was
25  pretty much it.

Page 291

1      Q.    Did Mendlowitz ever make any kind of
2  written warranties about the gloves?
3      A.    Whatever warranties we had would be
4  from Adorama. So I don't know if he's the one
5  that wrote them or who wrote them.
6      Q.    Which warranties did you get in
7  writing?
8      A.    The agreement we signed.
9      Q.    And outside the agreement, anything
10  else?
11      A.    No. Numerous phone calls.
12      Q.    Okay. So what kind of oral
13  warranties did Mendlowitz make to you about the
14  gloves?
15      A.    They're going to give us the proper
16  gloves that were requested for the hospitals
17  for examination.
18      Q.    Okay. Anything else?
19      A.    No.
20      Q.    How did you know you were talking
21  with Mendlowitz?
22      A.    He said he was Mendlowitz. Maybe he
23  lied.
24      Q.    How do you know it wasn't someone
25  else on the phone who said he was Mendlowitz?

Page 292

1      A.    How do I know that for a fact? I
2  don't know. Maybe I wasn't talking to Hershey
3  Weiner or Mendel Banon either.
4      Q.    I'm just trying to say -- you're
5  suing Joseph Mendlowitz here. I'm trying to
6  say, how do you know --
7      A.    If a man says he is who he is, then
8  I take it as his word. How do I know who
9  Hershey Weiner is?
10      Q.    How do you know Hershey Weiner
11  wasn't on the phone saying his name was
12  Mendlowitz?
13           MR. RAKHUNOV: Objection.
14           THE WITNESS: I don't know.
15      Committed a fraud once. Maybe they're
16      doing it again. Possible.
17  BY MR. SPERBER:
18      Q.    Did you ever do a Zoom call with
19  either of these people?
20      A.    We might have had a Zoom call
21  together. I'd have to ask Bradley. I can't
22  remember.
23      Q.    When you had these calls, how did
24  you do it? Was it a call-in number, or was
25  it --

Page 293

1      A.   Did mostly WhatsApp.
2      Q.   WhatsApp.  Okay.
3           So if you were calling Mendlowitz,
4  you called him via WhatsApp?
5      A.   Or a voice call in our office on a
6  speaker box.
7      Q.   Who would you be calling?
8      A.   I'd be calling the Adorama office
9  and talking to Mendel, Weiner, and Mendlowitz.
10      Q.   Okay.  Were these calls on a cell
11  phone or a land line?
12      A.   Cell phone -- cell phone.  I believe
13  most of them are cell phone.
14      Q.   Okay.  What's your phone number that
15  you were using?
16      A.   My number was -- my mobile number?
17      Q.   Yeah.
18      A.   I don't want to have my mobile
19  number all over the Internet.
20      Q.   That's fine.  It's just -- it's not
21  going to -- look, I'm going to -- I'm going to
22  be subpoenaing your phone records.  So I want
23  to understand what's your phone number and
24  what's the -- what is the --
25      A.   No, no.  I don't remember what phone

Page 294

1  I called him from.
2      Q.   So what are the options?
3      A.   Maybe it was a Zoom call or would
4  have been a WhatsApp call.  It was -- I'm not
5  sure.
6      Q.   So let's start with -- give me the
7  phone numbers that you might have been using.
8      A.   Zoom or WhatsApp.
9           MR. RAKHUNOV:  We're going to
10      designate this portion of the transcript as
11      confidential under the protective order.
12           MR. SPERBER:  You think his phone
13      numbers are confidential?
14           THE WITNESS:  Yeah.  I don't want my
15      number all over the Internet.
16           MR. RAKHUNOV:  His personal phone
17      number is confidential.
18           MR. SPERBER:  Well, at some point
19      I'll motion to the Court about that.  But
20      okay.  That's fine.  You can designate this
21      however you want, and we'll have to resolve
22      it later on.
23  BY MR. SPERBER:
24      Q.   What were the phone numbers that you
25  were using?

Page 295

1      A.   I used WhatsApp or I used Zoom.
2  It's not my phone number.
3      Q.   It's not your phone number.  Okay.
4  So either WhatsApp or Zoom.
5           So if they were Zoom links, were you
6  sent the link via email?
7      A.   I would have sent it; they would
8  have sent it to us.
9           MR. SPERBER:  Okay.  So I'm going to
10      call for production of any Zoom links that
11      were sent to -- to or from Mr. Kato
12      concerning phone calls with Adorama.
13  BY MR. SPERBER:
14      Q.   And you said the rest of it would
15  have been via WhatsApp?
16      A.   Yes.
17      Q.   Okay.  And, again, any WhatsApp
18  records that reflect phone calls with
19  Mr. Mendlowitz or anyone else at Adorama.
20           Okay.  Let's move on.
21           You mentioned earlier that part of
22  the reason why Rock Fintek didn't get paid was
23  because it had oversupplied gloves to -- to
24  Ascension; is that correct?
25      A.   We didn't get paid because we didn't

Page 296

1  get the correct gloves.
2      Q.   Okay.  So it's not true you
3  delivered more gloves than $200 million -- 200
4  million gloves in --
5      A.   We delivered more gloves, and the
6  gloves were not the correct gloves.
7      Q.   So would it be accurate to say that
8  part of the reason why you weren't paid for all
9  the gloves you delivered is because you
10  delivered more gloves than Ascension had agreed
11  to pay you for?
12      A.   No.  I would say it's because they
13  were not the gloves that they wanted.  I'm sure
14  they would have kept them and used them if they
15  were the right quality gloves.
16      Q.   How many gloves did you -- how many
17  MedCare gloves did you deliver to Ascension?
18      A.   Say about 1.9 million.
19           MR. RAKHUNOV:  Is that gloves or
20      boxes?
21  BY MR. SPERBER:
22      Q.   Cartons?
23      A.   Or cartons.  Sorry.  Maybe 190
24  million.
25           MR. SPERBER:  All right.  Let's go

Page 297

1  off the record. Let me just take a break.
2  I may be almost done here.
3      MR. RAKHUNOV: Okay.
4      (Break taken from 4:45 p.m. to
5  4:51 p.m.)
6      MR. SPERBER: Back on the record.
7  BY MR. SPERBER:
8      Q.  Okay. Just a couple more things.
9  You had mentioned earlier that Kitchen Winners
10 would sometimes directly deliver gloves to
11 Medline. When that happened, how did you know
12 how much to get paid by Ascension?
13     A.  We presumed whatever the order said
14 is what we were getting paid.
15     Q.  What order?
16     A.  Whatever that Adorama or
17 Kitchen Winners told us was being delivered, we
18 presumed that's what we were getting.
19     Q.  So you just trusted them. You
20 didn't check yourself?
21     A.  No. We couldn't check ourselves
22 because of COVID protocol.
23     Q.  And you trusted Medline to
24 accurately count and tell you the numbers?
25     A.  Yes.

Page 298

1      Q.  Is it fair to say that you were
2  relying upon Medline in this whole thing to be
3  honest and accurate in their counts?
4      A.  Yes.
5      Q.  Was Medline doing a good job at the
6  time?
7      A.  They seemed to be.
8      Q.  They seemed on top of their game?
9      A.  They seemed very -- they seemed at
10 the top of their game in the industry.
11     Q.  Okay. I'm showing you what I
12 previously showed you, which was an email chain
13 that we marked KWA-Kato 4 regarding LevMed.
14     Do you recall?
15     A.  Yeah.
16     Q.  If you scroll down, you see a
17 discussion of it here concerning LevMed
18 dated -- if you go to the very bottom, this
19 whole thing starts April 29th.
20     Is that when LevMed blew up?
21     A.  April -- I don't know. I'd have to
22 look or talk to Bradley about it. He was more
23 with the logistics.
24     Q.  It seems from that email chain --
25 and I looked through your production, and I

Page 299

1  don't see other things really concerning
2  LevMed. Not much, at least. This is when it
3  started.
4      If you go back to the chart that I
5  had created and I showed you and we marked
6  KWA-Kato 9, which I'll show you right now, it
7  appears that already by April 26 that
8  Rock Fintek was behind on its payments.
9      Can you explain that?
10     A.  When was the LevMed incident?
11     Q.  The 29th, at least according to the
12 emails that I had over there.
13     A.  Maybe that's when the emails
14 started.
15     MR. RAKHUNOV: Let me just object to
16 that last comment. It's -- the 29th is
17 just the date of the email from Mr. Gilling
18 to Adorama. That doesn't mean it's the
19 date --
20     MR. SPERBER: Okay. Let me ask.
21 BY MR. SPERBER:
22     Q.  Do you have any independent
23 knowledge concerning when the LevMed thing
24 began?
25     A.  I know that our payment schedule was

Page 300

1  thrown off because of the LevMed glove scandal.
2  I don't recollect two years ago from today what
3  the date -- exact date was in time. But I know
4  what caused the problem was the LevMed.
5      Q.  Did you come here today prepared to
6  discuss your damage claims?
7      A.  I sure did.
8      Q.  So why don't you have this
9  information in your head to explain?
10     MR. RAKHUNOV: Object.
11     THE WITNESS: I went through this,
12 and I don't have a photographic memory.
13 BY MR. SPERBER:
14     Q.  Is there somewhere I could look to
15 figure out, you know, beyond the emails that I
16 have in your production already, when the
17 LevMed thing blew up?
18     A.  The LevMed thing blew up -- for the
19 exact day it blew up? You have all of our
20 communications; so you should be able to see
21 everything.
22     Q.  So if it exists, it's in there;
23 correct?
24     A.  Yes. If it exists, that exists
25 there, but --

Page 301

1        MR. RAKHUNOV:  Objection.
2        THE WITNESS:  Maybe it is.  Maybe it
3    isn't.
4    BY MR. SPERBER:
5        Q.    Do you have Mr. Weiner's phone
6    number?
7        A.    I don't know.  Would you like me to
8    check?
9        Q.    If your lawyer will let you check.
10   If not, I'll call for the production of it.
11       MR. RAKHUNOV:  I'm not -- you know,
12   you can make a -- you can make a request.
13   I don't want the witness doing this on the
14   record.
15       MR. SPERBER:  Okay.
16       MR. RAKHUNOV:  Seems inappropriate.
17       MR. SPERBER:  That's fine.
18       THE WITNESS:  I 100 percent have
19   Mr. Banon's name.
20   BY MR. SPERBER:
21       Q.    Okay.  But you're not sure if you
22   have Mr. Weiner's number?
23       A.    I'm not positive, no.
24       Q.    Okay.  I'm going to call for the
25   production of Mr. Weiner's phone number or any

Page 302

1    contact information on your phone for
2    Mr. Weiner.
3        MR. RAKHUNOV:  And, you know, just
4    to make this easier for everybody so we
5    don't have to -- you know, the witness
6    testified he doesn't have perfect memory of
7    every one of thousands of documents out
8    there, but I'm happy to direct your
9    attention to the WhatsApp chat with
10   Mr. King, who on April 26 sent a message
11   that "Jimmy from the warehouse just called
12   me and told me that Mendel instructed him
13   to load the trailer half and half with
14   LevMed and MedCare gloves."
15       So April 26 is the date that the
16   LevMed issue seems to have originated,
17   based on the record that you-all have, and
18   hopefully that helps you.  That actually
19   came up in Mr. King's deposition.  So . . .
20   BY MR. SPERBER:
21       Q.    Now, Mr. Kato, am I correct in
22   understanding that Rock Fintek agreed in
23   contract with Kitchen Winners that it would
24   pick up the gloves from Kitchen Winners' LA
25   warehouse?

Page 303

1        A.    We agreed to pick them up?  I think
2    they were going to ship them to us, and we were
3    going to try to have Dimerco pick them up and
4    deliver them.
5        Q.    All right.  Well, let's take a look
6    at KWA-Kato 5.  That's the Sales and Purchase
7    Agreement.  If you go to page 2, the top
8    paragraph seems to indicate --
9        A.    Which part?  Which paragraph?
10       Q.    This is paragraph 2.d., which is the
11   top paragraph on page 2.
12       A.    Okay.
13       Q.    Seems to indicate that you'd be
14   picking up the gloves from Kitchen Winners'
15   warehouse.  No?
16       MR. RAKHUNOV:  Objection.
17       THE WITNESS:  Kitchen Winners and
18   Adorama didn't have a warehouse.  They said
19   they rented them, is what we were told.
20   And Dimerco picked up gloves from them and
21   delivered them to us, or they had their own
22   trucking company/freight company transport
23   them to us.
24   BY MR. SPERBER:
25       Q.    Take a look at paragraph 5,

Page 304

1    "Customs."
2        "The Products shall be shipped by
3    sea to the U.S. port of Long Beach.  Seller
4    shall import the Product, clear customs and pay
5    taxes and duties.  Buyer shall arrange for and
6    pay the cost of ground transportation after
7    customs clearance."
8        Did Rock Fintek do that?
9        A.    Did Adorama bring them in and ship
10   them by see to the U.S. ports?  I don't know
11   where they source their products from, if they
12   are --
13       Q.    What I'm asking is, did Rock Fintek
14   arrange for and pay the cost of ground
15   transportation after customs clearance?
16       A.    We said we'd pay the actual costs of
17   whatever the ground transportation cost, and
18   they never gave us an invoice.  They just gave
19   us numbers.  They would not release the
20   invoices to us.  Until this day, we still don't
21   have them.
22       Q.    Did you receive the invoices from a
23   trucking company called Tonersworld?
24       (Stenographer requests
25   clarification.)

Page 305

1       THE WITNESS:  Tonersworld.  I don't
2   recollect an invoice from a Tonersworld.
3   Possibly, but I don't recollect it.
4 BY MR. SPERBER:
5       Q.   How many employees does Rock Fintek
6   have?
7       A.   I don't understand the definition of
8   "employee."
9       Q.   Okay.  How many people are on
10   payroll at Rock Fintek?
11       A.   There's nobody on payroll.
12       Q.   Okay.  How many contract employees
13   does Rock Fintek have?
14       A.   Well, Brad Gilling --
15       MR. RAKHUNOV:  Now or when?
16 BY MR. SPERBER:
17       Q.   Let's say during the time when
18   Rock Fintek was engaged in these transactions.
19       A.   So we had Brad Gilling as chief
20   operations officer as a contractor and Anna as
21   bookkeeper/CFO at the time.
22       Q.   That's it?
23       A.   Yes.  No longer, but at the time.
24       Q.   So let's just back up.  What was
25   your role in regards to Rock Fintek?

Page 306

1       A.   My role as Rock Fintek?  I was
2   trying to source products and find the clients
3   and build the sales team.
4       Q.   And on a day-to-day basis, what were
5   you doing in regard to these gloves
6   transactions?
7       A.   I would solicit -- with the gloves?
8       Q.   Yeah.
9       A.   Communicating with Arik Maimon or
10   Kitchen Winners or Adorama, status, shipments,
11   tracking things, and communicating with Brad
12   Gilling about the logistics and about what
13   payments were received, what payments were
14   going to be due.
15       Q.   Okay.  You know, how many hours a
16   day were you putting in when this was really,
17   you know, at its peak?
18       A.   How many hours at its peak?  18
19   hours a day.
20       Q.   Just for this?
21       A.   Just for this.
22       Q.   Doing -- what were you doing with
23   all that time?
24       A.   We were just making sure everything
25   was going to arrive on time, payments came on

Page 307

1   time, payments were sent out correctly,
2   invoices were billed correctly.
3       Q.   What was Bradley Gilling's role in
4   all this?
5       A.   Mostly was logistics, but he's
6   operations.
7       Q.   Meaning what?
8       A.   Meaning he would manage and
9   coordinate the logistics.
10       Q.   When you say "logistics," what are
11   you referring to?
12       A.   Transportation.
13       Q.   So he was in charge of dealing with
14   Dimerco?
15       A.   Or Adorama Kitchen Winners for their
16   deliveries.
17       Q.   What were you paying Gilling for
18   this?
19       A.   He was making 10 percent of whatever
20   the company netted.
21       Q.   As of when?
22       A.   For the order.
23       Q.   Okay.  So did he make a -- did he
24   make any money off this?
25       A.   No.  We lost money.

Page 308

1       Q.   Okay.  Let me -- so Rock Fintek paid
2   you, let's say for argument's sake,
3   $35 million, somewhere in that range?
4       A.   Yes -- Rock Fintek paid me?  No.
5       Q.   Ascension paid Rock Fintek somewhere
6   around $35 million?
7       A.   Correct.
8       Q.   For this PO?
9       A.   Correct.
10       Q.   And how much did Rock Fintek spent
11   on procuring the gloves?
12       A.   37 or 40.
13       Q.   Million?
14       A.   Yes.
15       Q.   So you -- you spent $15 million more
16   than -- so $37 million to buy the gloves?
17       A.   37 to 40 million.
18       Q.   $40 million to buy gloves for a
19   $37 million contract?
20       A.   Correct.
21       Q.   Where did you find the cash -- you
22   know the extra -- you know, several million
23   dollars in cash?
24       A.   From previous product we sold to
25   Ascension, the masks.

Page 309

1    Q.   How much money did you pay to
2  Adorama and Kitchen Winners?
3    A.   Approximately 20 million, 19 --
4    Q.   How much money -- I'm sorry?
5    A.   19 and a half.
6    Q.   How much money did you pay to JNS or
7  Stern?
8    A.   I don't remember the amount I paid
9  to JNS and Stern.  I have to look.
10   Q.   Beyond that, what were your other
11 expenses?
12   A.   The bank statements will show
13 everything I paid everybody.
14   Q.   I'm sorry?
15   A.   The bank statements should show
16 everything.  So when I read it on the bank
17 statement, I didn't think I'd try to memorize
18 it ten times to give you the exact amount
19 because you have the statements.
20   Q.   What were your other major expenses?
21   A.   Major expenses?  Rent for the
22 office.  Insurance was pretty heavy.  Rent,
23 insurance. Legal was pretty extensive.  So we
24 had, I'd say, 5 to 7 percent in operational
25 costs.

Page 310

1    Q.   Okay.
2    A.   In rent.
3    Q.   Let's say rough numbers, $20 million
4  to Adorama, Kitchen Winners; right?  I don't
5  know -- let's say $3 million to Stern.  Is that
6  ballpark?
7    A.   I think it would be more, but you
8  can say three.
9    Q.   Let's say five.  Now we're talking
10 $25 million.  So where did the remaining --
11 what's that?  -- 12 million -- $12 million-ish
12 go?
13   A.   $6-7 million for freight.
14   Q.   That was Dimerco?
15   A.   Yeah.  6.2 million to Thailand.
16   Q.   How was Thailand related to this
17 transaction?
18   A.   It was part of the same purchase
19 order.
20   Q.   You didn't actually get any gloves;
21 right?  That was --
22   A.   That was when I lost the money.
23 Then I paid him for this order.
24   Q.   If you hadn't had the Thailand
25 situation, you would have made profit here?

Page 311

1    A.   If I hadn't had the -- if Thailand
2  would have went through, I would have never
3  met -- spoken or met or spoke with JNS,
4  Joel Stern, Kitchen Winners, or Adorama.
5  Correct.
6         I had other reasons to try to work
7  with them.
8    Q.   I'm sorry?
9    A.   They seemed to be honest people when
10 I met them.
11   Q.   Who?
12   A.   Kitchen Winners and Adorama.
13   Q.   When did you meet them?
14   A.   When we spoke earlier in the year.
15 Told me we could take everything on a
16 handshake, don't even need the contracts.
17   Q.   But you did have a contract; right?
18   A.   We had a contract, but they said
19 their golden handshake is stronger than a
20 contract and don't worry about the contract.  I
21 took them at their word.
22   Q.   How much money did you --
23   A.   On top of the contracts.
24        (Stenographer requests
25        clarification.)

Page 312

1  BY MR. SPERBER:
2    Q.   So in total, did Rock Fintek as an
3  enterprise make money or lose money?
4    A.   It made money until we did this
5  transaction with Adorama and Kitchen Winners.
6    Q.   But you lost money really on the
7  Thailand deal; right?
8    A.   If they would have given us the
9  correct product and not taken the extra rebate,
10 Ascension would have paid us the extra and not
11 overshipped us, we would have been profitable,
12 or close to.  And we would have got -- been
13 able to sell our test kits and other products
14 to them, continue the relationship we had.
15   Q.   Let me show you again -- this is
16 KWA-Kato 6, the initial disclosures.  If you go
17 to the last page, there's a paragraph that
18 starts -- second-to-last paragraph.  Read
19 through that.  This is on page 4?
20   A.   "The Adorama Parties are also
21 liable"?
22   Q.   Yeah.
23   A.   (Reviewing document.)
24        Okay.
25   Q.   So could you explain to me what

Page 313

1  you're asking for in this paragraph?
2      A.   The lawyer can explain that.  It's a
3  lot of legal words.
4      Q.   So you don't understand this?
5      A.   I don't understand all of it.  It
6  says figure detailed RF_ 0034- -- I don't know
7  what he's referring to in all this stuff.  So
8  you can ask him.
9      Q.   You say that "The Adorama Parties
10  are liable to Rock Fintek for 5,963 cartons of
11  gloves beyond the contractually called for
12  amount for which Rock Fintek overpaid."
13          Right?  You see that?
14      A.   Yep.
15      Q.   So could you explain -- what is this
16  referring to?
17      A.   Rock Fintek -- "The Adorama Parties
18  are also liable to Rock Fintek for . . . carton
19  of gloves beyond the contractually called for
20  amount" -- I don't know what he's -- they sent
21  us too many.  That's that it's -- the way it's
22  worded, like I said.
23      Q.   So your claim is that Adorama or
24  Kitchen Winners sent Rock Fintek approximately
25  6,000 too many cartons of gloves, which you

Page 314

1  paid for, and now you want a refund for that;
2  is that right?
3      A.   They sent about -- yes, about 20
4  million extra gloves.  I don't know if it's 6
5  million or 20 million, but we had about 20
6  million too many.
7      Q.   And then the next line says, "The
8  amount owed together with associated logistics
9  costs is $2,034,070."
10          See that as well?
11      A.   Yeah.  My claim is that they ruined
12  my relationship with --
13      Q.   So are you asking for this money
14  back also, or is this something -- you're not
15  asking for this?
16      A.   From Ascension?
17      Q.   No, from Adorama and Kitchen Winners
18  and Joseph Mendlowitz.
19      A.   I wanted my rebate back and the
20  overpaid -- for the over amount of products
21  they gave me which I didn't want and they
22  refused to take back.
23      Q.   So what are the associated logistics
24  that you're referring to over here?
25      A.   They charged us for insurance and

Page 315

1  shipping and office expenses that they had or
2  the trucking expenses.
3      Q.   And did you pay it on time?
4      A.   We paid them.  It was part of our
5  payments we made.  I just asked for invoices.
6  I don't have the invoices for -- for that.
7      Q.   So of the $2,034,070, how much is
8  logistics?
9      A.   If you have Hershey Weiner give me
10  the invoices, I'll tell you.  Or maybe it's on
11  those reports we're trying to put together.  I
12  don't know what they say.
13      Q.   When you paid those invoices that
14  you're talking about, did you know what you
15  were paying for?
16      A.   We paid --
17          MR. RAKHUNOV:  Objection.
18          THE WITNESS:  -- shipping for
19  Hershey and Dimerco.
20  BY MR. SPERBER:
21      Q.   I'm sorry?
22      A.   We aid for shipping to Dimerco, and
23  we paid Adorama and Kitchen Winners for gloves.
24  And --
25      Q.   And you're saying -- you're saying

Page 316

1  Kitchen Winners sent you invoices that included
2  insurance and shipping and other things; is
3  that right?
4      A.   Yes.  They didn't --
5      Q.   And you paid those invoices?
6      A.   Yes.  They said the shipping cost X
7  for the trucks that they shipped.  He was
8  holding the gloves hostage unless we paid the
9  unverified shipping costs.
10      Q.   And you paid them?
11      A.   Otherwise I wouldn't get the gloves
12  delivered.
13      Q.   Okay.  And now you're saying you
14  weren't supposed to pay them?
15      A.   I was supposed to -- I agreed to pay
16  the freight cost directly what they were.  I
17  was not given those freight costs.
18      Q.   So how much extra did you pay that
19  you shouldn't have paid?
20      A.   It says $2 million right here.
21      Q.   How much of that is for the gloves
22  and how much of that is for the logistics that
23  you're talking about?
24      A.   I guess you have to look at the
25  detailed report, as noted there.

Page 317

1    Q.   But you don't know off the top of
2  your head?
3    A.   I looked at these, and I don't have
4  a photographic memory.  I looked at them and
5  studied it yesterday with my attorney, and I
6  don't remember exactly it says.  I looked at a
7  lot of documents yesterday and before to
8  prepare for this.
9        MR. RAKHUNOV:  And I can just tell
10     you, Counsel, that the invoices from
11     Dimerco that have this information in
12     detail have been produced.  They're -- I
13     can even tell you they're in the WhatsApp
14     chats with Mr. King.  So -- among other
15     places.  So you have all that information.
16  BY MR. SPERBER:
17    Q.   All right.  Let's back up.  Are you
18  saying that Kitchen Winners or Adorama owes you
19  money because Dimerco -- you paid Dimerco money
20  to pick up gloves you didn't want?
21    A.   Dimerco did shipping, along with
22  Adorama, of gloves.
23    Q.   Are you saying that you want
24  Kitchen Winners and Adorama to reimburse you
25  for a portion of the Dimerco shipping fees you

Page 318

1  got charged?
2    A.   I want them to reimburse me for the
3  overage of cartons and any expenses associated
4  with it.
5    Q.   What expenses?
6    A.   Whatever came across.
7        MR. RAKHUNOV:  Objection.
8  BY MR. SPERBER:
9    Q.   Name the expenses.
10    A.   Shipping.
11    Q.   Okay.
12    A.   Insurance.
13    Q.   If you pay someone to pick up gloves
14  from Adorama or Kitchen Winners --
15    A.   I didn't want those gloves.
16    Q.   Let me ask the question.
17        If you pay someone to pick up gloves
18  from Adorama or Kitchen Winners, then you
19  decide you don't want them, why are they at
20  fault?
21    A.   I didn't want the gloves.  They
22  snuck them on the truck.
23    Q.   How did they sneak them on the
24  truck?
25    A.   They gave me miss -- wrong counts.

Page 319

1    Q.   You're saying the truck was already
2  there.
3    A.   They delivered --
4        (Simultaneous speaking.)
5        CERTIFIED STENOGRAPHER:  Excuse me.
6     Stop.  Wait until the question's finished,
7     please.
8        THE WITNESS:  Yes, ma'am.
9  BY MR. SPERBER:
10    Q.   Did you hear the question or no?
11    A.   No.
12    Q.   You're saying the truck was already
13  there and that they just snuck more gloves on
14  than you knew about?
15    A.   That's not what I said.  I said they
16  delivered more gloves than I paid for.
17    Q.   But you're also saying that you paid
18  Dimerco to pick those up; right?
19    A.   I paid for -- let me reword it.
20        I paid -- they gave me more gloves
21  than I contracted them to give me, and they did
22  not tell me the amount of gloves they were
23  supposed to give me.
24    Q.   But you picked them up from their
25  warehouse; right?

Page 320

1    A.   I didn't pick them up.  Dimerco
2  picked them up.
3    Q.   Okay.  So why is it Adorama or
4  Kitchen Winners' responsibility to pay Dimerco
5  for your own screwup?
6    A.   Adorama --
7        MR. RAKHUNOV:  Objection.
8        THE WITNESS:  It was not my screwup.
9     If they didn't commit fraud, I wouldn't
10     have anything here.
11        Adorama and Kitchen Winners was
12     paying for freight and having products
13     delivered.  I'll answer the question ten
14     more times the same way.  Just keep asking
15     it.
16  BY MR. SPERBER:
17    Q.   I will, because I'm not getting an
18  answer.  I don't understand.
19    A.   Great.  Great.  Kitchen Winners and
20  Adorama sent us freight order, and they didn't
21  give me their invoices.  They sent me more
22  gloves than I wanted.
23    Q.   And you weren't keeping your own
24  records of how many gloves you picked up.  So
25  you had no idea; right?

Page 321

1    A.   I would have to rely on the
2  transport companies of Adorama,
3  Kitchen Winners, Dimerco.
4    Q.   How did Dimerco know how many gloves
5  they were picking up?
6    A.   They gave them a sheet, I believe,
7  or something with a bill of lading or something
8  with the truck of what was supposed to be on
9  the truck.
10   Q.   And you were relying upon that?
11   A.   It was a sealed shipment. Nobody's
12  allowed to look at it.
13   Q.   So Dimerco didn't really know; they
14  were just relying upon Adorama and
15  Kitchen Winners?
16   A.   Correct.
17   Q.   So you were just relying upon
18  Adorama or Kitchen Winners?
19   A.   Correct.
20   Q.   So how is it that you didn't know
21  how many gloves you had picked up if --
22  presumably Adorama or Kitchen Winners gives
23  that document to Dimerco when they picked the
24  stuff up; right? You had that?
25   A.   The document wasn't accurate.

Page 322

1    Q.   Okay. We've been over that. All
2  right.
3        Why didn't Rock Fintek sue Adorama
4  or Kitchen Winners earlier?
5        MR. RAKHUNOV: All right. Hold on.
6  Objection.
7        If -- I mean I'm just going to
8  instruct you not to answer that one because
9  I don't see how you can possibly answer
10   that question without revealing
11   attorney-client communications as far as
12   litigation strategy.
13       THE WITNESS: There's your answer.
14  BY MR. SPERBER:
15   Q.   Well, litigation strategy is not
16  protected, only communications with counsel.
17  So if you have independent knowledge outside of
18  what your attorney told you, did Rock Fintek
19  make a decision on -- you know, as to when it
20  was going to sue?
21       MR. RAKHUNOV: Objection. Again,
22  if --
23       MR. SPERBER: Phil, let me back up.
24       MR. RAKHUNOV: Yeah. I'm going to
25  instruct you not to answer that. First of

Page 323

1  all, litigation strategy's absolutely
2  protected as work product. Second of all,
3  I still don't see how he can answer that
4  question without revealing communications
5  with me.
6        MR. SPERBER: First of all, attorney
7  work product is protected, not client.
8  BY MR. SPERBER:
9    Q.   Mr. Kato, when did you hire
10  Mr. Rakhunov?
11       THE WITNESS: When did I hire you,
12  Phil?
13       MR. RAKHUNOV: I can't remember
14  right now.
15       THE WITNESS: You're not a
16  professional, Phillip? You can't remember
17  when I hired you? I mean . . .
18       MR. RAKHUNOV: I'm not under oath.
19       THE WITNESS: I don't recollect
20  exactly when I hired Phillip.
21  BY MR. SPERBER:
22   Q.   Okay. Was it before or after
23  Kitchen Winners and -- Kitchen Winners sued
24  Rock Fintek?
25   A.   Before or after? I don't -- I'm not

Page 324

1  sure.
2        MR. RAKHUNOV: Objection. I don't
3  know if Mr. Kato remembers when
4  Kitchen Winners filed its lawsuit, but I
5  can tell you it was well before then.
6  BY MR. SPERBER:
7    Q.   How are you paying Mr. Rakhunov? Is
8  it on contingency fee, or is it hourly basis?
9        MR. RAKHUNOV: Objection. Do not
10  answer that. Come on.
11       MR. SPERBER: What's the objection?
12       MR. RAKHUNOV: That's absolutely
13  privileged. My fee arrangement with my
14  client is privileged.
15       MR. SPERBER: It's definitely not
16  privileged.
17       MR. RAKHUNOV: File a motion.
18       MR. FRISCH: It is 100 percent not
19  privileged.
20       MR. RAKHUNOV: Okay. File a motion.
21  BY MR. SPERBER:
22   Q.   You've alleged that Rock Fintek
23  required Adorama to be a party to the SPA and
24  to guarantee performance of Kitchen Winners.
25       Are there any documents that support

Page 325

1  that assertion?
2       MR. RAKHUNOV:  Objection.
3       THE WITNESS:  Is that something I'm
4  supposed to be reading somewhere?
5  BY MR. SPERBER:
6  Q.   No.  It's a question I asked.
7  A.   Could you repeat the question?
8  Q.   You've alleged that Rock Fintek
9  required Adorama to be a party to the SPA and
10 to guarantee the performance of
11 Kitchen Winners.
12      Are there any documents that support
13 that assertion?
14      MR. RAKHUNOV:  Objection.
15      THE WITNESS:  Adorama and
16 Kitchen Winners to me are one and the same.
17 Hershey held himself out as Adorama.
18 Mendel Banon held himself out as
19 distribution for Adorama.
20      MR. SPERBER:  All right.  Let's take
21 a five-minute break.  I think I'm basically
22 done.  I just want to confirm.
23      MR. RAKHUNOV:  Sure.
24      MR. FRISCH:  I will have some
25 follow-up.

Page 326

1       (Break taken from 5:25 p.m. to
2  5:31 p.m.)
3  BY MR. SPERBER:
4  Q.   Okay.  Mr. Kato --
5  A.   Yes.
6  Q.   -- you said earlier that you -- let
7  me ask it differently.
8       The gloves that you bought from
9  Stern and from Adorama, were these the best
10 prices you could find for gloves at the time?
11      MR. RAKHUNOV:  Objection.
12      THE WITNESS:  I believe we could
13 have bought some other gloves, but Adorama
14 seemed the most reliable company to work
15 with.
16 BY MR. SPERBER:
17 Q.   Were you aware at the time of
18 cheaper gloves that you could have purchased
19 that Ascension would have taken?
20      MR. RAKHUNOV:  Objection.
21      THE WITNESS:  When you say
22 "objection," that means I'm supposed to
23 answer or not supposed to answer?
24      MR. RAKHUNOV:  You can answer.
25      THE WITNESS:  I could have gotten

Page 327

1  other gloves from other people.  The price
2  was fluctuating.  The delivery time would
3  have been slower.
4       Some of the prices were slower than
5  I was paying -- were lower than I was
6  paying with Adorama.
7  BY MR. SPERBER:
8  Q.   But the problem was -- you said you
9  couldn't deliver on time.
10 A.   They would take nine months or
11 something to deliver them.
12 Q.   Would that have been acceptable to
13 Ascension?
14      MR. RAKHUNOV:  Objection.
15      THE WITNESS:  After what happened
16 now, I'm sure it would have been very
17 acceptable.
18 BY MR. SPERBER:
19 Q.   They didn't need the gloves
20 immediately?
21 A.   They needed the gloves for the
22 schedule we made.
23 Q.   Would they have let you have
24 delivered the gloves -- you know, different
25 gloves nine months later?

Page 328

1       MR. RAKHUNOV:  Objection.
2       THE WITNESS:  I don't know if they
3  would have or not would have.
4  BY MR. SPERBER:
5  Q.   Would it be accurate to say that if
6  you hadn't gone with the gloves from Stern,
7  JNS, Adorama, Kitchen Winners, you would have
8  had to pay more money to get gloves for -- to
9  meet your contractual requirements with
10 Ascension on --
11 A.   No.
12 Q.   -- the timeline that Ascension would
13 have been happy with?
14      MR. RAKHUNOV:  Objection.
15      THE WITNESS:  No.  I said the
16 opposite just now.
17 BY MR. SPERBER:
18 Q.   What are you saying?
19 A.   I said in your previous question --
20 two questions ago, I could have got them for
21 less.  Maybe the time would have been longer,
22 the delivery time.
23 Q.   You told me earlier that Ascension
24 got very upset when the delivery times were
25 delayed by the LevMed gloves.

Page 329

1    A.   Correct.  I don't know how happy
2  they would have been by me buying cheaper
3  gloves that take longer to get delivered.
4    Q.   So it's possible you would have lost
5  your customer?
6    A.   No.  I would have bought the guy's
7  whole allotment, and I'd probably still have my
8  customer because right now.  It would have been
9  real gloves, real examination gloves.
10    Q.   So if those were cheaper, why didn't
11  you buy them?
12    A.   I believed --
13       MR. RAKHUNOV:  Objection.
14       THE WITNESS:  -- Kitchen Winners and
15    Adorama, Kitchen Winners and JNS, to be
16    honest people.
17  BY MR. SPERBER:
18    Q.   Who was that seller who had cheaper
19  gloves for you at the time?
20    A.   There was a gentleman that we were
21  dealing with in Florida.
22    Q.   What was his name?
23    A.   I don't recall his name.
24    Q.   Do you have communications with him?
25    A.   Yeah.  I met -- I met him.

Page 330

1    Q.   Okay.  And, again, were those via
2  email or WhatsApp?
3    A.   No.  I met him face to face.
4    Q.   You never had anything in writing
5  with him?
6    A.   No.  I didn't have anything in
7  writing him I didn't move forward.
8    Q.   You didn't have a formal offer from
9  him?
10    A.   No.
11    Q.   How many gloves did he have
12  available to sell you?
13    A.   He had -- there was a variety of
14  different containers that would arrive every
15  single month.
16    Q.   What was his company's name?
17    A.   Medgluvs, I believe is the name of
18  the company.
19       (Stenographer requests
20    clarification.)
21  BY MR. SPERBER:
22    Q.   Did your PO with Ascension have a
23  expiration date on it?
24    A.   I don't believe so.
25    Q.   So you could have delivered the

Page 331

1  gloves five years later and they would have
2  been fine with it?
3    A.   I'm sure -- no.  They wanted the
4  gloves immediately.
5    Q.   Do you have the phone number for
6  this person in Florida that you were dealing
7  with?
8    A.   No.  I don't recollect his name.
9    Q.   So you don't know his name, the
10  company's name --
11    A.   It was Medgluv.  And I went to
12  Medgluvs, in to the office somewhere in
13  southern Florida.  I drove there, and I walked
14  in the office and I spoke to him face to face.
15  Met him twice, two or three times.
16    Q.   Well, let me -- I'm going to show
17  you what's been previously marked as Exhibit
18  KWA-Kato 3.
19       Is this the PO you had with
20  Ascension?
21       MR. RAKHUNOV:  Objection.
22       THE WITNESS:  Is this the PO we had
23    with Ascension?  Okay.  Yes.
24  BY MR. SPERBER:
25    Q.   Is this the one that you were trying

Page 332

1  to get gloves from Kitchen Winners and Adorama
2  and Stern and JNS to meet?
3    A.   I believe so.
4    Q.   Okay.  Is there a due date listed on
5  there?
6    A.   I'd have to read through it.  Do you
7  see a due date?
8    Q.   Take a look at the far right column.
9    A.   Due date, 12/14/20.  So one week
10  later.
11    Q.   Yeah.  I mean, very short timeline
12  to get these gloves.  Is there anything on here
13  that would have said you could deliver gloves
14  nine months later?
15       MR. RAKHUNOV:  Let me just note my
16    objection.  I don't know if -- what the due
17    date refers to.  I don't think you've laid
18    a foundation for that.
19       THE WITNESS:  I don't know what it
20    refers to.
21  BY MR. SPERBER:
22    Q.   Okay.
23    A.   I'm 100 percent positive they
24  weren't expecting me to deliver them in a week
25  from them signing.

30(b)(6)
THOMAS KATO

OCTOBER 03, 2023                                              Pages 333..336

Page 333

1    Q.   All right.  In discovery in this
2  action, Rock Fintek has produced a number of
3  WhatsApp chats.
4         Are you familiar with what I'm
5  talking about?
6    A.   Yes.
7    Q.   Were you involved in providing those
8  documents to your attorney?
9    A.   The ones that I had?  Yes.
10   Q.   Okay.  Have you looked over all the
11 WhatsApp chats that were produced by
12 Rock Fintek in this lawsuit?
13   A.   I believe we went over most of them.
14 Not all of them.
15   Q.   To your knowledge, are those -- the
16 documents that Rock Fintek produced, are those
17 accurate transcriptions of WhatsApp
18 communications between Rock Fintek or its
19 employees and other individuals?
20   A.   Yes.
21   Q.   So each of those chats that were
22 produced by Rock Fintek, those are -- those
23 are, you know, accurate, real WhatsApp chats
24 that Rock Fintek or its employees were engaged
25 in?

Page 334

1         MR. RAKHUNOV:  Objection.
2         But go ahead.
3         THE WITNESS:  I don't know the
4  context of what the messages might say.
5  "Jump off the roof" might not mean jump off
6  the roof.  I don't know.
7         But, yes, those communications that
8  we produced are communications.  It's clear
9  who they're to and who they're from.
10 BY MR. SPERBER:
11   Q.   Okay.  I'm going to share with you a
12 document.  I think we're up to 10.  I'm going
13 to stamp this as KWA-Kato 10.
14        (Exhibit Number KWA-Kato 10, Chat
15        started 3/4/21, was marked for
16        identification.)
17 BY MR. SPERBER:
18   Q.   Take a look, if you like.  Please
19 confirm that this is an accurate transcription
20 of the WhatsApp communication you were engaged
21 in.
22   A.   Let's see.
23        MR. RAKHUNOV:  You're expecting him
24 to go through a 47-page transcript and tell
25 you --

Page 335

1         THE WITNESS:  I've got time,
2  Phillip.  It's fine.
3         MR. RAKHUNOV:  No, but you're
4  expecting him to authenticate and confirm
5  that it's exactly accurate, given that
6  you're the one that printed it?  You could
7  have deleted things.  I mean --
8         MR. SPERBER:  That's fair.  Okay.
9  So let's just --
10        THE WITNESS:  Well, let me read it
11 first, and I'll tell you what I think.
12 BY MR. SPERBER:
13   Q.   No, that's all right.  I think Phil
14 makes a good point.
15   A.   Okay.
16        MR. RAKHUNOV:  By the way, your
17 client Mr. Banon has this -- or should have
18 this; so you can, you know, compare what we
19 produced to what he has.
20 BY MR. SPERBER:
21   Q.   One minute.  Let's go to page 21.
22 Are you there?
23   A.   I'm getting there.  Okay.
24   Q.   Just confirm this is an accurate
25 transcription of communications between

Page 336

1  Rock Fintek and Mr. Banon?
2         MR. RAKHUNOV:  Same objection.
3  BY MR. SPERBER:
4    Q.   Just this page.
5    A.   (Reviewing document.)
6         Do you have a question for me?
7    Q.   Would you say this is an accurate
8  transcription of a WhatsApp communication that
9  you were involved in with Mendel Banon?
10   A.   From when, from where to where?
11   Q.   What you see on page 21 of this
12 document.
13   A.   Only 21?
14   Q.   Only 21.
15   A.   Okay.  Only 21.
16        (Reviewing document.)
17        Seems accurate.
18        MR. SPERBER:  Okay.  I have nothing
19 further.  Avi?
20        MR. FRISCH:  Yes, I have a few
21 follow-ups.
22        EXAMINATION
23 BY MR. FRISCH:
24   Q.   First, just so I understand the math
25 on this issue with the 5,963 cartons that you

Page 337

1  claim were over -- oversold, isn't that only
2  about 4 percent of the total purchase you made
3  from Kitchen Winners?
4      A.   Possibly.
5      Q.   So how is it over $2 million owed as
6  a refund?
7      A.   Those are rebates plus the overage.
8      Q.   Okay.  So the $2 million includes
9  the rebate and the overage?  I just -- I just
10  want to make sure that --
11      THE WITNESS:  Is that how you worded
12  it, Phillip?
13      (Stenographer requests
14  clarification.)
15      MR. RAKHUNOV:  Tommy, I don't know.
16  Just listen to the questions.
17  BY MR. FRISCH:
18      Q.   I'm curious about your math because
19  it doesn't seem to make much sense to me.
20  Okay.
21      All right.  Let's see.  Is this the
22  next one I wanted to show?  Let me share this
23  one next.  Let me -- let me see what we're up
24  to first.  JNS -- we're up to Exhibit I [sic],
25  it looks like.  Stamp this as JNS I.

Page 338

1      (Exhibit Number JNS Q, Photograph
2  IMG_8428, was marked for identification.)
3  BY MR. FRISCH:
4      Q.   Do you see this sign?  This is from
5  your photos that you produced in this action.
6  Do you recall seeing this sign with the name
7  David Dembitzer?
8      A.   I think so, yes.
9      Q.   Is that the person you were
10  referring to earlier?
11      A.   No.
12      Q.   Okay.  Do you know who David
13  Dembitzer is?
14      A.   No.
15      Q.   Do you know what that TCLU8010739
16  refers to?
17      A.   TCLU -- I'd probably have to ask
18  Bradley.
19      MR. RAKHUNOV:  No.  We'll have to
20  ask Mr. Stern.  He certainly knows what it
21  is, and so do I.  But anyway, that's for
22  next week.
23      THE WITNESS:  Okay.
24      MR. FRISCH:  Thanks for the
25  commentary.  I can't wait -- I think, Phil,

Page 339

1  you may -- you seem to want to testify.
2  Should we depose you too?
3      MR. RAKHUNOV:  No.  I just can't
4  wait to actually talk to your clients.
5  That's all.  There's just a lot of stuff
6  you guys are asking, you know, Mr. Kato,
7  that both of your clients --
8      MR. FRISCH:  It literally is the
9  stupidest case left, but okay.  Stupid
10  case.  Should be gone after today.  All
11  right.  Let's see.  Let's see if we can get
12  rid of you.
13  BY MR. FRISCH:
14      Q.   So you said before that it was
15  impossible for these papers to have been
16  inserted by you; is that correct?
17      A.   That's correct.
18      Q.   And you said that's because it was
19  shrink-wrapped; isn't that correct?
20      A.   Shrink-wrapped.  I didn't come with
21  a paper printed.  Medline has cameras and would
22  have saw me place them in there if I did.  And
23  I said I didn't put the papers in there.
24      (Exhibit Number JNS J, Photograph
25  IMG_8429, was marked for identification.)

Page 340

1  BY MR. FRISCH:
2      Q.   So now I'm looking at this photo
3  that you produced.  It's now marked JNS Exhibit
4  J.
5      Do you see the quality of the
6  shrink-wrap in this photo?
7      A.   Yes.
8      Q.   And the paper is about 2 inches
9  below the beginning of the shrink-wrap.  Isn't
10  it possible that anybody could have stuck a
11  paper in that pallet?
12      MR. RAKHUNOV:  Objection.
13      THE WITNESS:  Not with that same
14  information on it, I don't believe.
15  BY MR. FRISCH:
16      Q.   You don't know what the information
17  means; correct?
18      A.   I don't know what it means, but
19  Phillip seems to know what it means.
20      Q.   Well, Phillip's not testifying.  So
21  good luck to him.  He already said he doesn't
22  want to testify.
23      Let's go to another one.
24      A.   If I put the paper on there, then I
25  would be able to tell you what it is.  But

Page 341

1  since I didn't put the paper in there, I don't
2  know what the purpose of --
3      Q.   These are your photos; right?
4      A.   I took photos. I didn't make the
5  paper. I didn't write the words on there and
6  the numbers.
7      Q.   Okay. This one says -- has a JNS
8  with some numbers. I guess these are the ones
9  with the stickers; right? That's --
10     A.   I don't see it yet.
11     Q.   Oh, I didn't share it. I'm sorry.
12          (Exhibit Number JNS K, Photograph
13     IMG_8369, was marked for identification.)
14  BY MR. FRISCH:
15     Q.   Do you see it now?
16     A.   Yes.
17     Q.   Again, the stickers on the boxes
18  were to replace -- it appears the boxes
19  originally were printed "Synthetic Nitrile
20  Gloves," and somebody put a sticker on to write
21  "Nitrile Examination Gloves"; is that correct?
22     A.   That's correct.
23     Q.   Do you have any idea -- do you have
24  any reason to assume it was Joel Stern who put
25  that sticker on?

Page 342

1          MR. RAKHUNOV: Objection. Asked and
2      answered.
3  BY MR. FRISCH:
4      Q.   Okay. Answer again.
5      A.   He suggested -- he suggested doing
6  it; so I presumed he did it after I didn't want
7  to do it.
8      Q.   Okay. And you have no idea what the
9  content of these boxes were; correct?
10     A.   What type of gloves?
11     Q.   Yes.
12     A.   I took samples, and I sent them
13  to -- for testing.
14     Q.   Okay. Now again with the white
15  paper. Since you said that it was impossible
16  for anybody to have placed them other than the
17  seller, again, there's no -- nothing on this
18  pallet preventing anybody from sticking a white
19  paper on; correct?
20     A.   I think Medline is a credible,
21  legitimate company and would have -- has no
22  motivation to put anything on anything.
23     Q.   I didn't say Medline put it on. I
24  said you put it on.
25     A.   I didn't come in with any papers.

Page 343

1      Q.   Okay. I understand you're denying
2  you put it on, but you're just as likely to
3  have put it on -- you could have put this one
4  on, had you had the paper with you; correct?
5      A.   If I had the paper with me, then I
6  would have to know what these numbers and
7  letters mean.
8      Q.   Not necessarily.
9      A.   Phillip has a reason that means
10  something that I'm not privy to at the moment.
11     Q.   All right. Next one. I believe
12  we're up to L.
13          (Exhibit Number JNS L, Photograph
14     IMG_8348, was marked for identification.)
15  BY MR. FRISCH:
16     Q.   This is your photo; right? That's
17  you in the photo; correct? Oh, I didn't share
18  it yet. I keep doing that. Sorry.
19          Is that you in the photo?
20     A.   Yes, it is.
21     Q.   Now, here you found a box that says
22  "Protection Gloves"; is that correct?
23     A.   I've got to zoom on it.
24     Q.   By the way, I discovered if you hit
25  the little gear icon on the right, you can go

Page 344

1  to full screen on the attachment -- on the
2  exhibit.
3      A.   That would have been good five hours
4  ago.
5      Q.   Yeah.
6          MR. RAKHUNOV: Look at that.
7          MR. FRISCH: I only discovered it 20
8  minutes ago.
9          MR. RAKHUNOV: Look at that.
10         THE WITNESS: Okay. What was the
11     question with this box?
12  BY MR. FRISCH:
13     Q.   This box says "Protection Gloves" on
14  it; correct?
15     A.   Correct.
16     Q.   Now, do you know where that box came
17  out of, which pallet?
18     A.   Probably the one I'm standing in
19  front of.
20     Q.   Do you know any way to know that
21  that's the pallet it came out of?
22     A.   That's why I took the photo in front
23  of that box. The other box is on top of it.
24     Q.   All right. Now, how do you know --
25  do you know if anything on the boxes -- on

Page 345

1 these boxes indicates that it's a box of
2 protection gloves?
3     A.   It says "Protection" on the box.
4     Q.   Where?
5     A.   Right where I'm pointing.
6     Q.   No, no, no.  On the cartons, on the
7 big brown cartons.
8     A.   Let me see.
9         MR. RAKHUNOV:  Objection.
10        THE WITNESS:  Protection -- it says
11    right there, under MedCare.  Protection.
12 BY MR. FRISCH:
13    Q.   That's the answer I thought you'd
14 give me.  Great.
15        (Exhibit Number JNS M, Photograph
16    IMG_0578, was marked for identification.)
17 BY MR. FRISCH:
18    Q.   The next one is Exhibit M.  These
19 also say "Protection," at least the ones I --
20 this may not be the one I wanted.
21    A.   Why are there two Hershey Weiners?
22 Is there somebody else on this deposition?
23    Q.   Hold on.  That wasn't the photo I
24 wanted.  Give me a second.
25        So it's your testimony that none of

Page 346

1 the boxes were labeled "Examination Gloves" in
2 the photos but had that -- but had the word
3 "Protection" under the MedCare name on any of
4 the boxes?
5     A.   No.
6     Q.   Is that --
7     A.   I just read what those boxes said to
8 you.  Show me other pictures; I'll tell you
9 what I see.
10    Q.   Okay.  But you're saying the word
11 "protection" under "MedCare" means it's a box
12 of protection gloves?
13        MR. RAKHUNOV:  Objection.
14        THE WITNESS:  Yeah.
15 BY MR. FRISCH:
16    Q.   That's what I've asked you.  Is that
17 correct?  Is that accurate as -- I didn't pick
18 the right one.  I apologize.  I'm looking for
19 the right photo.
20        MR. RAKHUNOV:  I don't think he's
21    asking about this particular exhibit,
22    Thomas.
23 BY MR. FRISCH:
24    Q.   No, no, no.  I'm not asking about
25 that because it's the wrong one.

Page 347

1     A.   These say "Protection" on them.
2     Q.   But doesn't every single one of --
3 meaning -- not every single one, but a lot of
4 these boxes say "Protection," and then they say
5 "Examination Gloves" underneath them.
6     A.   The ones that don't have
7 "Examination" are only protection inside.
8     Q.   I definitely saw a video, but I
9 don't know how to share a video.  So let me see
10 if I can find the thing I'm looking for in a
11 photo.  Otherwise, we'll just go with that.
12 Give me one more second.  I apologize.
13        And you're saying when you went --
14 here.  This is the one I was looking for.  My
15 apologies.  This will be Exhibit N.
16        (Exhibit Number JNS N, Photograph
17    IMG_8201, was marked for identification.)
18 BY MR. FRISCH:
19    Q.   Now, do you see this box says
20 "MedCare Protection," and then underneath it,
21 it says "NBR Nitrile Examination Gloves."
22        You see that?
23    A.   Yeah.
24    Q.   So the word "Protection" under
25 "MedCare" does not necessarily indicate the

Page 348

1 contents of the box; is that correct?
2     A.   When they add "Examination," then
3 you know the gloves inside have examination
4 too.  Has Joel Stern's name too, not JNS.
5     Q.   I don't know who put that sign
6 there.  So I don't know what that sign means.
7     A.   They did.  Those guys did.
8     Q.   That's your -- again, you don't know
9 that.  That's your assumption.
10    A.   I know Brad didn't do it.  I know I
11 didn't do it.
12    Q.   Well -- so when you look at all
13 these, were each of these -- when you said you
14 saw 9 million protection gloves with stickers
15 on them, did you open all these boxes and
16 actually look at the blue cartons?
17    A.   So we went through these pallets and
18 randomly opened up cartons inside most of all
19 those pallets you see everywhere in every one
20 of these photos.
21    Q.   Okay.  And some of them -- a lot of
22 them said "Examination," and some of them said
23 "Protection"?
24    A.   Everything that says "Protection"
25 without "Examination" on the outside of the box

Page 349

1  was only protection.
2      Q.   Well, wait until you -- I hope when
3  you come to trial you'll bring a whole pallet
4  with you, and we can go through the whole box.
5  But until then I'll have to take your word for
6  it.
7      A.   You can have them delivered from
8  Medline to you guys.
9      Q.   Medline doesn't want to answer us.
10  They're not interested.  So . . .
11          Okay.  All right.  I forgot to do
12  this one.  What am I up to?  All right.  I know
13  this one is tiny because I have it in a weird
14  format.
15          (Exhibit Number JNS O, Email from
16      Leah Lax to 9070854@gmail.com, was marked
17      for identification.)
18  BY MR. FRISCH:
19      Q.   I do apologize that this one is in a
20  -- sort of a screenshot.  So it came in a weird
21  format.
22          Have you ever seen this letter
23  before?
24      A.   I can't see that really.  Try to --
25          MR. RAKHUNOV:  And, Counsel, can you

Page 350

1  just identify where this document is in --
2          MR. FRISCH:  This came in the
3  Joel Stern email production last week.
4          MR. RAKHUNOV:  Okay.
5          MR. FRISCH:  Where exactly?
6  Offhand, I can't tell you, but somewhere in
7  there.
8          MR. RAKHUNOV:  Fair enough.
9          THE WITNESS:  What was the question
10  again about this?
11  BY MR. FRISCH:
12      Q.   Have you ever seen this letter?
13      A.   I don't think so.
14      Q.   Okay.  Well, then I don't have any
15  questions about it.
16      A.   I might have.  I've seen the red
17  stamp before.
18      Q.   It looks to you like a letter that
19  may have --
20      A.   Yosi is Anna's son.  He's also their
21  engineer.
22      Q.   Okay.  Do you see them claiming that
23  the NBR, synthetic, examination, and protection
24  are all the same?
25      A.   That's what they're saying here.

Page 351

1      Q.   Do you have any reason to doubt
2  that's true?
3      A.   They told us differently on the
4  phone.
5      Q.   They seem to say whatever needs to
6  be said to save themselves money.
7          Would you disagree with that?
8          MR. RAKHUNOV:  Objection.
9          THE WITNESS:  I'm not sure what they
10      say and why they say it.
11  BY MR. FRISCH:
12      Q.   Do you have any reason to believe
13  that MedCare was ever telling you the truth in
14  things they said to you?
15          MR. RAKHUNOV:  Objection.
16          THE WITNESS:  I believe people when
17      they first speak to me.  I give them the
18      benefit of the doubt.
19  BY MR. FRISCH:
20      Q.   Didn't they send you, like, 20
21  messages that they were sending you a free
22  container of gloves that never showed up?
23      A.   And I believed them.
24      Q.   But it never showed up; correct?
25      A.   Until the 20th message, and I

Page 352

1  figured, you know, I had been taken again.
2      Q.   Maybe they're the ones who took you
3  the entire time.  Is that not possible?
4          MR. RAKHUNOV:  Objection.
5          THE WITNESS:  I didn't believe that.
6  I trusted an honest-sounding accountant.  I
7  trusted an honest-sounding person in
8  Hershey Weiner and Mendel Banon and
9  Mendlowitz with a company with credibility,
10  which I believed at the time.  They all
11  appeared to be gentlemen, and that's why I
12  started to work with them.
13          (Exhibit Number JNS P, Email Chain,
14      Bates-stamped RF_003483 - 3486, was marked
15      for identification.)
16  BY MR. FRISCH:
17      Q.   Manning -- here's another email that
18  you sent in regard to the earlier quality of
19  the gloves.  This email says, "There has to be
20  something with a small lot of them.  We have
21  emails and calls with Vince several months ago
22  on how people were happy with them.  Has to be
23  something that happened in May."
24          I don't think I've seen those
25  emails.  Do you know -- have you produced the

Page 353

1  emails that Vince sent you saying people were
2  happy with the gloves?
3      A.  I gave Phillip all the emails that I
4  had in relation to this case.
5          MR. FRISCH:  Phillip, do you happen
6  to know where they are?
7          MR. RAKHUNOV:  Sorry.  Come again.
8          MR. FRISCH:  The emails he
9  references here, "emails and calls from
10  Vince several months ago on how people were
11  happy with them," I don't think I've seen
12  those emails from Vince.  So I'm wondering
13  if those emails -- if you happen to have
14  seen them in the production.
15          MR. RAKHUNOV:  I can go back and
16  take a look.  I --
17          MR. FRISCH:  I'd appreciate it.
18          MR. RAKHUNOV:  I don't know off the
19  top of my head.
20  BY MR. FRISCH:
21      Q.  How much money did you pay yourself
22  over the course of your dealings with Ascension
23  out of Rock Fintek?
24      A.  How much did I pay myself?
25      Q.  Uh-huh.

Page 354

1      A.  Before the glove deal?
2      Q.  Before, during, after.
3      A.  Before --
4          MR. RAKHUNOV:  Objection.
5  That's . . .
6          THE WITNESS:  I'd say 3 million,
7  4 million, 5 million.
8  BY MR. FRISCH:
9      Q.  How did you pay it?  Was that
10  transferred by an ACH transfer, or was that
11  paid by check?
12      A.  It was paid ACH.
13      Q.  And all of Rock Fintek's banking was
14  done at Bank of America and Wells Fargo?
15      A.  Correct.
16      Q.  All right.  Is there some reason why
17  you redacted the vast, vast majority of the
18  bank statements?
19      A.  There was other clients.
20      Q.  But you're out of business; so what
21  difference does it make?
22          MR. RAKHUNOV:  Objection.
23  BY MR. FRISCH:
24      Q.  And you already told us who the
25  clients are.

Page 355

1          MR. RAKHUNOV:  Objection.
2          THE WITNESS:  I'm giving you what
3  was relevant to all the business I did with
4  Ascension and with your clients.
5  BY MR. FRISCH:
6      Q.  Well, we'll have to serve subpoenas
7  on the banks, I guess.
8          (Simultaneous speaking.)
9          THE WITNESS:  Clients who I paid,
10  who paid me.
11  BY MR. FRISCH:
12      Q.  So -- now, you've alleged that
13  Joel Stern defrauded you.  Is there any aspect
14  of your damages that arise from other --
15  anything other than delivering the wrong
16  gloves, in your opinion?
17      A.  If he would have given me proper
18  examination gloves?  No.  There would be no
19  damages.
20      Q.  So your damages arise from his
21  failure to fulfill the terms of the contract,
22  in your opinion; correct?
23      A.  Well, he committed fraud.  He
24  changed the label of the boxes.
25      Q.  Well, that's what you say.

Page 356

1          MR. RAKHUNOV:  That's what you're
2  looking for -- right? -- is what he says.
3  BY MR. FRISCH:
4      Q.  But that being said, there were no
5  additional damages that arose from that, were
6  there?
7      A.  Just losing my biggest client.
8      Q.  Well, I'm not going to go back into
9  that.
10      A.  I could have made testing kits, sold
11  them to them, to other hospitals.  I could have
12  kept working with the Australian health system,
13  who stopped working with me.  It caused a chain
14  reaction of problems.
15      Q.  Meaning at some point, the MedCare
16  gloves were satisfactory, and by your own -- by
17  your own writings at the time
18  contemporaneous -- and those gloves, by your
19  own testimony, came from Joel Stern and JNS,
20  did they not?
21      A.  I was told by Vince, the doctors and
22  the hospitals were happy with all the gloves at
23  the time.
24      Q.  Okay.
25      A.  Later I was told that they sent that

Page 357

1  message and they were still sitting in the
2  warehouse and nobody got to see them yet till
3  three months later.  That's when they gave me a
4  different story about them and all the
5  investigation started.
6      Q.   Do you know when Vince -- do you
7  recall when Vince told you that, the precise
8  date?
9      A.   I don't remember exactly when, no.
10 I'm guessing around March.
11     Q.   So at least the initial shipment
12 from Mr. Stern and JNS was a good quality, is
13 your testimony?
14     A.   Say that again.
15     Q.   It's your testimony, then, that at
16 least the first shipment in February from
17 Mr. Stern was of good quality?
18     A.   My testimony is that I believed all
19 the gloves were in good quality, until -- until
20 later in July.
21     Q.   We also agree.  All gloves were of
22 good quality.
23          But if the gloves at some point --
24 if Vince at some point told you that the
25 doctors were happy with the gloves in March,

Page 358

1  that means that at least 90,000 boxes that were
2  shipped in February were of good quality, does
3  it not?
4          MR. RAKHUNOV:  Objection.
5          THE WITNESS:  No.  That's not --
6      they changed what they said to us.
7  BY MR. FRISCH:
8      Q.   Well, shouldn't they have done some
9  investigation, some attempt to look at the
10 gloves beforehand?
11     A.   Yeah.  I wish they would have done
12 more.
13     Q.   So do we all.
14          But at some point, don't you have an
15 obligation to look at the things you're buying
16 and tell people if there's a problem?
17          MR. RAKHUNOV:  Objection.
18          THE WITNESS:  I couldn't look at
19     them.
20 BY MR. FRISCH:
21     Q.   I'm just going to ask the same
22 question.  I know you're not going to answer
23 it.
24          What is your fee arrangement with
25 Mr. Rakhunov?

Page 359

1          MR. RAKHUNOV:  Objection.
2          Do not answer.
3          MR. FRISCH:  Yeah, but I just
4      wanted -- so when we make the application
5      to the judge, I can join in on it:  All
6      right.  That's all I've got.
7          MR. SPERBER:  I just have one last
8      follow-up on that.
9                  EXAMINATION
10 BY MR. SPERBER:
11     Q.   You entered into a contract with --
12 with Kitchen Winners and Adorama in April -- on
13 April 7, 2021.
14          Why were you still buying gloves
15 from Stern or JNS after that?
16     A.   We were trying to get as many gloves
17 as we could as fast as we could to the client.
18 They were pressing us to deliver as quick as
19 possible.
20     Q.   You said a few minutes ago it took
21 Ascension three months to look at the gloves
22 that JNS and Stern had sold you; is that
23 correct?
24     A.   That's what they said.
25     Q.   So it was a large (indiscernible)

Page 360

1  there between when you would sell them gloves
2  and when they'd start to use them?
3          CERTIFIED STENOGRAPHER:  I'm sorry.
4      It was a large --
5          MR. RAKHUNOV:  Same.  I couldn't --
6  BY MR. SPERBER:
7      Q.   So there was a large lag there
8  between when they would sell you gloves and
9  when you'd start to use them -- when they would
10 start to use them?
11         MR. RAKHUNOV:  Objection.
12 BY MR. SPERBER:
13     Q.   Let me rephrase that.
14     A.   I'm not aware of when they used
15 them.  I'm just aware -- I was told one story
16 and I'm told another story how they were; so I
17 just take them at their word for it.
18     Q.   Right.  No, I'm just trying
19 understand how that's reconciled with the
20 LevMed situation where you said that you first
21 learned it was a problem with LevMed when
22 Ascension complained to you, and that was --
23 seems like days after it was sold; right?
24     A.   I'm not following your question.
25     Q.   So with Stern, you were just saying

Page 361

1 that he sold gloves to Rock Fintek, and
2 Rock Fintek delivered them to Ascension, and
3 then it took several months for Ascension to
4 realize there was a problem with them. Is that
5 correct? Is that your testimony?
6     MR. RAKHUNOV: Objection.
7     THE WITNESS: They didn't tell me
8 there was any problem with them until
9 mid-July.
10 BY MR. SPERBER:
11    Q.  So there was a lag between when you
12 delivered the gloves that you purchased from
13 Stern to Ascension and when -- and when they
14 told you there was a problem?
15    A.  Correct.
16    Q.  And up until then, they were saying
17 the gloves were good; correct?
18    A.  Correct.
19    Q.  And they told you the reason why
20 they said the gloves were good earlier, when
21 really they were bad, is because they hadn't
22 used them yet; is that right?
23    A.  I don't know why they said what they
24 said.
25    Q.  What I'm trying to understand is you

Page 362

1 had said to me earlier that with the LevMed
2 gloves, you learned of the problem from
3 Ascension. It seems like from the timeline,
4 that was only days after Adorama or
5 Kitchen Winners sold them to you.
6     A.  I believe that's because it was a
7 different SKU that it caught the attention or a
8 red flag from somewhere. But the name LevMed
9 didn't have a SKU number; so Medline, I
10 believe, didn't know where to place them. They
11 knew who they came in from, and they tracked it
12 to our shipment and then contacted us, said we
13 gave them a different type of product.
14    Q.  How much did you personally make off
15 of this transaction?
16    A.  I lost money.
17    Q.  I thought you said you took out
18 several million dollars from Rock Fintek. Is
19 that not true?
20    A.  No, that -- the prior -- the year
21 before.
22    Q.  Oh, the year before?
23    A.  Yeah. Not during this transaction.
24    Q.  So during this transaction?
25    A.  This transaction put Rock Fintek out

Page 363

1 of business. We put negative, killed and
2 depleted all cash flow, and we stopped
3 operating. We cancelled the COVID testing
4 project. We cancelled -- we couldn't do
5 anything.
6     Q.  So when this transaction lost
7 Rock Fintek money, you put money into the
8 company?
9     A.  I was putting money in that I had
10 made previously to keep buying and sending
11 gloves at a loss in the beginning, yes.
12    Q.  You produced records in discovery
13 documenting that?
14    A.  You have the bank statements.
15 You'll see what I got paid and you'll see what
16 I paid.
17    Q.  The money that was put in came from
18 you personally?
19    A.  It came from the company.
20    Q.  Which company?
21    A.  Rock Fintek.
22    Q.  You said you had infused - you had
23 to put additional money into Rock Fintek.
24 Where did that money come from?
25    A.  I had to use previous profits that

Page 364

1 Rock Fintek made.
2     Q.  So this is money that Rock Fintek
3 already had in its accounts?
4     A.  Correct.
5     Q.  That -- so you weren't infusing
6 money in. It was just other profits that were
7 sitting there got depleted?
8     A.  Yes. That's exactly it.
9     Q.  So when did you take out the
10 $5 million?
11    A.  When the what?
12    Q.  When did you take out your
13 $3-5 million you were talking about earlier?
14    A.  No, I took out some money as profits
15 of the company. Brad took some profit; I took
16 some profit out, before we had anything to do
17 with any of this, the previous year.
18    Q.  Is that also in the bank statements?
19    A.  Yes. You have all transactions that
20 Ascension made and made and got paid. You
21 don't have profits that I made from the City of
22 New York, Delta Airlines, and all the other
23 clients.
24       And they were asking what the other
25 clients were. They were asking what the other

Page 365

1  dental practice distributors were because I
2  think they were trying to sell to them
3  directly.
4       Q.   Who was?
5       A.   I think Adorama, Kitchen Winners,
6  Joel Stern.
7       Q.   And you didn't tell them?
8       A.   I didn't tell them, but -- I didn't
9  tell them, no.  So they don't have that
10  information.  I don't believe I told them at
11  all.
12          MR. SPERBER:  All right.  I think
13  that's all I have.
14          MR. RAKHUNOV:  I actually have a
15  couple of really quick follow-up questions,
16  but if -- I don't know if Avi has anything
17  else.
18          MR. FRISCH:  No.  Go ahead.
19          MR. RAKHUNOV:  I don't know how
20  to -- how to do this, if I want to put up
21  an exhibit.
22          MR. FRISCH:  You have to upload it
23  first.
24          MR. RAKHUNOV:  Well, if it's one of
25  the -- no, it's something already used.

Page 366

1          MR. FRISCH:  I think you just click
2  on it and share it.
3          EXAMINATION
4  BY MR. RAKHUNOV:
5       Q.   Mr. Kato, do you see a Sales and
6  Purchase Agreement in front of you that was
7  previously marked as Kato 5?
8       A.   Yes, I do.
9       Q.   Okay.  So you remember you were
10  asked some questions earlier about
11  paragraph 2.d. that references seller's
12  warehouse in Los Angeles, and you were asked
13  some questions about paragraph 4 talking about
14  products arriving at the Port of Long Beach,
15  California.
16          Do you remember that earlier today?
17       A.   Yes, I do.
18       Q.   During the life of your transactions
19  with Kitchen Winners, Mr. Stern, Adorama, were
20  products always -- actually, strike that.
21          During the life of your transaction
22  with Adorama and Kitchen Winners, were products
23  always shipped to or from the Long Beach,
24  California, warehouse?
25       A.   No, they were shipped from Newark,

Page 367

1  New York, Texas, all around the country.
2  Multiple cities.
3          MR. RAKHUNOV:  Okay.  Nothing else.
4          MR. FRISCH:  Thank you, all.
5          CERTIFIED STENOGRAPHER:  Does
6  anybody need copies of transcripts?
7          MR. FRISCH:  We will need them, yes.
8          MR. SPERBER:  Yes.
9          CERTIFIED STENOGRAPHER:  Ms. Riddle,
10  do you guys need a transcript?
11          MS. RIDDLE:  Yes.
12          (Concluded at 6:16 p.m.)

Page 368

1                    CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF POLK
5
6          I, the undersigned authority,
7  certify that THOMAS KATO remotely appeared
8  before me and was duly sworn.
9          WITNESS my hand and official seal
10  this 17th day of October, 2023.
11
12
13
14
15  _____
16  Rhonda Hall-Breuwet, RDR, CRR, CSR, LCR, CCR, FPR
17  NCRA Realtime Systems Administrator
18  Notary Public - State of Florida
19  My Commission Expires:  9/28/27
20  Commission No. HH 414033
21
22
23
24
25

Page 369

```
1              CERTIFICATE OF STENOGRAPHER
2   STATE OF FLORIDA:
3
4              I, RHONDA HALL-BREUWET, RDR, CRR,
5   CSR, LCR, CCR, FPR, NCRA Realtime Systems
6   Administrator, shorthand reporter, do hereby
7   certify:
8              That the witness whose deposition is
9   hereinbefore set forth was duly sworn, and that
10  such deposition is a true record of the
11  testimony given by such witness.
12             I further certify that I am not
13  related to any of the parties to this action by
14  blood or marriage, and that I am in no way
15  interested in the outcome of this matter.
16             IN WITNESS WHEREOF, I have hereunto
17  set my hand this 17th day of October, 2023.
18
19
20
21
22  RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR,
23  NCRA Realtime Systems Administrator
24  Shorthand Reporter
25
```

Page 371

```
1             DECLARATION UNDER PENALTY OF PERJURY
2
3        I, THOMAS KATO, do hereby certify:
4        That I have read the foregoing deposition;
5        That I have made such changes in form and/or
6   substance to the within deposition as might be necessary
7   to render the same true and correct;
8        That having made such changes thereon, I hereby
9   subscribe my name to the deposition.
10       I declare, under penalty of perjury, that the
11  foregoing is true and correct.
12
13       Executed this _____ day of
14  _____, 2023, at _____,
         (MONTH)                    (CITY)
15  _____.
         (STATE)
16
17
18              _____
19                        THOMAS KATO
20
21
22
23
24
25
```

Page 370

```
1   ERRATA SHEET FOR THE TRANSCRIPT OF:
2   Case Name: KITCHEN WINNERS NY INC. v. ROCK FINTEK LLC;
    ROCK FINTEK LLC v. KITCHEN WINNERS NY INC. and
3   ADORAMA INC., HERSHEY WEINER, JOSEPH
    MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL
4   STERN
    Dep. Date: October 3, 2023
5   Deponent:  THOMAS KATO, as 30(b)(6)
    representative of Rock Fintek LLC
6                CORRECTIONS:
7   Pg.   Ln.   Now Reads      Should Read   Reason
8   ___   ___   _____    _____    _____
9   ___   ___   _____    _____    _____
10  ___   ___   _____    _____    _____
11  ___   ___   _____    _____    _____
12  ___   ___   _____    _____    _____
13  ___   ___   _____    _____    _____
14  ___   ___   _____    _____    _____
15  ___   ___   _____    _____    _____
16  ___   ___   _____    _____    _____
17  ___   ___   _____    _____    _____
18
19              _____
20              Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS _____ DAY OF _____, 2023
23
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES: _____
```