NOVEMBER 13, 2023                                                    MICHAEL ELSTRO

Page 1

```
        UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - x
KITCHEN WINNERS NY INC.,            :
       PLAINTIFF,                   :
    v.                              : CIVIL ACTION
ROCK FINTEK LLC,                    : NO.
       DEFENDANT.                   : 22-cv-05276-PAE
ROCK FINTEK LLC,
       COUNTERCLAIM AND
       THIRD-PARTY PLAINTIFF,
    v.
KITCHEN WINNERS NY INC,
       COUNTERCLAIM DEFENDANT
    and
ADORAMA INC., HERSHEY WEINER,
JOSEPH MENDLOWITZ, JNS CAPITAL
HOLDINGS LLC AND JOEL STERN,
       THIRD-PARTY DEFENDANTS.
- - - - - - - - - - - - x
       REMOTELY CONDUCTED DEPOSITION OF
                MICHAEL ELSTRO
           MONDAY, NOVEMBER 13, 2023
                  9:06 A.M. CST
REPORTED BY: KARISA EKENSEAIR, MO CCR RMR #1507
```

Page 2

1  DEPOSITION OF MICHAEL ELSTRO, CONDUCTED VIA
2  ZOOM VIDEOCONFERENCE WITH THE WITNESS LOCATED IN
3  MISSOURI.
4
5
6
7
8
9
10
11       Pursuant to notice, before Karisa J.
12  Ekenseair, Certified Shorthand Reporter in and for
13  the State Missouri; National Registered
14  Professional Reporter; National Registered Merit
15  Reporter; Notary Public in and for the State of
16  Arkansas.

Page 3

1              A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF KITCHEN WINNERS AND
3   THIRD-PARTY DEFENDANTS ADORAMA INC., HERSHEY
4   WEINER, AND JOSEPH MENDLOWITZ (VIA ZOOM):
5        ALEXANDER SPERBER, ESQUIRE
6        KIPSIUS BENHAIM LAW
7        80-02 KEW GARDENS ROAD, SUITE 1030
8        KEW GARDENS, NEW YORK 11415
9        212-981-8440
10       ASPERBER@LIPSIUSLAW.COM
11
12  ON BEHALF OF THE DEFENDANT ROCK FINTEK LLC (VIA
13  ZOOM):
14       PHILLIP RAKHUNOV, ESQUIRE
15       LAUREN RIDDLE, ESQUIRE
16       POLLACK SOLOMON DUFFY LLP
17       485 MADISON AVENUE, SUITE 1301
18       NEW YORK, NEW YORK 10022
19       212-493-3100
20       PRAKHUNOV@PSDFIRM.COM

Page 4

1         A P P E A R A N C E S   C O N T I N U E D
2   ON BEHALF OF THIRD-PARTY DEFENDANTS JNS CAPITAL
3   LLC AND JOEL STERN (VIA ZOOM):
4        AVRAM FRISCH, ESQUIRE
5        THE LAW OFFICE OF AVRAM E. FRISCH LLC
6        1 UNIVERSITY PLAZA DRIVE, SUITE 119
7        HACKENSACK, NEW JERSEY 07601
8        201-289-5352
9        FRISCHA@AVIFRISCHLAW.COM
10
11  ON BEHALF OF THE RESOURCE GROUP AND THE
12  DEPONENT (VIA ZOOM):
13       TAYLOR MATTHEWS, ESQUIRE
14       LEWIS RICE LLC
15       600 WASHINGTON AVENUE, SUITE 2500
16       ST. LOUIS, MISSOURI 63101
17       314-444-7600
18       TMATTHEWS@LEWISRICE.COM
19
20  ALSO PRESENT:
21       THOMAS KATO
22       HERSHEY WEINER
23       SEPIDEH KHANSARI, THE RESOURCE GROUP

Page 5

```
 1         T A B L E   O F   C O N T E N T S
 2                                              PAGE
 3  STYLE AND NUMBER.........................    1
 4  APPEARANCES..............................    3
 5
 6  WITNESS:   MIKE ELSTRO
 7  EXAMINATION BY MR. FRISCH..............    7
 8  EXAMINATION BY MR. SPERBER.............   56
 9  EXAMINATION BY MR. RAKHUNOV............   63
10
11  CERTIFICATE OF REPORTER................   68
12
13                   EXHIBITS
14  NUMBER      DESCRIPTION                     PAGE
15  EXHIBIT 1   E-MAIL CHAIN RE [EXTERNAL] FW:
16              200M NITRILE GLOVES, BATES
17              NUMBER TRG00000019 THROUGH 21,
18              CONFIDENTIAL..................   42
19  EXHIBIT 2   E-MAIL CHAIN RE [EXTERNAL] FW:
20              QUOTATION #1121-107405 FROM
21              AKRON RUBBER DEVELOPMENT
22              LABORATORY, INC., BATES NUMBER
23              TRG00001268 THROUGH 1270,
24              CONFIDENTIAL..................   45
25
```

Page 6

```
 1                   EXHIBITS
 2  NUMBER      DESCRIPTION                     PAGE
 3  EXHIBIT 3   E-MAIL CHAIN RE [EXTERNAL] INV
 4              200M NITRILE GLOVES REVISED,
 5              BATES NUMBER TRG00000066
 6              THROUGH 67, CONFIDENTIAL......   46
 7  EXHIBIT 4   E-MAIL CHAIN RE [EXTERNAL] RE:
 8              MEDCARE EXAM GLOVE - QA
 9              INSPECTION, BATES NUMBER
10              TRG00000542 THROUGH 543,
11              CONFIDENTIAL..................   47
12  EXHIBIT 5   E-MAIL CHAIN RE !! MEDCARE
13              BRAND GLOVES !!, BATES NUMBER
14              TRG00000261 THROUGH 263,
15              CONFIDENTIAL..................   49
16  EXHIBIT 6   E-MAIL CHAIN RE MEDCARE 3PL
17              GLOVES, BATES NUMBER
18              TRG00000087 THROUGH 88,
19              CONFIDENTIAL..................   53
20
```

Page 7

```
 1              P R O C E E D I N G S
 2                  MIKE ELSTRO
 3  of lawful age, being first duly sworn, deposes and
 4  says in reply to the questions propounded as
 5  follows:
 6                  EXAMINATION
 7  BY MR. FRISCH:
 8     Q  Good morning, sir.  My name is Avram
 9  Frisch.  I'm the attorney for third-party
10  defendants Joel Stern and JNS Capital Holdings
11  LLC.  And I'm going to be asking you questions
12  here today regarding the litigation between Rock
13  Fintek LLC, my clients, and the clients of
14  Mr. Sperber who is the plaintiff in this action,
15  and some of the other third-party defendants.
16         Can you state your name and address for
17  the record, please?  Your business address is
18  fine.
19     A  Yes.  My name is Michael Elstro.  My
20  business address would be 2554 West Port Center
21  Drive, St. Louis, Missouri.
22     Q  Thank you.  Have you ever testified at a
23  deposition before?
24     A  No, sir.  I have not.
25     Q  All right.  So let me explain to what you
```

Page 8

```
 1  this is about.
 2         During the course of the deposition, I and
 3  my colleagues in the case will be asking you
 4  questions about issues in the case.  We've
 5  negotiated with your counsel to limit the issues
 6  to specific items, which I'm sure he'll remind me
 7  when I stray beyond that.
 8         You're answering under oath, as you know.
 9  And you know, this is to be treated as the same as
10  if you were in a courtroom, right.  Tell the truth
11  and, you know, and you cannot discuss the
12  questions and answers directly with your counsel
13  as they're ongoing.
14         If you need a break, please let me know.
15  As long as no question is pending, we'll be happy
16  to take a break whenever you need it.
17         If you don't understand a question, please
18  let me know and I'll repeat it or rephrase it.
19  Please speak your answers aloud so that the
20  stenographer can record all of your responses.
21  Please also don't do uh-huhs, yes, no, head -- not
22  yes -- I mean, uh-huh, yeah, something like that.
23  Use full words and no head nods so that the court
24  reporter can take it down.
25         Other than with your attorney, have you
```

Page 9

1  discussed your testimony today with anyone?
2     A  I've had conversations with others within
3  the organization that were part of the transaction
4  that we had with Rock Fintek.
5     Q  Can you identify the specific people?
6     A  Yes.  Dewayne Rader, then other people
7  from our operations community, Scott Hebisen and
8  Vince Moccio.
9     Q  What's your -- what's your job description
10 at The Resource Group?
11    A  Yes.  My position title is, I'm senior
12 director of strategic sourcing for The Resource
13 Group.
14    Q  And what exactly does that -- does that
15 mean?
16    A  So on a day-in and day-out basis, the team
17 that I lead, we do contract terms and conditions
18 and price negotiations, specifically, my role with
19 medical device and medical product manufacturers.
20    Q  Okay.  How much involvement did you have
21 with the day-to-day of the transactions with
22 Mr. Kato, Mhub, and Rock Fintek?
23    A  When The Resource Group was engaged with
24 Rock Fintek, I was dealing with them on a weekly,
25 if not daily, basis.

Page 10

1     Q  Okay.  Were you the decision-maker who
2  decided to award contracts to them or was that
3  somebody else?
4         MR. MATTHEWS:  Objection, beyond the scope
5  of the topics.
6         But you may answer.
7         THE WITNESS:  I would say that I was
8  involved in the decision-making process and it was
9  a collective decision.
10 BY MR. FRISCH:
11    Q  All right.  So are you currently taking
12 any medications or other substances today that
13 would affect your ability to testify truthfully?
14        MR. MATTHEWS:  Objection, beyond the
15 scope.
16        You may answer.
17        THE WITNESS:  No, sir.  I'm not.
18 BY MR. FRISCH:
19    Q  Okay.  Did you review any documents in
20 preparation for today?
21    A  I'm sorry, can you repeat the question?
22    Q  Did you review any document -- documents
23 prior to today's deposition?
24    A  Yes, I did review documents prior to
25 today -- today's deposition regarding the

Page 11

1  transactions.
2     Q  What documents were those?
3     A  I reviewed documents that I believe were
4  pulled and prepared and shared with all parties as
5  part of this lawsuit.
6     Q  Thank you.  All right.  Do you recall when
7  The Resource Group first entered into business
8  with Thomas Kato?
9     A  Yes, I do.
10        MR. RAKHUNOV:  Just note my objection for
11 the record to the form.
12 BY MR. FRISCH:
13    Q  When was that?
14    A  We started interacting with Rock Fintek in
15 the beginning of the COVID-19 outbreaks, probably
16 around late February, early March of 2020.
17    Q  Okay.  And at that point in time, were you
18 dealing with Rock Fintek LCC or another entity
19 owned by Mr. Kato, if you know?
20    A  So when we started interacting with them
21 when I got involved during the COVID-19 outbreak,
22 we were referring to them as MHub, as Merchant Hub
23 which is one of, I believe, Mr. Kato's other
24 businesses, but we also transacted under Rock
25 Fintek as well.

Page 12

1     Q  Did he ever into any agreements under the
2  name of MHub with you?
3     A  I cannot recollect if our purchase orders
4  physically had Rock Fintek or Merchant Hub on
5  them, to be honest with you.
6     Q  Okay.  And from early in the pandemic,
7  what -- what do you recall purchasing from Rock
8  Fintek?  I'm just going to use Rock Fintek as a
9  shorthand of any of Mr. Kato's entities at this
10 point.
11    A  Understood.  Yes.  So early on in COVID,
12 we created purchase orders and received from Rock
13 Fintek three-ply, KN-95s.  We also received
14 isolation gowns from them outside of the nitrile
15 gloves in question today.
16    Q  Okay.  How did you come to be introduced
17 to Rock Fintek?
18        MR. MATTHEWS:  Objection to the form;
19 beyond the scope of the deposition topics.
20        But you may answer.
21        THE WITNESS:  I honestly do not know the
22 answer to that question.  During COVID-19, there
23 were numerous vendors that were introduced to us
24 through all kinds of channels, so I'm -- I'm not
25 aware.

Page 13

1  BY MR. FRISCH:
2  Q  Do you know what you did to vet Rock
3  Fintek's ability to sort of fulfill the terms of
4  any agreement?
5      MR. MATTHEWS:  Objection to the form;
6  beyond the scope the deposition topics.
7      But you may answer, if you know.
8      THE WITNESS:  I do not.
9  BY MR. FRISCH:
10  Q  Prior to the -- the purchase order for the
11  gloves in question here, how much business had you
12  done with Rock Fintek?
13  A  During the term of our engagement with
14  Rock Fintek, we ordered and received close to
15  $24 million in other medical products, the
16  three-ply masks, KN-95s, and isolation gowns.
17  Q  By the time you entered into the purchase
18  order for the gloves, were all of those purchase
19  orders fulfilled?
20  A  I don't recollect, like, what percentage
21  had been fulfilled, but it was the vast majority
22  of that.
23  Q  So the glove transaction, was that the
24  last transaction you did with Rock Fintek?
25  A  I don't recollect.  The isolation gowns

Page 14

1  that we purchased from them might have been made
2  after the glove order.  I don't recall.
3  Q  Who decided to give them this glove order
4  for, I guess, close to $40 million?
5      MR. MATTHEWS:  Object to the from; beyond
6  the scope of the deposition topics.
7      But you may answer.
8      THE WITNESS:  As previously stated, it was
9  a group decision.
10 BY MR. FRISCH:
11  Q  Were you concerned that you were putting
12  too many eggs in one basket when that decision was
13  made?
14      MR. MATTHEWS:  Object the form; beyond the
15  scope of the deposition topics.
16      But you may answer.
17      THE WITNESS:  Based upon their performance
18  of delivering products and our relationship to
19  that point, I was not.
20 BY MR. FRISCH:
21  Q  When you placed the order, were you buying
22  a specific brand of gloves?
23  A  During COVID-19, gloves were in high
24  demand and we had entertained creating purchase
25  orders with multiple different providers.  And

Page 15

1  they were seeking out gloves where they could
2  across the world.  Even the largest glove
3  manufacturers in the world could not meet supply
4  and demand.
5      So specifically, we did not agree upon a
6  certain brand of gloves that needed to be
7  provided.
8  Q  Did you understand that Rock Fintek had
9  gloves available, went to it, and -- strike that.
10     When you entered into that purchase order,
11 I think it was around December 2020, did
12 you -- did you believe that Rock Fintek had gloves
13 either on hand or had contracted firmly to get
14 gloves to fulfill the purchase order?
15  A  No.  I did not.
16  Q  You were aware that they had no gloves
17 whatsoever at that moment?
18  A  That is correct.
19  Q  And what were the terms of the purchase
20 order in terms of what were they supposed to
21 supply you?
22  A  Yes.  The purchase order was for 200
23 million, so roughly $37 million, 18-and-a-half
24 cents per glove of ASTM D6319-rated nitrile exam
25 gloves, FDA approved.

Page 16

1  Q  Had you -- at that time, had you ever
2  heard of Medcare brand gloves?
3  A  I don't recall.
4  Q  When did you first learn of Medcare as a
5  brand?
6  A  My recollection of Medcare gloves, the
7  first one I can recall, is when Brad Gilling sent
8  over documentation on Medcare glove to The
9  Resource Group to review.
10 Q  Do you recall when that was?
11 A  After the initial purchase order, but not
12 this exact date.  If I had to -- I'm not going to
13 speculate.
14 Q  Okay.  Was it in 2020 or in 2021?
15 I'm -- if you don't know, that's okay.
16 A  It would have been in early 2021.
17 Q  Okay.  Do you recall the delivery schedule
18 for the gloves?
19 A  I recall that we laid out a delivery
20 schedule.
21 Q  Do you recall whether Fintek met the
22 delivery schedule?
23 A  I would say that Rock Fintek did not meet
24 the original delivery schedule that was laid out.
25 But from day one, we knew that it would be tough

Page 17

1  to meet that delivery schedule based upon the
2  current supply chain conditions across the world.
3      Q  And what brands of gloves did Rock Fintek
4  ultimately deliver?
5      A  Rock Fintek delivered Medcare gloves as
6  part of our $200 million glove order.
7      Q  Did they deliver any other brands?
8      A  There was another brand of glove by the
9  name of LuvMed that they delivered as well.
10     Q  Any others?
11     A  Not that I can recall at this time.
12     Q  Do you recall when you first received the
13 Medcare gloves from Rock Fintek?
14     A  I don't recall when we received the first
15 shipment of gloves from Rock Fintek.  When they
16 started coming in, they were coming in hot and
17 heavy.  And we're talking about lots and lots of
18 truckloads of deliveries.
19     Q  Do you know if essentially The Resource
20 Group bought Medcare gloves from any other vendor?
21        MR. MATTHEWS:  Object to the form of the
22 question; and it's beyond the scope of the
23 deposition topics.
24        But you may answer, if you know.
25        THE WITNESS:  I do not recall.  We bought

Page 18

1  many glove brands during COVID-19.
2  BY MR. FRISCH:
3      Q  And how many -- how many vendors did you
4  have for gloves during the period from
5  February '21 through June 2021?
6        MR. MATTHEWS:  Object to form; beyond the
7  scope of the deposition topics.
8        But you may answer, if you know.
9        THE WITNESS:  I would -- I have no idea at
10 this point in time.
11 BY MR. FRISCH:
12     Q  But it wasn't only Rock Fintek at that
13 time?
14     A  We purchased gloves from other suppliers
15 outside of Rock Fintek.
16     Q  And are any of those suppliers currently
17 supplying you now?
18        MR. MATTHEWS:  Object to form; beyond the
19 scope the deposition topics.
20        But you may answer, if you know.
21        THE WITNESS:  Yes.
22 BY MR. FRISCH:
23     Q  Okay.  When you purchased these gloves,
24 did you do any examination of the gloves either
25 before or after they were delivered?

Page 19

1      A  Yes.  I have reviewed gloves.
2      Q  What did you do to examine them?
3        MR. MATTHEWS:  And Avi, this is just to
4  clarify.  Are you talking specifically about the
5  Medcare gloves?
6        MR. FRISCH:  Yes.
7  BY MR. FRISCH:
8      Q  Specifically about the Medcare gloves.
9      A  I had a box, a sample box, that was sent
10 to me after the $200 million were delivered of a
11 potential replacement, Medcare glove was delivered
12 to my household.
13     Q  Okay.  Were -- did you ever get those
14 replacement Medcare gloves?
15     A  No.  We have never received replacement
16 gloves.
17     Q  Did you ever examine the shipments of
18 gloves prior to their delivery to Resource Group?
19     A  We did not examine the gloves prior to
20 delivery to our distributor who held the gloves
21 and is still holding the gloves.
22     Q  Did you ever do anything to examine the
23 gloves after they were delivered to your
24 distributor?
25     A  I personally did not, but we have had

Page 20

1  numerous clinicians, members of the Ascension's
2  infection prevention team, we've had independent
3  third-party testing, and Medline, probably one of
4  if not the largest glove manufacturer in the
5  world, review and examine the gloves.
6      Q  And of those examinations, what did they
7  find?
8        MR. MATTHEWS:  Sorry, Avi.  Can you -- can
9  you repeat the --
10       THE WITNESS:  Yeah.
11       MR. RAKHUNOV:  Same.
12 BY MR. FRISCH:
13     Q  I said, of those examinations, what did
14 they find in those examinations?
15     A  So we found multiple things with the
16 examinations of the gloves.
17       So when the gloves started triculating out
18 to our healthcare providers across the country, we
19 received numerous complaints from the gloves from
20 people that have never met each other, never
21 talked to each other before, markets like
22 Birmingham, Alabama; Austin, Texas; Chicago,
23 Illinois; all over the country:  Complaints that
24 the gloves were tearing, complaints that fluids
25 were seeping through the gloves, complaints that

Page 21

1  the cuffs around the gloves were too large and
2  loose, complaints that the sizing of the gloves
3  did not represent what was listed on the box.  For
4  example, there might be large-size gloves in a box
5  that was labeled as small.
6       We had independent third-party testing
7  conducted by Akron Rubber Development Lab to look
8  at the elongation and tensile strength of the
9  gloves.  We pulled eight independent separate lots
10 from the 200 million.  The test determined that
11 none of the gloves passed for elongation and
12 tensile testing in relation to ASTM D6319
13 regulations.
14      We also had three separate lots of Medcare
15 gloves tested, chemical tested, and they were
16 determined by -- by Akron Rubber Development Lab
17 as well, and they were determined not to be
18 nitrile based upon the chemical testing.
19   **Q  All three of them were determined not to**
20 **be nitrile?**
21   A  Two of the three lots were determined not
22 to be nitrile as part of that chemical testing.
23 The third lot was a sample that was brought
24 forward as a potential replacement glove.  The two
25 lots that failed were part of the 200 million

Page 22

1  gloves that were shipped to us.
2    **Q  How did you determine which lots to have**
3  **tested for their chemical composition?**
4    A  They were randomly selected from the
5  warehouses where the gloves were being stored.
6    **Q  Isn't it true you tested eight -- eight**
7  **lots of gloves for tensile strength and elongation**
8  **but only two for chemical compensation?  Why is**
9  **that?**
10   A  I don't recall.
11   **Q  Was it because you thought some of them**
12 **would pass and, therefore, wanted to not have**
13 **testing that shows them passing that exam?**
14   A  I'll repeat, I don't recall.
15   **Q  Okay.  Isn't it true that Medline's gloves**
16 **also failed the elongation test that Akron Rubber**
17 **did?**
18   A  We did decide to test a --
19      MR. MATTHEWS:  Really quick, just to
20 interrupt, I'll let my continue objections, this
21 is beyond the scope of the topics.
22      Go ahead, Mike.
23      THE WITNESS:  We did decide to test a
24 Medline glove sample as well for the elongation
25 and tensile.  While it did not pass, I will state

Page 23

1  that the numbers from the elongation and tensile
2  testing were significantly superior to the Medcare
3  gloves.
4  BY MR. FRISCH:
5    **Q  Why wasn't some sort of testing done at**
6  **the beginning of the receipt of these gloves?**
7       MR. MATTHEWS:  Object to form; beyond the
8  scope the deposition topics.
9       But you may answer, if you know.
10      THE WITNESS:  So during COVID-19, as we're
11 all aware of watching the news, PPE was in high
12 demand and not being supplied.  Companies did not
13 have safety stock in the United States and product
14 was in high demand.
15      So we had been provided documentation by
16 Rock Fintek that the gloves were ASTM D6319-rated.
17 They were nitrile gloves.  And we had also been
18 provided documents that had Kitchen Winners' name
19 on it that stated that the gloves were nitrile.
20      And so based upon all representations, we
21 decided to let those gloves to our healthcare
22 providers because we were not getting our daily
23 needs in gloves shipments from our day-to-day
24 suppliers.
25 BY MR. FRISCH:

Page 24

1    **Q  Do you know when you first disputed the**
2  **Medcare gloves to your facilities?**
3    A  I don't recall.
4    **Q  How long -- do you recall how long after**
5  **you first started receiving them, like an**
6  **approximate number of days?**
7    A  I do not recall.
8    **Q  Do you know how many of those gloves were**
9  **actually used by providers?**
10      MR. MATTHEWS:  Object to form; beyond the
11 scope the deposition topics.
12      But you may answer, if you know.
13      THE WITNESS:  I don't know for sure.  I
14 know that we are left about 196 -- well, we were
15 shipped about 196 million of those, and the vast
16 majority did not make it out to our healthcare
17 providers.  And what was shipped into our
18 healthcare providers eventually was quarantined
19 and pulled to the side because it could not be
20 utilized.
21 BY MR. FRISCH:
22   **Q  Do you recall when you first received**
23 **complaints about the gloves?**
24   A  Early July of 2021.
25   **Q  And there was no use that you could have**

Page 25

1  put the gloves so that would have been at least a
2  way to use them up?
3       MR. MATTHEWS:  Object to the form; beyond
4  the scope of the deposition topics.
5       But you may answer, if you know.
6       THE WITNESS:  So healthcare providers
7  depend upon PPE, right.  It is their livelihood,
8  right, to protect them from bodily fluids, waste.
9  And when that comes into question, we can't take
10 that risk.  You're putting people's lives at
11 potential risk by utilizing product that is
12 counterfeit and ineffective.
13 BY MR. FRISCH:
14    Q  Well, let's ask that:  What makes you say
15 that the gloves were counterfeit?
16    A  I would say that the gloves were
17 counterfeit because they did not meet the
18 specifications and representations that The
19 Resource Group was provided.  It clear articulates
20 on our purchase orders that the gloves should be
21 ASTM D6319-rated, that they should be nitrile
22 gloves, they should be FDA approved.
23      And based upon the representations that
24 were provided to us from Rock Fintek and had
25 Kitchen Winners name on it, I mean, the boxes

Page 26

1  state -- even the outside of the boxes state
2  nitrile on them, the outer box and the inner box,
3  and that is not the case.
4     Q  Well, you -- you had two boxes examined,
5  right, for whether or not they were nitrile; isn't
6  that correct?
7       MR. RAKHUNOV:  Avi, I'm sorry, can you
8  just please speak up a little?  You trail off at
9  the end of your question.
10 BY MR. FRISCH:
11    Q  I said you had two boxes examined to
12 determine if they were nitrile; is that correct?
13    A  So that's not what I said.  I said the
14 gloves were not ASTM D6319-rated.  The gloves did
15 not pass elongation and tensile testing.
16 Therefore, they're not -- they did not meet the
17 requirement to be an ASTM D6319 nitrile glove.
18    Q  Would it surprise you to learn that the
19 contract between Rock Fintek and JNS and Joel
20 Stern did not -- did not reference ASTM D6319?
21      MR. MATTHEWS:  I'm going to object to the
22 form.  I'm going to object that it's beyond the
23 scope of the deposition topics.  And I will object
24 based upon foundation, or lack thereof.
25      Subject to that, you may answer, Mike.

Page 27

1       MR. RAKHUNOV:  Yeah.  Note my objection to
2  form as well.
3       THE WITNESS:  The Resource Group and
4  Ascension don't care what the contract says
5  between Rock Fintek and Kitchen Winners or JNS
6  Capital.  Our contract stated that there should be
7  ASTM D6319-rated nitrile gloves, FDA approved, and
8  the gloves are not.
9  BY MR. FRISCH:
10    Q  Did you -- were you ever in communication
11 with Medcare directly?
12    A  I was part of one conference call with
13 individuals that were, I'm told, part of Medcare.
14 I've met them one time on a conference call.
15    Q  Because you said they were counterfeit
16 gloves, do you have any reason to believe that
17 these gloves were not shipped by Medcare and not
18 manufactured by Medcare?
19      MR. MATTHEWS:  Object to form; beyond the
20 scope of the topics.
21      But you may answer, if you know.
22      THE WITNESS:  I can't speculate on that.
23 BY MR. FRISCH:
24    Q  Were there any gloves that were good
25 in -- in the 200 million gloves, did you figure

Page 28

1  out if there was any that were usable?
2     A  I don't know if any of the gloves were
3  good.  What I do know is that we cannot trust that
4  the 200 million gloves or 196 million that we
5  received some are good and some are not.  We can't
6  put that on a healthcare provider to send gloves
7  in and say open the box and see if you think these
8  are good enough.  They don't have time to do that.
9       If you're ever in a healthcare setting,
10 folks are running to grab gloves sometimes to take
11 care of their patients.  We cannot put that burden
12 on healthcare providers.
13    Q  Once you discovered the issues with the
14 gloves, did you request that Rock Fintek give you
15 a replacement?
16    A  The Resource Group has asked that Rock
17 Fintek make us whole on the situation.  I believe
18 there's a Lewis & Rice letter that was sent to
19 Rock Fintek in March of 2022 that lays out our
20 requests or demands of Rock Fintek, that we be
21 made whole on the order that was received, so the
22 196 million gloves, close to $37 million; not to
23 mention the fact that we have well north of
24 $2 million in holding costs for these gloves at
25 this point in time and that continues to grow, and

Page 29

1  other damages.
2     Q  And what was their response to that?
3     A  I do not know.
4     Q  I'm going to call up the letter.  Did it
5  pop up?  That was labeled at, I think, Mr. Kato's
6  deposition as JNS A -- Exhibit A.
7        Is this the letter you were referring to?
8        MR. MATTHEWS:  Mike, are you able to click
9  through it?
10       THE WITNESS.  Yes, sir.
11       That looks like the letter.  I'm just --
12 sorry, I'm just trying to make -- blow it up and
13 just make sure that --
14 BY MR. FRISCH:
15    Q  You can -- you can control --
16    A  Yes.
17    Q  -- the size and the scrolling --
18    A  Yes.
19    Q  -- on your own screen.
20    A  Yep.  Yes, sir.  I understand.
21       Yes.  That is the letter.
22    Q  Do you happen to know why your attorney
23 believed that Rock Fintek LLC was not formed until
24 May 1st, 2021?
25       MR. MATTHEWS:  Object to form; and calls

Page 30

1  for a disclosure of attorney-client
2  communications.
3        So I will instruct the witness not to
4  answer as to what his knowledge of his attorney's
5  belief is.
6        MR. FRISCH:  Okay.  Let me rephrase that
7  without reference.
8  BY MR. FRISCH:
9     Q  Do you know, without reference to any
10 conversations with any of your attorneys, if Rock
11 Fintek LLC was not formed until May 1st, 2021?
12    A  I'm sorry, can you repeat the last part of
13 your question?  You've asked -- I'm having issues
14 hearing you at the end.
15    Q  Sorry.  I'll get a little closer to the
16 screen.
17       Do you know, without reference to
18 conversations with your attorneys which I don't
19 want to know about, do you know if Rock Fintek LLC
20 was only formed on May 1, 2021, as noted in the
21 footnote in this letter?
22    A  I'm not aware.
23    Q  Okay. Did Rock Fintek ever offer you
24 another brand of gloves during the period, let's
25 say around April 2021, in -- in lieu of the

Page 31

1  Medcare gloves?
2     A  I don't recall specifically.  Although, I
3  do recall we had -- we had multiple conversations
4  with Rock Fintek when they thought that they had
5  found a provider that could fulfill the order, but
6  I don't recall all those different brands of
7  gloves.
8     Q  Okay.  What -- when you first discovered
9  the gloves were bad, did -- when did you first ask
10 Rock Fintek to replace the gloves or to make you
11 whole?
12    A  We brought it to their attention in July
13 of '21, that the gloves were bad and we needed to
14 find resolution and find replacement gloves.
15    Q  And what was -- what was their response in
16 July of 2021?
17       MR. RAKHUNOV:  Objection.  Go ahead.
18       THE WITNESS:  We had -- we had multiple
19 conversations with Rock Fintek.  I think at first
20 they believed that we had received good gloves.
21 But as time went on in the conversation and they
22 went out and they started looking at the gloves at
23 the Medline warehouses, they understood that we
24 had a situation on our hands.
25 BY MR. FRISCH:

Page 32

1     Q  Another document, this had also previously
2  been marked at Mr. Kato's deposition as JNS
3  Exhibit F.
4        And here, Mr. Kato writes -- I'm trying to
5  find the line I want you to look at.  In -- if
6  you -- well, just read through this -- this
7  e-mail.  I know you're not copied on it, but maybe
8  you're familiar with it anyway.
9        Just read through it quickly and then I'll
10 ask my question.
11    A  Okay.  Please give me just a couple of
12 minutes.
13       (Off-the-record discussion.)
14       MR. FRISCH:  All right.  Are we back on
15 the record?
16 BY MR. FRISCH:
17    Q  Michael, you ready?  You read it or
18 you still --
19    A  I did.  I was having problems trying to
20 read it when you guys were talking --
21    Q  Oh, sorry --
22    A  -- so if you guys can give me a couple
23 minutes of silence --
24    Q  Sure.
25    A  -- I'd appreciate it.  Thank you.

NOVEMBER 13, 2023                               MICHAEL ELSTRO                                Pages 33..36

Page 33

1  THE REPORTER: Would we like to go off the
2  record?
3  MR. RAKHUNOV: Yeah. Let's go off the
4  record for two minutes.
5  (Whereupon a break was had.)
6  BY MR. FRISCH:
7  **Q  Have you ever seen this document before?**
8  A  No, sir.  I have not.
9  **Q  In the middle, it says in -- later in**
10 **February and March, we were able to secure**
11 **pre-pandemic brand gloves like Kimberly Clark,**
12 **Intco, and others.  These name brands would have**
13 **cost us less to purchase but we did not.  Vince**
14 **told us not to.  He said Medcare gloves are in all**
15 **the hospitals and they are very happy with them**
16 **and it's more work to input a new product.**
17 **Were you aware of this conversation that**
18 **Mr. Kato says occurred?**
19 MR. MATTHEWS: Objection to the form;
20 beyond the scope of the deposition notice.
21 But you may answer, if you know.
22 THE WITNESS: I'm not aware of that.
23 BY MR. FRISCH:
24 **Q  Are you aware of any -- if I told you**
25 **Vince said this, is that -- would that have**

Page 34

1  **been -- strike that.**
2  **I guess, just to be clear, are you -- do**
3  **you think there's any truth to Mr. Kato's**
4  **statement here?**
5  MR. MATTHEWS: Object to the form; beyond
6  the scope of the deposition notice; calls for
7  speculation.
8  Subject to that, you may answer.
9  MR. RAKHUNOV: Objection.
10 THE WITNESS: We bought -- we bought
11 gloves from the other providers listed.  And when
12 I say from them, not from them, but from middle --
13 middlemen, right, that were selling those gloves.
14 We had Kimberly Clark, Intco.  We had multiple
15 brands of gloves we purchased during COVID-19.
16 And I can tell you the going rate for
17 gloves was very high.  We buy gloves
18 two-and-a-half, $0.03 a day.  Gloves were going
19 for 15 to close to $0.20 a glove during COVID-19.
20 BY MR. FRISCH:
21 **Q  Do you happen to recall if Kimberly Clark**
22 **gloves were more or less expensive than the**
23 **Medcare gloves you brought from Rock Fintek at**
24 **that point in time?**
25 MR. MATTHEWS: Object to the form; beyond

Page 35

1  the scope of the deposition notice.
2  But subject to that, you may answer, if
3  you know.
4  THE WITNESS: Unfortunately, I don't
5  remember the cost of every glove that we purchased
6  during COVID-19.  As I stated, they were -- they
7  were ranging from 15 to $0.20 a glove.
8  BY MR. FRISCH:
9  **Q  Did Rock Fintek ever replace a single**
10 **glove?**
11 A  To my knowledge, Rock Fintek has not
12 replaced any of the 196 million-ish gloves that
13 we -- we, The Resource Group, have received.
14 **Q  Did Rock Fintek refund any money?**
15 A  To my knowledge, we have not received any
16 reimbursement refunds of the close to $37 million
17 plus the holding costs and other damages as part
18 of this.
19 **Q  Did Rock Fintek do anything to make the**
20 **situation better on your end?**
21 MR. RAKHUNOV: Objection.
22 THE WITNESS: The situation is unresolved
23 on our end.  We still have purchased 196 million
24 gloves, close to $37 million, holding costs, and
25 other damages.  And we have not recouped any of

Page 36

1  that today.
2  BY MR. FRISCH:
3  **Q  And you testified you're still holding**
4  **them at the Medline distribution center?**
5  MR. MATTHEWS: Object to the form.  That's
6  beyond the scope of this deposition notice.
7  Subject to that, if you have personal
8  knowledge, you may answer.
9  THE WITNESS: I'm not -- so my day-to-day
10 role, I'm not directly tied into, like, the
11 holding of the gloves and distributing them.  I do
12 know that Ascension, so the parent organization of
13 The Resource Group, has donated a good number of
14 the gloves, but we are still holding a substantial
15 amount, over half of the order, at Medline
16 distribution centers.
17 BY MR. FRISCH:
18 **Q  Do you know how much you paid Rock Fintek**
19 **in total for the Medcare gloves?**
20 A  It was -- we paid Rock Fintek what we had
21 been invoiced for, so it was close to 100 -- 196
22 million at the 18-and-a-half cents per glove.
23 They invoiced us -- every time that we received an
24 order, Medline checked it, sent us a notice it was
25 received.  Rock Fintek would send us an individual

Page 37

1  invoice and we would pay it.
2     Q  But you're not aware of the total sitting
3  here today?
4     A  I don't know the exact total.  As I said,
5  it's close to $37 million.
6     Q  What -- had these gloves be acceptable,
7  what is the likelihood that Rock Fintek would have
8  gotten another contract from The Resource Group?
9     A  I -- so I'll -- I'll answer, but it's kind
10 of speculative at this point in time, like, what
11 it would have been.  And I'll address it from two
12 different angles.  So I'll approach it from a
13 short-term and long-term perspective.
14     So short term, while we were in the midst
15 of COVID-19, I think it's highly likely that we
16 would have continued to engage with Rock Fintek in
17 additional business opportunities.  There were
18 other needs that came up.  It was like playing
19 Whac-A-Mole, right.  You didn't know day-to-day,
20 week-to-week, what our medical supply needs would
21 be.
22     So you know, it was gloves when we made
23 the glove purchase.  But, you know, there was a
24 run where people were having issues getting bent
25 metal, things like wheelchairs and walkers,

Page 38

1  crutches and canes, right.
2     We reached out to the suppliers that we
3  had been dealing with during COVID-19 and said,
4  can you source any of these.  So an opportunity
5  like that is something like Rock Fintek would have
6  missed out upon.  Because once we received the
7  counterfeit gloves, we did not reach out to them
8  to do any more additional business.
9     Q  Okay.  Was there any -- who was your --
10 your regular provider of gloves prior to the
11 pandemic?
12     MR. MATTHEWS:  Object to form; beyond the
13 scope of the deposition notice.
14     Subject to that, you may answer, if you
15 know.
16     THE WITNESS:  So prior to COVID-19, we
17 were utilizing Medline for the vast majority of
18 our nitrile exam gloves business.
19 BY MR. FRISCH:
20    Q  And have you returned to Medline at this
21 point in time?
22     MR. MATTHEWS:  Object to the form; beyond
23 the scope of the notice.
24     But subject to that, you may answer.
25     THE WITNESS:  I'd state that we never left

Page 39

1  Medline, that we continued to buy during COVID-19
2  and we continue today.
3  BY MR. FRISCH:
4     Q  Was there any effort -- was there ever a
5  time where somebody would have told Thomas Kato
6  that he would have the ability to bid for a
7  contract for gloves in the future?
8     MR. MATTHEWS:  Avi, can you repeat that?
9  I'm sorry, we're having a hard time listening --
10    MR. FRISCH:  Sorry.  Every time I sit
11 back, it's a little bit --
12    MR. MATTHEWS:  That's okay.
13    MR. FRISCH:  Sorry about that.
14 BY MR. FRISCH:
15    Q  Was there ever a time where Mr. Kato would
16 have told by somebody at The Resource Group to
17 your knowledge that he was able to bid on a
18 contract for gloves going forward?
19    A  So I talked about the short-term potential
20 business earlier.  The long-term potential
21 business was a conversation that Rock Fintek had
22 brought forward to The Resource Group.  Obviously,
23 they wanted to continue a business relationship,
24 potentially get into the medical supplies
25 business.

Page 40

1     I don't recall directly having those
2  conversations with Tommy Kato or -- or Brad, but I
3  can tell you that I know Todd Adams who was at the
4  time our chief operating officer and Dewayne Rader
5  who is our vice president for -- for supply chain,
6  both individuals had conversations with Tommy and
7  they -- and told me that they had conversations
8  with Tommy about that.
9     The conversations really were around the
10 fact of if they would -- they need to clear some
11 major hurdles to do that, we would have
12 discussions with them, just like we would other
13 suppliers.  But to get into that medical space,
14 supply space, Todd and Dwayne let Rock Fintek
15 know, one, you've got to go through all the FDA
16 approvals, right.  And that is no small hurdle.
17     And two, you're also dealing with -- when
18 you talk about gloves and PPE and masks, you're
19 talking about some ginormous companies and
20 organizations that they would have to get very
21 competitive on price.
22     So there were a couple of big hurdles
23 there, but if they were willing to clear those,
24 then we would certainly talk to them.  But they
25 would have to look at winning the business.  It

Page 41

1  wasn't just going to be given to them.
2      Q  But there was no specific bid or contract
3  that they were told that they had a chance at that
4  moment in time?
5      MR. RAKHUNOV:  Objection.
6      THE WITNESS:  That is correct.  We never
7  talked to them about a specific, like, long-term
8  contract or bidding on a long-term nitrile glove
9  business for the organization.  That is correct.
10 BY MR. FRISCH:
11     Q  At this point in time, have the COVID-19
12 pandemic shortages largely cleared up or are there
13 still areas where -- where you -- you fall upon a
14 shortage?
15     MR. MATTHEWS:  Object to form; beyond the
16 scope of the topics in the deposition.
17     Subject to that, you may answer, Mike.
18     THE WITNESS:  I -- I'd state that things
19 have certainly settled down.  They're nowhere like
20 they were back in 2020 and 2021.
21     There's still some blips in supply chain,
22 but -- but nowhere like it was going back three
23 years ago.
24 BY MR. FRISCH:
25     Q  All right.  I think I want to ask about

Page 42

1  this.  One second.
2      Now, I'm just going through some of the
3  documents that I marked, but for some
4  reason -- give me a second.  I apologize.  I
5  premarked this one for today as JNS Ascension
6  Exhibit 1.
7      (Exhibit JNS-Ascension 1 marked for
8  identification.)
9  BY MR. FRISCH:
10     Q  If you could take a look at the -- I did
11 publish it, I think, so you can just quickly
12 glance through it.
13     You are copied, I will note, on this -- on
14 this thread.  Let me know when you're ready.
15     A  I've reviewed the document.
16     Q  Do you recall this -- this conversation?
17     A  Yes.  I recall this e-mail.
18     Q  Okay.  Did the photo meeting -- I didn't
19 take the one with the photos of the princes of
20 England, but did -- did that have any impact on
21 your desire to do business with Mr. Kato at that
22 time?
23     MR. MATTHEWS:  Object to form; beyond the
24 scope of the agreed-upon deposition notice topics.
25     Subject to that, you may answer, if you

Page 43

1  know.
2      THE WITNESS:  I don't -- I don't believe
3  seeing that photo of Prince William and Harry had
4  any influence on us to sign to buy gloves from
5  them.
6  BY MR. FRISCH:
7      Q  Did the description of 200 million gloves
8  from Hartalega Paloma in here, was that -- was
9  that part of your reason for going with Mr. Kato
10 at that point in time, the description of the
11 relationship he had with this Malaysian company?
12     A  Rock Fintek stated that they could procure
13 200 million gloves, and we were in need of
14 purchasing gloves.  So based upon his
15 representations that they could provide gloves to
16 us, I would say yes, that was part of the reason
17 why we decided to order with Rock Fintek.
18     Q  And initially, were you expecting delivery
19 of Hartalega Paloma gloves when you placed the
20 order?
21     A  Yes.  At the onset, I would say that they
22 had represented that we would be delivered to
23 Hartalega gloves, but I -- but I'll also say that
24 Rock Fintek was not the first organization that we
25 had ordered gloves from where we cut a purchase

Page 44

1  order and a company had a lead on gloves, told us
2  they had a lead on gloves and then they got outbid
3  or it wasn't what they thought it was and we had
4  to switch providers of gloves.
5      Q  When -- when did you become aware that
6  they could not get these gloves?
7      A  I don't recall the exact date.  If I had
8  to guess, I would say early 12021.
9      Q  Were you aware that $6 million of money
10 that you had deposited with Rock Fintek had been
11 wired to Malaysia as a deposit on these gloves?
12     MR. MATTHEWS:  Object to form; beyond the
13 scope of the deposition topics.
14     But you may answer.
15     THE WITNESS:  I was not aware that money
16 had been wired as part of this.  I can tell you
17 during COVID-19, some manufacturers asked for
18 money down in order to deliver product.  That was
19 not unusual for that time.
20 BY MR. FRISCH:
21     Q  Were you aware that the money was lost?
22     MR. MATTHEWS:  Object to form; beyond the
23 scope of the deposition notice.
24     You may answer, if you know.
25     THE WITNESS:  At the time, I was not

Page 45

1  aware.  In subsequent conversations months later,
2  it came out that they had lost some money as part
3  of the deal.
4  BY MR. FRISCH:
5     Q  And is that concerning to you at the time
6  and their ability to fulfill the contract?
7        MR. MATTHEWS:  Object to form; beyond the
8  scope of the deposition noticed topics.
9        You may answer.
10       THE WITNESS:  I don't recall having those
11 conversations prior to the glove order being
12 fulfilled.
13 BY MR. FRISCH:
14    Q  Okay.  I'm going to share this.  I think
15 we discussed this a little already, but maybe this
16 will refresh your recollection.
17       This is an e-mail from you to Ana Barbur
18 at the Akron Rubber Lab, November 12, 2021.  I've
19 labeled it as JNS-Ascension 2.
20       (Exhibit 2 marked for identification.)
21    Q  Does this e-mail thread refresh your
22 recollection as to why you only tested, looks
23 like, three lots of the gloves for nitrile
24 content?
25    A  I'd like a minute to read the document,

Page 46

1  please.
2     Q  Sure.  Take your time.
3     A  I've reviewed the document.
4     Q  Okay.  Does this refresh your recollection
5  at all as to why you chose to only test three of
6  the eight lots you had sent?  There were only
7  three lots in total for nitrile content.
8     A  No.  It does not.
9     Q  All right.  Let's move on to the next one
10 then.
11       All right.  Here's an e-mail.  I've
12 labeled the document JNS-Ascension 3.
13       (Exhibit 3 marked for identification.)
14    Q  This is an e-mail December 7th, 2020, from
15 you to Bradley Gilling, coping several other
16 parties.
17       Do you recall this -- this e-mail?
18    A  Yes, sir.  I do.
19    Q  In your opinion, did Rock Fintek fulfill
20 the terms of this purchase order?
21       MR. MATTHEWS:  Just for the record, Avi,
22 this purchase order, are you referring to the
23 attachment, you know, in the e-mail describing it?
24       MR. FRISCH:  Yes.
25       MR. RAKHUNOV:  Just note my objection for

Page 47

1  the record.
2        MR. MATTHEWS:  Go ahead, Mike.
3        THE WITNESS:  I would say that Rock Fintek
4  did not meet the specifications that were laid out
5  in the attachment and in my e-mails to them on
6  December 7th of 2020.
7        (Exhibit 4 marked for identification.)
8  BY MR. FRISCH:
9     Q  Okay.  Here is an exhibit.  This is
10 labeled JNS-Ascension 4.  This document is dated
11 July 23rd, 2021, and it's an e-mail from Adam
12 Swearingin to you and several other people, I
13 guess, at The Resource Group.
14       Are you familiar with Mr. Swearingin?
15    A  Yes, sir.  I work -- I've worked pretty
16 closely with Adam Swearingin in the past.
17    Q  Okay.  I apologize --
18    A  And continue to do so.
19    Q  -- for butchering his name.
20    A  That's okay.
21    Q  Okay.  And is he -- does he have any
22 expertise in gloves?
23       MR. MATTHEWS:  Object to form; beyond the
24 scope of the agreed-upon deposition topics; and
25 object on foundation.

Page 48

1        But other than that, if you know, you may
2  answer.
3        THE WITNESS:  I would say that Adam
4  Swearingin is more of a glove expert than any of
5  us on this call today and probably 99 percent of
6  the population.
7  BY MR. FRISCH:
8     Q  Okay.  So he wrote that some of the gloves
9  fit really well and donned easily; others are
10 stiff and extremely difficult to don, often
11 ripping.  The stiffer gloves honestly felt more
12 like an older generation vinyl than nitrile.
13       Had you asked him to do an analysis of the
14 gloves that had been delivered?
15    A  The Resource Group had requested that,
16 yes.  I don't recall if it was myself or others
17 from operations, but we asked him to do this.
18    Q  All right.  And so in his opinion, some
19 were good and some were bad?
20       MR. MATTHEWS:  Object to the form; beyond
21 the scope of the deposition noticed topics.
22       Subject to that, you may answer.
23       THE WITNESS:  Adam's statements here, I
24 think, confirm what The Resource Group has -- had
25 suspected, that there were significant

Page 49

1  inconsistencies across the gloves which would deem
2  them unusable by our healthcare providers.
3       (Exhibit 5 marked for identification.)
4    Q  Here's another e-mail chain.  This is
5  between Vince Moccio -- I don't how to pronounce
6  that either, to Dewayne Rader and yourself.  This
7  is July 15th, 2021, and labeled JNS-Ascension 5.
8       Do you -- are you familiar with
9  this -- with this e-mail?
10   A  Yes, sir.  I recall this e-mail.
11   Q  Do you know -- I think I asked you this.
12  It says here more than 4500-plus cases were
13  distributed before hearing a complaint.
14      How many gloves are in 4500-plus cases?
15      MR. MATTHEWS:  Object to the form; beyond
16  the scope of the notice.
17      Subject to that, you may answer.
18      THE WITNESS:  I believe the gloves come
19  100 to a box, 10 boxes per case.
20  BY MR. FRISCH:
21   Q  So it's about 450,000 gloves, correct?
22   A  Correct.
23   Q  And you don't recall when those were
24  distributed?
25   A  I do not recall exactly when they were

Page 50

1  distributed.
2    Q  Do you have any way to distinguish between
3  gloves sold to you by JNS and gloves sold to
4  you -- not sold to you, but sold to Rock Fintek
5  and delivered to you and gloves distributed by
6  Kitchen Winners and then sold to you by Rock
7  Fintek?
8       MR. RAKHUNOV:  Objection.
9       THE WITNESS:  Sorry, can you repeat the
10  question?
11  BY MR. FRISCH:
12   Q  Sure.  Are you -- let me step back.
13      Are you aware that Rock Fintek had
14  multiple suppliers of Medcare gloves?
15   A  I am not aware of that.
16   Q  Okay.  Do you have any way to track within
17  the collection of gloves that were at the Medline
18  distribution centers, do you have any way to track
19  which ones would have come from my clients, JNS,
20  or which ones would have come from Alex's clients,
21  Kitchen Winners?
22      MR. MATTHEWS:  Object to the form; beyond
23  the scope of the deposition topics.
24      Subject to that --
25      MR. RAKHUNOV:  Objection -- objection to

Page 51

1  form.
2       THE WITNESS:  The only way that you could
3  tell where certain products have come from in my
4  opinion would be by the lot number that's assigned
5  to every case carton.
6  BY MR. FRISCH:
7    Q  But without looking at every case carton
8  and understanding the lot number, you would have
9  no way to distinguish between the gloves that came
10  from -- with JNS and the gloves that came from
11  Kitchen Winners?
12      MR. MATTHEWS:  Objection, beyond the scope
13  of the deposition notice.
14      Subject to that you may answer.
15      THE WITNESS:  The lot number would be the
16  only way, and that information would have to be
17  provided by whoever Rock Fintek purchased them
18  from, so...
19  BY MR. FRISCH:
20   Q  But you didn't -- let me ask you this, if
21  you know:  Do you know if Medline tracked the
22  gloves based on when they were delivered or who
23  delivered them?
24      MR. MATTHEWS:  Objection to the form;
25  beyond the scope of the deposition notice.

Page 52

1       Subject to that, yaw may answer.
2       THE WITNESS:  I will -- I wouldn't want to
3  speculate on how Medline contracts these specific
4  gloves.  But I can tell you they are a very
5  sophisticated supply chain origination.
6       My -- my gut is that they could tell you
7  based upon what is in what receiving side of the
8  warehouse of when that came into the facilities.
9  BY MR. FRISCH:
10   Q  Okay.  By June -- by the middle of
11  June 2021, was Ascension trying to burn down the
12  stockpile of Medcare gloves?
13      MR. MATTHEWS:  Object to form; beyond the
14  scope of the deposition notice.
15      Subject to that, you may answer.
16      THE WITNESS:  I would not say we were
17  attempting to burn down the stockpile of gloves.
18  Coming out of COVID-19, our organization had set
19  out a strategy, as well as other healthcare
20  providers for that matter, of building up pandemic
21  inventory in case we ever incur a horrific
22  pandemic situation like this again.
23      So we wanted to make sure that we had
24  months worth of inventory of PPE items, medical
25  products that are not easily replaceable.  So they

Page 53

1  were going -- these gloves were going to be part
2  of our pandemic stock inventory.
3       And we planned to turn through them under
4  our normal turn rate for nitrile exam gloves.  And
5  as we pushed those out to our healthcare providers
6  and they used them, then we would backfill our
7  glove inventory to make sure that we were
8  maintaining months worth of product moving
9  forward.
10 BY MR. FRISCH:
11      Q  I mean, what was your target for number of
12 months of back inventory that you wanted to have?
13      MR. MATTHEWS:  Objection to form; beyond
14 the scope of the deposition notice.
15      Subject to that, you may answer.
16      THE WITNESS:  I don't recall specifically
17 on gloves.  We had different targets for all kinds
18 of different products of -- within the PPE space,
19 different numbers of months worth of inventory.
20      (Exhibit 6 marked for identification.)
21      Q  Here's an e-mail.  I know you're not
22 copied on this one specifically.  It's dated
23 JNS-Ascension 6, June 14th, 2021.  It's from Vince
24 Moccio to Brooke McKinley.
25      Does this refresh your recollection that

Page 54

1  there was a burn-down plan for Medcare gloves as
2  of June 14th, 2021?
3       MR. MATTHEWS:  Object to the form; beyond
4  the scope of the deposition notice; calls for
5  speculation; lack of foundation.
6       Subject to that, you may answer.
7       THE WITNESS:  I'm not familiar with this
8  specific e-mail, but I can tell you I think it's
9  poor wording on behalf of the author.
10 BY MR. FRISCH:
11      Q  What do you mean by that?
12      MR. MATTHEWS:  Same objection.
13      Subject to that, you may answer.
14      THE WITNESS:  I don't believe our
15 organization had any plans to, quote/unquote, burn
16 down inventory on the Medcare gloves.  We would
17 use them in our normal use patterns.
18 BY MR. FRISCH:
19      Q  Okay.  Was there any desire to use more of
20 the Medcare gloves at any point to sort of -- to
21 reduce the stockpile or -- or are you simply --
22 would just use them within the normal operations?
23      MR. MATTHEWS:  Object to the form; beyond
24 the scope of the deposition notice.
25      Subject to that, you may answer.

Page 55

1       THE WITNESS:  Our game plan for these
2  gloves and other PPE that we received during
3  COVID-19 was that it would be used on an as-needed
4  basis, and that we would -- we had suppliers that
5  we buy from on a day-in/day-out basis, and that
6  once those suppliers came back up and had product
7  available, like, this was supplemental inventory,
8  right.  But we might consider using these
9  suppliers moving forward.
10      But the inventory we were buying was going
11 to be held in our pandemic stock.  We would ship
12 it out on an as-needed basis.  And then we would
13 replenish behind it so our inventory levels for
14 our pandemic stock, quote -- quotations, that we
15 needed to maintain, in case there was a future
16 pandemic need.
17 BY MR. FRISCH:
18      Q  Okay.  By June of 2021, were you
19 interested in continuing to buy Medcare gloves?
20      MR. MATTHEWS:  Object to the form; beyond
21 the scope of the deposition notice.
22      Subject to that, you may answer.
23      THE WITNESS:  I would say in June of 2021,
24 after receiving close to 200 million gloves, we
25 weren't thinking about purchasing additional

Page 56

1  gloves at that very moment.  I believe the 200
2  million gloves we had estimated would be well
3  north of six months of usage for our provider
4  base, but we were good with that based upon our
5  pandemic stock need to build that up.
6  BY MR. FRISCH:
7       Q  Okay.
8       MR. FRISCH:  I think that's all I have
9  right now.  I will turn it over to Phil or Alex,
10 whoever is going next.
11      MR. RAKHUNOV:  As of this moment, I don't
12 have anything, but I may if Mr. Sperber has some
13 questions and I follow.
14      MR. SPERBER:  Can I just have a two-minute
15 break just to go over my notes?
16      MR. MATTHEWS:  Yeah.  Absolutely.
17      (Whereupon a break was had.)
18      EXAMINATION
19 BY MR. SPERBER:
20      Q  Good morning, Mr. Elstro.  My name is
21 Alexander Sperber.  I am the attorney for
22 Plaintiff and Counter-Defendant Kitchen Winners as
23 well as Third-Party Defendants Joseph Mendlowitz
24 and Adorama, Inc.  I just have a few follow-up
25 questions for you after Mr. Frisch's questioning.

Page 57

1  **When Ascension or The Resource Group,**
2  **excuse me, entered into its purchase order with**
3  **Rock Fintek in December of 2020 for 200 million**
4  **gloves, was there a time schedule by which you**
5  **were expecting them to deliver those gloves?**
6     A  Yes.  We did lay out a schedule if I
7  recollect correctly from the e-mail that was shown
8  earlier.  I believe that was mentioned within
9  there.
10    Q  Okay.  And was that -- let me see if I can
11 find that.  Give me one second.
12       Can you see a document in front of you
13 right now that's marked JNS-Ascension 3?
14    A  I do not.
15    Q  No?  Let me click share and if that makes
16 it work.
17       If you look -- you can see an e-mail,
18 correct?
19    A  That is correct.
20    Q  Okay.  Yeah.  So if you'll look on that
21 e-mail, I believe it says that right now the plan
22 is to deliver 40 million gloves per month for five
23 consecutive months.
24       Was that your understanding of -- of the
25 arrangement?

Page 58

1     A  Yes.
2     Q  And to your knowledge, did Rock Fintek
3  roughly hold to that schedule?
4     A  Yes.
5        MR. RAKHUNOV:  Objection.
6  BY MR. SPERBER:
7     Q  Would it have been okay with Ascension if
8  Rock Fintek had not delivered any gloves until
9  June of 2021?
10       MR. MATTHEWS:  Object to the form; beyond
11 the scope of the deposition notice.
12       Subject to that, you may answer.
13       THE WITNESS:  It didn't occur, so I would
14 have to speculate.  But if they didn't deliver
15 gloves until, I believe, you said June, if they
16 didn't deliver gloves, any of the gloves until
17 June, that would have been an issue.  Yes.
18 BY MR. SPERBER:
19    Q  Okay.  So the delivery schedule was
20 important to -- to you?
21       MR. MATTHEWS:  Objection; beyond the scope
22 of the deposition.
23       You may answer.
24       THE WITNESS:  I would say yes, the
25 delivery schedule was important to us based upon

Page 59

1  the needs that occurred because of COVID-19.
2        Although, I will also add that we also
3  could be flexible with them on the -- that one
4  piece, probably the schedule, just because we knew
5  what was going on across the world with supply
6  chain and our deals with -- dealings with Rock
7  Fintek and other medical device and product
8  manufacturers.
9  BY MR. SPERBER:
10    Q  Okay.  You also mentioned earlier, I
11 guess, you had -- you had divided up potential
12 future business with Rock Fintek into short-term
13 and long-term business.
14       Do you recall that?
15    A  Yes.  I recall that conversation.
16    Q  And you had mentioned -- I guess, you had
17 defined short-term business as business concerning
18 the COVID-19 pandemic specifically; is that
19 correct?
20    A  Yes.  I would say my short-term
21 conversation was looking around that time frame of
22 when COVID was more prevalent throughout the
23 United States, so in that 2020, 2021, 2022 time
24 frame when we had different needs arising based
25 upon shortages that were caused by the pandemic.

Page 60

1     Q  So in your mind, that -- that time frame
2  cuts off somewhere in 2022?
3     A  I would state that most of our pandemic,
4  what we called at the time, spot-buy purchases so
5  incremental inventory, starts to tail off during
6  2022.
7     Q  Okay.  Do you know specifically which
8  kinds of pandemic-related supplies Rock Fintek
9  would have been able to supply you with?
10       MR. MATTHEWS:  Objection, beyond the scope
11 of the notice.
12       But subject to that, you may answer.
13       THE WITNESS:  So Rock Fintek provides us
14 with three-ply masks, KN-95s, isolation gowns, and
15 nitrile exam gloves during the COVID-19 time
16 frame.  So I would assume that they would still
17 have those connections based on sourcing those
18 individual products.
19       Outside of that, I don't believe that they
20 had delivered other medical products to other
21 customers.  I'm not quite sure about, I guess,
22 other customers.  But for us, we had not really
23 talk about other products with them.
24 BY MR. SPERBER:
25    Q  And after your dispute with Rock Fintek

Page 61

1  arose in, I guess, it was July of 2021, if Rock
2  Fintek had made some efforts to address
3  Ascension's concerns or to make Ascension whole,
4  would you have still considered them eligible to
5  take on future related pandemic supply needs?
6      A  It's speculative.  As we discussed
7  earlier, as I mentioned earlier, we had talked to
8  them about being a long-term supplier.  And the
9  fact of the matter is we've not been made whole in
10 this situation, so I can't really state.
11         I think if -- if we would have been made
12 whole and they would have, you know, been able to
13 clear the major hurdles of being -- you know,
14 getting FDA approved and also going to bat and
15 being priced competitively with some of the large
16 players in this medical space, we might have.  I
17 can't say for certain.
18     Q  Okay.  You -- you mentioned earlier that
19 Rock Fintek delivered to you, I think, was 196
20 million, thereabout, Medcare gloves.
21         Is that roughly accurate?
22     A  Yes.  I would say that was -- that is
23 roughly accurate.
24     Q  And I think you also mentioned that one
25 point in time, they delivered a different brand of

Page 62

1  gloves as well.
2         Can you clarify that?
3      A  Yeah.  I recollect that they delivered a
4  brand of gloves called LuvMed.
5      Q  Whatever happened with those LuvMed
6  gloves?
7      A  The LuvMed gloves, from what I recall,
8  were actually delivered through a Medline
9  warehouse.  We weren't aware of them.  They were
10 delivered by mistake, in error.  But documentation
11 was subsequently provided stating that they were
12 ASTM D6319-rated.  They were nitrile gloves, FDA
13 approved.  Rock Fintek was able to provide that
14 documentation.
15         And based upon their statements that they
16 were, we decided to keep the gloves and pay for
17 them.
18     Q  Okay.  And that was outside of the 196
19 million Medcare gloves?
20     A  I believe that is the case.  Yes.
21     Q  Okay.  Give me one moment.  I think I
22 might be done.
23         MR. SPERBER:  I think those are the only
24 questions I have for you.  So thank you.  Unless
25 Phil has any questions.

Page 63

1       MR. RAKHUNOV:  I do have just a couple of
2  quick follow-ups.
3              EXAMINATION
4  BY MR. RAKHUNOV:
5      Q  Mr. Elstro, so you've been asked a few
6  questions about a potential long-term relationship
7  with Rock Fintek.
8         Had the hurdles that you described, had
9  Rock Fintek been able to clear those hurdles,
10 would a successful track record with Ascension for
11 prior transactions have put Rock Fintek in a
12 better position to compete for long-term business?
13        MR. FRISCH:  Objection.
14        MR. SPERBER:  Objection.
15        THE WITNESS:  Once again, I would have to
16 speculate, right.  The fact of the matter is,
17 unfortunately, Rock Fintek did not deliver the 200
18 million gloves and we've not been made whole in
19 the situation either.
20        If all 200 million would have been
21 delivered and Rock Fintek had cleared the FDA
22 hurdles to be an everyday medical device, medical
23 products supplier, and they could be priced
24 competitively, we would have considered them in
25 subsequent RF Ps.

Page 64

1  BY MR. RAKHUNOV:
2      Q  Okay.  And I guess, let me ask a slightly
3  different question.
4         So putting aside, you know, specifically
5  what happened here with the Medcare gloves, if two
6  suppliers compete for Ascension's or The Resource
7  Group's business and one has a prior track record
8  with Ascension for delivering products and the
9  other is -- is a brand new vendor, does the prior
10 track record have -- give the vendor an advantage
11 with Ascension in your --
12        MR. FRISCH:  Objection.
13 BY MR. RAKHUNOV:
14     Q  -- in your experience?
15        MR. MATTHEWS:  Objection, beyond the scope
16 of the deposition notice.
17        But subject to that, you may answer.
18        THE WITNESS:  I would say if all things
19 are considered equal, I would think that having a
20 past working business relationship would give a
21 leg up to one supplier versus another.
22 BY MR. RAKHUNOV:
23     Q  Okay.  And you were also asked about -- in
24 the beginning of the deposition about the letter
25 from Lewis Rice.

Page 65

1  **Do you remember that?**
2  A  Yes. I remember that.
3  **Q  And forgive me if this was already asked,**
4  **I just don't remember if I heard it.**
5  **But to your knowledge, has Ascension given**
6  **any release or has -- otherwise or a covenant not**
7  **to sue with respect to the -- the gloves here to**
8  **Rock Fintek?**
9  A  I -- I don't have firsthand knowledge of
10 that. With my role with the organization, there
11 are lawsuits that I probably have no knowledge of
12 whatsoever. So I -- I can't speak to has
13 Ascension sued Rock Fintek or have they not. I'm
14 not aware of any lawsuits, but I also might not be
15 notified if there was one.
16  **Q  And I'm sorry, I may have -- I may have**
17 **spoken.**
18  **Not -- I wasn't asking if there was a**
19 **lawsuit, but has Ascension essentially committed**
20 **to use or give Rock Fintek some release with**
21 **respect to any of the claims concerning the gloves**
22 **delivered to Ascension, if you know?**
23      MR. MATTHEWS: Phil, could -- this is
24 Taylor. Could you just -- you know, Mike's not a
25 lawyer and I don't know if he knows what a release

Page 66

1  is. Could you just try to rephrase in a way that
2  he could answer from a lay perspective?
3  BY MR. RAKHUNOV:
4  **Q  To your knowledge, has Ascension given**
5  **up -- well, I don't want to ask anything that**
6  **might implicate attorney-client privilege, so you**
7  **know, withdrawn. I -- that's -- that's not**
8  **something we need to follow up on.**
9      MR. RAKHUNOV: I don't have anything
10 further, Mr. Elstro. Thank you for your time this
11 morning.
12     THE WITNESS: Thank you.
13     MR. FRISCH: Thank you, sir.
14     THE REPORTER: Are we ready to go off the
15 record?
16     MR. MATTHEWS: Yes.
17     THE REPORTER: Could I get transcript
18 orders, please?
19     MR. FRISCH: Yeah. I'm going to order.
20     MR. SPERBER: I will as well.
21     MR. RAKHUNOV: I will take a copy.
22     MR. MATTHEWS: And we will take a copy as
23 well for the witness.
24     THE REPORTER: Okay.
25        (Off-the-record discussion.)

Page 67

1     MR. MATTHEWS: We'll want to read.
2  (Whereupon the proceedings were concluded at 10:30
3         a.m. CST)

Page 68

CERTIFICATE OF REPORTER

I, KARISA J. EKENSEAIR, a Registered Merit Reporter, Registered Professional Reporter, and Certified Court Reporter do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of this action.

*Karisa Ekenseair*

Karisa J. Ekenseair, RMR, RPR, CCR-1507

```
                                      Page 69
 1        DECLARATION UNDER PENALTY OF PERJURY
 2
 3        I, MICHAEL ELSTRO, do hereby certify:
 4        That I have read the foregoing deposition;
 5        That I have made such changes in form and/or
 6   substance to the within deposition as might be necessary
 7   to render the same true and correct;
 8        That having made such changes thereon, I hereby
 9   subscribe my name to the deposition.
10        I declare, under penalty of perjury, that the
11   foregoing is true and correct.
12
13        Executed this _____ day of
14   _____, 2023, at _____,
        (MONTH)                    (CITY)
15   _____.
        (STATE)
16
17
18                 _____
                        MICHAEL ELSTRO
19
20
21
22
23
24
25
```

```
                                      Page 70
 1                       ERRATA SHEET
 2   INSTRUCTIONS: After reading the transcript of testimony, please note any change,
 3   addition or deletion on this sheet. If you are in possession of the original transcript,
 4   DO NOT make any marks or notations directly on the transcript.
 5
 6   Page  Line   Correction Made        Reason for Correction
 7   ___   ___   _____     _____
 8   ___   ___   _____     _____
 9   ___   ___   _____     _____
10   ___   ___   _____     _____
11   ___   ___   _____     _____
12   ___   ___   _____     _____
13   ___   ___   _____     _____
14   ___   ___   _____     _____
15   ___   ___   _____     _____
16   ___   ___   _____     _____
17   ___   ___   _____     _____
18   ___   ___   _____     _____
19   ___   ___   _____     _____
20   ___   ___   _____     _____
21   ___   ___   _____     _____
22   ___   ___   _____     _____
23   ___   ___   _____     _____
24   ___   ___   _____     _____
25   ___   ___   _____     _____
```