### IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
### IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ROCK FINTEK, LLC,

        Plaintiff,

     v.

HUNTON ANDREWS KURTH LLP,

        Defendant.

_____/

Case No. _____

## COMPLAINT

Plaintiff Rock Fintek, LLC ("Plaintiff" or "Rock Fintek") sues Defendant Hunton Andrews Kurth LLP ("Hunton"), and states as follows:

## PARTIES

1. Plaintiff Rock Fintek LLC is a Delaware limited liability company with its principal place of business in Miami, Florida. Rock Fintek is a citizen of Florida because at least one of its members is a citizen of Florida.

2. Defendant Hunton Andrews Kurth LLP is a Virginia limited liability partnership with partners across the world. Some of Hunton's partners are citizens of Florida, so Hunton is considered a citizen of Florida for potential federal court diversity jurisdiction purposes.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this dispute, the amount in question being in excess of $750,000.00, exclusive of interest, costs, and fees.

4. This Court has personal jurisdiction over Defendant because it is registered to do business in Florida and has engaged in ongoing, systematic, and continuous business in the State of Florida; and because all or a substantial part of the acts or omissions giving rise or related to this suit occurred in Florida.

5. Venue is appropriate in Miami-Dade County, Florida because the Defendant is located there and the cause of action accrued there.

## FACTS

**A. Plaintiff Rock Fintek is an International Trading Company Based in Miami that Procured Protective Gear for American Hospitals During the Pandemic.**

6. Plaintiff Rock Fintek was formed in 2019 to acquire goods in China and import and sell them in the United States. Shortly after its formation, the global Covid-19 pandemic broke out, and Rock Fintek focused its business on acquiring medical equipment and supplies to provide to hospitals in the U.S. when normal supply chains became unreliable. In a tough, unpredictable market, Rock Fintek made deals happen by finding and procuring hard-to-find supplies and delivering them to buyers in need.

7. During the Covid pandemic, there was a shortage of critical personal protective equipment, or "PPE," such as medical-grade masks and gloves. Hospitals and medical professionals across America scrambled to procure PPE, at any cost.

8. Rock Fintek navigated difficult markets and supply chains in Asia to procure PPE for its customers from the factories where it is made. In particular, the nation's second-largest private healthcare system looked to Rock Fintek to supply it with PPE.

9. Doing so required navigating intense competition, foreign languages and business customs, different legal systems, supply chain logistics, cross-border movement of the product, and more, to procure the PPE and then deliver it to the customer on time. Rock Fintek learned how to navigate all of these challenges successfully and earned millions of dollars in the process while gaining its customers' trust and confidence.

**B.    Rock Fintek Agreed to Provide 200 Million Gloves to a Large Hospital Network.**

10. As the PPE shortage became more acute, in late 2020, a large hospital network placed an order with Rock Fintek for 200 million protective medical gloves for its frontline workers. This was a huge deal for Rock Fintek. If it could deliver, Rock Fintek would be in line to ink a permanent supplier deal with one of the biggest buyers in the industry.

11. The deal was high stakes. Rock Fintek had to perform; it was *contractually obligated* to provide the gloves on a defined schedule. Not only that, but the safety of thousands of frontline healthcare workers was also at stake.

12. Rock Fintek took on the deal because—through extensive time and effort—it had developed a roster of suppliers to procure the gloves.

**C.    In December 2020, Rock Fintek Identified a Potential Source of Nitrile Protective Gloves and Asked Hunton to Perform Due Diligence.**

13.  In early December 2020, Rock Fintek engaged in discussions with a Chinese distributor called Anhui Quinggong International Trading Co., Ltd ("Anhui") that claimed to

have connections to a manufacturer of nitrile gloves, SkyMed, located in Thailand. Anhui told Rock Fintek that it had secured the right to purchase a large shipment of gloves from SkyMed, and that SkyMed had substantial manufacturing capacity that could fulfill not only this order, but future orders as well.

14. Anhui sent Rock Fintek a contract to purchase 200 million nitrile gloves from SkyMed for a better price than any of Rock Fintek's other sources. In addition, SkyMed offered the promise of a reliable future supplier that could supply Rock Fintek and, in turn, its large customer with gloves during a time when they were increasingly hard to come by.

15. For both reasons, Rock Fintek's interest was piqued and it decided to pursue the deal. However, due diligence was critical. Rock Fintek needed to ensure that Anhui/SkyMed were legitimate before it invested both time and money buying gloves from them. SkyMed offered the most attractive pricing and volume, but if it was too risky, then Rock Fintek had other sources it could rely on.

16. To that end, Rock Fintek first sent the Anhui contract to its Chinese lawyers at Squire Patton Boggs, who responded with their thoughts and some concerns about the deal, but then were nonresponsive when Rock Fintek asked for them to redline the agreement and address the concerns.

17. Frustrated by Squire's lack of responsiveness, Rock Fintek sent the contract and Squire's comments to Hunton lawyer Jerry Li, who was based in China and the Chair of Hunton's China Practice. Earlier that year, in July, Rock Fintek had retained Hunton and specifically Jerry Li and signed an engagement agreement that broadly covered "Rock Fintek's business activities related to China." Rock Fintek already had a relationship with a

Hunton lawyer in Miami, and hired Jerry Li after he touted his and Hunton's expertise in China and Asia more broadly. In addition, Hunton had an office in Thailand, so Rock Fintek could use Hunton to verify SkyMed's production on the ground during a time when global travel restrictions prevented anyone from Rock Fintek actually traveling to Thailand to do their own due diligence.

18. Plus, Li had worked on another supply issue dispute in China Rock Fintek was dealing with. Through that matter, Li learned all about Rock Fintek's business, solicited more work from Rock Fintek, and told its principals that had it hired him at the beginning of that deal, he would have done the diligence and avoided the dispute it was in altogether. Rock Fintek liked Li's confidence, so it decided to ask him to work on the potential SkyMed deal.

19. From the first communication about this deal on December 11, 2020, Rock Fintek asked Li to review the Anhui contract and, critically, to conduct due diligence to confirm that this opportunity was legitimate—namely, that SkyMed was a real company that manufactures nitrile gloves with the capability to fulfill the contract. The contract required a significant upfront payment to secure the deal, so Rock Fintek wanted to be sure SkyMed was legitimate; again, since due diligence into its legitimacy was key. Based on Hunton's touted expertise in China and Thailand, Rock Fintek believed Hunton would know how to conduct proper due diligence and verify SkyMed's legitimacy or advise them if the deal was risky, in which case Rock Fintek would go source gloves from one of its other sources.

20. Li accepted the assignment without hesitation or limitation. In fact, he immediately relayed the assignment to another Hunton lawyer in Thailand, Thaphanut

Vimolkej, and confirmed that he had "just received an urgent instruction from our Client, Rock Fintek LLC . . . for us to help verify certain elements in its upcoming deal with SkyMed, presumably a nitrile glove manufacturer in Thailand . . . ."

21. Li went on to explain to Vimolkej that Rock Fintek wanted to verify that SkyMed "is real" and that "it is real that SkyMed supplies such 2,000,000 Boxes of Nitrile Gloves to the Anhui Company."

22. In a group WhatsApp chat titled "Validate SkyMed Deal," one of Rock Fintek's principals introduced Jerry and explained that he "will verify parties involved" and "make sure deal is solid."

23. Li then billed Rock Fintek thousands of dollars for due diligence activities that day:

| Date | Name | Description | Hours | Amount |
|---|---|---|---|---|
| 11/12/2020 | J LI | (1) 2.5 hours. Calls from Brad and Thomas re Validating SkyMed Deal. Review Brad's WhatsApp messages and the Anhui Company Contract. Check on Anhui Company's corporate record and litigation status. Email with Thaphanut (KJ) Vimolkej of HAK Bangkok Office to check whether SkyMed has a real deal with Anhui Company. Call with Daniel Lee. WhatsApp report to Thomas and Brad. (2) 2.5 hours. Revise the Sales Contract with Anhui Company based on RF and Sunbo's comments and the above calls discussions. Send to Brad and Thomas for review, copying Daniel Lee. (3) 1 hour. Calls from Brad and Thomas with Daniel Lee re strategies for validating SkyMed's stock for Anhui Company. Call with Thaphanut of HAK Bangkok Office re | 7.00 | 5,705.00 |

**D.    SkyMed is a Scam, but Hunton Fails to Discover it and Actually Advises Rock Fintek to Do the Deal With No Reservations Whatsoever.**

24.    As it turns out, SkyMed was a total scam.  It was not a real manufacturer, did not supply Anhui with gloves, and apparently did not even manufacture gloves at all.

25.    Yet despite undertaking the obligation and billing numerous hours and tens of thousands of dollars for conducting due diligence, Hunton failed to discover the scam and did not even so much as advise Rock Fintek of that risk.

26.    Instead, one day into the assignment, Jerry Li felt comfortable enough to affirmatively push Rock Fintek to do the deal, telling his client "Now, it's the time for you to execute the attached SPA to secure this deal."  Li did not qualify his advice at all or advise Rock Fintek that there were any risks, but instead actively promoted the transaction.  For instance, he touted it as "better than the prior Kimberly deal, because this SkyMed deal is directly with the manufacturer."

27.    Based on Hunton's advice and encouragement, Rock Fintek signed the contract.  It also relied on Li's assurance that Hunton would continue to conduct due diligence and ensure that SkyMed was legitimate before Rock Fintek had to wire the required deposit.

**E.    Even Worse, After Conducting Further Due Diligence, Hunton Advises Rock Fintek to Wire the $6.2 Million Deposit to the Scamsters.**

28.    Hunton continued to conduct due diligence and bill thousands of dollars for that work after the contract was signed.

| 13/12/2020 | J JIANG | Work on the due diligence on SkyMed based on public information. | 2.00 | 1,070.00 |
| 13/12/2020 | J LI | Per Thomas' instruction, further due diligence on SkyMed, Mr. Du and Anhui. Prepare the Power of Attorney for RF's execution. Prepare the detailed Project ThaiRock Working Group List for SkyMed, Mr. Du and Anhui's inputs. Coordinate thru Daniel with Anhui and SkyMed (Mr. Du) re | 8.50 | 6,927.50 |

29. During this time, Rock Fintek emphasized to Li how vitally important it was for Hunton to verify that SkyMed was legitimate before it wired the $6.2 million deposit on December 16th as required by the contract. It made clear to Li that his job was to "confirm [the] parties are real and can deliver gloves to us."

30. As the deposit deadline approached, Hunton advised Rock Fintek without reservation that, based on its due diligence, Rock Fintek should move forward and wire the deposit. Rock Fintek explicitly asked Li to confirm based on Hunton's due diligence that it was protected, instructing him, "Jerry I need your firm to be 100% comfortable that this is a real company" to which Li responded without reservation, **"We're sure that SkyMed and the SPA are real."**  (Emphasis added.)

31. In fact, Jerry Li had specifically advised Rock Fintek in the group WhatsApp chat that SkyMed "has over 40 OEM factories in Thailand" and further brushed aside any concerns Rock Fintek raised, such as SkyMed using a gmail address, without even so much as advising his client that it might have some risk in the deal. At no point did Li ever provide a due diligence report or tell Rock Fintek about any risk whatsoever.

32. Accordingly, in reliance on the advice, and even encouragement, of its supposedly top-notch law firm, Rock Fintek wired the $6.2 million to SkyMed. Of course,

the gloves never came, and eventually Rock Fintek (and Hunton) realized they had fallen victim to a scam. The $6.2 million was gone and appears to be permanently lost.

33. Rock Fintek has since learned from subsequent Thai counsel (at a different firm), that any reasonably competent lawyer in Thailand conducting due diligence of this type would have learned from some simple searches of publicly available information that SkyMed did not have the assets or sales revenue to support a legitimate factory operation, and that it reported total administrative expenses of only $450. All of that would have revealed that SkyMed was not legitimate. Presumably, other basic due diligence would have also uncovered the same thing.

34. Yet Hunton failed to do any of that, failed to conduct proper and adequate due diligence, and wrongfully advised Rock Fintek to proceed with this contract instead of procuring the gloves for a higher price from a more reliable source. Hunton never even sent Rock Fintek so much as a summary of findings and analysis, and never even raised so much as a simple concern, red flag, or hesitation for Rock Fintek to consider. Had Hunton done any of that, Rock Fintek would have procured the gloves on a timely basis from one of its other sources and delivered on time on its contract with its hospital customer.

35. Rock Fintek had expended substantial time and money exhausting all possible avenues to make a decision to pursue the SkyMed deal, and ultimately relied on the professional due diligence and encouragement of its highly touted law firm that gave it the green light to go forward.

**F.      Hunton Then Fires Rock Fintek As a Client When It Refuses to Pay for the Firm's Blunder, While Li Privately Offers to Work for Free.**

36.     As fallout from the scam unfolded, Hunton seemed more concerned about getting paid for its faulty due diligence than helping Rock Fintek to get its money back. Hunton repeatedly harassed Rock Fintek to pay its outstanding invoices, despite its costly blunder.  Understandably, Rock Fintek felt that was the last thing it should do given the circumstances.

37.      Eventually, Hunton fired Rock Fintek for the unpaid invoices.  Li, for his part, sent a feeble, self-serving email defending his and the firm's actions, but behind the scenes privately offered to work for free for Rock Fintek through a personal email address to make it up to them.

**G.      The Consequences of Hunton's Negligence Have Been Catastrophic for Rock Fintek.**

38.     Unfortunately, this scam was devastating to Rock Fintek's business.  The $6.2 million of lost capital Rock Fintek wired to the scamsters is just the tip of the iceberg.  After discovering it had been scammed, Rock Fintek scrambled to procure gloves to meet its obligations to its best customer, often at substantially higher prices and a loss.  By that time, Rock Fintek's other sources of gloves had sold out, forcing it to scrape together gloves from any source it could find and putting Rock Fintek on the verge of bankruptcy.

39.     Unfortunately, as a result, Rock Fintek lost its customer and subsequently went out of business altogether.  Li knew all of this and knew what the consequences would be to Rock Fintek if SkyMed was not legitimate, yet he pushed Rock Fintek to go forward. In fact, prior to his reckless advice, Li had come to learn Rock Fintek's business so well that

he often suggested that he leave Hunton and go work in-house for Rock Fintek. Thus, the massive consequences of the $6.2 million loss were entirely foreseeable to Li and Hunton.

40. Accordingly, Rock Fintek brings this action to recover those crushing losses from Hunton, who it trusted and relied on to its detriment.

## CAUSES OF ACTION

### Count One: Professional Negligence/Malpractice

41. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though they were set forth again herein.

42. Hunton represented Rock Fintek in connection with the proposed SkyMed transaction. As part of that representation, Rock Fintek specifically and explicitly directed Hunton to perform due diligence to ensure that SkyMed was legitimate, as detailed above. Hunton accepted and agreed to perform that work, as reflected in e-mails and in its time entries for the matter.

43. As a client, Hunton owed Rock Fintek a duty to use reasonable care and to render its services with the degree of skill, care, knowledge, and judgment exercised by other members of the legal profession.

44. Hunton breached its duty of care to Rock Fintek as alleged herein, including by failing to perform proper and adequate due diligence, and by failing to properly advise Rock Fintek in connection with the scam transaction.

45. As result, Rock Fintek has suffered substantial damages and harm. The $6.2 million has disappeared, but even more than that, as a foreseeable result of Hunton's negligence, Rock Fintek lost the profits it would have made from its deal with its large

hospital customer but for Hunton's negligence and suffered adverse consequences and harm that continues to ripple through its business even today. Accordingly, Rock Fintek seeks to recover those lost profits plus all other consequential damages to be proven at trial that were caused by Hunton's negligence.

## JURY DEMAND

46. Plaintiff hereby demands a trial by jury on all issues so triable by right.

## CONDITIONS PRECEDENT

47. All conditions precedent have been satisfied.

WHEREFORE, Plaintiff hereby requests that this Court enter judgment against Hunton for damages, costs for maintaining this action, attorneys' fees, interest, and such other and further relief as this Court deems just and proper.

DATED: April 3, 2023                    Respectfully submitted,

By: /s/ *Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq., FBN 73748
Robert Visca, Esq., FBN 111800
**BRODSKY FOTIU-WOJTOWICZ, PLLC**
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: 305-503-5054
bbrodsky@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

Jeffrey M. Tillotson (*pro hac vice* application forthcoming)
State Bar No. 20039200
jtillotson@tillotsonlaw.com
Jonathan R. Patton (*pro hac vice* application forthcoming)
Texas Bar No. 24088198
jpatton@tillotsonlaw.com
**TILLOTSON JOHNSON & PATTON**
1201 Main Street, Suite 1300
Dallas, Texas 75202
Telephone:     214-382-3040
Facsimile:      214-382-3043

**ATTORNEYS FOR PLAINTIFF**