**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KITCHEN WINNERS NY INC.,
                          *Plaintiff,*

                vs.

ROCK FINTEK LLC,
                          *Defendant.*

Civil Action No.
22-cv-05276-PAE

ROCK FINTEK LLC,
                          *Counterclaim and Third-Party*
                          *Plaintiff,*

                vs.

KITCHEN WINNERS NY INC,
                          *Counterclaim Defendant*,

                and

ADORAMA INC., HERSHEY WEINER, JOSEPH
MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and
JOEL STERN,
                          *Third-Party Defendants*.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**OF**
**JOEL STERN AND JNS CAPITAL HOLDINGS LLC**

---

**THE LAW OFFICE OF AVRAM E.**
**FRISCH LLC**
*Attorneys Third-Party Defendants JNS*
*Capital Holdings LLC, and Joel Stern*

Avram E. Frisch, Esq.
1 University Plaza, Suite 119
Hackensack, NJ 07601
201-289-5352
frischa@avifrischlaw.com

## Contents

Table of Authorities ................................................................................................................. 3

**PRELIMINARY STATEMENT** ....................................................................................... 1

**FACTS** .................................................................................................................................. 2

**ARGUMENT** ....................................................................................................................... 4

    **A.**    **STANDARD ON MOTION FOR SUMMARY JUDGMENT** ................................. 4

    **b.**    **The Fraud Claims cannot be maintained at the same time as a breach of contract** ............... 5

    **d.**    **Even if Mr. Stern was aware of JNS' alleged breach of the contract, it does not constitute fraud** ............... 10

    **e.**    **Mr. Stern was not a party to any contract with Rock Fintek** ................................. 10

    **f.**    **There is no basis to pierce the corporate veil under New York Law** ...................... 11

    **C.**    **Rock Fintek cannot establish its breach of contract claims against any party** ..................... 13

    **a.**    **The goods were resold immediately, and Rock Fintek was not damaged** ............................ 13

    **b.**    **The Consequential Damages claimed by Rock Fintek fail as a matter of law** ...................... 13

    **c.**    **The claimed consequential damages are not supported by any facts** ................................. 16

    **d.**    **There is no proof of any defect with the goods sold by JNS** ................................. 17

    **e.**    **Rock Fintek failed to timely object to the goods** ................................................. 19

    **D.**    **The Breach of Warranty Claims must fail** ............................................................. 21

    **a.**    **The alleged representations were not made by Stern or JNS** ................................. 21

**CONCLUSION** ................................................................................................................... 22

# Table of Authorities

## Cases

*Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 19-20 (2d Cir. 1996) ...................................6

*Bronx Store Equip. Co. v Westbury Brooklyn Assoc.*, 280 A.D.2d 352, 721 N.Y.S.2d 28 [2001] ...............7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .......................4

*Clarke v. TRIGO U.S., Inc.*, No. 22-cv-1917(PKC), 2023 U.S. Dist. LEXIS 186527, at *11 (S.D.N.Y. Oct. 16, 2023) .................................................................................................................................11

*Exchange Listing, LLC v. Inspira Technologies, Ltd.*, 22 Civ. 1889 (KPF), 2023 U.S. Dist. LEXIS 39093, 2023 WL 2403223, at *16 (S.D.N.Y. Mar. 8, 2023) .................................................................11

*Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988) .................................................................................4

*In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) ...........................................................................5

*Kesner v. Buhl*, 590 F. Supp. 3d 680, 692 (S.D.N.Y. 2022) ..................................................................4

*McKernin v. Fanny Farmer Candy Shops*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (App. Div. 2nd Dept. 1991) .......................................................................................................................................6

*Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142, 603 N.Y.S.2d 807, 811, 623 N.E.2d 1157, 1161 (1993) ...............................................................................................................................14

*Richbell Info. Servs. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 305, 765 N.Y.S.2d 575, 589 (App. Div. 1st Dept. 2003) .........................................................................................................................7

*Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ......................................................................4

*Sears, Roebuck & Co. v. Galloway*, 195 A.D.2d 825, 827, 600 N.Y.S.2d 773, 775 (App. Div. 3rd Dept. 1993) ...............................................................................................................................................23

*Sun Prods. Corp. v. Bruch*, 2011 U.S. Dist. LEXIS 125186, at *17-18 and N.66 (S.D.N.Y. Oct. 28, 2011) .............................................................................................................................................6, 7

*Trodale Holdings LLC v. Bristol Healthcare Inv'rs, L.P.*, 2017 U.S. Dist. LEXIS 196150, at *37 (S.D.N.Y. Nov. 29, 2017) ....................................................................................................................24

*Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 314 (S.D.N.Y. 2007).........................24

*William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989) ..............................................13, 14

## Statutes

Article 2 of the Uniform Commercial Code.................................................................................19

UCC § 2-607 [4] .................................................................................................................21

UCC § 2-607(3)(a).............................................................................................................20

UCC §2-602 .....................................................................................................................19

UCC §2-605(1)(a).............................................................................................................20

UCC §2-606.....................................................................................................................20

UCC §2-607.....................................................................................................................20

UCC §2-608.....................................................................................................................20

**PRELIMINARY STATEMENT**

Third-Party Defendants JNS Capital Holdings LLC ("JNS"), and Joel Stern ("Stern"; collectively, "Defendants") hereby submits this memorandum of law in support of their motion for summary judgment dismissing the claims of Third-Party Plaintiff Rock Fintek LLC's ("Rock Fintek"). Defendants rely on many of the same arguments as Plaintiff and the co-Third Party Defendants, and adopts their arguments in full by reference herein.

As will be demonstrated, the First Amended Third Party Complaint is simply one for breach of contract, even if Rock Fintek has tried to dress it up as something more. After completion of substantial discovery, it is clear that: Joel Stern is not a proper defendant to this action; there was no fraud (and no fraud claim would lie in any event); and Rock Fintek has suffered no damages from the alleged breach of contract. So while there remains a dispute between JNS and Rock Fintek as to whether the gloves was sufficient to satisfy JNS' contractual obligations, there is no doubt that the gloves were immediately resold by Rock Fintek to a third party, who has not taken any action against Rock Fintek to obtain a refund of any sums paid on to Rock Fintek for the JNS gloves. In fact, Rock Fintek pursued Mr. Stern and Kitchen Winners over several months to continue supplying millions of gloves because Ascension had indicated that they were extremely satisfied with the gloves.

Rock Fintek also has substantial evidentiary problems in its claims that cannot be remedied at trial. They simply have no ability to determine whether the gloves sold by JNS were in fact the gloves that they believe their customer was complaining about. There gloves were stored by a third party contractor, Medline Industries, on behalf of a hospital group known as Ascension Health. None of these parties made any effort to ensure that individual glove deliveries were traceable. As such, Rock Fintek can only point to multiple independent parties jointly for the claim that there was a breach. The only remaining damages, Rock Fintek's claim that the allegedly poor

quality gloves caused it to lose future business is not cognizable as a matter of law, and is simply contradicted by the undisputed facts, and is firmly demolished by Rock Fintek's inability to specify any mechanism for calculating such damages and apportioning the same to the four different parties it alleges were responsible, JNS and Stern, Adorama, Kitchen Winners, and the Hunton and Williams law firm, which it sued for the same damages in Florida, or how to prove which contract between JNS and Rock Fintek was breached if any.

These Defendants resold gloves they purchased from the Adorama Defendants to the Third Party Plaintiff.  Now, Third Party Plaintiff claims that the contract was breached and attempts to convert this action into something more, a tort action for fraud and negligent misrepresentation, several duplicative claims related to the contract and a breach of warranty claim for a warranty that it does not even allege existed.  Rock Fintek wants an additional windfall of $108 million dollars.  The Court should not tolerate this sort of frivolous litigation, and should grant this motion in its entirety.

## FACTS

The detailed factual predicate for this motion is set forth in the parties' joint statement of undisputed facts (ECF #135) and the accompanying Rule 56.1 Statement of Undisputed material facts.  Both of those documents are incorporated by reference, along with the Rule 56.1 statements of Kitchen Winners and Adorama.

## PROCEDURAL HISTORY

This action was initiated by Plaintiff Kitchen Winners NY Inc. in the Supreme Court of the State of New York on May 17, 2022.  (ECF 1-1)  Defendant Rock Fintek timely removed the action to this court, on the basis of diversity jurisdiction, on June 22, 2022 (ECF #1) and propounded an answer asserting counterclaims and third party claims against several parties including the JNS Parties.  (ECF #5). After Kitchen Winners and its affiliated parties moved to

dismiss the initial counterclaims and third party claims, Rock Fintek filed an amended version of its Third Party Complaint.  (ECF #43) (the "FATC")

Plaintiff and all third party Defendants moved to dismiss portions of the FATC.  Kitchen Winners Parties ECF #46-48, JNS Parties at ECF #53-54). After the parties briefed the motions, the Court granted the vast majority of the motions, and dismissed numerous claims asserted against the JNS Parties.  (ECF #68).  The FATC had the following counts directed at the JNS Parties:

> *(3) breach of contract, as to one-off transactions between the JNS parties and Rock Fintek, id. ¶¶ 127–32; (4) breach of the covenant of good faith and fair dealing (the "covenant claim"), as to Adorama, Kitchen Winners, and the JNS parties, id. ¶¶ 133–38; (5) fraud in the inducement (the "fraud claim"), as to Kitchen Winners and all third-party defendants, id. ¶¶ 139– 49; … (8) tortious interference with existing and prospective business relations, as to Kitchen Winners and all third-party defendants, id. ¶¶ 16470; (9) conspiracy, as to Kitchen Winners and all third-party defendants, id. ¶¶ 171–77; and (10) breach of warranties under N.Y. U.C.C. Law § 2-313 and New York common law, as to Kitchen Winners and all third-party defendants, id. ¶¶ 178–81.* Opinion and Order at P. 20
> (ECF #68).

The breach of the covenant of good faith and fair dealing claim was dismissed because the claims were for "fraudulent and omissions and misrepresentations about the nature and quantity of the gloves sold and the fraudulent use of stickers to conceal the true nature of the gloves." Id at P. 30 (internal quotation marks omitted).  Similarly, the negligent misrepresentation claims were dismissed against the JNS parties due to being nothing "more than the benefit of [Rock Fintek's] bargain with the … JNS Parties. Id. at P. 43.  The tortious interference and conspiracy claims were

dismissed for failing to plausibly allege a cause of action.  Id. at P. 47-49.  Thus the only causes of action that remain against the JNS Parties are the breach of contract, fraud and breach of warranty claims.

## <u>ARGUMENT</u>
### A.  STANDARD ON MOTION FOR SUMMARY JUDGMENT

"To prevail on a motion for summary judgment, the movant must 'show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Kesner v. Buhl*, 590 F. Supp. 3d 680, 692 (S.D.N.Y. 2022) quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) citing *Celotex* 477 U.S.at 323. "Where, as here, the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

Under these standards, Rock Fintek's Third-Party Complaint must be dismissed as to both JNS and Joel Stern in their entirety.  Rock Fintek sold each and every glove it purchased from JNS to a third party at a pre-determined price, there is simply no case here, even if Rock Fintek could prove the gloves were not up to the specifications, which it cannot.  JSF ¶37.

### B.  The Fraud Claims must be Dismissed

#### a.   Law of the Case dictates that the Fraud Claims must be dismissed

Rock Fintek alleges that Mr. Stern committed fraud by inducing it to enter into the Agreement with JNS by providing false information about the nature of the products and by taking

4

steps to hide JNS' failure to provide compliant goods.  Rock Fintek's fraud claims, however, are barred by the law of the case doctrine, which precludes relitigation of issues that have been decided in earlier stages of the same litigation. See *In re PCH Assocs*., 949 F.2d 585, 592 (2d Cir. 1991). Here, this Court has already dismissed Rock Fintek's fraud claims against the Kitchen Winners parties and the bad faith and negligent misrepresentation claims against Mr. Stern  in its decision on the motions to dismiss, as briefly summarized above (ECF #68).

Rock Fintek has no basis to distinguish the fraud claims against the JNS Parties from the claims already dismissed. Therefore, the law of the case doctrine applies and the fraud claims against the JNS parties should be dismissed for the same reasons the Court dismissed the bad faith and negligent misrepresentation claims against Mr. Stern and the fraud claims against the Kitchen Winners parties.

### b.  The Fraud Claims cannot be maintained at the same time as a breach of contract

Under New York law, it is clear that a party cannot maintain a fraud claim against a party to a contract, absent some claim beyond the scope of the contract.  "[A] claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie" *McKernin v. Fanny Farmer Candy Shops*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (App. Div. 2nd Dept. 1991) (internal citations omitted).  As such, the fraud claim certainly must be dismissed against JNS, as all of the claimed misrepresentations relate to the performance of the contract.

Rock Fintek is also seeking to pierce the corporate veil against Mr. Stern in its breach of contract claim.  As such, Rock Fintek is seeking judgment against Mr. Stern for both breach of the contract entered into by JNS and for the alleged fraud.  This is impermissible under New York

law.  Rock Fintek cannot seek contract and fraud damages for the same conduct against one party, regardless of whether the claim arises from a piercing of the corporate veil or direct contract liability.  "The rule barring duplicative claims of fraud and breach of contract is only applicable where the two claims are asserted against a common defendant." *Sun Prods. Corp. v. Bruch*, 2011 U.S. Dist. LEXIS 125186, at *17-18 and N.66 (S.D.N.Y. Oct. 28, 2011) (citing *Bridgestone/Firestone v. Recovery Credit Servs*., 98 F.3d 13, 19-20 (2d Cir. 1996) "To the extent that the Second Circuit in *Bridgestone/Firestone*, 98 F.3d at 19-20, barred a fraud claim against the individual defendant, the court in that case had already pierced the corporate veil, thus concluding that plaintiff could proceed on its breach of contract claim against the individual defendant." *Sun Prods. Corp.* at *18 n.66).  Notably, Rock Fintek cited *Bruch* in its premotion letter on this issue, even though it clearly defeats the claim for fraud against Mr. Stern.

Even if Rock Fintek was not seeking to pierce the corporate veil, its fraud claim would fail against Mr. Stern.  "although a fraud claim may be dismissed *as duplicative* only as against a defendant against whom the related contract claim is viable (*see Bronx Store Equip. Co. v Westbury Brooklyn Assoc.*, 280 A.D.2d 352, 721 N.Y.S.2d 28 [2001]),  the fraud claim was properly dismissed as to all the defendants, including those who were not parties to the AGIT note, since in any event their alleged fraud liability was essentially accessorial only, so that once the main fraud claim against the direct actor falls, so does the claim against the remaining defendants." *Richbell Info. Servs. v. Jupiter Partners, L.P*., 309 A.D.2d 288, 305, 765 N.Y.S.2d 575, 589 (App. Div. 1st Dept. 2003) (italics in original).  This is precisely the situation in this case.  Mr. Stern is simply an accessory to the claims against JNS, and the fact that the claims are not distinguishable demonstrates that there is no independent conduct of Mr. Stern that is the subject of Rock Fintek's claims.  Each of the allegations of the FATC are focused on steps that

Mr. Stern allegedly took to hide JNS' lack of compliance with the contract. These claims simply must fail.

Furthermore, Rock Fintek cannot plead in the alternative after discovery has been completed and summary judgment has been sought. Here, Rock Fintek has completed discovery and is standing at summary judgment on its breach of contract claim against JNS and Stern, which is based on the same facts and circumstances as its fraud claim against Mr. Stern. Therefore, Rock Fintek cannot maintain both claims and must elect one or the other.

    **c.   There is no evidence that Mr. Stern made any false statements to Rock Fintek**

Even if the Court were to consider Rock Fintek's fraud claim against Mr. Stern, it would have to dismiss it as a matter of law, because Rock Fintek has failed to produce any evidence that Mr. Stern made any false statements to Rock Fintek or that he had any intent to deceive or defraud Rock Fintek. In fact, the first transactions with JNS occurred in February 2021, despite wrongly being pled as having occurred in April 2021. JSF at ¶28. Initially, Rock Fintek worked through a broker they retained, Ms. Chunron Li, to locate suppliers of PPE. JSF at ¶28-32. Ms. Li was a stranger to Mr. Stern. Stern Decl. at ¶2. She was introduced to an individual named Bruno Azra, who informed her he had a supply of Medcare gloves. JSF at 28-32; Frisch Exh. 6 at p. 31 et seq. (see chat transcript from 2/2/21, 8:41:08 PM forward). Mr. Azra apparently submitted some marketing materials that he represented came from the seller (who was JNS). JSF at ¶32, Frisch Exh. 6 at P. 41 [2/9/21, 1:12:22 PM]; Frisch Exh 7-8. Mr. Stern admits having provided documents to Mr. Azra, and that those documents were obtained from Kitchen Winners. Stern Decl. at ¶3. To Mr. Stern's knowledge those documents were accurate documents. Stern Decl. at ¶4. Furthermore, he never provided them to Rock Fintek. Stern Decl. at ¶5 Frisch Exh. 6 (chat

demonstrating that the discussions occurred between Mr. Azra and Ms. Li); Frisch Exh. 9 (Joel Stern/Rock Fintek Chat demonstrating no discussion of the specifications of the gloves).    More importantly, Mr. Stern understood JNS to be buying Medcare Nitrile Examination gloves that were compliant with FDA 510(k) certification.    JSF at ¶27 and 117 and Exh. R; Stern Decl. at ¶6.  The documents he provided to Mr. Azra, were in fact accurate statements of what he ordered from Kitchen Winners and intended to supply via JNS to Rock Fintek.  Ibid.

There is no evidence that the gloves were fake, as the gloves were delivered directly to Mr. Stern's warehouse space by the manufacturer.  JSF at ¶91.  Needless to say, Mr. Stern could only verify the goods once they arrived, but he testified that he did so, and had no basis to know if Medcare/GTS was shipping non-compliant goods.  Stern Decl. at ¶7-9.  Most importantly, even if Medcare sent goods that were not compliant with the contract, they were not "knockoff" goods. JSF at ¶91; Stern Decl. at ¶7-9.  They were simply claimed to not meet the specification of a third party, Ascension, whose existence and requirements were never shared with JNS and not a provision of any contract.  See JSF at ¶81 (Ascension contends that Rock Fintek did not meet the specifications it had agreed to); Stern Decl. at ¶10; Frisch Exh 2 at 93:18-21; Frisch Exh. 9 at P. 10.

Contrary to the assertion of the FATC at ¶27, Mr. Stern never spoke to Rock Fintek prior to entering into the contract, and the statement that Kitchen Winners had a connection to Medcare is in fact true.  JSF at ¶¶28-32; Stern Decl. at ¶5; Frisch Decl. at Exh. 6 (Ms. Li Chat); Exh. 9 (Stern Chats); Frisch Exh. 18 at P.23.  ¶29 of the FATC is clearly a false allegation, as there were simply no written communications with JNS or Mr. Stern that support the claims.  Stern Decl. at ¶5; Frisch Decl. at Exh. 6 (Ms. Li Chat); Exh. 9 (Stern Chats).  At the outset of their dealings with JNS, Rock Fintek dealt with Ms. Li who dealt with Bruna Azra and had no direct connection with

Mr. Stern.  JSF at ¶¶28-32; Stern Decl. at ¶5; Frisch Decl. at Exh. 6(Ms. Li Chat); Exh. 9 (Stern

Chats).  It appears that Mr. Stern only first spoke directly with Rock Fintek over a month after the

initial dealings. Frisch Decl. Exh. 9 (Stern Chats).  Similarly, the documents described at FATC

¶¶29-31 were not provided by Stern to Rock Fintek, there is no evidence as to what documents

Rock Fintek received from Azra (other than the two documents annexed to the Ms. Li Chat at

Frisch Exh. 7 - 8).  While Rock Fintek asserts that the test reports were false, there is zero evidence

that the testing documented in the report is false in any way, and there is zero evidence that any of

the documents were false in any material way.  See Frisch Exh. 13.  The documents as presented

cannot be demonstrated to be false.  They were simply the marketing materials and test reports

provided by Medcare to Kitchen Winners, who provided them to Stern.  Stern Decl. ¶3-4.

        The allegations in ¶34 are similarly unsupported.  There is not a single written statement

from Mr. Stern as to "ASTM International Certifications."  See Frisch Decl. at Exh. 6(Ms. Li

Chat); Exh. 9 (Stern Chats).   Similarly, there is no representation from Mr. Stern in writing or

otherwise that the gloves were fit for a particular purpose.  See Frisch Decl. at Exh. 6(Ms. Li Chat);

Exh. 9 (Stern Chats).  The marketing materials were sent by Mr. Azra and were simply materials

forwarded from the manufacturer.  Stern Decl at ¶3-5.  Similarly, the allegations at ¶¶45-50 allege

that Stern was attempting to sell mislabeled gloves to Rock Fintek at a discount, even though he

had allegedly had previously simply loaded the same mislabeled gloves and sold them at full price

just the week before.  The allegations are that Mr. Stern caused the stickers to be applied to the

boxes is defeated by documentary evidence.  First, there are photos of the glove boxes from China

showing the stickers.  Frisch Decl. at Exh 10 at P. 12-19; 23; 27; 40-44; 47; 51; 55.  Second, there

is no evidence whatsoever that Mr. Stern knowingly sold any of the gloves with stickered boxes.

Stern Decl. at ¶ 14-15.   The whole allegation is invented by Rock Fintek to explain how it ended

up with boxes with stickers.  This allegation is simply ludicrous on its face as Mr. Stern offered

these at a discount and begged Rock Fintek to consider them on numerous occasions,  Frisch Exh

9 at P. 4-5; P. 12.  There is no evidence in the record whatsoever as to which seller delivered those

boxes, or whether there was any actual defect in those particular boxes.  As Mr. Kato testified, he

just assumed they were delivered by Stern.  .  Frisch Exh 2 at 77:14-20.  He also testified that the

boxes could have simply been misprints and the gloves actually were the correct examination

gloves.  Frisch Exh. 2 at 158:8-159:21.

### d.   Even if Mr. Stern was aware of JNS' alleged breach of the contract, it does not constitute fraud

Another claim being made by Rock Fintek is that during the course of dealings between

JNS and Rock Fintek, Mr. Stern was aware that JNS was in breach of the contract by supplying

goods that were not compliant with the contract terms, and Mr. Stern's allowance of these wrongful

products to be shipped somehow constitutes fraud.  While Mr. Stern strenuously objects to this

claim, as he was not aware of the non-compliance of any gloves sold by JNS, it simply does not

constitute fraud.  "Courts applying New York law routinely hold that representations by a non-

party made on behalf of the contracting party may be duplicative of the contract claim against the

contracting party," and this disallowed as a matter of law. *Clarke v. TRIGO U.S., Inc.*, No. 22-cv-

1917(PKC), 2023 U.S. Dist. LEXIS 186527, at *11 (S.D.N.Y. Oct. 16, 2023) citing *Exchange

Listing, LLC v. Inspira Technologies, Ltd.*, 22 Civ. 1889 (KPF), 2023 U.S. Dist. LEXIS 39093,

2023 WL 2403223, at *16 (S.D.N.Y. Mar. 8, 2023).  The facts of this case (as alleged by Rock

Fintek) are precisely like the cited cases, an attempt to convert a breach of contract claim against

a corporation into a fraud claim against its executives must fail.

### e.   Mr. Stern was not a party to any contract with Rock Fintek

The contracts between Rock Fintek and JNS did not include Mr. Stern as a party or guarantor.  JSF at ¶¶27-37; 44, 109.  No contract for goods from Mr. Stern has been shown to exist, and as such, any contract claim arising out of a claim that Mr. Stern was personally obligated under the terms of any contract with Rock Fintek must fail.

### f.   There is no basis to pierce the corporate veil under New York Law

Mr. Stern adopts the argument of the Adorama Parties on this point as if fully set forth herein.  Rock Fintek's claim that it is entitled to pierce the corporate veil or impose some form of alter ego liability on Mr. Stern fails as a matter of law.  JNS was a duly formed limited liability company formed for the purpose of selling PPE, specifically nitrile gloves that Mr. Stern was able to locate from suppliers and to resell to end users.  JSF at 11.  Mr. Stern obtained investors to fund the purchases of gloves and entered into contracts with Kitchen Winners and other entities for the supply of the goods.  Stern Decl at ¶16.   One of the customers to whom JNS was introduced was Rock Fintek.  JSF at ¶¶29-30.  JNS received a purchase order and subsequent orders and filled those orders with gloves sourced through Kitchen Winners.  There is simply no evidence of any fraudulent purpose.

JNS was also well capitalized and in active business.  The bank statements from this period show a company with adequate funds to fulfill the contracts it entered into.  See JSF ¶110 and Exh. K (JNS Bank Statements from February – June 2021).  The allegations that JNS should be disregarded appears to be based on two facts.  One is that Stern was the sole member of the entity.  The other is that Rock Fintek alleges that JNS breached the contract by providing substandard goods.  Neither fact justifies piercing the corporate veil in this matter.  Notably, Rock Fintek made no effort to obtain any personal guaranty from Stern and did not inquire into the finances of JNS.  JSF at ¶¶34-35.  Similarly, Mr. Gilling, the COO of rock Fintek testified that Rock Fintek was

represented by counsel when they initially entered into the purchase order with JNS in February 2021.  Frisch Exh. 1 at 296:8-15; Frisch Exh. 2 at 47:5-11.

Contrary to assertions by Rock Fintek, JNS had contracted to purchase the goods it was selling to Rock Fintek.  *See JSF* ¶117 and Exh. R.  The contracts clearly specify Medcare Nitrile Examination Gloves, which were the precise gloves being sold by JNS.  If Medcare delivered or Kitchen Winners sold JNS gloves that were not in accordance with the specifications, it is certainly not evidence of fraudulent intent by Stern or JNS.  There is no evidence that Mr. Stern was attempting to defraud anyone.  While JNS currently is out of business and out of money, at the time of these transactions it was well capitalized as demonstrated by JNS' bank statements from the relevant period.  JSF Exh. K.  "The corporate veil will be pierced only when the corporate 'form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that  it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.'"  *Bridgestone/Firestone* 98 F.3d at 17-18 quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979).  "Application of these many precedents to the literally infinite variety of situations which might warrant a court to pierce the corporate veil can be difficult, particularly in the case of small privately held corporations where the trappings of sophisticated corporate life are rarely present."  *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989).  Thus, piercing the corporate veil in small business is limited to circumstances where "the evidence demonstrated an abuse of that form either through on-going fraudulent activities of a principal, or a pronounced and intimate commingling of identities of the corporation and its principal or principals, which prompted the reviewing courts, driven by equity, to disregard the corporate form."  Id. at 601.

"The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene" *Morris v. State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 142, 603 N.Y.S.2d 807, 811, 623 N.E.2d 1157, 1161 (1993) (internal citations omitted). Thus, Rock Fintek's circular reasoning fails in this case. The only wrong credibly alleged is that JNS failed to comply with the requirements of the purchase orders from Rock Fintek. There is zero evidence that JNS was formed for the purpose of abusing the corporate form or engaging in some wrong. The evidence is that JNS was selling goods that it believed were compliant, even if they ultimately turned out to be defective in some way. As such, even if the claims against JNS were sustainable, they would not equitably be imposed against Stern on a veil piercing theory.

### C. Rock Fintek cannot establish its breach of contract claims against any party
#### a. The goods were resold immediately, and Rock Fintek was not damaged

As Rock Fintek has now admitted, all of the gloves at issue in this action were immediately resold to Ascension Health, via its purchasing arm. JSF at ¶37 and ¶70-81. The gloves were sold at a predetermined price, pursuant to a purchase order that Rock Fintek entered into prior to the transactions at issue in this action. JSF at ¶71. Ascension paid the full amount promised under its contract with Rock Fintek, approximately $37,000,000, and has not recovered a penny of that money from Rock Fintek. JSF at ¶¶79-80; Rock Fintek Third Amended Rule 26 Disclosures. In fact, Ascension has not commenced any litigation in the almost three years since it discovered the allegedly non-conforming gloves. JSF at ¶80. As Rock Fintek cannot claim any actual direct damages from the supposedly defective gloves, it is seeking only consequential damages from JNS and Stern (and Kitchen Winners). This claim must also fail.

#### b. The Consequential Damages claimed by Rock Fintek fail as a matter of law

Not only is Rock Fintek seeking only consequential damages, but it is seeking over $100,000,000 in damages on the specious theory that the gloves caused it substantial lost business. This issue is addressed at length in the summary judgment motion of Kitchen Winners, and those arguments are incorporated herein by reference in their entirety.

As an initial matter, Rock Fintek's prior business with Ascension was not profitable at all. JSF at ¶¶82-83.  Following the expert deposition of Mr. Kato, Frisch Decl. Exh. 3 well summarized in the Kitchen Winners brief,  it is abundantly clear that Rock Fintek's claim of more than $100 million in future lost profits is absolutely without any colorable basis.  To be entitled to future lost profits, those lost profits "must be capable of proof with reasonable certainty."  *Lovely Peoples Fashion v. Magna Fabrics*, 95 Civ. 8450 (AGS)(THK), 1998 U.S. Dist. LEXIS 11197, at *15 (S.D.N.Y. July 22, 1998).  Mr. Kato's testimony makes clear that Rock Fintek's alleged future lost profits come nowhere close to meeting that standard.   Rather, the claim is based upon Mr. Kato's speculation that Rock Fintek would have been able to win a bid for future purchase orders with Ascension, and Mr. Kato's further speculation about Rock Fintek's profit margins even if it did win such a bid bid.  It is also wholly out of line with Rock Fintek's own profits/revenues over the prior years when it was in business.  Mr. Kato was also unable to address the fact that Rock Fintek never gave a penny in refunds to Ascension, did nothing whatsoever to preserve the relationship, and made no efforts to shift the business to other customers.

Ascension was not in the need of any additional gloves in the near future and testified that it was unlikely that Rock Fintek could compete with its existing regular suppliers.  Frisch Decl. at Exh. 5 at 37:6-41:9.  In fact at that time, starting in mid-June 2021, Ascension was working to "burn down" its supply of Medcare gloves.  Frisch Exh. 15   Rock Fintek was a supplier retained for the COVID period, and for that period some additional business might have been solicited for

14

temporary supply issues, ibid., but Rock Fintek has provided zero basis for the claim that it could

in fact provide the goods that Ascension ultimately required, or any basis to measure the potential

profits on any such transactions. See Frisch Exh. 3 (Mr. Kato at length on potential profits).

Ascension did testify that under certain circumstances it might have considered additional long

term business with Rock Fintek, but that was conditioned on price competitiveness, FDA approvals

and having a supply of items that Ascension actually required. Frisch Exh. 5 at 39:15-41:1.

Furthermore, there simply is no evidence as to what the profit would have been, which is especially

significant in light of the fact that Ascension testified that price was a major factor in obtaining

long term business. Ibid. at 40:17-21; Frisch Exh 2 at 61:13-23.

Notably, Rock Fintek has admitted that it never issued a refund for any of the goods and

thus never suffered a direct financial loss. JSF at ¶¶79-80. Yet, Rock Fintek admits that upon

termination of its relationship with Ascension, it went out of business. Frisch Exh. 2 at 27:19-

29:13. As such, Rock Fintek is claiming to be so poorly capitalized that the loss of this one

customer made the entire business venture unworthy of continuing. It is simply incomprehensible

that a company worth over 100 million dollars would simply stop operating instead of working to

correct the alleged issues with the gloves.

Notably, Rock Fintek's claimed losses are entirely at odds with the amount of goods sold

by JNS and relate to the loss of a customer that it admits it never informed JNS about. It also

admits that its agreements with JNS did not specifically reference consequential damages or

otherwise put JNS on notice of same. See JSF Exh. J; Stern Decl at ¶12. Claiming losses of over

one hundred million dollars in consequential damages on a series of contracts of approximately

$3.5 million is simply unreasonable. It is made even more unlikely in that the Kitchen Winners

contract was approximately twenty million dollars, and Mr. Kato made clear that he could not

distinguish between damages arising from his claims from each party (and the Hunton and Williams law firm, which Rock Fintek also blamed for the demise of the Ascension relationship. Frisch Decl. Exh 3 at 59:14-60:7; Frisch Exh. 17 at ¶¶38-39.)

A review of the applicable New York law demonstrates that these facts are simply insufficient to support Rock Fintek's fantastic claims of $36 million per year in lost profits. As will be demonstrated in the following section, Rock Fintek never earned profits of anywhere near that amount, and in any event cannot distinguish between profits at the inflated prices of the COVID emergency, and ordinary profits that would be earned in a non-emergency time.

### c. The claimed consequential damages are not supported by any facts

Rock Fintek is claiming that Thomas Kato is an expert in potential future business that Rock Fintek might have obtained from Ascension. Frisch Exh. 12 (Expert Disclosure); Exh 3 (Kato Expert Deposition). Mr. Kato testified as both a fact witness (Frsich Decl. Exh. 2) and expert in this matter, and a review of the testimony show that Mr. Kato's claimed damages are simply unsupported by any facts. As an initial matter, Mr. Kato clearly refused to acknowledge the complete testimony of Michael Elstro on behalf of Ascension. Frisch Exh. 3 at 49:8-22; 67:4-8; 67:24-68:14. Mr. Elstro testified specifically that Ascension was open to further bidding from Rock Fintek (until it discovered the issues with the gloves at issue here) but that such bids must be price competitive with "ginormous" companies, and that Rock Fintek would have to comply with FDA requirements, which Ascension also asserted was a large burden. Frisch Exh. 5 at 39:15-41:1.

As noted above, Ascension testified that contrary to Mr. Kato's claims, it was not interested in purchasing more gloves from Rock Fintek in the short term, and that any long term would be tested against Ascensions other suppliers. As set forth in the Kitchen Winners' brief, Kato simply

could demonstrate no proof of the existence of supposedly hugely profitable covid test kits that were on the verge of being sold to Ascension.

During Mr. Kato's expert deposition, he indicated that his lost profits were related to third parties that he said were affiliated with Ascension. Frisch Exh. 3 at 8:1-9:4. No proof was offered for these, or why the losses were termed as coming from the destruction of the relationship with Ascension. Frisch Exh. 12 (Expert disclosure). Similarly, Mr. Kato made numerous fantastic claims about goods he would be selling to Ascension, which appear to expect the Court to accept that he was guaranteed to receive solid orders for every item he ever discussed with the Ascension team. Frisch Exh. 3 at 43:9-44:22; 45:1-10.

Furthermore, Mr. Kato was simply incapable of addressing how the loss of the relationship would be valued at $36 Million in profits when Rock Fintek only made around that amount in revenue over the course of its existence. Frisch Exh. 3 at 10:22-14:2. Furthermore, Mr. Kato's calculations ignore the impact of the COVID pandemic on the PPE business, as more fully discussed in the Kitchen Winners' motion and incorporated herein. Mr. Kato provided no documentary basis for his alleged projections and lost business, and simply appears to have assumed his figures.

As noted above, the claims here were in no way predictable for a small supplier such as JNS, which only provided about 20 million gloves out of a total purchase of over 200 million gloves.

### d.   There is no proof of any defect with the goods sold by JNS
Rock Fintek's claims also fail due to the inability for Rock Fintek to prove that a particular order of gloves from JNS was defective or not in compliance with the obligations of JNS under the contracts. Rock Fintek's claim has always relied on the fact that all of the gloves were

supposedly identical, and that it did not need to demonstrate that individual shipments by each party were defective.  Frisch Exh. Frisch Exh. 2 at 253:1-17.  Yet, the reality of the situation is that JNS sold goods in several distinct orders (and not pursuant to any master agreement) beginning in February 2021 and ending in May 2021.  Frisch Exh. 6 (Ms. Li Chat); JSF Exh. J; JSF Exh. K; Frisch Exh. 9 (Stern Chat). No complaints were received by Rock Fintek from Ascension until July 2021.  Frisch Exh. 9(Stern Chat).  Thomas Kato noted in multiple communications with Ascension that they had been satisfied with the gloves until approximately July 2021.  JSF Exh. P-Q.

This means that Rock Fintek cannot demonstrate any issue with any of the particular shipments from JNS, which its customer, operating through a third party called Medline Industries to store the gloves, received immediately upon sale and which then mixed all of the gloves without any ability to track particular shipments.  JSF at ¶92-94.

Even more, the issues with the gloves only arose when Ascension made a concerted effort to use up gloves it was paying to store as the PPE market returned to pre-pandemic conditions. Frisch Exh. 15.  It appears that after the gloves were largely maintained as an emergency stockpile, Ascension decided to perform a "burn down" in June 2021, to reduce its stockpile from a six month supply to a three month supply.  Ibid.  With such an aggressive plan, it is impossible to guess where the gloves came from, as Ascension was demanding its facilities order these gloves promptly.  Also, it is clear that the return of ordinary supply made it unnecessary for Ascension to tolerate any quality issues with these off-brand emergency gloves.  JSF Exh. Q at RF_003485. In fact, Ascension provided only approximately twenty complaints in regard to 200 million gloves. Frisch Exh. 16 (compilation of emails providing anecdotal concerns of several Ascension facilities).

Finally, Rock Fintek agreed to supply gloves to Ascension that met a particular standard for Nitrile Examination gloves, ASTM D6319.  JSF Exh. B.  It is notable that this term did not appear in any order with JNS (or apparently Kitchen Winners).  Frisch Exh. 6 (Ms. Li Chat); JSF Exh. J; Frisch Exh. 9 (Stern Chat).  The agreement with JNS was for the provision of Medcare Nitrile Examination Gloves produced in an FDA 510(k) certified factory.  This is what JNS sold. The quality of Medcare gloves may well have been below what Ascension was used to, but the gloves provided were in fact Medcare Nitrile Examination Gloves, and there is no way for Rock Fintek to prove otherwise.  This is especially true in that they only conducted testing on 14 glove samples from the entire universe of gloves, Frisch Exh. 13, when their own statistical expert declared that they must test at least 1160 gloves.  Frisch Exh. 14.

### e.  Rock Fintek failed to timely object to the goods

The transactions at issue in this action are clearly sales of goods governed by Article 2 of the Uniform Commercial Code.  The transactions between JNS and Rock Fintek occurred between February 2021 and May 9, 2021.  No notice was given of any issue with the gloves until July 2021. It is undisputed that Rock Fintek accepted delivery of the gloves, and never issued a notice of rejection under UCC §2-602.  Rock Fintek immediately resold the gloves and never made any effort to return the gloves.  In fact, the only effort Rock Fintek made to return the gloves in July 2021 was by text message and long before Ascension attempted to revoke its acceptance.

Rock Fintek's failure to timely inspect the goods also made it impossible for JNS to cure any issues.  Had the gloves been timely inspected and any issues raised seasonably, then JNS could have proceeded to seek replacement gloves from Kitchen Winners or Medcare to make Rock Fintek whole.  The delay until the market had rapidly changed from a supply constrained pandemic market to a more ordinary marketplace made it impossible for JNS to correct the issues, this is

especially true as to the earliest shipments in February 2021.  This delay certainly constituted a waiver under UCC §2-605(1)(a).

Under UCC §2-606, the goods were accepted when Rock Fintek failed to inspect the goods when it had the opportunity to do so.  The evidence is clear that Rock Fintek had opportunities to inspect goods at the warehouses where JNS was holding the goods, and in fact did so at least on some occasions (JSF at ¶31; Frisch Exh 2 at 271:5-14) that it had the opportunity to inspect once its trucking company took possession of the goods, and that it had the opportunity to ask its buyer to timely inspect the goods once they reached the Medline warehouses.  Frisch Exh. 4  at Part I, 42:4-43:18; Part II 62:18-63:16 (Alex King Deposition).  Contrary to the numerous allegations in the FATC, there was no pandemic era law preventing Rock Fintek from inspecting the goods once they took possession of them.  In particular, it should be noted that the goods were boxed by the factory, but the pallets were put together by JNS' warehouse at JNS' direction and the shrinkwrap could have been removed and then replaced.  Rock Fintek had every opportunity to ensure that the boxes appeared to be what was ordered (as the goods came straight from China, they had more opportunity than JNS, which was filling orders for Rock Fintek as fast as soon as the gloves arrived).  Similarly, Rock Fintek was able to open cases and remove a box of gloves for testing from any shipment, the fact that it failed to do so does not excuse the time lapse from acceptance to when it notified JNS of the claimed issues.

As the goods were clearly accepted, UCC §2-607 governs.  Pursuant to UCC § 2-607(3)(a), Rock Fintek is barred from any claim in this instance as failed to timely notify JNS of any breach. Even if the Court were to believe that COVID justified a delay in discovery of any issues, UCC §2-608 governs, and revocation of acceptance would still require the revocation to occur in a reasonable time, and Rock Fintek cannot demonstrate that it operated in a reasonable time frame.

In fact, there is no evidence that the acceptance was ever revoked at all. Its own negligence in failing to examine the goods that it had every opportunity to examine does not justify waiting for claims from Ascension.  Notably, Ascension has never sued Rock Fintek and the transactions at issue are now over three years old.  As noted above, Rock Fintek also never followed its obligations had this been deemed a rejection.

"'The burden is on the buyer to establish any breach with respect to the goods accepted" (UCC § 2-607 [4]), and mere conclusions, expressions of hope and unsubstantiated allegations are insufficient to meet this burden when the party seeking to recover for goods sold and delivered moves for summary judgment." *Sears, Roebuck & Co. v. Galloway*, 195 A.D.2d 825, 827, 600 N.Y.S.2d 773, 775 (App. Div. 3rd Dept. 1993) (internal citations omitted).  Simply put, Rock Fintek will not be able to establish that the goods were non-conforming, as the expert reports submitted by Rock Fintek are simply insufficient to demonstrate that the gloves sold by JNS were not in accordance with any particular contract agreed to between JNS and Rock Fintek.

### D.  The Breach of Warranty Claims must fail
#### a.  The alleged representations were not made by Stern or JNS
At this juncture it is clear that Mr. Stern never made any written warranties as to the nature of the gloves (and addressed at length above).  The initial paperwork was provided by a third party, Bruno Azra, and was simply marketing materials from the manufacturer and from Kitchen Winners (assuming the documents alleged are those that Stern provided to Azra).  The fact that the statements were not made directly by Stern but by an intermediary makes it impossible to ascribe the warranty claim to Stern personally.  Furthermore, an express warranty under UCC §2-213 is a term of the contract, and does not create personal liability on an employee of an entity seller.

The only written correspondence between Rock Fintek and Mr. Stern began by WhatsApp in March 2021 and continued until July 2021. There is not a single representation by Mr. Stern as to any quality or characteristic of the gloves in those chats. Similarly, there is not a single email form Mr. Stern to anyone at Rock Fintek making such a warranty.

More importantly, the remedy for a breach of warranty is the repair or replacement of defective goods. As Rock Fintek has sold all of the goods and is only claiming consequential damages at this time, it cannot demonstrate any damages from the alleged breach of warranty. *See* the Court's order on the motion to dismiss (ECF #68) at P. 52 "As to the argument that the warranty claim is impermissibly duplicative of the contract claim, "although [Rock Fintek] cannot recover twice for the same injuries, New York law entitles a plaintiff to assert alternative theories of liability." *Trump Int'l Hotel & Tower v. Carrier Corp*., 524 F. Supp. 2d 302, 314 (S.D.N.Y. 2007)[1] (noting that remedies differ under warranty claim, which provides for repair or replacement of defective items, and contract claim, which provides for consequential damages)." A party "could recover consequential damages on the breach-of-contract claim, whereas, on the breach-of-express-warranty claim, the remedy is traditionally limited to the repair or replacement of the item for which the warranty was breached." *Trodale Holdings LLC v. Bristol Healthcare Inv'rs, L.P.,* 2017 U.S. Dist. LEXIS 196150, at *37 (S.D.N.Y. Nov. 29, 2017) Citing *Trump Int'l.*

## CONCLUSION

For all of the above-mentioned reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Rock Fintek's Third-Party Complaint against them with prejudice.

Dated: Hackensack, New Jersey

---

[1] All citations to the Uniform Commercial Code are to the Code as enacted by New York and as reported by Consol., Lexis Advance through 2023 released Chapters 1-774.

February 16, 2024

                                 **THE LAW OFFICE OF AVRAM E. FRISCH LLC**
*Attorneys Third-Party Defendants JNS Capital Holdings LLC, and Joel Stern*

By:    /s/ Avram E. Frisch_____
           Avram E. Frisch, Esq.
           1 University Plaza, Suite 119
           Hackensack, NJ 07601
           201-289-5352
           frischa@avifrischlaw.com

23