**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KITCHEN WINNERS NY INC.,

*Plaintiff,*

-against-

ROCK FINTEK LLC,

*Defendant.*

Civil Action No. 22-cv-05276-PAE

ROCK FINTEK LLC,

*Counterclaim and Third-Party Plaintiff,*

-against-

KITCHEN WINNERS NY INC.,

*Counterclaim Defendant,*

and

ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN,

*Third-Party Defendants.*

## RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Third-Party Defendants Joseph Mendlowitz ("Mendlowitz") and Adorama Inc. ("Adorama") (collectively "the Adorama Parties") and Plaintiff and Counterclaim-Defendant Kitchen Winners NY Inc. ("Kitchen Winners") respectfully submit the following joint statement of undisputed material facts in support of their respective Motions for Summary Judgment:

1.      Kitchen Winners NY Inc. ("Kitchen Winners") commenced this action by Summons and Complaint filed on May 17, 2022 in the Supreme Court, New York County asserting claims for breach of contract and unjust enrichment. (Declaration of Alexander J. Sperber dated February 16, 2024 ("Sperber Dec."), in Support of Kitchen Winners, Adorama Inc. ("Adorama") and Joseph Mendlowitz ("Mendlowitz") Motion for Summary Judgment ("Sperber Dec.") at Exhibit "A" [Kitchen Winners' Complaint].)

2.      Rock Fintek subsequently removed this action to the United States District Court for the Southern District of New York  and filed its Counterclaim and Third-Party Complaint, wherein it impleaded a number of third-parties, including the Adorama Parties.  On August 5, 2022, Rock Fintek then filed its First Amended Counterclaim and Third-Party Complaint ("TPC") (Sperber Dec. at Exhibit "B" [TPC].)

**The Parties**

3.      Third-Party Plaintiff Rock Fintek LLC ("Rock Fintek") is a Limited Liability Company. (Sperber Dec. at Exhibit "C" [Joint Stipulation of Undisputed Facts ("JSUF") at ¶ 8.)

4.      Rock Fintek was formed for the purpose of buying and selling goods from China to the United States.  (Sperber Dec. at Exhibit "D" [T. Kato 30(b)(6) Transcript ("Kato Non-Expert")] at 16:19-22.)

5.      Thomas Kato ("Kato") is the sole member of Rock Fintek.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 9.)

6.      Bradley Gilling ("Gilling") was the Chief Operating Officer at Rock Fintek at all relevant times. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 10.)

7.      Third-Party Defendant Adorama Inc. ("Adorama") is a corporation formed under the laws of the State of New York. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 6.)

8.      Adorama is an e-commerce company, with its specialty as a retailer in the photography and video space.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 29:22-25.)

9.      The sole owner of Adorama is Eugene Mendlowitz.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 35:15-17.)

10.     Third-Party Defendant Joseph Mendlowitz ("Mendlowitz"; together with Adorama, the "Adorama Parties") is a director of multiple departments at Adorama.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 7.)

11.     Plaintiff and Counterclaim Defendant Kitchen Winners NY Inc. ("Kitchen Winners") is a corporation formed under the laws of the State of New York.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 1.)

12.     The president and sole shareholder of Kitchen Winners is Yitty Weiner.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 2.)

13.     Kitchen Winners was originally formed for the purpose of selling kitchen accessories online.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 3.)

14.     At the onset of the Covid-19 pandemic, Kitchen Winners expanded its business to focus on the sale of Personal Protective Equipment ("PPE").  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 4.)

15.     Joseph Weiner, also known as Hershey Weiner, is the husband of Yitty Weiner and runs the day-to-day operations of Kitchen Winners.  (Sperber Dec. at Exhibit "C" [JSUF] ¶ 5.)

16.     Rock Fintek has alleged that Kitchen Winners is an alter ego of Adorama.  (Sperber Dec. at Exhibit "B" [TPC] at ¶ 20.)

17.     That assertion is categorically untrue.  Neither Adorama nor Mendlowitz own any shares in Kitchen Winners.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 56:2-11.)

18.     Kitchen Winners and Adorama do not share owners, officers, employees, offices, or bank accounts.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 55:5-56:11; Exhibit "F" [J Weiner 11/15 Transcript] at 13:14-17.)

19.     Kitchen Winners and Adorama are separate entities involved in an arms-length business relationship.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 56:12-57:12; Exhibit "F" [J. Weiner 11/15 Transcript] at 22:9-15.)

20.     Indeed, when asked, both Kato and Gilling admitted that they had no information to prove the unsubstantiated allegations regarding Kitchen Winners being an alter ego of Adorama. (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 37:23-40:8;  Exhibit "D" [T. Kato Non-Expert Transcript] at 205:16-206:18.)

**The Relationship Between Adorama and Kitchen Winners**

21.     During the Covid-19 pandemic, Mendlowitz began looking to obtain personal protective equipment ("PPE") for the use of Adorama's employees, so that the employees would feel comfortable coming into work both in its offices and warehouses.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 52:15-24.)

22.     Mendlowitz quickly found that it was extremely difficult to source products like gloves and masks.  The only entity that he found able to actually supply PPE was Kitchen Winners. (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 53:10-18.)

23.     Mendlowitz knew Joseph Weiner, the principal of Kitchen Winners, from around his community.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 54:3-6.)

24.     Before Covid-19, however, neither he nor Adorama had ever had any business dealings with Weiner or Kitchen Winners.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 55:8-10.)

25.     While Kitchen Winners had started out as an online kitchen accessories business, during the COVID-19 pandemic, Kitchen Winners was also engaged in the business of importing and selling personal protective equipment (PPE), including medical gloves and KN95 masks. (Sperber Dec. at Exhibit "F" [J. Weiner 11/15 Transcript] at 12:12-16.)

26.     Realizing the business opportunity in the PPE market, Adorama agreed to lend Kitchen Winners funds to support its Covid-19 related business operations.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 57:6-12.)

27.     As lender, Adorama's profit came from the interest on its loan.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 59:2-13.)

28.     Given the lack of security to collateralize its loan, however, Adorama required that a portion of the funds paid by Kitchen Winners' customer be paid directly to Adorama.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 63:25-64:10.)

29.     Initially Adorama and Kitchen Winners operated on the basis of a handshake agreement.  During that time period, Adorama's loans to Kitchen Winners were small and short-term.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 81:24-82:10.)

30.     Kitchen Winners' agreement with Rock Fintek, however, was much larger than any of the prior transactions for which Adorama had provided financing.  Accordingly, on or about March 26, 2021, Adorama and Kitchen Winners memorialized their agreement in a written Hebrew-language loan agreement.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 74:17-77:24; 82:17-24.)

**Rock Fintek Purchases Gloves from JNS**

31.     Rock Fintek also shifted its focus and began dealing in the PPE market after the onset of Covid-19.  Kato believed that he had strong relationships in China from which he could buy PPE, and quickly began looking for a way to capitalize on the high demand. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 19:11-18; 24:22-25:4.)

32.     On December 7, 2020, The Resource Group, which is the purchasing entity for a large hospital chain called Ascension Health Alliance ("Ascension")  gave Rock Fintek a purchase order for 200 million nitrile exam gloves (the "Ascension Purchase Order").  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 71; Exhibit "I" [Ascension Purchase Order] produced in discovery as RF_001279-001285.)

33.     Rock Fintek accepted the purchase offer and the initial downpayment of $9,250,000, but did not yet have a contract with even a single vendor able to supply the gloves it had agreed to procure.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 36:13-21.)

34.     Rock Fintek initially attempted to fulfill the Ascension Purchase Order with gloves from a vendor in Thailand, to whom Rock Fintek wired $6,200,000 and who ultimately never provided any gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 310:15-23.)

35.     After the Thailand mishap, Rock Fintek was scrambling to meet its obligations.  In December 2020 or January 2021, Rock Fintek was introduced to JNS Capital Holdings LLC ("JNS"), which was able to supply it with nitrile medical gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 31:19-23.)

36.     Rock Fintek first purchased gloves from JNS in February 2021.  At that point in time, Rock Fintek was so desperate to locate gloves for Ascension that it purchased those gloves at a loss, paying $15 per box.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 56:23-57:10.)

37.     Rock Fintek purchased additional gloves from JNS in April and May 2021 at the slightly lower price of $11.50 per box.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 30, 36; Exhibit "H" [Declaration of Joel Stern] at ¶ 11.)

38.     All the gloves that Rock Fintek bought from JNS were Medcare brand gloves. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 32:24-33:5.)

39.     Since not all of the transactions between JNS and Rock Fintek were documented in purchase orders and invoices, the best method of calculating the total gloves sold is to work backwards from Rock Fintek's payments to JNS.  According to JNS's own bank records, it received the following payments from either Rock Fintek, Gilling (Rock Fintek's COO), or a company named "Rock 13" that appears to be a Rock Fintek affiliate:

| Date | Amount of Payment | Price Per Box | Number of Boxes |
|---|---|---|---|
| February 10, 2021 | $450,000 | $15/box | 30,000 |
| February 17, 2021 | $200,000 | $15/box | 13,333 |
| February 19, 2021 | $250,000 | $15/box | 16,667 |
| February 23, 2021 | $200,000 | $15/box | 13,333 |
| February 25, 2021 | $250,000 | $15/box | 16,667 |
| April 27, 2021 | $25,000 | $11.50/box | 2,174 |
| April 30, 2021 | $272,550 | $11.50/box | 23,700 |
| May 7, 2021 | $700,000 | $11.50/box | 60,870 |
| May 11, 2021 | $119,475 | $11.50/box | 10,389 |

| May 12, 2021 | $322,550 | $11.50/box | 28,048 |
| May 24, 2021 | $200,000 | $11.50/box | 17,391 |
| May 25, 2021 | $137,640 | $11.50/box | 11,969 |
| May 27, 2021 | $200,000 | $11.50/box | 17,391 |

(Sperber Dec. at Exhibit "J" [JNS Bank Records].)

40.     At 100 gloves per box, this was a total of 26,193,100 gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 41:10-15.)

41.     At some point, however, Kato saw the name Kitchen Winners on a purchase order that he received in connection with the JNS' transactions.  Hoping to source gloves at a lower price, so that Rock Fintek could cut its losses on the Ascension Purchase Order (or maybe even make a small profit), he attempted to contact Kitchen Winners.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 192:15-21.)

**Rock Fintek Purchases Gloves from Kitchen Winners**

42.     According to Kato, he Googled the name Kitchen Winners and somehow came across an individual named Mendel Banon.  Kato then contacted Banon and explained his interest in purchasing nitrile medical gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 193:6-21.)

43.     Initially, Rock Fintek was willing to do business with Kitchen Winners on a truck-by-truck basis.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 197:21-25.)

44.     Accordingly, in March 2021, Kitchen Winners sold Rock Fintek approximately 90,000 boxes of nitrile gloves in one-off transactions ("Kitchen Winners' One-Off Transactions"). (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 38.)

45.     Rock Fintek paid $14 per box for the Gloves during the Kitchen Winners' One-Off Transactions. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 39.)

46.     At that price, Rock Fintek was still purchasing the gloves at a loss – though less of a loss than in its earlier transactions with JNS. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] 193:22-194:1.)

47.     Rock Fintek has admitted that Adorama was not a party to the Kitchen Winners' One-Off Transactions. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ at 40.)

48.     All the gloves that Rock Fintek purchased from Kitchen Winners during the Kitchen Winners' One-Off Transactions were Medcare brand examination gloves but the boxes identified the gloves as "Protection Gloves." Kitchen Winners notified Rock Fintek and Rock Fintek agreed that the gloves would be labeled "Protection Gloves." (Sperber Dec. at Exhibit "F" [J Weiner 11/15 Transcript] at 33:6-19.)

49.     Clearly very happy with the quality of the gloves that it had purchased from Kitchen Winners, and given the huge number of gloves that it still needed to acquire under the Ascension Purchase Order, Rock Fintek asked Kitchen Winners to supply it with an additional 150,000,000 gloves. Kitchen Winners and Rock Fintek, through their respective principals and attorneys, therefore negotiated the terms and conditions of a sales and purchase agreement to document that large purchase order. (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 36:6-8; 40:19-22; 110:22-111:20; Exhibit "U" [T. Kato email] RF_001034-001035.)

50.     On or about April 7, 2021, Rock Fintek and Kitchen Winners entered into a Sales and Purchase Agreement (the "SPA"), pursuant to which Kitchen Winners agreed to sell Rock Fintek 1,500,000 boxes of nitrile medical gloves (each box containing 100 gloves) at a price of $11.50/box. Under the terms of the SPA, the gloves were to have the following specifications:

Nitrile Gloves (Box 100) Color: Blue, Medical exam grade with FDA 510k, "Medcare" brand, and in assorted sizes as set forth in the SPA (the "Gloves"). (Sperber Dec. at Exhibit "K" [Sales and Purchase Agreement ("SPA")] at ¶ 1.)

51.     The SPA provides an explicit disclaimer as to the gloves that Kitchen Winners was procuring.

> **Manufacturing Disclaimer.** Seller is merely a reseller of the Products and not the manufacturer, as such Seller does not make any warranties as to the Products except that they conform to the specifications provided.

(Sperber Dec. at Exhibit "K" [SPA] at ¶ 6.)

52.     Further, pursuant to the SPA, Kitchen Winners was to be "allowed a variance in packing quantities of up to ten (10%) percent." (Sperber Dec. at Exhibit "K" [SPA] at ¶ 7.)

**Adorama's Role Under the Sales and Purchase Agreement**

53.     Rock Fintek asserts in its TPC that Adorama is somehow a seller under the SPA. (Sperber Dec. at Exhibit "B" [TPC] at ¶ 63.)

54.     The singular noun "Seller" in the SPA is a defined term, unambiguously referring only to Kitchen Winners. (Sperber Dec. at Exhibit "K" [SPA] at Preamble.)

55.     When the SPA discusses Adorama's role, it refers to Adorama by name. (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(b).)

56.     The "Seller" (i.e., Kitchen Winners) has the sole responsibility for procuring the gloves that Rock Fintek was buying. (Sperber Dec. at Exhibit "K" [SPA] at Preamble.)

57.     In contrast, Adorama has no responsibility for procuring any gloves. It appears in the agreement solely as the agreed-upon entity to whom Rock Fintek's initial deposit would be paid. (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(b).)

58.    While Adorama signed the SPA, it did so solely in its capacity as Kitchen Winners' lender.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 40:24-41:7; 88:10-13; 97:8-12.)

59.    Indeed, Rock Fintek knew that Adorama's sole role in this transaction was as lender to Kitchen Winners.  In order to facilitate the sale of the Gloves, Rock Fintek hired non-party Arik Maimon. (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 126:19-127:5;  Exhibit "D" [T. Kato Non-Expert Transcript] at  200:20-25.)

60.    Rock Fintek and Arik Maimon entered into a Letter of Intent governing their relationship. ("LOI").  (Sperber Dec. at Exhibit "L" [Maimon LOI] produced in discovery as RF_000962-000963; Exhibit "G" [B. Gilling Transcript] at 127:19-128:6.)

61.    The LOI – signed April 1, 2021, less than a week before Rock Fintek signed the SPA – clearly and unambiguously defines Adorama's role under the SPA as "Adorama is financing these transactions for Kitchen Winners NY."   (Sperber Dec. at Exhibit "L" [Maimon LOI] produced in discovery as RF_000962-000963, at ¶ 3.)

62.    The SPA mentions Adorama only once, as the party to whom the initial deposit should be paid.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(b).)

63.    While Rock Fintek asserts in the TPC that Rock Fintek was somehow required to make all payments to Adorama (TPC at ¶ 21), the SPA explicitly differentiates between the initial deposit which is payable to Adorama – identified by name – and all subsequent payments made payable to "Seller."  (Sperber Dec. at Exhibit "K" [SPA] at ¶¶ 2(b) and (c).)

64.    Adorama was not involved and had no direct input when Rock Fintek and Kitchen Winners were negotiating the terms of the SPA.  Neither Kato nor Gilling ever met in person,

texted, emailed, or exchanged WhatsApp communications with Mendlowitz or anyone else at Adorama.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 16-19.)

65.     Similarly, Rock Fintek has not produced any text messages, emails, WhatsApp communications, records of Zoom meetings, or records of WhatsApp calls between any Rock Fintek employee or representative, on the one hand, and any Adorama employee including Mendlowitz, on the other hand.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 20-25.)

66.     Rock Fintek was unable to produce any records showing that it even had contact information for Mendlowitz.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 26.)

67.     Gilling could not recall whether Mendlowitz or anyone else at Adorama provided any written materials to Rock Fintek describing the gloves that would be sold.  (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 69:3-13; 72:14-73:4.)

68.     Kato testified that Rock Fintek did not get anything in writing from Adorama describing the gloves besides for the SPA.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 291:6-11.)

69.     At most, Rock Fintek alleges that it may have had oral conversations with Adorama prior to signing the SPA.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] 195:20-22; 291:11; Exhibit "G" [B. Gilling Transcript] at 35:16-19.)

70.     Gilling testified that he was on a single call with someone from Adorama, but could not be sure which specific principal of Adorama was on the call, or the date on which the call took place.  (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 35:16-23; 117:23-118:10.)

71.     He also could not recall what the Adorama principal even said, except vaguely to claim that they discussed "doing a deal to buy gloves." (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 56:12-57:8; 117:5-12.)

72.     Likewise, the only description that Kato could provide of his alleged calls with Mendlowitz, was that Mendlowitz purportedly told him that "[t]hey're going to give [Rock Fintek] the proper gloves."  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] 291:12-17.)

73.     Mendlowitz denies these alleged phone calls ever took place.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 88:21-89:9.)

74.     Kato initially claimed that his calls with Mendlowitz took place on his cell phone. When asked for his cell phone number and told that his cell phone records would be subpoenaed, Kato changed his story to assert that the call would have taken place over either Zoom or WhatsApp.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 293:10-295:12.)

75.     Defendants requested WhatsApp or Zoom records reflecting those purported calls. (Sperber Dec. at Exhibit "W" [Kitchen Winners Third Request for Production of Documents] at ¶ 2.)

76.     Rock Fintek agreed to produce any responsive records that might exist.  (Sperber Dec. at Exhibit "X" [Rock Fintek Responses to Kitchen Winners Third Request for Production of Documents] at ¶ 2.)

77.     Evidently no such records were ever found, as they certainly were not produced. (Sperber Dec. at Exhibit "C" [JSUF] at 20 ¶¶ 22-25.)

**Kitchen Winners' Performance Under the SPA**

78.     Pursuant to the SPA, if Rock Fintek "timely made" all payments due under the SPA, Rock Fintek was entitled to a rebate of $0.50 per box for the first five (5) containers delivered, for a total of $75,000.00, and a reduction of the price for the remaining boxes of Gloves to $11.00 per box.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 8.)

79.     The SPA further provided that a payment was due "upon Buyer's inspection of the products at Seller's warehouse" and that payment would be considered "timely" only "if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at Seller's Los Angeles warehouse."  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(d).)

80.     Rock Fintek forfeited its right to the rebate, as it failed to timely make "all payments due" under the SPA.

81.     The following chart demonstrates that, already by late May 2021, Rock Fintek was far behind on its payments to Kitchen Winners.  Note that the chart is not a complete listing of all shipments picked up by Rock Fintek; the parties' transactions continued thereafter through June 2021.

| Date | Amount Owed | Amount Rock Fintek Paid | Rock Fintek's Balance |
|---|---|---|---|
| April 8, 2021 | First Deposit due of $1,250,000 (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(a).) | $1,250,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 48.) | $0 |
| April 20, 2021 | $622,725 (Sperber Dec. at Exhibit "C" [JSUF] at at ¶ 49.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at at ¶ 45.) | $67,275 |
| April 26, 2021 | Second Deposit of $600,000 due (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(a).) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at at ¶ 45.) | $157,275 |
| April 26, 2021 | $671,600 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 50.) | | -$514,325 |
| April 27, 2021 | $345,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 51.) | $345,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 3, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 52.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 5, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 53.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 10, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 54.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 11, 2021 | $1,020,510 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 55.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$844,835 |
| May 12, 2021 | $1,035,000 (Sperber Dec. at | $690,000 (Sperber Dec. at | -$1,189,835 |

| | Exhibit "C" [JSUF] at ¶ 56.) | Exhibit "C" [JSUF] at ¶ 45.) | |
| --- | --- | --- | --- |
| May 13, 2021 | $666,770 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 57.) | | -$1,856,605 |
| May 19, 2021 | $2,070,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 59.) | $1,380,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$2,546,605 |
| May 20, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 60.) | $345,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$2,891,605 |

82.    Even after Kitchen Winners had delivered the full 1.5 million boxes of gloves agreed upon, Rock Fintek kept coming back to Kitchen Winners for more and more gloves.  And Kitchen Winners delivered.  (Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶¶ 23-24.)

**Rock Fintek Resells the Gloves to Ascension**

83.    As stated above, the Ascension Purchase Order required Rock Fintek to source 200 million nitrile exam gloves for Ascension.   (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 71; Exhibit "I" [Ascension Purchase Order] produced in discovery as RF_001279-001285.)

84.    Under the Ascension Purchase Order, Ascension agreed to pay Rock Fintek 18.5 cents per glove, for a total purchase price of $37,000,000.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 72; Exhibit "I" [Ascension Purchase Order] produced in discovery as RF_001279-001285.)

85.    Ascension testified that it paid Rock Fintek for every single glove that Rock Fintek delivered.  (Sperber Dec. at Exhibit "M" [Ascension's designated witness Michael Elstro ("M. Elstro") Transcript at 36:18-37:5.)

86.     Indeed, Rock Fintek's own bank records show that Ascension paid Rock Fintek **more** than the $37 million in the purchase order, because Rock Fintek delivered more than the 200 million gloves originally agreed upon.  (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

87.     Kato testified that all incoming payments from Ascension to Rock Fintek after the beginning of the transactions at issue in this action, were to pay for the gloves that Rock Fintek was buying from JNS and Kitchen Winners and reselling to Ascension.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15.)

88.     A review of Rock Fintek's bank statements from December 8, 2020 – one day after Rock Fintek accepted the Ascension Purchase Order –  until June 2021, when the parties' relationship ended, shows payments from Ascension totaling $38,842,608.75. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

89.     Rock Fintek has not returned to Ascension any of the money that Ascension paid for the gloves.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 79.)

90.     Nor has Ascension commenced any lawsuit or legal action to recover any portion of the funds that it paid Rock Fintek.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 80.)

**Rock Fintek Owes Substantial Sums to Kitchen Winners**

91.     Ascension testified that Rock Fintek fulfilled the purchase order for 200 million gloves, and did so solely with MedCare and LevMed brand gloves.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 73.)

92.     Ascension testified that Rock Fintek ultimately delivered approximately 196 million Medcare brand gloves (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 35:9-24; 61:18-23.)

93.     Any LevMed brand gloves were in excess of those 196 million Medcare brand gloves. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 61:24-62:20.)

94.     According to Rock Fintek, it only purchased Medcare gloves from JNS/Stern and Adorama/Kitchen Winners. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 77.)

95.     Rock Fintek maintains that it only purchased LevMed brand gloves from Adorama/Kitchen Winners. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 78.)

96.     The math, therefore, is straightforward.  Rock Fintek purchased 26,193,100 Medcare brand gloves from JNS.  The remaining 169,806,900 Medcare gloves (196 million minus 26,193,100) must have come from Kitchen Winners.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 73, 77-78; Exhibit "M" [M. Elstro Transcript] at 35:9-24, 61:18-62:20.)

97.     Further, Rock Fintek claims that it bought 90,000 boxes of LevMed brand gloves from Kitchen Winners and resold them to Ascension. (Sperber Dec. at Exhibit "B" [TPC] at ¶ 95.)

98.     Rock Fintek agreed to pay Kitchen Winners $14/box for the 90,000 boxes of gloves that it purchased in the Kitchen Winners One Off Transactions.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 39.)  Thereafter, it agreed to pay $11.50/box.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 1.)  The math therefore works out as follows:

| Transaction | Number of Boxes | Price Per Box | Total Owed |
|---|---|---|---|
| Kitchen Winners One Off Transactions | 90,000 boxes | $14/box | $1,260,000 |

| Remaining Medcare Gloves | 1,608,069 boxes[1] | $11.50/box | $18,492,793.50 |
| LevMed Gloves | 90,000 boxes | $11.50/box | $1,035,000 |

Adding these numbers together, Rock Fintek owed Kitchen Winners a total of $20,787,794 for the gloves that it purchased.

99.     Pursuant to the SPA, "Buyer shall arrange for and pay the cost of ground transportation after customs clearance." (Sperber Dec. at Exhibit "K" [SPA] at ¶ 5.)

100.    Rock Fintek consistently refused to pay for the trucking costs, oddly claiming that the trucking invoices were not real trucking invoices. (Sperber Dec. at Exhibit "P" [J. Weiner 11/16 Transcript] at 65:19-68:6.)

101.    Additionally, Rock Fintek owed $827,806.42 for trucking and related expenses. (Sperber Dec. at Exhibit "Q" [MD 3PL Trucking and Storage Invoices]; Exhibit "R" [ACL America, Inc. Trucking Invoices]; Exhibit "S" [delexpress Trucking Invoices]; Exhibit "T" [wenzy inc Trucking Invoices].)

102.    The SPA required Rock Fintek to make payments for each box of gloves "upon [Rock Fintek's] inspection of the products at [Kitchen Winners'] warehouse in Los Angeles, California prior to [Rock Fintek's] collection of the delivered Products.  Payments are considered timely if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at [Kitchen Winners'] Los Angeles warehouse.  (Sperber Dec. at Exhibit "K" [SPA]¶ 2(d).)

---

[1] Calculated at 169,806,900 Medcare gloves minus the 90,000 Medcare gloves sold in the Kitchen Winners One Off Transactions.

103.     In other words, Rock Fintek was required to pay Kitchen Winners within 48 hours

(excluding Saturday and Sunday) from when the gloves were available for Rock Fintek to pick

them up.

104.     Additionally, pursuant to the SPA, "Buyer shall arrange for and pay the cost of

ground transportation after customs clearance."  (SPA at ¶ 5.)

105.     However, following the first few payments, which Rock Fintek timely made, Rock

Fintek did not have a sufficient cash flow to pay Kitchen Winners for the gloves within 48 hours

of their availability at Kitchen Winners' warehouses. ((Sperber Dec. at Exhibit "Z" [Declaration

of J. Weiner dated February 16, 2024] at ¶ 12.)

106.     Rock Fintek explained that it lost a lot of money in Thailand and therefore could

not make timely payments.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February

16, 2024] at ¶ 13.)

107.     In order to gain time, during which Rock Fintek claimed that it would obtain the

necessary funds, Rock Fintek requested that Kitchen Winners hire trucking companies and truck

the gloves to the states in which Rock Fintek's customers were located.  ((Sperber Dec. at Exhibit

"Z" [Declaration of J. Weiner dated February 16, 2024] at  ¶ 15.)

108.     Specifically, Rock Fintek requested that Kitchen Winners truck the gloves to

Illinois and Texas.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16,

2024] at ¶ 16.)

109.     Although Rock Fintek was contractually required to pay for the trucking, which it

failed to do, Kitchen Winners agreed to front the money to pay for the trucking. ((Sperber Dec. at

Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 17.)

110.     Rock Fintek agreed to repay Kitchen Winners all of its costs for the trucking. ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 18.)

111.     Even after the gloves reached Illinois and Texas, Rock Fintek still did not have the funds to pay for the gloves.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 19.)

112.      Kitchen Winners was forced to hire third-party storage space to store the gloves until Rock Fintek was able to obtain the necessary funds to pay Kitchen Winners for the gloves. ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 20.)

113.     Kitchen Winners was forced to take on the unanticipated expenses of paying for third-party storage and the gloves would remain in that storage for a week, two, three or even as long as a month.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 21.)

114.     Rock Fintek consistently refused to pay for the trucking costs, oddly claiming that the trucking invoices were not real trucking invoices.  (Sperber Dec. at Exhibit "F" [J Weiner 11/15 Transcript] at  65:19-68:6)

115.     In total, Rock Fintek owed Kitchen Winners $21,615,600.42 for the gloves that it purchased and the trucking and related expenses.

116.     Rock Fintek only paid Kitchen Winners and/or Adorama a total of $20,648,435 (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 45-46.)

117.     Rock Fintek still owes Kitchen Winners $967,165.42.

118.     Ascension's bank records show that it paid Rock Fintek  $38,842,608.75, which was more than sufficient to pay Kitchen Winners the monies that Rock Fintek still owed. Rock

Fintek refused to pay these outstanding bills. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

**Rock Fintek's Specious Claims of a Future Business Relationship with Ascension**

119.    Rock Fintek has not retained an expert economist to project its future lost profits.

120.    The only expert that it has identified to testify as to its lost business calculations, is Kato.  (Sperber Dec. at Exhibit "V" [Rock Fintek's Expert Disclosures].)

121.    At his deposition, Kato could not explain how he calculated Rock Fintek's relationship with Ascension as worth $36,000,000 per year in profits. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 11:19-12:6; 15:8-21.)

122.    In the time period before the transaction at issue in this lawsuit – namely, between March 2020 and November 2020 – Rock Fintek's total revenue from its relationship with Ascension was approximately $24 million. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo]; (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 13:10-16.)

123.    Kato could not say what Rock Fintek's profits were from the transactions between March 2020 and November 2020. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 11:10-12:8.)

124.    In the time period between December 2020 and June 2021 – namely, the time period during which the transactions at issue in this lawsuit were taking place – Rock Fintek's total revenue from Ascension was $38,842,608.75. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

125.    Kato testified that all of the payments between December 2020 and June 2021 were in connection with the Ascension Purchase Order, and that Rock Fintek actually lost money on

that transaction. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15; Exhibit "C" [JSUF] at ¶¶ 82-83).

126.    Accordingly, Rock Fintek's profits between December 2020 and June 2021 were negative. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15; Exhibit "C" [JSUF] at ¶¶ 82-83).

127.    There is no way to know what Rock Fintek's future revenues (let alone profits) from its relationship with Ascension; Ascension explained that it would divide its potential future relationship with Rock Fintek into the long-term and the short-term. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 37:6-13.)

128.    Ascension defined the 'short term' as "when Covid was more prevalent throughout the United States, so that in 2020, 2021, 2022 time frame" and "starts to tail off during 2022" (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 59:16-60:6).

129.    Ascension testified that in the 'short term,' "it's highly likely that [they] would have continued to engage with Rock Fintek in additional business opportunities. There were other needs that came up. . . . there was a run where people were having issues getting bent metal, things like wheelchairs and walkers crutches and canes . . . an opportunity like that is something like Rock Fintek would have missed out upon."  (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 37:14-38:8.)

130.    It is unclear what specific products Rock Fintek would have *actually* been able to supply Ascension in the 'short term,' and what Rock Fintek's profit margin would have been on those products.

131.    Kato testified that, in the 'short term,' Rock Fintek would have supplied gloves, masks, gowns, and testing kits. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 24:8-17.)

132.    However, there is no way of knowing which of those products Ascension would have actually purchased from Rock Fintel, in what quantity, and at what price.

133.    For example, Ascension testified that as of June 2021, it was not thinking of purchasing any additional gloves. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 55:18-56:5.)

134.    Also, the testing kits referenced by Kato were never manufactured or approved by the FDA. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 29:19-30:8; 60:13-25.)

135.    There is no way of knowing what Rock Fintek's costs would have been in procuring gloves, masks, gowns, and testing kits products for Ascension.

136.    Accordingly, there is no way to project Rock Fintek's future lost profits during the "short term" time period.

137.    As to the long term, Ascension testified that its COO and vice president for supply chain had conversations with Rock Fintek as follows:

> [Rock Fintek would] need to clear some *major hurdles* to do that, we would have discussions with them, just like we would other Suppliers.  But to get into that medical space, supply space, Todd and Dwayne let Rock Fintek know, one, you've got to go through all the FDA approvals, right.  And that is *no small hurdle*. And two, you're also dealing with -- when you talk about gloves and PPE and masks, you're talking about some *ginormous companies* and organizations that they would have to get *very competitive* on price. So there were a couple of *big hurdles* there, but if they were willing to clear those, then we would certainly talk to them.  But they would have to look at winning the business.  It wasn't just going to be given to them.  . . .  We never talked to them about a specific, like, long-

> term contract or bidding on a long-term nitrile glove business for the
> organization

(Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 40:1-41:9)  (emphasis supplied).

138.    Ascension testified that Rock Fintek was certainly not guaranteed any future long

term business. (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 40:1-41:9.)

139.    In order for Rock Fintek to have any hopes for a long-term business relationship

with Ascension, it would need to (1) get FDA approvals for the products it was selling; and (2) be

"very competitive on price" with "ginormous companies" – cumulatively described by Ascension

as "major hurdles," "no small hurdle," and "big hurdles." (Sperber Dec. at Exhibit "M"  [M. Elstro

Transcript] at 40:1-41:9.)

140.    There is no way to square Rock Fintek's claim for $36 million per year in future

lost profit with Ascension's testimony that Rock Fintek's actual prospect for long-term business

with the company was highly tenuous. (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at

40:1-41:9.)

141.    There is no way to square Rock Fintek's claim for massive future profits – wholly

out of line with its own unprofitable past business with Ascension – with the fact that any potential

profit margins surely would have shrunk as it was forced to become "very competitive on price"

with "ginormous" competitors. (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 40:1-41:9.)

142.    There is no way to project Rock Fintek's post-Covid-19 profit on PPE sales based

upon revenue and pricing that Rock Fintek utilized during the Covid-19 pandemic.

143.    There is no way to know whether Rock Fintek would have been able to obtain the

FDA approvals that Ascension was demanding. (Sperber Dec. at Exhibit "M"  [M. Elstro

Transcript] at 40:1-41:9.)

144.   Rock Fintek's claim to have lost $36 million per year in lost profits, for the next three years, is utterly baseless.

145.   Mr. Kato and Mr. Gilling both testified that they had no relevant experience selling PPE prior to COVID.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 85; Exhibit "G" [B. Gilling Transcript] at 171:4-7;  Exhibit "D" [T. Kato Non-Expert Transcript] 24:18-21.)

Dated: Kew Gardens, New York
      February 16, 2024

                                  **LIPSIUS-BENHAIM LAW, LLP**
                                  *Attorneys for Kitchen Winners NY Inc.,*
                                  *Adorama Inc., and Joseph Mendlowitz*

By: _____
                                  Alexander J. Sperber, Esq.
                                  Yisroel Steinberg, Esq.
                                  80-02 Kew Gardens Road, Suite 1030
                                  Kew Gardens, NY 11415
                                  Tel: (212) 981-8440
                                  asperber@lipsiuslaw.com
                                  ysteinberg@lipsiuslaw.com