**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KITCHEN WINNERS NY INC.,<br>                              *Plaintiff*,<br><br>             vs.<br><br>ROCK FINTEK LLC,<br>                    *Defendant*.<br>────────────────────────────<br>ROCK FINTEK LLC,<br>                    *Counterclaim and Third-Party*<br>                    *Plaintiff*,<br><br>             vs.<br><br>KITCHEN WINNERS NY INC,<br>                    *Counterclaim Defendant*,<br><br>          and<br><br>ADORAMA INC., HERSHEY WEINER, JOSEPH<br>MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and<br>JOEL STERN,<br>                    *Third-Party Defendants*. | Civil Action No.<br>22-cv-05276-PAE |

---

**MEMORANDUM OF LAW IN SUPPORT OF KITCHEN WINNERS NY INC.'S
MOTION FOR SUMMARY JUDGMENT**

---

LIPSIUS BENHAIM LAW LLP
*Attorneys for Plaintiff and Counterclaim*
*Defendant Kitchen Winners NY Inc.*

Alexander J. Sperber
Yisroel Steinberg
Meir Z. Goldberg.
80-02 Kew Gardens Road
Suite 1030
Kew Gardens, New York 11415
Telephone: (212) 981-8440

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY ................................................................................. 2

STATEMENT OF FACTS ................................................................................. 2

   1.   The Parties ................................................................................. 2

   2.   Rock Fintek Purchases Gloves from JNS ......................................... ….. 4

   3.   Rock Fintek Purchases Gloves from Kitchen Winners ...................................... 6

   4.   Kitchen Winners' Performance Under the SPA ................................................. 7

   5.   Rock Fintek Resells the Gloves to Ascension ................................................. 8

   6.   Rock Fintek Owes Substantial Sums to Kitchen Winners ................................. 9

   7.   Rock Fintek's Specious Claims of a Future Business Relationship with Ascension....12

ARGUMENT ................................................................................. 15

  I.   STANDARD OF REVIEW ................................................................................. 15

  II.   KITCHEN WINNERS IS ENTITLED TO SUMMARY JUDGMENT AWARDING IT ALL THE OUTSTANDING AMOUNTS THAT IT IS INDISPUTABLY OWED BY ROCK FINTEK ................................................................................. 16

  III.   KITCHEN WINNERS IS ENTITLED TO SUMMARY JUDGMENT DISMISSING ROCK FINTEK'S CLAIM FOR UNJUST ENRICHMENT............................... 17

  IV.   ROCK FINTEK'S COUNTERCLAIMS AGAINST KITCHEN WINNERS FAIL FOR LACK OF DAMAGES ................................................................................. 18

     1.  Lost Future Profits from Ascension ...................................................….. 18

     2.  Potential Liability to Ascension....................................................... 24

     3.  Rebate.................................................................................. 24

     4.  Gloves Sold in Excess of SPA ................................................................. 25

CONCLUSION ................................................................................. 26

## TABLE OF AUTHORITIES

*Abraham v. Leigh,*
    471 F. Supp. 3d 540 (S.D.N.Y. 2020) .......................………………..   21

*Allard v. Arthur Andersen & Co.,*
    924 F. Supp. 488 (S.D.N.Y. 1996) .......................................................   21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ....................................................................   21

*Canfield v. Reynolds,*
    631 F.2d 169 (2d Cir. 1980) .................................................................   17

*EPN Ingenieria S.A. de C.V. v. GE,*
    92 Civ. 1563 (KMW), 1996 U.S. Dist. LEXIS 13687 (S.D.N.Y. Sep. 17, 1996)…  23

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.,*
    375 F.3d 168 (2d Cir. 2004) ............ ............ ............ ............ ............ ............ 18

*Hadami, S.A. v. Xerox Corp.,*
    272 F. Supp. 3d (S.D.N.Y. 2017) ............................ ............ ............ ............   18

*Frank Felix Associates, Ltd. v. Austin Drugs, Inc.,*
    111 F.3d 284 (2d Cir. 1997) ............ ............ ............ ............ ............ ............   17

*Great Earth intern, Franchising Corp. v. Milks Dev.,*
    311 F.Supp.2d 419 (S.D.N.Y. 2004) .. ...............................................   23

*Healing Power, Inc. v. Ace Cont'l Exps., Ltd.,*
    No. 07-cv-4175, 2008 U.S. Dist. LEXIS 83021 (E.D.N.Y. Oct. 17, 2008)...........   24

*Housey v. P&G,* 21 Civ. 2286 (NRB),
    2022 U.S. Dist. LEXIS 53603 (S.D.N.Y. March 24, 2022) ..............................   18

*Kenford Co. v. County of Erie,*
    67 N.Y.2d 257 (1986) ...................................       19

*Kenford Co. v. County of Erie,*
    73 N.Y.2d 312 (1989) ...................................       23

*Lovely Peoples Fashion v. Magna Fabrics,*
    95 Civ. 8450 (AGS)(THK), 1998 U.S. Dist. LEXIS 11197
    (S.D.N.Y. July 22, 1998) .......................................................................   20

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.,*
    992 F.2d 430 (2d Cir. 1993) .................................................................   21

*Pauwels v. Deloitte LLP*,
    83 F.4th 171 (2d Cir. 2023) ................................................................... 16

*Phoenix Warehouse of Cal., LLC v. Townley, Inc.*,
    08 Civ. 2856 (NRB), 2011 U.S. Dist. LEXIS 37206
    (S.D.N.Y. March 29, 2011)...................................................................... 23

*RDI Corp. v. Charter Communs., Inc.*,
    1:19-cv-10929, 2022 U.S. Dist. LEXIS 38123 (S.D.N.Y. Jan. 31, 2022) ............. 24

*Robert Cohn Associates, Inc. v. Kosich*,
    63 A.D.3d 1388 (3rd Dep't 2009) ........................................................... 17

*Septembertide Pub., B.V. v. Stein and Day, Inc.*,
    884 F.2d 675 (2d Cir. 1989) ................................................................... 17

*Trademark Research Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 ........................................................................................ 21

*Trez Capital (Fla.) Corp. v. Noroton Heights & Co., LLC*,
    2022 U.S. Dist. LEXIS 178040 (S.D.N.Y. 2022) .................................... 23

*Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*,
    736 Fed. Appx. 274 (2d Cir. 2018) ........................................................ 16

## PRELIMINARY STATEMENT

Plaintiff and counterclaim-defendant Kitchen Winners NY Inc. ("Kitchen Winners") respectfully submits this Memorandum of Law in support of its motion for summary judgment against defendant and counterclaim-plaintiff Rock Fintek LLC ("Rock Fintek").

Kitchen Winners relies on many of the same arguments as Third-Party Defendants Adorama Inc., Joseph Mendlowitz, JNS Capital Holdings LLC, and Joel Stern, and adopts their arguments in full herein by reference.

In the midst of the COVID-19 pandemic, the high demand for personal protective equipment ("PPE") led many companies to rush into the market. Rock Fintek – a company with no previous experience buying personal protective equipment – was one such entrant. Rock Fintek had somehow won a $37 million purchase order from Ascension Health Alliance ("Ascension") to supply it with 200 million medical gloves. Yet Rock Fintek had no supplier able to actually meet that demand. The massive purchase order was evidently too big to pass up, however, so Rock Fintek took the purchase order (and the accompanying $9.25 million downpayment) and went scrambling for a way to meet it.

After first losing $6.2 million to scammers in Thailand, Rock Fintek was so desperate to locate gloves that it began buying them from JNS Capital Holdings LLC ("JNS") at a loss. When it found out that JNS's supplier was Kitchen Winners, Rock Fintek jumped at the opportunity to bypass JNS and purchase from Kitchen Winners directly. Kitchen Winners agreed to sell gloves to Rock Fintek for a slightly better price, but Rock Fintek was still buying at a loss.

Evidently happy with the gloves but hoping for yet a better price and a way to meet the massive purchase order from Ascension, Rock Fintek entered into a contract with Kitchen Winners to buy 150,000,000 gloves. Kitchen Winners delivered. Yet those 150,000,000 gloves were still

not enough to fulfill the purchase order, so Rock Fintek kept coming back to Kitchen Winners for more and more gloves.  And Kitchen Winners delivered again and again.

Rock Fintek, however, did not meet its own side of the bargain.  Under the parties' contract, Rock Fintek had agreed to pay for the gloves, as well as to arrange for and pay the cost of any post-customs shipping.  It did not do so.  Rock Fintek owes hundreds of thousands of dollars for the gloves that it purchased, and for the shipping and related expenses that Kitchen Winners paid for on its behalf.  As a result, Kitchen Winners commenced this lawsuit to recover.

Rock Fintek has still refused to pay, claiming that the gloves Kitchen Winners supplied were somehow deficient.  Yet Rock Fintek sold each and every one of those gloves to Ascension, and got paid **more** than the originally agreed upon $37 million.  While Rock Fintek claims that Ascension was dissatisfied with the gloves, Rock Fintek has never returned a penny of that money to Ascension, nor has Ascension commenced any legal action against Rock Fintek.

Further, while Rock Fintek claims that it has suffered substantial lost future profits from its lost business relationship with Ascension, that claim is utterly baseless, supported only by the rank speculation and fantastical imaginings of Rock Fintek's owner.

Accordingly, Kitchen Winners respectfully requests that the Court grant it summary judgment in the amount of $967,165.42, plus prejudgment interest thereon, and further grant it summary judgment dismissing each and every one of Rock Fintek's counterclaims.

## PROCEDURAL HISTORY

Kitchen Winners incorporates by reference the section titled "Procedural History" in the memorandum of law submitted by the Adorama Parties.

## STATEMENT OF FACTS

8.   **The Parties**

2

Plaintiff and Counterclaim Defendant Kitchen Winners NY Inc. ("Kitchen Winners") is a New York corporation. (Statement of Undisputed Material Facts ("SUMF") at ¶ 11.) The president and sole shareholder of Kitchen Winners is Yitty Weiner. (SUMF at ¶ 12.) Kitchen Winners was originally formed for the purpose of selling kitchen accessories online. (SUMF at ¶ 13.) At the onset of the Covid-19 pandemic, Kitchen Winners expanded its business to focus on the sale of PPE. (SUMF at ¶ 14.) Joseph Weiner, also known as Hershey Weiner, is the husband of Yitty Weiner and runs the day-to-day operations of Kitchen Winners. (SUMF at ¶ 15.)

Third-Party Plaintiff Rock Fintek LLC ("Rock Fintek") is a Limited Liability Company (SUMF at ¶ 3) formed for the purpose of buying and selling goods from China to the United States. (SUMF at ¶ 4.) Thomas Kato ("Kato") is the sole member of Rock Fintek. (SUMFat ¶ 5.) Bradley Gilling ("Gilling") was the Chief Operating Officer at Rock Fintek at all relevant times. (SUMF at ¶ 6.)

Third-Party Defendant Adorama Inc. ("Adorama") is an e-commerce company, with its specialty as a retailer in the photography and video space. (SUMF at ¶ 8.) The sole owner of Adorama is Eugene Mendlowitz. (SUMF at ¶ 9.) Third-Party Defendant Joseph Mendlowitz ("Mendlowitz"; together with Adorama, the "Adorama Parties") is a director of multiple departments at Adorama. (SUFF at ¶ 10.)

Rock Fintek has alleged that Kitchen Winners is an alter ego of Adorama. (SUMF at ¶ 16.) That assertion is categorically untrue. Neither Adorama nor Mendlowitz own any shares in Kitchen Winners. (SUMF at ¶ 17.) The companies do not share owners, officers, employees, offices, or bank accounts. (SUMF at ¶ 18.) They are separate entities involved in an arms-length business relationship. (SUMF at ¶ 19.) Indeed, when asked, both Kato and Gilling admitted that they had no information to prove the unsubstantiated allegations regarding Kitchen Winners being

3

an alter ego of Adorama.  (SUMF at ¶ 20.)

While Kitchen Winners had started out as an online kitchen accessories business, during the COVID-19 pandemic, Kitchen Winners was also engaged in the business of importing and selling PPE, including medical gloves and KN95 masks.  (SUMF at ¶¶ 13-14.)

9.   **Rock Fintek Purchases Gloves from JNS**

Rock Fintek also shifted its focus to the PPE market after the onset of COVID.  (SUMF at ¶ 31.)  Kato believed that he had strong relationships in China that he could use to acquire PPE, and quickly began looking for a way to capitalize on the high demand. (SUMF at ¶ 31.)

Rock Fintek claims that it had a number of PPE customers during the pandemic.  One of those customers was The Resource Group, which is the purchasing entity for a large hospital chain called Ascension Health Alliance (the Resource Group and Ascension Health Alliance are collectively referred to herein as "Ascension").  (SUMF at ¶ 32.)

On December 7, 2020, Ascension gave Rock Fintek a purchase order for 200 million medical gloves (the "Ascension Purchase Order").  (SUMF at ¶ 32.)  Rock Fintek accepted the purchase offer and the initial downpayment of $9,250,000, but did not yet have a contract with even a single vendor able to supply the gloves it had agreed to procure.  (SUMF at ¶ 33.)

Rock Fintek initially attempted to fulfill the Ascension Purchase Order with gloves from a vendor in Thailand, to whom Rock Fintek wired $6,200,000 and who ultimately never provided any gloves.  (SUMF at ¶ 34.)

After the Thailand mishap, Rock Fintek was scrambling to meet its obligations.  In December 2020 or January 2021, Rock Fintek was introduced to JNS Capital Holdings LLC ("JNS"), which was able to supply it with medical gloves.  (SUMF at ¶ 35.)  Rock Fintek first purchased gloves from JNS in February 2021.  At that point in time, Rock Fintek was so desperate

to locate gloves for Ascension that it purchased those gloves at a loss, paying $15 per box.  (SUMF at ¶ 36.)  Rock Fintek purchased additional gloves from JNS in April and May 2021 at the slightly lower price of $11.50 per box.  (SUMF at ¶ 37.)  All the gloves that Rock Fintek bought from JNS were Medcare brand gloves.  (SUMF at ¶ 38.)

Since not all of the transactions between JNS and Rock Fintek were documented in purchase orders and invoices, the best method of calculating the total gloves sold is to work backwards from Rock Fintek's payments to JNS.  According to JNS's own bank records, it received the following payments from either Rock Fintek, Gilling (Rock Fintek's COO), or a company named "Rock 13" that appears to be a Rock Fintek affiliate:

| Date | Amount of Payment | Price Per Box | Number of Boxes |
|---|---|---|---|
| February 10, 2021 | $450,000 | $15/box | 30,000 |
| February 17, 2021 | $200,000 | $15/box | 13,333 |
| February 19, 2021 | $250,000 | $15/box | 16,667 |
| February 23, 2021 | $200,000 | $15/box | 13,333 |
| February 25, 2021 | $250,000 | $15/box | 16,667 |
| April 27, 2021 | $25,000 | $11.50/box | 2,174 |
| April 30, 2021 | $272,550 | $11.50/box | 23,700 |
| May 7, 2021 | $700,000 | $11.50/box | 60,870 |
| May 11, 2021 | $119,475 | $11.50/box | 10,389 |
| May 12, 2021 | $322,550 | $11.50/box | 28,048 |
| May 24, 2021 | $200,000 | $11.50/box | 17,391 |
| May 25, 2021 | $137,640 | $11.50/box | 11,969 |
| May 27, 2021 | $200,000 | $11.50/box | 17,391 |

(SUMF at ¶ 39.)[1]  Thus, in total, Rock Fintek purchased approximately 261,931 boxes of gloves from JNS.   At 100 gloves per box, this was a total of 26,193,100 gloves.  (SUMF at ¶ 40.)

At some point, however, Kato saw the name Kitchen Winners on a purchase order that he received in connection with the JNS' transactions.  Hoping to source gloves at a lower price, so that Rock Fintek could cut its losses on the Ascension Purchase Order (or maybe even make a small profit), he attempted to contact Kitchen Winners. (SUMF at ¶ 41.)

10.  **Rock Fintek Purchases Gloves from Kitchen Winners**

Initially, Rock Fintek was willing to do business with Kitchen Winners on a truck-by-truck basis.  (SUMF at ¶ 43.)   Accordingly, in March 2021, Kitchen Winners sold Rock Fintek approximately 90,000 boxes of nitrile gloves in one-off transactions ("Kitchen Winners' One-Off Transactions").  (SUMF at ¶ 44.)  Rock Fintek paid $14 per box for the Gloves during the Kitchen Winners' One-Off Transactions. (SUMF at ¶45.)  At that price, Rock Fintek was still purchasing the gloves at a loss – though less of a loss than in its earlier transactions with JNS.  (SUMF at ¶ 46.)  Rock Fintek has admitted that Adorama was not a party to the Kitchen Winners' One-Off Transactions.  (SUMF at ¶ 47.)

Clearly very happy with the quality of the gloves that it had purchased from Kitchen Winners, and given the huge number of gloves that it still needed to acquire under the Ascension Purchase Order, Rock Fintek asked Kitchen Winners to supply it with an additional 150,000,000 gloves.  Kitchen Winners and Rock Fintek, through their respective principals and attorneys, therefore negotiated the terms and conditions of a sales and purchase agreement to document that large purchase order.  (SUMF at ¶ 49.)

On or about April 7, 2021, Rock Fintek and Kitchen Winners entered into a Sales and

---

[1] The number of boxes is calculated by dividing the payment amount by the price per box.

Purchase Agreement (the "SPA"), pursuant to which Kitchen Winners agreed to sell Rock Fintek 1,500,000 boxes of nitrile medical gloves (each box containing 100 gloves) at a price of $11.50/box.  (SUMF at ¶ 50.)

11.   **Kitchen Winners' Performance Under the SPA**

Pursuant to the SPA, if Rock Fintek "timely made" all payments due under the SPA, Rock Fintek was entitled to a rebate of $0.50 per box for the first five (5) containers delivered, and a reduction of the price for the remaining boxes of Gloves to $11.00 per box.  (SUMF at ¶ 78.)

The SPA further provided that a payment was due "upon Buyer's inspection of the products at Seller's warehouse" and that payment would be considered "timely" only "if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at Seller's Los Angeles warehouse."  (SUMF at ¶ 79.)

Rock Fintek forfeited its right to the rebate, as it failed to timely make "all payments due." (SUMF at ¶ 80.)  The following chart demonstrates that, already by late May 2021, Rock Fintek was far behind on its payments.  Note that the chart is not a complete listing of all shipments picked up by Rock Fintek; the parties' transactions continued thereafter through June 2021.

| Date | Amount Owed | Amount Rock Fintek Paid | Rock Fintek's Balance |
|---|---|---|---|
| April 8, 2021 | First Deposit due of $1,250,000 | $1,250,000 | $0 |
| April 20, 2021 | $622,725 invoiced | $690,000 | $67,275 |
| April 26, 2021 | Second Deposit of $600,000 due | $690,000 | $157,275 |
| April 26, 2021 | $671,600 invoiced | | -$514,325 |
| April 27, 2021 | $345,000 invoiced | $345,000 | -$514,325 |
| May 3, 2021 | $690,000 invoiced | $690,000 | -$514,325 |
| May 5, 2021 | $690,000 invoiced | $690,000 | -$514,325 |
| May 10, 2021 | $690,000 invoiced | $690,000 | -$514,325 |
| May 11, 2021 | $1,020,510 invoiced | $690,000 | -$844,835 |
| May 12, 2021 | $1,035,000 invoiced | $690,000 | -$1,189,835 |
| May 13, 2021 | $666,770 invoiced | | -$1,856,605 |
| May 19, 2021 | $2,070,000 invoiced | $1,380,000 | -$2,546,605 |
| May 20, 2021 | $690,000 invoiced | $345,000 | -$2,891,605 |

(SUMF at ¶ 81.)

While Kitchen Winners only contracted to sell Rock Fintek 1.5 million boxes of gloves under the SPA, Rock Fintek needed far more gloves to fulfill the Ascension Purchase Order. Accordingly, even after Kitchen Winners had delivered the full 1.5 million boxes of gloves agreed upon, Rock Fintek kept coming back to Kitchen Winners for more and more gloves. And Kitchen Winners delivered. (SUMF at ¶ 82.) While the parties' own records of the total number of gloves sold are in dispute, as explained below it is incontrovertible that Kitchen Winners delivered a total of at least 1,698,069 boxes of Medcare brand gloves and 90,000 boxes of LevMed brand gloves.

12.    **Rock Fintek Resells the Gloves to Ascension**

Rock Fintek alleges that the gloves sold by Kitchen Winners did not comply with specifications in the SPA and that its customer, Ascension, was extremely dissatisfied. Whether or not that assertion is true, it is indisputable that Rock Fintek was able to resell each and every glove from Kitchen Winners at the price it had contracted in the Ascension Purchase Order.

As stated above, the Ascension Purchase Order required Rock Fintek to source 200 million nitrile exam gloves. (SUMF at ¶ 83.) Under the Ascension Purchase Order, Ascension agreed to pay Rock Fintek 18.5 cents per glove, for a total purchase price of $37,000,000. (SUMF at ¶ 84.) Ascension testified that it paid Rock Fintek for every single glove that Rock Fintek delivered. (SUMF at ¶ 85.) Indeed, Rock Fintek's own bank records show that Ascension paid Rock Fintek **more** than the $37 million in the purchase order, because Rock Fintek delivered more than the 200 million gloves originally agreed upon. (SUMF at ¶ 86.)

Kato testified that all incoming payments from Ascension to Rock Fintek after the beginning of the transactions at issue in this action, were to pay for the gloves that Rock Fintek was buying from JNS and Kitchen Winners and reselling to Ascension. (SUMF at ¶ 87.) A review of Rock Fintek's bank statements from December 8, 2020 – one day after Rock Fintek accepted the Ascension Purchase Order – until June 2021, when the parties' relationship ended, shows payments from Ascension totaling $38,842,608.75. (SUMF at ¶ 88.)

Rock Fintek has not returned to Ascension any of the money that Ascension paid for the gloves. (SUMF at ¶ 89.) Nor has Ascension commenced any lawsuit or legal action to recover any portion of the funds that it paid Rock Fintek. (SUMF at ¶ 90.)

13. **Rock Fintek Owes Substantial Sums to Kitchen Winners**

Ascension testified that Rock Fintek fulfilled the purchase order for 200 million gloves, and did so solely with MedCare and LevMed brand gloves. (SUMF at ¶ 91.) Ascension testified

that Rock Fintek ultimately delivered approximately 196 million Medcare brand gloves. (SUMF at ¶ 92.)  Any LevMed brand gloves were in excess of those Medcare gloves.  (SUMF at ¶ 93.)

According to Rock Fintek, it only purchased Medcare gloves from JNS/Stern and Adorama/Kitchen Winners.  (SUMF at ¶ 94.)  Further, Rock Fintek maintains that it only purchased LevMed brand gloves from Adorama/Kitchen Winners.  (SUMF at ¶ 95.)

The math, therefore, is straightforward.  Rock Fintek purchased 26,193,100 Medcare gloves from JNS.  The remaining 169,806,900 Medcare gloves (196 million minus 26,193,100) must have come from Kitchen Winners.  (SUMF at ¶ 96.)  Further, Rock Fintek claims that it bought 90,000 boxes of LevMed gloves from Kitchen Winners and resold them to Ascension. (SUMF at ¶ 97.)

Rock Fintek agreed to pay Kitchen Winners $14/box for the 90,000 boxes of gloves that it purchased in the Kitchen Winners One Off Transactions. (SUMF at ¶ 98.) Thereafter, it agreed to pay $11.50/box.  (SUMF at ¶ 98.)  The math therefore works out as follows:

| Transaction | Number of Boxes | Price Per Box | Total Owed |
|---|---|---|---|
| Kitchen Winners One Off Transactions | 90,000 boxes | $14/box | $1,260,000 |
| Remaining Medcare Gloves | 1,608,069 boxes[2] | $11.50/box | $18,492,793.50 |
| LevMed Gloves | 90,000 boxes | $11.50/box | $1,035,000 |

Adding these numbers together, Rock Fintek owed Kitchen Winners a total of $20,787,794 for the gloves that it purchased.  (SUMF at ¶ 98.)

Rock Fintek also owes Kitchen Winners significant amounts of money for the trucking and

---

[2] Calculated at 169,806,900 Medcare gloves minus the 90,000 Medcare gloves sold in the Kitchen Winners One Off Transactions.

storage of the gloves.  ((SUMF at ¶ 101.)  The SPA required Rock Fintek to make payments for the gloves "upon [Rock Fintek's] inspection of the products at [Kitchen Winners'] warehouse in Los Angeles, California prior to [Rock Fintek's] collection of the delivered Products.  Payments are considered timely if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at [Kitchen Winners'] Los Angeles warehouse.  (SUMF at ¶ 102.)  In other words, Rock Fintek was required to pay Kitchen Winners within 48 hours from when the gloves were available to pick up.  (SUMF at ¶ 103.)  Additionally, pursuant to the SPA, Rock Fintek agreed to "arrange for and pay the cost of ground transportation after customs clearance."  (SUMF at ¶ 104.)

However, following the first few payments, which Rock Fintek timely made, Rock Fintek did not have a sufficient cash flow to pay Kitchen Winners for the gloves within 48 hours of their availability. (SUMF at ¶ 105.) Rock Fintek explained that it lost a lot of money in Thailand and therefore could not make timely payments.  (SUMF at ¶ 106.)

In order to gain time, during which Rock Fintek claimed that it would obtain the necessary funds, Rock Fintek requested that Kitchen Winners hire trucking companies and truck the gloves to the states in which Rock Fintek's customers were located. (SUMF at ¶ 107.) Specifically, Rock Fintek requested that Kitchen Winners truck the gloves to Illinois and Texas.  (SUMF at ¶ 108.) Although Rock Fintek was contractually required to pay for the trucking, which it failed to do, Kitchen Winners agreed to front the money to pay for the trucking and Rock Fintek agreed to repay it.  (SUMF at ¶ 109.)  Even after the gloves reached Illinois and Texas, however, Rock Fintek still did not have the funds to pay for the gloves.  (SUMF at ¶ 111.)

Kitchen Winners was forced to hire third-party storage space in Illinois and Texas to store the gloves until Rock Fintek was able to obtain the necessary funds to pay Kitchen Winners for

the gloves.  (SUMF at ¶ 112.) Kitchen Winners was forced to take on the unanticipated expenses of paying for third-party storage, and the gloves would remain in that storage for a week, two, three or even as long as a month.  (SUMF at ¶ 113.)

Rock Fintek consistently refused to pay for the trucking costs, oddly claiming that the trucking invoices were not real trucking invoices.  (SUMF at ¶ 100.)  Rock Fintek owed $827,806.42 for trucking and related expenses.  (SUMF at ¶ 101.)

In sum, Rock Fintek owed Kitchen Winners $21,615,600.42 for the gloves that it purchased and the trucking and related expenses.  (SUMF at ¶ 115.)  Rock Fintek, however, only paid Kitchen Winners and/or Adorama a total of $20,648,435 (SUMF at ¶ 116.)  Accordingly, Rock Fintek still owes Kitchen Winners $967,165.42.

As was detailed above, Ascension's bank records show that it paid Rock Fintek $38,842,608.75, which was more than sufficient to pay Kitchen Winners the monies that Rock Fintek owed.  (SUMF at ¶ 118.)  Yet Rock Fintek refused to pay these outstanding bills.

14.   **Rock Fintek's Specious Claims of a Future Business Relationship with Ascension**

One of the categories of damages that Rock Fintek is asserting as part of this litigation, is a claim for lost future business profits from its relationship with Ascension.  Rock Fintek maintains that it expected to earn at least approximately $36 million per year in profits for at least three years from its business relationship with Ascension, but that Ascension terminated their relationship as a result of its dissatisfaction with the gloves.  That claim, however, appears to have been made up from whole cloth.  It certainly is not supported by Rock Fintek's history of profits in prior years, nor is it supported by any credible evidence of future business relations with Ascension.

Rock Fintek has not retained an expert economist to project its future lost profits.  (SUMF at ¶ 119.) The only expert that it has identified to testify as to its lost business calculations, is Kato.

(SUMF at ¶ 120.)   Kato has been deposed concerning his proposed expert testimony.   At his deposition, however, Kato could not explain how he calculated Rock Fintek's relationship with Ascension as worth $36,000,000 per year in profits.   (SUMF at ¶ 121.)

In the time period before the transaction at issue in this lawsuit – namely, between March 2020 and November 2020 – Rock Fintek's total revenue from its relationship with Ascension was approximately $24 million.   (SUMF at ¶ 122.)   Kato, however, could not say what Rock Fintek's profits were from those transactions.   (SUMF at ¶ 123.)

In the time period between December 2020 and June 2021 – namely, the time period during which the transactions at issue in this lawsuit were taking place – Rock Fintek's total revenue from Ascension was $38,842,608.75.   Kato has testified that all of these payments were in connection with the Ascension Purchase Order.   (SUMF at ¶ 125), and that Rock Fintek actually lost money on that transaction. (SUMF at ¶ 125.)   In other words, Rock Fintek's profits were negative.   Hardly a basis from which to project massive profits in future years.

Indeed, there is simply no way to even know what Rock Fintek's future revenues (let alone profits) might be from its relationship with Ascension.   Ascension was deposed in this matter, and explained that it would divide its potential future relationship with Rock Fintek into the long-term and the short-term.   (SUMF at ¶ 127.)

Ascension defined the 'short term' as "when Covid was more prevalent throughout the United States, so that in 2020, 2021, 2022 time frame" and "starts to tail off during 2022" (SUMF at ¶ 128).   In the 'short term,' Ascension testified that "it's highly likely that [they] would have continued to engage with Rock Fintek in additional business opportunities. There were other needs that came up. . . . there was a run where people were having issues getting bent metal, things like wheelchairs and walkers crutches and canes . . . an opportunity like that is something like Rock

Fintek would have missed out upon." (SUMF at ¶ 129.)

However, it is unclear what specific products Rock Fintek would have actually been able to supply Ascension during that time, and what Rock Fintek's profit margin would have been on those products. (SUMF at ¶ 130.) Kato testified that Rock Fintek would have supplied gloves, masks, gowns, and testing kits. (SUMF at ¶ 131..) Yet there is no way of knowing which of those products Ascension would have actually purchased, in what quantity, and at what price. For example, Ascension specifically testified that as of June 2021, it was not thinking of purchasing any additional gloves. (SUMF at ¶ 133.) And the testing kits referenced by Kato were never even manufactured or approved by the FDA. (SUMF at ¶ 134.) Nor is there any way of knowing what Rock Fintek's costs would have been in procuring those products for Ascension. In other words, there is no way to actually project Rock Fintek's future lost profits during that "short term" time period.

As to the long term, Ascension testified that its COO and vice president for supply chain had conversations with Rock Fintek as follows:

> [Rock Fintek would] need to clear some *major hurdles* to do that, we would have discussions with them, just like we would other Suppliers. But to get into that medical space, supply space, Todd and Dwayne let Rock Fintek know, one, you've got to go through all the FDA approvals, right. And that is *no small hurdle*. And two, you're also dealing with -- when you talk about gloves and PPE and masks, you're talking about some *ginormous companies* and organizations that they would have to get *very competitive* on price. So there were a couple of *big hurdles* there, but if they were willing to clear those, then we would certainly talk to them. But they would have to look at winning the business. It wasn't just going to be given to them. . . . We never talked to them about a specific, like, long-term contract or bidding on a long-term nitrile glove business for the organization

(SUMF at ¶ 137.) (emphasis supplied). In other words, Ascension testified that Rock Fintek was certainly not guaranteed any future long term business. In order for Rock Fintek to have any hopes

for a long-term business relationship with Ascension, it would need to (1) get FDA approvals for the products it was selling; and (2) be "very competitive on price" with "ginormous companies" – cumulatively described by Ascension as "major hurdles," "no small hurdle," and "big hurdles." (*Id.*)

Simply put, there is no way to square Rock Fintek's claim for $36 million per year in future lost profit with Ascension's testimony that Rock Fintek's actual prospect for long-term business with the company was highly tenuous.  (SUMF at ¶140.)  Nor is there any way to square Rock Fintek's claim for massive future profits – wholly out of line with its own unprofitable past business with Ascension – with the fact that any potential profit margins surely would have shrunk as it was forced to become "very competitive on price" with "ginormous" competitors.  Nor is there any way to project Rock Fintek's post-Covid-19 profit on PPE sales based upon revenue and pricing that Rock Fintek utilized during the Covid-19 pandemic.  Nor is there any way to know whether Rock Fintek would have been able to obtain the FDA approvals that Ascension was demanding.

In other words, Rock Fintek's claim to have lost $36 million per year in lost profits, for the next three years, is utterly baseless.

## ARGUMENT

### V.   STANDARD OF REVIEW

Kitchen Winners incorporates by reference the section titled "Standard of Review" in the memorandum of law submitted by the Adorama Parties.

### VI.   KITCHEN WINNERS IS ENTITLED TO SUMMARY JUDGMENT AWARDING IT ALL THE OUTSTANDING AMOUNTS THAT IT IS INDISPUTABLY OWED BY ROCK FINTEK

Kitchen Winners is entitled to summary judgment on its affirmative causes of action as

against Rock Fintek regardless of whether they sound in breach of contract or unjust enrichment.

Under New York law, the elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach. *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 Fed. Appx. 274, 276 (2d Cir. 2018). "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 186 (2d Cir. 2023).

Here, under either legal theory, the result is the same. Kitchen Winners delivered Rock Fintek the gloves it requested, yet Rock Fintek – despite reselling those gloves to its customer – refused to pay Kitchen Winners for a large portion of those gloves. Kitchen Winners is therefore entitled to summary judgment compensating it for the amounts that Rock Fintek refused to pay.

As calculated above, Rock Fintek owed Kitchen Winners a total of $20,787,794 for the gloves that it purchased.

There is also no dispute that, under the SPA, Rock Fintek was required to pay for all post-customs ground transportation and to make timely payments. (*See* SPA at ¶¶ 2(d), 5.) Yet, as explained above (Facts Section at § 6; *see also* Declaration of Hershey Weiner) Rock Fintek breached those obligations, forcing Kitchen Winners to hire trucking companies to transport the gloves to Illinois and Texas on Rock Fintek's behalf, and then store the gloves there for days or weeks. Rock Fintek is obligated to reimburse those expenses, which totaled $827,806.42.

In sum, therefore, Rock Fintek owed Kitchen Winners $21,615,600.42 for the gloves that it purchased and the trucking and related expenses. Rock Fintek, however, only paid Kitchen Winners and/or Adorama a total of $20,648,435. (SUMF at ¶ 116..) Accordingly, Rock Fintek

still owes Kitchen Winners $967,165.42.

Rock Fintek has argued that it refused to pay because Kitchen Winners breached the SPA by delivering gloves that failed to meet the requisite specifications. Even if that were true, however, Rock Fintek would not be absolved from its obligation to pay. Under New York law, a party's obligation to perform under a contract is only excused where the other party has committed a material breach of the agreement. *Robert Cohn Associates, Inc. v. Kosich*, 63 A.D.3d 1388, 1389, (3rd Dep't 2009) (citing *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). For a breach of a contract to be material, it must "go to the root of the agreement between the parties." *See Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (citing *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980)); *see* Restatement (Second) of Contracts § 241(a) (materiality depends, in part, on "the extent to which the injured party will be deprived of the benefit which he reasonably expected").

Here, it is undisputed that Rock Fintek successfully resold the Gloves to its customer, at the exact price it had agreed upon with that customer before entering into the SPA. Rock Fintek made all of the profit that it was expecting to make on the transaction. As such, any potential breach was immaterial, as it did not defeat Rock Fintek's object in making the contract.

Kitchen Winners therefore requests that the Court grant it summary judgment against Rock Fintek in the amount of $967,165.42, plus prejudgment interest thereon.

## VII.   KITCHEN WINNERS IS ENTITLED TO SUMMARY JUDGMENT DISMISSING ROCK FINTEK'S CLAIM FOR UNJUST ENRICHMENT

Kitchen Winners incorporates by reference the section titled "Adorama is Entitled to Summary Judgment Dismissing Rock Fintek's Claim for Unjust Enrichment" in the memorandum of law submitted by the Adorama Parties.

## VIII.   ROCK FINTEK'S COUNTERCLAIMS AGAINST KITCHEN WINNERS FAIL

## FOR LACK OF DAMAGES

Kitchen Winners is also entitled to summary judgment dismissing the claims against it, as Rock Fintek suffered no damages arising out of its purchase and subsequent sale of the gloves – a fatal flaw regardless of which cause of action it pursues.

It is black letter law that damages are an essential element of causes of action sounding in (a) breach of contract; (b) breach of the covenant of good faith and fair dealing; and (c) breach of warranty – the absence of which defeats any claims arising under any of the aforementioned theories. *See e.g., Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (damages is an element of a breach of contract claim); *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) (damages are an element of an implied covenant claim); *Housey v. P&G*, 21 Civ. 2286 (NRB), 2022 U.S. Dist. LEXIS 53603, *7 (S.D.N.Y. March 24, 2022) (damages are an element of a breach of warranty claim).

Here, even if Rock Fintek could ultimately prove its allegations regarding the quality of the gloves (it cannot), it still cannot prevail as it did not suffer any damages.

As explained above, Ascension paid Rock Fintek **more** than the $37 million agreed upon in the Ascension Purchase Order.  Rock Fintek has kept that money; it has not returned a single penny back to Ascension.  Nor has Ascension commenced any kind of legal proceeding against Rock Fintek to recoup the money.  In sum, Rock Fintek suffered no damages.  This should have been the end of the story.  Rock Fintek has nevertheless asserted several theories of damages.

### 1. Lost Future Profits from Ascension

Rock Fintek's first theory of its damages is the alleged destruction of its business relationship with Ascension, which Rock Fintek calculated as "at least approximately $36 million per year in profits for at least three years."  In other words, Rock Fintek is claiming to have lost

approximately $108,000,000 as a result of the transactions of gloves at issue.

Under New York law, recovery of lost profits for breach of contract is subject to stringent requirements. In order to recover lost profits (1) it must be demonstrated with certainty that such damages have been caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty; and (3) there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made. *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161-162 (2d Cir. 1996) (citations omitted). "In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986). Here, Rock Fintek cannot prove any of the required elements.

*First*, Rock Fintek cannot prove with any certainty whether, and on what terms, Ascension might have continued to do business with it. In the midst of the COVID-19 pandemic, the high demand of PPE led many new companies, including Rock Fintek, to briefly rush into the market. In fact, Mr. Kato and Mr. Gilling both testified that they had no relevant experience selling PPE prior to COVID. (SUMF at ¶ 145.) Rock Fintek was entirely a creature of the Covid-19 pandemic. Rock Fintek cannot prove that Ascension would have continued purchasing any PPE from Rock Fintek after the pandemic ended.

Indeed, fatal to Rock Fintek's hypotheses regarding the potential of any future business with Ascension is the testimony provided by Ascension. As explained in detail above, Ascension testified that whether it would have continued a business relationship with Rock Fintek should be approached from a short-term and long-term perspective.

In the short term (defined as ending sometime in 2022), Ascension might have continued

19

to do business with Rock Fintek.  But Rock Fintek cannot show what products it would have sold Ascension, at what price, in what quantity, and at what profit margin.  There is no evidence that Ascension would have provided Rock Fintek a large contract during that time.  Ascension itself testified that its own needs changed day-to-day, week-to-week, and characterized its response to Covid-19 as "playing Whac-A-Mole." (Elstro Tr. 37:18-19.)  Accordingly, Rock Fintek cannot prove its purported tens of millions of dollars in damages during the 'short term' period.

In the long term, Ascension testified that Rock Fintek would only be able to win Ascension's business if it (1) obtained FDA approvals for the products it was selling; and (2) could be "very competitive on price" with "ginormous companies" – a set of challenges described by Ascension as "major hurdles," "no small hurdle," and "big hurdles."   (Elstro 40:1-41:9)  Accordingly, Rock Fintek cannot demonstrate with any degree of certainty whether Ascension would have engaged with it in any long-term relationship.

Rather, Rock Fintek alleges quintessential "speculative, possible or imaginary" hopes of such a relationship, prior to which Rock Fintek would need to both get FDA approval ("no small hurdle") and be competitively priced (competing with "ginormous companies").  Then, Ascension would "talk to them"  not just "give [it] to them."  (SUMF at ¶ 137.)  Finally, there never was "any specific, like, long term contract"  that was discussed.  (Exhibit "G" [B. Gilling Transcript] at 37:23-40:8;  Exhibit "D" [T. Kato Non-Expert Transcript] at pp. 137-138.)  This is clearly inadequate to support a claim for future lost profits.  *See e.g., Lovely Peoples Fashion v. Magna Fabrics*, 95 Civ. 8450 (AGS)(THK), 1998 U.S. Dist. LEXIS 11197, at *17-*18 (S.D.N.Y. July 22, 1998) (granting summary judgment where "plaintiffs had no actual additional orders from J.C. Penney … [and] they had no assurance of future orders from J.C. Penney" and noting that "[a]t best, plaintiffs had only a hope of future orders, not the assurance of future orders"); *Abraham v.*

*Leigh*, 471 F. Supp. 3d 540, 564 (S.D.N.Y. 2020) (Plaintiff's argument is premised on an assumption that Mr. Nunn would have directed the MOLM revival … Mr. Nunn had only agreed 'in principle' to direct the revival[]; that Plaintiff and Mr. Nunn would have been able to agree to terms and conditions and enter into a binding contract…")

**Second**, even if Rock Fintek landed a future long-term contract with Ascension, its lost business is not capable of proof with any degree of reasonable certainty.  While lost profits need not "be determined with mathematical precision," they must "be capable of measurement based upon known reliable factors without undue speculation."  *Holland Loader Co., LLC v. FlSmidth A/S*, 313 F. Supp. 3d 447, 480 – 81 (S.D.N.Y. 2018).  In addition, "[a] plaintiff must provide a 'stable foundation for a reasonable estimate' of lost profits, or the claim 'falls for uncertainty.'" *Id.*  Moreover, it is well settled that a new business, such as Rock Fintek's involvement in PPE, is subject to an even stricter standard for recovery of lost profits because "there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986); *Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (lost profits claim insufficient where there was no evidence of net income the company would have made); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 331 (lost profits not demonstrated with requisite certainty where new business could not demonstrate historical basis for calculating profits nor competitor's experience, in support of plaintiff's lost profits projection); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (finding that calculating "lost profits would be highly speculative" for a "two-year-old dealership that only began to show a profit [the previous year and] lacks a track record from which to extrapolate").

Here, Rock Fintek's claim that it lost the opportunity to bid on a potential future contract

with Ascension is speculative on multiple levels.  At the outset, it is unknown what Rock Fintek's profit margins would have been had its business relationship with Ascension continued. As stated above, Rock Fintek was a new business that briefly entered into the PPE market during the pandemic and therefore cannot demonstrate a historical basis for calculating its future profits.

Furthermore, Rock Fintek calculated its lost profits based solely on the business it did with Ascension during the pandemic.  During that time, the market for PPE including medical gloves was extremely volatile and can hardly be an indicator of future profits. *See, e.g., Trez Capital (Fla.) Corp. v. Noroton Heights & Co., LLC*, 2022 U.S. Dist. LEXIS 178040, *12 (S.D.N.Y. 2022) (counterclaim plaintiff's lost profits analysis fails to take into account any economic effects of the COVID-19 pandemic, which presumably would have impacted its costs and projected revenues.); *see also* Analysis: PPE costs increase over 1,000% during COVID-19 crisis,https://www.mcknights.com/news/analysis-ppe-costs-increase-over-1000-during-covid-19-crisis, last accessed February 12, 2024).  Rock Fintek's calculations based on the PPE market during the Covid-19 pandemic it therefore at best speculative.

In addition, Rock Fintek did not make a profit on the gloves that it sold to Ascension.  In fact, Rock Fintek lost money on the gloves' transactions.  It is, therefore, almost preposterous for Rock Fintek to argue that it would have made tens of millions of dollars on the sale of PPE post-Covid, when it lost money during Covid – when the cost for PPE was sky high.

Furthermore, Rock Fintek is simply creating facts out of whole cloth when it cites three years as the proper scope of its future damages.  Rock Fintek has not provided any explanation for three years and not two or four.

Finally, As stated above, Rock Fintek alleges that it is entitled to "$36 million per year in **profits** for at least three years." (Emphasis supplied.)  However, Thomas Kato, Rock Fintek's

22

expert witness, testified that he calculated that number based on Rock Fintek's **revenue** from its dealings with Ascension between March 2020 and February 2021.  (SUMF at ¶ 121.)

*Third*, Rock Fintek cannot prove that Kitchen Winners contemplated assuming $108,000,000 in liability when it entered into the SPA.  New York Courts impose a "high standard" on parties seeking to establish that any agreement contemplated lost profits. *See Great Earth intern, Franchising Corp. v. Milks Dev.*, 311 F.Supp.2d 419, 436 (S.D.N.Y. 2004).  "The parties must contemplate, not turning a profit, but 'the particular damages' owing to lost profits should the deal turn sour." *Id*. at 435 (citation omitted).  In the absence of any provision for such an eventuality, "the commonsense rule to apply is to consider what the parties would have concluded had they considered the subject."  *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 320 (1989)  "The key consideration is not whether the breaching party could have foreseen that its counterparty might suffer the damages in question, but whether it 'contemplated at the time of the contract's execution that it assumed legal responsibility for these damages upon a breach of the contract.'" *Phoenix Warehouse of Cal., LLC v. Townley, Inc.*, 08 Civ. 2856 (NRB), 2011 U.S. Dist. LEXIS 37206, at *18 (S.D.N.Y. March 29, 2011) (quoting *Kenford Co*, 73 N.Y.2d at 320); *EPN Ingenieria S.A. de C.V. v. GE*, 92 Civ. 1563 (KMW), 1996 U.S. Dist. LEXIS 13687, at *5 n. 5 (S.D.N.Y. Sep. 17, 1996)  ("New York law requires proof that liability for lost profits was within the contemplation of the parties").

In this case, the SPA makes no mention of any assumption of liability.  The SPA is entirely silent on the issue of liability altogether. *See Spherenomics Glob. Contact Ctrs. v. vCustomer Corp.*, 427 F.Supp.2d 236, 252 (E.D.N.Y. 2006) (finding that the parties did not contemplate lost profits liability where their written agreement was silent as to such damages).  Moreover, Rock Fintek cannot proffer any evidence that the parties ever contemplated liability for lost profits. *See*

*Healing Power, Inc. v. Ace Cont'l Exps., Ltd.*, No. 07-cv-4175, 2008 U.S. Dist. LEXIS 83021 (E.D.N.Y. Oct. 17, 2008) (adopting recommendation that request for lost profits be denied where "plaintiff presents no evidence that the lost profits were within the contemplation of the parties at the time of contract").

In sum, there is no basis to hold Kitchen Winners liable for any future lost business – and definitely not to the tune of more than $100,000,000 (one-hundred million dollars).

### 2. Potential Liability to Ascension

Rock Fintek also seeks to recover for any potential future liability it has to Ascension for the allegedly nonconforming gloves. Ascension has not commenced any legal action against Rock Fintek to recover any of the funds that it paid for the gloves. There is simply no legal basis to seek millions of dollars from Kitchen Winners for a potential future lawsuit. *See RDI Corp.*, 1:19-cv-10929, at *31-33 ("Charter claims it faces *potential* exposure to legal liability . . . Charter's Corporate Representative admitted in his deposition testimony that any TCPA liability was only 'future liability.' . . . there is no evidence that Charter has ever been sued under the TCPA . . . if Charter is ever sued . . . it can always assert a claim for indemnification").

### 3. Rebate

Rock Fintek also seeks to recover $750,000 allegedly owed as a rebate pursuant to the SPA. However, Rock Fintek is not entitled to the rebate as it failed to fulfill the condition precedent – namely, making timely payments as required by the SPA. The SPA is clear that Rock Fintek was only entitled to a rebate if it "timely" made all payments due. (SPA at ¶ 8.) As detailed at length above (*see* Section 4 of the Statement of Facts), however, Rock Fintek failed to make timely payments. Accordingly, it is not entitled to the rebate.

### 4. Gloves Sold in Excess of SPA

Finally, Rock Fintek also seeks to recover $2,050,105 for the 178,270 boxes of gloves beyond the contractually called for amount that it purchased from Kitchen Winners, for which Rock Fintek alleges that it overpaid at $11.50 per box.

At the outset, Rock Fintek needed most of these "excess" gloves to fulfill the 200 million gloves required by the Ascension Purchase Order.  Ascension testified that Rock Fintek fulfilled the purchase order for 200 million gloves, and did so solely with MedCare and LevMed brand gloves.  (SUMF at ¶ 91.)  Further, according to Rock Fintek, it only purchased Medcare gloves from JNS/Stern and Adorama/Kitchen Winners, and only purchased LevMed gloves from Adorama/Kitchen Winners.  (SUMF at ¶ 94.)

As shown above, Rock Fintek purchased 26,193,100 Medcare brand gloves from JNS. Additionally, Rock Fintek bought 90,000 boxes from Kitchen Winners during the Kitchen Winners' One-Off Transactions.  Adding the 1,500,000 required under the SPA leaves Rock Fintek short 14,806,900 gloves from the 200 million that it was contractually obligated to source for Ascension.  As such, even accepting Rock Fintek's numbers, Rock Fintek only picked up 30,201 excess boxes and not 178,270.

Additionally, as stated above, Ascension paid Rock Fintek $38,842,608.75. (SUMF at ¶ 118.)  Dividing the amount that Ascension paid Rock Fintek in total for the gloves ($38,842,608.75) by the amount that Ascension paid per glove (18.5 cents) shows that Ascension paid Rock Fintek for approximately 210 million gloves.  Accordingly, Rock Fintek was paid in full for any excess gloves and was not damaged by any alleged overage.

## CONCLUSION

For all of the above-mentioned reasons, Kitchen Winners respectfully requests that the Court grant its motion for summary judgment (1) awarding it damages on its claims for breach of

contract and/or unjust enrichment against Rock Fintek; and (2) dismissing Rock Fintek's counterclaims in their entirety.

Dated: Kew Gardens, NY
February 16, 2024

         **LIPSIUS-BENHAIM LAW LLP**
         *Attorneys for Plaintiff and Counterclaim*
         *Defendant Kitchen Winners NY Inc.*

By: _____
         Alexander J. Sperber
         Yisroel Steinberg
         Meir Z. Goldberg
         80-02 Kew Gardens Road, Suite 1030
         Kew Gardens, New York 11415
         Telephone: 212-981-8440
         Facsimile: 888-442-0284
         asperber@lipsiuslaw.com
         ysteinberg@lipsiuslaw.com
         mzgoldberg@lipsiuslaw.com