# EXHIBIT 13

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
**Joel Stern on 10/13/2023**

```
 1

 2   UNITED STATES DISTRICT COURT

 3   FOR THE SOUTHERN DISTRICT OF NEW YORK

 4   -----------------------------------------X

 5   KITCHEN WINNERS NY INC.,

 6                       Plaintiff,

 7          -against-                          Index No.:
                                               22-cv-05276
 8   ROCK FINTEK LLC,

 9                       Defendant,

10   -----------------------------------------X

11   ROCK FINTEK LLC,

12                       Couterclaim and Third-
                         PartyPlaintiff,
13

14          -against-

15   KITCHEN WINNERS NY INC.,

16                       Counterclaim Defendant,

17           and

18   ADORAMA INC., HERSHEY WEINER, JOSEPH
     MENDLOWITZ, JNS CAPITAL HOLDINGS LLC
19   and JOEL STERN,

20                       Third-Party Defendants.

21   -----------------------------------------X

22                                 Remote EBT

23

24                                 October 13, 2023
                                   10:00 A.M.
25
```

1

2          EXAMINATION BEFORE TRIAL of JOEL STERN, a

3   Third-Party Defendant herein, taken by the attorneys

4   for the respective parties, pursuant to Notice, held

5   remotely, before Melissa Leonetti, RPR, a Notary

6   Public of the State of New York.

7

8                          - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                    A P P E A R A N C E S:

 3

 4   LIPSIUS-BENHAIM LAW, LLP
            Attorneys for Kitchen Winners NY, Inc.,
 5          Adorama and Joseph Mendlowitz
            80-02 Kew Gardens Road, Suite 1030
 6          Kew Gardens, New York 11415

 7   BY:  ALEXANDER SPERBER, ESQ.
            asperber@lipsiuslaw.com
 8

 9   POLLACK SOLOMON DUFFY, LLP
            Attorneys for Rock Fintek, LLC
10          31 St. James Avenue, Suite 940
            Boston, Massachusetts 02116
11
     BY:  PHILLIP RAKHUNOV, ESQ.
12          prakhunov@psdfirm.com

13          LAUREN RIDDLE
            lriddle@psdfirm.com
14

15   LAW OFFICE OF AVRAM E. FRISCH, LLC
            Attorneys for Joel Stern and JNS Holdings
16          1 University Plaza, Suite 412
            Hackensack, New Jersey
17
     BY:  AVRAM E. FRISCH, ESQ.
18          frischa@avifrischlaw.com

19

20

21

22   ALSO PRESENT:

23   BRADLEY GILLING

24   HERSHEY WEINER

25
```

1

2          F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED, by and

5     between the parties hereto, through their

6     respective Counsel, that the certification,

7     sealing and filing of the within examination will

8     be and the same are hereby waived;

9          IT IS FURTHER STIPULATED AND AGREED that all

10    objections, except as to the form of the question,

11    will be reserved to the time of the trial;

12         IT IS FURTHER STIPULATED AND AGREED that the

13    within examination may be signed before any Notary

14    Public with the same force and effect as though

15    signed and sworn to before this Court.

16

17

18

19

20

21

22

23

24

25

1

2                           I N D E X

3

4    EXAMINATION OF        BY                      PAGE

5    Joel Stern            P. Rakhunov             7-145

6

7

8                        E X H I B I T S

9

10   STERN                DESCRIPTION              PAGE

11   Stern 1              Email/attachment    41

12   Stern 2              Email               60

13   Stern 3              Email               69

14   Stern 4              Agreement           76

15   Stern 5              Agreement           81

16   Stern 6              Contract            85

17   Stern 7              Email               112

18   Stern 8              POD                 112

19   Stern 9              Invoice             112

20   Stern 10             Email               125

21   Stern 11             Email               127

22   Stern 12             Email               139

23   Stern 13             Email               142

24

25

```
 1

 2                    R E Q U E S T S

 3    DESCRIPTION                           PAGE

 4    Notes                                  31

 5    What's App messages                    54

 6    Investors                              93

 7    App with invoices                     106

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023                                    Page 7

1

2    J O E L    S T E R N, after having first been duly

3    affirmed by a Notary Public of the State of New

4    York, was examined and testified as follows:

5    EXAMINATION BY

6    PHILLIP RAKHUNOV, ESQ.:

7         Q    What is your name?

8         A    Joel Stern.

9         Q    What is your address?

10        A.    155 Skillman Street, Brooklyn, New York

11   11205.

12        Q.    Good morning, Mr. Stern.  My name is

13   Phillip Rakhunov.  I represent Rock Fintek.  I think

14   we briefly met before.

15             Is Joel Stern your full legal name?

16        A.    Yes.

17        Q.    There's no middle name?

18        A.    No.

19        Q.    And where are you physically located

20   right now?

21        A.    I believe it's -- It's not where I live.

22   Where I am physically right now is 667 Myrtle Avenue

23   in Brooklyn, New York 11205.  It's in an office.

24        Q.    Is anyone in the room with you?

25        A.    No.

1

2      Q.    Do you have any notes or any written

3   memory aids or materials in front of you today?

4      A.    No.

5      Q.    Okay.

6            Mr. Stern, have you ever had your

7   deposition taken before, either by Zoom or in

8   person?

9      A.    No.

10     Q.    Okay.

11           So I will just echo some of what the

12  court reporter said.  I will ask you questions.

13  Your job is to answer them truthfully to the best

14  of your abilities.  Please don't speak over me and

15  I will do my best not to speak over you.

16           If you need a break at any moment, just

17  let us know.  I ask that you not take a break

18  while a question is pending.

19           Is there any reason, like any

20  medications any other reason whatsoever, while you

21  would be unable to testify truthfully and

22  competently this morning?

23     A.    No.

24     Q.    You understand you're under oath,

25  correct?

1

2          A.    Yes.

3          Q.    Your testimony today, even though we're

4     in a deposition, is the same oath you would take if

5     you were sitting in a court of law?

6          A.    Yes.

7          Q.    Have you been involved in any litigation

8     as a party before this lawsuit?

9          A.    No.

10         Q.    This is the first time you have been

11    involved as a party?

12         A.    Yes.

13         Q.    Have you ever testified as a witness in

14    any lawsuit?

15         A.    No.

16         Q.    Did you do anything to prepare for

17    today's deposition?

18         A.    I have conversations with my attorney.

19         Q.    And I don't want to know any you and your

20    attorney discussed, so I won't go into that.

21               Anything other than conversations with

22    your attorney?

23         A.    No.

24         Q.    How many times did you speak with your

25    attorney in preparation for today's deposition?

1

2          A.    I don't recall exactly, but a few times.

3     Let's say up to ten.  I don't know.

4          Q.    Did you speak with anyone other than your

5     attorney to discuss your testimony today?

6          A.    No.

7          Q.    Did you speak with Hershey Weiner?

8          A.    No.

9          Q.    Joseph Mendlowits?

10         A.    No.

11         Q.    Okay.

12               Did you review any documents to prepare

13    for today?

14         A.    Just some.

15         Q.    Did those documents refresh your

16    recollection about the events at issue in this

17    lawsuit?

18         A.    Yes.

19         Q.    What documents did you review?

20         A.    Some shipping documents, invoices,

21    emails.  I didn't have a chance to view all of them,

22    but I tried as much as I could.

23         Q.    When you say shipping documents, can you

24    be a little more specific.

25         A.    Actually I don't have much shipping

1

2   documents.  It's just a few that I got by email at

3   one point.  I don't remember what it was at the

4   time.  Maybe two invoices that was sent to the

5   customer for payment and for advising what is being

6   shipped.

7        Q.    And when you say customer, you're

8   referring to Rock Fintek or some other customer?

9        A.    Rock Fintek.

10       Q.    Did you review any invoices that were

11  sent to you for gloves?

12       A.    No.

13       Q.    All right.  We certainly will today.

14             Can you briefly state your educational

15  background.

16       A.    Obviously as you see I'm -- I'm Jewish

17  background.  I learned in our schools, high schools,

18  and medical college, but no official -- how they

19  call it -- I don't remember the word I wanted to

20  use, but not any official -- not any official

21  college or whatever.  I don't know what to say.

22       Q.    When you say you went to medical college,

23  where --

24       A.    Not medical, Talmudical.

25       Q.    Where did you go to Talmudical College?

1

2      A.    UTA.

3      Q.    Where is that?  Is that in New York or --

4            (Technical interruption.)

5      Q.    You were describing your educational

6   background.

7            THE COURT STENOGRAPHER:  Mr. Gilling,

8       please mute yourself.

9      Q.    Mr. Stern, just a slight diversion.  I

10   did notice when you just turned your camera, there's

11   a video camera in the top corner of your office.

12           Are we being recorded right now?

13     A.    No.  It's a surveillance camera.  No

14   video.  No. audio.

15     Q.    So we were talking about your educational

16   background and you described Talmudical College.

17           When did you complete those studies?

18     A.    As far as I remember, around 2000 or

19   maybe 1999.  I don't remember exactly.

20     Q.    Okay.

21           Did you pursue any secondary education

22   after that?

23     A.    Yes.  I took a bookkeeping/accounting

24   course.  It was like a private class.  This is what

25   got me a job later on.

1

2          Q.    Okay.

3                Do you hold any professional

4    designations?

5          A.    No.

6          Q.    Are you a CPA?

7          A.    No.

8          Q.    How are you currently employed?

9          A.    Repeat, please.

10         Q.    Where did you work?

11         A.    I work for a company doing their

12   accounting -- part of their accounting team.

13         Q.    What company do you work for?

14         A.    Is that relevant to this case?

15         Q.    You have to answer.  I mean, if your

16   attorney instructs you not to answer --

17               MR. FRISCH:  You can answer that.

18         A.    That's a Long Beach Assisted Living.  I'm

19   not in the facility.  I'm just in a private office

20   with a few people and they manage their accounting

21   and the billing, accounts payable, and I'm part of

22   the team.

23         Q.    How long have you worked with Long Beach

24   Assisted Living?

25         A.    Around six months.

1

2       Q.      Where did you work before then?

3       A.      I was -- I worked for myself, but I was

4    brokering some deals, government deals, looking for

5    investors to cover them.  And it was going on for a

6    while, like the last two or three years.

7       Q.      When you say brokering deals and

8    government deals, can you give me more detail.  What

9    kind of deals?

10      A.      I partnered with a guy who got government

11   deals.  Nothing in my name and nothing that I was

12   involved with.  I just was trying to match investors

13   to cover this POs and get his fund.

14      Q.      What kind of products?

15      A.      Janitorial supplies.  Mainly janitorial

16   supplies and office supplies.  It was sometimes

17   including gloves as well, but nothing with my

18   gloves.  So whatever is in the janitorial line.

19      Q.      When you say "sometimes including

20   gloves," are you talking about gloves that are

21   sometimes referred to as personal protective

22   equipment?

23      A.      Yes.

24      Q.      Okay.

25              What type of gloves were you involved

1

2   in procuring with your last venture when you were

3   brokering --

4        A.    To be honest, I have no idea.  I was

5   never involved.  Not in the purchase.  Not in the

6   sale.  Just in the funding.

7        Q.    Who was your partner?

8        A.    I don't even know the customer.  I don't

9   even know the supplier.

10       Q.    Who was in charge of obtaining the

11  supplies and knowing the customer?  Your partner?

12       A.    Yes.

13       Q.    Who was your partner?

14       A.    Bernie Freilich.

15       Q.    Can you spell his last name.

16       A.    F-R-E-I-L-I-C-H.

17       Q.    Was Mr. Freilich involved in any way with

18  the business that you did with Rock Fintek?

19       A.    No.

20       Q.    When did you first begin working with

21  Mr. Freilich.

22       A.    Sometime in 2019.  Before COVID?  I don't

23  remember if it was March or April or May but

24  sometime around that time.

25       Q.    Does Mr. Freilich use any entity

1

2  corporation, or a limited liability company for the

3  business that he did with you?

4      A.    Yes.

5      Q.    What's the name of that company?

6      A.    Blink Supplies.

7      Q.    Is that the name of an entity?

8      A.    Yes.

9      Q.    Is it a limited liability company --

10     A.    No.  I'm not sure if it's an Inc. or a

11 Corp.  But it's some type of corporation.

12     Q.    Are you a shareholder in Blink Supplies?

13     A.    No, not at all.

14     Q.    How is your partnership with Mr. Freilich

15 memorialized?

16     A.    It was more like on a deal-to-deal basis.

17 Not an official partner in any way.  Not in the

18 business.  Not sharing customers or suppliers.

19          Just a matter of he was looking for

20 funding and I was trying to connect people to him.

21 That's all.

22     Q.    Where do you obtain the funding for your

23 work with Blink Supplies?

24     A.    Friends, relatives, neighbors.  Just

25 people that I know.

1

2        Q.    Were any of the people that were involved

3   in funding Blink Supplies business the same

4   investors that were involved in funding purchases of

5   gloves that you sold to Rock Fintek?

6        A.    No, at least as far as I remember.

7        Q.    Mr. Stern, you have been working -- are

8   you still working with Mr. Freilich on any private

9   deals?

10       A.    No.

11       Q.    Why not?

12       A.    Business stopped.  I don't know.  Not

13   getting the deals.  Game over.

14       Q.    So you said you were working with

15   Mr. Freilich for about three years before you

16   started working at your current job; is that

17   correct?

18       A.    Correct.

19       Q.    Is there anything else that you were

20   doing during the time frame between 2019 and through

21   six months ago when you started working at the

22   assisted living facility?

23       A.    Of course.  In the same time, I was

24   dealing with these gloves, sir.

25       Q.    Right.

1

2             Anything else?  Well, we'll talk about

3    the gloves in detail, obviously.

4             Anything other than working on the

5    gloves deals and working with Mr. Freilich?  Any

6    other business that you were involved in?

7        A.    Not an official business.  I had a

8    similar job before I started with Mr. Freilich that

9    I still kept until sometime in 2020.  I don't

10   remember.

11       Q.    Where was that?

12       A.    That is a company named AGM Decor, if I

13   remember, and they were doing facade.  Do you know

14   what facade is?  I don't know if I pronounce it

15   correctly, but they are providing glass for glass

16   buildings.

17       Q.    Why did you leave that job?

18       A.    I got too busy with the other stuff I was

19   doing.

20       Q.    When you were working on your deals with

21   Mr. Freilich, were you using any entity to do that

22   business or were you just operating in your own

23   name?

24       A.    Not my name, no.  I never used my name

25   for my business.  It's mainly his name.  He was the

1

2  business owner.

3       Q.    Okay.

4             I understand.  But you said you were

5  involved in -- you were getting paid somehow from

6  the deals, correct?

7       A.    Oh, yes.  I opened an entity for myself.

8  But in talking about operating a business.  I opened

9  named similar to him, Blink Capital Holding.  This

10 was to manage my money, whatever was going through

11 my account.

12      Q.    And Blink Capital Holding, what kind of

13 an entity is it?  Limited liability company?  A

14 corporation?

15      A.    LLC, limited liability.  Under my name.

16 No shares.  No partners.  No nothing.

17      Q.    Does Blink Capital Holding, LLC, have an

18 operating agreement?

19      A.    No.

20      Q.    Does it have a bank account?

21      A.    Yes.  Actually, I'm not sure if it's

22 still open, so I'm sorry.  It used to have a bank

23 account.  By now there's no money in there, so I

24 don't know if the account is still open.

25      Q.    Did you ever use Blink Capital Holding,

1

2    LLC, in connection with glove transactions involving

3    Rock Fintek or Kitchen Winners or Adorama?

4         A.    Just once.

5         Q.    Explain that.

6         A.    There's one time that I didn't want to

7    use the entity that I was using for gloves because I

8    had partners in that other company, and they were

9    not ready to sell that gloves at that time and I was

10   wanted to sell it and I didn't want them to get

11   involved, so I used this company.

12        Q.    Do you recall specifically what glove

13   transaction that you used Blink for in relation to

14   gloves?

15        A.    Meaning the date?

16        Q.    What do you remember about that

17   transaction?

18        A.    All I remember was that, as I just said,

19   I was having partners in the glove business.  And

20   they wanted to wait the price to go up and down -- I

21   don't even remember all the details.

22            The bottom line was they were not

23   willing to sell gloves that day.  I wanted to sell

24   it, so I decided to sell part of it under my other

25   company so they were not getting involved.  That's

1

2   all.

3        Q.     And was that the sale to Rock Fintek?

4        A.     Yes.   That's all.   Just once and just one

5   customer, Rock Fintek.   All the other was from a

6   company named -- I'm sure you know that -- JNS

7   Capital Holdings, LLC.

8        Q.     Do you remember when this transaction,

9   this one-off transaction you're describing, took

10  place, approximately?

11       A.     I would say April, May, 2021.   If you

12  want the specific date, you might go back to the

13  emails.   I don't know what -- what exact date.

14       Q.     Okay.

15              So if I use the term "PPE," you

16  understand I'm referring to personal protective

17  equipment, right?

18       A.     Yes.

19       Q.     Okay.

20              Other than gloves, were you ever

21  involved since 2019 -- really just focusing since

22  2019 -- in the sale of any other PPE?

23       A.     No.

24       Q.     So when we're referring to PPE, we're

25  only talking about gloves in this deposition?

1

2  That's fair?

3      A.    Correct.

4      Q.    When did you first become involved with

5  the PPE business?

6      A.    Actual transaction, I have to go back and

7  check when was my first sale.  When I got involved

8  working and dealing with it, it was probably

9  somewhere in April or May of 2020.

10          I was start looking into deals, try to

11 get gloves, try to sell gloves.  But I don't

12 recall offhand, unless I have to check my records,

13 when was my first actual sale or actual

14 transaction.

15     Q.    How did you become involved in the glove

16 business?

17     A.    I have friends that was doing gloves and

18 I heard from the community people, they're making

19 nice money out of PPE and I was trying to get also

20 some piece of that pie.  That's all.

21     Q.    Well, who specifically did you go into

22 the PPE business with in April or May of 2020?

23     A.    As I said, I tried with many friends or

24 relatives I know before that they are -- either that

25 they are into it or they have access companies that

 1

 2   they doing PPE and I was trying to connect until I

 3   finally got connected to Hershey Weiner, and he

 4   provided me the MedCare glove.  That's all I got.

 5   That's all I sell.

 6        Q.   So was Hershey Weiner the first business

 7   connection that you actually did business with in

 8   connection with the glove deals?

 9        A.   In real life, yes.

10        Q.   Do you know somebody name Ms. Chun Rong

11   Li?

12        A.   No.

13        Q.   You do not know somebody named Ms. Li?

14        A.   No.  I don't know her personally.  I

15   heard that name already from your emails or

16   somewhere, but I don't know her.

17        Q.   Did you hear -- do you recall hearing her

18   name in the course of being involved in the PPE

19   business?

20        A.   Yes.  Just once in the beginning.

21        Q.   From who?

22        A.   There is a man named Mr. Bruno -- I don't

23   remember the full name -- and he connect me to this

24   group Rock Fintek, Tommy Kato and Brad Gilling.

25        Q.   Who is Bruno?

1

2      A.    I don't know him personal, not from

3    before and not now.  Just some of my friends gave me

4    his number that he has customers for PPE.

5           I got connected to him by phone.  I met

6    him once or twice.  And he brought me that offer,

7    an ICPO from Rock Fintek signed by Tom and Brad.

8    This is how this business with these people start.

9      **Q.    So the ICPO that you just referenced --**

10   **and we will take a look at that -- was that the**

11   **first time that you had a written purchase order or**

12   **the like from Rock Fintek?**

13     A.    Yes.

14     **Q.    Okay.**

15           **Did you see the ICPO before you had**

16   **actually connected with either Mr. Kato or**

17   **Mr. Gilling?**

18     A.    Yes.

19           MR. RAKHUNOV:  Objection.

20     **Q.    Do you know Bruno's last name?  Do you**

21   **recall?**

22     A.    No.

23     **Q.    Do you know if Bruno actually was**

24   **involved in supplying any of the gloves that would**

25   **be sold to Rock Fintek?**

1

2            MR. FRISCH:  Objection.

3       A.    Possible.  I don't know.

4       Q.    Do you know if Bruno operated using any

5    entity or is it just him personally?

6       A.    Yes, he used an entity.

7       Q.    What was his entity?

8       A.    I'm trying to refresh my memory.  I don't

9    recall at the moment.  If I get it later on -- I

10   just don't remember.

11      Q.    Okay.

12            Was Rock Fintek your first PPE client?

13      A.    One of the first.

14      Q.    Okay.

15            Who were other PPE clients that you

16   worked with during the time period of 2020 when

17   you first became involved through the end of 2021?

18      A.    I sold to New York City.  I had a

19   customer Melvado.  I sold a lot to a company named

20   Bruche and Nachas, Inc.  And I sold to Ader Trading.

21      Q.    Anyone else that you can remember?

22      A.    And A few more.  I don't remember all of

23   them.

24            And, by the way, I just recall the name

25   Sourcing Connections for the name of Bruno.  I

1

2   don't know whatever he does under that name or

3   whatever PPE he does under a different name, but

4   that's just the company name that he used with me.

5        Q.    What was your compensation arrangement

6   with Bruno or his company, Sourcing Connection?

7        A.    Very straight to the point, I got access

8   to some gloves.  He has customers looking for gloves

9   at that time during COVID, and let's try to make a

10  deal.  And that's all.

11       Q.    Did Bruno or Sourcing Connections get a

12  piece of the deal?

13       A.    A commission.

14       Q.    Okay.

15             Do you recall what the commission was?

16       A.    It was a percentage.  I don't remember

17  exactly.  Maybe a dollar amount.  I remember I paid

18  him one time like $10,000.  I don't remember

19  offhand.  I have to go back to accounting.

20       Q.    Did you pay the commission directly to

21  Bruno or did he get paid it directly from the deal?

22       A.    The way he structured the deal is that

23  it's his customer, not mine, at that time.  And

24  every transaction while I was dealing with him

25  should go through him.

1

2          In other words, when I started with

3    Bruno dealing with Rock Fintek I did not send

4    anything to Rock Fintek directly.  I sent my

5    paperwork to Bruno and he forwarded over to them

6    and the sometime vice versa.

7          So whenever there was a bill and a

8    payment was collected, he charged me his

9    commission and I should pay him directly.

10       Q.    So but you received the payment directly

11   from the gloves that Rock Fintek purchased from you

12   through Bruno?

13       A.    Yes.

14       Q.    And then you paid Bruno the commission?

15       A.    Yes.

16       Q.    Did you pay it by check or wire transfer

17   or something else?

18       A.    Mostly wires.

19       Q.    Okay.

20             What bank account did you wire Bruno

21   payments from?

22       A.    Blink Capital -- sorry -- JNS Capital.

23       Q.    What is JNS Capital?

24       A.    I opened that LLC just for that PPE

25   business.  You get money to buy gloves and sell them

```
 1
 2   and get paid, pay my investors and whatever needs to
 3   be done.
 4       Q.    Does JNS have any members other than you?
 5       A.    No.
 6       Q.    Does JNS an operating agreement?
 7       A.    No.
 8       Q.    Does JNS have bank accounts?
 9       A.    Same story.
10             MR. FRISCH:  Objection.
11       A.    I'm not sure if it's still open.
12       Q.    Did it have one bank account or more than
13   one bank account?
14       A.    I believe only one.
15       Q.    When is the last time that JNS did any
16   transactions in its bank account?
17       A.    Around 12 months ago was leftover like
18   $2,000 paid to my attorney.  That's all.
19       Q.    So when JNS -- do you recall when JNS was
20   formed?
21       A.    I assume in January 2021.
22       Q.    Okay.
23             And, by the way, I don't want you to
24   assume.  I don't think your attorney wants you to
25   assume.  We just want your best recollection.
```

1

2          So when JNS was first formed to do PPE

3    transactions, where did it first obtain -- where

4    did it obtain funding to purchase gloves?

5          A.    People in my community, investors.

6    People I know.  Friends, family, relatives.  Private

7    money, in other words.

8          Q.    How did JNS obtain the funding?  I mean,

9    were these loans?  Were these capital investments?

10   Explain to me how this worked in the beginning.

11         A.    I'm not sure what you refer to capital

12   investment, but this was -- it was supposed to work

13   -- one second.  I'm trying to see how to explain it.

14         I don't know exactly what you mean or

15   referring by loan or capital investment.  This was

16   private money invested to this company for the

17   purpose of doing the business.  And once the money

18   is back, they should get paid a profit on top.

19         Q.    So how many investors did JNS have in the

20   beginning?

21         A.    I don't remember.  Five, ten.  Maybe

22   more.

23         Q.    Okay.

24         Were these investments memorialized in

25   any type of a written agreement?

1

2        A.    Yes, sure.  But not an officially legal

3    document.  It was more on a private level, like a

4    private note without any attorneys, without any

5    professionals.

6        Q.    Okay.

7              When you say a private note, I want to

8    make sure we're on the same page here.  Are you

9    referring to a handwritten note written on a piece

10   paper?

11       A.    Handwritten note.  Piece of paper.  It

12   might be typed up.  But I'm still referring to like

13   privately typed up.  Let's say an email or a

14   document and signed by the two parties; this is an

15   agreement between ABC and XYZ.  ABC is investing

16   this and that amount for the purpose of doing this

17   PPE business.

18             And once the product would be sold and

19   the money will be back, they will get back their

20   initial investment plus a profit, a piece of the

21   profit on top of it.

22       Q.    Do you still have copies of these

23   handwritten documents that memorialized initial

24   investments into JNS Capital?

25       A.    I might have them, but not handy.

1
2           MR. RAKHUNOV:  Please make sure that
3      you preserve them and I'm going to ask that
4      you provide a copy of all of those notes to
5      Mr. Frisch and then we will call for the
6      production of those documents in this
7      litigation.
8           MR. FRISCH:  Taken under advisement.
9           MR. RAKHUNOV:  Understood.
10     Q.    Do you recall the names of the initial
11  investors into JNS Capital?
12          MR. FRISCH:  Objection.
13     A.    No.
14     Q.    Okay.
15          You don't recall any of the investors
16  who put money into JNS?
17          MR. FRISCH:  Objection, meaning it's
18     really beyond the scope.
19     A.    I don't know.  I can't recall offhand,
20  no.
21     Q.    Did Adorama or Kitchen Winners invest in
22  JNS Capital in any way?
23     A.    No.
24     Q.    Do you know somebody named Joel
25  Lefkowitz?

1

2      A.    Yes.

3      Q.    **Who is he?**

4      A.    He's a nice guy.  He was doing business

5   together with Hershey Weiner.  He's one of the

6   people who I got connected with to purchase gloves.

7      Q.    **He purchased the gloves from you?**

8      A.    No.  I purchased the gloves.  I'm not

9   sure exactly his position, but he was working

10  together with Hershey Weiner, and he was like part

11  of the group or part of the team where I got the

12  gloves from.

13     Q.    **Okay.**

14           **Did Mr. Lefkowitz invest in JNS Capital**

15  **at all?**

16     A.    No.

17     Q.    **Okay.**

18           **So do you know whether Mr. Lefkowitz**

19  **was affiliated with Adorama or Kitchen Winners?**

20     A.    I don't know.

21     Q.    **What brand gloves did you purchase from**

22  **Mr. Lefkowitz?**

23     A.    MedCare gloves.

24     Q.    **Let me just ask you this:  Did you ever**

25  **purchase or sell gloves other than MedCare gloves**

1

2    when you were involved in the PPE business?

3        A.    No.

4        Q.    So your entire involvement in the PPE

5    business was in relation to MedCare brand gloves?

6              MR. FRISCH:  Objection.

7        A.    Correct.

8        Q.    Was Rock Fintek your biggest client

9    during the time you were involved in the PPE

10   business?

11       A.    I'm not sure.

12       Q.    Okay.

13             We'll come back to that.

14             When did you first meet Mr. Lefkowitz,

15   Joel Lefkowitz?

16       A.    To the best of my memory, around June,

17   July of 2021.

18       Q.    June or July.  Okay.

19       A.    No.  That doesn't make sense.  I'm sorry.

20   During July 2020.

21       Q.    And is Mr. Lefkowitz an attorney?

22       A.    No.

23       Q.    So he wasn't -- obviously he wasn't your

24   attorney.

25             You said he was a nice guy.  What do

1
2    you mean by that?

3         A.    Nothing special.  Just I didn't

4    understood the question of what type of a guy he is.

5    Just a nice guy and I find him to -- an opportunity

6    to do business with.  That's all.

7         Q.    Okay.

8               Is Jack Lefkowitz someone different?

9    Is that a different person?

10        A.    Totally different.

11        Q.    Okay.

12              Any relation to Joel Lefkowitz?

13        A.    No.

14        Q.    Who is Jack Lefkowitz?

15        A.    He's a consultant.

16        Q.    Is he an attorney?

17        A.    No.

18        Q.    Okay.

19              What kind of a consultant is he?

20        A.    A private consultant to whoever tries to

21    get him.

22        Q.    I'm not sure what that means.  What kind

23    of consulting does he do?

24        A.    Business consulting for whatever you

25    like.  Whatever question you have, is it in

1

2  business, is it in your personal life, whatever you

3  need help with, he's available to help.

4        Q.    Is he a consultant to you?

5        A.    Sometimes, yes.

6        Q.    Okay.

7              Do you hire him as a consultant?  Does

8  he get paid for his services?

9        A.    When I use him, I have to pay him.

10       Q.    Was Mr. Jack Lefkowitz an investor in

11  your glove business at any time?

12       A.    No.

13       Q.    Did Mr. Lefkowitz provide you with any

14  funding for any glove ventures at any time, whether

15  it was as a lender or an investor or otherwise?

16       A.    No.

17       Q.    Have you heard of an entity called The

18  Funding Depot?

19       A.    I might have heard that name before, but

20  I don't recall doing any business with them.

21       Q.    Okay.

22             Have you discussed your Rock Fintek

23  business with Jack Lefkowitz at any time?

24       A.    Yes.

25       Q.    Okay.

1

2              **When?**

3      A.    I don't remember.  Whenever I had a

4  question and I wanted to have some outside

5  consulting -- when I mean outside, outside my group.

6              And, by the way, just an explanation.

7  When you asking me if I hired Jack Lefkowitz, he's

8  not hired as some people have a steady accountant

9  or attorney, that this is my attorney or this is

10  my accountant on some kind of arrangement.

11              This is like he's a consultant

12  available.  Whenever you call him, you can make an

13  appointment like when you go to a doctor or when

14  you go to any other professional.

15              If he's available, you make an

16  appointment, use him, pay him.  And that's all.

17  You need him again, you call him again and use him

18  again.  There's no steady hire or available on a

19  daily basis.

20      **Q.    Do you know what expertise Mr. Jack**

21  **Lefkowitz has as a consultant?**

22      A.    Not specifically, but I know that he got

23  a lot of training in many other areas and a lot of

24  experience, a lot of networking.  That's all I know.

25      **Q.    When you say he got a lot of training,**

1

2    what do you mean?  I'm still trying to understand

3    what kind of consultant Mr. Jack Lefkowitz is.

4         A.    He was -- he was taking training by other

5    -- I don't know.  I've not seen any of his diplomas

6    or any paperwork, what kind of profession he is.

7              I've just heard his name from other --

8    and I used him and I liked him.  He's a wise guy.

9    He know what he's doing.  That's all.

10             I have no idea what his background is

11   and --

12        Q.    When did you first connect with Jack

13   Lefkowitz?

14        A.    Years ago.  Much before.  Before I got

15   involved in this PPE business.

16        Q.    Okay.

17             And during the time frame of 2020 and

18   2021 while you were doing business with Rock

19   Fintek, how many times did you consult Mr. Jack

20   Lefkowitz?

21        A.    I don't remember.

22        Q.    Okay.

23             Do you remember what advice or

24   consulting he gave you with respect to the Rock

25   Fintek business?

1

2      A.    Not at the moment, no.

3      Q.    Did you discuss this litigation at any

4   point with Jack Lefkowitz?

5      A.    Yes.

6      Q.    Okay.

7            And was that in writing or by phone or

8   both?

9      A.    Verbally.

10     Q.    What did you tell Mr. Lefkowitz and what

11  did he tell you about this litigation?

12     A.    I basically shared my story and what I

13  got involved with and with my attorney and what

14  is -- what we trying to do and what we trying to

15  gain and seek some additional advice.

16     Q.    What kind of advice did Mr. Jack

17  Lefkowitz give you about this matter?

18     A.    Nothing special that I can describe.

19  It's just basically use him like a place to discuss

20  myself and make sure that I'm feeling comfortable

21  the way, whatever I'm doing, attorney I'm using.

22  That's all.

23     Q.    Did you ever provide written write-ups

24  about this case to Jack Lefkowitz?

25     A.    I don't recall providing any written

1

2   communication about the Rock Fintek case.  I might

3   have given information about different part of this

4   business, but not about -- I don't recall

5   specifically about Rock Fintek.

6         **Q.    So you don't remember writing a detailed**

7   **narrative in September of 2022 to Mr. Jack Lefkowitz**

8   **about the Rock Fintek, Kitchen Winners, and Adorama**

9   **litigation?**

10        A.    I remember writing something about an

11  issue that I have with my own partners I was dealing

12  with, but not relating between -- not an issue

13  between me and Rock Fintek.  It's more of like an

14  issue between me and my own partners that I was

15  trying to get a way out of.

16        **Q.    Okay.**

17              **Who was your first PPE client?**

18        A.    I don't remember offhand.

19        **Q.    Okay.**

20              **So you've described a few minutes ago**

21  **that your first introduction to Rock Fintek was**

22  **through Bruno, correct?**

23        A.    Correct.

24        **Q.    And you said the first deal that you did**

25  **with Rock Fintek was entirely done through Bruno**

1

2  other than the payment from Rock Fintek came to you

3  directly; is that correct?

4       A.    Correct.

5       Q.    Do you know how many deals you did with

6  Rock Fintek through Bruno before you started dealing

7  with them directly?

8       A.    I would say three loads, three

9  containers.  So three containers of gloves sold o

10 Rock Fintek through Bruno.  I don't remember the

11 full amount, but I remember there was a quantity on

12 that -- that first initial PO that I got through

13 Bruno from Rock Fintek was a certain quantity.  I

14 don't remember the exact quantity, but I do remember

15 that this was never finished at that time.

16      Q.    What do you mean by that?

17      A.    For an example, and as I say, just and

18 example, I don't remember the exact count, but let's

19 say their PO says that they're going to buy five

20 containers and they got only three containers.

21 Something like it.  I don't remember the exact

22 quantities.  But they didn't finish their initial

23 ICPO.

24      Q.    How did you communicate with Bruno?

25      A.    At that time I did not communicate with

1

2   Bruno.  I'm sorry.  I meant the Rock Fintek.  Bruno?

3   Maybe by phone.

4        Q.    Okay.

5              Did you exchange SMS messages with him?

6        A.    Probably.

7        Q.    Do you still have your SMS messages with

8   Bruno preserved?

9        A.    No.

10       Q.    Why not?

11       A.    My phone broke that one time and I got a

12  new phone and I didn't got all the messages backed

13  up.

14       Q.    When did you get a new phone?

15       A.    I got at least three new phones since

16  then, so I don't recall.

17       Q.    Did you communicate with Bruno by email?

18       A.    As far as I remember, not much except for

19  paperwork that was shared, sent back and forth.  But

20  actual -- any type of dealing was mainly by phone.

21       Q.    Okay.

22             What did Bruno tell you about Rock

23  Fintek when he first introduced you to that

24  opportunity?

25       A.    I don't recall much details.  All I

1

2   remember is that he has a customer and -- that can

3   use a lot of gloves and if this works out, might get

4   much more than initial order and I should go through

5   him.  And that's all.

6        **Q.    What type of gloves did Bruno tell you**

7   **Rock Fintek was looking to purchase?**

8        A.    Nitrile examination gloves.

9        **Q.    What is your understanding of what a**

10  **Nitrile examination glove is?**

11             MR. FRISCH:  Objection.

12        A.    Not much of understanding not coming from

13  a PPE background from before.  All I know is that

14  this is a certain type of rubber and there's a

15  certain type of glove used in medical or healthcare

16  facilities and similar places.

17        **Q.    All right.**

18             MR. RAKHUNOV:  We're going to venture

19        into the world of introducing a first

20        exhibit.  I've just published an exhibit to

21        the final exhibits folder.  The name of it

22        should say Stern 1.

23             MR. FRISCH:  Hit the refresh button.

24             (Whereupon, an email and an attachment

25        was marked as Stern Exhibit 1 for

1
2        identification, as of this date.)
3        Q.    Do you have the document open, Mr. Stern?
4        A.    Yes.
5        Q.    Great.
6              For the record, this is a document.  It
7    doesn't have a Bates label but it came from the
8    production made to us by your attorney, Mr. Stern.
9              MR. RAKHUNOV:  It has -- I actually
10        can't put the file name into the record
11        because it's being blocked right now -- well,
12        I can do that.
13             So the file name is
14        000215_FWD_completed_pleaseDocuSign_IMFPA4900
15        0box.  That should be enough hopefully to
16        identify it on the record clearly.
17       Q.    Do you recognize this two-page document
18   which appears to be an email and an attachment,
19   Mr. Stern?
20       A.    Yes.
21       Q.    What is it?
22       A.    It's a ICPO from Rock Fintek to JNS
23   Capital to buy 90,000 boxes of gloves.
24       Q.    All right.
25             So first let me direct your attention

1

2    to the first page of the document where it says

3    from Bruno Azra via DocuSign.

4             Do you see that?

5    A.    Yes.

6    Q.    Does that refresh your recollection as to

7    Bruno's last name?

8    A.    Yes.

9    Q.    And before we look at the document, you

10   forwarded it to hindy@promoeref.com.

11            Do you see that?

12   A.    Yes.

13   Q.    Who is that?

14   A.    I don't remember.

15   Q.    You don't remember?

16   A.    No.

17   Q.    Do you remember why you were forwarding

18   this agreement to whoever this individual is?

19   A.    I'll tell you what I guess, but don't

20   catch me on the word.  I might -- this Hindy might

21   be someone dealing with --

22            MR. FRISCH:  Don't guess.

23   A.    Then I don't remember.

24   Q.    Do you remember anything about someone

25   named Hindy being involved in the --

1

2          A.    Yes.

3          Q.    Okay.

4                What do you remember?

5          A.    She was someone also dealing in PPE

6     gloves, and I probably wanted her advice if

7     everything make sense.  That's all I can say.  And

8     more than that, I don't remember.

9          Q.    All right.

10               So if you look at page 2 of this

11    document -- it's on Rock Fintek letterhead.

12               Do you see that?

13         A.    Yes.

14         Q.    -- do you know who drafted this corporate

15    purchase order?

16         A.    No.

17         Q.    Okay.

18               It was provided to you in this form; is

19    that correct?

20         A.    Correct.

21         Q.    And it's dated February 3, 2021, correct?

22         A.    Correct.

23         Q.    Okay.

24               And under Products in the middle of the

25    page, it says Nitrile Glove Medicare Medical Exam

1

2    Blue Color.

3              Do you see that?

4        A.   Yes.

5        Q.   Okay.

6              And the price was $15 per box of 100,

7    correct?

8        A.   Right.

9        Q.   And this was, again, the first glove deal

10   that you were involved in for Rock Fintek, correct?

11       A.   Correct.

12       Q.   Okay.

13              So did you accept this deal?

14       A.   Yes.

15       Q.   And what did you do to obtain medical

16   exam gloves for Rock Fintek pursuant to this

17   purchase order?

18       A.   Explain please.

19       Q.   Sure.

20              Well, did you already have the glove

21   source to provide to Rock Fintek?

22       A.   Yes.

23       Q.   Where did you obtain those gloves?

24       A.   Through Kitchen Winners.

25       Q.   What is Kitchen Winners?

1

2          MR. FRISCH:  Objection.

3     Q.    What is your understanding of what

4  Kitchen Winners is?

5     A.    My understanding is that Kitchen Winners

6  was dealing in many servicing import/export -- I'm

7  not sure exactly what and how many -- and in the

8  course of their business, they also got available

9  PPE to sell.  And that's all I know.

10     Q.    With whom were you dealing with at

11  Kitchen Winners?

12     A.    With Hershey Weiner and Joel Lefkowitz.

13     Q.    Are you aware of an entity or a business

14  called Adorama?

15     A.    Yes.

16     Q.    Do you have any understanding as to the

17  relationship between Kitchen Winners and Adorama?

18     A.    Not exactly.  I was never involved.  I

19  never spoke -- at that time, I never spoke with

20  anyone from Adorama.

21          I just understand that somehow Kitchen

22  Winners got either help or -- I don't know.  I

23  don't feel comfortable to talk something that I

24  was never involved and I don't know exactly what

25  it is.

1

2      Q.    And I'm only asking you about your

3   understanding, so that's --

4      A.    My understanding is that Kitchen Winners

5   got some kind of help -- could be financially, could

6   be other type of help -- to run that business with

7   the PPE.  Exactly details, I have no idea.  I can't

8   speak for them.

9      Q.    Did Mr. Weiner ever tell you anything

10   about the relationship between Kitchen Winners and

11   Adorama?

12      A.    I don't recall.

13      Q.    Okay.

14          Do you recall referring to Kitchen

15   Winners as Adorama when you were dealing with Rock

16   Fintek in 2020 and 2021?

17      A.    Limited to what I said before, that

18   Adorama might be their financial partner, but not

19   more than that.

20      Q.    And, by the way, I should have put this

21   on the record earlier just so it's clear.  You're

22   appearing today -- the camera view is through what

23   kind of a device?

24      A.    It's an Android smartphone like you see

25   here.  A Galaxy S10.

1

2      Q.    But you're viewing exhibits on a

3   different device, correct?

4      A.    Correct, on a computer.

5      Q.    Okay.

6            Do you have any other phones in front

7   of you?

8      A.    No.

9      Q.    And other than the folks on this screen

10  in this deposition, are you communicating with

11  anyone else during this deposition?  Have you been?

12     A.    No.

13     Q.    Okay.

14           Did Mr. Weiner explain to you what his

15  personal role was with either Kitchen Winners or

16  Adorama?

17     A.    I never got into specific questionnaire

18  with him.  My understanding is just, as I said

19  before, that Kitchen Winners has access to purchase

20  gloves.

21           My understanding -- it doesn't

22  necessarily mean that that's the fact -- that the

23  same as I used friends as investors, he used

24  Adorama as a financial partner.

25           This was my understanding at that time.

1

2  And that's all.  He got gloves and he's ready to

3  sell.

4      Q.    Well, do you recall during your deals

5  with Rock Fintek referring to your source of gloves

6  as being Adorama, using that specific word?

7      A.    I'm not referring specifically.  But

8  again, I can't recall thousands of conversations

9  that I had with many people.  In -- In a general

10  level, I was referring to Hershey Weiner.

11      Q.    Okay.

12            So we just looked at the purchase order

13  a minute ago that --

14            MR. FRISCH:  Phil, I don't see any

15       stamp on it.

16            MR. RAKHUNOV:  Off the record for a

17       second.

18            (Whereupon, a discussion was held off

19       the record.)

20      Q.    So we were talking a few minutes ago

21  about Nitrile medical exam gloves that you were

22  going to fulfill the purchase order for Rock Fintek.

23  And you testified, I believe, that you got the

24  entirety of the gloves for that purchase order from

25  Kitchen Winners; is that correct?

1

2      A.    Correct.

3      **Q.    What steps did you take to make sure that**

4   **those gloves were conforming to the specifications**

5   **in the purchase order?**

6            MR. FRISCH:  Objection to the form.

7            You can answer if you know how.

8      A.    I'm trying to figure how to explain.  Let

9   me try to first say a general introduction, if you

10   don't mind, because it looks like many questions

11   will be similar like.

12            As I said before, I'm not coming from a

13   PPE background or any similar type of business or

14   technicals.  And I was not that much details, so

15   you might ask whatever detail question, which I

16   have no problem, but just to get an understanding,

17   I was never that much detail involved.

18            All in all know is there's a pandemic,

19   people looking for medical gloves and people

20   making a lot of money on it and I was trying also

21   to get a part of that business.  Even a small part

22   of it is a nice profit for me.

23            And I got connected to this Kitchen

24   Winners to buy medical gloves.  I didn't know much

25   about it, just that this is Nitrile medical

1

2    examination gloves.

3              Then I got connected with -- not

4    directly to Rock Fintek, just as explained

5    before -- through Bruno.  And he explained to me

6    that they need medical examination gloves

7    specifically and he wants to get samples past

8    them.  He wants to get some paperwork to back them

9    up.

10             So I got some paperwork at that time

11   from Kitchen Winners that I provided to Bruno.

12   And he came personally to meet me and pick up some

13   sample gloves.

14             He took them to -- I don't know what --

15   probably send them over to Rock Fintek.  I don't

16   know what he did.  And then a week or two later he

17   came -- he called me back that, yeah, this is

18   approved, this is good to go, and we are in

19   business if I'm ready.  So I say yes.

20             So he ask me what specific steps I took

21   to make sure.  I don't feel like I did any

22   specific steps.  I just provided him what I got

23   and he examined them -- I mean to say Mr. Bruno or

24   whoever I took them the samples and the

25   paperwork -- and it got approved.

```
 1
 2              That's all.
 3      Q.    So let's break some of that down.
 4              So you understood that Rock Fintek was
 5   looking for specifically medical examination
 6   gloves, correct?
 7      A.    Correct.
 8      Q.    Okay.
 9              And Bruno understood -- well, discussed
10   with you that they were looking specifically for
11   medical examination gloves, correct?
12      A.    Correct.
13      Q.    You said you obtained some paperwork from
14   someone.  Who did you obtain that paperwork from?
15      A.    Hershey Weiner.
16      Q.    Okay.
17              How did Mr. Weiner --
18      A.    Or Joel Lefkowitz maybe.
19      Q.    Do you recall how they sent you that
20   paperwork, by what means?
21      A.    No.
22      Q.    Okay.
23              Is that what your memory is?
24      A.    I don't recall.  You want explanation?
25   It might be by email.  It might be by WhatsApp.  It
```

1

2    might be in person.  It might be actual paper.  I

3    don't remember.

4         Q.    Okay.

5               Did you communicate with Mr. Weiner by

6    WhatsApp?

7         A.    No.

8         Q.    Okay.

9               Did you communicate with Joel Lefkowitz

10   by WhatsApp?

11        A.    Sometimes.  Not much.

12        Q.    Do you still have your WhatsApp messages

13   with Mr. Lefkowitz?

14        A.    I'm not sure.  As I said before, I

15   changed phones many times in between.  I can check,

16   but I'm not sure.

17        Q.    Do you understand whether WhatsApp

18   preserves chat history that can be recovered from

19   phone to phone?

20        A.    I understand that WhatsApp has a backup

21   option, but it didn't work for me all the time.  I

22   lost a lot of information.  Thanks God I had what I

23   saved for Rock Fintek when you asked -- what I'm

24   saying is that I lost a lot of information.  Some of

25   them was backed up, and part of it was whatever I

 1
 2  had for Rock Fintek that was sent over to you.
 3      Q.    In connection with this litigation, did
 4  you search for any messages with Joel Lefkowitz
 5  through WhatsApp?
 6      A.    No.
 7      Q.    I'm going to ask you that you conduct a
 8  search for those messages and provide them to your
 9  attorney.
10          MR. RAKHUNOV:  And we are requesting
11      the production of messages with Joel
12      Lefkowitz in this matter.
13          MR. FRISCH:  To the extent they exist,
14      that's not a problem.  To follow up, just
15      send me an email so I can remember who you're
16      asking for.
17      Q.    You mentioned a moment ago that you
18  obtained some samples to provide to Bruno.
19          Do you remember that?
20      A.    Yes.
21      Q.    How were those samples given to you?
22      A.    Personal picked up from an office, the
23  Kitchen Winners, or from the car of Joel Lefkowitz.
24      Q.    When you say office of Kitchen Winners,
25  where is such an office?

1

2        A.    I'm not sure if the office still exists.

3   But at that time they had an office on -- Brooklyn

4   -- I don't remember the address.  I'm sorry.

5        Q.    **Well, can you describe what that office**

6   **looked like.**

7        A.    It was somewhere on 13 Avenue in

8   Brooklyn.  I don't remember the address.

9              The office looked like?  It looks like

10  -- to me, it looked like someone left an office.

11  And it was like a big room with two, three desks

12  and they just needed an office and they rented.

13  This what it looked to me.  Whoever is the owner,

14  where it is, I have no idea.

15       Q.    **Was there any signage on that office?**

16       A.    Any what?

17       Q.    **Like a big sign that said --**

18       A.    No. no, not at all.

19       Q.    **How often did you visit that office?**

20       A.    Not too often.  There was no reason to go

21  there that much.

22       Q.    **How many times did you visit the office?**

23       A.    Let's say three.

24       Q.    **Okay.**

25             **And who was there when you visited?**

1

2          A.    When I visit the office, it was only a

3     prearranged meeting with Hershey Weiner and Joel

4     Lefkowitz and some people also working there.

5          Q.    **When you say you picked up some samples,**

6     **do you recall what those samples were and how many**

7     **boxes?**

8          A.    It was -- I don't remember how many

9     boxes, but this was the same MedCare gloves that I

10    got and I sold.  I got the majority -- not the

11    majority.  Everything went straight to a warehouse,

12    so I didn't have any gloves on hand to provide

13    samples.  So I picked up a few individual boxes to

14    be able to have samples on that.

15         Q.    **And when you say a box, you're saying a**

16    **small box that has 100 gloves in it, correct?**

17         A.    Correct.

18         Q.    **Not a carton that has 100 boxes, correct?**

19         A.    Correct.

20         Q.    **Okay.**

21         A.    Some people refer to it like a tissue

22    box.

23         Q.    **That's helpful.**

24               **You just mentioned a moment ago that**

25    **everything went directly to a warehouse.**

1

2              What do you mean by that?

3        A.    That I -- whenever I received gloves, it

4   was not in a form that I received to my house or

5   that I have something written for gloves.

6              It came from the port and delivered

7   straight to a warehouse, a commercial or a public

8   warehouse.

9              So when I needed a sample there, I had

10  really nothing.  Not even one box.  But we

11  especially requested from the warehouse to send

12  either to me or to Hershey a carton, as we said

13  before, or two cartons of gloves just to have

14  samples.  That's how we got samples.

15       Q.    Okay.

16             And you provided the samples to Bruno

17  to give to --

18       A.    Yes.

19       Q.    And what was your understanding as to

20  what these gloves would be used for by the end

21  buyer?

22       A.    Whatever they need to do.  I understand

23  any healthcare facility, any nursing home, any

24  hospital using gloves come to me.

25       Q.    So you understood that the gloves would

1

2  be used in a medical facility, correct?

3       A.    Yes.

4             MR. RAKHUNOV:  Let's take a break.

5             (Whereupon, there was a pause in the

6       proceeding.)

7       Q.    By the way, as far as the gloves that you

8  were sourcing through Mr. Weiner and Mr. Lefkowitz

9  to sell to Rock Fintek to fulfill the purchase order

10  that we looked at in Stern Exhibit 1, did you

11  understand who the manufacturer was for those

12  gloves?

13      A.    I know the brand name of MedCare, but not

14  much more beyond.

15      Q.    Did you ever hear of the name of the

16  company behind MedCare, Global Tooling Services?

17      A.    I've seen that name, yes.

18      Q.    And did you communicate directly with

19  anyone at Global Tooling Services or MedCare about

20  the gloves?

21      A.    Not about these gloves, no.  I tried once

22  to -- I don't remember when it was -- it was some

23  kind -- truthfully, I don't remember.  Either I had

24  to send a deposit for -- I don't remember.

25  Something was that I tried to get connected once and

1
2    it didn't work out.
3        Q.    By the way, you testified a few minutes
4    ago that you understood the gloves would be put to
5    medical uses.
6             At that time in the beginning of your
7    relationship with Rock Fintek, did you understand
8    who Rock Fintek's client was?
9        A.    No.
10       Q.    Did you understand what type of a client
11   it was?
12       A.    No.
13       Q.    Did you know that it was a hospital?
14       A.    No.
15       Q.    Did you ever gain an understanding that
16   it was a hospital?
17       A.    Later on in the game, they start
18   complaining because that -- don't you know that we
19   are selling to a hospital?  But not before.
20       Q.    When you say "later on in the game," I
21   just want to get your best recollection of the
22   timing.
23            When did you first learn that Rock
24   Fintek's client was a hospital?
25       A.    I cannot recall a specific date, but

1

2    definitely not at that time of February 2021.  It

3    must be months later.  Maybe closer to the end of

4    2021, but I don't recall.

5         Q.    And when you learned that Rock Fintek's

6    client was a hospital, were you still doing business

7    with Rock Fintek or had you concluded your business

8    with Rock Fintek?

9         A.    To the best of my memory, I have not done

10   any business at that time anymore.

11             MR. RAKHUNOV:  I put an exhibit into

12        the folder marked as stern 2.

13             (Whereupon, an email was marked as

14        Stern Exhibit 2 for identification, as of

15        this date.)

16        Q.    Please pull that up and let me know when

17   you have it open.

18        A.    Okay.

19        Q.    So this is an email also produced by your

20   attorney.  It doesn't have a Bates number, but it's

21   from 9070854@gmail.com.

22             Is that your email address, Mr. Stern?

23        A.    Yes.

24        Q.    Okay.

25             And it's dated Wednesday, December 16,

1

2    2020, at 1:22 a.m. Eastern Standard Time, correct?

3        A.    Okay.

4        Q.    The recipients are Joel Lefkowitz,

5    someone at dlr858@gmail.com.

6              Who is that?

7        A.    He's one of the people who connect me to

8    Joel Lefkowitz.

9        Q.    What's his name?

10       A.    David Rubin.

11       Q.    Did David Rubin invest in your glove

12   purchases?

13       A.    No.

14       Q.    When you say he connected you with Joel

15   Lefkowitz, what do you mean by that?

16       A.    Simple as I said.  He was one of the

17   people who -- just -- kind of like a broker type of

18   deal.  I didn't know Joel Lefkowitz before.  I

19   didn't know Hershey Weiner before.  I didn't know

20   Kitchen Winners before.

21             All I know I was trying to get the

22   source of PPE and trying to get customers, trying

23   to create a business.

24             And there was like a nice few people

25   that I know that everyone tries their connections.

1

2   And David Rubin got a connection to Kitchen

3   Winners through Joel Lefkowitz.

4       Q.    What was David Rubin's financial interest

5   in the glove transactions?

6       A.    He also wanted to get a commission of

7   helping putting the deal together.

8       Q.    And who is Joel Masry, M-A-S-R-Y?

9       A.    Where do you see that name?  Oh, here.

10  He's the -- he's a partner with David Rubin.

11      Q.    What was Mr. Masry's role in the

12  transaction with the gloves?

13      A.    Same as David Rubin.

14      Q.    And is bhbhmnn Joel Masry's email address

15  or someone else?

16      A.    Correct.

17      Q.    And now please review the email, the body

18  of the email.

19            Do you recognize the agreement dated

20  12/15/2020 that's discussed in this email?

21      A.    Yes.

22      Q.    Okay.

23            Explain what this agreement is, please.

24      A.    So first, as described, Joel Lefkowitz

25  was working with or for Kitchen Winners to bring in

1

2  gloves, PPE gloves.  We wanted his help.  We should

3  get our gloves on time, as promised at that time,

4  whoever was involved in PPE or, actually, any

5  import/export business.

6          There was many obstacles from the

7  ports, from the shipping, getting empty containers

8  to place the boxes together to ship.  Many, many

9  issues to get import from overseas.

10         And since we were dealing with Joel

11 Lefkowitz, we had asked his help to prioritize, he

12 get our orders on time and he will get a

13 commission for that.

14     Q.    Okay.

15         Do you see in line 4 of this email that

16 it refers to a phrase "our contracted gloves"?

17     A.    Yes.

18     Q.    What does that phrase mean in this

19 particular agreement?

20     A.    The gloves we have contracted to buy from

21 Kitchen Winners where Joel Lefkowitz was part of the

22 team.

23     Q.    In this agreement, you're referring to

24 gloves that you're purchasing?  Not the gloves that

25 you're selling?

1

2              Do you understand my question?

3       A.    Yes.  So first of all, as I said before,

4   you see this is a typical example of a private

5   email, not done by any professional.

6              So what this saying is if Joel

7   Lefkowitz will prioritize, as he said, people will

8   have the gloves on time and the people we're able

9   to sell them on time for a good profit, he will

10  get a commission for that help.

11      Q.    Okay.

12            And what gloves were you contracting to

13  buy through Mr. Lefkowitz?

14      A.    MedCare gloves.

15      Q.    Any specific type of MedCare gloves?

16      A.    Of course.  Nitrile examination gloves.

17      Q.    And you understood that Rock Fintek was

18  only interested in buying examination Nitrile

19  MedCare gloves, correct?

20      A.    Correct.  And the same is I was only

21  interested in buying Nitrile examination gloves.

22      Q.    So you understand that a portion of the

23  gloves that you sold to Rock Fintek were labeled as

24  not examination gloves but protection gloves, as you

25  sit here today?

1

2      A.    No.

3      Q.    **You do --**

4            MR. FRISCH:  I couldn't hear half the

5      question.

6      Q.    **Did you hear my question, Mr. Stern?**

7      A.    My understanding in your question is if I

8      recall selling to Rock Fintek gloves labeled as

9      protection gloves and not examination gloves.

10           To the best of my knowledge and my

11     memory and information, I received from my

12     warehouse -- and information and instructions I

13     gave to my warehouse was to double-check -- first

14     of all, to make sure that any order came in, to

15     double-check they are Nitrile examination gloves,

16     which was confirmed to me by my warehouses that I

17     use.

18           And the same thing when they shipped

19     out goods, double-check again.  Make sure there's

20     no mistakes and you're only shipping Nitrile

21     examination gloves.

22     Q.    **Okay.**

23     A.    Just to add a note, I was not at the

24     warehouse at the time of the shipment arrived or was

25     shipped out so I couldn't do it on my own.

1

2          But the instructions I gave to the

3   warehouse people and the confirmations I received

4   from them was that this is what was happening,

5   only Nitrile examination gloves.

6          Q.    So in connection with your business with

7   Rock Fintek, what warehouses did you use?

8          A.    First I used the warehouse in New Jersey.

9   Give me a second.  I forgot the name.  Let me try to

10  look it up.

11         Q.    By the way, I'm not asking --

12         A.    I forgot the name, but a warehouse in New

13  Jersey.  And then later on it, the rest of the stuff

14  was through MD 3PL, and they have a few locations.

15  Actually, one is also in New Jersey, a large

16  location.  But mainly my stuff was in LA,

17  California.

18         Q.    By the way, Mr. Stern, were you just

19  trying to look something up?  Because I don't want

20  you to look anything up here.

21         A.    No.  I was about to ask if I should look

22  up something.

23         Q.    That's not for today.

24                Do you have -- I saw earlier you have

25  two screens open.  Do you have any email browsers

1

2  open or web browsers open through which you're

3  getting email or communication right now?

4      A.    No.

5      Q.    Okay.

6            Are you familiar with an entity called

7  Avro Logistics?

8      A.    Oh, that's the name of their -- of the

9  first place.  Actually, there was two names there.

10  I recall the other name.  Avira Logistics is one

11  name.  I don't remember the exact spelling, but

12  probably A-V-I-R-A.

13            Am I correct, Phil?

14      Q.    We'll find it in a document.

15      A.    Okay.

16      Q.    Did your logistics companies or

17  warehouses provide you with information like packing

18  slips or anything like that as to the gloves that

19  you were both receiving and sending out to Rock

20  Fintek?

21      A.    No.  They provided what they called a

22  tally sheet, and the information in that was

23  basically a container number with a date and some

24  details about the shipping arrived.

25            I don't recall specific details of the

1

2    contents of the container because this was

3    communicated verbally just to double-check to make

4    sure that they are Nitrile examination gloves and

5    not something else.

6         Q.    Do you recall receiving documents like

7    tally sheets that you just described or other such

8    documents by email from your logistics providers

9    during the course of your business relationship with

10   Rock Fintek?

11        A.    Yes, sure.

12        Q.    Okay.

13              And was it your custom and practice to

14   review such materials in the ordinary course of

15   business?

16        A.    Yes, more or less.

17        Q.    What do you mean more or less?

18        A.    More or less means that generally I was

19   reviewing them.  But might be sometimes that I just

20   missed or skipped something.

21        Q.    Okay.

22              MR. RAKHUNOV:  I'm putting another

23        exhibit into the folder.  Hopefully you have

24        that in the final exhibits folder.

25              (Whereupon, an email was marked as

1

2          Stern Exhibit 3 for identification, as of

3          this date.)

4          **Q.    While you're looking I'll just put on the**

5    **record, this is a 36-page document consisting of an**

6    **email and attachments from Joel Mendlovic to you,**

7    **subject gloves, dated Tuesday, January 12, 2021,**

8    **12:04 a.m.**

9              MR. FRISCH:  Just for clarity, can we

10         put on the record that Mendlovic is spelled

11         M-E-N-D-L-O-V-I-C.

12             MR. RAKHUNOV:  You anticipated my next

13         questions.

14         **Q.    Do you have it, Mr. Stern?**

15         A.    Yes.

16         **Q.    Who is Joel Mendlovic?**

17         A.    This is another guy that was trying to

18    bring in gloves, the same MedCare brand gloves, and

19    I was trying to get -- I got from him also a small

20    load of gloves.

21         **Q.    Was Mr. Mendlovic, to your knowledge,**

22    **affiliated with Adorama or Kitchen Winners?**

23         A.    Not at all.

24         **Q.    Do you know if Mr. Mendlovic was**

25    **affiliated with any entity other than his own**

1

2    personal name?

3        A.    Yes.

4        Q.    What was that entity?

5        A.    AMCM.

6        Q.    Well, did you obtain gloves from

7    Mr. Mendlovic that you sold to Rock Fintek?

8        A.    I obtained gloves from Mr. Mendlovic.

9    And later in the game when -- I'm trying to say

10   later is I start selling to Rock Fintek in February

11   2021 and later on in about April, May 2021.  And I'm

12   not sure at what point I start getting -- what's the

13   date of this agreement?  I think I got it at 2020,

14   this time, the gloves.

15       Q.    I'm sorry.  If you're looking at Stern 3,

16   I think the date of that email is --

17       A.    Oh, January 2021.  Right.  I didn't got

18   it at that time.  If I remember, I got it probably

19   not before May or maybe June.  I don't remember when

20   I got it.  It didn't come on time.

21             So I cannot say that I sold directly

22   gloves from this Rock Fintek because the timing

23   doesn't match.

24       Q.    So you don't remember right now one way

25   or the other whether gloves from AMCM were sold to

1

2    Rock Fintek?

3         A.    Not by me.  Not directly by me.

4         Q.    Okay.

5         A.    If a third party took over these gloves,

6    that's possible, but not directly what I sold to

7    Rock Fintek during that time.  Because based on the

8    timing, it doesn't make sense.

9         Q.    Do you know what clients, to which

10   clients you would have sold AMCM gloves if not for

11   Rock Fintek?

12        A.    Mostly to Bruche and Nachas and some

13   others I don't recall or don't remember.

14        Q.    Do you recall why Mr. Mendlovic is

15   sending you the materials attached to this email?

16   And you can scroll through them.

17        A.    I asked him for an inspection report.

18   Because usually any new customer that I was engaged

19   with asked me for an inspection report to get the

20   technical details of the gloves to make sure they

21   are official or what they're looking for.

22            In the case of Rock Fintek, I have not

23   done that on my own because it was done by Bruno.

24   But in other cases I couldn't sell anything before

25   I send that over.

1

2          Q.     All right.

3                 And the materials attached to this

4     email, you would agree with me show packaging for

5     Nitrile -- synthetic Nitrile examination gloves,

6     correct?

7          A.     Correct.

8          Q.     Okay.

9                 And to your knowledge -- go ahead.

10         A.     Just as a note, if you look at the top

11    right corner of these pages, it has in red "passed,"

12    which means that this inspection has passed

13    inspection and no major issues.

14         Q.     Do you know what the inspection consisted

15    of that is reflected in this document?

16         A.     I'm not that technical, but usually it

17    says somewhere in the beginning pages.  But usually

18    I forward the information to whoever asks for me

19    because I was not that technical.

20         Q.     And do you know if -- did you understand

21    the materials attached to Joel Mendlovic's email on

22    January 12th to apply to all gloves that you would

23    purchase from AMCM or just to some specific shipment

24    or quantity?

25         A.     It's not a clear-cut answer, and I will

1
2  explain you why.  I understand that this is like a
3  sample inspection that passed inspection.  And the
4  same applies to all gloves that I'm going to get
5  from AMCM.
6          But in reality this is a specific
7  inspection report for a specific either container
8  or lot number, whatever it says there.  But this
9  is just like a sample.  You taking out, let's say,
10  either a container or a lot, and they take out
11  samples of it -- I don't know exactly how it
12  works -- and this is what this inspection report
13  is about.
14      Q.    Okay.
15            And I'm sorry if I already asked you.
16  How did you come to know Joel Mendlovic?
17      A.    The same way I come to know someone else.
18  He's a guy in my community.  I found out about him I
19  met and we spoke.
20      Q.    Did you ever discuss Adorama or Kitchen
21  Winners with Mr. Mendlovic?
22      A.    Explain your question.
23      Q.    Sure.
24            Did you ever talk to Mr. Mendlovic
25  about the fact that you already had a deal to

1

2    obtain the same brand gloves through another

3    company?

4         A.    Yes.

5         Q.    What was the nature of your discussion?

6    What did you tell him?

7         A.    I cannot say it better the way you said

8    it.  Just that he should be aware that I'm buying

9    the same MedCare gloves from AMCM that I am already

10   getting from Kitchen Winners.

11        Q.    Do you recall his reaction to you telling

12   him that?

13        A.    No, not especially.

14        Q.    Did you have a written agreement with

15   AMCM for purchase of gloves?

16        A.    It was a written agreement.  I don't

17   remember if it was on paper or by email or I don't

18   --

19        Q.    Do you recall the price at which you

20   purchased gloves from AMCM?

21        A.    Not at this time, no.

22        Q.    So was your arrangement with Joel

23   Mendlovic a direct purchase arrangement or a

24   commission arrangement?

25        A.    I don't understand the question.

1

2      Q.    Let me ask it this way:  Were you paying

3  directly to Mr. Mendlovic or AMCM for the gloves or

4  paying another person or entity who then paid a

5  commission to them?

6      A.    So basically the same idea that I got

7  gloves from Kitchen Winners, and paying them as

8  directed by Kitchen Winners.  The same way I got

9  gloves from AMCM and paying either direct AMCM or

10  their attorney -- I don't remember -- wherever they

11  directed to send payment.  So I got gloves and paid

12  for it.  That's all.

13      Q.    Do you know who Mordechai Hershkowitz is?

14      A.    One of the names working for AMCM.

15      Q.    What about Chaim Mendlovic?

16      A.    So these two, Joel and Chaim Mendlovic,

17  they are both somehow related and they're both in

18  the same business at that time for AMCM.

19           MR. RAKHUNOV:  I put Stern 4 into the

20      final exhibit box.

21           (Whereupon, an email was marked as

22      Stern Exhibit 4 for identification, as of

23      this date.)

24      Q.    Mr. Stern if you could take a look at

25  that, please.

1

2          MR. RAKHUNOV:  For the record, this is

3      a two-page document, an email from Joel

4      Mendlovic to Mr. Stern, January 13, 2021,

5      with an attachment titled Agreement.

6      A.    Okay.

7      Q.    Do you see that?

8      A.    Yes.

9      Q.    Do you recognize the commission agreement

10   on page 2 of Stern 4?

11     A.    Let me read it and recall.

12           What's the question?

13     Q.    Do you recognize the document?  Do you

14   recall entering into this agreement?

15     A.    Somewhat.  I mean, it was a long time

16   ago.  Many things were happening since then.

17           But what's the question?

18     Q.    Do you see in the second paragraph --

19   well, first of all, the first paragraph, this

20   agreement is identified as being between three

21   individuals and you personally.

22           Do you see that?

23     A.    Me personal under a business name, yes?

24     Q.    What is your understanding of the acronym

25   d/b/a?

1

2        A.      Doing business as.

3        Q.      **Okay.**

4                **Do you have any understanding as to**

5    **what "doing business as" means?**

6        A.      I can tell you what my understanding was.

7    But I cannot tell you what --

8        Q.      **I can only ask you for your**

9    **understanding.**

10       A.      My understanding that I'm doing the

11   business under a business name, not on a personal

12   level.  That's the purpose I have written that note

13   there.

14       Q.      **Okay.**

15               **So in the second paragraph, do you see**

16   **an agreement to sell 300,000 boxes of MedCare**

17   **Nitrile exam gloves to Joel Stern with a**

18   **commission of 1.95 per box?**

19       A.      Yes.  This was in the first shipment that

20   I was supposed to receive through AMCM.  They

21   advised me to send a deposit directly to one of the

22   companies related to MedCare.  I cannot tell you

23   exactly if -- first of all, I don't remember, but

24   the name was not MedCare.  Either GTS, Global

25   Tooling or somewhere else, or some attorney or other

1

2    third party for the benefit of MedCare.

3              I sent the deposit directly to MedCare.

4    They have not made their profit on this first

5    shipment, but this is what this agreement is for.

6    But they should be covered as soon as their

7    shipment arrived.  They should also get paid.

8              After that shipment, I never sent money

9    anywhere else besides to that directly to AMCM.

10   There is no more commission agreements.

11        Q.   Okay.

12             And this is January 13, 2021?

13        A.   Right.

14        Q.   Do you remember shortly after you entered

15   this agreement entering into a non-circumvention

16   non-disclosure and working agreement with Bruno?

17        A.   After the initial agreement?

18        Q.   Yes.

19        A.   I'm sorry.  I'm not that good in timing.

20   But around that time, before or during Bruno

21   introduced me to Rock Fintek -- and again, as I

22   explained before, when I was initially introduced to

23   Rock Fintek, I did not have any connection directly

24   to Rock Fintek.

25             In other words, I have no contact

1

2  information, no email, no phone number, not to a

3  company Rock Fintek, not to a personal level to

4  Tom Kato or Brad Gilling.

5        The only thing I got is an agreement

6  signed supposedly by these two guys on behalf of

7  Rock Fintek and I should deliver and get paid.

8        At the same time, Bruno wants to

9  protect his commission, so we got signed into some

10 kind of this type of agreement.  I don't remember

11 exactly what it was, but yes, we got some kind of

12 agreement.

13 **Q.   Did that agreement apply to all business**

14 **that you would do with Rock Fintek for the remainder**

15 **of whatever business you did with Rock Fintek or was**

16 **it specific to certain transactions?**

17        MR. FRISCH:  Objection.

18        Joel, wait.

19        He's not here for legal conclusions.

20 And also for an agreement that is not up in

21 front of him --

22 **Q.   You can go ahead and answer.**

23        MR. FRISCH:  I'm going to direct him

24 not to answer, though?

25        MR. RAKHUNOV:  On what grounds?

```
 1
 2            MR. FRISCH:  On the grounds that you're
 3       asking him for legal conclusions he's not
 4       qualified.
 5            MR. RAKHUNOV:  But I'm not asking him
 6       for legal conclusions.  It's his agreement.
 7       I'm asking him for his understanding of an
 8       agreement that he signed.
 9       Q.    Was it your understanding that the
10   non-circumvention agreement that you just testified
11   recalling applied to all transactions with Rock
12   Fintek or just certain ones?
13       A.    At least for that time, for that
14   transaction that he introduced to me.  Other than
15   that, I don't recall now at the moment.
16            (Whereupon, an agreement was marked as
17       Stern Exhibit 5 for identification, as of
18       this date.)
19       Q.    Take a look at Stern 5 when you get a
20   chance, please.
21       A.    Okay.  Okay.
22       Q.    Is this the non-circumvention agreement
23   attached to the January 25th email from Bruno Azra
24   that we just talked about?
25       A.    Seems like.
```

1

2          Q.     Okay.

3                 If you go to page 3 of the document, is

4     that your signature under -- well, let me actually

5     ask you:  Do you recognize any of these signatures

6     as yours?

7          A.     Yes.

8          Q.     Which ones?

9          A.     Under my name.  But as you see, this was

10    done through DocuSign, and I don't know how all this

11    scribble came up, but I guess it was done on a note

12    pad.  I don't know what.

13         Q.     Well, your name appears in a number of

14    places in the signature block, it seems.  Is it the

15    top right box that's your signature?

16         A.     You know what?  You're right.  I don't

17    remember which one is mine.  I'm confused.

18         Q.     Take your time.

19         A.     One second.  Okay.

20                The top right one, that's my name and

21    my email address at that time, so I guess that's

22    my signature.  All the others are not.

23                As you can see, you can match the names

24    or the email address with other people referenced

25    before.  You have Joel Lefkowitz.  You have email

1

2  address starting with dlr858.  This is for David

3  Rubin.  And the next one on the right side is the

4  email address bhbhmmm which is for Joel Masry.

5          And on the bottom you have the seller

6  mandate, Bruno Azra.  And then we have one more,

7  and intermediary, which is empty.  It's blacked

8  for me.

9      Q.    All right.  You can close out of that

10  one.

11      A.    Okay.

12      Q.    Do you recall entering into a written

13  agreement with Adorama or Kitchen Winners or both

14  for purchase of gloves?

15      A.    Yes.

16      Q.    Okay.

17          What was the quantity of gloves that

18  you contracted to purchase from Adorama in

19  February of 2021?

20      A.    Before I answer, I would appreciate

21  whenever you have a document you're referring to,

22  first bring up the document.  Because there was so

23  many things happening in such a long time of a few

24  years, I don't have everything ready in my memory.

25  So I don't want to catch me something that I said, a

1

2  number up or down, by mistake.

3          If you have the document, I would

4  appreciate you bring up the document first.

5      Q.    Mr. Stern, let me just tell you this:  I

6  completely understand what you're saying and no one

7  is trying to trick you, but I am entitled to ask you

8  questions with respect to what you remember without

9  seeing a document, just like your attorney and other

10 parties' attorneys did at depositions of my client,

11 as they're entitled to do so.

12         No one is trying to trick you, but I do

13 get to ask you a question from your memory.  And

14 then if I want to show you a document, I will. I

15 completely understand your concern, but just do

16 your best and we'll get through this.

17     A.    Okay.  So as long as --

18         MR. FRISCH:  Joel, one second.

19         I am going to object to the extent I

20     don't know that the dates being recited are

21     correct by Mr. Rakhunov and we don't

22     necessarily know what agreement he's

23     referring to.

24         But to the extent that you know, you

25     can answer.

1

2      A.    Okay.  That's great.  I will answer to

3   the best of my memory but don't catch me if

4   something is by mistake.

5           Go ahead.

6      Q.    Okay.

7           Let me ask you this:  How many

8   agreements do you remember entering into with

9   Adorama and/or Kitchen Winners?

10     A.    At least three.

11     Q.    Okay.

12          And was the email that we looked at

13   early, the first one, the informal email

14   agreement?

15     A.    Should be.

16     Q.    Do you recall your second contract with

17   Adorama being for any particular quantity of gloves?

18          MR. SPERBER:  Objection to the form.

19     A.    You ask me based off my memory, I will

20   say a million boxes.  But might be wrong.  Might be

21   half.  Might be double.  I don't remember.

22     Q.    So as you requested, let's take a look --

23   we're up to Stern 6.

24          (Whereupon, a contract was marked as

25          Stern Exhibit 6 for identification, as of

1

2       this date.)

3       Q.    In a couple of moments you should have

4    Stern Exhibit 6.  When you open the document, I will

5    just direct your attention to the very last page of

6    the document, which is an email that attaches what

7    comes before it.  It just came out in PDF that way.

8            It's an email, again, that was produced

9    to us by your counsel.  It's dated February 4,

10   2021, from David Rubin to Hershey Weiner copying

11   Joel Lefkowitz, you, Jay Samry.  The subject is

12   Contract Kitchen Winners contract to JNS.  And it

13   has an attachment titled 2nd Contract with

14   adorama_02032021.

15           Do you see the email and the document

16   before you, Mr. Stern?

17       A.    Yes.

18       Q.    All right.

19           So you can take a look at the entire

20   document if you would like, but first I want to

21   ask you a few questions about the cover email and

22   then questions about the document.  But take your

23   time.

24       A.    What do you want to do first?  The

25   document or the email?

 1

 2      Q.    First the email.  But if you need --

 3      A.    Okay.  Go ahead.

 4      Q.    So the email --

 5            MR. SPERBER:  I'm sorry.  Stern 6?  The

 6      last page?

 7            MR. RAKHUNOV:  Yes.  It's on the last

 8      page.  I will represent to you that is the

 9      email and the attachment as it was produced.

10            MR. SPERBER:  Thank you.

11      Q.    First of all, do you see an email

12      embedded in the string from Joseph Weiner to Joel

13      Lefkowitz cc'ing Mendel Banon?

14      A.    Yes.

15      Q.    Is Joseph Weiner the same person as

16      Hershey Weiner?

17      A.    Yes.

18      Q.    Do you know who Mendel Banon is?

19      A.    No.

20      Q.    You don't know who he is?

21      A.    All I know is that he worked for or with

22      Hershey Weiner and Kitchen Winners.

23      Q.    Have you ever spoken with Mendel Banon

24      about glove transactions?

25      A.    To the best of my memory, I've never

1

2    spoke with him.

3         Q.    Okay.

4               So on Tuesday, February 2nd, it looks

5    like Joel Lefkowitz forwards the January 27th

6    email to someone.  And then on February 4th, David

7    Rubin forwards the contracts to you and Mr. Weiner

8    and others.

9               Do you see that?

10        A.    Yes.

11        Q.    So in the email where Hershey Weiner

12   writes Yoely, please review -- Yoely is just a

13   nickname for Joel, correct?

14        A.    Correct.

15        Q.    So when he writes "to customer," do you

16   have an understanding who the customer is in this

17   email exchange?

18        A.    JNS.

19        Q.    Okay.

20              So you're buying gloves from them,

21   correct?

22        A.    Correct.

23        Q.    Okay.

24              And then why is David Rubin sending the

25   signed contract around to Mr. Weiner and others?

1

2      A.      Exactly why, I cannot say for sure.  I

3   can give you one example that maybe we have met in

4   David Rubin's office and sign it, upload it, and

5   send it through his email.  That's one possible

6   cause, but I'm not 100 percent sure.

7           But basically you have the whole

8   picture that might prevent many questions that you

9   have prepared or asked before.  As you see here,

10  the chain that Joseph Weiner is sending this email

11  with the subject of Kitchen Winners contract to

12  JNS.

13          So we have a Joseph Weiner acting as

14  Kitchen Winners sending a contract to JNS but --

15  not sending it to JNS.  Sending it to his

16  colleague or coworker Joel Lefkowitz to review;

17  Mendel Banon, which I have never been on a

18  personal level connected.  I just see his name on

19  the emails.  So he somehow was working for Joseph

20  Weiner.  I have no idea what.

21          So this first initial email is Hershey

22  or Joseph Weiner sending to Joel Lefkowitz to

23  review then send it to the customer.

24          Joel Lefkowitz was sending this email

25  then maybe to me or David Rubin or one of the

1

2  group to get it signed and sent back.  And then --

3  so this is where Joel Lefkowitz forwarded it to

4  one of us.

5          Then we have David Rubin send this back

6  to Hershey Weiner sign.  This is the full picture

7  that is here.

8          Any questions?

9      Q.    Absolutely.

10          So do you see Mr. Rubin writes:  You

11  will have the 1.5m by tomorrow iyh?

12          1.5m, that refers to $1.5 million; is

13  that correct?

14      A.    Yes.

15      Q.    What does iyh stand for?

16      A.    It's an abbreviation.  It's a Hebrew

17  word, not an English word.  And the definition of

18  this word means with God's help, and Im Yirtzeh

19  Hashem if you know Hebrew.

20      Q.    Mr. Stern, if you go up to page 8, which

21  is the last page of the document, is that your

22  signature?

23      A.    Yes.

24      Q.    Okay.

25          So now we can go to the top of the

1
2    document, which is the attachment, Sales and
3    Purchase Agreement.
4              Do you know who drafted this document,
5    like who prepared it?
6        A.    It was prepared by or for Kitchen
7    Winners, so I don't know.
8        Q.    You didn't draft it?
9        A.    No.
10       Q.    Okay.
11             If we go under the purchase and sale
12   paragraph 1 of the agreement -- do you see that,
13   the description under product?
14       A.    Yes.
15       Q.    -- what product did you contract to buy
16   from Adorama, Kitchen Winners?
17       A.    Nitrile gloves, 100 gloves per tissue
18   box, color blue for medical exam grade with FDA
19   510(k).
20       Q.    Do you have an understanding as to what
21   FDA 510(k) means in this contract?
22       A.    Not technical details exactly what it is.
23   But the certain qualification is being called and
24   controlled by the FDA, which is called 510(k).
25       Q.    Okay.

1

2             Under payment terms, the unit price is

3     11.50 per box, correct?

4        A.    Correct.

5        Q.    Were all of the gloves subject to this

6     sales and purchase agreement to be sold to Rock

7     Fintek?

8        A.    No.

9        Q.    Do you know what portion of the gloves

10    subject to this agreement were sold to Rock Fintek?

11       A.    No.

12       Q.    Under paragraph 2, Payment Terms, do you

13    see there's a requirement that within 24 hours of

14    signing this agreement buyer shall wire to an

15    account designated by seller the sum of $1.5 million

16    to deposit?

17            Do you see that?

18       A.    Okay.

19       Q.    And that's the 1.5 million that was

20    referenced by David Rubin in the email attaching

21    this agreement, correct?

22       A.    Obviously, yes.

23       Q.    Do you know what account, bank account

24    that $1.5 million came from?

25       A.    As far as I remember, it was JNS.

1

2      Q.    Where did the funds necessary to fund

3   this contract come from?

4      A.    Investors.

5      Q.    Okay.

6            And again, these are investors that you

7   testified earlier you don't remember the names of?

8      A.    Correct.

9      Q.    You don't remember a single investor

10  name?

11     A.    I don't remember at the moment, no.

12     Q.    Where could you look other than the

13  handwritten notes that you described earlier to

14  refresh your recollection as to the names of these

15  investors who funded your glove purchases?

16     A.    I'm not sure.  I have to look into that.

17     Q.    Okay.

18           Is there a place you could look to find

19  that information?

20     A.    As I said, I have to look into that and

21  figure it out.  I don't know.

22     Q.    I am going to ask that you do figure it

23  out and we're going to follow up with a formal

24  request to your attorney.

25           MR. FRISCH:  We will respond when that

1

2      happens.

3          Q.    So of the million boxes of gloves subject

4      to this contract, I think you just testified that

5      you did not believe all were going to Rock Fintek,

6      but I want to be clear.

7                Do you know if -- any of the gloves you

8      purchased under the sales and purchase agreement

9      before you, did any of them go to Rock Fintek?

10         A.    Possible.  I don't -- I don't -- I'm not

11     prepared with the exact control which one was going

12     where.

13               In other words, this contract is

14     nothing related to Rock Fintek.  It was not

15     purchased for selling to Rock Fintek, and Rock

16     Fintek was not the purpose to get just rid of this

17     contract.

18               This is just a contract to buy stock

19     available to sell, and Rock Fintek is one of the

20     customers that I was trying to sell my stock.

21               So from my perspective, I have no

22     relation from contract 1 or contract 2, which one

23     goes there, which one goes there.  It's all the

24     same.  And that's all.

25               What else?

 1
 2      Q.    Okay.
 3            And other than AMCM and Adorama and
 4   Kitchen Winners, what other sources of MedCare
 5   gloves did you have during the time that you did
 6   business with Rock Fintek in 2020 and 2014?
 7            MR. SPERBER:  Objection to the form.
 8      A.    In reality, none.
 9      Q.    So it was just the sources I --
10      A.    Just these two sources, correct.
11      Q.    Okay.
12            Earlier this morning you testified
13   about a list of the clients that you could
14   remember, and all of those clients would have
15   received gloves sourced from either AMCM or
16   Adorama and Kitchen Winners, correct?
17      A.    From me --
18            MR. SPERBER:  Objection to the form.
19      A.    -- yes.
20      Q.    And by the way, do you know where AMCM
21   obtained its MedCare gloves?
22      A.    No.
23      Q.    So you don't know if they obtained them
24   directly from the manufacturer or through another
25   intermediary?

1

2      A.    What they said was directly from the

3  manufacturer.  But you ask me if I know, I cannot

4  testify something I have no idea.

5      Q.    Okay.  All right.

6            If you go to page -- let's look at

7  paragraph 2b.

8            Do you see on the right-hand side

9  there's some handwriting?  It appears to say "with

10  inspection report," if I'm reading the handwriting

11  correctly.

12      A.    Yes.

13      Q.    Is that your handwriting?

14      A.    Possible.

15      Q.    Okay.

16            And do you see there's a little

17  asterisk next to the bill of lading?

18      A.    Yes.

19      Q.    Do you recall inserting this language

20  into the contract?

21      A.    Yes.

22      Q.    Why did you add the requirement of an

23  inspection report next to bill of lading?

24      A.    Because the customers I was dealing with

25  at that time, all them requesting and inspection

1

2  report.  Without a passed inspection report, they

3  wasn't willing to accept the goods.

4      **Q.    You wanted to know what gloves you were**

5  **getting, right?**

6      A.    The inspection report is not a matter of

7  the type of gloves I'm getting.  Even though I'm

8  getting Nitrile examination gloves, blue color with

9  all the terms that was requested before, there is

10  still an official inspection that might be best

11  or -- I don't remember how they call something that

12  didn't pass inspection, or not passed.

13          So I had to make sure that this is

14  something that passed inspection for these

15  customers other than Rock Fintek.

16      **Q.    And as you sit here today, in 2020 and**

17  **2021, what percentage of all glove sales that you**

18  **made were made to Rock Fintek as opposed to other**

19  **customers of yours?**

20      A.    A global picture?

21      **Q.    Yes.**

22      A.    All of my gloves, I don't remember.  But

23  more than 10 percent.  If it's 10, 15, 20, I don't

24  remember.

25      **Q.    Okay.**

1
2          But it's not more than 20 percent, in
3  your estimate?
4      A.    I'm comfortable to say so, yes.
5      Q.    Okay.
6          When did you stop selling gloves to
7  anyone?  Like when did you exit the glove business
8  all together?
9      A.    I don't remember offhand exact date.  And
10  I'm not sure what it is related to this.  But to the
11  best of my memory, I would say like -- what's now?
12  October 2023 -- somewhere in the middle of 2022.  I
13  don't remember dates.  I'm sorry.
14      Q.    No need to apologize.
15          So let's go back up to purchase and
16  sale, paragraph 1.
17          The unit price for the million gloves
18  was 11.50 a box, correct?
19      A.    Correct.
20      Q.    And if you go down to page 7 of the
21  document that has a heading Side Agreement.  When
22  you get there, look at paragraph 2, Purchase Price,
23  and let me know if I'm reading this correctly:
24  Notwithstanding anything to the contrary contained
25  in the PSA, the purchase price for the order shall

1

2    be $11.25 per box.

3              Did I read that correctly?

4        A.    Yes.

5        Q.    So why did you enter into a side

6    agreement that appears to modify the purchase price

7    in the purchase agreement all dated the same day?

8        A.    Explain your question.

9        Q.    Well, you have an agreement and a side

10   agreement dated the same day.

11             Are we on the same page so far?

12       A.    Yes.

13       Q.    The agreement calls for $11.50 per box,

14   correct?

15       A.    Yes.

16       Q.    And then the side agreement modifies that

17   to $11.25 per box, correct?

18       A.    Right.

19       Q.    Why is there a separate agreement as

20   opposed to just putting $11.25 in the original

21   agreement?

22       A.    So I don't remember all the details,

23   whether some conditions based on that conditions

24   will change the price.  In other words, the official

25   price is still 11.50.  And based on certain

1

2   conditions, price will drop or let's call it like

3   getting a discount to 11.25.  And I don't remember

4   the details yet.  I'm sorry.

5          **Q.    Are these conditions identified in the**

6   **side agreement?**

7          A.    I'll have to pay attention and read over

8   the whole contract and the whole side agreement to

9   refresh my memory.

10         **Q.    Please go ahead.**

11         A.    Didn't say all the details there, no.

12         **Q.    Does it have any of the conditions in**

13  **there?**

14         A.    It has some of the conditions that you

15  can read for yourself.  It says --

16         **Q.    Under what condition does the price drop**

17  **from 11.50 to 11.25 per box?  Help me understand,**

18  **please.**

19         A.    I'll start from the other side, and I'll

20  try to get to the second part.

21               So the first part is that the price we

22  pay and the dollar amount that I had to wire that

23  time was based on the price of 11.50, and that's

24  calculated to 1.5 as initial deposit.

25               And this price on the side agreement

1

2  was based on certain conditions that we can both

3  help each other with the business of selling PPE.

4           I don't remember or recall all the

5  conditions, but some example is, for example, a

6  customer that we can refer to Kitchen Winners or

7  the opposite or -- I don't remember all the

8  details behind.

9           But based on these conditions, once

10 this goes through and we get paid, the price will

11 drop.  When this will go into reality is when it

12 comes to pay the balance.  If all these conditions

13 will happen, the price will drop and in reality,

14 this would make a difference when it comes for me

15 to pay the balance to Kitchen Winners.

16          But at that time, all the numbers

17 was -- I was dealing with was on the original

18 price of 11.50.

19    Q.    So what I'm understanding from your

20 testimony is that there were conditions tied to the

21 reduction of the price that are not listed in this

22 written agreement?

23    A.    Possible.

24    Q.    And you cannot point me to another

25 writing that contains those conditions?

1

2      A.      Not only that.  I cannot recall the

3   details of what type of conditions.

4      **Q.      So regardless of whether the price**

5   **ultimately was 11.50 or 11.25, do you recall how**

6   **much you sold this million boxes of gloves for to**

7   **your clients?**

8      A.      No.

9      **Q.      How would we find out that information?**

10     A.      Let me explain you something, if you

11  don't mind.  Probably you're coming from a totally

12  different background in your mind that you're

13  expecting.

14              I was an employee by a company, not a

15  business owner in PPE.  As I said before, I was

16  usually most of my time in accounting field.  When

17  we got in this business, we didn't form a

18  professional business setup, you know, with the

19  whole team of bookkeepers and secretaries and

20  office and customer service.

21              It was just like a one-man band.

22  Remember the few people that you have seen before,

23  the Joel Lefkowitz, David Rubin, Joel Masry, Me.

24  We connected with Kitchen Winners to buy the

25  specific gloves that was so much needed at that

1

2   time of COVID.  And the same way I tried to

3   connect to customers to sell them for a profit.

4            Now you ask me for information -- this

5   is not like a business with files and records and

6   computer systems.  It was done on a primitive --

7   on a personal level, buy and sell and get paid and

8   it's over.

9            So you ask me now how I can go back.  I

10  don't know.  It's a lot of work to figure out and

11  go back and look up all the customers.

12       Q.   Mr. Stern, I assure you I know because

13  we've done that work on our end.

14            So was this a cash business or were

15  transactions made by either by wire transfers or

16  other --

17       A.   No cash at all.

18       Q.   You testified that other than that first

19  Blink transaction, you used a bank account belonging

20  to JNS Capital Holdings, correct?

21       A.   Correct.

22       Q.   So it would be fair that -- I would be

23  reasonable to believe that a review of your bank

24  records would show you what you paid for these

25  gloves during a certain time period and what you

1

2  received for the gloves by wire transfers from

3  various clients?  Is that fair?

4       A.    To your surprise, absolutely not.

5  Because a wire amount doesn't say how much I pay for

6  gloves and how much gloves I got.

7       Q.    But a wire identifies to whom or from

8  whom the money is being sent, correct?

9       A.    Correct.  But doesn't say how many gloves

10 you got, how much you paid.

11      Q.    Well, of course it says how much you

12 paid.  It's a wire transfer.

13      A.    How much you paid for the total wire,

14 yes, but not how much you paid per gloves.  You

15 asked me how much I paid per box of gloves.  It

16 doesn't say --

17      Q.    And I'm not trying to argue with you, but

18 you're a bookkeeper and you deal with financial

19 transactions in your professional life, correct?

20      A.    Correct.

21      Q.    And we have an agreement before us that

22 specifies a price for gloves and promises a wire

23 transfer the following day, correct?

24      A.    Correct.

25      Q.    So if we were to looking at JNS Capital's

1

2  bank account, we would see a wire transfer on

3  February --

4        A.    But look --

5        Q.    -- 4th of $1.5 million, correct?

6        A.    So when you take this particular wire,

7  for example, and you look in the contract here,

8  which has backup paper, this was a certain percent

9  deposit.

10            I don't remember what.  13 percent is

11  what it says there.  Yeah.  13 percent,

12  approximate, of the project.  When you look at the

13  bank, 1.5 million, it doesn't say anything.

14  Doesn't say a percentage.  Doesn't say how many

15  gloves you get.  Doesn't say if this is a payment

16  in full or this is a good faith deposit or some

17  certain percent.

18            So how do you want me from an amount to

19  the bank to figure out how many gloves I got and

20  how much I paid for that?

21        Q.    Right.

22            You're looking at the Exhibit 6 right

23  now, correct?  The 13 percent?

24        A.    Yes.

25        Q.    Do you have your bank account statement

1

2    open by any chance?

3        A.    No.

4        Q.    Okay.

5              And that was exactly my question,

6    Mr. Stern.  If you're just looking at the bank

7    records together with the contracts, you can put

8    the information together.

9        A.    Not so easily, no.

10       Q.    Okay.

11             And when you sold gloves to your

12   clients, whether it was Rock Fintek or someone

13   else, you sent invoices, correct?

14       A.    Correct.

15       Q.    And the invoices had wire transfer

16   information on them, correct?

17       A.    Correct.  Most of the time.

18       Q.    And the clients wired you payment for the

19   gloves, correct?

20       A.    Yes.

21       Q.    Okay.

22             And how did you generate those

23   invoices?  Did you use an accounting system or --

24       A.    No.  I used a free app at that time.  It

25   was available, some app.

1

2        Q.    Do you know what that app is?

3        A.    I have to look it up.  I'm sorry.  Unless

4    it's noted on the invoices.

5        Q.    I'm going to ask you to look back at that

6    app and to pull together the records of all invoices

7    related to glove sales during 2020 and 2021.  And to

8    the extent that they're already preserved, preserve

9    those records and we will make a follow-up request

10   to your attorney.

11       A.    Okay.

12       Q.    So generally speaking, the 1 million

13   gloves that you purchased pursuant to Exhibit Stern

14   6, do you recall what level of profit you and your

15   partners made from those gloves?

16       A.    I didn't end up making a profit, so --

17   you're asking about the markup or profit?

18       Q.    Let's start with the markup.  What markup

19   did you apply -- did you sell those gloves at?

20       A.    I believe I sent you all the invoices.

21   If you want to bring up one of the invoices, you

22   have the prices are there.  Because there was not

23   one price fits all.  At the beginning it was one

24   price.  Later on a different price.  And then the

25   price start to drop.  So I don't remember offhand.

1
2             But we were trying to get the best we
3    could at that time.  As you see, I paid 11.50.  On
4    top of it, I paid for logistics.  I have many
5    people that you have to pay for commissions,
6    starting from Bruno and then our partners, Joel
7    Lefkowitz, and expenses was high-racking.  I was
8    trying to make a profit.
9        Q.    Do you recall selling gloves to Rock
10   Fintek at $15 a box?
11       A.    That makes sense.
12       Q.    And were those gloves that you paid 11 --
13             (Simultaneous crosstalk.)
14       A.    On the previous ICPO, I believe it was
15   noted $15 a box.
16       Q.    Right.
17             And were those gloves that you paid
18   11.50 for?
19       A.    Possible.
20       Q.    Okay.
21             By the way, did you receive that $.25
22   rebate or discount, however you want to frame it,
23   under the side agreement?
24       A.    I don't remember if I got it at the end.
25       Q.    How would you find out?

1

2       A.    Again, this is -- it was so many problems

3   here when it came -- and the prices dropped.  During

4   a period of time everyone was trying to get gloves

5   got a hard time.  And many people tried to bring in

6   gloves and they all stuck in logistics with these

7   type of problems that I have explained before.

8            First of all, just to get an empty

9   container to stock these boxes was a problem.

10  Then getting a shipping company, getting a vessel,

11  getting them out of the port.  So many issues at

12  that time, if you remember, if you call back.

13           So let's for the conversation's sake

14  pick a date.  So let's say that around April, May,

15  or maybe June of 2021, everything got more or less

16  back in order.  It was not the best, but suddenly

17  million boxes of gloves flooded the United States.

18           First of all, the better-quality

19  gloves, the brand-name gloves got back into stock.

20  And second of all, let's put aside the issue of a

21  brand name.  Just you got overflow to the United

22  States with gloves.  Even by now there's still

23  some leftover stock.

24           So the price dropped.  No one needed

25  anymore and everything got -- everyone in that

1
2    line got into trouble.
3           So ask me questions of something that
4    was so many obstacles and so many issues to deal
5    with, that's why we gave it up, end the business.
6       Q.    At that time in February of 2021, it's
7    correct that you were using the services of Avrio
8    Logistics, correct?
9       A.    Yes.
10      Q.    Do you remember dealing with someone
11   named Don Alston?
12      A.    Sure.
13      Q.    Who was Don?
14      A.    He was my contact with for the logistic
15   service by Avrio and another name that you might
16   come on soon.  And basically there were two
17   companies that Don was working together with.  Avrio
18   is one name.  I don't remember the other name.
19           One is more of the warehousing part.
20   Another one is more of the shipping and trucking
21   part and they both work together.
22      Q.    And Avrio Logistics invoiced you for
23   whatever services they provided for you?
24      A.    Correct.
25      Q.    And you paid for those services, right?

1

2     A.     Yes.

3         Q.     And do you recall what some of those

4     services were?  Forget the trucking.  Inside the

5     warehouse.

6     A.     Generally it's -- besides trucking is

7     warehousing.  What else?

8         Q.     Well, for example, did they charge you

9     extra for overtime labor?

10     A.     One time, yes.

11        Q.     Okay.

12     A.     At least one time.

13        Q.     Did they charge you specifically to

14    palletize and shrinkwrap boxes of gloves?

15     A.     Yes.

16        Q.     Did they charge you to sort pallets of

17    gloves?

18     A.     They charged for every service provided.

19    They are not working for free, and they didn't do

20    any favors for me.  I mean, they were nice people

21    but they're in business.

22        Q.     Understood?

23     A.     Sometimes they describe their services in

24    the billing and sometimes was just arranged verbally

25    and a fixed price for the services provided.  It's

1

2   the same as any other public warehouse.  It's not my

3   own warehouse.  It's not my own people.  And they

4   willing to help me with whatever I need as long as

5   they can provide it and get paid for.

6       Q.    Did you ever ask them to print labels for

7   gloves?

8       A.    No.

9             MR. RAKHUNOV:  Let's take a break.

10            (Whereupon, there was a pause in the

11            proceeding.)

12      Q.    Mr. Stern, I put a few new exhibits into

13   the final exhibit folder, Stern 7, 8, and 9.

14            (Whereupon, three documents were marked

15            as Stern Exhibits 7,8, and 9 for

16            identification, as of this date.)

17      Q.    Can you go to Exhibit 9 first.  Open that

18   up.

19      A.    Okay.

20      Q.    Exhibit 9, for the record, is again a

21   document produced by your attorney.  It's an email

22   from Stephanie Marcano, M-A-R-C-A-N-O, who is a

23   customer service representative at Avrio Logistics.

24   It's to you copying Don Alston with an attachment of

25   an invoice on February 11, 2021.

1

2                Do you see that?

3      A.    Yes.

4      Q.    If you go to page 2, do you recognize the

5  invoice sent from Avrio Logistics?

6      A.    Yes.

7      Q.    Is that what an invoice from Avrio

8  Logistics typically looks like?

9      A.    Yes.

10     Q.    Do you see the invoice is addressed to

11  JNS Services Corp. and Hershey Weiner?

12                Do you see that?

13     A.    Yes.

14     Q.    Do you know why JNS Services Corp. and

15  Hershey Weiner are being billed for -- by Avrio

16  Logistics?

17     A.    It's probably a mistake.

18     Q.    Okay.

19                Do you know if Hershey Weiner also used

20  Avrio Logistics for glove-related services?

21     A.    Yes.  So I got referred to Avrio

22  Logistics, I believe, by Hershey Weiner.  And when I

23  requested a service from Avrio, they got confused

24  and they thought in the beginning that me and

25  Hershey Weiner were the same thing, especially that

1

2   we were both having the same type of product.

3            So that's how they got confused and

4   they thought that Hershey Weiner and me were the

5   same team.  But in reality it's just a mistake.  I

6   remember calling them and saying that.  I don't

7   remember if they fixed it or not.  I don't

8   remember.

9        **Q.   The services described in the invoice, do**

10  **you know what the word drayage, D-R-A-Y-A-G-E,**

11  **means?**

12       A.   I'm not sure, but you can Google it.  My

13  understanding is this is the service of either

14  picking up a container or removing a container from

15  the truck.  Some of these services.

16       **Q.   And then palletize and shrinkwrap, 41**

17  **quantity.**

18            **What do you understand that portion of**

19  **the invoice to mean?**

20       A.   The product came in without pallets, just

21  stuff, the container with boxes from one end to

22  another.  And in order to keep them in a warehouse,

23  you cannot pick up each individual box individually.

24            So therefore they have to pack the

25  cartons on pallets shrinkwrapped so they can

1
2   manage in the warehouse facility.
3        Q.    Okay.
4              But when the products arrived in
5   containers -- I want to make sure I understand
6   your testimony -- the containers had -- do you
7   know how many cartons of gloves in any container?
8        A.    On average, it was like 3,000 cartons.
9        Q.    Okay.
10             And they were loose?  They were not
11  shrinkwrapped or --
12       A.    Loose cartons.  Each carton consists of
13  ten tissue boxes, meaning the size of a tissue box,
14  and 100 gloves per box.
15       Q.    Okay.
16             And one of the services that Avrio
17  Logistics provided for you would be to sort and
18  palletize and shrinkwrap those boxes onto pallets,
19  correct?
20       A.    Correct.  And let me explain what sort
21  mean, because the same way you got a container
22  filled with individual cartons, there's size mix,
23  small, large, medium, so they difference the
24  different sizes on separate pallets.
25       Q.    Is it your testimony that the sorting

1
2  here refers solely to sorting by size or something
3  else?
4      A.    By size.
5      Q.    Why was it important to sort by size?
6      A.    Because most customers requested
7  particular size mix.  It was called to that time
8  average size mix and then some customers required
9  the special size mix.  They want that quantity of
10  this size and this quantity of that size, so we have
11  to keep them separate by size.
12      Q.    Do you recall, sitting here today, what
13  Rock Fintek required with respect to the size mixes?
14      A.    Average size mix.
15      Q.    Okay.
16            Let me direct your attention to what's
17  been marked as Stern 7.
18      A.    Okay.
19      Q.    This is again an email from Don Alston to
20  you February 11, 2021, subject 3 truck.  And page 2
21  is a PDF document attached to the email.
22            Take a look at the email and the
23  attachment.  And, by the way, you can -- in the
24  document viewer, there's a little gear symbol to
25  the top left that allows you to rotate it.

1

2              And my question, once you look, will be

3    do you recognize the document attached as --

4         A.    Yes.

5         Q.    Okay.

6              What is it?

7         A.    This is what they called the tally sheet.

8    You see at the top of the sheet, Inbound Tally.

9         Q.    And what is your understanding of what

10   Caravan Inc., refers to?

11        A.    That's the second name I couldn't recall

12   earlier.

13        Q.    And that's a carrier, like a trucking

14   company?

15        A.    That's -- I don't remember which one is

16   what.  But one name was used for the trucking and

17   shipping logistic services and the other name was

18   used for the warehouse services.

19              So we have Caravan and we have Avrio.

20        Q.    Do you know who filled out this tally,

21   who prepared the attachment?

22        A.    Someone from the warehouse.

23        Q.    Okay.

24              This inbound tally represents the

25   products that you received at the warehouse that

1

2    you would then be able to sell to your clients,

3    correct?

4         A.    Correct.

5         Q.    Okay.

6               And do you see near the top right a

7    container number that's handwritten in there?

8         A.    Yes.

9         Q.    Okay.

10              And that container number on this

11   particular tally is TCNU5168672 with a load date

12   of 2/11/21, correct?

13        A.    Correct.

14        Q.    And is it -- I'm sorry.

15              And then the columns below describe

16   what was in the container, what was expected to be

17   in the container and what was actually in the

18   container, correct?

19        A.    Yes.

20        Q.    So let me ask you about the first column,

21   the Quantity Expected.  What is your understanding

22   of what that number means?  Who is expecting that

23   quantity?

24        A.    I guess this number comes from the bill

25   of lading.  When any shipment comes by vessel or by

1
2   any other means, it's being shipped together with a
3   bill of lading stating the quantity and the product
4   inside this shipping container or box.
5           And on the bill of lading, there's
6   quantities and sizes of what was shipped and this
7   is where it was received.  So to reconcile the
8   numbers are matching up, this was counted, as you
9   see, of individual boxes.
10      Q.    When you say boxes, you mean cartons,
11  correct?
12      A.    I'm sorry.  No.  What you see here is
13  counted the pallets.  56 cartons on a pallet, as far
14  as my understanding.
15      Q.    Okay.
16      A.    And each pallet has a box on the right
17  side.  Do you 56, 56, 56, and 10.  There's 10
18  leftover pieces that didn't fill up a full pallet of
19  that particular size.  That gives a total of 178.
20      Q.    Okay.
21      A.    So this particular case, they expected
22  800 of this product line and this size and finding
23  178.
24      Q.    800 or maybe -- the handwriting is not
25  perfect.  Maybe even 300.

1

2          A.     Yeah.   300.

3          Q.     So they're expecting 300 cartons of small

4    Nitrile examination gloves.  And it looks like they

5    got 178, correct?

6          A.     Correct.

7          Q.     In the container that has a specific

8    number on there, 1,200 cartons of medium Nitrile

9    examination gloves --

10         A.     Right.

11         Q.     -- and there were actually 450.  1,200

12   Nitrile examination gloves large, 1051 and extra

13   large 988.

14                Do you see the bottom line says Mixed

15   Inspection?  Do you know what that means?

16         A.     There were some cartons that the sizes

17   were mixed up and we had to manually repackage them,

18   take them out of the carton, sort them by size and

19   repackage them.

20         Q.     So when you say manually repackage, you

21   actually opened up the cartons and somebody at the

22   warehouse actually pulled tissue boxes out of the

23   cartons and repackaged them?  Correct?

24         A.     Correct.  And this is what triggered

25   extra labor, one example.

1

2        Q.    And did you use the existing cartons for

3    repackaging or did you have new cartons?  How did

4    that work?

5        A.    No.  Existing cartons.

6        Q.    So they would repackage them and retape

7    them?

8        A.    Correct.

9        Q.    Reseal them?  Okay.

10       A.    The same as we were working hard in the

11   United States during COVID, these manufacturing was

12   overwhelming busy producing and shipping gloves.

13            And when it comes to package these

14   containers, sometimes they just couldn't manage or

15   handle or was short on manpower and these mistakes

16   happen, as you see this tally.

17            We were expecting one thing and we got

18   a little different sizing.  And some cartons were

19   mixed up, a few sizes packed in the same carton.

20       Q.    So let's look at Stern 8.  And again,

21   it's -- you'll need to adjust the orientation.  But

22   this is, for the record, a February 11, 2021, email

23   from Don Alston to you attaching a POD.

24            Is it your understanding that POD

25   stands for proof of delivery?

1

2          A.     Yes.

3          Q.     So take a look at this two-page document.

4     And this looks like a similar inbound tally to what

5     we just looked at, correct?

6          A.     Correct.

7          Q.     Different container number, right?

8          A.     Right.

9          Q.     It's a scan, so the load date is not

10    entirely clear, but certainly within February of

11    2021.

12         A.     Correct.

13         Q.     Can't tell if that's 10 or 16.

14                Do you see in this particular tally,

15    the gloves are described as Nitrile gloves, not

16    Nitrile examination gloves?  Do you see that?

17         A.     Yes.

18         Q.     Do you have an understanding as to why

19    they're referred to as Nitrile gloves and not

20    Nitrile examination gloves?

21                MR. FRISCH:  Objection.

22         A.     I don't think that this is something on

23    purpose left out the word.  Just since they were

24    dealing with all the same, they shortened the

25    description because we understand what we're dealing

1

2    with.

3         Q.    How do you know that?  What is the basis

4    for this testimony?

5         A.    Because first of all, as I said before

6    and I will repeat it again, each and every time I

7    received a delivery or directed to send out to a

8    customer, I made sure to have a verbal phone call

9    with these people, including Don Alston or sometimes

10   spoke with another party in the warehouse, and asked

11   them please double-check, make sure that the goods

12   are received as Nitrile examination gloves.

13              And the same thing was sent out even

14   though I knew for a fact I didn't have any other

15   gloves than Nitrile examination gloves.  But I

16   also knew that in the same warehouse, other

17   people, other companies stored gloves, and I

18   wanted to make sure that they didn't mix up

19   anything.

20        Q.    And when you received this inbound tally,

21   were you concerned that the gloves were incorrect

22   once?  Because like the one we just look at within a

23   day or so had "examination" and this one didn't have

24   the word "examination" on them?

25        A.    No, not at all.  Because the beginning of

1

2    the time when the gloves came to New Jersey, I drive

3    down to New Jersey a few times -- not that far from

4    New York -- and I personal inspected my lot and they

5    all said Nitrile examination gloves.

6        Q.    Okay.

7              Do you see the very bottom row?  It

8    seems to say an asterisk and it says reworked 7PLT

9    marked incorrect, full inspection?

10             Do you see that?

11       A.    Yes.

12       Q.    Do you know what that means?

13       A.    PLT means pallets.  And marked incorrect,

14   as far as my memory goes, is probably the same

15   problem, the size mixing or the size mixed up.

16   Either the wrong size in the wrong box.  Box that is

17   labeled small has ten large instead of small.  All

18   the sizes mixed up.  The same box has some large,

19   some small, some medium.

20             As you can see, this tally sheet had

21   adjustments in the far right corner plus, minus.

22   That's probably part of the adjustment after they

23   went through the incorrect labeled boxes and

24   cartons.

25       Q.    And it's your testimony that this still

1

2   continues to refer to Nitrile examination gloves,

3   this tally sheet?

4        A.    Yes.

5        Q.    So Stern 10 should be in the file

6   exhibits.

7             (Whereupon, an email was marked as

8        Stern Exhibit 10 for identification, as of

9        this date.)

10       Q.    It's a February 10, 2021, 2:57 p.m. email

11   from you to Don Alston with a subject mixed

12   packages.

13            Let me know once you get it.  And my

14   question is:  What are you referring to here when

15   you write "how many boxes is mixed packaged and

16   how much would you charge to repackage them"?

17       A.    Again, based on my memory, it's the same

18   that we just spoke about.  The size mix, they're not

19   correct and we had to repackage the cartons to match

20   what's inside or they have the same size in the

21   carton.

22       Q.    So the goods that you were receiving from

23   AMCM and from Kitchen Winners and Adorama were all

24   Nitrile examination gloves?  Is that your testimony?

25       A.    To the best of my knowledge, yeah.  And

1

2   again, I had not inspected all of them personally.

3   But based on the information received from the

4   warehouse people and the logistics company, this is

5   what I got.

6        **Q.   Did you ever receive information directly**

7   **from Joel Lefkowitz or Hershey Weiner with packing**

8   **lists or the like that show the contents of the**

9   **product being shipped to you?**

10       A.   I don't remember that, no.  But I

11  remember the bill of lading showing either container

12  numbers, dates with quantities I would see, but not

13  pictures of the content that's in there.

14       **Q.   What about descriptions rather than**

15  **pictures?  Do you remember seeing that?  Something**

16  **more detailed than you would see in the bill of**

17  **lading.**

18       A.   No.  Just the same wording, Nitrile

19  gloves or Nitrile examination gloves.  And at that

20  time they all referred to the same Nitrile

21  examination gloves.

22            It was just like a matter of short

23  writing.  Instead of writing another word all the

24  time, we know it refers to the same thing.

25       **Q.   All right.**

1

2          By the way, when you would obtain

3    gloves through Mr. Lefkowitz and Weiner,

4    presumably they invoiced you for those gloves,

5    correct?

6        A.    Sure.

7        Q.    Sure.

8              All right.  I just published Stern 11

9    into the exhibit folder.

10             (Whereupon, an email was marked as

11             Stern Exhibit 11 for identification, as of

12             this date.)

13       Q.    Let me know once you have that.

14             MR. RAKHUNOV:  For the record, Stern 11

15             is an email from Joel Lefkowitz to you and

16             David Rubin and Jay Samry, subject forward

17             JNS invoice.  And it has three attachments

18             which are included in the document below the

19             email.

20       Q.    Take a look through this document.

21             MR. FRISCH:  I'm not seeing it.

22             MR. RAKHUNOV:  Maybe just refresh.

23             MR. FRISCH:  I have refreshed like

24             seven times.

25             MR. RAKHUNOV:  Stern 11?

```
 1
 2              THE WITNESS:  It's not going by order.
 3        You have to reorder it.
 4              MR. RAKHUNOV:  Yes.
 5              MR. FRISCH:  I found it.
 6        Q.   Do you recognize this email and the
 7   attachments to it?
 8        A.   Okay.
 9        Q.   Do you recognize this document,
10   Mr. Stern?
11        A.   Yes.
12        Q.   This is your email in the "to" field,
13   correct?
14        A.   Okay.
15        Q.   Okay.
16              And if you look at page 2 of the
17   document, you see title Packing List, Kitchen
18   Winners NY.
19              Do you see that?
20        A.   Yes.
21        Q.   And the date on the right is 2/8/2021,
22   and it's to JNS in red letters, correct?
23        A.   Yes.
24        Q.   And the production name under the second
25   column is non-sterile powder-free synthetic Nitrile
```

1

2     protection gloves.

3              Do you see that?

4        A.   Yes.

5        Q.   Okay.

6              So those are not examination gloves

7     that are being shipped to you?  They are

8     protection gloves, correct?

9        A.   Based on that paper.

10       Q.   Okay.

11             And the invoice on the third page of

12    the document is from Kitchen Winners to JNS

13    Services Corp., and the description matches the

14    numbers up in the packaging lists.  The invoice

15    itself just says Nitrile gloves with various

16    sizes, correct?

17       A.   Correct.

18       Q.   And it references a specific container

19    number, correct?

20       A.   Correct.

21       Q.   And this document that was sent to you by

22    Mr. Lefkowitz, you didn't provide this document to

23    Rock Fintek, correct?

24       A.   No.

25       Q.   Okay.

 1
 2             MR. FRISCH:  Objection.
 3       Q.    If then you look at page 4, it's a bill
 4   of lading, correct?
 5       A.    Correct.
 6       Q.    Do you know where a bill of lading in
 7   general terms is first prepared?
 8       A.    It depends who is shipping to whom.
 9       Q.    So whoever is shipping the product
10   prepares the bill of lading, correct?
11       A.    Usually.
12       Q.    In the middle of the document, it says
13   marks and numbers, MedCare.
14             Do you see that?
15       A.    Yes.
16       Q.    And No. of CONT or other PKGS, 3,000
17   cartons.
18             Do you see that?
19       A.    I see 3,000 cartons.
20       Q.    I was just reading the heading of the
21   column.
22       A.    Okay.
23       Q.    And next to 3,000 cartons, the
24   description is non-sterile powder-free synthetic
25   Nitrile protection gloves.

1

2              Do you see that?

3     A.    Yes.

4     Q.    And below that is a container seal number

5  again, correct?

6     A.    Correct.

7     Q.    Do you recall when you would bill Rock

8  Fintek for the gloves that you sold to them, did you

9  include container numbers as references in invoices

10  to Rock Fintek?

11     A.    It's possible, but I don't recall.  I

12  have to look at the invoices.

13     Q.    We certainly will.

14              So if an invoice from you to Rock

15  Fintek referenced container number KOCU4758119,

16  which is the number appearing in this document,

17  then it is true that the gloves shipped pursuant

18  to that invoice came from that container, correct?

19     A.    Most probably.  Not definitely, no.

20     Q.    Why not definitely?  What would give you

21  pause to --

22     A.    It was not like a drop shipment, a

23  container received and sent.  It was rather received

24  goods into a warehouse.  And when it got too much,

25  they start trying to keep track and put container

1

2    numbers on certain shipments just to

3    differentiate -- keep a difference which note come

4    from what date or what company and who is the owner,

5    and they attach labels to each load, where was the

6    container number.  This is one of the ways to keep

7    track of that.

8              When I gave a direction to the

9    warehouse to send, for example, 20,000 cartons of

10   Nitrile gloves and they gave me a container

11   number, it doesn't necessarily mean this comes

12   from the shipment.

13             It's not a matter that this particular

14   container was shipped to the customer at that

15   time.  It's just a matter that the lot that they

16   shipped was labeled with this container number to

17   keep track of this load.

18             As I said before, I always

19   double-checked and double-directed that my

20   customer need Nitrile examination gloves and

21   nothing else.

22        Q.    Okay.

23             I want to make sure I understand your

24   testimony.  So you are now testifying that --

25             MR. RAKHUNOV:  Strike that.

1

2      **Q.     What basis factually do you have for**

3  **testifying that the warehouse staff incorrectly**

4  **matched shipments to Rock Fintek to containers from**

5  **which the product came from?**

6           MR. FRISCH:  Objection.

7      A.     From my perspective, it's not

8  incorrectly.  They just used container numbers as

9  labels to keep certain shipments separate from

10  others.

11           So when will a label is the same name

12  as the container number, it's not tied that this

13  product comes from this container.  As a matter of

14  fact, the same container numbers are being used

15  over and over again in industry; it's just

16  different in dates.

17           So when they labeled a certain load --

18  let's say they have 50 pallets with a container

19  number and a container doesn't even go into 50

20  pallets, that these 50 pallets come from this

21  container.

22           Just a way that mean how to label

23  certain shipments different from another shipment

24  to keep track of what comes in and what goes out.

25      **Q.     Okay.**

1

2          So if a container of gloves shows up to

3   Avrio Logistics in, let's say, February 25th or

4   around that time, as reflected in Stern 11, and

5   the packing list shows container KOCU4758119

6   having 3,000 cartons of protection gloves in

7   various sizes and your invoice to Rock Fintek,

8   within that time frame, you know, shortly after

9   this date, references the same container number,

10  those gloves came from the same container; isn't

11  that right?

12      A.   Not necessarily.

13          MR. FRISCH:  Note my objection to the

14      question.

15      Q.   Again, what is your basis for that

16  speculation?

17          MR. FRISCH:  Objection.

18      A.   As I said, it was emptied out from the

19  container and re-sort.  Not re-sort.  It was sort in

20  the warehouse.  And when it got too much, too many,

21  they start putting labels on it.

22          So a label doesn't necessarily mean

23  it's directly from this container number.  Many

24  times they put together three containers under one

25  container number and vice versa.  It's just a

1

2   matter of keeping control of product.

3       Q.    How do you know this?  What's the basis

4   for this testimony?  How do you know that somebody

5   at the warehouse, when things got too much, put

6   boxes from one container and labeled them as boxes

7   from another container?

8       A.    Because at that time I was dealing with

9   them on a daily basis.  And sometimes the warehouse

10  people ask me I have container loads of this and I

11  have container loads of that.  I would like to put

12  it together under one label, is that okay?

13          And I said yes, why not.  It's just a

14  matter of keeping control and working efficient.

15      Q.    It doesn't sound like control, but even

16  under the scenario that you just described --

17          MR. FRISCH:  Objection.

18      Q.    Even under the scenario you just

19  described, half of the gloves invoiced to Rock

20  Fintek under the container number that we're looking

21  at would have been protection gloves, correct?

22          MR. FRISCH:  Objection.

23      A.    No, not necessarily.  Again, I called the

24  warehouse each and every time to double-check and

25  ask them over and over have you checked if this is

1

2  examination gloves because I don't want to have

3  problems with my customers.

4          So from my perspective, I have ordered

5  the receipt and to send only send examination

6  gloves.

7      Q.    So what did you do with the protection

8  gloves that you were receiving from Mr. Lefkowitz?

9      A.    I don't recall receiving them.  If I

10 remember, I had refused to accept it or returned it

11 or exchanged.  We did something that I shouldn't get

12 stuck with this protection gloves if there were any.

13 I believe that not all of them were protection

14 gloves.

15         The bottom line is I don't recall

16 exactly all the facts.  But one thing I know for

17 sure from the first point, I have focused to

18 receive and send only examination gloves.  And if

19 there were anything else, I made sure to get them

20 out of my inventory.

21     Q.    Let's look back at exhibit Stern 11.  You

22 agree that this email is directed to you and your

23 two partners, David Rubin and Jay Samry, correct?

24     A.    Correct.

25     Q.    And you agree with me that it

1

2  unambiguously states on the packing list non-sterile

3  powder-free synthetic protection gloves?

4      A.     Right.

5      Q.     And there's an invoice and a bill of

6  lading included, correct?

7      A.     Correct.

8      Q.     Did you respond to Mr. Lefkowitz saying

9  that I am not paying for these gloves, this is not

10 what I agreed to buy from you, take them back?

11     A.     Not this exact wording, but of course I

12 had responded.

13     Q.     How would you have responded to

14 Mr. Lefkowitz in this situation?

15     A.     First question would be if this is

16 something different than I got before.  And again, I

17 don't remember all the details.  I'm sorry for that.

18 But one thing that I remember is I double-checked

19 and over checked again and again to make sure that

20 the stock that I have or I held is examination

21 gloves and what I sent out is examination gloves.

22 Nothing else.

23     Q.     I understand that's your testimony, but

24 again, we're looking at a document here that shows

25 something different.

1

2           So is it your testimony that every

3    invoice that you sent to Rock Fintek that

4    references a container number that shows you

5    having received protection gloves is a mistake?

6    Every single one?

7           MR. FRISCH:  Objection.  Misstates his

8      testimony.

9    A.    I don't understand.

10          MR. RAKHUNOV:  I'm asking what his

11     testimony is.

12   A.    I don't understand the question.  I'm

13   sorry.

14   Q.    Okay.  We'll come back to that.  We will

15   slightly switch topics.

16          When you were buying gloves from

17   various sources -- well, from AMCM and from

18   Mr. Weiner and Mr. Lefkowitz -- were you treating

19   gloves as going into two separate kind of

20   categories, one for JNS and one for you

21   personally?

22   A.    No.

23   Q.    Okay.

24   A.    Maybe I didn't get your question.

25   Q.    That's fine.  I'm going to show you a

1

2   document right now so we can all be on the same

3   page.

4            While it is loading, who is David

5   Dembitzer, D-E-M-B-I-T-Z-E-R?

6       A.   The owner of MD 3PL warehouse.

7       Q.   And is MD 3PL different from Avrio

8   Logistics?

9       A.   Obviously, yes.

10      Q.   I will tell you, I get a little confused

11  with these logistics companies.  Sometimes they're

12  intertwined a little bit.

13           Were MD 3PL operating completely

14  separate warehouses and logistics services from

15  Avrio or was there some overlap?

16      A.   They're completely different.

17      Q.   Okay.

18           Were you using MD 3PL in connection

19  with buying gloves and selling gloves to Rock

20  Fintek?

21      A.   At some point, yes.

22      Q.   Okay.

23           (Whereupon, a Document was marked as

24           Stern Exhibit 12 for identification, as of

25           this date.)

1

2        Q.    Stern 12 is an email dated May 5, 2021 --

3   we're now a little bit into the spring -- from David

4   Dembitzer at MP 3PL to you.  The subject is please

5   advise JNS or Joel Stern.

6              Do you see that?

7        A.    Yes.

8        Q.    And David writes to you:  Joel, please

9   see attached DOs and advise if these are JNS or Joel

10  Stern.

11             Do you know what DO stands for?

12       A.    I believe for delivery order.

13       Q.    And then below that, there are three sets

14  of letters and numbers referenced.

15             Are those container numbers also?

16       A.    Seems like it, yes.

17       Q.    Okay.

18             Do you understand what Mr. Dembitzer

19  was asking when he was asking you to advise

20  whether they were JNS or Joel Stern?

21       A.    Yes.

22       Q.    Okay.

23             What do you understand?

24       A.    So, as we discussed before, I got the

25  majority of the gloves through Kitchen Winners

1

2   together with a group of the names that you have

3   seen in the email, including Joel Lefkowitz, David

4   Rubin, and Joel, or Jay Samry.

5            They were all handled under my business

6   name of JNS Capital.  Later on I got additional

7   gloves through a company name AMCM, and I have

8   managed the business also through my business of

9   JNS Capital.

10           However, these gloves that I purchased

11  from AMCM, I was alone without these partners.  So

12  I have to keep track.  Because when I sold this

13  load, I had partners.  When I told that load, I

14  had no partners.

15           In order to keep them separate, the

16  warehouse labeled some of these lots JNS, which

17  was referred as a group.  And the ones labeled the

18  Joel Stern's is referred that was coming AMCM and

19  has to keep separate track of this inventory.

**20       Q.   And those were private Joel Stern gloves**

**21  that came from AMCM, correct?**

22       A.   Absolutely not correct.  This is held by

23  JNS Capital.  It's just labeled Joel Stern to

24  difference that this is coming from AMCM and not

25  related to the group with Joel Lefkowitz and David

1

2    Rubin.

3         Q.    Well, that's not what you said to

4    Mr. Dembitzer, though.  Let's look at Stern 13.

5              (Whereupon, an email was marked as

6         Stern Exhibit 13 for identification, as of

7         this date.)

8         Q.    So you wrote back at 4:50 p.m.:  These

9    are Joel Stern private.  And BTW, anything that

10   comes from AMCM is Joel Stern private.  Thanks and

11   sorry for my late reply.

12        A.    That's what I said.  Joel Stern private

13   is referred to as JNS Capital.  And I'm not afraid

14   to say it again, because there is no one transaction

15   between Joel Stern, not my gloves from AMCM and not

16   selling to anyone.  Not even a single sale by Joel

17   Stern personal.

18             Joel Stern private means just the

19   different that this is not part of the group, as I

20   said before.

21        Q.    And who was funding the Joel Stern

22   private glove purchases that you were making?

23        A.    Again, it's not Joel Stern private.  It's

24   just labeled Joel Stern private because this is

25   without partners.  But still JNS Capital, and the

```
 1
 2   same type investors was --
 3        Q.    Were they actually the same investors or
 4   did you have different investors for the private
 5   gloves?
 6        A.    Some were the same and some were
 7   different.  Same idea.  Raising capital, buying
 8   gloves, and trying to sell them.
 9        Q.    And any gloves that you referred to in
10   this email as Joel Stern private, the revenues from
11   those sales went to you only and to your investors
12   for those gloves, correct?
13        A.    When you say "you only," I want to
14   specify.  This means my company, not Joel Stern.
15   There's not a single transaction to Joel Stern.
16        Q.    Your company JNS --
17        A.    Correct.  Now you get it.
18        Q.    That wasn't my question.
19              Your company JNS had no other members
20   or managers other than you, correct?
21        A.    Correct.
22        Q.    And then my question is:  So your
23   company -- any funds that went into JNS from the
24   transactions that you referred to here as Joel Stern
25   private, nobody else shared in those proceeds,
```

1

2  correct, other than investors?

3      A.    Investors and some commissions to

4  brokers.

5      Q.    So all gloves that you purchased from

6  AMCM were, as you refer to in this email, Joel Stern

7  private, correct?

8      A.    Labeled Joel Stern private for the

9  purpose to difference them from the JNS group

10  together with Joel Lefkowitz and -- and the same

11  thing here.  The gloves purchased from AMCM, this

12  comes with an overhead of logistics, warehousing.  I

13  have to pay the investors, some investors and

14  brokers.  I have to pay the -- all the costs

15  involved and brokers of the customers.

16          At the end of the day, I lost a lot of

17  money in this deal because most of the gloves were

18  not sold on time and I have to sold them for a

19  penny of the dollar just to get rid of them.

20      Q.    Do you have any accounting records that

21  would demonstrate you having lost money as you just

22  referenced?

23      A.    Not prepared accounting, but I do have

24  some records.

25      Q.    Well, whatever records you're referencing

1

2   right now, I would ask that you provide to your

3   attorney to be produced in this case.

4        A.   Whatever the attorney says.

5             MR. FRISCH:  Please follow up in

6        writing and we'll respond.

7             MR. RAKHUNOV:  Let's stop here and

8        we'll start Monday at 9:30.

9             (Whereupon, the within examination was

10       adjourned.  Time Noted, 2:08 P.M.)

11

12  STATE OF NEW YORK)

13                  ) SS.:

14  COUNTY OF        )

15

16   I have read the foregoing record of my testimony

17  taken at the time and place noted in the heading

18  hereof and I do hereby acknowledge it to be a true

19  and correct transcript of same.

20

21                              _____

22                              JOEL STERN

23  Subscribed and sworn to before me

24  on this _____ day of _____, 2023

25

```
 1

 2     _____
                            NOTARY PUBLIC
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                    C E R T I F I C A T E

 3

 4            I, Melissa Leonetti, RPR, a Notary

 5   Public of the State of New York, do hereby certify:

 6        That the testimony in the within proceeding was

 7   held before me at the aforesaid time and place.

 8   That said witness was duly sworn before the

 9   commencement of the testimony, and that the

10   testimony was taken stenographically by me, then

11   transcribed under my supervision, and that the

12   within transcript is a true record of the testimony

13   of said witness.

14            I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, that I am not interested directly or

17   indirectly in the matter in controversy, nor am I in

18   the employ of any of the counsel.

19            IN WITNESS WHEREOF, I have hereunto

20   signed this 22nd day of October, 2023.

21

22

23

24   Melissa Leonetti

25
```

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023

Index: $.25..2

**Exhibits**

SternJ-1
  5:11 42:25
  59:10

SternJ-2
  5:12 61:14

SternJ-3
  5:13 70:2

SternJ-4
  5:14 76:22

SternJ-5
  5:15 81:17

SternJ-6
  5:16 85:25
  86:4
  105:22

SternJ-7
  5:17
  112:13,15

SternJ-8
  5:18
  112:13,15

SternJ-9
  5:19
  112:13,15,
  17,20

SternJ-10
  5:20 125:8

SternJ-11
  5:21
  127:11

SternJ-12
  5:22

139:24

SternJ-13
  5:23 142:6

_____

_____
      **$**
_____

$.25  108:21

$1.5  90:12
  92:15,24
  105:5

$10,000
  26:18

$11.25  99:2,
  17,20

$11.50  99:13

$15  46:6
  108:10,15

$2,000  28:18

_____
      **0**
_____

000215_fwd_
completed_
pleasedocusign
_imfpa4900
  43:14

0box  43:15

_____
      **1**
_____

1  42:22,25
  59:10
  91:12
  94:22
  98:16
  107:12

1,200  120:8,
  11

1.5  92:19
  100:24
  105:13

1.5m  90:11,
  12

1.95  78:18

10  97:23
  119:17
  122:13
  125:5,8,10

100  46:6
  57:16,18
  89:6 91:17
  115:14

1051  120:12

11  108:12
  112:25
  116:20
  121:22
  127:8,11,
  14,25
  134:4
  136:21

11.25  100:3,
  17 102:5

11.50  92:3
  98:18
  99:25
  100:17,23
  101:18
  102:5
  108:3,18

11205  7:11,
  23

12  28:17
  70:7
  139:24
  140:2

12/15/2020
  63:20

12:04  70:8

12th  73:22

13  56:7
  77:4 79:12
  105:10,11,
  23 142:4,6

15  97:23

155  7:10

16  61:25
  122:13

178  119:19,
  23 120:5

1999  12:19

1:22  62:2

_____
      **2**
_____

2  45:10
  61:12,14
  77:10
  92:12
  94:22
  98:22
  113:4
  116:20
  128:16

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023                    Index: 2/11/21..a.m.

**2/11/21**
  118:12

**2/8/2021**
  128:21

**20**  97:23
  98:2

**20,000**  132:9

**2000**  12:18

**2014**  95:6

**2019**  15:22
  17:20
  21:21,22

**2020**  18:9
  22:9,22
  25:16
  33:20
  37:17
  48:16 62:2
  71:13 95:6
  97:16
  107:7

**2021**  21:11
  25:17
  28:21
  33:17
  37:18
  45:21
  48:16
  61:2,4
  70:7
  71:11,17
  77:4 79:12
  83:19
  86:10
  97:17

107:7
109:15
110:6
112:25
116:20
121:22
122:11
125:10
140:2

**2022**  39:7
  98:12

**2023**  98:12

**24**  92:13

**25th**  81:23
  134:3

**27th**  88:5

**2:08**  145:10

**2:57**  125:10

**2b**  96:7

**2nd**  86:13
  88:4

_____

**3**

**3**  45:21
  70:2 71:15
  82:3
  116:20

**3,000**  115:8
  130:16,19,
  23 134:6

**300**  119:25
  120:2,3

**300,000**

78:16

**36-page**  70:5

**3PL**  67:14
  139:6,7,
  13,18
  140:4

_____

**4**

**4**  64:15
  76:19,22
  77:10 86:9
  130:3

**41**  114:16

**450**  120:11

**4:50**  142:8

**4th**  88:6
  105:5

_____

**5**

**5**  81:17,19
  140:2

**50**  133:18,
  19,20

**510(k)**
  91:19,21,
  24

**56**  119:13,
  17

_____

**6**

**6**  85:23,25
  86:4 87:5

105:22
107:14

**667**  7:22

_____

**7**

**7**  98:20
  112:13
  116:17

**7,8**  112:15

**7PLT**  124:8

_____

**8**

**8**  90:20
  112:13
  121:20

**800**  119:22,
  24

_____

**9**

**9**  112:13,
  15,17,20

**90,000**  43:23

**9070854@gmail.
com**  61:21

**988**  120:13

**9:30**  145:8

_____

**A**

**A-V-I-R-A**
  68:12

**a.m.**  62:2

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023            Index: abbreviation..aids

70:8

abbreviation
 90:16

ABC  30:15

abilities
 8:14

absolutely
 90:9 104:4
 141:22

accept  46:13
 97:3
 136:10

access  22:25
 26:7 49:19

account
 19:11,20,
 23,24
 27:20
 28:12,13,
 16 92:15,
 23 103:19
 105:2,25

accountant
 36:8,10

accounting
 13:12,20
 26:19
 102:16
 106:23
 144:20,23

accounts
 13:21 28:8

acronym
 77:24

acting  89:13

actual  22:6,
 13 41:20
 54:2

add  66:23
 96:22

additional
 38:15
 141:6

address  7:9
 56:4,8
 61:22
 63:14
 82:21,24
 83:2,4

addressed
 113:10

Ader  25:20

adjourned
 145:10

adjust
 121:21

adjustment
 124:22

adjustments
 124:21

Adorama  20:3
 31:21
 32:19 39:8
 47:14,17,
 20 48:11,
 15,18
 49:16,24
 50:6 70:22

74:20
 83:13,18
 85:9,17
 91:16
 95:3,16
 125:23

adorama_
 02032021
 86:14

advice  37:23
 38:15,16
 45:6

advise
 140:5,9,19

advised
 78:21

advisement
 31:8

advising
 11:5

affiliated
 32:19
 70:22,25

affirmed  7:3

afraid
 142:13

AGM  18:12

agree  73:4
 136:22,25

agreed
 137:10

agreement
 19:18 28:6

29:25
 30:15
 44:18
 63:19,23
 64:19,23
 71:13
 75:14,16
 77:5,9,14,
 20 78:16
 79:5,15,
 16,17
 80:5,10,
 12,13,20
 81:6,8,10,
 16,22
 83:13
 84:22
 85:14
 91:3,12
 92:6,10,
 14,21 94:8
 98:21
 99:6,7,9,
 10,13,16,
 19,21
 100:6,8,25
 101:22
 104:21
 108:23

agreements
 79:10 85:8

ahead  73:9
 80:22 85:5
 87:3
 100:10

aids  8:3

Alston
  110:11
  112:24
  116:19
  121:23
  123:9
  125:11

AMCM   71:5,
  25  72:10
  73:23 74:5
  75:9,15,20
  76:3,9,14,
  18  78:20
  79:9 95:3,
  15,20
  125:23
  138:17
  141:7,11,
  18,21,24
  142:10,15
  144:6,11

amount   26:17
  30:16
  40:11
  100:22
  104:5
  105:18

and/or   85:9

Android
  48:24

anticipated
  70:12

anymore
  61:10
  109:25

apologize
  98:14

app   106:24,
  25 107:2,6

appearing
  48:22
  131:16

appears
  43:18
  82:13 96:9
  99:6

applied
  81:11

applies   74:4

apply   73:22
  80:13
  107:19

appointment
  36:13,16

approved
  52:18,25

approximate
  105:12

approximately
  21:10

April   15:23
  21:11
  22:9,22
  71:11
  109:14

areas   36:23

argue   104:17

arranged

  111:24

arrangement
  26:5 36:10
  75:22,23,
  24

arrived
  66:24
  68:24 79:7
  115:4

asks   73:18

assisted
  13:18,24
  17:22

assume
  28:21,24,
  25

assure
  103:12

asterisk
  96:17
  124:8

attach   132:5

attached
  72:15
  73:3,21
  81:23
  116:21
  117:3
  140:9

attaches
  86:6

attaching
  92:20
  121:23

attachment
  42:24
  43:18 77:5
  86:13 87:9
  91:2
  112:24
  116:23
  117:21

attachments
  70:6
  127:17
  128:7

attention
  43:25 86:5
  100:7
  116:16

attorney
  9:18,20,
  22,25 10:5
  13:16
  28:18,24
  33:21,24
  34:16 36:9
  38:13,21
  43:8 55:9
  61:20
  76:10
  78:25 84:9
  93:24
  107:10
  112:21
  145:3,4

attorneys
  30:4 84:10

audio   12:14

Avenue   7:22

56:7

average
 115:8
 116:8,14

Avira  68:10

Avrio  110:7,
 15,17,22
 112:23
 113:5,7,
 15,20,21,
 23 115:16
 117:19
 134:3
 139:7,15

Avro  68:7

aware  47:13
 75:8

Azra  44:3
 81:23 83:6

─────────
         B
─────────

back  21:12
 22:6 26:19
 29:18
 30:19
 33:13
 41:19
 52:8,17
 90:2,5
 98:15
 103:9,11
 107:5
 109:12,16,
 19 136:21
 137:10

138:14
 142:8

backed  41:12
 54:25

background
 11:15,17
 12:6,16
 37:10
 42:13
 51:13
 102:12

backup  54:20
 105:8

balance
 101:12,15

band  102:21

bank  19:20,
 22 27:20
 28:8,12,
 13,16
 92:23
 103:19,23
 105:2,13,
 19,25
 106:6

Banon  87:13,
 18,23
 89:17

based  72:7
 85:19
 99:23,25
 100:23
 101:2,9
 125:17
 126:3

129:9

basically
 38:12,19
 68:23 76:6
 89:7
 110:16

basis  16:16
 36:19
 123:3
 133:2
 134:15
 135:3,9

Bates  43:7
 61:20

Beach  13:18,
 23

begin  15:20

beginning
 23:20
 29:10,20
 60:6 73:17
 107:23
 113:24
 123:25

behalf  80:6

belonging
 103:19

benefit  79:2

Bernie  15:14

better-quality
 109:18

bhbhmmm  83:4

bhbhmnn

63:14

big  56:11,
 17

biggest  33:8

bill  27:7
 96:17,23
 118:24
 119:3,5
 126:11,16
 130:3,6,10
 131:7
 137:5

billed
 113:15

billing
 13:21
 111:24

bit  139:12
 140:3

blacked  83:7

Blink  16:6,
 12,23 17:3
 19:9,12,
 17,25
 20:13
 27:22
 103:19

block  82:14

blocked
 43:11

blue  46:2
 91:18 97:8

body  63:17

bookkeeper
  104:18

bookkeepers
  102:19

bookkeeping/
accounting
  12:23

bottom   20:22
  83:5
  120:14
  124:7
  136:15

box   46:6
  57:15,16,
  22 58:10
  76:20
  78:18
  82:15
  91:18 92:3
  98:18
  99:2,13,17
  100:17
  104:15
  108:10,15
  114:23
  115:13,14
  119:4,16
  124:16,18

boxes   43:23
  57:7,9,13,
  18 64:8
  78:16
  85:20 94:3
  102:6
  109:9,17
  111:14

114:21
115:13,18
119:9,10
120:22
124:23
125:15
135:6

Brad   23:24
  24:7 80:4

brand   32:21
  33:5 59:13
  70:18 75:2
  109:21

brand-name
  109:19

break   8:16,
  17 53:3
  59:4 112:9

briefly   7:14
  11:14

bring   63:25
  70:18
  83:22 84:4
  107:21
  109:5

broke   41:11

broker   62:17

brokering
  14:4,7
  15:3

brokers
  144:4,14,
  15

Brooklyn

7:10,23
56:3,8

brought   24:6

browsers
  67:25 68:2

Bruche   25:20
  72:12

Bruno   23:22,
  25 24:23
  25:4,25
  26:6,11,21
  27:3,5,12,
  14,20
  39:22,25
  40:6,10,
  13,24
  41:2,8,17,
  22 42:6
  44:3 52:5,
  11,23 53:9
  55:18
  58:16
  72:23
  79:16,20
  80:8 81:23
  83:6 108:6

Bruno's
  24:20 44:7

BTW   142:9

buildings
  18:16

business
  15:18
  16:3,18
  17:3,12

18:6,7,22,
25 19:2,8
20:19
22:5,16,22
23:6,7,19
24:8 27:25
29:17
30:17 32:4
33:2,5,10
34:6,24
35:2,11,
20,23
37:15,18,
25 39:4
47:8,13
48:6
51:13,21
52:19
61:6,7,10
62:23 64:5
67:6 69:9,
15 76:18
77:23
78:2,5,11
80:13,15
95:6 98:7
101:3
102:15,17,
18 103:5,
14 110:5
111:21
141:5,8

busy   18:18
  121:12

button   42:23

buy   27:25
  40:19

43:23
51:24
64:20
65:13
91:15
94:18
102:24
103:7
137:10

buyer  58:21
92:14

buying
65:18,21
75:8 88:20
138:16
139:19
143:7

───────────
         C
───────────

calculated
100:24

California
67:17

call  11:19
31:5
36:12,17
97:11
100:2
109:12
123:8

called  35:17
47:14
52:17
68:6,21
91:23,24

116:7
117:7
135:23

calling
114:6

calls  99:13

camera
12:10,11,
13 48:22

capital
19:9,12,
17,25 21:7
27:22,23
29:9,11,15
30:24
31:11,22
32:14
43:23
103:20
141:6,9,23
142:13,25
143:7

Capital's
104:25

car  55:23

Caravan
117:10,19

carrier
117:13

carton  57:18
58:12
115:12
120:18
121:19
125:21

cartons
58:13
114:25
115:7,8,
12,22
119:10,13
120:3,8,
16,21,23
121:2,3,5,
18 124:24
125:19
130:17,19,
23 132:9
134:6

case  13:14
38:24 39:2
72:22
119:21
145:3

cases  72:24

cash
103:14,17

catch  44:20
83:25 85:3

categories
138:20

cc'ing  87:13

Chaim  76:15,
16

chain  89:10

chance  10:21
81:20
106:2

change  99:24

changed
54:15

charge  15:10
111:8,13,
16 125:16

charged  27:8
111:18

chat  54:18

check  22:7,
12 27:16
54:15

checked
135:25
137:19

Chun  23:10

City  25:18

clarity  70:9

class  12:24

clear  48:21
94:6
122:10

clear-cut
73:25

client  25:12
33:8 39:17
60:8,10,24
61:6 84:10

clients
25:15
72:9,10
95:13,14
102:7
104:3

106:12,18
118:2

close  83:9

closer  61:3

colleague
89:16

collected
27:8

college
11:18,21,
22,25
12:16

color  46:2
91:18 97:8

column
118:20
128:25
130:21

columns
118:15

comfortable
38:20
47:23 98:4

commercial
58:7

commission
26:13,15,
20 27:9,14
63:6 64:13
65:10
75:24 76:5
77:9 78:18
79:10 80:9

commissions
108:5
144:3

communicate
40:24,25
41:17
54:5,9
59:18

communicated
69:3

communicating
49:10

communication
39:2 68:3

community
22:18 29:5
74:18

companies
22:25
68:16
78:22
110:17
123:17
139:11

company
13:11,13
16:2,5,9
18:12
19:13
20:8,11,25
21:6 25:19
26:4,6
29:16
59:16 75:3
80:3

102:14
109:10
117:14
126:4
132:4
141:7
143:14,16,
19,23

compensation
26:5

competently
8:22

complaining
60:18

complete
12:17

completely
84:6,15
139:13,16

computer
49:4 103:6

concern
84:15

concerned
123:21

concluded
61:7

conclusions
80:19
81:3,6

condition
100:16

conditions
99:23

100:2,5,
12,14
101:2,5,9,
12,20,25
102:3

conduct  55:7

confirmations
67:3

confirmed
66:16

conforming
51:4

confused
82:17
113:23
114:3
139:10

connect
16:20
23:2,23
37:12 62:7
103:3

connected
23:3 24:5,
16 32:6
51:23 52:3
59:25
62:14
89:18
102:24

connection
20:2 23:7,
8 26:6
55:3 63:2
67:6 79:23

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023          Index: connections..correct

139:18

connections
  25:25
  26:11
  62:25

consisted
  73:14

consisting
  70:5

consists
  115:12

consult
  37:19

consultant
  34:15,19,
  20 35:4,7
  36:11,21
  37:3

consulting
  34:23,24
  36:5 37:24

CONT  130:16

contact
  79:25
  110:14

contained
  98:24

container
  68:23 69:2
  74:7,10
  109:9
  114:14,21
  115:7,21
  118:7,10,

16,17,18
119:4
120:7
122:7
126:11
129:18
131:4,9,
15,18,23,
25 132:6,
10,14,16
133:8,12,
13,14,18,
19,21
134:2,5,9,
10,19,23,
25 135:6,
7,10,11,20
138:4
140:15

containers
  40:9,20
  64:7
  115:5,6
  121:14
  133:4
  134:24

content
  126:13

contents
  69:2 126:8

continues
  125:2

contract
  85:16,24
  86:12,13
  88:25

89:11,14
91:15,21
93:3 94:4,
13,17,18,
22 96:20
100:8
105:7

contracted
  64:16,20
  83:18

contracting
  65:12

contracts
  88:7 106:7

contrary
  98:24

control
  94:11
  135:2,14,
  15

controlled
  91:24

conversation's
  109:13

conversations
  9:18,21
  50:8

copies  30:22

copy  31:4

copying
  86:10
  112:24

corner  12:11
  73:11

124:21

Corp  16:11
  113:11,14
  129:13

corporate
  45:14

corporation
  16:2,11
  19:14

correct  8:25
  17:17,18
  19:6 22:3
  33:7
  39:22,23
  40:3,4
  45:19,20,
  21,22
  46:7,10,11
  49:3,4
  50:25 51:2
  53:6,7,11,
  12 57:16,
  17,18,19
  59:2 62:2
  63:16
  65:19,20
  68:13
  73:6,7
  84:21
  88:13,14,
  21,22
  90:13
  92:3,4,21
  93:8
  95:10,16
  98:18,19
  99:14,17

103:20,21
104:8,9,
19,20,23,
24 105:5,
23 106:13,
14,16,17,
19 110:7,
8,24
115:19,20
118:3,4,
12,13,18
119:11
120:5,6,
23,24
121:8
122:5,6,12
125:19
127:5
128:13,22
129:8,16,
17,19,20,
23 130:4,
5,10
131:5,6,18
135:21
136:23,24
137:6,7
141:21,22
143:12,17,
20,21
144:2,7

**correctly**
18:15
96:11
98:23 99:3

**costs** 144:14

**counsel** 86:9

**count** 40:18

**counted**
119:8,13

**couple** 86:3

**court** 8:12
9:5 12:7

**cover** 14:5,
13 86:21

**covered** 79:6

**COVID** 15:22
26:9 103:2
121:11

**coworker**
89:16

**CPA** 13:6

**create** 62:23

**crosstalk**
108:13

**current**
17:16

**custom** 69:13

**customer**
11:5,7,8
15:8,11
21:5 25:19
26:23 42:2
72:18
88:15,16
89:23
101:6
102:20
112:23
123:8

132:14,20

**customers**
16:18 24:4
26:8 62:22
94:20
96:24
97:15,19
103:3,11
116:6,8
136:3
144:15

---

**D**

---

D-E-M-B-I-T-Z-
E-R 139:5

D-R-A-Y-A-G-E
114:10

**d/b/a** 77:25

**daily** 36:19
135:9

**date** 20:15
21:12,13
43:2 60:25
61:15
68:23 70:3
71:13,16
76:23
81:18 86:2
98:9
109:14
112:16
118:11
122:9
125:9
127:12

128:21
132:4
134:9
139:25
142:7

**dated** 45:21
61:25
63:19 70:7
86:9 99:7,
10 140:2

**dates** 84:20
98:13
126:12
133:16

**David** 62:10,
11 63:2,4,
10,13 83:2
86:10
88:6,24
89:4,25
90:5 92:20
102:23
127:16
136:23
139:4
140:3,8
141:3,25

**day** 20:23
99:7,10
104:23
123:23
144:16

**deal** 26:10,
12,21,22
39:24
46:9,13

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023      Index: deal-to-deal..discount

62:18 63:7
74:25
104:18
110:4
144:17

**deal-to-deal**
16:16

**dealing**
17:24 22:8
26:24 27:3
39:11 40:6
41:20
44:21 45:5
47:6,10
48:15
64:10
96:24
101:17
110:10
122:24,25
135:8

**deals** 14:4,
7,8,9,11
17:9,13
18:5,20
19:6 22:10
23:8 40:5
50:4

**December**
61:25

**decided**
20:24

**Decor** 18:12

**definition**
90:17

**deliver** 80:7

**delivered**
58:6

**delivery**
121:25
123:7
140:12

**Dembitzer**
139:5
140:4,18
142:4

**demonstrate**
144:21

**depends**
130:8

**deposit**
59:24
78:21 79:3
92:16
100:24
105:9,16

**deposition**
8:7 9:4,
17,25
21:25
49:10,11

**depositions**
84:10

**Depot** 35:18

**describe**
38:18 56:5
111:23
118:15

**describing**

12:5 21:9

**description**
91:13
122:25
129:13
130:24

**descriptions**
126:14

**designated**
92:15

**designations**
13:4

**desks** 56:11

**detail** 14:8
18:3
51:15,17

**detailed**
39:6
126:16

**details**
20:21
41:25 48:7
51:14
68:24,25
72:20
91:22
99:22
100:4,11
101:8
102:3
137:17

**device** 48:23
49:3

**difference**

101:14
115:23
132:3
141:24
144:9

**differentiate**
132:3

**diplomas**
37:5

**direct** 43:25
75:23 76:9
80:23 86:5
116:16

**directed**
76:8,11
123:7
136:22

**direction**
132:8

**directly**
26:20,21
27:4,9,10
40:3,7
52:4 57:25
59:18
71:21
72:3,6
76:3 78:21
79:3,9,23
95:24 96:2
126:6
134:23

**discount**
100:3
108:22

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**

Joel Stern on 10/13/2023                    Index: discuss..email

discuss   10:5
38:3,19
74:20

discussed
9:20 35:22
53:9 63:20
140:24

discussion
50:18 75:5

diversion
12:9

dlr858   83:2

dlr858@gmail.
com.   62:5

doctor   36:13

document
30:3,14
43:3,6,17
44:2,9
45:11
68:14 70:5
73:15
77:3,13
82:3
83:21,22
84:3,4,9,
14 86:4,6,
15,20,22,
25 90:21
91:2,4
98:21
112:21
116:21,24
117:3
122:3
127:18,20

128:9,17
129:12,21,
22 130:12
131:16
137:24
139:2,23

documents
10:12,15,
19,20,23
11:2 30:23
31:6 69:6,
8 112:14

Docusign
44:3 82:10

dollar   26:17
100:22
144:19

Don   110:11,
13,17
112:24
116:19
121:23
123:9
125:11

DOS   140:9

double   85:21

double-check
66:13,15,
19 69:3
123:11
135:24

double-checked
132:19
137:18

double-
directed
132:19

draft   91:8

drafted
45:14 91:4

drayage
114:10

drive   124:2

drop   100:2,
16 101:11,
13 107:25
131:22

dropped
109:3,24

duly   7:2

_____

**E**
_____

earlier
48:21
67:24
93:7,13
95:12
117:12

early   85:13

easily   106:9

Eastern   62:2

echo   8:11

education
12:21

educational
11:14
12:5,15

efficient
135:14

email   11:2
30:13
41:17
42:24
43:18
53:25
55:15
61:13,19,
22 63:14,
17,18,20
64:15 65:5
67:25 68:3
69:8,25
70:6 71:16
72:15
73:4,21
75:17
76:21 77:3
80:2 81:23
82:21,24,
25 83:4
85:12,13
86:6,8,15,
21,25
87:2,4,9,
11 88:6,
11,17
89:5,10,
21,24
92:20
112:21
116:19,21,
22 121:22
125:7,10
127:10,15,
19 128:6,

12 136:22
140:2
141:3
142:5
143:10
144:6

emails  10:21
21:13
23:15
89:19

embedded
87:12

employed
13:8

employee
102:14

emptied
134:18

empty  64:7
83:7 109:8

end  25:17
58:20 61:3
103:13
107:16
108:24
110:5
114:21
144:16

engaged
72:18

English
90:17

enter  99:5

entered

79:14

entering
77:14
79:15
83:12 85:8

entire  33:4
86:19

entirety
50:24

entitled
84:7,11

entity  15:25
16:7 18:21
19:7,13
20:7 25:5,
6,7 35:17
47:13 68:6
70:25 71:4
76:4

equipment
14:22
21:17

ESQ  7:6

estimate
98:3

events  10:16

exact  21:13
40:14,18,
21 68:11
94:11 98:9
137:11

exam  45:25
46:16
50:21

78:17
91:18

examination
7:5 42:8,
10 52:2,6
53:5,11
65:16,18,
21,24
66:9,15,21
67:5 69:4
73:5 97:8
120:4,9,12
122:16,20
123:12,15,
23,24
124:5
125:2,24
126:19,21
129:6
132:20
136:2,5,18
137:20,21
145:9

examined  7:4
52:23

exchange
41:5 88:17

exchanged
136:11

exhibit
42:20,25
59:10
61:11,14
69:23 70:2
76:20,22
81:17

85:25 86:4
105:22
107:13
112:13,17,
20 125:8
127:9,11
136:21
139:24
142:6

exhibits
42:21 49:2
69:24
112:12,15
125:6

exist  55:13

existing
121:2,5

exists  56:2

exit  98:7

expected
118:16,21
119:21

expecting
102:13
118:22
120:3
121:17

expenses
108:7

experience
36:24

expertise
36:20

explain  20:5

29:10,13
46:18
49:14 51:8
63:23
74:2,22
99:8
102:10
115:20

**explained**
52:4,5
79:22
109:7

**explanation**
36:6 53:24

**extent** 55:13
84:19,24
107:8

**extra** 111:9
120:12,25

--- F ---

**F-R-E-I-L-I-C-H** 15:16

**facade**
18:13,14

**facilities**
42:16

**facility**
13:19
17:22
58:23 59:2
115:2

**fact** 49:22
74:25

123:14
133:14

**facts** 136:16

**factually**
133:2

**fair** 22:2
103:22
104:3

**faith** 105:16

**familiar**
68:6

**family** 29:6

**favors**
111:20

**FDA** 91:18,
21,24

**February**
45:21 61:2
71:10
83:19 86:9
88:4,6
105:3
110:6
112:25
116:20
121:22
122:10
125:10
134:3

**feel** 47:23
52:21

**feeling**
38:20

**field** 102:16
128:12

**figure** 51:8
93:21,22
103:10
105:19

**file** 43:10,
13 125:5

**files** 103:5

**fill** 119:18

**filled**
115:22
117:20

**final** 42:21
69:24
76:20
112:13

**finally** 23:3

**financial**
48:18
49:24 63:4
104:18

**financially**
48:5

**find** 34:5
68:14
93:18
102:9
108:25

**finding**
119:22

**fine** 138:25

**finish** 40:22

**finished**
40:15

**Fintek** 7:13
11:8,9
15:18 17:5
20:3 21:3,
5 23:24
24:7,12,25
25:12
27:3,4,11
33:8 35:22
37:19,25
39:2,5,8,
13,21,25
40:2,6,10,
13 41:2,23
42:7 43:22
45:11
46:10,16,
21 48:16
50:5,22
52:4,15
53:4 54:23
55:2 59:9
60:7 61:7,
8 65:17,23
66:8 67:7
68:20
69:10
71:7,10,22
72:2,7,11,
22 79:21,
23,24
80:3,7,14,
15 81:12
92:7,10
94:5,9,14,
15,16,19

95:6
97:15,18
106:12
108:10
116:13
129:23
131:8,10,
15 133:4
134:7
135:20
138:3
139:20

**Fintek's**
60:8,24
61:5

**fits**  107:23

**fixed**  111:25
114:7

**flooded**
109:17

**focused**
136:17

**focusing**
21:21

**folder**  42:21
61:12
69:23,24
112:13
127:9

**folks**  49:9

**follow**  55:14
93:23
145:5

**follow-up**

107:9

**Forget**  111:4

**forgot**  67:9,
12

**form**  45:18
51:6 58:4
85:18
95:7,18
102:17

**formal**  93:23

**formed**  28:20
29:2

**forward**
73:18
127:16

**forwarded**
27:5 44:10
90:3

**forwarding**
44:17

**forwards**
88:5,7

**found**  74:18
128:5

**frame**  17:20
37:17
108:22
134:8

**free**  106:24
111:19

**Freilich**
15:14,17,
21,25

16:14
17:8,15
18:5,8,21

**friends**
16:24
22:17,23
24:3 29:6
49:23

**Frisch**  13:17
25:2 28:10
31:5,8,12,
17 33:6
42:11,23
44:22 47:2
50:14 51:6
55:13 66:4
70:9
80:17,23
81:2 84:18
93:25
122:21
127:21,23
128:5
130:2
133:6
134:13,17
135:17,22
138:7
145:5

**front**  8:3
49:6 80:21

**fulfill**
50:22 59:9

**full**  7:15
23:23
40:11 90:6

105:16
119:18
124:9

**fund**  14:13
93:2

**funded**  93:15

**funding**  15:6
16:20,22
17:3,4
29:4,8
35:14,18
142:21

**funds**  93:2
143:23

---

**G**

---

**gain**  38:15
60:15

**Galaxy**  48:25

**game**  17:13
60:17,20
71:9

**gave**  24:3
37:24
66:13 67:2
110:5
132:8,10

**gear**  116:24

**general**  50:9
51:9 130:7

**generally**
69:18
107:12
111:6

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023                Index: generate..grade

generate
  106:22

get also
  22:19

Gilling   12:7
  23:24
  24:17 80:4

give   14:8
  38:17
  58:17 67:9
  89:3
  131:20

glass   18:15

global
  59:16,19
  78:24
  97:20

glove   20:2,
  12,19
  22:15
  23:4,8
  35:11,14
  42:10,15
  45:25
  46:9,20
  62:11 63:5
  87:24
  93:15
  97:17 98:7
  107:7
  142:22

glove-related
  113:20

gloves   11:11
  14:17,18,

20,25
17:5,24
18:3,5
20:7,9,14,
23 21:20,
25 22:11,
17 24:24
26:8
27:11,25
29:4 32:6,
7,8,12,21,
23,25 33:5
40:9 42:3,
6,8 43:23
45:6
46:16,23
49:20
50:2,5,21,
24 51:4,
19,24
52:2,6,13
53:6,11
57:9,12,16
58:3,5,13,
20,24,25
59:7,12,
20,21 60:4
63:12
64:2,3,16,
20,24
65:8,12,
14,15,16,
19,21,23,
24 66:8,9,
15,21 67:5
68:18 69:4
70:7,18,20
71:6,8,14,

22,25
72:5,10,20
73:5,22
74:4 75:2,
9,15,20
76:3,7,9,
11 78:17
83:14,17
85:17
88:20
91:17
92:5,9
94:3,7
95:5,15,21
97:4,7,8,
22 98:6,17
102:6,25
103:25
104:2,6,9,
14,15,22
105:15,19
106:11,19
107:13,15,
19 108:9,
12,17
109:4,6,
17,19,22
111:14,17
112:7
115:7,14
120:4,9,12
121:12
122:15,16,
19,20
123:12,15,
17,21
124:2,5
125:2,24

126:19,21
127:3,4
129:2,6,8,
15 130:25
131:8,17
132:10,20
134:2,6,10
135:19,21
136:2,6,8,
12,14,18
137:3,9,21
138:5,16,
19 139:19
140:25
141:7,10,
20 142:15
143:5,8,9,
12 144:5,
11,17

God   54:22

God's   90:18

good   7:12
  52:18 65:9
  79:19
  105:16

goods   66:19
  97:3
  123:11
  125:22
  131:24

Google
  114:12

government
  14:4,8,10

grade   91:18

great   43:5
  85:2

grounds
  80:25 81:2

group   23:24
  32:11 36:5
  90:2
  141:2,17,
  25 142:19
  144:9

GTS   78:24

guess   44:19,
  22 82:11,
  21 118:24

guy   14:10
  32:4 33:25
  34:4,5
  37:8 70:17
  74:18

guys   80:6

_____

**H**

_____

half   66:4
  85:21
  135:19

hand   57:12

handle
  121:15

handled
  141:5

handwriting
  96:9,10,13
  119:24

handwritten
  30:9,11,23
  93:13
  118:7

handy   30:25

happen
  101:13
  121:16

happening
  67:4 77:16
  83:23

hard   109:5
  121:10

Hashem   90:19

heading
  98:21
  130:20

healthcare
  42:15
  58:23

hear   23:17
  59:15
  66:4,6

heard   22:18
  23:15
  35:17,19
  37:7

hearing
  23:17

Hebrew
  90:16,19

held   50:18
  137:20
  141:22

helpful
  57:23

helping   63:7

Hershey   10:7
  23:3,6
  32:5,10
  47:12
  50:10
  53:15 57:3
  58:12
  62:19
  86:10
  87:16,22
  88:11
  89:21 90:6
  113:11,15,
  19,22,25
  114:4
  126:7

Hershkowitz
  76:13

high   11:17

high-racking
  108:7

Hindy   44:20,
  25

hindy@
promoeref.com.
  44:10

hire   35:7
  36:18

hired   36:7,8

history
  54:18

Hit   42:23

hold   13:3

Holding
  19:9,12,
  17,25

Holdings
  21:7
  103:20

home   58:23

honest   15:4

hospital
  58:24
  60:13,16,
  19,24 61:6

hours   92:13

house   58:4

_____

**I**

_____

ICPO   24:7,
  9,15 40:23
  43:22
  108:14

idea   15:4
  37:10 48:7
  56:14 76:6
  89:20 96:4
  143:7

identification
  43:2 61:14
  70:2 76:22
  81:17
  85:25
  112:16
  125:8

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023          Index: identified..investors

127:11
139:24
142:6

identified
77:20
100:5

identifies
104:7

identify
43:16

Im  90:18

import   64:9

import/export
47:6 64:5

important
116:5

inbound
117:8,24
122:4
123:20

include
131:9

included
127:18
137:6

including
14:17,19
123:9
141:3

incorrect
123:21
124:9,13,
23

incorrectly
133:3,8

individual
44:18
57:13
114:23
115:22
119:9

individually
114:23

individuals
77:21

industry
133:15

informal
85:13

information
39:3
54:22,24
66:11,12
68:17,22
73:18 80:2
93:19
102:9
103:4
106:8,16
126:3,6

initial
30:20,23
31:10
40:12,22
42:4 79:17
89:21
100:24

initially

79:22

inserting
96:19

inside   111:4
119:4
125:20

inspected
124:4
126:2

inspection
72:17,19
73:12,13,
14 74:3,7,
12 96:10,
23,25
97:2,6,10,
12,14
120:15
124:9

instructions
66:12 67:2

instructs
13:16

interest
63:4

interested
65:18,21

intermediary
83:7 95:25

interruption
12:4

intertwined
139:12

introduced
41:23
79:21,22
81:14

introducing
42:19

introduction
39:21 51:9

inventory
136:20
141:19

invest   31:21
32:14
62:11

invested
29:16

investing
30:15

investment
29:12,15
30:20

investments
29:9,24
30:24

investor
35:10,15
93:9

investors
14:5,12
17:4 28:2
29:5,19
31:11,15
49:23
93:4,6,15

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023                    Index: invoice..Joel

143:2,3,4,
11 144:2,
3,13

**invoice**
112:25
113:5,7,10
114:9,19
127:17
129:11,14
131:14,18
134:7
137:5
138:3

**invoiced**
110:22
127:4
135:19

**invoices**
10:20
11:4,10
106:13,15,
23 107:4,
6,20,21
131:9,12

**involved**
9:7,11
14:12,25
15:5,17
17:2,4
18:6 19:5
20:11,25
21:21
22:4,7,15
23:18
24:24
25:17
33:2,9

37:15
38:13
44:25
46:10
47:18,24
51:17 64:4
144:15

**involvement**
33:4

**involving**
20:2

**issue** 10:16
39:11,12,
14 109:20

**issues** 64:9
73:13
109:11
110:4

**iyh** 90:11,
15

—————
—————
J
—————

**Jack** 34:8,
14 35:10,
23 36:7,20
37:3,12,19
38:4,16,24
39:7

**janitorial**
14:15,18

**January**
28:21 70:7
71:17
73:22 77:4
79:12

81:23 88:5

**Jay** 86:11
127:16
136:23
141:4

**Jersey** 67:8,
13,15
124:2,3

**Jewish** 11:16

**JNS** 21:6
27:22,23
28:4,6,8,
15,19
29:2,8,19
30:24
31:11,16,
22 32:14
43:22
86:12
88:18
89:12,14,
15 92:25
103:20
104:25
113:11,14
127:17
128:22
129:12
138:20
140:5,9,20
141:6,9,
16,23
142:13,25
143:16,19,
23 144:9

**job** 8:13

12:25
17:16
18:8,17

**Joel** 7:8,15
31:24
33:15
34:12
47:12
53:18 54:9
55:4,11,23
57:3 62:4,
8,14,18
63:3,8,14,
24 64:10,
21 65:6
70:6,16
73:21
74:16
75:22
76:16 77:3
78:17
80:18
82:25 83:4
84:18
86:11
87:12
88:5,13
89:16,22,
24 90:3
102:23
108:6
126:7
127:15
140:5,8,9,
20 141:3,
4,18,20,
23,25
142:9,10,

12,15,16,
18,21,23,
24 143:10,
14,15,24
144:6,8,10

Joseph 10:9
87:12,15
89:10,13,
19,22

July 33:17,
18,20

June 33:16,
18 71:19
109:15

___

K
___

Kato 23:24
24:16 80:4

keeping
135:2,14

kind 14:9,
14 19:12
34:19,22
36:10
37:3,6
38:16
48:5,23
59:23
62:17
80:10,11
138:19

Kitchen 20:3
31:21
32:19 39:8
46:24,25

47:4,5,11,
17,21
48:4,10,14
49:15,19
50:25
51:23
52:11
55:23,24
62:20
63:2,25
64:21
70:22
74:20
75:10
76:7,8
83:13 85:9
86:12
87:22
89:11,14
91:6,16
95:4,16
101:6,15
102:24
125:23
128:17
129:12
140:25

knew
123:14,16

knowing
15:11

knowledge
66:10
70:21 73:9
125:25

KOCU4758119
131:15

134:5

___

L
___

LA 67:16

label 43:7
133:11,22
134:22
135:12

labeled
65:23 66:8
124:17,23
132:16
133:17
135:6
141:16,17,
23 142:24
144:8

labels 112:6
132:5
133:9
134:21

labor 111:9
120:25

lading
96:17,23
118:25
119:3,5
126:11,17
130:4,6,10
137:6

language
96:19

large 67:15
115:23
120:12,13

124:17,18

late 142:11

law 9:5

lawsuit 9:8,
14 10:17

learn 60:23

learned
11:17 61:5

leave 18:17

Lefkowitz
31:25
32:14,18,
22 33:14,
15,21
34:8,12,14
35:10,13,
23 36:7,21
37:3,13,20
38:4,10,
17,24 39:7
47:12
53:18
54:9,13
55:4,12,23
57:4 59:8
62:4,8,15,
18 63:3,24
64:11,21
65:7,13
82:25
86:11
87:13 88:5
89:16,22,
24 90:3
102:23
108:7

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023                    Index: left..majority

126:7
127:3,15
129:22
136:8
137:8,14
138:18
141:3,25
144:10

left   56:10
116:25
122:23

leftover
28:17
109:23
119:18

legal   7:15
30:2 80:19
81:3,6

lender   35:15

letterhead
45:11

letters
128:22
140:14

level   30:3
50:10
78:12 80:3
89:18
103:7
107:14

Li   23:11,13

liability
16:2,9
19:13,15

life   23:9
35:2
104:19

limited
16:2,9
19:13,15
48:17

list   95:13
128:17
134:5
137:2

listed
101:21

lists   126:8
129:14

litigation
9:7 31:7
38:3,11
39:9 55:3

live   7:21

living
13:18,24
17:22

LLC   19:15,
17 20:2
21:7 27:24

load   70:20
118:11
122:9
132:5,17
133:17
141:13

loading
139:4

loads   40:8
135:10,11

loan   29:15

loans   29:9

located   7:19

location
67:16

locations
67:14

logistic
110:14
117:17

logistics
68:7,10,16
69:8 108:4
109:6
110:8,22
112:23
113:5,8,
16,20,22
115:17
126:4
134:3
139:8,11,
14 144:12

long   13:18,
23 77:15
83:23
84:17
112:4

looked   50:12
56:6,9,10,
13 59:10
85:12
122:5

loose
115:10,12

lost   54:22,
24 144:16,
21

lot   25:19
36:23,24,
25 42:3
51:20
54:22,24
74:8,10
103:10
124:4
132:15
144:16

lots   141:16

_____

M

M-A-R-C-A-N-O
112:22

M-A-S-R-Y
63:8

M-E-N-D-L-O-V-
I-C   70:11

made   43:8
79:4 97:18
103:15
107:15
123:8
136:19

major   73:13

majority
57:10,11
140:25

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023                    Index: make..Melvado

make   26:9
  30:8 31:2
  33:19
  36:12,15
  38:20 45:7
  51:3 52:21
  66:14,19
  69:3 72:8,
  20 97:13
  101:14
  107:9
  108:8
  115:5
  123:11,18
  132:23
  137:19

makes  108:11

making  22:18
  51:20
  107:16
  142:22

man  23:22

manage  13:20
  19:10
  115:2
  121:14

managed
  141:8

managers
  143:20

mandate  83:6

manpower
  121:15

manually
  120:17,20

manufacturer
  59:11
  95:24 96:3

manufacturing
  121:11

Marcano
  112:22

March  15:23

marked  42:25
  61:12,13
  69:25
  76:21
  81:16
  85:24
  112:14
  116:17
  124:9,13
  125:7
  127:10
  139:23
  142:5

marks  130:13

markup
  107:17,18

Masry  63:8
  83:4
  102:23

Masry's
  63:11,14

match  14:12
  71:23
  82:23
  125:19

matched

133:4

matches
  129:13

matching
  119:8

materials
  8:3 69:14
  72:15
  73:3,21

matter  16:19
  38:17
  55:12 97:6
  126:22
  132:13,15
  133:13
  135:2,14

MD  67:14
  139:6,7,
  13,18

meaning
  20:15
  31:17
  115:13

means  34:22
  53:20
  69:18
  73:12 78:5
  90:18
  91:21
  114:11
  118:22
  119:2
  120:15
  124:12,13
  142:18
  143:14

meant  41:2

Medcare  23:4
  32:23,25
  33:5 57:9
  59:13,16,
  19 65:14,
  15,19
  70:18 75:9
  78:16,22,
  24 79:2,3
  95:4,21
  130:13

medical
  11:18,22,
  24 42:15
  45:25
  46:15
  50:21
  51:19,24,
  25 52:6
  53:5,11
  59:2 60:5
  91:18

Medicare
  45:25

medications
  8:20

medium
  115:23
  120:8
  124:19

meet  33:14
  52:12

meeting  57:3

Melvado

25:19

**members** 28:4
143:19

**memorialized**
16:15
29:24
30:23

**memory** 8:3
25:8 33:16
53:23 61:9
66:11
83:24
84:13
85:3,19
87:25
98:11
100:9
124:14
125:17

**Mendel**
87:13,18,
23 89:17

**Mendlovic**
70:6,10,
16,21,24
71:7,8
72:14
74:16,21,
24 75:23
76:3,15,16
77:4

**Mendlovic's**
73:21

**Mendlowits**
10:9

**mentioned**
55:17
57:24

**messages**
41:5,7,12
54:12
55:4,8,11

**met** 7:14
24:5 74:19
89:3

**middle** 7:17
45:24
98:12
130:12

**million**
85:20
90:12
92:15,19,
24 94:3
98:17
102:6
105:5,13
107:12
109:17

**mind** 51:10
102:11,12

**mine** 26:23
82:17

**minus** 124:21

**minute** 50:13

**minutes**
39:20
50:20 60:3

**missed** 69:20

**Misstates**
138:7

**mistake** 84:2
85:4
113:17
114:5
138:5

**mistakes**
66:20
121:15

**mix** 115:22
116:7,8,9,
14 123:18
125:18

**mixed**
120:14,17
121:19
124:15,18
125:11,15

**mixes** 116:13

**mixing**
124:15

**modifies**
99:16

**modify** 99:6

**moment** 8:16
25:9 38:2
55:17
57:24
81:15
93:11

**moments** 86:3

**Monday** 145:8

**money** 19:10,
23 22:19
27:25
29:7,16,17
30:19
31:16
51:20 79:8
104:8
144:17,21

**months** 13:25
17:21
28:17 61:3

**Mordechai**
76:13

**morning** 7:12
8:22 95:12

**MP** 140:4

**mute** 12:8

**Myrtle** 7:22

---

**N**

**Nachas** 25:20
72:12

**named** 18:12
19:9 21:6
23:13,22
25:19
31:24
44:25
110:11

**names** 31:10
68:9 76:14
82:23
93:7,14

141:2

**narrative**
39:7

**nature**  75:5

**necessarily**
49:22
84:22
132:11
134:12,22
135:23

**needed**  56:12
58:9
102:25
109:24

**neighbors**
16:24

**networking**
36:24

**nice**  22:19
32:4 33:25
34:5 51:22
62:24
111:20

**nickname**
88:13

**Nitrile**
42:8,10
45:25
50:21
51:25
65:16,18,
21 66:15,
20 67:5
69:4 73:5
78:17

91:17 97:8
120:4,8,12
122:15,16,
19,20
123:12,15
124:5
125:2,24
126:18,19,
20 128:25
129:15
130:25
132:10,20

**non-
circumvention**
79:15
81:10,22

**non-disclosure**
79:16

**non-sterile**
128:25
130:24
137:2

**Notary**  7:3

**note**  30:4,
7,9,11
66:23
73:10
78:12
82:11
132:3
134:13

**noted**  107:4
108:15
145:10

**notes**  8:2
31:4 93:13

**notice**  12:10

**Notwithstandin
g**  98:24

**number**  24:4
61:20
68:23 74:8
80:2 82:13
84:2
118:7,10,
22,24
120:8
122:7
129:19
131:4,15,
16 132:6,
11,16
133:12,19
134:9,23,
25 135:20
138:4

**numbers**
101:16
119:8
126:12
129:14
130:13
131:9
132:2
133:8,14
140:14,15

**nursing**
58:23

**NY**  128:18

─────────

O

**oath**  8:24
9:4

**object**  84:19

**objection**
24:19 25:2
28:10
31:12,17
33:6 42:11
47:2 51:6
80:17
85:18
95:7,18
122:21
130:2
133:6
134:13,17
135:17,22
138:7

**obstacles**
64:6 110:4

**obtain**  16:22
29:3,4,8
46:15,23
53:14 71:6
75:2 127:2

**obtained**
53:13
55:18 71:8
95:21,23

**obtaining**
15:10

**October**
98:12

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023                                    Index: offer..palletize

offer   24:6

offhand
  22:12
  26:19
  31:19
  39:18 98:9
  107:25

office   7:23
  12:11
  13:19
  14:16
  55:22,24,
  25 56:2,3,
  5,9,10,12,
  15,19,22
  57:2 89:4
  102:20

official
  11:18,20
  16:17 18:7
  72:21
  97:10
  99:24

officially
  30:2

one-man
  102:21

one-off   21:9

open   19:22,
  24 28:11
  43:3 61:17
  67:25 68:2
  86:4 106:2
  112:17

opened   19:7,

8 27:24
  120:21

operated
  25:4

operating
  18:22
  19:8,18
  28:6
  139:13

opportunity
  34:5 41:24

opposed
  97:18
  99:20

opposite
  101:7

option   54:21

order   24:11
  42:4 45:15
  46:17
  50:12,22,
  24 51:5
  59:9 66:14
  98:25
  109:16
  114:22
  128:2
  140:12
  141:15

ordered
  136:4

orders   64:12

ordinary
  69:14

orientation
  121:21

original
  99:20
  101:17

overflow
  109:21

overhead
  144:12

overlap
  139:15

overseas
  64:9

overtime
  111:9

overwhelming
  121:12

owner   19:2
  56:13
  102:15
  132:4
  139:6

_____

_____
      P
_____

p.m.   125:10
  142:8
  145:10

pack   114:24

package
  121:13

packaged
  125:15

packages

125:12

packaging
  73:4
  129:14

packed
  121:19

packing
  68:17
  126:7
  128:17
  134:5
  137:2

pad   82:12

pages   73:11,
  17

paid   19:5
  26:17,21
  27:14
  28:2,18
  29:18 35:8
  76:4,11
  79:7 80:7
  101:10
  103:7,24
  104:10,12,
  13,14,15
  105:20
  108:3,4,
  12,17
  110:25
  112:5

pallet
  119:13,16,
  18

palletize

111:14
114:16
115:18

pallets
111:16
114:20,25
115:18,24
119:13
124:13
133:18,20

pandemic
51:18

paper  30:10,
11 54:2
75:17
105:8
129:9

paperwork
27:5 37:6
41:19
52:8,10,25
53:13,14,
20

paragraph
77:18,19
78:15
91:12
92:12 96:7
98:16,22

part  13:12,
21 20:24
32:10,11
39:3 51:21
54:25
64:21
100:20,21

110:19,21
124:22
142:19

parties
30:14

parties'
84:10

partner
15:7,11,13
16:17
48:18
49:24
63:10

partnered
14:10

partners
19:16
20:8,19
39:11,14
107:15
108:6
136:23
141:11,13,
14 142:25

partnership
16:14

party  9:8,11
72:5 79:2
123:10

pass  97:12

passed
73:11,12
74:3 97:2,
12,14

past  52:7

pause  59:5
112:10
131:21

pay  26:20
27:9,16
28:2 35:9
36:16
100:7,22
101:12,15
104:5
108:5
144:13,14

payable
13:21

paying  76:2,
4,7,9
137:9

payment  11:5
27:8,10
40:2 76:11
92:2,12
105:15
106:18

payments
27:21

PDF  86:7
116:21

pending  8:18

penny  144:19

people  13:20
16:20,25
17:2 22:18
24:8 29:5,

6 32:6
36:8 50:9
51:19
57:4,21
62:7,17,24
65:7,8
67:3 82:24
102:22
108:5
109:5
111:20
112:3
123:9,17
126:4
135:10

percent  89:6
97:23 98:2
105:8,10,
11,17,23

percentage
26:16
97:17
105:14

perfect
119:25

period  25:16
103:25
109:4

person  8:8
34:9 54:2
76:4 87:15

personal
14:21
21:16 24:2
35:2 49:15
55:22 71:2

77:23
78:11 80:3
89:18
103:7
124:4
142:17

**personally**
23:14 25:5
52:12
77:21
126:2
138:21

**perspective**
94:21
133:7
136:4

**Phil**  50:14
68:13

**Phillip**  7:6,
13

**phone**  24:5
38:7 41:3,
11,12,14,
20 54:19
80:2 123:8

**phones**  41:15
49:6 54:15

**phrase**
64:16,18

**physically**
7:19,22

**pick**  52:12
109:14
114:23

**picked**  55:22
57:5,13

**picking**
114:14

**picture**  89:8
90:6 97:20

**pictures**
126:13,15

**pie**  22:20

**piece**  22:20
26:12
30:9,11,20

**pieces**
119:18

**PKGS**  130:16

**place**  21:10
38:19 64:8
68:9 93:18

**places**  42:16
82:14

**PLT**  124:13

**PO**  40:12,19

**POD**  121:23,
24

**point**  11:3
26:7 38:4
71:12
101:24
136:17
139:21

**port**  58:6
109:11

**portion**
65:22 92:9
114:18

**ports**  64:7

**POS**  14:13

**position**
32:9

**powder-free**
128:25
130:24
137:3

**PPE**  21:15,
22,24
22:5,19,22
23:2,18
24:4
25:12,15
26:3 27:24
29:2 30:17
33:2,4,9
37:15
39:17
42:13 45:5
47:9 48:7
51:13
62:22
64:2,4
101:3
102:15

**practice**
69:13

**prearranged**
57:3

**preparation**
9:25

**prepare**  9:16
10:12

**prepared**
89:9 91:5,
6 94:11
117:21
130:7
144:23

**prepares**
130:10

**preserve**
31:3 107:8

**preserved**
41:8 107:8

**preserves**
54:18

**prevent**  89:8

**previous**
108:14

**price**  20:20
46:6 75:19
92:2
98:17,22,
25 99:6,
24,25
100:2,16,
21,23,25
101:10,13,
18,21
102:4
104:22
107:23,24,
25 109:24
111:25

**prices**

107:22
109:3

primitive
  103:6

print   112:6

prioritize
  64:11 65:7

private
  12:24
  13:19 17:8
  29:6,16
  30:3,4,7
  34:20 65:4
  141:20
  142:9,10,
  12,18,22,
  23,24
  143:4,10,
  25 144:7,8

privately
  30:13

problem
  51:16
  55:14
  109:9
  124:15

problems
  109:2,7
  136:3

proceeding
  59:6
  112:11

proceeds
  143:25

procuring
  15:2

produced
  61:19 86:8
  87:9
  112:21
  145:3

producing
  121:12

product
  30:18
  91:13,15
  114:2,20
  119:3,22
  126:9
  130:9
  133:5,13
  135:2

production
  31:6 43:8
  55:11
  128:24

products
  14:14
  45:24
  115:4
  117:25

profession
  37:6

professional
  13:3 36:14
  65:5
  102:18
  104:19

professionals

30:5

profit   29:18
  30:20,21
  51:22 65:9
  79:4 103:3
  107:14,16,
  17 108:8

project
  105:12

promised
  64:3

promises
  104:22

pronounce
  18:14

proof   121:25

protect   80:9

protection
  65:24 66:9
  129:2,8
  130:25
  134:6
  135:21
  136:7,12,
  13 137:3
  138:5

protective
  14:21
  21:16

provide   31:4
  35:13
  38:23
  46:21
  55:8,18

57:12
  68:17
  112:5
  129:22
  145:2

provided
  23:4 45:18
  52:11,22
  58:16
  68:21
  110:23
  111:18,25
  115:17

providers
  69:8

providing
  18:15
  38:25

PSA   98:25

public   7:3
  58:7 112:2

published
  42:20
  127:8

pull   61:16
  107:6

pulled
  120:22

purchase
  15:5 24:11
  29:4 32:6,
  21,25 42:7
  45:15
  46:17
  49:19

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023      Index: purchased..reasonable

50:12,22,
24 51:5
59:9 73:23
75:15,23
83:14,18
91:3,11
92:6 94:8
98:15,22,
25 99:6,7

purchased
27:11
32:7,8
75:20
94:8,15
107:13
141:10
144:5,11

purchases
17:4 62:12
93:15
142:22

purchasing
64:24

purpose
29:17
30:16
78:12
94:16
122:23
144:9

pursuant
46:16
107:13
131:17

pursue  12:21

put  31:16
43:10
48:20 60:4
61:11
70:4,10
76:19
106:7
109:20
112:12
131:25
134:24
135:5,11

putting  63:7
69:22
99:20
134:21

―――――――
Q
―――――――

qualification
91:23

qualified
81:4

quantities
40:22
119:6
126:12

quantity
40:11,13,
14 73:24
83:17
85:17
114:17
116:9,10
118:21,23
119:3

question
8:18 34:4,
25 36:4
51:15 65:2
66:5,6,7
74:22
75:25
77:12,17
84:13 99:8
106:5
117:2
125:14
134:14
137:15
138:12,24
143:18,22

questionnaire
49:17

questions
8:12 51:10
70:13 84:8
86:21,22
89:8 90:8
110:3

―――――――
R
―――――――

Raising
143:7

Rakhunov
7:6,13
24:19
31:2,9
42:18 43:9
50:16
55:10 59:4
61:11

69:22
70:12
76:19 77:2
80:25 81:5
84:21 87:7
112:9
127:14,22,
25 128:4
132:25
138:10
145:7

re-sort
134:19

reaction
75:11

read  77:11
99:3
100:7,15

reading
96:10
98:23
130:20

ready  20:9
50:2 52:19
83:24

real  23:9

reality  74:6
95:8
101:11,13
114:5

reason  8:19,
20 56:20

reasonable
103:23

rebate
  108:22

recall  10:2
  20:12
  22:12
  23:17
  24:21
  25:9,24
  26:15
  28:19
  31:10,15,
  19 35:20
  38:25 39:4
  41:16,25
  48:12,14
  50:4,8
  53:19,24
  57:6 60:25
  61:4 66:8
  68:10,25
  69:6
  72:13,14
  75:11,19
  77:11,14
  81:15
  83:12
  85:16
  96:19
  101:4
  102:2,5
  107:14
  108:9
  111:3
  116:12
  117:11
  131:7,11
  136:9,15

recalling
  81:11

receipt
  136:5

receive
  78:20
  108:21
  126:6
  136:18

received
  27:10
  58:3,4
  66:11 67:3
  95:15
  104:2
  117:25
  119:7
  123:7,12,
  20 126:3
  131:23
  138:5

receiving
  68:19 69:6
  125:22
  136:8,9

recipients
  62:4

recited
  84:20

recognize
  43:17
  63:19
  77:9,13
  82:5 113:4
  117:3
  128:6,9

recollection
  10:16
  28:25 44:6
  60:21
  93:14

reconcile
  119:7

record  43:6,
  10,16
  48:21
  50:16,19
  70:5,10
  77:2
  112:20
  121:22
  127:14

recorded
  12:12

records
  22:12
  103:5,24
  106:7
  107:6,9
  144:20,24,
  25

recovered
  54:18

red  73:11
  128:22

reduction
  101:21

refer  29:11
  57:21
  101:6
  125:2

144:6

referenced
  24:9 82:24
  92:20
  131:15
  140:14
  144:22

references
  129:18
  131:9
  134:9
  138:4

referencing
  144:25

referred
  14:21
  113:21
  122:19
  126:20
  141:17,18
  142:13
  143:9,24

referring
  11:8
  21:16,24
  29:15
  30:9,12
  48:14
  50:5,7,10
  64:23
  83:21
  84:23
  125:14

refers  64:16
  90:12
  116:2

117:10
126:24

**reflected**
73:15
134:4

**refresh**
10:15  25:8
42:23  44:6
93:14
100:9
127:22

**refreshed**
127:23

**refused**
136:10

**related**
76:17
78:22
94:14
98:10
107:7
141:25

**relating**
39:12

**relation**
20:13  33:5
34:12
94:22

**relationship**
47:17
48:10  60:7
69:9

**relatives**
16:24
22:24  29:6

**relevant**
13:14

**remainder**
80:14

**remember**
11:3,19
12:18,19
15:23  17:6
18:10,13
20:16,18,
21  21:8
23:23
25:10,21,
22  26:16,
17,18
29:21  36:3
37:21,23
39:6,10,18
40:10,11,
14,18,21
41:18  42:2
44:14,15,
17,23,24
45:4,8
54:3
55:15,19
56:4,8
57:8
59:22,23,
24  68:11
71:18,19,
24  72:13
75:17
76:10
78:23
79:14
80:10

82:17  84:8
85:8,21
92:25
93:7,9,11
95:14
97:11,22,
24  98:9,13
99:22
100:3
101:4,7
102:22
105:10
107:25
108:24
109:12
110:10,18
114:6,7,8
117:15
126:10,11,
15  136:10
137:17,18

**removing**
114:14

**rented**  56:12

**reorder**
128:3

**repackage**
120:17,19,
20  121:6
125:16,19

**repackaged**
120:23

**repackaging**
121:3

**repeat**  13:9
123:6

**reply**  142:11

**report**
72:17,19
74:7,12
96:10,23
97:2,6

**reporter**
8:12

**represent**
7:13  87:8

**representative**
112:23

**represents**
117:24

**request**
93:24
107:9

**requested**
58:11
85:22  97:9
113:23
116:6

**requesting**
55:10
96:25

**required**
116:8,13

**requirement**
92:13
96:22

**Reseal**  121:9

**respect**
37:24  84:8
116:13

respond
  93:25
  137:8
  145:6

responded
  137:12,13

rest   67:13

retape   121:6

returned
  136:10

revenues
  143:10

review
  10:12,19
  11:10
  63:17
  69:14
  88:12
  89:16,23
  103:23

reviewing
  69:19

reworked
  124:8

rid   94:16
  144:19

right-hand
  96:8

Rock   7:13
  11:8,9
  15:18 17:5
  20:3 21:3,
  5 23:24
  24:7,12,25

25:12
27:3,4,11
33:8 35:22
37:18,24
39:2,5,8,
13,21,25
40:2,6,10,
13 41:2,22
42:7 43:22
45:11
46:10,16,
21 48:15
50:5,22
52:4,15
53:4 54:23
55:2 59:9
60:7,8,23
61:5,7,8
65:17,23
66:8 67:7
68:19
69:10
71:7,10,22
72:2,7,11,
22 79:21,
23,24
80:3,7,14,
15 81:11
92:6,10
94:5,9,14,
15,19 95:6
97:15,18
106:12
108:9
116:13
129:23
131:7,10,
14 133:4

134:7
135:19
138:3
139:19

role   49:15
  63:11

Rong   23:10

room   7:24
  56:11

rotate
  116:25

row   124:7

rubber   42:14

Rubin   62:10,
  11 63:2,
  10,13 83:3
  86:10
  88:7,24
  89:25
  90:5,10
  92:20
  102:23
  127:16
  136:23
  141:4
  142:2

Rubin's   63:4
  89:4

run   48:6

_____

S

_____

S10   48:25

sake   109:13

sale   15:6
  21:3,22
  22:7,13
  91:11
  98:16
  142:16

sales   91:2
  92:6 94:8
  97:17
  107:7
  143:11

sample   52:13
  58:9 74:3,
  9

samples
  52:7,24
  55:18,21
  57:5,6,13,
  14 58:14,
  16 74:11

Samry   86:11
  127:16
  136:23
  141:4

saved   54:23

scan   122:9

scenario
  135:16,18

schools
  11:17

scope   31:18

screen   49:9

screens
  67:25

scribble
  82:11

scroll  72:16

seal  131:4

search  55:4,
  8

secondary
  12:21

secretaries
  102:19

seek  38:15

sell  20:9,
  10,23,24
  22:11 23:5
  27:25
  32:25 47:9
  50:3 59:9
  65:9 72:24
  78:16
  94:19,20
  103:3,7
  107:19
  118:2
  143:8

seller  83:5
  92:15

selling
  60:19
  64:25 66:8
  71:10
  94:15 98:6
  101:3
  108:9
  139:19
  142:16

send  27:3
  52:15
  55:15
  58:11
  59:24
  72:25
  76:11
  78:21
  89:5,23
  90:5 123:7
  132:9
  136:5,18

sending
  68:19
  72:15
  88:24
  89:10,14,
  15,22,24

sense  33:19
  45:7 72:8
  108:11

separate
  99:19
  115:24
  116:11
  133:9
  138:19
  139:14
  141:15,19

September
  39:7

service
  102:20
  110:15
  111:18
  112:23

113:23
  114:13

services
  35:8
  59:16,19
  110:7,23,
  25 111:4,
  23,25
  113:11,14,
  20 114:9,
  15 115:16
  117:17,18
  129:13
  139:14

servicing
  47:6

sets  140:13

setup  102:18

shared  38:12
  41:19
  143:25

shareholder
  16:12

shares  19:16

sharing
  16:18

sheet  68:22
  117:7,8
  124:20
  125:3

sheets  69:7

ship  64:8

shipment
  66:24

73:23
  78:19
  79:5,7,8
  118:25
  131:22
  132:12
  133:23

shipments
  132:2
  133:4,9,23

shipped  11:6
  66:18,25
  119:2,6
  126:9
  129:7
  131:17
  132:14,16

shipping
  10:20,23,
  25 64:7
  66:20
  68:24
  109:10
  110:20
  117:17
  119:4
  121:12
  130:8,9

short  121:15
  126:22

shortened
  122:24

shortly
  79:14
  134:8

| | | | |
|---|---|---|---|
| show 73:4 | signed 24:7 | sizes 115:24 | 92:6,10 |
| 84:14 | 30:14 | 119:6 | 102:6 |
| 103:24 | 80:6,9 | 120:16 | 106:11 |
| 126:8 | 81:8 88:25 | 121:19 | 131:8 |
| 138:25 | 90:2 | 124:18 | 141:12 |
| showing | signing | 129:16 | 144:18 |
| 126:11 | 92:14 | 134:7 | solely 116:2 |
| shows 134:2, | similar 18:8 | sizing | sort 111:16 |
| 5 137:24 | 19:9 42:16 | 121:18 | 115:17,20 |
| 138:4 | 51:11,13 | Skillman | 116:5 |
| shrinkwrap | 122:4 | 7:10 | 120:18 |
| 111:14 | Simple 62:16 | skipped | 134:19 |
| 114:16 | simultaneous | 69:20 | sorting |
| 115:18 | 108:13 | slight 12:9 | 115:25 |
| shrinkwrapped | single 93:9 | slightly | 116:2 |
| 114:25 | 138:6 | 138:15 | sound 135:15 |
| 115:11 | 142:16 | slips 68:18 | source 46:21 |
| side 83:3 | 143:15 | small 51:21 | 50:5 62:22 |
| 96:8 98:21 | sir 17:24 | 57:16 | sourced |
| 99:5,9,16 | sit 65:25 | 70:19 | 95:15 |
| 100:6,8, | 97:16 | 115:23 | sources |
| 19,25 | | 120:3 | 95:4,9,10 |
| 108:23 | sitting 9:5 | 124:17,19 | 138:17 |
| 119:17 | 116:12 | smartphone | sourcing |
| sign 56:17 | situation | 48:24 | 25:25 |
| 89:4 90:6 | 137:14 | SMS 41:5,7 | 26:6,11 |
| signage | size | sold 17:5 | 59:8 |
| 56:15 | 115:13,22 | 24:25 | speak 8:14, |
| signature | 116:2,4,5, | 25:18,19, | 15 9:24 |
| 82:4,14, | 7,8,9,10, | 20 30:18 | 10:4,7 |
| 15,22 | 11,13,14 | 40:9 57:10 | 48:8 |
| 90:22 | 119:19,22 | 65:23 | speaking |
| signatures | 120:18 | 71:7,21,25 | 107:12 |
| 82:5 | 124:15,16 | 72:6,10 | special 34:3 |
| | 125:18,20 | | |

38:18
116:9

**specific**
10:24
21:12
49:17 50:6
52:20,22
60:25
65:15
68:25
73:23
74:6,7
80:16
102:25
120:7
129:18

**specifically**
20:12
22:21
36:22 39:5
50:7 52:7
53:5,10
111:13

**specifications**
51:4

**specifies**
104:22

**speculation**
134:16

**spell**   15:15

**spelled**
70:10

**spelling**
68:11

**SPERBER**

85:18
87:5,10
95:7,18

**spoke**   47:19
74:19 88:2
123:10
125:18

**spoken**   87:23

**spring**   140:3

**staff**   133:3

**stamp**   50:15

**stand**   90:15

**Standard**
62:2

**stands**
121:25
140:11

**start**   22:10
24:8 60:17
71:10,12
100:19
107:18,25
131:25
134:21
145:8

**started**
17:16,21
18:8 27:2
40:6

**starting**
83:2 108:6

**state**   7:3
11:14

**statement**
105:25

**states**
109:17,22
121:11
137:2

**stating**
119:3

**steady**   36:8,
18

**STENOGRAPHER**
12:7

**Stephanie**
112:22

**steps**   51:3
52:20,22

**stern**   7:8,
12,15 8:6
12:9 17:7
42:22,25
43:3,8,19
59:10
61:12,14,
22 66:6
67:18
70:2,14
71:15
76:19,22,
24 77:4,10
78:17
81:17,19
84:5
85:23,25
86:4,16
87:5 90:20

103:12
106:6
107:13
112:12,13,
15 116:17
121:20
125:5,8
127:8,11,
14,25
128:10
134:4
136:21
139:24
140:2,5,
10,20
141:20,23
142:4,6,9,
10,12,15,
17,18,21,
23,24
143:10,14,
15,24
144:6,8

**Stern's**
141:18

**stock**   94:18,
20 109:9,
19,23
137:20

**stop**   98:6
145:7

**stopped**
17:12

**stored**
123:17

**story**   28:9

38:12

straight
  26:7  57:11
  58:7

Street  7:10

Strike
  132:25

string  87:12

structured
  26:22

stuck  109:6
  136:12

studies
  12:17

stuff  18:18
  67:13,16
  114:21

subject  70:7
  86:11
  89:11
  92:5,10
  94:3
  116:20
  125:11
  127:16
  140:4

suddenly
  109:16

sum  92:15

supplier
  15:9

suppliers
  16:18

supplies
  14:15,16
  15:11
  16:6,12,23
  17:3

supplying
  24:24

supposed
  29:12
  78:20

supposedly
  80:6

surprise
  104:4

surveillance
  12:13

switch
  138:15

symbol
  116:24

synthetic
  73:5
  128:25
  130:24
  137:3

system
  106:23

systems
  103:6

——————————
          T
——————————

taking  37:4
  74:9

talk  18:2
  47:23
  74:24

talked  81:24

talking
  12:15
  14:20  19:8
  21:25
  50:20

tally  68:22
  69:7
  117:7,8,
  20,24
  118:11
  121:16
  122:4,14
  123:20
  124:20
  125:3

Talmudical
  11:24,25
  12:16

TCNU5168672
  118:11

team  13:12,
  22  32:11
  64:22
  102:19
  114:5

technical
  12:4  72:20
  73:16,19
  91:22

technicals
  51:14

telling
  75:11

ten  10:3
  29:21
  115:13
  124:17

term  21:15

terms  92:2,
  12  97:9
  130:7

testified
  7:4  9:13
  50:23  60:3
  81:10  93:7
  94:4  95:12
  103:18

testify  8:21
  96:4

testifying
  132:24
  133:3

testimony
  9:3  10:5
  101:20
  115:6,25
  123:4
  124:25
  125:24
  132:24
  135:4
  137:23
  138:2,8,11

thing  66:18
  80:5
  113:25

121:17
123:13
126:24
136:16
137:18
144:11
**things**   77:16
83:23
135:5
**thought**
113:24
114:4
**thousands**
50:8
**tied**   101:20
133:12
**time**   9:10
11:4 15:24
17:20,23
20:6,9
24:11
25:16
26:9,18,23
28:15 33:9
35:11,14,
23 37:17
40:15,25
41:11
47:19
49:25
52:10
54:21 56:3
60:6 61:2,
10 62:2
64:3,12
65:8,9

66:24
71:14,18,
20 72:7
75:21
76:18
77:15
79:20 80:8
81:13
82:18,21
83:23
86:23 95:5
96:25
100:23
101:16
102:16
103:2,25
106:17,24
108:3
109:4,5,12
110:6
111:10,12
116:7
123:6
124:2
126:20,24
132:15
134:4,8
135:8,24
144:18
145:10
**times**   9:24
10:2 37:19
54:15
56:22
124:3
127:24
134:24

**timing**   60:22
71:22 72:8
79:19
**tissue**   57:21
91:17
115:13
120:22
**title**   128:17
**titled**   77:5
86:13
**today**   8:3
9:3 10:5,
13 11:13
48:22
65:25
67:23
97:16
116:12
**today's**
9:17,25
**told**   141:13
**Tom**   24:7
80:4
**Tommy**   23:24
**tomorrow**
90:11
**Tooling**
59:16,19
78:25
**top**   12:11
29:18
30:21
73:10
82:15,20

90:25
108:4
116:25
117:8
118:6
**topics**
138:15
**total**   104:13
119:19
**totally**
34:10
102:11
**track**   131:25
132:7,17
133:24
141:12,19
**Trading**
25:20
**training**
36:23,25
37:4
**transaction**
20:13,17
21:8,9
22:6,14
26:24
63:12
81:14
103:19
142:14
143:15
**transactions**
20:2 28:16
29:3 63:5
80:16

KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC
Joel Stern on 10/13/2023                    Index: transfer..view

81:11
87:24
103:15
104:19
143:24

transfer
27:16
104:12,23
105:2
106:15

transfers
103:15
104:2

treating
138:18

trick  84:7,
12

triggered
120:24

trouble
110:2

truck  114:15
116:20

trucking
110:20
111:4,6
117:13,16

true  131:17

truthfully
8:13,21
59:23

Tuesday  70:7
88:4

turned  12:10

two-page
43:17 77:3
122:3

type  14:25
16:11
29:25 34:4
41:20
42:6,14,15
48:6 51:13
60:10
62:17
65:15
80:10 97:7
102:3
109:7
114:2
143:2

typed  30:12,
13

typical  65:4

typically
113:8

——————————

U

——————————

ultimately
102:5

unable  8:21

unambiguously
137:2

understand
8:24 19:4
21:16 37:2
47:21

54:17,20
58:22
59:11
60:7,10
65:2,22
73:20 74:2
75:25
84:6,15
100:17
114:18
115:5
122:25
132:23
137:23
138:9,12
140:18,23

understanding
42:9,12
47:3,5,16
48:3,4
49:18,21,
25 51:16
58:19
60:15 66:7
77:24
78:4,6,9,
10 81:7,9
88:16
91:20
101:19
114:13
117:9
118:21
119:14
121:24
122:18

understood

31:9 34:4
53:4,9
58:25 60:4
65:17
111:22

unit  92:2
98:17

United
109:17,21
121:11

upload  89:4

UTA  12:2

——————————

V

——————————

venture  15:2
42:18

ventures
35:14

verbal  123:8

verbally
38:9 69:3
111:24

versa  27:6
134:25

vessel
109:10
118:25

vice  27:6
134:25

video  12:11,
14

view  10:21
48:22

viewer
  116:24

viewing  49:2

visit  56:19,
  22 57:2

visited
  56:25

_____

        W
_____

wait  20:20
  80:18

wanted  11:19
  20:10,20,
  23 36:4
  45:6 63:6
  64:2 97:4
  123:18

warehouse
  57:11,25
  58:7,8,11
  66:12,13,
  24 67:3,8,
  12 111:5
  112:2,3
  114:22
  115:2
  117:18,22,
  25 120:22
  123:10,16
  126:4
  131:24
  132:9
  133:3
  134:20
  135:5,9,24

139:6
141:16

warehouses
  66:16 67:7
  68:17
  139:14

warehousing
  110:19
  111:7
  144:12

ways  132:6

web  68:2

Wednesday
  61:25

week  52:16

Weiner  10:7
  23:3,6
  32:5,10
  47:12 48:9
  49:14
  50:10
  53:15,17
  54:5 57:3
  59:8 62:19
  86:10
  87:12,15,
  16,22
  88:7,11,25
  89:10,13,
  20,22 90:6
  113:11,15,
  19,22,25
  114:4
  126:7
  127:3

138:18

Whatsapp
  53:25
  54:6,10,
  12,17,20
  55:5

whatsoever
  8:20

Winners  20:3
  31:21
  32:19 39:8
  46:24,25
  47:4,5,11,
  17,22
  48:4,10,15
  49:15,19
  50:25
  51:24
  52:11
  55:23,24
  62:20
  63:3,25
  64:21
  70:22
  74:21
  75:10
  76:7,8
  83:13 85:9
  86:12
  87:22
  89:11,14
  91:7,16
  95:4,16
  101:6,15
  102:24
  125:23
  128:18

129:12
140:25

wire  27:16,
  20 92:14
  100:22
  103:15
  104:2,5,7,
  12,13,22
  105:2,6
  106:15

wired  106:18

wires  27:18

wise  37:8

word  11:19
  44:20 50:6
  90:17,18
  114:10
  122:23
  123:24
  126:23

wording
  126:18
  137:11

words  27:2
  29:7 79:25
  94:13
  99:24

work  13:10,
  11,13 14:2
  16:23
  29:12
  54:21 60:2
  103:10,13
  110:21
  121:4

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK LLC**
Joel Stern on 10/13/2023                    Index: worked..Zoom

**worked**  13:23
  14:3 25:16
  29:10
  87:21

**working**
  15:20
  17:7,8,14,
  16,21
  18:4,5,20
  22:8 32:9
  57:4 63:25
  76:14
  79:16
  89:19
  110:17
  111:19
  121:10
  135:14

**works**  42:3
  74:12

**world**  42:19

**write**  125:15

**write-ups**
  38:23

**writes**
  88:12,15
  90:10
  140:8

**writing**  38:7
  39:6,10
  101:25
  126:23
  145:6

**written**  8:2
  24:11

  29:25 30:9
  38:23,25
  58:5
  75:14,16
  78:12
  83:12
  101:22

**wrong**  85:20
  124:16

**wrote**  142:8

_____
             **X**
_____

**XYZ**  30:15

_____
             **Y**
_____

**years**  14:6
  17:15
  37:14
  83:24

**Yirtzeh**
  90:18

**Yoely**  88:12

**York**  7:4,
  10,23 12:3
  25:18
  124:4

_____
             **Z**
_____

**Zoom**  8:7