**EXHIBIT 24**

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3      KITCHEN WINNERS NY INC.,
                  Plaintiff,
 4                                           CASE NO.
        vs.                                  22-CV-05276-PAE
 5
        ROCK FINTEK LLC,
 6                Defendant.
        ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 7      ROCK FINTEK LLC,
                  Third-Party
 8                Plaintiff and
                  Counterclaimant,
 9
        vs.
10
        KITCHEN WINNERS NY INC.,
11                Counterclaim
                  Defendant,
12      and

13      JNS CAPITAL HOLDINGS LLC,
        JOEL STERN, HERSHEY WEINER,
14      JOSEPH MENDLOWITZ, ADORAMA,
        INC.,
15                Third-Party
                  Defendants.
16      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~

17                         DEPOSITION OF

18                         ALAN SCHWARTZ

19

20                  Tuesday, February 13, 2024

21                         12:11 P.M.

22                       Videoconference

23

24      Reported By John Sheffield, Commission No. 01SH6435698

25                      Job No. 00048635
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

```
 1                APPEARANCES OF COUNSEL

 2
    On behalf of the Third-Party Plaintiff, ROCK FINTEK
 3  LLC,:

 4        PHILLIP RAKHUNOV, ESQ.
          LAUREN RIDDLE, ESQ.
 5        POLLACK SOLOMON DUFFY LLP
          31 Saint James Avenue
 6        Suite 940
          Boston, Massachusetts 02116
 7        617-960-3118
          prakhunov@psdfirm.com
 8        lriddle@psdfirm.com
          APPEARED VIA VIDEOCONFERENCE
 9

10
    On behalf of the Counterclaim Defendants/Third-Party
11  Defendants, KITCHEN WINNERS NY INC., ADORAMA, INC., AND
    JOSEPH MENDLOWITZ:
12
          ALEXANDER J. SPERBER, ESQ.
13        LIPSIUS BENHAIM
          80-02 Kew Gardens Road
14        Suite 1030
          Kew Gardens, New York 11415
15        212-981-8440
          asperber@lipsiuslaw.com
16        APPEARED VIA VIDEOCONFERENCE

17

18  On behalf of the Third-Party Defendants, JNS CAPITAL
    HOLDINGS LLC and JOEL STERN:
19
          AVRAM E. FRISCH, ESQ.
20        THE LAW OFFICE OF AVRAM E. FRISCH LLC
          1 University Plaza Drive
21        Suite 119
          Hackensack, New Jersey 07601
22        201-289-5352
          ariela@avifrischlaw.com
23        APPEARED VIA VIDEOCONFERENCE

24

25
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 3

```
 1                    INDEX OF EXAMINATION

 2

 3   WITNESS:  ALAN SCHWARTZ

 4   EXAMINATION                                   PAGE

 5   By Mr. Rakhunov                                5

 6   By Mr. Sperber                                93

 7   By Mr. Rakhunov                               94

 8

 9                    INDEX TO EXHIBITS

10

11   NO.            DESCRIPTION                    PAGE

12   Exhibit 1      Expert Witness Report          6

13   Exhibit 3      4 Page Document, Photos

14                  Cartons, Boxes, Gloves         68

15   Exhibit 4      92 Page Document, Complete

16                  Final Expert Report by

17                  Dr. Poulton                    73

18   Exhibit 6      Ardl Communications            82

19   Exhibit 7      Letter dated

20                  March 9, 2016 K157212          13

21   Exhibit 8      June 11, 2021

22                  Acknowledgement Letter         34

23      (Exhibit 1 was attached to the original

24   transcript. Exhibits 3 through 4 and 6 through 8 were

25   retained.)
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 4

```
 1                  (On the record at 12:11 P.M.)

 2              THE COURT REPORTER:  We are here today for

 3      the purposes of recording the deposition of Dr. (sic)

 4      Alan Schwartz taken by Plaintiff in the matter of

 5      Kitchen Winners, New York, Inc. v.  Rock FinTek, LLC,

 6      case number 22-CV-05276-PAE in the District Court,

 7      Southern District of New York.

 8              Counsel will now state their appearances.

 9              MR. RAKHUNOV:  Good -- good afternoon.  My

10      name is Phillip Rakhunov with Pollack Solomon Duffy.  I

11      represent Rock FinTek, LLC.

12              MR. SPERBER:  Good afternoon.  My name is

13      Alexander Sperber of Lipsius-BenHaim.  I represent

14      Kitchen Winners, Adorama, and Joseph Mendlowitz.

15              MR. FRISCH:  Good afternoon.  Avram Frisch,

16      the law office of Avram E.  Frisch, and I represent JNS

17      Capital Holdings and Joel Stern, third-party

18      defendants.

19              THE COURT REPORTER:  Thank you.  I will now

20      swear in the witness.

21              Mr. -- Dr. Allen Schwartz, do you swear --

22              MR. SCHWARTZ:  No.  It's -- it's Mr.

23              THE COURT REPORTER:  Okay.

24                          ALAN SCHWARTZ,

25          having first been duly sworn, testified as follows:
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 5

```
1              THE COURT REPORTER:  Thank you, sir.
2         You may now begin.
3                        EXAMINATION
4  BY MR. RAKHUNOV:
5      Q.   Good afternoon, Mr. Schwartz.  We met
6  briefly off the record.  My name is Phillip Rakhunov.
7  I represent Rock FinTek.
8           When -- when is the last time you were
9  deposed in any case?
10     A.   Let me see.  I have to refresh my memory.
11 It -- it was probably about a year or two ago.
12     Q.   So I -- I assume you're familiar with the
13 process.  I'll -- I will ask you questions.  You -- you
14 will answer them to the best of your ability.  We'll
15 try not to speak over each other so the court reporter
16 can take down a clean record.  Your attorneys may
17 object from time to time, but unless you're instructed
18 not to answer, please do.  If you do not understand any
19 of my questions, let me know and I will do my best to
20 clarify.  If you answer, I will assume you understood
21 my question.
22           Is that fair?
23     A.   That's fair.  No problem with that.
24     Q.   All right.  And any reasons such as
25 medications, or any other reason that you're not able
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 6

```
 1   to testify clearly and truthfully today?

 2        A.   Under no medications.

 3        Q.   Do you have any notes or memory aids in

 4   front of you to assist in -- with your testimony?

 5        A.   Nope.

 6        Q.   Anyone in the room with you today?

 7        A.   Nope.

 8        Q.   And anyone communicating with you via any

 9   device during this deposition?

10        A.   Nope.

11             MR. RAKHUNOV:  You have before you, or you

12   should have before you, Exhibit 1, which is an expert

13   disclosure that we were provided by your counsel in

14   this case.  It's a 73-page document consisting of the

15   caption, Expert Disclosure, and then your expert

16   rebuttal report with exhibits.

17             (EXHIBIT 1 MARKED FOR IDENTIFICATION)

18   BY MR. RAKHUNOV:

19        Q.   Do you have that before you, sir?

20        A.   I do.

21        Q.   So first, I -- I'd like to direct your

22   attention to your CV, which is at the end of the

23   report.  It is page 68 of the PDF document.  Let -- let

24   me know when you get there.

25        A.   Okay.
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 7

1      Q.   So is this -- oh, sorry.  Is -- is the CV

2  attached with your expert disclosure in Exhibit 1 a

3  complete and accurate and updated description of your

4  experiences and qualifications?

5      A.   As far as I can tell, yes.

6      Q.   So you are executive vice president with MDI

7  Consultants, correct?

8      A.   Well, actually, there has been a change

9  consensus.  I am now president of MDI Consultants.

10     Q.   As -- as of when?

11     A.   Let's see, about beginning of February.

12     Q.   What does MDI Consultants do?

13     A.   MDI is a consulting company specializing in

14  U.S.  Food and Drug regulations.  We consult to the

15  manufacturers of medical devices, pharmaceuticals, and

16  foods, as well as nutritional supplements on all

17  aspects of FDA compliance.

18     Q.   Have you, in your work with MDI, ever

19  consulted to a manufacturer of -- of gloves, medical

20  gloves?

21     A.   Yes, I have.

22     Q.   Have you consulted the glove manufacturers

23  located overseas, including China?

24     A.   Correct.

25     Q.   Have you provided any consulting services to

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 8

```
 1   a company known as Global Tooling Services?
 2        A.   Not that I could recall.  I don't think so.
 3        Q.   Have you ever provided consulting services
 4   to any company that ever manufactured gloves under the
 5   brand name Medcare, M-E-D-C-A-R-E?
 6        A.   Not that I can recall.  I don't think so.
 7        Q.   Okay.  And do you recall having ever worked
 8   with an individual by the name of Anna Grinvald, G-R-I-
 9   N-V-A-L-D?
10        A.   Not that I can recall.
11        Q.   Approximately how many glove manufacturers
12   have you consulted to in your career?  And I'm talking
13   about medical -- I'm -- I'm sorry.
14             Just to clarify, medical gloves as opposed
15   to food service or other gloves?
16        A.   I would say in the realm of 30 to 50
17   companies.
18        Q.   Have you ever provided consulting services
19   outside of this lawsuit to any importers of medical
20   gloves who were not the manufacturer?
21        A.   Yes.
22        Q.   And did -- how many -- how many such
23   importers have you provided services to?
24        A.   I would say a dozen at least.
25        Q.   And have you provided any such services
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 9

1  during -- so since the COVID-19 pandemic broke out?

2          MR. SPERBER:  Objection to form.  Can you

3  clarify when you say, since?  Is that meaning --

4          MR. RAKHUNOV:  Sure.

5          MR. SPERBER:  -- the beginning or since the

6  end?

7  BY MR. RAKHUNOV:

8      Q.   How about -- how about since the beginning

9  of March -- since -- since the beginning of 2020

10  through the present?

11      A.   Yes.

12      Q.   Are you able to identify those clients?

13      A.   I -- right.  I mean, I would be able to, but

14  I don't have them off the top of my head, because I

15  deal with a lot of companies over the years.

16      Q.   Can you identify any of the importers of

17  gloves to whom you provided consulting services?

18      A.   You know what, I -- I do not have a good

19  memory for names.

20      Q.   But you would be able to obtain that

21  information if you looked through your records,

22  correct?

23      A.   Yes, I would.

24      Q.   What type of consulting services have you

25  provided to importers of medical gloves into the U.S.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 10

1   since January 1st, 2020, through the present?

2        A.   Some importers like to get their own 510(k),

3   which is a pre-market notification for them to be able

4   to import medical gloves into the United States.  I

5   help them with the 510(k).  I help them registering

6   with the FDA as an initial importer, which is a

7   requirement if they are the initial importer for

8   foreign manufacturers.  I help them with their quality

9   system of what is expected of them as an initial

10  importer.  And I help them identify the companies,

11  whether they have a 510(k), and if they are registered.

12       Q.   What entails having -- getting an importer

13  registered with a 510(k) number?

14       A.   A -- an importer would need to submit an

15  application to the FDA on the technical aspects of the

16  product or the -- the gloves, have all the necessary

17  testing and labeling, and we would prepare and submit

18  the application to the FDA.

19       Q.   And were any of the gloves, with respect to

20  which you provided services, nitrile examination

21  gloves?

22       A.   Yes.

23       Q.   Okay.  What -- what are the requirements to

24  obtain a 510(k) certification to import nitrile

25  examination gloves into the United States?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 11

1        A.    Well, for nitrile gloves, like for any

2   gloves, the -- they have to do biocompatibility testing

3   on sensitivity and irritation.  They have to do spec

4   testing to show that it meets the standards.  And --

5   and they would have to submit that information to the

6   FDA as part of an application.

7        Q.    When you say they have to do spec testing to

8   meet the standards, what standards specifically are you

9   referring to?

10        A.    There are ASTM standards.  I do not know the

11   number offhand.

12        Q.    Does D6319 sound familiar?

13        A.    It could be, yes.

14        Q.    And -- and you -- you mentioned

15   biocompatibility testing.  What does that mean?

16        A.    Well, because gloves are -- come in contact

17   with the skin, the FDA wants to make sure that the

18   gloves are found to be safe for their use.  So they

19   have to do biocompatibility, it's irritation and

20   sensitivity testing, which is usually animal testing,

21   to show that the gloves are safe to be handled.

22        Q.    And -- and when you -- I'm sorry, give me

23   one second.  I'm actually e-mailing -- it goes slightly

24   out of order, but I'm going to e-mail another exhibit

25   to Mr. Sperber that hopefully he can forward to you.

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

1          When you mention certain ASTM testing for

2    nitrile medical examination gloves, did the ASTM

3    standards vary, be -- from -- you know, from glove to

4    glove, or is there one overall set of standards that

5    would apply to all nitrile examination gloves in order

6    to obtain a 510(k) number?

7          A.   Since I'm not a lab specialist or a chemist,

8    I am not sure if there would be multiple standards that

9    would have to -- that would be available.  There might

10   be.  But the FDA allows if there -- if there is a

11   recognized standard, the FDA allows you to use that

12   standard to get the 510(k).  Are there multiple

13   standards for nitrile gloves?  I am not sure.  I could

14   not answer that.

15        Q.   And if -- and in your experience, is a glove

16   importer able to rely on an existing 510(k) number

17   that, for example, a glove manufacturer in China had

18   previously obtained?

19        A.   If a foreign manufacturer has a 510(k), is

20   registered and listed, the products are listed with the

21   FDA, they're allowed to export, and an importer is

22   allowed to accept those products.  And the FDA would

23   normally green -- what's called green ticket those

24   products so the importer could take ownership of them.

25        Q.   And if a particular and -- and if -- if a

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 13

1    particular 510(k) number is used to import gloves, then

2    the importer -- let -- let me rephrase that.

3              MR. RAKHUNOV:  You know, I actually -- Alex,

4    have you received my e-mail yet?

5              MR. SPERBER:  Yes.  I forwarded it to Mr.

6    Schwartz.

7              MR. RAKHUNOV:  Okay.

8              Yeah, Mr. Schwartz, there -- there should be

9    an e-mail that you received from Counsel that will have

10   an attachment that's labeled Exhibit 7.  I know we're

11   going a little bit out of order, but please let me know

12   when --

13             (EXHIBIT 7 MARKED FOR IDENTIFICATION)

14             THE WITNESS:  I -- I have it.

15   BY MR. RAKHUNOV:

16        Q.   You have it?

17        A.   I received it.

18        Q.   Okay.  Great.  Do you have that open?

19        A.   Yes.

20        Q.   Okay.  So this is a letter dated March 9th,

21   2016, regarding -- in the first line of the subject, it

22   says, K-152712.  Do you see that?

23        A.   Yes, I do.

24        Q.   Does this letter look familiar to you in

25   terms of its format and contents, generally?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 14

```
 1      A.   Yes, it does.
 2      Q.   Okay.  What do you -- do you understand what
 3   this letter is?
 4      A.   This is a -- an FDA clearance letter for the
 5   510(k) that was submitted to the FDA by that company.
 6      Q.   And this specific document, have you
 7   reviewed this document in connection with your work in
 8   this case?
 9      A.   No.
10      Q.   Okay.  So this is the first time you're
11   seeing this specific document, correct?
12      A.   Correct.
13      Q.   And a -- a manufacturer company that obtains
14   -- that obtained this pre-market approval letter, what
15   does this letter authorize or allow that manufacturer
16   to do?
17      A.   All right.  First of all, I just want to
18   clarify, it's not an approval.  It's a pre-market
19   clearance.
20      Q.   What's the difference?
21      A.   510(k)s --the FDA does not approve a 510(k).
22   A 510(k) is showing how your product is substantially
23   equivalent to a product that is already -- have a
24   510(k).  So they are clearing your 510(k) stating that
25   they have found it to be substantially equivalent to
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 15

1  the 510(k) that you submitted, or to a product that's

2  already on the market.

3           A -- an approval is given to a PMA or de

4  novo, those who have to prove safety and efficacy, and

5  there is no substantially equivalent.  So a 510(k) is

6  cleared, not approved.

7       Q.   I appreciate the clarification.  So this

8  clearance letter -- is it fair to say that this

9  clearance letter entitles the holder of the 510(k)

10  number to import nitrile powder-free patient

11  examination gloves, blue color?

12       A.   That is correct.

13       Q.   And if you turn to Page 5 of this Exhibit 7,

14  Paragraph -- Paragraph 6, does -- what -- what does

15  Paragraph 6 describe?

16       A.   Let me see.  Page 5.  Let me see what --

17  Page 5.  I'm on Page 7.  Hold on.

18       Q.   Yeah.  It -- it's Page 5 of the PDF, not --

19  there's no -- it's numbered Page 2 out of 4, actually,

20  of --

21       A.   Yeah.  Two out of --

22       Q.   -- Section C.

23       A.   Do you want me -- Number 6 you wanted me to

24  look at?

25       Q.   Yes, sir.

Page 16

1       A.    All right.  So that is a -- let's see.

2  Standard.  That is their summary of the technology --

3  tech characteristics of the device that they're looking

4  510(k) --

5       **Q.    And what is that -- what -- what is the**

6  **significance of the description of the -- the table in**

7  **Section 6?**

8       A.    Well, the company is supposed to outline the

9  characteristics of their device, what standards they

10  use, and the -- what the results of those tests were.

11  So in this case, they did a dimension test, the --

12  well, first of all, they outlined that it's nitrile,

13  powder-free examination gloves, blue color, non-

14  sterile.  And they tested it for dimensions using an

15  ASTM standard D, as in David, 6319-10, and they found

16  that it meets those performance standards.

17       Then they did a test for physical

18  properties.  Again, ASTM standard D6319-10, and they

19  said it met the performance property testing.  Then

20  they did a test for freedom from pinholes, and that --

21  they said they followed 21CFR820, and they found that

22  it meets those requirements.  They did a powder

23  residual test using ASTM standards, D, again David,

24  6319-10 and D, as in David, 6124-06 reapproved 2011,

25  and they said it met those requirements, less than two

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 17

1   milligrams per whole -- glove -- sorry, per glove.

2           And again, finally, they did the

3   biocompatibility studies, which we discussed.  They did

4   a primary skin irritation in rabbits, ISO standard

5   10993-10, third edition, 2 -- 2010-08-01.  I guess

6   that's the date of that standard.  And they said under

7   the conditions of the study, the subject's devices is

8   non-irritating.  And they also did, under

9   biocompatibility, their dermal sensitivity test --

10  testing in guinea pigs.  And it's ISO standard 10993-

11  10, third edition, 2010-08-01.  And they said under the

12  conditions of the study, the subject's devices is not -

13  - is not a sensitizer.

14      Q.   And -- and then if you turn to the next

15  page, looking at the chart in Section 9, and -- you

16  know, do you -- take -- take as much time as you need

17  to review it.  I -- I don't think we need to read the -

18  - the whole thing into the record, but is it fair that

19  -- that Section 9 contains a detailed comparison of the

20  predicate device in -- in the second column compared to

21  the device for which clearance is being sought in this

22  letter with respect to the product names, size, intent

23  for use, and various specifications and properties?

24      A.   Yeah.  This is a very common substantially

25  equivalent chart that we use for all our 510(k)s.

Page 18

1          And doing a quick review, it looks like they

2     did a -- a good comparison and found them to be equal -

3     - either the same or found them to be substantially

4     equivalent.

5          **Q.   So is it fair to say that any -- any**

6     **manufacturer or importer or seller of these gloves**

7     **under the 510(k) number issued in this letter is**

8     **required to provide gloves that meet the specifications**

9     **described in this clearance letter?**

10         MR. SPERBER:  Objection to the form.

11         You -- you can answer.

12         THE WITNESS:  The company is stating that

13    these are the requirements and specifications of their

14    gloves, and those gloves that they ship are supposed to

15    meet these specifications.

16    BY MR. RAKHUNOV:

17         **Q.   And -- and just to be clear, a -- I -- I'm**

18    **sorry if I'm asking you this again, but I -- I just**

19    **don't remember if I asked you this exactly.**

20         **If a trader of gloves, like for example,**

21    **Kitchen Winners, a party to this case, is -- is -- is**

22    **telling a buyer that they're providing gloves under the**

23    **510(k) number set forth in this letter, again, then**

24    **those gloves would be expected to meet the**

25    **specifications described herein?**

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 19

1          MR. SPERBER:  Objection to the form.

2          THE WITNESS:  Can I answer it?

3          MR. SPERBER:  Yes.

4    BY MR. RAKHUNOV:

5          Q.   Yes.

6          A.   Well, an importer could only go with what

7    the manufacturer is supplying.  So if the -- if they

8    are purchasing gloves that are nitrile gloves that had

9    a 510(k), they're expecting those gloves to meet that

10   specification.  But they normally don't do any testing

11   on the gloves once they come in.

12          They're -- the -- the responsibility of the

13   specification is going to fall on the manufacturer,

14   ultimately.

15         Q.   What -- what do you mean by that?

16         A.   Well, if -- if the FDA were to sample the

17   gloves before they came in, if there was any problems,

18   the gloves would be stopped at the port.  If the gloves

19   are found to have a problem after they're brought into

20   the country, they would go to -- to the importer, find

21   out what was going on, find out who the supplier was.

22   Because sometimes the boxes might have a brand name

23   that is -- that doesn't relate to the manufacturer.

24   And then they would go back to the manufacturer and see

25   what went on and what the problems -- of why these

Page 20

1    products are not meeting specifications.

2        Q.   So in -- in other words, is it accurate to

3    say that if -- if one is a buyer of gloves with a

4    certain 510(k) number -- well, let -- let me ask you to

5    be more specific.

6            If -- if one is a buyer of gloves with the

7    510(k) number listed in this letter, that company or

8    individual would expect those gloves to meet the

9    specifications herein.  Is that -- is that what you're

10   saying?

11       A.   That's correct.  I think I lost your sound.

12       Q.   No.  No.  I -- I -- I actually was just

13   taking a pause.

14           All right.  Well, we can -- we can put --

15       A.   I saw your lips move.  That's why I thought

16   --

17       Q.   We can put that as -- maybe there's a little

18   lag there.  Let -- let's put Exhibit 7 aside for the

19   moment, and -- well, let me actually ask you one

20   question.

21           So if -- if -- if a product is being sold as

22   having a 510(k) certification, does that mean that the

23   FDA would have issued either an approval or a clearance

24   letter by the time the product is being sold?

25       A.   Well, first of all, again, the FDA gives a

Page 21

1   clearance letter, not a certification.  So you get a

2   clearance letter on your 510(k).  Before you could

3   export, the -- the company needs the 510(k) because

4   they're going to have to register with the FDA.

5             They're going to have to list the device.

6   If the device requires a 510(k), they're going to have

7   to have the 510(k) number on the device listed.

8   Without that, they couldn't -- they -- I mean, not that

9   it's guaranteed it wouldn't get through.  If the FDA

10  caught it, it would be stopped at the border, that they

11  would not be able to be import -- export their product

12  into the U.S.

13      Q.   And how does the FDA -- I -- I guess the

14  FDA, or a customs agent, know whether or not a given

15  product has 510(k) clearance at the time of import?

16      A.   Every shipment, medical device shipment,

17  goes through customs.  If it's a medical device, it's

18  sent to the FDA for green ticketing or rejection.  The

19  FDA then could go into their database, look at the

20  company, look at the 510(k) number, look at their

21  registration, and see are they registered, is the

22  device listed, does it have a 510(k)?  If any of those

23  are not there, the FDA would put a hold on it.  If any

24  of those are there, the FDA usually, unless they find

25  something suspicious or some problem, they would green

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 22

1    ticket it and let it into the country.

2         Q.   And does the FDA actually -- or customs

3    agent, actually open up, for example, boxes of gloves

4    and do any physical ASTM or other testing to check if

5    those products actually conform to the specifications

6    in the FDA clearance?

7         A.   Not usually.  There are just too many

8    products coming into the country.  Unless they're doing

9    a specific sampling program, or they are suspicious of

10   a problem, usually the products are released into the

11   country without exam -- without exam.

12        Q.   Is it possible that -- for products to get

13   into the country that have -- that were manufactured at

14   a factory that does not have a 510(k) certification?

15        A.   Unfortunately, yes.

16        Q.   So for example, if a container of gloves has

17   some cartons that are -- well, withdraw.

18             Are you -- are you aware of product code

19   specifications associated with FDA 510(k)

20   certifications -- or sorry, clearances?

21        A.   No.  No.  The product code --

22        Q.   Well, let -- let --

23        A.   With the 510(k) -- if you're talking about

24   the FDA three -- three letter code has nothing to do --

25        Q.   Yes.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 23

1      A.   -- with the -- of -- with the 510(k).

2      Q.   So -- and if you look at Page 1 of Exhibit

3   7, do you see LZA product code?

4      A.   Yes, I do.

5      Q.   Well, do you know what that refers to?

6      A.   Well, I'm not sure if that is the right

7   code.  It -- I guess it's the right code, because the

8   FDA put it down, but that is a code for a patient

9   examination glove.

10      Q.   Got it.  In your in your CV you describe

11   something as QSR/CGMP.  What does that mean?

12      A.   Yeah.  All right.  QSR stands for Quality

13   System Regulation, and then the FDA does /C, means

14   current, G is good, M is manufacturing, and P is

15   practices.

16      Q.   Do you --

17      A.   This is for the regulations dealing with

18   manufacturing of medical devices, what companies are

19   required to be in compliance with.

20           THE COURT REPORTER:  Could you please repeat

21   the -- the name -- the name -- the Q?  Starting with

22   the Q?

23           THE WITNESS:  Q stands for quality, S is

24   system, R is regulations.  The C is for current, C-U-R-

25   R-E-N-T, good manufacturing practices.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 24

1          THE COURT REPORTER:  Thank you for that.

2    BY MR. RAKHUNOV:

3         Q.   So let -- let me actually go back for a

4    moment.  So you -- you -- you testified a few minutes

5    ago that some importers like to get their own 510(k)

6    number?

7         A.   That is correct.

8         Q.   So you know, in a situation, like -- like

9    the one we have here, where -- where a non-manufacturer

10   is importing medical gloves into the United States,

11   what steps would that importer take to get their own

12   510(k) number rather than rely on the one provided by

13   the manufacturer?

14        A.   All right.  Usually, we recommend if a

15   company is going to be doing a lot of importing and

16   wants to control the product and have their own

17   product, they get a 510(k).  Many times, they don't

18   want to rely on one manufacturer supplying them the

19   product, so they want to have more control.

20            They would have to find or -- or get product

21   -- they could -- they could use the product that

22   they're importing, get all the testing done under their

23   name, and submit the application showing they're

24   substantially equivalent to the device that's already

25   being imported.  And then they would be considered a

Page 25

1   specification developer and an importer.  And then they

2   would find a contract manufacturer to make the gloves

3   for them.

4          Does that make sense?  Is that clear?

5      **Q.   It -- it does make sense.  So they would**

6   **have to demonstrate similar type of bioequivalency as a**

7   **manufacturer would for a pre-existing product, or**

8   **compared to a pre-existing product?**

9      A.   Correct.  And a lot of them might actually

10  take the product they're importing and have that tested

11  and claiming these are the specs they're going to make.

12  The FDA approves -- I mean, a company could move from

13  one manufacturer to another as long as the manufacturer

14  meets the same specifications for the finished product.

15     **Q.   And -- and by the way, in your experience,**

16  **what -- what types of nitrile gloves -- nitrile rubber**

17  **gloves are approved for medical uses?**

18     A.   Ones that would pass that ASCM -- ASTM

19  testing.  I -- I'm not sure what that question means.

20  If there are multiple nitrile -- I think there are

21  different colored nitrile gloves, but I think they all

22  have to pass that standard.

23     **Q.   Are you aware of any product code or any**

24  **medical gloves, nitrile gloves, described as protection**

25  **gloves as opposed to --**

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 26

1      A.   Well, there are --

2      **Q.   As opposed to --**

3      A.   Yeah.  They -- they're -- they're -- I'm not

4    sure if they're nitrile.  There might be nitrile gloves

5    that might be used for -- for various chemicals, like

6    if they're doing chemotherapy or things like that.

7    They might be called protection gloves.

8           Now, under the PP -- PPP, everything was a

9    protection glove.  So I'm not sure if that's what

10   you're looking for.  I'm not sure what you're --

11   exactly what you're looking for here.

12     **Q.   What's PPP?**

13     A.   Personal protection -- well, the personal

14   product protection.  These were all the stuff under the

15   COVID -- oh, PPE, personal --

16     **Q.   I'm sorry.  PPE.  Okay.  But that -- that's**

17   **not -- but that has nothing to do with the 510(k)**

18   **registration, correct?**

19     A.   No.  You would need your -- well, at the

20   time, every -- a lot of stuff was passing through

21   because of the Emergency Use Act.  But the only other

22   gloves that might be under protection are chemical

23   gloves that are -- that are -- are rated for different

24   chemicals.

25     **Q.   Would that have a separate product code from**

Page 27

1    -- different from LZA that we looked at a moment ago?

2         A.   Yes.   They would.

3         Q.   And it would have to have a different 510(k)

4    clearance or registration from a nitrile examination

5    glove, correct?

6         A.   Correct.

7         Q.   Has -- have you been retained in this case

8    by Kitchen Winners or -- or any other parties to

9    provide any expert opinion on whether the gloves at

10   issue were, in fact, 510(k) registered gloves, one way

11   or another?

12        A.   No.

13        Q.   Let me turn back to your CV.  Let's see.

14   There is a number of bullet points on the first page.

15   And bullet point 3 says, "audited over 400 medical

16   device, pharmaceutical manufacturers, and food

17   companies worldwide for FDA compliance, sterile and not

18   sterile devices."  Do you see that?

19        A.   Yes.

20        Q.   Can -- can you describe what type -- well,

21   let -- let me actually try to narrow it down.  Were any

22   of these audits involving companies that either

23   manufactured or sold nitrile medical gloves?

24        A.   Probably.  I -- I can't -- I know I've been

25   in latex glove factories.  I might have been in a -- a

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 28

1  nitrile glove factory.  I can't remember because I

2  haven't been in a glove factory in a while, but it

3  might have been a nitrile glove factory.

4      Q.   What -- what would these audits -- what

5  would an audit of a nitrile glove factory entail, in

6  your professional experience?

7      A.   Well, normally when they're asking us to

8  come in is we're doing a mock FDA QSR/CGMP audit, where

9  we would look at their quality system manual, see how

10 they are -- have they implemented and following it, and

11 looking at their documentation to make sure that the --

12 all the testing that is required is being done before

13 the products are -- before the products are shipped.

14 So it's a full audit, similar to what an FDA inspector

15 would be doing.

16     Q.   And would -- would that audit involve

17 actually testing gloves or other products for

18 compliance with physical and chemical specifications?

19     A.   Like an FDA investigator, the investigators

20 do not do any testing.  All they do is look at what

21 testing the company may be doing and looking at their

22 test results and looking at their documentation.  I

23 wouldn't be involved in actually looking at or doing

24 any testing on any of the gloves.

25     Q.   And when you look at documentation, do you

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 29

1    look at the types of, for example, labs that did the

2    testing on the report?

3         A.   Do I -- do I audit the labs or look -- just

4    look at the lab reports?

5         Q.   Well, either?

6         A.   I have been in labs, but I haven't been in a

7    lab -- well, some of the companies have their own labs

8    where they do all their strength tests, elongation

9    tests, pinhole tests.  They don't usually do

10   identification tests, though some may have an ASTM --

11   not an ASTM.

12        A gas chromatograph for identification of

13   material, but that is very unusual in a -- a glove

14   manufacturer.  Normally, if they did any identification

15   test for the biocompatibility, it would be sent out to

16   a recognized lab.

17        Q.   And -- and -- and I guess that was more of

18   my question is, would you look at the reports from such

19   labs that -- that a manufacturer or, you know, an

20   importer would, or a factory would provide to you?

21        A.   Yes, I would look at it.  Yes.  If -- if --

22   if -- if it came -- if it was some kind of problem,

23   once the 510(k) is cleared and the company is

24   manufacturing the product, they set up their

25   specifications and their testing requirements before

Page 30

1    product release.

2           So that's what I would be looking at, as an

3    FDA investigator would be looking at it.  I -- I was a

4    former FDA investigator, so I'm very familiar with --

5    with the type of inspections that have to be done.

6       **Q.   Would you look at the quality or -- or**

7    **qualifications of a given lab in connection with such**

8    **an audit?**

9       A.   Well, we would look at -- if they -- well,

10   we would do that during the 510(k).  If the lab was

11   doing their final product testing, we would want to see

12   the certification of the lab.  We possibly would ask

13   for that to make sure that they qualified their lab to

14   do the testing for them.  That would be a GMP and QSR

15   requirement of a -- a vendor qualification.

16      **Q.   And in this case, for example, you assisted**

17   **Kitchen Winners with selecting a lab to do some testing**

18   **of gloves, correct?**

19      A.   That is correct.

20      **Q.   And you view a lab, such as ARDL, as a**

21   **qualified lab to do chemical and physical testing of**

22   **gloves?**

23      A.   Yes.  They appear to be qualified.

24      **Q.   And we will come back to that.  In -- in the**

25   **fifth bullet point in your CV, you -- you write,**

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

1    "provided strategic planning, FDA liaison, and

2    documentation review, prepared and/or assisted with

3    over several hundred 510(k)/PMAs."

4            I just want to make sure, PMA stands for

5    what?

6        A.   Pre-market approval.

7        Q.   And -- and that's the type of clearance that

8    we looked at a few minutes ago, correct?

9        A.   We looked at a 510(k), not a PMA.

10       Q.   Okay.  What's the difference?

11       A.   510(k), you have to show substantially

12   equivalent to a product that's already on the market

13   that already has a 510(k).  A PMA, there is no

14   substantially equivalent of your device, and you have

15   to show safety and efficacy.  Where a 510(k), you

16   normally have to show comparison between your device

17   and the device that you're substantially equivalent to

18   that already has a 510(k).  FDA approves a PMA.  FDA

19   clears a 510(k).

20       Q.   And -- and again, is it your testimony that

21   you do not recall providing services with respect to

22   obtaining a 510(k) number for -- well, let me ask,

23   actually, a different question, because I didn't ask

24   you this.

25            Are you familiar with a company named

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 32

1     Dongguan Grinvald Technology Co., Ltd.?

2          A.   Doesn't sound familiar.

3          Q.   Okay.  I mean, are you personally involved

4     with every project that MDI Consultants works on?

5          A.   No.

6          Q.   In your work with FDI Consultants -- MDI

7     Consultants, are you involved with any product

8     labeling?

9               MR. SPERBER:  Objection as to the form.

10              THE WITNESS:  Yeah.  We -- we review product

11    labeling, and we have to review product labeling for

12    any 510(k) that we would submit.

13    BY MR. RAKHUNOV:

14         Q.   Okay.  What is the significance of labeling

15    with respect to -- from the FDA perspective with

16    respect to medical devices, such as nitrile gloves?

17         A.   Well, the labeling has to -- there are --

18    there are specific requirements for medical device

19    labeling.  I don't know what the exact 21 CFR number it

20    is, but for medical devices you have to have the --

21    identify the product that's in the -- in the -- the

22    device that you're marketing, it has to be on the

23    label.

24              You have to have the amount or number.  You

25    have to have if there was any warnings.  Like, if there

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 33

```
 1    was -- if there was latex warnings about any allergies,
 2    then you have to have a -- the name and address or the
 3    -- or how the company could be contacted in case of an
 4    emergency.  I -- offhand, I think those are the things
 5    that you need.
 6         Q.   And does the labeling of a particular
 7    product have to be consistent with the product code and
 8    other -- other six of the 510 number for the device?
 9         A.   Repeat that.  You broke up.  Repeat that,
10    please.
11         Q.   Yeah.  So let me -- let me -- let me ask it
12    again.  The labeling on medical device, such as nitrile
13    gloves, does it have to be consistent, in your
14    experience, with the product code for which the 510(k)
15    was received?
16         A.   That is correct.
17         Q.   Does someone -- do you -- are you familiar
18    with an individual named Aristotle Nafpliotis?
19         A.   Oh, Aristotle?  Yeah.  He's my associate.
20         Q.   He's your associate.  Okay.  How long has
21    Aristotle worked with MDI?
22         A.   I think a little over three years.
23              MR. RAKHUNOV:  Let me -- sending another e-
24    mail, Counsel, with -- so we have Exhibit 1, and we
25    have Exhibit 7.  Let's call this Exhibit 8.  We will
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 34

1    fill the others in.

2              (EXHIBIT 8 MARKED FOR IDENTIFICATION)

3              THE COURT REPORTER:  Just for clarity, what

4    -- what would you like to title Exhibit 1?

5              MR. RAKHUNOV:  Expert -- Expert Report.  We

6    can do it.

7              THE COURT REPORTER:  Thank you for that.

8    And this next exhibit, Exhibit 8?

9              MR. RAKHUNOV:  Exhibit 8, we can call it

10   June 11th, 2021, Acknowledgement Letter.

11             THE COURT REPORTER:  Thank you, sir.

12             THE WITNESS:  I'm waiting for -- all right.

13   Just came in.

14   BY MR. RAKHUNOV:

15        Q.   Okay.  Great.

16        A.   Okay.

17        Q.   So Mr. Schwartz, once you open up Exhibit 8,

18   please review it and let me know if you recognize the

19   document.

20        A.   Okay.  Well, I understand the letter.  Yeah.

21        Q.   So what -- what is this letter?

22        A.   This is an acknowledgement letter that the

23   FDA received a 510(k) application by my associate,

24   Aristotle, that we submitted to the FDA in June of

25   2021.  And it was a --

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

1        Q.   And did --

2        A.   For powder-free nitrile gloves for --

3        Q.   And it's --

4        A.   That we prepared and submitted for Dongguan

5    Grinvald Technology.  And sorry, I did not remember

6    that.

7        Q.   No.  That -- that's okay.  There's no need

8    to apologize.  And -- and you see that -- that this

9    acknowledgement letter specifically mentions Medcare

10   powder-free blue nitrile patient examination gloves,

11   correct?

12       A.   That's correct.

13       Q.   And how quickly does an acknowledgement

14   letter like this usually come from the FDA following an

15   application submission?

16       A.   Well, this was during COVID still, so things

17   were pretty crazy.  But it -- normally 30 -- about 30

18   days or so, 30 to 45 days.  They want to make sure they

19   have -- that's the first review, and that's just an

20   acknowledgement, and they give it the number.  So from

21   then on, that number is supposed to follow that

22   application.

23       Q.   So the -- that number K211808, you know,

24   would that be -- if this product were approved, would

25   that ultimately become the 510(k) number for the

Page 36

1    product, subject to this application?

2         A.   If the 510(k) is cleared, yes, not approved.

3         Q.   Cleared, I'm sorry.  I --

4         A.   I just want to keep --

5         Q.   I appreciate --

6         A.   I just want to keep it under the same level.

7         Q.   Absolutely.  And this acknowledgement letter

8    dated June 11th, 2021, this -- this does not constitute

9    a clearance, correct?

10        A.   That is correct.

11        Q.   All right.  And -- and looking at this

12   acknowledgement letter, does this, in any way, refresh

13   your recollection as to the work that MDI did for

14   Grinvald -- Dongguan Grinvald Technology Co.?

15        A.   No.  At that time, we were submitting a -- a

16   very large amount of 510(k)s for various companies.

17   That -- that does not refresh my memory.

18        Q.   Do you know -- does this, in any way,

19   refresh your memory as to whether Dongguan Grinvald

20   Technology still a client of MDI to this date?

21        A.   I would have to ask my office manager if we

22   are their U.S. agent or official correspondent.  I have

23   -- I would not know offhand.

24        Q.   And as far as the -- and I know this

25   acknowledgement letter doesn't have this type of

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 37

1    information, but does this suggest that your firm would

2    have been the one to submit the application for the

3    clearance for this product?

4        A.   That is correct.

5        Q.   And would that application for clearance

6    identify the -- the predicate device and the

7    bioequivalency standards that the product -- that would

8    apply to the products?

9        A.   That is correct.

10       Q.   And wait, do you see that in -- this

11   particular acknowledgement letter references the word

12   Medcare specifically?  Does a 510(k) letter have to

13   specify the brand name of a particular device, for

14   example?

15       A.   We don't recommend it.  You can get away

16   with it being --

17       Q.   I'm -- I'm sorry.  I just -- I -- I got an

18   e-mail and it cut out your last word.  Can you just

19   repeat your answer?

20       A.   It does not have to have a specific brand.

21       Q.   But it has to meet the specific

22   specifications?

23       A.   Correct.

24       Q.   All right.  So I -- I believe you said this

25   earlier, but you're not an expert in actually

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 38

1   performing testing on gloves for physical or chemical
2   properties, correct?
3       A.   That is correct.
4       Q.   Okay.  And you're not a statistician expert,
5   correct?
6       A.   That is correct.
7       Q.   And -- and you've never been -- you've never
8   been retained as a statistician, correct?
9       A.   Oh, that is correct.
10      Q.   Okay.  There's a publication identified
11  under lectures and -- and it's actually the first.  And
12  it says, "Seminar on FDA Regulations as They Pertain to
13  the Examination Glove Industry."
14      A.   Are you -- well, I -- I lost you.  Where are
15  you looking?
16      Q.   So I'm looking under lectures, seminars, in
17  your CV, and it's the first one that says, "Seminar on
18  FDA Regulations as They Pertain to the Examination
19  Glove Industry."
20      A.   Okay.  Let me -- let me find that one.
21  Okay.  Got it.
22      Q.   Do you recall what that was -- what that
23  seminar was about?
24      A.   Wow.  Well, you see the date on that, right?
25      Q.   I do.  I know.  And I know it's a long shot,

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 39

1    but I -- I thought I would ask.

2         A.   Well, I'll tell you.  Prior to 19 -- prior

3    to 1988, the FDA classified examination gloves as a

4    Class I, which they still are, but they were 510(k)

5    exempt.  In 1988, as a result of the HIV crisis and

6    hepatitis, the FDA reclassified examination gloves to

7    need -- to require a 510(k) and that the manufacturing

8    had to follow the GMP.

9              So the -- the main manufacturing plants of

10   examination gloves was in Taiwan, and we were invited

11   to Taiwan to give a -- a seminar at the Taiwan Glove

12   Association.  So I remember this like -- like it was

13   yesterday.  And we had 400 -- there was 400

14   manufacturers involved or -- or members of the

15   Taiwanese Glove Association.  And we went to Taipei,

16   and we gave a seminar on the FDA regulation as they

17   pertain to the examination glove industry.

18             It was a two-day seminar explaining the new

19   rules and regulations that will pertain to them to be

20   able to export these gloves to the United States.  And

21   then we were lucky enough to pick up about two dozen

22   clients from that seminar.

23        Q.   Okay.  Do you still have any written

24   materials from that seminar -- well, let me actually

25   ask a different question.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 40

1          In -- in more recent past, have you given

2    any seminars or -- or -- or speeches or taught any

3    classes regarding examination gloves?

4          A.   Probably not specific to examination gloves,

5    unless I was at an examination glove company and I was

6    giving them a -- an introduction to the U.S.

7    regulations, because I do that as part of the training

8    to the staff.

9          Q.   So Mr. Schwartz, did you do anything to

10   prepare for today's deposition?

11         A.   Did I do anything?  I took a shower.

12         Q.   Well, we're not in the same room, so I -- I

13   -- I guess that -- I -- I don't even have to say I

14   appreciate that.  Did you review any documents to

15   prepare for today?

16         A.   No.

17         Q.   Did you meet with -- and this is just a yes

18   or no answer.  Did you meet with Mr. Sperber to prepare

19   for today?

20         A.   Sperber -- did I meet with Sperber?  I may -

21   - I might --

22         Q.   And --

23         A.   I -- not today.

24         Q.   Not today.  Okay.  Did you -- did you have

25   discussions with anyone whatsoever, whether Aristotle

Page 41

1   or anyone else, in preparation for today's deposition?

2       A.   Yes.

3       Q.   With who?

4       A.   With an attorney, Meir.

5       Q.   And do you know what firm or office that

6   attorney --

7            MR. SPERBER:  Just -- just -- just for

8   clarity, Meir Goldberg is -- is one of my associates.

9            MR. RAKHUNOV:  Okay.  Okay.

10  BY MR. RAKHUNOV:

11      Q.   That's -- that -- and when did you have a

12  meeting or a conversation with that attorney?

13      A.   Yesterday afternoon.

14      Q.   How long did you meet with the attorney for?

15      A.   About 20 minutes.

16      Q.   Did you have any discussions with someone

17  named Hershey Weiner in preparation for today's

18  deposition?

19      A.   Please clarify.  I'm not sure.  I -- there

20  was somebody else on the call.  I -- I don't recall the

21  name.

22           MR. SPERBER:  Yeah.  That would be me.

23           THE WITNESS:  Okay.  It was.  Okay.

24           MR. SPERBER:  For -- for the record.

25           MR. RAKHUNOV:  Fair enough.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 42

```
 1   BY MR. RAKHUNOV:
 2        Q.   Do you know someone named Joseph or Hershey
 3   Weiner?
 4        A.   Doesn't sound familiar.
 5        Q.   All right.  Mr. Schwartz, when were you
 6   first contacted about providing expert work for this
 7   case?
 8        A.   I think it was in December sometime.
 9        Q.   In December of --
10        A.   In the -- late December.
11        Q.   Of 2023, correct?
12        A.   That is correct.
13        Q.   Who contacted you?
14        A.   Mr. Goldberg.
15        Q.   Do you know how Mr. Goldberg learned of you
16   or MDI Consultants?
17        A.   I worked with him on a case prior to this.
18        Q.   That was my next question.  What -- what
19   case did you work on with Mr. Goldberg?
20        A.   You know what?  I -- I would have to refresh
21   my memory.  I -- I don't remember cases.
22        Q.   Well, what kind of a case was it?  Let's
23   start with that.
24        A.   It was a glove case also, examination.
25        Q.   It was -- was it another case involving
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

```
 1   Medcare brand nitrile examination gloves?
 2        A.   I don't think so.
 3        Q.   Was it -- did it involve LevMed brand
 4   gloves?
 5        A.   You know what?  You're catching me off -- I
 6   -- I would have to get back to you.  I can get you the
 7   exact name.  I -- names -- I don't remember the names
 8   of my grandkids.
 9        Q.   Did you provide -- the other case that you
10   worked with Mr. Sperber's firm on, when did you work on
11   that case?
12        A.   It was the spring, summer, just --
13        Q.   Of -- of 2023?
14        A.   That's correct.
15        Q.   And did you provide any expert testimony in
16   that case?
17        A.   Written.
18        Q.   So you -- you provided a written report?
19        A.   Correct.
20        Q.   Okay.  Have you been deposed in that case?
21        A.   Not yet.
22        Q.   Okay.  But you -- you expect to be deposed
23   in that case?
24        A.   There's a chance.
25        Q.   Does that case involve a party named Silver
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 44

1  Wing Medical?  Does that sound familiar?

2       A.   Again, it might, but I -- I -- I -- I don't

3  want to say yes or no until I look at it.  Sorry.

4       Q.   No.  That -- that's fine.  Is Kitchen

5  Winners a party to that case, that retained you?

6       A.   I don't think so.

7       Q.   What kind of -- of expert advice did you --

8  or expert opinion did you provide in the other case for

9  Mr. Sperber's firm?

10      A.   That case was involving the quality of the

11  gloves that were being shipped overseas and the -- the

12  -- the possibility of damage to the gloves because of

13  time-related storage.

14      Q.   And what expertise did you lend to that

15  case?

16           MR. SPERBER:  Objection to the form.

17           THE WITNESS:  It was my experience with

18  environmental conditions that might affect the quality

19  of the gloves.

20  BY MR. RAKHUNOV:

21      Q.   Do you know whether that case is pending in

22  state or federal --

23      A.   I -- not offhand.

24      Q.   Were you providing an expert report in that

25  case as a rebuttal expert or as a -- as an affirmative

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 45

1   expert, if you remember?

2       A.   I -- I -- I don't remember if -- when we --

3   I'm -- I'm not sure exactly.  I would have to go back

4   and look at the report.

5       Q.   Is the case that we just talked about the

6   only other case that you've worked on with Mr.

7   Sperber's law firm?

8       A.   I think Meir hired me a few years, a -- over

9   a year ago on another case.  And I can't remember

10  exactly, but it was a -- a case involving gloves.

11      Q.   And did -- were you -- did you give a

12  deposition in that other case?

13      A.   No.

14      Q.   Did you give any testimony other than --

15  well, did you give a written report in that other case?

16      A.   You know what?  I'd have to go back and

17  look.  I -- I know I didn't -- we -- we sent gloves out

18  for testing.  I can't remember -- I can't remember now

19  whether it was a written report or -- or an opinion

20  page.

21      Q.   So turning back to this engagement, do you

22  know how many hours you spent working on this

23  particular case?

24      A.   This case right now, I -- I would say

25  probably eight -- maybe eight hours.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 46

1      Q.   Let's turn to the beginning of your report.

2   This is -- we're -- we're back to Exhibit 1, and this

3   is Page 4 of the PDF document, and it's titled Alan

4   Schwartz Expert Rebuttal Report.  Let me know when you

5   get there.

6      A.   And that goes all the way back.  Okay.  That

7   was it before.  All right.  That's, yeah, Exhibit 1.

8   Okay.  Let me get to the top.  All right.

9      Q.   Okay.  So first question, who drafted this

10   report?

11      A.   Let's see.  That's my background.  Wait a

12   minute.  Let me get -- is it the first -- let's see.

13   The report.  Exhibit 1 is my -- okay, my rebuttal

14   report.  It was drafted -- an -- an original draft was

15   drafted by Mr. Goldberg.

16      Q.   Did you review a draft?

17      A.   Of course.

18      Q.   Okay.  Do -- do you recall having

19   substantial edits?

20      A.   There were edits.  I don't know if they were

21   substantial, but there were edits.

22      Q.   Was Mr. -- if you -- if it's okay, I'll call

23   him Aristotle.  Was Aristotle involved in your -- your

24   work on this case?

25      A.   I think he helped me find the lab, but I

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 47

1    think that was about it.

2         Q.   Do you know what he did to find the lab?

3         A.   I did.  He -- I think he did the research of

4    where we could get the lab tested and -- and get it

5    done as fast as possible.

6         Q.   Did he have communications with the lab?

7         A.   Did he have communications?

8         Q.   Yeah.

9         A.   Either he did, or my office manager did.

10        Q.   Do you recall Mr. Sperber asking you to

11   collect your communications with -- or MDIs

12   communications with ARDL lab to be produced in this

13   case?

14        A.   Yes.

15        Q.   Did you ask Aristotle or others in your firm

16   to gather any such communications?

17        A.   I did.  I asked my office manager.

18        Q.   All right.  So let's -- let's -- let's get -

19   - get into your report.  What opinions were you asked

20   to render in this case?

21        A.   Strictly about having the gloves sent to the

22   lab, having them tested, and what the results of the

23   tests were.

24        Q.   Why -- so -- and -- and -- and just take

25   this for what it is, but I'm just trying to understand

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 48

1   why separate expertise was required in order to send --

2   send gloves to a lab to get tested rather than just,

3   you know, Mr. Sperber hiring a lab directly.

4           I want to understand what your role is and

5   what expertise you bring to bear to this case?

6       A.   I think you want to ask them, not me.

7       Q.   Well, I -- I do have to ask you.  I -- I

8   can't get them under oath, not -- not quite yet.

9       A.   Well, I guess as a former FDA -- involved

10  with gloves and -- and being involved, they wanted to

11  know which lab could get the -- the gloves tested and

12  work with the lab to get it done as fast as possible.

13  We work with a lot of labs.  So it's -- it's not

14  unusual that they would ask an expert in the area to do

15  it.

16      Q.   And you're not rendering any opinions here

17  as to whether the testing reflects compliance or non-

18  compliance with any particular FDA specifications or

19  regulations, correct?

20      A.   Well, the test that they wanted done was to

21  determine if it was nitrile gloves.  So they wanted the

22  test to determine that they were -- the gloves were

23  made of nitrile.  So that's a pretty straightforward

24  test.  It's not a -- a test of an ASTM standard for

25  various specifications.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 49

1    Q.   And you're also described as providing a

2    rebuttal report to -- to a report submitted by Dr.

3    Jason Poulton of ARDL, and an expert report of John

4    Carson, statistician.  You see that identified in your

5    -- in the second paragraph under Background section?

6    A.   Right.  Let's see.  I retained -- what's

7    since been identified a testing laboratory.  Right.

8    And the rebuttal reports, right.  I see that, yes.

9    Q.   Okay.  But you're not actually disputing any

10   testing results or conclusions from the testing results

11   provided by Dr. Poulton and ARDL, correct?

12   A.   Correct.

13   Q.   And you're not actually providing any

14   opinion to rebut any statistical issues in Dr. Carson's

15   report, correct?

16   A.   Correct.

17   Q.   So when you write, and we're still in the

18   Paragraph 2, that you were asked to quote, "analyze the

19   results of those tests."  What -- what does that mean?

20   A.   Well, they wanted me to just review the test

21   reports of both Dr. Poulton, Dr. Carson, and review the

22   test reports I received from the lab.

23   Q.   Okay.  So let -- let's just -- I mean, we --

24   we can agree that the testing reports that, for

25   example, ARDL provided on whatever gloves that they

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 50

1    tested showed some nitrile content, correct?

2         A.   Correct.

3         Q.   And we can all see that just looking on the

4    face of those reports, correct?

5         A.   Correct.

6         Q.   Okay.  What -- what expert opinion did you

7    render to Mr. Sperber and his firm beyond what the

8    reports actually say?

9         A.   Well, the only thing that I -- I -- that I

10   did bring up to them was the amount of gloves that were

11   tested based on the size -- the sample size that was

12   sent to the lab and how that represented the -- the --

13   the large amount of -- of gloves that were shipped.

14        Q.   Can you explain that?

15        A.   In other words, there was not -- they didn't

16   -- there is a -- a -- the FDA recommends you do a

17   statistical sampling.  I'm not a -- a -- an expert in

18   statistical sampling or statistics, but the FDA does

19   have a statistical sample in size to determine -- to be

20   used, that the FDA uses, and they recommend that

21   companies use for testing.

22             And I just brought up the -- the fact that,

23   you know, the sample size they used did not represent a

24   -- the AQL level that the FDA might ask for in -- in

25   looking at testing of a product.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 51

1      Q.    And when you say, "they used," you're
2    talking about Mr. Sperber, correct?
3      A.    Correct.
4      Q.    So you're not opining that the testing that
5    they did is representative of any particular --
6      A.    Are you -- you mean Mr. Sperber's testing or
7    Mr. Carson's or Mr. Poulton's testing?
8      Q.    Well, that -- that -- and that's what I'm
9    asking you to clarify.  It wasn't exactly clear.  Whose
10   testing are you referring to when you're just talking
11   about sampling sizes?
12     A.    Well, both.  Dr. Carson's testing sample was
13   -- was very small.
14     Q.    And what FDA recommendations are you
15   referring to here?
16     A.    The FDA uses the ASTM -- the -- let's see.
17   According with the sample size, ISO 2859-1.
18     Q.    Can you repeat that a little -- a little
19   slower?  Sorry.
20     A.    ISO 2859-1, the standard for sampling.
21     Q.    Are you -- have you implemented ISO 2859-1
22   in -- in your experience with MDI?
23     A.    For -- for this sampling or in general?
24     Q.    In general?
25     A.    We have used that at times to -- to -- to

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 52

1   pick up samples and to determine the samples that

2   companies use when testing their various products.

3       Q.   And are you giving any opinions with respect

4   to sampling in this case?

5       A.   Well, I -- I just made a -- a -- an opinion

6   as to the sample size that was used by Dr. Carson, that

7   their sample size did not follow the ISO sampling

8   plans.

9       Q.   And -- and -- and this is in Section B, you

10  actually quote Dr. Carson referring to the ISO 2859

11  standard, correct?

12      A.   Correct.

13      Q.   And then you opine that Dr. Poulton's

14  testing did not meet that standard; is that correct?

15      A.   That is correct.

16      Q.   Okay.  And you're not -- and you're simply

17  looking at the two reports side by side and just

18  reading them, correct?

19      A.   Correct.

20      Q.   Have you been asked by Mr. Sperber or his

21  firm to conduct any -- any statistical sampling on the

22  gloves at issue?

23      A.   They did not ask me to do that.

24      Q.   Do you have any opinions as to whether the

25  gloves sampled that are described in Section C and D of

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 53

1    your report, and we'll -- we'll get to those in a

2    moment, comply or do not comply with the FDA ISO 2859-1

3    sampling procedures?

4         A.   All right.  It's not an FDA sampling.  ISO

5    is the International Standards Organization.  It's not

6    an FDA sampling.  The FDA doesn't have a sampling plan.

7    They used to use mill spec standards.

8              Now the -- the -- basically the world uses

9    the ISO standards for sampling -- sample size.  So

10   that's the ISO 2859-1.  They didn't ask me to sample --

11   or what the sample size should be for that standard.

12   They did not ask that.

13        Q.   But you agree that some gloves -- some

14   gloves, and some quantities of gloves, were tested as

15   described in Section C and D of your report, correct?

16        A.   That is correct.

17        Q.   And -- and you're not opining as to whether

18   that sampling meets or doesn't meet the ISO 2859-1

19   standards, correct?

20        A.   That is correct.

21        Q.   All right.  So by the way, if you need -- I

22   know we've been going a little over an hour.  If you

23   need a five-minute break, this would be a good time to

24   take one before I jump to the --

25        A.   About how long do you think it will be?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 54

1      Q.   I'm sorry?

2      A.   About how much longer, do you think?

3      **Q.   I'm hoping to wrap up in -- in an hour.**

4      A.   All right.  Let me just take a quick break.

5      **Q.   Yeah, that sounds good.  Okay.  Go ahead.**

6      A.   All right.  So I'm going to put you on --

7   I'm going to take a --

8           THE COURT REPORTER:  The time is now 1:25

9   p.m.  We are off the record.

10          (OFF THE RECORD)

11          THE COURT REPORTER:  The time is now 1:36

12   p.m.  We are back on the record.

13   BY MR. RAKHUNOV:

14      **Q.   During the break, Mr. Schwartz, did you**

15   **speak with the Counsel?**

16      A.   No.

17      **Q.   So let's look at the bottom paragraph on**

18   **Page 1 of your rebuttal report, the one that begins**

19   **with "on or about April 7th"?**

20      A.   Okay.  The bottom -- let's see.  It's, "on

21   or about April 7th."  Oh, what page was that?

22      **Q.   It is Page 4 of the PDF of Exhibit 1.**

23   **That's the first page of your rebuttal report.**

24      A.   Okay.  Let's see.  It's, "on or about 7th of

25   April."  On or about April -- April 7th, you said?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 55

1      Q.   Yeah.  It's the last paragraph, the bottom

2   paragraph.

3      A.   I got it.

4      Q.   Okay.  So turning to the second sentence,

5   and I'll just read it into the record, "Pursuant to the

6   SPA, the defendants procured approximately 55 to 60

7   containers of gloves, amounting to approximately 1.7

8   million boxes of gloves."  You -- you see that

9   sentence?

10     A.   Yes.

11     Q.   So where did you get the information that

12  the defendants procured approximately 55 to 60

13  containers of gloves?

14     A.   From the attorneys.

15     Q.   Okay.  Did you review any packing slips,

16  invoices, or any documentation to independently verify

17  that statement?

18     A.   I don't think they sent me any documents on

19  that.

20     Q.   Okay.  Well, do you have an understanding,

21  in your -- in your industry experience, whether the

22  word container has any significance when it comes to

23  shipping medical devices from China to the U.S.?

24     A.   Yeah.  Yes.

25     Q.   What is your understanding?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 56

1      A.    A container is a -- a -- well, they use

2   containers for shipping large volumes of products, and

3   they -- the container could be of various sizes.  And

4   they may have -- made of steel containers that are put

5   on ships to sit -- ship them by -- by boat.

6      Q.    Okay.  So when you write here, "55 to 60

7   containers," I mean, are you assuming any particular

8   size?  And I'm not asking you to do the math, dividing

9   1.7 million by that number, but do you have any

10  assumptions as to the types of containers that gloves

11  would be shipped in?

12     A.    No.

13     Q.    Well, let's -- let's go to the next

14  sentence, "I have been informed that the gloves the

15  defendants procured were all manufactured under two

16  different lot numbers - 202103010101 and T4."  You see

17  that sentence?

18     A.    Yes.

19     Q.    Okay.  Where did you obtain that information

20  from?

21     A.    From the attorneys.

22     Q.    Did you do anything, such as review any

23  documentation, to verify that statement?

24     A.    No.

25     Q.    Okay.  Do you have any understanding of what

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 57

1    a lot number means in the context of glove

2    manufacturing?

3         A.   Well, a lot is supplied by a company and it

4    -- it depends on them on what size the lot would be.

5    So a lot number could be one day's production.  It

6    could be a -- a purchase order production.  So it all

7    depends on the company and how they want to define it.

8         Q.   Do you have any understanding, specifically,

9    as to how the lot numbers were defined for the gloves

10   at issue in this case?

11        A.   No.

12        Q.   In your experience generally, is -- do you

13   have any understanding or opinion as to the

14   significance of gloves sharing the same lot number?

15        A.   Gloves sharing the same lot number.  I -- I

16   would have to know more information as to what that

17   means.  It -- it all depends on -- on the manufacturer,

18   or the shipper, or what they are using as a lot number

19   and how they're using it.

20        Q.   Okay.  And did you obtain any information in

21   this case about what -- you know, what lot numbers

22   signify?

23        A.   No.

24        Q.   Were you asked to make any assumptions by

25   Mr. Sperber, or his firm, as to what these lot numbers

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 58

1   signified?

2        A.   No.

3        Q.   All right.  So for the next sentence here,

4   you know, approximately 80 percent of the gloves were

5   manufactured under lot number 202103010101, and 20

6   percent under lot number T4.

7             That information, safe to assume, also came

8   from Counsel?

9        A.   Correct.

10       Q.   And you didn't review any documents or any

11  other materials to independently verify the accuracy of

12  that assumption?

13       A.   Correct.

14       Q.   Okay.  These lot numbers that are referenced

15  in your report, have you seen any actual glove boxes

16  bearing those lot numbers?

17       A.   No.

18       Q.   In performing your expert work here, did you

19  see any glove boxes, period?

20       A.   No.

21       Q.   Were any glove boxes shipped to MDI in

22  connection with your expert work in this case?

23       A.   No.

24       Q.   Have you ever seen a box of Medcare brand

25  gloves?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 59

```
 1      A.   Not that I can remember.
 2      Q.   So if I were to show you on the screen,
 3 right now, this box of gloves -- I don't know how well
 4 you can see it on your phone.
 5           MR. SPERBER:  For the record, it's very
 6 blurry.
 7           MR. RAKHUNOV:  It is.  And I'm hoping --
 8 well, you know what?  That's okay.  There'll be -- I --
 9 I have an exhibit with some images on it, so we'll
10 handle it that way.
11 BY MR. RAKHUNOV:
12      Q.   All right.  And -- and again, just to be
13 clear, the information about the lot numbers and the
14 percentage allocations came from Counsel or from actual
15 parties?
16      A.   That's correct.
17           MR. SPERBER:  Just -- just could you --
18 which was the answer?  I didn't understand.
19           MR. RAKHUNOV:  Oh.  Yeah.  Yeah.
20 BY MR. RAKHUNOV:
21      Q.   So Counsel provided you the information, not
22 somebody at Kitchen winners or Adorama, correct?
23      A.   That is correct.
24      Q.   All right.  So flipping to the next page of
25 the report, I understand that first paragraph -- well,
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 60

1   it looks like it at least purports to summarize some of

2   the allegations in this lawsuit.

3           Did you review any pleadings in this case,

4   like, the complaint, or counterclaim, or any discovery

5   responses?

6       A.  I did not.

7       Q.  So let's turn to Section B, the one titled

8   ARDL's Testing for Rock FinTek.

9       A.  Okay.

10      Q.  Okay.  So I -- I -- I think we already

11  covered this, so I'll be brief.  But is it fair to say

12  that in Section B, you reviewed the two expert reports

13  that Rock FinTek submitted in this case and just

14  compared them side by side in terms of what the reports

15  say?

16      A.  That's correct.

17      Q.  And if we look at the last paragraph in

18  Section B, the one that begins with, "furthermore," and

19  you say in the second sentence, "Also, as stated above,

20  the gloves procured by Defendants were manufactured

21  under only two lot numbers."

22          Again, that is an assumption that you make

23  from Counsel, not a fact that you're -- that -- that

24  you're opining it to, correct?

25      A.  Correct.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 61

1        Q.   And in the last sentence, when you write, "I

2    can only speculate that the other lots referenced in

3    Dr. Poulton's report submitted for testing are the lots

4    for gloves that were procured by the other defendants

5    in this action."

6             Do you see that?

7        A.   Yep.

8        Q.   Do you know who the other defendants are?

9        A.   No.

10       Q.   And you don't know what -- what relative

11   quantity of gloves was sold by other defendants as

12   opposed to Mr. Sperber's clients to Rock FinTek?

13       A.   That's correct.

14       Q.   All right.  Let's -- let's turn to Section

15   C, SGS Testing by the Defendants.  That's the following

16   page.  Let me know when you're there, sir.

17       A.   I'm -- I'm here.

18       Q.   Okay.  Great.  So from reading your report -

19   - and tell me if I'm -- if I'm reading this correctly.

20            You or anyone at MDI had no direct

21   involvement with the testing described in Section C,

22   correct?

23       A.   That is correct.

24       Q.   Okay.  So you have no personal knowledge, or

25   no one at your firm has personal knowledge, as to the

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 62

1    SGS testing described in this section, correct?

2        A.   Correct.

3        Q.   Okay.  And so you write that you have been

4    informed that the gloves were stored at various

5    warehouses operated -- owned and operated by Medline

6    Industries, and that Defendants visited several of

7    those warehouses and obtained samples of some of the

8    gloves being stored there.

9             Again, that -- you were informed by Counsel,

10   correct?

11       A.   Correct.  Correct.

12       Q.   All right.  So the -- the last sentence in

13   that paragraph -- second to last says, "Specifically,

14   the defendant submitted 40 samples of gloves, 10 gloves

15   from each of the four largest warehouses, to be tested

16   by SGS-IPS."

17            How do you know that the gloves came from

18   four of the largest warehouses?

19       A.   This is what I was informed.

20       Q.   And the four bullet points immediately

21   following this paragraph are -- are what?

22       A.   I guess, these are the gloves that -- I

23   guess, those showed which warehouse or where they were

24   taken from, and what the lots were taken, and the date

25   they were taken, except for the second one, which was

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 63

1    stated, Middletown.

2         Q.   And -- and if I told you that -- well, have

3    you reviewed any documentation from Medline showing

4    these gloves in -- in various warehouses?

5         A.   No.

6         Q.   And if I told you that the Middletown, New

7    York warehouse was, in fact, the smallest of the

8    warehouses, would you have any factual basis to

9    disagree with me?

10        A.   No.

11        Q.   And the gloves -- so -- that were tested by

12   SGS, those are the ones that appear in -- in the SGS

13   testing reports attached as Exhibit A to your report;

14   is that correct?

15        A.   I think so, yes.

16        Q.   And the -- you know, the four bullet points

17   that we're looking at right now, you know, it -- it

18   appears those are the labels on the plastic baggies in

19   which the gloves were -- appear in the photographs.

20             Do you recall reviewing that?

21        A.   Yes.

22        Q.   Okay.  So let's just take a look at those

23   four bullet points.  Do you see in the latter two,

24   there's a -- a number-letter sequence that begins with

25   WH?  The first one is -- let me just read it into the

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 64

1   record.  It says, "6-13-23, WH9550DD0300"?

2       A.   Yes.

3       Q.   Okay.  And then there's one below it, has

4   the same date of 6-13-23, and it says, "WH9251CC0200."

5   Do you see that?

6       A.   Correct, yes.

7       Q.   Do -- do you know what the WH number-letter

8   sequence refers to in these bullet points?

9       A.   I -- I could only speculate, but I would

10  have no idea if it's true or not.  WH usually stands

11  for warehouse, but I'm not sure.

12      Q.   And did -- did you ask Counsel what these

13  numbers stood for?

14      A.   No.

15      Q.   But you were asked to assume that the gloves

16  came from four different warehouses with these labels,

17  correct?

18      A.   That's what I was informed of.

19      Q.   If we look at -- let's -- let's jump to the

20  SGS reports, which -- which should be Exhibit A to your

21  report.

22           What is SGS Organization?

23      A.   It's a world -- worldwide testing lab.

24      Q.   And -- and just curious.  Why did your firm

25  not retain SGS when you were asked to do additional

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 65

1    testing in 2024?

2        A.   Well, we were just looking for a local lab

3    to get it done as fast as possible.  Normally, a

4    smaller lab might be able to get stuff done faster.

5    SGS is a huge operation, and very, very bureaucratic,

6    and sometimes it's more difficult to get things done

7    quickly.

8        **Q.   But looking at -- and now I'm on Page 9 of**

9    **the PDF, and it's the -- the -- the page that says,**

10   **"Page 1 of 10, SGS-IPS Testing."  Are you with me?**

11       A.   I'm looking at Page 9?

12       **Q.   Page 9 of the PDF, and -- and at the top**

13   **right, it says, "Test report, November 29th, 2023"?**

14       A.   Yep.

15       **Q.   Okay.  "Sample description, four NBR glove**

16   **samples."  Do you see that?**

17       A.   Hold on a minute.  Four -- let's see.

18   Report of analysis.  You're looking at still where it

19   says, "Report of the analysis"?

20       **Q.   Yes.**

21       A.   Yeah.  And it says, "Four NBR glove samples

22   provided"?

23       **Q.   Yep.**

24       A.   Yeah.  Okay.

25       **Q.   You -- you would agree with me that nowhere**

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 66

1    in that page, or nowhere in the SGS report, is the

2    brand Medcare mentioned?  Do you agree with me?

3          A.   I agree with you.

4          Q.   And then if you scroll down to Page 3 of 10

5    in the top right corner, it's, "Table 1, infrared

6    spectroscopy results"?

7          A.   I got it.

8          Q.   Okay.  So the -- the four entries under

9    sample identification seem to be consistent with the

10   four bullet points of the warehouse locations that were

11   -- that were tested, correct?

12         A.   Correct.

13         Q.   Okay.  All right.  And then we have a few

14   pages of lab results, but I want to direct your

15   attention to Appendix A, Page 9 of 10 of the SGS

16   report.

17         A.   9 of 10?  Hold on.

18         Q.   Yes.

19         A.   9 of 10 -- 3 of 10.  All the way past it.

20   Okay.  Hold on.

21         Q.   And actually the last two --

22         A.   9 of 10.

23         Q.   Yeah. 9 of 10 and 10 of 10 have photographs

24   of, would appear to be, you know, sandwich baggies

25   containing some gloves.  And each one has a label that

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 67

1    has Mr. Sperber's law firm name on it.

2         Do you see that?

3    A.   Yes, I do.

4    Q.   Okay.  And -- and do you see that some of

5    the gloves have different color hues to them?

6    A.   I -- I -- maybe I could see a slight

7    different color change, I think, or a slight different

8    color between -- let's see.  I think -- let's see.  The

9    Figure 1.  Figure 2, it just looks like more of them.

10   I don't know if that's a different color.  Figure 3

11   looks like it's a little lighter, and Figure 4 goes

12   back to the original -- goes to the ones that look like

13   1 and 2.  So there might be a slight color change.

14   Q.   Any -- any significance to you as a -- as an

15   FDA expert in the color differences between the gloves?

16   A.   Well, I don't know if that would be an

17   expert -- an FDA expert, but unless I was working in

18   the lab, if that would mean anything to me.  I am not

19   sure why there would be a -- a slight difference in the

20   colors.  Or the shades, not the colors, and the shades

21   of the blue.  They -- they -- I guess, they're all

22   labeled blue nitrile, but I'm not sure.

23   Q.   And do you have -- have you seen any

24   documentation or any evidence whatsoever to -- that --

25   that would confirm that these gloves in these plastic

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 68

1    baggies are Medcare gloves, or what they are at all?

2         A.   Well, I --

3              MR. SPERBER:  Object to the form.

4              THE WITNESS:  No.  I -- I couldn't make that

5    determination.

6    BY MR. RAKHUNOV:

7         Q.   And were you provided any communications

8    between Mr. Sperber's firm and SGS when you were --

9    when you were asked to put together your expert report

10   here?

11        A.   Only this information that was given to me.

12        Q.   And if -- okay.  Well, let's -- it's been a

13   couple of hours, so I forget now exactly which exhibits

14   I've e-mailed out.  So let me just take a look --

15        A.   I -- I got Exhibit 1.  I got Exhibit 2.  I

16   got Exhibit 3, and I got Exhibit 7.

17             MR. RAKHUNOV:  Right.  So let's -- let's

18   open Exhibit 3.

19             (EXHIBIT 3 MARKED FOR IDENTIFICATION)

20             THE WITNESS:  I have it open.  Yeah.

21   BY MR. RAKHUNOV:

22        Q.   Okay.  And so do you see this is a four-page

23   document that has some photographs of cartons and boxes

24   of gloves.  And take a look at the very first

25   photograph.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 69

1          Do you see it depicts a -- a white piece of
2   paper taped to some cartons, and it has a number
3   starting with WH on it?  Do you see that?
4          A.   I do.
5          Q.   Okay.  And just under that is a glove of
6   Medcare that -- that says "Medcare" on it.  Do you see
7   that?
8          A.   Yes.
9          Q.   So this is a little more clear than what I
10  was trying to show you.
11          Is this the first time that you're seeing an
12  actual box of Medcare gloves in connection with your
13  work on this case?
14          A.   I think so.
15          Q.   And do you see right under that, there's a
16  picture with an enlarged side of the box, and it says,
17  "Lot HFK202103010101"?  Do you see that?
18          A.   Yes.
19          Q.   Looking at a lot number actually on a box of
20  gloves, does that give you any more information about
21  the significance of what that lot number means in this
22  context?
23          A.   Well, no.  That -- that lot number appears
24  to be assigned to that -- that box of gloves.  And then
25  it determine -- you know, that was their lot number

Page 70

1   that they assigned it.  That -- that's all that I would

2   be able to determine on that.  It looks like it was

3   manufactured on a date and I -- you know, as an FDA

4   investigator, it looks like it's 2021, March.  March

5   1st of 2021, but I -- I couldn't determine any more.

6          If you look underneath, it says, "2021.3,"

7   so it looks like -- that build date -- is a

8   manufacturer.  It looks like it was built -- it was

9   manufactured in March of 2021, and it looks like time

10  runs out on this in February of 2024.

11     Q.   And that little white building symbol, is

12  that a standard symbol used in -- an -- an industry

13  standard symbol used for manufacture date?

14     A.   Yes.  It would be, yeah.

15     Q.   Okay.  Now, if two boxes of gloves shared

16  this particular lot number, having now looked at the

17  box of gloves, does that tell you anything about what

18  those boxes may have in common?

19     A.   Well, they should have been manufactured in

20  the same lot.  That -- like I said, that lot could

21  represent a lot of different things depending on the

22  manufacturer.  So could have been a -- a run, a

23  production run, which could take several days.  It

24  could be an hour.  It could be one day.  It -- it --

25  you know, it -- it all depends what the last digits on

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 71

1  that -- that lot code is.  It -- it -- we don't know

2  exactly what it means.

3     Q.   Is it -- is it reasonable to assume that

4  gloves manufactured in the same lot, under the same lot

5  number, would be manufactured under the -- at -- at the

6  same factory?

7     A.   Oh, yes.

8     Q.   Okay.  And would it be reasonable to assume

9  that gloves manufactured under the same lot number were

10  manufactured under the same specifications?

11     A.   Yes.  It should be, yes.  It's expected.

12     Q.   Okay.  So -- and then scrolling down to the

13  last two photos on this page, the same thing.  We see

14  another label with a WH number, and another photograph

15  of a box of gloves.

16          This one has a different style lot number

17  that says, "20201106."  Do you see that?

18     A.   Yes, I do.

19     Q.   Okay.  And then here, that would appear to

20  refer to a November 6th, 2020, manufacturer date,

21  correct?

22     A.   That appears to be the date of it.

23     Q.   And this one has a size on it, and then a

24  three-year later expiration date, correct?

25     A.   Correct.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

```
 1        Q.   And if I told you that the two white slips
 2   in the photographs in Exhibit 3 represent a pallet
 3   location number in the same warehouse in Grayslake,
 4   Illinois, would you have any factual basis on which to
 5   disagree with that statement?
 6        A.   I would have no factual basis for that.
 7        Q.   And in connection with your work in this
 8   case, you reviewed Dr. Jason Poulton's expert report,
 9   correct?
10        A.   Correct.
11        Q.   The two lot numbers that are in Exhibit 3,
12   do you recall seeing those lot numbers identified as
13   part of -- as -- as the lot numbers that Dr. Poulton
14   had tested at ARDL?
15        A.   I would have to go back and look at it.  I
16   can't tell offhand.
17             MR. RAKHUNOV:  No.  And I -- I appreciate
18   that.  And -- and, you know what?  Let's -- let's do
19   that.  And I don't believe I sent that one over yet, so
20   let me -- let me do that right now.
21             So I just sent it to Mr. Sperber.  So
22   hopefully you have it in a few minutes.
23             MR. SPERBER:  Not yet.  I'm -- I'm waiting.
24             MR. RAKHUNOV:  Okay.
25             MR. SPERBER:  I uploaded your --
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 73

1          THE COURT REPORTER:  Apologies.  Is this

2   Exhibit 4?

3          MR. SPERBER:  Your exhibit.

4          MR. RAKHUNOV:  Yes.

5          THE COURT REPORTER:  And what --

6          THE WITNESS:  Still waiting for it to come.

7          THE COURT REPORTER:  What would you like to

8   label this exhibit?

9          MR. RAKHUNOV:  This one is a little bit

10  bigger in size, so it'll take a second.

11          So this -- I guess, off the record while

12  you're loading that.

13          (OFF THE RECORD)

14          MR. RAKHUNOV:  Okay.  All right.  We can go

15  back on.

16          So Exhibit 4 is -- it's a 92-page document,

17  and -- and I will represent to you it's the complete,

18  final, expert report that was submitted by Dr. Poulton

19  in this case.

20          (EXHIBIT 4 MARKED FOR IDENTIFICATION)

21  BY MR. RAKHUNOV:

22     **Q.   And -- and you're welcome to look through as**

23  **much of this document as you need to.  And I will**

24  **direct your attention to Page 3 at first.**

25     A.   Okay.  I'm on Page 3.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

1      Q.   Okay.  And you see a table in the middle of

2  Page 3 that has a -- a number.  It -- it has samples

3  and lot numbers in that column.  Do you see that?

4      A.   Yep.

5      Q.   And two of the lot numbers are -- and I'm

6  looking at sample 15 and then sample 25 are the lot

7  numbers that we just saw on the sides of boxes in

8  Exhibit 3, correct?  You can compare the two if you

9  need to.

10      A.   Give me a chance here.  Let's see.  Let's

11  see.  0300, 1106.  1106 is the 15 and -- and you're

12  saying 25 of -- of 0101.  Let me just check that, 0101.

13  0101.  Yeah.  That looks like -- yeah.  Those two, yes.

14      Q.   And then if you could please turn to PDF

15  Page 45 of Exhibit 4.

16      A.   45.  Okay.

17      Q.   We need to zoom in a little bit.

18      A.   Okay.  I'm in 45.

19      Q.   Okay.  And do you see that there's an actual

20  image on this -- on -- on this expert report of a box

21  of gloves bearing lot number HFK, the -- the 3010101?

22      A.   I see the number.  It's very hard.  Even

23  when I'm enlarging, it doesn't look very good, but if

24  that's what they typed there, I will assume, but I'm

25  not supposed to.  Let me see if I can enlarge it any

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 75

1    more.  That they took it from the box, let me see.  I

2    made it very --

3         Q.   Well, that's okay.  You -- you are

4    absolutely entitled to assume things as long as it's

5    clear on the record.  So let me just ask you to assume

6    that the gloves that were tested by Dr. Poulton, as

7    reflected on Page 3 of his report, were in fact pulled

8    out of the boxes bearing the lot numbers that we saw in

9    Exhibit 3.

10             Can you make that assumption?

11        A.   If that -- if that -- well, I could assume

12   that, but if that's what it says -- I mean, I wasn't

13   there to see what he did, but if that's what he's

14   attesting to, I guess, that's what he did.

15        Q.   Okay.  So -- and if that's what he did, and

16   the total nitrogen levels in those two lots are non-

17   detectable, you would have no -- no basis to disagree

18   with that, or do you?  This is --

19        A.   You mean nitrile.  Nitrogen or nitrile?

20        Q.   Nitrile.  I -- I apologize.  Nitrile.  Thank

21   you.

22        A.   I didn't know what nitrogen was, but all

23   right.  If that's what he pulled out and tested, then I

24   would have nothing to say on it one way or the other.

25        Q.   And you would expect that those test results

Page 76

1    would be consistent across a particular lot number of

2    gloves?

3         A.   I could not assume that.  I would have to

4    see how large the lot was, and how many days it might

5    have crossed over, or something else.  I mean, I -- I

6    would have to go into the plant and see how the plant

7    was operating, and if there was any chance of cross

8    contamination, or mix-up, or something like that.  So

9    there could be a lot of reasons why one box might have

10   had something that didn't test for nitrile, but I

11   cannot attest to that now.

12        Q.   Okay.  And -- and I'm not asking you -- I

13   understand that's outside of your opinions here, but I

14   -- I am asking you as far -- that it would be

15   consistent with your expectations that gloves in the

16   same lot number would be manufactured to the same

17   specifications, correct?

18        A.   That is -- that is an assumption I would

19   make, yes.

20        Q.   So and -- and -- all right.  So let -- let's

21   -- let's go back to Exhibit 1, your expert report.  And

22   I'm sorry, we're jumping around it's just the nature of

23   this.

24             And -- and I'll ask you to go back to the

25   body of your report in --

Page 77

1      A.    I'm on --

2      Q.    -- the section -- Section D.

3      A.    Okay. D, yes.  Got it.

4      Q.    Well, it -- well and before actually I go

5   there, so the second -- the last sentence of Section C

6   says, "The SGS report confirmed that nitrile was

7   detected in each of the gloves that were tested."  Do

8   you see that?

9      A.    Yes.

10     Q.    And again, based on the information that you

11  were provided, you have absolutely no way of knowing

12  that the gloves that the SGS report refers to were in

13  fact MedCare brand gloves that were sold to Rock FinTek

14  that -- in the events underlying this lawsuit, correct?

15     A.    Correct.

16     Q.    So turning to Section D, now this section

17  reflects the testing that MDI ordered to have

18  performed, correct?

19     A.    Correct.

20     Q.    All right.  So first sentence, "On or about

21  January 12th, 2024, I received from defendants a total

22  of 150 gloves in varying sizes and from various

23  warehouse for testing analysis and reporting."

24        How did you receive those gloves?

25     A.    In plastic bags.

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 78

1      Q.   And what were the plastic bags contained in?
2  Were they in a box and -- if you recall how they
3  actually arrived?
4      A.   I don't remember.
5      Q.   And I see that you -- again, in your --
6  Section D of your report, similar to SGS, you don't
7  actually describe the gloves by brand name, including
8  MedCare, correct?
9      A.   Correct.
10     Q.   That's because you didn't know what brand
11 name they were, correct?
12     A.   Correct.
13     Q.   You didn't care, it wasn't a part of your
14 work, correct?
15     A.   Correct.
16     Q.   And -- and the gloves came by mail?
17     A.   Correct.
18     Q.   And did they come from Mr. Sperber's firm or
19 from somewhere else?
20     A.   Sperber's firm.
21     Q.   How -- how do you know that it was 150
22 gloves?  Did somebody actually count them or were you
23 just, again, relying on Mr. Sperber to give you the --
24 the numbers?
25     A.   We didn't count them.  It was based on the

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 79

1    numbers that was on the bags.

2        Q.   And again, there are three bullet points now

3    in Section D, the -- 80 of the gloves were taken from

4    one lot number, 20 of the gloves from another lot

5    number.

6             You are relying on the labels on the bags

7    for that information, correct?

8        A.   That is correct.

9        Q.   And I'm going to ask you about bullet point

10   3.

11            You -- you -- there -- you write here, "50

12   of the gloves were taken from various lot numbers," the

13   lot numbers are identified in parentheses, "five of

14   which were randomly selected for testing and

15   reporting."  Do you see that?

16       A.   Yes.

17       Q.   So why did you test gloves from other lot

18   numbers if -- if the assumption you were asked to make

19   was that all gloves at issue came from the two lot

20   numbers in the first two bullet points?

21       A.   They asked me to run the test.  I ran the

22   test.

23       Q.   Okay.  And they could have just gone

24   directly to ARDL for this testing, correct?

25       A.   That is correct.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 80

1    Q.   Did Mr. Sperber, or anyone at his firm, ask

2    you to have the gloves, the various gloves, combined

3    together before doing the -- sending them out for

4    testing, if you understand?

5    A.   Yeah.  I'm not sure, but I don't recall if

6    that came up.

7    Q.   Do you recall asking ARDL to -- to combine

8    the gloves from multiple boxes together and to test

9    them as one composite sample?

10    A.   I asked them if they could do that.

11    Q.   Okay.  Why?  Why did you ask them if they

12    could do that?

13    A.   Well, first of all, if the test would be

14    accurate.  Normally what happens when you do that, if

15    it does -- if -- if you find one negative, you might

16    not know which lot number it is.  I -- I mean, say you

17    find one that is not the -- what you're looking for in

18    the results or would it affect the results.  So

19    sometimes it's basically to save time and money, right?

20    Q.   Yeah.  But what --

21    A.   By -- by putting all this together.

22    Q.   Well, wouldn't that affect the accuracy of

23    the testing?

24    A.   Well, that's what I wanted to know.  If it

25    would affect the accuracy if you -- if you combine 10

Page 81

1  gloves and one is not -- one is adulterated, meaning

2  not the actual material, would that be covered by the -

3  - by the other gloves?  So you want to make sure that

4  that's not going to happen.

5       Q.   I'm so -- and I'm sorry.  I don't fully

6  understand that answer.

7            So if we have 10 different gloves and --

8  doesn't it make sense to test the 10 separate gloves to

9  see if any particular, for example, lot number is

10 coming up with different results from others, rather

11 than just mix them all together?

12      A.   Well, when you are using a gas -- what --

13 they used a -- an ASTM method and they use the infrared

14 spectrophotometer.  I think the -- these give off some

15 wavelengths.  And if it's the -- and they're -- it's

16 like a fingerprint.  So if it gives off a wavelength,

17 say nitrile has a special wavelength and say there was

18 not nitrile, then it would also give off a different

19 wavelength.

20           So it would show that something was

21 adulterated or -- or something was coming up that was

22 not the nitrile.  So you might be able to do all the --

23 all the gloves at one time to see if they are all of

24 the same ingredients.

25      Q.   I think I understand.  And -- and -- and do

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 82

1    you recall what I -- what ARDL told your firm about

2    that request?

3        A.   Right now, I don't remember offhand.

4        Q.   Okay.  Why -- and -- and so what is the

5    benefit to combine -- if any, to combining different

6    gloves for testing as opposed to testing multiple

7    individual gloves?

8        A.   Well, it would save money.  A lot of

9    companies will do that if they could get away and do

10   that and still get the results that would be accurate

11   for the -- for the -- for the testing that they're

12   looking for.

13       Q.   Okay.  And was that proposal something that

14   was requested of you by Mr. Sperber's firm or something

15   that you suggested in order to save money on the

16   testing?

17       A.   It would probably be something I suggested

18   if they wanted to do bulk testing.

19            MR. RAKHUNOV:  Got it.

20            So if you look at Exhibit 6, which hopefully

21   you have by now.

22            (EXHIBIT 6 MARKED FOR IDENTIFICATION)

23            THE WITNESS:  Yep.  Exhibit -- Exhibit 6.

24   Oh, hold on.

25   BY MR. RAKHUNOV:

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 83

```
1        Q.   Yes.  It's a -- it is a new one.

2             Hold on.  Give me a minute.

3             THE COURT REPORTER:  And what would you like

4    to label this exhibit?

5             MR. RAKHUNOV:  ARDL communications will be

6    fine.

7             THE COURT REPORTER:  Thank you.  And what

8    was Exhibit number 5, if I may?

9             MR. RAKHUNOV:  There was not -- I -- I

10   decided to not use it.  That -- that is the one

11   limitation of these Zoom depos.  It's a little -- takes

12   a little more work to renumber things, if you go out of

13   order and it's different from what you expected.  But

14   we can always clean it up in the transcript.

15            THE COURT REPORTER:  Not a problem

16            THE WITNESS:  All right.  I got you.

17            THE COURT REPORTER:  Thank you.

18            THE WITNESS:  Opening it up.

19   BY MR. RAKHUNOV:

20       Q.   Okay.  So it's --

21       A.   I got --

22       Q.   Yeah.  A Seven-page -- seven-page document,

23   sir.  And I -- I will tell you these were provided to

24   us by Dr. Poulton at ARDL.

25            And so do you see the first page is --
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 84

```
1        A.    Yep.

2        Q.    -- submission by Aristotle and the

3   description of requested services is -- it -- it -- the

4   last line of that is, "Is it possible to combine gloves

5   from multiple boxes together and test them as one

6   composite sample for polymer identification?"  Do you

7   see that?

8        A.    Yep.  Yeah, sorry.

9        Q.    All right.  So that -- go ahead.

10       A.    Yes.

11       Q.    By the way when -- when your firm reached

12  out to ARDL for testing, did anyone advise ARDL that

13  this testing was being conducted for litigation

14  purposes?

15       A.    No.

16       Q.    Do you know whether that would have made a

17  difference in the way that ARDL approached its testing

18  in this matter?

19       A.    It shouldn't.

20       Q.    Or at least any protocols prior to doing the

21  testing, do you -- do you know that one way or another?

22       A.    Well, I'm not familiar with the -- with

23  their protocols.  I would suspect it shouldn't, but

24  they might have some internal protocols.  But I'm not

25  sure.
```

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 85

1      Q.    And you did not ask ARDL to serve as an

2   expert in this matter, right, just to test some gloves?

3      A.    Correct.

4      Q.    At the time that your firm submitted these

5   requests to ARDL, did you know that Rock FinTek had

6   already hired ARDL and Dr. Poulton to serve as an

7   expert in this case?

8      A.    No.  We found that -- that -- that was a

9   coincidence after we saw the other testing there.

10     Q.    All right.  So I want to direct your

11  attention to Page 5.  And this is an e-mail from Ana

12  Barbur, A-N-A, B-A-R-B-U-R, dated January 9th, 2024,

13  back to Aristotle.  And she writes, "Hello, Aristotle.

14  Incorrect polymer ID is a serious problem across the

15  medical PPE market intensely discussed at our ASTM

16  rubber group meetings/medical gloves subcommittee

17  level.  BTW, FDA reps were present there as well."

18          Have you, as an FDA consultant, ever -- are

19  -- are you familiar, as an FDA consultant, an expert,

20  in incorrect polymer ID being a serious problem across

21  the medical PPE market?

22     A.    I have not heard that specifically, no.

23     Q.    And in the second part of the paragraph, Ms.

24  Barbur writes, "Please try to explain to your customer

25  that running a composite sample is simply useless and

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 86

1    potentially harmful to the end users in the healthcare

2    industry."  Do you see that?

3        A.   I do see that.

4        Q.   Okay.  Do you have any basis to disagree

5    with Ms. Barbur's statement about that?

6        A.   I would not have any way to dispute it.

7        Q.   Okay.  And in any event, following this e-

8    mail exchange, the gloves were tested in the way that

9    ARDL suggested they should be tested, individually,

10   correct?

11       A.   Correct.

12       Q.   Probably cost a little bit more to do,

13   correct?

14       A.   Correct.

15       Q.   And again, you have absolutely no idea

16   whatsoever where the gloves that you were -- that you

17   were asked to submit to ARDL came from, correct?

18       A.   That is correct.

19       Q.   And again, beyond simply delivering the

20   results of the testing on whatever these gloves were by

21   ARDL, you're not providing any additional expert

22   explanation or analysis regarding the results of the

23   nitrile testing, correct?

24       A.   That is correct.

25       Q.   So if we were to assume, just for the sake

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024

Page 87

1    of assumption however, that the gloves that you had

2    tested and the gloves that SGS had tested were -- they

3    -- let's assume they were in fact gloves that came from

4    MedCare boxes that were associated with the lot numbers

5    set forth in your report.

6            What would be the significance of -- of such

7    test results in your opinion, if you have one?

8        A.   Repeat the question?

9        Q.   Yeah.  So let's -- so first, let's assume

10   that the -- the testing you described, that you relay

11   in your rebuttal report, let's assume that those gloves

12   in fact were MedCare gloves that came from, you know,

13   some of the boxes at -- at issue in this lawsuit, okay.

14   And let's assume that the tests for those gloves were -

15   - had detectable levels of nitrogen as -- that the test

16   attached to your rebuttal reports reflect.

17           What would be the significance of such

18   testing results?

19       A.   Well, first of all, it's nitrile not

20   nitrogen.

21       Q.   I'm sorry.  I keep using that word

22   interchangeably.  Nitrile.  Okay.

23       A.   Okay.  No.  If they tested the nitrile and

24   that's what showed up, then I would suspect that the

25   main ingredient that the gloves were made from was

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 88

1  nitrile.

2      Q.   Okay.  And -- and how would you extrapolate

3  that to the other gloves in this case?

4      A.   I'm not sure what you mean.

5      Q.   Yeah.  So -- so and -- and you would --

6  would you extend that opinion beyond the actual gloves

7  that were tested?

8      A.   If it came from a lot, that was -- if it

9  came from a lot that was manufactured and that had the

10 lot -- had the nitrile and the test showed nitrile, I

11 would assume that the rest of the gloves in the lot

12 were made of nitrile.

13     Q.   And how many years have you been in the

14 industry, involved in helping manufacturers and

15 importers bring nitrile and other types of medical

16 gloves into the United States?

17     A.   Well, I guess it started in -- 1989 is when

18 latex -- when -- when the FDA changed the regulations

19 on examination gloves.  Nitrile gloves didn't come into

20 effect until sometime in the '90s, I don't know exactly

21 when.  Because of the latex problems, people went to

22 nitrile.

23     Q.   Did you --

24     A.   But I -- I saw -- the gloves --

25     Q.   I'm sorry.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 89

1    A.   Gloves were back in 1988, 1989 when we

2 worked -- when the FDA changed the regulations.

3    Q.   So the assumptions that you -- you just

4 described about lot numbers are based on decades of

5 experience in the industry, fair to say?

6    A.   Fair to say.

7    Q.   Just a minute.  I think we're very close to

8 -- oh, okay.

9         So let's we -- we can close out of that

10 exhibit and -- and go back -- just briefly back to your

11 CV in Exhibit 1?

12   A.   That's at the bottom of the 1, right?  No.

13 That was at the top.

14   Q.   At the bottom.  Yes, sir.  At the bottom.

15   A.   Okay.  Hold on.

16   Q.   And -- and -- and I will -- actually let's -

17 -

18   A.   Okay.  I'm there again.

19   Q.   Great.  So let's turn to your expert witness

20 cases.

21   A.   Okay.

22   Q.   On Page 2 of your CV?

23   A.   Okay.

24   Q.   So one -- I just want to run through these

25 and -- and ask a couple of questions.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 90

1           So the first listing is an expert witness

2    report under NDA, it just means it's under a

3    confidentiality agreement?

4       A.   Correct.

5       Q.   And it -- it's a patent infringement case,

6    taped deposition.  Do you know where that case is

7    pending, what court?

8       A.   Expert witness taped deposition.  Let me --

9    well, the company is in Pennsylvania, so I think it was

10   in Pennsylvania.  I'm not sure.  That's no -- 2018,

11   right?

12      Q.   No.  I'm looking at the very first one,

13   expert witness report under NDA?

14      A.   Oh, patent case.

15      Q.   Yes.

16      A.   That was in 2021.  That was out of New York.

17      Q.   Okay.  And is that case -- have -- I

18   understand there's a confidentiality agreement, so

19   let's just try yes or no.

20           Did that case have anything to do with

21   gloves?

22      A.   No.

23      Q.   Okay.  The -- the 2019, testified in a

24   partnership case, expert for the company, Respire

25   Medical Inc., Brooklyn, New York.

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 91

1          What did that -- what did test -- your

2     testimony in that case involved?

3          A.   It was -- my expertise was in manufacturing

4     processes and quality control and -- and there was a

5     partnership dispute and just wanted to make sure on who

6     was in charge of what was going on at the time.

7          Q.   Anything to do with gloves?

8          A.   No.

9          Q.   2018 expert witness in Macario Vazquez v.

10    Brookdale Senior Living case.  What did that case

11    involve?

12         A.   I think that was a scooter -- a scooter that

13    went on fire.

14         Q.   Oh, okay.  Do you know what court that --

15    that case was in?

16         A.   I think -- well, I know the company is in

17    Pennsylvania, so I'm not sure if it was -- where --

18    where the company was defending it or where the --

19    where the -- where they took law -- did the lawsuit,

20    I'm not sure.

21         Q.   So let's see.  The 2017 Hologic case.  What

22    did that involve?

23         A.   That was an injury case with a medical

24    device.  And I think I -- that was taped in New York.

25    I -- I'm not sure.  I -- I -- definitely wasn't a New

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 92

1    York case.  I think it was either Texas or Arizona.

2         Q.   Okay.  Anything to do with gloves?

3         A.   No.

4         Q.   1997 GMP expert witness deposition, Becton

5    Dickinson.  What did that have to do with?

6         A.   Not gloves.  That was test tubes.

7         Q.   So I know earlier today I asked you about

8    some cases that you're involved with that do have

9    something to do with gloves, and I understand you have

10   not been deposed in those cases.

11        Have you ever given any testimony at

12   deposition or at trial in any case having to do with

13   medical gloves?

14        A.   No.

15        Q.   Okay.  I guess until today?

16        A.   Yeah.  And I'll add it to the list.

17        Q.   And do you -- other than what we discussed,

18   what I've asked you about and what's set forth in your

19   rebuttal report, are you going to testify as to any

20   other expert opinions in this case?

21        A.   Not that I know of.

22        Q.   Okay.  Other than what we've discussed today

23   and what's set forth in your report, do you have any

24   additional rebuttals to the expert reports of either

25   Dr. Carson or Dr. Poulton?

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 93

1      A.    Not at this time.

2            MR. RAKHUNOV:  Okay.  So I -- I believe that

3    I'm done.  I'm not sure if Mr. Sperber has anything.

4            MR. SPERBER:  I -- I just have -- I just

5    have one question to clarify something.

6            MR. RAKHUNOV:  Okay.  If -- and then I --

7    and then actually, if you don't mind, I'll take just

8    one minute to run through my notes to make sure I

9    didn't forget something before we wrap it up.

10            MR. SPERBER:  Do you -- do you want to do

11    that first or should I ask my one question?

12            MR. RAKHUNOV:  It's up -- it's up to you.

13    It might be more efficient for you to just go ahead

14    with your question while I --

15            MR. SPERBER:  Okay.  Sure.  Sure.

16                          EXAMINATION

17    BY MR. SPERBER:

18      Q.    So Mr. Schwartz, you mentioned earlier that

19    the -- the gloves that you sent to ARDL for testing and

20    this matter came from my office.

21            Is -- is it possible if they were sent to

22    your office directly from the client in this matter and

23    not from my office?

24      A.    It -- it is possible.  I -- I wasn't in the

25    office when they opened it up, so I would have to check

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 94

```
1    with my office.  I'm sorry.

2              MR. SPERBER:  Okay.  Thank you.

3              MR. RAKHUNOV:  Great.

4                        EXAMINATION

5    BY MR. RAKHUNOV:

6         Q.    And regardless of who sent them to you, they

7    came in plastic baggies with no -- and not in boxes or

8    -- or otherwise -- well, they came in plastic baggies

9    and not in actual boxes of gloves, correct?

10        A.    That's correct.

11             MR. RAKHUNOV:  I -- you know, it probably

12   makes sense for me to just go off-screen for a second.

13   Let's just take one minute, and I think we're done.

14             THE COURT REPORTER:  Would you like to stay

15   on record, or would you like to go off one minute?

16             MR. RAKHUNOV:  Up to you.

17             THE COURT REPORTER:  Okay.  Off the record,

18   2:35 p.m.

19             (OFF THE RECORD)

20             THE COURT REPORTER:  Back on the record,

21   2:36 p.m.

22             MR. RAKHUNOV:  Mr. Schwartz, thank you for

23   your time.  I have nothing further and have a -- have a

24   great day.

25             THE WITNESS:  Thank you.  Bye now.
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024

Page 95

1          MR. SPERBER:  Thank you very much.

2          THE COURT REPORTER:  And would you like a

3   regular delivery of the transcript?

4          MR. RAKHUNOV:  Regular is fine, and we just

5   need electronic.

6          THE COURT REPORTER:  Okay.  Any copies

7   today?

8          MR. SPERBER:  Same on -- same on my end.

9   I'll take an E-tran, electronic version.

10         THE COURT REPORTER:  Okay.  Is that a

11  separate order or -- or you'll be receiving from --

12         MR. SPERBER:  I guess we'll be receiving

13  that as -- as the counsel for the deponent.

14         THE COURT REPORTER:  You got it.

15         Okay.  That ends the deposition today.  The

16  time is 2:36 p.m.  We are off the record.

17             (DEPOSITION CONCLUDED AT 2:36 P.M.)

18

19

20

21

22

23

24

25

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 96

1               REPORTER'S CERTIFICATE

2

3               I, JOHN SHEFFIELD, a Court Reporter and

4    Notary Public in and for the State of New York, do

5    hereby certify:

6               That ALAN SCHWARTZ, the witness whose

7    examination is hereinbefore set forth, was first

8    duly sworn by me and that this transcript of said

9    testimony is a true record of the testimony given by

10   said witness.

11              I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage, and that I am in no way interested in the

14   outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto

16   subscribed my name this 13th day of February, 2024.

17

18   _____

19   JOHN SHEFFIELD

20   Court Reporter and Notary Public

21   Notary Commission New York/01SH6435698

22   Commission Expires:  July 5, 2026

23

24

25

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 97

```
 1                  DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No. 00048635

 4   Case Caption: ROCK FINTEK LLC v. KITCHEN WINNERS NY

 5   INC. ET AL.

 6

 7           DECLARATION UNDER PENALTY OF PERJURY

 8

 9           I declare under penalty of perjury that I

10   have read the entire transcript of my deposition

11   taken in the above-captioned matter or the same has

12   been read to me, and the same is true and accurate,

13   save and except for changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION ERRATA

15   SHEET hereof, with the understanding that I offer

16   these changes as if still under oath.

17

18       Signed on the _____ day of _____, 2024.

19

20

21           _____

22                   ALAN SCHWARTZ

23

24

25
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

Page 98

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    Reason for change:_____

 4    Page No._____Line No._____Change to:_____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    Reason for change:_____

10    Page No._____Line No._____Change to:_____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    Reason for change:_____

16    Page No._____Line No._____Change to:_____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    Reason for change:_____

22    Page No._____Line No._____Change to:_____

23    Reason for change:_____

24    SIGNATURE:_____DATE:_____

25             ALAN SCHWARTZ
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
**Alan Schwartz on 02/13/2024**

**Page 99**

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    Reason for change:_____

 4    Page No._____Line No._____Change to:_____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    Reason for change:_____

10    Page No._____Line No._____Change to:_____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    Reason for change:_____

16    Page No._____Line No._____Change to:_____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    Reason for change:_____

22    Page No._____Line No._____Change to:_____

23    Reason for change:_____

24    SIGNATURE:_____DATE:_____

25              ALAN SCHWARTZ
```

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024                        Index: --the..4

_____
  Exhibits
_____

SchwartzA-1
  3:12,23
  6:12,17
  7:2 33:24
  34:4 46:2,
  7,13 54:22
  68:15
  76:21
  89:11

_____
     -
_____

--the  14:21

_____
     0
_____

0101  74:12,
  13

0300  74:11

_____
     1
_____

1  6:12,17
  7:2 23:2
  33:24 34:4
  46:2,7,13
  54:18,22
  65:10 66:5
  67:9,13
  68:15
  76:21
  89:11,12

1.7  55:7
  56:9

10   17:11
  62:14
  65:10
  66:4,15,
  17,19,22,
  23 80:25
  81:7,8

10993-  17:10

10993-10
  17:5

1106  74:11

11th  34:10
  36:8

12:11  4:1

12th  77:21

15  74:6,11

150  77:22
  78:21

19  39:2

1988  39:3,5
  89:1

1989  88:17
  89:1

1997  92:4

1:25  54:8

1:36  54:11

1st  10:1
  70:5

_____
     2
_____

2  15:19
  17:5 49:18

67:9,13
  68:15
  89:22

20  41:15
  58:5 79:4

2010-08-01
  17:5,11

2011  16:24

2016  13:21

2017  91:21

2018  90:10
  91:9

2019  90:23

2020  9:9
  10:1 71:20

20201106
  71:17

2021  34:10,
  25 36:8
  70:4,5,9
  90:16

2021.3  70:6

202103010101
  56:16 58:5

2023  42:11
  43:13
  65:13

2024  65:1
  70:10
  77:21
  85:12

21  32:19

21CFR820
  16:21

22-CV-05276-
PAE  4:6

25  74:6,12

2859  52:10

2859-1
  51:17,20,
  21 53:2,
  10,18

29th  65:13

2:35  94:18

2:36  94:21
  95:16,17

_____
     3
_____

3  27:15
  66:4,19
  67:10
  68:16,18,
  19 72:2,11
  73:24,25
  74:2,8
  75:7,9
  79:10

30  8:16
  35:17,18

3010101
  74:21

_____
     4
_____

4  15:19
  46:3 54:22

67:11
73:2,16,20
74:15

**40** 62:14

**400** 27:15
39:13

**45** 35:18
74:15,16,
18

---
**5**
---

**5** 15:13,16,
17,18 83:8
85:11

**50** 8:16
79:11

**510** 33:8

**510(k)** 10:2,
5,11,13,24
12:6,12,
16,19 13:1
14:5,21,
22,24
15:1,5,9
16:4 18:7,
23 19:9
20:4,7,22
21:2,3,6,
7,15,20,22
22:14,19,
23 23:1
24:5,12,17
26:17
27:3,10
29:23

30:10
31:9,11,
13,15,18,
19,22
32:12
33:14
34:23
35:25 36:2
37:12
39:4,7

**510(k)/pmas**
31:3

**510(k)s**
14:21
17:25
36:16

**55** 55:6,12
56:6

---
**6**
---

**6** 15:14,15,
23 16:7
82:20,22,
23

**6-13-23**
64:1,4

**60** 55:6,12
56:6

**6124-06**
16:24

**6319-10**
16:15,24

**68** 6:23

**6th** 71:20

---
**7**
---

**7** 13:10,13
15:13,17
20:18 23:3
33:25
68:16

**73-page** 6:14

**7th** 54:19,
21,24,25

---
**8**
---

**8** 33:25
34:2,8,9,
17

**80** 58:4
79:3

---
**9**
---

**9** 17:15,19
65:8,11,12
66:15,17,
19,22,23

**90s** 88:20

**92-page**
73:16

**9th** 13:20
85:12

---
**A**
---

**A-N-A** 85:12

**ability** 5:14

**absolutely**
36:7 75:4
77:11
86:15

**accept** 12:22

**accuracy**
58:11
80:22,25

**accurate** 7:3
20:2 80:14
82:10

**acknowledgemen**
**t** 34:10,22
35:9,13,20
36:7,12,25
37:11

**Act** 26:21

**action** 61:5

**actual** 58:15
59:14
69:12
74:19 81:2
88:6 94:9

**add** 92:16

**additional**
64:25
86:21
92:24

**address** 33:2

**Adorama** 4:14
59:22

**adulterated**
81:1,21

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024                    Index: advice..assume

advice   44:7

advise   84:12

affect   44:18
  80:18,22,
  25

affirmative
  44:25

afternoon
  4:9,12,15
  5:5 41:13

agent   21:14
  22:3 36:22

agree   49:24
  53:13
  65:25
  66:2,3

agreement
  90:3,18

ahead   54:5
  84:9 93:13

aids   6:3

Alan   4:4,24
  46:3

Alex   13:3

Alexander
  4:13

allegations
  60:2

Allen   4:21

allergies
  33:1

allocations

59:14

allowed
  12:21,22

amount   32:24
  36:16
  50:10,13

amounting
  55:7

Ana   85:11

analysis
  65:18,19
  77:23
  86:22

analyze
  49:18

and/or   31:2

animal   11:20

Anna   8:8

Apologies
  73:1

apologize
  35:8 75:20

appearances
  4:8

appears
  63:18
  69:23
  71:22

Appendix
  66:15

application
  10:15,18
  11:6 24:23

34:23
  35:15,22
  36:1 37:2,
  5

apply   12:5
  37:8

approached
  84:17

approval
  14:14,18
  15:3 20:23
  31:6

approve
  14:21

approved
  15:6 25:17
  35:24 36:2

approves
  25:12
  31:18

approximately
  8:11 55:6,
  7,12 58:4

April   54:19,
  21,25

AQL   50:24

ARDL   30:20
  47:12
  49:3,11,25
  72:14
  79:24 80:7
  82:1 83:5,
  24 84:12,
  17 85:1,5,

6 86:9,17,
  21 93:19

ARDL's   60:8

area   48:14

Aristotle
  33:18,19,
  21 34:24
  40:25
  46:23
  47:15 84:2
  85:13

Arizona   92:1

arrived   78:3

ASCM   25:18

aspects   7:17
  10:15

assigned
  69:24 70:1

assist   6:4

assisted
  30:16 31:2

associate
  33:19,20
  34:23

associates
  41:8

Association
  39:12,15

assume   5:12,
  20 58:7
  64:15
  71:3,8
  74:24

75:4,5,11
76:3 86:25
87:3,9,11,
14 88:11

assuming
56:7

assumption
58:12
60:22
75:10
76:18
79:18 87:1

assumptions
56:10
57:24 89:3

ASTM 11:10
12:1,2
16:15,18,
23 22:4
25:18
29:10,11
48:24
51:16
81:13
85:15

attached 7:2
63:13
87:16

attachment
13:10

attention
6:22 66:15
73:24
85:11

attest 76:11

attesting
75:14

attorney
41:4,6,12,
14

attorneys
5:16 55:14
56:21

audit 28:5,
8,14,16
29:3 30:8

audited
27:15

audits 27:22
28:4

authorize
14:15

Avram 4:15,
16

aware 22:18
25:23

---

**B**

---

B-A-R-B-U-R
85:12

back 19:24
24:3 27:13
30:24 43:6
45:3,16,21
46:2,6
54:12
67:12
72:15
73:15

76:21,24
85:13
89:1,10
94:20

background
46:11 49:5

baggies
63:18
66:24 68:1
94:7,8

bags 77:25
78:1 79:1,
6

Barbur
85:12,24

Barbur's
86:5

based 50:11
77:10
78:25 89:4

basically
53:8 80:19

basis 63:8
72:4,6
75:17 86:4

bear 48:5

bearing
58:16
74:21 75:8

Becton 92:4

begin 5:2

beginning
7:11 9:5,

8,9 46:1

begins 54:18
60:18
63:24

benefit 82:5

bigger 73:10

biocompatibili
ty 11:2,15,
19 17:3,9
29:15

bioequivalency
25:6 37:7

bit 13:11
73:9 74:17
86:12

blue 15:11
16:13
35:10
67:21,22

blurry 59:6

boat 56:5

body 76:25

border 21:10

bottom
54:17,20
55:1
89:12,14

box 58:24
59:3
69:12,16,
19,24
70:17
71:15

74:20 75:1
76:9 78:2

**boxes** 19:22
22:3 55:8
58:15,19,
21 68:23
70:15,18
74:7 75:8
80:8 84:5
87:4,13
94:7,9

**brand** 8:5
19:22
37:13,20
43:1,3
58:24 66:2
77:13
78:7,10

**break** 53:23
54:4,14

**briefly** 5:6
89:10

**bring** 48:5
50:10
88:15

**broke** 9:1
33:9

**Brookdale**
91:10

**Brooklyn**
90:25

**brought**
19:19
50:22

**BTW** 85:17

**build** 70:7

**building**
70:11

**built** 70:8

**bulk** 82:18

**bullet**
27:14,15
30:25
62:20
63:16,23
64:8 66:10
79:2,9,20

**bureaucratic**
65:5

**buyer** 18:22
20:3,6

**Bye** 94:25

―――――――

C

―――――――

**C-U-R-** 23:24

**call** 33:25
34:9 41:20
46:22

**called** 12:23
26:7

**Capital** 4:17

**caption** 6:15

**care** 78:13

**career** 8:12

**Carson** 49:4,
21 52:6,10

92:25

**Carson's**
49:14
51:7,12

**cartons**
22:17
68:23 69:2

**case** 4:6
5:9 6:14
14:8 16:11
18:21 27:7
30:16 33:3
42:7,17,
19,22,24,
25 43:9,
11,16,20,
23,25
44:5,8,10,
15,21,25
45:5,6,9,
10,12,15,
23,24
46:24
47:13,20
48:5 52:4
57:10,21
58:22
60:3,13
69:13 72:8
73:19 85:7
88:3 90:5,
6,14,17,
20,24
91:2,10,
15,21,23
92:1,12,20

**cases** 42:21
89:20
92:8,10

**catching**
43:5

**caught** 21:10

**certification**
10:24
20:22 21:1
22:14
30:12

**certifications**
22:20

**CFR** 32:19

**chance** 43:24
74:10 76:7

**change** 7:8
67:7,13

**changed**
88:18 89:2

**characteristics** 16:3,9

**charge** 91:6

**chart** 17:15,
25

**check** 22:4
74:12
93:25

**chemical**
26:22
28:18
30:21 38:1

**chemicals**

26:5,24

chemist  12:7

chemotherapy
26:6

China  7:23
12:17
55:23

chromatograph
29:12

claiming
25:11

clarification
15:7

clarify  5:20
8:14 9:3
14:18
41:19 51:9
93:5

clarity  34:3
41:8

Class  39:4

classes  40:3

classified
39:3

clean  5:16
83:14

clear  18:17
25:4 51:9
59:13 69:9
75:5

clearance
14:4,19
15:8,9

17:21 18:9
20:23
21:1,2,15
22:6 27:4
31:7 36:9
37:3,5

clearances
22:20

cleared  15:6
29:23
36:2,3

clearing
14:24

clears  31:19

client  36:20
93:22

clients  9:12
39:22
61:12

close  89:7,9

code  22:18,
21,24
23:3,7,8
25:23
26:25
33:7,14
71:1

coincidence
85:9

collect
47:11

color  15:11
16:13
67:5,7,8,

10,13,15

colored
25:21

colors  67:20

column  17:20
74:3

combine
80:7,25
82:5 84:4

combined
80:2

combining
82:5

common  17:24
70:18

communicating
6:8

communications
47:6,7,11,
12,16 68:7
83:5

companies
8:17 9:15
10:10
23:18
27:17,22
29:7 36:16
50:21 52:2
82:9

company  7:13
8:1,4
14:5,13
16:8 18:12
20:7 21:3,

20 24:15
25:12
28:21
29:23
31:25 33:3
40:5 57:3,
7 90:9,24
91:16,18

compare  74:8

compared
17:20 25:8
60:14

comparison
17:19 18:2
31:16

complaint
60:4

complete  7:3
73:17

compliance
7:17 23:19
27:17
28:18
48:17,18

comply  53:2

composite
80:9 84:6
85:25

CONCLUDED
95:17

conclusions
49:10

conditions
17:7,12

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024        Index: conduct..counterclaim

44:18

conduct
  52:21

conducted
  84:13

confidentialit
y  90:3,18

confirm
  67:25

confirmed
  77:6

conform   22:5

connection
  14:7 30:7
  58:22
  69:12 72:7

consensus
  7:9

considered
  24:25

consistent
  33:7,13
  66:9 76:1,
  15

consisting
  6:14

constitute
  36:8

consult   7:14

consultant
  85:18,19

Consultants
  7:7,9,12

32:4,6,7
42:16

consulted
  7:19,22
  8:12

consulting
  7:13,25
  8:3,18
  9:17,24

contact
  11:16

contacted
  33:3 42:6,
  13

contained
  78:1

container
  22:16
  55:22
  56:1,3

containers
  55:7,13
  56:2,4,7,
  10

contamination
  76:8

content   50:1

contents
  13:25

context   57:1
  69:22

contract
  25:2

control
  24:16,19
  91:4

conversation
  41:12

copies   95:6

corner   66:5

correct   7:7,
  24 9:22
  14:11,12
  15:12
  20:11 24:7
  25:9 26:18
  27:5,6
  30:18,19
  31:8 33:16
  35:11,12
  36:9,10
  37:4,9,23
  38:2,3,5,
  6,8,9
  42:11,12
  43:14,19
  48:19
  49:11,12,
  15,16
  50:1,2,4,5
  51:2,3
  52:11,12,
  14,15,18,
  19 53:15,
  16,19,20
  58:9,13
  59:16,22,
  23 60:16,
  24,25
  61:13,22,

23 62:1,2,
  10,11
  63:14
  64:6,17
  66:11,12
  71:21,24,
  25 72:9,10
  74:8 76:17
  77:14,15,
  18,19
  78:8,9,11,
  12,14,15,
  17 79:7,8,
  24,25 85:3
  86:10,11,
  13,14,17,
  18,23,24
  90:4 94:9,
  10

correctly
  61:19

correspondent
  36:22

cost   86:12

counsel   4:8
  6:13 13:9
  33:24
  54:15 58:8
  59:14,21
  60:23 62:9
  64:12
  95:13

count   78:22,
  25

counterclaim
  60:4

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024      Index: country..determination

country
  19:20
  22:1,8,11,
  13

couple  68:13
  89:25

court  4:2,6,
  19,23 5:1,
  15 23:20
  24:1 34:3,
  7,11 54:8,
  11 73:1,5,
  7 83:3,7,
  15,17 90:7
  91:14
  94:14,17,
  20 95:2,6,
  10,14

covered
  60:11 81:2

COVID  26:15
  35:16

COVID-19  9:1

crazy  35:17

crisis  39:5

cross  76:7

crossed  76:5

curious
  64:24

current
  23:14,24

customer
  85:24

customs
  21:14,17
  22:2

cut  37:18

CV  6:22 7:1
  23:10
  27:13
  30:25
  38:17
  89:11,22

———————————
          D
———————————

D6319  11:12

D6319-10
  16:18

damage  44:12

database
  21:19

date  17:6
  36:20
  38:24
  62:24 64:4
  70:3,7,13
  71:20,22,
  24

dated  13:20
  36:8 85:12

David  16:15,
  23,24

day  70:24
  94:24

day's  57:5

days  35:18

70:23 76:4

de  15:3

deal  9:15

dealing
  23:17

decades  89:4

December
  42:8,9,10

decided
  83:10

defendant
  62:14

defendants
  4:18 55:6,
  12 56:15
  60:20
  61:4,8,11,
  15 62:6
  77:21

defending
  91:18

define  57:7

defined  57:9

delivering
  86:19

delivery
  95:3

demonstrate
  25:6

depending
  70:21

depends

57:4,7,17
  70:25

depicts  69:1

deponent
  95:13

depos  83:11

deposed  5:9
  43:20,22
  92:10

deposition
  4:3 6:9
  40:10
  41:1,18
  45:12
  90:6,8
  92:4,12
  95:15,17

dermal  17:9

describe
  15:15
  23:10
  27:20 78:7

description
  7:3 16:6
  65:15 84:3

detailed
  17:19

detectable
  75:17
  87:15

detected
  77:7

determination
  68:5

determine
48:21,22
50:19 52:1
69:25
70:2,5

developer
25:1

device  6:9
16:3,9
17:20,21
21:5,6,7,
16,17,22
24:24
27:16
31:14,16,
17 32:18,
22 33:8,12
37:6,13
91:24

devices  7:15
17:7,12
23:18
27:18
32:16,20
55:23

Dickinson
92:5

difference
14:20
31:10
67:19
84:17

differences
67:15

difficult
65:6

digits  70:25

dimension
16:11

dimensions
16:14

direct  6:21
61:20
66:14
73:24
85:10

directly
48:3 79:24
93:22

disagree
63:9 72:5
75:17 86:4

disclosure
6:13,15
7:2

discovery
60:4

discussed
17:3 85:15
92:17,22

discussions
40:25
41:16

dispute  86:6
91:5

disputing
49:9

District
4:6,7

dividing
56:8

document
6:14,23
14:6,7,11
34:19 46:3
68:23
73:16,23
83:22

documentation
28:11,22,
25 31:2
55:16
56:23 63:3
67:24

documents
40:14
55:18
58:10

Dongguan
32:1 35:4
36:14,19

dozen  8:24
39:21

draft  46:14,
16

drafted
46:9,14,15

Drug  7:14

Duffy  4:10

duly  4:25

——————————
         E
——————————
e-  33:23

86:7

e-mail  11:24
13:4,9
37:18
85:11

e-mailed
68:14

e-mailing
11:23

E-TRAN  95:9

earlier
37:25 92:7
93:18

edition
17:5,11

edits  46:19,
20,21

effect  88:20

efficacy
15:4 31:15

efficient
93:13

electronic
95:5,9

elongation
29:8

emergency
26:21 33:4

end  6:22
9:6 86:1
95:8

ends  95:15

engagement
 45:21

enlarge
 74:25

enlarged
 69:16

enlarging
 74:23

entail   28:5

entails
 10:12

entitled
 75:4

entitles
 15:9

entries   66:8

environmental
 44:18

equal   18:2

equivalent
 14:23,25
 15:5 17:25
 18:4 24:24
 31:12,14,
 17

event   86:7

events   77:14

evidence
 67:24

exact   32:19
 43:7

exam   22:11

examination
 5:3 10:20,
 25 12:2,5
 15:11
 16:13 23:9
 27:4 35:10
 38:13,18
 39:3,6,10,
 17 40:3,4,
 5 42:24
 43:1 88:19
 93:16 94:4

exchange
 86:8

executive
 7:6

exempt   39:5

exhibit
 6:12,17
 7:2 11:24
 13:10,13
 15:13
 20:18 23:2
 33:24,25
 34:2,4,8,
 9,17 46:2,
 7,13 54:22
 59:9 63:13
 64:20
 68:15,16,
 18,19
 72:2,11
 73:2,3,8,
 16,20
 74:8,15
 75:9 76:21
 82:20,22,

23 83:4,8
 89:10,11

exhibits
 6:16 68:13

existing
 12:16

expect   20:8
 43:22
 75:25

expectations
 76:15

expected
 10:9 18:24
 71:11
 83:13

expecting
 19:9

experience
 12:15
 25:15 28:6
 33:14
 44:17
 51:22
 55:21
 57:12 89:5

experiences
 7:4

expert   6:12,
 15 7:2
 27:9 34:5
 37:25 38:4
 42:6 43:15
 44:7,8,24,
 25 45:1
 46:4 48:14

49:3 50:6,
 17 58:18,
 22 60:12
 67:15,17
 68:9 72:8
 73:18
 74:20
 76:21
 85:2,7,19
 86:21
 89:19
 90:1,8,13,
 24 91:9
 92:4,20,24

expertise
 44:14
 48:1,5
 91:3

expiration
 71:24

explain
 50:14
 85:24

explaining
 39:18

explanation
 86:22

export   12:21
 21:3,11
 39:20

extend   88:6

extrapolate
 88:2

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024          Index: face..freedom

**F**

face  50:4

fact  27:10
  50:22
  60:23 63:7
  75:7 77:13
  87:3,12

factories
  27:25

factory
  22:14
  28:1,2,3,5
  29:20 71:6

factual  63:8
  72:4,6

fair  5:22,
  23 15:8
  17:18 18:5
  41:25
  60:11
  89:5,6

fall  19:13

familiar
  5:12 11:12
  13:24 30:4
  31:25 32:2
  33:17 42:4
  44:1 84:22
  85:19

fast  47:5
  48:12 65:3

faster  65:4

FDA  7:17

10:6,15,18
11:6,17
12:10,11,
21,22
14:4,5,21
19:16
20:23,25
21:4,9,13,
14,18,19,
23,24
22:2,6,19,
24 23:8,13
25:12
27:17
28:8,14,19
30:3,4
31:1,18
32:15
34:23,24
35:14
38:12,18
39:3,6,16
48:9,18
50:16,18,
20,24
51:14,16
53:2,4,6
67:15,17
70:3
85:17,18,
19 88:18
89:2

FDI  32:6

February
  7:11 70:10

federal
  44:22

Figure  67:9,
  10,11

fill  34:1

final  30:11
  73:18

finally  17:2

find  19:20,
  21 21:24
  24:20 25:2
  38:20
  46:25 47:2
  80:15,17

fine  44:4
  83:6 95:4

fingerprint
  81:16

finished
  25:14

Fintek  4:5,
  11 5:7
  60:8,13
  61:12
  77:13 85:5

fire  91:13

firm  37:1
  41:5 43:10
  44:9 45:7
  47:15 50:7
  52:21
  57:25
  61:25
  64:24 67:1
  68:8
  78:18,20

80:1 82:1,
14 84:11
85:4

five-minute
  53:23

flipping
  59:24

follow  35:21
  39:8 52:7

food  7:14
  8:15 27:16

foods  7:16

foreign  10:8
  12:19

forget  68:13
  93:9

form  9:2
  18:10 19:1
  32:9 44:16
  68:3

format  13:25

forward
  11:25

forwarded
  13:5

found  11:18
  14:25
  16:15,21
  18:2,3
  19:19 85:8

four-page
  68:22

freedom

16:20

Frisch   4:15,
  16

front   6:4

full   28:14

fully   81:5

_____

G
_____

G-R-I-   8:8

gas   29:12
  81:12

gather   47:16

gave   39:16

general
  51:23,24

generally
  13:25
  57:12

get all
  24:22

give   11:22
  35:20
  39:11
  45:11,14,
  15 69:20
  74:10
  78:23
  81:14,18
  83:2

giving   40:6
  52:3

Global   8:1

glove   7:22
  8:11 12:3,
  4,15,17
  17:1 23:9
  26:9 27:5,
  25 28:1,2,
  3,5 29:13
  38:13,19
  39:11,15,
  17 40:5
  42:24 57:1
  58:15,19,
  21 65:15,
  21 69:5

gloves   7:19,
  20 8:4,14,
  15,20
  9:17,25
  10:4,16,
  19,21,25
  11:1,2,16,
  18,21
  12:2,5,13
  13:1 15:11
  16:13
  18:6,8,14,
  20,22,24
  19:8,9,11,
  17,18
  20:3,6,8
  22:3,16
  24:10
  25:2,16,
  17,21,24,
  25 26:4,7,
  22,23
  27:9,10,23
  28:17,24

30:18,22
  32:16
  33:13
  35:2,10
  38:1 39:3,
  6,10,20
  40:3,4
  43:1,4
  44:11,12,
  19 45:10,
  17 47:21
  48:2,10,
  11,21,22
  49:25
  50:10,13
  52:22,25
  53:13,14
  55:7,8,13
  56:10,14
  57:9,14,15
  58:4,25
  59:3 60:20
  61:4,11
  62:4,8,14,
  17,22
  63:4,11,19
  64:15
  66:25
  67:5,15,25
  68:1,24
  69:12,20,
  24 70:15,
  17 71:4,9,
  15 74:21
  75:6 76:2,
  15 77:7,
  12,13,22,
  24 78:7,

16,22
  79:3,4,12,
  17,19
  80:2,8
  81:1,3,7,
  8,23 82:6,
  7 84:4
  85:2,16
  86:8,16,20
  87:1,2,3,
  11,12,14,
  25 88:3,6,
  11,16,19,
  24 89:1
  90:21 91:7
  92:2,6,9,
  13 93:19
  94:9

GMP   30:14
  39:8 92:4

Goldberg
  41:8
  42:14,15,
  19 46:15

good   4:9,
  12,15 5:5
  9:18 18:2
  23:14,25
  53:23 54:5
  74:23

grandkids
  43:8

Grayslake
  72:3

great   13:18
  34:15

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024        Index: green..individually

61:18
89:19
94:3,24

green  12:23
  21:18,25

Grinvald  8:8
  32:1 35:5
  36:14,19

group  85:16

guaranteed
  21:9

guess  17:5
  21:13 23:7
  29:17
  40:13 48:9
  62:22,23
  67:21
  73:11
  75:14
  88:17
  92:15
  95:12

guinea  17:10

―――――――
        H
―――――――

handle  59:10

handled
  11:21

happen  81:4

hard  74:22

harmful  86:1

head  9:14

healthcare

86:1

heard  85:22

helped  46:25

helping
  88:14

hepatitis
  39:6

Hershey
  41:17 42:2

HFK  74:21

HFK20210301010
1  69:17

hired  45:8
  85:6

hiring  48:3

HIV  39:5

hold  15:17
  21:23
  65:17
  66:17,20
  82:24 83:2
  89:15

holder  15:9

Holdings
  4:17

Hologic
  91:21

hoping  54:3
  59:7

hour  53:22
  54:3 70:24

hours  45:22,

25 68:13

hues  67:5

huge  65:5

hundred  31:3

―――――――
        I
―――――――

ID  85:14,20

idea  64:10
  86:15

identification
  6:17 13:13
  29:10,12,
  14 34:2
  66:9 68:19
  73:20
  82:22 84:6

identified
  38:10
  49:4,7
  72:12
  79:13

identify
  9:12,16
  10:10
  32:21 37:6

Illinois
  72:4

image  74:20

images  59:9

immediately
  62:20

implemented
  28:10

51:21

import  10:4,
  24 13:1
  15:10
  21:11,15

imported
  24:25

importer
  10:6,7,10,
  12,14
  12:16,21,
  24 13:2
  18:6 19:6,
  20 24:11
  25:1 29:20

importers
  8:19,23
  9:16,25
  10:2 24:5
  88:15

importing
  24:10,15,
  22 25:10

including
  7:23 78:7

incorrect
  85:14,20

independently
  55:16
  58:11

individual
  8:8 20:8
  33:18 82:7

individually

86:9

**Industries**
62:6

**industry**
38:13,19
39:17
55:21
70:12 86:2
88:14 89:5

**information**
9:21 11:5
37:1 55:11
56:19
57:16,20
58:7
59:13,21
68:11
69:20
77:10 79:7

**informed**
56:14
62:4,9,19
64:18

**infrared**
66:5 81:13

**infringement**
90:5

**ingredient**
87:25

**ingredients**
81:24

**initial**
10:6,7,9

**injury** 91:23

**inspections**
30:5

**inspector**
28:14

**instructed**
5:17

**intensely**
85:15

**intent** 17:22

**interchangeabl
y** 87:22

**internal**
84:24

**International**
53:5

**introduction**
40:6

**investigator**
28:19
30:3,4
70:4

**investigators**
28:19

**invited**
39:10

**invoices**
55:16

**involve**
28:16
43:3,25
91:11,22

**involved**
28:23

32:3,7
39:14
46:23
48:9,10
88:14 91:2
92:8

**involvement**
61:21

**involving**
27:22
42:25
44:10
45:10

**irritation**
11:3,19
17:4

**ISO** 17:4,10
51:17,20,
21 52:7,10
53:2,4,9,
10,18

**issue** 27:10
52:22
57:10
79:19
87:13

**issued** 18:7
20:23

**issues** 49:14

─────────────

**J**

**January** 10:1
77:21
85:12

**Jason** 49:3
72:8

**JNS** 4:16

**Joel** 4:17

**John** 49:3

**Joseph** 4:14
42:2

**jump** 53:24
64:19

**jumping**
76:22

**June** 34:10,
24 36:8

─────────────

**K**

**K-152712**
13:22

**K211808**
35:23

**kind** 29:22
42:22 44:7

**Kitchen** 4:5,
14 18:21
27:8 30:17
44:4 59:22

**knowing**
77:11

**knowledge**
61:24,25

─────────────

**L**

**lab** 12:7

KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.
Alan Schwartz on 02/13/2024                    Index: label..lot

29:4,7,16
30:7,10,
12,13,17,
20,21
46:25
47:2,4,6,
12,22
48:2,3,11,
12 49:22
50:12
64:23
65:2,4
66:14
67:18

**label**   32:23
66:25
71:14 73:8
83:4

**labeled**
13:10
67:22

**labeling**
10:17
32:8,11,
14,17,19
33:6,12

**labels**   63:18
64:16 79:6

**laboratory**
49:7

**labs**   29:1,
3,6,7,19
48:13

**lag**   20:18

**large**   36:16

50:13 56:2
76:4

**largest**
62:15,18

**late**   42:10

**latex**   27:25
33:1
88:18,21

**law**   4:16
45:7 67:1
91:19

**lawsuit**   8:19
60:2 77:14
87:13
91:19

**learned**
42:15

**lectures**
38:11,16

**lend**   44:14

**letter**
13:20,24
14:3,4,14,
15 15:8,9
17:22
18:7,9,23
20:7,24
21:1,2
22:24
34:10,20,
21,22
35:9,14
36:7,12,25
37:11,12

**level**   36:6
50:24
85:17

**levels**   75:16
87:15

**Levmed**   43:3

**liaison**   31:1

**lighter**
67:11

**limitation**
83:11

**lips**   20:15

**Lipsius-
benhaim**   4:13

**list**   21:5
92:16

**listed**   12:20
20:7 21:7,
22

**listing**   90:1

**litigation**
84:13

**Living**   91:10

**LLC**   4:5,11

**loading**
73:12

**local**   65:2

**located**   7:23

**location**
72:3

**locations**
66:10

**long**   25:13
33:20
38:25
41:14
53:25 75:4

**longer**   54:2

**looked**   9:21
27:1 31:8,
9 70:16

**lost**   20:11
38:14

**lot**   9:15
24:15 25:9
26:20
48:13
56:16
57:1,3,4,
5,9,14,15,
18,21,25
58:5,6,14,
16 59:13
60:21
69:17,19,
21,23,25
70:16,20,
21 71:1,4,
9,16
72:11,12,
13 74:3,5,
6,21 75:8
76:1,4,9,
16 79:4,
12,13,17,
19 80:16
81:9 82:8
87:4 88:8,
9,10,11

89:4

lots  61:2,3
  62:24
  75:16

lucky  39:21

LZA  23:3
  27:1

_____

        M
_____

M-E-D-C-A-R-E
  8:5

Macario  91:9

made  48:23
  52:5 56:4
  75:2 84:16
  87:25
  88:12

mail  33:24
  78:16 86:8

main  39:9
  87:25

make  11:17
  25:2,4,5,
  11 28:11
  30:13 31:4
  35:18
  57:24
  60:22 68:4
  75:10
  76:19
  79:18
  81:3,8
  91:5 93:8

makes  94:12

manager
  36:21
  47:9,17

manual  28:9

manufacture
  70:13

manufactured
  8:4 22:13
  27:23
  56:15 58:5
  60:20
  70:3,9,19
  71:4,5,9,
  10 76:16
  88:9

manufacturer
  7:19 8:20
  12:17,19
  14:13,15
  18:6 19:7,
  13,23,24
  24:13,18
  25:2,7,13
  29:14,19
  57:17
  70:8,22
  71:20

manufacturers
  7:15,22
  8:11 10:8
  27:16
  39:14
  88:14

manufacturing
  23:14,18,
  25 29:24

39:7,9
  57:2 91:3

March  9:9
  13:20
  70:4,9

MARKED  6:17
  13:13 34:2
  68:19
  73:20
  82:22

market  15:2
  31:12
  85:15,21

marketing
  32:22

material
  29:13 81:2

materials
  39:24
  58:11

math  56:8

matter  4:4
  84:18 85:2
  93:20,22

MDI  7:6,9,
  12,13,18
  32:4,6
  33:21
  36:13,20
  42:16
  51:22
  58:21
  61:20
  77:17

MDIS  47:11

meaning  9:3
  81:1

means  23:13
  25:19
  57:1,17
  69:21 71:2
  90:2

Medcare  8:5
  35:9 37:12
  43:1 58:24
  66:2 68:1
  69:6,12
  77:13 78:8
  87:4,12

medical
  7:15,19
  8:13,14,19
  9:25 10:4
  12:2
  21:16,17
  23:18
  24:10
  25:17,24
  27:15,23
  32:16,18,
  20 33:12
  44:1 55:23
  85:15,21
  88:15
  90:25
  91:23
  92:13

medications
  5:25 6:2

Medline  62:5

63:3

meet   11:8
18:8,15,24
19:9 20:8
37:21
40:17,18,
20 41:14
52:14
53:18

meeting   20:1
41:12

meetings/
medical
85:16

meets   11:4
16:16,22
25:14
53:18

Meir   41:4,8
45:8

members
39:14

memory   5:10
6:3 9:19
36:17,19
42:21

Mendlowitz
4:14

mention   12:1

mentioned
11:14 66:2
93:18

mentions
35:9

met   5:5
16:19,25

method   81:13

middle   74:1

Middletown
63:1,6

mill   53:7

milligrams
17:1

million   55:8
56:9

mind   93:7

minute   46:12
65:17 83:2
89:7 93:8
94:13,15

minutes   24:4
31:8 41:15
72:22

mix   81:11

mix-up   76:8

mock   28:8

moment   20:19
24:4 27:1
53:2

money   80:19
82:8,15

move   20:15
25:12

multiple
12:8,12
25:20 80:8

82:6 84:5

_____

**N**

N-V-A-L-D
8:9

Nafpliotis
33:18

named   31:25
33:18
41:17 42:2
43:25

names   9:19
17:22 43:7

narrow   27:21

nature   76:22

NBR   65:15,
21

NDA   90:2,13

negative
80:15

nitrile
10:20,24
11:1 12:2,
5,13 15:10
16:12 19:8
25:16,20,
21,24 26:4
27:4,23
28:1,3,5
32:16
33:12
35:2,10
43:1
48:21,23

50:1 67:22
75:19,20
76:10 77:6
81:17,18,
22 86:23
87:19,22,
23 88:1,
10,12,15,
19,22

nitrogen
75:16,19,
22 87:15,
20

non-   16:13
48:17
75:16

non-irritating
17:8

non-
manufacturer
24:9

notes   6:3
93:8

notification
10:3

November
65:13
71:20

novo   15:4

number   4:6
10:13
11:11
12:6,16
13:1
15:10,23

18:7,23
20:4,7
21:7,20
24:6,12
27:14
31:22
32:19,24
33:8
35:20,21,
23,25 56:9
57:1,5,14,
15,18
58:5,6
69:2,19,
21,23,25
70:16
71:5,9,14,
16 72:3
74:2,21,22
76:1,16
79:4,5
80:16 81:9
83:8

number-letter
63:24 64:7

numbered
15:19

numbers
56:16
57:9,21,25
58:14,16
59:13
60:21
64:13
72:11,12,
13 74:3,5,
7 75:8

78:24
79:1,12,
13,18,20
87:4 89:4

nutritional
7:16

─────────────
         O
─────────────

oath   48:8

object   5:17
68:3

Objection
9:2 18:10
19:1 32:9
44:16

obtain   9:20
10:24 12:6
56:19
57:20

obtained
12:18
14:14 62:7

obtaining
31:22

obtains
14:13

off-screen
94:12

offhand
11:11 33:4
36:23
44:23
72:16 82:3

office   4:16
36:21 41:5
47:9,17
93:20,22,
23,25 94:1

official
36:22

open   13:18
22:3 34:17
68:18,20

opened   93:25

Opening
83:18

operated
62:5

operating
76:7

operation
65:5

opine   52:13

opining   51:4
53:17
60:24

opinion   27:9
44:8 45:19
49:14 50:6
52:5 57:13
87:7 88:6

opinions
47:19
48:16
52:3,24
76:13
92:20

opposed   8:14
25:25 26:2
61:12 82:6

order   11:24
12:5 13:11
48:1 57:6
82:15
83:13
95:11

ordered
77:17

Organization
53:5 64:22

original
46:14
67:12

outline   16:8

outlined
16:12

overseas
7:23 44:11

owned   62:5

ownership
12:24

─────────────
         P
─────────────

p.m.   4:1
54:9,12
94:18,21
95:16,17

packing
55:15

pages   66:14

pallet   72:2

pandemic   9:1

paper   69:2

paragraph
  15:14,15
  49:5,18
  54:17
  55:1,2
  59:25
  60:17
  62:13,21
  85:23

parentheses
  79:13

part   11:6
  40:7 72:13
  78:13
  85:23

parties   27:8
  59:15

partnership
  90:24 91:5

party   18:21
  43:25 44:5

pass   25:18,
  22

passing
  26:20

past   40:1
  66:19

patent   90:5,
  14

patient

15:10 23:8
  35:10

pause   20:13

PDF   6:23
  15:18 46:3
  54:22
  65:9,12
  74:14

pending
  44:21 90:7

Pennsylvania
  90:9,10
  91:17

people   88:21

percent
  58:4,6

percentage
  59:14

performance
  16:16,19

performed
  77:18

performing
  38:1 58:18

period   58:19

personal
  26:13,15
  61:24,25

personally
  32:3

perspective
  32:15

pertain
  38:12,18
  39:17,19

pharmaceutical
  27:16

pharmaceutical
s   7:15

Phillip   4:10
  5:6

phone   59:4

photograph
  68:25
  71:14

photographs
  63:19
  66:23
  68:23 72:2

photos   71:13

physical
  16:17 22:4
  28:18
  30:21 38:1

pick   39:21
  52:1

picture
  69:16

piece   69:1

pigs   17:10

pinhole   29:9

pinholes
  16:20

Plaintiff
  4:4

plan   53:6

planning
  31:1

plans   52:8

plant   76:6

plants   39:9

plastic
  63:18
  67:25
  77:25 78:1
  94:7,8

pleadings
  60:3

PMA   15:3
  31:4,9,13,
  18

point   27:15
  30:25 79:9

points   27:14
  62:20
  63:16,23
  64:8 66:10
  79:2,20

Pollack   4:10

polymer   84:6
  85:14,20

port   19:18

possibility
  44:12

possibly
  30:12

potentially
  86:1

Poulton
  49:3,11,21
  72:13
  73:18 75:6
  83:24 85:6
  92:25

Poulton's
  51:7 52:13
  61:3 72:8

powder  16:22

powder-free
  15:10
  16:13
  35:2,10

PP  26:8

PPE  26:15,
  16 85:15,
  21

PPP  26:8,12

practices
  23:15,25

pre-existing
  25:7,8

pre-market
  10:3
  14:14,18
  31:6

predicate
  17:20 37:6

preparation
  41:1,17

prepare
  10:17
  40:10,15,

18

prepared
  31:2 35:4

present  9:10
  10:1 85:17

president
  7:6,9

pretty  35:17
  48:23

previously
  12:18

primary  17:4

prior  39:2
  42:17
  84:20

problem  5:23
  19:19
  21:25
  22:10
  29:22
  83:15
  85:14,20

problems
  19:17,25
  88:21

procedures
  53:3

process  5:13

processes
  91:4

procured
  55:6,12
  56:15

60:20 61:4

produced
  47:12

product
  10:16
  14:22,23
  15:1 17:22
  20:21,24
  21:11,15
  22:18,21
  23:3
  24:16,17,
  19,20,21
  25:7,8,10,
  14,23
  26:14,25
  29:24
  30:1,11
  31:12
  32:7,10,
  11,21
  33:7,14
  35:24 36:1
  37:3,7
  50:25

production
  57:5,6
  70:23

products
  12:20,22,
  24 20:1
  22:5,8,10,
  12 28:13,
  17 37:8
  52:2 56:2

professional

28:6

program  22:9

project  32:4

properties
  16:18
  17:23 38:2

property
  16:19

proposal
  82:13

protection
  25:24
  26:7,9,13,
  14,22

protocols
  84:20,23,
  24

prove  15:4

provide  18:8
  27:9 29:20
  43:9,15
  44:8

provided
  6:13 7:25
  8:3,18,23,
  25 9:17,25
  10:20
  24:12 31:1
  43:18
  49:11,25
  59:21
  65:22 68:7
  77:11
  83:23

providing
 18:22
 31:21 42:6
 44:24
 49:1,13
 86:21

publication
 38:10

pulled   75:7,
 23

purchase
 57:6

purchasing
 19:8

purports
 60:1

purposes   4:3
 84:14

Pursuant
 55:5

put   20:14,
 17,18
 21:23 23:8
 54:6 56:4
 68:9

putting
 80:21

─────────────
          Q
─────────────

QSR   23:12
 30:14

QSR/CGMP
 23:11 28:8

qualification
 30:15

qualifications
 7:4 30:7

qualified
 30:13,21,
 23

quality   10:8
 23:12,23
 28:9 30:6
 44:10,18
 91:4

quantities
 53:14

quantity
 61:11

question
 5:21 20:20
 25:19
 29:18
 31:23
 39:25
 42:18 46:9
 87:8 93:5,
 11,14

questions
 5:13,19
 89:25

quick   18:1
 54:4

quickly
 35:13 65:7

quote   49:18
 52:10

─────────────
          R
─────────────

R-E-N-T
 23:25

rabbits   17:4

Rakhunov
 4:9,10
 5:4,6
 6:11,18
 9:4,7
 13:3,7,15
 18:16 19:4
 24:2 32:13
 33:23
 34:5,9,14
 41:9,10,25
 42:1 44:20
 54:13
 59:7,11,
 19,20
 68:6,17,21
 72:17,24
 73:4,9,14,
 21 82:19,
 25 83:5,9,
 19 93:2,6,
 12 94:3,5,
 11,16,22
 95:4

ran   79:21

randomly
 79:14

rated   26:23

reached
 84:11

read   17:17
 55:5 63:25

reading
 52:18
 61:18,19

realm   8:16

reapproved
 16:24

reason   5:25

reasonable
 71:3,8

reasons   5:24
 76:9

rebut   49:14

rebuttal
 6:16 44:25
 46:4,13
 49:2,8
 54:18,23
 87:11,16
 92:19

rebuttals
 92:24

recall   8:2,
 6,7,10
 31:21
 38:22
 41:20
 46:18
 47:10
 63:20
 72:12 78:2
 80:5,7
 82:1

receive
77:24

received
13:4,9,17
33:15
34:23
49:22
77:21

receiving
95:11,12

recent   40:1

reclassified
39:6

recognize
34:18

recognized
12:11
29:16

recollection
36:13

recommend
24:14
37:15
50:20

recommendation
s   51:14

recommends
50:16

record   4:1
5:6,16
17:18
41:24
54:9,10,12
55:5 59:5

64:1
73:11,13
75:5
94:15,17,
19,20
95:16

recording
4:3

records   9:21

refer   71:20

referenced
58:14 61:2

references
37:11

referring
11:9
51:10,15
52:10

refers   23:5
64:8 77:12

reflect
87:16

reflected
75:7

reflects
48:17
77:17

refresh   5:10
36:12,17,
19 42:20

register
21:4

registered

10:11,13
12:20
21:21
27:10

registering
10:5

registration
21:21
26:18 27:4

regular
95:3,4

regulation
23:13
39:16

regulations
7:14
23:17,24
38:12,18
39:19 40:7
48:19
88:18 89:2

rejection
21:18

relate   19:23

relative
61:10

relay   87:10

release   30:1

released
22:10

rely   12:16
24:12,18

relying

78:23 79:6

remember
18:19 28:1
35:5 39:12
42:21 43:7
45:1,2,9,
18 59:1
78:4 82:3

render   47:20
50:7

rendering
48:16

renumber
83:12

repeat   23:20
33:9 37:19
51:18 87:8

rephrase
13:2

report   6:16,
23 29:2
34:5 43:18
44:24
45:4,15,19
46:1,4,10,
13,14
47:19
49:2,3,15
53:1,15
54:18,23
58:15
59:25
61:3,18
63:13
64:21

65:13,18,
19 66:1,16
68:9 72:8
73:18
74:20 75:7
76:21,25
77:6,12
78:6 87:5,
11 90:2,13
92:19,23

**reporter**
4:2,19,23
5:1,15
23:20 24:1
34:3,7,11
54:8,11
73:1,5,7
83:3,7,15,
17 94:14,
17,20
95:2,6,10,
14

**reporting**
77:23
79:15

**reports**
29:4,18
49:8,21,
22,24
50:4,8
52:17
60:12,14
63:13
64:20
87:16
92:24

**represent**
4:11,13,16
5:7 50:23
70:21 72:2
73:17

**representative**
51:5

**represented**
50:12

**reps** 85:17

**request** 82:2

**requested**
82:14 84:3

**requests**
85:5

**require** 39:7

**required**
18:8 23:19
28:12 48:1

**requirement**
10:7 30:15

**requirements**
10:23
16:22,25
18:13
29:25
32:18

**requires**
21:6

**research**
47:3

**residual**
16:23

**respect**
10:19
17:22
31:21
32:15,16
52:3

**Respire**
90:24

**responses**
60:5

**responsibility**
19:12

**rest** 88:11

**result** 39:5

**results**
16:10
28:22
47:22
49:10,19
66:6,14
75:25
80:18
81:10
82:10
86:20,22
87:7,18

**retain** 64:25

**retained**
27:7 38:8
44:5 49:6

**review** 17:17
18:1 31:2
32:10,11
34:18
35:19

40:14
46:16
49:20,21
55:15
56:22
58:10 60:3

**reviewed**
14:7 60:12
63:3 72:8

**reviewing**
63:20

**Rock** 4:5,11
5:7 60:8,
13 61:12
77:13 85:5

**role** 48:4

**room** 6:6
40:12

**rubber** 25:16
85:16

**rules** 39:19

**run** 70:22,
23 79:21
89:24 93:8

**running**
85:25

**runs** 70:10

_____

**S**
_____

**safe** 11:18,
21 58:7

**safety** 15:4
31:15

sake  86:25

sample  19:16
  50:11,19,
  23 51:12,
  17 52:6,7
  53:9,10,11
  65:15 66:9
  74:6 80:9
  84:6 85:25

sampled
  52:25

samples  52:1
  62:7,14
  65:16,21
  74:2

sampling
  22:9
  50:17,18
  51:11,20,
  23 52:4,7,
  21 53:3,4,
  6,9,18

sandwich
  66:24

save  80:19
  82:8,15

Schwartz
  4:4,21,22,
  24 5:5
  13:6,8
  34:17 40:9
  42:5 46:4
  54:14
  93:18
  94:22

scooter
  91:12

screen  59:2

scroll  66:4

scrolling
  71:12

section
  15:22 16:7
  17:15,19
  49:5 52:9,
  25 53:15
  60:7,12,18
  61:14,21
  62:1 77:2,
  5,16 78:6
  79:3

selected
  79:14

selecting
  30:17

seller  18:6

seminar
  38:12,17,
  23 39:11,
  16,18,22,
  24

seminars
  38:16 40:2

send  48:1,2

sending
  33:23 80:3

Senior  91:10

sense  25:4,5

81:8 94:12

sensitivity
  11:3,20
  17:9

sensitizer
  17:13

sentence
  55:4,9
  56:14,17
  58:3 60:19
  61:1 62:12
  77:5,20

separate
  26:25 48:1
  81:8 95:11

sequence
  63:24 64:8

serve  85:1,6

service  8:15

services
  7:25 8:1,
  3,18,23,25
  9:17,24
  10:20
  31:21 84:3

set  12:4
  18:23
  29:24 87:5
  92:18,23

seven-page
  83:22

SGS  61:15
  62:1 63:12
  64:20,22,

25 65:5
  66:1,15
  68:8 77:6,
  12 78:6
  87:2

SGS-IPS
  62:16
  65:10

shades  67:20

shared  70:15

sharing
  57:14,15

ship  18:14
  56:5

shipment
  21:16

shipped
  28:13
  44:11
  50:13
  56:11
  58:21

shipper
  57:18

shipping
  55:23 56:2

ships  56:5

shot  38:25

show  11:4,
  21 31:11,
  15,16 59:2
  69:10
  81:20

showed  50:1
  62:23
  87:24
  88:10
shower  40:11
showing
  14:22
  24:23 63:3
sic  4:3
side  52:17
  60:14
  69:16
sides  74:7
significance
  16:6 32:14
  55:22
  57:14
  67:14
  69:21
  87:6,17
signified
  58:1
signify
  57:22
Silver  43:25
similar  25:6
  28:14 78:6
simply  52:16
  85:25
  86:19
sir  5:1
  6:19 15:25
  34:11
  61:16

83:23
89:14
sit  56:5
situation
  24:8
size  17:22
  50:11,19,
  23 51:17
  52:6,7
  53:9,11
  56:8 57:4
  71:23
  73:10
sizes  51:11
  56:3 77:22
skin  11:17
  17:4
slight  67:6,
  7,13,19
slightly
  11:23
slips  55:15
  72:1
slower  51:19
small  51:13
smaller  65:4
smallest
  63:7
sold  20:21,
  24 27:23
  61:11
  77:13
Solomon  4:10

sought  17:21
sound  11:12
  20:11 32:2
  42:4 44:1
sounds  54:5
Southern  4:7
SPA  55:6
speak  5:15
  54:15
spec  11:3,7
  53:7
special
  81:17
specialist
  12:7
specializing
  7:13
specific
  14:6,11
  20:5 22:9
  32:18
  37:20,21
  40:4
specifically
  11:8 35:9
  37:12 57:8
  62:13
  85:22
specification
  19:10,13
  25:1
specifications
  17:23

18:8,13,
15,25
20:1,9
22:5,19
25:14
28:18
29:25
37:22
48:18,25
71:10
76:17
specs  25:11
spectrophotome
ter  81:14
spectroscopy
  66:6
speculate
  61:2 64:9
speeches
  40:2
spent  45:22
Sperber
  4:12,13
  9:2,5
  11:25 13:5
  18:10
  19:1,3
  32:9
  40:18,20
  41:7,22,24
  44:16
  47:10 48:3
  50:7 51:2
  52:20
  57:25
  59:5,17

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024          Index: Sperber's..supplied

68:3
72:21,23,
25 73:3
78:23 80:1
93:3,4,10,
15,17 94:2
95:1,8,12

Sperber's
43:10 44:9
45:7 51:6
61:12 67:1
68:8
78:18,20
82:14

spring   43:12

staff   40:8

standard
12:11,12
16:2,15,18
17:4,6,10
25:22
48:24
51:20
52:11,14
53:11
70:12,13

standards
11:4,8,10
12:3,4,8,
13 16:9,
16,23 37:7
53:5,7,9,
19

stands
23:12,23
31:4 64:10

start   42:23

started
88:17

starting
23:21 69:3

state   4:8
44:22

stated   60:19
63:1

statement
55:17
56:23 72:5
86:5

States   10:4,
25 24:10
39:20
88:16

stating
14:24
18:12

statistical
49:14
50:17,18,
19 52:21

statistician
38:4,8
49:4

statistics
50:18

stay   94:14

steel   56:4

steps   24:11

sterile

16:14
27:17,18

Stern   4:17

stood   64:13

stopped
19:18
21:10

storage
44:13

stored   62:4,
8

straightforwar
d   48:23

strategic
31:1

strength
29:8

Strictly
47:21

studies   17:3

study   17:7,
12

stuff   26:14,
20 65:4

style   71:16

subcommittee
85:16

subject
13:21 36:1

subject's
17:7,12

submission

35:15 84:2

submit
10:14,17
11:5 24:23
32:12 37:2
86:17

submitted
14:5 15:1
34:24 35:4
49:2 60:13
61:3 62:14
73:18 85:4

submitting
36:15

substantial
46:19,21

substantially
14:22,25
15:5 17:24
18:3 24:24
31:11,14,
17

suggest   37:1

suggested
82:15,17
86:9

summarize
60:1

summary   16:2

summer   43:12

supplements
7:16

supplied
57:3

supplier
  19:21

supplying
  19:7 24:18

supposed
  16:8 18:14
  35:21
  74:25

suspect
  84:23
  87:24

suspicious
  21:25 22:9

swear   4:20,
  21

sworn   4:25

symbol
  70:11,12,
  13

system   10:9
  23:13,24
  28:9

───────────

          T
───────────

T4   56:16
  58:6

table   16:6
  66:5 74:1

Taipei   39:15

Taiwan
  39:10,11

Taiwanese
  39:15

takes   83:11

taking   20:13

talked   45:5

talking   8:12
  22:23
  51:2,10

taped   69:2
  90:6,8
  91:24

taught   40:2

tech   16:3

technical
  10:15

technology
  16:2 32:1
  35:5
  36:14,20

telling
  18:22

terms   13:25
  60:14

test   16:11,
  17,20,23
  17:9 28:22
  29:15
  48:20,22,
  24 49:20,
  22 65:13
  75:25
  76:10
  79:17,21,
  22 80:8,13
  81:8 84:5
  85:2 87:7,

15 88:10
91:1 92:6

tested   16:14
  25:10
  47:4,22
  48:2,11
  50:1,11
  53:14
  62:15
  63:11
  66:11
  72:14
  75:6,23
  77:7 86:8,
  9 87:2,23
  88:7

testified
  4:25 24:4
  90:23

testify   6:1
  92:19

testimony
  6:4 31:20
  43:15
  45:14 91:2
  92:11

testing
  10:17
  11:2,4,7,
  15,20 12:1
  16:19
  17:10
  19:10 22:4
  24:22
  25:19
  28:12,17,

20,21,24
29:2,25
30:11,14,
17,21 38:1
45:18
48:17
49:7,10,24
50:21,25
51:4,6,7,
10,12
52:2,14
60:8 61:3,
15,21 62:1
63:13
64:23
65:1,10
77:17,23
79:14,24
80:4,23
82:6,11,
16,18
84:12,13,
17,21 85:9
86:20,23
87:10,18
93:19

tests   16:10
  29:8,9,10
  47:23
  49:19
  87:14

Texas   92:1

There'll
  59:8

thing   17:18
  50:9 71:13

things   26:6
  33:4 35:16
  65:6 70:21
  75:4 83:12

third-party
  4:17

thought
  20:15 39:1

three-year
  71:24

ticket   12:23
  22:1

ticketing
  21:18

time   5:8,17
  14:10
  17:16
  20:24
  21:15
  26:20
  36:15
  53:23
  54:8,11
  69:11 70:9
  80:19
  81:23 85:4
  91:6 93:1
  94:23
  95:16

time-related
  44:13

times   24:17
  51:25

title   34:4

titled   46:3
  60:7

today   4:2
  6:1,6
  40:15,19,
  23,24
  92:7,15,22
  95:7,15

today's
  40:10
  41:1,17

told   63:2,6
  72:1 82:1

Tooling   8:1

top   9:14
  46:8 65:12
  66:5 89:13

total   75:16
  77:21

trader   18:20

training
  40:7

transcript
  83:14 95:3

trial   92:12

true   64:10

truthfully
  6:1

tubes   92:6

turn   15:13
  17:14
  27:13 46:1
  60:7 61:14

74:14
  89:19

turning
  45:21 55:4
  77:16

two-day
  39:18

type   9:24
  25:6 27:20
  30:5 31:7
  36:25

typed   74:24

types   25:16
  29:1 56:10
  88:15

_____

          U

_____

U.S.   7:14
  9:25 21:12
  36:22 40:6
  55:23

ultimately
  19:14
  35:25

underlying
  77:14

underneath
  70:6

understand
  5:18 14:2
  34:20
  47:25 48:4
  59:18,25
  76:13 80:4

81:6,25
  90:18 92:9

understanding
  55:20,25
  56:25
  57:8,13

understood
  5:20

United   10:4,
  25 24:10
  39:20
  88:16

unusual
  29:13
  48:14

updated   7:3

uploaded
  72:25

useless
  85:25

users   86:1

_____

          V

_____

vary   12:3

varying
  77:22

Vazquez   91:9

vendor   30:15

verify   55:16
  56:23
  58:11

version   95:9

**KITCHEN WINNERS NY INC. vs ROCK FINTEK LLC, ET AL.**
Alan Schwartz on 02/13/2024                     Index: vice..zoom

vice  7:6

view  30:20

visited  62:6

volumes  56:2

———————————
         **W**
———————————

wait  37:10
  46:11

waiting
  34:12
  72:23 73:6

wanted  15:23
  48:10,20,
  21 49:20
  80:24
  82:18 91:5

warehouse
  62:23 63:7
  64:11
  66:10 72:3
  77:23

warehouses
  62:5,7,15,
  18 63:4,8
  64:16

warnings
  32:25 33:1

wavelength
  81:16,17,
  19

wavelengths
  81:15

Weiner  41:17

42:3

WH  63:25
  64:7,10
  69:3 71:14

WH9251CC0200
  64:4

WH9550DD0300
  64:1

whatsoever
  40:25
  67:24
  86:16

white  69:1
  70:11 72:1

Wing  44:1

winners  4:5,
  14 18:21
  27:8 30:17
  44:5 59:22

withdraw
  22:17

word  37:11,
  18 55:22
  87:21

words  20:2
  50:15

work  7:18
  14:7 32:6
  36:13
  42:6,19
  43:10
  46:24
  48:12,13
  58:18,22

69:13 72:7
  78:14
  83:12

worked  8:7
  33:21
  42:17
  43:10 45:6
  89:2

working
  45:22
  67:17

works  32:4

world  53:8
  64:23

worldwide
  27:17
  64:23

Wow  38:24

wrap  54:3
  93:9

write  30:25
  49:17 56:6
  61:1 62:3
  79:11

writes
  85:13,24

written
  39:23
  43:17,18
  45:15,19

———————————
         **Y**
———————————

year  5:11
  45:9

years  9:15
  33:22 45:8
  88:13

yesterday
  39:13
  41:13

York  4:5,7
  63:7
  90:16,25
  91:24 92:1

———————————
         **Z**
———————————

zoom  74:17
  83:11