# EXHIBIT 26

**KITCHEN WINNERS NY INC, ET AL. V. ROCK FINTEK LLC., ET AL.**
**Tzali Gombo on 11/02/2023**

```
1                   UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
2                   CIVIL ACTION NO. 22-cv-05276-PAE
   _____
3  KITCHEN WINNERS NY INC.,

4                      Plaintiff,

5              V.

6  ROCK FINTEK LLC,

7                      Defendant.
   _____
8  ROCK FINTEK LLC,

9                      Counterclaim and Third-
                       Party Plaintiff,
10
               v.
11
   KITCHEN WINNERS NY INC.,
12
                       Counterclaim Defendant,
13
            and
14
   ADORAMA INC., HERSHEY WEINER, JOSEPH
15 MENDLOWITZ, JNS CAPITAL HOLDINGS LLC
   and JOEL STERN,
16
                       Third-Party Defendants.
17 _____

18        T R A N S C R I P T of the stenographic
   notes of the Deposition by Oral Examination of TZALI
19 GOMBO, taken remotely pursuant to notice in the
   above-entitled matter, by and before Catherine
20 McLaughlin, a Certified Court Reporter of the State
   of New Jersey, License No. 30XI00186100, via Zoom
21 Video Conference on Thursday, November 2, 2023,
   commencing at approximately 12:15 p.m.

22

23

24

25
```

**KITCHEN WINNERS NY INC, ET AL. V. ROCK FINTEK LLC., ET AL.**
**Tzali Gombo on 11/02/2023**                                    Page 2

```
 1    A P P E A R A N C E S:  (Via Videoconference)

 2

 3         LIPSIUS-BENHAIM LAW
           BY:  ALEXANDER SPERBER, ESQ.
 4         80-02 Kew Gardens Road
           Suite 1030
 5         Kew Gardens, New York  11415
           212-981-8440
 6         asperber@lipsiuslaw.com
           Attorneys for Plaintiff and Third-Party Defendants
 7         Adorama, Inc. and Joseph Mendlowitz

 8

           POLLACK SOLOMON DUFFY LLP
 9         BY:  LAUREN RIDDLE, ESQ.

10         43 West 43rd Street
           Suite 174
11         New York, New York  10036-7424
           212-493-3100
12         lriddle@psdfirm.com
           Attorneys for Defendant and Counterclaim Third-Party
13         Plaintiff

14
      A L S O   P R E S E N T:  (Via Videoconference)
15
      Bob Calvert, New York Notary Public
16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS:                                    PAGE

 3   TZALI GOMBO

 4       BY:  MS. RIDDLE                         5,55

 5            MR. SPERBER                        54

 6

 7

 8                  E X H I B I T

 9   NUMBER            DESCRIPTION               PAGE

10   Exhibit 1         Third Amended Disclosure  30
                       Statement of Plaintiff/
11                     Counterclaim Defendant
                       Kitchen Winners NY Inc.
12                     and Third-Party Defendants
                       Adorama Inc. and Joseph
13                     Mendlowitz Pursuant to
                       Federal Rules of Civil
14                     Procedure 26(a)(1) and
                       26(e)
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         -  -  -

 2              DEPOSITION SUPPORT INDEX

 3                         -  -  -

 4   Direction to Witness Not to Answer

 5   Page  Line

 6

 7

 8   Request for Production of Documents

 9   Page  Line
     8      18
10   15     16
     40     1
11

12

13
     Stipulations
14   Page  Line

15

16
     Question Marked
17   Page  Line

18

19

20

21

22   (ph) indicates a phonetic spelling.

23   [sic] indicates the text is as stated.

24   Quoted text is as stated by the speaker.

25
```

```
 1                    - - -

 2            TZALI GOMBO, present address stated as 9

 3   Yerek Drive, Lakewood, New Jersey 08701, situated as

 4   stated at 37 Granite Drive, Lakewood, New Jersey,

 5   having been first duly sworn or affirmed, was

 6   examined and testified as follows:

 7            (Mr. Calvert no longer present.)

 8                    - - -

 9                 EXAMINATION

10                    - - -

11   BY MS. RIDDLE:

12       Q.    Good afternoon, Mr. Gombo.  We've spoken

13   via text before.  I just want to go over some ground

14   rules for being deposed.  Have you ever been deposed

15   before?

16       A.    Yes.

17       Q.    And how many times?

18       A.    I think once or twice for the same case.

19       Q.    What case?

20       A.    For a personal investment matter.

21       Q.    Do you know the name of the case?

22       A.    Again?

23       Q.    Do you know the name of the case?

24       A.    It's a personal matter which I would

25   like not to discuss.
```

```
 1         Q.      Okay.   So let's go over how this works,
 2    although it sounds like you may have some experience
 3    with this.   But I'll just go over it to be clear.
 4              It's important that we not speak at the
 5    same time because our court reporter is taking down
 6    every word we say.   I'll do my best not to start my
 7    questions before you finish, and I ask that you wait
 8    until I finish my questions before you start
 9    answering.
10              We'll need clear answers for the court
11    reporter, so no shaking of your head.   We need clear
12    yes or no.
13              If you don't understand one of my
14    questions, please let me know and I'll try again.
15    If you answer, I will assume that you understood
16    that.   If you want to take any breaks, please let me
17    know.   I just ask that it not be when a question is
18    outstanding.
19              Do you understand that you're under oath
20    today and that you must tell the truth subject to
21    penalties of perjury?
22         A.      Yes.
23         Q.      Have you taken any medication, drugs or
24    alcohol that would affect your ability to testify?
25         A.      No.
```

1      Q.      Any reasons that you know of that you

2  can't testify accurately today?

3      A.      No.

4      Q.      Okay.  Do you have any pending lawsuit

5  that you're named in as a plaintiff or a defendant?

6      A.      If I have any?

7      Q.      Lawsuits that you're named in?

8      A.      I don't know if it's called a lawsuit,

9  but I have a personal situation going on in regards

10  to an investment that I made.

11      Q.      Would that be the Gombo versus

12  Professional Account Management, LLC?

13      A.      Not what I recall.

14      Q.      What do you recall?

15      A.      It's a personal investment matter that I

16  would like not to discuss.

17      Q.      I'd like you to answer the questions to

18  the fullest extent that you can, please.

19      A.      Okay.  It's a personal investment

20  matter.  I don't recall if it's Gombo versus the

21  name you just said.  I don't remember a name like

22  that.

23      Q.      Is it a debt collection action?

24      A.      No.  It's an investment, as I said

25  earlier.

1      Q.      Is it Shulem Gombo versus Bezalel Gombo?

2      A.      Yes.

3      Q.      Can you just tell me briefly about that?

4   I understand that you would rather not, I just need

5   to --

6      A.      I'd rather not.  The reason why I'm here

7   is to testify on a matter that I believe that you

8   want to have a better understanding about a case

9   that you have going on, so that's why I'm here for,

10  not to discuss my personal matters.  I would like

11  to --

12     Q.      Can you just let me know the status of

13  that case, before we move on?  I just want to know

14  if it's relevant.

15     A.      There's a lawyer dealing with the case.

16  I'm not involved day to day with that case.

17     Q.      But it's ongoing?

18     A.      I believe so.

19             MS. RIDDLE:  Okay.  I'd like to call for

20  the production of any deposition transcripts in that

21  matter, just for the record.

22             MR. SPERBER:  Was there a subpoena of

23  documents of Mr. Gombo?

24             MS. RIDDLE:  There was not.

25  BY MS. RIDDLE:

1    Q.    Okay, a bit of background I'd like to

2    get from you.  Can you tell me about your education

3    history, please?

4    A.    I learned in yeshiva until I got

5    married.  When I got married I started working for

6    my father's company.  He had a company named Dynamic

7    Health labs.  It was manufacturing health products

8    such as vitamins, different types of vitamins.  My

9    father got sick, he passed away, and I started the

10   company called CrystalWare.

11   Q.    When did you start working at Dynamic

12   Health labs?

13   A.    I believe I was around, I was -- around

14   22 years ago.

15   Q.    And that company manufactured vitamins,

16   you said?

17   A.    Correct.

18   Q.    What else did it do?  Anything else?

19   A.    It was bottling private label.  It was

20   doing some drinks.  That's basically it.

21   Q.    What did you do there?

22   A.    I was managing the company.

23   Q.    So did you have like a title?  Were you

24   a manager?

25   A.    It's just my father's son and my father

1   wanted me to work there.  It was a very successful

2   company, actually, I think it's on the stock market

3   right now.  It was being sold by my family after my

4   father passed away, and I went on on my own to start

5   my own company.

6        Q.     Okay.  And your company, you said, was

7   CrystalWare --

8        A.     Correct.

9        Q.     -- did I get that?  What does your

10  company do?

11       A.     We manufacture disposable food service

12  and some medical products for commercial use.

13       Q.     What kind of materials?

14       A.     Again?

15       Q.     What kind of disposable materials?

16       A.     Like plastic, paper, foil, gloves.  You

17  can look it up online.

18       Q.     Did you -- I'm sorry, what was that?

19       A.     I said you can look it up online.

20  You'll see in details what it manufactures and

21  imports.

22       Q.     When did you start CrystalWare?

23       A.     I would say around 19 years ago, 20

24  years ago.

25       Q.     Can you tell me a little bit more about

1   the facility?  What do you do there?

2      A.    I was actively managing the company up

3   until lately.  I was involved in every aspect from

4   manufacturing the product, zoning the product,

5   getting the product out overseas or wherever it's

6   being manufactured, getting it into warehouses or

7   directly to customers, dealing with situations

8   for -- on a day-to-day basis what can happen with,

9   you know, and -- managing the office, the office

10  overseas, and we had -- we have salespeople in a

11  couple states in America.  So, yeah, that's what I

12  used to be busy with up until lately.

13     **Q.    Okay.  What happened lately?  Did you**

14  **just decide to step back a little?**

15     A.    Yeah, I decided to go on vacation.

16     **Q.    Good for you.  So you mentioned plastic,**

17  **paper, foil.  Do you make multiple products all at**

18  **the same time?  How does --**

19     A.    Yeah.

20     **Q.    -- that work?**

21     A.    We have a couple hundred different

22  products that we manufacture.  Actually, the largest

23  product line that we sell, we import, is, and we

24  have a grant for that, we have two grants for this

25  is gloves.

1      Q.      And what are the brands?

2      A.      Sterex and Safeguard.

3      Q.      What is that first one?  Can you spell

4      it?

5      A.      S-T-E-R-E-X, which actually we -- that's

6      the brand we started the company with, and a couple

7      years ago we added another brand which is called

8      Safeguard.

9      Q.      Safeguard.  Right?

10     A.      Correct.

11     Q.      Do you manufacture these gloves inhouse?

12     A.      No.  Nobody manufactures in the house

13     gloves as far as I know.  We have factories

14     overseas, not our own factories but factories that

15     we deal with, some factories that we help set up

16     overseas, and we're very involved in the

17     manufacturing, importing and, you know, making sure

18     that our brand -- our brand is a quality brand.

19     Q.      Where do you get your gloves from

20     overseas?

21     A.      From China, from Thailand, from -- from

22     Malaysia.

23     Q.      Do you know the warehouse name?

24     A.      Our warehouse name?

25     Q.      Yeah.

```
 1        A.      There's no name.  It's CrystalWare.
 2   It's the name of the company.
 3        Q.      Okay.  How did you become involved in
 4   the PPE industry?  And when I say "PPE," I assume
 5   that you understand it's personal protection
 6   equipment?
 7        A.      That's our base.  Yes, that's what I --
 8   we do for a living.  That's how I got involved 20
 9   years ago.
10        Q.      How did you get involved 20 years ago?
11   You just started your company?
12        A.      Yes.
13        Q.      And you had no experience before that?
14        A.      I had experience in the vitamin
15   manufacturer, as my father...
16        Q.      What percentage would you say -- is your
17   company focused on gloves?  What else?  Is there
18   like --
19        A.      (Voices overlap.)
20                (Reporter interruption for clarification
21   of the record.)
22   BY MS. RIDDLE:
23        Q.      Sorry, what is that?
24        A.      A little over 30 percent.  Three zero.
25        Q.      The 30 percent is gloves or the 30
```

1   percent is other than gloves?

2       A.      Gloves.

3       Q.      **Can you tell me a little bit about the**

4   **certifications that your warehouses have overseas?**

5       A.      Like certifications, are you talking

6   about such as F.D.A.?

7       Q.      **Yeah, and I have some general**

8   **understanding that some gloves shipped into the**

9   **United States need particular certifications?**

10      A.      So that if you -- if you're importing

11  medical vinyl or nitrile or any item -- (audio

12  disruption.)

13              (Reporter interruption for clarification

14  of the record.)

15              THE WITNESS:  Or any gloves that it's

16  called, exam or medical gloves, then the factory

17  would need an F.D.A. 510(k) number.  It would need

18  to be approved by the FDA that those gloves meet

19  the -- the specs that an exam gloves needs to meet.

20  BY MS. RIDDLE:

21      Q.      **Are these exam gloves that your company**

22  **manufactures?**

23      A.      We import all types of gloves, such as

24  vinyl or nitrile or latex.  It can -- some gloves

25  can be used just for food service products.  Some

```
 1  gloves are being used for cleaning products and some

 2  gloves are being used for medical or dental or

 3  anything that has to do with in the medical

 4  industry.  And those gloves will need to have a

 5  510(k) -- (audio disruption.)

 6              (Reporter interruption for clarification

 7  of the record.)

 8              THE WITNESS:  I'm saying these medical

 9  gloves would need to have a 510(k) certification.

10  BY MS. RIDDLE:

11      Q.      How many people does your company

12  employ?

13      A.      Around 100.

14      Q.      Is your 510(k) certain, like, do you

15  know the certification number by any chance?

16      A.      Not offhand.

17      Q.      I would ask if you don't mind to provide

18  that.

19      A.      I don't have it offhand.

20      Q.      Oh, I mean you could email it to me

21  after.

22      A.      Okay.

23      Q.      Thank you.

24              Have you ever been retained as an expert

25  in this industry?
```

1           MR. SPERBER:  Objection to the form.

2     You can answer.

3           THE WITNESS:  I had some companies in

4     different industries asking me for input in the

5     industry.

6     BY MS. RIDDLE:

7       Q.     My question was vague.  Have you ever

8     been retained as an expert in a lawsuit?

9       A.     No.

10      Q.     When you just described being an

11    industry expert, what did you mean by that?

12      A.     There's some investment firms that are

13    involved with companies that are trying to buy off

14    companies in the industry, and they would need to

15    speak to professionals in the same industry to hear

16    or have that understanding of the industry.  So I've

17    been retained for some such type of whatever you

18    want to call it, such type of expertise or -- or

19    input in my view about the industry with the

20    understanding, having the understanding of this

21    industry.

22      Q.     Can you give me an example?

23      A.     Such as companies that are looking to

24    buy off similar companies, they would like to hear

25    from somebody that owns a company like that and has

1   experience in a company like that.  They would like

2   to -- they would ask for different types of

3   questions to have a better understanding of the

4   industry.

5       Q.     Do you have any such company you can

6   name?

7       A.     There's some investment firms.  I want

8   to name those investment firms.  I don't have those

9   names offhand.

10      Q.     Any best memory?

11      A.     I don't have those offhand.

12      Q.     Have you been retained as an expert in

13  this case?

14      A.     No.

15      Q.     Okay.  And to be clear, just for the

16  record, I'm taking your deposition today not as an

17  expert but because you were disclosed as a fact

18  witness by Mr. Sperber.

19      A.     Okay.

20             MR. SPERBER:  And just for the record,

21  we reserve our right to --

22             THE WITNESS:  One second.

23             Hello?

24             MR. SPERBER:  Just for the record, we

25  reserve our right to disclose Mr. Gombo as an expert

1  witness whenever the appropriate time comes, should

2  we choose to do so.

3           (Whereupon, discussion was held off the

4  record.)

5           MS. RIDDLE:  Just to be clear, we

6  wouldn't be precluded from deposing him as an expert

7  once that occurs.

8           MR. SPERBER:  Okay.  Understood.

9  BY MS. RIDDLE:

10      Q.      Okay.  Do you work with Adorama or

11  Kitchen Winners --

12      A.      (Voices overlap.)

13      Q.      -- or have you ever?

14          (Simultaneous indiscernible cross talk.)

15  BY MS. RIDDLE:

16      Q.      Sorry, I interrupted.

17      A.      I know Kitchen Winners through me

18  traveling to overseas.  I used to meet Hershey a lot

19  overseas.  I know Adorama through having some

20  interests in real estate.

21      Q.      Sorry, I didn't hear that last one.  You

22  know Adorama?  Is that what --

23      A.      I know --

24      Q.      Is that what you -- yeah.

25      A.      I know Yasi (ph) from Adorama to having

 1  the same investments in the same type of industry

 2  that I'm investing in.

 3       Q.    And is that, when you say "Yasi," what

 4  is his last name?

 5       A.    Mendlowitz.

 6       Q.    So that would be Joseph Mendlowitz?

 7       A.    Yeah.

 8       Q.    And you know him because you both have

 9  real estate interests?  Is that what you said?

10       A.    Yes.

11       Q.    Where is that?

12       A.    Different states.

13       Q.    In New York?

14       A.    No.

15       Q.    New Jersey?

16       A.    No, in give different states.  I

17  don't -- I don't -- I'm not involved, I just have

18  investments in those real estate.  I don't know any

19  details, and that's actually, you know, I'm here

20  to -- to, you want to know more about the glove

21  industry and I don't think we have so much more time

22  for that and, you know, I'm not here for being

23  investigated on my personal businesses, which I

24  don't like to talk about it.

25       Q.    Okay.  I was just asking a question.

1      A.      My personal investments that I have with

2  Joseph.

3      **Q.      So you have personal investments --**

4      A.      (Voices overlap) -- here to help Adorama

5  or with this case.

6              MR. SPERBER:  I'm sorry, it's getting

7  very garbled.  Could you repeat what you said?

8              THE COURT REPORTER:  Please.

9              THE WITNESS:  What's that?

10             MR. SPERBER:  Mr. Gombo, your connection

11  is a little bit garbled.  Could you repeat what you

12  said a few minutes ago?  I'm sorry, it --

13             THE WITNESS:  I, oh, I said those

14  investments have nothing to do with Adorama or with

15  Kitchen Winners or anything involves in this case.

16  It's a personal investment in real estate and I

17  don't like to discuss my real estate in this case.

18  BY MS. RIDDLE:

19     **Q.      Just before we move on, you have**

20  **personal investments with Mr. Mendlowitz in real**

21  **estate?**

22     A.      Correct.

23     **Q.      Correct?**

24     A.      I would not like to discuss, I do not

25  feel comfortable discussing my personal investments

1    in real estate and where they are, or --

2          Q.      I understand --

3                  (Voices overlap.)

4                  (Reporter interruption for clarification

5    of the record.)

6                  THE WITNESS:  I'm saying I would not, do

7    not want to discuss my personal investments in real

8    estate, simple as that.  That's not what I'm hear

9    for.

10   BY MS. RIDDLE:

11         Q.      So how do you know Mr. Weiner?

12         A.      Through traveling in China meeting him

13   overseas.

14         Q.      Where did you meet him?

15         A.      Several places in China for many, many

16   years.  Where I met him?  I used to meet him in

17   China.  Either when we went out to eat or when we

18   went to pray, that's where I used to meet him.

19         Q.      How long have you known him for?

20         A.      I believe since a little bit after I

21   went into business from -- for importing from

22   overseas.

23         Q.      So would that be when you created

24   CrystalWare?

25         A.      Correct.

1          Q.      How did you become involved with this

2    matter?

3          A.      Alex asked me if I can be a witness in

4    this case.

5          Q.      When did that occur?

6          A.      I don't -- I don't recall the date.

7    Probably like a month ago, maybe, maybe a little bit

8    more.

9          Q.      What did Alex ask you?

10         A.      If I can be a witness in this, in this

11   case.

12         Q.      About what?

13         A.      I don't remember if he asked me or --

14   or -- or, yeah, something like that.  Asked me if I

15   would have any knowledge on being a witness in this

16   case, saying my expertise in this case, whatever I

17   know in this industry.  And I agreed to that.

18         Q.      Are you receiving any payment?

19         A.      No.

20         Q.      I think I did get a check in the mail

21   for $40 maybe.  I think I -- I lost that check or

22   maybe it's somewhere.  Where?  I don't know where.

23   But that -- that's what I received, but no payment.

24                 MR. SPERBER:  Just for the record --

25   BY MS. RIDDLE:

1      Q.      And the check -- I'm sorry, what was

2    that?

3              MR. SPERBER:  For the record, that check

4    was not from me.  I assume that came with your

5    subpoena.

6              MS. RIDDLE:  Yes, the check came, to be

7    clear, my firm sent that check with the subpoena, as

8    the witness --

9              THE WITNESS:  I actually didn't want to

10   deposit that check because I was scared that it's

11   coming from Alex.

12     Q.      Nope, that is from your subpoena and

13   under federal rules you're allowed to be

14   compensated.

15     A.      Okay.

16     Q.      Have you spoken to Joseph Mendlowitz

17   about this case?

18     A.      No.

19     Q.      When is the last time you spoke with

20   him?

21     A.      I spoke with him?

22     Q.      Yeah.

23     A.      Probably like two weeks ago.

24     Q.      And I presume that is about the real

25   estate matter.  Or is it about this matter?

```
 1         A.     I spoke with him to thank him for coming
 2    to my son's wedding.
 3         Q.     Have you spoken to Mr. Weiner about this
 4    case?
 5         A.     No.
 6         Q.     When was the last time you spoke with
 7    Mr. Weiner?
 8         A.     I speak to him almost every day.  And
 9    I -- he knows that I'm a subpoena witness but not in
10    like I -- I know all.  All he asked me is that I
11    should say whatever I know about this case, but not
12    like nothing in, uh, detail.
13         Q.     When you say you speak with him every
14    day is it because you're friends or are you
15    business --
16         A.     Yes.
17                MR. SPERBER:  I'm sorry --
18                MS. RIDDLE:  Yes, he --
19                THE WITNESS:  By when I say "every day"
20    doesn't mean every day, but I mean to say I spoke to
21    him, I speak to him on a regular basis, we're
22    friends and, and, yeah.  There's nothing that I need
23    to discuss with anybody this -- at this case.  But
24    if you have any questions specifically about gloves
25    I'll be very happy to say what I know about the
```

```
 1   gloves.  Meanwhile, we didn't even get into it.

 2   We're almost -- (technical disruption.)

 3                (Witness not present.)

 4                MS. RIDDLE:  Perfect.

 5                I'm just going off-screen a minute until

 6   the witness comes back on.

 7                THE COURT REPORTER:  Off the record?

 8                MR. SPERBER:  Yep.

 9                MS. RIDDLE:  Yeah.

10                (Off the record.)

11                (Witness is present.)

12   BY MS. RIDDLE:

13        Q.    How many times have you spoken with Mr.

14   Sperber?

15        A.    What, about this case?

16        Q.    Yes.

17        A.    Maybe once.

18        Q.    Have you spoken to him about anything

19   else?

20        A.    No.

21        Q.    Do you know a Joel Stern?

22        A.    No.

23        Q.    Have you spoken with Mr. Stern's

24   counsel, Mr. Frisch?

25        A.    No.
```

```
 1        Q.      Do you know Rock Fintek?

 2        A.      No.

 3        Q.      Do you know Extension Health?

 4        A.      Are you talking about Medline?  I'm

 5   asking if you're talking about Medline.

 6        Q.      No.  I'm talking about the hospital

 7   Extension Health.

 8        A.      No.

 9        Q.      Did you review any documents in

10   preparation for this deposition?

11        A.      No.

12        Q.      Back to your connections with Mr. Weiner

13   and mister --

14        A.      Give me one second, I'm sorry, it's my

15   wife.

16        Q.      Okay.

17                MR. SPERBER:  Off the record.

18                (Off the record.)

19   BY MS. RIDDLE:

20        Q.      Back to your relationships with Mr.

21   Weiner and Mr. Mendlowitz.  I get to ask you

22   questions to determine if you have any biases.  Can

23   you please tell me your relationship with Mr.

24   Weiner?

25        A.      I have --
```

```
 1                    MR. SPERBER:  (Voices overlap.)

 2                    (Reporter interruption for clarification

 3      of the record.)

 4                    MR. SPERBER:  I said asked and answered.

 5                    THE WITNESS:  Alex, I didn't hear you.

 6                    MR. SPERBER:  You can answer the

 7      question.

 8                    THE WITNESS:  Okay.  I have some

 9      investments in the same real estate that he has.

10      BY MS. RIDDLE:

11          Q.    And can you please tell me where?

12          A.    I don't know details, offhand.

13          Q.    You don't know the details of the real

14      estate?

15          A.    I don't know the details offhand.  If

16      you want me to prepare an investigation about my

17      real estate industry, you'll have to give me time to

18      prepare, and I did not prepare myself for that.

19          Q.    What did you prepare yourself today for?

20          A.    To put away time that -- to talk about

21      the industry of the gloves during COVID.

22          Q.    I subpoenaed you and you are a fact

23      witness.  I get to ask you questions, and I would

24      like to know --

25          A.    Okay.
```

1       Q.      -- did your real estate --

2       A.      I'm not prepared for that.  I don't

3   know.  I don't have any details.

4       Q.      Do you know what state your real estate

5   is in with Mr. Weiner?

6       A.      I don't recall offhand.

7       Q.      Are you refusing to testify about them?

8       A.      No.  I just don't recall offhand.  I

9   answered very -- my honest answer, that I don't

10  recall offhand where the real estate is.

11      Q.      Is it in Philadelphia?

12      A.      Not that I know of.

13      Q.      Pennsylvania?

14      A.      What?

15      Q.      Is it in Pennsylvania?

16      A.      Not what I know of.

17      Q.      Do you have other financial connections

18  with Mr. Weiner?

19      A.      Besides real estate --

20      Q.      Correct.

21      A.      -- investments?

22      Q.      Correct.

23      A.      No.

24      Q.      Do you operate under a company with Mr.

25  Weiner?

 1        A.     The real estate has companies, has a

 2    company name.

 3        **Q.     Do you know that company name?**

 4        A.     Not really, I don't.  I never, like I'm

 5    not involved.  It's just for investments.  So it's

 6    just a name that I've -- I believe it's associated

 7    with a address of those -- addresses of those

 8    buildings.  I think so.  Not a hundred percent sure.

 9        **Q.     So you're an investor in a real estate**

10    **firm along with Mr. Weiner, is that correct?**

11               MR. SPERBER:  Objection to form.

12               THE WITNESS:  Not really a firm, but I

13    think it's in some real estate, some different

14    warehouses in different states.  I think that

15    each -- each property has a different name for real

16    estate purposes, which I'm not even sure why.  I

17    don't know details.  I'm not managing.  I'm just

18    investing.

19    BY MS. RIDDLE:

20        **Q.     How much have you invested in that?**

21        A.     I don't recall the numbers.

22        **Q.     Can you give me an estimate?**

23        A.     I don't recall.

24        **Q.     Like one million?**

25        A.     It's possible.

| | | |
|---|---|---|
| 1 | Q. | Over a million? |
| 2 | A. | Also possible. |
| 3 | Q. | Two million? |
| 4 | A. | Possible. |
| 5 | Q. | Five million? |
| 6 | A. | I don't think so. |
| 7 | Q. | So between one and five million? |
| 8 | A. | Probably. |
| 9 | | MR. SPERBER:  Objection to the form. |
| 10 | | THE WITNESS:  Maybe. |
| 11 | BY MS. RIDDLE: | |
| 12 | Q. | Do you have any financial connection to |
| 13 | Mr. Weiner? | |
| 14 | A. | No. |
| 15 | | (Exhibit 1 is noted and was subsequently |
| 16 | electronically marked for identification.) | |
| 17 | BY MS. RIDDLE: | |
| 18 | Q. | Okay, I'd like to enter the first |
| 19 | exhibit into the record.  If I do this properly it | |
| 20 | should show up on your screen.  One moment. | |
| 21 | | Do you see something called a Rule 26 |
| 22 | disclosure on your screen? | |
| 23 | | MR. SPERBER:  I don't see anything on my |
| 24 | screen. | |
| 25 | | MS. RIDDLE:  Okay. |

```
 1                    THE WITNESS:  Me neither.

 2                    MS. RIDDLE:  Anything?

 3                    MR. SPERBER:  Not there.

 4                    Yep.

 5                    MS. RIDDLE:  This is, I'm marking this

 6     Exhibit 1 for the record.  This is Adorama's Third

 7     Amended Rule 26 disclosure.

 8                    Can you see when I scroll?  No?

 9                    MR. SPERBER:  I see it on my end, but,

10     Mr. Gombo, can you see it?

11                    THE WITNESS:  I see a page.

12     BY MS. RIDDLE:

13          Q.    Can you see that I'm moving it right

14     now?

15          A.    Yes.

16          Q.    Do you see your name right here?

17          A.    Yes.

18          Q.    And is that your address?

19          A.    Yes.

20          Q.    Perfect.  This says, I'll read it into

21     the record, it says:

22                    "Mr. Gombo has knowledge of the

23          medical glove industry and the market

24          conditions during and after COVID-19 pandemic

25          including the subsequent drop in demand which
```

```
 1            is at issue in Rock Fintek's damages claim."
 2                 Is that correct?
 3      A.     Yes.
 4      Q.     Can you please tell us about your
 5  knowledge of the medical glove industry?
 6      A.     You have to ask me --
 7                 MR. SPERBER:  Objection.
 8                 THE WITNESS:  You have to ask me
 9  something specific so I can answer.
10  BY MS. RIDDLE:
11      Q.     Okay.  Why don't you -- okay.  Can you
12  tell us about the market conditions during the
13  COVID-19 pandemic?
14                 MR. SPERBER:  Objection to the form.
15                 THE WITNESS:  Alex, I couldn't hear you.
16                 MR. SPERBER:  I just said, for the
17  record, "Objection to the form."  But you're allowed
18  to answer the question.
19                 THE WITNESS:  Okay.
20  BY MS. RIDDLE:
21      Q.     Do you want me to repeat the question?
22                 THE WITNESS:  Alex, you just said that I
23  don't -- I don't need to.
24                 MR. SPERBER:  You -- you should answer
25  the question.
```

1          THE WITNESS:  Oh, okay.  Yes, please

2    repeat the question.

3    BY MS. RIDDLE:

4          Q.    Can you tell us about the market

5    conditions during the COVID-19 pandemic?

6          A.    All right.  So when the -- when the

7    COVID hit, started, you know, when I found out about

8    that there is a situation going on was that I had

9    one of my customers calling me up asking me --

10   asking me for some products such as masks and

11   gloves, one of my regular customers.  He told me

12   that he would buy anything that I have available.

13          I asked him what happened.

14          So he explained to me that there's going

15   to be a very big shortage in the market because

16   everyone's going to be needing those products.

17          From that day on I got multiple phone

18   calls from customers telling me the same thing.  I

19   think it was around March 2020.

20          At that time, you know, I was in touch

21   with the factories, my suppliers every day, even

22   before that.  But I'm saying when this started I

23   started, you know, talking to them in regards to

24   finding out if we will be able to get a product

25   regular supply, which I was told that it's not going

1   to be possible to get regular supply, there's going

2   to be a shortage of raw material, there's going to

3   be a shortage on workers, they're not going to have

4   enough workers to manufacture because they're going

5   to be on and off for day workers to be home, the

6   shipping companies, they're going to be working from

7   home or -- or they're not able to come in so,

8   therefore, there's not going to be enough product

9   shipping out.

10              Therefore, all the prices are going to

11  start going up because the supplies won't be huge

12  and the demand is going to be huge and the supply is

13  going to be very minimal.  And I think like right

14  away it started going up to like, if I remember

15  correct, like the first day or two after we found

16  out about the situation it started going up to from

17  $120 a case, a case has ten boxes of 100 gloves per

18  box, so that's a thousand gloves in a case.  So they

19  started selling around from 120 up to 150 dollars a

20  case, per case.

21              While the demand got higher the supply

22  got lower and we got deeper into the COVID

23  situation.  Prices kept on climbing up even from 180

24  to up to 250 dollars per case.  This was going on

25  for around almost a year, maybe a little bit over a

1   year, I think maybe until May of 2021.  That's when,

2   you know, all of a sudden factories started begging

3   me back for their business and prices started --

4   people stopped buying.  People were scared that

5   they're going to be stuck with product that they

6   paid too much and then I won't be able to sell it.

7              Also, one more thing.  During COVID a

8   lot of companies were losing -- were making, you

9   know, investments into the glove industry, you know,

10  in order for them to be able to secure product and

11  they found out that they lost their money.  They

12  were, you know, sending money overseas.  There were

13  a lot of either fake companies or companies claiming

14  that they're a certain company, which they were not.

15             There was also a lot of like homemade

16  manufacturers.  I'm not sure how to call them, like

17  pirate manufacturers, that they made their gloves,

18  they took their -- the seconds or their third glove,

19  it's called by the manufacturers "second," like all

20  the gloves that they would be throwing out in the

21  garbage or recycling, they used to put them into a

22  box and sell them as like regular gloves.

23             I know there was a lot of issues going

24  on with COVID and it was very, very difficult for

25  regular companies to be able to -- to buy regular

1  gloves while they're in COVID, was getting very

2  difficult to get gloves, people weren't, and weren't

3  doing the same type of verifications or -- or same

4  type of stringent fees, fees that they would want to

5  have on a regular business day.

6           They would buy gloves from whomever they

7  were trusting that they can bring them gloves, a

8  normal quality gloves which -- which on a regular

9  day they would say they wouldn't buy that, that

10  exact brand or that exact quality, or they wouldn't,

11  you know, become a customer of certain companies on

12  a regular before COVID just because they have their

13  own -- own steps on how they approve a supplier.

14  But all that went away during COVID just because

15  people just wanted to get product in the door so

16  hospitals or doctor's offices or whether it needs

17  gloves can use them.  That's what I know about the

18  industry during COVID.  And if you have any other

19  specific questions in regard to, if I know, I'll be

20  happy to answer.

21     **Q.     Thank you.  Who is your supplier?  You**

22  **said "supplier" during that.**

23     A.     Yeah, we had a couple suppliers but our

24  main suppliers were Top Glove and -- (audio

25  distortion.)

```
 1                  (Reporter interruption for clarification

 2    of the record.)

 3    BY MS. RIDDLE:

 4                  THE WITNESS:  Top Glove is T-O-P, Glove

 5    is G-L-O-V-E.

 6                  (Whereupon, discussion was held off the

 7    record.)

 8                  THE WITNESS:  I-N-T-C-O.

 9    BY MS. RIDDLE:

10         Q.    Do you know anything about the Medcare

11    supplier?

12         A.    I don't know --

13         Q.    Medcare --

14         A.    I don't know them personally, but I have

15    heard from them during COVID, and also actually

16    during COVID Hershey was showing me the Medcare

17    gloves, he wanted to hear from me my opinion about

18    the -- the Medcare gloves.  So that's how I'm

19    familiar with the Medcare glove.

20         Q.    What was your opinion about the gloves

21    he was showing you during COVID?

22         A.    My opinion was that it's a okay glove.

23    It's meaning from what was out there in the industry

24    was -- was very comparable, I would say even very

25    good.  I wouldn't say that it's the same exact
```

```
 1   quality that was before COVID, but it was, even
 2   before COVID it would have passed, this glove,
 3   meaning it was normal quality, normal nitrile
 4   gloves.  But if you -- but I understood during COVID
 5   a lot of people were buying the Medcare gloves and
 6   it was -- they had some reliable, some better
 7   reliable ways how to deal with the situation during
 8   COVID that they were able to ship a lot of product
 9   to certain people.  That's what I know about
10   Medcare.
11        Q.    You said they had reliable ways to deal
12   with the situation.  What do you mean by that?
13        A.    Meaning that most factories overseas
14   during COVID, they were very extremely not reliable
15   with the shipping situation.  They were telling you
16   that they're going to ship it and you -- we expect
17   it to ship and you pay money already and you told
18   your customers already when they're going to be
19   getting their product, but at the end it never
20   happened, and they -- it kept on getting pushed off.
21             And I think Medcare, of what I heard as
22   an industry, I've never dealt with them directly,
23   but I understood in the industry that Medcare was
24   pretty reliable, their shipping dates.  So a lot of
25   larger companies were -- were trying to get Medcare
```

 1   products because they knew if they had a reliable

 2   supplier for a Medcare product they felt that --

 3   more secure that they're going to get the product on

 4   time than any other gloves.

 5       **Q.    I believe you said earlier that Mr.**

 6   **Weiner would show you these gloves.  How did he show**

 7   **you them?**

 8       A.    He used to send them to my house and I

 9   used to check them.

10       **Q.    He would send physical gloves to your**

11   **house?**

12       A.    Yes.

13       **Q.    How did you communicate about the gloves**

14   **with him during that time?**

15       A.    How I spoke with him?

16       **Q.    Yes.**

17       A.    My -- my cell phone.

18       **Q.    So would you call?**

19       A.    He would call me, I would call him.

20       **Q.    Would you text?**

21       A.    Could be a text, I am not sure.

22       **Q.    Did you email?**

23       A.    I don't think so.  Probably the best way

24   for me to communicate is usually either by phone

25   or -- or by text.  But I believe, I speak with

1   Hershey a lot, so I believe it was on the phone.

2        Q.     I'd like to call, if there are any

3   relevant texts between you and Mr. Weiner, I'd like

4   to call for the production of those.

5             MR. SPERBER:  Send requests to me.  Any

6   requests should be sent to me and they'll be taken

7   under advisement.

8   BY MS. RIDDLE:

9        Q.     Okay, thank you.

10            When he would send physical boxes over,

11  or in general, was it your understanding that he was

12  buying a certain type of glove?

13       A.     I didn't understand the question.

14       Q.     Was Mr. Weiner trying to buy a

15  particular type of glove?  Does that make it any

16  more --

17       A.     I wasn't involved in what he was trying

18  to buy.  I know that he used to show me, he used to

19  ask me sometimes he used to ask me if those nitrile,

20  like, whichever nitrile he had he used to ask me in

21  my opinion if it's good quality or not.

22       Q.     Do you have an understanding about the

23  difference of an examination glove versus a

24  protection glove?

25       A.     What I believe is that there would be

 1  more pinholes in a -- when tested in the lab, a

 2  regular glove, not examination gloves would -- would

 3  not be able to test, to pass a test when filling up

 4  with water in a certain way in the lab.  It would

 5  have more pinholes, meaning when you stretch those

 6  gloves by filling it up with water, it would have

 7  more pinholes than an exam glove.

 8       Q.     Was Mr. Weiner asking you to look at

 9  examination gloves?

10       A.     Yes.

11       Q.     Could you tell if they were examination

12  gloves?

13       A.     Again?

14       Q.     Could you tell if they were examination

15  gloves that you were looking at?

16       A.     If I can tell?

17       Q.     Yeah.

18       A.     You can only test it in the lab.

19       Q.     So when he asked you to approve of

20  them --

21       A.     You can tell.  You can just tell if it's

22  good quality or not, or if it's garbage quality.

23       Q.     How?

24       A.     By putting it on.

25       Q.     The gloves he was sending you you would

```
 1   put on?
 2        A.    Correct.
 3        Q.    So what did you -- what generally would
 4   happen when --
 5        A.    I would see if it's a strong glove or
 6   not.
 7        Q.    How many times did he send you gloves?
 8        A.    Probably twice or three times.
 9   Probably.
10        Q.    Do you remember when?
11        A.    I didn't write it down.  I don't
12   remember when.  I don't remember those days.  Sorry.
13        Q.    Was it in like the spring of 2021?
14        A.    I didn't write down those dates when he
15   sent it to me.
16        Q.    Best estimate?
17        A.    I can't answer you.
18        Q.    Sir, I believe you gave me a bit of a
19   time line earlier when you said the price started to
20   go up.  Are you saying that that occurred in March
21   of 2020?
22        A.    Correct.
23        Q.    And when did the price start to go down?
24        A.    Around, I believe it would be around May
25   2021.
```

1       Q.      Okay.  What is the normal price of

2  gloves before COVID?

3       A.      Around $30 per case, per case of ten

4  boxes in a case.  Each box has 100 gloves.  These

5  are the prices --

6       Q.      Do you --

7       A.      -- I would sell them at.

8       Q.      What would you say was the highest the

9  gloves went up to, in your opinion, during COVID?

10      A.      I believe approximately $250.

11      Q.      I think earlier you said that a lot of

12  fake companies popped up during COVID?

13      A.      Yes.

14      Q.      Can you explain that a little further?

15      A.      People were just saying that they have,

16  people in China would have -- would communicate with

17  people overseas in America or different countries

18  and just tell them that they have a factory, and

19  they never had a factory.  But people were very,

20  very extremely desperate for gloves, and, you know,

21  and they lost a lot of money from having

22  transactions going on between them.

23      Q.      Can you give me an example of one of

24  those names, if you know it?

25      A.      I don't know any of those names.  I just

 1   heard in the industry.

 2        Q.    So you also mentioned a -- pirate

 3   manufacturers, you called them.  Can you give me an

 4   example --

 5        A.    For explaining, for explaining purposes

 6   I said that name.  But I explained explicitly what I

 7   meant.  Do you need a duplicate explanation?

 8        Q.    Yes.

 9        A.    Okay.  So people either took seconds

10   from the factories, gloves that usually would be

11   either recycled or put into the garbage, and they

12   would stuff it into a box and ship it out to people

13   over here.

14        Q.    Did they?

15        A.    And show them -- what?

16        Q.    I'm sorry, you can continue.

17        A.    And showed them pictures or proved that

18   they're shipping out a container of gloves.

19   Meanwhile, those people would have gotten those

20   containers opened up, those boxes, and realized they

21   got gloves that they can't use.

22        Q.    Do you know what company name --

23        A.    No.

24        Q.    -- they were using?

25        A.    I answered already that I don't know.

1      Q.      Do you know of any companies that popped
2   up during COVID?
3      A.      I answered that already for the third
4   time that I do not know.
5      Q.      Back to the Rule 26 disclosure, do you
6   still see that on your screen --
7      A.      Yeah.
8      Q.      -- or did that go away?  Great.
9              Do you know anything about Rock Fintek's
10  damages claims?
11     A.      Don't know any details.
12     Q.      Do you know anything about Levmed?
13     A.      Who?
14     Q.      L-E-V-M-E-D?
15     A.      I'm not familiar with that brand.
16             MS. RIDDLE:  If we can just take a
17  quick, five-minute break, I just want to look over
18  my notes --
19             MR. SPERBER:  Sure.
20             MS. RIDDLE:  -- and collect myself
21  before we clean this up.
22             MR. SPERBER:  Off the record.
23             (Off the record.)
24  BY MS. RIDDLE:
25     Q.      So I believe we covered the rise and

```
 1   fall of demand.  Have you told me everything

 2   about --

 3        Q.     -- the rises and --

 4        A.     (Guttural sound.)

 5        Q.     -- the rises and...

 6               MR. SPERBER:  Uh.

 7               MS. RIDDLE:  What?

 8               MR. SPERBER:  Just objection.

 9               MS. RIDDLE:  I'm not done.

10               MR. SPERBER:  Restating everything that

11   was covered, but, objection.

12   BY MS. RIDDLE:

13        Q.     Okay.  Have you told me everything about

14   the subsequent drop in demand after COVID-19?

15        A.     If I told you everything, I can't tell

16   you --

17        Q.     Yes.

18        A.     I told you everything.  If you have any

19   questions you can ask me and I can tell you if -- if

20   I know anything more.

21        Q.     Okay.

22        A.     But I can't tell you if I told you

23   everything.

24        Q.     Do you know anything about the

25   transactions at issue in this lawsuit?
```

1      A.      No.

2      Q.      Okay.  So you have no understanding of

3   what type of gloves the parties were trying to

4   purchase?

5      A.      I know that they were purchasing the

6   Medcare gloves.

7      Q.      And how do you know that?

8      A.      Because Hershey told me.

9      Q.      Did he tell you anything else?

10     A.      He told me that after -- that after the

11   demand dropped Medline did not want any more of

12   those gloves.  They wanted to send it back.

13     Q.      Do you work with Medline?

14     A.      No.

15     Q.      Do you know anything about Medline?

16     A.      Yes.

17     Q.      Can you tell me --

18     A.      I know Medline has a large medical

19   supplier in the industry.  I know Medline.  I did,

20   you know, I was on the phone with a couple people in

21   Medline a few times.  But I don't remember if we

22   sold them directly product.

23     Q.      So you don't sell to Medline?

24     A.      I don't think so.  Could be -- could be

25   there is some product of ours by Medline, but I

1    don't believe that it's directly from us.

2         Q.    Do you purchase from Medline?

3         A.    No.

4         Q.    Okay.  So you would be selling to them?

5         A.    I didn't say that we would be selling.

6    I said it could be they have our product, but I

7    don't believe that they have it directly from our

8    company.  Probably if they have our product they

9    would have it through middleman.

10              (Reporter interruption for clarification

11   of the record.)

12              MS. RIDDLE:  I think he said

13   "middleman".

14   BY MS. RIDDLE:

15        Q.    So back to when you said Mr. Weiner

16   would send you gloves and you would put them on to

17   test the quality, I believe you said that they were

18   an okay glove and that it wasn't the same quality as

19   before COVID.  Can you explain that a little bit

20   more?

21        A.    Before COVID the gloves, those

22   manufacturers that larger companies were dealing

23   with, their gloves were perfect, meaning you

24   wouldn't be able to see any discoloration or you

25   wouldn't be able to see any almost creases in the

1  gloves.  It was packed perfectly.  It was very

2  nicely presented.

3              But during COVID, even Top Glove's

4  product was not exactly the same as before COVID

5  because, I believe that the reasons are because they

6  had a shortage of workers, a shortage of workers

7  packing them, or maybe even by the quality control,

8  no glove that they would usually take off the line,

9  they did not want to waste those gloves if it passed

10  the quality, meaning there's something called in the

11  industry, I don't remember the professional name for

12  it, but on the top of the glove, we put on the

13  gloves, at the top by the rim would be a little bit

14  like creased, like you would see the other side of

15  it, the inside side of it, let's say, of the gloves.

16  They would still pack those in because, you know,

17  the quality is -- is okay.  It has nothing to do

18  with the -- doesn't affect the product itself.  It's

19  just I will call it, um, you know, it just doesn't

20  look, you know, it just doesn't look as nice as you

21  want it to be, but the quality was okay.  No, I had

22  no complaints about the quality itself.

23      Q.    And when you say "no complaints," are

24  you talking about the Medcare glove?

25      A.    It's either the Medcare or even the

1    regular brands.  They weren't exactly the same as

2    before COVID, but it was good quality, passable

3    quality.  You know, people weren't that picky during

4    COVID on those type of issues.

5             I can just add that in my knowledge what

6    I have heard in the industry that people even got,

7    you know, empty boxes, the first few rows on the

8    container were -- you open those boxes, you saw

9    gloves, but then after a few rows back in the

10   container they were either empty or they filled it

11   up with, like, literature, like just plastic or just

12   garbage in those -- in those boxes.

13            So people went through nightmares during

14   COVID.  And wherever it did get decent quality

15   gloves was usually very excited to get them, knowing

16   that they paid for gloves and they got gloves and

17   they got the gloves that can be used in hospitals or

18   nursing homes or whichever medical facilities it can

19   be used in.

20      **Q.    What qualifications would you say you**

21   **would have to test the quality of these gloves?**

22      A.    Just my experience.

23      **Q.    And your experience being working in the**

24   **industry?**

25      A.    Correct.

1      Q.      And you said earlier when you founded

2   CrystalWare, that was about 19 years; is that

3   correct?

4      A.      19 or 20 years ago, correct.

5      Q.      And you've been working with gloves that

6   entire time?

7      A.      Correct.

8      Q.      Do you know what ASTM D6319 is?

9      A.      I know it's some type of certification

10   that it needs to pass.

11      Q.      What is that?

12      A.      I don't recall offhand.

13      Q.      Do you know if a F.D.A. 510(k) certified

14   glove has to meet an ASTM standard?

15      A.      I believe so.  But I wouldn't be the --

16   I wouldn't be the right person to ask anything about

17   certifications.

18      Q.      Why is that?

19      A.      Because I -- I'm just not familiar with

20   it.  I know, you know, we did research, you know,

21   when we -- when we started with the factory, but I

22   wasn't involved with certification situation

23   while -- while I was doing it.

24      Q.      Okay.  So does a medical-exam-grade

25   glove that is 510(k) have to meet an ASTM standard?

1      A.     I believe so.

2      **Q.     Okay.**

3      A.     But I'm not -- you know, I'm not the

4  right person to ask.  Probably, I believe you can

5  call up the F.D.A., they would answer you right

6  away.

7      **Q.     Does a protection glove have to have**

8  **ASTM --**

9      A.     I don't recall.  I'm not very good on

10 technical certification.  I'm not -- I'm not a

11 professional in that.

12     **Q.     Is there -- is there anything I've not**

13 **covered today that you intend to speak about.**

14            MR. SPERBER:  Objection.

15            (Voices overlap.)

16            THE WITNESS:  You're asking I should

17 answer you if there's anything more you have to ask

18 me?

19 BY MS. RIDDLE:

20     **Q.     No.  I'm asking you if -- you're being**

21 **presented as a fact witness.  Is there anything I've**

22 **missed that you intend to speak about?**

23            MR. SPERBER:  Objection.

24            THE WITNESS:  (Voices overlap.)

25            (Reporter interruption for clarification

 1   of the record.)

 2            THE WITNESS:  I would not be able to

 3   answer that question.

 4   BY MS. RIDDLE:

 5       Q.    I'm just looking through my outline to

 6   see if I have anything else.

 7            Have you ever purchased from Medcare?

 8       A.    No.

 9       Q.    And you do not know what gloves the

10   parties were contracted to buy and sell in this

11   lawsuit, do you?

12       A.    Again?

13       Q.    Do you know the type of gloves that the

14   parties were contracted to purchase from one another

15   in this lawsuit?

16       A.    I have no involvement with that, no

17   idea, no involvement.

18       Q.    And you have no idea what type of

19   certification an ASTM D3619, what the qualifications

20   are for that?

21       A.    Not offhand.

22            MS. RIDDLE:  Okay.  I believe I'm all

23   set, but I'd just like to take another quick break.

24            THE WITNESS:  I need --

25            MS. RIDDLE:  Sorry, what?

1                    THE WITNESS:  I can't -- I can't

2       continue anymore.  My time is up.  I, really, what

3       we discussed is one hour.  It's already one hour --

4                    MS. RIDDLE:  We didn't discuss one hour,

5       for the record, however.

6                    THE WITNESS:  I, specifically, text, I

7       texted I will have one hour.  I think I was texting

8       with you.  Is that true?

9                    MS. RIDDLE:  That is true.

10                    THE WITNESS:  So check back your text.

11      You'll see that I did text you, clearly, one hour.

12      Right now is one hour, 45 minutes.  So if you have

13      any other questions, then I would rather if you can

14      ask it right now so I don't have to come back.

15                    MS. RIDDLE:  Alex, do you have any

16      questions?

17      BY MR. SPERBER:

18          Q.    I just have a couple very quick

19      questions, Mr. Gombo.

20                    Yeah, Mr. Gombo, am I correct you've

21      been involved in the glove industry for more than 20

22      years?

23          A.    Around 20 years.

24          Q.    Okay.  And you answered a bunch of

25      questions today about the glove industry, but is it

 1    possible that if you were asked more specific

 2    questions you would have additional information to

 3    share?

 4        A.    Yes.

 5        Q.    And same thing, if I were to ask you

 6    more specific questions about market conditions in

 7    the glove industry during the COVID-19 pandemic or

 8    afterwards, would you perhaps have additional

 9    information to share?

10        A.    Yes.

11              MR. SPERBER:  Those are all the

12    questions I have.  Thank you.

13    BY MS. RIDDLE:

14        Q.    Before we go, I just have some follow-up

15    questions.

16              Can you let me know what other specific

17    things you would testify about?

18        A.    If you're going to ask me specific

19    questions, then I can answer.  So I was in the

20    industry for around 20 years.  I was dealing with

21    gloves on a daily basis, besides not-working days or

22    when maybe I -- when I was on vacation.  So I

23    believe I'm qualified enough to understand what a

24    medical glove means.  I can -- I can look at it, I

25    can feel it, I can smell it, I -- I slept with

1  gloves in my brain every single day.  So I -- I

2  understand this industry.  So if you have any

3  specific questions, very specific questions, if you

4  want to know about gloves, I believe I'm qualified

5  enough to answer those questions.

6       **Q.    When you say that you would test the**

7  **glove, feel it, smell it, can you go through that**

8  **process for me?**

9       A.    Just by looking at a glove, putting it

10  on, stretching it, feeling it, seeing the thickness,

11  seeing how the glove is built from the bottom to the

12  top, where the thickness are, where the colors are

13  going to be off-colored, I can know if it's good, a

14  good quality glove or not good quality glove.

15      **Q.    What makes a glove a good quality versus**

16  **a bad quality?**

17      A.    A good quality glove is not going to rip

18  when putting it on.  It's not going to get

19  discolored when putting it on.  It's not going to

20  have a smell of plastic.  It's not going to have a

21  smell of some types of oils or different types of

22  smells that it can have, that gloves can have.

23            When you stretch it a little bit, it's

24  not going to look -- become see-through.  The tips

25  are going to be stronger than the top -- the top

1   part of the glove because that's where you're

2   touching and that's where it's going to be thin, but

3   strong, because they want you to be able to feel

4   whatever you want to feel with, you know, when

5   you're doing a procedure, or whatever, you need to

6   feel with the fingers.  So that's my experience that

7   I know how to check a glove.

8       **Q.    Did you view all of the above with the**

9   **gloves that Mr. Weiner sent to you during COVID?**

10      A.    Exactly.

11      **Q.    And do you recall what your opinion on**

12  **all of those were of these gloves?**

13      A.    My opinion -- my opinion was that it's a

14  good quality glove, sellable in the industry as an

15  exam gloves, if it has the right certifications,

16  which I'm not involved in, but the quality itself

17  was a good, passable nitrile glove.

18      **Q.    Can you explain "nitrile glove"?**

19      A.    Again?

20      **Q.    When you say "nitrile glove," what does**

21  **that mean?**

22      A.    Nitrile glove is a certain material that

23  they put into the gloves.  I think if I recall

24  correctly they put in a percentage, certain

25  percentage of nitrile in the material, so that makes

1   it a nitrile glove.  The nitrile glove --

2        **Q.     What qualification --**

3        A.     The nitrile glove --

4               (Voices overlap.)

5               THE WITNESS:  The idea of nitrile glove

6   is that it should be, the feel should be the same as

7   latex glove.  A lot of people are allergic to latex,

8   to rubber.  So, therefore, they came up with the

9   idea of the technology, of the mix of the chemical

10  of being able to make something that is like latex

11  gloves, but it's not latex gloves.  The idea is it's

12  a thin glove, but it's a strong, stretchable glove.

13  BY MS. RIDDLE:

14       **Q.     And how do you know that?**

15       A.     How do I?

16       **Q.     Yes, how do you -- do you have any**

17  **qualifications in glove making or is that just from**

18  **experience in the industry?**

19       A.     Exactly like what I said.  I was in this

20  business for around 20 years and that's my

21  experience.  I used to go around to factories.  I

22  used to check them.  I used to understand, you know,

23  exactly how a good glove should look like and feel

24  like and smell like and I have enough good glove

25  should, you know, not be, so.

1      Q.      And what is a not good glove like?

2      A.      All the above that's said.  If it is

3  not, then it's not a good glove.

4      Q.      Meaning, if it is not, I think you said

5  thickness --

6      A.      Correct.

7      Q.      -- is a very important factor?  Stretch?

8      A.      Correct.

9      Q.      Color?

10      A.      Correct.

11      Q.      And was there anything else?

12      A.      There's --

13      Q.      You said smell?

14      A.      They can be, you know, the way you

15  stretch it where you're going to see where it's

16  going to rip first, how it -- how it's going to rip,

17  how it's going to tear.  Sometimes it can tear just

18  from the top, you know, just the top of the glove,

19  sometimes once starts tearing the whole glove -- the

20  whole glove falls apart.  So that's how you're able

21  to see if it's a good quality or not a good quality.

22  And as stated earlier, Medcare passed that it was a

23  good quality glove.

24      Q.      Do you have any certifications to check

25  the quality of gloves, or is this just from your

1  experience in the field?

2      A.     As I answered for the fifth time that I

3  have experience for around 20 years in this

4  industry.

5      **Q.     Okay.**

6      A.     Okay, I really need to go.  It was a

7  pleasure.  It was a pleasure speaking with you, to

8  all of you, and it is -- if there's anything else

9  that you would want to continue a different time, so

10  you can let, I guess, whoever needs to know, so.

11           MS. RIDDLE:  Okay, we'll reserve the

12  right for any additional questions.

13           (Whereupon, discussion was held off the

14  record.)

15           THE COURT REPORTER:  Mr. Sperber, for

16  record, are you ordering a copy of the transcript?

17           MR. SPERBER:  I'm not sure.  I'll get

18  back to you.

19           THE COURT REPORTER:  Okay.

20           MR. SPERBER:  Can you email me asking if

21  I want one and I'll respond?

22           THE COURT REPORTER:  Yes.

23           MR. SPERBER:  Thank you.

24           THE COURT REPORTER:  And are we waiving

25  reading and signing?

```
 1              MR. SPERBER:  No.

 2              (Witness excused.)

 3                   - - -

 4              (Whereupon, the deposition concluded at

 5     approximately 1:54 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T E

 2

 3              I, Catherine McLaughlin, a Certified

 4     Court Reporter of the State of New Jersey, do hereby

 5     certify that prior to the commencement of the

 6     examination, the witness appeared before Bob

 7     Calvert, New York Notary Public, to be duly sworn.

 8              I DO FURTHER CERTIFY that the

 9     preceding is a true and accurate computer-aided

10     transcript of the proceedings as taken to the best

11     of my ability stenographically by and before me

12     remotely at the time and date hereinbefore set

13     forth.

14              I DO FURTHER CERTIFY that I am

15     neither a relative nor employee, nor attorney or

16     counsel to any parties involved; that I am neither

17     related to nor employed by any such attorney or

18     counsel; and that I am not interested in the event

19     nor outcome of this action.

20

21     _____

       CATHERINE McLAUGHLIN, Certified Court Reporter
22     of the State of New Jersey
       NJ C.C.R. License No. 30XI00186100
23     NO. 407200 026606

24

25
```

```
 1               SIGNATURE PAGE OF TZALI GOMBO

 2    Page   Line            Should be Changed to Read

 3    _____  _____  _____

 4    _____  _____  _____

 5    _____  _____  _____

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14         I, TZALI GOMBO, hereby certify that I have

15    read the transcript of my testimony taken under oath

16    and that the transcript is a true and complete

17    record of my testimony, and that the answers on the

18    record as given by me are true and correct.

19

20    _____

21                            TZALI GOMBO

22    Sworn to before me

23    This_____ day of _____, 2023

24         _____

25            Notary Public
```

**Exhibits**

**GomboT-1**
  3:10  30:15
  31:6

**$**

**$120**  34:17

**$250**  43:10

**$30**  43:3

**$40**  22:21

**0**

**08701**  5:3

**1**

**1**  30:15
  31:6

**100**  15:13
  34:17 43:4

**120**  34:19

**150**  34:19

**180**  34:23

**19**  10:23
  51:2,4

**1:54**  61:5

**2**

**20**  10:23
  13:8,10
  51:4

54:21,23
55:20
58:20 60:3

**2020**  33:19
  42:21

**2021**  35:1
  42:13,25

**22**  9:14

**250**  34:24

**26**  30:21
  31:7 45:5

**3**

**30**  13:24,25

**37**  5:4

**4**

**45**  54:12

**5**

**510(k)**  14:17
  15:5,9,14
  51:13,25

**9**

**9**  5:2

**A**

**ability**  6:24

**Account**  7:12

**accurately**
  7:2

**action**  7:23

**actively**
  11:2

**add**  50:5

**added**  12:7

**additional**
  55:2,8
  60:12

**address**  5:2
  29:7 31:18

**addresses**
  29:7

**Adorama**
  18:10,19,
  22,25
  20:4,14

**Adorama's**
  31:6

**advisement**
  40:7

**affect**  6:24
  49:18

**affirmed**  5:5

**afternoon**
  5:12

**agreed**  22:17

**alcohol**  6:24

**Alex**  22:3,9
  23:11 27:5
  32:15,22

54:15

**allergic**
  58:7

**allowed**
  23:13
  32:17

**Amended**  31:7

**America**
  11:11
  43:17

**answering**
  6:9

**answers**  6:10

**anymore**  54:2

**approve**
  36:13
  41:19

**approved**
  14:18

**approximately**
  43:10 61:5

**aspect**  11:3

**assume**  6:15
  13:4 23:4

**ASTM**  51:8,
  14,25 52:8
  53:19

**audio**  14:11
  15:5 36:24

**B**

**back**  11:14

**KITCHEN WINNERS NY INC, ET AL. V. ROCK FINTEK LLC., ET AL.**

25:6
26:12,20
35:3 45:5
47:12
48:15 50:9
54:10,14
60:18

**background**
9:1

**bad** 56:16

**base** 13:7

**basically**
9:20

**basis** 11:8
24:21
55:21

**begging** 35:2

**Bezalel** 8:1

**biases** 26:22

**big** 33:15

**bit** 9:1
10:25 14:3
20:11
21:20 22:7
34:25
42:18
48:19
49:13
56:23

**bottling**
9:19

**bottom** 56:11

**box** 34:18

35:22 43:4
44:12

**boxes** 34:17
40:10 43:4
44:20
50:7,8,12

**brain** 56:1

**brand** 12:6,
7,18 36:10
45:15

**brands** 12:1
50:1

**break** 45:17
53:23

**breaks** 6:16

**briefly** 8:3

**bring** 36:7

**buildings**
29:8

**built** 56:11

**bunch** 54:24

**business**
21:21
24:15 35:3
36:5 58:20

**businesses**
19:23

**busy** 11:12

**buy** 16:13,
24 33:12
35:25
36:6,9
40:14,18

53:10

**buying** 35:4
38:5 40:12

_____

_____

C

**call** 8:19
16:18
35:16
39:18,19
40:2,4
49:19 52:5

**called** 7:8
9:10 12:7
14:16
30:21
35:19 44:3
49:10

**calling** 33:9

**calls** 33:18

**Calvert** 5:7

**case** 5:18,
19,21,23
8:8,13,15,
16 17:13
20:5,15,17
22:4,11,16
23:17
24:4,11,23
25:15
34:17,18,
20,24
43:3,4

**cell** 39:17

**certification**

15:9,15
51:9,22
52:10
53:19

**certifications**
14:4,5,9
51:17
57:15
59:24

**certified**
51:13

**chance** 15:15

**check** 22:20,
21 23:1,3,
6,7,10
39:9 54:10
57:7 58:22
59:24

**chemical**
58:9

**China** 12:21
21:12,15,
17 43:16

**choose** 18:2

**claim** 32:1

**claiming**
35:13

**claims** 45:10

**clarification**
13:20
14:13 15:6
21:4 27:2
37:1 48:10
52:25

KITCHEN WINNERS NY INC, ET AL. V. ROCK FINTEK LLC., ET AL.
Tzali Gombo on 11/02/2023                    Index: clean..customer

clean   45:21

cleaning
   15:1

clear   6:3,
   10,11
   17:15 18:5
   23:7

climbing
   34:23

collect
   45:20

collection
   7:23

Color   59:9

colors   56:12

comfortable
   20:25

commercial
   10:12

communicate
   39:13,24
   43:16

companies
   16:3,13,
   14,23,24
   29:1 34:6
   35:8,13,25
   36:11
   38:25
   43:12 45:1
   48:22

company   9:6,
   10,15,22
   10:2,5,6,

10 11:2
12:6 13:2,
11,17
14:21
15:11
16:25
17:1,5
28:24
29:2,3
35:14
44:22 48:8

comparable
   37:24

compensated
   23:14

complaints
   49:22,23

concluded
   61:4

conditions
   31:24
   32:12 33:5
   55:6

connection
   20:10
   30:12

connections
   26:12
   28:17

container
   44:18
   50:8,10

containers
   44:20

continue
   44:16 54:2
   60:9

contracted
   53:10,14

control   49:7

copy   60:16

correct   9:17
   10:8 12:10
   20:22,23
   21:25
   28:20,22
   29:10 32:2
   34:15
   42:2,22
   50:25
   51:3,4,7
   54:20
   59:6,8,10

correctly
   57:24

counsel
   25:24

countries
   43:17

couple
   11:11,21
   12:6 36:23
   47:20
   54:18

court   6:5,10
   20:8 25:7
   60:15,19,
   22,24

covered
   45:25
   46:11
   52:13

COVID   27:21
   33:7 34:22
   35:7,24
   36:1,12,
   14,18
   37:15,16,
   21 38:1,2,
   4,8,14
   43:2,9,12
   45:2
   48:19,21
   49:3,4
   50:2,4,14
   57:9

COVID-19
   31:24
   32:13 33:5
   46:14 55:7

creased
   49:14

creases
   48:25

created
   21:23

cross   18:14

Crystalware
   9:10 10:7,
   22 13:1
   21:24 51:2

customer
   36:11

KITCHEN WINNERS NY INC, ET AL. V. ROCK FINTEK LLC., ET AL.
Tzali Gombo on 11/02/2023                    Index: customers..eat

customers
  11:7 33:9,
  11,18
  38:18

_____

         D
_____

D3619   53:19

D6319   51:8

daily   55:21

damages   32:1
  45:10

date   22:6

dates   38:24
  42:14

day   8:16
  24:8,14,
  19,20
  33:17,21
  34:5,15
  36:5,9
  56:1

day-to-day
  11:8

days   42:12
  55:21

deal   12:15
  38:7,11

dealing   8:15
  11:7 48:22
  55:20

dealt   38:22

debt   7:23

decent   50:14

decide   11:14

decided
  11:15

deeper   34:22

defendant
  7:5

demand   31:25
  34:12,21
  46:1,14
  47:11

dental   15:2

deposed   5:14

deposing
  18:6

deposit
  23:10

deposition
  8:20 17:16
  26:10 61:4

desperate
  43:20

detail   24:12

details
  10:20
  19:19
  27:12,13,
  15 28:3
  29:17
  45:11

determine
  26:22

difference
  40:23

difficult
  35:24 36:2

directly
  11:7 38:22
  47:22
  48:1,7

disclose
  17:25

disclosed
  17:17

disclosure
  30:22 31:7
  45:5

discoloration
  48:24

discolored
  56:19

discuss   5:25
  7:16 8:10
  20:17,24
  21:7 24:23
  54:4

discussed
  54:3

discussing
  20:25

discussion
  18:3 37:6
  60:13

disposable
  10:11,15

disruption
  14:12 15:5
  25:2

distortion
  36:25

doctor's
  36:16

documents
  8:23 26:9

dollars
  34:19,24

door   36:15

drinks   9:20

Drive   5:3,4

drop   31:25
  46:14

dropped
  47:11

drugs   6:23

duly   5:5

duplicate
  44:7

Dynamic   9:6,
  11

_____

         E
_____

earlier   7:25
  39:5 42:19
  43:11 51:1
  59:22

eat   21:17

education
  9:2

electronically
  30:16

email   15:20
  39:22
  60:20

employ   15:12

empty   50:7,
  10

end   31:9
  38:19

enter   30:18

entire   51:6

equipment
  13:6

estate   18:20
  19:9,18
  20:16,17,
  21 21:1,8
  23:25
  27:9,14,17
  28:1,4,10,
  19 29:1,9,
  13,16

estimate
  29:22
  42:16

everyone's
  33:16

exact   36:10
  37:25

exam   14:16,

19,21 41:7
  57:15

examination
  5:9 40:23
  41:2,9,11,
  14

examined   5:6

excited
  50:15

excused   61:2

exhibit
  30:15,19
  31:6

expect   38:16

experience
  6:2 13:13,
  14 17:1
  50:22,23
  57:6
  58:18,21
  60:1,3

expert   15:24
  16:8,11
  17:12,17,
  25 18:6

expertise
  16:18
  22:16

explain
  43:14
  48:19
  57:18

explained
  33:14 44:6

explaining
  44:5

explanation
  44:7

explicitly
  44:6

Extension
  26:3,7

extent   7:18

extremely
  38:14
  43:20

_____

F

_____

F.D.A.   14:6,
  17 51:13
  52:5

facilities
  50:18

facility
  11:1

fact   17:17
  27:22
  52:21

factor   59:7

factories
  12:13,14,
  15 33:21
  35:2 38:13
  44:10
  58:21

factory
  14:16

43:18,19
  51:21

fake   35:13
  43:12

fall   46:1

falls   59:20

familiar
  37:19
  45:15
  51:19

family   10:3

father   9:9,
  25 10:4
  13:15

father's
  9:6,25

FDA   14:18

federal
  23:13

feel   20:25
  55:25 56:7
  57:3,4,6
  58:6,23

feeling
  56:10

fees   36:4

felt   39:2

field   60:1

filled   50:10

filling
  41:3,6

financial

28:17
30:12

**finding**
33:24

**fingers**   57:6

**finish**   6:7,8

**Fintek**   26:1

**Fintek's**
32:1  45:9

**firm**   23:7
29:10,12

**firms**   16:12
17:7,8

**five-minute**
45:17

**focused**
13:17

**foil**   10:16
11:17

**follow-up**
55:14

**food**   10:11
14:25

**form**   16:1
29:11  30:9
32:14,17

**found**   33:7
34:15
35:11

**founded**   51:1

**friends**
24:14,22

**Frisch**   25:24

**fullest**   7:18

---

### G

---

**G-L-O-V-E**
37:5

**garbage**
35:21
41:22
44:11
50:12

**garbled**
20:7,11

**gave**   42:18

**general**   14:7
40:11

**generally**
42:3

**give**   16:22
19:16
26:14
27:17
29:22
43:23  44:3

**glove**   19:20
31:23  32:5
35:9,18
36:24
37:4,19,22
38:2
40:12,15,
23,24
41:2,7
42:5  48:18

49:8,12,24
51:14,25
52:7
54:21,25
55:7,24
56:7,9,11,
14,15,17
57:1,7,14,
17,18,20,
22  58:1,3,
5,7,12,17,
23,24
59:1,3,18,
19,20,23

**Glove's**   49:3

**gloves**   10:16
11:25
12:11,13,
19  13:17,
25  14:1,2,
8,15,16,
18,19,21,
23,24
15:1,2,4,9
24:24  25:1
27:21
33:11
34:17,18
35:17,20,
22  36:1,2,
6,7,8,17
37:17,18,
20  38:4,5
39:4,6,10,
13  41:2,6,
9,12,15,25
42:7  43:2,

4,9,20
44:10,18,
21  47:3,6,
12  48:16,
21,23
49:1,9,13,
15  50:9,
15,16,17,
21  51:5
53:9,13
55:21
56:1,4,22
57:9,12,
15,23
58:11
59:25

**Gombo**   5:2,12
7:11,20
8:1,23
17:25
20:10
31:10,22
54:19,20

**good**   5:12
11:16
37:25
40:21
41:22  50:2
52:9
56:13,14,
15,17
57:14,17
58:23,24
59:1,3,21,
23

**Granite**   5:4

grant 11:24

grants 11:24

Great 45:8

ground 5:13

guess 60:10

guttural
46:4

---

**H**

happen 11:8
42:4

happened
11:13
33:13
38:20

happy 24:25
36:20

head 6:11

health 9:7,
12 26:3,7

hear 16:15,
24 18:21
21:8 27:5
32:15
37:17

heard 37:15
38:21 44:1
50:6

held 18:3
37:6 60:13

Hershey
18:18

37:16 40:1
47:8

higher 34:21

highest 43:8

history 9:3

hit 33:7

home 34:5,7

homemade
35:15

homes 50:18

honest 28:9

hospital
26:6

hospitals
36:16
50:17

hour 54:3,
4,7,11,12

house 12:12
39:8,11

huge 34:11,
12

hundred
11:21 29:8

---

**I**

I-N-T-C-O
37:8

idea 53:17,
18 58:5,9,
11

identification
30:16

import 11:23
14:23

important
6:4 59:7

importing
12:17
14:10
21:21

imports
10:21

including
31:25

indiscernible
18:14

industries
16:4

industry
13:4 15:4,
25 16:5,
11,14,15,
16,19,21
17:4 19:1,
21 22:17
27:17,21
31:23 32:5
35:9 36:18
37:23
38:22,23
44:1 47:19
49:11
50:6,24
54:21,25
55:7,20

56:2 57:14
58:18 60:4

information
55:2,9

inhouse
12:11

input 16:4,
19

inside 49:15

intend
52:13,22

interests
18:20 19:9

interrupted
18:16

interruption
13:20
14:13 15:6
21:4 27:2
37:1 48:10
52:25

invested
29:20

investigated
19:23

investigation
27:16

investing
19:2 29:18

investment
5:20 7:10,
15,19,24
16:12

17:7,8
20:16

**investments**
19:1,18
20:1,3,14,
20,25 21:7
27:9 28:21
29:5 35:9

**investor**
29:9

**involved**
8:16 11:3
12:16
13:3,8,10
16:13
19:17 22:1
29:5 40:17
51:22
54:21
57:16

**involvement**
53:16,17

**involves**
20:15

**issue** 32:1
46:25

**issues** 35:23
50:4

**item** 14:11

---
**J**
---

**Jersey** 5:3,4
19:15

**Joel** 25:21

**Joseph** 19:6
20:2 23:16

---
**K**
---

**kind** 10:13,
15

**Kitchen**
18:11,17
20:15

**knew** 39:1

**knowing**
50:15

**knowledge**
22:15
31:22 32:5
50:5

---
**L**
---

**L-E-V-M-E-D**
45:14

**lab** 41:1,4,
18

**label** 9:19

**labs** 9:7,12

**Lakewood**
5:3,4

**large** 47:18

**larger** 38:25
48:22

**largest**
11:22

**latex** 14:24

58:7,10,11

**lawsuit** 7:4,
8 16:8
46:25
53:11,15

**Lawsuits** 7:7

**lawyer** 8:15

**learned** 9:4

**Levmed** 45:12

**literature**
50:11

**living** 13:8

**LLC** 7:12

**long** 21:19

**longer** 5:7

**losing** 35:8

**lost** 22:21
35:11
43:21

**lot** 18:18
35:8,13,
15,23
38:5,8,24
40:1
43:11,21
58:7

**lower** 34:22

---
**M**
---

**made** 7:10
35:17

**mail** 22:20

**main** 36:24

**make** 11:17
40:15
58:10

**makes** 56:15
57:25

**making** 12:17
35:8 58:17

**Malaysia**
12:22

**Management**
7:12

**manager** 9:24

**managing**
9:22 11:2,
9 29:17

**manufacture**
10:11
11:22
12:11 34:4

**manufactured**
9:15 11:6

**manufacturer**
13:15

**manufacturers**
35:16,17,
19 44:3
48:22

**manufactures**
10:20
12:12
14:22

manufacturing
9:7  11:4
12:17

March   33:19
42:20

marked   30:16

market   10:2
31:23
32:12
33:4,15
55:6

marking   31:5

married   9:5

masks   33:10

material
34:2
57:22,25

materials
10:13,15

matter   5:20,
24  7:15,20
8:7,21
22:2 23:25

matters   8:10

meaning
37:23
38:3,13
41:5 48:23
49:10 59:4

means   55:24

meant   44:7

Medcare
37:10,13,

16,18,19
38:5,10,
21,23,25
39:2 47:6
49:24,25
53:7 59:22

medical
10:12
14:11,16
15:2,3,8
31:23 32:5
47:18
50:18
55:24

medical-exam-
grade   51:24

medication
6:23

Medline
26:4,5
47:11,13,
15,18,19,
21,23,25
48:2

meet   14:18,
19 18:18
21:14,16,
18 51:14,
25

meeting
21:12

memory   17:10

Mendlowitz
19:5,6
20:20

23:16
26:21

mentioned
11:16 44:2

met   21:16

middleman
48:9,13

million
29:24
30:1,3,5,7

mind   15:17

minimal
34:13

minute   25:5

minutes
20:12
54:12

missed   52:22

mister   26:13

mix   58:9

moment   30:20

money   35:11,
12 38:17
43:21

month   22:7

move   8:13
20:19

moving   31:13

multiple
11:17
33:17

---

**N**

named   7:5,7
9:6

names   17:9
43:24,25

needing
33:16

nice   49:20

nicely   49:2

nightmares
50:13

nitrile
14:11,24
38:3
40:19,20
57:17,18,
20,22,25
58:1,3,5

normal   36:8
38:3 43:1

not-working
55:21

noted   30:15

notes   45:18

number   14:17
15:15

numbers
29:21

nursing
50:18

KITCHEN WINNERS NY INC, ET AL. V. ROCK FINTEK LLC., ET AL.

Tzali Gombo on 11/02/2023                    Index: oath..phone

---

**O**

oath   6:19

objection
  16:1 29:11
  30:9 32:7,
  14,17
  46:8,11
  52:14,23

occur   22:5

occurred
  42:20

occurs   18:7

off-colored
  56:13

off-screen
  25:5

offhand
  15:16,19
  17:9,11
  27:12,15
  28:6,8,10
  51:12
  53:21

office   11:9

offices
  36:16

oils   56:21

ongoing   8:17

online
  10:17,19

open   50:8

opened   44:20

operate
  28:24

opinion
  37:17,20,
  22 40:21
  43:9
  57:11,13

order   35:10

ordering
  60:16

outline   53:5

outstanding
  6:18

overlap
  13:19
  18:12 20:4
  21:3 27:1
  52:15,24
  58:4

overseas
  11:5,10
  12:14,16,
  20 14:4
  18:18,19
  21:13,22
  35:12
  38:13
  43:17

owns   16:25

---

**P**

p.m.   61:5

pack   49:16

packed   49:1

packing   49:7

paid   35:6
  50:16

pandemic
  31:24
  32:13 33:5
  55:7

paper   10:16
  11:17

part   57:1

parties   47:3
  53:10,14

pass   41:3
  51:10

passable
  50:2 57:17

passed   9:9
  10:4 38:2
  49:9 59:22

pay   38:17

payment
  22:18,23

penalties
  6:21

pending   7:4

Pennsylvania
  28:13,15

people   15:11
  35:4 36:2,
  15 38:5,9

43:15,16,
17,19
44:9,12,19
47:20
50:3,6,13
58:7

percent
  13:24,25
  14:1 29:8

percentage
  13:16
  57:24,25

perfect   25:4
  31:20
  48:23

perfectly
  49:1

perjury   6:21

person   51:16
  52:4

personal
  5:20,24
  7:9,15,19
  8:10 13:5
  19:23
  20:1,3,16,
  20,25 21:7

personally
  37:14

ph   18:25

Philadelphia
  28:11

phone   33:17
  39:17,24

---

40:1  47:20

**physical**
39:10
40:10

**picky**  50:3

**pictures**
44:17

**pinholes**
41:1,5,7

**pirate**  35:17
44:2

**places**  21:15

**plaintiff**
7:5

**plastic**
10:16
11:16
50:11
56:20

**pleasure**
60:7

**popped**  43:12
45:1

**PPE**  13:4

**pray**  21:18

**precluded**
18:6

**preparation**
26:10

**prepare**
27:16,18,
19

**prepared**
28:2

**present**  5:2,
7  25:3,11

**presented**
49:2  52:21

**presume**
23:24

**pretty**  38:24

**price**  42:19,
23  43:1

**prices**
34:10,23
35:3  43:5

**private**  9:19

**procedure**
57:5

**process**  56:8

**product**
11:4,5,23
33:24  34:8
35:5,10
36:15
38:8,19
39:2,3
47:22,25
48:6,8
49:4,18

**production**
8:20  40:4

**products**  9:7
10:12
11:17,22
14:25  15:1

33:10,16
39:1

**professional**
7:12  49:11
52:11

**professionals**
16:15

**properly**
30:19

**property**
29:15

**protection**
13:5  40:24
52:7

**proved**  44:17

**provide**
15:17

**purchase**
47:4  48:2
53:14

**purchased**
53:7

**purchasing**
47:5

**purposes**
29:16  44:5

**pushed**  38:20

**put**  27:20
35:21  42:1
44:11
48:16
49:12
57:23,24

**putting**
41:24
56:9,18,19

———————

Q

———————

**qualification**
58:2

**qualifications**
50:20
53:19
58:17

**qualified**
55:23  56:4

**quality**
12:18
36:8,10
38:1,3
40:21
41:22
48:17,18
49:7,10,
17,21,22
50:2,3,14,
21  56:14,
15,16,17
57:14,16
59:21,23,
25

**question**
6:17  16:7
19:25  27:7
32:18,21,
25  33:2
40:13  53:3

**questions**

6:7,8,14
7:17 17:3
24:24
26:22
27:23
36:19
46:19
54:13,16,
19,25
55:2,6,12,
15,19
56:3,5
60:12

quick  45:17
53:23
54:18

―――――――――

R

―――――――――

raw  34:2

read  31:20

reading
60:25

real  18:20
19:9,18
20:16,17,
20 21:1,7
23:24
27:9,13,17
28:1,4,10,
19 29:1,9,
13,15

realized
44:20

reason  8:6

reasons  7:1
49:5

recall  7:13,
14,20 22:6
28:6,8,10
29:21,23
51:12 52:9
57:11,23

received
22:23

receiving
22:18

record  8:21
13:21
14:14 15:7
17:16,20,
24 18:4
21:5 22:24
23:3 25:7,
10 26:17,
18 27:3
30:19
31:6,21
32:17
37:2,7
45:22,23
48:11 53:1
54:5
60:14,16

recycled
44:11

recycling
35:21

refusing
28:7

regard  36:19

regular
24:21
33:11,25
34:1
35:22,25
36:5,8,12
41:2 50:1

relationship
26:23

relationships
26:20

relevant
8:14 40:3

reliable
38:6,7,11,
14,24 39:1

remember
7:21 22:13
34:14
42:10,12
47:21
49:11

repeat  20:7,
11 32:21
33:2

reporter
6:5,11
13:20
14:13 15:6
20:8 21:4
25:7 27:2
37:1 48:10
52:25
60:15,19,

22,24

requests
40:5,6

research
51:20

reserve
17:21,25
60:11

respond
60:21

Restating
46:10

retained
15:24
16:8,17
17:12

review  26:9

RIDDLE  5:11
8:19,24,25
13:22
14:20
15:10 16:6
18:5,9,15
20:18
21:10
22:25 23:6
24:18
25:4,9,12
26:19
27:10
29:19
30:11,17,
25 31:2,5,
12 32:10,
20 33:3

37:3,9
40:8
45:16,20,
24 46:7,9,
12 48:12,
14 52:19
53:4,22,25
54:4,9,15
55:13
58:13
60:11

**rim** 49:13

**rip** 56:17
59:16

**rise** 45:25

**rises** 46:3,5

**Rock** 26:1
32:1 45:9

**rows** 50:7,9

**rubber** 58:8

**Rule** 30:21
31:7 45:5

**rules** 5:14
23:13

——————————
**S**
——————————

**S-T-E-R-E-X**
12:5

**Safeguard**
12:2,8,9

**salespeople**
11:10

**scared** 23:10

35:4

**screen**
30:20,22,
24 45:6

**scroll** 31:8

**seconds**
35:18 44:9

**secure** 35:10
39:3

**see-through**
56:24

**sell** 11:23
35:6,22
43:7 47:23
53:10

**sellable**
57:14

**selling**
34:19
48:4,5

**send** 39:8,
10 40:5,10
42:7 47:12
48:16

**sending**
35:12
41:25

**service**
10:11
14:25

**set** 12:15
53:23

**shaking** 6:11

**share** 55:3,9

**ship** 38:8,
16,17
44:12

**shipped** 14:8

**shipping**
34:6,9
38:15,24
44:18

**shortage**
33:15
34:2,3
49:6

**show** 30:20
39:6 40:18
44:15

**showed** 44:17

**showing**
37:16,21

**Shulem** 8:1

**sick** 9:9

**side** 49:14,
15

**signing**
60:25

**similar**
16:24

**simple** 21:8

**simultaneous**
18:14

**single** 56:1

**Sir** 42:18

**situated** 5:3

**situation**
7:9 33:8
34:16,23
38:7,12,15
51:22

**situations**
11:7

**slept** 55:25

**smell** 55:25
56:7,20,21
58:24
59:13

**smells** 56:22

**sold** 10:3
47:22

**son** 9:25

**son's** 24:2

**sound** 46:4

**sounds** 6:2

**speak** 6:4
16:15
24:8,13,21
39:25
52:13,22

**speaking**
60:7

**specific**
32:9 36:19
55:1,6,16,
18 56:3

**specifically**
24:24 54:6

specs  14:19

spell  12:3

Sperber  8:22
  16:1
  17:18,20,
  24 18:8
  20:6,10
  22:24 23:3
  24:17
  25:8,14
  26:17
  27:1,4,6
  29:11
  30:9,23
  31:3,9
  32:7,14,
  16,24 40:5
  45:19,22
  46:6,8,10
  52:14,23
  54:17
  55:11
  60:15,17,
  20,23 61:1

spoke  23:19,
  21 24:1,6,
  20 39:15

spoken  5:12
  23:16 24:3
  25:13,18,
  23

spring  42:13

standard
  51:14,25

start  6:6,8
  9:11 10:4,

22 34:11
  42:23

started  9:5,
  9 12:6
  13:11
  33:7,22,23
  34:14,16,
  19 35:2,3
  42:19
  51:21

starts  59:19

state  28:4

stated  5:2,4
  59:22

states  11:11
  14:9
  19:12,16
  29:14

status  8:12

step  11:14

steps  36:13

Sterex  12:2

Stern  25:21

Stern's
  25:23

stock  10:2

stopped  35:4

stretch  41:5
  56:23
  59:7,15

stretchable
  58:12

stretching
  56:10

stringent
  36:4

strong  42:5
  57:3 58:12

stronger
  56:25

stuck  35:5

stuff  44:12

subject  6:20

subpoena
  8:22 23:5,
  7,12 24:9

subpoenaed
  27:22

subsequent
  31:25
  46:14

subsequently
  30:15

successful
  10:1

sudden  35:2

supplier
  36:13,21,
  22 37:11
  39:2 47:19

suppliers
  33:21
  36:23,24

supplies
  34:11

supply  33:25
  34:1,12,21

sworn  5:5

_____

**T**

T-O-P  37:4

taking  6:5
  17:16

talk  18:14
  19:24
  27:20

talking  14:5
  26:4,5,6
  33:23
  49:24

tear  59:17

tearing
  59:19

technical
  25:2 52:10

technology
  58:9

telling
  33:18
  38:15

ten  34:17
  43:3

test  41:3,
  18 48:17
  50:21 56:6

tested  41:1

testified

5:6

**testify**  6:24
7:2 8:7
28:7 55:17

**text**  5:13
39:20,21,
25 54:6,
10,11

**texted**  54:7

**texting**  54:7

**texts**  40:3

**Thailand**
12:21

**thickness**
56:10,12
59:5

**thin**  57:2
58:12

**thing**  33:18
35:7 55:5

**things**  55:17

**thousand**
34:18

**throwing**
35:20

**time**  6:5
11:18 18:1
19:21
23:19 24:6
27:17,20
33:20
39:4,14
42:19 45:4

**times**  5:17
25:13
42:7,8
47:21

**tips**  56:24

**title**  9:23

**today**  6:20
7:2 17:16
27:19
52:13
54:25

**told**  33:11,
25 38:17
46:1,13,
15,18,22
47:8,10

**top**  36:24
37:4 49:3,
12,13
56:12,25
59:18

**touch**  33:20

**touching**
57:2

**transactions**
43:22
46:25

**transcript**
60:16

**transcripts**
8:20

**traveling**
18:18
21:12

**true**  54:8,9

**trusting**
36:7

**truth**  6:20

**type**  16:17,
18 19:1
36:3,4
40:12,15
47:3 50:4
51:9
53:13,18

**types**  9:8
14:23 17:2
56:21

**TZALI**  5:2

---

**U**

---

**understand**
6:13,19
8:4 13:5
21:2 40:13
55:23 56:2
58:22

**understanding**
8:8 14:8
16:16,20
17:3
40:11,22
47:2

**understood**
6:15 18:8

38:4,23

**United**  14:9

---

**V**

---

**vacation**
11:15
55:22

**vague**  16:7

**verifications**
36:3

**versus**  7:11,
20 8:1
40:23
56:15

**view**  16:19
57:8

**vinyl**  14:11,
24

**vitamin**
13:14

**vitamins**
9:8,15

**voices**  13:19
18:12 20:4
21:3 27:1
52:15,24
58:4

---

**W**

---

**wait**  6:7

**waiving**
60:24

wanted  10:1
  36:15
  37:17
  47:12
warehouse
  12:23,24
warehouses
  11:6 14:4
  29:14
waste  49:9
water  41:4,6
ways  38:7,
  11
wedding  24:2
weeks  23:23
Weiner  21:11
  24:3,7
  26:12,21,
  24 28:5,
  18,25
  29:10
  30:13 39:6
  40:3,14
  41:8 48:15
  57:9
whichever
  40:20
  50:18
whomever
  36:6
wife  26:15
Winners
  18:11,17
  20:15

word  6:6
work  10:1
  11:20
  18:10
  47:13
workers
  34:3,4,5
  49:6
working  9:5,
  11 34:6
  50:23 51:5
works  6:1
write  42:11,
  14

—————————
              Y
—————————

Yasi  18:25
  19:3
year  34:25
  35:1
years  9:14
  10:23,24
  12:7 13:9,
  10 21:16
  51:2,4
  54:22,23
  55:20
  58:20 60:3
Yerek  5:3
yeshiva  9:4
York  19:13

—————————
              Z
—————————

zoning  11:4