**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KITCHEN WINNERS NY INC.,

                          *Plaintiff*,

      -against-

ROCK FINTEK LLC,

                          *Defendant*.

 

ROCK FINTEK LLC,

                 *Counterclaim and Third-Party Plaintiff*,

      -against-

KITCHEN WINNERS NY INC.,

                 *Counterclaim Defendant*,

     and

ADORAMA INC., HERSHEY WEINER,
JOSEPH MENDLOWITZ, JNS CAPITAL
HOLDINGS LLC and JOEL STERN,

                 *Third-Party Defendants.*

Civil Action No. 22-cv-05276-PAE

## ROCK FINTEK LLC'S RESPONSES TO ADORAMA PARTIES' RULE 56.1 STATEMENT OF FACTS AND ADDITIONAL STATEMENT OF FACTS

    Rock Fintek LLC respectfully submits its responses to the following statement of facts submitted by Third-Party Defendants Joseph Mendlowitz ("Mendlowitz") and Adorama Inc. ("Adorama") (collectively "the Adorama Parties") and Plaintiff and Counterclaim-Defendant

Kitchen Winners NY Inc. ("Kitchen Winners"), and respectfully submits additional statement of facts ("ASOF") in opposition to the moving parties' respective Motions for Summary Judgment:

1.     Kitchen Winners NY Inc. ("Kitchen Winners") commenced this action by Summons and Complaint filed on May 17, 2022 in the Supreme Court, New York County asserting claims for breach of contract and unjust enrichment. (Declaration of Alexander J. Sperber dated February 16, 2024 ("Sperber Dec."), in Support of Kitchen Winners, Adorama Inc. ("Adorama") and Joseph Mendlowitz ("Mendlowitz") Motion for Summary Judgment ("Sperber Dec.") at Exhibit "A" [Kitchen Winners' Complaint].)

2.     Rock Fintek subsequently removed this action to the United States District Court for the Southern District of New York  and filed its Counterclaim and Third-Party Complaint, wherein it impleaded a number of third-parties, including the Adorama Parties.  On August 5, 2022, Rock Fintek then filed its First Amended Counterclaim and Third-Party Complaint ("TPC") (Sperber Dec. at Exhibit "B" [TPC].)

**The Parties**

3.     Third-Party Plaintiff Rock Fintek LLC ("Rock Fintek") is a Limited Liability Company. (Sperber Dec. at Exhibit "C" [Joint Stipulation of Undisputed Facts ("JSUF")] at ¶ 8.)

4.     Rock Fintek was formed for the purpose of buying and selling goods from China to the United States.  (Sperber Dec. at Exhibit "D" [T. Kato 30(b)(6) Transcript ("Kato Non-Expert")] at 16:19-22.)

5.     Thomas Kato ("Kato") is the sole member of Rock Fintek.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 9.)

6.     Bradley Gilling ("Gilling") was the Chief Operating Officer at Rock Fintek at all relevant times. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 10.)

7.      Third-Party Defendant Adorama Inc. ("Adorama") is a corporation formed under the laws of the State of New York. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 6.)

8.      Adorama is an e-commerce company, with its specialty as a retailer in the photography and video space.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 29:22-25.)

**RESPONSE:** Disputed as incomplete. In 2020 and 2021, Adorama also sold personal protective equipment and was still selling Nitrile gloves and other personal protective equipment on its website through at least October 26, 2023. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 37:9-14, 38:12-18, 44:12-47:2; Declaration of Phillip Rakhunov ("Rakhunov Dec."), Exh. 1 [Mendlowitz Dep. Exh. 2].

9.      The sole owner of Adorama is Eugene Mendlowitz.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 35:15-17.)

10.     Third-Party Defendant Joseph Mendlowitz ("Mendlowitz"; together with Adorama, the "Adorama Parties") is a director of multiple departments at Adorama.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 7.)

11.     Plaintiff and Counterclaim Defendant Kitchen Winners NY Inc. ("Kitchen Winners") is a corporation formed under the laws of the State of New York.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 1.)

12.     The president and sole shareholder of Kitchen Winners is Yitty Weiner.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 2.)

**RESPONSE**: Disputed that Kitchen Winners has a president. (Sperber Dec., Exh. "F" [Weiner Tr. Day I a.m.] at 13:18-19 ("Q. Does it [Kitchen Winners] have a president? A. No.").)

13.     Kitchen Winners was originally formed for the purpose of selling kitchen accessories online.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 3.)

14.     At the onset of the Covid-19 pandemic, Kitchen Winners expanded its business to focus on the sale of Personal Protective Equipment ("PPE").  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 4.)

15.     Joseph Weiner, also known as Hershey Weiner, is the husband of Yitty Weiner and runs the day-to-day operations of Kitchen Winners.  (Sperber Dec. at Exhibit "C" [JSUF] ¶ 5.)

16.     Rock Fintek has alleged that Kitchen Winners is an alter ego of Adorama.  (Sperber Dec. at Exhibit "B" [TPC] at ¶ 20.)

17.     That assertion is categorically untrue.  Neither Adorama nor Mendlowitz own any shares in Kitchen Winners.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 56:2-11.)

**RESPONSE:** Rock Fintek does not dispute that discovery has revealed that Adorama and Kitchen Winners are separate business entities and do not appear to be corporate affiliates. Rock Fintek maintains that both Kitchen Winners and Adorama are liable as "Sellers" under the parties' Sales and Purchase Agreement (the "SPA") as detailed below.

18.     Kitchen Winners and Adorama do not share owners, officers, employees, offices, or bank accounts.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 55:5-56:11; Exhibit "F" [J Weiner 11/15 Transcript] at 13:14-17.)

19.     Kitchen Winners and Adorama are separate entities involved in an arms-length business relationship. (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 56:12-57:12; Exhibit "F" [J. Weiner 11/15 Transcript] at 22:9-15.)

**RESPONSE:** Disputed that the cited evidence supports the legal conclusion that the business relationship between Kitchen Winners and Adorama was "arms-length."

20.     Indeed, when asked, both Kato and Gilling admitted that they had no information to prove the unsubstantiated allegations regarding Kitchen Winners being an alter ego of Adorama. (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 37:23-40:8; Exhibit "D" [T. Kato Non-Expert Transcript] at 205:16-206:18.)

> **RESPONSE:** Disputed that the cited evidence supports the characterizations in this statement. In any event, Rock Fintek does not dispute that discovery has revealed that Adorama and Kitchen Winners are separate business entities but maintains that both are liable as "Sellers" under the SPA.

**The Relationship Between Adorama and Kitchen Winners**

21.     During the Covid-19 pandemic, Mendlowitz began looking to obtain personal protective equipment ("PPE") for the use of Adorama's employees, so that the employees would feel comfortable coming into work both in its offices and warehouses.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 52:15-24.)

22.     Mendlowitz quickly found that it was extremely difficult to source products like gloves and masks.  The only entity that he found able to actually supply PPE was Kitchen Winners. (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 53:10-18.)

23.     Mendlowitz knew Joseph Weiner, the principal of Kitchen Winners, from around his community.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 54:3-6.)

24.     Before Covid-19, however, neither he nor Adorama had ever had any business dealings with Weiner or Kitchen Winners.   (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 55:8-10.)

25.     While Kitchen Winners had started out as an online kitchen accessories business, during the COVID-19 pandemic, Kitchen Winners was also engaged in the business of importing

and selling personal protective equipment (PPE), including medical gloves and KN95 masks. (Sperber Dec. at Exhibit "F" [J. Weiner 11/15 Transcript] at 12:12-16.)

**RESPONSE:** Disputed that the cited evidence supports that Kitchen Winners sold KN95 masks.

26.     Realizing the business opportunity in the PPE market, Adorama agreed to lend Kitchen Winners funds to support its Covid-19 related business operations.   (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 57:6-12.)

**RESPONSE:** Disputed as it pertains to the SPA with Rock Fintek. Adorama was not merely a lender under the SPA but was a Seller of the pertinent gloves. *See* ASOF ¶¶ 164-185.

27.     As lender, Adorama's profit came from the interest on its loan.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 59:2-13.)

**RESPONSE**:  Disputed as it pertains to the SPA with Rock Fintek. Adorama was not merely a lender under the SPA but was a Seller of the pertinent gloves. *See* ASOF ¶¶ 164-185.

28.     Given the lack of security to collateralize its loan, however, Adorama required that a portion of the funds paid by Kitchen Winners' customer be paid directly to Adorama.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 63:25-64:10.)

**RESPONSE**:  Undisputed that Mendlowitz testified this way and that Rock Fintek made all payments under the SPA directly to Adorama. Disputed that Adorama was merely a lender under the SPA. Adorama was a Seller of the pertinent gloves. *See* ASOF ¶¶ 164-185.

29.     Initially Adorama and Kitchen Winners operated on the basis of a handshake agreement.  During that time period, Adorama's loans to Kitchen Winners were small and short-term.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 81:24-82:10.)

**RESPONSE**:   Rock Fintek has no basis on which to dispute or not dispute the arrangements between Kitchen Winners and Adorama on transactions not involving Rock Fintek but disputes that Adorama was merely a lender under the SPA. Rather, Adorama was a Seller of the pertinent gloves. *See* ASOF ¶¶ 164-185.

30.     Kitchen Winners' agreement with Rock Fintek, however, was much larger than any of the prior transactions for which Adorama had provided financing.  Accordingly, on or about March 26, 2021, Adorama and Kitchen Winners memorialized their agreement in a written Hebrew-language loan agreement.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 74:17-77:24; 82:17-24.)

**RESPONSE**: Rock Fintek objects to the introduction of Exhibit E, which has not been translated into English or properly authenticated. Without waiving its objection, Rock Fintek disputes that Adorama was merely a lender under the SPA. Rather, Adorama was a Seller of the pertinent gloves. *See* ASOF ¶¶ 164-185.

**Rock Fintek Purchases Gloves from JNS**

31.     Rock Fintek also shifted its focus and began dealing in the PPE market after the onset of Covid-19.  Kato believed that he had strong relationships in China from which he could buy PPE, and quickly began looking for a way to capitalize on the high demand. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 19:11-18; 24:22-25:4.)

**RESPONSE**: The first sentence of Paragraph 31 is undisputed, but disputed that the cited testimony supports the remainder of the statement. Kato testified that when Covid-19

started, the demand for other products that Rock Fintek was selling was not there, that he had strong relationships in China from which he could buy PPE and that Kato wanted to see if anyone needed those products.

32.     On December 7, 2020, The Resource Group, which is the purchasing entity for a large hospital chain called Ascension Health Alliance ("Ascension") gave Rock Fintek a purchase order for 200 million nitrile exam gloves (the "Ascension Purchase Order").  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 71; Exhibit "I" [Ascension Purchase Order] produced in discovery as RF_001279-001285.)

33.     Rock Fintek accepted the purchase offer and the initial downpayment of $9,250,000, but did not yet have a contract with even a single vendor able to supply the gloves it had agreed to procure.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 36:13-21.)

> **RESPONSE**: Disputed to the extent this statement calls for an inference that Rock Fintek was required to have any contracts to supply the gloves at the time it received the Ascension Purchase Order.   Indeed, Ascension's corporate representative testified that when Ascension gave Rock Fintek the purchase order, it was aware that Rock Fintek had no gloves at that moment. (Sperber Dec., Exh. M [Elstro Tr.] at 15:10-18).

34.     Rock Fintek initially attempted to fulfill the Ascension Purchase Order with gloves from a vendor in Thailand, to whom Rock Fintek wired $6,200,000 and who ultimately never provided any gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 310:15-23.)

35.     After the Thailand mishap, Rock Fintek was scrambling to meet its obligations.  In December 2020 or January 2021, Rock Fintek was introduced to JNS Capital Holdings LLC

("JNS"), which was able to supply it with nitrile medical gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 31:19-23.)

> **RESPONSE**: Disputed. The cited evidence does not support the statement or an inference that Rock Fintek was "scrambling to meet its obligations" rather than simply seeking another source of gloves. In addition, the gloves that JNS provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. *See* ASOF ¶¶ 270-275. A significant number of gloves that JNS sold to Rock Fintek were also not even labelled as medical examination gloves as required but were labelled as cheaper "protection" gloves. *See* ASOF ¶¶ 264-268.

36.     Rock Fintek first purchased gloves from JNS in February 2021.  At that point in time, Rock Fintek was so desperate to locate gloves for Ascension that it purchased those gloves at a loss, paying $15 per box.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 56:23-57:10.)

> **RESPONSE**: Disputed. The cited evidence does not support the statement or an inference that Rock Fintek was "desperate." Kato's cited testimony is that Rock Fintek "sold gloves at a loss in the beginning …. It's just what I was willing to pay, and I was willing to take a loss."

37.     Rock Fintek purchased additional gloves from JNS in April and May 2021 at the slightly lower price of $11.50 per box.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 30, 36; Exhibit "H" [Declaration of Joel Stern] at ¶ 11.)

38.     All the gloves that Rock Fintek bought from JNS were Medcare brand gloves. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 32:24-33:5.)

39.     Since not all of the transactions between JNS and Rock Fintek were documented in purchase orders and invoices, the best method of calculating the total gloves sold is to work backwards from Rock Fintek's payments to JNS.  According to JNS's own bank records, it received the following payments from either Rock Fintek, Gilling (Rock Fintek's COO), or a company named "Rock 13" that appears to be a Rock Fintek affiliate:

| Date | Amount of Payment | Price Per Box | Number of Boxes |
|---|---|---|---|
| February 10, 2021 | $450,000 | $15/box | 30,000 |
| February 17, 2021 | $200,000 | $15/box | 13,333 |
| February 19, 2021 | $250,000 | $15/box | 16,667 |
| February 23, 2021 | $200,000 | $15/box | 13,333 |
| February 25, 2021 | $250,000 | $15/box | 16,667 |
| April 27, 2021 | $25,000 | $11.50/box | 2,174 |
| April 30, 2021 | $272,550 | $11.50/box | 23,700 |
| May 7, 2021 | $700,000 | $11.50/box | 60,870 |
| May 11, 2021 | $119,475 | $11.50/box | 10,389 |
| May 12, 2021 | $322,550 | $11.50/box | 28,048 |
| May 24, 2021 | $200,000 | $11.50/box | 17,391 |
| May 25, 2021 | $137,640 | $11.50/box | 11,969 |
| May 27, 2021 | $200,000 | $11.50/box | 17,391 |

(Sperber Dec. at Exhibit "J" [JNS Bank Records].)

**RESPONSE**: Rock Fintek disputes that the evidence cited supports the speculation as to what "the best method" is for calculating the amounts of gloves that it bought from JNS and disputes that the cited evidence supports the calculation of the number of boxes of gloves included

in each order but does not dispute that the above chart accurately reflects the payments that JNS Bank Records show JNS having received from or on behalf of Rock Fintek totaling $3,327,215.

40.    At 100 gloves per box, this was a total of 26,193,100 gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 41:10-15.)

>    **RESPONSE**: Undisputed that Kato testified that there were supposed to be 100 gloves in
>    each glove box. Disputed that the cited evidence supports the statement that JNS actually
>    delivered the amount of gloves for which Rock Fintek paid or that the math is correct
>    regarding the glove total.

41.    At some point, however, Kato saw the name Kitchen Winners on a purchase order that he received in connection with the JNS' transactions.  Hoping to source gloves at a lower price, so that Rock Fintek could cut its losses on the Ascension Purchase Order (or maybe even make a small profit), he attempted to contact Kitchen Winners.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 192:15-21.)

>    **RESPONSE**: Disputed that the cited testimony supports the portion of the statement that
>    states "(or maybe even make a small profit)."

**Rock Fintek Purchases Gloves from Kitchen Winners**

42.    According to Kato, he Googled the name Kitchen Winners and somehow came across an individual named Mendel Banon.  Kato then contacted Banon and explained his interest in purchasing nitrile medical gloves.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 193:6-21.)

43.    Initially, Rock Fintek was willing to do business with Kitchen Winners on a truck-by-truck basis.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 197:21-25.)

44.     Accordingly, in March 2021, Kitchen Winners sold Rock Fintek approximately 90,000 boxes of nitrile gloves in one-off transactions ("Kitchen Winners' One-Off Transactions"). (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 38.)

> **RESPONSE**: Disputed. The cited JSUF does not support the statement that the gloves were "nitrile." (*See* Sperber Dec., Exh. "C" ¶ 38 ("In March 2021, Kitchen Winners sold Rock Fintek approximately 90,000 boxes of gloves in one-off transactions.").) In fact, glove testing revealed that the gloves were polyvinyl chloride gloves with no detectible levels of nitrile. *See* ASOF ¶¶ 270-275.

45.     Rock Fintek paid $14 per box for the Gloves during the Kitchen Winners' One-Off Transactions. (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 39.)

46.     At that price, Rock Fintek was still purchasing the gloves at a loss – though less of a loss than in its earlier transactions with JNS.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] 193:22-194:1.)

47.     Rock Fintek has admitted that Adorama was not a party to the Kitchen Winners' One-Off Transactions.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ at 40.)

48.     All the gloves that Rock Fintek purchased from Kitchen Winners during the Kitchen Winners' One-Off Transactions were Medcare brand examination gloves but the boxes identified the gloves as "Protection Gloves." Kitchen Winners notified Rock Fintek and Rock Fintek agreed that the gloves would be labeled "Protection Gloves."  (Sperber Dec. at Exhibit "F" [J Weiner 11/15 Transcript] at 33:6-19.)

> **RESPONSE**: Rock Fintek does not dispute that many boxes of gloves it received from Kitchen Winners during the one-off transactions were improperly labelled "Protection" Gloves. Rock Fintek disputes, however that the gloves contained in those boxes were nitrile

"Examination" gloves. *See* ASOF ¶¶ 263-277. Kitchen Winners has provided no evidence whatsoever that gloves it sold that were labelled as "Protection" met the specifications of "Examination" gloves. In addition, selling boxes labelled as "Protection Gloves" in itself violated the parties' agreements, which required Medcare brand Nitrile Examination gloves bearing FDA 510(k) clearance. ASOF ¶¶ 201, 217-224.

49.     Clearly very happy with the quality of the gloves that it had purchased from Kitchen Winners, and given the huge number of gloves that it still needed to acquire under the Ascension Purchase Order, Rock Fintek asked Kitchen Winners to supply it with an additional 150,000,000 gloves.  Kitchen Winners and Rock Fintek, through their respective principals and attorneys, therefore negotiated the terms and conditions of a sales and purchase agreement to document that large purchase order.  (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 36:6-8; 40:19-22; 110:22-111:20; Exhibit "U" [T. Kato email] RF_001034-001035.)

**RESPONSE**: Disputed that the cited evidence supports the statement or inference that Rock Fintek had attorneys' involved in negotiating or drafting the SPA beyond advising that Adorama sign the SPA as a seller, or that Rock Fintek was "very happy" with the quality of the gloves.

50.     On or about April 7, 2021, Rock Fintek and Kitchen Winners entered into a Sales and Purchase Agreement (the "SPA"), pursuant to which Kitchen Winners agreed to sell Rock Fintek 1,500,000 boxes of nitrile medical gloves (each box containing 100 gloves) at a price of $11.50/box.  Under the terms of the SPA, the gloves were to have the following specifications: Nitrile Gloves (Box 100) Color: Blue, Medical exam grade with FDA 510k, "Medcare" brand, and in assorted sizes as set forth in the SPA (the "Gloves"). (Sperber Dec. at Exhibit "K" [Sales and Purchase Agreement ("SPA")] at ¶ 1.)

**RESPONSE**: Disputed. The SPA was between Rock Fintek as buyer on the one hand, and Kitchen Winners *and Adorama* as sellers of the Gloves on the other hand. *See* ASOF ¶¶ 164-185. The written terms of the SPA speak for themselves.

51.     The SPA provides an explicit disclaimer as to the gloves that Kitchen Winners was procuring.

> **Manufacturing Disclaimer.** Seller is merely a reseller of the Products and not the manufacturer, as such Seller does not make any warranties as to the Products except that they conform to the specifications provided.

(Sperber Dec. at Exhibit "K" [SPA] at ¶ 6.)

**RESPONSE**: Undisputed that this language appears in the SPA and requires that Adorama and Kitchen Winners deliver Gloves that conform to the specifications therein.

52.     Further, pursuant to the SPA, Kitchen Winners was to be "allowed a variance in packing quantities of up to ten (10%) percent."  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 7.)

**RESPONSE**: Undisputed that this language appears in the SPA.

**Adorama's Role Under the Sales and Purchase Agreement**

53.     Rock Fintek asserts in its TPC that Adorama is somehow a seller under the SPA. (Sperber Dec. at Exhibit "B" [TPC] at ¶ 63.)

**RESPONSE**: Disputed that this is merely an assertion. Adorama is in fact a Seller under the SPA. *See* ASOF ¶¶ 164-185.

54.     The singular noun "Seller" in the SPA is a defined term, unambiguously referring only to Kitchen Winners.  (Sperber Dec. at Exhibit "K" [SPA] at Preamble.)

**RESPONSE**: Disputed. Adorama signed the SPA as a Seller and was referred to in the SPA as a Seller including in payment provisions in Paragraph 2. *See* ASOF ¶¶ 164-185.

14

55.     When the SPA discusses Adorama's role, it refers to Adorama by name.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(b).)

**RESPONSE**: Disputed. The SPA also expressly refers to Adorama as a "Seller" in payment provisions in Paragraph 2, and Adorama signed the SPA as a Seller. *See* ASOF ¶¶ 173-174.

56.     The "Seller" (i.e., Kitchen Winners) has the sole responsibility for procuring the gloves that Rock Fintek was buying.  (Sperber Dec. at Exhibit "K" [SPA] at Preamble.)

**RESPONSE**: Disputed. First, Adorama signed the SPA as a Seller and was referred to in the SPA as a Seller including in payment provisions in Paragraph 2. *See* ASOF ¶¶ 173-174. Second, even Adorama Sellers' own version of the facts negates this statement because Adorama was responsible for the financial investment required to procure the Gloves.

57.     In contrast, Adorama has no responsibility for procuring any gloves.  It appears in the agreement solely as the agreed-upon entity to whom Rock Fintek's initial deposit would be paid.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(b).)

**RESPONSE**: Disputed. Adorama signed the SPA as a Seller and was expressly referred to in the SPA as a Seller to whom not only the initial deposit, but all payments would be made and in fact were made. *See* ASOF ¶¶ 173-176.  Even Adorama Sellers' own version of the facts negates this statement because Adorama was responsible for the financial investment required to procure the Gloves.

58.     While Adorama signed the SPA, it did so solely in its capacity as Kitchen Winners' lender.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 40:24-41:7; 88:10-13; 97:8-12.)

**RESPONSE:** Disputed. Adorama was not merely a lender under the SPA but was a Seller of the Gloves. *See* ASOF ¶¶ 164-185.

59.     Indeed, Rock Fintek knew that Adorama's sole role in this transaction was as lender to Kitchen Winners.  In order to facilitate the sale of the Gloves, Rock Fintek hired non-party Arik Maimon. (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 126:19-127:5;  Exhibit "D" [T. Kato Non-Expert Transcript] at  200:20-25.)

**RESPONSE:** Disputed. The cited evidence does not come close to supporting the false first sentence of Paragraph 59. As detailed in ASOF ¶¶ 164-185, Rock Fintek at all times understood that Adorama was a Seller under the SPA and responsible for the breaches at issue in this action. Furthermore, Mendlowitz admitted that Adorama and Kitchen Winners did not disclose to Rock Fintek the terms of their lending arrangements with respect to the SPA. *See* ASOF ¶ 178.

60.     Rock Fintek and Arik Maimon entered into a Letter of Intent governing their relationship. ("LOI").  (Sperber Dec. at Exhibit "L" [Maimon LOI] produced in discovery as RF_000962-000963; Exhibit "G" [B. Gilling Transcript] at 127:19-128:6.)

**RESPONSE**: Disputed.  The LOI is, by its own terms, vague, unenforceable and open ended. The enforceability and meaning of the LOI are at issue in a separate litigation that Maimon brought against Rock Fintek. Indeed, Maimon has betrayed Rock Fintek in many ways, including inducing Rock Fintek into the SPA by providing a forged letter on Adorma letterhead bearing a fake Mendlowitz signature. (*See* Rakhunov Exh. 2 [Rock Fintek Answer & Counterclaim against Maimon in CASE NO. 2023-023843-CA-01], *passim*).

61.     The LOI – signed April 1, 2021, less than a week before Rock Fintek signed the SPA – clearly and unambiguously defines Adorama's role under the SPA as "Adorama is financing

these transactions for Kitchen Winners NY."   (Sperber Dec. at Exhibit "L" [Maimon LOI]

produced in discovery as RF_000962-000963, at ¶ 3.)

> **RESPONSE**: Disputed. In Paragraph 1 of the LOI, Adorama is expressly referenced as a
>
> seller of the Gloves. (*See* Sperber Dec., Exh. L [Maimon LOI], ¶ 1 ("Rock Fintek desires
>
> to purchase up to 1 million boxes of powder-free nitrile medical gloves (100 gloves/box as
>
> per specifications) ***from Kitchen Winners NY Inc (KWNY) / Adorama*** … (emphasis
>
> added).).

62.     The SPA mentions Adorama only once, as the party to whom the initial deposit

should be paid.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(b).)

> **RESPONSE**: Disputed. Adorama signed the SPA as a Seller and was expressly referred
>
> to in the SPA as a Seller to whom not only the initial deposit, but all payments would be
>
> made and in fact were made. (*See* ASOF ¶¶ 172-177; Sperber Dec., Exh. "K" at ¶ 2.)

63.     While Rock Fintek asserts in the TPC that Rock Fintek was somehow required to

make all payments to Adorama (TPC at ¶ 21), the SPA explicitly differentiates between the initial

deposit which is payable to Adorama – identified by name – and all subsequent payments made

payable to "Seller."  (Sperber Dec. at Exhibit "K" [SPA] at ¶¶ 2(b) and (c).)

> **RESPONSE**: Rock Fintek objects to Paragraph 63 as containing legal argument and not a
>
> statement of fact. In any event, this argument precisely supports Rock Fintek's position –
>
> it is undisputed that all subsequent payments under the SPA were in fact made to Seller –
>
> Adorama. (*See* ASOF ¶ 176).

64.     Adorama was not involved and had no direct input when Rock Fintek and Kitchen

Winners were negotiating the terms of the SPA. Neither Kato nor Gilling ever met in person,

17

texted, emailed, or exchanged WhatsApp communications with Mendlowitz or anyone else at Adorama.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 16-19.)

> **RESPONSE**: Disputed that Adorama had no involvement in the negotiations of the SPA. On April 5, 2021, prior to the execution of the SPA, Weiner emailed a draft version of the SPA to Mendlowitz asking him to "look it over" and call him about it. (Rakhunov Dec., Exh. 3 [5529_0002_AKW000650_002078_001]). Following that email between Weiner and Mendlowitz, several material changes were made to the SPA including a change in quantity from 1 million to 1.5 million boxes of gloves, change in amounts and timing of payments, the removal of an additional order option, and modification of the rebate provision. (*Compare* Sperberg Dec., Exh. K to Rakhunov Dec., Exh. 3 [5529_0002_AKW000650_002078_001]).
>
> In addition, Rock Fintek disputes that it had no communications with "anyone else at Adorama." At all pertinent times, Mendel Banon held himself out as a representative of Adorama and communicated with Rock Fintek as Adorama's representative. (*See* ASOF ¶¶ 190-192).

65.     Similarly, Rock Fintek has not produced any text messages, emails, WhatsApp communications, records of Zoom meetings, or records of WhatsApp calls between any Rock Fintek employee or representative, on the one hand, and any Adorama employee including Mendlowitz, on the other hand.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 20-25.)

> **RSPONSE**: Disputed. At all pertinent times, Mendel Banon held himself out as a representative of Adorama and communicated with Rock Fintek as Adorama's representative. (*See* ASOF ¶¶ 190-192).

66.     Rock Fintek was unable to produce any records showing that it even had contact information for Mendlowitz.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 26.)

67.     Gilling could not recall whether Mendlowitz or anyone else at Adorama provided any written materials to Rock Fintek describing the gloves that would be sold.  (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 69:3-13; 72:14-73:4.)

> **RESPONSE**: Disputed.  Gilling testified that he was "not sure" because at pertinent times, "Kitchen Winners and Adorama were told to [him] by those parties as being the same company." (Sperber Dec., Exh. G at 70:2-20). Mendlowitz signed the SPA on behalf of Adorama, which described the gloves that were required to be sold. (*Id.*; *see also* Sperber Dec., Exh. K [SPA]). In addition, prior to entering into any glove transactions, Banon acting as a broker and representative of Adorama and Kitchen Winners provided Rock Fintek written materials describing the glove specifications. (*See* ASOF ¶¶ 190-192, 208-209).

68.     Kato testified that Rock Fintek did not get anything in writing from Adorama describing the gloves besides for the SPA. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 291:6-11.)

> **RESPONSE**: Disputed that Rock Fintek did not get anything in writing other than the SPA. Prior to entering into any glove transactions, Banon acting as a broker and representative of Adorama and Kitchen Winners provided Rock Fintek written materials describing the glove specifications. (*See* ASOF ¶¶ 208-209).

69.     At most, Rock Fintek alleges that it may have had oral conversations with Adorama prior to signing the SPA.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] 195:20-22; 291:11; Exhibit "G" [B. Gilling Transcript] at 35:16-19.)

19

**RESPONSE**: Disputed. Rock Fintek does not merely allege that Kato and Gilling had oral conversations with Adorama's Mendlowitz, but has provided sworn testimony that they had such conversations. (*See* ASOF ¶¶ 164, 166, 167). Furthermore, Mendlowitz signed the SPA on behalf of Adorama, which described the gloves that were required to be sold and Banon, acting as a broker and representative of Adorama and Kitchen Winners, provided Rock Fintek written materials describing the glove specifications. (*See* ASOF ¶¶ 168-178; 208-209).

70.     Gilling testified that he was on a single call with someone from Adorama, but could not be sure which specific principal of Adorama was on the call, or the date on which the call took place.  (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 35:16-23; 117:23-118:10.)

**RESPONSE**: Disputed. Gilling testified that the call took place prior to the SPA being executed and that the parties specifically discussed that Adorama would be a party to the SPA. (Sperber Dec., Exh. G [Gilling Tr.] at 35:7-36:16, 37:15-20, 70:10-20, 100:4-11; 113:9-114:14; 116:8-119:18).

71.     He also could not recall what the Adorama principal even said, except vaguely to claim that they discussed "doing a deal to buy gloves." (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 56:12-57:8; 117:5-12.)

**RESPONSE**: Disputed. Gilling testified that the call took place prior to the SPA being executed and that the parties specifically discussed that Adorama would be a party to the SPA. (Sperber Dec., Exh. G [Gilling Tr.] at 35:7-36:16, 37:15-20, 70:10-20, 100:4-11; 113:9-114:14; 116:8-119:18).

72.     Likewise, the only description that Kato could provide of his alleged calls with Mendlowitz, was that Mendlowitz purportedly told him that "[t]hey're going to give [Rock Fintek] the proper gloves."  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] 291:12-17.)

**RESPONSE**: Disputed. Kato testified that during his one or two conversations with Mendlowitz, Kato and Mendlowitz discussed that if Rock Fintek was going to make a large purchase order it was going to have to be directly with Adorama "and not via Kitchen Winners" because Adorama seemed like a legitimate large company that had been around since the '70s. (*Id.*, 196:21-197:15, 290:18-292:43).

73.     Mendlowitz denies these alleged phone calls ever took place.  (Sperber Dec. at Exhibit "E" [J. Mendlowitz Transcript] at 88:21-89:9.)

**RESPONSE**: Undisputed that a factual dispute exists regarding these phone calls.

74.     Kato initially claimed that his calls with Mendlowitz took place on his cell phone. When asked for his cell phone number and told that his cell phone records would be subpoenaed, Kato changed his story to assert that the call would have taken place over either Zoom or WhatsApp.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 293:10-295:12.)

**RESPONSE**: Disputed. As Kato testified, he could not recall the exact means by which his conversations with Mendlowitz took place – whether via a conference call, a group call initiated by one of the participants, or whether those conversations took place via a WhatsApp voice call. During that time period, I was taking and making hundreds of phone calls a week via various means in connection with efforts to develop Rock Fintek's PPE business and his other businesses. Kato did not change his testimony to purportedly avoid a subpoena on his telephone records. Had the Adorama Parties wanted to subpoena his

telephone records (as they subpoenaed Rock Fintek's bank records), they could have done so. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 34; *see also* ASOF ¶¶ 166-169).

75.    Defendants requested WhatsApp or Zoom records reflecting those purported calls. (Sperber Dec. at Exhibit "W" [Kitchen Winners Third Request for Production of Documents] at ¶ 2.)

76.    Rock Fintek agreed to produce any responsive records that might exist.  (Sperber Dec. at Exhibit "X" [Rock Fintek Responses to Kitchen Winners Third Request for Production of Documents] at ¶ 2.)

**RESPONSE**: Disputed. Rock Fintek agreed to "conduct a reasonable search for" such records.

77.    Evidently no such records were ever found, as they certainly were not produced. (Sperber Dec. at Exhibit "C" [JSUF] at 20 ¶¶ 22-25.)

**Kitchen Winners' Performance Under the SPA**

78.    Pursuant to the SPA, if Rock Fintek "timely made" all payments due under the SPA, Rock Fintek was entitled to a rebate of $0.50 per box for the first five (5) containers delivered, for a total of $75,000.00, and a reduction of the price for the remaining boxes of Gloves to $11.00 per box.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 8.

**RESPONSE**: Disputed as incomplete. The SPA speaks for itself.

79.    The SPA further provided that a payment was due "upon Buyer's inspection of the products at Seller's warehouse" and that payment would be considered "timely" only "if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at Seller's Los Angeles warehouse."  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(d).)

**RESPONSE**: Disputed as incomplete. The SPA speaks for itself.

80.     Rock Fintek forfeited its right to the rebate, as it failed to timely make "all payments due" under the SPA.

**RESPONSE**: Disputed. (*See* ASOF ¶¶ 278-281).

81.     The following chart demonstrates that, already by late May 2021, Rock Fintek was far behind on its payments to Kitchen Winners.  Note that the chart is not a complete listing of all shipments picked up by Rock Fintek; the parties' transactions continued thereafter through June 2021.

| Date | Amount Owed | Amount Rock Fintek Paid | Rock Fintek's Balance |
|---|---|---|---|
| April 8, 2021 | First Deposit due of $1,250,000 (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(a).) | $1,250,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 48.) | $0 |
| April 20, 2021 | $622,725 (Sperber Dec. at Exhibit "C" [JSUF] at at ¶ 49.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at at ¶ 45.) | $67,275 |
| April 26, 2021 | Second Deposit of $600,000 due (Sperber Dec. at Exhibit "K" [SPA] at ¶ 2(a).) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at at ¶ 45.) | $157,275 |
| April 26, 2021 | $671,600 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 50.) | | -$514,325 |
| April 27, 2021 | $345,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 51.) | $345,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 3, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 52.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 5, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 53.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 10, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 54.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$514,325 |
| May 11, 2021 | $1,020,510 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 55.) | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$844,835 |
| May 12, 2021 | $1,035,000 (Sperber Dec. at | $690,000 (Sperber Dec. at | -$1,189,835 |

| | Exhibit "C" [JSUF] at ¶ 56.) | Exhibit "C" [JSUF] at ¶ 45.) | |
|---|---|---|---|
| May 13, 2021 | $666,770 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 57.) | | -$1,856,605 |
| May 19, 2021 | $2,070,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 59.) | $1,380,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$2,546,605 |
| May 20, 2021 | $690,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 60.) | $345,000 (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 45.) | -$2,891,605 |

**RESPONSE**: Disputed that the cited evidence demonstrates that any issues related to the timeliness of Rock Fitek's payments were Rock Fintek's fault or excused Adorama and Kitchen Winners' rebate obligations under the SPA. To the contrary, any timelines issues with respect to payments for glove deliveries were caused by Adorama and Kitchen Winners delivering wrong brand gloves which caused cash flow problems for Rock Fintek through delayed payments to Rock Fintek from Ascension. (*See* ASOF ¶¶ 278-281).

82.     Even after Kitchen Winners had delivered the full 1.5 million boxes of gloves agreed upon, Rock Fintek kept coming back to Kitchen Winners for more and more gloves.  And Kitchen Winners delivered.  (Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶¶ 23-24.)

**RESPONSE**: Disputed. The cited vague statement by Weiner does not support the statement that Rock Fintek "kept on requesting additional boxes of gloves." To the contrary, the documentary evidence demonstrates that Kitchen Winners and Adorama acknowledged having unilaterally delivered a larger quantity of gloves than requested and

that disputes arose over those overages once Rock Fintek became aware of them. (*See* ASOF ¶¶ 278-281).

**Rock Fintek Resells the Gloves to Ascension**

83.     As stated above, the Ascension Purchase Order required Rock Fintek to source 200 million nitrile exam gloves for Ascension.   (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 71; Exhibit "I" [Ascension Purchase Order] produced in discovery as RF_001279-001285.)

84.     Under the Ascension Purchase Order, Ascension agreed to pay Rock Fintek 18.5 cents per glove, for a total purchase price of $37,000,000.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 72; Exhibit "I" [Ascension Purchase Order] produced in discovery as RF_001279-001285.)

85.     Ascension testified that it paid Rock Fintek for every single glove that Rock Fintek delivered.  (Sperber Dec. at Exhibit "M" [Ascension's designated witness Michael Elstro ("M. Elstro") Transcript at 36:18-37:5.)

> **RESPONSE**: Disputed. Consistent with Ascension's testimony, Rock Fintek's bank records demonstrate that Ascension paid Rock Fintek approximately $36.7 million for MedCare gloves. (*See* ASOF ¶¶ 152-153).

86.     Indeed, Rock Fintek's own bank records show that Ascension paid Rock Fintek **more** than the $37 million in the purchase order, because Rock Fintek delivered more than the 200 million gloves originally agreed upon.  (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

> **RESPONSE**: Disputed. Rock Fintek's bank records demonstrate that Ascension paid Rock Fintek approximately $36.7 million for MedCare gloves. (*See* ASOF ¶¶ 152-153).

87.     Kato testified that all incoming payments from Ascension to Rock Fintek after the beginning of the transactions at issue in this action, were to pay for the gloves that Rock Fintek

was buying from JNS and Kitchen Winners and reselling to Ascension.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15.)

> **RESPONSE**: Disputed. At Kato's deposition, counsel did not show Kato Rock Fintek's bank records and did not question him regarding specific transactions reflected therein. In fact, Rock Fintek's bank records demonstrate that Ascension paid Rock Fintek approximately \$36.7 million for MedCare gloves. (*See* ASOF ¶¶ 152-153).

88.     A review of Rock Fintek's bank statements from December 8, 2020 – one day after Rock Fintek accepted the Ascension Purchase Order –  until June 2021, when the parties' relationship ended, shows payments from Ascension totaling \$38,842,608.75. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

> **RESPONSE**: Disputed that all payments subsequent to December 8, 2020 were for the gloves at issue. The payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling \$2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame. (ASOF ¶ 152).

89.     Rock Fintek has not returned to Ascension any of the money that Ascension paid for the gloves.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 79.)

90.     Nor has Ascension commenced any lawsuit or legal action to recover any portion of the funds that it paid Rock Fintek.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 80.)

> **RESPONSE**: Disputed to the extent this statement calls for an inference that Rock Fintek has no current significant exposure to Ascension. (*See* ASOF ¶¶ 294-296).

**Rock Fintek Owes Substantial Sums to Kitchen Winners**

91.    Ascension testified that Rock Fintek fulfilled the purchase order for 200 million gloves, and did so solely with MedCare and LevMed brand gloves.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 73.)

92.    Ascension testified that Rock Fintek ultimately delivered approximately 196 million Medcare brand gloves (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 35:9-24; 61:18-23.)

RESPONSE: Disputed that all of those gloves were MedCare brand. Elstro testified that he "believe[d]" that the LevMed gloves were "outside" of the 196 million gloves, whatever that means. Contemporaneous documentary evidence demonstrates to the contrary that Medline warehouses entered the 2,495 cartons (2,495,000 gloves) of LevMed gloves as MedCare gloves when they arrived and shelved those gloves as MedCare gloves. (Rakhunov Exh. 4 [Mendel Rock Gloves Chat] at 10). In other words, the approximately 196 million gloves that Rock Fintek sold to Ascension included the 2.495 million erroneously sold LevMed gloves.

93.    Any LevMed brand gloves were in excess of those 196 million Medcare brand gloves.  (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 61:24-62:20.)

RESPONSE: Disputed. The cited testimony does not support this statement. Elstro testified that he "believe[d]" that the LevMed gloves were "outside" of the 196 million gloves, whatever that means. Contemporaneous documentary evidence demonstrates to the contrary that Medline warehouses entered the 2,495 cartons (2,495,000 gloves) of LevMed gloves as MedCare gloves when they arrived and shelved those gloves as MedCare gloves. (Rakhunov Exh. 4 [Mendel Rock Gloves Chat] at 10). In other words, the approximately

196 million gloves that Rock Fintek sold to Ascension included the 2.495 million erroneously sold LevMed gloves.

94.    According to Rock Fintek, it only purchased Medcare gloves from JNS/Stern and Adorama/Kitchen Winners.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 77.)

95.    Rock Fintek maintains that it only purchased LevMed brand gloves from Adorama/Kitchen Winners.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 78.)

96.    The math, therefore, is straightforward.   Rock Fintek purchased 26,193,100 Medcare brand gloves from JNS.  The remaining 169,806,900 Medcare gloves (196 million minus 26,193,100) must have come from Kitchen Winners.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 73, 77-78; Exhibit "M" [M. Elstro Transcript] at 35:9-24, 61:18-62:20.)

RESPONSE: Disputed.  The math is far from straightforward.  For example, contemporaneous documentary evidence demonstrates that Kitchen Winners and Adorama delivered 2,495 cartons (2,495,000 gloves) of LevMed gloves, which Medline entered as MedCare gloves when they arrived and shelved those gloves as MedCare gloves.

97.    Further, Rock Fintek claims that it bought 90,000 boxes of LevMed brand gloves from Kitchen Winners and resold them to Ascension.  (Sperber Dec. at Exhibit "B" [TPC] at ¶ 95.)

RESPONSE: Disputed.  As discovery revealed, Kitchen Winners and Adorama admitted that they may have delivered approximately 2.495 million LevMed gloves. (Rakhunov Dec., Exh. 4 [Mendel Rock Chat] at 10).

98.    Rock Fintek agreed to pay Kitchen Winners $14/box for the 90,000 boxes of gloves that it purchased in the Kitchen Winners One Off Transactions.   (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 39.)   Thereafter, it agreed to pay $11.50/box.  (Sperber Dec. at Exhibit "K" [SPA] at ¶ 1.)  The math therefore works out as follows:

| Transaction | Number of Boxes | Price Per Box | Total Owed |
|---|---|---|---|
| Kitchen Winners One Off Transactions | 90,000 boxes | $14/box | $1,260,000 |
| Remaining Medcare Gloves | 1,608,069 boxes[1] | $11.50/box | $18,492,793.50 |
| LevMed Gloves | 90,000 boxes | $11.50/box | $1,035,000 |

Adding these numbers together, Rock Fintek owed Kitchen Winners a total of $20,787,794 for the gloves that it purchased.

**RESPONSE**: Disputed. Putting aside the fact that Kitchen Winners and Adorama delivered non-conforming gloves, this statement ignores the contractual rebate of $750,000 owed to Rock Fintek, ignores the $1,035,000 by which Adorama and Kitchen Winners overcharged Rock Fintek, and ignores the fact that the quantities of gloves for which Kitchen Winners and Adorama invoiced Rock Fintek do not match up to the quantities that are reflected as having been delivered in the bills of lading. (Compare Rakhunov Exh. 41 at RF_00578-79, 581, 583, 585, 587, 636, 638-39, 641-43, 588-97, 599-601, 603, 605, 607, 609, 611, 613, 624, 615, 617, 619, 621, 623, 626-28, 632-35, 629-631, to *id.* at RF_0000644-45). In a contemporaneous email to Mendlowitz attaching a delivery report, Weiner admitted that some loads sold to Rock Fintek "have less quantities, but their payments was always for full loads." (Rakhunov Dec., Exh. 5 [COMPILATION 2 at AKW001598]). In yet another email to Mendlowitz, Weiner admitted that there was an

---

[1] Calculated at 169,806,900 Medcare gloves minus the 90,000 Medcare gloves sold in the Kitchen Winners One Off Transactions.

"[o]verage" beyond what was supposed to be delivered and that there was a dispute as to whether 22,760 boxes (2,276,000 gloves) were even delivered. (*Id.* at AKW001909).

99.     Pursuant to the SPA, "Buyer shall arrange for and pay the cost of ground transportation after customs clearance." (Sperber Dec. at Exhibit "K" [SPA] at ¶ 5.)

**RESPONSE**: Disputed that this clause of the SPA was implemented in this way by the parties during the performance of the SPA. Rock Fintek never picked up gloves right after customs clearance but picked up gloves from the sellers' warehouses. (Sperber Dec., Exh. G [Gilling Tr.] at 154:18-155:16).

100.     Rock Fintek consistently refused to pay for the trucking costs, oddly claiming that the trucking invoices were not real trucking invoices. (Sperber Dec. at Exhibit "P" [J. Weiner 11/16 Transcript] at 65:19-68:6.)

**RESPONSE**: Disputed that the cited vague testimony supports this statement. Testimony and contemporaneous documentary evidence demonstrates that Rock Fintek repeatedly asked for support for the extravagant trucking costs that Kitchen Winners and Adorama sought to charge it but Kitchen Winners and Adorama refused to provide that information. (Sperber Dec., Exh. G [Gilling Tr.] at 155:23-156:16; Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat] at 21).

101.     Additionally, Rock Fintek owed $827,806.42 for trucking and related expenses. (Sperber Dec. at Exhibit "Q" [MD 3PL Trucking and Storage Invoices]; Exhibit "R" [ACL America, Inc. Trucking Invoices]; Exhibit "S" [delexpress Trucking Invoices]; Exhibit "T" [wenzy inc Trucking Invoices].)

**RESPONSE**: Disputed. Kitchen Winners and Adorama have still failed to provide support for the extravagant trucking costs that they sought to charge Rock Fintek.  (Sperber Dec.,

Exh. G [Gilling Tr.] at 155:23-156:16). Rock Fintek disputes that wenzy inc. is even a real trucking company. (Rakhunov Dec., Exh. 6 [RF_000477-478]). At his deposition, Weiner could not provide any information about wenzy, inc. other than he believed it was a company owned either by his wife or his friend's wife, and testified that he didn't use that company for a "very long time." (Sperber Dec., Exh. P [Weiner Day II] at 55:14-59:5). When Rock Fintek sought to subpoena wenzy inc. during the course of this litigation at its registered location, that address appeared to have been a private residence in the past but was vacant. (Rakhunov Dec., Exh. 7 [Affidavit of attempted service and cover email from process server]).

Indeed, the wenzy inc. "invoices" look nothing like invoices provided by other (legitimate) trucking companies but look identical in form to invoices provided *by Kitchen Winners* for gloves. (*Compare, e.g.,* Sperber Dec., Exh. T [wenzy invoices], *with* Rakhunov Dec., Exh. 48 [Kitchen Winners invoices for gloves], with Sperber Dec., Exhs. R & S [ACL and DelExpress invoices]). Kitchen Winners has never produced any evidence that it actually paid those amounts to wenzy inc. In other words, Kitchen Winners has never been able to provide legitimate support for the extraordinary trucking costs that it seeks to impose on Rock Fintek.

102.    The SPA required Rock Fintek to make payments for each box of gloves "upon [Rock Fintek's] inspection of the products at [Kitchen Winners'] warehouse in Los Angeles, California prior to [Rock Fintek's] collection of the delivered Products.  Payments are considered timely if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at [Kitchen Winners'] Los Angeles warehouse.  (Sperber Dec. at Exhibit "K" [SPA]¶ 2(d).)

**RESPONSE**: Rock Fintek objects to this statement as setting forth a legal conclusion. The SPA speaks for itself. Kitchen Winners and Adorama materially breached their obligations under the SPA including by delivering non-conforming gloves that crippled Rock Fintek's cash flow and caused delayed payments. (*See* ASOF ¶¶ 278-281). Furthermore, not all glove shipments were picked up from the Sellers' warehouse in Los Angeles but were at times picked up from other warehouses. (Sperber Dec., Exh. P [Weiner Tr. Day II] at 66:7-15).

103.    In other words, Rock Fintek was required to pay Kitchen Winners within 48 hours (excluding Saturday and Sunday) from when the gloves were available for Rock Fintek to pick them up.

**RESPONSE**: Rock Fintek disputes the characterization of the SPA, which speaks for itself.

104.    Additionally, pursuant to the SPA, "Buyer shall arrange for and pay the cost of ground transportation after customs clearance." (SPA at ¶ 5.)

**RESPONSE**: Disputed that this clause of the SPA was implemented in this way by the parties during the performance of the SPA. Rock Fintek never picked up gloves right after customs clearance but picked up gloves from the sellers' warehouses. (Sperber Dec., Exh. G [Gilling Tr.] at 154:18-155:16).

105.    However, following the first few payments, which Rock Fintek timely made, Rock Fintek did not have a sufficient cash flow to pay Kitchen Winners for the gloves within 48 hours of their availability at Kitchen Winners' warehouses. ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 12.)

**RESPONSE**: Denied as characterized. Any payments that ended up being made more than 48-hours after product availability were caused by Kitchen Winners and Adorama when they delivered LevMed brand gloves that were non-conforming to the parties' contract and caused significant problems with Rock Fintek's client Ascension. (ASOF ¶¶ 219, 278).

106.    Rock Fintek explained that it lost a lot of money in Thailand and therefore could not make timely payments.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 13.)

**RESPONSE**: Rock Fintek objects to the evidence supporting this statement as lacking foundation and as hearsay. Weiner does not attribute this supposed statement to any particular individual or provide any context or specificity that could make this statement subject to any hearsay exception. In any event, this statement is disputed. Any payments that ended up being made more than 48-hours after product availability were caused by the delivery of LevMed brand gloves that were non-conforming to the parties' contract and caused significant problems with Rock Fintek's client Ascension, disrupting Rock Fintek's cash flow. (ASOF ¶¶ 219, 278).

107.    In order to gain time, during which Rock Fintek claimed that it would obtain the necessary funds, Rock Fintek requested that Kitchen Winners hire trucking companies and truck the gloves to the states in which Rock Fintek's customers were located.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 15.)

**RESPONSE**: Disputed. Rock Fintek does not dispute that Kitchen Winners trucked certain later shipments of gloves to Chicago and Texas, but disputes the purported reason for doing so. Instead, any payments that ended up being made more than 48-hours after product availability were caused by the delivery of LevMed brand gloves that were non-conforming

34

to the parties' contract and caused significant problems with Rock Fintek's client Ascension, disrupting Rock Fintek's cash flow. (ASOF ¶¶ 219, 278).

108.    Specifically, Rock Fintek requested that Kitchen Winners truck the gloves to Illinois and Texas.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 16.)

109.    Although Rock Fintek was contractually required to pay for the trucking, which it failed to do, Kitchen Winners agreed to front the money to pay for the trucking. ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 17.)

**RESPONSE**: Disputed that the trucking services at issue in this statement were within the scope of the SPA. In any event, while Rock Fintek did agree to pay for pass-through trucking costs for gloves, testimony and contemporaneous documentary evidence demonstrates that Rock Fintek repeatedly asked for support for the extravagant trucking costs that Kitchen Winners and Adorama sought to charge it but Kitchen Winners and Adorama refused to provide that information. (Sperber Dec., Exh. G [Gilling Tr.] at 155:23-156:16; Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat] at 21). Rock Fintek also disputes that wenzy inc. is even a real trucking company or that the invoices submitted purportedly on wenzy inc.'s behalf were real. (Rakhunov Dec., Exh. 6 [RF_000477-478]). At his deposition, Weiner could not provide any information about wenzy, inc. other than he believed it was a company owned either by his wife or his friend's wife, and testified that he didn't use that company for a "very long time." (Sperber Dec., Exh. P [Weiner Day II] at 55:14-59:5). When Rock Fintek sought to subpoena wenzy inc. during the course of this litigation at its registered location, that address appeared to have been a private

residence in the past but was vacant. (Rakhunov Dec., Exh. 7 [Affidavit of attempted service and cover email from process server]).

Indeed, the wenzy inc. "invoices" look nothing like invoices provided by other (legitimate) trucking companies but look identical in form to invoices provided *by Kitchen Winners* for gloves. (*Compare, e.g.,* Sperber Dec., Exh. T [wenzy invoices], *with* Rakhunov Dec., Exh. 48 [Kitchen Winners invoices for gloves], with Sperber Dec., Exhs. R & S [ACL and DelExpress invoices]). Kitchen Winners has never produced any evidence that it actually paid those amounts to wenzy inc. In other words, Kitchen Winners has never been able to provide legitimate support for the extraordinary trucking costs that it seeks to impose on Rock Fintek.

110.    Rock Fintek agreed to repay Kitchen Winners all of its costs for the trucking. ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 18.)

**RESPONSE**: Disputed that Rock Fintek agreed to repay "all" of Kitchen Winners' trucking costs. Rock Fintek agreed to pay for certain ground transportation as "pass-through cost." (Sperber Dec., Exh. G [Gilling Tr.] at 156:6-9). As detailed above, Kitchen Winners has never been able to substantiate the shipping charges to Rock Fintek.

111.    Even after the gloves reached Illinois and Texas, Rock Fintek still did not have the funds to pay for the gloves.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 19.)

**RESPONSE**: Rock Fintek objects to the evidence underlying this statement as lacking foundation.

112.     Kitchen Winners was forced to hire third-party storage space to store the gloves until Rock Fintek was able to obtain the necessary funds to pay Kitchen Winners for the gloves. ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 20.)

**RESPONSE**: Rock Fintek objects to the evidence underlying this statement as lacking foundation and as immaterial and irrelevant.

113.     Kitchen Winners was forced to take on the unanticipated expenses of paying for third-party storage and the gloves would remain in that storage for a week, two, three or even as long as a month.  ((Sperber Dec. at Exhibit "Z" [Declaration of J. Weiner dated February 16, 2024] at ¶ 21.)

**RESPONSE**: Rock Fintek objects to the evidence underlying this statement as lacking foundation and as immaterial and irrelevant.

114.     Rock Fintek consistently refused to pay for the trucking costs, oddly claiming that the trucking invoices were not real trucking invoices.  (Sperber Dec. at Exhibit "F" [J Weiner 11/15 Transcript] at 65:19-68:6)

**RESPONSE**:  *See* Responses to ¶¶ 100-101, *supra*.

115.     In total, Rock Fintek owed Kitchen Winners $21,615,600.42 for the gloves that it purchased and the trucking and related expenses.

**RESPONSE**: Disputed. As detailed above, this number includes unsubstantiated purported trucking costs, fails to take into account the $750,000 contractually-required rebate and includes charges for incorrect quantities of gloves. (*See* Responses to ¶¶ 100-101, *supra*., Sperber Decl. Exh. K [SPA]).

116.     Rock Fintek only paid Kitchen Winners and/or Adorama a total of $20,648,435 (Sperber Dec. at Exhibit "C" [JSUF] at ¶¶ 45-46.)

117.     Rock Fintek still owes Kitchen Winners $967,165.42.

**RESPONSE**: Disputed. As detailed above, this number includes unsubstantiated purported trucking costs, fails to take into account the $750,000 contractually-required rebate and includes charges for incorrect quantities of gloves. (*See* Responses to ¶¶ 100-101, *supra*., Sperber Decl. Exh. K [SPA]).

118.     Ascension's bank records show that it paid Rock Fintek $38,842,608.75, which was more than sufficient to pay Kitchen Winners the monies that Rock Fintek still owed. Rock Fintek refused to pay these outstanding bills. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

**RESPONSE**: Disputed to the extent that this statement claims that all of this revenue was from the glove transactions at issue. As set forth in ASOF ¶ 152, *infra*, the payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame. (ASOF ¶¶ 152).

**Rock Fintek's Specious Claims of a Future Business Relationship with Ascension**

119.     Rock Fintek has not retained an expert economist to project its future lost profits.

**RESPONSE**: Disputed to the extent that this statement seeks an inference or legal conclusion that Rock Fintek was required to retain an expert economist beyond Kato, who is qualified to project future lost profits of his own business.

120.     The only expert that it has identified to testify as to its lost business calculations, is Kato.  (Sperber Dec. at Exhibit "V" [Rock Fintek's Expert Disclosures].)

121.    At his deposition, Kato could not explain how he calculated Rock Fintek's relationship with Ascension as worth $36,000,000 per year in profits. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 11:19-12:6; 15:8-21.)

**RESPONSE**: Disputed. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

122.    In the time period before the transaction at issue in this lawsuit – namely, between March 2020 and November 2020 – Rock Fintek's total revenue from its relationship with Ascension was approximately $24 million. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo]; (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 13:10-16.)

**RESPONSE**:  Disputed. The revenue that Rock Fintek received from Ascension outside of the transactions at issue in this lawsuit was approximately $25.9 million. *See* ASOF ¶ 151-154.

123.    Kato could not say what Rock Fintek's profits were from the transactions between March 2020 and November 2020. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 11:10-12:8.)

**RESPONSE**: Disputed. In the cited testimony, Kato referred to the financials, which were not shown to him at his deposition. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

124.    In the time period between December 2020 and June 2021 – namely, the time period during which the transactions at issue in this lawsuit were taking place – Rock Fintek's total revenue from Ascension was $38,842,608.75. (Sperber Dec. at Exhibit "N" [Rock Fintek Bank Records at Bank of America]; Exhibit "O" [Rock Fintek Bank Records at Wells Fargo].)

**RESPONSE**: Disputed to the extent that this statement suggests that all of this revenue was from the glove transactions at issue. As set forth in ASOF ¶ 152, *infra*, the payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame. (ASOF ¶¶ 152).

125.    Kato testified that all of the payments between December 2020 and June 2021 were in connection with the Ascension Purchase Order, and that Rock Fintek actually lost money on that transaction. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15; Exhibit "C" [JSUF] at ¶¶ 82-83).

**RESPONSE**: Disputed. As set forth in ASOF ¶ 152, *infra*, the payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame.

126.    Accordingly, Rock Fintek's profits between December 2020 and June 2021 were negative. (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15; Exhibit "C" [JSUF] at ¶¶ 82-83).

**RESPONSE**: Disputed as incomplete and therefore misleading. Rock Fintek lost money on the Ascension deal not because of the glove transactions at issue but primarily because of the theft of $6.2 million that it suffered from a purported glove supplier in Thailand. *See* ¶ 34, *supra*. But for that theft, Rock Fintek would have made at least $6 million in profit on the transaction at issue.

127.    There is no way to know what Rock Fintek's future revenues (let alone profits) from its relationship with Ascension; Ascension explained that it would divide its potential future relationship with Rock Fintek into the long-term and the short-term. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 37:6-13.)

**RESPONSE**: Disputed. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

128.    Ascension defined the 'short term' as "when Covid was more prevalent throughout the United States, so that in 2020, 2021, 2022 time frame" and "starts to tail off during 2022" (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 59:16-60:6).

**RESPONSE**: Disputed. Ascension was still experiencing some blips in the supply chain at the time of Mr. Elstro's deposition and other short-term suppliers of gloves to Ascension continue selling gloves to Ascension to this day. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

129.    Ascension testified that in the 'short term,' "it's highly likely that [they] would have continued to engage with Rock Fintek in additional business opportunities. There were other needs that came up. . . . there was a run where people were having issues getting bent metal, things like wheelchairs and walkers crutches and canes . . . an opportunity like that is something like Rock Fintek would have missed out upon."  (Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 37:14-38:8.)

130.    It is unclear what specific products Rock Fintek would have *actually* been able to supply Ascension in the 'short term,' and what Rock Fintek's profit margin would have been on those products.

**RESPONSE**: Disputed to the extent this statement seeks an unwarranted inference in the moving party's favor or a legal conclusion that Rock Fintek has to prove specifically rather than with reasonable certainty which products it would have supplied to Ascension but for the non-conforming glove delivery.

131.    Kato testified that, in the 'short term,' Rock Fintek would have supplied gloves, masks, gowns, and testing kits. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 24:8-17.)

132.    However, there is no way of knowing which of those products Ascension would have actually purchased from Rock Fintel, in what quantity, and at what price.

**RESPONSE**: Disputed to the extent this statement seeks an unwarranted inference in the moving party's favor or a legal conclusion that Rock Fintek has to prove specifically rather than with reasonable certainty which products it would have supplied to Ascension but for the non-conforming glove delivery.

133.    For example, Ascension testified that as of June 2021, it was not thinking of purchasing any additional gloves. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 55:18-56:5.)

**RESPONSE**: Disputed. The cited testimony does not support this statement. Ascension testified that "at that moment" Ascension was not thinking of purchasing additional gloves having just purchased a six-month supply. (Sperber Dec., Exh. M [Elstro Tr.] at 55:23-56:5).

134.    Also, the testing kits referenced by Kato were never manufactured or approved by the FDA. (Sperber Dec. at Exhibit "Y" [T. Kato Expert Deposition Transcript] at 29:19-30:8; 60:13-25.)

135.   There is no way of knowing what Rock Fintek's costs would have been in procuring gloves, masks, gowns, and testing kits products for Ascension.

**RESPONSE**: Disputed to the extent this statement seeks an unwarranted inference in the moving party's favor or a legal conclusion that Rock Fintek has to prove specifically rather than with reasonable certainty which products it would have supplied to Ascension but for the non-conforming glove delivery.

136.   Accordingly, there is no way to project Rock Fintek's future lost profits during the "short term" time period.

**RESPONSE**: Disputed to the extent this statement seeks an unwarranted inference in the moving party's favor or a legal conclusion that Rock Fintek has to prove specifically rather than with reasonable certainty which products it would have supplied to Ascension but for the non-conforming glove delivery. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

137.   As to the long term, Ascension testified that its COO and vice president for supply chain had conversations with Rock Fintek as follows:

> [Rock Fintek would] need to clear some *major hurdles* to do that, we would have discussions with them, just like we would other Suppliers.  But to get into that medical space, supply space, Todd and Dwayne let Rock Fintek know, one, you've got to go through all the FDA approvals, right.  And that is *no small hurdle*. And two, you're also dealing with -- when you talk about gloves and PPE and masks, you're talking about some *ginormous companies* and organizations that they would have to get *very competitive* on price. So there were a couple of *big hurdles* there, but if they were willing to clear those, then we would certainly talk to them.  But they would have to look at winning the business.  It wasn't just going to be given to them.  . . .  We never talked to them about a specific, like, long-term contract or bidding on a long-term nitrile glove business for the organization

(Sperber Dec. at Exhibit "M"  [M. Elstro Transcript] at 40:1-41:9)  (emphasis supplied).

43

**RESPONSE**: Disputed as incomplete. Rock Fintek witnesses testified as to additional details regarding their discussions with Ascension as to long-term business opportunities. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

138.    Ascension testified that Rock Fintek was certainly not guaranteed any future long term business. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 40:1-41:9.)

139.    In order for Rock Fintek to have any hopes for a long-term business relationship with Ascension, it would need to (1) get FDA approvals for the products it was selling; and (2) be "very competitive on price" with "ginormous companies" – cumulatively described by Ascension as "major hurdles," "no small hurdle," and "big hurdles." (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 40:1-41:9.)

**RESPONSE**: Disputed as incomplete. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

140.    There is no way to square Rock Fintek's claim for $36 million per year in future lost profit with Ascension's testimony that Rock Fintek's actual prospect for long-term business with the company was highly tenuous. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 40:1-41:9.)

**RESPONSE**: Rock Fintek objects to this statement as an unsupported conclusion of fact and as improperly seeking unreasonable inferences to be drawn in the moving party's favor. The cited evidence does not support this statement. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

141.    There is no way to square Rock Fintek's claim for massive future profits – wholly out of line with its own unprofitable past business with Ascension – with the fact that any potential

profit margins surely would have shrunk as it was forced to become "very competitive on price" with "ginormous" competitors. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 40:1-41:9.)

      **RESPONSE**: Rock Fintek objects to this statement as an unsupported conclusion of fact and as improperly seeking unreasonable inferences to be drawn in the moving party's favor. The cited evidence does not support this statement. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

142.    There is no way to project Rock Fintek's post-Covid-19 profit on PPE sales based upon revenue and pricing that Rock Fintek utilized during the Covid-19 pandemic.

      **RESPONSE**: Disputed to the extent this statement seeks an unwarranted inference in the moving party's favor or a legal conclusion that Rock Fintek has to prove specifically rather than with reasonable certainty which products it would have supplied to Ascension but for the non-conforming glove delivery. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

143.    There is no way to know whether Rock Fintek would have been able to obtain the FDA approvals that Ascension was demanding. (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 40:1-41:9.)

      **RESPONSE**: Disputed to the extent this statement seeks an unwarranted inference in the moving party's favor or a legal conclusion that Rock Fintek has to prove specifically rather than with reasonable certainty which products it would have supplied to Ascension but for the non-conforming glove delivery. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

144.    Rock Fintek's claim to have lost $36 million per year in lost profits, for the next three years, is utterly baseless.

**RESPONSE**: Rock Fintek objects to this statement as an unsupported conclusion of fact and as improperly seeking unreasonable inferences to be drawn in the moving party's favor. The cited evidence does not support this statement. The detailed facts supporting Rock Fintek's anticipated lost profits are set forth in ASOF ¶¶ 282-293, *infra*.

145.    Mr. Kato and Mr. Gilling both testified that they had no relevant experience selling PPE prior to COVID.  (Sperber Dec. at Exhibit "C" [JSUF] at ¶ 85; Exhibit "G" [B. Gilling Transcript] at 171:4-7;  Exhibit "D" [T. Kato Non-Expert Transcript] 24:18-21.)

### ROCK FINTEK'S ADDITIONAL STATEMENTS OF FACT ("ASOF")

***Rock Fintek Enjoyed a Profitable PPE Business with Ascension Health and Other Clients***

146.    Rock Fintek began doing business with Ascension in or about March 2020. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 2).

147.    Between March 2020 and June 2021, Rock Fintek had sold PPE primarily to the following clients:  Ascension Health, City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., Patterson Companies Inc., and some other smaller customers. (Rakhunov Dec., Exh. 8 [Declaration of Thomas Kato dated March 14, 2024 ("Kato Dec.")] at ¶ 9; Sperber Dec., Exh. D [Kato Tr.] at 27:5-21).

148.    Mr. Kato was introduced to Ascension through an acquaintance who did real estate work for Ascension. (Sperber Dec., Exh. D [Kato Tr.] at 26:12-23).

149.    After Kato was introduced to Ascension, he also learned that he had a close family connection to one of Ascension's top executives, which uniquely positioned Rock Fintek to solidify a long-term relationship with Ascension. Kato viewed the Ascension relationship as an incredible business opportunity for Rock Fintek and critical to Rock Fintek's profitability and survival. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 3).

150.     Other than the purchase order for the gloves at issue, between March 2020 and April 2021, Rock Fintek had sold to Ascension approximately $25.9 million in other PPE, including masks, gloves and gowns. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 4).

151.     The following chart is a summary of payments received from Ascension for products *other than the gloves at issue* in this lawsuit:

| Ascension Payments to Rock Fintek for Non-MedCare Glove Products | | | |
|---|---|---|---|
| BANK | ACCOUNT | Payment Date | Amount |
| Wells Fargo | ******7633 | 03/23/20 | $1,625,000.00 |
| Wells Fargo | ******7633 | 03/23/20 | $2,150,000.00 |
| Wells Fargo | ******7633 | 03/24/20 | $4,000,000.00 |
| Wells Fargo | ******7633 | 04/22/20 | $1,625,000.00 |
| Wells Fargo | ******7633 | 04/22/20 | $2,150,000.00 |
| Wells Fargo | ******7633 | 05/08/20 | $397,660.00 |
| Wells Fargo | ******7633 | 05/11/20 | $1,244,900.00 |
| Wells Fargo | ******7633 | 05/12/20 | $945,180.00 |
| Wells Fargo | ******7633 | 05/13/20 | $741,760.00 |
| Wells Fargo | ******7633 | 05/15/20 | $3,374,000.00 |
| Wells Fargo | ******7633 | 05/21/20 | $626,000.00 |
| Wells Fargo | ******7633 | 06/15/20 | $825,000.00 |
| Wells Fargo | ******7633 | 06/22/20 | $825,000.00 |
| Wells Fargo | ******7633 | 07/14/20 | $445,500.00 |
| Wells Fargo | ******7633 | 08/18/20 | $1,575,000.00 |
| Wells Fargo | ******7633 | 09/02/20 | $82,000.00 |
| Wells Fargo | ******7633 | 11/10/20 | $750,000.00 |
| Wells Fargo | ******7633 | 01/13/21 | $17,685.00 |
| Wells Fargo | ******7633 | 02/23/21 | $295,260.00 |
| Bank of America | ******** 9205 | 02/25/21 | $422,771.25 |
| Bank of America | ******** 9205 | 03/03/21 | $406,400.00 |
| Bank of America | ******** 9205 | 03/19/21 | $800,000.00 |
| Bank of America | ******** 9205 | 03/22/21 | $200,000.00 |
| Bank of America | ******** 9205 | 04/08/21 | $400,000.00 |
| | | **Total** | **$25,924,116.25** |

(Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 5; Sperber Dec., Exhs. N & O [Rock Fintek bank records]).[2]

152.    Contrary to Adorama Parties' claim, the payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 6; Exh. 9 [Ascension POs for Masks]).

153.    The following chart is a summary of payments received from Ascension for the gloves at issue in this lawsuit:

| Ascension Payments to Rock Fintek for MedCare and LevMed Gloves | | | |
|---|---|---|---|
| BANK | ACCOUNT | Payment Date | Amount |
| Wells Fargo | ******7633 | 12/08/20 | $9,250,000.00 |
| Bank of America | ******** 9205 | 03/05/21 | $357,975.00 |
| Bank of America | ******** 9205 | 03/09/21 | $393,600.00 |
| Bank of America | ******** 9205 | 03/18/21 | $589,548.75 |
| Bank of America | ******** 9205 | 03/25/21 | $360,750.00 |
| Bank of America | ******** 9205 | 03/29/21 | $331,890.00 |
| Bank of America | ******** 9205 | 04/07/21 | $141,276.25 |
| Bank of America | ******** 9205 | 04/26/21 | $716,643.75 |
| Bank of America | ******** 9205 | 04/27/21 | $444,693.75 |
| Bank of America | ******** 9205 | 04/28/21 | $346,042.50 |
| Bank of America | ******** 9205 | 04/30/21 | $812,103.75 |
| Bank of America | ******** 9205 | 05/04/21 | $388,500.00 |
| Bank of America | ******** 9205 | 05/05/21 | $807,525.00 |
| Bank of America | ******** 9205 | 05/06/21 | $414,168.75 |
| Bank of America | ******** 9205 | 05/07/21 | $413,475.00 |
| Bank of America | ******** 9205 | 05/10/21 | $804,611.25 |
| Bank of America | ******** 9205 | 05/11/21 | $831,667.50 |
| Bank of America | ******** 9205 | 05/12/21 | $1,169,801.25 |
| Bank of America | ******** 9205 | 05/18/21 | $1,643,910.00 |
| Bank of America | ******** 9205 | 05/21/21 | $808,357.50 |
| Bank of America | ******** 9205 | 05/24/21 | $2,837,298.75 |
| Bank of America | ******** 9205 | 05/25/21 | $767,426.25 |

---

[2] Pursuant to the Court's March 12, 2024 Order, Rock Fintek intends to file redacted versions of its bank records.

| Bank of America | ******** 9205 | 05/27/21 | $3,638,580.00 |
| Bank of America | ******** 9205 | 05/28/21 | $800,171.00 |
| Bank of America | ******** 9205 | 06/01/21 | $1,606,308.75 |
| Bank of America | ******** 9205 | 06/03/21 | $1,614,495.00 |
| Bank of America | ******** 9205 | 06/08/21 | $1,211,148.75 |
| Bank of America | ******** 9205 | 06/10/21 | $752,441.25 |
| Bank of America | ******** 9205 | 06/15/21 | $394,743.75 |
| Bank of America | ******** 9205 | 06/16/21 | $456,348.75 |
| Bank of America | ******** 9205 | 06/18/21 | $1,212,675.00 |
| | | **Total** | **$36,318,177.25** |

(Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 7; Sperber Dec., Exhs. N & O [Rock Fintek bank records]).

154.    Accordingly, Rock Fintek received $62,242,293.50 in revenue from Ascension through purchase orders obtained between March and December 2020.  (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 8).

155.    In addition to the Ascension business, between March 2020 and June 2021, Rock Fintek had sold approximately $39.936 of PPE to the City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., and Patterson Companies Inc. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 9 & Figure 3).

156.    In other words, between March 2020 and June 2021, Rock Fintek did more than $100 million of revenue in PPE business. (*Id.* ¶ 10).

157.    During that time frame, Rock Fintek sourced PPE primarily from the following suppliers:  JNS Capital Holdings/Joel Stern, Adorama Sellers, INTCO, Bomgogo LTD, and Alit Group. (*Id.* ¶ 11).

158.    As reflected in Rock Fintek's banking records and in Paragraphs 39 & 116, *supra*, Rock Fintek paid approximately $3,327,215 to JNS/Stern; $20,648,435 to Adorama Sellers; and

$19,451,332 to INTCO, Bomgogo LTD, and Alit Group combined. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 12).

159.    In connection with its all or substantially all of its PPE business, Rock Fintek used logistics and trucking services provided by Dimerco and ACT Logistics. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 13).

160.    As reflected in Rock Fintek's banking records, Rock Fintek paid approximately $6.2 million to ACT Logistics and Dimerco in 2020 and 2021. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 14; Sperber Dec., Exhs. O & P).

161.    Based on these numbers, the average profit margin for Rock Fintek in connection with its PPE business in 2020 and 2021 was approximately 50%. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 15).

162.    While the Ascension glove deal at issue in this lawsuit was less profitable than other Ascension transactions due to high supply costs, Rock Fintek did not make a profit on the Ascension glove deal not because of the deal itself, but because of the theft of $6.2 million that it suffered from a purported glove supplier in Thailand. *See* ¶ 34, *supra*. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 16).

163.    Had the Thailand deal been real, Rock Fintek would have paid $15.5 million for 200 million gloves rather than approximately $24 million that it paid to the Adorama Sellers and JNS, and would have received greater profits from its Ascension business. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 16).

**Adorama Is a Seller under the SPA, not Merely a Lender**

164.    Rock Fintek's COO Gilling testified that Rock Fintek was very specific that Adorama had to be a party to the SPA as a seller. To that end, Mr. Gilling participated in a telephone call with an Adorama principal on the line where the parties specifically discussed that Adorama

would be a party to the SPA. (Sperber Dec., Exh. G [Gilling Tr.] at 35:7-36:16, 37:15-20, 70:10-20, 100:4-11; 113:9-114:14; 116:8-119:18).

165. Prior to entering into the SPA, Adorama Sellers' broker Banon told Kato that Adorama was Kitchen Winners' partner that works with them in distribution, in charge of either manufacturing or procuring the gloves. (Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 194:8-15).

166. Rock Fintek would not have done the large deal with Kitchen Winners if Adorama was not a party to the transaction as a seller. To that end, prior to executing the Sales and Purchase Agreement (SPA) with Adorama and Kitchen Winners, Kato had one or two telephone conversations on which Joseph Mendlowitz from Adorama was present to discuss the proposed transaction. (*Id.* at 195:15-22, 290:8-292:9; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 33).

167. During those conversations, Kato and Mendlowitz discussed that if Rock Fintek was going to make a large purchase order it was going to have to be directly with Adorama "and not via Kitchen Winners" because Adorama seemed like a legitimate large company that had been around since the '70s. (Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 196:21-197:15, 290:18-292:43).

168. The SPA was drafted by attorneys who represented both, Adorama and Kitchen Winners. (Sperber Dec., Exh. E [Mendlowtiz Tr.] at 95:13-14; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 35).

169. Rock Fintek was not represented by counsel in connection with drafting or negotiating the SPA. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 36; Exh. 10 [Weiner Tr. Day I p.m.] at 180:4-7).

170.     On April 5, 2021, Weiner emailed a draft SPA to Mendlowitz asking him to "look it over" and call him about it. (Rakhunov Dec., Exh. 3 [5529_0002_AKW000650_002078_001]; Sperber Dec., Exh. E [Mendlowitz Tr.] at 95:15-96:7).

171.     Following that email between Weiner and Mendlowitz, material changes were made to the SPA including a change in quantity from 1 million to 1.5 million boxes of gloves, change in amounts and timing of payments, the removal of an additional order option, and modification of the rebate provision. *(Compare* Sperberg Dec., Exh. K, with Rakhunov Dec., Exh. 3 [5529_0002_AKW000650_002078_001]).

172.     Rock Fintek, Kitchen Winners and Adorama executed the SPA on or about April 7, 2021. (Sperber Dec., Exh. K [SPA]).

173.     Adorama signed the SPA as a "Seller." (*Id.* at 5.)

174.     Paragraph 2.c. of the SPA requires that "Buyer ***shall pay Seller*** in full by wire transfer of funds for each container Delivered to the Seller's warehouse..." (*Id.* at 2 (emphasis added).)

175.     Paragraph 2.d. of the SPA provided that "Any payment of the Purchase Price payable for each box of gloves delivered ***shall be paid to Seller*** …." (*Id.* at 3 (emphasis added).)

176.     It is undisputed that Rock Fintek made *every payment* under the *SPA to Adorama* in its bank account and not to Kitchen Winners. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 23:23:6-18, 68:23-69:4; Sperber Dec., Exh. E [Mendlowitz Tr.] at 63:25-64:8, 104:6-14). In other words, Adorama acted as a seller and received the benefits of a "Seller" under the express written terms of the SPA.

177.     The SPA does not anywhere refer to Adorama as a "lender" or the like. (*Id.*)

178.    Mendlowitz could not point to anywhere in the SPA that supported a position that Adorama was merely a lender under the SPA, but took the position that any arrangement between Adorama and Kitchen Winners did not need to be disclosed to Rock Fintek. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 97:13-100:4; 102:10-20).

179.    Mendlowitz is not aware of any communications to Rock Fintek notifying Rock Fintek that Adorama's role under the SPA was merely that of a lender. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 106:24-107:5).

180.    When Weiner was pressed at his deposition regarding his understanding of Adorama's obligations under the SPA, he was evasive and claimed that he does not "read English." (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 179:11-21 ("Q. I'm not asking what you told Mr. Maimon. I'm asking: Is there anything in this agreement that describes Adorama as a lender? That's a pretty simple "yes" or "no" question. A. Yes. Q. Where? A. I don't know, I don't read English so look for yourself. Find it.").

181.    To the extent that Adorama relies on any purported lending agreement between Adorama and Kitchen Winners, it is undisputed that Rock Fintek was never provided a copy of any such agreement or notified that any such agreement or arrangement existed. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 83:16-19).

182.    Arik Maimon, who assisted Rock Fintek with negotiating the SPA also viewed Adorama as a seller of gloves. (*See* Sperber Dec., Exh. L [Maimon LOI], ¶ 1 ("Rock Fintek desires to purchase up to 1 million boxes of powder-free nitrile medical gloves (100 gloves/box as per specifications) *from Kitchen Winners NY Inc (KWNY) / Adorama* … (emphasis added)).

183.    During the performance of the SPA, Weiner routinely kept Mendlowitz informed as to shipments to Rock Fintek and payments by Rock Fintek, and the specification and packaging

of gloves that were purportedly being sold to Rock Fintek. (Rakhunov Dec., Exh. 5 [Compilation of Emails Produced in Discovery]).

184.    When disputes between the parties arose in June and July 2021, Weiner kept Mendlowitz informed and either copied or BCC'd Mendlowitz on communications with Rock Fintek. (Rakhunov Dec., Exh. 11; Rakhunov Dec., Exh. 12 [Mendlowitz Dep. Exh. 15]; Sperber Dec., Exh. E [Mendlowitz Tr.] at 136:7-22).

185.    In those communications, Kitchen Winners and Adorama sought to condition providing documentation to show that the gloves already delivered conformed to specifications (which they did not) and conditioned the contractually required return of overcharges and payment of a rebate, on Rock Fintek buying 2 million more boxes of gloves from Adorama and Kitchen Winners for an additional $18 million and making a payment to *Maimon*, among other things. (Rakhunov Dec., Exh. 12).

**Adorama Sellers and Stern All Knew that Gloves Purchased by Rock Fintek Would Immediately Be Sold to its Hospital Client**

186.    In early February 2021, Rock Fintek was introduced to Joel Stern through Ms. Chunron Li and an individual named Bruno Azra. (JSUF ¶ 28; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

187.    From the very beginning of selling gloves to Rock Fintek, Stern understood that the gloves would be used in a hospital or other healthcare medical facility. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 58:19-59:3). Stern knew even without being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 82:6-19).

188.    Once they established direct contact with Stern, Kato and Gilling routinely had numerous telephone calls with Stern during the course of their business dealings when they told

him that their client was a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 24; *see also* Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 73:7-11, 80:21 ("everything was done over the phone"); Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 93:18-94:24.

189.    By April 2021, Stern was making efforts to learn the identity of Rock Fintek's client to try and get a purchase order directly from the hospital. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 79:23-80:20).

190.    Mendel Banon acted as the broker and representative of Kitchen Winners and Adorama in connection with the gloves transactions with Rock Fintek. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 19:10-17; Exh. F [Weiner Tr. Day I a.m.] at 33:20-34:14; 61:8-11 ("What is Mendel Banon's role with respect to Kitchen Winners?  A. He was a broker."); Exh. G [Gilling Tr.] at 48:11-15 ("Mendel Bannon held himself out as a representative of Kitchen Winners and associated with Adorama."), 53:6-13.); Rakhunov Dec., Exh. 15 [AKW_004957] (Bannon writing to Rock Fintek: "As per our call with Hershey and Arik *we* will release five today and *we will get paid* 8 to 9 loads on Tuesday…" (emphasis added)).

191.    In fact, Banon was the originator of the relationship between Kitchen Winners/Adorama and Anna Grinvald, the CEO and owner of Global Tooling Services, Inc. ("GTS"), the purported manufacturer of the MedCare brand gloves. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 87:4-16; *see also* Rakhunov Dec., Exh. 16 [AKW - 003168].

192.    Before Rock Fintek started buying gloves from Kitchen Winners/Adorama, in addition to written communications, Kato had numerous telephone calls, WhatsApp calls, and video calls with Mendel Banon, and even hosted Banon for lunch. During those discussions and

meetings, Banon consistently held himself out as the representative of Kitchen Winners and Adorama, using those names interchangeably. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 26).

193.     During those discussions and meetings, Kato told Banon very clearly that Rock Fintek was not the end user of the gloves but was purchasing them for its client – a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 26).

194.     Indeed, on **March 14, 2021**, in connection with one of the first one-off transactions and prior to the SPA, Banon asked Rock Fintek in a chat: "[3/14/21, 12:00:13 PM] Mendel: Hey, hope you're all enjoying ur weekend so far, any feedback regarding *the glove delivery to the hospital*? Which I assume were already delivered?" (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat highlighted] at 6.)

195.     While Rock Fintek did not disclose to Adorama Sellers or JNS/Stern the actual name of its hospital client during the course of the glove transactions, Rock Fintek unambiguously put all sellers of gloves on notice that its client was hospital group that had to approve the product and could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards.  (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 25-29; *id.*, Exh. 4 [Mendel Rock Gloves Chat highlighted] at 1, 2, 5, 8, 14, 20; *id.*, Exh. 17 [RF_000443-447 "if the hospital accepts it"]; Sperber Dec., Exh. G [Gilling Tr.] at 66:3-67:1).

196.     Arik Maimon, who was a personal acquaintance of Kato, sought to insert himself into Rock Fintek's PPE business and held himself out as having the ability to protect Rock Fintek's interests with respect to the transactions with Adorama and Kitchen Winners, insisting to Kato that his cultural and religious similarities with the Adorama Sellers put him in a unique position to protect Rock Fintek in Rock Fintek's business dealings with Adorama and Kitchen Winners.

Maimon communicated with the Adorama Sellers on behalf of Rock Fintek during the transactions at issue and knew at all times – because Kato told him – that the gloves being bought by Rock Fintek were for Ascension Health and undertook to protect Rock Fintek in that regard but betrayed Rock Fintek. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶¶ 27-28; *id.*, Exh. 18 [RF_000831-36]).

197.    Similarly, prior to entering into the SPA, Kato participated in numerous telephone calls with Hershey Weiner during which calls I told Weiner very clearly that the large glove order contemplated under the SPA was for Rock Fintek's hospital client that could only accept properly labelled FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 29).

198.    In his early conversations with Stern, Banon and Weiner, Kato not disclose the name of Ascension but told each of them that the end buyer of the gloves was an important hospital client of Rock Fintek – one of the two largest hospital systems in the United States – that had placed a purchase order for a large quantity of gloves and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, Kato specifically discussed with Stern, Banon and Weiner (in multiple separate conversations) that the money that was stolen in Thailand was a part of the large deposit made by the hospital client and that Rock Fintek was pursuing claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the 6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Kato sought to impress on the sellers both the potential upside of the glove

deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 31).

199.    In fact, during the ongoing business relationship, Kato and Gilling expressly discussed with Weiner, Arik Maimon and Banon the potential next large order of gloves for Ascension. When the relationship broke down, the sellers actually tried to use the information learned in those discussions to try and extort Rock Fintek to buy an additional 2 million boxes of gloves even though Ascension no longer wanted to do business with Rock Fintek. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 31; Exh. 12 [Mendlowitz Dep. Exh. 15]).

200.    Ascension testified that prior to purchasing any gloves from Rock Fintek, they had been provided documents by Rock Fintek that had Kitchen Winners' name on them, stating that the gloves were ASTM D-6319 rated and that the gloves were Nitrile. (Sperber Dec., Exh. M [Elstro Tr.] at 23:15-24).

***Adorama Sellers and Joel Stern Made Specific Material Representations About the Nature of the Gloves, Yet Knowingly Delivered Non-Conforming Gloves***

201.    All parties agree that the gloves sold under the SPA, the one-off Kitchen Winners transactions and gloves sold by Stern were required to be Medcare brand Nitrile Examination gloves with FDA 510(k) clearance. (Sperber Dec., Exh. K [SPA]; JSUF ¶ 33).

202.    Prior to any transactions taking place with Stern, Mr. Azra, on behalf of Stern, passed along to Ms. Li an offer to sell to Rock Fintek MedCare Nitrile Exam Gloves for $15 a box. (JSUF ¶ 29; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

203.    Stern, through Azra, passed paperwork about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the gloves he would sell to them were nitrile medical examination gloves. (JSUF ¶ 32; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 52:3-25; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

204.    Stern obtained this paperwork from Kitchen Winners. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 53:13-54:3)

205.    The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

> a.   CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]). As set forth in ¶¶ 270-274, *infra*, gloves from this Lot subsequently failed ASTM D-6319 testing and tested as Polyvinylchloride gloves having no detectible levels of nitrile.

> b.   A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

> c.   Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves identified by Weiner as detailed in Paragraph 239, *infra*. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

> d.   An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

206.    In reliance on these written materials from Stern, Rock Fintek gave an Irrevocable Corporate Purchase Order ("ICPO") to JNS, which specifically required FDA 510(k) certified MedCare Nitrile Medical Exam gloves.  (JSUF ¶¶ 30, 33; Rakhunov Dec., Exh. 13 [Stern Tr. Day

I] at 45:18-46:14; Rakhunov Exh. 23 [ICPO, Stern Dep., Exh. 1]; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

207.    The ICPO was with **JNS**, not with Bruno or Ms. Li.  (*Id.*)

208.    On March 4, 2021, prior to any one glove transactions between Rock Fintek and Kitchen Winners or Adorama taking place, Gilling specifically asked Banon via WhatsApp chat for documentation of FDA clearance and ASTM D-6319 certifications for the gloves that would be sold to Rock Fintek. (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat highlighted] at 1).

209.    In response, Banon provided Rock Fintek with a copy of the same March 9, 2016 FDA 510(k) clearance letter that Stern had provided previously and a series of links to the FDA website for that letter, through which Banon represented to Rock Fintek that the gloves that would be sold to Rock Fintek by Kitchen Winners (and later Adorama) were manufactured under the FDA 510(k) number K152712, with the ASTM D-6319 and other specifications detailed in that submission. (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves chat] at 1; Exh. 25 [00000017-K152712.pdf]; *see also* Rakhunov Dec., Exh. 25 [Gombo Tr.] at 51:13-52:2).

210.    To obtain FDA 510(k) clearance, a product has to be shown to be substantially equivalent to another product that is already on the market. (Rakhunov Dec. Exh. 24 [Deposition Transcript of Alan Schwartz ("Schwartz Tr.")] at 14:21-15:11).

211.    The FDA clearance letter that Banon provided represented equivalence to ASTM D-6319 gloves and also included a product code "LZA" which, as explained by Adorama Sellers' gloves expert, is a product code for medical "examination" gloves. (Exh. 25 [00000017-K152712.pdf]; Rakhunov Exh. 24 [Schwartz Tr.] at 23:2-9).

212.    ASTM D-6319 specifications require, among other things that the gloves be manufactured with "Nitrile" material, that the gloves be free from pinholes, demonstrate greater

than 500% elongation, and greater than 14 Mpa tensile strength.  (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat highlighted] at 1; Exh. 25[00000017-K152712.pdf] at Section C, p. 2/4; Exh. 27 [Expert Report of Jason Poulton, Ph.D] at 5-18).

213.    A "protection" glove as opposed to an "examination" glove would have more pin holes in it and would not pass a test when filling up with water in a lab. (Rakhunov Dec., Exh. 26 [November 2, 2023 Deposition Transcript of Tzali Gombo ("Gombo Tr.")] at 40:22-41:7).

214.    Weiner admitted that there were differences in quality and usage for "protection" gloves versus "examination" gloves and that a "protection" glove would be sold for less money than an "examination" glove. (Sperber Dec., Exh. F [Weiner Day I a.m.] at 97:13-98:21; 101:7-9).

215.    Indeed, Stern tried to sell the "protection" gloves that he had – all of which he got from Kitchen Winners – for less. (Rakhunov Dec., Exh. 28 [Joel Gloves NY Chat] at 4).

216.    Only lab testing can reveal if a glove is truly an "examination" glove. (Rakhunov Dec., Exh. 26 [Gombo Tr.] at 41:8-41:18).

***Rock Fintek Never Agreed to Purchase nor Accepted Mis-Labelled Gloves***

217.    Adorama Sellers FDA/gloves expert explained that medical devices, such as nitrile examination gloves must be labelled consistent with the product code for which FDA 510(k) clearance was received. (Rakhunov Dec., Exh. 24 [Schwartz Tr.] at 32:14-33:16).

218.    Rock Fintek made it clear to Banon at the latest on March 19, 2021, prior to entering into the SPA that Rock Fintek's client would not accept mislabeled products – "It's all about the box." (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 9).

219.    When wrong brand (LevMed) gloves were delivered by the Adorama Sellers in April 2021, Rock Fintek immediately notified sellers that this caused "a major issue with our

client" that was "causing us serious damages" and "this has created great tension with our client." (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 9, 10).

220.    On April 6, 2021, Stern offered to sell Rock Fintek gloves labelled "Protection" rather than "Examination" and in a WhatsApp message wrote that "this one is the same good gloves, inspection and test reports showing examination but not printed on the box... give me an offer and we will correct the boxes for you." (Rakhunov Dec., Exh. 28 [Joel NY Gloves Chat] at 3).

221.    Later on April 6, 2021, Gilling asked Stern to "[s]end pictures of the box" and Stern sent Rock Fintek pictures of proposed glove boxes in two files, including a file that showed "Protection" gloves. (Rakhunov Dec., Exh. 28[Joel NY Gloves Chat] at 4; Exh. 29 [00000100-CT04130_20210311_LangTai_Judy(1)]).

222.    Stern tried to convince Rock Fintek that "Protection" labelled gloves were the same gloves just mis-packaged, but Rock Fintek never agreed to buy "Protection" gloves from JNS/Stern. (Rakhunov Dec., Exh. 28 [Joel NY Gloves Chat] at 4; Exh. 14  [Stern Tr. Day II] at 57:22-58:6).

223.    Weiner has claimed that Arik Maimon agreed on behalf of Rock Fintek to accept gloves labelled "Protection" in connection with the one-off transactions predating the SPA. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 33:12-23).

224.    Rock Fintek ***never*** authorized Arik Maimon – in writing or orally – to accept gloves labelled "Protection" or as anything other than MedCare Nitrile/NBR Examination Gloves. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 30).

***Ascension Health Discovers Significant Quality and Consistency Problems with the Gloves***

225.    In July 2021, Ascension brought issues regarding the quality of gloves to the attention of Rock Fintek. (Rakhunov Dec. Exh. 30 [Ascension Exh. 5]; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 210:19-22 ).

226.    Ascension testified that Rock Fintek did not meet the specifications for gloves that were laid out in the Purchase Order. (Sperber Dec., Exh. M [Ascension Tr.] at 25:14-26:3, 47:3-6).

227.    When the gloves began trickling out to Ascension healthcare providers across the country it began receiving complaints that the gloves were tearing, fluids were seeping through the gloves, the cuffs around the gloves were too large and loose, the sizing did not represent what was on the box. (Sperber Dec., Exh. M [Ascension Tr.] at 20:13-21:18; Rakhunov Dec. Exh. 30 [Ascension Exh. 5]).

228.    Ascension provided Rock Fintek with videos from hospital staff and messages regarding the poor quality of the gloves. (Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 92:16-93:13.)

229.    Immediately upon being notified of quality issues by Ascension and ascertaining the extent of the problem, Rock Fintek demanded documentation and testing reports concerning the quality gloves, conducted testing on the gloves at its own expense, demanded refunds, demanded replacement of gloves from JNS, Kitchen Winners, and Adorama and also asked Medcare to replace the gloves. (Rakhunov Dec. Exh. 31 [Compilation of AKW_004373, AKW_004376, AKW_005044, Adorama INC. and Kitchen Winners NY INC.000076-77]; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 287:17-289:22; Rakhunov Exh. 28 [Joel NY Gloves chat] at 30-31; Sperber Decl. Exh. M, Kato 30(b)(6) 210:13-211:23.

***Overwhelming Record Evidence Demonstrates that the Adorama Parties and JNS/Stern Sold Non-Conforming Gloves to Rock Fintek***

230.    By November 19, 2021, Medline Industries completed a "label audit" for Ascension Health. (Rakhunov Dec. Exh. 32 [Medline 30b6 Tr.] at 53:6-25; Rakhunov Dec., Exh. 33 [RF_00001–11]; Exh. 34 [Medline, Exh. F]).

231.    Medline conducts such audits upon customer request. (Rakhunov Dec. Exh. 32_[Medline 30b6 Tr.] at 60:17-61:18).

232.    Medline employees spent approximately 108 hours on the audit and were paid for that work by Ascension. (Rakhunov Dec. Exh. 32 [Medline 30b6 Tr.]_at 64:5-64-10.

233.    Medline went to each slot that the product was stored in, removed one random case, opened the case and removed one random box within that case and inspected it for the label that was identified by Ascension.  (Rakhunov Dec. Exh. 32_[Medline 30b6 Tr.] at 55:4-18; 63:21-63:25 (chart "accurately and fairly" represents the results of the audit).)

234.    Approximately half the slots of gloves checked were labelled "protection" on boxes. (Rakhunov Dec. Exh. 33 [RF_00001–11]; Exh. 34 [Medline, Exh. F] at Medline 00038).

235.    Pursuant to Ascension's instructions, if a slot was identified as having "protection" gloves, the entire slot was blocked from use. (Rakhunov Dec. Exh. 332_[Medline 30b6 Tr.] at 67:18-25).

236.    Ascension Health, the end buyer of the gloves, testified that this audit revealed that there were significant inconsistencies across the gloves that would deem them unusable by Ascension's healthcare providers.  [Ascension Tr. , sperber Exhibit M at 48:8-49:2].

237.    As early as January 5, 2021, Weiner and Banon were put on notice by their shipping company that bills of lading did not list "Protection" gloves as medical devices as would be required for "Examination" gloves and that it was a "huge risk" if that statement was not accurate. (Rakhunov Dec., Exh. 36 [AKW002728- AKW002729]).

238.    Weiner admits and documents reflect that he received significant boxes of gloves labelled as "protection" gloves from GTS, the purported manufacturer and raised that issue with GTS. (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 114:19-25; Exh. 35 [Weiner Dep. Exhibit 5]).

239.    On February 18, 2021, Weiner revealed his intentions, when complaining to GTS about a box that was labelled "Protection":

We received the load of container number OOCU7022928.

Please see attached photos of the boxes,

1) it does not say exam on the box, this is unacceptable
2) the factory in back of the box is different than the 510k
These 2 issues are major, I don't know how to solve this, my customer is throwing me back the merchandise, I don't have where to sell it now.
If I would have known this I wouldn't sell it to a government account *I would give it to someone that doesn't look*.

(Rakhunov Dec., Exh. 35 [Weiner Dep. Exhibit 5]).

240.    In a follow up email, Weiner does not suggest that any boxes in a given container may be different from others but is comfortable relying on container number when asking: "Please let me know *which container numbers* have this same problem." (Rakhunov Dec., Exh. 37 [AKW-003064 – 003066] (emphasis added)).

241.    Indeed, the Protection gloves from the same container about which Weiner complains to GTS were sold *to Rock Fintek* by JNS/Stern. (Frisch Dec., Exh. 6 [Ms. Li Chat] at p. 32 of 82; Rakhunov Dec., Exh. 21 [00000960-HBL - STSH2012150 (1583)]; Rakhunov Dec. Exh. 43 [Ms. Li Dec.]).

242.    Weiner – the source of gloves for Rock Fintek and JNS – acknowledged in contemporaneous communications that boxes of gloves in any given container are the same. (Rakhunov Dec., Exh. 38 [Weiner Dep. Exhibit 9] (Instructing warehouse staff: "Is it possible to

open one box per container to see if it is the same? ***Each container is one type of box there are no 2 different boxes in a container*** ….."  (emphasis added)).

243.    At his deposition, Weiner acknowledged that each container should have the same type of boxes of gloves. (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 139:16-19).

244.    Stern's logistics provider testified that each pallet of gloves contained boxes from the same container, and was labelled with the container number and the name of the selling party. (Rakhunov Dec., Exh. 39 [Avrio Logistics Tr.] at 6:15-22, 10:22-13:19, 38:19-39:2; *see also* Exh. 40 [Avrio Dep. Exh. 1]; Exh. 32 [Jager (Medline 30(b)6 Tr.] at 66:2-66:11).

245.    Stern acknowledged that when purchasing gloves, he received Packing Lists – that he described as "tally sheets" – from his warehouses that included container numbers and some details about the gloves, and that it was his custom and practice to review such documents. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 68:16-69:20).

246.    Contemporaneous documentary evidence and Stern's testimony confirm that Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]).

247.    Stern's invoices to Rock Fintek expressly referenced container numbers from which the gloves were sourced. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 131:14-19; Exh. 45 [Sample of Stern Invoices]).

248.    Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of

"Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]).

249.    When purchasing the gloves from GTS, Kitchen Winners received Packing Lists from GTS along with each shipment that identified specific container numbers for that shipment, the types of gloves in each container (i.e. Examination or Protection), and quantity of gloves of each size. (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 157:8-158:12; Exh. 46 [Weiner Dep. Tr. Exh. 11]).

250.    Packing Lists are required to accurately describe the product that is supposed to be in the container, which is a representation to the U.S. Customs made "in the normal course of business".  (Rakhunov Dec., Exh. 39 [Avrio Logistics Tr.] at 27:7-29:21).

251.    The following chart summarizes certain containers of gloves that various sellers delivered to Rock Fintek that were unquestionably "Protection" gloves:

| Container # | Date of Shipment | Approx. Glove Quantity | Supporting Evidence | Box Label | Seller |
|---|---|---|---|---|---|
| MATU2723257 | 3/4/2021 | 3,000,000 | Rakhunov Dec. Exh. 4 at 5; Exh. 51 at 5. | Protection | Kitchen Winners |
| BMOU5449439 | 11-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 17, 51-54. | Protection | KW/Adorama |
| EGHU9883700 | 6-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 17-18, 39. | Protection | KW/Adorama |

| | | | | | |
|---|---|---|---|---|---|
| MATU2282716 | 6-May-21 | 2,600,000 | Rakhunov Dec. Exah. 51 at 7-10, 13-16, 36; Exh. 53. | Protection | KW/Adorama |
| MATU2310931 | 6-May-21 | 2,600,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| MATU2621168 | 6-May-21 | 2,660,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| MATU2695094 | 6-May-21 | 3,205,000 | Rakhunov Dec. Exh. 51 at c-10, 13-16, 36. | Protection | KW/Adorama |
| MATU2709520 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 12. | Protection | KW/Adorama |
| MATU5164173 | 3-May-21 | 2,500,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| MATU5173637 | 7-May-21 | 2,500,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| SEGU4306317 | 7-May-21 | 2,200,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| SEGU4842243 | 3-May-21 | 3,200,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| SMCU1018005 | 11-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| TCNU8493573 | 10-May-21 | 3,200,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| TRHU5523277 | 4-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | LevMed | KW/Adorama |
| TRHU5525114 | 11-May-21 | 2,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| TRHU5521973 | 3-May-21 | 2,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| CBHU8904290 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Exh. 53. | Protection | KW/Adorama |

| | | | | | |
|---|---|---|---|---|---|
| CSNU7178458 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Exh. 53. | Protection | KW/Adorama |
| BEAU4566776 | 4-Mar-21 | 1,500,000 | Rakhunov Dec. Exh. 51 at 49, 59. | Protection | KW/Adorama |
| MATU2709520 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Rakhunov Dec., Exh. 50 | Protection | KW/Adorama |
| TCLU8010739 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Rakhunov Dec., Exh. 50 | Protection | KW/Adorama |
| MATU2630154 | 18-Mar-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 6. | Protection | KW/Adorama |
| MATU2728990 | 4-Mar-21 | 3,000,000 | Rakhunov Dec. Exh. 48; Exh. 51 at 49. | Protection | KW/Adorama |
| OOCU7022928 | Feb-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 41; Exh. 21 [Ms. Li Chat at 25]; Exh. 21. | Protection | Stern |
| KOCU4758119 | 24-Feb-21 | 1,928,000 | Rakhunov Dec. Exh. 42. | Protection | Stern |
| MEDU7201798 | 7-Apr-21 | 459,000 | Rakhunov Dec. Exh. 44 at p. 2; Exh 14 at 77-78. | Protection | Stern |
| TRHU7077889 | 7-Apr-21 | 2,840,000 | Rakhunov Dec. Exh. 44  at p. 2; Exh 14 at 77-78. | Protection | Stern |
| CAIU7364752 | 12-Apr-21 | 2,840,000 | Rakhunov Dec. Exh. 44 at p. 2; Exh 14 at 77-78. | Protection | Stern |
| ZCSU7197695 | 7-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 44 [Stern Exh. 23] at p. 12—27. | Protection | Stern |
| CSNU7773635 | 29-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 52; Exh. 51 at 2-4. | Protection | Stern |
| TRHU7078041 | 23-Apr-21 | 2,840,000 | Rakhunov Dec. Exh. 52; Exh. 51 at 60-61. | Stickered | Stern |
| | **TOTAL** | **86,072,000** | | | |

252.    Photographs taken by Rock Fintek at Medline warehouses in July 2021 reveal printed sheets of paper as labels on pallets of gloves bearing glove container numbers and, at times, names of the seller of the gloves (i.e. Kitchen Winners or Joel Stern). (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 40-41; Exh. 52 [examples of JNS/Stern Pallets with container numbers]; Exh. 53 [examples of Kitchen Winners/Adorama pallets with container numbers]).

253.    Those labels were placed on the glove pallets by the logistics providers for the sellers - MD3PL or Avrio logistics, certainly not Rock Fintek. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 109:5-110:19; Exh. 32 [Jager Tr.] at 65:18-66:11; Exh. 39 [Avrio Logistics Tr.] at 6:15-22, 10:22-13:19, 38:19-39:2; *see also* Exh. 40 [Avrio Dep. Exh. 1]; Exh. 8 [Kato Dec.] at ¶ 40).

254.    Weiner admitted that if a box was "labelled correctly as a protection glove" that would not comply with Kitchen Winners' contract with GTS that purportedly called for "examination" gloves. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 98:17-21).

255.    By his admitted logic, if a box was labelled correctly as a protection glove that box would not comply with Kitchen Winners' contract with Rock Fintek that indisputably called for "examination" gloves. *Id.*

256.    Contrary to his testimony, documentary evidence confirms that Weiner knowingly shipped "protection" gloves to JNS. (Rakhunov Dec., Exh. 49 [AKW-002865 – AKW-002889] (email from Weiner attaching SGS reports for Synthetic nitrile protection gloves; reports show elongation results that are inconsistent and non-conforming with ASTM D-6319 standards).

257.    Following the completion of the transaction with Rock Fintek and after the dispute had arisen between the parties with respect to the nature of the gloves, the Adorama Parties and JNS continued to knowingly possess synthetic "protection" gloves in their respective inventories.

(Rakhunov Dec., Exh. 54 ([AKW_004543 (and parent email and attachments); Exh, 55 [AKW_004550]; Exh. 56 [AKW_004595]).

258.     Weiner even admitted in September and October 2021 that he believed that gloves remaining in Kitchen Winners' inventory were a "hybrid Nitrile/Vinyl mix" or a "vinyl blend." (Rakhunov Dec., Exh. 57 [AKW_004580 & AKW_004665]).

259.     In addition, there is no dispute that gloves from Kitchen Winners/Adorama came from a Lot numbered T4. (Rakhunov Dec. Exh. 61 [Excerpt of Schwartz Report]; Exh. 24 [Schwartz Tr.] at 56:13-21).

260.     Gloves in Lot T4 had a sticker placed on them that said "Synthetic Nitrile Examination Gloves." (Rakhunov Exh. Dec. 8 at ¶ 40; Rakhunov Dec. Exh. 52).

261.     When peeled off by fingernail, under the stickers, the boxes simply said "Synthetic Nitrile Gloves."  Rock Fintek has preserved samples of those (and other) boxes to show to the jury. (Rakhunov Exh. 8 [Kato Dec.] ¶ 40).

262.     In a document produced in response to a subpoena by UL (Underwriters Laboratories) – a testing facility - Rock Fintek learned that by June 2021 UL was investigating reports of Weiner and Banon submitting falsified testing reports with respect to LevMed nitrile gloves. (Rakhunov Dec. Exh. 11 [Weiner H 17M and 231023 Production Letter]).

***Testing of Various Lots of Gloves in 2021 and During this Litigation Creates Reveals that the Gloves Are Polyvinylchloride Gloves that Do Not Meet ASTM DD-6319 Specifications***

263.     The boxes of MedCare gloves sold to Rock Fintek had a "Lot" number printed on the side of the box. (Sperber Dec., Exh. G [Gilling Tr.] at 140:24-141:14; Rakhunov Exh. 26 [Poulton Report]; Rakhunov Exh. 59 [July 2021 Photographs of Lot Numbers]; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 42).

264.    When inspecting gloves at Medline warehouses in July 2021, after being notified that there was a problem with the gloves, Rock Fintek identified the following Lot numbers on boxes of gloves purchased by Rock Fintek: 20201106; HFK-202103010101; HFK-2021050102; MED202011;      MED202101;      MED202102;      MEDCARE202101;      MEDCARE202103; QDMD01202002; T4; ZKMD01202101; ZKMD012; ZKMD202104, T202104,. (Rakhunov Dec., Exh. 60 [RF_004279-81]; Exh. 8 [Kato Dec.] at ¶¶ 38-39; Exh. 27 [Poulton Expert Report] at JP_003).

265.    In October 2021, Ascension Health commissioned ARDL to conduct physical testing for ASTM D-6319 compliance on gloves sold to Rock Fintek from Lot numbers HFK-202103010101; HFK-2021050102; MED202011; MED202101; MED202102; ZKMD01202101; ZKMD202104. All of the gloves failed the ASTM D-6319 testing. (Rakhunov Dec. Exh. 27 [Poulton at JP_83-92]; Sperber Dec., Exh. M [Elstro Tr.] at 21:6-18)

266.    Following the discovery of problems with the gloves, Rock Fintek established direct contact with Anna Grinvald and Yosi Atias of Global Tooling Services LTD, the purported manufacturer in China of MedCare brand gloves. On or about July 26, 2021, GTS provided Rock Fintek with copies of testing reports concerning the various lots of gloves that GTS claimed in sold to Rock Fintek. Most of these reports, which were produced in discovery, either identify particular Lot numbers of gloves to which they pertain or include photographs of gloves boxes displaying the Lot numbers. The Lot numbers on the reports provided by GTS match up with Lot numbers that Gilling and Kato observed on boxes at Medline warehouses. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 42-44).

267.    In early December 2021, Ascension Health commissioned ARDL to conduct polymer testing on gloves from Lot numbers HFK-202103010101, MED202101, and

ZYMD01202103 – a proposed replacement glove provided by GTS based on a purported new formula. (Rakhunov Dec. Exh. 27 Poulton Report at JP_074-82; Sperber Dec., Exh. M [Ascension Tr.] at 21:19-22:1; Rakhunov Dec. Exh. 8 [Kato Dec.] at ¶ 42).

268.    Gloves from Lots HFK-202103010101 and MED202101 tested as Polyvinyl Chloride with no detectible levels of Nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_074-82).

269.    Gloves from the proposed replacement Lot ZYMD01202103, however, tested positive for Nitrile content. (*Id.*)

270.    In December 2021, Rock Fintek commissioned ARDL to conduct polymer testing of gloves from Lot numbers 20201106, HFK-202103010101, HFK-2021050102, T4, MEDCARE202101, QDMD01202002, MED202102 and ZKMD012. Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48).

271.    All of the gloves from those Lots tested as Polyvinylchloride with no detectible levels of Nitrile. (*Id.*).

272.    Rock Fintek also had MedCare gloves tested from a proposed *replacement* lot ZYMD01202103, which was NOT sold to Rock Fintek by any of the Adorama Parties or JNS Parties. Unlike the gloves sold to Rock Fintek, those gloves tested positive for Nitrile content. (Rakhunov Dec. Exh. 27 Poulton Report at JP_036-39).

273.    In December 2023 and January 2024, during this litigation, ARDL tested for Polymer identification and ASTM D-6319 specifications additional gloves that were sold to Rock Fintek from Lot numbers : T202104, 20201106; HFK-202103010101; HFK-2021050102; MED202011; MED202101; MED202102; MEDCARE202101; MEDCARE202103; QDMD01202002; T4; ZKMD01202101. (Rakhunov Dec. Exh. 27 Poulton Report at JP_003-25).

274.    All of the gloves tested by ARDL from these Lots tested as Polyvinyl Chloride with no detectible levels of Nitrile, and all of the gloves failed to meet ASTM D-6319 standards. (Rakhunov Dec. Exh. 27 [Poulton Report] at JP_003-25]).

275.    ARDL has analyzed multiple lots of gloves labeled "nitrile" on boxes and found them to be in fact vinyl rubber. The absence of detectable nitrogen also confirms that the gloves in question do not contain a detectable amount nitrile rubber. (Rakhunov Dec. Exh. 27 [Poulton Report] at JP_024).

276.    Compared to nitrile rubber, gloves made from vinyl rubber are unsuitable for use in medical applications due to their inferior physical properties as shown in ASTM D-6319 testing as well as their inferior chemical resistance to materials commonly found in a medical environment such as alcohols and hazardous drugs. (*Id*).

277.    Adorama Parties' glove expert admitted that ARDL is a qualified lab to do chemical and physical testing of gloves and, in fact, chose ARDL as the lab to conduct certain testing in this case. (Rakhunov Dec. Exh. 24 [Schwartz Tr.] at 30:20-23).

***Significant Factual Disputes Exist as to Quantities of Gloves Delivered and the cause of any Allegedly Delayed Payments under the SPA***

278.    The delivery of the wrong brand (LevMed) gloves by Adorama Sellers crippled Rock Fintek's cash flow and delayed payments. (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 11; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 278:2-7; Sperber Dec., Exh. G [Gilling Tr.] at 150:10-151:4; ).

279.    As of April 28, 2021, Rock Fintek had paid for more gloves than the Adorama Sellers had delivered. (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 11).

280.    In a contemporaneous email to Mendlowitz attaching a delivery report, Weiner admitted that some loads sold to Rock Fintek "have less quantities, but their payments was always for full loads." (Rakhunov Dec., Exh. 5 [Email Compilation] at AKW001598).

281.    In yet another email to Mendlowitz, Weiner admitted that there was an "[o]verage" beyond what was supposed to be delivered and that there was a dispute as to whether 22,760 boxes (2,276,000 gloves) were even delivered. (*Id.* at AKW001909).

***Rock Fintek Can Demonstrate with Reasonable Certainty that it Would Have Continued Doing Significant Business with Ascension but for the Non-Conforming MedCare Gloves***

282.    Ascension testified that it was "highly likely" that it would have "continued to engage" in business with Rock Fintek but for the bad gloves. Ascension testified that as a result of the counterfeit gloves Rock Fintek missed out on opportunities to sell to Ascension not only gloves but other medical supply needs that came up, such as wheelchairs and walkers, crutches and canes, and any other medical supply needs that would come up. (Sperber Dec., Exh. M [Ascension Tr.] at 37:14-38:8).

283.    Ascension testified that as of June 2021, it has just purchased a 6-month supply of gloves and was not interested in buying more gloves "*at that moment*."  (Sperber Dec., Exh. M [Ascension Tr.] at 55:23-56:5).

284.    Ascension was still experiencing some blips in the supply chain at the time of deposition. (*Id.* at 41:21).

285.    Other suppliers similarly situated to Rock Fintek were continuing doing business with Ascension through at least late 2023, including selling gloves, which is business that Rock Fintek would have been a part of but for the bad gloves, earning at least two more years of revenue. (*Id.* at 41:21; 17:25-18:21; Rakhunov Exh. 8 [Kato Dec.] at ¶ 18).

286.    No one disputes that Rock Fintek did $62 million of business with Ascension on purchase orders placed between March 2020 and March 2021. Had Adorama Sellers and JNS/Stern delivered good gloves, Kato expected with certainty that Rock Fintek would have done at least the same amount of business with Ascension from July 2021 through November 2023 and beyond at similar profit margins of approximately 50%. In other words, Rock Fintek should be allowed to argue to the jury that based on its track record with Ascension , the high likelihood of future business and overall average profit margins it would have earned upwards of $30 million a year in profits for three years. (Rakhunov Exh. 8 [Kato Dec.] at ¶ 19.)

287.    Ascension's chief operating officer at the time Todd Adams and vice president for supply chain Dewayne Rader had conversations with Rock Fintek about long term potential business with Rock Fintek, including bidding on a $1 billion glove contract. (Sperber Dec., Exh. M [Ascension Tr.] at 39:15-40:25; Sperber Decl. Exh. D [Kato Tr.] at 60:4-12; Sperber Decl. Exh. G [Gilling Tr.] at 256:9-19).

288.    Ascension testified that had Rock Fintek been able to clear those hurdles, it would have had a "leg up" in bidding on future long-term Ascension business given its past working business relationship with Ascension. (Sperber Dec., Exh. M [Elstro Tr.] at 64:18-21).

289.    Rock Fintek also had plans to sell COVID-19 kits to Ascension and was in the process of obtaining FDA approval for those kits.  (Sperber Dec., Exh. Y [Kato Damages Tr.] at 11:7-9; 67:4-9).

290.    The Adorama and JNS parties appear to focus in their papers on the potential longer term annual contract for $1 billion dollars of glove sales that Kato discussed with Ascension and Covid-19 test kits that Rock Fintek was developing for Ascension. While Rock Fintek did lose the opportunity to bid on that contract and to pursue the Covid-19 test kit sales because of the bad

gloves, the existence (and loss) of that opportunity does not form the basis of Rock Fintek's lost profits claim but further demonstrates the strong commercial relationship that had developed between Rock Fintek and Ascension in 2020 and early 2021. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 23.

291.    As Kato testified, based on his extensive experience as an entrepreneur, Rock Fintek would have done more revenue with Ascension and its affiliates going forward than it did in the past. For example, by April 2021, Kato had been connected by Ascension to St. John of God Health Care hospital in Australia, which described Rock Fintek as "a reliable supplier to Ascension's circa 200 hospitals" whom St. John's was "close" to using as a PPE supplier in Australia. (Rakhunov Dec., Exh. 47 [RF_003489]; Sperber Dec., Exh. Y [Kato Damages Tr.] at 29:16-30:2; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 21).

292.    By late 2021, Rock Fintek had an order for 4 million masks from St. John of God, which was reduced, after the delivery of the bad gloves, to approximately 100,000 masks for a total payment of $95,290. Instead of buying 4 million masks, the April 14, 2022 wire transfer for $95,290.91 in Rock Fintek's bank records is the total amount of business that St. John did with Rock Fintek despite referring to it as a reliable supplier just months earlier. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 22 & Figure 2.)

293.    Following discovery of the non-conforming gloves in July 2021, Kato continued to closely monitor prices, trends and demand in the PPE market, including as part of Rock Fintek's efforts to mitigate its damages, including finding a potential buyer for the MedCare gloves and to find potential replacement gloves for Ascension. While PPE prices fluctuated and ultimately went down from the levels they were at in early 2021, the demand and profit margins for PPE sales

remained steady and have remained steady through this day. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 23).

***Rock Fintek Faces Exposure to Significant Liability to Ascension for Which Adorama Sellers and JNS/Stern Are Liable***

294.    Since discovery by Ascension of the bad gloves, Ascension refused to do further business with Rock Fintek and threatened legal action. Ascension sent Rock Fintek a demand letter dated March 16, 2022, and has demanded that Rock Fintek make Ascension whole. From Ascension's perspective, its damages include a loss of the gloves, close to $37 million it paid to Rock Fintek, and north of $2 million in holding costs that continue to grow. (Sperber Dec., Exh. M [Elstro Tr.] at 28:13-29:1; Rakhunov Dec., Exh. 62; Exh. 8 [Kato Dec.] at ¶ 44).

295.    Ascension testified that they have not been made whole and the situation is unresolved. (Sperber Dec., Exh. M [Elstro Tr.] at 35:9-36:1).

296.    Although Ascension has not sued Rock Fintek as of this date, Ascension has not given Rock Fintek any releases or assurances, and Rock Fintek views the exposure to Ascension as a serious and significant ongoing claim worth tens of millions of dollars that, among other things, has caused Rock Fintek to go out of business. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 45).

297.    In April 2023, Rock Fintek filed a lawsuit in Florida Circuit Court against Hunton Andrews Kurth LLP, the law firm that did the due diligence in connection with the theft in Thailand of $6.2 million. In that lawsuit Rock Fintek never sought to blame Hunton directly for the destruction of the business with Ascension but rather claimed that the alleged misconduct in that case led Rock Fintek to doing business with the Adorama Sellers and JNS/Stern, which is the actual cause of the destruction of the Ascension relationship and exposure to Ascension for tens of millions of dollars for the bad gloves. The case against Hunton has settled confidentially before any discovery took place. (*Id.* ¶ 46.)

Dated:   March 15, 2024                    Respectfully submitted,

                                        /s/Phillip Rakhunov
                                          Phillip Rakhunov
                                          Lauren Riddle (*pro hac vice*)
                                          POLLACK SOLOMON DUFFY LLP
                                          48 Wall Street, 31st Floor
                                          New York, NY 10005
                                          Telephone: (212) 493-3100
                                          Facsimile: (212) 434-0109
                                          prakhunov@psdfirm.com
                                          lriddle@psdfirm.com

**<u>Certificate of Service</u>**

The undersigned certifies that this document is being served on counsel on all parties via ECF on March 15, 2024.

/s/ Phillip Rakhunov