**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KITCHEN WINNERS NY INC.,

*Plaintiff,*

-against-

ROCK FINTEK LLC,

*Defendant.*

Civil Action No. 22-cv-05276-PAE

ROCK FINTEK LLC,

*Counterclaim and Third-Party Plaintiff,*

-against-

KITCHEN WINNERS NY INC.,

*Counterclaim Defendant,*

and

ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN

*Third-Party Defendants.*

**ROCK FINTEK LLC'S RESPONSES TO JNS CAPITAL HOLDINGS LLC'S AND JOEL STERN'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Rock Fintek LLC respectfully submits its responses to the following statement of facts submitted by JNS Capital Holdings LLC ("JNS"), and Joel Stern ("Stern"; together with JNS, the "JNS Parties"), to supplement the facts set forth in the parties' joint statement of undisputed facts, which is incorporated herein by reference (ECF #135). Rock Fintek incorporates by reference and

1

relies upon its Additional Statement of Facts ("ASOF") set forth in Rock Fintek's response to the Statement of Facts submitted by Adorama Inc., Kitchen Winners NY Inc. and Joseph Mendlowitz.

1. JNS sold Medcare gloves, and was introduced to Rock Fintek indirectly through Ms. Chunron Li and Bruno Azra.  Frisch Exh. 6 at p. 31 et seq. (see chat transcript from 2/2/21, 8:41:08 PM forward).

2. Mr. Stern never met Ms. Chunron Li, and did not deal with her.  Stern Decl ¶2.

   **RESPONSE**: Disputed that Stern did not deal with Ms. Li. As described in the Declaration of Ms. Li (Rakhunov Dec., Exh. 43) Stern, through Mr. Azra, passed along to Ms. Li an offer to sell to Rock Fintek MedCare Nitrile Exam Gloves for $15 a box. (JSUF ¶ 29). Stern, through Azra, passed paperwork about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the gloves he would sell to them were medical examination gloves. (JSUF ¶ 32; Rakhunov Dec.,[1] Exh. 13 [Stern Tr. Day I] at 52:3-25). The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

   a. CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]).

   b. A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

   c. Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

---

[1] Declaration of Phillip Rakhunov dated March 15, 2024 ("Rakhunov Dec.") filed herewith.

    d. An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

For a short period of time, Ms. Li acted as an intermediary for written and telephone communications between Mr. Stern and Rock Fintek. From time to time, Mr. Azra forwarded to Ms. Li communications from Mr. Stern to forward to Rock Fintek. She would copy and paste emails from Mr. Stern into WhatsApp chats to Rock Fintek. At other times, she facilitated arranging telephone calls with Mr. Stern. Examples of such communications can be seen on pages 27, 28, 31, 34, 35, 41, 42, 44, 50, 51, and 52 of the WhatsApp chat enclose to Ms. Li's Declaration. (Rakhunov Dec., Exh. 43).

3. He had never heard her name until this lawsuit was commenced. Stern Decl ¶2.

   **RESPONSE:** Disputed. Stern, through Mr. Azra, passed along to Ms. Li an offer to sell to Rock Fintek MedCare Nitrile Exam Gloves for $15 a box. (JSUF ¶ 29). Stern, through Azra, passed paperwork about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the gloves he would sell to them were medical examination gloves. (JSUF ¶ 32; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 52:3-25). The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

       a. CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]).

       b. A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

    c.  Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

    d.  An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

For a short period of time, Ms. Li acted as an intermediary for written and telephone communications between Mr. Stern and Rock Fintek. From time to time, Mr. Azra forwarded to Ms. Li communications from Mr. Stern to forward to Rock Fintek. She would copy and paste emails from Mr. Stern into WhatsApp chats to Rock Fintek. At other times, she facilitated arranging telephone calls with Mr. Stern. Examples of such communications can be seen on pages 27, 28, 31, 34, 35, 41, 42, 44, 50, 51, and 52 of the WhatsApp chat enclose to Ms. Li's Declaration. (Rakhunov Dec., Exh. 43).

4.  Apparently, she was a contact of Bruno Azra and working for Rock Fintek to locate supplies of gloves to fulfill their obligations to Ascension.  Stern Decl ¶2.

5.  Mr. Stern gave some documents to Bruno Azra to help acquire customers.  Stern Decl ¶3.

6.  Those documents were given to Mr. Stern by Kitchen Winners, who had told him the documents were obtained from Medcare.  Stern Decl ¶3.

**RESPONSE:** Rock Fintek objects to the second portion of this statement, which is inadmissible hearsay.

7.  As far as Mr. Stern is aware, those documents were accurate and obtained from Medcare. Stern Decl ¶4.

**RESPONSE:** Disputed to the extent this suggests that the documents he provided represent the gloves that were actually sold. The gloves that JNS sold to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 [Poulton Report] at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]; *see also* ASOF ¶ 251, Rakhunov Decl. Exh. 51, 52).

8. The documents were sent by Ms. Li over whatsapp chat to Rock Fintek.  Frisch Exh. 6  at P. 41 [2/9/21, 1:12:22 PM]; Frisch Exh 7-8.

9. At the time of the negotiation of the initial contract, Rock Fintek was represented by counsel. Frisch Exh. 1 at 296:8-15; Frisch Exh. 2 at 47:5-11.

**RESPONSE:** Disputed to the extent this statement suggests that the cited evidence supports an inference that any counsel was actually representing Rock Fintek with respect to the glove transactions.

10. Ms. Li assisted Rock Fintek in locating suppliers and was asked to inspect the gloves prior to the initial purchase from JNS.  Frisch Exh. 1 at 245:8 – 246:10.

11. This inspection was recorded on video and sent to Rock Fintek via video.  Ibid. and JSF ¶31.

12. Ms. Li approved the gloves.  Frisch Exh. 1 at 245:8 – 246:10.

**RESPONSE:** Disputed to the extent that this calls for an inference that the gloves actually delivered were the same gloves that Ms. Li approved, particularly where the video at issue does not actually show the box, the Lot number or the container number of the gloves that were sent to her.

13. Ms. Li worked on behalf of Rock Fintek. JSF ¶28.

14. Mr. Stern never made any representations or provided any written documents to Rock Fintek in regard to the characteristics or quality of the Medcare gloves.  Stern Decl. ¶5; Frisch Exh. 6 (chat demonstrating that the discussions occurred between Mr. Azra and Ms. Li); Frisch Exh. 9 (Joel Stern/Rock Fintek Chat demonstrating no discussion of the specifications of the gloves).

**RESPONSE**: Disputed. Stern, through Azra, passed paperwork about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the gloves he would sell to them were medical examination gloves. (JSUF ¶ 32; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 52:3-25. The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

e.  CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]).

f.  A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

g.  Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

h.  An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

For a short period of time, Ms. Li acted as an intermediary for written and telephone communications between Mr. Stern and Rock Fintek. From time to time, Mr. Azra forwarded to Ms. Li communications from Mr. Stern to forward to Rock Fintek. She would copy and paste emails from Mr. Stern into WhatsApp chats to Rock Fintek. At other times, she facilitated arranging telephone calls with Mr. Stern. Examples of such communications can be seen on pages 27, 28, 31, 34, 35, 41, 42, 44, 50, 51, and 52 of the WhatsApp chat enclose to Ms. Li's Declaration. (Rakhunov Dec., Exh. 43).

In reliance on these written materials from Stern, Rock Fintek gave an Irrevocable Corporate Purchase Order ("ICPO") to JNS, which specifically required FDA 510(k) certified MedCare Nitrile Medical Exam gloves.  (JSUF ¶¶ 30, 33; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 45:18-46:14; Rakhunov Exh. 23 [ICPO, Stern Dep., Exh. 1]).

15. Bruno Azra worked independently to drum up business to earn a commission on my

sales.  Anything he provided to Rock Fintek was his decision.  Stern Decl ¶5.

**RESPONSE:** Disputed as to the transactions at issue. Stern was the seller who made the

decisions as to what documents to provide and what gloves to sell to Rock Fintek and

whose emails were communicated to Rock Fintek.  Stern, through Azra, passed paperwork

about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the

gloves he would sell to them were medical examination gloves. (JSUF ¶ 32; Rakhunov

Dec., Exh. 13 [Stern Tr. Day I] at 52:3-25. The paperwork from Stern, which was

forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021,

includes the following:

    a. CTS Inspection Report purportedly for "nitrile examination gloves," Lot

       20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]).

    b. A screenshot of an FDA 510(k) clearance letter purportedly for the gloves

       to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

    c. Bills of lading for certain containers of gloves, including container

       OOCU7022928, which is the "problem" container with "Protection" gloves.

       (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-

       STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

    d. An 8-page packet of materials including a copy of the FDA 510(k) clearance

       letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh.

       22 [00001179-FILE-4268.pdf]).

For a short period of time, Ms. Li acted as an intermediary for written and telephone

communications between Mr. Stern and Rock Fintek. From time to time, Mr. Azra

forwarded to Ms. Li communications from Mr. Stern to forward to Rock Fintek. She would copy and paste emails from Mr. Stern into WhatsApp chats to Rock Fintek. At other times, she facilitated arranging telephone calls with Mr. Stern. Examples of such communications can be seen on pages 27, 28, 31, 34, 35, 41, 42, 44, 50, 51, and 52 of the WhatsApp chat enclose to Ms. Li's Declaration. (Rakhunov Dec., Exh. 43).

In reliance on these written materials from Stern, Rock Fintek gave an Irrevocable Corporate Purchase Order ("ICPO") to JNS, which specifically required FDA 510(k) certified MedCare Nitrile Medical Exam gloves. (JSUF ¶¶ 30, 33; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 45:18-46:14; Rakhunov Exh. 23 [ICPO, Stern Dep., Exh. 1]).

16. JNS never purchased any gloves from Kitchen Winners that were not intended to be Nitrile Examination Gloves. Stern Decl. ¶6; JSF ¶117 and Exh R (contracts between JNS and Kitchen Winners).

**RESPONSE:** Disputed. The gloves that JNS provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20]

(demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶251, Rakhunov Decl. Exh. 51, 52.

17. JNS had contracted with Kitchen Winners for the gloves, and they were to be Medcare Nitrile Examination Gloves.  Stern Decl. ¶7, JSF Exh. R.

**RESPONSE:** Disputed. The gloves that JNS provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶251, Rakhunov Decl. Exh. 51, 52.

18. The gloves were delivered from China directly to warehouse space that JNS rented and were promptly picked up by Kitchen Winners.  Stern Decl. ¶7.

    **RESPONSE:** Disputed. The record does not reflect that Stern sold gloves to Kitchen Winners and Mr. Stern testified that he personally inspected the gloves. (Rakhunov Dec. Exh. 13 at 96:22-97:15; 123:20-124:6 (testimony that he personally inspected gloves.))

19. Mr. Stern had limited opportunity to inspect, and if any issue appeared with the gloves, he reached out to Mr. Wiener who promised that the gloves were correct.  Stern Decl. ¶7.

    **RESPONSE:** Disputed. Mr. Stern testified that he personally inspected the gloves. (Rakhunov Dec. Exh. 13 at 96:22-97:15; 123:20-124:6 (testimony that he personally inspected gloves.))

20. He was never aware of any issue with the gloves that were supplied to Rock Fintek, but there was a shipment here and there where the gloves were labeled as Protection Gloves. When he checked with Mr. Wiener, he told me that the paperwork was incorrect or the gloves would be replaced.  Stern Decl. ¶8.

    **RESPONSE:** Disputed. The gloves that JNS provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant

amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶ 251, Rakhunov Decl. Exh. 51, 52.

21. It is without a doubt that the goods were shipped from Medcare to JNS' warehouses. Stern Decl. ¶9.

**RESPONSE:** Disputed. This statement lacks foundation. Bills of Lading show that gloves were shipped from China, but not necessarily from MedCare or GTS. (*See, e.g.,* Rakhunov Dec. Exh. 21 [bills of lading]).

22. At no point to did Rock Fintek inform Stern that Ascension was their customer.  Stern Decl. ¶10.; Frisch Exh. 2 at 93:18-21.

**RESPONSE:** Disputed in part. From the very beginning of selling gloves to Rock Fintek, Stern understood that the gloves would be used in a hospital or other healthcare medical facility. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 58:19-59:3). Stern knew even without being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 82:6-19).

In his early conversations with Stern, Banon and Weiner, Kato not disclose the name of Ascension but told each of them that the end buyer of the gloves was an important hospital client of Rock Fintek – one of the two largest hospital systems in the United

States – that had placed a purchase order for a large quantity of gloves and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, Kato specifically discussed with Stern, Banon and Weiner (in multiple separate conversations) that the money that was stolen in Thailand was a part of the large deposit made by the hospital client and that Rock Fintek was pursuing claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the 6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Kato sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶¶ 25, 31).

23. In February 2021, JNS was selling to Rock Fintek at 15.00 a box, and in April and May 2021, JNS was selling to Rock Fintek at 11.50 a box.  Stern Decl. ¶11.

24. JNS' total sales to Rock Fintek were approximately $3.5 million.  Stern Decl. ¶12.

25. Mr. Stern never had notice that Rock Fintek had a customer for $37,000,000, the exact nature of that customer or anything else that would put him or JNS on notice of a claim for over $100 million in lost profits.  Stern Decl. ¶12.

**RESPONSE:** Disputed. From the very beginning of selling gloves to Rock Fintek, Stern understood that the gloves would be used in a hospital or other healthcare medical

facility. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 58:19-59:3). Stern knew even without being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 82:6-19.)

In his early conversations with Stern, Banon and Weiner, Kato not disclose the name of Ascension but told each of them that the end buyer of the gloves was an important hospital client of Rock Fintek – one of the two largest hospital systems in the United States – that had placed a purchase order for a large quantity of gloves and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, Kato specifically discussed with Stern, Banon and Weiner (in multiple separate conversations) that the money that was stolen in Thailand was a part of the large deposit made by the hospital client and that Rock Fintek was pursuing claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the 6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Kato sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶¶ 25, 31).

26. Thomas Kato explicitly stated that "[4/21/21, 8:20:15 PM] Tommy H. Kato: I would

never introduce anyone to any of my clients." Frisch Exh. 9 at P.10.

**RESPONSE:** Disputed in part. While Rock Fintek did not disclose to Adorama Sellers or

JNS/Stern the actual name of its hospital client during the course of the glove

transactions, Rock Fintek unambiguously put all sellers of gloves on notice that its client

was hospital group that had to approve the product and could only accept FDA 510(k)

approved nitrile medical examination gloves meeting ASTM D-6319 standards.

(Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 25, 31; *id.*, Exh. 4 [Mendel Rock Gloves Chat

highlighted] at 1, 2, 5, 8, 14, 20; *id.*, Exh. 17 [RF_000443-447 "if the hospital accepts

it"]; Sperber Dec., Exh. G [Gilling Tr.] at 66:3-67:1).

27. The transactions between JNS and Rock Fintek were initiated through text messages and

simple purchase orders. They had no discussion of potential consequential damages. JSF

Exh. J; Frisch Exh. 9.

**RESPONSE:** Disputed. In his early conversations with Stern, Banon and Weiner, Kato

not disclose the name of Ascension but told each of them that the end buyer of the gloves

was an important hospital client of Rock Fintek – one of the two largest hospital systems

in the United States – that had placed a purchase order for a large quantity of gloves and

was likely to continue buying significant amounts of gloves and other PPE through Rock

Fintek with a potential for significant profit for all parties involved if Rock Fintek

delivered good products. Having recently been a victim of a fraudulent transaction in

Thailand, Kato specifically discussed with Stern, Banon and Weiner (in multiple separate

conversations) that the money that was stolen in Thailand was a part of the large deposit

made by the hospital client and that Rock Fintek was pursuing claims against the

Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the 6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Kato sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶¶ 25, 31)

28. Mr. Kato could not establish what portion of the damages were specifically caused by JNS.  Frisch Exh. 2 at 65:9-69:9.

**RESPONSE:** Disputed. When questioned at his deposition about the amount of damage attributable to JNS and Stern, Kato did not disagree with counsel that Stern's liability could be reasonably apportioned by the percentage of gloves that Stern/JNS sold to Rock Fintek. To be clear, Rock Fintek's loss of business here was caused by the totality of the bad gloves delivered to Ascension, who did not care whether the bad gloves came from Stern or Kitchen Winners. In other words, there is no question that Stern delivered non-conforming gloves (many of which originated with Kitchen Winners/Adorama) and the jury should decide how to apportion the harm to Rock Fintek among the defendants. (Rakhunov Exh. 8 [Kato Dec.] at ¶ 47; SOF, ¶¶ 244-248).

29. Rock Fintek blamed these identical losses on the Hunton Andrews Kurth law firm in an action in Florida.  Frisch Exh 17 at ¶¶38-39.

**RESPONSE:** Disputed. In April 2023, Rock Fintek filed a lawsuit in Florida Circuit Court against Hunton Andrews Kurth LLP, the law firm that did the due diligence in

connection with the theft in Thailand of $6.2 million. In that lawsuit Rock Fintek did not blame Hunton directly for the destruction of any business but rather claimed that the alleged misconduct in that case led Rock Fintek to doing business with the Adorama Sellers and JNS/Stern, which is the actual cause of the destruction of the Ascension relationship and exposure to Ascension for tens of millions of dollars for the bad gloves. (Rakhunov Exh. 8 [Kato Decl.] at ¶46).

30. The transactions occurred from February 2021 - May 9, 2021.  Stern Decl. ¶13.

31. At one point, a supplier other than Kitchen Winners offered JNS boxes of gloves with misprinted boxes that had stickers applied to correct the misprint. Mr. Stern offered these gloves to Rock Fintek (on behalf of JNS) at a lower price, as he was able to obtain them at a lower price. Stern Decl. ¶14; Frisch Exh 9 at 4-5.

32. When Rock Fintek rejected the gloves, JNS did not purchase them from the other supplier, and certainly never shipped any such gloves to Rock Fintek.  Stern Decl. ¶14.

**RESPONSE:** Disputed. The gloves that JNS provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek and sold gloves that had stickers on them.

(*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19;

Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock

Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons

(6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from

containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See*

*also* ASOF ¶ 251, Rakhunov Decl. Exh. 51, 52).

33. At no point did Mr. Stern cause any stickers to be applied to any boxes of gloves.  Stern

Decl. ¶15.

**RESPONSE:** Disputed.  Regardless  of  who  applied  stickers,  Stern  knowingly  sold

nonconforming gloves, including those that had stickers on the labels. The gloves that JNS

provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl

chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report

at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts

of gloves that were plainly identified in contemporaneous Packing Lists as "Protection"

gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-

131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44

[Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]).  Contemporaneous documentary

evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that

Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*See*

Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh.

41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek

approximately  9,000  cartons  (9,000,000  gloves)  of  gloves,  of  which  6,139  cartons

(6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from

containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also*
ASOF ¶251, Rakhunov Decl. Exh. 51, 52.

34. He had no reason to do so, and did not have the manpower to undertake such a task on
hundreds of thousands of boxes.  Stern Decl. ¶15.

**RESPONSE:** Disputed in part. Regardless of who applied stickers, Stern knowingly sold
nonconforming gloves at prices higher. The gloves that JNS provided to Rock Fintek were
not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible
levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48). Stern/JNS
received from his suppliers containers with significant amounts of gloves that were plainly
identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination"
gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep.
Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep.
Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's
invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold
significant amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13
[Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20]
(demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000
cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were
plainly identified in contemporaneous Packing Lists as from containers of "Protection"
gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶251, Rakhunov
Decl. Exh. 51, 52).

35. Rock Fintek never returned any gloves to JNS.  Frisch Exh. 2 at 139:4-8.

**RESPONSE:** Disputed to the extent this statement suggests that Rock Fintek did not try to return the gloves. (Rakhunov Exh. 28 at 30-31). *See* Response to SOF ¶ 72, *infra*.

36. Rock Fintek made one request to return gloves via Whatsapp in July 2021 to Mr. Stern. The request was for Mr. Stern to identify the gloves with stickers on the boxes and remove them from the warehouses that Ascension had placed them in.  The request specifically stated that rock Fintek would orchestrate the return.  Rock Fintek never did any such thing.  Frisch Exh. 9 at p. 30.

**RESPONSE:** The WhatsApp exchange speaks for itself. Stern ignored Rock Fintek's numerous messages.

37. Mr. Kato testified that all of the damages alleged arose from the boxes with stickers on them, for which he blamed JNS.  Frisch Exh. 2 at 65:9-69:9

**RESPONSE:** Disputed that testimony supports this statement. When questioned at his deposition about the amount of damage attributable to JNS and Stern, Kato did not disagree with counsel that Stern's liability could be reasonably apportioned by the percentage of gloves that Stern/JNS sold to Rock Fintek. To be clear, Rock Fintek's loss of business here was caused by the totality of the bad gloves delivered to Ascension, who did not care whether the bad gloves came from Stern or Kitchen Winners. In other words, there is no question that Stern delivered non-conforming gloves (many of which originated with Kitchen Winners/Adorama) and the jury should decide how to apportion the harm to Rock Fintek among the defendants. (Rakhunov Exh. 8 [Kato Dec.] at ¶ 47; SOF, ¶¶ 244-248).

38. Mr. Kato could not provide a basis for the number of boxes of gloves he claimed had stickers.  Frisch Exh 2 at 76:8-77:20.

**RESPONSE:** Disputed that testimony supports this statement. Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek and sold gloves that had stickers on them. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶251, Rakhunov Decl. Exh. 51, 52).

39. Mr. Kato also said he assumed that Mr. Stern sold him 9 million boxes with stickers on them because that is what he understood Mr. Stern had available.  Frisch Exh 2 at 77:14-20.

**RESPONSE:** Disputed that this statement somehow refutes the documentary evidence of what Stern actually sold. Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek and sold gloves that had stickers on them. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶251, Rakhunov Decl. Exh. 51, 52).

40. Mr. Kato testified that it was possible that the boxes were simply misprinted and the gloves were the correct gloves. Frisch Exh. 2 at 158:8-159:21.

   **RESPONSE:** Disputed to the extent this suggests that the gloves were in fact scorrect. The gloves that JNS provided to Rock Fintek were not nitrile medical gloves but were cheaper polyvinyl chloride gloves with no detectible levels of nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48). Stern/JNS received from his suppliers containers with significant amounts of gloves that were plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination" gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11]; Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23, 24, 26]). Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]). *See also* ASOF ¶251, Rakhunov Decl. Exh. 51, 52.

41. There are photos from testing of gloves in China showing the boxes with stickers placed on them in China. Frisch Exh. 10 at P. 12-19; 23; 27; 40-44; 47; 51; 55.

   **RESPONSE:** Disputed. The photos have not been authenticated and there is no foundation to make the conclusion that anything was placed on the boxes in China.

22

42. Mr. Stern formed JNS for the purpose of selling PPE during the pandemic, seeing this as a strong business opportunity (which it turned out not to be).  Stern Decl. ¶16.

RESPONSE: Disputed that this was not a strong business opportunity, as Rock Fintek paid JNS $3.5 million. Stern Decl. ¶12; Rakhunov Decl. Exh. 8 [Kato Decl.] at ¶12.

43. Stern obtained investors from his Hassidic community to purchase product and resell it. Stern Decl. ¶16

44. As can be seen from the JNS bank statements, the business was well capitalized and operating well during the time frame of the transactions at issue in this case.  Stern Decl. ¶17; JSF Exh. K.

RESPONSE: Disputed. JNS had no funds in its bank account as of October 2023. JSUF at ¶15.

45. Rock Fintek alleged that the lost business relationship was the fault of the Hunton law firm that it had engaged for due diligence on another transaction that resulted in over $6 million being stolen.  Frisch Decl. Exh. 17.

RESPONSE: Disputed. Rock Fintek filed a lawsuit in Florida Circuit Court against Hunton Andrews Kurth LLP, the law firm that did the due diligence in connection with the theft in Thailand of $6.2 million. In that lawsuit Rock Fintek did not blame Hunton directly for the destruction of any business but rather claimed that the alleged misconduct in that case led Rock Fintek to doing business with the Adorama Sellers and JNS/Stern, which is the actual cause of the destruction of the Ascension relationship and exposure to Ascension for tens of millions of dollars for the bad gloves. The case against Hunton has settled confidentially. (Rakhunov Decl. Exh. 8 [Kato Decl.] at ¶ 46).

46. Rock Fintek went out of business after the conclusion of the deal with Ascension at issue in this action.  Frisch Exh. 2 at 27:19-29:13.

    **RESPONSE**: Disputed only to the extent that this statement calls for an unwarranted inference that Rock Fintek went out of business for any reason other than the delivery of bad gloves to Ascension for which Ascension has claimed tens of millions of dollars in damages, among other things. (*See* Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 45).

47. starting in mid-June 2021, Ascension was working to "burn down" its supply of Medcare gloves.  Frisch Exh. 15

    **RESPONSE:** Disputed as inadmissible hearsay and mischaracterizes Ascension Testimony. Ascension's representative testified that "burn down" was a poor choice of words and that Ascension's strategy was simply to ensure sufficient nitrile gloves and "to turn through them under our normal turn rate for nitrile exam gloves."  (Sperber Decl. Exh. M 52:10-55:15).

48. Ascension testified that in the short term it might have requested that Rock Fintek help resolve supply chain issues that arose during the COVID Pandemic.  Frisch Exh. 5 37:6-41:9.

    **RESPONSE:** Disputed. Ascension testified it was "highly likely" that Rock Fintek would be requested to resolved supply chain issues. Ascension also testified that it was still experiencing some blips in the supply chain at the time of deposition and other short-term suppliers of gloves to Ascension continue selling gloves to Ascension to this day. Ascension testified that there were other medical supply needs that came up, such as wheelchairs and walkers, crutches and canes, which are opportunities on which Rock

Fintek missed out because of the quality of the Gloves. (Sperber Dec., Exh. M [Ascension Tr.] at 37:14-38:8.)

49. By June 15, 2021, Ascension was seeking to reduce its supply of Medcare gloves in a "burn down".  Frisch Exh. 15.

    **RESPONSE:** Disputed as inadmissible hearsay and mischaracterizes Ascension Testimony. Ascension testified that "burn down" was a poor choice of words and that Ascension's strategy was simply to ensure sufficient nitrile gloves and "to turn through them under our normal turn rate for nitrile exam gloves.". (Sperber Decl. Exh. M at 52:10-55:15).

50. Rock Fintek was a supplier retained for the COVID period, and for that period some additional business might have been solicited for temporary supply issues. Frisch Exh. 5 37:6-41:9.

    **RESPONSE:** Disputed, mischaracterizes testimony. Undisputed that Rock Fintek was a supplier retained for the COVID period, but Ascension also testified that it was still experiencing some blips in the supply chain at the time of deposition and other short-term suppliers of gloves to Ascension continue selling gloves to Ascension to this day. Ascension testified that there were other medical supply needs that came up, such as wheelchairs and walkers, crutches and canes, which are opportunities on which Rock Fintek missed out because of the quality of the Gloves. (Sperber Dec., Exh. M [Ascension Tr.] at 37:14-38:8).

51. Rock Fintek's supposed expert, Mr. Kato, could provide no factual basis for any calculation of damages.  Frisch Exh. 3 (in its entirety).

**RESPONSE:** Disputed and objectionable. Rock Fintek's financial documentation and Mr. Kato's declaration provides more than adequate estimate of Rock Fintek's damages. (*See* Rakhunov Dec. Exh. 8 at ¶¶ 17-23).

52. Ascension would have considered long term contracts with Rock Fintek if it could obtain FDA approval and compete on price with "ginormous companies."  Frisch Exh. 5 at 40:17-21.

**RESPONSE:** Undisputed that Ascension was considering long term contracts with Rock Fintek. Ascension's chief operating officer at the time Todd Adams and vice president for supply chain Dewayne Rader had conversations with Rock Fintek about long term potential business with Rock Fintek, including bidding on a $1 billion glove contract. (Sperber Dec., Exh. M [Ascension Tr.] at 39:15-40:25; Sperber Decl. Exh. D [Kato Tr.] at 60:4-12; Sperber Decl. Exh. G [Gilling Tr.] at 256:9-19). Ascension testified that had Rock Fintek been able to clear those hurdles, it would have had a "leg up" in bidding on future long-term Ascension business given its past working business relationship with Ascension. (Sperber Dec., Exh. M [Elstro Tr.] at 64:18-21. Rock Fintek had plans to sell COVID 19 kits to Ascension and was in the process of obtaining FDA approval for those kits.  (Sperber Dec., Exh. Y [Kato 2/1/24 Deposition] at 11:7-9; 67:4-9).

53. Mr. Kato admitted that he could not estimate the specific profit from future glove contracts.  Frisch Exh. 2 at 61:13-23.

**RESPONSE:**  Disputed. Rock Fintek's financial documentation and Mr. Kato's declaration provides more than adequate estimate of Rock Fintek's damages. (Rakhunov Dec. Exh. 8 at ¶¶ 17-23).

54. Kitchen Winners purchased the gloves from Medcare.  Frisch Exh. 18 at p. 23.

**RESPONSE:**  Disputed. Kitchen Winners purchased gloves from GTS, not Medcare, which is a brand.

55. Rock Fintek alleged that "From the outset of their dealings, Rock Fintek expressly explained orally and in writing to Stern, Weiner, Mendlowitz and Banon that all gloves that Rock Fintek would purchase from the Adorama Seller and JNS Sellers would be immediately sold to Rock Fintek's hospital group client in the United States for use by medical professionals. Rock Fintek expressly told Stern, Weiner, Mendlowitz, Banon, and the consultant Maimon that its hospital client required that all gloves had to be medical Examination grade and had to comply with ASTM D6319 standards. Prior to each transaction at issue, Stern, Weiner, and Banon represented orally and in writing that the gloves that they were sourcing to sell to Rock Fintek were in fact nitrile/NBR medical grade Examination gloves bearing FDA 510(k) certification and provided written materials purporting to substantiate that representation." FATC ¶29.

56. There is no evidence of any such written communication with Mr. Stern or JNS.  Stern Decl. at ¶5; Frisch Decl. at Exh. 6 (Ms. Li Chat); Exh. 9 (Stern Chats).

**RESPONSE:**  Disputed. Kato and Gilling routinely had numerous telephone calls with Stern during the course of their business dealings when they told him that their client was a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 24-25;  *see also* Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 73:7-11, 80:21 ("everything was done over the phone"); Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 93:18-94:24). Stern understood that the gloves would be used in a hospital or other healthcare

medical facility. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 58:19-59:3). Stern knew even without being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 82:6-19). The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

    a.   CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]).

    b.   A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

    c.   Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

    d.   An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

For a short period of time, Ms. Li acted as an intermediary for written and telephone communications between Mr. Stern and Rock Fintek. From time to time, Mr. Azra forwarded to Ms. Li communications from Mr. Stern to forward to Rock Fintek. She would copy and paste emails from Mr. Stern into WhatsApp chats to Rock Fintek. At other times, she facilitated arranging telephone calls with Mr. Stern. Examples of such communications can be seen on pages 27, 28, 31, 34, 35, 41, 42, 44, 50, 51, and 52 of the WhatsApp chat enclose to Ms. Li's Declaration. (Rakhunov Dec., Exh. 43)

In reliance on these written materials from Stern, Rock Fintek gave an Irrevocable Corporate Purchase Order ("ICPO") to JNS, which specifically required FDA 510(k) certified MedCare Nitrile Medical Exam gloves.  (JSUF ¶¶ 30, 33; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 45:18-46:14; Rakhunov Exh. 23 [ICPO, Stern Dep., Exh. 1]).

57. Rock Fintek never tested the gloves that were the subject of the testing report provided by Ms. Li.  Frisch Exh. 7 (Testing Report); Frisch Exh. 13 (Testing Report of Jason Poulton).

**RESPONSE:** Disputed, Rock Fintek and Ascension tested the lots that were sold to it by all sellers. (*See* ASOF ¶¶ 263- 277).

58. No evidence was provided that anything in the specific report was false.  Frisch Exh. 13 (Testing Report of Jason Poulton).

**RESPONSE:** Rock Fintek objects to this statement as vague and unintelligible and therefore not susceptible to a response. Rock Fintek does not dispute that Poulton's expert testing revealed that none of the gloves tested for Nitrile content but were instead cheaper Polyvinylchloride gloves that failed to meet ASTM D-6319 specifications.

59. Similarly, the 510(k) certification was provided by Medcare, and there is no evidence that any component of that document is false.  Frisch Exh. 8 (510(k) certification); Frisch Exh. 13.

**RESPONSE:**  Disputed to the extent that this indicates Rock Fintek ever claimed that the letter was false, as opposed to the fact that the gloves sold to Rock Fintek were not gloves described in that FDA 510(k) clearance letter.

60. Mr. Stern never made any representation to Rock Fintek about "ASTM International Certifications" as alleged in ¶34 of the FATC.  See Frisch Decl. at Exh. 6(Ms. Li Chat); Exh. 9 (Stern Chats).

**RESPONSE:**  Disputed. Stern, through Mr. Azra, passed along to Ms. Li an offer to sell to Rock Fintek MedCare Nitrile Exam Gloves for $15 a box. (JSUF ¶ 29). Stern, through Azra, passed paperwork about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the gloves he would sell to them were medical examination gloves. (JSUF ¶ 32; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 52:3-25). The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

   a.  CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]).

   b.  A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

   c.  Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

   d.  An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

For a short period of time, Ms. Li acted as an intermediary for written and telephone communications between Mr. Stern and Rock Fintek. From time to time, Mr. Azra

forwarded to Ms. Li communications from Mr. Stern to forward to Rock Fintek. She would copy and paste emails from Mr. Stern into WhatsApp chats to Rock Fintek. At other times, she facilitated arranging telephone calls with Mr. Stern. Examples of such communications can be seen on pages 27, 28, 31, 34, 35, 41, 42, 44, 50, 51, and 52 of the WhatsApp chat enclose to Ms. Li's Declaration. (Rakhunov Dec., Exh. 43).

61. Similarly, there is no written statement from Mr. Stern that the gloves were fit for a particular purpose.  Ibid.

**RESPONSE:** Disputed, Stern understood that the gloves would be used in a hospital or other healthcare medical facility. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 58:19-59:3). Stern knew even without being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 82:6-19). Kato and Gilling routinely had numerous telephone calls with Stern during the course of their business dealings when they told him that their client was a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 24-25, 31; *see also* Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 73:7-11, 80:21 ("everything was done over the phone"); Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 93:18-94:24).

62. Rock Fintek assumed that all of the gloves delivered to Ascension were equally defective, regardless of the supplier  or the contract in which it occurred.  Frisch Exh. 2 at 253:1-17.

**RESPONSE:**  Rock Fintek did not *assume* they were not equally defective. All of the gloves from various Lots tested as Polyvinylchloride gloves with no detectable levels of

nitrogen and failing ASTM D-6319 specifications. *See* Rakhunov Decl. Exh. 27 at JP_004, 018.

63. Yet, the reality of the situation is that JNS sold goods in several distinct orders (and not pursuant to any master agreement) beginning in February 2021 and ending in May 2021. Frisch Exh. 6 (Ms. Li Chat); JSF Exh. J; JSF Exh. K; Frisch Exh. 9 (Stern Chat).

64. No complaints were received by Rock Fintek from Ascension until July 2021.  Frisch Exh. 9(Stern Chat).

65. Thomas Kato noted in multiple communications with Ascension that they had been satisfied with the gloves until approximately July 2021.  JSF Exh. P-Q.

    **RESPONSE:**  Disputed. Kato specifically testified that he believed all the gloves were good quality, until he found out otherwise in July 2021. (Sperber Decl., Exh. D at 357:18-20).

66. the issues with the gloves only arose when Ascension made a concerted effort to use up gloves it was paying to store as the PPE market returned to pre-pandemic conditions. Frisch Exh. 15.

    **RESPONSE:**  Disputed that the cited material supports this statement. After Ascension began distributing the gloves to its medical providers who began experiencing significant quality issues, Ascension brought issues regarding the quality of gloves to the attention of Rock Fintek. (Rakhunov Dec. Exh. 30 [Ascension Exh. 5]; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 210:19-22).

67. It appears that after the gloves were largely maintained as an emergency stockpile, Ascension decided to perform a "burn down" in June 2021, to reduce its stockpile from a six month supply to a three month supply.  Ibid.

**RESPONSE:** Disputed to this extent that his statement seeks an unwarranted inference that the problems with the gloves weren't real. Ascension testified that its strategy was simply to ensure a sufficient nitrile gloves stockpile and "to turn through them under our normal turn rate for nitrile exam gloves." (Sperber Decl. Exh. M at 52:10-55:15).

68. It was at this time that complaints about quality began to appear, with anecdotal reports coming into Ascension's purchasing department.  Frisch Exh. 16.

69. Rock Fintek only conducted testing on 14 glove samples from the entire universe of gloves, Frisch Exh. 13.

**RESPONSE:** Disputed that the cited testimony supports this statement. Mr. Poulton's Report states that "ARDL received 28 boxes (two boxes from 14 unique lots) of unopened gloves… one box from each of the 14 unique lots was submitted for the following analytical tests." 14 unique *Lots* were chosen, not just 14 gloves were tested. *See* Frisch Exh. 13 at 1.

70. Rock fintek's statistical expert declared that they must test at least 1160 gloves to reach any statistically meaningful conclusions.  Frisch Exh. 14.

**RESPONSE:** Disputed that the cited testimony supports this statement.

71. Rock Fintek never issued a formal notice of rejection or revocation of acceptance of the goods.  Frisch Exh. 9 at P.30.

**RESPONSE:** Disputed. Rock Fintek objects to this statement to the extent that it seeks to require Rock Fintek to more than what was required. In addition, Rock Fintek expressly wrote to Stern upon learning that he delivered non-conforming product:

We have identified the gloves that are failing tests and of poor quality (fake nitrile) are from you. When you approached us in the past to buy these gloves, we specifically said no. How you got these on out trucks and delivered to our client is unacceptable.

Furthermore we have identified these gloves were being offered at $4.80 buy price, to move these fake gloves. Obviously you made a significant amount of margin to sell us these gloves.

We are having a meeting with our client to discuss full return and replacement of these fake nitrile gloves. We need you to find and replace these gloves as they are not what we agreed to buy. We will be orchestrating the return of the goods to you with full credit and replacement immediately.

(Rakhunov Dec., Exh. 28 [Joel NY Gloves Chat highlighted] at 31). Stern ignored Rock Fintek.

72. Rock Fintek had opportunities to inspect goods at the warehouses where JNS was holding the goods, and in fact did so at least on some occasions (JSF at ¶31; Frisch Exh 2 at 271:5-14).

   **RESPONSE:** Disputed. Mr. Kato testified that Rock Fintek could not inspect the gloves, which JNS was aware of. (*See* Frisch Exh. 2 at 138:17-139:10).

73. It had the opportunity to inspect once its trucking company took possession of the goods, and that it had the opportunity to ask its buyer to timely inspect the goods once they reached the Medline warehouses.  Frisch Exh. 4 at Part I, 42:4-43:18; Part II 62:18-63:16 (Alex King Deposition).

   **RESPONSE:** Disputed that the cited testimony supports this statement. Mr. King testified that the truckers are "absolutely not" able to look over the goods before they left the warehouse. *See* Frisch Exh. 4 at 42:4-43:18.

Dated:   March 15, 2024                    Respectfully submitted,

                                          /s/Phillip Rakhunov
                                          Phillip Rakhunov
                                          Lauren Riddle (*pro hac vice*)
                                          POLLACK SOLOMON DUFFY LLP
                                          48 Wall Street, 31st Floor
                                          New York, NY 10005
                                          Telephone: (212) 493-3100
                                          Facsimile: (212) 434-0109
                                          prakhunov@psdfirm.com
                                          lriddle@psdfirm.com

## **Certificate of Service**

The undersigned certifies that this document is being served on counsel on all parties via ECF on March 15, 2024.

/s/ Phillip Rakhunov