# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| KITCHEN WINNERS NY INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| ROCK FINTEK LLC, | ) | |
| Defendant, | ) | |
| | ) | Civil Action No. 22-cv-05276-PAE |
| ROCK FINTEK LLC, | ) | |
| Counterclaim and Third-Party Plaintiff, | ) | |
| v. | ) | |
| KITCHEN WINNERS NY INC, | ) | |
| Counterclaim Defendant, | ) | |
| and | ) | |
| ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN, | ) | |
| Third-Party Defendants. | ) | |

**ROCK FINTEK LLC'S COMBINED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT OF KITCHEN WINNERS NY INC., ADORAMA, INC., JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC AND JOEL STERN**

**TABLE OF CONTENTS**

Introduction.................................................................................................................1

Background...............................................................................................................3

Discussion................................................................................................................20

I.      ADORAMA IS A "SELLER" UNDER THE SPA AND LIABLE FOR ITS
        BREACH.......................................................................................................21

II.     RECORD EVIDENCE SUPPORTS THE BREACH OF GOOD FAITH AND
        FAIR DEALING CLAIMS AGAINST ADORAMA AND KITCHEN WINNERS.......25

III.    THE UNJUST ENRICHMENT CLAIM AGAINST ADORAMA SURVIVES
        IN THE ALTERNATIVE TO THE CONTRACT CLAIM ...............................26

IV.     JNS AND STERN ARE LIABLE FOR DELIVERING NON-CONFORMING
        GLOVES........................................................................................................27

V.      THERE IS NO DISPUTE AS TO THE *EXISTENCE* OF ROCK FINTEK'S
        LOST PROFITS, LEAVING DETERMINATION OF THE REASONABLE
        *AMOUNT* OF LOST PROFITS FOR THE JURY .........................................29

        A.      Jury Should Decide Whether Liability for Destruction of Rock
                Fintek's Relationship with Ascension was Fairly within Contemplation
                of the Parties .................................................................................31

        B.      Rock Fintek Made a Sufficient Showing that it Can Prove the Amount
                of its Lost Profits for Approximately Three Years with Reasonable Certainty....35

        C.      Rock Fintek is Entitled to Present at Trial the Proof of Damages Resulting
                from Exposure to Ascension Caused by the Sellers ...............................40

VI.     DISPUTES REGARDING THE REBATES AND OVERPAYMENTS ARE FOR
        THE JURY......................................................................................................41

VII.    KITCHEN WINNERS' AFFIRMATIVE CLAIMS FAIL DUE TO ITS
        OWN BREACHES AND EXISTING QUESTIONS OF FACT REGARDING
        CLAIMED GLOVE CHARGES AND SHIPPING COSTS ...........................43

        A.      Kitchen Winners Is not Entitled to Summary Judgment on its Claims under
                the SPA Because it Substantially and Materially Breached the SPA ..................43

VIII.   THE FRAUD CLAIM AGAINST STERN, INDIVIDUALLY, SURVIVES ................45

IX.     STERN IS LIABLE ON THE CONTRACT CLAIM AGAINST JNS ...........................48

X.      THE WARRANTY CLAIM AGAINST THE SELLERS SURVIVES ...........................49

Conclusion ........................................................................................................................51

## **TABLE OF AUTHORITIES**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144 (2002) ............................... 25

*67 Wall St. Co. v. Franklin Nat. Bank*, 37 N.Y.2d 245 (1975) ...................................................... 25

*Abraham v. Leigh*, 471 F. Supp. 3d 540 (S.D.N.Y. 2020) ............................................................. 38

*Advanced Knowledge Tech, LLC v. Fleitas*, No. 21-CV-992 (PKC), 2021 WL 6126966
   (S.D.N.Y. Dec. 28, 2021) ........................................................................................................ 48

*Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488 (S.D.N.Y. 1996) ............................. 39

*Amusement Bus. Underwriters v. American Intl. Group*, 66 N.Y.2d 878 (1985) ......................... 25

*Aramony v. United Way of Am.*, No. 96 CIV. 3962 (SAS), 1998 WL 205331
   (S.D.N.Y. Apr. 27, 1998) ........................................................................................................ 32

*Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395 (1993) .................................................................. 31

*ASM Fin. Funding Corp. v. K-Sher Corp.*, 873 N.Y.S.2d 231 (Sup. Ct. 2008) .......................... 44

*Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428 (2d Cir. 2005) ......................................... 21

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297
   (2d Cir. 2016) .......................................................................................................................... 44

*Bd. of Managers of Beacon Tower Condo. v. 85 Adams St., LLC*, 136 A.D.3d 680
   (2d Dep't 2016) ....................................................................................................................... 48

*Brkic v. Dumbo Moving & Storage, Inc.*, No. 22-CV-07029 (CM), 2023 WL 128801
   (S.D.N.Y. Jan. 9, 2023) ........................................................................................................... 23

*Busrel Inc. v. Dotton*, No. 1:20-CV-1767, 2021 WL 2980494 (W.D.N.Y. July 15, 2021) .......... 47

*Calltrol Corp. v. Loxysoft AB*, No. 18 CV 9026 (NSR), 2023 WL 2529844
   (S.D.N.Y. Mar. 15, 2023) ........................................................................................................ 37

*Capax Discovery, Inc. v. AEP RSD Invs., LLC*, 285 F. Supp. 3d 579 (W.D.N.Y. 2018) ............. 24

*Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 557 F. Supp. 3d 381
   (E.D.N.Y. 2021) ....................................................................................................................... 30

*Case v. City of New York*, No. 12 CIV. 2189 AJN AJP, 2012 WL 5951296, at *4
   (S.D.N.Y. Nov. 28, 2012)…………………………………………………………………..22

*Casolaro v. Armstrong*, No. 10 CV 4276 DRH ETB, 2012 WL 6093778
(E.D.N.Y. Dec. 7, 2012) ................................................................................. 23

*City of New York v. Lead Indus. Ass'n, Inc.*, 222 A.D.2d 119 (1996) ......................................... 40

*Clarke v. TRIGO U.S., Inc.,* No. 22-CV-1917 (PKC), 2023 WL 6806074
(S.D.N.Y. Oct. 16, 2023) ................................................................................. 48

*Collins v. Harrison–Bode*, 303 F.3d 429 (2d Cir. 2002) ............................................. 23

*Cottonaro v. Southtowns Indus., Inc.*, 213 A.D.2d 993, 625 N.Y.S.2d 773 (1995) .................... 51

*Credit Suisse First Bos. v. Utrecht Am. Fin. Co.*, 30 Misc. 3d 879, 914 N.Y.S.2d 600, 603
(Sup. Ct. 2010), aff'd, 84 A.D.3d 579 (2011) ..................................................... 32

*Diamond Castle Partners IV PRC, L.P. v. IAC/InterActivecorp,* 82 A.D.3d 421
(1st Dep't 2011) ................................................................................. 22

*Dierkes Transp. Inc. v. Germantown Cent. Sch. Dist.*, 295 A.D.2d 683 (3d Dep't 2002) .......... 45

*Ehag Eisenbahnwerte Holding Aktiengesellschaft v. Banca Nationala A Romaniei*, 306 N.Y.
242 (1954) ................................................................................. 24

*EPN Ingenieria S.A. De C.V. v. Gen. Elec. Co.*, No. 92 CIV 1563 (KMW), 1996 WL
531867 (S.D.N.Y. Sept. 19, 1996) ..................................................... 34

*Exch. Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134 (S.D.N.Y. 2023) .............. 48

*Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 89 S. Ct. 1144,
22 L. Ed. 2d 371 (1969) ................................................................. 41

*Forty Cent. Park S., Inc. v. Anza*, 130 A.D.3d 491 (1st Dep't 2015) ................................. 48

*Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284 (2d Cir.1997) ........................... 44

*Geis Constr. S., LLC v. Delahunt*, No. 20CV03834MKBJMW, 2022 WL 18859052
(E.D.N.Y. Oct. 3, 2022), report and recommendation adopted, No. 20CV3834MKBJMW,
2023 WL 2731692 (E.D.N.Y. Mar. 31, 2023) .......................................... 46

*Gold v. 22 St. Felix, LLC*, 219 A.D.3d 588 (2d Dep't 2023) ....................................... 49

*Grammas v. Lockwood Assoc., LLC*, 95 A.D.3d 1073 (2d Dept 2012) ............................. 48

*Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419 (S.D.N.Y. 2004) ........ 34

*Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88 (1974) ................................. 43, 44

*Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07CV4175NGGRLM, 2008 WL 4693246 (E.D.N.Y. Oct. 17, 2008) ........................................ 35

*Heritage Springs Sewer Works, Inc. v. Boghosian*, 61 A.D.3d 1038, 875 N.Y.S.2d 635 (3d Dep't 2009) ......................................................... 45

*Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447 (S.D.N.Y. 2018) .................. 39

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12CV5354KAMRLM, 2016 WL 1274011 (E.D.N.Y. Mar. 31, 2016) ....................................... 28

*Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66 (S.D.N.Y. 2019) .................................... 24

*Johnson & Johnson & Lifescan, Inc. v. S. Pointe Wholesale, Inc.*, No. 08CV1297SLTSMG, 2014 WL 12558573 (E.D.N.Y. Apr. 4, 2014) .......................................... 27

*Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312 (1989) .................................................... 33

*Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199 (S.D.N.Y. 2010) .......................... 31

*Lexington Products, Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251 (2d Cir.1982) ............... 30

*Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95CIV.8450(AGS)(THK), 1998 WL 422482 (S.D.N.Y. July 22, 1998) ....................................... 38

*Marine Steel Transp. Line, LLC v. E. Metal Recyling, LLC*, No. 19-CV-2275-FB-SJB, 2023 WL 3603489 (E.D.N.Y. May 23, 2023) .......................................... 31

*Matter of Wallace v. 600 Partners Co.*, 205 A.D.2d 202 (1st Dep't 1994) ................................ 22

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) .......... 37, 43, 44

*Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552 (S.D.N.Y. 2018) .............................. 27

*Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135 (1993) .............................. 49, 50

*Mortimer v. Otto*, 206 N.Y. 89 (1912) ........................................................ 32

*Murphy v. Snyder*, No. CV101513JSAKT, 2014 WL 12988632 (E.D.N.Y. Aug. 15, 2014), report and rec. adopted, No. 10-CV-1513 JS AKT, 2014 WL 4700213 (E.D.N.Y. Sept. 22, 2014) ........................................... 29

*MuscleTech Rsch. & Dev., Inc. v. E. Coast Ingredients, LLC*, No. 00-CV-753A, 2007 WL 655755 (W.D.N.Y. Feb. 26, 2007) ....................................... 27

*Nationwide Sales & Servs. Inc. v. Envirocare Techs. Int'l, Ltd.*, No. CV 16-6617 (GRB), 2018 WL 2436969 (E.D.N.Y. May 30, 2018) ....................................... 27

*Phoenix Warehouse of California, LLC v. Townley, Inc.*, No. 08 CIV. 2856 NRB, 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011) .......................................................... 33

*Raymond Weil, S.A. v. Theron*, 585 F. Supp .2d 473 (S.D.N.Y. 2008) ........................................ 30

*RDI Corp. v. Charter Commc's., Inc.*, 1:19-cv-10929, 2022 U.S. Dist. LEXIS 38123 (S.D.N.Y. Jan. 31, 2022)....................................................................................................... 41

*Robert Cohn Associates, Inc. v. Kosich*, 63 A.D.3d 1388 (3d Dep't 2009).................................. 45

*Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675 (2d Cir. 1989)........................... 45

*Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820 (2d Cir.1990) ............................................ 37

*Sherkate Sahami Khass Rapol (Rapol Const. Co.) v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049 (2d Cir. 1983) ........................................................................................................... 51

*Sigmon for Hindin v. Goldman Sachs Mortg. Co.*, No. 1:12-CV-3367 (ALC), 2018 WL 1517189, (S.D.N.Y. Mar. 26, 2018) ............................................................................. 23

*Simon v. Electrospace Corp.*, 28 N.Y.2d 136 (1971) ........................................................... 29, 37

*Small Business Bodyguard Inc. v. House of Moxie, Inc.*, No. 14-cv-170 (CM), 2015 WL 1290897 (S.D.N.Y. Mar. 20, 2015) .................................................................................. 24

*Spherenomics Glob. Contact Centers v. vCustomer Corp*, 427 F. Supp. 2d 236 (E.D.N.Y. 2006) ............................................................................................................. 34, 36

*Sun Prod. Corp. v. Bruch*, No. 10 CIV. 4816 SAS, 2011 WL 5120307 (S.D.N.Y. Oct. 28, 2011), aff'd, 507 F. App'x 46 (2d Cir. 2013)............................................ 48

*TOMRA of N. Am., Inc. v. Count & Crush, LLC*, No. 118CV1266LEKDJS, 2023 WL 6066034 (N.D.N.Y. Sept. 18, 2023) ............................................................. 21, 25, 31, 51

*Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326 (2d Cir. 1993) .......................... 39

*Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, No. 20CV9622 (DLC), 2022 WL 4547412, (S.D.N.Y. Sept. 29, 2022) ....................................................................... 39

*U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153 (2d Cir. 1996)....................................................................................................... 39

*Unique Lotus Gems v. Gholian Enterprises Inc.*, No. 18CIV10808(ATG)(WG), 2019 WL 6227856 (S.D.N.Y. Nov. 22, 2019), report and rec. adopted, No. 18CIV10808(ATG)(WG), 2019 WL 6701953 (S.D.N.Y. Dec. 9, 2019)................................... 46

*Wolff v. Rare Medium, Inc.*, 65 F. App'x 736 (2d Cir. 2003) ....................................................... 24

*Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10 CIV. 3304 (HB), 2011 WL 1002419
(S.D.N.Y. Mar. 15, 2011)....................................................................................... 46, 47

## Other Authorities

3A Corbin, Contracts, ss 704—707 .............................................................................. 44

6 Williston, Contracts, ss 841—844 (3d ed.)............................................................... 44

### Rules

Fed. R. Civ. P. 56(c) .................................................................................................. 21

Defendant and third-party/counterclaim plaintiff Rock Fintek LLC respectfully submits this combined Opposition to the motions for summary judgment filed by Kitchen Winners NY Inc. ("Kitchen Winners") (ECF 137), Adorama, Inc. ("Adorama") and Joseph Mendlowitz (ECF138) (Kitchen Winners, Adorama and Mendlowitz are together referred to as "Adorama Sellers"), and JNS Capital Holdings LLC ("JNS") and Joel Stern (together, "JNS/Stern") (ECF 136).

## Introduction

Between February and June 2021, Rock Fintek bought more than $23 million of gloves from the Adorama Sellers and JNS/Stern Sellers to be immediately resold and delivered to Ascension Health – one of the largest hospital groups in the United States and Rock Fintek's most valuable client. Each of the sellers knew – because Rock Fintek's principal and its COO told them – that the hospital had placed a purchase order with Rock Fintek for a large quantity of FDA 501(k) Nitrile/NBR medical examination gloves that complied with ASTM D-6319 standards. Each of the sellers knew that the hospital was likely to continue buying significant amounts of gloves and other personal protective equipment (PPE) through Rock Fintek with a potential for significant profit for all parties if Rock Fintek delivered good products. Having recently been a victim of a theft of millions of dollars of its client's deposit in Thailand, Rock Fintek's representatives specifically discussed with all sellers that delivering fake or non-conforming products to Rock Fintek's client would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability. Rock Fintek sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal.

As it turns out, the sellers did not provide the contractually required gloves, but knowingly sold Rock Fintek low quality cheap Polyvinylchloride gloves with no detectible levels of Nitrile

that failed ASTM D-6319 testing. Even worse, discovery revealed that the sellers knew that nearly half of the gloves at issue were not even labelled as required "examination" gloves but were labelled as the non-medical "protection" gloves, which made those gloves unsuitable for their intended hospital use. Once Ascension started trickling the MedCare gloves into its hospitals, the gloves began failing on the hands of medical providers, and Ascension immediately quarantined the gloves from further use and launched an investigation including conducting laboratory testing and a full inventory label audit by its warehouse operator Medline Industries. Although Asension paid Rock Fintek for the gloves (at the time of delivery to the warehouses), Ascension immediately ceased doing any further business with Rock Fintek, despite a near certainty of future business, having purchased $62 million of PPE in the prior year, and demanded that Rock Fintek make it whole including through threats of litigation, driving Rock Finek out of business.

The moving parties cannot seriously contest at the summary judgment stage that at least material disputes of fact exist as to their liability for delivering non-conforming gloves and do not appear to contest that the delivery of these gloves in fact destroyed Rock Fintek's existing and future business with Ascension but argue primarily that Rock Fintek cannot reasonably estimate the *amount* of its damages or demonstrate that the moving parties fairly contemplated that Rock Fintek would seek to hold them liable for the destruction of the Ascension relationship. As detailed below, the hotly disputed record facts with reasonable inferences drawn in Rock Fintek's favor adequately satisfies the requirements under New York law to have a jury determine the amount of Rock Fintek's lost profits that directly flow from the moving parties' intentional misconduct.

Adorama's effort to escape liability under the contract that *it signed* also fails on this record. As detailed below and as the Court already ruled at the motion to dismiss stage, the pertinent Sales and Purchase Agreement ("SPA") is at most ambiguous as to Adorama's precise obligations

particularly where the SPA requires payments to the "Seller" and it was *Adorama* and not Kitchen Winners that received *all* payments from Rock Fintek under the SPA and expressly "agreed" to be bound by its terms. Kitchen Winners cannot come close to winning affirmative summary judgment on its counterclaim for certain unpaid amounts for the non-conforming gloves because Kitchen Winners materially breached its contractual obligations excusing Rock Fintek's further payments.

The motion by JNS and Stern also fails on this record. Incredibly, Stern argues that Rock Fintek cannot demonstrate that he delivered non-conforming gloves despite overwhelming contemporaneous documentary evidence of precisely what Stern sold, including packing slips, invoices, communications with logistics providers and photographs. The fraud claim against Stern also survives summary judgment because he should not be allowed to hide behind an empty corporate shell to escape liability for having caused JNS to engage in a fraudulent transaction, particularly while also claiming that he is not liable on JNS's contract covering that transaction. Alternatively, a jury should decide whether to pierce JNS's thin corporate veil and hold Stern personally liable for JNS's breaches. The moving parties' grounds for summary judgment on the remaining warranty and quasi contract claims are similarly not susceptible to summary judgment as addressed in detail below.

### Background

***Rock Fintek Enjoyed a Profitable PPE Business with Ascension Health and Other Clients***

Rock Fintek began doing business with Ascension in or about March 2020. (SOF ¶ 146).[1] Between March 2020 and June 2021, Rock Fintek had sold PPE primarily to the following clients: Ascension Health, City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., Patterson Companies Inc., and some other smaller customers. (*Id.* ¶ 147). Rock Fintek's

---

[1] Rock Fintek LLC's Responses to Adorama Parties' Rule 56.1 Statement of Facts and Additional Statement of Facts ("SOF").

principal Thomas Kato was introduced to Ascension through an acquaintance who did real estate work for Ascension. (*Id.* ¶ 148). After Kato was introduced to Ascension, he also learned that he had a close family connection to one of Ascension's top executives, which uniquely positioned Rock Fintek to solidify a long-term relationship with Ascension. (*Id.* ¶ 149). Kato viewed the Ascension relationship as an incredible business opportunity for Rock Fintek and critical to Rock Fintek's profitability and survival. (*Id.*).

Other than the purchase order for the gloves at issue, between March 2020 and April 2021, Rock Fintek had sold to Ascension approximately $25.9 million in other PPE, including masks, gloves and gowns. (*Id.* ¶¶ 150-151). Contrary to moving parties' assertion, $2,542,116.25 of the payments made to Rock Fintek by Ascension in 2021 were not for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension in this time frame. (*Id.* ¶ 152). For the gloves at issue, Ascension paid Rock Fintek a total of $36,318,177.25. (*Id.* ¶ 153). In total Rock Fintek earned $62,242,293.50 in revenue from Ascension through purchase orders obtained between March and December 2020. (*Id.* ¶ 154).

In addition to the Ascension business, between March 2020 and June 2021, Rock Fintek had sold approximately $39.9 million of PPE to the City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., and Patterson Companies Inc. (*Id.* ¶ 155). Between March 2020 and June 2021, Rock Fintek did more than $100 million of revenue in PPE business. (*Id.* ¶ 156). Rock Fintek sourced this PPE primarily from the following suppliers: JNS/Joel Stern, Adorama Sellers, INTCO, Bomgogo LTD, and Alit Group. (*Id.* ¶ 157). During this time frame, Rock Fintek paid approximately $3,327,215 to JNS/Stern; $20,648,435 to Adorama Sellers; and $19,451,332 to INTCO, Bomgogo LTD, and Alit Group combined, and paid approximately $6.2 million for logistics and trucking services in relation to its PPE business. (*Id.* ¶¶ 158-160). Rock

Fintek's average profit margin for its PPE business in 2020 and 2021 was therefore approximately 50%. (*Id.* ¶ 161).

While the Ascension glove deal at issue in this lawsuit was less profitable than other Ascension transactions due to higher supply costs, Rock Fintek did not make a profit on the Ascension glove deal not because of the deal itself, but because of the theft of $6.2 million that it suffered from a purported glove supplier in Thailand. (*Id.* ¶ 162). But for that theft, Rock Fintek would not have lost the $6.2 million out of pocket, would have paid lower costs for the 200 million gloves (between $7.90 and $10/box of 100 gloves) and would have made close to $10 million in profit on the Ascension glove purchase order at issue. (*Id.* ¶ 163).

***Sellers Knew that Gloves Purchased by Rock Fintek would Immediately be Sold to its Important Hospital Client that Required FDA 510(k) ASTM-D6319 Nitrile Medical Examination Gloves***

In early February 2021, Rock Fintek was introduced to Joel Stern through Ms. Chunron Li and an individual named Bruno Azra. (JSUF ¶ 28; SOF ¶¶ 202-205). Stern understood from the outset that the gloves would be used in a hospital or other healthcare medical facility, and admitted to knowing this without even being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (SOF ¶ 187). Once they established direct contact with Stern, Kato and Rock Fintek COO Bradley Gilling had numerous telephone calls with Stern during the course of their business dealings and told him repeatedly that their client was a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards. (*Id.* ¶¶ 188, 195). By April 2021, Stern was even trying to learn the identity of Rock Fintek's client to try and get a purchase order directly from the hospital. (*Id.* ¶ 189).

Mendel Banon was the broker and representative of Kitchen Winners and Adorama in connection with the glove transactions with Rock Fintek, and was the originator of the relationship

between Kitchen Winners/Adorama and Anna Grinvald, the CEO and owner of Global Tooling Services, Inc. ("GTS"), the purported manufacturer of the MedCare brand gloves. (*Id.* ¶¶ 190-191). Before Rock Fintek made *any* glove purchases from Kitchen Winners/Adorama, Kato had numerous telephone calls, WhatsApp calls, and video calls with Mendel Banon, and even hosted Banon for lunch. (*Id.* ¶ 192). During those discussions and meetings, Kato told Banon very clearly that Rock Fintek was not the end user of the gloves but was purchasing them for its client – a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications. (*Id.* ¶¶ 193, 195). Indeed, on March 14, 2021, after one of the first one-off transactions with Kitchen Winners and prior to the SPA, Banon confirmed in writing his knowledge that an initial order of gloves was delivered "to the hospital." (*Id.* ¶ 194). Prior to entering into the SPA, Kato had similar telephone calls with Hershey Weiner, the principal of Kitchen Winners, explaining the very specific requirements of the hospital. (*Id.* ¶ 197).

Arik Maimon was a personal acquaintance of Kato and sought to insert himself into Rock Fintek's PPE business, holding himself out as having the ability to protect Rock Fintek's interests with respect to the transactions with Adorama Sellers, insisting that his cultural and religious similarities with the Adorama Sellers put him in a unique position to protect Rock Fintek. (*Id.* ¶ 196). Maimon routinely communicated with the Adorama Sellers on behalf of Rock Fintek during the transactions at issue and knew at all times – because Kato told him – that the gloves being bought by Rock Fintek were for Ascension Health and undertook to protect Rock Fintek in that regard, but betrayed Rock Fintek. (*Id.*).

In his early conversations with Stern, Banon and Weiner, Kato not disclose the name of Ascension but told each of them that the end buyer of the gloves was an important hospital client of Rock Fintek – one of the two largest hospital systems in the United States – that had placed a

purchase order for a large quantity of gloves and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, Kato specifically discussed with Stern, Banon and Weiner (in multiple separate conversations) that the money that was stolen in Thailand was a part of the large deposit made by the hospital client and that Rock Fintek was pursuing claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the 6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Kato sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal. (*Id.* ¶ 198).

In fact, during the ongoing business relationship, Kato and Gilling expressly discussed with Weiner, Arik Maimon and Banon the potential next large order of gloves for Ascension. When the relationship broke down, the sellers actually tried to use the information learned in those discussions to try and extort Rock Fintek to buy an additional 2 million boxes of gloves even though Ascension no longer wanted to do business with Rock Fintek. (*Id.* ¶¶ 185, 199).

In addition, Ascension confirmed that prior to purchasing any gloves from Rock Fintek, they had been provided documents by Rock Fintek that had Kitchen Winners' name on them, stating that the gloves were ASTM D-6319 rated and that the gloves were Nitrile. (*Id.* ¶ 200).

### *Adorama Is a Seller under the SPA, not Merely a Lender*

Banon had told Kato that Adorama was Kitchen Winners' partner that works with them in distribution, in charge of either manufacturing or procuring the gloves. (*Id.* ¶ 165). Prior to entering

into the SPA, Kato and Gilling participated in a telephone call *with Joseph Mendlowitz* and others where they discussed that Rock Fintek would only make a large purchase order if it were directly with Adorama "and not via Kitchen Winners" because Adorama seemed like a legitimate large company that had been around since the '70s. (*Id.* ¶¶ 164, 166-167).

The SPA was drafted by attorneys who represented both Adorama and Kitchen Winners. (*Id.* ¶ 168). Rock Fintek was not represented by counsel in connection with drafting or negotiating the SPA. (*Id.* ¶ 169). Adorama was directly involved in negotiating the SPA. On April 5, 2021, Weiner emailed a draft SPA to Mendlowitz asking him to "look it over" and call him about it. (*Id.* ¶ 170). Following that email between Weiner and Mendlowitz, material changes were made to the SPA including a change in quantity from 1 million to 1.5 million boxes of gloves, change in amounts and timing of payments, the removal of an additional order option, and modification of the rebate provision. (*Id.* ¶ 171).

Rock Fintek, Kitchen Winners and Adorama executed the SPA on or about April 7, 2021. (*Id.* ¶ 172). Adorama signed the SPA as a "Seller." (*Id.* ¶ 173). Paragraph 2.c. of the SPA requires that "Buyer **shall pay Seller** in full by wire transfer of funds for each container Delivered to the Seller's warehouse..." (*Id.* ¶ 174). Paragraph 2.d. of the SPA provided that "Any payment of the Purchase Price payable for each box of gloves delivered **shall be paid to Seller** …." (*Id.* ¶ 175).

It is undisputed that Rock Fintek wired *every payment* under the *SPA to Adorama* in its bank account and not to Kitchen Winners. (*Id.* ¶ 176). In other words, Adorama acted a Seller and received the benefits of a "Seller" under the express written terms of the SPA. (*Id.*).

The SPA does not anywhere refer to Adorama as a "lender" or the like. (*Id.* ¶ 177). Mendlowitz could not point to anywhere in the SPA that supported a position that Adorama was merely a lender and is not aware of any communication to Rock Fintek notifying it of Adorama

purportedly limited role but took the position that any arrangement between Adorama and Kitchen Winners did not need to be disclosed to Rock Fintek. (*Id.* ¶¶ 178-179). When Weiner was pressed at his deposition regarding his understanding of Adorama's obligations under the SPA, he was evasive and claimed that he does not "read English." (*Id.* ¶ 180). To the extent that Adorama relies on any purported lending agreement with Kitchen Winners, it is undisputed that Rock Fintek was never provided any such agreement or notified that such an arrangement existed. (*Id.* ¶ 181).

Maimon, who assisted Rock Fintek with negotiating the SPA, also viewed Adorama as a seller of gloves. (*Id.* ¶ 182). During the performance of the SPA, Weiner routinely kept Mendlowitz informed as to shipments to Rock Fintek and payments by Rock Fintek, and the specification and packaging of gloves that were purportedly being sold to Rock Fintek. (*Id.* ¶ 183). When disputes between the parties arose in June and July 2021, Weiner kept Mendlowitz informed and either forwarded or copied Mendlowitz on communications with Rock Fintek, on attempts to extort concessions in exchange for complying with existing obligations. (*Id.* ¶ 184). In particular, Kitchen Winners and Adorama sought to condition providing documentation concerning specifications of the delivered gloves and conditioned the contractually required return of overcharges and payment of a rebate on Rock Fintek buying 2 million more boxes of gloves from Adorama and Kitchen Winners for an additional $18 million and on making a payment to *Maimon*, among other things. (*Id.* ¶ 185).

***Adorama Sellers and JNS/Stern Made Specific Material Representations About the Nature of the Gloves, Yet Knowingly Delivered Non-Conforming Gloves***

All parties agree that all gloves sold to Rock Fintek were required to be MedCare brand Nitrile medical examination gloves with FDA 510(k) clearance. (*Id.* ¶ 201). Prior to any transactions taking place with Stern, Bruno Azra, on behalf of Stern, passed to Rock Fintek through Ms. Li an offer to sell MedCare Nitrile Exam Gloves for $15 a box. (JSUF ¶ 29; SOF ¶ 202). Stern,

through Azra, passed paperwork about the gloves to Ms. Li, which she provided to Rock Fintek with a sample of gloves to demonstrate to Rock Fintek that the gloves he had were nitrile medical examination gloves. (SOF ¶ 203). The paperwork, which Stern obtained from Kitchen Winners, included: (a) CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106, which Lot subsequently failed ASTM D-6319 testing and tested as Polyvinylchloride gloves having no detectible levels of nitrile; (b) a screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold; (c) bills of lading for certain containers of gloves, including container OOCU7022928, about which Weiner complained to GTS as having "Protection" gloves; and (d) an 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.* ¶¶ 205, 239). In reliance on written materials from Stern, Rock Fintek gave an Irrevocable Corporate Purchase Order ("ICPO") to JNS – not Ms. Li or Azra – for 90,000 boxes of FDA 510(k) certified MedCare Nitrile Medical Exam gloves. (*Id.* ¶¶ 206-207).

On March 4, 2021, prior to *any* transactions with Kitchen Winners or Adorama, Gilling specifically asked Banon via WhatsApp chat for documentation of FDA clearance and ASTM D-6319 compliance. (*Id.* ¶ 208). In response, Banon provided Rock Fintek with a copy of the same March 9, 2016 FDA 510(k) clearance letter that Stern had provided previously and a series of links to the FDA website for that letter, through which Banon represented that the gloves that would be sold to Rock Fintek were manufactured under the FDA 510(k) number K152712, with the ASTM D-6319 and other specifications detailed in that submission. (*Id.* ¶ 209).

To obtain FDA 510(k) clearance, a product has to be shown to be substantially equivalent to another product that is already on the market. (*Id.* ¶ 210). The FDA clearance letter that Banon provided represented equivalence to ASTM D-6319 gloves and also included a product code

"LZA" which, as explained by Adorama Sellers' gloves expert, is a product code for medical "examination" gloves. (*Id.* ¶ 211). ASTM D-6319 specifications require, among other things that the gloves be manufactured with "Nitrile" material, that the gloves be free from pinholes, demonstrate greater than 500% elongation, and greater than 14 MPa tensile strength.  (*Id.* ¶ 212).

A "protection" glove as opposed to an "examination" glove would have more pin holes in it and would not pass a test when filling up with water in a lab. (*Id.* ¶ 213). Weiner admitted that there were differences in quality and usage for "protection" gloves versus "examination" gloves and that a "protection" glove would be sold for less money than an "examination" glove. (*Id.* ¶ 214). Indeed, Stern even tried to sell the "protection" gloves that he had for less. (*Id.* ¶ 215).

### Rock Fintek Never Agreed to Purchase nor Accepted Mis-Labelled Gloves

Only lab testing can reveal if a glove is truly an "examination" glove. (*Id.* ¶ 216). The Adorama Sellers' retained gloves and FDA expert explained that medical devices, such as nitrile examination gloves, must be labelled consistent with the product code for which FDA 510(k) clearance was received. (*Id.* ¶ 217).

Prior to the SPA, Rock Fintek made it clear to Banon no later than March 19, 2021, that Rock Fintek's client would not accept mislabeled products – "It's all about the box." (*Id.* ¶ 218). Indeed, when wrong brand (LevMed) gloves were delivered by the Adorama Sellers in April 2021, Rock Fintek immediately notified sellers that this caused "a major issue with our client" that was "causing us serious damages" and "this has created great tension with our client." (*Id.* ¶ 219).

On April 6, 2021, Stern offered to sell Rock Fintek gloves labelled "Protection" rather than "Examination" and in a WhatsApp message wrote that "this one is the same good gloves, inspection and test reports showing examination but not printed on the box... give me an offer and we will correct the boxes for you." (*Id.* ¶ 220). That same day Gilling asked Stern to "[s]end pictures of the box" and Stern sent Rock Fintek pictures of proposed glove boxes in two files,

including a file that showed "Protection" gloves. (*Id.* ¶ 221). Stern tried to convince Rock Fintek that "Protection" labelled gloves were the same gloves just mis-packaged, but Rock Fintek indisputably never agreed to buy the "Protection" gloves from him. (*Id.* ¶ 222).

Weiner has acknowledged selling Rock Fintek "Protection" labelled gloves but claimed that Maimon agreed on behalf of Rock Fintek to accept those gloves in the one-off transactions predating the SPA. (*Id.* ¶ 223). Rock Fintek ***never*** authorized Arik Maimon – in writing or orally – to accept gloves labelled "Protection" or as anything other than MedCare Nitrile/NBR Examination Gloves. (*Id.* ¶ 224).

In July 2021, Ascension brought issues regarding the quality of gloves to the attention of Rock Fintek, asserting that the gloves did not meet the specifications for gloves that were laid out in the Purchase Order. (*Id.* ¶¶ 225-226). When the gloves began trickling out to Ascension healthcare providers across the country it began receiving complaints that the gloves were tearing, fluids were seeping through the gloves, the cuffs around the gloves were too large and loose, the sizing did not represent what was on the box. (*Id.* ¶¶ 227-228).

Immediately upon being notified of quality issues by Ascension and ascertaining the extent of the problem, Rock Fintek brought the issues to the attention of the Adorama Sellers and JNS/Stern, demanded documentation and testing reports concerning the quality gloves, conducted testing on the gloves at its own expense, demanded refunds, demanded replacement of gloves from Adorama Sellers and JNS/Stern, and made direct contact with GTS asking them to replace the gloves. (*Id.* ¶ 229; Stern SOF Response ¶ 71).

***Overwhelming Record Evidence Demonstrates that the Adorama Parties and JNS/Stern Sold Non-Conforming Gloves to Rock Fintek***

By November 19, 2021, Medline Industries, the operator of the warehouse storing the gloves for Ascension completed a "label audit" for Ascension. (*Id.* ¶ 230). Medline conducts such

audits upon customer request. (*Id.* ¶ 231). Medline employees spent approximately 108 hours on the audit. (*Id.* ¶ 232). Medline removed one random case from each pallet slot, opened the case and removed one random box within that case and inspected it for the label that was identified by Ascension. (*Id.* ¶ 233). Approximately half the slots of gloves checked were labelled "protection" on boxes. (*Id.* ¶ 234). Ascension testified that this audit revealed that there were significant inconsistencies across the gloves that would deem them unusable by Ascension's healthcare providers. (*Id.* ¶ 236). Accordingly, if a slot was identified as having "Protection" gloves, Ascension blocked the entire slot from use. (*Id.* ¶ 235).

As early as January 5, 2021, Weiner and Banon were put on notice by their shipping company that bills of lading did not list "Protection" gloves as medical devices as would be required for "Examination" gloves and that it was a "huge risk" if that statement was not accurate. (*Id.* ¶ 237). Indeed, when just over a month later Weiner received several containers (i.e. thousands of cartons) of gloves labelled as "Protection" from GTS, he immediately raised that "major" issue with GTS and revealed his intentions of how he would handle the "Protection" glove inventory:

> We received the load of container number OOCU7022928.
>
> Please see attached photos of the boxes,
>
> 1) it does not say exam on the box, this is unacceptable
> 2) the factory in back of the box is different than the 510k
> These 2 issues are major, I don't know how to solve this, my customer is throwing me back the merchandise, I don't have where to sell it now.
> If I would have known this I wouldn't sell it to a government account ***I would give it to someone that doesn't look***.

(*Id.* ¶¶ 238-239).

Incredibly, the Protection gloves from container OOCU7022928 were sold to Rock Fintek – and to Ascension – by JNS/Stern. (*Id.* ¶ 241). Although at depositions Weiner and Stern have tried to argue that a given container would not necessarily contain the same type of gloves,

contemporaneous documents and communications reveal otherwise. (*Id.* ¶ 240 ("Please let me know **which container numbers** have this same problem."); ¶ 242 (acknowledging in contemporaneous communications that "[e]ach container in one type of box there are no 2 different boxes in a container"); ¶ 243 (admitting the same in deposition testimony)).

Similarly, Stern's logistics provider testified that each pallet of gloves contained boxes from the same container and was labelled with the container number and the name of the selling party. (*Id.* ¶ 244). Stern acknowledged that when purchasing gloves, he received packing lists – that he described as "tally sheets" – from his warehouses that included container numbers and some details about the gloves, and that it was his custom and practice to review such documents. (*Id.* ¶ 245). Contemporaneous documentary evidence and Stern's own testimony confirm that Stern/JNS received containers with significant amounts of gloves plainly identified in packing lists as "Protection" gloves, not "Examination" gloves. (*Id.* ¶ 246). Indeed, Stern's invoices to Rock Fintek reference *the container numbers* from which the gloves were sourced. (*Id.* ¶ 247). Thus, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*Id.* ¶ 248) (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves).

Similarly, when purchasing gloves from GTS, Kitchen Winners received packing lists from GTS along with each shipment that identified specific container numbers for that shipment, the types of gloves in each container (i.e. Examination or Protection), and quantity of gloves of each size. (*Id.* ¶ 249). Packing lists are required to accurately describe the product that is supposed to

be in the container, which is a representation to the U.S. Customs made "in the normal course of business." (*Id.* ¶ 250).

Consistent with the results of the Medline label audit, documents produced in discovery demonstrate to a near certainty that approximately 86 million gloves delivered through Rock Fintek to Ascension (i.e. just under 45%) were either labelled as Protection gloves or had fake "Examination" stickers (*Id.* ¶ 251) (chart summarizing container numbers, dates, quantities, box labels, sellers and evidentiary sources of information).

In addition, photographs taken by Rock Fintek at Medline warehouses in July 2021 reveal labels on pallets of gloves bearing glove container numbers and, at times, names of the seller of the gloves (*i.e.* Kitchen Winners or Joel Stern). (*Id.* ¶ 252). Those labels were placed on the pallets by logistics providers for the sellers (MD3PL/Avrio), but certainly not Rock Fintek. (*Id.* ¶ 253).

Weiner admitted that if a box was "labelled correctly as a protection glove" that would not comply with Kitchen Winners' contract with GTS that purportedly called for "examination" gloves. (*Id.* ¶ 254). By Weiner's own logic, if a box was labelled correctly as a protection glove that box of gloves would not comply with Kitchen Winners' contract with Rock Fintek that indisputably called for "examination" gloves. (*Id.* ¶ 255).

Following the completion of the transaction with Rock Fintek and after the dispute had arisen between the parties with respect to the nature of the gloves, the Adorama Parties and JNS/Stern continued to knowingly possess synthetic "protection" gloves in their respective inventories. (*Id.* ¶¶ 256, 257). Weiner even admitted in September and October 2021 that gloves remaining in his inventory were a "hybrid Nitrile/Vinyl mix" or a "vinyl blend." (*Id.* ¶ 258).

Indeed, through a document produced in response to a subpoena by UL – a testing facility - Rock Fintek learned that by June 2021 UL was investigating reports of Weiner and Banon using

falsified testing reports with respect to nitrile gloves. (*Id.* ¶ 262).

***Testing of Various Lots of Gloves in 2021 and During this Litigation Creates Reveals that the Gloves Are Polyvinylchloride Gloves that Do Not Meet ASTM D-6319 Specifications***

The boxes of MedCare gloves sold to Rock Fintek had a "Lot" number printed on the side of the box. (*Id.* ¶ 263). When inspecting gloves at Medline warehouses in July 2021, after being notified that there was a problem with the gloves, Rock Fintek identified the following Lot numbers on boxes of gloves delivered to Ascension: 20201106; HFK-202103010101; HFK-2021050102; MED202011; MED202101; MED202102; MEDCARE202101; MEDCARE202103; QDMD01202002; T4; ZKMD01202101; ZKMD012; ZKMD202104, T202104. (*Id.* ¶ 264). In October 2021, Ascension commissioned the ARDL testing lab[2] to conduct testing for ASTM D-6319 properties on gloves sold to Rock Fintek from Lot numbers HFK-202103010101; HFK-2021050102; MED202011; MED202101; MED202102; ZKMD01202101; ZKMD202104. (*Id.* ¶ 265). *All* of the gloves tested failed ASTM D-6319 specifications. (*Id.*).

Following the discovery of problems with the gloves, Rock Fintek established direct contact with Anna Grinvald and Yosi Atias of GTS, the purported manufacturer in China of MedCare brand gloves. GTS provided Rock Fintek with copies of testing reports concerning various lots of gloves that GTS claimed it sold to Kitchen Winners. Most of these reports, which were produced in discovery, either identify particular Lot numbers of gloves to which they pertain or include photographs of gloves boxes displaying the Lot numbers. The Lot numbers on the reports provided by GTS match up with Lot numbers that Gilling and Kato observed on boxes at Medline warehouses. (*Id.* ¶ 266).

In early December 2021, Ascension commissioned ARDL to conduct polymer testing on

---

[2] Adorama Parties' glove expert agreed that ARDL is a qualified lab to do chemical and physical testing of gloves and, in fact, chose ARDL as the lab to conduct certain testing on behalf of the Adorama Sellers in this case. (*Id.* ¶ 277).

gloves from Lot numbers HFK-202103010101, MED202101 and ZYMD01202103 (a proposed replacement MedCare glove). (*Id.* ¶ 267). Gloves from HFK-202103010101 and MED202101 tested as Polyvinylchloride with no detectible Nitrile. (*Id.* ¶ 268). Proposed replacement Lot ZYMD01202103, however, tested positive for Nitrile content. (*Id.* ¶ 269).

In December 2021, Rock Fintek independently commissioned ARDL to conduct polymer testing of gloves from Lots 20201106, HFK-202103010101, HFK-2021050102, T4, MEDCARE202101, QDMD01202002, MED202102 and ZKMD012. (*Id.* ¶ 270). All the gloves from those Lots tested as Polyvinylchloride with no detectible levels of Nitrile. (*Id.* ¶ 271). Rock Fintek also had MedCare gloves tested from a proposed *replacement* lot ZYMD01202103, which was NOT sold to Rock Fintek by any of the Adorama Parties or JNS Parties. (*Id.* ¶ 272). Unlike the gloves sold to Rock Fintek, those gloves tested positive for Nitrile content. (*Id.*).

In December 2023 and January 2024, during this litigation, ARDL tested for Polymer identification and ASTM D-6319 specifications additional gloves that were sold to Rock Fintek from Lots: T202104, 20201106; HFK-202103010101; HFK-2021050102; MED202011; MED202101; MED202102; MEDCARE202101; MEDCARE202103; QDMD01202002; T4; ZKMD01202101. (*Id.* ¶ 273). All of the gloves tested by ARDL from these Lots tested as Polyvinylchloride with no detectible Nitrile levels, and all of the gloves failed to meet ASTM D-6319 standards. (*Id.* ¶ 274). In other words, multiple lots of gloves labeled "nitrile" on boxes tested, in fact, as vinyl rubber. The absence of detectable nitrogen also confirms that the gloves in question do not contain a detectable amount nitrile rubber. (*Id.* ¶ 275).

Compared to nitrile rubber, gloves made from vinyl rubber are unsuitable for use in medical applications due to their inferior physical properties as shown in ASTM D-6319 testing as well as

their inferior chemical resistance to materials commonly found in a medical environment such as alcohols and hazardous drugs. (*Id.* ¶ 275).

### *Significant Factual Disputes Exist as to Quantities of Gloves Delivered and the cause of any Allegedly Delayed Payments under the SPA*

There is no dispute that an early glove shipment in April 2021 contained the wrong brand (LevMed) gloves. (SOF ¶ 92 & Response; SOF ¶¶ 219, 278-281). Adorama Sellers' delivery of the LevMed gloves in April 2021 crippled Rock Fintek's cash flow and delayed payments from Ascension. (*Id.* ¶ 278). Far from any delay *by Rock Fintek* by that time, as of April 28, 2021, Rock Fintek had paid for more gloves than the Adorama Sellers had delivered. (*Id.* ¶ 279).

Indeed, in an email to Mendlowitz attaching a delivery report, Weiner admitted that some loads sold to Rock Fintek by that time "have less quantities, but their payments was always for full loads." (*Id.* ¶ 280). In yet another contemporaneous email to Mendlowitz, Weiner admitted that there was already an "[o]verage" beyond what was supposed to be delivered and that there was a dispute as to whether 22,760 boxes (2,276,000 gloves) were even delivered. (*Id.* ¶ 281).

### *Rock Fintek Can Demonstrate with Reasonable Certainty that it Would Have Continued Doing Significant Business with Ascension but for the Non-Conforming MedCare Gloves*

Ascension testified that it was "highly likely" that it would have "continued to engage" in business with Rock Fintek but for the bad gloves. (*Id.* ¶ 282). Ascension testified that as a result of the counterfeit gloves Rock Fintek missed out on opportunities to sell to Ascension not only gloves but other medical supply needs that came up, such as wheelchairs and walkers, crutches and canes, and any other medical supply needs that would come up. (*Id.*) Ascension is still experiencing some blips in the supply chain (*Id.* ¶ 284). Other suppliers similarly situated to Rock Fintek were continuing doing business with Ascension through at least late 2023, including selling gloves, which is business that Rock Fintek would have been a part of but for the bad gloves, earning at least two more years of revenue. (*Id.* at ¶ 285).

18

No one disputes that Rock Fintek did $62 million of business with Ascension on purchase orders placed between March 2020 and March 2021. Had Adorama Sellers and JNS/Stern delivered good gloves, Kato expected with certainty that Rock Fintek would have done at least the same amount of business with Ascension from July 2021 through November 2023 and beyond at similar profit margins of approximately 50%. In other words, Rock Fintek should be allowed to argue to the jury that based on its track record with Ascension, the high likelihood of future business and overall average profit margins it would have earned upwards of $30 million a year in profits for three years. (*Id.* ¶ 286).

Ascension's chief operating officer at the time Todd Adams and vice president for supply chain Dewayne Rader had conversations with Rock Fintek about long term potential business with Rock Fintek, including bidding on a $1 billion glove contract. (*Id.* ¶ 287). Ascension testified that had Rock Fintek been able to clear those hurdles, it would have had a "leg up" in bidding on future long-term Ascension business given its past working business relationship with Ascension. (*Id.* ¶ 288). Rock Fintek also had plans to sell COVID-19 kits to Ascension and was in the process of obtaining FDA approval for those kits.  (*Id.* ¶ 289).

As Kato testified, based on his extensive experience as an entrepreneur, Rock Fintek would have done more revenue with Ascension and its affiliates going forward than it did in the past. For example, by April 2021, Kato had been connected by Ascension to St. John of God Health Care hospital in Australia, which described Rock Fintek as "a reliable supplier to Ascension's circa 200 hospitals" whom St. John's was "close" to using as a PPE supplier in Australia. (*Id.* ¶ 291).

By late 2021, Rock Fintek had an order for 4 million masks from St. John of God, which was reduced, after the delivery of the bad gloves, to approximately 100,000 masks for a total payment of $95,290. Instead of buying 4 million masks, the April 14, 2022 wire transfer for

$95,290.91 in Rock Fintek's bank records is the total amount of business that St. John did with Rock Fintek despite referring to it as a reliable supplier just months earlier. (*Id.* ¶ 292).

Following discovery of the non-conforming gloves in July 2021, Kato has continued to closely monitor prices, trends and demand in the PPE market, including as part of Rock Fintek's efforts to mitigate its damages, including finding a potential buyer for the MedCare gloves and to find potential replacement gloves for Ascension. While PPE prices fluctuated and ultimately went down from the levels they were at in early 2021, the demand and profit margins for PPE sales remained steady and have remained steady through this day. (*Id.* ¶ 293).

***Rock Fintek Faces Exposure to Significant Liability to Ascension for Which Adorama Sellers and JNS/Stern Are Liable***

Since discovery by Ascension of the bad gloves, Ascension would no longer do business with Rock Fintek and threatened legal action. Ascension sent Rock Fintek a demand letter dated March 16, 2022, and has demanded that Rock Fintek make Ascension whole. From Ascension's perspective, its damages include a loss of the gloves, close to $37 million it paid to Rock Fintek, and north of $2 million in holding costs that continue to grow. (*Id.* ¶ 296). Ascension testified that they have not been made whole and the situation is unresolved. (*Id.* ¶ 295). Although Ascension has not sued Rock Fintek as of this date, Ascension has not given Rock Fintek any releases or assurances, and Rock Fintek views the exposure to Ascension as a serious and significant ongoing claim worth tens of millions of dollars that, among other things, has caused Rock Fintek to go out of business. (*Id.* ¶ 296).

**Discussion**

Summary judgment is only appropriate where "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary

judgment, and in assessing the record to determine whether there is a genuine issue as to a material

fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in

favor of the party against whom summary judgment is sought." *Atl. Mut. Ins. Co. v. CSX Lines,*

*L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005); *TOMRA of N. Am., Inc. v. Count & Crush, LLC*, No.

118CV1266LEKDJS, 2023 WL 6066034, at *1 (N.D.N.Y. Sept. 18, 2023) ("What the voluminous

record created by the submissions establishes beyond doubt is that questions of fact predominate

that requires denial" of summary judgment motions).

## I.     ADORAMA IS A "SELLER" UNDER THE SPA AND LIABLE FOR ITS BREACH.

Adorama does not present any evidence that could change this Court's conclusion at the

motion to dismiss stage that the SPA reflected Adorama's intent to be bound by its terms and that

Adorama's "status as a recipient of payments made under the SPA sufficiently supports Adorama's

'privy of contract,'" enabling Adorama to be held liable for breaches of the SPA. (ECF 68 at 24-

25). No evidence other than Mendlowitz's hotly disputed testimony reflects any intent of the

parties to limit Adorama's liability or role as a "Seller" under the SPA. Adorama continues, as it

did at the pleading stage, to selectively rely on the preamble to the SPA and inapplicable caselaw

while ignoring that plain language in Section 2 of the SPA requires all payments be made to the

"Seller," all of which payments (not just the initial deposit) Rock Fintek indisputably made directly

to Adorama and *not* to Kitchen Winners. Adorama also misconstrues the significance of the SPA

signature block that unequivocally lists Adorama as a signatory to the SPA as a "Seller" that

expressly "agreed" to be bound by its terms.

Adorama's argument that it was merely a lender to Kitchen Winners with no obligations

to as to the gloves sold to Rock Fintek finds no support in the language of the SPA or the factual

record, but effectively presupposes a finding as a matter of law – to which Adorama is not entitled

– that as a mere lender it had no obligations under the SPA because it was not a "Seller" under the

SPA, which is the very issue in dispute. Nothing in the SPA identifies Adorama as a lender to Kitchen Winners. Discovery has instead revealed that Adorama did not act as a mere lender in this transaction but participated in the negotiation of the SPA, stayed closely informed regarding deliveries of gloves and payments from Rock Fintek during the performance of the SPA and the disputes that arose during the contractual relationship. Adorama has admitted that whatever financial arrangement existed between Adorama and Kitchen Winners regarding the SPA transactions was never disclosed to Rock Fintek. *Case v. City of New York*, No. 12 CIV. 2189 AJN AJP, 2012 WL 5951296, at *4 (S.D.N.Y. Nov. 28, 2012) ("The secret or subjective intent of the parties is irrelevant."). To the extent that Adorama seeks to rely on its rendition of Mendlowitz's purported lack of pre-SPA discussions with Rock Fintek, plainly a dispute of material fact exists as to whether and to what extent such discussions took place. Similarly, Adorama's reliance on the LOI between Rock Fintek and Maimon does not resolve any such dispute or ambiguity because that LOI refers to Adorama as both a seller of gloves and as a party financing the sales.

Adorama urges a strained reading of the SPA and misconstrues fundamental tenets of New York contract law when seeking to avoid liability under the SPA. First, Adorama focuses on the deposit clause in Paragraph 2.b of the SPA where Adorama is referred to by name but effectively asks the Court to read out of the SPA Paragraphs 2.c and 2.d which provide, respectively, that: "c. Buyer shall ***pay Seller in full by wire transfer*** of funds for each container …." (emphasis added); and "d. Any payment of the Purchase Price payable for each box of gloves delivered ***shall be paid to Seller*** …." There is no dispute that Rock Fintek made *all* payments under the SPA to Adorama. New York law does not permit Adorama to selectively rely on certain provisions of the SPA while ignoring those that cut against its position. *See Diamond Castle Partners IV PRC, L.P. v. IAC/InterActivecorp,* 82 A.D.3d 421, 422 (1st Dep't 2011) (*citing Matter of Wallace v. 600*

*Partners Co.*, 205 A.D.2d 202, 206 (1st Dep't 1994) ("It is a cardinal rule of construction that a court adopt an interpretation that renders no portion of the contract meaningless (internal editing and quotation marks omitted). At the very least, an ambiguity exists.

Second, Adorama's continued reliance on the preamble of the SPA which defines "Seller" as Kitchen Winners does not carry the day where that initially-defined term is used inconsistently in the contract. *Collins v. Harrison–Bode*, 303 F.3d 429, 433–434 (2d Cir. 2002) (defined term used inconsistently throughout integrated agreement rendered contract ambiguous); *Casolaro v. Armstrong*, No. 10 CV 4276 DRH ETB, 2012 WL 6093778, at *3 (E.D.N.Y. Dec. 7, 2012) (denying summary judgment based on contractual ambiguity as a result of inconsistent use of a defined "Effective Date"). While "Seller" is defined in the preamble one way, Paragraphs 2.c & 2.d of the SPA refer to Seller in a different way – as the party to whom Rock Fintek was required to and did make all payments under the SPA – *i.e.* Adorama.

Third, Adorama's argument that the Court should disregard the heading "Seller" under which Adorama's signature block appears when "agree[ing]" to the "foregoing Agreement" has already been rejected by this Court and is not supported by any legal authority. To the contrary, under New York law, "title or headings of a contract may be considered to provide context and inform the meaning of the sections they label." *Sigmon for Hindin v. Goldman Sachs Mortg. Co.*, No. 1:12-CV-3367 (ALC), 2018 WL 1517189, at *4 (S.D.N.Y. Mar. 26, 2018); *Small Business Bodyguard Inc. v. House of Moxie, Inc.*, No. 14-cv-170 (CM), 2015 WL 1290897, at *7 (S.D.N.Y. Mar. 20, 2015) (noting that headings of paragraphs "give[] a great deal of 'context' to the words that follow"). Thus, it is for the jury to weigh and determine the significance of the fact that Adorama signed the contract under the "Seller" heading together with Kitchen Winners.

Adorama misplaces reliance on this Court's decision in *Brkic v. Dumbo Moving & Storage,*

*Inc.*, No. 22-CV-07029 (CM), 2023 WL 128801, at *4 (S.D.N.Y. Jan. 9, 2023). That case has no application here, where Mendlowitz signed the SPA expressly "On behalf of: Adorama Inc." resulting in Adorama receiving from Rock Fintek more than $19 million in direct payments. In *Brkic*, an employee tried to avoid obligations of an arbitration agreement that he signed in his individual capacity by claiming that the mere fact that he wrote another company's name under his signature changed the identity of the parties to the agreement. The Court – on a motion to dismiss – rejected the employee's argument based on "the plain language of the Agreement, which identifies Plaintiff as the party, and the fact that he signed in his capacity as 'Sales Representative' – the very capacity in which he is identified as a Party to the Agreement in its opening paragraph." *Id.* In other words, unlike here, the preamble to the agreement in *Brkic* was completely ***consistent with*** the signature block, and, unlike here, no other inconsistencies were evident within the four corners of the contract. Invoking presumption in favor arbitrability and unambiguous arbitration clause between the individual and his former employer, this Court compelled arbitration. *Id.*

Other cases on which Adorama relies are similarly inapposite. *See Capax Discovery, Inc. v. AEP RSD Invs., LLC*, 285 F. Supp. 3d 579, 595 (W.D.N.Y. 2018) (dismissing contract claims against non-parties to the Agreement who, unlike Adorama, were "non-signatories to the Agreement"); *Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 72 (S.D.N.Y. 2019) (finding allegations *sufficient* to allege that a contractual non-signatory parent corporation manifested an intent to be bound by its subsidiary's contract); *Wolff v. Rare Medium, Inc.*, 65 F. App'x 736, 738 (2d Cir. 2003) (plaintiff could not maintain a claim for breach of a contractual provision that imposed no obligations on defendants but "serves only to restrict ***plaintiffs'*** disposition of their exchanged shares" (emphasis added)); *Ehag Eisenbahnwerte Holding Aktiengesellschaft v. Banca Nationala A Romaniei*, 306 N.Y. 242, 249 (1954) (plaintiffs were not parties to the contract at

issue and, therefore, defendants had no contractual obligation to the plaintiffs).

At most, the SPA is ambiguous as to the scope of Adorama's obligations, which ambiguity cannot be resolved on summary judgment, particularly where counsel for Adorama Sellers indisputably drafted the SPA. *See 67 Wall St. Co. v. Franklin Nat. Bank*, 37 N.Y.2d 245, 249 (1975) ("in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it"); *Amusement Bus. Underwriters v. American Intl. Group*, 66 N.Y.2d 878, 880 (1985) (when contract is ambiguous, its construction presents a question of fact that may not be resolved on summary judgment); *TOMRA of N. Am., Inc. v. Count & Crush, LLC*, No. 118CV1266LEKDJS, 2023 WL 6066034, at *4 (N.D.N.Y. Sept. 18, 2023) ("If the contract is ambiguous, and if the opposing party proffers a reasonable interpretation and submits supporting extrinsic evidence over which there is a genuine dispute, summary judgment is precluded.").[3]

Adorama's motion on the contract claim against it should therefore be denied.

## II.   RECORD EVIDENCE SUPPORTS THE BREACH OF GOOD FAITH AND FAIR DEALING CLAIMS AGAINST ADORAMA AND KITCHEN WINNERS.

In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) ("neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). Just as Rock Fintek's breach of contract claim against Adorama survives, so does the claim for breach of covenant of good faith and fair dealing, premised on extra-contractual extortionate conduct, including conditioning providing information regarding the gloves that had been delivered on Rock Fintek paying improper transportation and

---

[3] Contrary to the way in which Adorama and Kitchen Winners and their agents conducted themselves during the parties' business dealings, discovery has revealed that Adorama and Kitchen Winners are apparently separate unaffiliated corporate entities. Accordingly, while Adorama is directly liable for its breach of the SPA as discussed above, Rock Fintek is no longer pursuing the theory that Adorama is liable for that breach as an alter-ego of Kitchen Winners.

insurance costs and conditioning contractually required return of overcharges and payment of a rebate on Rock Fintek buying 2 million more boxes of gloves from Adorama and Kitchen Winners for an additional $18 million.

As detailed above, discovery has revealed that Adorama's Mendlowitz was more involved in the extortionate communications that previously suspected, being kept apprised by email of those efforts by Mr. Weiner and even "bcc'd" on communications seeking to extort concessions for Rock Fintek. (*See* SOF ¶¶ 184, 185, 199).

The good faith and fair dealings claims are sufficiently distinct from the contract claims to survive summary judgment.

## III. THE UNJUST ENRICHMENT CLAIM AGAINST ADORAMA SURVIVES IN THE ALTERNATIVE TO THE CONTRACT CLAIM.[4]

As the Court recognized at the motion to dismiss stage, Rock Fintek believes that the SPA constitutes a valid and enforceable contract between Rock Fintek and Adorama with respect to the transactions under the SPA, but has alleged an unjust enrichment claim in the alternative given Adorama's challenge to having any liability under the SPA despite being the recipient of all payments including the $750,000 that should have been returned to Rock Fintek as a rebate under the SPA and payment for the overage of gloves for which Rock Fintek paid Adorama, which amounts remain in dispute. If the Court concludes, as Rock Fintek respectfully submits it should, that the contract at issue is valid and enforceable as to Adorama, then Rock Fintek does not dispute that Adorama is entitled to summary judgment on the unjust enrichment claim. *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 594 (S.D.N.Y. 2018). Alternatively, the jury should

---

[4] It does not appear from discovery and Kitchen Winners' motion papers that Kitchen Winners contests that all transactions between it and Rock Fintek are subject to a then-existing contractual relationship, including the one-off transactions, and the overages during the SPA performance. In light of the undisputed existence of a contractual relationship, Rock Fintek agrees that the unjust enrichment claim against Kitchen Winners is unnecessary.

determine the basis for Adorama's liability at trial.

## IV.    JNS IS LIABLE FOR SALES OF NON-CONFORMING GLOVES.

Stern and JNS ask the Court to turn a blind eye to two days of Stern's deposition testimony and unambiguous documentary evidence demonstrating that Stern knowingly sold Rock Fintek at least 19 million non-conforming gloves. (*See* SOF ¶ 251). Stern's arguments appear to fall into three categories: that Rock Fintek cannot discern which gloves in Medline warehouses came from Stern's various shipments particularly in light of some "aggressive" burn-down plan, that the gloves did not need to meet ASTM D-6319 standards and therefore conformed to the contractual requirements, and that Ascension was apparently satisfied with the gloves. Each of these arguments is easily disposed of on summary judgment on this record.

First, even if Stern were somehow right that the gloves that Stern sold to Rock Fintek were mixed in with other products and not susceptible to identification after delivery (he is not), the record is replete with authenticated and admissible documentary evidence consisting of packing lists, invoices, bills of lading and communications with warehouse workers, all reflecting container numbers that identify precisely which gloves came from Stern. (*See* SOF ¶¶ 244-248). This is precisely the type of evidence on which courts routinely rely to prove past transactions. *See, e.g., Johnson & Johnson & Lifescan, Inc. v. S. Pointe Wholesale, Inc.*, No. 08CV1297SLTSMG, 2014 WL 12558573, at *5 (E.D.N.Y. Apr. 4, 2014) (relying on invoices and deposition testimony to establish that "Gymtrade sold large quantities of LifeScan test strips to Rowan Tree/Hadida: 10,240 boxes in December 2005; 16,159 in February 2006; and 6,046 in July 2006"); *Nationwide Sales & Servs. Inc. v. Envirocare Techs. Int'l, Ltd.*, No. CV 16-6617 (GRB), 2018 WL 2436969, at *4 (E.D.N.Y. May 30, 2018) (describing "undisputed evidence, based on Nationwide's own invoices to Steel City, that the subject products were directly sold by plaintiffs to Steel City prior to the litigation"); *MuscleTech Rsch. & Dev., Inc. v. E. Coast Ingredients, LLC*, No. 00-CV-753A,

2007 WL 655755, at *6 (W.D.N.Y. Feb. 26, 2007) ("indirect and circumstantial proof of the quantity of counterfeit MuscleTech products Sho Me manufactured and distributed based on invoices and packing slips provided to Mr. Parziale provides a sufficient basis for a 'reasoned conclusion' as to the amount of Plaintiffs' lost gross profits attributed to Defendants' sale of counterfeit MuscleTech products"); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12CV5354KAMRLM, 2016 WL 1274011, at *2 (E.D.N.Y. Mar. 31, 2016) ("FDI purchased from Baja at least 1,928 cases of what Baja sold as 5-hour ENERGY, for a total price of $540,552 … purchase orders, and invoices sent from Baja to FDI, evidence these transactions"). Thus, even if stern was right that it would be difficult to identify his gloves in Medline warehouses, documentary evidence more than suffices to prove to a jury the types of gloves that Stern sold.

Moreover, Stern has admitted a custom and practice of reviewing such information, which further belies his feigned innocence. (*Id.* ¶ 245). And if that is not enough, contemporaneously taken photographs reveal pallets of gloves in Medline warehouses bearing JNS and Stern's name *and* container numbers and link him directly to non-conforming protection gloves. (SOF ¶ 252-253). Finally, while different Lots of gloves may have different packaging, identify different factories and different manufacture dates, *all* lots that were tested by an independent laboratory tested as non-conforming Polyvinylchloride gloves with no Nitrile content, failing to meet ASTM D-6319 specifications, and unsuitable for medical use. (SOF ¶¶ 263-275).

Second, Stern's argument that his contractual obligations did not require him to provide ASTM D-6319 rated gloves is easily dispensed with by Stern's own admission that he provided to Rock Fintek – through Azra and Ms. Li – a screenshot and a full copy of an FDA 510(k) clearance letter purportedly covering the gloves to be sold that expressly described the gloves as meeting ASTM D-6319 standards. (*See* SOF ¶ 205).

Third, Stern's scattershot references to Ascension's purported "burn down" plan and its supposed satisfaction with the gloves also blatantly ignores the factual record. As the Ascension representative testified the term "burn down" was a poor choice of words by its author, where Ascension's strategy was simply to ensure sufficient nitrile gloves and "to turn through them under our normal turn rate for nitrile exam gloves." (Response to JNS SOF, ¶ 50). Furthermore, the record is clear that when gloves began trickling out to Ascension healthcare providers across the country it began receiving complaints that the gloves were tearing, fluids were seeping through the gloves, the cuffs around the gloves were too large and loose, the sizing did not represent what was on the box. (SOF ¶¶ 227-228). These complaints caused Ascension to test the gloves and conduct a label audit that revealed that the gloves were unusable by Ascension's healthcare providers. (*Id.* ¶¶ 230-235).

Simply said, Stern is not entitled to ignore documentary evidence and seek unwarranted inferences in his favor on summary judgment.

## V.   THERE IS NO DISPUTE AS TO THE *EXISTENCE* OF ROCK FINTEK'S LOST PROFITS, LEAVING DETERMINATION OF THE REASONABLE *AMOUNT* OF LOST PROFITS FOR THE JURY.

"The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of the breach." *Murphy v. Snyder*, No. CV101513JSAKT, 2014 WL 12988632, at *8 (E.D.N.Y. Aug. 15, 2014), report and rec. adopted, No. 10-CV-1513 JS AKT, 2014 WL 4700213 (E.D.N.Y. Sept. 22, 2014) (citing *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 269 N.E.2d 21, 26 (1971). "Because New York law aims to place the non-breaching party in as good a position as it would have occupied but for the breach, lost profits may be awarded for breach of contract where they are a natural consequence of the breach, where that measure of damages was contemplated by the parties when the contract was formed, and where the lost profits are capable of reasonably accurate measurement."

New York courts do not require scientific rigor in the calculation of damages. *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 600 (S.D.N.Y. 2004) (citing *Lexington Products, Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251, 253 (2d Cir.1982). "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain." *Id.*; *see also Raymond Weil, S.A. v. Theron*, 585 F. Supp .2d 473, 488 (S.D.N.Y. 2008) (even where "the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any.").

Here, the hotly contested factual record supports Rock Fintek's right to argue to a jury its damages claims for (1) losses incurred from the destruction of Rock Fintek's lucrative business relationship with Ascension; (2) ongoing exposure to Ascension; (3) an unpaid contractual rebate of $750,000; and (4) Rock Fintek's overpayment for approximately $2 million of gloves for which Rock Fintek did not get paid. Whatever defenses and evidence the moving parties may have as to Rock Fintek's claimed *amount* of damages, those defenses are not appropriately raised on summary judgment, particularly where the *existence* of lost profits is beyond dispute. In New York, a party may recover lost profits from the destruction of a collateral business relationship if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties. *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 557 F. Supp. 3d 381, 401 (E.D.N.Y. 2021) (explaining that lost profits from plaintiff's loss of ability to ship products were foreseeable because defendants' familiarity with

the industry gave them "every reason to know of the commercial consequences that [plaintiff] might suffer if it abandoned cargo and failed to pay an ocean carrier"); *see also Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 220 (S.D.N.Y. 2010) ("Although plaintiffs may ultimately have difficulty establishing lost profits damages that are not speculative, the issue raises questions of fact that cannot be resolved at summary judgment."); *TOMRA of N. Am., Inc. v. Count & Crush, LLC*, No. 118CV1266LEKDJS, 2023 WL 6066034, at *9 (N.D.N.Y. Sept. 18, 2023) (denying summary judgment on a lost profits theory even where non-moving party did not offer a specific accounting of the precise amount of lost revenue).

Here, the moving parties do not appear to contest that the destruction of the Ascension relationship was caused by the sale to Rock Fintek of non-conforming gloves. Rather, the moving parties focus on the other two elements of the inquiry – whether the lost profit damages were fairly within the contemplation of the parties and whether Rock Fintek can prove those damages with reasonable certainty under New York law. On the record before the Court at least a question of fact exists on those two elements of Rock Fintek's lost profits claim.

### A.    A Jury Should Decide Whether Liability for Destruction of Rock Fintek's Relationship with Ascension was Fairly within Contemplation of the Parties.

Drawing all reasonable inferences in Rock Fintek's favor, a jury can easily find on this record that it was in the fair contemplation of the parties that delivering non-conforming gloves to Rock Fintek's best client – a large hospital – for use in the middle of a global pandemic would destroy Rock Fintek's relationship with that hospital for which Rock Fintek would seek to hold the sellers responsible. *See Marine Steel Transp. Line, LLC v. E. Metal Recyling, LLC*, No. 19-CV-2275-FB-SJB, 2023 WL 3603489, at *2 (E.D.N.Y. May 23, 2023) ("[w]hether or not Thornton's alleged lost profits were foreseeable and within the contemplation of the parties is a question of fact." (internal citations and quotation marks omitted)); *Ashland Mgmt. Inc. v. Janien*,

82 N.Y.2d 395, 403 (1993) ("The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable."); *Aramony v. United Way of Am.*, No. 96 CIV. 3962 (SAS), 1998 WL 205331, at *6 (S.D.N.Y. Apr. 27, 1998) (which injuries were contemplated by the parties at the time of the agreement "present questions of fact that will be resolved at trial."); *see also Mortimer v. Otto*, 206 N.Y. 89, 91 (1912) ("In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered….").

Here, neither the SPA nor any other writing or pre-existing contract between the parties limits in any way the damages recoverable from the Sellers' breach and nothing in the record suggests any such contemplated limitation. Ambiguity created by this silence cannot be resolved on summary judgment and must be construed against the drafters – Kitchen Winners and Adorama. *See Credit Suisse First Bos. v. Utrecht Am. Fin. Co.*, 30 Misc. 3d 879, 883, 914 N.Y.S.2d 600, 603 (Sup. Ct. 2010), aff'd, 84 A.D.3d 579 (2011) (determination of what liability defendant may fairly be supposed to have assumed consciously is a question of fact).

With the parties contracts silent on the issue of consequential damages, the Court turns to record evidence of the parties' interactions which demonstrates that that Kato and Gilling had numerous phone calls and in-person meetings with Banon, Weiner, Stern and Maimon to whom they relayed unambiguously that gloves would immediately be re-sold by Rock Fintek to its large hospital client; and that the hospital client required the gloves to be FDA 510(k) Nitrile Medical Examination Gloves meeting ASTM D-6319 specification, short of which the hospital would not accept the gloves; and that this was an important hospital client of Rock Fintek – one of the two largest hospital systems in the United States; that the hospital had placed a purchase order for a

large quantity of gloves; and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, Kato specifically and significantly discussed with Stern, Banon and Weiner that the money that was stolen in Thailand was a part of the large deposit made *by the hospital* and that Rock Fintek was pursuing claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the $6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Given the risky yet profitable business climate for PPE, Kato sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised. (*See* SOF ¶¶ 187-200). On this record, Rock Fintek is entitled to have a jury evaluate testimony and determine what the parties reasonably and fairly should have contemplated in this unique situation.

The cases on which the moving parties rely are readily distinguishable. In *Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 317 (1989), the Court of Appeals found that it was not reasonable to assume that the County contemplated consequential damages consisting of "lost appreciation in the value" of plaintiff's property that was *peripheral* to the property subject to the contract, had a stadium not been built on the subject property. No such attenuated theory is before the Court here.

In *Phoenix Warehouse of California, LLC v. Townley, Inc.*, No. 08 CIV. 2856 NRB, 2011 WL 1345134, at *6 (S.D.N.Y. Mar. 29, 2011), this Court considered whether an alleged breach of certain timing obligations in a settlement agreement gave rise to a reasonable contemplation that

a warehouse would be liable for millions in consequential damages where the warehouse had been holding on to defendant's products under a *lien for non-payment* and only agreed to release those goods upon entering into a settlement and escrow agreement providing for payment of an owed sum of $200,000 with an additional similar amount placed in escrow. Given the respective bargaining positions of the parties at the time of contracting, the Court found that it was "plainly obvious that had this question been considered by the parties, Phoenix would have refused to assume responsibility for such liability. If Townley had insisted that Phoenix take such responsibility, Phoenix would have ended negotiations and continued to hold on to Townley's goods, as was its right." Here, no such circumstances exist.

To the contrary, the moving parties were receiving millions of dollars from Rock Fintek for (purported) medical gloves knowing that those gloves were being procured for immediate delivery to hospitals and were required to meet stringent specifications for medical use. As detailed above, the record reflects numerous communications prior to and during the contractual relationship supporting a reasonable inference that the glove sellers reasonably should have contemplated being liable for consequential damages had they delivered bad gloves. *See also Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 433 (S.D.N.Y. 2004) (the contract at issue contained an express disclaimer of lost profit or consequential damages); *EPN Ingenieria S.A. De C.V. v. Gen. Elec. Co.*, No. 92 CIV. 1563 (KMW), 1996 WL 531867, at *2 (S.D.N.Y. Sept. 19, 1996) (no reasonable contemplation of liability for lost profits where contract stated that no party would be liable for the lost profits of any other party); *Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07CV4175NGGRLM, 2008 WL 4693246, at *8 n.6 (E.D.N.Y. Oct. 17, 2008) (agreement expressly disclaimed consequential damages, including "loss of distribution rights, loss of goodwill or any similar loss"); *Spherenomics Glob. Contact Centers v. vCustomer*

*Corp*, 427 F. Supp. 2d 236, 252 (E.D.N.Y. 2006) (rejecting *after trial* damages theory where plaintiff presented no evidence whatsoever from which the court could "could conclude that the parties intended to indemnify Spherenomics for its lost profits in the event that the fox, having gained admission to the hen house, acted like a fox").

Accordingly, Rock Fintek has made an adequate showing that its lost profits were fairly within the contemplation of the parties, leaving further disputes to be resolved by the jury.

**B.    Rock Fintek Made a Sufficient Showing that it Can Prove the Amount of its Lost Profits for Approximately Three Years with Reasonable Certainty.**

The moving parties glibly rely on snippets of testimony and focus narrowly on whether Rock Fintek can prove specifically the $36 million of lost profits per year figure that Rock Fintek estimated in its damages disclosure. The moving parties either ignore or downplay, however, actual documentary evidence that supports the strength of Rock Fintek's business relationship with Ascension, the profitability of its overall PPE business at the time and its reasonable expectations to earn upwards of $30 million per year in the short term from continued business with Ascension.

The record is undisputed that Rock Fintek quickly developed a strong and mutually beneficial business relationship with Ascension and did more than $25 million of PPE business with Ascension outside of the transactions at issue and more than $62 million of PPE business with Ascension on purchase orders placed between March 2020 and April 2021. (SOF ¶¶ 146-154). It is also clear from Rock Fintek's financial records that during this time it did more than $100 million in PPE business at an approximately 50% profit margin. (SOF ¶¶ 155-161).

The moving parties' blind reliance on the fact that Rock Fintek did not make a profit from the Ascension purchase order underlying this case simply ignores the plain truth that Rock Fintek had $6.2 million stolen from it (on December 16, 2020) and then was saddled with high supply costs – from JNS and Kitchen Winners – on the early purchases. But for that theft, Rock Fintek

would not have lost the $6.2 million out of pocket, would have paid lower costs for the 200 million gloves (between $7.90 and $10/box of 100 gloves) and would have made close to $10 million in profit on the Ascension purchase order at issue. (SOF ¶¶ 162-163).

Together with a track record of past sales, Ascension's unambiguous testimony that it was "highly likely" to continue doing business with Rock Fintek, that other similarly situated suppliers were taking advantage of opportunities through this day on which Rock Fintek missed out because of the bad gloves, and that PPE supply chain problems for Ascension persist through this day, is sufficient to show that lost profits are capable of proof with reasonable certainty, leaving it for the jury to weigh the disputed evidence. The moving parties' argument to the contrary ignores undisputed documentary financial evidence regarding Rock Fintek's business focusing instead on selective excerpts from Kato's testimony.[5] Indeed, one of the cases on which the moving parties rely explains that such financial evidence is sufficient to demonstrate the existence and reasonable estimate of lost profits. *Spherenomics Glob. Contact Centers*, 427 F. Supp. 2d at 252 (invoices that establish the revenues and financial records from which the Court could estimate profits based on the evidence of its revenues).

In addition, the moving parties focus on but misconstrue the evidence concerning Rock Fintek's anticipated effort to bid on a $1 billion/year glove contract with Ascension, Rock Fintek's anticipated business with St. John of God Health Care hospital, Ascension's affiliate in Australia that described Rock Fintek as a as "a reliable supplier to Ascension's circa 200 hospitals" in April 2021, and the development of Covid-19 test kits that Rock Fintek planned to sell to Ascension,

---

[5] Throughout their papers, the moving parties cast aspersions on the testimony of Kato who admittedly did not have Rock Fintek's financial data and bank records memorized. The moving parties made a strategic choice not to question Kato about Rock Fintek's bank records, which would have elicited the same information that Kato summarizes in his enclosed declaration. While the moving parties are free to cross-examine Kato at trial regarding the quality of his ability to recall specific numbers at deposition, the evidence is indisputable that Rock Fintek's Ascension PPE business was profitable. (*See* Kato Dec., ¶ 17).

which opportunities were destroyed by the delivery of bad MedCare gloves. (*See* SOF ¶¶ 287-292). To be clear, Rock Fintek's lost profits claim is *not* based on the potential $1 billion bid (on which Ascension testified Rock Fintek would have a "leg up" over other bidders but for the bad gloves), the cancelled Australian mask order or the halting of development of test kits. Instead, this evidence corroborates and supports the existence of a strong commercial relationship that had developed between Rock Fintek and Ascension in 2020 and early 2021, and the reasonable likelihood of future business. (*See* SOF ¶ 290).

Moving parties' argument that Rock Fintek was a "creature of the Covid-19 pandemic" and therefore could not expect that lucrative PPE transactions would continue into the future is also unavailing under New York law, particularly on summary judgment.[6] The breaches at issue occurred in the first half of 2021 at which time Rock Fintek had very reasonable expectations of continuing to do significant and valuable business with Ascension. In New York, it is a well-established principle that contract damages are measured at the time of the breach. *Calltrol Corp. v. Loxysoft AB*, No. 18 CV 9026 (NSR), 2023 WL 2529844, at *7 (S.D.N.Y. Mar. 15, 2023) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach."); *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir.1990) (collecting cases); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971). As the Second Circuit explained, "inquiry into [acquired business's] performance and market conditions in the months following the acquisition was improper because events subsequent to the breach, viewed in hindsight, may neither offset nor enhance" the contractual damages. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007). In any event, the

---

[6] An April 2020 article on which Adorama Sellers appear to rely on page 22 of their brief not only predates the transactions at issue by a year but constitutes inadmissible hearsay and should not be considered.

moving parties' apparent position that Rock Fintek's expectations of continued Ascension business should be limited in scope or timeframe to 2022 is precisely the type of argument that should be presented to the jury for a determination of *the amount of damages* not their existence.

The authorities cited by the moving parties are readily distinguishable. In *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95CIV.8450(AGS)(THK), 1998 WL 422482, at *4 (S.D.N.Y. July 22, 1998), this Court rejected a lost profits theory for a "new business" where defendant supplier provided non-conforming fabric for plaintiff's *second order* with a retailer under extreme the circumstances where "there is no evidence that plaintiffs made any profit on their first order from J.C. Penney … [and] plaintiffs have not disputed that they have no evidence of ever having made a net profit on any order." Unlike the extensive evidence here, the plaintiff in *Lovely Peoples* had no evidence *whatsoever* to support their lost profits theory:

> Plaintiffs have taken no discovery, nor submitted any affidavits, of representatives of J.C. Penney, supporting plaintiffs' contention that J.C. Penney was committed to placing future orders with Lovely Peoples. Nor have plaintiffs offered any evidence that J.C. Penney did not place future orders for reasons related to Lovely Peoples' one incomplete shipment and defendants' purported breach of the contract to supply fabric to plaintiffs. At best, plaintiffs had only a hope of future orders, not the assurance of future orders.

*Id.* As explained above, the moving parties' argument that Rock Fintek cannot sustain a lost profits theory because it did not profit on this particular glove transaction is factually incomplete and does not carry the day on this hotly disputed record. (SOF ¶¶ 162-163).

Similarly, *Abraham v. Leigh*, 471 F. Supp. 3d 540 (S.D.N.Y. 2020) has no application here. In *Abraham*, plaintiff could not establish any reasonably anticipated lost profits from staging a revival of musical Man of La Mancha ("MOLM"), where the record demonstrated that two recent MOLM revivals had lost money, there was no evidence to support a reasonable finding that plaintiff would have even directed the revival, evidence demonstrated that other shows plaintiff

directed were "financial failures," and plaintiff's claim that he earned hundreds of millions in other productions had no substantiation in the record. *Id.* at 564.

In *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018), the Court rejected a lost profits theory that was based on sales projections *in a different industry* that were not based on any historical data but "were based on the dollar amounts that [plaintiff] believed the board of directors would require in order to approve the acquisition" where "he and a colleague had manufactured those figures with scant support in order to obtain approval of a deal." The plaintiff produced "no evidence of sales of similar products by which a comparison may be made" which was insufficient to provide a baseline by which to calculate damages. *Id.*

In *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993), the court rejected plaintiff's effort to extrapolate lost profits for seven years from four months of sales in a brand new trademark search product where plaintiff's damages theory assumed that plaintiff would reverse the long decline in its market share, would reverse years of prior losses and where new online searching technology was shrinking the overall market for the trademark searching service at issue. *See also U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996) (explaining that a party "may well have been able to pursue lost profits and lost business opportunities as consequential damages pursuant to its breach of contract claim" but waived that claim because it did not do so); *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 493 (S.D.N.Y. 1996) ("Nowhere has the Trustee even argued that DMC would have earned profits had the company not been plagued by misconduct."); *Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, No. 20CV9622 (DLC), 2022 WL 4547412, at *4 (S.D.N.Y. Sept. 29, 2022) (denying lost profits where projections "hinge[d] on a hypothetical joint venture partnership whose terms are hardly solidified to a reasonable degree of certainty" in

the real estate industry that was – unlike here – negatively affected by the Covid-19 pandemic).

The record here is in stark contrast to the facts in the above-cited cases. Ascension testified that future orders that Rock Fintek missed out on would have been "highly likely" but for the gloves; Rock Fintek's financial records and Ascension purchase orders reflect a pattern of PPE transactions totaling more than $62 million (including the gloves at issue) as part of a more than $100 million business at an average 50% profit margin, and Ascension testified unambiguously that it would have continued doing business with Rock Fintek but refused to do so specifically because of the non-conforming MedCare gloves. On this record, drawing all reasonable inferences in Rock Fintek's favor, the projection that Rock Fintek would have earned upwards of $30 million a year in profits for three years is reasonable and supported by sufficient evidence. (SOF ¶ 286).

**C.     Rock Fintek is Entitled to Present to a Jury the Proof of Damages Resulting from Exposure to Ascension Caused by the Sellers.**

Ascension has in no unclear terms threatened legal action against Rock Fintek and has demanded that Rock Fintek make Ascension whole, claiming a loss of 200 million gloves, close to $37 million that it paid to Rock Fintek, and north of $2 million in holding costs that continue to grow. (SOF ¶ 295-296). Although Ascension has not sued Rock Fintek as of this date, Ascension has not given Rock Fintek any releases or assurances, and Rock Fintek views the exposure to Ascension as a serious and significant ongoing claim worth tens of millions of dollars that, among other things, has caused Rock Fintek to go out of business. (*Id.* ¶ 296).

Under New York law, Rock Fintek's potential liability to Ascension is a proper measure of damages directly stemming from the Adorama Parties' sale of non-conforming gloves. *See City of New York v. Lead Indus. Ass'n, Inc.*, 222 A.D.2d 119, 129 (1996) (explaining that to deny recovery for liability to third parties for "remediating and inhibiting the potential for injury and damages due to defendants' unsafe product, would be to permit the alleged defendant-wrongdoers

to be 'unjustly enriched' by insulating them, at plaintiffs' expense, from potential tort and indemnity liability that would otherwise have arisen"); *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 89 S. Ct. 1144, 22 L. Ed. 2d 371 (1969) (stevedore was not prevented from seeking "reimbursement from shipowner for compensation it ***might*** be required to pay" for injuries to widow and children of deceased employee (emphasis added)).

Kitchen Winners glosses over this damages theory and cites one inapposite case in support of its motion. *See RDI Corp. v. Charter Commc's., Inc.,* 1:19-cv-10929, 2022 U.S. Dist. LEXIS 38123 (S.D.N.Y. Jan. 31, 2022). In *Charter*, the Court granted summary judgment on a damages claim consisting of a vague potential exposure of a telephone carrier to liability for fines from calls made by a contracting party to individuals on a do not call list. The exposure in that case, however, consisted of hypothetical FCC fines that had never been assessed or even threatened and, unlike here, the plaintiff's corporate represented admitted in his deposition testimony that any such liability was only "future liability." This is a far cry from the record here, which shows a significant exposure to a specific claim that Ascension has asserted against Rock Fintek, which Rock Fintek views as a real and serious threat.

It should be for the jury to determine the value of Rock Fintek's exposure, which is a direct and not consequential measure of damages.

## VI.   DISPUTES ON REBATES AND OVERPAYMENTS ARE FOR THE JURY.

Claiming entitled to affirmative summary judgment on alleged non-payment for gloves delivered and claiming that untimeliness of payments by Rock Fintek excuses payment of a $750,000 rebate under the SPA, Kitchen Winners ignores clear evidence that the Adorama Sellers' delivery of the wrong (LevMed) gloves in April 2021 by Adorama Sellers crippled Rock Fintek's cash flow and delayed payments. (*Id.* ¶ 278). Thus, any delays were caused by the Adorama Sellers, which excuses Rock Fintek's obligations and requires that the rebate be paid. Furthermore,

the record reflects that far from any delay in payment, as of April 28, 2021, Rock Fintek had paid for more gloves than the Adorama Sellers had delivered. (*Id.* ¶ 279). In a contemporaneous email to Mendlowitz attaching a delivery report, Weiner admitted that as of late April some loads sold to Rock Fintek "have less quantities, but their payments was always for full loads." (*Id.* ¶ 280). In yet another contemporaneous email to Mendlowitz, Weiner admitted that there was an "[o]verage" beyond what was supposed to be delivered and that there was a dispute as to whether 22,760 boxes (2,276,000 gloves) were even delivered. (*Id.* ¶ 281).

Similarly, the record demonstrates – and Adorama Sellers admit in their papers – that significant disputes exist regarding the total quantities of gloves sold and the legitimacy of the trucking invoices on which Kitchen Winners bases its claims. (*See* Response SOF ¶ 101). Indeed, the quantities in bills of lading for deliveries do not even come close to matching up to amounts in Weiner's own spreadsheets that he provided to Rock Fintek. (*See* Response to SOF ¶ 98). Moreover, Kitchen Winners and Adorama have still failed to provide support for the extravagant trucking costs they sought to charge Rock Fintek and Rock Fintek disputes that wenzy inc. is even a real trucking company. (*See* Response SOF ¶ 101). At his deposition, Weiner could not provide any information about wenzy, inc. other than he believed it was a company owned either by his wife or his friend's wife, and testified that he didn't use that company for a "very long time" and when Rock Fintek sought to subpoena wenzy inc. during the course of this litigation at its registered location, that address appeared to have been a private residence in the past but was vacant. (*Id.*) Indeed, wenzy inc. "invoices" look nothing like invoices of legitimate trucking companies but look identical in form to invoices provided *by Kitchen Winners* for gloves. (*Id.*)

Tellingly, Kitchen Winners does not even try to reconcile evidentiary inconsistencies admitting vaguely that parties "own records of the total number of gloves sold are in dispute," yet

somehow still argues that the total number of gloves delivered is undisputed. Kitchen Winners'

internally inconsistent position should rejected and summary judgment should be denied.

Finally, the argument regarding the $2 million in gloves that Adorama Parties admitted

overdelivering is just that, an argument. The record shows that Kitchen Winners delivered and

charged for far more gloves than the SPA required. The precise amount of those gloves for which

Rock Fintek did not get paid is a question of fact to be resolved at trial.

## VII.   KITCHEN WINNERS' AFFIRMATIVE CLAIMS FAIL DUE TO ITS OWN BREACHES AND EXISTING QUESTIONS OF FACT REGARDING CLAIMED GLOVE CHARGES AND SHIPPING COSTS.

### A.   Kitchen Winners Is not Entitled to Summary Judgment on its Claims under the SPA Because it Substantially and Materially Breached the SPA.

Under New York law, "a party's performance under a contract is excused where the other

party has substantially failed to perform its side of the bargain or, synonymously, where that party

has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d

171, 186 (2d Cir. 2007) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 (1974)).

There is no simple test for determining whether substantial performance has been rendered and

several factors must be considered, including the ratio of the performance already rendered to that

unperformed, the quantitative character of the default, the degree to which the purpose behind the

contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved

party has already received the substantial benefit of the promised performance. *Hadden v. Consol.

Edison Co.,* 34 N.Y.2d at 96 (citing 3A Corbin, Contracts, ss 704—707; 6 Williston, Contracts, ss

841—844 (3d ed.)); *see also Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*,

821 F.3d 297, 311 (2d Cir. 2016) ("Substantial performance is performance, the deviations

permitted being minor, unimportant, inadvertent, and unintentional." (internal citation omitted)).

The issue of whether a party has substantially failed to perform is usually a question of fact.

*Merrill Lynch*, 500 F.3d at 186 (even where party owned an asset for two-years, "the trial court was required to address appellant's argument that [the business] turned out to be substantially different from what the parties had bargained for, thereby defeating the object of the parties in making the contract." (internal citation marks and editing omitted)) (citing *Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997)). "Such a claim, if proved, would excuse defendant's non-performance under the Purchase Agreement." *Id.*; *see also ASM Fin. Funding Corp. v. K-Sher Corp.*, 21 Misc. 3d 1102(A), 873 N.Y.S.2d 231 (Sup. Ct. 2008) ("ASM's breach of the very contract it seeks to enforce bars recovery.").

As detailed above, the record evidence demonstrates that Kitchen Winners (and Adorama) materially and intentionally breached the SPA by knowingly failing to deliver FDA 510(k) certified MedCare Nitrile/NBR Examination Gloves, instead delivering cheaper Polyvinylchloride Protection Gloves that were not suitable for medical use. At the very least, significant questions of fact abound as to the full extent of the breach, while Rock Fintek substantially complied with its obligations under the SPA by paying more than $20 million for gloves and transportation services. Accordingly, Kitchen Winners cannot obtain summary judgment on its affirmative claims for the non-payment of because it materially breached the parties' contractual relationship by delivering an entirely wrong product for which Ascension has asserted claims against Rock Fintek.

Cases cited by Kitchen Winners are easily distinguishable and none comes close to the facts here, where the Adorama Sellers delivered completely non-conforming products. In *Robert Cohn Associates, Inc. v. Kosich*, 63 A.D.3d 1388, 1389 (3d Dep't 2009), defendants unilaterally breached a 1-year exclusive listing agreement for the sale of a commercial building by using another broker to consummate a sale and sought to excuse their breach by claiming that the plaintiff broker first breached the listing agreement because it did not "sufficiently advertise and market

the property, it made significant errors in the data provided to the multiple listing service describing the property, and it refused to communicate with defendants other than by certified mail during the contract period." Not only did record evidence contradict conclusively defendants' claims of breach, but such trivial departures, if true, did not defeat the very purpose of the contract. *See also Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (not addressing excusal of performance but discussing "extraordinary remedy" of rescission, holding that "failing to pay the final one-third—a far cry from a total failure to pay" and did not justify rescission).

To the contrary, New York courts have found contractual breaches that resulted in excused payment obligations on conduct far less deviating from the purpose of the agreement than the delivery of non-conforming gloves like here. *See Dierkes Transp. Inc. v. Germantown Cent. Sch. Dist.*, 295 A.D.2d 683, 684 (3d Dep't 2002) (school district excused from payment obligations where bus transportation company provided the services but decided to combine two bus routes so that one bus and one driver transported the children from both routes); *Heritage Springs Sewer Works, Inc. v. Boghosian*, 61 A.D.3d 1038, 1042 (3d Dep't 2009) (denying summary judgment on breach of contract claim for failure to pay where defendant raised a question of fact as to the reasonableness of fees under the contract).

Kitchen Winners appears to argue, without legal support, that its breach was "immaterial" because Rock Fintek resold the gloves to Ascension, got paid for them and received its expected "profit." That argument is factually and legally flawed. This is not a case where an intermediary trader resold a non-conforming product to an otherwise satisfied customer. Instead, Ascension has threatened suit over the funds paid to Rock Fintek for the gloves and has shut the door to a near certain profitable future commercial relationship.

## VIII.   THE FRAUD CLAIM AGAINST STERN, INDIVIDUALLY, SURVIVES.

Under New York law, in order to prove fraudulent inducement, plaintiff must allege that

(i) the defendant made a material false representation, (ii) intending to defraud the plaintiff, (iii) who reasonably relied upon the representation, and (iv) suffered damages. *Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10 CIV. 3304 (HB), 2011 WL 1002419, at \*4 (S.D.N.Y. Mar. 15, 2011). It is well settled that under New York law, "[a] corporate officer who participates in the commission of a tort may be held individually liable, ... regardless of whether the corporate veil is pierced." *Geis Constr. S., LLC v. Delahunt*, No. 20CV03834MKBJMW, 2022 WL 18859052, at \*7 (E.D.N.Y. Oct. 3, 2022), report and recommendation adopted, No. 20CV3834MKBJMW, 2023 WL 2731692 (E.D.N.Y. Mar. 31, 2023); *Unique Lotus Gems v. Gholian Enterprises Inc.*, No. 18CIV10808(ATG)(WG), 2019 WL 6227856, at \*9 (S.D.N.Y. Nov. 22, 2019), report and rec. adopted, No. 18CIV10808(ATG)(WG), 2019 WL 6701953 (S.D.N.Y. Dec. 9, 2019) ("[A] corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the officer acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced"); *Busrel Inc. v. Dotton*, No. 1:20-CV-1767, 2021 WL 2980494, at \*8 (W.D.N.Y. July 15, 2021) (same).

The crux of Stern's motion on the fraud claim is that he is similarly situated with respect to the fraud claims that were dismissed against the Adorama Sellers, that Stern did not make any false representations to Rock Fintek as to the nature of the gloves, and that Rock Fintek cannot maintain a fraud claim against Stern while maintaining a contract claim against JNS. Each of those arguments fails on this record.

First, Stern's argument that he did not make any false statements or representations about the nature of the gloves ignores the overwhelming record evidence to the contrary. As detailed above, Stern – through his broker – made specific written representations to Rock Fintek on which Rock Fintek relied to induce it into giving Stern the IPCO, knew from reviewing packing lists

exactly what gloves he had, expressly tried to sell cheap non-conforming gloves to Rock Fintek, and, despite Rock Fintek's refusal to buy those gloves, foisted them on Rock Fintek (and Ascension) in any event. (*See* SOF ¶¶ 220-222, 244-248). These facts easily establish at least a dispute as to whether Stern fraudulently induced Rock Fintek into buying non-conforming gloves under false pretenses. *See Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10 CIV. 3304 (HB), 2011 WL 1002419, at *4 (S.D.N.Y. Mar. 15, 2011) (Under New York law, in order to prove fraudulent inducement, plaintiff must allege that (i) the defendant made a material false representation, (ii) intending to defraud the plaintiff, (iii) who reasonably relied upon the representation, and (iv) suffered damages).

Second, Stern's position that the fraud claim *against him* cannot proceed because it is duplicative of the contract claim *against JNS* has been squarely rejected in New York. *See Sun Prod. Corp. v. Bruch*, No. 10 CIV. 4816 SAS, 2011 WL 5120307, at *5 (S.D.N.Y. Oct. 28, 2011),[7] aff'd, 507 F. App'x 46 (2d Cir. 2013) ("The rule barring duplicative claims of fraud and breach of contract is only applicable where the two claims are asserted against a common defendant."); *Advanced Knowledge Tech, LLC v. Fleitas*, No. 21-CV-992 (PKC), 2021 WL 6126966, at *3 (S.D.N.Y. Dec. 28, 2021) ("fraud claim is not duplicative of a breach of contract claim because it is asserted against Fleitas who is sued in his individual capacity and is not a party to the contract") (citing *Forty Cent. Park S., Inc. v. Anza*, 130 A.D.3d 491, 492 (1st Dep't 2015)); *see also Bd. of Managers of Beacon Tower Condo. v. 85 Adams St., LLC*, 136 A.D.3d 680, 681-82 (2d Dep't 2016) (members of limited liability companies, such as corporate officers, may be held personally liable if they participate in the commission of a tort in furtherance of company business). Stern

---

[7] Stern's apparent reliance on *Bruch* is misplaced. There, the Court granted affirmative summary judgment on a fraud claim *against* a corporate officer explaining that a fraud claim could proceed because that individual was not a party to the contract. *Id.*

cannot escape liability for having caused JNS to engage in a fraudulent transaction, particularly while also claiming that he is not liable on JNS's contract covering that transaction.

The cases on which Stern relies are distinguishable and do not require dismissal of the fraud claim against Stern, individually, particularly where Rock Fintek has not alleged that Stern was acting within the course of his "employment" at JNS but was acting for his own personal benefit. *See Clarke v. TRIGO U.S., Inc.,* No. 22-CV-1917 (PKC), 2023 WL 6806074, at *4 (S.D.N.Y. Oct. 16, 2023) (refusing to allow addition of fraud claims against officers who were alleged at all times to be acting withing the course and scope of their employment); *Exch. Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 157 (S.D.N.Y. 2023) (explaining that "courts applying New York law have held that a plaintiff may separately state a claim for fraud against a non-party to a contract that would otherwise be barred as duplicative of a breach of contract claim against a party to the contract" but dismissing fraud claim against president of contracting party whose representations of performance were made "in a purely representative capacity").

To be clear, if the Court finds that Stern should be individually held liable for JNS's breach of contract, then Rock Fintek has no objection to the fraud claim against Stern being dismissed.

## IX.   STERN IS LIABLE ON THE CONTRACT CLAIM AGAINST JNS.

As detailed above, the record confirms that Stern made fraudulent statements related to transactions on which Stern *used JNS* to serve as the contracting party. The law does not permit Stern to hide behind the JNS corporate form to avoid liability for knowingly and intentionally selling fake medical gloves to Rock Fintek. To maintain a veil piercing claim in New York against a member of a limited liability company, evidence must indicate, as it does here, that the member exercised complete domination and control over the company and abused the privilege of doing business in that form to perpetrate a wrong or injustice. *See Grammas v. Lockwood Assoc., LLC*, 95 A.D.3d 1073, 1075 (2d Dept 2012). Factors to be considered in determining whether an

individual has abused the privilege of doing business in the corporate or LLC form include the failure to adhere to LLC formalities, inadequate capitalization, commingling of assets, and the personal use of LLC funds. *Id.* Here, the record evidence shows that Stern formed and used JNS specifically and solely for the purpose of engaging in sales of Medcare brand gloves, including fraudulent sales to Rock Fintek, that JNS did not observe corporate formalities, and that JNS no longer has assets sufficient to meet its obligations, including for knowingly selling non-conforming gloves. (JSUF ¶¶ 13-14). Moreover, Stern is the sole member and manager of JNS who unquestionably exercised complete control over the transaction at issue. *Gold v. 22 St. Felix, LLC*, 219 A.D.3d 588, 590 (2d Dep't 2023) (veil piercing available when owners exercised complete domination of the LLC in respect to the transaction attacked and such domination was used to commit a fraud or wrong against the party seeking to pierce the corporate veil causing injury).

Stern's reliance on *Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135 (1993) is unavailing. There, the Court of Appeals recognized the fact-intensive nature of veil piercing analysis and expressly on the factual finding of, unlike here, "no evidence of an intent to defraud…." *Id.*, 82 N.Y.2d at 143. On this record, the veil piercing determination is for the jury.

## X.   THE WARRANTY CLAIM AGAINST THE SELLERS SURVIVES.

As detailed above, the moving parties turn a blind eye to their written representations – made through their duly authorized representatives Banon and Azra – regarding the origin, nature and quality of the gloves, including purported testing reports and FDA 510(k) letters. The unambiguous (false) written representations as to the nature of the gloves together with contemporaneous evidence that the gloves were non-conforming Polyvinylchloride "protection" gloves with no detectible levels of Nitrile failing to meet ASTM D-6310 specification dispenses with any argument that each of Stern, Kitchen Winners and Adorama somehow did not make false

warranties as to the nature of the gloves.[8]

Finally, the moving parties' argument that Rock Fintek did not adequately or timely lodge a complaint about the defective products is not susceptible to summary judgment on the breach of contract or warranty claims. First, Stern mischaracterizes Rock Fintek's response to learning of his participation in the fraudulent transaction. Far from simply asking for testing reports, Rock Fintek's written communication to Stern was clear:

> We have identified the gloves that are failing tests and of poor quality (fake nitrile) are from you. When you approached us in the past to buy these gloves, we specifically said no. How you got these on our trucks and delivered to our client is unacceptable.
>
> Furthermore we have identified these gloves were being offered at $4.80 buy price, to move these fake gloves. Obviously you made a significant amount of margin to sell us these gloves.
>
> We are having a meeting with our client to discuss full return and replacement of these fake nitrile gloves. We need you to find and replace these gloves as they are not what we agreed to buy. We will be orchestrating the return of the goods to you with full credit and replacement immediately.

(Stern SOF Response ¶ 71 (emphasis added)). Stern simply ignored Rock Fitnek's rejection of the fake gloves resulting in this lawsuit. (*Id.*)

Second, "[a]bsent exceptional circumstances, whether an action has been taken within a 'reasonable time' is a question of fact." *TOMRA of N. Am., Inc. v. Count & Crush, LLC*, No. 118CV1266LEKDJS, 2023 WL 6066034, at *9 (N.D.N.Y. Sept. 18, 2023). The moving parties ignore evidence that Rock Fintek provided notice of defects in gloves *immediately* upon learning of those defects from its client, and ignore evidence that Rock Fintek did not have a reasonable opportunity to inspect the gloves including due to COVID safety restrictions. Record evidence

---

[8] With respect to Mendlowitz individually, discovery has revealed that Maimon apparently either forged Mendlowitz's signature that he passed to Rock Fintek purportedly from Adorama or otherwise forwarded a forged document. (*See* Response SOF ¶ 60) Rock Fintek therefore does not contest Mendlowitz's motion for summary judgment on the individual claim against him.

demonstrates that upon learning from Ascension about the glove problems, Rock Fintek immediately called, texted and emailed Banon, Weiner, Stern and Maimon (who by that time was beholden to Kitchen Winners) and that Weiner immediately forwarded those notices to Mendlowitz. In any event, under New York law, what constitutes a "reasonable time" for a buyer to inspect and provide notice of non-conforming goods is "generally held to present questions of fact for the jury." *Sherkate Sahami Khass Rapol (Rapol Const. Co.) v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051 (2d Cir. 1983) (collecting cases); *Cottonaro v. Southtowns Indus., Inc*., 213 A.D.2d 993, 994, 625 N.Y.S.2d 773 (1995). Nothing here justifies departing from the general rule.

### Conclusion

Based on the foregoing, Rock Fintek respectfully requests that the Court deny the moving parties' respective motions for summary judgment and schedule this case for trial.

Dated:   March 15, 2024                    Respectfully submitted,

/s/Phillip Rakhunov
Phillip Rakhunov
Lauren Riddle (*pro hac vice*)
POLLACK SOLOMON DUFFY LLP
48 Wall Street, 31st Floor
New York, NY 10005
Telephone: (212) 493-3100
Facsimile: (212) 434-0109
prakhunov@psdfirm.com
lriddle@psdfirm.com

## <u>Certificate of Service</u>

The undersigned certifies that this document is being served on counsel on all parties via ECF on March 15, 2024.

<u>/s/ Phillip Rakhunov</u>