UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KITCHEN WINNERS NY INC.,<br>　　　　*Plaintiff*,<br><br>　　vs.<br><br>ROCK FINTEK LLC,<br>　　　　*Defendant*.<br><br>ROCK FINTEK LLC,<br>　　　　*Counterclaim and Third-Party Plaintiff,*<br><br>　　vs.<br><br>KITCHEN WINNERS NY INC,<br>　　　　*Counterclaim Defendant*,<br><br>　　and<br><br>ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN,<br>　　　　*Third-Party Defendants*. | Civil Action No.<br>22-cv-05276-PAE |

**MEMORANDUM OF LAW IN REPLY AND FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
JOEL STERN AND JNS CAPITAL HOLDINGS LLC**

**THE LAW OFFICE OF AVRAM E. FRISCH LLC**
*Attorneys Third-Party Defendants JNS Capital Holdings LLC, and Joel Stern*

Avram E. Frisch, Esq.
1 University Plaza, Suite 119
Hackensack, NJ 07601
201-289-5352
frischa@avifrischlaw.com

# Contents

Table of Authorities ................................................................................................................3

**PRELIMINARY STATEMENT** ........................................................................................1

    **A.**    **Rock Fintek Cannot Distinguish Alleged Breaches by Kitchen Winners from Alleged Breaches by the JNS Defendants** ........................................................................1

    **J.**     **Rock Fintek Cannot Maintain a Claim for Potential Damages to Ascension** ..........9

    **K.**    **The Fraud Claim Must Fail** ......................................................................................10

    **L.**    **There is no basis to pierce the corporate veil under New York Law** ....................10

    **M.**   **The Remaining Arguments of Rock Fintek are without Merit** ............................10

**CONCLUSION** ..................................................................................................................11

## Table of Authorities

### Cases

*City of New York v. Lead Indus. Ass'n, Inc.*, 222 A.D.2d 119, 129 (1996) ................................................... 9

*Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 89 S. Ct. 1144, 22 L. Ed. 2d 371 (1969) ........................................................................................................................................................ 9

*Hayes v. N.Y.C. Dep't of Corr.*, 84 *F*.3d 614, 619 (2d Cir. 1996) ............................................................... 2

### Statutes

28 U.S.C. § 1746 ........................................................................................................................................ 3

**PRELIMINARY STATEMENT**

Third-Party Defendants JNS Capital Holdings LLC ("JNS"), and Joel Stern ("Stern"; collectively, "JNS Defendants") hereby submit this memorandum of law in reply to the combined opposition of Third Party Plaintiff Rock Fintek.

As an initial matter, Rock Fintek's brief far exceeds the permissible page limit with no application to the Court to permit such a lengthy brief. The Court should therefore disregard the portions of the brief that exceed the Court's page limits. Notwithstanding this fact, the JNS Defendants will reply to the full brief, which fails to demonstrate any issue of **material** fact in dispute. In addition, the JNS Defendants incorporate the arguments of the Adorama and Kitchen Winners parties.

Rock Fintek fails to truly contest the major issues with its claims. There remains no basis for any claims directed personally at Joel Stern; no basis for a fraud claim and Rock Fintek still fails to demonstrate any actual damages that are cognizable at law, which makes sense considering it sold the gloves it purchased at the pre-determined price with no offsets relating to any alleged quality issues. It still has never paid a penny to mitigate any alleged losses of Ascension, and has not refunded a penny. For this reason, it is asking the Court to allow it to take a claim of lost future profits to the jury. As will be demonstrated below, the opposition fails to establish any meaningful evidence of its alleged losses, and this is simply fatal to its claims. Furthermore, Rock Fintek continues to rely on sleights of hand to disguise the fact that it cannot establish a link between a particular sale and any particular loss, and has no meaningful response to the unreasonable time frame for its raising the issues or compliance with its obligations under the UCC.

**ARGUMENT**

**A. Rock Fintek Cannot Distinguish Alleged Breaches by Kitchen Winners from Alleged Breaches by the JNS Defendants**

1

A review of the Rock Fintek response to the Statement of Undisputed Facts and the first line of the background of its brief demonstrate that Rock Fintek refuses to engage with a fundamental problem with its case – the JNS and Adorama parties are not related and engaged in entirely separate transactions. Rock Fintek's inability to determine which gloves came from whom, what was wrong with any particular gloves, or how to tease out damages from each particular transaction remain fatal to its claims. The fact that Rock Fintek had a total of 14 boxes of gloves tested, which its own expert admitted was insufficient to draw any conclusions, makes any assertion about the vast majority of gloves simply ludicrous. This is especially true when the purchases from JNS were several separate and distinct transactions, so even if Rock Fintek could establish a breach as to one sale, it would not be possible to simply assume that the other sales were also suspect.

**B. Thomas Kato's Declaration should be Disregarded at least to the Extent it Conflicts with his Depositions**

After being deposed twice, and lying consistently throughout each deposition, inventing whatever fact he decided was useful, Mr. Kato now submits a declaration in opposition to the summary judgment motion. This declaration claims new facts that contradict his lengthy depositions. As such, this declaration must be disregarded. "[A] a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corr.*, 84 *F*.3d 614, 619 (2d Cir. 1996) (internal citations omitted).

First, despite substantial testimony that the glove deal was not profitable, Mr. Kato is now trying to pretend otherwise by giving an explanation that he did not provide during his deposition. Kato Decl. at ¶16 and Frisch Exh 2 (Kato 30(b)(6) Dep. At 56:23-57:10; 57:23-58:2 ("I believe I

2

paid more than I received"). Similarly, Mr. Kato now claims he was unprepared for his deposition, and thus could not testify truthfully at his deposition. Such post hoc explanations, especially for a witness allegedly testifying as a damages expert and for the second time, is just absurd and must be disregarded. Kato Decl. ¶17. Mr. Kato's failure to be prepared to answer questions at his deposition is his own fault, and he cannot simply recreate a new version of events for the declaration in support of summary judgment.

He similarly now contradicts his testimony at the deposition in regard to whether Rock Fintek was represented by counsel in its negotiations with Stern. Kato Decl at ¶36. During his deposition, Mr. Kato testified that he did not believe that they had counsel, but to ask Mr. Gilling, the company COO. Mr. Gilling had already testified that yes, Rock Fintek was in fact represented by counsel. It is understandable that Mr. Kato would like to revise his testimony, he simply cannot do so to avoid a grant of summary judgment. Frisch Exh. 1 at 296:8-15; Frisch Exh. 2 at 47:5-11

Finally, the declaration fails to conform to the requirements of 28 U.S.C. § 1746 in that it does not specify that it is under the penalty of perjury under the laws of the United States of America, and as such it must be disregarded in its entirety, as it does not substantially conform to the statutory language.

## C. Rock Fintek is Unable to Distinguish its Claims against the Various Parties

Rock Fintek has always relied on group pleading in this action, and it appears to think that it should be able to survive summary judgment despite not being able to distinguish between the various parties. The opposition drives home the point that Rock Fintek has no ability to state what JNS, Stern or any of the Adorama parties did to them without reference to alleged harms imposed by others. This is simply insufficient to justify a cause of action for each individual sale made by JNS to Rock Fintek. For this reason, Kato asks the Court to allow him to attempt to bamboozle a

paid more than I received"). Similarly, Mr. Kato now claims he was unprepared for his deposition, and thus could not testify truthfully at his deposition. Such post hoc explanations, especially for a witness allegedly testifying as a damages expert and for the second time, is just absurd and must be disregarded. Kato Decl. ¶17. Mr. Kato's failure to be prepared to answer questions at his deposition is his own fault, and he cannot simply recreate a new version of events for the declaration in support of summary judgment.

He similarly now contradicts his testimony at the deposition in regard to whether Rock Fintek was represented by counsel in its negotiations with Stern. Kato Decl at ¶36. During his deposition, Mr. Kato testified that he did not believe that they had counsel, but to ask Mr. Gilling, the company COO. Mr. Gilling had already testified that yes, Rock Fintek was in fact represented by counsel. It is understandable that Mr. Kato would like to revise his testimony, he simply cannot do so to avoid a grant of summary judgment. Frisch Exh. 1 at 296:8-15; Frisch Exh. 2 at 47:5-11

Finally, the declaration fails to conform to the requirements of 28 U.S.C. § 1746 in that it does not specify that it is under the penalty of perjury under the laws of the United States of America, and as such it must be disregarded in its entirety, as it does not substantially conform to the statutory language.

## C. Rock Fintek is Unable to Distinguish its Claims against the Various Parties

Rock Fintek has always relied on group pleading in this action, and it appears to think that it should be able to survive summary judgment despite not being able to distinguish between the various parties. The opposition drives home the point that Rock Fintek has no ability to state what JNS, Stern or any of the Adorama parties did to them without reference to alleged harms imposed by others. This is simply insufficient to justify a cause of action for each individual sale made by JNS to Rock Fintek. For this reason, Kato asks the Court to allow him to attempt to bamboozle a

jury while refusing to present any evidence of his specific claims. The purpose of summary judgment is to force a claimant to put up or shut up, and Rock Fintek has definitively refused to proffer any evidence of its claims, and asks the Court to simply assume everything it needs to prove. Unlike on a motion to dismiss, Rock Fintek is not entitled to the assumption that any factual averment it has made is true, rather it must proffer admissible evidence, which it has largely failed to do.

### D. The Damages from St. John of God in Australia should be disregarded.

In a quintessential example of the way that Rock Fintek has handled this matter, it discusses a new avenue for damages that was not disclosed until after fact discovery was complete, and then only incompletely. At the same time, it subsequently declares that this aspect of its alleged damages is not actually a part of its claim. As noted above, there are definitely facts in dispute, like this one, but it is not in fact material to whether Rock Fintek can succeed on its claims.

It is undisputed that Rock Fintek never included any damages from the St. John of God hospital in Australia in its damage disclosures. Mr. Kato might believe it is an entity related to Ascension, but it simply is not, and the fact that Rock Fintek never disclosed this supposed lost opportunity until after discovery closed is sufficient to disregard it as a category of damages. More importantly, however, is that Mr. Kato's timing shows that any loss has nothing to do with the claims in this case. All of the gloves delivered by the JNS Defendants were completed by Mid-May 2021. The complaints were made in July 2021 and Kato knew that the JNS Defendants would not agree to replace any gloves almost immediately, as Mr. Stern refused to address the issue with him. The St. John's deal is recited in Mr. Kato's declaration to have occurred in late 2021, after Kitchen Winners and Ascension had full knowledge of any alleged defects in the gloves.

### E. There is no Evidence the Gloves were of Insufficient Quality

As set forth in the opening papers, Rock Fintek simply cannot demonstrate its fundamental claim – that every glove delivered by JNS was a PVC glove.  Apparently, if you repeat it often enough, Rock Fintek believes it to be true.  Yet, they tested 14 boxes of gloves, with no ability to demonstrate where the gloves came from, who the particular boxes were sold by (even if they could prove that the boxes came from any of the parties to this action) and their own statistician made clear this is insufficient to demonstrate anything about the gloves as a whole.

Rock Fintek relies heavily on a claim that boxes were labeled "protection" instead of examination.  They have no presented no evidence as to what the distinction is, whether a box labeled protection means something less than Examination, or that the issue is not with the printing of the boxes.  They cannot deny that all gloves Stern delivered came directly from the manufacturer, or that the gloves were purchased from Kitchen Winners pursuant to a contract for the provision of Medcare Examination gloves.  Without evidence from GTS, the manufacturer of the gloves, it is impossible to determine what GTS meant by the various boxes, and whether the issue was with the gloves or with misprinted boxes.

The alleged audit by Medline is entirely inadmissible.  As an initial matter, it was conducted for the purposes of litigation at the direction of Rock Fintek.  Rock Fintek admits in its brief that the audit was performed at customer request.  It was not performed in the ordinary course of business. Further, it was commissioned by Rock Fintek and Ascnesion upon discovery of issues with the quality of the gloves. The report is an amalgamation of checks by hundreds of employees at numerous warehouses.  Rock Fintek cannot give the name of a single individual who worked on the preparation of the data in the report, and the overall totals are simply hearsay within hearsay (even if the overall report would be subject to a hearsay exception).  Importantly, there is no evidence that Medline did anything but examine some labels on cases of boxes.  The

determinations were made by Rock Fintek as to the meaning of the words on the exterior brown cardboard boxes. The audit is thus useless, even if admissible.

Rock Fintek largely relies on the fact that packing lists contain references to protection gloves. They have presented no evidence as to what GTS meant by the word protection gloves, whether the packing lists were accurate, or whether Stern was aware that the gloves were somehow in breach of the agreement he had with Rock Fintek. Stern testified at length that the conclusions being made by Rock Fintek were incorrect, and that as far as he understood, the gloves actually shipped to Rock Fintek were in fact examination gloves. Rakhunov Exh. 13 (Stern Dep. I) At 66:6-67:5; 131:20-132:21; 135:18-136:6; 136:7-20.

Finally, Rock Fintek has a major problem with the claim that the gloves in the Medline warehouses came from JNS or from Kitchen Winners. Only Medline had access to its own warehouses. JNS and Kitchen Winners sold gloves they had received. Once they left the warehouses where the gloves were stored temporarily, the sellers have no way of knowing what happened to the gloves. They went into a third party warehouse of a company that was overwhelmed and unable to handle the loads they were receiving. Rock Fintek simply cannot even establish that the gloves Medline stated came from JNS and Kitchen Winners in fact did so.

**F. There is no Evidence that the JNS Defendants were Aware of Ascension**

Even if the argument by Rock Fintek was true (and it is not) that Mr. Stern was aware of the existence of a large hospital group as the customer of Rock Fintek, it is clear that he was unaware of the existence of Ascension, which Mr. Kato himself vigorously stated he kept a secret, or the nature of Rock Fintek's relationship with Ascension. Frisch Exh. B (Kato Dep. At 93:18-21). Mr. Kato brought up additional new facts in his Declaration about how he obtained the relationship. There is no evidence that Mr. Stern was aware of any aspect of the relationship that

6

Kato had with Ascension to ever dream of the alleged scope that Mr. Kato has invented for the purposes of this action.

Relying on a claim that the JNS Defendants were aware of Mr. Kato getting ripped off by another supplier, a fact that has no support other than Mr. Kato's unsupported testimony, there simply is no basis for the JNS Defendants to know the impact of selling actual goods to Rock Fintek would have on Rock Fintek's business with an unknown third party.

### G. Bruno Azra Did not act on behalf of Stern

As set forth in the opening papers, Mr. Azra was a broker who earned a commission for connecting buyers and sellers of PPE. He worked with JNS and made a contact with Ms. Li. Neither Mr. Stern, nor JNS, controlled the communications from Mr. Azra to Ms. Li. The reality is that the paperwork submitted by Rock Fintek was likely the paperwork Azra received from Mr. Stern and there is no evidence that it was false. It was the marketing paperwork he had received from Kitchen Winners and GTS. Notably, for an individual who is apparently crucial to linking Mr. Stern to an alleged fraud, Rock Fintek has no testimony from Mr. Azra. His existence was known from the beginning of the matter, and Rock Fintek made no effort to serve a subpoena or obtain any evidence from him, and presents none.

Mr. Stern's testimony as to his relationship to Mr. Azra is thus undisputed. Ms. Li's declaration supports Mr. Stern's version of events, as it makes clear that she dealt with Mr. Azra. The fact that Mr. Azra was working as a broker for JNS, does not make him an agent of Mr. Stern, in his personal capacity as alleged by Rock Fintek (notably, Mr. Azra was not an agent of JNS either as discussed in the opening papers).

### H. Rock Fintek Cannot Prove any of Its Claims

Rock Fintek's claims against Stern neglect several basic facts: Ascension used millions of

7

gloves prior to any complaint, they stored them in a third party warehouse with no control over them, and the gloves were moved randomly by that third party. There is no way to know what any box represents and there is certainly no evidence that a lot number on a box from GTS means anything at all. Similarly, Rock Fintek cannot overcome its failures to take the steps required by the Uniform Commercial Code.

### I. The Lost Profit Claim must Fail

#### a. There is no Evidence of any Lost Profits

As set forth in the opening papers, Rock Fintek cannot establish a lost profits claim under New York law, but the assertion that there is proof that it lost any profits is simply delusional. Mr. Kato's assertion that he knows he would have made some money because he might have had some unknown orders of unknown PPE is not proof of anything. The only fact undisputed is that had Rock Fintek complied with its contract with Ascension for the gloves, they might have been approached about other orders. There is no evidence that Rock Fintek would have had the goods available, been able to sell them at a profitable price or importantly what that profit would have been. This is a quintessential case of lost profit damages that simply cannot be calculated with any certainty whatsoever.

#### b. The Amount of Lost Profits is Impossible to Calculate

Rock Fintek now admits that many elements of potential lost business are no longer a portion of its claims. It is now focused on the continuation of the relationship for spot purchases due to COVID related shortages. There is simply no way to determine what the profits on any such sales would be. Mr. Kato's assertions that he knows are neither reliable evidence nor indicative as to what the amounts are. How can anyone know what would have been ordered without a single piece of evidence to an actual order placed by Ascension to another party. Rock

Fintek simply failed to obtain any such information, and is asking the Court to assume that it would have had substantial future profits.

The fact is that none of the figures suggested by Rock Fintek have any evidentiary support. They claim $62 million in sales, but present no evidence as to the actual profit after all expenses. On the glove contract, which the parties have closer familiarity with, the total contract was for $37 million and Rock Fintek lost money. Even if the loss was because of the $6,200,000 theft in Thailand, the profit on the gloves would have been only about $6 million on $37 million in sales, around 16%. In any event, percentages tell the court nothing, as there is no way to know the selling price of the mystery goods that Rock Fintek is claiming it would have sold.

**J. Rock Fintek Cannot Maintain a Claim for Potential Damages to Ascension**

It seems self-evident that a party cannot maintain an action for damages when no damage exists. Yet, Rock Fintek continues to claim it is entitled to damages that may arise to Ascension. This simply is not cognizable under New York law. Rock Fintek admits that to date it has not spent a penny to pay any damages or mitigate damages with Ascension. As such, it simply has no damages. The case cited in its brief, *City of New York v. Lead Indus. Ass'n, Inc*., 222 A.D.2d 119, 129 (1996) is not comparable as it deals with suing for the cost of mitigation measures undertaken by the Plaintiff, which is not the damages being sought by Rock Fintek. *Fed. Marine Terminals, Inc. v. Burnside Shipping Co*., 394 U.S. 404, 89 S. Ct. 1144, 22 L. Ed. 2d 371 (1969) is an action under maritime law and not New York law, and is an action for indemnity in regard to the claims of a pending third party lawsuit. The lawsuit was actually pending, and was not a potential future claim that might be brought later. Considering that the JNS Defendants are not plaintiffs, did not commence this action, and were involuntarily brought into this matter, Rock Fintek should be bound by its choice to proceed with its claims prior to any action from Ascension.

### K. The Fraud Claim Must Fail

Rock Fintek adds little to the analysis that requires a response, beyond pointing to the opening papers, but it should be noted that Rock Fintek still has no evidence of any false statements by Stern, any proof that he knew the statements that Rock Fintek complains of were false, and no evidence of any intent to defraud. There simply is no evidence of anything beyond a basic claim for breach of contract that Rock Fintek is trying to pretend is something more than that.

Furthermore, Rock Fintek fails to address the fact that at this stage of the action, it cannot seek a contract judgment against Stern and a fraud judgment, **even if the contract claim is based on piercing the corporate veil**. Rock Fintek appears to understand this, claiming that if Stern is found "individually liable for JNS's breach of contract, then [it] has no objection to the fraud claim being dismissed." This is a red herring, since Rock Fintek has no pending motion for summary judgment. It also cannot survive with inconsistent causes of action at this stage, as noted in the opening brief.

### L. There is no basis to pierce the corporate veil under New York Law

Rock Fintek says that the corporate veil should be pierced because JNS no longer is in business. This is an odd claim, as the corporate veil would then be pierced against Mr. Kato and Mr. Gilling, who have substantial liability to Plaintiff. There is simply no evidence that Mr. Stern was hiding anything. Rock Fintek needs to establish evidence of its claims, and it cannot. Simply asserting the circular claim that because JNS may have breached the contract that Mr. Stern is no longer entitled to the protection of the corporate form because he was a sole member is without merit.

### M. The Remaining Arguments of Rock Fintek are without Merit

Rock Fintek briefly addresses the breach of warranty and UCC arguments. As Rock Fintek cannot justify its claim of an express warranty by Mr. Stern, there simply is no claim. There simply

10

is no statement issued by Mr. Stern personally.  Similarly, Rock Fintek's response to the UCC arguments are insufficient to merit a detailed response, but needless to say, waiting months to make a claim cannot be considered reasonable under the circumstances as detailed in the opening brief.

## CONCLUSION

For all of the above-mentioned reasons and those in the opening papers, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Rock Fintek's Third-Party Complaint against them with prejudice.

Dated: Hackensack, New Jersey
March 31, 2024

**THE LAW OFFICE OF AVRAM E. FRISCH LLC**
*Attorneys Third-Party Defendants JNS Capital Holdings LLC, and Joel Stern*

By:  /s/ Avram E. Frisch_____
Avram E. Frisch, Esq.
1 University Plaza, Suite 119
Hackensack, NJ 07601
201-289-5352
frischa@avifrischlaw.com