**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KITCHEN WINNERS NY INC.,<br>                    *Plaintiff*,<br><br>        vs.<br><br>ROCK FINTEK LLC,<br>                    *Defendant*. | Civil Action No.<br>22-cv-05276-PAE |

ROCK FINTEK LLC,
                    *Counterclaim and Third-Party Plaintiff*,

        vs.

KITCHEN WINNERS NY INC,
                    *Counterclaim Defendant*,

        and

ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN,
                    *Third-Party Defendants*.

**<u>RESPONSE TO ROCK FINTEK'S ADDITIONAL STATEMENTS OF FACT</u>**

Kitchen Winners NY Inc., Adorama Inc., and Joseph Mendlowitz ("Defendants") hereby submit this response to the additional statement of facts ("ASOF") submitted by Rock Fintek. Local Rule 56.1 does not require Defendants to submit any response to Rock Fintek's ASOF. Accordingly, whether or not Defendants respond specifically to an assertion made by Rock Fintek in its ASOF, Defendants explicitly reserve the right to contest any of the assertions made by Rock Fintek in its ASOF should this matter proceed to trial.

146.    Rock Fintek began doing business with Ascension in or about March 2020. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 2).

**RESPONSE:** Admitted.

147.    Between March 2020 and June 2021, Rock Fintek had sold PPE primarily to the following clients: Ascension Health, City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., Patterson Companies Inc., and some other smaller customers. (Rakhunov Dec., Exh. 8 [Declaration of Thomas Kato dated March 14, 2024 ("Kato Dec.")] at ¶ 9; Sperber Dec., Exh. D [Kato Tr.] at 27:5-21).

> **RESPONSE:**   Denied. Rock Fintek's Chief Operating Officer, Bradley Gilling, only identified the following entities as customers of Rock Fintek: Fresna Health, Delta Airlines, Mejer Inc., and the City of New York. (Gilling Tr. at 19:15-20:2.) Kato only identified the following PPE customers of Rock Fintek: Prisma Health, Delta Airlines, Bell Tire, Next Level, and a sheriff's department. (Kato Tr. 27:9-15.) These lists do not line up with Mr. Kato's new declaration, including the assertion that Patterson Companies Inc. was a customer of Rock Fintek.

148.    Mr. Kato was introduced to Ascension through an acquaintance who did real estate work for Ascension. (Sperber Dec., Exh. D [Kato Tr.] at 26:12-23).

**RESPONSE:** Admitted.

149.    After Kato was introduced to Ascension, he also learned that he had a close family connection to one of Ascension's top executives, which uniquely positioned Rock Fintek to solidify a long-term relationship with Ascension. Kato viewed the Ascension relationship as an

incredible business opportunity for Rock Fintek and critical to Rock Fintek's profitability and survival. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 3).

> **RESPONSE:**  Admitted that, according to Mr. Kato, he had a " close family connection to one of Ascension's top executives."  Admitted that Mr. Kato "viewed the Ascension relationship as an incredible business opportunity for Rock Fintek."  The remaining assertions in paragraph 149 are denied.  Mr. Kato's claim that his "close family connection to one of Ascension's top executives . . . uniquely positioned Rock Fintek to solidify a long-term relationship with Ascension" is unsupported conjecture.  Mr. Kato's claim that Rock Fintek's relationship with Ascension was "critical to Rock Fintek's profitability and survival" is contradicted by Mr. Kato's claim that its business transactions with other clients were extremely profitable.  *See* Kato Dec. at ¶ 15.

150.    Other than the purchase order for the gloves at issue, between March 2020 and April 2021, Rock Fintek had sold to Ascension approximately $25.9 million in other PPE, including masks, gloves and gowns. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 4).

> **RESPONSE:**   Denied.  Mr. Kato testified that all monies received from Ascension December 2020 and onwards were only for the gloves at issue in this lawsuit.  (Sperber Dec., Exh. D [Kato Tr.] at 188:3-17 [Q. "How would I distinguish those funds from other funds that Ascension paid to Rock Fintek? A. Anything done December and on was only for this order."].)  Prior to December 2020, Rock Fintek had approximately $22.9 in revenue from its business with Ascension.  (Sperber Dec., Exhs. N & O [Rock Fintek bank records]).

151.   The following chart is a summary of payments received from Ascension for products *other than the gloves at issue* in this lawsuit:

| Ascension Payments to Rock Fintek for Non-MedCare Glove Products | | | |
|---|---|---|---|
| BANK | ACCOUNT | Payment Date | Amount |
| Wells Fargo | ******7633 | 03/23/20 | $1,625,000.00 |
| Wells Fargo | ******7633 | 03/23/20 | $2,150,000.00 |
| Wells Fargo | ******7633 | 03/24/20 | $4,000,000.00 |
| Wells Fargo | ******7633 | 04/22/20 | $1,625,000.00 |
| Wells Fargo | ******7633 | 04/22/20 | $2,150,000.00 |
| Wells Fargo | ******7633 | 05/08/20 | $397,660.00 |
| Wells Fargo | ******7633 | 05/11/20 | $1,244,900.00 |
| Wells Fargo | ******7633 | 05/12/20 | $945,180.00 |
| Wells Fargo | ******7633 | 05/13/20 | $741,760.00 |
| Wells Fargo | ******7633 | 05/15/20 | $3,374,000.00 |
| Wells Fargo | ******7633 | 05/21/20 | $626,000.00 |
| Wells Fargo | ******7633 | 06/15/20 | $825,000.00 |

| Wells Fargo | ******7633 | 06/22/20 | $825,000.00 |
|---|---|---|---|
| Wells Fargo | ******7633 | 07/14/20 | $445,500.00 |
| Wells Fargo | ******7633 | 08/18/20 | $1,575,000.00 |
| Wells Fargo | ******7633 | 09/02/20 | $82,000.00 |
| Wells Fargo | ******7633 | 11/10/20 | $750,000.00 |
| Wells Fargo | ******7633 | 01/13/21 | $17,685.00 |
| Wells Fargo | ******7633 | 02/23/21 | $295,260.00 |
| Bank of America | ******** 9205 | 02/25/21 | $422,771.25 |
| Bank of America | ******** 9205 | 03/03/21 | $406,400.00 |
| Bank of America | ******** 9205 | 03/19/21 | $800,000.00 |
| Bank of America | ******** 9205 | 03/22/21 | $200,000.00 |
| Bank of America | ******** 9205 | 04/08/21 | $400,000.00 |
| | | **Total** | **$25,924,116.25** |

(Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 5; Sperber Dec., Exhs. N & O [Rock Fintek bank records]).

**RESPONSE:** Denied. Kato unequivocally testified that all of the payments after December 2020 were only for the gloves at issue in this lawsuit. Kato cannot contradict his own sworn testimony. (Sperber Dec., Exh. D [Kato Tr.] at 188:3-17 [Q. "How would I distinguish those funds from other funds that Ascension paid to Rock Fintek? A. Anything done December and on was only for this order."].) Accordingly, the 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25, were all for the gloves at issue in this lawsuit.

152.    Contrary to Adorama Parties' claim, the payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 6; Exh. 9 [Ascension POs for Masks]).

**RESPONSE:** Denied. Kato unequivocally testified that all of the payments after December 2020 were only for the gloves at issue in this lawsuit. Kato cannot contradict his own sworn testimony. Sperber Dec., Exh. D [Kato Tr.] at 188:3-17 [A. "How would I distinguish those funds from other funds that Ascension paid to Rock Fintek? A. Anything done December and on was only for this order."].) Accordingly, the 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25, were all for the gloves at issue in this lawsuit.

153.    The following chart is a summary of payments received from Ascension for the gloves at issue in this lawsuit:

| Ascension Payments to Rock Fintek for MedCare and LevMed Gloves | | | |
|---|---|---|---|
| **BANK** | **ACCOUNT** | **Payment Date** | **Amount** |
| Wells Fargo | ******7633 | 12/08/20 | $9,250,000.00 |
| Bank of America | ******** 9205 | 03/05/21 | $357,975.00 |
| Bank of America | ******** 9205 | 03/09/21 | $393,600.00 |
| Bank of America | ******** 9205 | 03/18/21 | $589,548.75 |
| Bank of America | ******** 9205 | 03/25/21 | $360,750.00 |
| Bank of America | ******** 9205 | 03/29/21 | $331,890.00 |
| Bank of America | ******** 9205 | 04/07/21 | $141,276.25 |
| Bank of America | ******** 9205 | 04/26/21 | $716,643.75 |
| Bank of America | ******** 9205 | 04/27/21 | $444,693.75 |
| Bank of America | ******** 9205 | 04/28/21 | $346,042.50 |
| Bank of America | ******** 9205 | 04/30/21 | $812,103.75 |
| Bank of America | ******** 9205 | 05/04/21 | $388,500.00 |
| Bank of America | ******** 9205 | 05/05/21 | $807,525.00 |

| | | | |
|---|---|---|---|
| Bank of America | ******** 9205 | 05/06/21 | $414,168.75 |
| Bank of America | ******** 9205 | 05/07/21 | $413,475.00 |
| Bank of America | ******** 9205 | 05/10/21 | $804,611.25 |
| Bank of America | ******** 9205 | 05/11/21 | $831,667.50 |
| Bank of America | ******** 9205 | 05/12/21 | $1,169,801.25 |
| Bank of America | ******** 9205 | 05/18/21 | $1,643,910.00 |
| Bank of America | ******** 9205 | 05/21/21 | $808,357.50 |
| Bank of America | ******** 9205 | 05/24/21 | $2,837,298.75 |
| Bank of America | ******** 9205 | 05/25/21 | $767,426.25 |
| Bank of America | ******** 9205 | 05/27/21 | $3,638,580.00 |
| Bank of America | ******** 9205 | 05/28/21 | $800,171.00 |
| Bank of America | ******** 9205 | 06/01/21 | $1,606,308.75 |
| Bank of America | ******** 9205 | 06/03/21 | $1,614,495.00 |
| Bank of America | ******** 9205 | 06/08/21 | $1,211,148.75 |
| Bank of America | ******** 9205 | 06/10/21 | $752,441.25 |

| Bank of America | ******** 9205 | 06/15/21 | $394,743.75 |
| Bank of America | ******** 9205 | 06/16/21 | $456,348.75 |
| Bank of America | ******** 9205 | 06/18/21 | $1,212,675.00 |
| | | **Total** | **$36,318,177.25** |

(Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 7; Sperber Dec., Exhs. N & O [Rock Fintek bank records]).

> **RESPONSE:** Denied.   Kato unequivocally testified that all of the payments after December 2020 were only for the gloves at issue in this lawsuit.   Kato cannot now contradict his own sworn testimony.  Sperber Dec., Exh. D [Kato Tr.] at 188:3-17 [A. "How would I distinguish those funds from other funds that Ascension paid to Rock Fintek? A. Anything done December and on was only for this order."].)  Accordingly, Ascension paid Rock Fintek $38,842,608.75 for the gloves at issue in this lawsuit.

154.   Accordingly, Rock Fintek received $62,242,293.50 in revenue from Ascension through purchase orders obtained between March and December 2020.  (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 8).

> **RESPONSE**:  Admitted that the totality of the revenue that Rock Fintek received from Ascension is approximately $62 million.  That amount encompasses the gloves at issue in this lawsuit and the revenue from any other products that Rock Fintek sold to Ascension.

155.    In addition to the Ascension business, between March 2020 and June 2021, Rock Fintek had sold approximately $39.936 of PPE to the City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., and Patterson Companies Inc. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 9 & Figure 3).

**RESPONSE:**  Denied.  The assertions in paragraph 155 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added). Further, Rock Fintek's Chief Operating Officer, Bradley Gilling, only identified the following entities as customers of Rock Fintek: Fresna Health, Delta Airlines, Mejer Inc., and the City of New York.  (Gilling Tr. at 19:15-20:2.)  Kato only identified the following PPE customers of Rock Fintek: Prisma Health, Delta Airlines, Bell Tire, Next Level, and a sheriff's department.  (Kato Tr. 27:9-15.)  These lists do not line up with Mr. Kato's new declaration, including the assertion that Patterson Companies Inc. was a customer of Rock Fintek.

156.    In other words, between March 2020 and June 2021, Rock Fintek did more than $100 million of revenue in PPE business. (*Id.* ¶ 10).

**RESPONSE:**  Denied to the extent that the assertions in paragraph 156 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material*

*facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).  Rock Fintek's sale to any entity besides Ascension  is immaterial to the
issues in this lawsuit.  Accordingly, only $62,242,293.50 that Rock Fintek received in
revenue from Ascension is relevant.

157.    During that time frame, Rock Fintek sourced PPE primarily from the following
suppliers:  JNS Capital Holdings/Joel Stern, Adorama Sellers, INTCO, Bomgogo LTD, and Alit
Group. (*Id.* ¶ 11).

**RESPONSE**:  The assertions in this paragraph are denied, as it is unclear what Rock Fintek
means by "primarily from the following suppliers."  Admitted that Rock Fintek sourced
PPE from JNS Capital Holdings.  Admitted that Rock Fintek sourced gloves from Kitchen
Winners.  Denied that Rock Fintek sourced gloves from either Joseph Mendlowitz or
Adorama.  (*See* ECF No. 139 at pp. 8-12.)

The remaining assertions in paragraph 157 are denied as immaterial to the motions for
summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or
to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the
notice of motion a separate, short and concise statement . . . of the *material facts* as to
which the moving party contends there is no genuine issue to be tried") (emphasis added).
Rock Fintek's purchase of gloves from suppliers other than Kitchen Winners and JNS has
no relevance to the motion before the Court.

158.    As reflected in Rock Fintek's banking records and in Paragraphs 39 & 116, *supra*,
Rock Fintek paid approximately $3,327,215 to JNS/Stern; $20,648,435 to Adorama Sellers; and

$19,451,332 to INTCO, Bomgogo LTD, and Alit Group combined. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 12).

**RESPONSE**:   Admit that Rock Fintek paid Adorama/Kitchen Winners approximately $20,648,435.  Rock Fintek's payment to any entities for any gloves beyond those sourced from JNS and Kitchen Winners is immaterial to the issues in this lawsuit, and are accordingly denied.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

159.    In connection with its all or substantially all of its PPE business, Rock Fintek used logistics and trucking services provided by Dimerco and ACT Logistics. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 13).

**RESPONSE**:   Admitted that Rock Fintek used logistics and trucking services provided by Dimerco in connection with the transaction between Rock Fintek and JNS and in connection with the transaction between Rock Fintek and Kitchen Winners.  The remaining assertions in paragraph 159 are denied as immaterial to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).  Rock Fintek's purchase of gloves from suppliers other than Kitchen Winners and JNS has no relevance to the motion before the Court.

160.    As reflected in Rock Fintek's banking records, Rock Fintek paid approximately $6.2 million to ACT Logistics and Dimerco in 2020 and 2021. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 14; Sperber Dec., Exhs. O & P).

**RESPONSE**:  Denied.  This does not appear to be an accurate accounting of Rock Fintek's payments to ACT Logistics and Dimerco in 2020 and 2021.  The Court is referred to Rock Fintek's bank records, which speak for themselves.

161.    Based on these numbers, the average profit margin for Rock Fintek in connection with its PPE business in 2020 and 2021 was approximately 50%. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 15).

**RESPONSE**:  Denied.  It is unclear what an "average profit margin" means in this context. Is each transaction, no matter how large, being weighted equally in such a calculation? Further, Mr. Kato tellingly does not state that Rock Fintek's only costs were trucking and logistics, so the rough math being applied does not necessarily permit the Court to calculate Rock Fintek's profit margin on its PPE business.  In any event, Kato testified that Rock Fintek lost money on the $38 million transaction at issue in this lawsuit.  (Sperber Dec. at Exhibit "D" [T. Kato Non-Expert Transcript] at 129:2-15; Exhibit "C" [JSUF] at ¶¶ 82-83.).)  Accordingly, it is mathematically impossible for Rock Fintek to have an "average profit margin" of 50% in connection with its approximately $62 million of business with Ascension.  That would imply that Rock Fintek made more than 100% profit on its other transactions with Ascension.

162.    While the Ascension glove deal at issue in this lawsuit was less profitable than other Ascension transactions due to high supply costs, Rock Fintek did not make a profit on the

Ascension glove deal not because of the deal itself, but because of the theft of $6.2 million that it suffered from a purported glove supplier in Thailand. *See* ¶ 34, *supra*. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 16).

> **RESPONSE:** Admitted that, according to Kato, Rock Fintek did not make a profit on the transaction at issue in this lawsuit because Rock Fintek lost approximately $6.2 million to a purported glove supplier in Thailand. It is unclear, however, what Mr. Kato means by "high supply costs" in connection with this transaction. Mr. Kato asserted that Rock Fintek used the same trucking and logistics supplier in connection with this transaction, as Rock Fintek used in connection with its other PPE transactions. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 13.)

163.    Had the Thailand deal been real, Rock Fintek would have paid $15.5 million for 200 million gloves rather than approximately $24 million that it paid to the Adorama Sellers and JNS, and would have received greater profits from its Ascension business. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 16).

> **RESPONSE**: Admitted that, had the fake deal that Rock Fintek tried to enter into with a Thai supplier not been fake, Rock Fintek would have been able to purchase gloves at a lower price than it ultimately paid to JNS and Kitchen Winners.

***Adorama Is a Seller under the SPA, not Merely a Lender***

164.    Rock Fintek's COO Gilling testified that Rock Fintek was very specific that Adorama had to be a party to the SPA as a seller. To that end, Mr. Gilling participated in a telephone call with an Adorama principal on the line where the parties specifically discussed that

Adorama would be a party to the SPA. (Sperber Dec., Exh. G [Gilling Tr.] at 35:7-36:16, 37:15-20, 70:10-20, 100:4-11; 113:9-114:14; 116:8-119:18).

**RESPONSE**:  Denied.  Joseph Mendlowitz denied ever speaking with Kato or being on a telephone conversation with Gilling.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 88:21-89:9, 107:6-10.)

165.    Prior to entering into the SPA, Adorama Sellers' broker Banon told Kato that Adorama was Kitchen Winners' partner that works with them in distribution, in charge of either manufacturing or procuring the gloves. (Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 194:8-15).

**RESPONSE**:  Denied.  Mendlowitz specifically testified that Bannon was not a broker of Adorama.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 19:10-17 [Q. "Do you know who Mr. Bannon worked for in connection with personal protective equipment sales in 2020 and 2021? A. I'm not sure.  Like my understanding is that he's self-employed, he works for himself. He's more like a broker. That was my understanding."].)

Moreover, Kato's testimony as to what non-party Banon allegedly told him is paradigmatic hearsay and inadmissible.  Pursuant to Fed. R. Civ. P. 56(c)(2) "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

In any event, the cited evidence does not support the assertion that "Banon told Kato that Adorama was Kitchen Winners' partner that works with them in distribution, in charge of either manufacturing or procuring the gloves."  It is also unclear who "them" is in this sentence.

166.    Rock Fintek would not have done the large deal with Kitchen Winners if Adorama was not a party to the transaction as a seller. To that end, prior to executing the Sales and Purchase Agreement (SPA) with Adorama and Kitchen Winners, Kato had one or two telephone conversations on which Joseph Mendlowitz from Adorama was present to discuss the proposed transaction. (*Id.* at 195:15-22, 290:8-292:9; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 33).

**RESPONSE**: Admitted that Kato maintains that "Rock Fintek would not have done the large deal with Kitchen Winners if Adorama was not a party to the transaction as a seller." The remaining assertions in paragraph 166 are denied.  Specifically, Joseph Mendlowitz denied ever speaking with Kato or being on a telephone conversation with Kato.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 88:21-89:9, 107:6-10.)

167.    During those conversations, Kato and Mendlowitz discussed that if Rock Fintek was going to make a large purchase order it was going to have to be directly with Adorama "and not via Kitchen Winners" because Adorama seemed like a legitimate large company that had been around since the '70s. (Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 196:21-197:15, 290:18-292:43).

**RESPONSE**: Denied.  Joseph Mendlowitz denied ever speaking with Kato or being on a telephone conversation with Kato.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 88:21-89:9, 107:6-10.)

168.    The SPA was drafted by attorneys who represented both, Adorama and Kitchen Winners. (Sperber Dec., Exh. E [Mendlowtiz Tr.] at 95:13-14; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 35).

**RESPONSE**: Admitted that the law firm of Nussbaum and Associates was involved in drafting the SPA, and that Nussbaum and Associates, at times, represented both Adorama and Kitchen Winners.  Counsel for Rock Fintek was also involved in drafting the SPA. (Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 36:6-8; 40:19-22; 110:22-111:20.).

169.    Rock Fintek was not represented by counsel in connection with drafting or negotiating the SPA. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 36; Exh. 10 [Weiner Tr. Day I p.m.] at 180:4-7).

**RESPONSE**: Denied.  Rock Fintek was represented by counsel in the negotiations of the SPA.  (See Sperber Dec. at Exhibit "G" [B. Gilling Transcript] at 36:6-8; 40:19-22; 110:22-111:20; Exh. D [Kato 30(b)(6) Tr.] at 47:5-11.).

170.    On April 5, 2021, Weiner emailed a draft SPA to Mendlowitz asking him to "look it over" and call him about it. (Rakhunov Dec., Exh. 3 [5529_0002_AKW000650_002078_001]; Sperber Dec., Exh. E [Mendlowitz Tr.] at 95:15-96:7).

**RESPONSE**:  Admitted.

171.    Following that email between Weiner and Mendlowitz, material changes were made to the SPA including a change in quantity from 1 million to 1.5 million boxes of gloves, change in amounts and timing of payments, the removal of an additional order option, and modification of the rebate provision. (*Compare* Sperberg Dec., Exh. K, with Rakhunov Dec., Exh. 3 [5529_0002_AKW000650_002078_001]).

**RESPONSE**:  Admitted that, over the course of negotiations between the parties, changes were made to the SPA.  Admitted that some of those changes were made after April 5,

2021.  Rock Fintek, however, has failed to submit any evidence to support the inference that such modifications were at the behest of Mendlowitz.

172.    Rock Fintek, Kitchen Winners and Adorama executed the SPA on or about April 7, 2021. (Sperber Dec., Exh. K [SPA]).

**RESPONSE**:  Admitted.

173.    Adorama signed the SPA as a "Seller." (*Id.* at 5.)

**RESPONSE**:  Denied.   The SPA explicitly defines only Kitchen Winners as "Seller." (*See* SPA at Preamble.)  Further, the heading "Seller" on the signature page appears only in connection with Kitchen Winners, and not Adorama.  The Court is referred to pages 9-12 of Adorama's memorandum of law in support of its motion for summary judgment (ECF No. 139), which discuss this issue at length.  That discussion is incorporated herein by reference.

174.    Paragraph 2.c. of the SPA requires that "Buyer *shall pay Seller* in full by wire transfer of funds for each container Delivered to the Seller's warehouse..." (*Id.* at 2 (emphasis added).)

**RESPONSE**:  Admitted that the quoted language appears in Paragraph 2.c. of the SPA.

175.    Paragraph 2.d. of the SPA provided that "Any payment of the Purchase Price payable for each box of gloves delivered *shall be paid to Seller* …." (*Id.* at 3 (emphasis added).)

**RESPONSE**:  Admitted that the quoted language appears in Paragraph 2.d. of the SPA.

176. It is undisputed that Rock Fintek made *every payment* under the *SPA to Adorama* in its bank account and not to Kitchen Winners. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 23:23:6-18, 68:23-69:4; Sperber Dec., Exh. E [Mendlowitz Tr.] at 63:25-64:8, 104:6-14). In other words, Adorama acted as a seller and received the benefits of a "Seller" under the express written terms of the SPA.

**RESPONSE**: Admitted that Rock Fintek made every payment under the SPA to the bank account of Adorama. The remaining assertions in paragraph 176 are denied as unsupported by the referenced documentation. Adorama never directed Rock Fintek to make any payments to itself. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 147:4-7.) Accordingly, it is false to assert that "Adorama acted as a seller." Rock Fintek's unilateral decision to make payments to Adorama does not and cannot transform Adorama's responsibilities under the SPA.

177. The SPA does not anywhere refer to Adorama as a "lender" or the like. (*Id.*)

**RESPONSE**: Admitted that the SPA does not anywhere refer to Adorama as a "lender." It is unclear what "or the like" would encompass in this context.

178. Mendlowitz could not point to anywhere in the SPA that supported a position that Adorama was merely a lender under the SPA, but took the position that any arrangement between Adorama and Kitchen Winners did not need to be disclosed to Rock Fintek. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 97:13-100:4; 102:10-20).

**RESPONSE**: Admitted that "Mendlowitz could not point to anywhere in the SPA that supported a position that Adorama was merely a lender under the SPA." The SPA, however, speaks for itself.

179.    Mendlowitz is not aware of any communications to Rock Fintek notifying Rock Fintek that Adorama's role under the SPA was merely that of a lender. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 106:24-107:5).

**RESPONSE**: Admitted.

180.    When Weiner was pressed at his deposition regarding his understanding of Adorama's obligations under the SPA, he was evasive and claimed that he does not "read English." (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 179:11-21 ("Q. I'm not asking what you told Mr. Maimon. I'm asking: Is there anything in this agreement that describes Adorama as a lender? That's a pretty simple "yes" or "no" question. A. Yes. Q. Where? A. I don't know, I don't read English so look for yourself. Find it.").

**RESPONSE**: Deny the characterization of Weiner's testimony as "evasive." The cited testimony speaks for itself. Weiner testified that he has dyslexia, and that as a result has difficulty reading written text. (Sperber Dec. at Exh. F [Weiner Tr. Day I a.m.] 10:23-25.)

181.    To the extent that Adorama relies on any purported lending agreement between Adorama and Kitchen Winners, it is undisputed that Rock Fintek was never provided a copy of any such agreement or notified that any such agreement or arrangement existed. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 83:16-19).

**RESPONSE**:  Admitted that Mendlowitz never communicated with anyone at Rock Fintek.  Admitted that Mendlwoitz testified that he did not provide a copy of the lending agreement to Rock Fintek.

182.    Arik Maimon, who assisted Rock Fintek with negotiating the SPA also viewed Adorama as a seller of gloves. (*See* Sperber Dec., Exh. L [Maimon LOI], ¶ 1 ("Rock Fintek desires to purchase up to 1 million boxes of powder-free nitrile medical gloves (100 gloves/box as per specifications) *from Kitchen Winners NY Inc (KWNY) / Adorama* … (emphasis added)).

**RESPONSE**:  Denied.  The LOI is explicit that Maimon's understanding of Adorama's role in the transaction was one of a lender.  (*See* Sperber Dec., Exh. L [Maimon LOI], ¶ 3 ("Adorama is financing these transactions for Kitchen Winners NY."))  Adorama further refers to the Preamble where the SPA explicitly defines only Kitchen Winners as "Seller," and to Paragraph 2.a. and 2.b. where the SPA refers to Adorama by name, when referencing Adorama's limited role as recipient of the deposit.

183.    During the performance of the SPA, Weiner routinely kept Mendlowitz informed as to shipments to Rock Fintek and payments by Rock Fintek, and the specification and packaging of gloves that were purportedly being sold to Rock Fintek. (Rakhunov Dec., Exh. 5 [Compilation of Emails Produced in Discovery]).

**RESPONSE**:  Admitted that Weiner sent a number of emails to Mendlowitz regarding shipments to Rock Fintek and payments by Rock Fintek.  Denied to the extent that there is any inference from the cited emails that being kept apprised of shipments somehow transformed Adorama into a "Seller."   The word "routinely," moreover, is a vague term whose use here is denied.

184.    When disputes between the parties arose in June and July 2021, Weiner kept Mendlowitz informed and either copied or BCC'd Mendlowitz on communications with Rock Fintek. (Rakhunov Dec., Exh. 11; Rakhunov Dec., Exh. 12 [Mendlowitz Dep. Exh. 15]; Sperber Dec., Exh. E [Mendlowitz Tr.] at 136:7-22).

> **RESPONSE**: Admitted that Weiner sent a number of emails to Mendlowitz regarding communication with Rock Fintek.  Denied to the extent that there is any inference from the cited emails that being kept apprised of shipments somehow transformed Adorama into a "Seller.".

185.    In those communications, Kitchen Winners and Adorama sought to condition providing documentation to show that the gloves already delivered conformed to specifications (which they did not) and conditioned the contractually required return of overcharges and payment of a rebate, on Rock Fintek buying 2 million more boxes of gloves from Adorama and Kitchen Winners for an additional $18 million and making a payment to *Maimon*, among other things. (Rakhunov Dec., Exh. 12).

> **RESPONSE**:  Denied.  The cited evidence does not support the stated conclusion.  Rock Fintek cites only one email, not "communications."   That email is from Weiner, not Mendlowitz, and so any assertion that "Kitchen Winners *and Adorama* sought . . ." is unsupported.  Further, the referenced email was an offer of settlement, that explicitly states that it was for "settlement purposes," and so is inadmissible pursuant to Federal Rule of Evidence 408.   In any event, Kitchen Winners was not "condition[ing] providing documentation," but rather making a "global settlement [offer] intended to resolve all outstanding matters between the parties."  (Rakhunov Dec., Exh. 12).

***Adorama Sellers and Stern All Knew that Gloves Purchased by Rock Fintek Would Immediately Be Resold to its Hospital Client***

186.    In early February 2021, Rock Fintek was introduced to Joel Stern through Ms. Chunron Li and an individual named Bruno Azra. (JSUF ¶ 28; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

187.    From the very beginning of selling gloves to Rock Fintek, Stern understood that the gloves would be used in a hospital or other healthcare medical facility. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 58:19-59:3). Stern knew even without being told that the gloves were going to a hospital or another medical facility because who else could be buying such a large quantity of gloves. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 82:6-19).

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

188.    Once they established direct contact with Stern, Kato and Gilling routinely had numerous telephone calls with Stern during the course of their business dealings when they told

him that their client was a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 24; *see also* Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 73:7-11, 80:21 ("everything was done over the phone"); Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 93:18-94:24.

> **RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

189.     By April 2021, Stern was making efforts to learn the identity of Rock Fintek's client to try and get a purchase order directly from the hospital. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 79:23-80:20).

> **RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

190.     Mendel Banon acted as the broker and representative of Kitchen Winners and Adorama in connection with the gloves transactions with Rock Fintek. (Sperber Dec., Exh. E [Mendlowitz Tr.] at 19:10-17; Exh. F [Weiner Tr. Day I a.m.] at 33:20-34:14; 61:8-11 ("What is Mendel Banon's role with respect to Kitchen Winners?  A. He was a broker."); Exh. G [Gilling Tr.] at 48:11-15 ("Mendel Bannon held himself out as a representative of Kitchen Winners and

associated with Adorama."), 53:6-13.); Rakhunov Dec., Exh. 15 [AKW_004957] (Bannon writing to Rock Fintek: "As per our call with Hershey and Arik *we* will release five today and *we will get paid* 8 to 9 loads on Tuesday…" (emphasis added)).

**RESPONSE**: Denied.  The cited evidence does not support the stated conclusion.  Rock Fintek is conflating Kitchen Winners with Adorama.  Mendlowitz specifically testified that Bannon was not a broker of Adorama.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 19:10-17 [Q. "Do you know who Mr. Bannon worked for in connection with personal protective equipment sales in 2020 and 2021? A. I'm not sure.  Like my understanding is that he's self-employed, he works for himself.  He's more like a broker.  That was my understanding."].)  Weiner's testimony was specifically limited to Kitchen Winners and did not refer to Banon's role at Adorama.  Gilling has no personal knowledge of Bannon's role vis a vis Kitchen Winners/Adorama.  Banon's message at Rakhunov Dec., Exh. 15, does not establish a broker relationship in any legal sense and does not reference Adroama or Mendlowitz.  Adorama and Kitchen Winners are distinct legal entities as Rock Fintek has conceded.  (MOL at p. p. 25, n. 3.)

191.    In fact, Banon was the originator of the relationship between Kitchen Winners/Adorama and Anna Grinvald, the CEO and owner of Global Tooling Services, Inc. ("GTS"), the purported manufacturer of the MedCare brand gloves. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 87:4-16; *see also* Rakhunov Dec., Exh. 16 [AKW - 003168].

**RESPONSE**:  Admitted that Banon connected Weiner with Anna Grinvald, the CEO and owner GTS.  Denied that Banon connected Mendlowitz and/or Adorama with GTS.  Nothing in the referenced evidence would support such an assertion.  Adorama, Kitchen

Winners, and Mendlowitz further deny the characterization of MedCare as "the purported manufacturer" of MedCare brand gloves.

192.    Before Rock Fintek started buying gloves from Kitchen Winners/Adorama, in addition to written communications, Kato had numerous telephone calls, WhatsApp calls, and video calls with Mendel Banon, and even hosted Banon for lunch. During those discussions and meetings, Banon consistently held himself out as the representative of Kitchen Winners and Adorama, using those names interchangeably. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 26).

**RESPONSE**: Denied. As discussed above and in Adorama's memorandum of law, Adorama did not sell gloves to Rock Fintek.  (ECF No. 139 at pp. 8-12.)  Further, Kato's testimony as to what Bannon allegedly told him is paradigmatic hearsay and inadmissible. Pursuant to Fed. R. Civ. P. 56(c)(2) "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

193.    During those discussions and meetings, Kato told Banon very clearly that Rock Fintek was not the end user of the gloves but was purchasing them for its client – a large hospital group that could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 26).

**RESPONSE**:  Admitted that Kato asserts that he told Banon that Rock Fintek was purchasing the gloves for its client.  Denied that there is any inference that either Adorama or Kitchen Winners had any knowledge of the conversations between Banon and Kato.

194.    Indeed, on *March 14, 2021*, in connection with one of the first one-off transactions and prior to the SPA, Banon asked Rock Fintek in a chat:  "[3/14/21, 12:00:13 PM] Mendel: Hey,

hope you're all enjoying ur weekend so far, any feedback regarding *the glove delivery to the hospital*? Which I assume were already delivered?" (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat highlighted] at 6.)

> **RESPONSE**: Denied.   Purported statements by non-party Mendel Banon constitute hearsay, and are therefore inadmissible.  Pursuant to Fed. R. Civ. P. 56(c)(2) "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

195.   While Rock Fintek did not disclose to Adorama Sellers or JNS/Stern the actual name of its hospital client during the course of the glove transactions, Rock Fintek unambiguously put all sellers of gloves on notice that its client was hospital group that had to approve the product and could only accept FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards.  (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 25-29; *id.*, Exh. 4 [Mendel Rock Gloves Chat highlighted] at 1, 2, 5, 8, 14, 20; *id.*, Exh. 17 [RF_000443-447 "if the hospital accepts it"]; Sperber Dec., Exh. G [Gilling Tr.] at 66:3-67:1).

> **RESPONSE**:  Denied.  Rock Fintek did not communicate with Adorama.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 88:21-89:9, 107:6-10)  Mendlowitz is not copied on any of the referenced communications.  Further, in the referenced communications, Rock Fintek did not reference a "hospital group."  In addition, the SPA between Rock Fintek and Kitchen Winners lays out specifications for the gloves being sold, and specifically states that "Seller does not make any warranties as to the Products except that they conform to the specifications provided." (Sperber Dec., Exh. K [SPA]at ¶ 6.)  None of those specifications reference ASTM D-6319.

196.    Arik Maimon, who was a personal acquaintance of Kato, sought to insert himself into Rock Fintek's PPE business and held himself out as having the ability to protect Rock Fintek's interests with respect to the transactions with Adorama and Kitchen Winners, insisting to Kato that his cultural and religious similarities with the Adorama Sellers put him in a unique position to protect Rock Fintek in Rock Fintek's business dealings with Adorama and Kitchen Winners. Maimon communicated with the Adorama Sellers on behalf of Rock Fintek during the transactions at issue and knew at all times – because Kato told him – that the gloves being bought by Rock Fintek were for Ascension Health and undertook to protect Rock Fintek in that regard but betrayed Rock Fintek. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶¶ 27-28; *id.*, Exh. 18 [RF_000831-36]).

**RESPONSE**: Admitted that Arik Maimon was a personal acquaintance of Kato.  Admitted that Arik Maimon communicated with Kitchen Winners on behalf of Rock Fintek.  Rock Fintek has not submitted any evidence to support the assertion that Arik Maimon ever communicated with either Joseph Mendlowitz or anyone else at Adorama.  Kato's conclusory assertion, in paragraph 28 of his declaration, that "Maimon communicated with the Adorama Sellers" is insufficient to support a conclusion that Maimon communicated with Joseph Mendlowitz or anyone else at Adorama, as Kato does not purport to have personal knowledge of Maimon's communications.  Finally, Kato's claim that Maimon "betrayed" Rock Fintek is extraordinarily vague; it is unclear what Maimon is exactly being accused of doing.

197.    Similarly, prior to entering into the SPA, Kato participated in numerous telephone calls with Hershey Weiner during which calls I told Weiner very clearly that the large glove order contemplated under the SPA was for Rock Fintek's hospital client that could only accept properly

labelled FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 29).

**RESPONSE**:  Denied. Joseph Weiner specifically testified that Mr. Kato never told him during any telephone conversations the assertions made in paragraph 197. (Affidavit of Joseph Weiner dated April 5, 2024("Weiner Aff.") at ¶ 4.)

198.    In his early conversations with Stern, Banon and Weiner, Kato not disclose the name of Ascension but told each of them that the end buyer of the gloves was an important hospital client of Rock Fintek – one of the two largest hospital systems in the United States – that had placed a purchase order for a large quantity of gloves and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, Kato specifically discussed with Stern, Banon and Weiner (in multiple separate conversations) that the money that was stolen in Thailand was a part of the large deposit made by the hospital client and that Rock Fintek was pursuing claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. Kato told each of the sellers that delivering fake or non-conforming products to Rock Fintek's client, particularly after the 6.2 million theft of that client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. Kato sought to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should Rock Fintek's client's funds and Rock Fintek's relationship be compromised in this deal. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 31).

**RESPONSE**: Denied. Joseph Weiner specifically testified that Mr. Kato never told him the assertions made in paragraph 198. (Weiner Aff.) at ¶ 6.)

199.    In fact, during the ongoing business relationship, Kato and Gilling expressly discussed with Weiner, Arik Maimon and Banon the potential next large order of gloves for Ascension. When the relationship broke down, the sellers actually tried to use the information learned in those discussions to try and extort Rock Fintek to buy an additional 2 million boxes of gloves even though Ascension no longer wanted to do business with Rock Fintek. (Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 31; Exh. 12 [Mendlowitz Dep. Exh. 15]).

**RESPONSE**: Denied.  Rock Fintek's citation to "Rakhunov Dec., Exh. 8 [Kato Dec.] ¶ 31" does not support the assertions made in paragraph 199.  In any event, Kato's vague and conclusory assertion that "the sellers" tried to "extort" Rock Fintek is unsupported. Kato does not state what this purported "extortion" consisted of, or who exactly did this purported extorting.

Further, Rock Fintek's reference to Rakhunov Dec. at Exh. 12 is improper, as the referenced email was an offer of settlement, that explicitly states that it was for "settlement purposes," and so is inadmissible pursuant to Federal Rule of Evidence 408.  In any event, the proposed "global settlement [offer] intended to resolve all outstanding matters between the parties" does not constitute any form of extortion.

200.    Ascension testified that prior to purchasing any gloves from Rock Fintek, they had been provided documents by Rock Fintek that had Kitchen Winners' name on them, stating that the gloves were ASTM D-6319 rated and that the gloves were Nitrile. (Sperber Dec., Exh. M [Elstro Tr.] at 23:15-24.)

**RESPONSE**:  Denied.  Rock Fintek is conflating two separate things.  Elstro testified that Ascension "had been provided documentation by Rock Fintek that the gloves were ASTM D6319-rated."  He then testified that Ascension had "also been provided documents that had Kitchen Winners' name on it that stated that the gloves were nitrile."  Elstro did not testify that the documents, with Kitchen Winners' name on them, stated that the gloves were ASTM D-6319 rated.  (Sperber Dec., Exh. M [Elstro Tr.] at 23:15-24).

***Adorama Sellers and Joel Stern Made Specific Material Representations About the Nature of the Gloves, Yet Knowingly Delivered Non-Conforming Gloves***

201.    All parties agree that the gloves sold under the SPA, the one-off Kitchen Winners transactions and gloves sold by Stern were required to be Medcare brand Nitrile Examination gloves with FDA 510(k) clearance. (Sperber Dec., Exh. K [SPA]; JSUF ¶ 33).

**RESPONSE**: Denied.  Rock Fintek has not cited any evidence that gloves sold pursuant to the one-off transactions were required to be "Medcare brand Nitrile Examination gloves with FDA 510(k) clearance."

202.    Prior to any transactions taking place with Stern, Mr. Azra, on behalf of Stern, passed along to Ms. Li an offer to sell to Rock Fintek MedCare Nitrile Exam Gloves for $15 a box. (JSUF ¶ 29; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

203.     Stern, through Azra, passed paperwork about the gloves to Ms. Li and a sample of gloves to demonstrate to Rock Fintek that the gloves he would sell to them were nitrile medical examination gloves. (JSUF ¶ 32; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 52:3-25; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

204.     Stern obtained this paperwork from Kitchen Winners. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 53:13-54:3)

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

205.     The paperwork from Stern, which was forwarded to Rock Fintek by Ms. Li via WhatsApp chat on February 2, 3, and 9, 2021, includes the following:

    a)  CTS Inspection Report purportedly for "nitrile examination gloves," Lot 20201106. (Rakhunov Dec., Exh. 19 [00000879-CT41939.doc (1)]). As set forth in ¶¶ 270-274, *infra*, gloves from this Lot subsequently failed ASTM D-

6319 testing and tested as Polyvinylchloride gloves having no detectible levels of nitrile.

b)  A screenshot of an FDA 510(k) clearance letter purportedly for the gloves to be sold. (*Id.*, Exh. 20 [00000880-PHOTO-2021-02-02-09-50-41]).

c)  Bills of lading for certain containers of gloves, including container OOCU7022928, which is the "problem" container with "Protection" gloves identified by Weiner as detailed in Paragraph 239, *infra*. (*Id.*, Exh. 21 [00000-HBL-STSH2012206 (1584), 00000959-HBL-STSH2012103 (1582), 00000960-HBL-STSH2012150 (1583)]).

d)  An 8-page packet of materials including a copy of the FDA 510(k) clearance letter setting forth ASTM D-6319 specifications for the gloves. (*Id.*, Exh. 22 [00001179-FILE-4268.pdf]).

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

206.    In reliance on these written materials from Stern, Rock Fintek gave an Irrevocable Corporate Purchase Order ("ICPO") to JNS, which specifically required FDA 510(k) certified MedCare Nitrile Medical Exam gloves.  (JSUF ¶¶ 30, 33; Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 45:18-46:14; Rakhunov Exh. 23 [ICPO, Stern Dep., Exh. 1]; Rakhunov Dec., Exh. 43 [Ms. Li Dec.]).

**RESPONSE**: Denied.  The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

207.    The ICPO was with **JNS**, not with Bruno or Ms. Li.  (*Id.*)

**RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

208.    On March 4, 2021, prior to any one glove transactions between Rock Fintek and Kitchen Winners or Adorama taking place, Gilling specifically asked Banon via WhatsApp chat for documentation of FDA clearance and ASTM D-6319 certifications for the gloves that would be sold to Rock Fintek. (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves Chat highlighted] at 1).

**RESPONSE**: Denied.  Gilling asked Banon via WhatsApp chat for documentation of *either* ASTM D-6319 certification *or* "FDA," not both.  It is unclear what was meant by "FDA."

209.    In response, Banon provided Rock Fintek with a copy of the same March 9, 2016 FDA 510(k) clearance letter that Stern had provided previously and a series of links to the FDA website for that letter, through which Banon represented to Rock Fintek that the gloves that would

be sold to Rock Fintek by Kitchen Winners (and later Adorama) were manufactured under the FDA 510(k) number K152712, with the ASTM D-6319 and other specifications detailed in that submission. (Rakhunov Dec., Exh. 4 [Mendel Rock Gloves chat] at 1; Exh. 25 [00000017-K152712.pdf]; *see also* Rakhunov Dec., Exh. 25 [Gombo Tr.] at 51:13-52:2).

> **RESPONSE**: Denied.  Any purported communications from non-party Banon constitute inadmissible hearsay.  Further, Rock Fintek's assertion that Banon was "represent[ing] to Rock Fintek that the gloves that would be sold to Rock Fintek by Kitchen Winners (and later Adorama) were manufactured under the FDA 510(k) number K152712, with the ASTM D-6319 and other specifications detailed in that submission" is unsupported.  First, Adorama never sold any gloves to Rock Fintek, and was certainly not involved in the one-off transaction (Sperber Dec. at Exhibit "C" [JSUF] at ¶ at 40).  Second, Rock Fintek has not provided any evidence to connect this WhatsApp communication with the later glove transactions between Rock Fintek and Kitchen Winners.  In particular, the SPA between Rock Fintek and Kitchen Winners lays out specifications for the gloves being sold, and specifically states that "Seller does not make any warranties as to the Products except that they conform to the specifications provided."  (Sperber Dec., Exh. K [SPA] at ¶ 6.)  None of those specifications reference either ASTM D-6319 or a particular FDA 510(k) number.

210.    To obtain FDA 510(k) clearance, a product has to be shown to be substantially equivalent to another product that is already on the market. (Rakhunov Dec. Exh. 24 [Deposition Transcript of Alan Schwartz ("Schwartz Tr.")] at 14:21-15:11).

> **RESPONSE**:  Denied.  The assertions in paragraph 210 constitute legal arguments or conclusions, which are inappropriate for inclusion in a statement of material facts.

Additionally, the assertions in paragraph 210 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

211.     The FDA clearance letter that Banon provided represented equivalence to ASTM D-6319 gloves and also included a product code "LZA" which, as explained by Adorama Sellers' gloves expert, is a product code for medical "examination" gloves. (Exh. 25 [00000017-K152712.pdf]; Rakhunov Exh. 24 [Schwartz Tr.] at 23:2-9).

**RESPONSE**:  Denied.  It is unclear what the phrase "represented equivalence" means as it is used in the paragraph above.   To the extent that Rock Fintek is making a legal argument, such an argument is inappropriate for inclusion in a statement of material facts. Further, Schwartz testified in the referenced testimony that he was "unsure" if the product code "LZA" was a code for "patient examination gloves."

Additionally, the assertions in paragraph 211 are denied as immaterial to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

212.     ASTM D-6319 specifications require, among other things that the gloves be manufactured with "Nitrile" material, that the gloves be free from pinholes, demonstrate greater than 500% elongation, and greater than 14 Mpa tensile strength.  (Rakhunov Dec., Exh. 4 [Mendel

Rock Gloves Chat highlighted] at 1; Exh. 25[00000017-K152712.pdf] at Section C, p. 2/4; Exh. 27 [Expert Report of Jason Poulton, Ph.D] at 5-18).

**RESPONSE**: Denied as stated. None of the referenced documents explain what ASTM D-6319 requires.

213.    A "protection" glove as opposed to an "examination" glove would have more pin holes in it and would not pass a test when filling up with water in a lab. (Rakhunov Dec., Exh. 26 [November 2, 2023 Deposition Transcript of Tzali Gombo ("Gombo Tr.")] at 40:22-41:7).

**RESPONSE**: Defendants deny the assertions in paragraph 213, as paragraph 213 mischaracterizes the deposition testimony of Tzali Gombo. Tzali Gombo testified that it was his understanding that "a regular glove, not examination gloves would -- would not be able to test, to pass a test when filling up with water in a certain way in the lab."

214.    Weiner admitted that there were differences in quality and usage for "protection" gloves versus "examination" gloves and that a "protection" glove would be sold for less money than an "examination" glove. (Sperber Dec., Exh. F [Weiner Day I a.m.] at 97:13-98:21; 101:7-9).

**RESPONSE**: Defendants deny the assertions in paragraph 214, as paragraph 214 mischaracterizes the deposition testimony of Joseph Weiner. Mr. Weiner only testified as to the difference in usage. He did not testify as to the differences in quality between protection gloves and examination gloves. In fact, when asked whether "an exam glove is more protective, for lack of a better word, than a protection glove," Mr. Weiner testified that he did not know. (Sperber Dec., Exh. F [Weiner Day I a.m.] at 101:10-14.)

215.     Indeed, Stern tried to sell the "protection" gloves that he had – all of which he got from Kitchen Winners – for less. (Rakhunov Dec., Exh. 28 [Joel Gloves NY Chat] at 4).

**RESPONSE**:  Denied.  The assertions in this paragraph are not material to motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

216.     Only lab testing can reveal if a glove is truly an "examination" glove. (Rakhunov Dec., Exh. 26 [Gombo Tr.] at 41:8-41:18).

**RESPONSE**: Denied. It is unclear what the phrase "*truly* an 'examination' glove" (emphasis supplied) means as it is used in paragraph 216. In any event, Tzali Gombo testified that he could approve the quality of examination gloves by putting them on.  (Rakhunov Dec., Exh. 26 [Gombo Tr.] at 41:14-24.)

*Rock Fintek Never Agreed to Purchase nor Accepted Mis-Labelled Gloves*

217.     Adorama Sellers FDA/gloves expert explained that medical devices, such as nitrile examination gloves must be labelled consistent with the product code for which FDA 510(k) clearance was received. (Rakhunov Dec., Exh. 24 [Schwartz Tr.] at 32:14-33:16).

**RESPONSE**: Denied.    The assertions in paragraph 217 constitute legal arguments or conclusions, which are inappropriate for inclusion in a statement of material facts. Additionally, the assertions in paragraph 217 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock

Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

218.    Rock Fintek made it clear to Banon at the latest on March 19, 2021, prior to entering into the SPA that Rock Fintek's client would not accept mislabeled products – "It's all about the box."  (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 9).

   **RESPONSE**: Denied.  The referenced evidence does not support the assertion that Rock Fintek told Banon that its client would not accept mislabeled products.  Gilling merely told Banon that their client would not care if the gloves were also "chemo rated" if that was not included on the box itself.

219.    When wrong brand (LevMed) gloves were delivered by the Adorama Sellers in April 2021, Rock Fintek immediately notified sellers that this caused "a major issue with our client" that was "causing us serious damages" and "this has created great tension with our client." (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 9, 10).

   **RESPONSE**: Admitted that Rock Fintek wrote the above-quoted language to Banon. Denied that the delivery of LevMed gloves actually caused "serious damages" to Rock Fintek, as Ascension actually accepted the LevMed gloves.  (Sperber Dec. at Exh. M [Elstro Tr.] 62:5-17.)  Denied that the LevMed gloves were delivered by the "Adorama Sellers," as neither Mendlowitz nor Adorama sold any gloves to Rock Fintek, and nothing in the referenced evidence establishes otherwise.

220.    On April 6, 2021, Stern offered to sell Rock Fintek gloves labelled "Protection" rather than "Examination" and in a WhatsApp message wrote that "this one is the same good gloves, inspection and test reports showing examination but not printed on the box... give me an offer and we will correct the boxes for you." (Rakhunov Dec., Exh. 28 [Joel NY Gloves Chat] at 3).

**RESPONSE**: Denied.  The assertions in paragraph 220 are denied as immaterial to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

221.    Later on April 6, 2021, Gilling asked Stern to "[s]end pictures of the box" and Stern sent Rock Fintek pictures of proposed glove boxes in two files, including a file that showed "Protection" gloves. (Rakhunov Dec., Exh. 28[Joel NY Gloves Chat] at 4; Exh. 29 [00000100-CT04130_20210311_LangTai_Judy(1)]).

**RESPONSE**: Denied.  The assertions in paragraph 221 are denied as immaterial to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

222.     Stern tried to convince Rock Fintek that "Protection" labelled gloves were the same gloves just mis-packaged, but Rock Fintek never agreed to buy "Protection" gloves from JNS/Stern. (Rakhunov Dec., Exh. 28 [Joel NY Gloves Chat] at 4; Exh. 14  [Stern Tr. Day II] at 57:22-58:6).

**RESPONSE**: Denied.  The assertions in paragraph 222 are denied as immaterial to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

223.     Weiner has claimed that Arik Maimon agreed on behalf of Rock Fintek to accept gloves labelled "Protection" in connection with the one-off transactions predating the SPA. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 33:12-23).

**RESPONSE**: Admitted.

224.     Rock Fintek _never_ authorized Arik Maimon – in writing or orally – to accept gloves labelled "Protection" or as anything other than MedCare Nitrile/NBR Examination Gloves. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 30).

**RESPONSE**:  Admitted that Kato testified to the referenced claims.  However, the assertions in paragraph 224 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in

its complaint.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

### *Ascension Health Discovers Significant Quality and Consistency Problems with the Gloves*

225.    In July 2021, Ascension brought issues regarding the quality of gloves to the attention of Rock Fintek. (Rakhunov Dec. Exh. 30 [Ascension Exh. 5]; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 210:19-22 ).

**RESPONSE**:  Admitted that Ascension raised complaints with the quality of the gloves. However, the assertions in paragraph 225 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

226.    Ascension testified that Rock Fintek did not meet the specifications for gloves that were laid out in the Purchase Order. (Sperber Dec., Exh. M [Ascension Tr.] at 25:14-26:3, 47:3-6).

**RESPONSE**:   Admitted that Ascension testified that the gloves did not meet the specifications in the Purchase Order between Ascension and Rock Fintek.  Ascension further clarified that Acension did not care whether the purchase orders between Rock

Fintek and Kitchen Winners had the same specifications as the purchase order between Ascension and Rock Fintek.

227.    When the gloves began trickling out to Ascension healthcare providers across the country it began receiving complaints that the gloves were tearing, fluids were seeping through the gloves, the cuffs around the gloves were too large and loose, the sizing did not represent what was on the box. (Sperber Dec., Exh. M [Ascension Tr.] at 20:13-21:18; Rakhunov Dec. Exh. 30 [Ascension Exh. 5]).

**RESPONSE**:  Admitted that Ascension testified that it received complaints about the quality of the gloves.  However, the assertions in paragraph 227 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

228.    Ascension provided Rock Fintek with videos from hospital staff and messages regarding the poor quality of the gloves. (Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 92:16-93:13.)

**RESPONSE**:  Admitted that Kato testified that Ascension provided Rock Fintek with the referenced videos.  However, the assertions in paragraph 228 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock

Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

229.    Immediately upon being notified of quality issues by Ascension and ascertaining the extent of the problem, Rock Fintek demanded documentation and testing reports concerning the quality gloves, conducted testing on the gloves at its own expense, demanded refunds, demanded replacement of gloves from JNS, Kitchen Winners, and Adorama and also asked Medcare to replace the gloves. (Rakhunov Dec. Exh. 31 [Compilation of AKW_004373, AKW_004376, AKW_005044, Adorama INC. and Kitchen Winners NY INC.000076-77]; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 287:17-289:22; Rakhunov Exh. 28 [Joel NY Gloves chat] at 30-31; Sperber Decl. Exh. M, Kato 30(b)(6) 210:13-211:23.

> **RESPONSE**:  Denied that Rock Fintek ever raised any issues regarding the quality of the gloves with Adorama.  Joseph Mendlowitz denied ever speaking with Kato or being on a telephone conversation with Gilling.  (Sperber Dec., Exh. E [Mendlowitz Tr.] at 88:21-89:9, 107:6-10.)  None of the referenced citations show any communication between Rock Fintek and Adorama.

*Overwhelming Record Evidence Demonstrates that the Adorama Parties and JNS/Stern Sold Non-Conforming Gloves to Rock Fintek*

230.    By November 19, 2021, Medline Industries completed a "label audit" for Ascension Health. (Rakhunov Dec. Exh. 32 [Medline 30b6 Tr.] at 53:6-25; Rakhunov Dec., Exh. 33 [RF_00001–11]; Exh. 34 [Medline, Exh. F]).

> **RESPONSE**:  Denied.  The referenced documentation from non-party Medline Industries constitutes inadmissible hearsay, as it consists of out-of-court statements submitted for the truth of the matter asserted therein.  While Medline produced a corporate witness to testify in this matter, that witness claimed that the purported "audit" was conducted by an unknown number of employees at Medline warehouses across the country.  The Medline corporate witness had not spoken with each of the employees involved, and therefore had no way to confirm that the audit was accurate.  Further, the Medline witness testified that such audits are not conducted in the ordinary course of business.  (Medline Tr. at 53:6-60:18.)  Accordingly, evidence of the purported "audit" is not admissible.
>
> Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

231.    Medline conducts such audits upon customer request. (Rakhunov Dec. Exh. 32_[Medline 30b6 Tr.] at 60:17-61:18).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

232.    Medline employees spent approximately 108 hours on the audit and were paid for that work by Ascension. (Rakhunov Dec. Exh. 32 [Medline 30b6 Tr.]_at 64:5-64-10.

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

233.    Medline went to each slot that the product was stored in, removed one random case, opened the case and removed one random box within that case and inspected it for the label that was identified by Ascension.  (Rakhunov Dec. Exh. 32_[Medline 30b6 Tr.] at 55:4-18; 63:21-63:25 (chart "accurately and fairly" represents the results of the audit).)

**RESPONSE**:  Denied.  The referenced documentation from non-party Medline Industries constitutes inadmissible hearsay, as it consists of out-of-court statements submitted for the truth of the matter asserted therein.  While Medline produced a corporate witness to testify in this matter, that witness claimed that the purported "audit" was conducted by an unknown number of employees at Medline warehouses across the country.  The Medline corporate witness had not spoken with each of the employees involved, and therefore had no way to confirm that the audit was accurate or even how it was conducted.  Further, the Medline witness testified that such audits are not conducted in the ordinary course of business.  (Medline Tr. at 53:6-59:11.)  Accordingly, evidence of the purported "audit" is not admissible.

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

234.    Approximately half the slots of gloves checked were labelled "protection" on boxes. (Rakhunov Dec. Exh. 33 [RF_00001–11]; Exh. 34 [Medline, Exh. F] at Medline 00038).

**RESPONSE**:  Denied.  The referenced documentation from non-party Medline Industries constitutes inadmissible hearsay, as it consists of out-of-court statements submitted for the truth of the matter asserted therein.  While Medline produced a corporate witness to testify

in this matter, that witness claimed that the purported "audit" was conducted by an unknown number of employees at Medline warehouses across the country.  The Medline corporate witness had not spoken with each of the employees involved, and therefore had no way to confirm that the audit was accurate or even how it was conducted.  Further, the Medline witness testified that such audits are not conducted in the ordinary course of business.  (Medline Tr. at 53:6-59:11.)  Accordingly, evidence of the purported "audit" is not admissible.

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

235.    Pursuant to Ascension's instructions, if a slot was identified as having "protection" gloves, the entire slot was blocked from use. (Rakhunov Dec. Exh. 332_[Medline 30b6 Tr.] at 67:18-25).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be

annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

236.    Ascension Health, the end buyer of the gloves, testified that this audit revealed that there were significant inconsistencies across the gloves that would deem them unusable by Ascension's healthcare providers.  [Ascension Tr. , sperber Exhibit M at 48:8-49:2].

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).  Further, Ascension's testimony as to the results of a Medline "audit," constitutes hearsay within hearsay and is therefore inadmissible.

237.    As early as January 5, 2021, Weiner and Banon were put on notice by their shipping company that bills of lading did not list "Protection" gloves as medical devices as would be required for "Examination" gloves and that it was a "huge risk" if that statement was not accurate. (Rakhunov Dec., Exh. 36 [AKW002728- AKW002729]).

**RESPONSE**:  Denied.  There is no evidence that the referenced email is in any way connected to the transaction at issue between Kitchen Winners and Rock Fintek.  Further, the assertions in this paragraph are not material to the motions for summary judgment filed

by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

238.    Weiner admits and documents reflect that he received significant boxes of gloves labelled as "protection" gloves from GTS, the purported manufacturer and raised that issue with GTS. (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 114:19-25; Exh. 35 [Weiner Dep. Exhibit 5]).

> **RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

239.    On February 18, 2021, Weiner revealed his intentions, when complaining to GTS about a box that was labelled "Protection":

> We received the load of container number OOCU7022928.
> Please see attached photos of the boxes,

1) it does not say exam on the box, this is unacceptable

2) the factory in back of the box is different than the 510k

These 2 issues are major, I don't know how to solve this, my customer is throwing me back the merchandise, I don't have where to sell it now.

If I would have known this I wouldn't sell it to a government account *I would give it it to someone that doesn't look*.

(Rakhunov Dec., Exh. 35 [Weiner Dep. Exhibit 5]).

**RESPONSE**:  Denied.  Weiner did not "reveal his intentions," and nothing in the referenced email supports such an assertion.

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

240.    In a follow up email, Weiner does not suggest that any boxes in a given container may be different from others but is comfortable relying on container number when asking: "Please let me know **which container numbers** have this same problem." (Rakhunov Dec., Exh. 37 [AKW-003064 – 003066] (emphasis added)).

**RESPONSE**:  Admitted that the referenced email contains the quoted text.  The remainder of the assertions in this paragraph are denied.  The referenced email speaks for itself.

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint. *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

241.    Indeed, the Protection gloves from the same container about which Weiner complains to GTS were sold *to Rock Fintek* by JNS/Stern. (Frisch Dec., Exh. 6 [Ms. Li Chat] at p. 32 of 82; Rakhunov Dec., Exh. 21 [00000960-HBL - STSH2012150 (1583)]; Rakhunov Dec. Exh. 43 [Ms. Li Dec.]).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint. *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

242.    Weiner – the source of gloves for Rock Fintek and JNS – acknowledged in contemporaneous communications that boxes of gloves in any given container are the same.

(Rakhunov Dec., Exh. 38 [Weiner Dep. Exhibit 9] (Instructing warehouse staff: "Is it possible to open one box per container to see if it is the same? ***Each container is one type of box there are no 2 different boxes in a container*** …."  (emphasis added)).

> **RESPONSE**:  Denied.  Nothing in the referenced evidence supports the assertion that "Weiner" was "the source of gloves for Rock Fintek and JNS."
>
> Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

243.    At his deposition, Weiner acknowledged that each container should have the same type of boxes of gloves. (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 139:16-19).

> **RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material*

*facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).

244.    Stern's logistics provider testified that each pallet of gloves contained boxes from
the same container, and was labelled with the container number and the name of the selling party.
(Rakhunov Dec., Exh. 39 [Avrio Logistics Tr.] at 6:15-22, 10:22-13:19, 38:19-39:2; *see also* Exh.
40 [Avrio Dep. Exh. 1]; Exh. 32 [Jager (Medline 30(b)6 Tr.] at 66:2-66:11).

> **RESPONSE**: Denied.  The assertions in this paragraph are not material to motions for
> summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or
> to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the
> notice of motion a separate, short and concise statement . . . of the *material facts* as to
> which the moving party contends there is no genuine issue to be tried") (emphasis added).

245.    Stern acknowledged that when purchasing gloves, he received Packing Lists – that
he described as "tally sheets" – from his warehouses that included container numbers and some
details about the gloves, and that it was his custom and practice to review such documents.
(Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 68:16-69:20).

> **RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for
> summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,
> which specifically argue that – even if the gloves were nonconforming – Rock Fintek's
> third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on
> the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be
> annexed to the notice of motion a separate, short and concise statement . . . of the *material*

*facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).

246.    Contemporaneous documentary evidence and Stern's testimony confirm that
Stern/JNS received from his suppliers containers with significant amounts of gloves that were
plainly identified in contemporaneous Packing Lists as "Protection" gloves, not "Examination"
gloves. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 128:16-131:6; Exh. 42 [Stern Dep. Exh. 11];
Exh. 14 [Stern Tr. Day II] at 104:2-107:3; Exh. 44 [Compilation of Stern Dep. Exhs. 20, 22, 23,
24, 26]).

> **RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for
> summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,
> which specifically argue that – even if the gloves were nonconforming – Rock Fintek's
> third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on
> the causes of action set forth in its complaint.  See Local Rule 56.1(a) ("there shall be
> annexed to the notice of motion a separate, short and concise statement . . . of the material
> facts as to which the moving party contends there is no genuine issue to be tried")
> (emphasis added).

247.    Stern's invoices to Rock Fintek expressly referenced container numbers from
which the gloves were sourced. (Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 131:14-19; Exh. 45
[Sample of Stern Invoices]).

> **RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for
> summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,
> which specifically argue that – even if the gloves were nonconforming – Rock Fintek's

third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

248.    Contemporaneous documentary evidence, including Stern's invoices to Rock Fintek and Stern's testimony demonstrate that Stern knowingly sold significant amounts of "Protection" gloves to Rock Fintek. (*See* Rakhunov Dec., Exh. 13 [Stern Tr. Day I] at 77:25-78:10; 104:2-107:3, 131:14-19; Exh. 41 [Stern Dep. Exh. 20] (demonstrating that in April 2021, Stern/JNS sold to Rock Fintek approximately 9,000 cartons (9,000,000 gloves) of gloves, of which 6,139 cartons (6,139,000 gloves) were plainly identified in contemporaneous Packing Lists as from containers of "Protection" gloves); Exh. 44 [Stern Dep. Exhs. 20, 22, 23, 24, 26]).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

249.    When purchasing the gloves from GTS, Kitchen Winners received Packing Lists from GTS along with each shipment that identified specific container numbers for that shipment,

the types of gloves in each container (i.e. Examination or Protection), and quantity of gloves of each size. (Rakhunov Dec., Exh. 10 [Weiner Tr. Day I p.m.] at 157:8-158:12; Exh. 46 [Weiner Dep. Tr. Exh. 11]).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).  Further, Ascension's testimony as to the results of a Medline "audit," constitutes hearsay within hearsay and is therefore inadmissible.

250.    Packing Lists are required to accurately describe the product that is supposed to be in the container, which is a representation to the U.S. Customs made "in the normal course of business".  (Rakhunov Dec., Exh. 39 [Avrio Logistics Tr.] at 27:7-29:21).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material*

*facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).

251.    The following chart summarizes certain containers of gloves that various sellers
delivered to Rock Fintek that were unquestionably "Protection" gloves:

| Container # | Date of Shipment | Approx. Glove Quantity | Supporting Evidence | Box Label | Seller |
|---|---|---|---|---|---|
| MATU2723257 | 3/4/2021 | 3,000,000 | Rakhunov Dec. Exh. 4 at 5; Exh. 51 at 5. | Protection | Kitchen Winners |
| BMOU5449439 | 11-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 17, 51-54. | Protection | KW/Adorama |
| EGHU9883700 | 6-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 17-18, 39. | Protection | KW/Adorama |
| MATU2282716 | 6-May-21 | 2,600,000 | Rakhunov Dec. Exah. 51 at 7-10, 13-16, 36; Exh. 53. | Protection | KW/Adorama |
| MATU2310931 | 6-May-21 | 2,600,000 | Rakhunov Dec. Exh. 51 | Protection | KW/Adorama |

| | | | | | |
|---|---|---|---|---|---|
| | | | at 7-10, 13-16, 36. | | |
| MATU2621168 | 6-May-21 | 2,660,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| MATU2695094 | 6-May-21 | 3,205,000 | Rakhunov Dec. Exh. 51 at c-10, 13-16, 36. | Protection | KW/Adorama |
| MATU2709520 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 12. | Protection | KW/Adorama |
| MATU5164173 | 3-May-21 | 2,500,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| MATU5173637 | 7-May-21 | 2,500,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| SEGU4306317 | 7-May-21 | 2,200,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| SEGU4842243 | 3-May-21 | 3,200,000 | Rakhunov Dec. Exh. 51 | Protection | KW/Adorama |

| | | | at 7-10, 13-16, 36. | | |
|---|---|---|---|---|---|
| SMCU1018005 | 11-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| TCNU8493573 | 10-May-21 | 3,200,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| TRHU5523277 | 4-May-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | LevMed | KW/Adorama |
| TRHU5525114 | 11-May-21 | 2,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| TRHU5521973 | 3-May-21 | 2,000,000 | Rakhunov Dec. Exh. 51 at 7-10, 13-16, 36. | Protection | KW/Adorama |
| CBHU8904290 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Exh. 53. | Protection | KW/Adorama |
| CSNU7178458 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 | Protection | KW/Adorama |

| | | | | | |
|---|---|---|---|---|---|
| | | | at 59; Exh. 53. | | |
| BEAU4566776 | 4-Mar-21 | 1,500,000 | Rakhunov Dec. Exh. 51 at 49, 59. | Protection | KW/Adorama |
| MATU2709520 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Rakhunov Dec., Exh. 50 | Protection | KW/Adorama |
| TCLU8010739 | 27-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 59; Rakhunov Dec., Exh. 50 | Protection | KW/Adorama |
| MATU2630154 | 18-Mar-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 6. | Protection | KW/Adorama |
| MATU2728990 | 4-Mar-21 | 3,000,000 | Rakhunov Dec. Exh. 48; Exh. 51 at 49. | Protection | KW/Adorama |
| OOCU7022928 | Feb-21 | 3,000,000 | Rakhunov Dec. Exh. 51 at 41; Exh. 21 [Ms. Li Chat at 25]; Exh. 21. | Protection | Stern |

| | | | | | |
|---|---|---|---|---|---|
| KOCU4758119 | 24-Feb-21 | 1,928,000 | Rakhunov Dec. Exh. 42. | Protection | Stern |
| MEDU7201798 | 7-Apr-21 | 459,000 | Rakhunov Dec. Exh. 44 at p. 2; Exh 14 at 77-78. | Protection | Stern |
| TRHU7077889 | 7-Apr-21 | 2,840,000 | Rakhunov Dec. Exh. 44 at p. 2; Exh 14 at 77-78. | Protection | Stern |
| CAIU7364752 | 12-Apr-21 | 2,840,000 | Rakhunov Dec. Exh. 44 at p. 2; Exh 14 at 77-78. | Protection | Stern |
| ZCSU7197695 | 7-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 44 [Stern Exh. 23] at p. 12—27. | Protection | Stern |
| CSNU7773635 | 29-Apr-21 | 3,000,000 | Rakhunov Dec. Exh. 52; Exh. 51 at 2-4. | Protection | Stern |
| TRHU7078041 | 23-Apr-21 | 2,840,000 | Rakhunov Dec. Exh. 52; Exh. 51 at 60-61. | Stickered | Stern |
| | **TOTAL** | **86,072,000** | | | |

**RESPONSE**: Denied.  The assertions in this paragraph are not supported by the referenced evidence.  To the extent that Rock Fintek relies upon container numbers to establish that the containers had "Protection" stickers, Stern testified that the same container numbers are used over and over again in the industry, so an email referring to a container with a particular number holding certain goods is not evidence that the container later contained the same goods.  (Rakhunov Dec. at Exh. 13 [Stern Depo.] 133:1-134-25.)  Further, Rock Fintek has not submitted evidence that the referenced containers were actually delivered to Rock Fintek.

In addition, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

252.    Photographs taken by Rock Fintek at Medline warehouses in July 2021 reveal printed sheets of paper as labels on pallets of gloves bearing glove container numbers and, at times, names of the seller of the gloves (i.e. Kitchen Winners or Joel Stern). (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 40-41; Exh. 52 [examples of JNS/Stern Pallets with container numbers]; Exh. 53 [examples of Kitchen Winners/Adorama pallets with container numbers]).

**RESPONSE**:  Denied.  While printed sheets of paper appear on some of the pallets, it is unclear who created those pieces of paper, who placed them on the pallets, and what the numbers on the papers actually mean.

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

253.    Those labels were placed on the glove pallets by the logistics providers for the sellers - MD3PL or Avrio logistics, certainly not Rock Fintek. (Rakhunov Dec., Exh. 14 [Stern Tr. Day II] at 109:5-110:19; Exh. 32 [Jager Tr.] at 65:18-66:11; Exh. 39 [Avrio Logistics Tr.] at 6:15-22, 10:22-13:19, 38:19-39:2; *see also* Exh. 40 [Avrio Dep. Exh. 1]; Exh. 8 [Kato Dec.] at ¶ 40).

**RESPONSE**:  Denied.  The assertions in this paragraph are not supported by the referenced evidence.  It is unclear who created the referenced "labels" or who placed them on the pallets.

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes

of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

254.    Weiner admitted that if a box was "labelled correctly as a protection glove" that would not comply with Kitchen Winners' contract with GTS that purportedly called for "examination" gloves. (Sperber Dec., Exh. F [Weiner Tr. Day I a.m.] at 98:17-21).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

255.    By his admitted logic, if a box was labelled correctly as a protection glove that box would not comply with Kitchen Winners' contract with Rock Fintek that indisputably called for "examination" gloves. *Id.*

**RESPONSE**:  Denied. The assertions in this paragraph are not supported by the referenced documentation.  Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on

the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

256.   Contrary to his testimony, documentary evidence confirms that Weiner knowingly shipped "protection" gloves to JNS. (Rakhunov Dec., Exh. 49 [AKW-002865 – AKW-002889] (email from Weiner attaching SGS reports for Synthetic nitrile protection gloves; reports show elongation results that are inconsistent and non-conforming with ASTM D-6319 standards).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

257.   Following the completion of the transaction with Rock Fintek and after the dispute had arisen between the parties with respect to the nature of the gloves, the Adorama Parties and JNS continued to knowingly possess synthetic "protection" gloves in their respective inventories. (Rakhunov Dec., Exh. 54 ([AKW_004543 (and parent email and attachments); Exh, 55 [AKW_004550]; Exh. 56 [AKW_004595]).

**RESPONSE**:  Denied. The assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

258.    Weiner even admitted in September and October 2021 that he believed that gloves remaining in Kitchen Winners' inventory were a "hybrid Nitrile/Vinyl mix" or a "vinyl blend." (Rakhunov Dec., Exh. 57 [AKW_004580 & AKW_004665]).

**RESPONSE**: Denied. The email contained in Exhibit 57 fails to support the assertions in paragraph 258.  Further, an email from Qusai Kanchwala to Joseph Weiner as to what Mr. Weiner supposedly told him constitutes inadmissible hearsay. *See* F.R.E. 801; *see also* Local Rule 56.1 ("Each statement by the . . . opponent … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Further, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the

notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

259.     In addition, there is no dispute that gloves from Kitchen Winners/Adorama came from a Lot numbered T4. (Rakhunov Dec. Exh. 61 [Excerpt of Schwartz Report]; Exh. 24 [Schwartz Tr.] at 56:13-21).

**RESPONSE**: Denied.  The assertions in paragraph 259 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

260.     Gloves in Lot T4 had a sticker placed on them that said "Synthetic Nitrile Examination Gloves." (Rakhunov Exh. Dec. 8 at ¶ 40; Rakhunov Dec. Exh. 52).

**RESPONSE**: Denied.   The assertions in paragraph 260 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material*

*facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).

261.    When peeled off by fingernail, under the stickers, the boxes simply said "Synthetic
Nitrile Gloves."  Rock Fintek has preserved samples of those (and other) boxes to show to the jury.
(Rakhunov Exh. 8 [Kato Dec.] ¶ 40).

**RESPONSE**: Denied.  The assertions in paragraph 261 are not material to the motions for
summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,
which specifically argue that – even if the gloves were nonconforming – Rock Fintek's
third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover
on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be
annexed to the notice of motion a separate, short and concise statement . . . of the *material*
*facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).

262.    In a document produced in response to a subpoena by UL (Underwriters
Laboratories) – a testing facility - Rock Fintek learned that by June 2021 UL was investigating
reports of Weiner and Banon submitting falsified testing reports with respect to LevMed nitrile
gloves. (Rakhunov Dec. Exh. 11 [Weiner H 17M and 231023 Production Letter]).

**RESPONSE**: Denied.  The assertions in paragraph 262 are not material to the motions for
summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,
which specifically argue that – even if the gloves were nonconforming – Rock Fintek's
third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover
on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be

annexed to the notice of motion a separate, short and concise statement . . . of the *material*

*facts* as to which the moving party contends there is no genuine issue to be tried")

(emphasis added).   Further, the evidence cited in Rakhunov Dec. Exh. 11 constitutes

hearsay evidence inadmissible on a motion for summary judgment.

***Testing of Various Lots of Gloves in 2021 and During this Litigation Creates Reveals that the Gloves Are Polyvinylchloride Gloves that Do Not Meet ASTM DD-6319 Specifications***

263.     The boxes of MedCare gloves sold to Rock Fintek had a "Lot" number printed on

the side of the box. (Sperber Dec., Exh. G [Gilling Tr.] at 140:24-141:14; Rakhunov Exh. 26

[Poulton Report]; Rakhunov Exh. 59 [July 2021 Photographs of Lot Numbers]; Rakhunov Dec.,

Exh. 8 [Kato Dec.] at ¶ 42).

> **RESPONSE**: Denied.  The assertions in paragraph 263 are not material to the motions for
>
> summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,
>
> which specifically argue that – even if the gloves were nonconforming – Rock Fintek's
>
> third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover
>
> on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be
>
> annexed to the notice of motion a separate, short and concise statement . . . of the *material*
>
> *facts* as to which the moving party contends there is no genuine issue to be tried")
>
> (emphasis added).

264.     When inspecting gloves at Medline warehouses in July 2021, after being notified

that there was a problem with the gloves, Rock Fintek identified the following Lot numbers on

boxes of gloves purchased by Rock Fintek: 20201106; HFK-202103010101; HFK-2021050102;

MED202011;     MED202101;     MED202102;     MEDCARE202101;     MEDCARE202103;

QDMD01202002; T4; ZKMD01202101; ZKMD012; ZKMD202104, T202104,. (Rakhunov Dec.,

Exh. 60 [RF_004279-81]; Exh. 8 [Kato Dec.] at ¶¶ 38-39; Exh. 27 [Poulton Expert Report] at JP_003).

> **RESPONSE**: Denied.   Rock Fintek's reliance upon the expert report of Jason Poulton is entirely misplaced. According to William Huber, Defendants' expert, the Pulton report is, *inter alia*, "notable for its redundancies, its typographical errors, its inconsistencies, its lack of clarity, [and] evidence of unexplained omissions and revisions." In any event, The assertions in paragraph 264 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

265.    In October 2021, Ascension Health commissioned ARDL to conduct physical testing for ASTM D-6319 compliance on gloves sold to Rock Fintek from Lot numbers HFK-202103010101; HFK-2021050102; MED202011; MED202101; MED202102; ZKMD01202101; ZKMD202104. All of the gloves failed the ASTM D-6319 testing. (Rakhunov Dec. Exh. 27 [Poulton at JP_83-92]; Sperber Dec., Exh. M [Elstro Tr.] at 21:6-18)

> **RESPONSE**: Denied. Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced. According to William Huber, Defendants' expert, the "ARDL lab reports of glove testing (as compiled in Poulton (2024)) are inconsistent, riddled with typographical errors, incomplete, and do not clearly identify

most (if any) of the samples that were tested." (Declaration of Alexander J. Sperber dated April 5, 2024 ("Sperber April Decl.") at Exh. C.)  Huber further opined that the ARDL "results are difficult (if not impossible) to relate to each other, nor can they be related to warehouses, pallets, boxes, or any kind of "lots" of gloves." (*Id.*)  Importantly, Huber found that the ARDL report lacked "information that would permit drawing any kind of inferences about the remaining population of all unsampled gloves from these results." (*Id.*)

Moreover, John H. Carson Jr., PH. D, Rock Fintek's own statistician, suggested to Rock Fintek a sampling scheme to be followed in testing for the ASTM D6319 standard. Specifically, according to Dr. Carson, "specification standard ASTM D6319 calls for physical property testing to be performed in accordance with acceptance sampling standard ISO 2859-1, Sampling procedures for inspection by attributes-Part 1: Sampling schemes indexed by acceptance quality limit (AQL) for lot-by-lot inspection at quality level AQL (Acceptance Quality Limit) 4.0 under Special Inspection Level S-2." (*Id.*) Under this sampling standard, Dr. Carson opines that Rock Fintek LLC should have tested: "3 warehouses X 30 pallets/warehouse X 13 gloves/pallets," i.e., a total of 90 boxes of gloves and a total of 1,170 gloves, in order to "form[] an excellent basis for estimating the properties of the entire inventory of gloves." (*Id.*)  However, according to Alan Schwartz, Defendants' expert, "a review of Dr. Poulton's expert report indicates that Rock Fintek LLC did not follow the sampling scheme suggested by Dr. Carson." (Rakhunov Dec. Exh. 61 [Excerpt of Schwartz Report] at p. 2.)  In his report, Dr. Poulton states that "ARDL received 28 boxes (two boxes from 14 unique lots) of unopened gloves labeled 'Medcare'" and that "[o]ne box from each of the 14 unique lots was submitted for ... analytical tests ...

" (Rakhunov Dec. Exh. 27 [Poulton Expert Report] at JP_001). That is, ARDL tested only 14 boxes of gloves and did not follow the ISO 2859-1 sampling scheme suggested by Dr. Carson. Accordingly, the testing performed by Rock Fintek was inadequate and the results are not in any way representative of all the gloves stored at all eleven warehouses.

In any event, the assertions in paragraph 265 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

266.    Following the discovery of problems with the gloves, Rock Fintek established direct contact with Anna Grinvald and Yosi Atias of Global Tooling Services LTD, the purported manufacturer in China of MedCare brand gloves. On or about July 26, 2021, GTS provided Rock Fintek with copies of testing reports concerning the various lots of gloves that GTS claimed in sold to Rock Fintek. Most of these reports, which were produced in discovery, either identify particular Lot numbers of gloves to which they pertain or include photographs of gloves boxes displaying the Lot numbers. The Lot numbers on the reports provided by GTS match up with Lot numbers that Gilling and Kato observed on boxes at Medline warehouses. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶¶ 42-44).

**RESPONSE**: Denied.  The assertions in paragraph 266 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).  Further, communications from non-party GTS constitute hearsay evidence inadmissible on a motion for summary judgment.

267.   In early December 2021, Ascension Health commissioned ARDL to conduct polymer testing on gloves from Lot numbers HFK-202103010101, MED202101, and ZYMD01202103 – a proposed replacement glove provided by GTS based on a purported new formula.  (Rakhunov Dec. Exh. 27 Poulton Report at JP_074-82; Sperber Dec., Exh. M [Ascension Tr.] at 21:19-22:1; Rakhunov Dec. Exh. 8 [Kato Dec.] at ¶ 42).

**RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  In any event, the assertions in paragraph 267 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the

*material facts* as to which the moving party contends there is no genuine issue to be tried")
(emphasis added).

268.    Gloves from Lots HFK-202103010101 and MED202101 tested as Polyvinyl
Chloride with no detectible levels of Nitrile. (Rakhunov Dec. Exh. 27 Poulton Report at JP_074-
82).

> **<u>RESPONSE</u>**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's
> reliance upon the expert report of Jason Poulton and the testing performed by ARDL is
> entirely misplaced.  Further, the ARDL testing results found in the Poulton Report are
> contradicted by the testing results of both SGS and ARDL found in the expert report of
> Alan Schwartz. Specifically, Alan Schwartz oversaw the testing of gloves from lot number
> 202103010101, and determined that the gloves tested were in fact nitrile.  In any event, the
> assertions in paragraph 268 are not material to the motions for summary judgment filed by
> either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that –
> even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be
> dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in
> its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a
> separate, short and concise statement . . . of the *material facts* as to which the moving party
> contends there is no genuine issue to be tried") (emphasis added).

269.    Gloves from the proposed replacement Lot ZYMD01202103, however, tested
positive for Nitrile content. (*Id.*)

> **<u>RESPONSE</u>**: Denied.  The assertions in paragraph 269 are not material to the motions for
> summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz,

which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

270.    In December 2021, Rock Fintek commissioned ARDL to conduct polymer testing of gloves from Lot numbers 20201106, HFK-202103010101, HFK-2021050102, T4, MEDCARE202101, QDMD01202002, MED202102 and ZKMD012. Rakhunov Dec. Exh. 27 Poulton Report at JP_042-48).

> **RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  In any event, the assertions in paragraph 270 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

271.    All of the gloves from those Lots tested as Polyvinylchloride with no detectible levels of Nitrile. (*Id.*).

**RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  Further, the ARDL testing results found in the Poulton Report are contradicted by the testing results of both SGS and ARDL found in the expert report of Alan Schwartz. Specifically, Alan Schwartz oversaw the testing of gloves from many of the same lots that Rock Fintek claims to have tested, and determined that the gloves tested were in fact nitrile. In any event, the assertions in paragraph 271 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

272.    Rock Fintek also had MedCare gloves tested from a proposed *replacement* lot ZYMD01202103, which was NOT sold to Rock Fintek by any of the Adorama Parties or JNS Parties. Unlike the gloves sold to Rock Fintek, those gloves tested positive for Nitrile content. (Rakhunov Dec. Exh. 27 Poulton Report at JP_036-39).

**RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  Further, the ARDL testing results found in the Poulton Report are contradicted by the testing results of both SGS and ARDL found in the expert report of Alan Schwartz. Specifically, Alan Schwartz oversaw the testing of gloves from many of

the same lots that Rock Fintek claims to have tested, and determined that the gloves tested were in fact nitrile. In any event, the assertions in paragraph 272 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint. *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

273.    In December 2023 and January 2024, during this litigation, ARDL tested for Polymer identification and ASTM D-6319 specifications additional gloves that were sold to Rock Fintek from Lot numbers : T202104, 20201106; HFK-202103010101; HFK-2021050102; MED202011;     MED202101;     MED202102;     MEDCARE202101;     MEDCARE202103; QDMD01202002; T4; ZKMD01202101. (Rakhunov Dec. Exh. 27 Poulton Report at JP_003-25).

**RESPONSE**: Denied.  The assertions in paragraph 273 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint. *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

274.     All of the gloves tested by ARDL from these Lots tested as Polyvinyl Chloride with no detectible levels of Nitrile, and all of the gloves failed to meet ASTM D-6319 standards. (Rakhunov Dec. Exh. 27 [Poulton Report] at JP_003-25]).

**RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  Further, the ARDL testing results found in the Poulton Report are contradicted by the testing results of both SGS and ARDL found in the expert report of Alan Schwartz. Specifically, Alan Schwartz oversaw the testing of gloves from many of the same lots that Rock Fintek claims to have tested, and determined that the gloves tested were in fact nitrile.  In any event, the assertions in paragraph 274 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

275.     ARDL has analyzed multiple lots of gloves labeled "nitrile" on boxes and found them to be in fact vinyl rubber. The absence of detectable nitrogen also confirms that the gloves in question do not contain a detectable amount nitrile rubber. (Rakhunov Dec. Exh. 27 [Poulton Report] at JP_024).

**RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  Further, the ARDL testing results found in the Poulton Report are contradicted by the testing results of both SGS and ARDL found in the expert report of Alan Schwartz. Specifically, Alan Schwartz oversaw the testing of gloves from many of the same lots that Rock Fintek claims to have tested, and determined that the gloves tested were in fact nitrile.  In any event, the assertions in paragraph 275 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

276.     Compared to nitrile rubber, gloves made from vinyl rubber are unsuitable for use in medical applications due to their inferior physical properties as shown in ASTM D-6319 testing as well as their inferior chemical resistance to materials commonly found in a medical environment such as alcohols and hazardous drugs. (*Id*).

**RESPONSE**: Denied.  As stated in Response to Paragraph 265 above, Rock Fintek's reliance upon the expert report of Jason Poulton and the testing performed by ARDL is entirely misplaced.  In any event, the assertions in paragraph 276 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock

Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

277.    Adorama Parties' glove expert admitted that ARDL is a qualified lab to do chemical and physical testing of gloves and, in fact, chose ARDL as the lab to conduct certain testing in this case. (Rakhunov Dec. Exh. 24 [Schwartz Tr.] at 30:20-23).

**RESPONSE**: Denied.  The assertions in paragraph 277 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, which specifically argue that – even if the gloves were nonconforming – Rock Fintek's third-party complaint must still be dismissed and Kitchen Winners' is entitled to recover on the causes of action set forth in its complaint.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

***Significant Factual Disputes Exist as to Quantities of Gloves Delivered and the cause of any Allegedly Delayed Payments under the SPA***

278.    The delivery of the wrong brand (LevMed) gloves by Adorama Sellers crippled Rock Fintek's cash flow and delayed payments. (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 11; Sperber Dec., Exh. D [Kato 30(b)(6) Tr.] at 278:2-7; Sperber Dec., Exh. G [Gilling Tr.] at 150:10-151:4; ).

**RESPONSE**: Admitted that Rock Fintek maintains that delivery of the LevMed gloves delayed its receipt of one or more payments from Ascension.

279.    As of April 28, 2021, Rock Fintek had paid for more gloves than the Adorama Sellers had delivered. (Rakhunov Dec., Exh. 4 [Mendel Rock Chat highlighted] at 11).

**RESPONSE**: Denied.  While Brad Gilling asserts, in the referenced chat, that Rock Fintek was "one container short from what we have paid," it is unclear how Gilling would have personal knowledge of this purported fact.  Gilling testified that Rock Fintek did not count gloves on its own, and instead relied entirely upon non-party MedLine to count.  (Sperber Dec., Exh. G [Gilling Tr.] at 90:12-17.)

280.    In a contemporaneous email to Mendlowitz attaching a delivery report, Weiner admitted that some loads sold to Rock Fintek "have less quantities, but their payments was always for full loads." (Rakhunov Dec., Exh. 5 [Email Compilation] at AKW001598).

**RESPONSE**: Admitted.

281.    In yet another email to Mendlowitz, Weiner admitted that there was an "[o]verage" beyond what was supposed to be delivered and that there was a dispute as to whether 22,760 boxes (2,276,000 gloves) were even delivered. (*Id.* at AKW001909).

**RESPONSE**: Admitted that the referenced email contains the word "overage."  However, the email does not state that the "overage" is an amount "beyond what was supposed to be delivered."  Rather, it appears from the context that it refers to the number of gloves delivered in excess of the contract amount.  Rather than being "beyond what was supposed

to be delivered," these are gloves that Rock Fintek requested that Kitchen Winners supply. (Sperber Dec. at Exh. Z. [Weiner Dec.] at ¶¶ 23-25.)

Denied that there was "a dispute as to whether 22,760 boxes (2,276,000 gloves) were even delivered." While Weiner's email makes clear that there was some kind of "dispute," which is not described, he also makes clear that the gloves were delivered "according to BOLs."

***Rock Fintek Can Demonstrate with Reasonable Certainty that it Would Have Continued Doing Significant Business with Ascension but for the Non-Conforming MedCare Gloves***

282.    Ascension testified that it was "highly likely" that it would have "continued to engage" in business with Rock Fintek but for the bad gloves. Ascension testified that as a result of the counterfeit gloves Rock Fintek missed out on opportunities to sell to Ascension not only gloves but other medical supply needs that came up, such as wheelchairs and walkers, crutches and canes, and any other medical supply needs that would come up. (Sperber Dec., Exh. M [Ascension Tr.] at 37:14-38:8).

> **RESPONSE**:   Denied that any of the gloves supplied by Kitchen Winners were "counterfeit." The remaining assertions in this paragraph are admitted.

283.    Ascension testified that as of June 2021, it has just purchased a 6-month supply of gloves and was not interested in buying more gloves "*at that moment*." (Sperber Dec., Exh. M [Ascension Tr.] at 55:23-56:5).

> **RESPONSE**:   Admitted that Ascension testified that was not interested in purchasing additional gloves. Ascension further clarified that it estimated that it had gloves "well north of six months of usage." (Sperber Dec., Exh. M [Ascension Tr.] at 56:1-5)

284.    Ascension was still experiencing some blips in the supply chain at the time of deposition. (*Id.* at 41:21).

**RESPONSE**:  Admitted that Ascension testified that there were still some blips in the supply chain.  Ascension further clarified that those blips were "nowhere like it was going back three years ago" and that "things have certainly settled down. They're nowhere like they were back in 2020 and 2021."  (Sperber Dec., Exh. M [Ascension Tr.] at 41:18-23.)

285.    Other suppliers similarly situated to Rock Fintek were continuing doing business with Ascension through at least late 2023, including selling gloves, which is business that Rock Fintek would have been a part of but for the bad gloves, earning at least two more years of revenue. (*Id.* at 41:21; 17:25-18:21; Rakhunov Exh. 8 [Kato Dec.] at ¶ 18).

**RESPONSE**:  Admitted that Ascension testified that other suppliers were supplying goods to Ascension at the time of the deposition.  The remaining assertions in paragraph 285 are denied.  Ascension did not testify that Rock Fintek would have "earn[ed] at least two more years of revenue" "but for the bad gloves."  Ascension specifically testified that it was not interested in buying additional gloves from Rock Fintek after June 2021.  (Sperber Dec., Exh. M [Ascension Tr.] at 56:1-5)  Ascension additionally did not testify that those suppliers that were selling gloves to it during the pandemic, are still selling it gloves at this time.  It merely testified that it is still buying unspecified goods from those companies.

286.    No one disputes that Rock Fintek did $62 million of business with Ascension on purchase orders placed between March 2020 and March 2021. Had Adorama Sellers and JNS/Stern delivered good gloves, Kato expected with certainty that Rock Fintek would have done at least the same amount of business with Ascension from July 2021 through November 2023 and beyond at

similar profit margins of approximately 50%. In other words, Rock Fintek should be allowed to argue to the jury that based on its track record with Ascension , the high likelihood of future business and overall average profit margins it would have earned upwards of $30 million a year in profits for three years. (Rakhunov Exh. 8 [Kato Dec.] at ¶ 19.)

> **RESPONSE**: Admitted that Rock Fintek did approximately $62 million of business with Ascension, which includes the gloves at issue in this lawsuit.  Admitted that "Kato expected with certainty that Rock Fintek would have done at least the same amount of business with Ascension from July 2021 through November 2023 and beyond at similar profit margins of approximately 50%."  Denied that there is any evidence for Kato's beliefs.  The remaining assertions in paragraph 286 regarding what Rock Fintek should be permitted to argue to a jury constitute legal arguments or conclusions, which are inappropriate for inclusion in a statement of material facts.

287.    Ascension's chief operating officer at the time Todd Adams and vice president for supply chain Dewayne Rader had conversations with Rock Fintek about long term potential business with Rock Fintek, including bidding on a $1 billion glove contract. (Sperber Dec., Exh. M [Ascension Tr.] at 39:15-40:25; Sperber Decl. Exh. D [Kato Tr.] at 60:4-12; Sperber Decl. Exh. G [Gilling Tr.] at 256:9-19).

> **RESPONSE**: Denied.  Ascension testified that "We never talked to them about a specific, like, long-term contract or bidding on a long-term nitrile glove business for the organization."  (Sperber Dec. at Exhibit "M" [M. Elstro Transcript] at 40:1-41:9)  Further, Rock Fintek has withdrawn any claims arising out of the purported long term potential business with Rock Fintek, including bidding on a $1 billion glove contract.  (Rakhunov

Dec., Exh. 8 [Kato Dec.] at ¶20.)  Accordingly, the assertions in paragraph 287 are not

material to the motions for summary judgment filed by either Kitchen Winners, Adorama,

or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there

shall be annexed to the notice of motion a separate, short and concise statement . . . of the

*material facts* as to which the moving party contends there is no genuine issue to be tried")

(emphasis added).

288.    Ascension testified that had Rock Fintek been able to clear those hurdles, it would

have had a "leg up" in bidding on future long-term Ascension business given its past working

business relationship with Ascension. (Sperber Dec., Exh. M [Elstro Tr.] at 64:18-21).

**RESPONSE**:  Admitted that Rock Fintek would have had a "leg up."  Ascension clarified

that the hurdles that Rock Fintek would need to clear in order to have the "leg up" were as

follows:

> [Rock Fintek would] need to clear *some major hurdles* to do that, we would
> have discussions with them, just like we would other Suppliers. But to get
> into that medical space, supply space, Todd and Dwayne let Rock Fintek
> know, one, you've got to go through all the FDA approvals, right. And that
> is *no small hurdle*. And two, you're also dealing with -- when you talk about
> gloves and PPE and masks, you're talking about some *ginormous
> companies* and organizations that they would have to get very competitive
> on price. So there were a *couple of big hurdles* there, but if they were willing
> to clear those, then we would certainly talk to them. But they would have to
> look at winning the business. It wasn't just going to be given to them. . . .

(Sperber Dec., Exh. M [Elstro Tr.] at 40:1-41:9.)  Further, Rock Fintek has withdrawn any

claims arising out of the purported long term potential business with Rock Fintek, including

bidding on a $1 billion glove contract.  (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶20.)

Accordingly, the assertions in paragraph 288 are not material to the motions for summary

judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock

Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

289.    Rock Fintek also had plans to sell COVID-19 kits to Ascension and was in the process of obtaining FDA approval for those kits.  (Sperber Dec., Exh. Y [Kato Damages Tr.] at 11:7-9; 67:4-9).

> **RESPONSE**:  Admitted that Kato testified that Rock Fintek was "making a Covid test to give them" and "had multiple FDA attorneys on retainer that we were already working with."  Kato further testified that the supposed test kits were never FDA approved.  (Kato Tr. at 60:4-25.)   However, Rock Fintek has withdrawn any claims arising out of the purported long term potential business with Rock Fintek, including its alleged plans to sell Covid-19 test kits.  (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶20.)   Accordingly, the assertions in paragraph 289 are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  *See* Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).

290.    The Adorama and JNS parties appear to focus in their papers on the potential longer term annual contract for $1 billion dollars of glove sales that Kato discussed with Ascension and Covid-19 test kits that Rock Fintek was developing for Ascension. While Rock Fintek did lose the opportunity to bid on that contract and to pursue the Covid-19 test kit sales because of the bad gloves, the existence (and loss) of that opportunity does not form the basis of Rock Fintek's lost

profits claim but further demonstrates the strong commercial relationship that had developed between Rock Fintek and Ascension in 2020 and early 2021. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 23.

**RESPONSE**:  Denied. The assertions in paragraph 290 constitute legal arguments or conclusions, which are inappropriate for inclusion in a statement of material facts.

291.    As Kato testified, based on his extensive experience as an entrepreneur, Rock Fintek would have done more revenue with Ascension and its affiliates going forward than it did in the past. For example, by April 2021, Kato had been connected by Ascension to St. John of God Health Care hospital in Australia, which described Rock Fintek as "a reliable supplier to Ascension's circa 200 hospitals" whom St. John's was "close" to using as a PPE supplier in Australia. (Rakhunov Dec., Exh. 47 [RF_003489]; Sperber Dec., Exh. Y [Kato Damages Tr.] at 29:16-30:2; Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 21.)

**RESPONSE**:   Admitted that Kato testified that Rock Fintek would have done more revenue with Ascension and its affiliates going forward than it did in the past.  Denied that there is any evidence to support those assertions.   Moreover, the assertion that St. John of God Health Care hospital "described Rock Fintek as 'a reliable supplier to Ascension's circa 200 hospitals' whom St. John's was 'close' to using as a PPE supplier in Australia, constitutes inadmissible hearsay.  In addition, as Rock Fintek has asserted that its potential business relationship with St. John of God Health Care does not form a part of its damages calculation, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  See Local Rule 56.1(a) ("there shall be annexed to the notice of

motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added). Accordingly, any assertions pertaining to a potential relationship between Rock Fintek and St. John of God Health Care are denied.

292.     By late 2021, Rock Fintek had an order for 4 million masks from St. John of God, which was reduced, after the delivery of the bad gloves, to approximately 100,000 masks for a total payment of $95,290. Instead of buying 4 million masks, the April 14, 2022 wire transfer for $95,290.91 in Rock Fintek's bank records is the total amount of business that St. John did with Rock Fintek despite referring to it as a reliable supplier just months earlier. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 22 & Figure 2.)

**RESPONSE**:  Denied.  Rock Fintek's assertion that St. John of God gave it a purchase order, or that the purchase order was reduced, constitutes inadmissible hearsay.  Tellingly, Kato has not attached a copy of that purchase order to his declaration, nor was one produced during discovery.

In addition, as Rock Fintek has asserted that its potential business relationship with St. John of God Health Care does not form a part of its damages calculation, the assertions in this paragraph are not material to the motions for summary judgment filed by either Kitchen Winners, Adorama, or Joseph Mendlowitz, or to Rock Fintek's response thereto.  See Local Rule 56.1(a) ("there shall be annexed to the notice of motion a separate, short and concise statement . . . of the *material facts* as to which the moving party contends there is no genuine issue to be tried") (emphasis added).  Accordingly, any assertions pertaining to a purported relationship between Rock Fintek and St. John of God Health Care are denied.

293.    Following discovery of the non-conforming gloves in July 2021, Kato continued to closely monitor prices, trends and demand in the PPE market, including as part of Rock Fintek's efforts to mitigate its damages, including finding a potential buyer for the MedCare gloves and to find potential replacement gloves for Ascension. While PPE prices fluctuated and ultimately went down from the levels they were at in early 2021, the demand and profit margins for PPE sales remained steady and have remained steady through this day. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 23).

> **RESPONSE**:  Admitted that Kato claims that he continued to closely monitor prices, trends and demand in the PPE market, including as part of Rock Fintek's efforts to mitigate its damages, including finding a potential buyer for the MedCare gloves and to find potential replacement gloves for Ascension.  Denied that the demand and profit margins for PPE sales remained steady and have remained steady through this day.

### Rock Fintek Faces Exposure to Significant Liability to Ascension for Which Adorama Sellers and JNS/Stern Are Liable

294.    Since discovery by Ascension of the bad gloves, Ascension refused to do further business with Rock Fintek and threatened legal action. Ascension sent Rock Fintek a demand letter dated March 16, 2022, and has demanded that Rock Fintek make Ascension whole. From Ascension's perspective, its damages include a loss of the gloves, close to $37 million it paid to Rock Fintek, and north of $2 million in holding costs that continue to grow. (Sperber Dec., Exh. M [Elstro Tr.] at 28:13-29:1; Rakhunov Dec., Exh. 62; Exh. 8 [Kato Dec.] at ¶ 44).

> **RESPONSE**:  Admitted that Ascension sent a letter, dated March 16, 2022.  The referenced Ascension letter speaks for itself.

295.    Ascension testified that they have not been made whole and the situation is unresolved. (Sperber Dec., Exh. M [Elstro Tr.] at 35:9-36:1).

**RESPONSE**:  Admitted that Ascension testified that the situation is unresolved.

296.    Although Ascension has not sued Rock Fintek as of this date, Ascension has not given Rock Fintek any releases or assurances, and Rock Fintek views the exposure to Ascension as a serious and significant ongoing claim worth tens of millions of dollars that, among other things, has caused Rock Fintek to go out of business. (Rakhunov Dec., Exh. 8 [Kato Dec.] at ¶ 45).

**RESPONSE**:   Admitted that Kato claims that Rock Fintek "views the exposure to Ascension as a serious and significant ongoing claim worth tens of millions of dollars that, among other things, has caused Rock Fintek to go out of business."  Admitted that Ascension has not sued Rock Fintek as of this date.  Denied that there is any evidence that Rock Fintek went out of business because of any potential legal exposure to Ascension.

297.    In April 2023, Rock Fintek filed a lawsuit in Florida Circuit Court against Hunton Andrews Kurth LLP, the law firm that did the due diligence in connection with the theft in Thailand of $6.2 million. In that lawsuit Rock Fintek never sought to blame Hunton directly for the destruction of the business with Ascension but rather claimed that the alleged misconduct in that case led Rock Fintek to doing business with the Adorama Sellers and JNS/Stern, which is the actual cause of the destruction of the Ascension relationship and exposure to Ascension for tens of millions of dollars for the bad gloves. The case against Hunton has settled confidentially before any discovery took place. (*Id.* ¶ 46.)

**RESPONSE**: Admitted that Kato claims to have filed a lawsuit in Florida Circuit Court against Hunton Andrews Kurth LLP. The allegations of the lawsuit speak for itself. As explained at length in Defendants' papers, Defendants deny that Rock Fintek's "business with the Adorama Sellers and JNS/Stern, [] is the actual cause of the destruction of the Ascension relationship and exposure to Ascension for tens of millions of dollars for the bad gloves."

Dated: Kew Gardens, New York
      April 5, 2024

                    **LIPSIUS-BENHAIM LAW LLP**
                    *Attorneys for Kitchen Winners NY Inc., Adorama Inc., and Joseph Mendlowits*

                By: _____
                    Alexander J. Sperber
                    Yisroel Steinberg
                    Meir Z. Goldberg
              80-02 Kew Gardens Road, Suite 1030
              Kew Gardens, New York 11415
              Telephone: 212-981-8440
              Facsimile: 888-442-0284
              asperber@lipsiuslaw.com
              ysteinberg@lipsiuslaw.com
              mzgoldberg@lipsiuslaw.com