UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KITCHEN WINNERS NY INC., | | |
| | Plaintiff, | 22 Civ. 5276 (PAE) |
| -v- | | <u>OPINION & ORDER</u> |
| ROCK FINTEK LLC, | | |
| | Defendant. | |

ROCK FINTEK LLC,

                               Third-Party Plaintiff and
                               Counter Claimant,

              -v-

KITCHEN WINNERS NY INC.,

                               Counterclaim Defendant,

JNS CAPITAL HOLDINGS LLC, JOEL STERN,
HERSHEY WEINER, JOSEPH MENDLOWITZ,
ADORAMA, INC.

                               Third-Party Defendants.

PAUL A. ENGELMAYER, District Judge:

      The claims in this case involve a series of COVID-era transactions for the supply of

synthetic gloves. Before the onset of the pandemic, none of the parties in this case were in the

business of manufacturing or supplying Personal Protective Equipment ("PPE"). Each, to some

extent, saw a business opportunity in this space in the weeks and months following March 2020.

Central to the events here, defendant Rock Fintek, LLC ("Rock Fintek") secured a contract to supply gloves with certain specifications for use by Ascension Health Alliance ("Ascension"), a large nationwide hospital group. Rock Fintek eventually connected with the other parties, each of which by then had entered the PPE-supply business, and which each then took on a role supplying Rock Fintek and its customer Ascension with the required gloves. Negotiations, transactions, shipments, and deliveries followed. So did disagreements, dysfunction, and discord. And the parties' ill-documented and at times seemingly chaotic course of dealings leaves aspects of these difficult to reliably reconstruct.

In 2021, Ascension notified Rock Fintek that its hospital facilities were having problems with the substandard gloves Rock Fintek had supplied. Thereafter, Rock Fintek lost its fledgling business relationship with this hospital. Its nascent PPE business also cratered. These events spawned this litigation. Plaintiff Kitchen Winners NY Inc. ("Kitchen Winners"), a supplier of gloves to Rock Fintek, initiated this action in state court, suing Rock Fintek for breach of contract based on Rock Fintek's failure to pay approximately $1 million allegedly due it. Rock Fintek removed to this Court. It brought counterclaims against Kitchen Winners and impled multiple third-party defendants, which it blamed for furnishing it with substandard gloves.

Following contentious and prolonged discovery, the Court is now presented with several sets of motions for summary judgment. Each is brought against Rock Fintek; Rock Fintek does not itself move or cross-move for relief. Kitchen Winners, both as plaintiff and as counterclaim-defendant, moves for summary judgment on its claims against Rock Fintek and on Rock Fintek's counterclaims against it. The remaining third-party defendants—JNS Capital Holdings LLC

("JNS") and its sole member Joel Stern, Adorama, Inc. ("Adorama") and its executive Joseph Mendlowitz[1]—move for summary judgment on Rock Fintek's claims against them.

For the reasons that follow, the Court (1) denies Kitchen Winners' motion for summary judgment on its claims against Rock Fintek and (2) grants in part and denies in part all other summary judgment motions. The decision, although pruning this litigation, leaves substantial claims standing. These will now proceed to trial.

## I.    Background

### A.    Factual Background[2]

The following summary presents, with such clarity as the challenging discovery record permits, the events on which the pending motions turn.

---

[1] The Court has previously dismissed all claims against an additional third-party defendant, Kitchen Winners' employee Joseph Weiner, a/k/a "Hershey Weiner," whom Rock Fintek had sued. *See infra*, n.17.

[2] The Court draws the following facts from the parties' submissions in support of and in opposition to the pending summary judgment motions. These include the following: (1) the parties' joint statement of undisputed facts ("JSF"), Dkt. 135, and attached exhibits; (2) JNS and Stern's Local Rule 56.1 statement, Dkt. 136, Ex. 1 ("JNS 56.1"); the declarations of Joel Stern, Dkt. 136, Ex. 2 ("Stern Decl.") and of Avram Frisch, *id.*, Ex. 3 ("Frisch Decl."), in support of JNS and Stern's motion, and attached exhibits; Kitchen Winners', Adorama's, and Mendlowitz's Local Rule 56.1 statement, Dkt. 137, Ex. 1 ("Kitchen Winners/Adorama 56.1"); the declaration of Alexander J. Sperber, Dkt. 141 ("Sperber Decl.") in support of Kitchen Winners' and Adorama's motions, and attached exhibits; Rock Fintek's Local Rule 56.1 counter-statements to Kitchen Winners' and Adorama's Local Rule 56.1 statement, Dkt. 147 ("Rock Fintek 56.1") and to JNS and Stern's Local Rule 56.1 statement, Dkt. 148 ("Rock Fintek JNS 56.1"); the declaration of Phillip Rakhunov in opposition to all motions for summary judgment, Dkt. 146 ("Rakhunov Decl.") and attached exhibits; as well as Adorama and Kitchen Winners' additional Local Rule 56.1 statement, Dkt. 159 ("Kitchen Winners/Adorama Reply 56.1"); and a reply declaration of Alexander J. Sperber, Dkt. 156 ("Sperber Reply Decl."), and attached exhibits.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the

### 1.    The Parties

This case involves numerous corporate entities and their officers and representatives, all of whom came to be involved, after early 2020, in the purchase and sale of PPE following the onset of the COVID-19 pandemic.

Plaintiff and counterclaim-defendant Kitchen Winners is a New York corporation. JSF ¶ 1. Kitchen Winners' sole shareholder is Yitty Weiner; Kitchen Winners also identifies her as its president, although Rock Fintek contests that Kitchen Winners has a president. *Id.* ¶ 2; Rock Fintek 56.1 ¶ 12. Yitty Weiner's husband, Joseph Weiner—a/k/a "Hershey Weiner"—runs Kitchen Winners' day-to-day operations. JSF ¶ 5. Kitchen Winners was originally founded as an online outlet for kitchen wares. At the start of the pandemic, it "expanded its business to focus on the sale of Personal Protective Equipment ("PPE")." *Id.* ¶ 4.

Defendant, third-party plaintiff, and counterclaim-plaintiff Rock Fintek is a limited liability company formed in Delaware to facilitate sales of goods from China to the United States. *Id.* ¶ 8; Rock Fintek 56.1 ¶ 4; *see also* Frisch Decl., Ex. 2 ("Kato 30(b)(6) Dep.") at 16. Thomas Kato is Rock Fintek's sole member. Bradley Gilling was Rock Fintek's chief operating officer at all relevant times. JSF ¶¶ 9–10.

Third-party defendant Adorama, a New York corporation, is an e-commerce company that specialized, before the pandemic, in photography and video-related goods. Kitchen Winners/Adorama 56.1 ¶ 8. In 2020 and 2021, Adorama appears to have advertised for sale various types of "nitrile"—a synthetic compound—gloves. Rock Fintek 56.1 ¶ 8. Eugene

---

statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Mendlowitz is Adorama's sole owner; third-party defendant Joseph Mendlowitz[3] directs multiple Adorama departments. Kitchen Winners/Adorama 56.1 ¶ 10. In this litigation, Rock Fintek claimed at times that Adorama was an "alter ego" of Kitchen Winners, but it has abandoned that claim; the exact relationship between these entities is in dispute. *See* Rock Fintek 56.1 ¶¶ 17, 19.

Third-party defendant JNS, an LLC, was formed for the purpose of selling PPE during the pandemic. JSF ¶ 11. Third-party defendant Joel Stern is JNS's sole member. *Id.* ¶ 13. During the pandemic, JNS sold, as PPE, MedCare brand gloves. *Id.* ¶ 12. As of October 2023, JNS's bank account was empty. *Id.* ¶ 15.

### 2. 2020-2021: Rock Fintek's Entry Into the PPE Business and its Agreement to Supply Hundreds of Millions of Gloves to Ascension

In or around 2018, Kato formed Rock Fintek. Kato 30(b)(6) Dep. at 16. At the onset of the COVID-19 pandemic, when demand dipped for products it had been sourcing from China, Rock Fintek shifted to selling PPE. *Id.* at 24–25. Rock Fintek represents that, between March 2020 and June 2021, it obtained approximately $100 million in revenue from the PPE business. Rock Fintek 56.1 ¶ 156. Taking into account these revenues and its payments to "primar[y]" suppliers of PPE and to trucking or logistics companies it used in connection with its PPE business, Rock Fintek estimates its "average profit margin" in 2020 and 2021 as "approximately 50%." *Id.* ¶¶ 156–61.

Rock Fintek's first PPE client was Ascension, a large hospital chain. Kato 30(b)(6) Dep. at 27.[4] Kato, Rock Fintek's Rule 30(b)(6) representative, states that Rock Fintek obtained this

---

[3] The parties alternatively spell this name as Mendlowits or Mendlowitz. The Court heeds the latter, as it is the named used in the filing of this action.

[4] Rock Fintek claims it had other PPE clients, including the City of New York, Prisma Health, and Delta Airlines. Kato 30(b)(6) Dep. at 27.

contract after Kato was introduced to Ascension by an acquaintance who did real estate work with Ascension in St. Louis.  Ascension was interested in whether Rock Fintek had connections in China to obtain PPE.  *Id.* at 26.  Rock Fintek asked intermediaries with whom it already sourced other products whether they had access to PPE; the intermediaries indicated yes.  *Id.* Kato also learned he had a "close family connection" to an Ascension executive, which "positioned Rock Fintek to solidify a long-term relationship with Ascension."  Rakhunov Decl., Ex. 8 ¶ 3.

In or around March 2020, Rock Fintek began doing business, and entered into a series of contracts, with Ascension, which became Rock Fintek's largest client.  Kato 30(b)(6) Dep. at 26, 53; Frisch Decl., Ex. 1 ("Gilling Dep.") at 31.  The first was entered into in September 2020.  All involved the sale of PPE—specifically gloves, masks, and gowns.  Kato 30(b)(6) Dep. at 53; *see also* JSF ¶ 86.  Between March 2020 and December 2020, Rock Fintek's bank records reflect receiving approximately $23 million in payments from Ascension for products other than the gloves at issue in this case.  Rock Fintek 56.1 ¶ 151; Kitchen Winners/Adorama Reply 56.1 ¶ 151.[5]

On December 7, 2020, Rock Fintek and The Resource Group, Ascension's purchasing entity, executed the purchase order at issue in this case.  It called for Rock Fintek to supply 200 million "examination-grade" gloves bearing FDA 510(k) certification and meeting ASTM D6319 specifications.  JSF ¶¶ 32, 71; *see also id.*, Ex. 2 ("Ascension Purchase Order").  Under the contract, Ascension was to pay Rock Fintek $37 million for the 200 million gloves, equating

---

[5] The parties dispute whether payments by Ascension to Rock Fintek between January 2021 and April 2021, which totaled approximately $2.5 million, were for gloves at issue in this lawsuit or for other products.  *See* Kitchen Winners/Adorama 56.1 ¶ 151.

to 18.5 cents per glove. JSF ¶ 72. At the time the purchase order went into effect, Rock Fintek did not have contracts with vendors to secure the examination-grade gloves specified. Kitchen Winners/Adorama 56.1 ¶ 33; Rock Fintek 56.1 ¶ 33.

In trying thereafter to source the 200 million gloves, Rock Fintek attempted to procure gloves from a supplier in Thailand. It wired this entity $6.2 million. Kitchen Winners/Adorama 56.1 ¶ 34. The potential Thailand supplier, however, did not supply the promised gloves, and kept Rock Fintek's money in what Rock Fintek terms a theft. *See* Rock Fintek 56.1 ¶ 162.[6] This purported theft ate into the approximately $9 million deposit Rock Fintek had received from Ascension, impaired its ability to fulfill the Ascension Purchase Order, and, with the higher supply costs Rock Fintek came to pay, resulted in Rock Fintek's not making a profit from the Ascension Purchase Order. *Id.*

### 3.    Late 2020 and Early 2021: Rock Fintek Comes to Purchase Gloves from JNS/Stern and Kitchen Winners

After the Thailand episode, Rock Fintek was seeking alternative suppliers of gloves to fulfill the Ascension Purchase Order. *See* Rock Fintek 56.1 ¶ 35. At this point, the other parties to this action come into view. In or around December 2020 or January 2021, Rock Fintek was introduced to JNS as a potential supplier; it came to do several transactions with JNS for examination-grade gloves. *Id.* ¶¶ 35–38. Through its dealings with JNS, Rock Fintek came into contact with Kitchen Winners, a supplier to JNS. Rock Fintek then sought out Kitchen Winners as an additional (and potentially lower-cost) supplier of the same gloves. *See id.* ¶¶ 40–42. It entered into several agreements to buy gloves from Kitchen Winners, culminating in a larger

---

[6] Rock Fintek later sued the law firm that it claims to have hired to do due diligence on the Thailand deal. Rock Fintek 56.1 ¶ 297. In that Florida state court lawsuit, which settled, Rock Fintek maintained that the firm's misconduct caused it to do business with the parties in this case, which Rock Fintek maintains is the "actual cause" of the demise of its relationship with Ascension. *Id.*

purchase agreement in April 2021. *See id.* ¶¶ 43–50. Thus, from early 2021 through the summer, as detailed below, Rock Fintek contracted with either or both of JNS and Kitchen Winners for gloves to fulfill its Ascension Purchase Order.

> *a. JNS/Stern's dealings with Rock Fintek*

Beginning in December 2020, JNS entered into a series of Sales and Purchase Agreements with Kitchen Winners to purchase MedCare brand examination-grade gloves. JSF ¶ 27; *id.*, Ex. 20. The agreement in the record, at least, specified that the gloves JNS would purchase from Kitchen Winners were to be "Nitril Gloves (Box 100) Color: Blue, Medical exam grade with FDA 510(k) [certification]." *Id.*, Ex. 20 at 1. JNS intended then to re-sell these gloves. JNS 56.1 ¶ 1.

When JNS would purchase gloves, and store them at its warehouses, Stern—JNS's sole member—would receive from the warehouses "Packing Lists" or "tally sheets" that listed container numbers for the gloves, and a bare description of the gloves. *See* Rakhunov Decl., Ex. 13 ("Stern Dep.") at 68–69; *id.*, Ex. 44 (emails from Stern attaching packing lists). Stern attested that it was his practice to review these documents. Stern Dep. at 68–69. Some packing lists in evidence list "synthetic nitrile *protection* gloves"; others list "nitrile *examination* gloves[.]" Rakhunov Decl., Ex. 44 (emphasis added). Protection-grade gloves do not meet the same specifications as examination-grade gloves and are not fit for the same uses. *See* Rock Fintek 56.1 ¶¶ 213–14.

To help acquire customers for JNS's gloves, JNS and Stern associated with a man named Bruno Azra. Azra "worked independently to drum up business to earn a commission on [Stern's and JNS's] sales." Stern Decl. ¶ 5. Azra helped broker JNS's first order from Rock Fintek. In particular, in early February 2021, Azra discussed the prospect of a sale from JNS to Rock Fintek

with a woman named Chunron Li. Rakhunov Decl., Ex. 43 ("Li Decl.") ¶ 4; *see also* JSF ¶¶ 28–29. Li was also in the business of buying and selling PPE, became acquainted with Kato and Rock Fintek in late 2020, and worked as a quasi-broker for Rock Fintek in its transactions with JNS. Li Decl. ¶ 2.

As part of these efforts, Azra gave Li paperwork concerning the gloves to be purchased. Rock Fintek 56.1 ¶ 203. Stern had given these documents to Azra in an effort to generate business for JNS. Stern Decl. ¶ 3. Stern attests that the documents he gave to Azra were ones Kitchen Winners had given to him and that he understood them to have come from the brand Medcare and to be authentic. *Id.* ¶¶ 3–4; *see also* Rock Fintek 56.1 ¶ 204 ("Stern obtained this paperwork from Kitchen Winners.").

Paperwork from Azra in hand, Li then provided these documents to Rock Fintek via a WhatsApp chat. Rock Fintek 56.1 ¶ 205. The documents Li sent included: (1) a CTS Inspection Report for "examination gloves," with "Kitchen Winners INC" listed as the "client," Rakhunov Decl., Ex. 19, (2) a screenshot of the first page of an FDA 510(k) clearance letter from 2016 for "Nitrile Powder Free Patient Examination Gloves, Blue Color", *id.*, Ex. 20, (3) bills of lading for shipments of "nitrile gloves" from Qingdao, China to New York, *id.*, Ex. 21, and (4) a packet of materials including the FDA 510(k) letter, additional testing reports, and photos of boxes of gloves marked with the Medcare brand and labeled "Nitrile Examination Gloves," *id.*, Ex. 22.

On February 2 and 3, 2021, Rock Fintek gave an Irrevocable Corporate Purchase Order to JNS for 90,000 boxes of 100 gloves, designated as "NITRILE GLOVE MEDICARE MEDICAL EXAM BLUE COLOR," for a total of $1,350,000. JSF, Ex. 12.[7] At $15/box, this

---

[7] It appears that the purchase order may have been edited at some point to reflect the proper brand name "Medcare" (not "Medicare"). *See* Dkt. 136, Ex. 9 ("Li WhatsApp Chat") at 41–42.

pricing arrangement meant Rock Fintek was buying at a loss. *Id.* The Purchase Order provided that once the gloves were released from U.S. Customs Enforcement (having been shipped to New York from China), the buyer (Rock Fintek) had 48 hours to inspect the goods and thereafter release the funds. *Id.* Li was deputized to inspect the gloves in the first instance. She sent a video in a WhatsApp chat with Gilling and Kato depicting this inspection. Li WhatsApp Chat at 43.[8] After this correspondence, Rock Fintek wired the relevant funds to JNS. *Id.* at 43–44.

JNS thereafter sold Rock Fintek additional orders of gloves until May 2021, although not all were sold pursuant to purchase orders or written contracts. JNS sold gloves in April and May 2021 for $11.50/box, below the $15/box price governing the February 2021 sale. Kitchen Winners/Adorama 56.1 ¶ 37. Stern, Kato, and Gilling appear to have coordinated these additional sales directly via a WhatsApp chat among themselves, with purchases being made informally based on Rock Fintek's needs and Stern's ability and/or willingness to supply given quantities of gloves at given times. *See generally* Rakhunov Decl., Ex. 28 ("Stern WhatsApp Chat"). Standard procedures for all of these transactions, however, had gloves shipping from China to JNS's warehouses, *see* Rakhunov Decl., Ex. 21 (bills of lading), with trucking companies hired by Rock Fintek picking up the gloves at JNS's warehouses, and delivering them to Ascension's warehouses, *see* Rock Fintek JNS 56.1 ¶ 73.

In early April 2021, Stern attests, he received an offer from a supplier other than Kitchen Winners for boxes of examination-grade gloves whose labels were "misprinted" as protection-grade gloves. Stern Decl. ¶ 14. These boxes had stickers placed on them to "correct the misprint." *Id.* Stern offered these gloves to Rock Fintek at a lower price. Although Kato and

---

[8] Rock Fintek appears to have been unhappy about the distribution of glove sizes upon inspection of the goods at JNS's warehouse (more extra-large gloves than expected). Li WhatsApp Chat at 45–50. This discrepancy appears to have been resolved and is not a basis for any present claims.

Gilling appear to have considered buying these gloves in the event they could find a buyer, they ultimately did not agree to buy boxes labeled protection grade. *See* Rock Fintek 56.1 ¶¶ 221–22; Stern WhatsApp Chat at 4–6.[9]

Unsurprisingly in light of the ad hoc and only partly documented dealings between JNS and Rock Fintek, the parties dispute the exact number of gloves JNS delivered to Rock Fintek during their business relationship. However, all agree that JNS's bank records show 13 separate payments from Rock Fintek, Gilling, or a related entity through the end of May 2021, totaling $3,327,215. Rock Fintek 56.1 ¶ 39.

### b. *Rock Fintek's Early 2021 One-Off Transactions With Kitchen Winners*

At some point in connection with Rock Fintek's purchases from JNS, Kato saw the name "Kitchen Winners" on a purchase order from JNS. Rock Fintek 56.1 ¶ 41. Hoping to source gloves for a lower price than JNS provided, Kato sought to contact Kitchen Winners. *Id.* Kato Googled "Kitchen Winners," which led him to a man named Mendel Banon. *Id.* ¶ 42. Banon apparently worked as a broker for Kitchen Winners. The parties dispute to what extent he also worked for Adorama; Rock Fintek asserts that Banon held himself out as working with both

---

[9] Later in April, Kato told Stern that, if Stern could give Rock Fintek short-term credit, Rock Fintek would place another order with Stern. *See* Stern WhatsApp Chat at 10. Stern responded: "Can I possibly get a [Purchase Order] direct from a Hospital? Or some other sort of security . . . ." *Id.* Kato responded that a personal guaranty from him and Rock Fintek would be possible, but that he "would never introduce anyone to any of [his] clients." *Id.*

On April 27, 2021, in a WhatsApp message, Stern told Kato and Gilling that JNS's warehouse had given Rock Fintek more gloves in its latest order than Rock Fintek had paid for. He asked Rock Fintek to pay for the surplus gloves. *Id.* at 15. Kato responded that this was "a major mess up," because it meant Rock Fintek had delivered "more [gloves] to the hospitals" than contracted and would need to prove this to the hospitals to get them to pay for the overage. *Id.* Stern asked if Rock Fintek had placed the gloves it had picked up in warehouses or had sent them straight to customers; Kato responded that Rock Fintek had sent the gloves straight to its customer, and only had paperwork documenting the amount of gloves Rock Fintek understood itself to be delivering, as the customer was "a major group with warehouses around the US." *Id.*

Kitchen Winners and Adorama, but Mendlowitz attests that he never did business with Banon. *See* Kato 30(b)(6) Dep. at 194–97; Sperber Decl., Ex. 5 ("Mendlowitz Dep.") at 19.

In addition, early in its dealings with Kitchen Winners and Banon, Rock Fintek arranged for Arik Maimon, an acquaintance of Kato's, to participate in Rock Fintek's PPE business. Rock Fintek 56.1 ¶ 196. Maimon told Kato that cultural and religious similarities between Maimon and the parties with whom Kato was working (all Jewish) would help Maimon protect Rock Fintek's business interests. *Id.*

Kato contacted Banon in early 2021 and told him Rock Fintek was already buying Kitchen Winners' gloves from JNS, but could buy much larger quantities for a lower price. Kato 30(b)(6) Dep. at 193–96. Kato attests that Banon told him Kitchen Winners could slowly bring the price down on gloves for Rock Fintek, *id.* at 193, and that thereafter in March 2021, Kitchen Winners and Rock Fintek did a series of one-off transactions for the examination-grade gloves, JSF ¶¶ 38–40.[10] In these transactions, Kitchen Winners sold Rock Fintek 90,000 boxes of gloves, at $14/box. *Id.*

On March 4, 2021, before the series of one-off transactions, Gilling wrote Banon via WhatsApp: "Mendel, I do not see an ASTM D6319 certification or FDA with what was sent via email. Do you have documents?" Rakhunov Decl., Ex. 4 ("Banon WhatsApp Chat") at 1. In response, Rock Fintek asserts that Mendel provided the FDA 510(k) clearance letter Stern had provided. Rock Fintek 56.1 ¶ 209.[11] That letter states that the product given clearance to go to

---

[10] Rock Fintek does not claim Adorama was a party to these transactions. Rock Fintek 36.1 ¶ 47.

[11] Adorama and Kitchen Winners argue that any statement by non-party Banon is inadmissible hearsay. *See, e.g.*, Kitchen Winners/Adorama Reply 56.1 ¶ 209. They are correct that a party cannot survive a motion for summary judgment by relying on evidence inadmissible at trial. The Court recites Banon's statements here to provide a full account of relevant events, and considers

market was substantially similar to one approved by the FDA—"Nitrile Powder Free Patient Examination Gloves, Blue Color" which are "manufactured in accordance with the requirements of ASTM D6319 and ASTM D5151 requirements." Rakhunov Decl., Ex. 25 ("Banon FDA 510(k) Letter") at 5–6.

It is undisputed that many boxes of gloves that Kitchen Winners provided Rock Fintek as part of these transactions were labelled "Protection" gloves, despite the parties' understanding that Rock Fintek sought examination-grade gloves. *See* Kitchen Winners/Adorama 56.1 ¶ 48; Rock Fintek 56.1 ¶ 48. Kitchen Winners states that these gloves were mistakenly labeled as protection-grade, but in fact were *examination*-grade gloves, Kitchen Winners/Adorama 56.1 ¶ 48. Kitchen Winners further states that it notified Rock Fintek about the labelling error, and that Maimon, on Rock Fintek's behalf, agreed to accept the mislabeled gloves. Kitchen Winners/Adorama 56.1 ¶ 48; Rakhunov Decl., Ex. 10 ("Weiner Dep.") at 33. Rock Fintek disputes that it ever agreed to purchase gloves labeled "Protection"; to the extent Maimon represented as much, it contends, he was not authorized to do so. Rock Fintek 56.1 ¶ 224. Rock Fintek also disputes that the gloves Kitchen Winners provided were actually examination-grade gloves, mislabeled or otherwise. Rock Fintek 56.1 ¶ 48.

### 4. The Transactions Between Rock Fintek, Kitchen Winners, and Adorama, Leading to the April 2021 Execution of a Sales Purchase Agreement

In March and early April 2021, after several one-off orders between them, Rock Fintek and Kitchen Winners began to negotiate a larger deal for the purchase and sale of gloves. Kato attests that, leading up to this deal, he participated in "numerous" telephone calls with Weiner

---

issues of admissibility *infra* to the extent Banon's statements, taken for the truth, are potentially dispositive of a summary judgment motion. Given the limited briefing to date on this point, the Court's assessments here are without prejudice to the parties' right to litigate, *in limine*, whether and to what extent Banon's statements will be admissible at trial.

directly, had frequent communications with Banon, and conveyed that the large order Rock

Fintek intended to make was for Rock Fintek's hospital client, who required examination-grade

gloves meeting required specifications.  Rock Fintek 56.1 ¶¶ 192, 197.  Rock Fintek also states

that it was willing to enter into a larger deal with Kitchen Winners because it understood that

Adorama—whom Rock Fintek thought to be a manufacturer or procurer of gloves for Kitchen

Winners and an established business "around since the 70s," *id.* ¶¶ 165, 167—would be a party

to the transaction "as a seller," *id.* ¶ 166.  To this end, Kato states, he had "one or two" telephone

conversations with Mendlowitz to discuss a larger deal.  *Id.*

　　　Meanwhile, Adorama and Mendlowitz worked with Kitchen Winners as part of its PPE-

related business.  Mendlowitz attests that when the pandemic started, he began looking to obtain

PPE for internal use by Adorama's employees while in the office or in Adorama's warehouses.

Kitchen Winners/Adorama 56.1 ¶ 21.  Mendlowitz was able to source PPE only from Kitchen

Winners.  *Id.* ¶ 22.  Although Adorama had not done business with Kitchen Winners before the

pandemic, Mendlowitz knew Weiner from their community in New York.  *Id.* ¶¶ 23–24.

Viewing Kitchen Winners' PPE business as profitable, Mendlowitz and Adorama agreed to loan

Kitchen Winners funds to further its PPE business, with Adorama charging interest.  *Id.* ¶¶ 26–

27.  Initially, such business was based on a "handshake agreement"; Adorama made small, short-

term loans to Kitchen Winners; in lieu of providing security, Kitchen Winners had its customers

pay Adorama directly.  *Id.* ¶¶ 28–29.  But, Mendlowitz attests, because Kitchen Winners'

anticipated deal with Rock Fintek stood to be larger than any prior transactions Adorama had

financed, on or about March 26, 2021, Adorama and Kitchen Winners "memorialized their agreement in a written Hebrew-language loan agreement." *Id.* ¶ 30.[12]

Rock Fintek disputes knowledge of such an agreement. *See Id.* ¶¶ 28–30. Its understanding of Adorama's role, it states, was as set forth in a Letter of Intent ("LOI") it signed with Maimon on April 1, 2021 in connection with the anticipated deal with Kitchen Winners and Adorama. The LOI states: "Rock Fintek desires to purchase up to 1 million boxes of powder-free nitrile medical gloves (100 gloves/box as per specifications) from Kitchen Winners NY Inc (KWNY) / Adorama for import to the USA[.]" JSF, Ex. 3 ("Maimon LOI") at 1. It anticipates payments due under the transactions to Kitchen Winners as largely to flow to Adorama, because "Adorama is financing these transactions for Kitchen Winners." *Id.* at 1.

On April 5, 2021, Weiner emailed a document titled "Sales Purchase Agreement – Kitchen Winners to Rock Fintek v6 clean" to Mendlowitz. The email read: "Please look it over and call me about." Rakhunov Decl., Ex. 3 at 1. It is unclear if Mendlowitz did call Weiner in response or, if so, what the two discussed. The final, executed Sales Purchase Agreement ("SPA") that emerged was, in various respects, different from the draft Weiner had sent. Kitchen Winners/Adorama Reply 56.1 ¶ 171.

### 5.    April 7, 2021: The Sales and Purchase Agreement

On April 7, 2021, the parties' negotiations terminated with the execution of the SPA. JSF, Ex. 1 ("SPA"). The SPA's preamble designates Kitchen Winners as "Seller," Rock Fintek as "Buyer," and the two collectively as "Parties," and does not mention Adorama. *Id.* at 1. The SPA provides that "Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller the 'Products' described below subject to the following terms and conditions[.]" *Id.* The SPA

---

[12] The parties have not produced this Hebrew-language agreement, let alone a certified English translation thereof.

specifies the product to be sold as "Nitrile Gloves (Box 100) Color: Blue, Medical exam grade with FDA 510k," "Brand: Medcare, examination glove," and sets out the gloves to be sold by size (small through extra large). *Id.* The SPA states that the sale will involve 1.5 million boxes of gloves, at $11.50/box, with a total purchase price of $17,250,000. *Id.*

Under the subhead "Payment Terms," the SPA provides that "Buyer shall wire to an account designated by Seller the sum of $1,250,000.00 (the 'First Deposit')." *Id.* It provides for a "Second Deposit" of $600,000, to be wired by the "Buyer" to "an account designated by Seller" on April 26, 2021. *Id.* The SPA states that the deposits "shall be paid to Adorama Inc." and lists Adorama's bank account and wire information. *Id.* The SPA states that "Buyer shall pay Seller in full by wire transfer of funds for each container Delivered to the Seller's warehouse in Los Angeles, California." *Id.* Buyer Rock Fintek was to pay Seller Kitchen Winners upon its inspection of the products before collecting them; payments would be considered timely "if wire confirmation is made within 48 hours (excluding Saturday and Sunday) from product availability at Seller's Los Angeles warehouse." *Id.* at 2. Rock Fintek would also be eligible for a rebate of $75,000 total on the first five containers of gloves delivered, provided it timely made all payments due. *Id.* After applying this rebate, the SPA stated, the purchase price for the gloves would drop to $11/box for the balance of the contract's term, provided the purchases under the SPA were all completed. *Id.*

The SPA was signed, on its final page, by Weiner on behalf of Kitchen Winners, Mendlowitz on behalf of Adorama, and Gilling on behalf of Rock Fintek. *Id.* at 4. The signature page is reproduced as follows:

16

The foregoing Agreement is read and agreed by:

Seller:

Signature:

April 7, 2021

Name:    Hershey Weiner
Title:

On behalf of:  **Kitchen Winners NY Inc.**
Phone:
Email:

Signature:

Name:    Joseph Mendlowitz
Title:

On behalf of:  **Adorama Inc.**
Phone:
Email:

Buyer:

4/7/21

Signature:
Name:    Bradley Gilling
Title:    COO

On behalf of:  **Rock Fintek LLC**
Phone:
Email:

*Id.*

## 6.    The Parties' Performance Under the SPA

Throughout the SPA's implementation, there were hiccups in its performance. For example, on April 26, 2021, Kato alerted Banon via WhatsApp chat to a mistake in the brand of gloves Rock Fintek had received and sent to the warehouses of its client, Ascension. Banon

WhatsApp Chat at 9–10. Kitchen Winners' warehouse had apparently supplied Rock Fintek with LevMed brand gloves, not the agreed-upon Medcare brand. This caused a "major issue" with Ascension and delayed Rock Fintek's receipt of payment from Ascension. *Id.* On April 28, 2021, Gilling wrote in the WhatsApp chat that "[t]his disaster has crippled our [c]ash flow and . . . [b]ecause of this mess, we can not buy containers today." *Id.* at 11. Rock Fintek, for its part, continued to have periodic cash flow issues for the duration of the SPA's term. It attributed these to the errant LevMed delivery, which led to discussions among the parties and delayed or incomplete payments. *See id.* at 11–16, 21.

At least partly in response to its cash flow issues, Rock Fintek began requesting that some shipments of gloves be delivered by truck to its client's warehouses across the country, including in Illinois and Texas. Rock Fintek 56.1 ¶¶ 107–08. The parties dispute whether the SPA envisioned direct deliveries to Rock Fintek's client, but all agree that Rock Fintek agreed to pay for these trucking costs. *Id.* ¶ 109. Rock Fintek, however, viewed Kitchen Winners' transportation bills as exorbitant and demanded shipping invoices from Kitchen Winners. Banon WhatsApp Chat at 20.[13] Kitchen Winners claims that, at times, Rock Fintek lacked the funds to pay for shipments of gloves that had been delivered to the client in Illinois or Texas, requiring Kitchen Winners to pay to store the gloves until Rock Fintek had paid. Kitchen Winners/Adorama 56.1 ¶¶ 109–13.

Rock Fintek asserts that at various points it paid for more gloves than Kitchen Winners had actually delivered. Rock Fintek 56.1 ¶¶ 279–80. For example, Rock Fintek points to an

---

[13] Kitchen Winners has produced invoices from a company named "wenzy inc." which it represents reflected these shipping services. *See* JSF, Ex. 4 (invoices). Rock Fintek disputes that these are valid. It states that it was unable to serve wenzy inc. at its listed address which now appears vacant, and that the wenzy invoices produced "look nothing like invoices provided by other (legitimate) trucking companies." Rock Fintek 56.1 ¶ 9.

email Weiner sent to Mendlowitz stating that some loads sold to Rock Fintek "have less quantities, but their payments was always for full loads." *Id.* ¶ 280; *see also* Rakhunov Decl., Ex. 5. Kitchen Winners counters that, at Rock Fintek's request, it ultimately supplied Rock Fintek with thousands of gloves in excess of those specified under the SPA. Kitchen Winners/Adorama Reply 56.1 ¶ 281.

It is undisputed that the parties concluded the SPA in early June 2021. The following table documents the payments Rock Fintek made to Kitchen Winners through May 2021, and the invoices Kitchen Winners issued to Rock Fintek under this agreement:

| Date | Amount Due | Amount Paid By Rock Fintek |
|---|---|---|
| April 8, 2021 | $1,250,000 | $1,250,000 |
| April 20, 2021 | $622,725 | $690,000 |
| April 26, 2021 | $600,000 | $690,000 |
| April 26, 2021 | $671,600 | N/A |
| April 27, 2021 | $345,000 | $345,000 |
| May 3, 2021 | $690,000 | $690,000 |
| May 5, 2021 | $690,000 | $690,000 |
| May 10, 2021 | $690,000 | $690,000 |
| May 11, 2021 | $1,020,510 | $690,000 |
| May 12, 2021 | $1,035,000 | $690,000 |
| May 13, 2021 | $666,770 | N/A |
| May 19, 2021 | $2,070,000 | $1,380,000 |
| May 20, 2021 | $690,000 | $345,000 |

Kitchen Winners/Adorama 56.1 ¶ 82. The parties dispute, however, how many gloves were actually sought, paid for, and delivered under the SPA.

### 7.     Alleged Deficiencies with the Gloves Delivered to Fintek by Kitchen Winners, Adorama, and JNS

A central area of factual dispute is whether, if so, and to what extent Kitchen Winners, Adorama, and/or JNS delivered to Rock Fintek lesser-quality, protection-grade gloves, as opposed to examination-grade gloves meeting certain specifications. On summary judgment, the parties have submitted ample evidence on this issue. However, because this dispute is generally not central to the pending motions—and because it does not appear capable of resolution other than by the ultimate trier of fact—the Court reviews the evidence on this point only as necessary to the pending motions.

Ascension has attested that when the gloves delivered by Rock Fintek began to leave Medline warehouses for use by Ascension's healthcare providers across the country, it began receiving complaints about the gloves, including of gloves tearing, fluid seeping into the gloves, gloves stretching and other issues with size and fit. Rock Fintek 56.1 ¶ 227; *see also* Rakhunov Decl., Ex. 30. Ascension has attested that the gloves supplied by Rock Fintek did not meet the specifications for gloves set out in the Purchase Order. Rock Fintek 56.1 ¶ 226.

There is substantial contemporaneous documentation of these complaints, dating to July 2021, when Ascension first raised concerns to Rock Fintek about the quality of the gloves Rock Fintek had delivered. *Id.* ¶ 225. It includes the following. On July 8, 2021, Gilling sent an email to Weiner, copying Kato, asking for "SGS or other testing documents for the gloves we received from you," explaining that he had "just got a call from the hospital wanting to verify the nitrile gloves testing." Rakhunov Decl., Ex. 31 at 4. Weiner forwarded this message to Maimon. *Id.* at 5. On July 12, 2021, a representative from Ascension reported such problems to Kato and

Gilling by email, asking for Rock Fintek's "perspective on this situation and possible resolution[.]" *Id.*, Ex. 30 at 3.  On July 12, 2021, Gilling emailed Maimon, copying Kato, Weiner, and Banon, stating, "Hershey and Mendel, the email I sent email [sic] is very important to gather documentation of the authenticity of the MedCare gloves.  We have a serious issue with our client that we would like to distinguish with proper documentation and testing reports. . . . Our attempt to mitigate this immediately would be helpful for all parties." *Id.*, Ex. 31 at 2.  That same day, Weiner forwarded this message to Mendlowitz. *Id.*

On July 14, 2021, Weiner sent an email to Kato, Gilling, and Maimon, copying Banon and Mendlowitz, with the subject line: "SETTLEMENT PROPOSAL FINTEK KITCHEN WINNERS[.]" Rakhunov Decl., Ex. 12.  The body of that message reads:

> Good day Tom, Bradley and Arik,
> For settlement purposes only, and towards a global settlement intended to resolve all outstanding matters between the parties, including the open invoices in the amount of $661,095.00 which owed to Kitchen Winners and overdue, a contract for 2 million boxes (of Medcare nitrile gloves for $9.30 ($9 for KW, $.30 for Arik) per box of 100 — promised by Rock Fintek to Kitchen Winners), $662,000.00 that Rock Fintek claims is owed to it by Kitchen Winners and a demand/request by Rock Fintek that Kitchen Winners provide documentation in order to verify that the nitrile gloves delivered to Rock Fintek were in fact produced by a licensed Medcare Factory, I would like to propose the following path forward to a mutually agreeable resolution.
>
> 1. Rock Fintek shall unconditionally acknowledge in writing the Six Hundred Sixty One Thousand Ninety Five and 00/100 ($661,095.00) dollars outstanding in open invoices due to the seller under the contract of sale for nitrile gloves.
> 2. Within 45 days (eg on or before Friday, August 27, 2021) Rock Fintek shall deliver to Kitchen Winners and enter into a contract with Kitchen Winners and fund the deposit for the purchase of Two (2) Million boxes of Medcare nitrile gloves for $9.30 ($9 for KW, $.30 for Arik) per box of 100 (all other terms remain the same as previous agreement unless the parties agree otherwise).
> 3. Upon Rock Fintek's written (email shall be sufficient to constitute a "writing" for the purpose of this agreement) acknowledgement of the invoices and consent to the terms as delineated above, Kitchen Winners shall immediately cooperate with the document demands of Rock Fintek

and proceed with providing the documentation, evidence and verifications requested.

4. Upon entering into a purchase and sale agreement pursuant to section 2 above, and in furtherance of an amicable resolution, Kitchen Winners shall waive the outstanding balance ( $661,095.00) due under the original contract and additionally, Kitchen Winners shall pay $662,000.00 (from the new contract) to Rock Fintek as follows:

> a. $200,000.00 issued Arik Maimon towards the debt owed by Rock Fintek to Arik, and an additional,
>
> b. $200,000.00 credited to Arik Maimon in full satisfaction of the promissory note, PG and COJ (in the amount of $200k that Arik owes to Kitchen Winners) and such payment shall also be towards the debt owed by Rock Fintek to Arik, and
>
> c. $262,000.00 payable to Rock Fintek directly.

Tom, Bradley and Arik, please review the terms above carefully with your respective attorneys and respond to this message confirming you understand, acknowledge and agree with all the above terms. Please call me if you have any questions I will not accept ambiguous replies. Thank you in advance for your anticipated cooperation regarding this very important matter and I look forward to hearing from you soon.

*Id.* The record as presented leaves unclear whether any party ever responded to this message.

Email correspondence between Rock Fintek and JNS/Stern immediately after Ascension's reports of faulty gloves has not been presented—nor evidence that Kitchen Winners or Adorama supplied Rock Fintek with replacement or additional gloves.[14]

On July 19, 2021, however, Kato and Gilling messaged Stern via WhatsApp:

We have identified the gloves that are failing tests and of poor quality (fake nitrile) are from you. When you approached us in the past to buy 31 these gloves, we specifically said no. How you got these on out trucks and delivered to our client is unacceptable. Furthermore we have identified these gloves were being offered at $4.80 buy price, to move these fake gloves. Obviously you made a significant amount of margin to sell us these gloves. We are having a meeting with our client to discuss full return and replacement of these fake nitrile gloves. We need you to find and replace these gloves as they are not what we agreed to buy. We will be

---

[14] Gilling did testify that he participated in a phone call with Weiner and Maimon in summer 2021, in which Weiner threatened to kill and bury Gilling. Gilling Dep. at 312–13. The summary judgment record does not make clear whether this episode relating to asserted deliveries of deficient gloves.

orchestrating the return of the goods to you with full credit and replacement immediately.

Stern WhatsApp Chat at 30–31.  Kato and Gilling followed up with similar messages to Stern on July 19 and 20.  It does not appear Stern ever responded in that message chain.  *See id.* at 31.

### 8.    Ascension's Demands to Rock Fintek and Rock Fintek's Claim of Lost Business From Ascension

Ascension did not do additional business with Rock Fintek after reporting the deficient gloves delivered under the Purchase Order.  On March 16, 2022, Ascension sent Rock Fintek a letter demanding to be made whole, including for the money it paid under the Purchase Order and for the costs of storing the gloves.  Rock Fintek 56.1 ¶ 294; Rakhunov Decl., Ex. 62.  To date, Ascension has not sued Rock Fintek or taken other concrete action against it.  Rock Fintek 56.1 ¶ 296.

Although no additional purchase plans were in place between Ascension and Rock Fintek at the time Ascension protested the gloves that had been delivered, its representative has testified in this litigation that, but for its dissatisfaction with those gloves, Ascension would have been willing to do further business with Rock Fintek.  JSF ¶¶ 84, 87.[15]  The representative testified that Ascension's then-chief operating officer and its vice president for supply chain had spoken with Rock Fintek about future business, potentially involving providing medical supplies, while notifying Rock Fintek that, to do such work, Rock Fintek would need to clear "major" hurdles

---

[15] In the "short term," the representative testified, "it's highly likely that [Ascension] would have continued to engage with Rock Fintek in additional business opportunities" including to meet its needs for "wheelchairs and walkers [and] crutches and canes."  Frisch Decl., Ex. 5 ("Elstro Dep.") at 37–38  The representative also testified that supply chain "blips" did continue into the future, potentially creating opportunities for a supplier like Rock Fintek.  *Id.* at 41; *see also id.* at 18 (noting that after ceasing to use Rock Fintek, Ascension continued to obtain PPE from another supplier).

such as obtaining its own FDA 510(k) certifications, and price its offerings to compete with existing "ginormous" companies in the space. Elstro Dep. at 40–41.

All told, Rock Fintek—between March 2020, when it entered the PPE business, and July 2021, when its relationship with Ascension ended—obtained about $62 million in revenue from dealings with Ascension. The final purchase order was placed in March 2021. *See* Rock Fintek 56.1 ¶ 286. Kato estimated that, but for the glove dispute that ended the companies' relationship, Rock Fintek would have done at least the same amount of business, at a profit margin of about 50%, from July 2021 through November 2023 if not later. *Id.*; *see also* Rakhunov Decl., Ex. 8 ¶ 19. On those assumptions, Kato testified, Rock Fintek would have earned approximately $30 million a year had it supplied Ascension for another three years. Rakhunov Decl., Ex. 8 ¶ 19.

## B.    Procedural History

On May 17, 2022, Kitchen Winners initiated this action, suing Rock Fintek on various grounds in New York State Supreme Court in Manhattan. Dkt. 1. On June 22, 2022, Rock Fintek removed this case to federal court, based on diversity jurisdiction. *Id.* On June 24, 2022, Rock Fintek filed an answer, and brought a counterclaim against Kitchen Winners and a third-party complaint against JNS, Stern, Hershey Weiner, Mendlowitz, and Adorama. Dkt. 5.

On July 15, 2022, Kitchen Winners, Weiner, Mendlowitz, and Adorama filed a motion to dismiss Rock Fintek's third-party claims and counterclaims. Dkt. 31. The Court ordered Rock Fintek to oppose the motion or amend its pleadings as a matter of course, pursuant to Federal Rule of Civil Procedure 15(a). Dkt. 35. Rock Fintek filed an amended answer, amending its

third-party complaint and counterclaim. Dkt. 43. Kitchen Winners, Weiner, Mendlowitz, and Adorama again moved to dismiss, Dkt. 46, as did JNS and Stern, Dkt. 53.[16]

On March 31, 2023, the Court resolved these motions, granting some and denying some. Dkt. 68. The Court dismissed Rock Fintek's fraud, negligent misrepresentation, tortious interference, and conspiracy claims against Kitchen Winners, Adorama, Weiner, and Mendlowitz, its breach of express warranty claim against Weiner, and its breach of covenant, negligent misrepresentation, tortious interference of contract, and conspiracy claims against JNS and Stern.[17] That left the following claims, on which the parties proceeded to discovery:

- All of Kitchen Winners' claims against Rock Fintek (against which Rock Fintek had not moved).

- Rock Fintek's breach of contract claims, under the SPA, against Kitchen Winners and Adorama. Dkt. 43 at 27–28.

- Rock Fintek's breach of contract claims against Kitchen Winners and Adorama (on an alter-ego theory) as to the one-off transactions. *Id.* at 28–29.

---

[16] On August 31, 2022, during briefing of these motions, Rock Fintek sought an emergency conference to discuss preservation of the gloves at issue. Dkt. 49. It reported that the gloves it had secured from other parties had been shipped to Ascension's warehouses throughout the country, and that Ascension was still storing them at significant cost. *See id.* at 2. But, Rock Fintek represented, because Ascension viewed the gloves as unfit for medical use, Ascension had notified Rock Fintek that it planned to dispose of the gloves rather than continuing to store them. *Id.* Rock Fintek asked the Court to intervene to order that a statistically significant sample of the gloves be preserved for testing as anticipated evidence. *Id.* at 2–3. The other parties opposed this request, raising concerns, including about the chain of custody and Rock Fintek's proposed methodology for testing the gloves. Dkt. 51 at 3–5. The Court found it premature to address these concerns but that it was necessary that the adequate sample of the gloves to preserving for future testing and examination. Dkt. 56. On October 28, 2022, the Court approved a joint letter setting out terms governing the identification, inspection, and preservation of a sample of gloves in the Ascension warehouses. Dkt. 62.

[17] These rulings eliminated all claims against Joseph Weiner. *See* Dkt. 43; Dkt. 68 at 52.

- Rock Fintek's breach of contract claims against JNS and Stern. *Id.* at 29–30.

- Rock Fintek's breach of the covenant of good faith and fair dealing claims against Kitchen Winners and Adorama. *Id.* at 30–31.

- Rock Fintek's fraudulent inducement claims against JNS and Stern. *Id.* at 31–33.

- Rock Fintek's unjust enrichment claims against Kitchen Winners and Adorama. *Id.* at 36.

- Rock Fintek's breach of warranty claims against Kitchen Winners, Adorama, JNS, Mendlowitz, and Stern. *Id.* at 39–40.

On January 16, 2024, after a conference regarding summary judgment motions, the parties filed a Joint Statement of Undisputed Facts, and attached exhibits. Dkt. 135. On February 16, 2024, JNS and Stern, Kitchen Winners, and Adorama and Mendlowitz filed motions for summary judgment on Rock Fintek's remaining claims plus memoranda of law and attachments in support. *See* Dkts. 136–138; Dkts. 136, Ex. 22 ("JNS Br."), 139 ("Adorama Br."), 140 ("Kitchen Winners Br."). On March 15, 2024, Rock Fintek filed a combined memorandum in opposition, plus supporting materials. Dkts. 146–49 ("Rock Fintek Br."). On March 31, 2024, JNS and Stern filed a reply. Dkt. 154 ("JNS Reply Br."). On April 5, 2024, Kitchen Winners, Adorama and Mendlowitz filed replies. Dkts. 157 ("Adorama Reply Br."), 158 ("Kitchen Winners Reply Br.").

## II.    Applicable Legal Standards

### A.    Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The

26

movant bears the burden of demonstrating the absence of a question of material fact. In making
this determination, the Court must view all facts "in the light most favorable" to the non-moving
party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with
admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary
judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may
not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion
for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).
Rather, to survive a summary judgment motion, the opposing party must establish a genuine
issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A);
*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing
law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986). In determining whether there are genuine issues of material fact, a court is "required
to resolve all ambiguities and draw all permissible factual inferences in favor of the party against
whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)
(quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**B.    Breach of Contract**

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2)
adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer &
Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

As to questions of interpretation, "[t]he primary objective of a court in interpreting a
contract is to give effect to the intent of the parties as revealed by the language of their
agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,*

*Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Id.* at 157. "The question of whether the language of a contract is ambiguous is a question of law to be decided by the Court." *Id.* at 158. Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see Sayers v. Rochester Tel. Corp. Supplemental Mgm't Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (citation omitted)).

To give effect to the intent of the parties, a court must interpret a contract by considering all of its provisions, and "words and phrases . . . should be given their plain meaning." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (quoting *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (BGD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012)). At the summary judgment stage, "[t]he mere assertion of an ambiguity does not suffice to make an issue of fact." *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990); *see also Sayers*, 7 F.3d a 1095 ("Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement."). "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [] the contract language

beyond its reasonable and ordinary meaning.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 161 N.Y.S.2d 90, 94 (1957)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a 'reasonable' interpretation." *Id.* (internal citation and quotations omitted).

Generally, summary judgment is appropriate in a contract dispute only where the contract's terms are unambiguous, whereas "interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder." *Compagnie Financiere*, 232 F.3d at 158. However, summary judgment is also appropriate "when the [contract] language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997); *see also 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) ("[T]he court may resolve ambiguity in contract language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary."). "Similarly, if there is no extrinsic evidence bearing on the parties' intentions, the proper interpretation of ambiguous contract language is an issue for the court." *In re Coudert Bros.*, 487 B.R. at 390 (emphasis in original) (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994); *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993)).

## III.    Discussion

The Court separately considers each motion for summary judgment, while noting overlap between them as relevant.

### A.    Kitchen Winners' Motions

Kitchen Winners seeks summary judgment on: (1) its affirmative claims for breach of contract and/or unjust enrichment, and (2) Rock Fintek's counterclaims against it. *See* Kitchen Winners Br. at 15–25.[18]

#### 1.    Kitchen Winners' Affirmative Claims

Kitchen Winners argues it prevails as a matter of law on its breach of contract and unjust enrichment claims against Rock Fintek.

#### *a.    Breach of Contract*

Kitchen Winners argues that there is no genuine issue of material fact that Rock Fintek breached the SPA by refusing to pay it for (1) gloves Kitchen Winners provided or (2) certain ground transportation and storage services. It argues it is entitled to $967,165.42 for these breaches, a sum which reflects the total amounts it claims it was owed for providing gloves under the contract ($20,787,794), for "post-customs ground transportation" and storage ($827,806.42), minus the total amount Rock Fintek paid Kitchen Winners and/or Adorama ($20,648,435). Kitchen Winners Br. at 15–17. Rock Fintek counters that summary judgment is unwarranted, because disputes of fact exist as to (1) whether Kitchen Winners materially breached by delivering nonconforming gloves, excusing Rock Fintek's performance; and (2) the amount Rock Fintek owes. Rock Fintek Br. at 43–45. Rock Fintek is correct on both points.

---

[18] In moving against Rock Fintek's unjust enrichment claim, Kitchen Winners incorporates by reference Adorama's argument for summary judgment on Rock Fintek's unjust enrichment claim against it. Kitchen Winners Br. at 17. Because Kitchen Winners does not add substantive argument on this point, the Court relies on Adorama's briefing and addresses this motion in connection with Adorama's motion.

Taking these points in reverse order, there is clearly a genuine dispute of material fact as to the outstanding balances on the contract. On several points, a reasonable jury, reviewing the evidence adduced, could reject Kitchen Winners' calculations.

For one, a jury could find discrepancies in the number of gloves or boxes of gloves actually delivered by Kitchen Winners. In an email from Weiner to Mendlowitz on May 28, 2021, during the SPA, Weiner attached a Microsoft Excel document titled "qty delivered.xlsx" and commented: "See attached report[.] Note, some loads have less quantities, but their payments was always for full loads." Rakhunov Decl., Ex. 5 at 2. In another email to Mendlowitz on June 27, 2021, Weiner references an "[o]verage" of a certain amount, and comments that "there are 22,760 boxes in dispute, which according to BOLs were delivered[.]" *Id.* at 12. Kitchen Winners acknowledges that there are multiple interpretations available of these communications. Kitchen Winners/Adorama Reply 56.1 ¶ 281. A reasonable factfinder could construe them to mean that Kitchen Winners did not uniformly deliver the precise quantity of gloves due under the contract.

A reasonable jury could also dispute Kitchen Winners' claim against Rock Fintek for shipping or storage costs. The parties stipulated to the authenticity of trucking invoices from wenzy inc., but Rock Fintek disputes that wenzy inc. was a real trucking company. *Compare* JSF ¶ 98, *with* Rock Fintek 56.1 ¶ 101. And it has adduced evidence giving rise to a genuine dispute whether the wenzy inc. invoices on which Kitchen Winners relies reflect costs actually incurred for shipping services. It notes evidence that wenzy, inc.'s listed address "appeared to have been a private residence in the past but was vacant," Rock Fintek Br. at 42; *see also* Rakhunov Decl., Ex. 7 (affidavit of attempted service), and testimony from Weiner calling into question the ownership of the company and whether it ever provided trucking services. Sperber

Decl., Ex. 32 at 55–56 ("Q: Has Wenzy, Inc. ever provided trucking services? A: Not that I

recall—I don't recall."). Given these ambiguities, the Court cannot find on the record presented

that the purported invoices would be received as business records. *See Kasper Glob. Collection*

*& Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 572–74

(S.D.N.Y. 2013) (invoices likely inadmissible at trial, and improperly considered at summary

judgment, where a qualified witness, familiar with the business's record-keeping system, had not

testified when or how invoices were made). This prevents crediting the purported wenzy

invoices—on which Kitchen Winners relies in seeking summary judgment as to this aspect of its

damages. *See, e.g., James v. Albank*, 763 N.Y.S.2d 838, 839 (2d Dep't 2003) (competing

evidence about authenticity in contract action created fact question for jury).

  In any event, there is a genuine issue of material fact about whether, and to what extent,

Kitchen Winners materially breached its obligations, excusing performance by Rock Fintek.

"Under New York law, a party's performance under a contract is excused where the other party

has substantially failed to perform its side of the bargain or, synonymously, where that party has

committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d

171, 186 (2d Cir. 2007) (citing *Hadden v. Consol. Edison Co.*, 356 N.Y.S.2d 249, 255 (1974)).

For a breach to be material, it must "go to the root of the agreement between the parties."

*Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989). "A party's

obligation to perform under a contract is only excused where the other party's breach of the

contract is so substantial that it defeats the object of the parties in making the contract." *Frank*

*Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (citing *Babylon*

*Assocs. v. County of Suffolk*, 475 N.Y.S.2d 869, 874 (2d Dep't 1984)). In this inquiry, courts are

to consider factors such as "the ratio of the performance already rendered to that unperformed,

the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance." *Hadden*, 356 N.Y.S.2d at 255. In most cases, "the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment." *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005).

There is a genuine dispute of material fact here surrounding whether any breach on Rock Fintek's part should be excused in light of material breaches by Kitchen Winners. A reasonable jury could find that Kitchen Winners knowingly delivered protection-grade gloves that did not conform to the SPA's specifications and which were unfit for their intended purpose of hospital use, and that this breach went to the heart of the parties' contract. *See, e.g.*, *Exp. Dev. Canada v. Elec. Apparatus & Power, L.L.C.*, No. 03 Civ. 2063 (HBP), 2008 WL 4900557, at *15 n.7 (S.D.N.Y. Nov. 14, 2008) (systemic failure of products bought and sold under contract constituted material breach); *Sinco, Inc. v. Metro-North Commuter R. Co.*, 133 F. Supp. 2d 308, 311–12 (S.D.N.Y. 2001) (material breach where one component of worker safety system was uniformly defective).

Kitchen Winners denies a dispute of material fact as to whether it breached the SPA in this respect. It argues that any breach was necessarily immaterial. Kitchen Winners Br. at 17. That argument is a loser on summary judgment. A reasonable factfinder could find such a breach material, based on the fact that the SPA provided for the purchase of examination-grade gloves according to provided specifications, *see* SPA at 1; testimony from Gilling that Kitchen Winners was on notice Rock Fintek was contracting to buy gloves for resale to a hospital that

33

needed gloves with these specifications, *see* Gilling Dep. at 66–67; emails by Weiner supporting

that he understood the need for properly labeled and constituted gloves, Rakhunov Decl., Ex. 35;

and results from scientific tests Rock Fintek commissioned post-dispute that purport to show the

gloves provided by Kitchen Winners were not examination-grade gloves, *see, e.g.*, Rock Fintek

56.1 ¶ 268. Although a finder of fact could view the evidence otherwise, the record does not

permit the Court to find the absence of breaches by Kitchen Winners, or that any breaches were

immaterial. *See, e.g., Soldiers', Sailors', Marines' & Airmen's Club, Inc. v. Carlton Regency

Corp.*, 10 N.Y.S.3d 65, 66 (1st Dep't 2015) (issues of fact regarding whether breach was in fact

material precluded summary judgment); *Smolev v. Carole Hochman Design Grp., Inc.*, 913

N.Y.S.2d 79, 80 (1st Dep't 2010) (same); *see also Jacob & Youngs v. Kent*, 230 N.Y. 239, 243

(1921).

Kitchen Winners responds that because Rock Fintek was able to resell the gloves at issue

here to Ascension, and because Ascension has yet to sue it or demand repayment, any breach by

Kitchen Winners in furnishing substandard gloves was necessarily immaterial. Kitchen Winners

Br. at 17; Kitchen Winners Reply Br. at 9. That argument is most germane to any claim by Rock

Fintek for damages from Kitchen Winners arising from its breach—a point addressed below.

But Rock Fintek's ability to resell the gloves notwithstanding their deficiencies is only one factor

a reasonable jury could consider in assessing whether Kitchen Winners substantially performed.

*See Hadden*, 356 N.Y.S.2d at 255 (extent to which aggrieved party received benefit of bargain

only one factor in determining materiality of breach). Kitchen Winners' breach is a far cry from

breaches so clearly immaterial as to enable a court to find immateriality as a matter of law.

*Compare Wolfson v. Faraci Lange, LLP*, 959 N.Y.S.2d 792, 794 (4th Dep't 2013) (plaintiff's

failure to submit invoices within reasonable time not, as a matter of law, a material breach of

agreement for medical consulting services); *Savasta v. Duffy*, 683 N.Y.S.2d 511, 511–12 (1st

Dep't 1999) (plaintiff's failure to disclose $4400 assessment in context of a million-dollar

contract immaterial as a matter of law), *with Bear, Stearns Funding, Inc.*, 361 F. Supp. 2d at

296–97 (genuine dispute of material fact precluding summary judgment on material breach

where evidence went both ways as to whether breach precluded benefit of bargain); *RR Chester,*

*LLC v. Arlington Bldg. Corp.*, 803 N.Y.S.2d 100, 101–102 (2d Dep't 2005) (failure to deposit

down payment check could not establish material breach as a matter of law).

The Court thus denies Kitchen Winners' summary judgment motion on its breach of

contract claim.

> ### b.    Unjust Enrichment

The Court likewise denies Kitchen Winners' summary judgment motion on its unjust

enrichment claim against Rock Fintek.  Under New York law, a "cause of action for unjust

enrichment requires a showing that the defendant was enriched at the expense of the plaintiff and

that it would be inequitable for the defendant to retain the benefit provided by the plaintiff."

*Milherst Constr., Inc. v. Natale Bldg. Corp.*, 193 N.Y.S.3d 539, 541 (4th Dep't 2023).  "The

existence of a valid and enforceable written contract governing a particular subject matter

ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 521 N.Y.S.2d 653, 656 (1987).  But, where there is

a "bona fide dispute" whether certain transactions are covered under the contract, a quasi-

contract action, such as for unjust enrichment, may proceed as to those transactions.  *See Pulver*

*Roofing Co. v. SBLM Architects, P.C.*, 884 N.Y.S.2d 802, 804 (2009).

Here, to the extent Kitchen Winners' unjust enrichment claim is based on gloves it claims

to have delivered in excess of the amount called for under the contract, an unjust enrichment

claim may proceed.  Kitchen Winners thusly defines this claim.  *See* Kitchen Winners Reply Br.

at 10 n.3 ("Kitchen Winners can only recover payment for those excess gloves, and the trucking costs associated therewith, under an unjust enrichment cause of action."). But Kitchen Winners is not entitled to summary judgment on this claim. There are disputes of material fact as to how many, if any, gloves were delivered in excess of those called for under the SPA, and, as reviewed above in connection with the contract-breach claim, whether misconduct by Kitchen Winners occurred—*e.g.*, providing gloves unwanted by Rock Fintek—that create an issue of fact whether the retention of any excess gloves by Rock Fintek would be "inequitable." *See, e.g., E.D. & F. Man Sugar, Inc. v. ZZY Distributors, Inc.*, 55 N.Y.S.3d 10, 11 (1st Dep't 2017) ("issues of fact as to whether and to what extent there [was] any unpaid balance in connection with the three shipments at issue" precluded summary judgment on unjust enrichment claim); *Speedfit LLC v. Woodway USA, Inc.*, 432 F. Supp. 3d 183, 219 (E.D.N.Y. 2020) (summary judgment on unjust enrichment claim inappropriate where reasonable jury could find either way on equities prong of the test).

### 2.    Kitchen Winners' Challenge to Rock Fintek's Counterclaims

Kitchen Winners also moves for summary judgment on Rock Fintek's counterclaims against it. It argues that the breach of contract, breach of the covenant of good faith and fair dealing, and breach of warranty claims fail because Rock Fintek cannot establish damages. *See* Kitchen Winners Br. at 17–25. In so arguing, Kitchen Winners assumes *arguendo* that "Rock Fintek could ultimately prove its allegations regarding the quality of the gloves[.]" *Id.* at 18. But even if all of Rock Fintek's damages theories were found factually unsustainable—and the Court does not so find, *see infra*—that would not support summary judgment in favor of Kitchen Winners on the contract- and covenant-breach claims. That is because, on these claims, Rock Fintek could still seek nominal damages at trial.

It is well established that "[u]nder New York law, where actual damages have not been proven with the requisite certainty, and indeed even if the breach of contract caused no loss at all, nominal damages are available 'as a formal vindication of plaintiff's legal right to compensation.'" *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 10 Civ. 5762 (PAE), 2016 WL 3098842, at *17 (S.D.N.Y. June 1, 2016) (quoting *Freund v. Washington Square Press, Inc.*, 357 N.Y.S.2d 857, 861 (1974)); *see also T & N PLC v. Fred S. James & Co. of N.Y., Inc.*, 29 F.3d 57, 60 (2d Cir. 1994) ("[N]ominal damages are always available for breach of contract."). Thus, "a plaintiff may proceed to trial on a breach of contract claim even if the claim is limited to nominal damages." *NAF Holdings, LLC*, 2016 WL 3098842, at *17 (internal quotation and citation omitted).

The parties have not directed the Court to case law resolving whether nominal damages are also available for breach of covenant claims. But movant Kitchen Winners has not adduced law in its favor on this point, and, insofar as these claims are variants of a contract-breach claim, it is likely the case that nominal damages would be available to vindicate these legal rights as well. *See, e.g., Forman v. Guardian Life Ins. Co.*, 908 N.Y.S.2d 27, 30–31 (1st Dep't 2010) ("It is axiomatic that all contracts imply a covenant of good faith and fair dealing in the course of performance."). Absent persuasive authority in Kitchen Winners' favor on this point, the Court would permit Rock Fintek to pursue these claims even if only nominal damages were available.

Rock Fintek's express warranty claims are, however, distinct. These require a showing of injury caused by the alleged breach. If an express warranty was made, a plaintiff must then make out a "breach of the warranty, and [] *injury* to the buyer *caused* by the breach." *Housey v. Procter & Gamble Co.*, No. 21 Civ. 2286 (NRB), 2022 WL 874731, at *3 (S.D.N.Y. Mar. 24, 2022) (emphasis added); *see also id.* at *7–8 (express warranty claim failed given inadequate

injury allegations); *Avola v. Louisiana-Pacific Corp*, 991 F. Supp. 2d 381, 401–02 (E.D.N.Y. 2013) (for breach of express warranty claim, as with false advertising claim, party needed to establish breach caused injury).

To determine whether this claim survives, the Court therefore must assess the viability of Rock Fintek's theories of injury, each of which Kitchen Winners challenges. This assessment is also important in that it delimits the damages available on Rock Fintek's breach of contract and breach of covenant claims. *See, e.g., Lauricella v. LC Apartments, LLC*, 103 N.Y.S.3d 726, 727–28 (4th Dep't 2019) (affirming grant of partial summary judgment limiting permissible theories of damages).

Because Rock Fintek has not been compelled to pay Ascension for allegedly providing it non-conforming gloves, it does not and cannot claim damages to cover such repayment. It advances four alternative theories of damages: that (1) its lost profits as a result of Ascension's decision not to do future business with it; (2) it faces potentially future legal exposure to Ascension, notwithstanding that Ascension to date has not sued it; (3) it stood to, but did not, receive a $750,000 rebate under the SPA; and (4) it is owed approximately $2 million for gloves it claims to have bought from Kitchen Winners above the quantity which the SPA provided. Rock Fintek Br. at 30. Kitchen Winners argues that the record does not permit Rock Fintek to recover under any of these theories.

### a.    *Lost future profits*

Rock Fintek seeks damages on all its claims on the ground that, because of Kitchen Winners' nonperformance and malfeasance, it lost out on a business relationship with Ascension, that could have netted it $30 million or more per year in revenue "in the short term." Rock Fintek Br. at 35. Kitchen Winners argues that this damage claim cannot be calculated with reasonable certainty, and that such damages were not in reasonable contemplation when the

parties entered into the SPA. Kitchen Winners Br. at 18–24. On this point, the Court holds with Kitchen Winners and enters summary judgment precluding this theory of damages. Rock Fintek has not come close to establishing future profits that could be calculated with any certainty.

"Under New York law, loss of future profits which would have been earned but for the breach of contract are recoverable, provided they satisfy three criteria." *Great Earth Intern. Franchising Corp. v. Milks Development*, 311 F. Supp. 2d 419, 432 (S.D.N.Y. 2004). "First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty." *Kenford Co v. Erie County*, 502 N.Y.S.2d 131, 132 (1986) [hereinafter "*Kenford I*"]. Third, "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Id.*

Critically here, as to the second requirement, a plaintiff (including a counterclaim-plaintiff) is "entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). "[T]he damages may not be merely speculative, possible or imaginary." *Kenford I*, 502 N.Y.S.2d at 132. "Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgmt. Inc. v. Janien*, 604 N.Y.S.2d 912, 915 (1993). But, "[p]rojections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty." *Schonfeld*, 218 F.3d at 172.

Here, Rock Fintek's ostensible lost profits can be arrived at only by extreme speculation. It is conjectural that Rock Fintek would have done future business with Ascension, let alone the

nature or profitability of this business. Even assuming such business, Kato, testifying for Rock Fintek, made broad guesstimates as to revenue and damages. He derived a $62 million/year revenue estimate taking Rock Fintek's revenue from Ascension for a period of about 15 months during the height of the pandemic (March 2020 to July 2021). He then assumed a 50% profit margin, Rakhunov Decl., Ex. 8 ¶ 19, based on subtracting the money Rock Fintek paid to its suppliers in connection with that business, plus sums it paid to its two trucking and logistic companies. *See* Rock Fintek 56.1 ¶¶ 157–61; *see also* Rakhunov Decl., Ex. 8 ¶ 15. This methodology is inexact and conclusory.

Particularly problematic, Rock Fintek's lost-profits theory proceeds from the highly dubious premise that its services to Ascension early in the pandemic would recur in the future and/or, if different, be representative, in revenue and profitability, of its future services. *See, e.g.*, *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1063–64 (S.D.N.Y. 1996) (declining to award lost profits on basis of "simple mathematical formula" based on unsubstantiated assumptions); *Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101 (SHS), 2004 WL 1574629 (S.D.N.Y. July 14, 2004) (proffered calculation of lost-profit damages insufficient where, among other things, it failed to satisfactorily account for potential costs, and was not based on reliable analysis of any outside expert); *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 154 (1st Dep't 2007), *aff'd*, 14 N.Y.3d 791 (2010) (expert report did not assist in lost-profits showing, as it was "based on nothing but unverified assumptions about future profitability given to [expert] by plaintiffs themselves"); *cf. Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993) (rejecting damages calculation by accounting expert as based on dubious assumptions). It has also not accounted for the anomalies of the March 2020 to March 2021 period, marked by acute demand and

idiosyncratic supply chain issues that may have provided rare opportunities for profit-taking. Ascension itself acknowledged that its supply chain problems receded after this period. Elstro Dep. at 41; *see Schonfeld*, 218 F.3d at 174 (noting New York courts' hesitance to embrace claims for lost profits on entertainment industry ventures, given the volatile nature of the business environment and consumer preferences).[19]

Rock Fintek's *ipse dixit* that it would continue to earn approximately $30 million in profits from its business dealings with Ascension for years to come is also undermined by its own short history. Its own evidence supports that Rock Fintek was first formed as an LLC in 2018 and first entered the PPE market and did business with Ascension in March 2020. *See* Kato 30(b)(6) Dep. at 16–27. Even treating as accurate Rock Fintek's assumptions of the profit it stood to make from its arrangement with Ascension, it is conclusory to assume that arrangement would prefigure its future profits. New York courts hesitate to permit lost profit theories in connection with a new business, recognizing that without a proven track record, past profits are not reliably prologue. *See, e.g., Coastal Aviation, Inc.*, 937 F. Supp. at 1065 ("[W]e have found no case from a New York State court permitting a recovery of lost profits to a 'new business.'"); *Kenford I*, 502 N.Y.S.2d at 132 ("If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty."). That caution is all the more warranted here, given the volatility of the pandemic-era work that defined Rock Fintek's relationship with Ascension, and the inherent uncertainty of the

---

[19] The integrity of Rock Fintek's mathematical calculations is further impeached by its decision to discount as irrelevant the $6.2 million it squandered in the Thailand "theft," on the premise that a loss event of this nature could not happen again. *See* Rock Fintek 56.1 ¶¶ 162–63; *see also* Rakhunov Decl., Ex. 8 ¶ 16.

premise that new and equally lucrative contracts for different services would have followed but for the non-conforming gloves it received. *See* Elstro Dep. at 37–40 (testimony of Ascension representative that there was no guarantee of future contracts with Rock Fintek). And while Ascension's representative testified that there had been short-term opportunities for business with it, such as helping it source bent metal products like wheelchairs, for which Rock Fintek could have competed, *id.* at 37–38, there was no assurance that Rock Fintek would have secured such business, let alone that it lost profits calculable to a reasonable certainty. *See Buffalo Riverworks LLC v. Schenne*, 199 N.Y.S.3d 311, 314 (4th Dep't 2023) (plaintiff failed to support claim for lost profits where it did not establish benchmark from which factfinder could determine future performance with reasonable certainty); *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 931 N.Y.S.2d 105, 108 (2d Dep't 2011) (performance of other outlets in chain store did not help calculate lost future profits with reasonable certainty where there were relevant differences between outlets).

In the end, the scant evidence adduced by Rock Fintek falls far short of supporting a claim for lost profits damages. Any such claim would turn on unacceptable guesswork. The Court grants Kitchen Winners' motion to bar a lost profits theory of damages.

### b.    *Potential liability to Ascension*

Rock Fintek next pursues damages based on its asserted exposure to claims from Ascension. But it is premature to assert such money damages, as Ascension has not pursued such a claim, let alone recovered on it. *See RDI Corp. v. Charter Comm'cns, Inc.*, No. 19 Civ. 10929 (CM), 2022 U.S. Dist. LEXIS 38123, at *31–33 (S.D.N.Y. Jan. 31, 2022) (contract damages cannot lie based on possibility of future fines or other liability from federal agency where fines had not been assessed). In March 2022, Ascension sent Rock Fintek a demand letter. Rock Fintek 56.1 ¶ 294. But there is no evidence that Ascension took further action,

42

including filing a lawsuit. Were it to do so, Rock Fintek could seek indemnification from responsible parties. *RDI Corp.*, 2022 U.S. Dist. LEXIS 38123, at *31–33. Rock Fintek cannot, however, pursue money damages based on a claim against it that has not been made.

Rock Fintek's case authority is unavailing. *See* Rock Fintek Br. at 40–41. In *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404 (1969), the Supreme Court stated that a stevedore could seek *indemnity* for liability it might face from the family of a deceased employee. *Id.* at 408–09. But it did not hold exposure to as-of-yet hypothetical liability could support a contract damages claim. And in *City of New York v. Lead Industries Ass'n*, 644 N.Y.S.2d 919 (1st Dep't 1996), the First Department held that a plaintiff could recover for measures it took to protect against the threat of liability caused by an alleged breach of contract. *Id.* at 129. Rock Fintek has not, however, pointed to any such actions on its part, let alone identified money damages traceable to them. The Court grants Kitchen Winners' summary judgment motion as against this theory of damages.

  *c.*  *Contractual Rebate and Alleged Overages*

Rock Fintek's final two theories of damages are properly analyzed together. It alleges that Kitchen Winners owes it money under the SPA's rebate provision, for gloves it paid for but never received in full quantity, and for trucking and associated costs that were not actually or properly incurred. Rock Fintek Br. at 42–43. Kitchen Winners argues that a reasonable jury could not find that it owes Rock Fintek any of this money. Kitchen Winners Br. at 24–25.

Kitchen Winners is wrong. Its arguments largely replicate its arguments in favor of its affirmative breach of contract claim. As noted, however, genuine disputes of material fact exist as to whether Rock Fintek should have been paid a rebate under the SPA, and the balance due under the contract. Although the parties have not specifically briefed the point, the Court

assumes that Rock Fintek's breach of covenant claim would support its claim for damages based on the withheld contractual rebate, gloves supplied in excess of the SPA, and shipping costs.

However, on Rock Fintek's breach of warranty claim, a reasonable jury could not find that a breach as to the quality of the gloves that Kitchen Winners sold Rock Fintek caused Rock Fintek these injuries. If established, these sources of monetary injuries derive from factors other than Kitchen Winners' breach of warranty. And Rock Fintek has not articulated how Kitchen Winners' alleged breach of warranty in failing to provide examination-grade gloves caused it an injury. *See, e.g.*, *Dickinson v. Dowbrands Inc.*, 689 N.Y.S.2d 548, 549–50 (3d Dep't 1999) (warranty claim failed where record did not support that alleged defect was proximate cause of injury); *Nitz v. Gusmer Corp.*, 666 N.Y.S.2d 841, 843–44 (3d Dep't 1997) (same). That leaves Rock Fintek without a theory of injury on its breach of warranty claim against Kitchen Winners. The Court accordingly dismisses that claim.

\*\*\*

In sum, as to the claims brought by Rock Fintek against Kitchen Winners, the Court denies Kitchen Winners' motion for summary judgment on account of a lack of damages as to the breach of contract and covenant claims, but grants it on the breach of warranty claim. The Court likewise grants Kitchen Winners' motion to preclude, as to all claims, Rock Fintek's lost profits and litigation-exposure theories of damages. Because the other parties sued by Rock Fintek incorporate Kitchen Winners' challenges to damages theories, *see* Adorama Br. at 19; JNS Br. at 13–17, the Court's holdings as to the availability of damages equally apply to Adorama, JNS, and Stern, except as specifically noted in the following.

### B.     Adorama's Motion

Adorama moves for summary judgment on all claims Rock Fintek brings against it. Adorama Br. at 19.[20]

### 1.     Breach of Contract

Rock Fintek argues that Adorama breached the SPA by "knowingly" delivering gloves that did not conform to the SPA's specifications. Rock Fintek Br. at 9. For purposes of its summary judgment motion, Adorama does not dispute that there was such a breach. It instead argues that it was not a "Seller" under the SPA, that it had no obligations under the SPA, and thus that it did not breach the SPA. Adorama Br. at 8–12.[21]

The parties centrally dispute whether Adorama can be found a "Seller" under the SPA. If so, as Rock Fintek argues, it is bound by the SPA's relevant provisions, including the obligation to provide examination-grade gloves. Rock Fintek Br. at 21–25. If not, as Adorama argues, it was not so obligated, and cannot be held liable for breach of contract on that basis. Adorama Br. at 8–12. This dispute is one of contract interpretation: to which parties does the term "Seller" in the SPA apply. Drawing on the legal principles above, the Court finds that the SPA is textually ambiguous on this point, and that a reasonable jury, considering extrinsic evidence, could find for Rock Fintek that Adorama was a "Seller."

Analysis begins with the text of the SPA. *See Compagnie Financiere*, 232 F.3d at 157–58 (summary judgment on contract claim based on contract construction appropriate only where

---

[20] Rock Fintek has withdrawn its one claim against Mendlowitz in his individual capacity—for breach of warranty. *See* Rock Fintek Br. at 50 n.8. The remaining claims against the "Adorama Parties" are those brought against Adorama itself. Rock Fintek has also abandoned its "alter ego" theory of contract liability for Adorama. Rock Fintek Br. at 25 n.3.

[21] Adorama also argues that Rock Fintek's damages claims are too uncertain to support a breach of contract claim. For the reasons above, some species of damages are available on that claim.

Court finds language unambiguous).  Adorama argues that the SPA's definition of a "Seller" in

its preamble excludes it.  *See* Adorama Br. at 8–12.  That preamble reads:

> **THIS SALES AND PURCHASE AGREEMENT** (this "<u>Agreement</u>") is entered
> into on April , <u>7</u>, 2021 (the "<u>Effective Date</u>"), **KITCHEN WINNERS NY INC**, a
> New York corporation having an address at 1134 53rd Street, Brooklyn, NY 11219
> ( "Seller") and **ROCK FINTEK LLC** a Limited Liability Company having an
> address at 1680 Michigan Avenue, Miami Beach, Florida 33139 ("Buyer") (each a
> "<u>Party</u>" and, collectively, the "<u>Parties</u>").  The Parties agree jointly, severally,
> mutually, and reciprocally to the terms and conditions stated herein . . .

SPA at 1.  The preamble indeed does not identify Adorama as a "Seller," or even as a "Party."

Indeed, as Adorama notes, the preamble, using the singular, defines Kitchen Winners as the sole

"Seller," and lacks language suggestive of multiple Sellers.  Further, as Adorama notes, it is first

mentioned in the SPA by name in a provision that Adorama's account as the destination for Rock

Fintek's deposit under the SPA—an account that the SPA identifies as "an account designated by

Seller."  SPA at 1.  These aspects of the SPA support Adorama's claim not to be a Seller.

But the signature page of the SPA points in the other direction.  Rock Fintek notes that on

it, reproduced above, Mendlowitz signed the SPA on Adorama's behalf—and did so immediately

below Weiner's signature on behalf of Kitchen Winners, with the signatures immediately below

the designation "Seller."  SPA at 4.  Gilling's signature, on Rock Fintek's behalf, in turn appears

immediately below the designation "Buyer."  *Id.*  That Adorama signed the SPA, and under the

heading "Seller," is evidence within the four corners of the contract that the intent of the parties

was that Adorama be bound by the SPA as a Seller.  *See Brown Bros. Elec. Contractors, Inc. v.

Beam Const. Corp.*, 393 N.Y.S.2d 350, 352 (1977) ("In determining whether the parties entered

into a contractual agreement and what were its terms, it is necessary to look . . . to the objective

manifestations of the intent of the parties as gathered by their expressed words and deeds[.]"

(citations omitted)); *Willsey v. Gjuraj*, 885 N.Y.S.2d 528, 530 (2d Dep't 2009) ("When the terms

of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations.").

Rock Fintek fairly argues that Adorama's signature under the word "Seller" is hard to square with its bid for summary judgment on the ground that the parties all understood Adorama to be merely Kitchen Winners' financer and as such an expected recipient of part of Kitchen Winners's payout under the SPA. *Cf. BOCA Aviation Ltd. v. AirBridgeCargo Airlines, LLC*, 669 F. Supp. 3d 204, 223 (S.D.N.Y. 2023) ("[A] contract should be interpreted in a way that reconciles all of its provisions, if possible." (quoting *N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010)). Had such been the case, the SPA provision designating Adorama's bank account as the place for the deposit would have appeared to have protect Adorama's interest in this payment, if its role were thus limited. *See* SPA at 1. Put differently, Adorama's signature on the SPA complicates its proposed construction, under which it had no obligations under the agreement. The Court thus finds that the SPA is textually inconclusive as to whether Adorama qualified—and could be held liable—as a Seller thereunder.

Adorama urges that it intended to sign the SPA solely in its capacity as a lender to Kitchen Winners, and that none of it, Rock Fintek, and Kitchen Winners intended it to be bound by the SPA's terms. Adorama Br. at 8–12. The SPA, however, does not unambiguously support that construction. In the provision that provides for the deposit to be made to Adorama's bank account, the SPA does not delineate Adorama as a lender, SPA at 1, and it does not anywhere memorialize what Adorama contends was a mutual understanding that it was not obligated under the SPA. With the contract language ambiguous, Adorama's argument that it signed the SPA solely as a lender thus can be credited only on the basis of extrinsic evidence, as this Court noted

in denying Adorama's motion to dismiss. *See* Dkt. 68 at 24–27. The same is so as to Rock

Fintek's contrary argument. *See* Rock Fintek Br. at 22; *Compagnie Financiere*, 232 F.3d at 157.

Where contract text is ambiguous, for a movant to obtain summary judgment on the basis

of extrinsic evidence, that evidence must so buttress its position that a reasonable fact-finder

could not resolve the ambiguity otherwise. *See Indep. Energy Corp. v. Trigen Energy Corp.*, 944

F. Supp. 1184, 1193 (S.D.N.Y. 1996). On the summary judgment record, the Court finds

sufficient evidence on which a reasonable jury could find either way. It thus denies Adorama's

summary judgment motion on its theory to not qualify under the SPA as a "Seller."

Adorama—which as the movant bears the burden on summary judgment—adduces some

evidence that the parties did not intend it to be a Seller, but rather to be Kitchen Winners' lender,

without any performance duties. Mendlowitz directly so testified. He stated that Adorama's

relationship with Kitchen Winners and its involvement in the PPE business writ large was solely

as a financer of deals between other buyers and sellers. *See* Mendlowitz Dep. at 36–40. He

testified that he signed the SPA on behalf of Adorama solely out of a desire to protect its money

"from a lender's perspective." *Id.* at 41. A reasonable jury could credit this account.

But Rock Fintek's opposite narrative also has testimonial support. Its Rule 30(b)(6)

witness, Kato, testified that the only reason Rock Fintek agreed to pivot to the SPA from its prior

practice of doing smaller, one-off transactions with Kitchen Winners was because Adorama,

which Kato viewed as a legitimate and established concern, signed onto the deal. Kato 30(b)(6)

Dep. at 196–98. A jury could credit that, too.

The balance of the potentially apposite extrinsic evidence bearing on the SPA parties'

view of Adorama's intended role carries limited weight. Adorama relies on the absence of

evidence of direct pre-SPA communications between Kato, Gilling, or anyone else at Rock

48

Fintek and Mendlowitz or anyone else at Adorama. *See* Adorama Br. at 6–7. Although he had

had numerous conversations with Banon, apparently in Banon's capacity as a broker for Kitchen

Winners, Mendlowitz testified that Banon did not work with or for Adorama. Mendlowitz Dep.

at 92–93. Rock Fintek, for its part, notes testimony by Gilling that Banon held himself out as

working for Kitchen Winners and Adorama, and that, in calls discussion and negotiating terms of

the SPA, an unidentified Adorama principal participated, and that in at least one, he recalls the

parties discussing that Adorama would be a party to the SPA. *See* Gilling Dep. at 35–37, 113–

19. A reasonable jury might credit Gilling's testimony on these points, but, perhaps noting the

absence of any supporting documentation or other corroboration, might reject it as incredible.

Relevant too, but not dispositive, is the pre-SPA LOI between Rock Fintek and Maimon.

It states that "Adorama is financing [the glove] transactions for Kitchen Winners." LOI at 1. A

factfinder could logically infer from this that Rock Fintek knew that Adorama was serving as a

financing party for Kitchen Winners. But the LOI does not establish, one way or the other,

whether Adorama's role was larger. The LOI lists as its "Subject" that "Rock Fintek desires to

purchase up to 1 million boxes of powder-free nitrile medical gloves (100 gloves/box as per

specifications) from Kitchen Winners NY Inc (KWNY)/Adorama[.]" *Id.* Although it is far from

conclusive, a factfinder could conclude from this language that the parties did not understand

Adorama's function as lender to be mutually exclusive with its function as a Seller.

Rock Fintek has adduced other evidence that undermines Adorama's bid for summary

judgment on this ground. It includes an email from Weiner to Mendlowitz seeking feedback on

a draft of the SPA a few days before its execution, Rakhunov Decl., Ex. 3 at 2; the post-SPA fact

that all payments under the SPA were directed to Adorama, not Kitchen Winners, Rock Fintek

56.1 ¶ 176; and evidence that Weiner kept Mendlowitz apprised of performance under the SPA during its contract term, Rakhunov Decl., Ex. 5.

On Adorama's motion for summary judgment, Rock Fintek has adduced enough extrinsic evidence on which a finder of fact could find Adorama to be a Seller under the SPA. The Court denies Adorama's motion for summary judgment on the breach of contract claim.

### 2.    Breach of the Covenant of Good Faith and Fair Dealing

Adorama next moves against Rock Fintek's claim for breach of the implied covenant of good faith and fair dealing. Adorama Br. at 15–17.

Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam)). A claim for breach of the implied covenant requires the existence of a duty, breach of that duty, causation, and damages. *See Washington v. Kellwood Co.*, No. 05 Civ. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009). "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)). Where the breach of the implied duty arises from a breach of the underlying contract, it does not create a freestanding cause of action. *See, e.g., Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

Here, as Rock Fintek admits, the only part of its claim for breach of an implied duty of good faith that is independent of a breach of the SPA itself is based on an email by Weiner on July 14, 2021, which Rock Fintek claims attempted to extort $18 million from Rock Fintek under

the guise of a settlement proposal.[22]  Rock Fintek Br. at 25–26; *see also* Rakhunov Decl., Ex. 12 (settlement email from Weiner).  But the only evidence Rock Fintek has adduced of Adorama's involvement in the alleged extortionate plot is that Weiner "bcc-ed" Mendlowitz on this single email.  *See* Rakhunov Decl., Ex. 12 (bcc-ing Mendlowitz and Banon).  It does not point to any evidence that Adorama took any step to further Weiner's asserted extortion plot, let alone evidence to overcome the presumption of Adorama's good faith.  On this record, a reasonable jury could not find that Adorama breached an implied duty of good faith.  The Court grants Adorama's motion for summary judgment on this claim.

### 3.    Unjust Enrichment

Adorama next moves to dismiss Rock Fintek's unjust enrichment claim against it, arguing both that it duplicates the breach of contract claim and that Rock Fintek cannot prove enrichment.  Adorama Br. at 17–18; Adorama Reply Br. at 5–6.  Rock Fintek responds that it brings this claim as an alternative to its breach of contract claim, in the event the Court or jury find Adorama not bound by the SPA (i.e., not a "Seller").  Rock Fintek. Br. at 26–27.  That is correct.  The Court has sustained the contract breach claim against Adorama under the SPA as factually supportable while noting the contract's ambiguity as to whether Adorama was a Seller bound under it.  As such, Rock Fintek's unjust enrichment claim properly survives, to cover the circumstance that Adorama is found not to be bound by the SPA.  *See, e.g.*, *Kramer v. Greene*, 36 N.Y.S.3d 448, 451–52 (1st Dep't 2016) (denying summary judgment on unjust enrichment claim because genuine dispute of material fact existed as to coverage of contract); *Goldman v.*

---

[22] The Court assumes *arguendo* that this email, though styled as a settlement proposal, could be received under Federal Rule of Evidence 408 as offered for a purpose other than to prove the validity of Rock Fintek's contract claims—to show the asserted breach of the implied covenant. *Cf. PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 114 (2d Cir. 2008) (defendant in trademark infringement suit permitted to use evidence that during settlement discussions plaintiff gave permission to use trademark, as such furthered estoppel defense).

*Simon Prop. Grp., Inc.*, 869 N.Y.S.2d 125, 135 (2d Dep't 2008) ("[W]here there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract, and will not be required to elect his or her remedies[.]" (citation omitted)); *cf. Federal Deposit Insur. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 120–21 (S.D.N.Y. 2020) (where court at summary judgment awarded plaintiff summary judgment on breach of contract claim, unjust enrichment claim could no longer be maintained in the alternative). As for Adorama's argument about its lack of enrichment, Kitchen Winners' evidence Adorama received and kept money from Rock Fintek for non-conforming gloves would support its claim of enrichment (and damages).[23]

### 4.    Breach of Written Warranty

Finally, Adorama challenges Rock Fintek's claim for breach of express written warranty, which alleges that Adorama, through Banon, provided written (but false) assurances that the gloves would meet the SPA's specifications. *See* Adorama Br. at 18. The Court's bases for precluding the warranty claim against Kitchen Winners equally apply to this claim against Adorama. Additionally, as to Adorama, the record at summary judgment does not contain evidence on which a reasonable jury could infer that Adorama ever made the warranty at issue, which provides an independent ground for entering summary judgment against this claim.

A claim for breach of express warranty entails: "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach." *Housey*, 2022 WL 874731, at *3. "Generalized or vague allegations that defendant made express warranties are insufficient; plaintiff must plead some affirmative statement of fact

---

[23] The Court has precluded Rock Fintek's alternative damages theories, based on lost future profits or legal exposure to Ascension.

that forms the basis of the warranty." *Tears v. Bos. Sci. Corp.*, 344 F. Supp. 3d 500, 512 (S.D.N.Y. 2018) (citation omitted).

Critically here, there is no evidence on which a jury could find that Adorama made any express warranty to Rock Fintek regarding the gloves at issue. Rock Fintek argues that Adorama made such a warranty via Banon, whom Rock Fintek says was working for both Adorama *and* Kitchen Winners when he provided Rock Fintek with documentation that allegedly described the composition of the gloves. Rock Fintek Br. at 49–50; *see also* Banon WhatsApp Chat at 1 (sending documentation). But even if a jury could find that Banon represented Adorama as well as Kitchen Winners—and the evidence on that point is threadbare and likely inadmissible, as it consists of second-hand testimony from Kato and/or Gilling about what Banon ostensibly told them—Rock Fintek has not adduced evidence that that was so at the early point at which Banon provided Rock Fintek with the documentation in question. Banon did so on March 4, 2021, before the SPA, at the start of the period when Kitchen Winners and Rock Fintek engaged in a series of one-off glove transactions, *see* Banon WhatsApp Chat at 1. No evidence has been adduced that Adorama was a party to these pre-SPA transactions. Rock Fintek identifies evidence suggesting that Adorama at some point sold some PPE on its website, *see* Rakhunov Decl., Ex. 1 (website screenshot), but that does not tie Adorama to the one-off sales by Kitchen Winners to Adorama. Kitchen Winners' name alone appears on the documents that Rock Fintek contends were a written warranty by *Adorama*.

A reasonable jury could not find that Adorama made an actionable express warranty here. The Court thus grants summary judgment to Adorama's on Rock Fintek's breach of warranty claim against it.

### C.    JNS/Stern's Motion

JNS and Stern move for summary judgment on all of Rock Fintek's claims against them.

1.    **Claims Against Stern**

Stern moves against Rock Fintek's claims against him individually for breach of contract, fraudulent inducement, and breach of express warranty. JNS Br. at 5–13.

a.  *Breach of contract*

Stern is not himself a party to any contract between JNS and Rock Fintek. To hold Stern liable for breach, Rock Fintek would have to justify piercing the corporate veil. Rock Fintek argues that such is justified here because Stern assertedly "made fraudulent statements related to transactions on which Stern *used JNS* to serve as the contracting party." Rock Fintek Br. at 48. *see also* Stern Dep. at 52–54 (discussing passing documentation for the gloves to Azra, who in turn passed to Rock Fintek). The record, however, does not support piercing the corporate veil to enable Stern to help liable for JNS's breach of contract.

New York law "allows a party to pierce the corporate veil upon showing '(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *Parnell v. Tremont Capital Mgmt. Corp.*, 280 F. App'x 76, 77–78 (2d Cir. 2008) (summary order) (citing *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)). And to be entitled to the equitable remedy of piercing the corporate veil, a "plaintiff must allege 'more' than the underlying fraud or breach of contract in the sense that in addition to the fraud or breach of contract or other injustice he or she must also allege that 'the *corporate structure itself* [was] used to further the fraud or injustice or "as a shield for" unjust acts.'" *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 341 (S.D.N.Y. 2021) (quoting *Partner Reinsurance Co. Ltd. v. RPM Mortg., Inc.*, No. 18 Civ. 5831 (PAE), 2020 WL 6690659, at *11 (S.D.N.Y. Nov. 13, 2020)). Further, because it is "perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners," "[t]he party seeking to pierce

the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate" the subject wrong or injustice. *Morris v. New York State Dept. of Taxation and Fin.*, 603 N.Y.S.2d 807, 810–11 (1993).

Here, even assuming *arguendo* Stern's domination, Rock Fintek has not adduced any evidence that Stern used the corporate form to perpetrate the alleged fraud. Rock Fintek argues that Stern fraudulently induced it to contract with JNS by falsely promising that the gloves provided would be conforming. Rock Fintek Br. at 48–49; *see also* Stern Dep. at 52–54 (discussing passing documentation for the gloves to Azra, who in turn passed to Rock Fintek). But it does not point to any evidence that Stern, in making the allegedly fraudulent statements, "abused the privilege of doing business in the corporate form," *Morris*, N.Y.S.2d at 810–11. That JNS alone signed any contract with Rock Fintek—and that JNS today may be judgment-proof—does not justify holding Stern liable for JNS's alleged breach of contract. *See, e.g., Skanska USA Bldg. Inc. v. Atlantic Yards B2 Owner, LLC*, 40 N.Y.S.3d 46, 54 (1st Dep't 2016) (piercing corporate veil on breach of contract claim unjustified where plaintiff, itself a "sophisticated party," had knowingly entered contract with corporation, not with third-party against whom sought to bring claim); *E. Hampton Union Free School Dist. v. Sandpebble Builders, Inc.*, 884 N.Y.S.2d 94, 99 (2d Dep't 2009) (despite individual defendant's domination over corporate conduct, no basis to pierce corporate veil where evidence did not suggest that defendant "acted other than in his capacity as president and principal owner of [corporation], or that he failed to respect the separate legal existence of the corporation . . . or that he, in any other way, abused the privilege of doing business in the corporate form"). The Court thus enters summary judgment for Stern on Rock Fintek's breach of contract claim against him individually.

*b.    Fraudulent inducement*

55

"In New York[,] a plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co. Inc.*, 500 F.3d at 181. "The clear and convincing evidence standard 'demands a high order or proof and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory' because 'fraud will not be assumed on doubtful evidence or circumstances of mere suspicion.'" *Hindsight Sols. LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014) (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009)). Summary judgment is thus appropriate if "no reasonable trier of fact could find" that clear and convincing evidence supports Rock Fintek's claim. *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002).

Rock Fintek has not adduced sufficient evidence to allow a reasonable jury to find the necessary elements of its fraudulent inducement claim. That claim asserts that Stern, through Azra, gave Rock Fintek documentation as to the specifications of the gloves to be sold, knowing based on packing lists that he had reviewed that the gloves were non-compliant, and that Rock Fintek relied on this. *See* Stern Dep. at 52–54; *see generally* Li Decl. But even if a reasonable jury could find that Stern at some point had reason to know that the gloves JNS was selling were protection grade and not examination grade, Rock Fintek has not adduced evidence on which a jury could find that Stern knew this at the time he provided the documents on which Rock Fintek is said to have relied, let alone that he did so intending to induce Rock Fintek's reliance.

Following discovery, Rock Fintek's fraud claim against Stern turns on several packing lists documenting gloves that JNS received from China and allegedly later sold to Rock Fintek.

*See* Rakhunov Decl., Ex. 44. The majority of these describe examination-grade gloves, although some describe *protection*-grade gloves. *See id.* Rock Fintek argues that JNS delivered to Rock Fintek gloves corresponding to the shipment numbers for protection grade gloves, in contravention of the SPA. *See* Rock Fintek 56.1 ¶¶ 248–52. In arguing that Stern knew the gloves were non-conforming, Rock Fintek notes deposition testimony by Stern to the effect that he typically reviewed these packing lists. Stern Dep. at 68–69.

Rock Fintek's evidence, however, falls short of supplying clear and convincing evidence of Stern's fraudulent inducement. For one, the packing lists largely post-date the single act of alleged false representation for which Rock Fintek seeks to hold Stern accountable—Azra's provision to it of certification and testing documents. *See* Rakhunov Decl., Ex. 44. Rock Fintek has not established when Stern provided these documents to Azra, but the evidence reflects that Azra handed them to Li, and Li to Rock Fintek, in early February 2021. Li WhatsApp Chat at 32–33; Rock Fintek 56.1 ¶ 205. Rock Fintek and JNS thereafter entered into the irrevocable purchase order, on February 3, 2021. JSF, Ex. 12. The packing lists at issue, however, are mostly from March 2021 or later. And those from February are dated February 3, 2021—the same date that Rock Fintek entered into the purchase order with JNS. *See* Rakhunov Decl., Ex. 44. Without more, Rock Fintek thus cannot rely on Stern's ostensible review of these documents to establish that he knew at the time that Azra provided Rock Fintek the document at issue that such was false. *See, e.g., Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 323 (S.D.N.Y. 2012) (fraudulent inducement could not lie where evidence did not establish defendant knew or should have known statements were false); *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *13 (S.D.N.Y. Dec. 22, 2003) ("[Plaintiff] has failed to plead a cause of action for fraudulent inducement because it has not alleged that

Citibank knew the statements to be false at the time the statements were made or that Citibank intended to defraud BESI.").

Moreover, even assuming Stern's review of the packing documents predated the representations to Rock Fintek, many if not most of these documents describe shipments of what appear to be examination-grade gloves consistent with the representations to Rock Fintek. *See* Rakhunov Decl., Ex. 44. A jury would have to assume Stern's real-time appreciation that, while many if not most gloves described in the documents were examination-grade, a subset were described otherwise. That is possible. But Rock Fintek has not adduced evidence, let alone clear and convincing evidence, on which a jury could non-speculatively so find, to wit, that when Stern caused Rock Fintek to receive the certification of compliant gloves, he appreciated that in fact, it stood to receive some non-compliant protection-grade gloves. *See Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524 (1st Dep't 2010) (fraudulent inducement requires "knowing misrepresentation of material present fact, which is intended to deceive another party and induce that part to act on it"). Rock Fintek, finally, notes Stern's April 2021 offer to it of protection grade gloves. *See* Stern WhatsApp Chat at 4–6. But that does not bear on Stern's state of mind at the critical point two months earlier, in early February 2021.

The Court grants summary judgment to Stern on the fraudulent inducement claim brought against him individually.

### c. *Breach of written warranty*

As to the breach of express warranty claim against Stern, Rock Fintek does not identify—or even attempt to—any injury to it resulting from this alleged breach, beyond the lost profits and litigation exposure theories of damages that this Court ruled against as a matter of law. The Court enters summary judgment for Stern on this claim.

### 2.    Breach of Contract Claim Against JNS

JNS moves for summary judgment on the breach of contract claim against it.[24]
It argues that: (1) Rock Fintek cannot establish damages; (2) there is insufficient evidence to
prove that the gloves JNS shipped were defective or otherwise in breach of the purchase order;
and (3) Rock Fintek failed to timely object to allegedly non-conforming goods, as required by
the Uniform Commercial Code ("UCC"), barring its breach of contract claim on this basis.  JNS
Br. at 13–21.

### a.    Contract damages

Like Kitchen Winners and Adorama, JNS argues that Rock Fintek's breach of contract
claim against it fails for lack of cognizable damages.  The holdings above that Rock Fintek
cannot pursue damages based on lost future profits or legal exposure to Ascension equally apply
to this claim against JNS.  Rock Fintek does not specifically allege other damages than those it
seeks on its contract-breach claim against Adorama.  However, as noted above, under New York
law, where actual damages have not been proven, nominal damages are available "'as a formal
vindication of plaintiff's legal right to compensation.'"  *NAF Holdings, LLC*, 2016 WL 3098842,
at *17 (quoting Freund, 357 N.Y.S.2d at 861).  The Court thus rejects JNS's challenge to the
contract breach claim to the extent based on the unavailability of damages.

---

[24] Rock Fintek brought a warranty-based claim and a fraudulent inducement claim against JNS as
well as against Stern, Dkt. 43 ¶¶ 140 (fraud claim naming JNS and Stern), 179 (warranty claim
doing the same), but it did not defend that claim in its opposition to summary judgment,
addressing that claim only in relation to Stern.  *See* Rock Fintek Br. at 49 (listing Stern,
Adorama, and Kitchen Winners as parties relevant to a warranty-based claim), 45–48 (arguing
only that the fraud claim against Stern survives because it is not duplicative of a breach of
contract claim where only JNS is named).  The Court dismisses those claims as abandoned. *See*
*Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).

b.    *Breach*

JNS next argues that the evidence does not establish JNS sold it non-conforming gloves. It disputes that there is evidence on which a reasonable jury could trace nonconforming gloves to any of its shipments. It also disputes that it was contractually required to provide gloves in accordance with ASTM D6319. JNS Br. at 13–19. These arguments fail.

There is a genuine dispute of fact whether JNS sold Rock Fintek non-conforming gloves. JNS notes that it sold Rock Fintek gloves in distinct orders. *See generally* Stern WhatsApp Chat (negotiating these orders). It notes evidence that these orders were shipped from JNS's warehouses to Ascension's warehouses for storage, Stern Dep. at 131–32, but that Ascension's warehouses mingled JNS's gloves with other shipments such that it is impossible to track which originated with JNS. *See* Elstro Dep. at 50–52. But although a jury might draw this conclusion, the evidence would also give it a basis to trace non-conforming gloves to JNS. Among other evidence, Rock Fintek points to packing lists, Rakhunov Decl., Ex. 44, bills of lading, *id.*, Ex. 42, and contemporaneous communications, Li WhatsApp Chat at 41, that trace deliveries from JNS by reference to container numbers. *See* Rock Fintek 56.1 ¶¶ 244–48. Some appear to link JNS containers in Ascension's warehouses described as containing protection-grade—not examination-grade—gloves.[25] Notwithstanding the issues tracing the provenance of non-conforming gloves after their delivery to hospitals, this evidence would permit a reasonable jury to infer that at least some non-conforming gloves delivered to Ascension derived from JNS.

JNS alternatively denies an obligation to supply Ascension with ASTM D6319 certified gloves. That argument does not defeat Rock Fintek's claim of its contractual liability. Under its

---

[25] Rock Fintek also points to photographic evidence from July 2021 that pallets of gloves stored in Ascension's warehouses were labelled with container numbers, some of which identified the pallet's supplier (including JNS). Rock Fintek 56.1 ¶ 252; Rakhunov Decl., Ex. 52.

agreement with Rock Fintek, JNS was to provide "Medcare Nitrile Examination Gloves produced in an FDA 510(k) certified factory." JSF, Ex. 12. As reflected in documents that Stern, through Azra, furnished Rock Fintek during negotiations, an FDA 510(k) certification means that the product or process to be certified need not go through more extensive FDA approval processes before hitting the market because it is "substantially similar" to an entity that the FDA has previously approved. *See* Banon FDA 510(k) Letter at 5–6. The FDA 510(k) certification thus incorporates by reference the attributes of a comparator product. The FDA letter that JNS provided Rock Fintek identified, as the substantially similar product supporting 510(k) certification, "Nitrile Powder Free Patient Examination Gloves, Blue Color" which are "manufactured in accordance with the requirements of ASTM D6319 and ASTM D5151 requirements." *Id.* There is thus a factual basis on which JNS could be found to have contractually committed that its gloves would meet the ASTM D6319 standards. At trial, JNS will be at liberty to adduce evidence—if any exists—that the reference to FDA 510(k) incorporated different standards with respect to Medcare Nitrile Examination Gloves, and to persuade the jury that the gloves it supplied met those alternative standards. JNS is not entitled to summary judgment on this ground.

*c.*    *U.C.C. Timely Rejection of Goods*

JNS, finally, argues that because Rock Fintek accepted all gloves within the meaning of the U.C.C. as adopted in New York, Rock Fintek was required to timely notify JNS of any breach or forfeit ability to bring claims for breach of contract (or of express warranty). JNS contends that Rock Fintek did not timely notify it of a breach. On this premise, it argues that this supports summary judgment in JNS's favor. JNS Br. at 19–22. Questions of fact on this point, however, require this claim to go to a jury.

The parties agree that the U.C.C. covers the transactions at issue.  Section 2-606 of the New York U.C.C. provides that a buyer accepts goods when it, among other things, "after a reasonable opportunity to inspect the goods[,] signifies to the seller that the goods are conforming or that [it] will take or retain them in spite of their non-conformity" or "fails to make an effective rejection . . . but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them."  N.Y. U.C.C. §§ 2-606(1)(a)–(b).  Once a buyer accepts a tender offer, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  *Id.* § 2-607(3)(a).

The Court assumes *arguendo* there will be competent evidence that Rock Fintek accepted JNS's asserted non-compliant gloves.  But there is a genuine dispute of material fact whether Rock Fintek notified JNS of the alleged breach in a reasonable time.  JNS shipped gloves to Rock Fintek in a series of orders spanning February 2021 to May 2021.  In July 2021, after Rock Fintek heard from Ascension, to whose warehouses the gloves had been directly shipped, of various problems with the gloves, Rock Fintek promptly raised this concern with JNS's Stern.  It stated, among other things:  "We need you to find and replace these gloves as they are not what we agreed to buy."  Stern WhatsApp Chat at 30–31.  Stern apparently never responded directly to this notice.

This communication on its face clearly gave JNS notice of the asserted breach.  Whether that notice was given within reasonable time, as required by the U.C.C., presents a question of fact.  *See, e.g., Cliffstar Corp. v. Elmar Industries, Inc.*, 678 N.Y.S.2d 222, 223 (4th Dep't 1998) (U.C.C. requirement of notice satisfied to the extent that plaintiff "alert[ed] [defendant] that the transaction [was] troublesome and [did] not need to include a claim for damages or threat of future litigation." (quoting *Comput. Strategies v. Commodore Bus. Machs.*, 483 N.Y.S. 2d 716,

723 (2d Dep't 1984))); *In re Frito-Law N. Am., Inc. All Natural Litig.*, No. 12 MD 2413 (RRM) (RLM), 2013 WL 4647512, at *28 (E.D.N.Y. Aug. 29, 2013) (notice sufficient where seller is "informed that the buyer considers him to be in breach of the contract." (quoting *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 971 (5th Cir. 1976))). Reported cases have often left that determination, based on the assembled circumstances, to the finder of fact. *See Cuba Cheese, Inc. v. Aurora Valley Meats, Inc.*, 494 N.Y.S.2d 571, 572 (4th Dep't 1985) ("Timely notification is governed by the standard of reasonableness and is a question of fact."); *Hubbard v. Gen Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *4 (S.D.N.Y. May 22, 1996) ("[T]he sufficiency and timeliness of the notice if generally a question for the jury.").

The evidence would permit a reasonable jury to find that Rock Fintek's notice to JNS of the deficient merchandise was reasonably timely, under the circumstances. A jury could so find based on, *inter alia*, (1) JNS's representation that it would be shipping examination-grade gloves, JSF, Ex. 12, (2) the absence of notice to Rock Fintek before July 2021 that some gloves sent by JNS were non-compliant, (3) the promptness with which Rock Fintek notified JNS of this deficiency upon its notification of this by Ascension in July 2021 of various problems with the gloves, and (4) the exigencies associated with the ongoing COVID pandemic. *See Patellos v. Hello Products, LLC*, 523 F. Supp. 3d 523, 533 (S.D.N.Y. 2021) (notice of breach seven months after purchase not unreasonable in light of fact that defect first became apparent after use).

The Court therefore denies JNS's motion for summary judgment on this ground, too.

## CONCLUSION

For the foregoing reasons, the Court hereby grants each motion for summary judgment in part, and denies each in part.

To recap the rulings on summary judgment:

As to all parties, the Court dismisses Rock Fintek's theories of damages based on lost profits and based on ongoing exposure to Ascension.  The Court dismisses Rock Fintek's breach of warranty claim against Kitchen Winners; Rock Fintek's covenant of good faith and fair dealing and warranty claims against Adorama, and its alter-ego theory of liability for Adorama under the breach of contract claim (as abandoned); Rock Fintek's breach of express warranty claim against Mendlowitz (as abandoned); and Rock Fintek's breach of contract, fraudulent inducement, and breach of warranty claims against Stern.

That leaves the following claims surviving in this action:

- Kitchen Winners' claims against Rock Fintek for breach of contract (under the SPA only) and for unjust enrichment.

- Rock Fintek's breach of contract claims, under the SPA, against Kitchen Winners and Adorama.

- Rock Fintek's unjust enrichment claims against Kitchen Winners and Adorama.

- Rock Fintek's breach of contract claim against Kitchen Winners as to the one-off transactions.  This claim may proceed for the recovery of nominal damages only.

- Rock Fintek's breach of the covenant of good faith and fair dealing claim against Kitchen Winners.  This claim may proceed for the recovery of nominal damages only.

- Rock Fintek's breach of contract claim against JNS.  This claim may proceed for the recovery of nominal damages only.

All claims against individual defendants have been dismissed.

The case will now proceed to trial.  The remaining parties are directed to file a joint pretrial order, compliant with the Court's Individual Rules, by Tuesday, September 17, 2024, and

to contemporaneously file any motions *in limine*.  Any oppositions to motions *in limine* are due

Tuesday, September 24, 2024.

     The Clerk of Court is respectfully directed to terminate all pending motions.


SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge


Dated: August 6, 2024
      New York, New York