**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
**Joseph Weiner on 11/15/2023**

```
2   UNITED STATES DISTRICT COURT
3   FOR THE SOUTHERN DISTRICT OF NEW YORK
4   ----------------------------------------X

5   KITCHEN WINNERS NY INC.,

6                      Plaintiff,

7           -against-                    Index No.:
                                         22-cv-05276
8   ROCK FINTEK LLC,

9                      Defendant,

10  ----------------------------------------X

11  ROCK FINTEK LLC,

12                     Couterclaim and Third-
                       PartyPlaintiff,
13

14          -against-

15  KITCHEN WINNERS NY INC.,

16                     Counterclaim Defendant,

17               and

18  ADORAMA INC., HERSHEY WEINER, JOSEPH
    MENDLOWITZ, JNS CAPITAL HOLDINGS LLC
19  and JOEL STERN,

20                     Third-Party Defendants.

21  ----------------------------------------X

22                                  Remote EBT

23

24                                  November 15, 2023
                                    8:57 A.M.
25
```

2          EXAMINATION BEFORE TRIAL of JOSEPH WEINER,

3    s/h/a HERSHEY WEINER, a Witness on behalf of Kitchen

4    Winners NY Inc., herein, taken by the attorneys for

5    the respective parties, pursuant to Notice, held

6    remotely, before Melissa Leonetti, RPR, a Notary

7    Public of the State of New York.

8

9                         - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 2                A P P E A R A N C E S:
 3
 4    LIPSIUS-BENHAIM LAW, LLP
            Attorneys for Kitchen Winners NY Inc.,
 5          Adorama and Joseph Mendlowits
            80-02 Kew Gardens Road, Suite 1030
 6          Kew Gardens, New York 11415
 7    BY:  ALEXANDER SPERBER, ESQ.
            asperber@lipsiuslaw.com
 8
 9    POLLACK SOLOMON DUFFY, LLP
            Attorneys for Rock Fintek, LLC
10          31 St. James Avenue, Suite 940
            Boston, Massachusetts 02116
11
      BY:  PHILLIP RAKHUNOV, ESQ.
12          prakhunov@psdfirm.com
13          LAUREN RIDDLE
            lriddle@psdfirm.com
14
15    LAW OFFICE OF AVRAM E. FRISCH, LLC
            Attorneys for Joel Stern and JNS Holdings
16          1 University Plaza, Suite 412
            Hackensack, New Jersey
17
      BY:  AVRAM E. FRISCH, ESQ.
18          frischa@avifrischlaw.com
19
20
21
22    ALSO PRESENT:
23    BRADLEY GILLING
24    THOMAS KATO
25
```

2          F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED, by and

5     between the parties hereto, through their

6     respective Counsel, that the certification,

7     sealing and filing of the within examination will

8     be and the same are hereby waived;

9          IT IS FURTHER STIPULATED AND AGREED that all

10    objections, except as to the form of the question,

11    will be reserved to the time of the trial;

12         IT IS FURTHER STIPULATED AND AGREED that the

13    within examination may be signed before any Notary

14    Public with the same force and effect as though

15    signed and sworn to before this Court.

16

17

18

19

20

21

22

23

24

25

```
 2                    I N D E X

 3

 4   EXAMINATION OF        BY                    PAGE

 5   J. Weiner             P. Rakhunov           6-101

 6

 7                    E X H I B I T S

 8

 9   WEINER                DESCRIPTION           PAGE

10   Exhibit 1             Notice                  8

11   Exhibit 2             Email                  42

12   Exhibit 3             MedCare letter         87

13   Exhibit 4             Email                  90

14

15

16                    R E Q U E S T S

17   DESCRIPTION                                 PAGE

18   All messages                                 35

19

20

21

22

23

24

25
```

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                Page 6

```
 2    J O S E P H    W E I N E R, after having first been

 3    duly affirmed by a Notary Public of the State of New

 4    York, was examined and testified as follows:

 5    EXAMINATION BY

 6    PHILLIP RAKHUNOV, ESQ.:

 7         Q.    Good morning, Mr. Weiner.  We've heard

 8    your name said different ways.  What's the proper

 9    way of saying your last name?

10         A.    Weiner.

11         Q.    You did just say you go by Hershey, but

12    your legal name is Joseph; is that correct?

13         A.    Yes.

14         Q.    Do you go by any other first names?

15         A.    No.

16         Q.    Do you know a name Yitti Weiner,

17    Y-I-T-T-I?

18         A.    Yes.

19         Q.    Who is that?

20         A.    My wife.

21         Q.    So I know you have been deposed before,

22    Mr. Weiner.

23               Was your most recent deposition in the

24    Silverwing Medical case?

25         A.    Yes.
```

2        Q.    Other than the Silverwing Medical case,

3    have you been deposed in any litigation concerning

4    gloves?

5        A.    Not that I recall.

6        Q.    Okay.

7              Have you had your deposition taken in

8    any cases involving the business of Kitchen

9    Winners?

10       A.    Not that I recall.

11       Q.    So other than this lawsuit and the

12   lawsuit involving Silverwing Medical, are you

13   personally or Kitchen Winners NY Inc., a party to

14   any other lawsuit that involves disputes over the

15   sale of personal protective equipment, including

16   gloves?

17       A.    There's another case that's pending,

18   but never took a deposition.

19       Q.    Okay.

20             What's the other case?

21       A.    Hershenson.

22       Q.    Mr. Weiner, that is pending in New York

23   State Court or Federal Court?

24       A.    I don't know.  You would have to ask my

25   lawyer.

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                    Page 8

2      Q.     Okay.

3             So you've taken an oath.  You

4      understand that you're under the same oath that

5      you would be if you were testifying in a court of

6      law, correct?

7      A.     Correct.

8      Q.     Okay.

9             Do you know whether any other lawsuits

10     exist outside of New York, in any other state,

11     that involve the business of Kitchen Winners or

12     the sale of personal protective equipment,

13     including gloves?

14     A.     Not that I recall.

15     Q.     Now, you understand you're appearing

16     today in your capacity as Hershey Weiner and as a

17     corporate representative for Kitchen Winners NY

18     Inc.?

19     A.     Yes.

20     Q.     Okay.

21            (Whereupon, a Notice of Deposition was

22            marked as Weiner Exhibit 1 for

23            identification, as of this date.)

24     Q.     Now, so the document that I put in the

25     chat box a few minutes ago, we've marked it as

2    Exhibit 1.  I believe you were able to look at it.

3              It has a caption of this case, and it's

4    titled Notice of Deposition of Kitchen Winners NY

5    Inc.

6              Have you seen that document before?

7        A.    Yes.

8        Q.    If I can direct your attention to the

9    second to last page wherein the middle of the page

10   it says Topics.  Let me know when you get there.

11       A.    Okay.  I'm there.

12       Q.    Have you seen these topics before this

13   morning?

14       A.    I think -- yes, I think I saw this.

15       Q.    Did you prepare to testify today on each

16   of the 22 topics set forth in this deposition

17   notice?

18       A.    To the best of my knowledge.

19       Q.    Did you do anything to learn any

20   information that may be outside of your personal

21   knowledge that may be responsive to these topics?

22       A.    Can you explain to me if I learned -- I

23   went through a lot of paperwork and I went through

24   the topics.  That's it.

25       Q.    What paperwork did you review to prepare

2    for today's deposition?

3        A.    I -- I went over all the discovery

4    paperwork back and forth.  I'm involved in the

5    case.  If you notice, I was sitting through most

6    of the depositions.

7            MR. RAKHUNOV:  Off the record.

8            (Whereupon, a discussion was held off

9        the record.)

10       Q.    So you said you went over discovery

11   paperwork.  When you say discovery paperwork, what

12   do you mean exactly?

13       A.    I went over all the paperwork that you

14   guys sent us and I went over all the paperwork

15   that we shared with you guys, most of them, in the

16   period of the last couple of months.

17       Q.    Did you speak with anyone other than your

18   attorney to prepare for today's deposition?

19       A.    No.

20       Q.    You're aware of -- you can take down the

21   exhibit if you still have it on your screen.  I

22   can't see you if there's a paper up.

23       A.    I just want to tell Phil I'm dyslexic,

24   so if you show me paperwork, in order to -- if you

25   can read it to me, it would be much easier.

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                    Page 11

2      Q.    What would be easier?

3      A.    I have on my iPad that it reads to me

4   automatically me emails or I talk back to them.

5   So if you want to show me an exhibit, if you can

6   please read it to me what you want and that will

7   make it easier.

8      Q.    I appreciate what you're saying.  Again,

9   we have a lot of documents in this case that I could

10  not possibly read to you.  So we will have to do the

11  best we can and see where it takes us.  That's all I

12  can say.

13         Are you familiar with an entity known

14  as Kitchen Winners NY Inc.?

15     A.    I have to check.  Not that I remember.

16     Q.    Kitchen Winners NY Inc., the party on

17  whose behalf you sued Rock Fintek in this lawsuit?

18     A.    Yes.

19     Q.    Okay.

20         You're familiar with that entity,

21  correct?

22     A.    Yes.

23     Q.    When was Kitchen Winners formed as a

24  corporation?

25     A.    I don't recall, but I think somewhere

```
 2   in -- my best recollection would be somewhere in

 3   2018 or 2019.

 4        Q.    What was the purpose for which Kitchen

 5   Winners was formed?

 6        A.    Purpose of doing kitchen accessories

 7   online.

 8        Q.    What type of kitchen accessories?

 9        A.    Kitchen organizers and kitchen

10   accessories like scoop for ice creams.  Such kind

11   of kitchen accessories.

12        Q.    At some point did Kitchen Winners expand

13   its business into personal protective equipment?

14        A.    Yes.

15        Q.    When?

16        A.    When COVID started.

17        Q.    And before we go into that, who are the

18   shareholders of Kitchen Winners NY Inc.

19        A.    Only one owner, my wife, Yitti Weiner.

20        Q.    Is Kitchen Winners a C Corp. or an S

21   Corp.?

22        A.    I don't know.

23        Q.    Does Kitchen Winners file its own tax

24   returns?

25        A.    I don't know.
```

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                      Page 13

2       Q.     Who would know?

3       A.     Accountant.

4       Q.     Who is the Kitchen Winners accountant?

5       A.     Fred E. Nussbaum or Mendel Shapiro.

6       Q.     Who signs the tax returns for Kitchen

7   Winners?  Is it your wife?

8       A.     I believe so.

9       Q.     What is your role with respect to Kitchen

10  Winners?

11      A.     Running the day-to-day operation.

12      Q.     Do you have an actual position?

13      A.     No.

14      Q.     Does Kitchen Winners have any officers?

15      A.     I don't know what that means in

16  language.  But it has -- only my wife is the sole

17  owner.

18      Q.     Does it have a president?

19      A.     No.

20      Q.     Does it have any vice presidents or CEO

21  or treasurer?

22      A.     No.

23      Q.     Do you, Hershey Weiner, get paid by

24  Kitchen Winners?

25      A.     Yes.

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                    Page 14

```
 2        Q.    How do you get paid?

 3        A.    They take care of certain bills that

 4   has to be paid, the office bills.  I get small

 5   payment allowance for my car and some other

 6   things.

 7        Q.    Do you have a contract with Kitchen

 8   Winners?

 9        A.    No.

10        Q.    Who makes these payments?  Like who

11   actually writes you the check or wire transfer,

12   however these payments are made?

13        A.    My wife.

14        Q.    Okay.

15              What is your wife's role in the

16   business of Kitchen Winners?

17        A.    Kitchen Winners is not such a big

18   company that there's so many roles.  My wife is

19   the owner and I run it.

20        Q.    Okay.

21              When you say she's the owner, does she

22   perform any day-to-day tasks for Kitchen Winners?

23        A.    No.

24        Q.    Does she perform any tasks for Kitchen

25   Winners other than acting as its owner?
```

2      A.    She goes down to the bank.  She makes

3   the checks.  Not all of them.  Most of them.

4   That's it.  She signs every check.

5      Q.    Is Kitchen Winners profitable?

6      A.    Not that I'm aware of.

7      Q.    We'll talk about this in much more

8   detail, of course, but from the transactions that

9   involved gloves sold to Rock Fintek, did Kitchen

10  Winners make a profit?

11     A.    Right now it's in a deficit because

12  certain people didn't pay up.

13     Q.    Who are those people?

14     A.    There's a company, TD Reds.

15     Q.    How much does TD Red owe Kitchen Winners?

16     A.    I don't know.  It's in court.

17     Q.    Where is it in court?

18     A.    I don't know.  Ask the lawyer.

19     Q.    Is Attorney Sperber your attorney in that

20  case?

21     A.    No.

22     Q.    Is it in New York?

23     A.    I think, but I don't know.

24     Q.    What kind of products did TD Red buy from

25  Kitchen Winners?

2        A.    Didn't buy.  I gave him a deposit and

3    he never delivered.

4        Q.    For what kind of product?

5        A.    Gloves.

6        Q.    What kind of gloves?

7        A.    It was a brand.  I don't remember.

8    Nitrile examination gloves.

9        Q.    Were they MedCare gloves?

10       A.    No.

11       Q.    We they LevMed gloves?

12       A.    No.

13       Q.    So you never actually got gloves from TD

14   Red, correct?

15       A.    No.  They took a deposit and never gave

16   me back the money.

17       Q.    So that's another case that involves

18   gloves, correct.

19       A.    Yes.  Sorry.  That's why I'm reminding

20   myself.

21       Q.    No problem.

22            If can you think of any other cases

23   during this deposition, just feel free to

24   interrupt me and let me know.

25            Do you know approximately how much TD

2    Red owes Kitchen Winners?

3        A.    No.

4        Q.    You don't know how much of a deposit you

5    gave them?

6        A.    I know what I gave them, but I don't

7    know what he owes me.  He made one payment in

8    return and I have to check the total numbers.

9        Q.    How much did you give them?

10       A.    A deposit?

11       Q.    Yes.

12       A.    If I remember correctly, anywhere

13   between 400- and $500,000.

14       Q.    Okay.

15             Who else didn't pay Kitchen Winners?

16   And I'm excluding for now your claims against Rock

17   Fintek in this case.  We'll get to those.

18       A.    Hershenson.

19       Q.    What happened with Hershenson?

20       A.    I don't know.

21       Q.    How much money do you believe Hershenson

22   owes you?

23       A.    Whatever the contract was for minus the

24   deposit.

25       **Q.    Did you actually deliver products to**

2    Hershenson?

3         A.    No.

4         Q.    So that was another case involving a

5    deposit, correct?

6         A.    Yes.

7         Q.    And does the Hershenson case involve

8    MedCare gloves or something else?

9         A.    MedCare gloves.

10        Q.    Anyone else other than TD Red,

11   Hershenson, and your claims in this lawsuit?

12        A.    Silverwing.

13        Q.    Anyone else?

14        A.    Not that I recall at the moment.

15        Q.    So even though you don't have a formal

16   title or ownership in Kitchen Winners, do you

17   consider yourself authorized to act on its behalf

18   when conducting business?

19        A.    To a certain extent.

20        Q.    What's the limitation?

21        A.    I can't tell you offhand.  You have to

22   ask me certain things.  I'll tell you yes or no.

23        Q.    I'm sorry.  Can you repeat that.  I

24   didn't understand the -- let me ask a different

25   question.

2           Is there something you believe you're

3   not authorized to do on behalf of Kitchen Winners?

4       A.    There is some things, yes.

5       Q.    Like what?

6       A.    I can't recall.

7       Q.    Okay.

8           What could I show you to refresh your

9   recollection as to what you are or you not

10  authorized to do on behalf of Kitchen Winners?

11      A.    You'll show me and I will tell you.

12      Q.    What would refresh your recollection?

13      A.    You show me something and I will tell

14  you if I'm authorized or not authorized.

15      Q.    Are you authorized to enter into

16  transactions for Kitchen Winners?

17      A.    Yes.

18      Q.    Are you authorized to negotiate pricing

19  and product quality for Kitchen Winners?

20      A.    Yes.

21      Q.    Are you aware of an entity called

22  Adorama, Inc.?

23      A.    Yes.

24      Q.    Okay.

25           And prior to Kitchen Winners becoming

```
 2    involved in -- let me just back up.

 3              When I say PPE, you understand I mean

 4    personal protective equipment, correct?

 5         A.    Yes.

 6         Q.    Before Kitchen Winners became involved in

 7    the PPE business, did you have any business

 8    relationship with Adorama?

 9         A.    No.

10         Q.    Did Kitchen Winners have any business

11    relationship with Adorama?

12         A.    No.

13         Q.    How do you know Adorama?

14         A.    I know them for years.  Like everybody

15    knows B&H Photo.  So people know Adorama Photo.

16    Like you know of Costco.  It's a known thing in

17    the market.  People know them.

18         Q.    Do you personally know any of the owners

19    or officers of Adorama?

20         A.    I know -- yes.

21         Q.    Who do you know?

22         A.    I know Eugene and I know Yussie.  I

23    don't know Yussie's title.

24         Q.    Okay.

25              And you know Joseph Mendlowits?
```

```
 2        A.     Yussie is Joseph.

 3        Q.     Got it.

 4               How long have you known Yussie

 5   Mendlowits?

 6        A.     2020.  June, July.

 7        Q.     How did you become introduced to Yussie?

 8        A.     I heard that he bought masks beginning

 9   of 2020, and I reached out to somebody to connect

10   me to him that he should buy from me masks.

11               And I had a meeting with him.  I don't

12   remember of it was -- I think it was a phone

13   conversation, and he said he would let me know.

14        Q.     And what happened with that?

15        A.     He didn't buy.

16        Q.     Okay.

17               How did you and Adorama become involved

18   together in the glove business?

19        A.     After that he asked me if I can get --

20   he might be able to use gloves.  And I started

21   working on the gloves with my connections from

22   overseas.  At one point I told him I could most

23   probably get him gloves.

24               I think we were trying to sell him.  I

25   made a certain contract with him, but it didn't go
```

2    through.  And then we formed like -- I called him

3    when I think that I could get gloves.

4         Q.    What was going to be Adorama's role in

5    the glove business?

6         A.    I don't know what your question, if you

7    can give it to me clear.

8         Q.    Sure.

9               Is it fair to say that you were going

10   to partner with Adorama in the glove business?

11        A.    It's not our partner.

12        Q.    So how would you describe the business

13   relationship?

14        A.    Gave me a loan on various contracts

15   that I needed funding.

16        Q.    And we saw you were present for his

17   deposition, correct?

18        A.    Yes.

19        Q.    And you saw the contract that was written

20   in Hebrew that he produced.

21              Is that the contract memorializing your

22   loan?

23        A.    That's only on Rock Fintek, not on the

24   other ones.

25        Q.    So were there separate agreements?

```
2        A.    On the rest of them, he didn't need

3    from me an agreement because it was a very short

4    period of time and not a big amount of money.

5        Q.    And we'll get back to this more later.

6              But you agree with me that all payments

7    by Rock Fintek for the gloves at issue in this

8    case were made to the bank account of Adorama,

9    correct?

10       A.    The contract?

11       Q.    I'm sorry?  The contract?  What do you

12   mean by that?

13       A.    From all the payments from the contract

14   was made to Adorama.

15       Q.    And when you say the contract, you mean

16   the sales and purchase agreement in April of 2021,

17   correct?

18       A.    Yes.

19       Q.    Before you entered into the contract, did

20   Kitchen Winners make other sales of gloves to Rock

21   Fintek?

22       A.    Yes.

23       Q.    And how did those payments get made?

24       A.    Went to my lawyer.

25       Q.    Who is your lawyer?
```

```
 2        A.     Mark Nussbaum.

 3        Q.     Okay.

 4               And he's also Adorama's lawyer,

 5   correct?

 6        A.     Yes.

 7        Q.     And how did you fund the purchases of the

 8   gloves that you sold to Rock Fintek before entering

 9   into the sales and purchase agreement in April of

10   2021?

11        A.     I didn't have to fund it.

12        Q.     What do you mean by that?

13        A.     It was merchandise my customers had

14   here on the ground.  And I know what price they

15   paid for it and I gave them -- they were willing

16   to take a profit and give it over to Rock Fintek.

17   I asked them.  They were willing.

18        Q.     And I'm sorry.  I don't fully understand

19   that.

20               You said your customers had the product

21   on the ground?

22        A.     Yes.

23        Q.     Who were your customers?

24        A.     Like six, seven customers or more.

25        Q.     Can you list them?
```

```
 2        A.    I can list what I remember, to the best

 3   of my knowledge.  There was Prestige Sales.  It

 4   was -- not everybody I know the company name.  I

 5   know them by the names, so I'll give you the

 6   names.  It was JNS Sales.

 7        Q.    Is that Joel Stern?

 8        A.    Yes, with other people as well

 9   involved.  I don't know to -- he had some

10   investors.

11        Q.    Okay.

12        A.    Then Mr. Klein.  I don't remember his

13   company name.  I had M2020.  I had Jacobowitz.  I

14   had Rubin.  I had Stein.  I had Silverwing.  I had

15   Isaac Fisher.  I had a couple of other names that

16   I would have to go back and look.

17        Q.    So explain to me how the transactions

18   worked with the customers that had product on the

19   ground and were willing to take a profit that you

20   just identified.

21        A.    It was companies that they had product

22   that they overbought.  In COVID, a lot of people

23   thought that the end of the world was going to

24   happen.  So a lot of people was assuming in

25   assumptions.
```

```
 2              Like people bought into the mask

 3     business.  There was few kinds of masks people

 4     bought in.  And they overbought themselves based

 5     on -- prices went up every day, jumping up.

 6              Same thing happened with gloves.

 7     People started buying gloves because there was

 8     no -- hardly able to get gloves from January 2020

 9     or February until, I would say, April or May 2021.

10     It was very tough to get gloves.  Even in May it

11     was also still tough.

12              Started opened up windows in April or

13     May.  Something like that.  So people were

14     speculating and they bought on speculation.

15              So when they came in and they couldn't

16     sell fast enough, they were willing to -- if the

17     price was $18, they were willing to give it for

18     cheaper in order to move the product.

19              And at the beginning when Rock Fintek

20     came to me, they represent themselves that they

21     wanted to do with me a contract but they want to

22     have -- they knew that I was selling or something,

23     that I have connections to it.  They knew that I'm

24     having connections to gloves, so they came to me.

25     I didn't go to them.
```

2            I spoke to Arik Maimon most of the

3    time.  And Arik Maimon asked me that in order to

4    prove yourself that we can rely on you, get us

5    something on the ground and once you show us

6    you're delivering, we'll make the big contract

7    with you.

8            They wanted to -- I mean, we had this a

9    lot.  Now if I remember, we had a government

10   contract, a government company, a company that

11   supposedly was working for the government and

12   procuring gloves.

13           And he did the same thing from us.  But

14   he never gave us a contract.  He bought from us --

15   I don't remember -- three or five containers I got

16   for him from my customers.

17           In the end, he never bought from us a

18   contract.  Same thing.  I got him stuff from my

19   customers and he never gave me the order.  But it

20   was common for me to go and get from my customers

21   back some gloves to a certain extent that I will

22   be able to get a bigger contract.

23           And that's what happened with Rock

24   Fintek.  Arik Maimon reached out to me and asked

25   me I should get him whatever gloves I could get on

```
 2   the ground.

 3              I know for sure they paid more money

 4   than the contract.  I don't remember exactly, but

 5   I didn't make money.  It went straight to my

 6   customers and they were making a profit off it and

 7   moving it.

 8              And I asked them a favor, that they

 9   should do me a favor so I can get a bigger

10   contract.  And they were willing to work with me.

11      Q.    You made money when you sold the gloves

12   to them, to your customers, in the first place,

13   correct?

14      A.    Yes.  But that's not the normal sale

15   business.  Business is when it comes back in here

16   and I'm busy with this and arranging it and

17   getting it for somebody, you're making something

18   usually on this.  That's the customary of

19   business.

20      Q.    I want to make sure that I completely

21   understand your --

22      A.    I didn't finish.

23      Q.    I'm sorry.

24      A.    It's just a normal thing.  When you

25   pick up a phone from a lawyer, the lawyer charges
```

2    you every minute that he does your work.  Same

3    thing also.

4            If I go out procuring gloves over here

5    in the States, it was a lot of work for me.  But I

6    was willing to do it in order to get the contract.

7    Q.    Understood.

8            So to make sure that I understand how

9    this works, so let's just take Joel Stern and JNS,

10   for example.

11           So you had sold some gloves to

12   Mr. Stern, correct?

13   A.    I will walk you through it so you

14   understand how it worked.

15   Q.    Okay.

16   A.    I never sold somebody gloves in the

17   United States.  I sold it when it got loaded out

18   of overseas.  It had to be paid.

19           As soon as it went up on a document

20   paperwork that I gave and it loaded up on a boat,

21   the customer had a contract that had to pay it

22   within 24 hours.  And specifically if it didn't

23   pay it within 24 hours, I had a right to take it

24   away from him and assign it to a different

25   customer.

```
 2               That's why it was always a very short

 3      period that I needed money.  And it was smaller

 4      amounts of money.  Because if I shipped out three

 5      containers a week, the turnaround time was five to

 6      seven days.

 7               The turnaround time was five to seven

 8      days from me paying for the factory, getting

 9      loaded and putting on a boat.  It's usually

10      anywhere between five to seven days.  And I need

11      to get back my money within seven to eight days.

12               With Rock Fintek, Arik Maimon worked

13      out the different structure with us; more money

14      and for more longer period.

15          Q.   So you're talking about the big contract

16      right now, correct?

17          A.   I had big contracts the same as Rock

18      Fintek, close to it, and it worked the way I

19      explained to you right now.  When it went on to a

20      vessel, I needed to get paid within 24 hours.

21          Q.   I appreciate you explaining this, but

22      let's focus a little bit on the questions so we can

23      move this along.

24          A.   You asked me --

25          Q.   Understood.  And just remember that if we
```

2    talk at the same time, Missy cannot get both of us.

3              I want to walk through an example of a

4    transaction before you entered into the big

5    contract in April with Rock Fintek.  Let's just

6    take JNS and Joel Stern, for example.

7              You sold MedCare brand gloves to JNS

8    and Joel Stern in February and March of 2021 and

9    January, correct?

10        A.    Yes.

11        Q.    Okay.

12              And you sat through Mr. Stern's

13    deposition, correct?

14        A.    Yes.

15        Q.    And you saw I showed him documentation

16    both from Kitchen Winners and from logistic

17    companies that showed gloves going to Joel Stern

18    from Kitchen Winners, correct?

19        A.    I don't recall every paper.  I

20    wasn't -- but I remember the deposition.

21        Q.    But generally, the --

22        A.    Yes.  I don't know.

23        Q.    And so when Rock Fintek or when Arik

24    Maimon came to you for Rock Fintek to do some of

25    these glove sales to show that you were able to

2  deliver product, you went back to someone like Joel

3  Stern and took some of his inventory to be sold to

4  Rock Fintek?  Is that correct?

5       A.    I didn't go to Joel Stern.  I went to

6  some other people and I asked them to give me back

7  stuff and sell it to Rock Fintek.

8       Q.    So you did not go to Joel Stern?

9       A.    No.

10      Q.    So when you said earlier that you had

11 customers that had product on the ground and you

12 identified JNS and Joel Stern, that's not correct?

13      A.    I didn't say JNS.  I said M2020 and

14 Prestige Sales.

15      Q.    Okay.

16      A.    I said Joel Stern also had -- like they

17 are -- he asked me who they are.  So I explained

18 that they are like Joel Stern.  I said that M2020

19 and Prestige Sales are customers of mine like Joel

20 Stern.

21      Q.    So the record is very clear, your

22 testimony is that you did not get gloves from Joel

23 Stern back to sell to Rock Fintek before you entered

24 into the big contract?

25      A.    Correct.

 2          Q.      Okay.

 3                  So you got gloves from Prestige?  You

 4    got gloves from M2020?  Correct?

 5          A.      Correct.

 6          Q.      What kind of gloves were those?

 7          A.      MedCare gloves.

 8          Q.      Any specific kind of MedCare gloves?

 9          A.      There was Nitrile examination gloves,

10    and it was packaged in boxes that it said

11    protection.

12          Q.      So you acknowledge and you agree with me

13    that the boxes you sold that came from Prestige and

14    M2020 did not say examination on the box?

15          A.      Prior to the contract, and I identified

16    it to them, and they said it's okay, they want it.

17          Q.      Who told you that?

18          A.      Arik Maimon.

19          Q.      Okay.

20                  How did you communicate with Arik

21    Maimon about the Prestige and M2020 source

22    protection gloves?

23          A.      Or by phone or through Mendel.

24          Q.      When you say "through Mendel," just to be

25    clear, Mendel Banon, correct?

2       A.    Correct.

3       Q.    And so Mendel would tell you what Arik

4   told him or you were on a call together?

5       A.    Sometimes it was a call together.

6   Sometimes -- in the beginning Arik didn't talk to

7   me directly.  Arik didn't know me and he couldn't

8   connect to me.  Mendel connected him to me.  That

9   was way in the beginning, so I don't recall if it

10  was a three-way call.

11            But I know after a certain time when we

12  built up a relationship he spoke to me directly on

13  a daily basis.  Not every day, but it was quite

14  often to me on the phone.

15      Q.    Okay.

16            Did you exchange text messages or

17  WeChat or WhatsApp messages with Arik?

18      A.    I'm not a big texter, so not that I

19  recall.  If you want, I can go back and check.  I

20  wouldn't believe so, because I'm not so good at --

21  as I told you, I'm dyslexic so I'm not the biggest

22  texter or WeChat or those kinds of stuff.

23      Q.    Have you checked for any text messages or

24  WeChat or WhatsApp messages between you and Arik or

25  Mr. Banon in searching for discovery in this

2    lawsuit?

3        A.    I checked whatever I could check and

4    whatever I have record on.

5        Q.    Can you be more specific?  You just

6    offered that you could go back and check for

7    messages with Arik Maimon, and I'm asking does that

8    mean that you haven't done that until today?

9        A.    I went through, but in the beginning of

10   discovery.  Most of my messages to him is "I can't

11   talk" or "call me later" or "please call me.  We

12   need to discuss."  One-line sentences.

13       Q.    Did you provide those messages to your

14   attorney in this lawsuit or did you just look at

15   them yourself and decide that they weren't relevant?

16       A.    I would have to check.

17       Q.    Well, you understand that discovery in

18   this case closes tomorrow, right?

19       A.    I gave my lawyer permission to go into

20   whatever he can go into and check and do his

21   research.  I believe whatever he said she needed

22   to do, we did.

23            He asked me permission to open up all

24   my contacts and all my emails and he did his own

25   search.  You have to ask him what he did.

```
 2                 MR. RAKHUNOV:  So I'm going to ask for

 3           clarification as to whether WeChat or text

 4           messages or WhatsApp messages with Arik

 5           Maimon were searched for and produced.

 6                 And if they haven't, I'm calling for

 7           their production.  We will follow up promptly

 8           in writing.

 9           A.    I just want to clarify.  I don't have

10      WeChat and I don't have WhatsApp.  With Arik

11      Maimon, I don't have WhatsApp at all.

12           Q.    Okay.

13                 So do you use WeChat in any way for

14      Kitchen Winners business?

15           A.    No.

16           Q.    Have you ever had WeChat conversations

17      with Anna or others at GTS, also known as MedCare?

18           A.    No.

19           Q.    So it would be SMS messages between you

20      and Arik Maimon if they exist?

21           A.    If they exist, anything.  But I don't

22      think so because I hardly spoke to him on

23      messages.  I'm not good at that.  I might have

24      said call me or --

25           Q.    Okay.
```

 2                So when did you start having -- I know
 3    you said that you developed a relationship and
 4    started speaking with Arik on a daily basis.
 5                Can you tell me when in time you
 6    started speaking to him directly.
 7        A.    After Rock Fintek started failing of
 8    picking up merchandise, I started building up
 9    myself with the communication with him and talking
10    to him.
11        Q.    Do you know approximately when that was
12    in the spring of 2021, if that's when it was?
13        A.    Right in the beginning.  The first
14    shipment, I notified them that it's in house and
15    it's here on the docks and they didn't pick it up
16    on time.
17        Q.    Okay.
18                What happened with that first shipment?
19        A.    If I remember, I had to take it into
20    warehouse and wait they should come up with the
21    money.
22        Q.    And now I'm a little confused.
23                So now you're saying they didn't pay
24    you on time or they didn't send a trucking company
25    to pick up the gloves on time?

```
 2        A.    Started off the first thing they didn't
 3    pay me on time.
 4        Q.    From the first shipment?
 5        A.    Yes.
 6        Q.    What do you mean by that?  Give me more
 7    details.
 8        A.    If I told them it's ready on the 10th,
 9    they came to pick it up on the 12th, two or three
10    days later.
11        Q.    And do you have documentation of this?
12        A.    I don't know, because you have to go
13    through all the emails that I wrote them.
14        Q.    And these emails you produced in this
15    case?
16        A.    Yes.  I didn't complain, but this is
17    what it was.  It was ready on a certain date.
18    They had to pick it up on that date.  If I
19    remember correctly, they came in -- I was even
20    quite nervous because they were supposed to come
21    on a Monday and they came, I think, towards the
22    end of the week -- I don't remember -- or the
23    following or beginning of the week.  They were
24    stalling time with the payments.
25        Q.    But you did get paid by Rock Fintek more
```

2    than $19 million, correct?

3         A.    Did I tell you here I didn't get paid?

4    Or I told you they were struggling with payments?

5         Q.    Well, I'm just asking you the question.

6              MR. SPERBER:  Objection to the form.

7              Can you clarify your question.

8              MR. RAKHUNOV:  We can move on.

9         Q.    So you started talking to Arik from the

10   time that Rock Fintek did not pick up the first

11   shipment on time?

12        A.    Yes.

13        Q.    And, again, do you have a memory of when

14   this was?  Was it March?  February?  April?  May?

15   Can you approximate the time?

16        A.    I think it's in April in 2021, but I

17   can't give you a time, 8 o'clock in the morning or

18   time.  I can give you a window.  It was in April.

19        Q.    Okay.

20              So I want to go back to the beginning

21   of this line of testimony.  You said that Arik

22   Maimon agreed on behalf of Rock Fintek to buy

23   gloves that were labeled as protection gloves on

24   the box?

25        A.    That one, I remember clearly because it

2   was a back-and-forth, a lot of conversations about

3   it.

4        Q.    Tell me everything you remember about

5   what you said to Arik or Mendel, directly or through

6   Mendel, and what you heard from Arik directly or

7   through Mendel about the topic of buying gloves

8   labeled as protection for Rock Fintek.

9        A.    They came first that they want

10  merchandise on the ground.  So I explained to them

11  that I don't own any merchandise on the ground and

12  I will have to look into what I can get.

13             And I was trying to explain to Mendel

14  and Arik that there's no such a thing, that I

15  don't own any merchandise in my warehouse on the

16  ground.  I don't have such a thing.  I never

17  bought in merchandise on myself on the ground

18  until Rock Fintek asked me.

19             That was clearly my cutoff because I

20  saw what happened on the masks.  A lot of people

21  lost money by bringing in the masks.  And it went

22  from 90 cents or 95 cents back down to, I would

23  say, a quarter in a period of five days.

24             So I had on my policy that I don't

25  bring in merchandise up to Rock Fintek.

2      Q.    Okay.  But that wasn't my question.  I

3   was asking you about your conversations with Maimon

4   --

5      A.    I'm explaining to you.  So they kept on

6   pushing.  No, you have merchandise.  Get us.

7   Procure us.  Get from somebody.  It went back and

8   forth, a few phone calls.

9           Then I told Arik I can get him the --

10  but it says on the box protection, but it's an

11  examination glove.

12          I don't recall if he asked for a sample

13  or -- I remember vaguely that he asks if Mendel

14  could bring him a sample.  I don't exactly

15  remember.  They looked at it and they came back

16  after two or three days, and yes, they will take

17  it.

18     Q.    When you say they came back after two or

19  three days, what do you remember about that?

20     A.    That Arik came back saying in -- and I

21  think at that time I still did not talk to him on

22  -- it was a three-way call with Mendel, and he

23  said that they -- they're okay with it.  It's

24  okay.  They're good.  As long as I gave them the

25  paperwork that it's coming from MedCare -- I don't

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                    Page 42

2  recall what the regular paperwork, the standard

3  paperwork we had on file -- and I gave it to them

4  and he said they're okay with it.  This is good.

5  He used to say the sample was approved by the

6  hospital.

7      Q.   And when you say "he" again, I just want

8  to be very clear you're speaking with Arik Maimon --

9      A.   On behalf of Rock Fintek.

10     Q.   Okay.

11          Did Thomas Kato or Bradley Gilling ever

12  give you approval to buy gloves or -- that was

13  labeled as protection on the boxes?

14     A.   I don't recall me talking to Tommy Kato

15  and to Bradley at that point.

16          (Whereupon, an email was marked as

17          Weiner Exhibit 2 for identification, as of

18          this date.)

19     Q.   This will be Exhibit 2.  It's in the chat

20  box.  Ignore that there's a little Number 8 in the

21  title.  That's just for my organization purposes.

22          This is a document, for the record,

23  that was produced by your counsel.  It has a Bates

24  number AKW 004935, a one-page email from Mendel

25  Banon to you, dated 10/16/2020.

2          Let me know when you have it open and

3     I'll ask you a few questions.

4          A.    Yes.  I have it open.

5          Q.    Okay.

6               Do you recognize this email, sir?

7               MR. SPERBER:  Objection to the form.

8          A.    I recognize the box, but I don't

9     recognize the email.

10         Q.    Okay.

11              You don't remember Mr. Banon emailing

12    you this photograph or, I guess, the image of the

13    box on December 16, 2020?

14         A.    No.

15         Q.    Okay.

16              Do you know why Mr. Banon would have

17    sent you an image of a MedCare Nitra Force

18    examination gloves NBR Nitrile box?

19         A.    No.

20         Q.    Would this image be -- well, do you see

21    the name of the attachment is MedCare China Data

22    Sheet PDF on this document?

23         A.    Yes.

24         Q.    Okay.

25              Would this be the document that either

2    you or Mr. Banon would provide to Arik to

3    demonstrate the data specs on the MedCare gloves

4    to be sold to Rock Fintek?

5         A.    I don't know.  Usually it was a whole

6    package, not one.  I don't think this would be the

7    thing, no.

8         Q.    Okay.  You can close that one.

9         A.    By the way, it doesn't say Exhibit 2.

10        Q.    I understand that.  We will rename it.

11        A.    Not a problem.  I just wanted you to be

12   aware of that.

13        Q.    I appreciate that.

14              So you said you don't recall talking to

15   Thomas Kato, Bradley Gilling at that point.  When

16   do you recall first speaking with either Thomas

17   Kato or Bradley Gilling about gloves?

18        A.    I remember in the beginning there was

19   one conference call regarding the price.  We

20   were -- in details, I never spoke to Tommy and

21   Bradley Gilling.  I didn't look to sell to them.

22              Arik Maimon came running after me for

23   two, three weeks I should sell him.  And I spoke

24   to Arik, I think, in the beginning one time.

25              He put up Tommy -- I don't remember

```
 2   even Bradley.  I think only Tommy.  Maybe Bradley,

 3   too.  I remember I was on the street and they were

 4   talking about pricing.  We were negotiating about

 5   pricing.

 6            That's the one time I spoke and then I

 7   started talking to them again communicating after

 8   the whole shipments were done or towards the end.

 9            Maybe in the middle one or two times,

10   Bradley or Tommy came up on the phone trying to

11   push me about the credit issues.  Not maybe.

12   There was once Tommy came up with an idea I should

13   go out and take credit on this company and blah,

14   blah, blah, blah.  Yada-yada-yada.

15            MR. RAKHUNOV:  Let's take a five-minute

16       break.

17            (Whereupon, there was a pause in the

18       proceeding.)

19       Q.   What else did Arik Maimon say to you

20   about Rock Fintek agreeing to buy protection-labeled

21   gloves?

22       A.   He said that they will send me a wire

23   transfer.

24       Q.   And these were the wire transfers that

25   went to Kitchen Winners, not Adorama, at this point,
```

2    correct?

3        A.    It went to my lawyer, Mark Nussbaum, on

4    behalf of Kitchen Winners.

5        Q.    Adorama was not yet involved, correct?

6        A.    Please let me finish talking.  I might

7    make a breathing gap and you start talking.

8              Correct.

9        Q.    Is there anything else you wanted to say?

10       A.    I didn't need money on this.  Correct.

11       Q.    Okay.

12             Other than Prestige and M2020, did you

13   sell any gloves to Rock Fintek before the April

14   purchase agreement that came from any other of

15   your customers?

16       A.    Not that I'm aware of at that time.

17       Q.    Okay.

18             Did you sell any gloves to Rock Fintek

19   before the April purchase agreement that came

20   directly from MedCare?

21       A.    I didn't know Rock Fintek and I didn't

22   deal with them and I didn't know who they are.

23       Q.    That wasn't my question yet.

24             So you made a number of sales to Rock

25   Fintek before the sales and purchase agreement in

2    April, correct?

3        A.    As we spoke before, I made -- I don't

4    know if it's three containers or four containers

5    or five containers I sold them directly and they

6    send the money to Mark Nussbaum.

7        Q.    And my question is:  Did all of the

8    gloves that you sold to Rock Fintek before the big

9    contract come from Prestige and M2020?

10       A.    To the best of my recollection.

11       Q.    Okay.

12             When did you first meet Joel Stern?

13       A.    I would say November -- not November.

14   Sorry -- January or December of 2020/2021.

15       Q.    And you were selling MedCare gloves to

16   Joel Stern, correct?

17       A.    Correct.

18       Q.    Were you selling gloves to him that were

19   labeled both protection and examination or just one

20   kind?

21       A.    Just examination.

22       Q.    So is your testimony that Kitchen Winners

23   only sold gloves to Joel Stern that were labeled

24   examination?

25       A.    Correct.

2          Q.    I'm sorry there's some background noise.

3                When you made sales of gloves to Joel

4    Stern, did these gloves come directly from Asia to

5    his warehouses or did you store them at your

6    warehouses in the US before he bought them or

7    something else?

8          A.    As I told you, my merchandise was sold

9    on the water and he got the bill of lading and he

10   picked it up straight from the vessel.  I wasn't

11   involved.

12         Q.    Okay.

13               And when he picked up -- how did the

14   shipments come?  What is your understanding of how

15   the gloves came?

16         A.    (No verbal response given.)

17         Q.    How were they packaged on the ship on the

18   vessel?

19         A.    Usually those that goes into container,

20   certain amount of gloves.  There's a 40-foot

21   container, 40-high foot container, or bigger

22   containers.  It's various, each container

23   differently.

24               It was very rough.  On that time, the

25   time of COVID, there was a very hard -- especially

2    towards the end of COVID.  Not in the beginning,

3    in 2019.  Just in 2020 there started becoming big

4    issue with containers.

5              So everybody was scrambling for getting

6    out merchandise from China or they were scrambling

7    on containers, scrambling on chassis.  There was a

8    whole scramble.

9              So it wasn't in a routine that normally

10   when you order 40-foot container, you get a

11   40-foot container.  You could have gotten a

12   40-high or 53-foot.  There's various different

13   sizes.

14             And it went out to vessel, and the

15   vessel usually travels anywhere between four to

16   six weeks until it gets to United States.  And

17   then United States takes some time to dock.

18             I think at that time it was also

19   problem some vessels were already in the United

20   States but it didn't dock.  It took ten or five or

21   six days to dock because there was lack of

22   employees due to COVID, shortage of employees at

23   that time.

24             And then, my understanding, it gets

25   unloaded.  Started the struggle of getting a

2   chassis, which every container it comes.  It comes

3   without wheels.  Comes stacked one on top of the

4   other.  It's like a puzzle game on the boat.

5            And then they come with a crane.  They

6   unload it from the boats to a chassis.  And the

7   chassis has wheels, and this is how gets wheeled

8   into a warehouse.

9            This is my understanding how it works

10  on a normal daily basis.  This is how it worked in

11  COVID.

12       Q.   And you would agree with me that each

13  container had a unique container number assigned to

14  it, correct?

15       A.   I'm not familiar exactly how this

16  works, but I remember that it has a container

17  number, yeah.

18       Q.   You remember having an understanding that

19  each container would have the same type of gloves

20  within it?

21       A.   Give me the question again.  I didn't

22  understand.

23       Q.   Sure.

24            So, for example, if a container had --

25  well, let me ask it a different way.

```
 2                 Would you agree with me that your

 3     understanding was that each container would be

 4     filled with the same kind of MedCare gloves?

 5                 MR. SPERBER:  Objection to the form.

 6          A.    I don't understand your question, if

 7     you can go details into it.

 8          Q.    Sure.

 9                 For example, if you got a container

10     that had gloves that were labeled protection on

11     the box, then all of the boxes in that container

12     would be the same boxes labeled as protection?

13          A.    No.

14          Q.    Why not?  What is your understanding?

15          A.    Because my understanding was on COVID

16     that there is sometime they were very stressed on

17     COVID and they -- they didn't have exact employees

18     or something.  They could have mixed in one box or

19     ten boxes.

20                 I mean, I don't -- I wouldn't rule it

21     out.  I remember some kind of issues that was

22     mixed.  I don't remember exactly, but it could

23     have been mixed in by mistake, one or two pieces.

24          Q.    Do you remember --

25          A.    I don't know how to say it in English.
```

2            THE WITNESS:  Alex, I'll tell it to

3       you.  It's not a klal.

4            MR. SPERBER:  A rule, not a rule.

5       A.    Not a rule.

6       Q.    So the clients that you had in the United

7  States, including Rock Fintek, what is your

8  understanding of the type of gloves that they were

9  looking to buy from Kitchen Winners?

10      A.    Whatever the contract says.

11      Q.    And is it your understanding that Rock

12 Fintek was looking to buy from Kitchen Winners

13 examination Nitrile gloves with an FDA 510(k)

14 certification?

15      A.    If that's what it says in the contract,

16 that's what they were looking for.

17      Q.    And it would be important for you to know

18 that you're delivering the correct product to your

19 customers, correct?

20      A.    I did deliver the correct product.

21      Q.    Okay.

22            And how can you know that the product

23 that was coming over from China that MedCare was

24 sending over was the correct products?

25      A.    First of all, we had inspections in

2   China, to my knowledge.  And, second of all, we

3   also had another inspection over here because Rock

4   Fintek -- had opportunity -- because Rock Fintek

5   didn't pick up on a timely basis the merchandise,

6   we had an opportunity to inspect it again over

7   here in the United States.

8        Q.    Who did the inspections in China?

9        A.    It's all in the production.

10       Q.    Say that again.

11       A.    All in your production.

12       Q.    Okay.

13             Was it somebody that was hired by

14   Kitchen Winners or somebody that worked for

15   MedCare?

16       A.    I don't remember.  It's in your

17   protection.

18       Q.    Okay.

19             Did you pay for those inspections?

20       A.    No.

21       Q.    Did you get results of those inspections?

22       A.    Yes.  It's in your production.

23       Q.    Okay.

24             What was the scope of the inspection?

25   What were they inspecting for?

2      A.    Should be in your production and

3   details.  I don't recall.

4      Q.    Okay.  We'll take another look.

5            Do you remember who specifically was

6   involved in the inspections, the names of people?

7      A.    I don't recall.

8      Q.    Okay.

9            And then you said you had an

10  opportunity to inspect the merchandise here in the

11  United States.

12           Do you know if that opportunity was

13  taken?

14     A.    Yes.

15     Q.    Okay.

16           And who did the inspection here in the

17  United States?

18     A.    Me, myself.

19     Q.    Where did you do this inspection?

20     A.    The warehouse.

21     Q.    Where?

22     A.    California.

23     Q.    Okay.

24           And did you inspect every single

25  container that came in or are you just referring

2    to the first one?

3         A.    I inspected every container that came

4    in for my goods that was on the ground.

5         Q.    So it's your testimony that you -- well,

6    where do you live, Mr. Weiner?

7         A.    Brooklyn, New York.

8         Q.    Okay.

9              Do you know approximately how many

10   containers were sold to Rock Fintek over the

11   entire life of the relationship, whether it's

12   before the big contract or during the big

13   contract?

14        A.    Approximately in the 50s.

15        Q.    Okay.

16              And how many vessels --

17              MR. RAKHUNOV:  Strike that.

18        Q.    So it's your testimony that you

19   personally inspected every one of the 50 containers?

20        A.    Yes.

21        Q.    And how many vessels did these containers

22   arrive on?  How many times did you have to go to LA?

23        A.    I didn't have to go to LA.  It was done

24   by Zoom.

25        Q.    Okay.

```
 2                 So you were not personally at the

 3      warehouses to do this inspection?

 4           A.    Not every time.

 5           Q.    How many times did you go to LA to

 6      personally inspect the containers?

 7           A.    I can't tell you, but I know it was

 8      numerous times.

 9           Q.    And you flew to California each time?

10           A.    No.  I walked.  LOL.  Sure I flew.

11           Q.    And if you had to produce records of your

12      flights to California to inspect the containers, you

13      would be able to do that?

14           A.    Correct.  Just call up somebody that I

15      think that made me the tickets and asked him to

16      produce it.

17           Q.    What did you inspect?  What did you do

18      when you got to the warehouse or you were on Zoom?

19      What were you looking for?

20           A.    I was looking how it came in in the

21      container packed.  Because sometimes they didn't

22      fill up a full container and it was empty space.

23      And so it didn't lock in good --

24                 (Reporter clarification.)

25           A.    You need to pack the container a
```

2    certain way so it didn't fall off.  It doesn't

3    fall if it's not full to the T.  You have to pack

4    it in a way that it interlocks the boxes.

5              This was the beginning when I came in.

6    Then the markings on the boxes.  Then inside the

7    boxes on the quality.

8        Q.    So when you say "inside the boxes," I

9    want to be clear because there's some confusion

10   about cartons versus boxes.

11             When you use the word "box," are you

12   talking about the brown cardboard box or are you

13   talking about the tissue-sized box inside?

14       A.    Both.

15       Q.    Okay.

16             So you actually opened up the cartons

17   to see what the boxes looked like?

18       A.    If I was there, I opened up.  And if I

19   was not there, I made him open up.

20       Q.    How many -- when I say carton, I'm

21   talking about the brown box that has ten tissue

22   boxes in it.

23             How many cartons did you open up during

24   any given inspections?

25       A.    It would be approximately between 5 to

2    8 percent.

3        Q.    Did you seal those cartons back up when

4    you were done or did you have somebody at the

5    warehouse do it?

6        A.    Somebody at the warehouse.

7        Q.    You paid them for it, right?

8        A.    It was included in the charge.

9        Q.    By the way, do you remember the name of

10   the logistics company you were using for storing

11   these goods?

12       A.    I think MD 3PL or something like that,

13   if I remember correctly.

14       Q.    Have you heard of a company called

15   IronLink Logistics?

16       A.    No, not that I recall.

17       Q.    If I told you that IronLink was another

18   name for MD 3PL, would that sound familiar to you?

19       A.    No.

20       Q.    Is MD 3PL Logistics the only logistics

21   company you used for your business with Rock Fintek?

22       A.    We used another two warehouses towards

23   the end.  But it had to first go into MD 3PL.  And

24   then from MD P3L, it was struck down to -- what

25   happened is towards the end -- like I told you in

2    the beginning, every payment was a struggle, so

3    maybe after the second threshold of delivery or

4    the first threshold of delivery -- I would have to

5    look in exactly -- they came up on a call and they

6    said that they miscalculated the timing.

7              Because they thought that if they'll

8    pick up from me in California, they'll be able to

9    deliver it within two or three days and get the

10   money in another day.  So they'll be able to make

11   two -- two swings or -- I don't know what it was,

12   but they were off with timing.  They saw they were

13   going to have a big problem.

14             So they came up on the phone and they

15   asked me to -- they'll give me two places, like

16   Chicago and some other place -- I don't remember

17   which.  Their customer are in that area and I

18   should hold out to find their warehouse and keep

19   -- and from there, they'll pick it up.

20             But that was only for a few days

21   because I brought in only -- because I didn't want

22   it to sit over there, because I had prior problems

23   that it was sitting too long in M3 warehouse.

24             Eventually I make with them a deal that

25   it should sit only a week or 15 days because that

2   was my -- that was my understanding.  They were

3   supposed to pick it up from the payer.

4            The payer cost a lot of money if it

5   sits.  The payer charges crazy amount of money.  I

6   think it's like -- crazy amount of money.  It's

7   unbearable.

8            So I took it to MD 3PL and I put it in

9   their storage.  And my understanding was that they

10  will pick it up in the next few days.  So first I

11  made a deal only for 15 days.  Then back then I

12  saw that it's tracking longer.

13            But on the second warehouse.  I was

14  already knowing what's going on so I didn't send

15  out there only -- I didn't send out like unlimited

16  merchandise to Chicago.

17            I was preparing myself.  I knew what

18  their -- I wouldn't send down ten trucks or 15

19  trucks.  I would prepare for two, three trucks or

20  four.  Whatever.

21       Q.   Okay.

22            And the warehouses towards the end,

23  other than the LA ones, were in Chicago, correct,

24  or outside of Chicago?  Do you remember that?

25       A.   I would have to check.  I believe Phil

```
 2   has all the paperwork.  It's in my part of my

 3   production.

 4        Q.    Okay.

 5              So let me turn to a slightly different

 6   topic.  We've talked about Mendel Banon a few

 7   times.

 8              What is Mendel Banon's role with

 9   respect to Kitchen Winners?

10        A.    He was a broker.

11        Q.    Okay.

12              Can you describe how he provided broker

13   services to Kitchen Winners with respect to the

14   Rock Fintek business.

15        A.    Rock Fintek was a little bit more also

16   in the beginning because he felt that he was doing

17   the sales, also.  Because Arik Maimon came to him,

18   not to me.  So he was a broker on that part, also.

19   He felt he deserved something out of that as well.

20              So he was -- in the beginning, he spoke

21   to Arik Maimon quite -- I think on every -- one or

22   two or three phone calls, he was involved or more.

23   And that's what I remember.

24        Q.    So did Mr. Banon have gloves of his own

25   to sell to Rock Fintek?
```

2          A.    You have to ask him.

3          Q.    Okay.

4                Do you have knowledge of any MedCare

5     brand gloves that Mr. Banon sold to Rock Fintek

6     directly?

7          A.    Not to my knowledge.

8          Q.    Okay.

9                So at some point Mr. Banon reached out

10    to you looking to sell MedCare gloves to Rock

11    Fintek?  What was the first time you discussed

12    Rock Fintek business with Mr. Banon?

13                MR. SPERBER:  Objection to the form.

14         A.    I don't recall.  But I can recall that

15    he was very excited that they took him to a boat

16    to schmooze him up and like get him on board.  And

17    he was excited.

18                You know, they take him on the yacht,

19    all this spiel, I'm a billionaire and I was

20    sitting on a yacht on the deck and I had a

21    beautiful time, you have to come here.

22                That's what I remember.  He was all

23    excited.  Oh, the billions -- guys that have

24    billions of dollars.  He was all excited.

25         Q.    He was excited to do business with

KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Weiner on 11/15/2023                                    Page 63

```
 2   someone who he viewed as wealthy and viewed this as

 3   an opportunity?

 4        A.    He was excited.  I just told you

 5   what -- you asked me what happened.  This is what

 6   I remember.  I remember a kid getting a candy.

 7        Q.    So you observed him being excited.  What

 8   did he tell you about Rock Fintek?

 9        A.    That they want to buy gloves and he's

10   excited.  I wasn't so impressed because I heard

11   this every day.

12        Q.    Okay.

13              So what did he -- how did --

14        A.    He got a big candy.

15        Q.    When you say he acted as a broker, did

16   you have an agreement with Mr. Banon?

17        A.    No.  It's all verbal.

18        Q.    Okay.

19              And what was your verbal agreement?

20        A.    That he would get something when we're

21   done out of the sales of it.

22        Q.    How much was he going to get?

23        A.    I would have to talk to him and go over

24   the conversations.

25        Q.    Well, did you review any --
```

```
 2        A.    I think 10 cents or 5 cents.  It was

 3    small amount.

 4        Q.    5 or 10 cents for what?

 5        A.    Per tissue box.

 6        Q.    Okay.

 7              Well, that would add up to a

 8    significant amount of money, right?

 9        A.    Yeah.  Yeah, 2- or 300,000, maybe.

10    Maybe less.  I would have to check.  Quarter or 50

11    cents per case.

12        Q.    How did Mr. Banon --

13        A.    I think it was a quarter.  I remember

14    now.  It was a quarter.  25 cents per master box.

15              THE WITNESS:  Just one second.

16              (Whereupon, a discussion was held off

17        the record.)

18        Q.    Did Mr. Banon get paid this quarter per

19    box or carton commission on the gloves that were

20    sold under the large sales and purchase contract or

21    just the gloves that were sold before the big

22    contract?

23        A.    No.  He was supposed to get the

24    large -- on the whole thing.  He had the candy.

25        Q.    Did Kitchen Winners, in fact, pay
```

2    Mr. Banon this commission?

3        A.    Not in full.

4        Q.    Why not?

5        A.    We lost money.

6        Q.    How much did Mr. Banon get paid by

7    Kitchen Winners?

8        A.    I would have to look into the numbers,

9    but he got some money.

10        Q.    How did he get paid?  By check?  By wire

11    transfer?  Cash?

12        A.    Wire transfer.

13        Q.    Would that wire transfer be reflected in

14    the Dime bank account of Kitchen Winners?

15        A.    No.  It would be reflected in Mark

16    Nussbaum's payments.

17        Q.    All right.  Let's break that down.

18            Is it your understanding that before

19    the big contract, the money from Rock Fintek would

20    go to Mark Nussbaum as Kitchen Winners counsel,

21    right?  Step 1.  And then Mark Nussbaum would

22    distribute that money to either Dime Bank or

23    Mendel Banon or wherever that money needed to go?

24    Is that correct?

25        A.    To a certain extent.

2        Q.    Tell me what I'm missing.

3        A.    I don't know if every payment went from

4    people -- or went, but Mendel Banon's for sure I

5    know went from Mark Nussbaum.  Larger payments

6    went from Mark Nussbaum.

7        Q.    Okay.

8              And when the payments from Rock Fintek

9    were going into the Adorama bank account directly,

10   was it Adorama that would pay Mendel Banon's

11   portion or something else?

12       A.    Adorama never made payment to nobody.

13   Only to Mark Nussbaum on behalf of me.  I mean to

14   Mark Nussbaum to give to me.

15       Q.    I'm a little confused here.

16             You understand that in connection with

17   the big contract -- and I think we've seen it in

18   documents you produced -- Rock Fintek paid

19   directly to Adorama, correct?

20       A.    Correct.

21       Q.    All right.

22             What happened with the money -- what

23   did Adorama do with that money, to the best of

24   your knowledge?  How did it distribute Rock

25   Fintek's payments for the gloves?

```
 2        A.    Let's start.  Adorama didn't do

 3   nothing.  Adorama gave me an advance.  Let's

 4   assume $5 million.  Then when payment came in, he

 5   had an accountant -- I don't know if it's in his

 6   production or my production -- somebody by the

 7   name -- I don't remember.  You asked about this.

 8   The accounting department that he gave -- he gave

 9   up that money came in and --

10              (Technical interruption.)

11        A.    And notified me that the money came in

12   and now I can get more money to send to China.

13              So I asked another advance.  I was

14   always advancing out money.  So adorama was never

15   really paid in full, full, full, full.  Only

16   towards the end.

17        Q.    Okay.  Again, my question is focused on

18   Mr. Banon.

19              How do you understand Mr. Banon got

20   paid for the large contract?

21        A.    Your focus was not on Mr. Banon.

22   Because I answered you that question clearly that

23   he got it from Mark Nussbaum.

24              You asked me if Adorama ever paid money

25   for Mr. Banon.  And I explained to you no, they
```

2    did not make no payments to anybody.

3            You can ask me again how does the money

4    from Adorama get distributed.  I told you what

5    happened.

6        Q.    And I apologize.  It's really hard to get

7    your answers right now because every other word

8    you're getting cut off.  Maybe if you could log back

9    out and log back in that would solve the problem

10   because this isn't going to work for the day.

11           (Whereupon, there was a pause in the

12       proceeding.)

13       Q.    Can you again explain how did -- let me

14   try to make this as quick as possible.

15           Adorama received the money from Rock

16   Fintek.  They would keep whatever they needed to

17   repay the loan.  Is that right so far?  Or a

18   portion of a loan.

19       A.    Let's keep it very clean.  Adorama

20   didn't pay no payments to anybody, only to Mark

21   Nussbaum that what I asked for advance for.

22       Q.    Okay.

23           But my question is after Rock Fintek

24   paid Adorama.  You agree with me that Rock Fintek

25   wired $19 plus million to Adorama's bank account

2    in connection with the sales and purchase

3    agreement?  You agree with me on that?

4          A.    Correct.

5          Q.    Okay.

6                And kitchen Winners received a portion

7    of that money, correct?

8          A.    Again, to make it very clear, I don't

9    know the numbers in front of me, but Adorama got

10   paid and the warehouses got paid and the trucking

11   companies and the vessels got paid.

12               But all the payments went out from Mark

13   Nussbaum or Kitchen Winners, nothing from Adorama.

14   All the payments went out from Kitchen Winners or

15   from Mark Nussbaum.

16               Adorama, I was always in the red

17   because he always had to advance me money.  I

18   constantly had money out on this contract until

19   maybe the last -- even after the end, because I

20   was owed money towards the end.

21         Q.    But somehow the money made it from

22   Adorama's bank account to Mark Nussbaum or to

23   someone else, right?

24         A.    Again, from Adorama to Mark Nussbaum.

25   That's a fact.

2          Q.    And then Mark Nussbaum as an agent of --

3    well, he was an attorney for both Adorama and

4    Kitchen Winners, and he handled the payment

5    logistics.  Am I understanding correctly?

6          A.    I would have to check if he did

7    logistics.  I explained to you certain wires went

8    from him because it was larger.  Or if I sent out

9    a check, it went from Kitchen Winners.  If it was

10   a wire, it went from -- for sure from Mark

11   Nussbaum.

12         Q.    So again, any payments that would have

13   been made to Mendel Banon came from Mark Nussbaum?

14         A.    As I told you in the beginning, yes.

15         Q.    Okay.

16               By the way, were any payments made to

17   Arik Maimon by either Adorama or Kitchen Winners,

18   Mark Nussbaum?  By anyone on your side of the

19   transaction?

20         A.    Payments?  No.

21         Q.    Loans --

22         A.    He wasn't working for me.

23         Q.    Okay.

24               Did you loan him any money?

25         A.    After everything he started crying.  We

```
2    built up a relationship.  He started sobbing to me

3    that he got stiffed and he went into contract in

4    buying a house, an apartment or something, and I

5    should help him out, and yes, I gave him a loan.

6         Q.    How much was that loan?

7         A.    $200,000.

8         Q.    Did he repay the loan?

9         A.    Yes.

10        Q.    When did he repay the loan?

11        A.    I would have to check the records, and

12   he paid me the loan in installments.

13        Q.    Okay.

14              But it's paid off in full as of today?

15        A.    Yes.  Fully satisfied.

16        Q.    Does Kitchen Winners or any entity that

17   you're affiliated with have any business

18   relationship with Arik Maimon directly or indirectly

19   through today?

20        A.    No.  No.

21        Q.    Has Arik Maimon reached out to you to try

22   to do business with you after this whole glove deal

23   fell apart?

24        A.    It didn't fall apart.  After they

25   didn't pay me, he reached out to me numerous times
```

2    to make other businesses and it never panned out.

3         Q.    What didn't pan out?

4         A.    When he reached out and he wanted to

5    make with me other businesses, it didn't pan out.

6         Q.    He reached out to you after the glove

7    deal was over and tried to do other business with

8    you?

9         A.    We stayed friends.

10        Q.    Okay.

11              Are you still friends to this day?

12        A.    Yes.

13        Q.    Okay.

14              How often do you talk to Arik?

15        A.    Not on a daily basis, but I would say

16   every couple of weeks.

17        Q.    Okay.

18              Do you discuss Rock Fintek with him?

19        A.    Certain parts I discussed with him.

20        Q.    Okay.

21              Has he agreed to appear as a witness

22   for Kitchen Winners in this case?

23              MR. SPERBER:  Objection to the form.

24        A.    You would have to ask my counsel.

25        **Q.    Okay.**

 2                   Well, have you discussed Arik appearing

 3    as a witness for you in this case?

 4          A.    Please ask my counsel.

 5          Q.    I understand that, but I'm asking you.

 6                 Have you and Arik had a conversation

 7    about him serving as a witness in this case?

 8          A.    We had a lot of conversations.  I can't

 9    remember in details every conversation.  But

10    especially when it came to this case, we talked

11    all together: me, him, his lawyer, and my lawyer.

12    I never talked to him direct that I can recall in

13    details about something, just details that he got

14    stiffed and I got stiffed.  We shared our burdens

15    and our pain and our crying.

16          Q.    When did you have a conversation with

17    you, Arik, and the lawyers present about this case?

18          A.    Ask my counsel.

19          Q.    I'm asking you under oath.

20          A.    I don't recall the dates.

21          Q.    Okay.

22                 Where was the conversation?  Was it on

23    Zoom?  By phone?  In-person?

24          A.    On the phone.

25          Q.    Okay.

2           Who was on that phone call?

3      A.   My counsel, Arik Maimon, and his

4  counsel.

5      Q.   Okay.

6           What was said during that conversation?

7      A.   I have to ask my counsel.  He should

8  answer, because I don't know if I'm at liberty --

9           MR. SPERBER:  You can answer.

10     A.   The conversation was that they fooled

11  him and they say they didn't make money.  They

12  fooled us all, they didn't make money.

13           And we all feeling so disappointed and

14  hurt that they made so many millions of dollars

15  and -- and they lost in Thailand, and we bailed

16  them out on the Thailand problem, $6 million.

17           And this contract, our gloves bailed

18  them out of this problem and we felt all painful

19  and disappointed and hurt.  And the same me and

20  the same Arik Maimon.

21     Q.   And did you have this conversation before

22  or after you brought this lawsuit?

23     A.   After.  We were always crying together

24  about our pain.  But we didn't know in details.

25  And Arik was also, I think, thinking that I'm

```
 2   playing games with him.

 3              And later on when we saw certain things

 4   in discovery and so on, we felt double -- double

 5   -- he felt more than me because he was together

 6   with them, he felt like double-stabbed or

 7   whichever way you want to call it, like almost

 8   walking in on your wife or something.

 9        Q.   All right.

10              Let's just get right to the point here.

11              So is it your position that all of the

12   gloves that Kitchen Winners sold to Rock Fintek

13   under the contract were in boxes labeled

14   examination gloves?

15        A.   Correct.

16        Q.   And it is your position that all of the

17   approximately $1.7 million boxes of gloves were

18   Nitrile examination medical grade gloves bearing an

19   FDA 510(k) certification?

20              MR. SPERBER:  Objection to the form.

21        A.   Correct.

22        Q.   So, again, during the many conversations

23   that you and Arik have had as friends, what kind of

24   business has he proposed doing with you in the

25   future?
```

2          A.    He went into bringing a machine from

3    Israel that builds blocks.  It's like a 3D printer

4    that builds big blocks of building houses.

5    Instead of building a house with a brick, they're

6    doing now with a 3D printer that prints not one

7    brick; it's as big as four, five, or six bricks.

8    It's bigger pieces and it brings down the cost of

9    construction.

10              And he showed me pictures of it and he

11   got -- he wanted to sell me -- that I should come

12   in partnership with him and I should take a loan

13   from Mendlowits.  I told him I didn't like the

14   idea.

15              I don't know if he ended up buying.  He

16   showed me a video of the machine by Skype or

17   something.  I don't recall how.  I think it was in

18   Fort Lauderdale or next to Orlando.

19              But this was the first opportunity that

20   came up, and he tried me to get Adorama involved

21   of giving us a loan.  I didn't even pursue it.  I

22   told him I don't like the idea.

23              I don't -- I thought at that time that

24   construction is over-hiked on pricing, and I spoke

25   to a couple of construction people here in New

2    York and it's not going to work.

3            If I remember correctly, it goes only

4    up three floors.  It's not for a New York market.

5    It's more for suburban markets that go up only

6    three floors.  That's what I remember, the first

7    thing, the first opportunity.

8            Then he called me again -- don't forget

9    he owed me money this time.  And I was talking to

10   him on a monthly basis at that time, now less,

11   because I needed to collect on a monthly basis,

12   payments.

13           Then he offered me another idea of

14   going into vapes.  Lighting, vapes, those kinds of

15   cigarettes.  I made also a little research on it

16   and I spoke to a few people about the vaping

17   business and they explained to me that it's a dime

18   a dozen and unless you had the MYLE brand -- I

19   remember now, the MYLE brand.  There's a few big

20   brands.

21           And I made also my research.  And lo

22   and behold, I think he did go into some of it a

23   little bit.  Because after that he called me as a

24   friend crying that he can't pay me because he lost

25   all their money and I should help him out selling

2    it.

3              So I tried making a few phone calls to

4    the friends that I spoke to.  They offered him --

5    I remember one guy offered him 80 cents or 90

6    cents.  And I think he wanted 1.75.  He was

7    crushed.

8              Then he asked me a favor, that he was

9    going to send me a key and if I could go down to a

10   storage place, that he had some stuff and blah,

11   blah, blah, like this will be able to help me and

12   help sell it.

13             I went down there.  I took samples.  It

14   was part of my still trying to help him out to

15   sell it.  He told me it's worth a certain amount

16   of money.  Blah, blah.  And then at the end, it

17   was all talk, talk, talk, talk, talk.

18             And I think he ended up sending down --

19   I had the key for a long time.  I think I remember

20   having it misplaced.  And he called me one day

21   that he has someone, a kid coming down, he's

22   flying in and I should go with the kid.

23             And I told him I don't work for you,

24   basically.  I could try to help you.  But don't

25   call me friend, go, fly, come.  Tell the guy to

2    call me.  I will see my best how I can help you.

3    But I'm not an employee by you.  Don't tell me

4    when to come and to go.

5              So he says, no, the guy's flying

6    special in.  We were joking.  I said last time I

7    checked, I'm not your employee.  And I will try to

8    help you if I can help you.

9              At that time I misplaced the key.  I

10   remember I was telling my wife I'm looking for

11   this key high and low all night.  But then I found

12   it in my car where the cup holder is.  I found the

13   key.

14             And he send down here the guy with a

15   van, a truck.  I don't remember.  It's vaguely.

16   He's asking me question.  I didn't pay attention.

17   It was a rental.  The guy came down with the

18   rental and I gave him the key.

19             Supposedly I had -- he - I explained

20   him how to walk into the building.  I still

21   remember.  It was from a side entrance.  It was a

22   little bit complicated.

23             So I told him it was the self-storage

24   places.  So I told him to go to the side entrance

25   so he doesn't have to go through what I went

2   through and waste so much time.  And he walks down

3   to the basement.  There's numbers.

4              I gave him my little bit of a spiel of

5   what I went through that I was looking for it for

6   over an hour and a half.  I was helping him out to

7   shorten the time, the distance.

8              That was the second approach he gave me

9   to sell this lighters or be involved with him.

10  And then I told him, you see, I told you it's not

11  a good idea.  Why did you go in?  He was crying

12  that he lost more money and now he thought he was

13  going to be able to pay me from this better.

14             He was lacking on payments so I

15  constantly tried working with him.  I know the

16  loan was supposed to be paid originally in

17  paperwork, I think, in 12 months.  I think he

18  ended up paying it in -- I don't know, but much

19  longer time; two or three years, whatever.  It was

20  double the time, I think.

21             Then, he offered me recently another

22  adventure, something he offered me recently.  I

23  don't remember what it was.  I really don't

24  remember recently what he offered me because he

25  told me and then I got a beep and he got a beep.

```
2                    He told me about something, a new
3        investment, but I don't remember what it was.
4        That was our conversations.
5                    From time to time we brought up the
6        pain.  I was crying.  He was crying.  He was
7        saying that it was a big burden on him.  And blah,
8        blah, blah.
9                    I blamed him a little bit.  I didn't
10       take out my frustration, but I blamed him a little
11       bit because he asked me constantly to release
12       goods.
13                   And he trusted me that Arik Maimon's
14       name is on the line, and I will never get stiffed
15       with money because I would never give credit for
16       -- I didn't know who Tommy Kato is, I especially
17       didn't know Bill.  He came highly recommended.
18       I'm representing.  And blah, blah, blah.  I will
19       make sure my name and, you know.  And he always
20       told me I'm a stock company, a CEO, I can't
21       afford.
22                   And he has on the chairman a lot of
23       people I remember, big shots in the community.  I
24       don't remember now the names, but if you want I
25       can find it out.
```

2            All these big, big shots and

3    billionaires, or one or two billionaires on his

4    board.  And I checked out with one or two people

5    and they gave me very good recommendations on him.

6            And also it was very spiritual.  Me and

7    him, we shared a lot of -- we both -- I'm original

8    from one culture in more Hasidic community.  And

9    he is more modern.  He doesn't have a beard.  He

10   doesn't have curls.

11            We shared a lot of information

12   regarding Chabad -- I don't know if you ever heard

13   of them -- and it was always like I would rather

14   everything is with the blessing of the Rabbi.  The

15   Rabbi is not alive, but the blessing with the

16   Rabbi.  There is such a thing that the Rabbi has a

17   book and when you open up the book, it gives you

18   in certain pages blessings.

19   Q.    Mr. Weiner, I appreciate the response but

20   we do have a limited amount of time so if could cut

21   you off now.

22            Just to bring this around, is it fair

23   to say that since July of 2021, you and Mr. Maimon

24   have developed a friendship and he has approached

25   you with numerous business opportunities and he

```
 2    obtained a loan from you that he has since repaid?

 3         A.    I consider him a friend.

 4         Q.    And he has brought all the business

 5    opportunities to you that you have just described,

 6    right?  We don't need to repeat your testimony.

 7         A.    Yeah.  He brought me different

 8    opportunities.

 9         Q.    When was the last time you spoke to

10    Mr. Maimon?

11         A.    With my lawyer or without my lawyer?

12         Q.    Either way.

13         A.    I think last week one day with my

14    lawyer.

15         Q.    Did you talk about this case?

16         A.    We did talk about the case regarding

17    his testimony, that he didn't feel good that day.

18    It was my lawyer, his lawyer, and me and him.

19              And one line we always had, me and

20    him -- we both vouched by this line -- that if

21    anybody needs me to testify for him or he testify

22    for me, we will keep to the amos, you know what

23    means the word amos?  The truth.

24              I will never lie for him and he should

25    never ever lie for me.  We should keep to the
```

2    guidelines of the truth.  Because this is the

3    truth and this is what we want to do, we want to

4    keep that, the truth.  We believe in the truths.

5              This is what we had vouched together.

6    So I think we went on a phone call, my lawyer and

7    his lawyer, and he said that he wasn't prepared.

8    He didn't realize that he has to testify and --

9              THE WITNESS:  Alex, you can babble it

10       more, because I don't know the legal term on

11       it.

12       Q.    Just what he said.

13       A.    He wasn't prepared to testify with the

14   documents and this and he has to review

15   everything.

16       Q.    Did he say anything about responding to a

17   document subpoena that we issued, that Rock Fintek

18   issued in this case?

19       A.    I think he said that you issued -- my

20   recollection is that he said that you asked him

21   for a paperwork subpoena and not on a deposition.

22              Why am I deposing him and what do I

23   need from him?  I recall saying Alex, my lawyer,

24   shall respond.  I think my lawyer was responding

25   to his -- this.  And then my lawyer and his lawyer

2    were yada-yada-yada.  I don't know legal version.

3    So I don't know F21 2035.  All these numbers, I

4    don't know what it means.  To me, it just means

5    numbers.

6        Q.    Was his lawyer Gary Murphy on the call or

7    someone named Max?

8        A.    No, somebody Gary.

9        Q.    Okay.

10             Did Arik say that he did not respond to

11   my document subpoena?

12       A.    Opposite.  He said he gave you all the

13   paperwork.

14       Q.    He said he gave us all the paperwork?

15       A.    That's what my understanding was.

16             THE WITNESS:  Alex, that's --

17       A.    That's what I understood.

18       Q.    Okay.

19             Well, I'll tell you, if that's what he

20   told you, he was not being truthful with you.

21       A.    I don't know.  I didn't ask him to

22   provide me.  He said that you guys asked only him

23   for documents, not to be on the stand.

24       Q.    Sure.  I understand.

25             So did --

2          A.    And he did say that he provided the

3     documents.

4          Q.    He said that he provided the documents?

5          A.    That's what I recall.  Unless I was

6     confused because there was also a lot of talk

7     between -- you have to understand, I don't know --

8     all this legal terminology, I don't know.

9                So I don't know what my lawyer spoke

10    with him.  I can't relate to that.  But they were

11    exchanging -- what I understood, from how much

12    English, I understand that he provided whatever

13    needed to be provided to you guys, paperwork.

14         Q.    So let's go back to Kitchen Winners

15    relationship with MedCare.

16               Do you understand that MedCare brand

17    was manufactured by a company called Global

18    Tooling Services?  Yes?

19         A.    Yes.

20         Q.    Okay.

21               And if I refer to MedCare in this

22    deposition, is it okay that -- you understand I'm

23    referring to Global Tooling Services?  Is that

24    okay?

25         A.    Okay.

2          Q.    Okay.  Just so the record is clear.  It's

3    easier to say MedCare than Global Tooling Services.

4                So when did you first become involved

5    with doing business with MedCare?

6          A.    End of 2020.  September, October.  I

7    think October, November.

8          Q.    How did you become -- how did you start

9    doing business with MedCare?

10         A.    Also Mendel brought me a connection,

11   somebody from Europe.  That guy from Europe

12   connected us to Anna Grinvald and we started

13   connecting and doing business.

14         Q.    So the MedCare connection came through

15   Mendel Banon?

16         A.    Yes.

17         Q.    Was he in any way compensated for

18   connecting you with MedCare?

19         A.    No.

20         Q.    Okay.

21               Let's go through some exhibits.

22               (Whereupon, a letter was marked as

23         Weiner Exhibit 3 for identification, as of

24         this date.)

25         Q.    This one should be quick.  I've put a

2    document in the chat box that will be marked as

3    Exhibit 3.  It starts with a 7 in the way the

4    document is titled.  It's Bates-labeled AKW 3168.

5            While the document is loading, let me

6    ask you --

7        A.    I have it.

8        Q.    -- does Kitchen Winners consider itself

9    an exclusive dealer of MedCare gloves in the USA?

10       A.    No.

11       Q.    Okay.

12            So take a look at the letter.  It's

13   page 2 of Exhibit 3.

14            Do you see it's a letter on MedCare

15   letterhead dated March 22, 2021?  Do you recognize

16   this document?

17       A.    Yes.

18       Q.    Okay.

19            What were the circumstances of you

20   receiving this letter?

21       A.    That was proposed by Mendel and her

22   that maybe we should become sole distributors.

23       Q.    Okay.

24            Where do you -- can you point me to

25   something in this document that refers to it as a

KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Weiner on 11/15/2023                                    Page 89

2   proposal?

3       A.    No.  I don't point in the documents.

4   But if you would follow all of the emails, I think

5   you would figure it out.

6            Because I also was never a sole

7   distributor.  She sold for a lot of different

8   people.  There was a company in New York over

9   here.  It was called -- it's a medical company.

10  It was called -- oh, I don't remember the name.  I

11  can look it up.  I had a meeting with people that

12  they sold to.

13           She told to Texas.  She sold to a lot

14  of people.  She didn't sell to me.  At that time

15  she sold the volume that I'm trying to move and

16  buy.

17           Don't forget at that time I already

18  purchased -- in February and March, I already gave

19  her POs for close to 2 or 3 million boxes.  I was

20  the largest buyer, so she proposed it to me so I

21  can show it to my investors.

22      Q.    So do you see in the last line of letter,

23  Ms. Grinvald writes:  We hereby confirm that Kitchen

24  Winners has full exclusivity for MedCare in USA?

25           Do you see that?

2        A.    I see that, yeah.

3        Q.    So is it your testimony that this was

4   only a proposal?

5        A.    Yes.

6        Q.    Did you tell any customers of yours that

7   Kitchen Winners was an exclusive dealer of MedCare

8   gloves in the United States?

9        A.    No.  There was, in fact, a lot of

10  different people that they had merchandise from

11  MedCare.

12       Q.    Isn't it true that you told Thomas Kato

13  and Bradley Gilling on a phone call that Kitchen

14  Winners was an exclusive provider of MedCare gloves?

15       A.    No.

16       Q.    You can close that one.

17             (Whereupon, an email was marked as

18       Weiner Exhibit 4 for identification, as of

19       this date.)

20       Q.    This is Exhibit 4.  It does have a number

21  3 in the title.  And this is another email produced

22  by your counsel, Bates-numbered AKW 002750.  It's a

23  one-page document.

24             By the way, at the top, the email

25  address hersheyweiner@gmail.com, that's you,

```
2    correct?

3        A.    Yes.

4        Q.    All right.

5              And in the cc field, do you see

6    weinerhershey@gmail.com.?

7              That is also you, correct?

8        A.    Correct.

9        Q.    All right.

10             So my only question about this email is

11   do you see the subject is Chat History for Group

12   GTS?

13             Do you see that?

14       A.    Correct.

15       Q.    Does that refer to history of a WeChat

16   group or something else?

17       A.    No.

18       Q.    What is it?

19       A.    It's a phone calls conversation group.

20       Q.    So chat history refers to phone calls?

21       A.    To a group that we spoke.  We used to

22   speak on a chat group together.  Every time that

23   we had a meeting, it was a chat group.

24       Q.    So it's your testimony that this does not

25   refer to any kind of an electronic --
```

2    A.    No, not that I know.

3    Q.    Okay.

4          MR. RAKHUNOV:  Let's take a break.

5          (Whereupon, there was a pause in the

6    proceeding.)

7          THE WITNESS:  When we take a break for

8    30 minutes, we should notify each other.

9          MR. RAKHUNOV:  And, Mr. Weiner, we were

10   just talking to your counsel.  Hopefully we

11   can do a break shorter than 30 minutes

12   because we have -- we are entitled to seven

13   hours of testimony.

14         I understand the issues with

15   scheduling, and we are accommodating you

16   leaving when you need to leave.  But I hope

17   everybody will accommodate a shorter lunch

18   break so we can get this done.

19         THE WITNESS:  With all due respect, I

20   understand but I gave you a few different

21   days and I told everybody in the beginning

22   that I would be traveling this day and I was

23   ready at 8 o'clock sitting on my street.  I

24   have to be at the airport by 4:30.

25

2          MR. RAKHUNOV:  I don't want to waste

3      any more time on this.

4          MR. SPERBER:  Let's get going.

5      Q.    When did you start buying gloves from

6  MedCare?

7      A.    If I recall, October or November of

8  2020.

9      Q.    And other than the big contract with Rock

10 Fintek, did Adorama make you loans or other funding

11 for any other glove purchases from MedCare?

12     A.    Yes.

13     Q.    Okay.

14          How much percentage-wise of the MedCare

15 business did Adorama fund?

16     A.    Please explain the question.

17     Q.    Well, did Adorama fund all of the gloves

18 that you bought from MedCare?

19     A.    No.

20     Q.    Okay.

21          Can you estimate what percentage of the

22 gloves that you bought from MedCare were used

23 funding from Adorama?

24     A.    I can't do an estimate.  I would have

25 to check.

2          Q.    Okay.

3                But at least some other MedCare

4    purchases were funded by Adorama, correct?

5          A.    As I told you before, yes, for a very

6    short period of time, a very small amount of

7    money.

8          Q.    Okay.

9                Of all the gloves that Kitchen Winners

10   bought from MedCare during the whole time you did

11   business with them, what percentage,

12   approximately, of those gloves were sold to Rock

13   Fintek?

14         A.    Less than 50 percent.

15         Q.    Less than 50 percent?

16         A.    Way less, yeah.

17         Q.    Who was the next largest customer other

18   than Rock Fintek?

19         A.    Matter of fact, JNS, I think, was

20   larger than Rock Fintek.

21         Q.    Okay.

22               What kind of MedCare gloves did you

23   sell to JNS?

24         A.    Examination gloves.

25         **Q.    Any other kind?**

```
 2        A.     No.

 3        Q.     So it is your testimony that if JNS had

 4   protection labeled gloves in their inventory, those

 5   did not come from you?

 6               MR. FRISCH:  Objection.

 7        A.     My testimony is that I sold them

 8   examination.

 9        Q.     Did you get any gloves other than

10   examination gloves from MedCare?

11        A.     Yes.

12        Q.     Okay.

13               What kind of other gloves did you get

14   from MedCare?

15        A.     I'm sorry.  I'm sorry.  I'm sorry.

16   recall.

17               Everything was examination.  But I had

18   labeled boxes that came in protection.

19        Q.     Okay.  So let me back up for a second.

20               When you say everything was examination

21   but you had boxes labeled protection, I understand

22   that testimony.  But what I want to ask you is do

23   you understand the difference between an

24   examination glove and a protection glove?

25        A.     When you say the name examination and
```

2    protection, I understand what the difference is

3    because I remember at that time what we pointed

4    out.

5              And my contract with MedCare -- like we

6    said, we're not going to call it, whatever, a

7    different name.  My contract with MedCare was

8    specific examination.  And the same contract made

9    with them, the same contract I sold.

10             I didn't purchase other name what is

11   called protection, and I didn't purchase other

12   things, examination.  This is what I purchased and

13   this is what I verified constantly that I should

14   get.  If I got mislabeled boxes, yes.

15        Q.    Okay.

16             So putting aside the labeling issue --

17   by the way, your contract with MedCare, did you

18   have a single contract or was it in forms of

19   purchase orders or something different?

20        A.    It was produced in production.

21        Q.    What was it?

22        A.    I don't recall.

23        Q.    And you're saying that your contract with

24   MedCare specifically called for examination gloves?

25        A.    Yes.

2      Q.    Did your contract with MedCare call for

3    FDA 510(k) examination gloves?

4      A.    Yes.  Blue collar -- blue collar.

5    Different things inside, but I don't remember

6    everything exactly.

7      Q.    But it's your testimony that 510(k) and

8    examination were expressly mentioned in your

9    contract with MedCare?

10     A.    Yes.

11     Q.    Okay.

12     A.    As protection.

13     Q.    Now, back to my earlier question.

14          Do you have an understanding, if you

15   have one, what a protection glove is as opposed to

16   an examination glove?  And I don't mean the

17   labeling.  I mean the actual nature of the glove.

18     A.    A protection glove is a glove that is a

19   Nitrile protection glove.  It's a glove that is

20   used is nursing homes, maybe, and not in surgery.

21   And examination is also allowed to be used by

22   surgery.

23          That's what I understand, not going

24   into the depth of it.

25     **Q.    Well, let me ask you this:  So where do**

```
 2    you gain your understanding of the difference

 3    between the gloves?

 4         A.    When I went in to do the gloves, I

 5    contact various people that were doing gloves and

 6    I spoke to them in lengthy conversations with the

 7    knowledge of the glove business.

 8              I reached out, consulting with various

 9    different people on the phone in lengthy

10    conversations with professionals in the business

11    of 15, 20 years.

12         Q.    Do you consider yourself to be an expert

13    in gloves?

14         A.    I don't think that I'm an expert, but I

15    consider the verification that I made.  I spoke

16    with experts at that time.

17         Q.    So you learned -- so if a box of gloves

18    was labeled correctly as a protection glove, that

19    would not comply with your contract with MedCare,

20    correct?

21         A.    Yes.

22         Q.    And, similarly, if a box of gloves was

23    labeled protection that you sold to Rock Fintek and

24    it was correctly labeled protection, that would not

25    comply with your contract with Rock Fintek?
```

2        A.    Unless if I give them a letter and they

3   accept that it's an examination.  I don't know.  I

4   would have to ask.  I'm not -- I'm not in -- in

5   the lawyer's language to know exactly those

6   things.

7             I know that they got all boxes

8   examination.  And I don't know if they would have

9   gotten protection, if the glove from manufacturer

10  said it was mislabeled, if that's considered not

11  what they got.  I don't know.

12       Q.    Okay.  But my question was much simpler

13  than that.

14             I mean, you agree with me that your

15  contract with Rock Fintek called for Nitrile

16  examination gloves bearing a 510(k) certification,

17  correct?

18             MR. FRISCH:  Objection to the form.

19       A.    If that's what in my contract.

20       Q.    And if you, in fact, delivered protection

21  gloves and not examination gloves, that would be a

22  breach of contract, correct?

23       A.    Again, I don't know.  You have to ask

24  the lawyers.  The glove itself is an examination

25  glove.  Oreo cookies, and it's --

2          Q.    Mr. Weiner, with all due respect I don't

3     want to talk about --

4          A.    I don't know.  Ask my lawyer.

5          Q.    You were willing a moment ago to say that

6     it would be a breach of contact if MedCare sent you

7     a protection glove instead of an examination glove,

8     correct?

9          A.    I didn't say that.  I said it would not

10    be the one that I asked them for.  But if they

11    would give me a letter that it was an examination,

12    I might accept it.  And I accepted the quantity if

13    my customer was accepting it.

14         Q.    So have you ever heard of something

15    called ASTM D6319?

16         A.    I've heard it a lot of times in

17    conversations, but I don't know what it is.

18         Q.    Okay.

19              So do you understand that there are

20    certain quality, glove quality specifications and

21    standards that an examination-grade glove bearing

22    a FDA 510(k) certification has to meet?

23              MR. FRISCH:  Objection to the form.

24         A.    Again, I don't recall the details.

25         Q.    I'm not asking you for details.

2          I'm asking do you generally understand

3     that there are certain quality specifications that

4     an exam glove would meet that would be different

5     from a protection glove?

6          MR. FRISCH:  Objection to the form.

7     A.    I understand that protection could be

8     used in a hospital and examination could be used

9     in a surgery room.  That's what my knowledge was.

10     Q.    So an exam glove is more protective, for

11     lack of a better word, than a protection glove,

12     correct?

13     A.    I don't know why, but -- I mean, I

14     don't know.  I don't know.

15     Q.    Okay.

16          Do you know if a protection glove would

17     be less -- not a mislabeled glove, but an actual

18     protection glove would be sold for less than an

19     examination glove?

20     A.    I would assume so, but not that I know.

21     To be very clear, I went to the experts at that

22     time and discussed it.

23     Q.    What experts did you go to?

24     A.    I don't recall everybody, but I do

25     recall that I went to few people and we spoke

2    about this.

3        Q.    And my question is:  Can you identify any

4    of those people or companies?

5        A.    Sally Gumbo.  Him I consulted a lot.

6        Q.    And he was deposed in this case, correct?

7        A.    Yes.

8        Q.    Anyone else?

9              (Continued on the next page to

10             include the jurat and signature line.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 2        A.    I had also a lot of conversations with

 3   different people in the glove business.  Dynarex.

 4   Other people also.  I think the name Schwartz.  I

 5   think his name is Isaac Schwartz.  At one point --

 6   twice -- different Isaac Schwartz.  One point

 7   Isaac Schwartz was supposed to open manufacturing.

 8             (Whereupon, the examination was

 9        suspended due to a power outage.  Time Noted,

10        11:56 A.M.)

11   STATE OF NEW YORK)

12                   ) SS.:

13   COUNTY OF        )

14

15    I have read the foregoing record of my testimony

16   taken at the time and place noted in the heading

17   hereof and I do hereby acknowledge it to be a true

18   and correct transcript of same.

19

20                           _____

21                           JOSEPH WEINER

22   Subscribed and sworn to before me

23   on this _____ day of _____, 2023.

24

25   _____

                        NOTARY PUBLIC
```

```
 2                 C E R T I F I C A T E

 3

 4            I, Melissa Leonetti, RPR, a Notary

 5   Public of the State of New York, do hereby certify:

 6       That the testimony in the within proceeding was

 7   held before me at the aforesaid time and place.

 8   That said witness was duly sworn before the

 9   commencement of the testimony, and that the

10   testimony was taken stenographically by me, then

11   transcribed under my supervision, and that the

12   within transcript is a true record of the testimony

13   of said witness.

14            I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, that I am not interested directly or

17   indirectly in the matter in controversy, nor am I in

18   the employ of any of the counsel.

19            IN WITNESS WHEREOF, I have hereunto

20   signed this 24th day of November, 2023.

21

22

23

24   Melissa Leonetti

25
```

KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Weiner on 11/15/2023                                    Index: $19..future

## Exhibits

**EXHIBIT 1**
  5:0  8:0
  9:0

**EXHIBIT 2**
  5:0  42:0
  44:0

**EXHIBIT 3**
  5:0  87:0
  88:0

**EXHIBIT 4**
  5:0  90:0

---

### $

$19    68:25

---

### 1

10/16/2020
  42:25

15    59:25

---

### 5

5    57:25

---

### A

account
  68:25

acting    14:25

address
  90:25

Adorama
  45:25

Adorama's
  68:25

agreement
  46:25

agreements
  22:25

approximately
  16:25
  57:25

Arik    74:25

assumptions
  25:25

---

### B

bank    68:25

Banon    33:25
  34:25
  42:25
  67:25

beep    80:25

bring    40:25

business
  62:25
  82:25

---

### C

call    78:25

charges
  28:25

check    60:25

93:25

clear    33:25

comply    98:25

construction
  76:25

container
  54:25
  56:25

contract
  21:25
  98:25

cookies
  99:25

correct
  33:25

couple    76:25

COVID    48:25

crying    70:25

customer
  29:25

---

### D

dated    42:25

days    59:25

deliver
  17:25

discovery
  34:25

document
  43:25
  88:25

---

### E

easier    10:25

electronic
  91:25

end    58:25

English
  51:25

examination
  95:25

excited
  62:25

explained
  67:25

extent    65:25

---

### F

fact    64:25

find    81:25

Fintek    38:25
  40:25
  46:25
  61:25
  98:25

Fintek's
  66:25

fly    78:25

friend    78:25

future    75:25

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                Index: glove..separate

**G**

glove   31:25
  99:25

gloves   27:25
  37:25
  66:25

guy   78:25

**H**

happened
  58:25

hard   48:25

hersheyweiner@
gmail.com
  90:25

**I**

inspecting
  53:25

inspections
  52:25

**J**

Joseph   20:25

**K**

kind   91:25
  94:25

Kitchen
  15:25
  19:25

  45:25
  64:25

**L**

lawyer   7:25
  23:25
  28:25
  84:25

lie   83:25

list   24:25

**M**

made   21:25

Medcare
  41:25

Mendel   33:25

Mendlowits
  20:25

merchandise
  40:25

million
  68:25

money   77:25

**N**

numerous
  71:25
  82:25

**O**

opportunities
  82:25

Oreo   99:25

owner   14:25

**P**

pack   56:25

paid   38:25

paperwork
  41:25

pay   64:25
  71:25

payments
  66:25

people   76:25

Phil   60:25

phone   28:25

pick   28:25
  37:25

point   45:25

prior   19:25

products
  17:25

purchase
  46:25

put   44:25
  87:25

**Q**

question
  18:25

quick   87:25

**R**

reached
  71:25

read   10:25

recall   11:25

refer   91:25

referring
  54:25

refers   88:25

remember
  30:25
  39:25
  44:25

review   63:25

Rock   38:25
  40:25
  61:25
  98:25

**S**

sales   31:25
  46:25

search   35:25

searching
  34:25

sell   61:25

selling
  77:25

separate
  22:25

**KITCHEN WINNERS NY INC., ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Weiner on 11/15/2023                                      Index: show..wired

```
show   31:25        64:25

sit    59:25    wired   68:25

started
  49:25
  70:25

struggle
  49:25

_____

          T
_____

TD    16:25

thinking
  74:25

time   37:25
  48:25

times   71:25

told   58:25
  80:25

Tommy   44:25

_____

          U
_____

Understood
  30:25

unloaded
  49:25

_____

          W
_____

week   59:25

Winners
  14:25
  15:25
  19:25
  45:25
```