**KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.**
**Joseph Mendlowits on 10/26/2023**

```
 2   UNITED STATES DISTRICT COURT
 3   FOR THE SOUTHERN DISTRICT OF NEW YORK
 4   ----------------------------------------X

 5   KITCHEN WINNERS NY INC.,

 6                    Plaintiff,

 7           -against-                      Index No.:
                                            22-cv-05276
 8   ROCK FINTEK LLC,

 9                    Defendant,

10   ----------------------------------------X

11   ROCK FINTEK LLC,

12                    Couterclaim and Third-
                      PartyPlaintiff,
13

14           -against-

15   KITCHEN WINNERS NY INC.,

16                    Counterclaim Defendant,

17           and

18   ADORAMA INC., HERSHEY WEINER, JOSEPH
     MENDLOWITS, JNS CAPITAL HOLDINGS LLC
19   and JOEL STERN,

20                    Third-Party Defendants.

21   ----------------------------------------X

22                                    Remote EBT

23

24                                    October 26, 2023
                                      10:19 A.M.
25
```

2          EXAMINATION BEFORE TRIAL of JOSEPH MENDLOWITS,

3     s/h/a JOSEPH MENDLOWITS, a Third-Party Defendant

4     herein, taken by the attorneys for the respective

5     parties, pursuant to Notice, held remotely, before

6     Melissa Leonetti, RPR, a Notary Public of the State

7     of New York.

8

9                          - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.**
**Joseph Mendlowits on 10/26/2023**                    Page 3

```
 2                A P P E A R A N C E S:
 3
 4   LIPSIUS-BENHAIM LAW, LLP
          Attorneys for Kitchen Winners NY, Inc.,
 5        Adorama and Joseph Mendlowits
          80-02 Kew Gardens Road, Suite 1030
 6        Kew Gardens, New York 11415
 7   BY:  ALEXANDER SPERBER, ESQ.
          asperber@lipsiuslaw.com
 8
 9   POLLACK SOLOMON DUFFY, LLP
          Attorneys for Rock Fintek, LLC
10        31 St. James Avenue, Suite 940
          Boston, Massachusetts 02116
11
     BY:  PHILLIP RAKHUNOV, ESQ.
12        prakhunov@psdfirm.com
13        LAUREN RIDDLE
          lriddle@psdfirm.com
14
15   LAW OFFICE OF AVRAM E. FRISCH, LLC
          Attorneys for Joel Stern and JNS Holdings
16        1 University Plaza, Suite 412
          Hackensack, New Jersey
17
     BY:  AVRAM E. FRISCH, ESQ.
18        frischa@avifrischlaw.com
19
20
21
22   ALSO PRESENT:
23   BRADLEY GILLING
24   HERSHEY WEINER
25
```

2                F E D E R A L   S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED, by and

5    between the parties hereto, through their

6    respective Counsel, that the certification,

7    sealing and filing of the within examination will

8    be and the same are hereby waived;

9        IT IS FURTHER STIPULATED AND AGREED that all

10   objections, except as to the form of the question,

11   will be reserved to the time of the trial;

12       IT IS FURTHER STIPULATED AND AGREED that the

13   within examination may be signed before any Notary

14   Public with the same force and effect as though

15   signed and sworn to before this Court.

16

17

18

19

20

21

22

23

24

25

```
 2                    I N D E X

 3

 4    EXAMINATION OF        BY                    PAGE

 5    J. Mendlowits         P. Rakhunov           7-144

 6                          A. Sperber            144-147

 7                          A. Frisch             148

 8

 9                    E X H I B I T S

10

11    ADORAMA               DESCRIPTION           PAGE

12    Exhibit 1             Notice                22

13    Exhibit 2             Screenshot            44

14    Exhibit 3             NYS printout          49

15    Exhibit 4             Letter                66

16    Exhibit 5             Agreement             74

17    Exhibit 6             Agreement             85

18    Exhibit 7             SPA                   93

19    Exhibit 8             Email                 109

20    Exhibit 9             Email                 113

21    Exhibit 10            Email                 121

22    Exhibit 11            Email                 123

23    Exhibit 12            Email                 126

24    Exhibit 13            Email                 129

25    Exhibit 14            Email                 132
```

**KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.**
**Joseph Mendlowits on 10/26/2023**                                    Page 6

```
 2    Exhibit 15          Email              137

 3    Exhibit 16          Email              139

 4    Exhibit 17          Email              140

 5

 6                    R E Q U E S T S

 7    DESCRIPTION                          PAGE

 8    Contracts                            43

 9    Agreement                            84

10    Messages with Mendel Banon          93

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2    J O S E P H   M E N D L O W I T S, after having

3    first been duly affirmed by a Notary Public of the

4    State of New York, was examined and testified as

5    follows:

6    EXAMINATION BY

7    PHILLIP RAKHUNOV, ESQ.:

8        Q.    Good morning, Mr. Mendlowits.  My name is

9    Phillip Rakhunov.  I represent Rock Fintek, the

10   plaintiff in this case.

11             Have you ever had your deposition taken

12   before?

13       A.    Yes.

14       Q.    Okay.

15             How many times?

16       A.    One time.

17       Q.    When was that one time?

18       A.    Only a couple of months ago.

19       Q.    Okay.

20             And what case was that in connection

21   with?

22       A.    That was the Silverwing case.

23       Q.    Tell me your understanding of what the

24   Silverwing case is about.

25       A.    The Silverwing case is -- my

2    understanding is that it's a case about a breach of

3    contract.

4         Q.    Are you a party to that case?

5         A.    Yeah.

6              MR. SPERBER:  When you say "you," who

7         are you referring to?

8              MR. RAKHUNOV:  I'll clear that up.

9         Q.    Are you personally, in your individual

10    capacity, a party to that case?

11        A.    I don't think so, no.

12        Q.    Okay.

13              Is Adorama, Inc., a party to that case?

14        A.    Yes.

15        Q.    And in what capacity were you testifying

16    in the Silverwing case?

17        A.    On behalf of Adorama.

18        Q.    You were its designated corporate

19    representative?

20        A.    Yes, for that case.

21        Q.    And you understand you're appearing today

22    individually and as a corporate representative of

23    Adorama, correct?

24        A.    Yes.

25        **Q.    Now, I've seen your name in emails and**

 2    some other records spelled with a Z rather than an S

 3    at the end.

 4            Are you aware of that happening from

 5    time to time?

 6        A.    Yeah.  That can happen.  I guess when I

 7    create a document, then I will make sure it's

 8    spelled correctly.  But sometimes when others are

 9    involved --

10        Q.    What is your email address at Adorama?

11        A.    Josephm.

12        Q.    So if your name comes up with a Z but

13    with a josephm@adorama email address, is it fair to

14    say that that is you and not someone else whose name

15    is spelled with a Z at the end?

16        A.    I guess if -- if it's at Adorama, then it

17    will be my email address, correct.

18        Q.    Okay.

19            So other than providing testimony in

20    the Silverwing case, have you ever testified in

21    court?

22        A.    No.

23        Q.    Okay.

24            Have you ever testified or given under

25    oath statements in any government investigation

```
 2   relating to personal protective equipment?

 3        A.    Other than the one prior mentioned?

 4        Q.    Correct.

 5        A.    I don't think so, no.

 6        Q.    Okay.

 7              So I think the court reporter did a

 8   great job giving you instructions so I won't

 9   repeat them.

10              Are there any reasons such as

11   medications that you might be taking or anything

12   else whatsoever that could prevent you from

13   testifying truthfully and competently today?

14        A.    No.

15        Q.    And you understand that you're under

16   oath, which is the same oath that you would be under

17   if you were testifying before a court?

18        A.    Yes.

19        Q.    Did you do anything to prepare for

20   today's deposition?

21        A.    No.

22        Q.    Okay.

23              You didn't review any documents?

24        A.    I mean, I was seeing all the documents

25   like the back and forth since this case started.  I
```

KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Mendlowits on 10/26/2023                                    Page 11

```
 2    mean, I think Alex has shared with me most of them.
 3              MR. SPERBER:  I'm going to direct
 4         Mr. Mendlowits not to discuss any
 5         conversations you have had with counsel,
 6         specifically in preparation for today's
 7         deposition that you were reviewing documents.
 8         A.    No.
 9         Q.    Okay.
10              I'm not looking for any discussions
11    between you and your attorney.
12              Did you speak with anyone other than
13    your attorney about your anticipated testimony,
14    whether it was directly in preparation for today's
15    deposition or otherwise?  Other than your
16    attorney.
17         A.    No.
18         Q.    Have you ever discussed this case with
19    Hershey Weiner, also known as Joseph Weiner?
20         A.    Yes.  I mean, we were jointly sitting
21    with Alex and talking about the case.
22         Q.    When was this?
23         A.    It was probably a couple of times during
24    the last couple of months.  Since -- I don't recall
25    the exact dates.
```

 2        Q.    Okay.

 3              But you recall having two meetings with

 4    Hershey Weiner and Alex together?

 5              MR. SPERBER:  Objection to the form.

 6        Q.    You can still answer.

 7        A.    I'm sorry.  Do you mind repeating the

 8    question.

 9        Q.    You said you sat together with Hershey

10    and Alex and talked about the case a couple of times

11    during the last couple of months, if I heard your

12    testimony correctly.  Is that right?

13        A.    Is the question if -- if that happened

14    within the last couple of months?

15        Q.    Do you recall discussing this case with

16    Mr. Weiner?

17        A.    Yes.

18        Q.    Okay.

19              In the last couple of months?  Is that

20    correct?

21        A.    Yes.

22        Q.    Okay.

23              What do you recall about the substance

24    of what you discussed with Mr. Weiner about this

25    case?

```
 2              MR. SPERBER:  To the extent that

 3         counsel was involved in those discussions,

 4         those discussions are privileged.

 5              I'm going to direct the witness not to

 6         respond, not to discuss the contents of those

 7         discussions.

 8         Q.    Let me ask a different question.

 9              Have you discussed this case with

10    Mr. Weiner outside of the presence of Attorney

11    Sperber?

12         A.    I for sure have called him like to see

13    what's going on, what's happening.  But I don't

14    recall the extent like of the context of the

15    conversation, exact details, if that's what you're

16    looking for.

17         Q.    How often do you speak with Mr. Weiner

18    without counsel present?

19         A.    We mostly do the calls jointly like

20    together with counsel, but I won't be able to give

21    you like an accurate breakdown on that.

22         Q.    Okay.

23              Are you currently doing any business

24    with Mr. Weiner?

25         A.    No.
```

2      Q.    Do you know who Joel Stern is?

3      A.    I know of him.  I've heard from him out

4    of this case.

5      Q.    Okay.

6            Outside of this litigation, do you know

7    who Joel Stern is?

8      A.    I do not.

9      Q.    Have you ever spoken with Joel Stern?

10     A.    He called me after the lawsuit.  That was

11   the first time I spoke to him.

12     Q.    When?  Do you remember when he called

13   you?

14     A.    Yeah.  It was probably at the time the

15   lawsuit was filed.

16     Q.    Who was on that call?

17     A.    It was just me and him and -- and that

18   was the only time that he called me, and I told him

19   like for any future conversations, I would like to

20   have together with my counsel.

21     Q.    Do you know how he got your number?

22     A.    I do not.

23     Q.    Did he call you on your cell phone?

24     A.    That's correct.

25     Q.    What is your cell phone number?

2        A.    917-387-6506.

3        Q.    And what did Mr. Stern say to you during

4   that call and what did you say to him?

5        A.    I don't recall exactly, but it was like

6   -- it was in the context of if he can -- like if I

7   could help him out like figuring out what attorney

8   he should take.  More about that.  And he was -- you

9   know, that's basically it.  That was basically the

10  context of it.  I don't remember the details.

11       Q.    Was he -- did you refer an attorney to

12  him?

13       A.    I did not.  I sent him to Alex, maybe

14  speak to Alex.  But that was basically -- I wasn't

15  able to refer an attorney to him, no.

16       Q.    Do you recall Mr. Stern saying anything

17  to you about the plaintiff, Rock Fintek, on that

18  phone call?

19       A.    In the context of?

20       Q.    During that phone call.

21       A.    No.  I don't recall.

22       Q.    Okay.

23             Do you recall Mr. Stern saying anything

24  to you during that phone call about the substance

25  of the allegations in the lawsuit?

2         A.    No.  I don't recall.

3         Q.    Have you had any discussions of -- and

4    just to bring this to the end.  So other than that

5    one discussion, that phone call you just referenced,

6    have you had any conversations with Joel Stern with

7    counsel present?

8         A.    No.

9         Q.    Okay.

10             Have you ever discussed this case with

11   Attorney Avi Frisch, Mr. Stern's lawyer?

12        A.    No.

13        Q.    Do you know who Mendel Banon is?

14        A.    I've heard his name, yeah.

15        Q.    Well, do you know him outside of having

16   heard his name?

17        A.    On a personal level?

18        Q.    Yes.

19        A.    I don't know him on a personal level, no.

20        Q.    You have never met him?

21        A.    Never met him, no.

22        Q.    Have you ever spoken with him?

23        A.    I might have been on a call together --

24   together with -- together with Hershey where he got

25   connected, he was on that call.  That's the only

2    engagement I probably had with him, together with

3    him.

4         Q.    When you say on a call together, are you

5    referring to during this litigation or prior to this

6    litigation in the context --

7         A.    No.  Way prior to this litigation.

8         Q.    Okay.

9               And was that a call about selling

10   gloves to Rock Fintek?

11        A.    I don't recall.  It was for sure about

12   gloves or PPE equipment, but I don't recall

13   reference to -- to what it was.

14        Q.    Okay.

15              And when you just referenced -- do you

16   recall any other conversations with Mr. Banon

17   other than this one call?

18              MR. RAKHUNOV:  Strike that.

19        Q.    When did you speak with Mr. Banon?  Can

20   you estimate to the best of your ability.

21        A.    I would say for sure prior to 2022.

22        Q.    Can you do any better --

23        A.    That's --

24        Q.    And would that conversation have taken

25   place on your cell phone that you just gave us a few

2    minutes ago?

3         A.    I'm thinking where I was.  I'm not sure

4    it was my business phone or my business extension or

5    my home phone for that matter.  I'm trying to think

6    where it was -- where I was.  It could have been --

7    potentially been on my cell phone.  I'm not sure.

8         Q.    What other telephones --

9              MR. RAKHUNOV:  Strike that.

10        Q.    Do you use your cell phone for business

11   in general?

12        A.    In general, yeah.  Probably to some

13   extent.

14        Q.    Is this cell phone number that you gave

15   me the same cell phone number you had in 2020 and

16   2021?

17        A.    Yes.

18        Q.    What other telephone numbers do you use

19   for business?

20        A.    I would use the Adorama official line.

21   That's about it.

22        Q.    When you say "Adorama official line,"

23   what are you referring to?

24        A.    Like our internal phone system.

25        Q.    And where are those phones?  Are you

2    talking about at the store in New York or do you

3    have separate offices that you're referring to?

4         A.    In the offices above the store.

5         Q.    Okay.

6               So your testimony is that you have

7    never discussed this case, the litigation, with

8    Mr. Banon?

9         A.    That's correct.

10        Q.    Do you know who Mr. Banon worked for in

11   connection with personal protective equipment sales

12   in 2020 and 2021?

13        A.    Was the question for whom he works?

14        Q.    Yes.

15        A.    I'm not sure.  Like my understanding is

16   that he's self-employed, he works for himself.  He's

17   more like a broker.  That was my understanding.

18        Q.    Have you ever seen a contract that

19   includes Mr. Banon in relation to MedCare glove

20   sales?

21        A.    I have not.

22        Q.    Can you describe briefly your educational

23   background, Mr. Mendlowits, since high school.

24        A.    Mostly religious studies.  I don't have

25   like an official secular education above high

 2    school.

 3        Q.    Where did you attend religious studies?

 4        A.    Nitra, N-I-T-R-A.

 5        Q.    In New York, right?

 6        A.    Yes.

 7        Q.    How are you currently employed?

 8        A.    What do you mean how?

 9        Q.    Are you employed right now?

10        A.    Yes.

11        Q.    What is your job?

12        A.    I'm a director at Adorama.

13        Q.    Director of what?  Is there a more

14    specific title?

15        A.    Not really.  It's like -- it's a director

16    of multiple -- multiple departments through Adorama.

17        Q.    When you say director, is that -- are you

18    a member of the board of directors of Adorama?

19        A.    Yes.

20        Q.    Okay.

21              Have you ever seen yourself referred to

22    as a director of private brands and new business

23    development?

24        A.    Yes.  That might have been my -- so I

25    worked for Adorama like for the last roughly 15

```
 2   years.  And probably throughout my career I was in

 3   private label and business development, and I

 4   haven't updated my LinkedIn profile for a while.

 5       Q.    So you anticipated my next question,

 6   which was how long you have worked at Adorama.

 7             You're saying it's 15 years?

 8       A.    Roughly.

 9       Q.    Prior to working at Adorama, did you work

10   anywhere else or did you start there right after you

11   completed your religious studies?

12       A.    That was my first job.

13       Q.    Okay.

14             Have you ever held employment with any

15   entity other than Adorama, Inc.?

16       A.    As an employee, no.

17       Q.    So what about in other capacities other

18   than an employee?

19       A.    I mean, I have like -- I have other

20   entities where I'm involved in, different kind of

21   businesses, for example, real assets but nothing

22   operational.

23       Q.    Nothing what?  I'm sorry?

24       A.    Nothing operational.  Not in a business.

25   It would be like in a real estate.  Stuff like that.
```

2        Q.    What other entities are you involved in

3   that have had any relation to sales or purchase of

4   personal protective equipment?

5        A.    None.

6        Q.    All right.

7              I want to show you an exhibit.

8   Hopefully you're able to --

9              MR. RAKHUNOV:  Alex, is Mr. Mendlowits

10       able to go into the exhibit portal?

11             MR. SPERBER:  He should.  Let me go

12       over there.

13             MR. RAKHUNOV:  We're going to look at

14       Exhibit 1 right now.

15             (Whereupon, a Notice was marked as

16       Adorama Exhibit 1 for identification, as of

17       this date.)

18             MR. SPERBER:  It just says present an

19       exhibit to him.

20             MR. RAKHUNOV:  I'm sorry?

21             MR. SPERBER:  It just says present an

22       exhibit to him.  I don't see the portal.

23             MR. RAKHUNOV:  So I'm not sure what you

24       --

25             We can go off the record.

2               (Whereupon, a discussion was held off

3        the record.)

4        Q.    Mr. Mendlowits, do you see an exhibit

5    that's been marked as Adorama -- should be marked

6    Adorama 1 in front of you?

7        A.    Yes, I do.

8        Q.    Have you ever seen this document before?

9        A.    Seems like a lawsuit.

10       Q.    Do you see the heading that says Notice

11    of Deposition of Adorama, Inc., Fed.Civ.P.30(b)(6)?

12             Do you see that?

13       A.    Yeah.

14       Q.    Do you recognize this document?  And you

15    should be able to scroll through it yourself without

16    me doing it, I hope, if the system works.

17       A.    I'm reading it.

18             Are you asking if I recognize it?

19       Q.    Well, that's the first question.  And

20    then I want to direct your attention to -- page 1,

21    2, 3 -- page 4 in the middle where it says Topics,

22    and then it goes over to page 5.

23             So the first question is:  Do you

24    recognize this document?  And once you answer

25    that, I'll direct your attention to pages 4 and 5.

2      A.    Yes.

3      Q.    You recognize it?

4      A.    I've probably seen it, like if I remember

5  exactly.  I probably have saw it.

6      Q.    Do you understand this document to be

7  requesting that you be prepared to testify regarding

8  the topics on pages 4 and 5 on behalf of Adorama?

9      A.    Yes.

10      Q.    Okay.

11            So directing your attention to topics 1

12  through 22 on pages 4 and 5 of this document, what

13  did you do to prepare as a corporate

14  representative of Adorama to testify on these

15  topics today?

16      A.    I mean, I worked through -- I was working

17  with Alex and he kind of walked me like what I need

18  to search for and where I need to locate it and what

19  I kind of need to produce.

20            MR. SPERBER:  I'm going to direct

21       Mr. Mendlowits not to discuss conversations

22       with counsel.  I meant to say that he may

23       have had conversations with counsel.

24      Q.    This is one of those areas where I think

25  if you looked at the case law -- you know, I'm

2    certainly not interested in your conversations with

3    counsel regarding legal advice, but I am entitled to

4    explore what you did as a corporate representative

5    to testify as to various topics.

6                    If information was given to you by

7    counsel, you can tell me that, and I think I'm

8    entitled to know what information was sort of

9    provided to you through counsel to prepare you for

10   your testimony.  But I'm not sure if we're there

11   yet, though, so let me back up and break this down

12   to avoid any unnecessary issues.

13                   So what I thought I heard you say a

14   moment ago is that you were referring to discovery

15   efforts and documents that you needed to produce

16   in this litigation.  Right?

17        A.    That's correct.

18        Q.    Okay.

19                   So I'm not asking about that right now.

20   I may get to that later.

21                   What I'm asking is specifically in

22   connection with the 22 topics set forth in this

23   notice, what did you do to prepare for today's

24   testimony regarding these topics?  If anything.

25        A.    I guess reviewing the documents with my

2    attorney.  I reviewed the details with my attorney.

3        Q.    Okay.

4             So you testified a little earlier this

5    morning that you did nothing to prepare for

6    today's deposition.

7             Are you changing that testimony?

8        A.    I probably didn't understand the question

9    clearly.  Yeah, of course I had conversations with

10   my attorney and going through what we need to

11   produce, what information I should be searching for.

12       Q.    Okay.

13            Again, I think we're speaking past each

14   other a little bit.  My question is not about what

15   you did in discovery in this case.  My question is

16   what you did to prepare for today's deposition as

17   Adorama's corporate representative.

18            If you're changing your testimony and

19   you're saying that you did review things and so

20   forth to prepare for today's deposition, that's

21   fine.  We'll explore that.  But I want to make

22   sure we understand each other.

23       A.    Yes.  In that sense, I did prepare.  Of

24   course I thought about it and I kind of reviewed all

25   the exchange of documents.

```
 2        Q.    Okay.

 3              When did you do that?

 4        A.    Like I guess for the last couple of

 5   weeks.

 6        Q.    And I don't want you to guess.  I want

 7   you to give me the best recollection.

 8              When did you review documents to

 9   prepare for today's deposition?

10        A.    Well, if you want dates, I can't give you

11   like exact dates.  My best answer I can give you is

12   the last couple of weeks.

13        Q.    And what documents did you review to

14   testify as a corporate representative today?

15        A.    I don't recall the specific documents.

16   It was a whole bunch of them.  It was whatever was

17   shown to me by Alex.  I was spending a lot of time

18   trying to review like what was what and making sense

19   of a lot of the things, different documents.

20        Q.    How many documents did you review?

21        A.    I can't give you a specific amount.

22        Q.    Was it more than five?

23        A.    Sure.  And more than 50 as well.

24        Q.    More than 50.  Okay.

25              Was it more than 100?
```

2          A.     It was probably more than 100.

3          Q.     How much time did you spend reviewing

4    documents in preparation for your deposition today?

5          A.     Probably a couple of hours.

6          Q.     Okay.

7                 And is this document that's marked as

8    Exhibit 1 one of the documents that you reviewed

9    in preparation for today's deposition?

10         A.     It is, yes.

11         Q.     And you're prepared to testify regarding

12   each of the topics on pages 4 and 5 on this Exhibit

13   1?

14         A.     Yes.

15         Q.     Okay.  All right.  Let's see what happens

16   when I close the exhibit.

17         A.     I lost my view.

18         Q.     Okay.  That is fine.

19                So you work for a company names

20   Adorama, Inc., correct?

21         A.     Yes.

22         Q.     And what does Adorama, Inc., do?

23         A.     Adorama's a mostly nowadays an e-commerce

24   company, a specialty retailer in the photography and

25   video space.

2     Q.   What other types of products does Adorama

3  sell?

4     A.   Like I guess a good way to categorize it

5  would be like electronics.

6     Q.   And it's fair to say that Adorama sells

7  other products other than electronics, correct?

8     A.   The photo, photography, video, lighting,

9  audio, music.

10    Q.   Let me back up is a second.

11     As a director at Adorama, what are your

12  day-to-day job responsibilities?

13    A.   Focused a lot around operations.

14    Q.   What does that mean?

15    A.   That means anything operational.

16  Logistics pieces.  The -- mostly logistic.

17    Q.   What kind of logistics?  I'm just trying

18  to be a little more specific.  Are you talking about

19  shipping?  Procurement?  What logistics?

20    A.   It's like the inbound, the outbound, and

21  the warehouse operations.

22    Q.   Okay.

23     And what do you do in connection with

24  those logistics?

25    A.   I oversee it.

2        Q.    Okay.

3              Who do you report to?

4        A.    I report to the owner of the company.

5        Q.    Who is the owner?

6        A.    It would be my father, Eugene Mendlowits.

7        Q.    What is your father's title at Adorama?

8        A.    Owner.

9        Q.    Does he have an official title other than

10   owner?  President?  CEO?  Anything like that?

11       A.    No.  It's probably -- he doesn't -- I

12   don't think he has an official title.

13       Q.    Okay.

14             In 2020 and 2021, what was your title

15   at Adorama?

16       A.    The same what it's now.

17       Q.    And as far as your job responsibilities,

18   were they any different in 2020 and 2021 than they

19   are now?

20       A.    Not really.  Roughly around the same

21   thing.

22       Q.    You mentioned earlier that you're a board

23   director at Adorama.  Who else sits on the Adorama

24   board of directors?

25       A.    It's basically -- it's basically me and

2    my father.

3          Q.    Okay.

4                There are no other board members?

5          A.    Board members as in board?  No.

6          Q.    What are you distinguishing as in board

7    from?

8          A.    Someone who is like privy to the

9    financials.

10         Q.    Okay.

11               So are you referring to like officers

12   or folks in the accounting department?  You say

13   somebody who is privy to the financials.  What are

14   you referring to?

15         A.    Like to -- the bottom line, operational

16   costs.  That kind of side of things.

17         Q.    Okay.

18               So who are the individuals who would be

19   privy to that information?

20         A.    That would be me and my father and some

21   folks in accounting.

22         Q.    Does Adorama hold board meetings?

23         A.    Official board -- yeah.  I mean, we do

24   have meetings, right.

25         Q.    How often?

 2      A.    Once a month.

 3      Q.    And are there minutes kept at those

 4  meetings?

 5      A.    No.

 6      Q.    Are there -- does Adorama keep formal

 7  books and records as a corporation?

 8      A.    Yes.

 9      Q.    Okay.

10            Does it file annual reports with the

11  State of New York?

12      A.    Like taxes?

13      Q.    No.  Like annual corporate filings.

14      A.    Corporate filings?  That would be like

15  related to taxes or are you referring to something

16  else?  Let me tell you this.  Maybe this will answer

17  your question.  We do everything what is required in

18  the State of New York in terms of filings.

19      Q.    Okay.

20            Who is in charge of making filings

21  required by the State of New York?

22      A.    That would be our accounting firm.

23      Q.    Do you internal or external accounting?

24      A.    External.

25      Q.    And who is that?

```
 2        A.    Roth & Co.

 3        Q.    And are they located in New York as well?

 4        A.    That's correct.

 5        Q.    Okay.

 6              Do you know where in New York they're

 7   located?

 8        A.    In Brooklyn.

 9        Q.    Do you know their address?

10        A.    Not offhand.

11        Q.    Okay.

12              Adorama has an internal accounting

13   department as well, correct?

14        A.    That's correct.

15        Q.    So again, your testimony is that Adorama

16   does not take board meeting minutes, correct?

17        A.    That's correct.

18        Q.    Are there any official records that

19   Adorama keeps reflecting that board meetings took

20   place?

21        A.    No.  I don't think we hold like official

22   records.

23        Q.    And so when the board meetings take

24   place, it's just you and your father, correct?

25        A.    Correct.
```

2      Q.    Are there -- do you need to clarify an

3    answer?

4      A.    I wanted to ask for like a quick bio

5    break.  If that's okay.

6      Q.    Absolutely.  That's fine with me.

7            (Whereupon, there was a pause in the

8      proceeding.)

9      Q.    Did you discuss during the break your

10   testimony with your attorney?

11     A.    No.

12     Q.    Do you understand what an officer of a

13   company is, that term "officer"?

14     A.    I understand it the way I understand it.

15   I mean, maybe in the more official capacity you

16   might have a different interpretation.  I can tell

17   you what I know.

18     Q.    Tell me whether Adorama has officers, in

19   your understanding.

20     A.    Like --

21     Q.    Like president, CEO, vice president.

22   Folks that are considered executives.

23     A.    Yes.  I mean, we have an official CEO.

24   We have -- if that's your question.  But since it's

25   a private company, it's -- it will probably not be

2    the same way how you seen it.  It's like -- it's

3    more internally for the other employees.

4         Q.    What do you mean by that, more internally

5    for other employees?

6         A.    They're not going to be making all the

7    decisions in the company.  They might be part of the

8    decision, but it's not like they truly have -- they

9    truly run the company.

10        Q.    Okay.

11              Just to shortcut this, you mean the

12   decisions rest in the hands of you and your father

13   as the board members and owner, correct?

14        A.    Correct.

15        Q.    So who are, if there's more than one,

16   shareholders of Adorama?

17        A.    There's only one, my father.

18        Q.    Okay.

19              So you're not an owner of Adorama?

20        A.    That's correct.

21        Q.    Okay.

22              How many employees does Adorama have?

23        A.    I would estimate like roughly 500

24   employees at the moment.

25        Q.    When you use the word "employees," are

2    you talking about like W-2 traditional employees or

3    are you including folks that might be independent

4    contractors?

5        A.    I'm including -- that would only be W-2.

6    I don't think -- I don't think -- I don't think we

7    have independent contractors on the moment.

8        Q.    Okay.

9              Of those employees -- let me actually

10   back up.

11             Who is the CEO of Adorama?

12       A.    His name is Michael Amkreutz.

13       Q.    What is the CEO's job at Adorama?

14       A.    It's to help create and communicate the

15   company strategy and is responsible for execution.

16       Q.    Are there any other officers other than

17   Mr. Amkreutz at Adorama?

18       A.    No.

19       Q.    So other than a director, do you have an

20   officer title at Adorama?

21       A.    You're asking if I have?

22       Q.    Yes, you.

23       A.    No, I don't have -- I don't have an

24   official officer -- I'm called an executive, but I

25   don't have an official officer title.

KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Mendlowits on 10/26/2023                                    Page 37

2        Q.     Okay.

3               Does Adorama have written by-laws?

4        A.     By-laws around what?

5        Q.     Does it have corporate by-laws?  Do you

6    know what that term means?

7        A.     No.

8        Q.     Okay.

9               In 2020 and 2021, was Adorama involved

10   in the business of selling personal protective

11   equipment?

12       A.     Technically we sold some masks on our

13   website.

14       Q.     Anything else?

15       A.     I was a party to some contracts.

16       Q.     One of those contracts involves Rock

17   Fintek, correct?

18       A.     No.

19       Q.     I'm sorry?

20       A.     No.  I wasn't -- I wasn't -- not -- I was

21   a lender over there.  I wasn't like part of the

22   buyers/sellers side of the thing, if you're saying.

23       Q.     Okay.

24              We will look at the Rock Fintek

25   contracts, I assure you.

2        A.      I'm sorry?

3        Q.      I said we will certainly look at that

4    contract today.  We will come back to that.

5                So other than Rock Fintek, what

6    contracts were you a party to with respect to PPE

7    in 2020 and 2021?

8        A.      As a buyer and a seller?

9        Q.      Let's start with that.

10       A.      It would be like Silverwing and it would

11   be one or two more.  I'm blanking on the names.

12       Q.      What products were involved in the

13   Silverwing contracts and the one or two whose names

14   you can't remember?

15       A.      Gloves.

16       Q.      Okay.

17               What kind of gloves?

18       A.      Nitrile gloves.

19       Q.      Okay.

20               Were these of any particular brand?

21       A.      In Silverwing, I think the brand name was

22   LevMed.  And in the other ones, it would have been

23   MedCare.

24       Q.      And in those situations, Adorama was a

25   seller of those gloves, correct?

2        A.    Well, we were -- the intent was to be a

3    lender but we ended up in the contract as a seller,

4    yes.

5        Q.    What do you mean by that?

6        A.    Because our expertise was never PPC [sic]

7    -- we didn't -- our whole involvement in -- in the

8    PPE business really came to us as someone looking to

9    finance a sale agreement, what they have.

10       Q.    Okay.

11             Was that someone specific who came

12   looking to finance an agreement?

13       A.    Well, I've had a couple of people

14   approaching me, but it was basically Kitchen Winners

15   only.

16       Q.    How did you end up in the contract as a

17   seller when you're intent was to be a lender?  Help

18   me understand that.

19             MR. SPERBER:  Can you clarify which

20       contract or contracts you're referring to.

21       Q.    So is Silverwing one of the contracts

22   where you were intending, or Adorama was intending,

23   to be a lender but ended up being a seller?

24       A.    Yes.  I mean, that's actually a good

25   question and I guess I didn't see that -- at that

2   time, I didn't realize the difference.  I didn't see

3   it as being a big deal as being on the contract as a

4   seller.  I didn't realize the significance.  Let me

5   say this.

6        Q.    So you signed onto the contract as a

7   seller without realizing the significance of that?

8   That's your testimony?

9        A.    Comprehending the significance, yeah.

10       Q.    Did Adorama take the position in the

11  Silverwing lawsuit that it was not a seller under

12  the contract but merely a lender?

13       A.    Well, we can't -- we can't -- no.  I

14  mean, we can take whatever position we want but it's

15  -- we're clearly on the contract as a party.

16       Q.    What do you mean as a party?  Meaning

17  you're a signatory to that contract as Adorama?

18       A.    No.  It says sales between -- this is a

19  seller agreement between Kitchen Winners, Adorama,

20  and Silverwing.  So I guess that makes me a seller.

21       Q.    You're referring to the first paragraph

22  of the contract?

23       A.    Yeah.

24       Q.    You understand that on the Rock Fintek

25  sales and purchase agreement, Adorama is a signatory

2    to that agreement, correct?

3         A.    Yes.  We are signing because we wanted --

4    because we are there to protect our money in terms

5    of -- from a lender's prospective.  Since it has on

6    the contract our account number and that's where the

7    money was going, yeah.

8         Q.    And, in fact, during your entire

9    relationship with Rock Fintek for the MedCare gloves

10   sales, Rock Fintek made payments to Adorama's bank

11   account, correct?

12             MR. SPERBER:  Objection to the form.

13        Q.    Yes?

14             THE WITNESS:  Can I answer that?

15             MR. SPERBER:  Yes.

16        A.    Payments went to Adorama.

17        Q.    All right.

18             Like I said, we'll come back to the

19   purchase agreement later.

20             Other than Silverwing, did the two

21   other agreements, the one or two that you

22   testified about that related to MedCare gloves,

23   did those also involve Kitchen Winners as a

24   co-signer on the contract?

25        A.    What?

```
2        Q.     So you testified a few minutes ago that
3   in addition to Silverwing, you remember being a part
4   to one or two other contracts where Adorama was a
5   buyer or seller, correct?
6        A.     Okay.
7        Q.     Was Kitchen Winners involved in those
8   transactions?
9        A.     Those other two?
10       Q.     Yes.
11       A.     Yes.
12       Q.     Did either of those other two
13  transactions result in any litigation or disputes?
14       A.     Silverwing resulted in a dispute.  The
15  other two, yes.  One for sure, yeah.
16       Q.     And that resulted in a lawsuit?
17       A.     Resulted in a lawsuit and -- yeah.  And
18  it never went anywhere.
19       Q.     Who was the lawsuit with?
20       A.     I still don't remember the name.
21       Q.     Does it happen to be Dynarex?
22       A.     No, there was no lawsuit in Dynarex.
23  Dynarex is another contract where we were involved.
24  And then there was one more.  I don't recall the
25  name, but I can easily find it.
```

2      Q.    I would ask -- you don't have to do it

3   during this deposition, but I would ask that you do

4   provide that information to your attorney.

5            MR. SPERBER:  Any requests for

6       information should be put in writing after

7       the deposition.  And we will take it under

8       advisement.

9      Q.    Where was the lawsuit filed against this

10  other contract?

11     A.    In New York.

12     Q.    Was it in state or federal court?

13     A.    I think it was state.

14     Q.    Is that someone involving an individual

15  named Evan Hershenson?

16     A.    Yeah, that one.

17     Q.    So that's the other contract that you're

18  referring to?

19     A.    Yeah.

20     Q.    What is the status of that lawsuit?

21     A.    I don't know the exact status, but I know

22  that it -- it didn't move anywhere for a while.

23     Q.    But it's still pending today, correct?

24     A.    It's probably still pending.  From what I

25  know.

2      Q.     Is Adorama, Inc., a party to that lawsuit

3   brought by Evan Hershenson?

4      A.     Yes.

5      Q.     And Adorama is not claiming in that

6   lawsuit that it was not a buyer or seller under the

7   agreement at issue there?

8      A.     I don't remember the details of the

9   contract, of the claims and even the purchase

10  agreement.

11     Q.     Okay.

12            And Adorama continues to sell Nitrile

13  gloves to this date, correct, on its website?

14     A.     Sell Nitrile gloves today?

15     Q.     Yes.

16     A.     I don't think so.

17     Q.     All right.  Well, let me show you Adorama

18  2.

19            (Whereupon, a screenshot was marked as

20        Adorama Exhibit 2 for identification, as of

21        this date.)

22     Q.     Do you see Adorama 2 up?

23            Let me just ask:  When I scroll, is it

24  scrolling on your screen?

25     A.     Yes.

2      Q.    Take a look at Exhibit 2.  For the

3   record, this is a screenshot taken earlier this

4   morning from Adorama's website.  And you can see

5   search results for the word "Nitrile" bring up 26

6   products, including Nitrile gloves.

7            Do you see that?

8      A.    Yes.  That's --

9      Q.    Okay.

10     A.    Go ahead.

11     Q.    No.  Go ahead.

12     A.    I think that's for forensics.  We have --

13  in photography, there's a forensic category.  But I

14  don't think these are medical gloves.  It's more for

15  the commercial use.

16     Q.    Do you see the third product on the first

17  page of Exhibit 2?  Do you see it says "Nitrile

18  disposable exam glove"?

19            Do you see that?

20     A.    Yes.

21            MR. SPERBER:  We are you?  What page?

22            MR. RAKHUNOV:  I'm at the bottom of the

23       first page of the exhibit just above the

24       exhibit sticker.

25            MR. SPERBER:  Okay.  Thank you.

2        Q.    So exam gloves are medical gloves,

3    though, correct?

4        A.    Might be, but the customer wouldn't be

5    here like for the medical industry.  It's retailed

6    around a category mentioned before.

7        Q.    Okay.

8              And if we scroll through, regardless of

9    what you just said as to what the customer might

10   be there for, there are a number of other listings

11   on your website that reflect Nitrile examination

12   gloves; is that fair?  You're welcome to scroll

13   through this entire exhibit one by one.

14       A.    Might be, and I would say this is

15   probably the residual from COVID.  But I guess

16   anything we sill have in stock, we still sell out

17   and have posted on the website.

18       Q.    Okay.

19             But through today, based on this

20   Exhibit 2, Adorama is, in fact, selling Nitrile

21   exam gloves on its website, correct?

22       A.    Yes.

23       Q.    Okay.

24             And other personal protective

25   equipment?

```
 2        A.    Yes.

 3        Q.    Okay.

 4              Does Adorama -- let me ask you a

 5   question:  Does Adorama -- do you know what an S

 6   Corporation is?

 7        A.    I know what it is.

 8        Q.    Is Adorama an S Corporation or a C

 9   Corporation?

10        A.    That, I don't know.  I don't know

11   offhand.

12        Q.    Okay.

13              Does Adorama consolidate financial

14   statements with any other entity?

15        A.    No.

16        Q.    Does Adorama consolidate tax filing with

17   any other entity or entities?

18        A.    I don't know.

19        Q.    Okay.

20              Is it Roth & Co. that would know about

21   Adorama's tax filings?

22        A.    That's correct.

23        Q.    Who at Adorama -- an Adorama employee --

24   is in charge of Adorama's tax preparation and

25   financial reporting?
```

2      A.     That would be -- so do you mind like

3   elaborating on your question?  What do you mean in

4   charge of?

5      Q.     Is there a department or an individual at

6   Adorama that oversees tax preparation and financial

7   reporting?

8      A.     That would be -- that would be the

9   accounting department, and they would be sending it

10  to Roth & Co.

11     Q.     Who is the head of the accounting

12  department at Adorama?

13     A.     That would be Bob.

14     Q.     What is Bob's last name?

15     A.     Weider, W-E-I-D-E-R.

16     Q.     Okay.

17            Other than the store, the brick and

18  mortar store in Manhattan, does Adorama have any

19  other physical locations?

20     A.     Like when you say -- where we sell goods?

21     Q.     Well, anything.  Where you sell goods or

22  where you just have back office space or warehouses.

23  Any other physical locations that are owned or

24  leased by Adorama.

25     A.     So it would be the either the store and

2    the building above the store.  And it would be our

3    two warehouses in Tennessee and Utah.

4         Q.    Where are these warehouses located?

5         A.    One would be in Chattanooga, Tennessee,

6    and one would be in Salt Lake City, Utah.

7         Q.    Okay.

8               Do you have any warehouse locations in

9    New Jersey?

10        A.    Not active.

11        Q.    Okay.

12              Are you familiar with a company named

13   Avrio Logistics?

14        A.    No.

15        Q.    You're not aware of Adorama using Avrio

16   Logistics for any work related to PPE?

17        A.    No.

18        Q.    Let me publish Exhibit 3.

19              (Whereupon, a NYS printout was marked

20        as Adorama Exhibit 3 for identification, as

21        of this date.)

22        Q.    So I've placed before you Exhibit 3.

23   It's a printout from the New York Department of

24   State Division of Corporations for Adorama, Inc.

25              Do you see that in front of you, sir?

 2        A.    I do.

 3        Q.    Okay.

 4              So under -- if you go to the middle of

 5    the page, hopefully you can see it says:  Service

 6    of process of the Secretary of State as agent --

 7              Do you see the name Eugene Mendlowits

 8    listed in the middle of the page?

 9        A.    I do.

10        Q.    That's your father, correct?

11        A.    Yes.

12        Q.    He's identified as the registered agent

13    for the corporation?

14        A.    Yeah.  That's what it seems, yeah.

15        Q.    Okay.

16              And do you see the Sunny Isles Beach,

17    Florida, address?

18        A.    Yes.

19        Q.    What is that address?

20        A.    I don't know.

21        Q.    Okay.

22              Does Adorama have any operations or

23    offices in Florida?

24        A.    I don't think so.  It might be like a

25    personal residency.

2          Q.     Does your father live in Sunny Isles

3     Beach?

4          A.     No, but I think my father has a house

5     there.

6          Q.     Under Chief Executive Officer's name and

7     address of this filing, it lists Mendel Mendlowits.

8                 Is that your grandfather?

9          A.     That's my grandfather, yes, may he rest

10    in peace.

11         Q.     So this is just an outdated listing,

12    correct?

13         A.     I would think so.

14         Q.     Okay.

15                When did Adorama first become involved

16    in the business of selling or buying personal

17    protective equipment?

18         A.     So in the context of what we've seen

19    before, what you've showed before in one of your

20    exhibits that we sell under -- I forgot the name of

21    the category.  What was the name of the category --

22    forensics.  Forensics, like where we sell to police

23    departments and that kind of -- that kind of

24    vehicle.

25                I guess that we've -- we've done it

2    like for as long as I can remember.  But it's

3    really ancillary.  It's really like the odds and

4    ends accessories, that category.

5              But in the context of refinancing or

6    selling directly was during COVID for the -- for

7    PPE.  That started in COVID.

8         Q.    And who at Adorama was in charge of

9    sourcing personal protective equipment in the

10   context of COVID?  I'm not asking about the gloves

11   for photography or developing film.  I'm only asking

12   about personal protective equipment in the context

13   of COVID.

14             Who was in charge?

15        A.    So how it started off, I was actually

16   just looking for our internal use.  I was in charge

17   and -- I don't know if you want the background on

18   that.

19        Q.    Sure.  Please give me the background on

20   that.

21        A.    So the background on that was that I was

22   -- I was looking for -- to -- for internal use.  We

23   needed it for the warehouses, for the employees to

24   feel comfortable to come into work at the time.

25             And that's how I got started.  And then

2    I kind of got -- got into being involved in PPE

3    during COVID.

4         Q.    Okay.  I'm not sure I understand the

5    answer.

6              So you were looking for gloves for just

7    Adorama's use?

8         A.    Gloves, masks.  It was difficult to get

9    at the time.

10        Q.    Well, what happened that led you to

11   actually enter the business, either as a lender or

12   as a direct buyer or seller?

13        A.    Because I was looking for -- to get PPE

14   for us, and I guess -- and it was very difficult.

15   And I was almost not successful in obtaining

16   anything.  And, actually, the person was able to buy

17   from was actually Kitchen Winners.  And that's where

18   I knew that he does have sources.

19        Q.    Okay.

20              And when you say person at Kitchen

21   Winners, who are you referring to specifically?

22        A.    To Joseph Weiner.

23        Q.    And Joseph Weiner also goes by Hershey

24   Weiner as well, correct?

25        A.    Yes.

2       Q.    Okay.

3             How do you know Hershey Weiner?

4       A.    Well, I knew of him for -- I don't know.

5   I think like everyone in the community knows him.

6   Like he's popular in sourcing, in sourcing product.

7       Q.    Okay.

8             What kind of products?

9       A.    He sources like -- I think like he

10  sources everything.

11      Q.    Can you be --

12      A.    I don't think any --

13      Q.    Let's break this down.

14            So prior to you becoming involved with

15  Mr. Weiner for gloves and other personal

16  protective equipment, if any, what other products

17  had you or Adorama sourced through Mr. Weiner?

18      A.    From Mr. Weiner, nothing.

19      Q.    Okay.

20            How did you become connected to

21  Mr. Weiner in connection with the gloves?

22      A.    I don't remember exactly.  But I guess I

23  was looking for gloves and, you know, his name came

24  up as someone who was able to get that.

25      **Q.    Who gave you his name?**

2          A.    I don't recall.  But that's basically the

3      path, how we kind of -- how we started getting

4      involved.

5          Q.    Is your father friends with Mr. Weiner?

6          A.    No.

7          Q.    Okay.

8                Are you aware of any prior business

9      relationships between your father and Mr. Weiner?

10         A.    No.

11         Q.    Okay.

12               So you've testified you're familiar

13     with an entity known as Kitchen Winners NY, Inc.?

14         A.    Yes.

15         Q.    Okay.

16               Do you know who the shareholders of

17     Kitchen Winners are or is?

18         A.    No.  I would assume Joseph Weiner.

19         Q.    Does Adorama consider Kitchen Winners to

20     be a related company?

21         A.    No.

22         Q.    Does it consider Kitchen Winners to be an

23     affiliate?

24         A.    No.

25         Q.    Okay.

2              Is Adorama a shareholder of Kitchen

3      Winners?

4         A.    No.

5         Q.    Are you a shareholder of Kitchen Winners?

6         A.    No.

7         Q.    Is anyone in your family a shareholder of

8      Kitchen Winners?

9         A.    No.  I --

10        Q.    I'm sorry.  Did you finish your answer?

11        A.    Not that I'm aware of, no.

12        Q.    How would you describe the relationship

13     between Adorama and Kitchen Winners?

14        A.    The same way you would with any company

15     dealing with another company.

16        Q.    Can you be more specific.  There are many

17     ways companies deal with each other.

18        A.    If we would purchase from them, then we

19     would be the buyer.  If we would sell to them, then

20     we would be the seller.  If we would lend to them,

21     then we would be the lender.

22        Q.    With respect to MedCare gloves -- right

23     now I'm not just focusing on Rock Fintek, but

24     overall MedCare brand gloves -- how would you

25     describe Adorama's relationship with Kitchen

2  Winners?

3       A.    I'm not sure how to answer that question.

4  It's -- do you mind elaborating like what -- I'm not

5  sure like what --

6       Q.    Yes.  I'm trying to understand how

7  Kitchen Winners and Adorama did business together

8  with respect to MedCare gloves.

9       A.    It wasn't specifically to MedCare gloves.

10 We -- it was really around PPE.  And we kind of lent

11 them money for them to be able to support their

12 contracts.

13      Q.    Okay.

14      A.    That was the general idea.

15      Q.    So when you say you lend them money, what

16 does that look like?

17           MR. SPERBER:  Objection to the form.

18           MR. RAKHUNOV:  Let me ask a better

19      question.

20      Q.    For example, did Kitchen Winners have a

21 line of credit with Adorama?  Or were there

22 specific, you know, individual loans?  How did the

23 lending relationship that you're testifying about

24 work?

25      A.    So it would usually be like -- it was

2    usually like straightforward like for like a month

3    or two.  We gave them a certain amount like based on

4    the contract.

5         Q.    Based on what contract?

6         A.    Like I wouldn't just give him money like

7    without anything.  I would want to see like what his

8    plan is.  I only gave him money if he had a contract

9    with another company who was committing to kind of

10   buy and -- buy from him.

11        Q.    Okay.

12              When was the first time that you funded

13   a glove purchase for Mr. Weiner, or any PPE

14   purchase?

15        A.    It would probably be like in -- say like

16   in -- I would say like since 2020, end of 2020,

17   mid-2020.  I don't recall the exact date, but

18   roughly around that.

19        Q.    So did the terms of -- I guess you had

20   testified -- the lending vary from deal to deal or

21   are they consistent?

22        A.    It was more or less the same deal.  It

23   was more or less -- usually he needed money for like

24   just for very short periods.  The rolls was very

25   quick.

2        Q.    And how did Adorama make money on these

3    transactions?

4        A.    We would set like an interest for that

5    period and it was based on the maximum line we would

6    give him.  It was like a maximum amount.

7        Q.    Okay.

8        A.    And we get a percent.  That's it.

9        Q.    Okay.

10             What was the interest that you recall

11    setting for the PPE transactions?

12        A.    In general it was 1 1/2 percent a month.

13        Q.    1 1/2 percent per month.  Okay.

14             Do you have an estimate or an exact

15    number of the total amounts that Adorama provided

16    to Kitchen Winners in funding during the entire

17    relationship between them?

18        A.    Like how do you calculate it?

19        Q.    Well, how much money did Adorama put out

20    to fund PPE transactions with Kitchen Winners in

21    total?

22        A.    Once or -- do you consider like every

23    month?  If it was a million dollars a month and the

24    same million dollars the next month, are you kind of

25    going to calculate it and say that it equals to two?

2       Q.    Well, you tell me.  That's why I'm asking

3    you.

4             So your testimony is that for -- well,

5    was there a specific monthly amount that you

6    committed to fund to Kitchen Winners or was it on

7    a transaction-by-transaction basis?

8       A.    Transaction basis.

9       Q.    Okay.

10            So over the entire relationship with

11   Kitchen Winners, do you know how much Adorama paid

12   out to Kitchen Winners to fund PPE transactions?

13            MR. SPERBER:  Phil, I'm confused by the

14       question.  I'm just making up numbers here,

15       but if Adorama loans $5 million and they get

16       paid back $3 million and then loans out $2

17       million, what is the number at that point?  I

18       don't understand how the math is supposed to

19       work here.

20            MR. RAKHUNOV:  Sure.

21       Q.    So you're no longer doing business with

22   Kitchen Winners, I believe you testified; is that

23   correct?

24       A.    I'm sorry.  I'm no longer --

25       **Q.    Doing business with Kitchen Winners; is**

 2   that correct?

 3        A.    That's correct.

 4        Q.    Okay.

 5              When did the relationship with Kitchen

 6   Winners end?

 7        A.    I think it was like after the Rock Fintek

 8   -- most likely after the Rock Fintek -- I think Rock

 9   Fintek was the last -- was the last transaction.

10        Q.    Okay.

11              So from the beginning of dealing with

12   Kitchen Winners and PPE through the end of the

13   last transaction, which you just testified is Rock

14   Fintek, in total how much money did Adorama lend

15   to Kitchen Winners for PPE transactions?

16        A.    Since I'm not clear how I should

17   calculate it -- you didn't really explain that, so I

18   would say just say like millions of dollars, tens of

19   millions of dollars.

20        Q.    Did you say tens of millions of dollars?

21        A.    Yeah.  I mean, I'm not exactly sure what

22   accounting method you would apply here and how to

23   calculate it, so if I need to generalize it.

24              MR. SPERBER:  Again, I don't

25        understand.  If they loaned $5 million and

  2        they're paid --

  3               MR. RAKHUNOV:  Alex, I'm going to work

  4        with the witness on this.  We're fine.

  5               MR. SPERBER:  The question is unclear

  6        and I'm objecting to the question.

  7               MR. RAKHUNOV:  You can state your

  8        objection and I'll continue on with the

  9        questioning.  I believe Mr. Mendlowits just

 10        testified that it was tens of millions of

 11        dollars and I asked do you know an exact

 12        number.

 13        Q.    Did Kitchen Winners repay all the loans

 14   that Adorama made to it?

 15        A.    Yes.

 16        Q.    Okay.

 17               Has Kitchen Winners and Adorama ever

 18   had a dispute about --

 19        A.    I'm sorry.  The loans?

 20        Q.    Go ahead.

 21        A.    They're still outstanding with

 22   Silverwing.  Other than that, everything was paid

 23   back.

 24        Q.    What is still outstanding?

 25        A.    Silverwing.

2      Q.    Is there anything outstanding to Adorama

3   from Kitchen Winners that relates to the Rock Fintek

4   relationship?

5      A.    No.

6      Q.    Do you know, as you sit here today, how

7   much Adorama profited from the Rock Fintek

8   transactions?

9      A.    Not offhand.

10     Q.    Do you have an estimate?

11     A.    Probably a couple of $100,000.

12     Q.    How would you go about calculating the

13  exact amounts that Adorama profited from Rock

14  Fintek?

15     A.    It would be like the outstanding we had

16  by month times the interest we charged we had set

17  for Rock Fintek for that contract.  And I think that

18  contract, it was a bit of a higher interest because

19  of -- because it was different than every deal

20  because we needed to sit with the outstanding money

21  for longer periods because I think they're agreement

22  was to be delivered in the US versus all other

23  contracts was paid out of China once it left China,

24  or overseas.

25     **Q.    And again, the funds from Rock Fintek**

2   were wired into Adorama's bank accounts, correct?

3        A.    That's correct.

4        Q.    Why were the funds wired to Adorama and

5   not to Kitchen Winners?

6        A.    Because I wanted to make sure I get back

7   my money.  That was the condition with every --

8   every time I had money out.

9        Q.    Okay.

10       A.    I didn't have any means of security.

11       Q.    Okay.

12             And then Adorama would keep its share

13  and then pay Kitchen Winners' portion to Kitchen

14  Winners?  Is that how this worked?

15       A.    That's correct.

16       Q.    Okay.

17             And the payments to Kitchen Winners,

18  were they made by check, wire transfer, or

19  something else?

20       A.    From what I remember, wire transfers.

21       Q.    And your accounting department would have

22  records of the wire transfers to Kitchen Winners; is

23  that correct?

24       A.    Yes.  It was sent to Kitchen Winners

25  behalf, meaning -- I don't think we ever sent money

2    to a Kitchen Winners account.  It was to Mark

3    Nussbaum.  It was an attorney's account to where he

4    requested we sent the money to.

5         Q.    Who is Mark Nussbaum?

6         A.    Mark Nussbaum is a transactional

7    attorney.

8         Q.    Does Mark Nussbaum represent Adorama?

9         A.    He represented Adorama as well.

10        Q.    Does he still represent Adorama?

11        A.    At the moment, no.

12        Q.    But he did in connection with the PPE

13   transactions, correct?

14        A.    That's correct.

15        Q.    And it's your testimony that Nussbaum

16   represented Adorama and Kitchen Winners?

17        A.    Yes.

18        Q.    Okay.

19              Did Adorama have any escrow agreement

20   with Attorney Nussbaum's firm with respect to PPE

21   transactions?

22        A.    Not that I recall, no.

23        Q.    I'm going to put up another exhibit, but

24   let's take a break first.

25              (Whereupon, there was a pause in the

 2        proceeding.)

 3        Q.    I'm going to publish another exhibit.

 4   This is Adorama 4.

 5             (Whereupon, a letter was marked as

 6        Adorama Exhibit 4 for identification, as of

 7        this date.)

 8        Q.    Let me know when you have this one-page

 9   document before you.

10        A.    I see it.

11        Q.    Okay.

12             The first question is do you recognize

13   the document before you?  It doesn't have a Bates

14   number, but it was produced in this case.

15             Do you recognize the document in front

16   of you as Exhibit 4?

17        A.    No.  It is a letter you mentioned to me.

18   Yeah.

19        Q.    Is this on Adorama letterhead?

20        A.    It is.

21        Q.    Is that your signature at the bottom?

22        A.    Absolutely not.

23        Q.    So is it your testimony that you did not

24   draft this document?

25        A.    That's correct.

2        Q.    Okay.

3              Have you ever seen this document before

4    I showed it to you just now?

5        A.    I think like Alex showed it to me like a

6    couple of days ago, but --

7        Q.    Have you searched -- have you conducted

8    any searches in Adorama's servers or computer

9    systems for a copy of this document since it was

10   shown to you a few days ago?

11       A.    I wouldn't know how to search this.  But

12   I got like explicit instructions, like a whole list

13   on all the searches I should do on my server side,

14   and I haven't seen this.

15       Q.    Okay.

16             Do you know who other than you would

17   have access --

18             MR. RAKHUNOV:  Strike that.

19       Q.    So you're saying that signature is not

20   your handwriting, correct?

21       A.    Yes.

22       Q.    Do you have any idea whose handwriting

23   that is?

24       A.    No.

25       **Q.    Do you know who outside of Adorama would**

2   have access to your letterhead to enable them to

3   create a document like that?

4        A.    I mean, anyone can -- anyone who knows

5   how -- how our letterhead looks would be able to do

6   something like that.

7        Q.    Okay.

8              Do you know who an individual named

9   Arik Maimon is?

10       A.    Yes.  I've heard of him.

11       Q.    Okay.

12             Do you know him other than from the

13  allegations in this lawsuit?

14       A.    No.

15       Q.    Did you deal with Mr. Maimon at all in

16  relation to the Rock Fintek glove transactions

17  directly?

18       A.    No.

19       Q.    So I can represent to you, and you can

20  just take it as a foundation for the next couple of

21  questions, that this document was provided to my

22  client by Mr. Maimon in a WhatsApp message, which,

23  again, has been produced in this case.

24             Do you have any idea of how Mr. Maimon

25  came into possession of this document?

2          A.     No clue.

3          Q.     Okay.

4                 Do you recall providing anyone,

5    including Mr. Weiner, with authority to sign your

6    name to this document?

7          A.     No.

8          Q.     Is it your belief that someone forged

9    your name on this document?

10         A.     It's not even forged.  It's not even a

11   similar signature to me.

12         Q.     So let me ask you about a couple of

13   statements in this document, then.

14                So the first phrase says:  This

15   document is submitted by Adorama, Inc.

16                I take it you would disagree with that

17   statement?

18         A.     That's correct.

19         Q.     Okay.

20                Do you see later in the top line, this

21   document describes Kitchen Winners NY, Inc., as

22   "our related company"?

23                Do you see that?

24         A.     (No verbal response given.)

25         Q.     In the top.  In the first line.

2      A.    I see.

3      Q.    Okay.

4            Do you agree with that statement?

5      A.    No.  I disagree with that statement.

6      Q.    Okay.

7            Can you please read the rest of this

8      letter.  Do you see in the middle of -- well, once

9      you read it -- I just want to make sure you read

10     the whole thing.  It's not very long -- let me

11     know when you have completed it and I will ask you

12     some more questions.

13     A.    Go ahead.

14     Q.    Do you see a name mentioned Tomaz Lovse?

15     Is that someone you're familiar with?

16     A.    No.

17     Q.    You have no idea who that person is?

18     A.    No clue.

19     Q.    Okay.

20           Do you see a statement that Kitchen

21     Winners NY, Inc., are authorized to act on our

22     behalf to procure Nitrile gloves as discussed

23     subject to contract.  I understand Tomaz Lovse is

24     working through his company, Medical Group Care,

25     as our procurement partner.

2            Do you agree with that statement?

3     A.    I disagree with that statement as well.

4     Q.    Okay.

5            Do you know who Medical Group Care is?

6     A.    No clue.

7     Q.    Okay.

8            And you see a reference in the last

9     paragraph that Adorama will fully fund and execute

10    payments through an irrevocable documentary letter

11    of credits to be issued according to the signed

12    SPA?

13           Do you see that?

14    A.    Yes.

15    Q.    Did Adorama fund any glove transactions

16    through irrevocable letters of credit?

17    A.    No.

18    Q.    So is it your testimony that all funding

19    for PPE transactions were with cash wire transfers?

20    A.    That's correct.

21    Q.    Do you have any idea whatsoever as to the

22    circumstances behind the creation of this Exhibit 4?

23    A.    No idea.

24    Q.    No idea where it came from?

25    A.    No idea from where it came from or what

2    this is.

3         Q.    And to the extent that Rock Fintek was

4    induced into any transactions based on this

5    document, you would agree that that would be

6    fraudulent?

7              MR. SPERBER:  Objection to the form.

8         Calls for a legal conclusion.

9         Q.    You can answer.

10        A.    So what is the question again?

11        Q.    The question is if Rock Fintek entered

12   into some transaction based on -- in reliance on

13   this document in Exhibit 4, you would agree with me

14   that that would constitute fraud, correct?

15             MR. SPERBER:  Note my objection.

16        A.    But why would they -- what would that --

17   what does that letter have to do with that at all?

18   I don't see them -- I don't see them mentioned.

19        Q.    You agree with me that this letter is not

20   what it purports to be?  Or at least that's your

21   testimony, correct?

22        A.    Yes.  Yes.

23        Q.    Okay.

24             And if someone held this letter out as

25   coming from Adorama and signed by you without your

2    authority, that would be a fraudulent act,

3    correct?

4            MR. SPERBER:  Objection to the form.

5        Calls for a legal conclusion.

6        A.    Yes, I can answer that, but I'm not

7    sure -- like how is this related to Rock Fintek?

8        Q.    As I represented to you, that was

9    provided to Rock Fintek.  It was something that --

10   well, I'm just asking you if Rock Fintek relied on

11   this thinking this came from Adorama, then whoever

12   provided this to Rock Fintek would be committing

13   fraud, in your opinion?

14           MR. RAKHUNOV:  And I understand same

15       objections.  You don't have to --

16           MR. SPERBER:  Again, I don't see fraud

17       exactly, but fine.

18       A.    You can easily see that it doesn't have

19   the same signature as I have on my contract or any

20   other signatures of me.

21       Q.    But somebody who hadn't seen your

22   signature before wouldn't know that, would they?

23       A.    And usually when there's letters like

24   this, there's like a verification, contact, email

25   address.  So if I got something like that, I would

2    contact the other person and confirm.

3         Q.    That wasn't my question.

4               This document is not what it purports

5    to be, correct?

6         A.    Yeah.

7         Q.    All right.

8               So just before this deposition, your

9    attorney provided us with a document that I don't

10   believe had been produced previously in this case.

11   I didn't have time to go back to check, but I

12   understand that it hadn't.  I'm going to mark that

13   as Exhibit 5.

14              (Whereupon, an agreement was marked as

15       Adorama Exhibit 5 for identification, as of

16       this date.)

17        Q.    You should have it in a couple of

18   seconds.  For the record, Exhibit Adorama 5 is a

19   document written mostly in Hebrew, Bates-labeled

20   AKW_005153.  It's a one-page document --

21        A.    This is interest agreement on how much

22   Kitchen Winners is going to owe Adorama for the

23   money we're lending to them for this transaction.

24        Q.    Okay.

25              So, you know, obviously we did not have

2    the time to obtain a translation of this agreement

3    prior to today's deposition, and my Hebrew is a

4    bit rusty.

5              We also don't have any kind of a Word

6    version of this document, but -- so I'm going to

7    ask you to do your best, understanding you're not

8    a professional translator, to translate this

9    document.

10             But before I do that, who signed this

11   document on behalf of Adorama?

12        A.    That's my Hebrew signature.

13        Q.    And who signed this document on behalf of

14   Kitchen Winners?

15        A.    I remember that would be Hershey, Joseph

16   Weiner.

17        Q.    When was this document executed?

18        A.    It seems like, based on the date what I'm

19   reading, it's -- it says March 26, 2021.

20        Q.    Okay.

21             So now I'm going to ask you, starting

22   from the top to just slowly so the court reporter

23   can take it down, do the best you can to translate

24   this document on the record.

25        A.    It says on the top that this is an

 2  Agreement.  That's a title.  The next line, it says

 3  -- it follows our religious formality on how we need

 4  to write like agreements, so that might be difficult

 5  for me to interpret.  But it says this is an

 6  agreement between -- between two people.  One is

 7  Adorama -- two entities -- and one is Kitchen

 8  Winners.  And it has hand signatures signed on the

 9  bottom.

10           The translation is a bit weird, but I

11  will keep going.  It's going to talk about a line

12  of credit, what I'm going to borrow.  The first

13  one is going to kind of commit to add to --

14           (Reporter clarification.)

15      A.    Party A, which is Adorama, commits to a

16  maximum line of credit, a maximum loan in a way what

17  Jewish law allows to lend because -- and -- and it's

18  going to be for four months from -- a maximum for

19  four months, from April 1 to August 30.  It's going

20  to be about -- and that money can only be used for

21  the transaction of Rock Fintek.

22      Q.    And you're referring to the line where

23  Rock Fintek is written out in English, correct?

24      A.    That's correct.

**25      Q.    And in the following line, there's a**

2    reference to 3 percent.

3              What does that refer to?

4         A.    It's 3 percent interest per month.

5         Q.    Okay.

6              And then what does the 5 percent number

7    in the line just below that refer to?

8         A.    If for some reason he will still owe me

9    money after the April 1 to August 30, then the

10   interest will be set at 5 percent.  Like some sort

11   of penalty, something like it, if he goes over.

12        Q.    Okay.

13             What else?

14        A.    And then it works out -- it kind of --

15   it's going to go -- so basically over here --

16             THE WITNESS:  Alex, do you want to

17        explain it?

18             MR. SPERBER:  No.

19        A.    Because we're not allowed to officially

20   borrow on interest, but there is ways how to

21   technically set it up as borrow on interest and it's

22   religiously allowed, so it works through that

23   technicality.

24             That's basically it.

25        Q.    Let me ask you a couple of questions.  I

2    think, you know, given that we got this just before

3    your deposition, there's not much I can do with it

4    other than have it officially translated, but I'm

5    trying to get you to answer a few questions about it

6    so we can hopefully not have to come back.

7              Are there any indemnification

8    provisions in this contract as between Kitchen

9    Winners and Adorama?  Do you know what that means?

10        A.    Meaning indemnification --

11        Q.    Do you know what indemnification means?

12        A.    I'm trying to work how the definition

13   would be applied over here.

14        Q.    Well, I'm asking you do you know what the

15   word "indemnification" means?

16        A.    Yeah.  Like if you harm someone, you're

17   responsible to kind of -- like indemnify someone if

18   you kind of harm them.  Is that translation?

19        Q.    Are there any provisions in here that

20   would require Adorama or Kitchen Winners to pay

21   something to the other if, for example, there was a

22   lawsuit or a claim about the quality of the product?

23        A.    No.  No.

24        Q.    All right.

25        A.    The only indemnification is that -- well,

2   obviously if I don't have my money back by whatever

3   is the end date, then the interest is set at 5

4   percent, as a -- kind of as a penalty.

5        Q.    Who drafted this document?

6        A.    So it's a common document.  So you go to

7   someone who's like kind of an expert -- how do I

8   explain it?  -- an expert in Jewish law and related

9   to trade, and such an individual will kind of

10  compose such a document.

11       Q.    I understand.

12             But specifically this document, do you

13  know who drafted this document?

14       A.    I wouldn't know who drafted it.  I would

15  assume Kitchen Winners took care of it and it was --

16  it was reviewed -- I would have reviewed it by -- in

17  this case I went to my brother, who was familiar

18  with it, and he would kind of walk me through the

19  details and make sure it's aligned with what I'm

20  looking to accomplish.

21       Q.    Okay.

22             So what makes you assume that Kitchen

23  Winners would have taken care of it?

24       A.    Because I don't remember being busy with

25  it in terms of drafting it, so -- I just don't

2  recall me being busy with drafting a letter.  And

3  for that fact, I wasn't -- anything related to

4  Kitchen Winners, I wasn't involved.  Even in the

5  contracts being busy drafting it, so I would imagine

6  that he did it.

7       Q.   Let's say your assumption is correct.  Do

8  you recall how Mr. Weiner would have provided this

9  document to you?

10      A.   Yes.  He would -- I actually remember

11 like -- yeah, he brought it to me in the office and

12 I signed it.  I signed one copy.  We made two

13 copies.  He made two copies.  I signed them both and

14 he signed them both.  And yeah.  I actually remember

15 he brought it to my office.

16      Q.   Okay.

17           He didn't send you a draft to review by

18 email first?

19      A.   I don't think so.

20      Q.   Okay.

21           You said your brother reviewed it.  Was

22 your brother in the office with you?

23      A.   My brother was in the office then.

24      Q.   Well, when did your brother review this

25 agreement?

2        A.    Because I had a copy and I know we met a

3    couple of times.  And I was reviewing the copy, and

4    I guess at home I showed it to my brother.  He

5    doesn't have email or anything.

6        Q.    What's your brother's first name?

7        A.    Joel.  At the time he was studying

8    religious study full-time so --

9        Q.    Joel Mendlowits?

10       A.    Yeah.

11       Q.    Safe to assume that he's not Joel

12   Mendlovic associated with AMCM Gloves or is he?

13       A.    Very safe to assume.  He was studying at

14   that time.

15       Q.    Is he younger or older than you?

16       A.    Younger.

17       Q.    All right.  Look.  I don't think I can

18   ask meaningfully anymore questions about this

19   contract right now.  But given that it was produced

20   right before the deposition, obviously not in

21   English, I will reserve the right to take

22   appropriate steps, but we don't need to get into an

23   argument now.

24             Why was the loan agreement or this line

25   of credit agreement between Kitchen Winners and

2    Adorama executed in Hebrew under Jewish law as

3    opposed to in English under American secular law?

4         A.    Because with Kitchen Winners on all the

5    transactions, I had a handshake agreement with them.

6    It was straightforward.  It was for a very short

7    period of time where -- from when I lay out money

8    until the money gets back to me.  So I didn't have

9    any other agreements with them other than a verbal

10   agreement.

11        Q.    I don't think that was my question,

12   though.

13              Why did you formalize your line of

14   credit with them in a contract in Hebrew under

15   Jewish law as opposed to a one-page agreement in

16   English under New York law, for example?

17        A.    I was trying to explain to you.  I didn't

18   have any agreements with them, period.  But when it

19   came to this transaction, I kind of wasn't

20   comfortable to go again without an agreement.

21              It was relatively a lot of money

22   compared to everything else in terms of money I

23   would need to be out with, so I wanted to have

24   something with him on paper.

25              And when -- usually if both parties

2    agree, our preferred method is to have it in a

3    Hebrew agreement, and we would go to -- if there

4    would be like a conflict between us two, then we

5    would go to Jewish court, Beth Din.  That's

6    customary when two religious people have a

7    conflict or they want to get into a deal to kind

8    of do such an agreement.

9         Q.    And this is without you revealing any

10   attorney-client communications, but is it your

11   understanding that this contract would or would not

12   be enforceable in a secular court in New York?

13        A.    100 percent it would.  That's exactly why

14   I showed it to my brother, because he studies that

15   subject so he was familiar with how to structure it.

16        Q.    Did you ever circulate this agreement by

17   email to anyone else involved with the Rock Fintek

18   transaction?

19        A.    No.

20        Q.    Do you know if this agreement was

21   produced to us by you or by Kitchen Winners in

22   advance of today's deposition?

23        A.    It was definitely not by -- it was

24   definitely produced not from me.  I even forgot

25   about this agreement.  I probably still have it in

2    my drawer somewhere sitting.

3        Q.    When you were conducting searches for

4    documents in connection with this litigation, did

5    you look for paper documents as opposed to

6    electronic ones?

7        A.    I literally almost don't have any paper

8    documents, and I haven't seen this for a while.

9    Yeah.

10       Q.    Do you still have a copy of this

11   agreement?

12       A.    I would need to check.

13       Q.    Okay.

14       A.    I would assume probably not because I was

15   paid in full so I probably didn't need it anymore.

16   It wouldn't have any value.

17       Q.    I will ask that you search for it in your

18   paper files, and we'll follow up with counsel.

19            MR. SPERBER:  Any requests for

20        production should be made in writing

21        following the deposition and we will take it

22        under advisement.

23       Q.    Okay.  Let's take this one down and look

24   at 6.  I'm just putting a document up.  This is

25   Adorama Exhibit 6.

2              (Whereupon, an agreement was marked as

3         Adorama Exhibit 6 for identification, as of

4         this date.)

5         Q.    I have published what's been being marked

6    as Adorama 6.  It's a 16-page document.  You should

7    have it up in a minute.  It begins with Bates number

8    AKW_004854, consisting of an email and some

9    attachments.  At least that's how it appeared in the

10   production.

11             Take a minute to scroll through this

12   document and let me know if you recognize either

13   any of the email communications -- and I

14   understand you're not -- you don't appear to be

15   copies on at least these versions -- or the

16   document that begins on page 6 of the PDF that's

17   headed Sales Contract Between Kitchen Winners NY,

18   Inc., and Adorama, Inc.

19        A.    Based on the signatory, I'm sure that

20   this was -- that this was an agreement we wanted to

21   buy from Kitchen Winners, gloves.  But that never

22   came to fruition and we never kind of executed this.

23        Q.    Okay.

24             Do you actually have an independent

25   recollection of this proposed transaction?

2       A.    Correct, of the proposed transaction.

3   And based on the signatory, I can see that the

4   signatory is a buyer within Adorama, like someone in

5   the purchasing department.

6               And if I remember correctly, this

7   was -- there was like a government bid out there

8   to -- government bid like BtB requests for such

9   products, for gloves.

10              And -- but it never got -- it never got

11  executed or I don't think Kitchen Winners ended up

12  selling us any gloves at that time.

13      Q.    Did you ever buy gloves directly from

14  Kitchen Winners, or did Adorama?

15      A.    No.

16      Q.    So it's your testimony that this

17  agreement never was executed?

18      A.    Correct.

19      Q.    Okay.

20              And you see under where it says for and

21  on behalf of the Buyer, Adorama, Inc., or the

22  signature block that you're referring to, there's

23  a name Usher Sperber?

24      A.    Yes.

25      **Q.    Any relation to your attorney?**

2          A.    My attorney?

3          Q.    Yes.

4          A.    To my attorney, no.

5          Q.    Okay.

6                And what is Mr. Sperber's position

7    within Adorama?

8          A.    He's a purchasing agent within Adorama.

9          Q.    Okay.

10               Did Mr. Sperber have any involvement in

11   the gloves that were sold to Rock Fintek?

12         A.    No.  It's like he came to me, there's a

13   bid for gloves in our BtB department, and he asked

14   me if I can kind of connect him with someone.  And I

15   think that's where probably we started working with

16   agreement.  But it never -- it never happened.

17               At that time Kitchen Winners wasn't

18   able to getting any gloves.  When was it?  Before

19   2021.

20         Q.    Did Adorama, in fact, bid on this

21   contract or the underlying contract?

22         A.    No, like without a commitment of the

23   source.  It's a waste of time.

24         Q.    All right.  We can put that exhibit away.

25               You obviously know who Rock Fintek is

2    or what Rock Fintek is?

3         A.    Right now, yes.

4         Q.    Well, you knew who Rock Fintek was back

5    in April of 2021, correct?

6         A.    I knew the name.  I've seen the name, but

7    I wasn't -- I wasn't familiar with their principals

8    or with their -- or with the kind of work they do.

9         Q.    Okay.

10             So you would agree with me that you

11   were a signatory, that Adorama is a signatory to

12   a sales and purchase agreement with Rock Fintek?

13        A.    No.  We're a signatory as a lender.

14        Q.    I understand you're probably not going to

15   agree with me on the interpretation of that

16   contract, and, you know, we don't have to hide in

17   that sense.  But Adorama signed the agreement on

18   which Rock Fintek is a party, correct?

19        A.    Yes.

20        Q.    Okay.

21             Prior to signing that agreement, did

22   you personally participate in any telephone calls

23   with either Bradley Gilling or Thomas Kato or

24   both?

25        A.    Never.  I've never seen them, talked to

2    them, or even know how they look like.

3         Q.    So you've never spoke with Mr. Kato?

4         A.    Never ever.

5         Q.    Did you have any involvement in the

6    negotiations of the sale and purchase agreement with

7    Rock Fintek?

8         A.    No.

9         Q.    Okay.

10             Well, who do you understand as being

11   the primary negotiator of that sales and purchase

12   agreement?

13        A.    To be honest, I didn't know and it wasn't

14   really relevant for me on who the principals are.

15   Like as far as I was concerned, you know, based on

16   the agreement, if they -- if whoever -- whoever the

17   principal is give the money, if the deposit comes, I

18   know they are real, and then I'm committing to that

19   kind of -- to that tranche of lending for Kitchen

20   Winners to support the purchase agreement, to

21   support the PSA.

22        Q.    Let me put the contract up on -- by the

23   way, before I ask you questions about that, you

24   testified earlier that you have an office phone at

25   Adorama, correct?

2        A.      Correct.

3        Q.      What is that phone number if somebody

4    were to call you there?

5        A.      If someone would call me, he would need

6    to kind of speak to the operator and then -- and

7    then ask for my name and get transferred to that

8    line.  Or if someone knows my extension, he would be

9    able to dial me directly.

10       Q.      What is the main line of Adorama that

11   someone would call?

12       A.      212-741-0401.  And then there is a 1-800

13   number as well.  I don't remember the full number.

14       Q.      Do you use WhatsApp to communicate

15   regarding business?

16       A.      Not really, but I have WhatsApp.

17       Q.      Okay.

18               In 2020 and 2021, did you communicate

19   with Hershey Weiner on WhatsApp?

20       A.      No.  As far as I'm concerned, he doesn't

21   have WhatsApp.

22       Q.      Did you communicate with him on something

23   called WeChat?

24       A.      No.

25       **Q.      Did you communicate with him via text**

2    messages?

3        A.    Yes.

4        Q.    Have you given to your counsel in this

5    litigation your text messages with Mr. Weiner?

6        A.    I didn't really have any text messages to

7    give.  Most of his text messages are "please call

8    me" or I tell him to call me.  He wasn't like big on

9    typing or email or a chat.  He was always like a

10   phone call.  Occasionally I would get some email,

11   but --

12       Q.    So I guess let me ask you a different

13   question.  To the extent that you were in any phone

14   calls concerning any glove business back in March or

15   April or 2021, would those phone calls have taken

16   place through any medium other than your cell phone

17   or your Adorama office phone?

18       A.    No.  That would be the only medium.

19       Q.    Okay.

20             And you understand that through

21   WhatsApp, for example, you're able to have video

22   and IP phone calls with other folks?  Yes?

23       A.    Yes.

24       Q.    Okay.

25             Have you ever had any phone calls or

2    video calls through WhatsApp regarding the glove

3    transactions in April or March or May of 2021?

4         A.    With Hershey?

5         Q.    With anyone.

6         A.    With Kitchen Winners or with other

7    parties?

8         Q.    Anyone.

9         A.    I mean, I was -- I was on WhatsApp groups

10   where people were selling and -- selling and buying

11   PPE, I mean, because I was interested in that market

12   so I was understanding what's happening there.  But

13   I might have reached out to people to get some

14   questions because I wanted to get some insights.  Or

15   people reached out to me.  I don't think around

16   active transactions or anything to that sort to what

17   I recall.

18             And I was looking up my WhatsApp as

19   part of my review for discovery.  I didn't have

20   anything related to that.

21        Q.    That was actually my next question.

22             So you reviewed your WhatsApp messages

23   in connection of this litigation?

24        A.    Yes.

25        Q.    Did you look for any communications

2    between you and Mendel Banon?

3        A.    Yes.   Actually, me and Mendel Banon?   I

4    don't have his phone number.  I couldn't find his

5    phone number so I wasn't able to kind of look that

6    up.  But if I have WhatsApp with Mendel Banon?   I

7    don't think so.

8        Q.    Okay.

9              We will provide Mr. Banon's phone

10   number to your attorney and, again, we'll follow

11   up in writing to just ask that you confirm.  Maybe

12   it's an unsafe phone number and we want to make

13   sure that you're able to do a complete search.

14              And, again, is it your testimony that

15   you did not communicate with Mr. Banon directly

16   during 2020 and 2021 regarding PPE transactions?

17       A.    Correct, to what I recall.

18       Q.    Do you recall being on any email

19   communications with Bradley Gilling or Thomas Kato?

20       A.    No.   I'm pretty positive I was never on a

21   communication with them.  Or, for that fact, with

22   Arik Maimon.

23       Q.    Okay.

24              (Whereupon, an SPA was marked as

25       Adorama Exhibit 7 for identification, as of

2            this date.)

3                 I have put up Adorama 7.  It's a sales

4    and purchase agreement dated April 7, 2021.

5        A.    I see that.

6        Q.    You see that document?

7        A.    Yes.

8        Q.    All right.

9                 So first, please go to the second to

10   last page of the document.

11       A.    The signature page?

12       Q.    The signature page.  And it says "the

13   foregoing agreement is read and agreed by."  And

14   then there's a heading Seller.  And there's a

15   signature of -- it says Hershey Weiner.

16                 Do you recognize that to be

17   Mr. Weiner's English signature?

18       A.    If I recognize it specifically?

19       Q.    Either way.

20       A.    I don't know what his signature looks

21   like exactly.  I haven't paid attention to it.

22   Seems like his name.

23       Q.    In the middle above your name, is that

24   your name?  Is that your signature?

25       A.    It's my name, yeah, and it seems like --

2   seems like my signature.

3         Q.    Okay.

4               And you're not contending in this case

5   that you did not sign this contract, correct?

6         A.    Correct.  I agree I signed.

7         Q.    And do you see how your name is spelled

8   with a Z here?  Do you know why it's spelled with a

9   Z?

10        A.    Probably because the name at the bottom

11  was spelled with a Z so I just signed it like that.

12  I don't know.

13        Q.    Who drafted this contract?

14        A.    That would probably be Nussbaum's office.

15        Q.    Did you review this document before you

16  signed it?

17        A.    Yeah, I probably reviewed it.  I think

18  like the schedule was important and I wanted to make

19  sure that -- that I had enough money to support his

20  contract and I was able to support his contract.

21              I want to make sure that there was a

22  deposit before I start giving money.  Right?  And

23  I would want to make sure the terms include that

24  all money goes through Adorama's bank account,

25  that everything needs to be paid through that bank

```
 2   account.

 3        Q.    Okay.

 4              So you did review this document before

 5   signing it?

 6        A.    Yes, probably on the key details.

 7        Q.    Do you recall making or requesting any

 8   edits be made to this agreement before you signed

 9   it?

10              MR. SPERBER:  I'm just going to object

11        and direct Mr. Mendlowits not to answer to

12        the extent that any of those communications

13        were with his counsel.

14        Q.    Do you recall requesting -- I'm not

15   interested in communications with your attorney, but

16   I do want to know if you had any edits or changes

17   that you wanted made to this agreement before you

18   executed whether those changes were made by Kitchen

19   Winners or Rock Fintek.

20              Do you recall?

21        A.    I don't recall.  I don't recall.

22        Q.    Okay.

23              You didn't ask that the spelling of

24   your name be fixed in the agreement, either,

25   right?
```

2      A.     No.   I probably didn't pay so much

3  attention to that.   I was really focusing on the few

4  key details, what matters to me, like the money

5  should go through Adorama so it's secured, and

6  understand the schedule and make sure the contract

7  is in line with the schedule.

8      Q.     And if I understand correctly, your

9  position in this lawsuit is that this contract --

10  that the role of Adorama under this contract is as a

11  lender only?   Am I stating your position correctly?

12      A.     Yes.

13      Q.     Okay.

14             Can you show me where in this agreement

15  you believe -- the language in this agreement that

16  you believe supports your position that Adorama,

17  Inc., is only a lender in this transaction.

18      A.     Well --

19      Q.     And I assume you can control the

20  document, so --

21      A.     I know it's not my chance to ask

22  questions, but where do you see otherwise?

23      Q.     Well, I'm asking you.

24      A.     It doesn't say that I'm a seller or

25  purchaser, so -- and my bank account is here and

2    money is to be passed through that, so --

3         Q.    I'm sorry.  Go ahead and finish.

4         A.    Yeah.  I mean, so to me it seems

5    straightforward that my involvement here is a

6    lender.

7         Q.    Well, okay.

8              Where does it say that the money would

9    be passed through Adorama's account as opposed to

10   paid to Adorama's account?  It doesn't say that

11   anywhere, correct?

12        A.    Could be paid because I guess the payee

13   needs to pay.  Right?  So it won't pass through like

14   as what it relates to me.  But in terms of the

15   buyer/seller, the payment, what Rock Fintek owes to

16   Kitchen Winners, needs to be paid to Adorama.

17        Q.    Okay.

18              But where does it say that in this

19   agreement?

20        A.    It says payment terms to be -- deposits

21   shall be paid to Adorama, Inc.

22        Q.    It doesn't say that deposits shall be

23   paid to Adorama, Inc., to be distributed to Kitchen

24   Winners or anything to that effect, correct?

25        A.    Yeah.  Again, as part of -- as it relates

2    to Rock Fintek, it's -- it's not their -- it's not

3    really -- it doesn't really matter to them.  Right?

4        Q.    Well --

5        A.    This was a seller and purchase agreement,

6    right, so we want to know like what the parties are

7    supposed to do; what is the seller supposed to do

8    and what is the buyer suppose to do.

9             And I guess like the technicalities

10   between Adorama and Kitchen Winners isn't related

11   to this contract.  It's not supposed to be on this

12   contract, like the technicalities between Kitchen

13   Winners and Adorama.

14            That would be on a different agreement

15   what you have seen, what you have showed me

16   before, like the religious agreement, like what it

17   says exactly like related to this contract that I

18   need to -- that he owes me that interest and the

19   interest conditions and that's the agreement.

20       Q.    Well, the religious agreement, a copy of

21   that was never provided to Rock Fintek, correct?

22       A.    Why is it their business?

23       Q.    Okay.

24            But you would agree with me that the

25   arrangement between Kitchen Winners and Adorama

2    was not provided to Rock Fintek, correct?

3         A.    Yeah.  I don't see why -- yes.  I don't

4    see why it should.

5         Q.    I'm not asking whether it should or not.

6    It just wasn't.

7         A.    The facts -- I would assume Kitchen

8    Winners didn't provide it.  I for sure -- I didn't

9    have any of the accounting info, so I wouldn't be

10   able to provide it to them.  So I guess that would

11   be a question for Hershey or Kitchen Winners, if he

12   provided it to them.

13        Q.    And the contact info for Rock Fintek is

14   actually in the introductory paragraph to this

15   agreement, correct?

16        A.    I can probably send them a letter or

17   something.

18        Q.    And you could have asked for

19   Mr. Gilling's and Mr. Kato's email or phone number,

20   correct?

21        A.    If I felt it was relevant for them to

22   know.

23        Q.    And, in fact, from time to time,

24   Mr. Weiner would forward you emails from Rock Fintek

25   to keep you updated as to the business relationship,

2    correct?

3        A.    Not so much about the relationship.  It

4    was about -- it was about the tranches, about the

5    money.  Because I know they have -- they didn't pay

6    on time and I know like delayed the -- the money got

7    delayed to me and I was concerned about my -- about

8    my capital.

9            So yeah.  So I actually told Hershey

10   that I want to know like if something goes off

11   course, I want to know that -- you know, don't

12   tell me a week after that that I can't pay you.  I

13   want to know when something's happening, and so --

14       Q.    Okay.

15            So I think you said a moment ago that

16   it wasn't --

17            MR. RAKHUNOV:  Strike that.

18       Q.    Is it your testimony that it was not

19   important to Rock Fintek to know with whom they were

20   entering into a contract for more than $17 million

21   worth of transactions?

22       A.    It was not -- it was -- I do think it was

23   important for them to know who their seller is.  And

24   I think that says it very clearly on the header in

25   the first paragraph who the parties are.

**KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Mendlowits on 10/26/2023                            Page 102

```
 2        Q.    Okay.

 3              So let me direct your attention back to

 4     the signature page.  Let's just start from the

 5     bottom.

 6              Do you see where Bradley Gilling's

 7     signature is?  Next to it there's an underlined

 8     word named "buyer"?

 9        A.    Yeah.

10        Q.    Okay.

11              And do you see above Mr. Weiner's and

12     your signatures, there's an underlined word named

13     "seller"?

14        A.    Yes.

15        Q.    Do you see any underlined word named

16     "lender" or anything like that next to your name?

17        A.    No.  I don't see neither seller or buyer

18     on my name.

19        Q.    And you don't see lender either, correct?

20        A.    That's correct.

21        Q.    If we go back to paragraph 2 on page 1.

22     So we already looked at 2b where you said the

23     deposits shall be paid to Adorama, Inc., and then it

24     provides wire information, right?

25        A.    Yes.
```

2      Q.      And then in 2c, it says:   Buyer shall pay

3   seller in full by wire transfer of funds for each

4   container delivered to the seller's warehouse in Los

5   Angeles, California.

6              Do you see that?

7      A.      Yes.

8      Q.      And you've already testified that Rock

9   Fintek paid Adorama by wire transfer throughout the

10  -- from the transactions, correct?

11     A.      Sorry?

12     Q.      You've already testified -- and we can go

13  over this in much more detail -- that the payments

14  by Rock Fintek were made by wire transfer to Adorama

15  in its bank account ending in 5791.

16             MR. SPERBER:  Can you ask that again.

17     Q.      Let's back up.

18             So in paragraph 2c, the agreement

19  states:  Buyer shall pay seller in full by wire

20  transfer of funds?

21     A.      Correct.

22     Q.      Okay.

23             And you would agree with me, as you

24  testified earlier today, that Rock Fintek made

25  payments by wire transfer to Adorama?

2        A.    Correct.

3        Q.    Okay.  That's my question.

4        A.    I don't see a question.  Like is there

5   any question?

6        Q.    The question was -- so the contract

7   requires buyer to pay seller in full by wire

8   transfer of funds --

9        A.    Okay.  So?

10       Q.    -- correct?

11       A.    Yeah.

12       Q.    And Rock Fintek did pay for the

13  transactions by wire transfer to Adorama, correct?

14       A.    Okay.  Yes.

15       Q.    Okay.  That was my question.

16       A.    And also used Citibank -- a Citibank

17  bank.

18       Q.    I'm sorry?  Citibank, meaning the account

19  that's described in paragraph 2b, correct?

20       A.    Yes.

21       Q.    That's Adorama's account, correct?

22       A.    Yes.

23       Q.    And it is your position that the fact

24  that Adorama's name does not appear in the first

25  paragraph of this agreement is the reason why

2    Adorama should not be treated as a seller under this

3    agreement?  Am I correct?

4         A.    (No verbal response given.)

5         Q.    I don't want to put words in your mouth.

6    I want your testimony as to what aspects of this

7    agreement, what language in this agreement, this

8    five-page document, are you relying on for your

9    contention that Adorama should not be held liable as

10   a seller under this agreement.

11        A.    My testimony is straightforward that only

12   what the contract says who the seller and the buyer

13   is.  They are actually the party, right?  Otherwise

14   if it would be something, someone else, then another

15   party, then it should be mentioned there, right?

16   That's basic contract, right?  So that's my

17   testimony.

18        Q.    So you would want the court to ignore the

19   fact that Adorama's signature appears under the

20   underlying heading Seller in the signature block,

21   correct?

22        A.    Maybe it goes from the bottom up as well.

23   Maybe it was a buyer.

24        Q.    And you would want the court to ignore

25   that payments which were required to be made from

2  buyer to seller were made to Adorama during the life

3  of this agreement, correct?

4       A.    Yes, and that's very standard.

5       Q.    Other than what you have just described,

6  is there anything, any fact or any writing,

7  communication or anything that you are aware of that

8  would put Rock Fintek on notice that they were --

9  that Adorama was merely a lender, as you contend,

10  under this agreement?

11       A.    I would imagine Kitchen Winners would

12  have told them -- would have told them if they would

13  ask.  Or I'm not sure what -- obviously now I hear

14  what they're saying, but -- but I don't think they

15  cared about it when this agreement happened.

16            But they might have asked like why the

17  money should go to Adorama.  That might have been

18  a possibility.  That might have been discussed

19  with Kitchen Winners.  I'm not sure.

20       Q.    So, respectfully, we can imagine a lot of

21  things, a lot of possibilities.  I can imagine a

22  world where my client got good gloves.  But that's

23  not going to helpful to the court or to us.

24            I'm asking you what you're aware of.  I

25  mean, are you aware of any communications from

```
 2    Kitchen Winners to Rock Fintek where they notified

 3    them of Adorama's role that you contend is its

 4    role under this agreement?

 5         A.    I'm not aware.

 6         Q.    And again, it is your testimony that you

 7    have never been on a conference call with Thomas

 8    Kato or Bradley Gilling?

 9         A.    That's correct.

10         Q.    Okay.

11               MR. RAKHUNOV:  Off the record.

12               (Whereupon, a lunch recess was taken.)

13         Q.    Good afternoon, Mr. Mendlowits.

14               Have you ever heard of a company called

15    Skymed?

16         A.    Yes.

17         Q.    Okay.

18               What do you know about Skymed?

19         A.    Skymed is like MedCare.  It's a glove

20    manufacturer.

21         Q.    Is that a company from whom gloves were

22    sourced for transactions in which Adorama was

23    involved?

24         A.    Yeah.  I think there was one contract

25    where we tried to get it.  Yes.
```

2      Q.    Okay.

3            Is that with a Dynarex, I guess?

4      A.    Yes.  Yes.

5      Q.    What happened with that relationship?

6  And when I say that relationship -- well, let me

7  back up.

8            Did you learn at some point that Skymed

9  was a fraudulent company?

10     A.    Skymed in general is a new company.  I

11 think so.  Like from what I know, it's a real brand.

12 There was -- there was a fake product under their

13 name.

14     Q.    And are you aware that Rock Fintek, prior

15 to entering into any commercial relationship with

16 Kitchen Winners or Adorama, was a victim of Skymed

17 fraud?  Did you ever --

18     A.    I'm actually hearing it the first time.

19     Q.    Okay.

20           So, now, what happened with the Dynarex

21 relationship?

22     A.    So I remember that they -- if the Skymed

23 we received wasn't real or it wasn't -- it wasn't

24 adequate -- the point is that they weren't happy

25 with it.  And from what I remember is that we took

2    it back and we took the hit on it.

3        Q.    Okay.

4              And with respect to Dynarex, what was

5    Adorama's role in that --

6        A.    On that PSA, we were a party to the

7    seller.

8        Q.    Okay.

9              And was Kitchen Winners also involved

10   in that?

11       A.    Yes.

12       Q.    Was Mendel Banon involved in the Dynarex

13   relationship?

14       A.    I don't think so, no.  Not what I know

15   of.

16       Q.    Do you recall specifically what issues

17   Dynarex had with respect to MedCare gloves?

18       A.    I do not remember the specifics.

19       Q.    Just give me a second.  I had the

20   document I wanted to use open and it disappeared.

21   We're now up to Adorama Exhibit 8, and you should

22   have it in a moment.

23             (Whereupon, a six-page email was marked

24        as Adorama Exhibit 8 for identification, as

25        of this date.)

2      Q.    Please pull open Exhibit 8.  Once you

3    have it --

4      A.    Yeah.

5      Q.    -- I will have a few questions.  So

6    Exhibit 8 is a document produced to us from Kitchen

7    Winners.  It's Bates-numbered AKW_002818 on the

8    first page.  It's a six-page email exchange

9    involving you and some others.

10          Just take a look through the document

11    and let me know if you remember this email

12    exchange.

13      A.    I remember the email.  I don't remember

14    the specifics.  Like is there anywhere in particular

15    you want me to kind of focus in?

16      Q.    Yes.  I just wanted to give you a chance

17    to look at the whole email first.

18          So looking at the bottom of page 1

19    under the underlined heading MedCare, this is an

20    email from Devora Bernal at Dynarex.

21          The email says:  We received samples of

22    the MedCare gloves.  We're not happy with the

23    quality.  However, as mentioned, we might still

24    find buyers for these if the product comes with

25    full 100 count boxes as represented.

2          Does that remind you or refresh your

3    recollection in any way as to what quality issues

4    existed with the MedCare gloves?

5          A.    Which page?

6          Q.    The very bottom of page 1 and going over

7    to the top of page 2.  It says 1 out of 6.

8          A.    I don't remember the specifics, but at

9    that point I was involved, and I think like we ended

10   up coming to an amicable agreement.

11         Q.    Did you understand what the quality

12   issues were?

13         A.    No.  Like actually I think I spoke with

14   them even on the phone and they told me like for

15   them, they didn't have -- they didn't tell me -- I

16   don't remember the specifics, but they didn't like

17   that quality.

18         Q.    Do you remember having any direct

19   communications with the folks over at Dynarex?

20         A.    I lost my exhibit.

21         Q.    I took it down.

22         Do you remember having any direct

23   either phone calls or video calls or any other

24   communications directly with folks at Dynarex

25   regarding the quality of MedCare gloves?

2      A.    Yes.  I'm sure we had -- I'm sure we had

3  like -- yeah, I had a discussion with the owner of

4  Dynarex and -- with one of the owners and -- yeah.

5  Then they agreed that they committed for that.

6            And I think like where we were kind of

7  bumping heads, so to speak, is they were right on

8  the Skymed gloves.  I think that came in poor

9  quality, and we agreed that we would eat that

10  loss.

11           But as pertaining to MedCare, we felt

12  that this is still exactly what they ordered.  And

13  they knew that MedCare wasn't the top brand.  I

14  mean, it wasn't a secret to the industry.  They're

15  probably not the Tier 1 brand, but this is the

16  product that was available then and they committed

17  to a contract for it.

18           And we were ready to give them a way

19  out.  But if they kind of want to back out of

20  everything, then they should give us back the two

21  containers, what we did deliver.  And we were

22  ready to get back everything and make the money.

23           And -- but they still wanted -- even

24  though it wasn't the quality what they were saying

25  that they hoped for, they still wanted to hold

2    onto it.

3            But I guess we came on an agreement and

4    they paid us something for the remaining contract

5    and we settled it.

6        Q.    So the contract with Dynarex was for

7    medical grade exam gloves, correct?

8        A.    Yes.

9        Q.    Let's look at another exhibit.  And, by

10   the way, you understand that the contract with Rock

11   Fintek that bears your signature was also for

12   medical grade exam gloves, correct?

13           MR. SPERBER:  Objection to the form.

14       A.    I don't have the contract in front of me,

15   but yeah, it might.  If you want to show me the

16   contract again, I can double-check it.  But like as

17   far as I know, MedCare has exam gloves.  That's what

18   they make.

19       Q.    Okay.

20           (Whereupon, an email exchange was

21           marked as Adorama Exhibit 9 for

22           identification, as of this date.)

23       Q.    So I just put up Adorama 9.  It's another

24   email exchange involving Dynarex.

25           So at the very top, do you see it's an

2  email that's -- it's a 17-page document, again,

3  produced by Kitchen Winners.  The last in day and

4  time email is Thursday, February 25, 2021.  It's

5  an email from Devora Bernal at Dynarex to Daniel

6  Kugel at MJN, PLLC.  It's the very first page at

7  the top.

8       A.    Okay.

9       Q.    Do you recognize this email exchange?

10 Feel free to scroll through.

11      A.    Let me scroll through a moment.

12            Okay.

13      Q.    So Daniel Kugel is an attorney at the

14 Nussbaum & Associates law firm, correct?

15      A.    Correct.

16      Q.    And you've testified earlier that firm

17 represents or has represented both Adorama and

18 Kitchen Winners, correct?

19      A.    Correct.

20      Q.    Okay.

21            Devora -- it's a she or he --

22      A.    She.

23      Q.    So she writes to Daniel:  We'd like to

24 address your comments defending your client's

25 abhorrent behavior refusing to return our money.

  2              Do you see that line?

  3       A.    What page?

  4       Q.    We're still on the same page, second

  5   line.

  6       A.    Okay.

  7       Q.    Do you have an understanding as to what

  8   Ms. Bernal is referring to when she's describing

  9   "abhorrent behavior"?

 10       A.    I do not recall.

 11       Q.    Okay.

 12              If you go a little bit further down --

 13   still on the same page -- do you see the paragraph

 14   that begins with -- you know, maybe let me try

 15   using one of these advanced features.

 16              Do you see an underline on the exhibit

 17   under the phrase "not medical grade"?

 18       A.    Yes.

 19       Q.    Okay.

 20              So reading that paragraph --

 21              MR. SPERBER:  Just to be clear, that's

 22        a line you just added there?

 23              MR. RAKHUNOV:  That's a line that I

 24        just put in there.  It's just to direct the

 25        witness's attention to that paragraph.

2          MR. SPERBER:  I wanted to be clear for

3      the record whether there was a line there or

4      not.  No problem.

5          MR. RAKHUNOV:  It was not in the

6      original exhibit and I will remove it right

7      now.

8      Q.    Do you see it says:  And then the latest

9  MedCare container came with only size medium instead

10 of the size breakdown we ordered and paid for.  And

11 in all cases, glove quality was substandard, not

12 medical grade.

13          Do you see that?

14     A.    Yes.

15     Q.    Do you recall what Ms. Bernal was

16 referring to when she's describing MedCare gloves as

17 "not medical grade"?

18     A.    I do not recall.

19     Q.    Do you recall taking any steps in

20 connection with MedCare gloves to ensure that they

21 were medical grade for future transactions?

22     A.    We didn't agree with their opinion that

23 it's not medical grade.  I mean, that was their

24 opinion.  It was their opinion.

25          So I'm sure Kitchen Winners did their

2  due diligence to kind of figure out like exactly

3  the details, like what makes it medical grade.

4  I'm a seller.  I'm not familiar with the details.

5      Q.    Well, let me just stop you there.

6          When you say I'm sure Kitchen Winners

7  did due diligence, is there something specific

8  that you recall that you're aware of having been

9  done to ensure that these gloves were medical

10  grade?

11     A.    I don't remember the specifics, but I

12  remember the conversations, because I probably asked

13  Kitchen Winners like -- and we were all talking

14  together, Dynarex, Kitchen Winners, and myself, and

15  we were still of the opinion -- and actually, we

16  didn't have in a record, but they also agreed at the

17  end of the day it still qualifies as medical grade

18  gloves.  And for them it didn't work because they

19  had something better at that time.

20     Q.    Okay.

21          When you say you remember

22  conversations, I just want to make sure that I

23  understand whether you or Adorama did anything to

24  ensure the quality of these gloves other than

25  relying on Kitchen Winners and Hershey Weiner.

2        A.    Yes.  So -- so what I started saying is

3   we had a discussion with one of the partners of

4   Dynarex, Kitchen Winners, and myself and went

5   through the details and they admitted in person that

6   it was medical grade.

7              And the argument was that they got

8   screwed on the Skymed side of things.  And by the

9   end of day they received -- so that would be their

10  way out of contract.

11             And at the end of the day they received

12  a shipment of a better brand which -- and they

13  kind of ended up asking us to kind of get out of

14  the contract and we came to some settlement.  But

15  it's not like they've stated the position that

16  it's not medical grade.

17       Q.    So it's your testimony that the folks at

18  Dynarex came around and admitted the MedCare gloves

19  were, in fact, medical grade?

20       A.    Right.  In a discussion.

21       Q.    And who was involved in that discussion?

22  Which individuals?

23       A.    It was me, his name -- I forgot his last

24  name -- Yidi, and Joseph Weiner.

25       **Q.    What is Yidi's position at Dynarex?**

2          A.     He's one of the partners.

3          Q.     Was Zalman Tenenbaum involved in that

4     discussion?

5          A.     No.

6          Q.     Was Devora Bernal involved in that

7     discussion?

8          A.     No.

9          Q.     Okay.

10                Does Adorama have any ongoing business

11    relationship with Dynarex?

12         A.     No.

13         Q.     Did you have any business relationship

14    with them other than the transaction at issue in the

15    email --

16         A.     No.

17         Q.     -- in front of you.

18                Do you know, to your knowledge, if

19    Kitchen Winners had any other transactions or

20    business relationships with Dynarex?

21         A.     Not that I know.

22         Q.     Okay.

23                Have you reviewed any -- at any point

24    in this case -- deposition transcripts?

25         A.     So far?

**KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.**
Joseph Mendlowits on 10/26/2023                                    Page 120

```
 2        Q.    So far.

 3        A.    I have not.  I don't think -- did we

 4    receive any yet?

 5        Q.    You either did or you didn't or you don't

 6    remember.

 7        A.    No.

 8        Q.    Okay.

 9              Are you aware that your attorney and

10    co-defendant Mr. Stern's attorney have taken a

11    position in this lawsuit that Rock Fintek

12    purchased MedCare brand gloves from sources other

13    than Kitchen Winners or Joel Stern and his

14    company?

15        A.    Yes.  I am aware and -- I don't recall

16    from whom I heard that conversation, but it was

17    definitely -- once the whole dispute started, we

18    actually got some names from who they bought.  I

19    don't recall the details, but I understand that we

20    know for a fact that they bought from other sources.

21        Q.    Okay.

22              What else do you know about that?

23        A.    I'm trying to kind of recall.  I don't

24    recall the details, but I remember knowing that they

25    had bought from other sources.
```

```
2          Q.    Okay.

3                Do you recall that Kitchen Winners held

4    itself out together with the MedCare manufacturer

5    as the exclusive dealer of MedCare gloves in the

6    United States?

7                MR. SPERBER:  Objection to the form.

8                You can answer.

9          A.    No, I wasn't aware.  I mean, I was

10   actually aware that they are not exclusive.  I knew

11   of a lot of people who were trading, selling,

12   importing MedCare gloves.

13         Q.    Let me put up Adorama 10.

14               (Whereupon, an email was marked as

15         Adorama Exhibit 10 for identification, as of

16         this date.)

17         Q.    I placed the document produced by Kitchen

18   Winners, and it's a March 22, 2021, email from

19   Joseph Weiner to you and to himself attaching a

20   letter, a Kitchen Winners PDF, which is the second

21   page of the document.

22               Please review it.  Let me know when you

23   have done so.

24         A.    Actually, I have seen it now that I --

25   now that you show it to me, I do recall seeing it.
```

2      Q.    Okay.

3      A.    But my statement earlier that I know

4   other people who sold MedCare gloves is still -- I

5   still knew as a fact that other people who were

6   selling.

7      Q.    So are you aware that Rock Fintek, Thomas

8   Kato, Bradley Gilling were told by Kitchen Winners

9   that they were an exclusive MedCare dealer in the

10  USA?

11     A.    I wasn't -- I'm -- no, I wasn't aware

12  about what Kitchen Winners told Rock Fintek

13  principals.

14     Q.    Do you have any reason to dispute that

15  Rock Fintek believed that Kitchen Winners and

16  Adorama were the exclusive MedCare dealers in the

17  United States, at least as of April when they signed

18  the sales and purchase agreement?

19     A.    Where do you see Adorama?  This letter

20  doesn't say Adorama.

21     Q.    No, this letter doesn't.  But I'm asking

22  what Rock Fintek believed when they signed this

23  purchase agreement?

24     A.    I have no clue what they believed.

25     Q.    Okay.

2                  Did you ever deal directly with Anna

3      Grinvald at Global Tooling Services?

4          A.    Never ever spoke to her or met her or saw

5      her.  Absolutely not.

6          Q.    So to the extent you have communications

7      from her, those were all forwarded to you by others,

8      correct?

9          A.    Correct.  Any communication what I would

10     have or seen was if someone else forwarded it to me

11     or showed it to me.

12         Q.    So this letter is sent to you by email

13     from Joseph Weiner on March 22, 2021.

14                 Do you see that?

15         A.    Yes.

16         Q.    Do you recall why Mr. Weiner is sending

17     you a copy of the letter declaring that Kitchen

18     Winners has full exclusivity for MedCare in the USA?

19         A.    I do not.

20         Q.    You don't recall?

21         A.    I do not.

22         Q.    Okay.  I'm marking Adorama 11.

23                 (Whereupon, an email was marked as

24          Adorama Exhibit 11 for identification, as of

25          this date.)

2      Q.    You should have that in a moment.  Again,

3  for the record -- please review the document.  And

4  while you're doing so -- this is a five-page

5  document produced by Kitchen Winners, an email dated

6  Thursday, April 8, 2021, at 8:30 p.m., from Mendel

7  Banon to you and cc'ing Joseph Weiner.  The subject

8  is Cemo [sic] rated, and there's an attachment,

9  although it's hard to tell if it's an attachment or

10  just a copy-and-pasted image within an email.

11          And if you need to rotate the document,

12  I think you can do that within the tool or I can

13  do it for you.  That would make it easier for you

14  to read the second and third pages.  If you need

15  to.

16      A.    I'm trying to remind what this was.

17      Q.    And that's my first question.  Do you

18  recall what this email communication from Mendel

19  Banon was about?

20      A.    I don't recall.

21      Q.    Okay.

22          But does this refresh your recollection

23  that you, in fact, did communicate with Mendel

24  Banon in the spring of 2021?

25      A.    That he sent me this email?  That I was

2    included in this email?

3         Q.    Well, you testified earlier that you had

4    no communications with Mendel Banon during the time

5    of Rock Fintek's relationship with Kitchen Winners.

6    And to the extent that you weren't recalling doing

7    so, does this email refresh your recollection?

8         A.    I'm seeing it now.  Obviously he sent me

9    an email.

10        Q.    Do you remember trying to obtain

11   chemo-rated gloves during this time period?

12        A.    No.  Now I'm recalling.

13        Q.    Okay.

14              What do you remember?

15        A.    I think like that she mentioned to me

16   that MedCare is going to -- is trying for a

17   certification to get to become chemo-rated.  And I

18   guess I saw it advertised so I sent it to them.  And

19   I guess they told me that it's fake.

20        Q.    Okay.

21              When you say they told you they're

22   fake, what does that mean?

23        A.    That's a false advertisement.

24        Q.    That MedCare gloves were chemo-rated?

25        A.    Or this specific glove is chemo-rated.

2        Q.    When you say a specific glove, you mean

3    the one attached to that email, correct?

4        A.    Correct.

5        Q.    And at least looking at the attachment,

6    the glove bears a MedCare logo, correct?

7        A.    I can see on the attachment that they're

8    pointing out that manufactured by -- and maybe

9    they're pointing out that that's not really the

10   MedCare source, so maybe this whole thing is not

11   true.

12       Q.    I've put up another exhibit up, Adorama

13   12.

14            (Whereupon, an email was marked as

15       Adorama Exhibit 12 for identification, as of

16       this date.)

17       Q.    It's the same chain but with a response

18   from you.  But before I ask you about that, if you

19   go to page 4, it's a screenshot of a WhatsApp

20   message.

21            Do you see the phone number

22   561-866-3810?

23       A.    Yes.

24       Q.    Do you know whose number that is?

25       A.    I do not.

2      Q.    Do you see the photograph of a gentleman

3   in a tie?

4      A.    Yeah.

5      Q.    Do you know who that is?

6      A.    No clue.

7      Q.    Okay.

8            Isn't that Mr. Banon?

9      A.    I don't know how he looks.

10     Q.    Okay.

11           In any event, you responded to his

12  email that same evening saying:  At first I

13  thought we were finally chemo-rated.  You spoiled

14  the moment for me.

15           Do you see that?

16     A.    Yes.

17     Q.    Okay.

18           What are you referring to there?

19     A.    I don't -- I don't recall exactly.  But

20  what I told you before, I know that MedCare was

21  supposed to become chemo-rated.  But -- so I thought

22  that it became chemo-rated, but obviously they told

23  us -- he told us that it's fake.

24     Q.    Do you know if during the time that

25  gloves were being sold, MedCare gloves were being

2    sold to Rock Fintek, if the MedCare product ever

3    achieved a chemo rating, to your knowledge?

4         A.    I don't remember that detail.  It was a

5    long time.

6         Q.    Sure.

7               Do you recall whether Rock Fintek was

8    ever told that the MedCare gloves were

9    chemo-rated?

10        A.    I don't recall.

11        Q.    Do you recall having an understanding

12   that MedCare gloves were chemo-rated?

13        A.    I don't recall.

14        Q.    Who is Richard Fryer?  Somebody at

15   Adorama's accounting department?

16        A.    He's an associate in the accounting

17   department, yeah.

18        Q.    And you've already told us Bob Weider was

19   the head --

20        A.    The head of the department.

21        Q.    And whenever wire transfers came in from

22   Rock Fintek, somebody from your accounting

23   department would let you know, correct?

24        A.    Correct.

25        **Q.    And you would let Mr. Weiner know,**

2    correct?

3         A.    Correct.

4         Q.    Okay.

5               Let me get another exhibit up there.

6    We're moving along pretty well.

7         A.    Am I supposed to see an exhibit now?

8         Q.    You will in a moment.  The system has its

9    nice features, but it's a little bit funky.  This is

10   Adorama 13.

11              (Whereupon, an email was marked as

12         Adorama Exhibit 13 for identification, as of

13         this date.)

14        Q.    This is a three-page document produced by

15   Kitchen Winners.  It's an email dated Friday, May

16   28, 2021, from Mr. Weiner to you.

17              It says:  See attached report.  Note,

18   some loads have less quantities, but their

19   payments was always for full loads.

20              And the subject of the email is Rock

21   Fintek quantities delivered.  And then there's a

22   two-page Excel spreadsheet attached.

23              Do you recognize this email?

24        A.    Not offhand, but I see what it is.

25        Q.    Okay.

```
 2               When Mr. Weiner writes "some loads have
 3      less quantities, but their payments was always for
 4      full loads," do you understand what he's referring
 5      to?
 6          A.    In the context I'm reading it, yes, that
 7      they paid for full loads and some have less.
 8          Q.    And you understand that quantities of
 9      gloves or incorrect quantities of gloves is one of
10      the allegations that Rock Fintek has made in this
11      lawsuit, correct?
12          A.    Yes.
13          Q.    Do you know what steps either Mr. Weiner
14      or you took to remedy the fact that some loads had
15      less quantities but the payment was for full loads?
16          A.    I don't know.  I would assume that --
17      that --
18          Q.    I don't want you to assume.
19          A.    Then never mind.  Strike it.
20          Q.    So you don't know?
21          A.    I don't know.
22          Q.    Did you have any discussions with
23      Mr. Weiner about this email?
24          A.    Not what I recall.
25          Q.    Okay.
```

2        A.    Is this the complete transaction list?

3   Is this like the full contract?

4        Q.    This is an email with this attachment as

5   of that date that was produced to us.  That's all I

6   can say.

7        A.    It seems actually less money and less

8   quantity for what the contract calls, based on what

9   I remember.

10       Q.    Well, do you know what time period the

11  contract went through?

12       A.    What time period the contract is what?

13       Q.    Well, this email is dated May 28, 2021,

14  correct?

15       A.    Okay.  Yeah.

16       Q.    And you understand there were additional

17  deliveries and payments made subsequent to that

18  date, correct?

19       A.    I would imagine, because I don't think

20  either Kitchen Winners or Rock Fintek says that --

21  would agree that Kitchen Winners delivered -- I

22  think even Rock Fintek says that Kitchen Winners has

23  delivered like -- I think like one of their

24  arguments was that Kitchen Winners sold them --

25  shipped to Rock Fintek 1.7 versus 1.5 to what the

 2    contract called for.

 3              So obviously everyone is aligned that

 4    they have received more than the 1244 and 1.2

 5    million units or boxes, whatever this is.  So I'm

 6    not sure what to make out of this attachment.

 7        Q.   Well, you're aware that Rock Fintek has

 8    alleged that at times the quantities were less than

 9    they were supposed to be and at times they were

10    over.  And I do agree with you that we've alleged

11    that ultimately Rock Fintek was overcharged for

12    gloves that it did not order.

13              But you're aware that --

14              MR. RAKHUNOV:  Strike that.  It's

15        neither here nor there.

16        Q.   To your point, let me put up another

17    exhibit.

18              (Whereupon, an email was marked as

19        Adorama Exhibit 14 for identification, as of

20        this date.)

21        Q.   While I'm putting this exhibit up, I know

22    I asked you earlier like what means of communication

23    you would have used for business purposes back in

24    the spring of 2021.

25              Would there have been a conference line

2    that Adorama has that you used for business phone

3    calls at that time like a dial-in?

4        A.    No.

5        Q.    Do you use a dial-in today?

6        A.    We can create a dial-in.

7        Q.    Could you create one back in the spring

8    of 2021?

9        A.    2021?  Like an official dial-in?

10       Q.    Well, I don't know -- I don't want to

11   characterize it in any way.  But if a handful of

12   people wanted to get on a phone call with you from

13   different places, could you provide a dial-in?

14       A.    Yeah.  I think everyone can.  There's

15   multiple tools for it.

16       Q.    Well, did you do that in the spring of

17   2021?

18       A.    For Rock Fintek?  For Kitchen Winners?

19   I've never used that for -- for actually any

20   transaction with Kitchen Winners.  So to answer your

21   question, the answer is no.

22       Q.    Okay.

23             Do you recall Mr. Weiner ever providing

24   you with a dial-in to use for phone calls in

25   relation to glove transactions, whether with Rock

2    Fintek or anyone else?

3          A.    No.

4          Q.    Okay.

5                I'm putting up Exhibit 14.  It's

6    another document produced by Kitchen Winners.

7    It's an email from June 27, 2021, from Mr. Weiner

8    to you forwarding an email from Mr. Weiner to

9    Mr. Weiner, subject Rock Fintek.  It's a one-page

10   document, AKW_001909.

11               Please take a look and let me know if

12   you recognize this document.

13         A.    I don't recognize it, but obviously it

14   was sent to me.  I don't recall the details like why

15   he would send this to me.  Let me see.  I don't

16   remember the reason sending it to me, but it seems

17   like this was at that time where the dispute has

18   already happened.

19         Q.    Do you recall that the email embedded in

20   -- well, the email on June 27th at 2:43 p.m., to

21   himself, is Mr. Weiner writing to you or is it a

22   draft email to someone else that he sent to you to

23   review?

24         A.    I don't recall.

25         Q.    Do you see in the -- so Mr. Weiner

KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Mendlowits on 10/26/2023                                    Page 135

```
 2   writes:  As we discussed, here are the figures --

 3   whoever he is writing it to -- total agreed

 4   deliveries, 1,678,270.  In the second line, he

 5   writes:  Contract amount, 1.5 million at 11.50.

 6              That is consistent with what the

 7   purchase agreement provided, correct?

 8        A.   I think so.

 9        Q.   In the third line, it says:  Overage,

10   178,270 at 9.50.  And then there's a dollar figure.

11              Do you see that?

12        A.   Yes.

13        Q.   Do you know where the 9.50 comes from?

14        A.   No clue.

15        Q.   Looking at this doesn't refresh your

16   recollection as to what the figures in this email

17   refer to?

18        A.   No clue.

19        Q.   So at some point in the summer of 2021,

20   you became aware that a dispute arose with Rock

21   Fintek regarding MedCare gloves?

22        A.   I did.

23        Q.   How did you become aware of the disputes?

24        A.   I guess Hershey told me.

25        Q.   Okay.
```

KITCHEN WINNERS NY INC.,ET AL. -against- ROCK FINTEK LLC, ET AL.
Joseph Mendlowits on 10/26/2023                               Page 136

2              And do you recall emails from Rock

3    Fintek setting forth the various contentions about

4    the MedCare gloves?

5         A.    Yes.  Like whatever I got forwarded --

6    whatever was forwarded to me I was aware of.

7         Q.    So it's fair to say that, you know,

8    Mr. Weiner was keeping you updated as to the issues

9    with Rock Fintek, correct?

10        A.    Yes.

11        Q.    For the most --

12        A.    Like I don't know what I don't know.  But

13   what I do know, he kept me in the loop.  Yeah.

14        Q.    And if there are emails that have been

15   produced in this case that are forwarded to you by

16   Mr. Weiner -- the emails from Rock Fintek on which

17   you're not copied but they're forwarded to you by

18   Mr. Weiner, you have no reason to believe you didn't

19   receive those, correct?

20        A.    If it has my email address on it, then I

21   would probably receive it.

22        Q.    Okay.

23              And do you recall discussing with

24   Mr. Weiner any potential resolutions or settlement

25   proposals with Rock Fintek?

2        A.    No.

3        Q.    Do you recall being included on a

4   communication with Rock Fintek, Mr. Weiner, and Arik

5   Maimon, Mendel Banon concerning a settlement

6   proposal to Rock Fintek?

7        A.    I was included in the email or I was

8   forwarded?

9        Q.    Do you remember being included as a blind

10  carbon copy?

11       A.    I cannot remember.

12       Q.    All right.

13       A.    Might have been.

14       Q.    Okay.

15             I'm going to show you this email.

16             (Whereupon, an email was marked as

17       Adorama Exhibit 15 for identification, as of

18       this date.)

19       Q.    This is an email dated July 14, 2021,

20  produced by Kitchen Winners, Bates number -- well, I

21  can't see the Bates number in the middle of the

22  page.  Oh, it's AKW_001948.  This is Exhibit 15.

23             Do you recognize this email?

24       A.    No.  Obviously I was on it, so I might

25  have seen it.

2      Q.    You don't remember receiving this email?

3      A.    No.

4      Q.    Okay.

5            Do you see under paragraph 4b there's a

6    reference to $200,000 credited to Arik Maimon in

7    full satisfaction of the promisory note, PG and

8    COJ (in the amount of $200,000 that Arik owes to

9    Kitchen Winners)?

10           Do you see that?

11     A.    Yes.

12     Q.    Do you know what that refers to?

13     A.    No.

14     Q.    Okay.

15           Do you recall discussing this

16   settlement proposal with Mr. Weiner?

17     A.    No.

18     Q.    Do you know if Adorama was going to have

19   any financial contribution to this settlement

20   proposal?

21     A.    No.  I don't see why it would.

22     Q.    Okay.

23           Do you know who Eli Wiener is?

24     A.    Eli?

25     Q.    Eli, E-L-I?

2          A.    No clue.

3          Q.    Let me see if you recognize it once you

4    see an email.  Actually, before I go there, do you

5    recall around that time frame any wire transfers

6    from Rock Fintek to Adorama being recalled by Rock

7    Fintek?

8          A.    I don't think -- I don't think any wire

9    transfer was recalled.  Can you recall a wire

10   transfer?

11         Q.    I have no idea.

12         A.    I don't recall.

13         Q.    Okay.

14               (Whereupon, an email was marked as

15         Adorama Exhibit 16 for identification, as of

16         this date.)

17         Q.    I have published Adorama 16.  It's

18   another email produced by Kitchen Winners dated July

19   28, 2021, 6:43 p.m.  It's a two-page document.

20               Do you recognize this email from

21   Mr. Weiner to eliwiener@wecrs.com and it's copying

22   you?

23         A.    I don't recall, but I'm seeing it now.

24   Obviously I was copied.  I'm not sure what the

25   context is.  I don't know who Eli Wiener would be.

2        Q.      Sounds like this does not refresh your

3    recollection as to who Eli Wiener is.

4        A.      That's correct.

5        Q.      Okay.  All right.

6                Do you know who Attorney Zaki Tamir is?

7        A.      Yes.

8        Q.      Who does that attorney represent or has

9    represented?

10       A.      He represented me, Adorama, and Kitchen

11   Winners.  Because I know like Rock Fintek was

12   threatening that they're going to sue us, they're

13   going to sue Adorama as well, so yeah, he was

14   representing us both.

15       Q.      Has Attorney Tamir represented --

16               MR. RAKHUNOV:  Strike that.

17       Q.      So Attorney Tamir was representing you

18   and Kitchen Winners in connection with disputes to

19   Rock Fintek, correct?

20       A.      Yes.

21       Q.      Let me show you a document.

22               THE WITNESS:  Can you give me two

23          minutes for a bio break?

24               MR. RAKHUNOV:  Of course.

25               (Whereupon, there was a pause in the

2        proceeding.)

3                 (Whereupon, an email was marked as

4        Adorama Exhibit 17 for identification, as of

5        this date.)

6        Q.    So just a few more questions,

7    Mr. Mendlowits.  There should be an exhibit up,

8    Adorama 17.  It's a two-page document.  It doesn't

9    have the attachments enclosed, but it's an email

10   forwarded to you from Hershey Weiner, and it's

11   forwarding an email from Attorney Tamir to

12   arik@nextcommunications.com, ariknext@gmail.com, and

13   another attorney, gnm@amlaw-miami.com, subject $200k

14   Convertible Loan.

15               Do you see that?

16       A.    Yes.

17       Q.    Do you know why Mr. Weiner forwarded that

18   email to you?

19       A.     No, but maybe because I told him to keep

20   me in the loop, everything that was going on.

21       Q.    Does this in any way refresh your

22   recollection as to the loan from Kitchen Winners to

23   Arik Maimon and what happened to that loan?

24       A.    No.

25       Q.    Okay.

2              For the claims by Rock Fintek against

3     Adorama in this lawsuit, are you aware of any

4     insurance policies or coverage that could be

5     available in the event Rock Fintek obtains a

6     judgment against Adorama?

7         A.    Again?

8         Q.    Is there any insurance coverage of which

9     you're aware for Rock Fintek's claims against

10    Adorama in this lawsuit?

11        A.    Where rock Fintek holds a policy?  Or

12    where Adorama holds a policy?

13        Q.    Adorama.

14        A.    So adorama doesn't hold a policy, but I

15    heard from Kitchen Winners that they hold a policy.

16        Q.    What kind of a policy do you understand

17    Kitchen Winners has?

18        A.    Like in the case where he doesn't get

19    paid, he can -- he can kind of claim the insurance

20    until a certain amount.

21        Q.    Okay.

22              Did he tell you that he has, in fact,

23    made such a claim?

24        A.    Yes, I am aware that he made such a

25    claim.

2        Q.    Do you know if Kitchen Winners received

3    any payment?

4        A.    I don't know.

5        Q.    Do you know who the insurance company is?

6        A.    No.

7        Q.    Okay.

8              I believe you testified earlier, and I

9    just want to make sure I have this correctly, that

10   there's still some outstanding amount that Kitchen

11   Winners owes to Adorama on the Silverwing case,

12   correct?

13       A.    That's correct.

14       Q.    That transaction?

15       A.    That's correct.

16       Q.    So are there any claims between Kitchen

17   Winners and Adorama in either direction relating to

18   the business relationship with Rock Fintek?

19       A.    Any -- no.  Kitchen Winners has paid me

20   in full, capital plus interest.

21       Q.    Okay.

22             So you understand that in this lawsuit,

23   Kitchen Winners actually sued Rock Fintek first,

24   claiming certain unpaid amounts?

25       A.    Yes.

2          Q.     Okay.

3                 Does Adorama allege any claim to any

4   alleged underpayments to Kitchen Winners?

5          A.     For Rock Fintek?

6          Q.     Yes.

7          A.     No.

8          Q.     Okay.

9                 You also testified earlier that

10  Attorney Nussbaum's firm had represented both, you

11  know, Adorama and Kitchen Winners.

12                Are you aware of any conflict waivers

13  or the like that Adorama signed in connection with

14  such representation?  That's a yes-or-no question.

15         A.     I'm not aware.  I don't even know to the

16  extent what it means.

17         Q.     Okay.

18                MR. RAKHUNOV:  All right.  I am done

19      for the day.  I appreciate your time.

20                MR. FRISCH:  I don't have anything.

21                MR. SPERBER:  I have some questions.

22  EXAMINATION BY

23  ALEXANDER SPERBER, ESQ.:

24         Q.     Mr. Mendlowits, at the very beginning of

25  the deposition, Mr. Rakhunov asked you about email

2    addresses that you have.

3           What is your email address?

4      A.   It's josephm@adorama.com.

5      Q.   Do you have any other email addresses at

6    Adorama?

7      A.   I don't.

8      Q.   Any email sent to any other email address

9    would not reach you; is that correct?

10     A.   Correct.

11     Q.   Did you ever speak with Thomas Kato?

12     A.   Never ever.

13     Q.   Did you ever write to Thomas Kato?

14     A.   Never.

15     Q.   Did you ever communicate with Thomas

16   Kato?

17     A.   Never.

18     Q.   Did Adorama ever speak with Thomas Kato?

19          MR. RAKHUNOV:   Objection.

20     A.   No.

21     Q.   Did Adorama ever communicate with Thomas

22   Kato?

23     A.   Anyone at Adorama?

24          MR. RAKHUNOV:   Objection.

25     A.   I would say no.  I mean, obviously I

2    don't know what everyone at Adorama does, but I

3    don't think anyone was aware -- at Adorama has

4    knowledge about this besides my father.

5          Q.    Okay.

6                Did you ever speak with Mr. Gilling?

7          A.    No.

8          Q.    Did you ever communicate with

9    Mr. Gilling?

10         A.    No.

11         Q.    Did Adorama ever communicate with

12   Mr. Gilling?

13         A.    No.

14         Q.    Did you ever speak with anyone at Rock

15   Fintek?

16         A.    No.

17         Q.    Did you ever communicate with anyone at

18   Rock Fintek?

19         A.    No.

20         Q.    Did anyone at Adorama ever communicate

21   with anyone at Rock Fintek, to your knowledge?

22               MR. RAKHUNOV:   Objection.

23         A.    No.

24         Q.    Did you make any representations or

25   warrantees to anyone at Rock Fintek?

2          MR. RAKHUNOV:  Objection.

3      A.    No.

4      Q.    Did you ever tell anyone at Rock Fintek

5  to make payments to Adorama?

6          MR. RAKHUNOV:  Objection.

7      A.    No.

8      Q.    Did you ever speak with Arik Maimon?

9      A.    No.

10     Q.    Did you ever communicate with Arik

11 Maimon?

12     A.    No.

13     Q.    Did Adorama ever communicate with Arik

14 Maimon?

15         MR. RAKHUNOV:  Objection.

16     A.    No.

17     Q.    Do you know why Rock Fintek made payments

18 to Adorama beyond the initial deposit listed in the

19 contract discussed earlier?

20         MR. RAKHUNOV:  Objection.

21     A.    No.

22     Q.    But, again, if Rock Fintek chose to make

23 payments to Adorama, that was not because Adorama

24 told them to do so, correct?

25         MR. RAKHUNOV:  Objection.

2          A.    That's correct.

3                MR. SPERBER:  Those are my questions.

4                MR. FRISCH:  Let me ask three

5     questions.

6     EXAMINATION BY

7     AVRAM E. FRISCH, ESQ.:

8          Q.    You testified earlier you had never met

9     Joel Stern?

10         A.    That's correct.

11         Q.    Did you ever speak to anybody working on

12    behalf of JNS?

13         A.    No.

14         Q.    And you said you had one conversation

15    with Mr. Stern when this case was commenced?

16         A.    Correct.

17         Q.    And you have never spoken with me?

18         A.    Correct.

19         Q.    And you don't know anything about the --

20    do you know anything about the supply of gloves that

21    Joel Stern possessed or JNS?

22                (Continued on the next page to

23                include the jurat and signature line.)

24

25

2        A.    No.

3              MR. FRISCH:  Thank you.

4              THE COURT REPORTER:  Is anyone ordering

5        a copy of the transcript?

6              MR. SPERBER:  I will order.

7              (Whereupon, the within examination was

8        concluded.  Time Noted, 3:30 P.M.)

9

10   STATE OF NEW YORK)

11                    ) SS.:

12   COUNTY OF        )

13

14    I have read the foregoing record of my testimony

15   taken at the time and place noted in the heading

16   hereof and I do hereby acknowledge it to be a true

17   and correct transcript of same.

18

19                              _____

20                              JOEL MENDLOWITS

21   Subscribed and sworn to before me

22   on this _____ day of _____, 2023.

23

24   _____

                       NOTARY PUBLIC

25

2                    C E R T I F I C A T E

3

4                  I, Melissa Leonetti, RPR, a Notary

5    Public of the State of New York, do hereby certify:

6        That the testimony in the within proceeding was

7    held before me at the aforesaid time and place.

8    That said witness was duly affirmed before the

9    commencement of the testimony, and that the

10   testimony was taken stenographically by me, then

11   transcribed under my supervision, and that the

12   within transcript is a true record of the testimony

13   of said witness.

14                  I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, that I am not interested directly or

17   indirectly in the matter in controversy, nor am I in

18   the employ of any of the counsel.

19                  IN WITNESS WHEREOF, I have hereunto

20   signed this 3rd day of November, 2023.

21

22

23

24   Melissa Leonetti

25

| Exhibits | 5:0 28:0 129:0 | | 7 | | arrangement 99:25 |

**Exhibits**

MendlowitsJ-1
5:0 22:0
28:0

MendlowitsJ-2
5:0 44:0
45:0 46:0

MendlowitsJ-3
5:0 49:0

MendlowitsJ-4
5:0 66:0
71:0 72:0

MendlowitsJ-5
5:0 23:0
74:0

MendlowitsJ-6
5:0 84:25
85:0

MendlowitsJ-7
5:0 93:25

MendlowitsJ-8
5:0 109:0
110:0

MendlowitsJ-9
5:0 113:0

MendlowitsJ-10
5:0 121:0

MendlowitsJ-11
5:0 123:0

MendlowitsJ-12
5:0 126:0

MendlowitsJ-13

5:0 28:0
129:0

MendlowitsJ-14
5:0 132:0
134:0

MendlowitsJ-15
6:0 137:0

MendlowitsJ-16
6:0 139:0

MendlowitsJ-17
6:0 115:0
141:0

**$**

$5    61:25

**1**

1.5    131:25

1.7    131:25

100    27:25
110:25

15    20:25

**2**

2023    149:21

**3**

3:30    149:7

**6**

6    84:25

**7**

7    93:25

**A**

abhorrent
114:25

account
97:25

acknowledge
149:15

address
73:25

Adorama
20:25
40:25
67:25
72:25
84:25
89:25
93:25
99:25
103:25

Adorama's
56:25

agreement
40:25
80:25
81:25
83:25
104:25

allegations
15:25

arrangement
99:25

assure    37:25

attention
115:25

attorney
86:25

aware    106:25

**B**

back    10:25

bank    95:25
97:25

basically
30:25

behalf    64:25

behavior
114:25

bought
120:25

boxes    110:25

business
60:25
100:25

**C**

calculate
59:25

call    16:25

calls    91:25

case    10:25

12:25
24:25

**chemo-rated**
125:25

**claim**  142:25

**communicate**
90:25

**communications**
92:25
106:25

**company**
34:25

**concluded**
149:7

**conference**
132:25

**connected**
16:25

**context**
139:25

**contracts**
37:25

**copy**  149:4

**correct**
38:25
89:25
149:16

**count**  110:25

**COUNTY**
149:11

**couple**  77:25

**COURT**  149:3

**credit**  81:25

_____
D

**date**  109:25
123:25

**dates**  11:25

**day**  149:21

**deposition**
144:25

**describe**
56:25

**document**
68:25

**documents**
25:25
26:25

**drafting**
79:25

**Dynarex**
118:25

_____
E

**E-L-I**  138:25

**easily**  42:25

**education**
19:25

**Eli**  138:25
139:25

**email**  124:25
144:25

**emails**  8:25

**employees**
35:25

**equals**  59:25

**equipment**
46:25

**estate**  21:25

**exact**  11:25

**examination**
149:6

**exchange**
26:25

**Exhibit**
84:25
93:25

_____
F

**financial**
47:25

**find**  42:25

**Fintek**  63:25
87:25
131:25
136:25
146:25

**foregoing**
149:13

**FRISCH**  149:2

**front**  49:25

**full**  110:25

**funds**  63:25

_____
G

**gave**  54:25

**glove**  125:25
133:25

**gloves**  38:25
111:25
127:25

**guess**  25:25
39:25
51:25

_____
H

**heading**
149:14

**hereof**
149:15

**Hershey**
117:25

**high**  19:25

**hold**  112:25

**hoped**  112:25

_____
I

**idea**  71:25

**identification**
93:25

**indemnification**
78:25

**J**

JOEL    149:19

**K**

Kitchen
56:25
60:25
81:25
99:25
116:25
117:25

**L**

law    24:25

lawsuit
15:25

loaned    61:25

looked    24:25

**M**

made    105:25

meaning
64:25

Medcare
111:25
127:25

MENDLOWITS
149:19

million
61:25

money    64:25

114:25

**N**

NOTARY
149:24

noted    149:7,
14

**O**

Objection
147:25

officer
36:25

official
19:25
36:25

order    149:5

ordering
149:3

oversee
29:25

**P**

P.M.    149:7

paid    95:25

paragraph
101:25
104:25
115:25

part    98:25

parties
82:25

101:25

partner
70:25

pause    65:25
140:25

payments
103:25
105:25

personal
50:25

phone    91:25

phones    18:25

place    149:14

position
118:25

possession
68:25

private
34:25

procurement
70:25

proposals
136:25

proposed
85:25

PUBLIC
149:24

purchase
40:25

purchaser
97:25

**Q**

quality
111:25

question
39:25

questions
77:25

quick    58:25

**R**

Rakhunov
144:25
147:25

read    149:13

real    21:25

reason
104:25

recall
121:25

recollection
85:25

record
149:13

refusing
114:25

relates
98:25

relation
86:25
133:25

relationship

56:25
100:25

**relying**
117:25

**remember**
108:25

**REPORTER**
149:3

**reporting**
47:25

**represented**
110:25

**required**
105:25

**residency**
50:25

**return**
114:25

**reviewing**
25:25

**Rock**  63:25
87:25
131:25
133:25
136:25
146:25

**roughly**
20:25

---
**S**
---

**sales**  40:25

**secular**
19:25

**seller**  38:25

**shipped**
131:25

**show**  121:25

**signatory**
40:25

**signed**  72:25

**Silverwing**
62:25

**sir**  49:25

**sold**  127:25

**sources**
120:25

**space**  28:25

**specific**
125:25

**SPERBER**
45:25
149:5

**SS**  149:10

**started**
10:25
52:25

**STATE**  149:9

**store**  48:25

**Stuff**  21:25

**Subscribed**
149:20

**sworn**  149:20

---
**T**
---

**talked**  88:25

**terms**  79:25

**testimony**
149:13

**text**  90:25

**time**  149:7,
14

**title**  36:25

**top**  69:25
75:25
113:25

**transaction**
85:25

**transactions**
133:25

**transcript**
149:4,16

**transfer**
103:25

**true**  149:15

---
**U**
---

**understand**
61:25

**updated**
100:25

---
**V**
---

**versus**

131:25

**video**  28:25

---
**W**
---

**wanted**
112:25

**warrantees**
146:25

**Weiner**
117:25
128:25
134:25

**Wiener**
139:25

**Winners**
60:25
81:25
99:25
116:25
117:25

**wire**  103:25

**witness's**
115:25

**word**  35:25

**worked**  20:25

---
**Y**
---

**Yidi's**
118:25

**YORK**  149:9