UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

KITCHEN WINNERS NY INC.,          )
    Plaintiff,                    )
    vs.                           )  Case No.:
                                  )  1:22-cv-05276-PAE
ROCK FINTEK LLC,                  )
    Defendant.                    )
————————————————————————)
                                  )
ROCK FINTEK LLC,                  )
    Counterclaimant and           )
    Third-Party Plaintiff         )
vs.                               )
                                  )
KITCHEN WINNERS NY INC.,          )
    Counterdefendant.             )
                                  )
and                               )
                                  )
ADORAMA INC., HERSHEY             )
WEINER, JOSEPH MENDLOWITZ,        )
JNS CAPITAL HOLDINGS LLC          )
and JOEL STERN,                   )
    Third-Party Defendants.       )
————————————————————————)

REMOTE DEPOSITION OF THOMAS KATO

As (30(b)(6) Representative of Rock Fintek LLC

Tuesday, October 3, 2023

STENOGRAPHICALLY REPORTED BY:
RHONDA HALL-BREUWET, RDR, CRR, CSR, CCR, LCR, FPR
JOB NO. 1812

1

2

3

4                      October 3, 2023

5                      10:13 a.m. Eastern

6

7

8          Deposition of THOMAS KATO, as

9    (30(b)(6) Representative of Rock Fintek LLC,

10   held remotely before Rhonda Hall-Breuwet,

11   Registered Diplomate Reporter, Certified

12   Realtime Reporter, Certified Shorthand

13   Reporter (CA and TX), Licensed Court Reporter

14   (TN), Certified Court Reporter (GA, LA, NJ,

15   NM, NV, and WA), Florida Professional

16   Reporter, and Notary Public of the State of

17   Florida.

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2   ATTORNEYS FOR KITCHEN WINNERS NY, ADORAMA,

 3   INC., AND JOSEPH MENDLOWITZ:

 4           LIPSIUS-BENHAIM LAW, LLP

 5           80-02 Kew Gardens Road

 6           Suite 1030

 7           Kew Gardens, New York 11415

 8           (212) 981-8449

 9           BY:  ALEXANDER JARED SPERBER, ESQUIRE

10           EMAIL:  asperber@lipsiuslaw.com

11

12   ATTORNEYS FOR ROCK FINTEK LLC:

13           POLLACK SOLOMON DUFFY LLP

14           43 West 43rd Street

15           Suite 174

16           New York, New York  10036

17           (617) 960-3118

18           BY:  PHILLIP  RAKHUNOV, ESQUIRE

19                LAUREN A. RIDDLE, ESQUIRE

20           EMAIL:  prakhunov@psdfirm.com

21                   lriddle@psdfirm.com

22

23

24

25   (Continued)
```

```
 1   ATTORNEYS FOR JNS CAPITAL HOLDINGS LLC AND

 2   JOEL STERN:

 3           AVRAM E. FRISCH LLC

 4           1372 Milford Terrace

 5           Teaneck, New Jersey 07666

 6           (201) 289-5352

 7           BY:  AVRAM ELIEZER FRISCH, ESQUIRE

 8           EMAIL:  frischa@avifrischlaw.com

 9

10   ALSO PRESENT:

11        HERSHEY WEINER

12        BRAD GILLING

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     I N D E X

2

3                                              PAGE

4   Examination By Mr. Frisch                   9

5   Examination By Mr. Sperber                173

6   Examination By Mr. Frisch                 336

7   Examination By Mr. Sperber                359

8   Examination By Mr. Rakhunov               366

9   Certificate of Oath                       368

10  Certificate of Stenographer               369

11  Errata Sheet                              370

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  |            E X H I B I T S

 2  |

 3  |  EXHIBIT NUMBER          DESCRIPTION              PAGE

 4  |      JNS A    Letter from Winthrop B.      21
    |               Reed, III, to Tommy
 5  |               Kato d/b/a Rock Fintek,
    |               dated 3/16/22,
 6  |               Bates-stamped RF_001153
    |               - 1154
 7  |
    |      JNS B    Escrow Agreement,            47
 8  |               Bates-stamped RF_000660
    |               - 667
 9  |
    |      JNS C    Irrevocable Corporate        49
10  |               Purchase Order from
    |               Rock Fintek to JNS
11  |               Capital, dated 2/2/21

12  |      JNS D    "NY Gloves" Chat,            106
    |               Started 3/26/21
13  |
    |      JNS E    First Amended                110
14  |               Counterclaim and
    |               Third-Party Complaint
15  |
    |      JNS F    Email from Thomas Kato       116
16  |               to Dewayne Rader, dated
    |               9/10/21, Bates-stamped
17  |               RF_001034 - 1035

18  |      JNS G    Email Chain,                 121
    |               Bates-stamped RF_001345
19  |               - 1347

20  |      JNS H    Email Chain,                 133
    |               Bates-stamped RF_001042
21  |               - 1044

22  |      JNS I    Chat Started 8/9/21          169

23  |      JNS J    Photograph IMG_8429          339

24  |      JNS K    Photograph IMG_8369          341

25  |      JNS L    Photograph IMG_8348          343
```

```
 1 |              E X H I B I T S
   |
 2 |
   |
 3 |  EXHIBIT NUMBER         DESCRIPTION          PAGE
   |
 4 |      JNS M       Photograph IMG_0578         345
   |
 5 |      JNS N       Photograph IMG_8201         347
   |
 6 |      JNS O       Email from Leah Lax to      349
   |                  9070854@gmail.com
 7 |
   |      JNS P       Email Chain,                352
 8 |                  Bates-stamped RF_003483
   |                  - 3486
 9 |
   |      JNS Q       Photograph IMG_8428         338
10 |
   |   KWA-Kato 1     Purchase Order dated        178
11 |                  8/13/20, Bates-stamped
   |                  RF_001166 - 1167
12 |
   |   KWA-Kato 2     Purchase Order dated        182
13 |                  8/13/20, Bates-stamped
   |                  RF_001171 - 1177
14 |
   |   KWA-Kato 3     Purchase Order dated        183
15 |                  12/7/20, Bates-stamped
   |                  RF_001284 - 1285
16 |
   |   KWA-Kato 4     Email Chain,                225
17 |                  Bates-stamped RF_000443
   |                  - 446
18 |
   |   KWA-Kato 5     Sales and Purchase          227
19 |                  Agreement
   |
20 |   KWA-Kato 6     Rock Fintek LLC's           243
   |                  Amended Initial
21 |                  Disclosures
   |
22 |   KWA-Kato 7     Rock Fintek Invoice         247
   |                  283299000000870083
23 |
   |   KWA-Kato 8     Letter of Intent,           264
24 |                  Bates-stamped RF_000962
   |                  - 963
25 |
```

1

1                        E X H I B I T S
2

3    EXHIBIT NUMBER            DESCRIPTION            PAGE

4      KWA-Kato 9    Chart Created by              279
                     Alexander Sperber
5
       KWA-Kato 10   Chat started 3/4/21           334
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFIED STENOGRAPHER:  Raise your
 2        right hand, please.
 3              Mr. Kato, can you raise your right
 4        hand.
 5              Do you solemnly swear the testimony
 6        you are about to give will be the truth,
 7        the whole truth, and nothing but the truth?
 8              THE WITNESS:  Yes, I do.
 9                    THOMAS KATO,
10   as 30(b)(6) representative of Rock Fintek LLC,
11   acknowledged having been duly sworn to tell the
12   truth and testified upon his oath as follows:
13                    EXAMINATION
14   BY MR. FRISCH:
15        Q.   Good morning, Mr. Kato.  My name is
16   Avram Frisch.  I am the attorney for
17   third-party defendants Joel Stern and
18   JNS Holdings.  We're here to talk about your
19   case with them.
20              You are testifying here today on
21   behalf of Rock Fintek LLC; correct?
22        A.   Yes, I am.
23        Q.   Okay.  I believe Mr. Sperber will
24   have questions for you when I am done, on
25   behalf of his clients.
```

1              Can you state your name and address

2    for the record, please.

3         A.    Thomas Kato.

4              MR. RAKHUNOV:  Before you answer --

5         he can give his business address rather

6         than his home address; correct?

7              MR. FRISCH:  I'm fine with that.

8              MR. RAKHUNOV:  Okay.

9              THE WITNESS:  Thomas Kato, 1680

10        Michigan Avenue, Suite 800, Miami Beach,

11        Florida 33139.

12             (Stenographer requests

13        clarification.)

14             (Comments off the record.)

15   BY MR. FRISCH:

16        Q.    All right.  Have you ever testified

17   at a deposition before?

18        A.    Yes, I have.

19        Q.    What was the circumstances of that

20   deposition, or those depositions?

21        A.    Other lawsuits.

22        Q.    In regard to Rock Fintek?

23        A.    Yes.

24        Q.    What were the -- what were the

25   circumstances of the cases that you testified

1  in?

2       A.    Circumstances?  One of them, I was

3  suing the broker for a noncompete agreement.

4       Q.    And the others?

5       A.    Not recently, no.  And nothing

6  related to Rock Fintek.

7       Q.    Okay.  We'll go over the procedure

8  for the deposition, even though you probably

9  are aware.

10            I'm going to be asking you

11  questions.  You're answering them under oath,

12  as you know.  If you don't understand any of

13  the questions, please let me know, and I will

14  repeat or rephrase the question, however, to

15  help you.  If you don't ask me to clarify, I'll

16  assume you understood it.

17            Is that clear to you?

18       A.    Understood.

19       Q.    And obviously if you don't hear me,

20  just ask me to speak up.

21            Also, please speak all your answers

22  aloud so the stenographer can take it down.

23  Don't say uh-huh or huh-uh or shake your head.

24  You know, say yes or no if it's a yes-or-no

25  question.

```
 1              And also obviously, as she already
 2  noted, try to speak as loud as you can because
 3  it is a little quiet.
 4              You are -- this is a
 5  videoconference, but it's the same as if you
 6  were testifying in court or in person, and you
 7  are under oath.
 8       A.    (Indiscernible.)
 9       Q.    Sorry?
10       A.    Try to put this on.
11       Q.    Are you able to hear me now?  I
12  don't think your AirPods are working.
13              MR. RAKHUNOV:  Thomas, you might
14        need to -- can you hear me?
15              MR. FRISCH:  I don't think he can
16        hear us.
17              MR. RAKHUNOV:  He might need to do
18        what I did with the options, the sound
19        options.
20              MR. FRISCH:  We can't hear you.
21              CERTIFIED STENOGRAPHER:  Do we want
22        to go off the record?
23              MR. FRISCH:  Yeah, let's go off.
24              MR. RAKHUNOV:  Let's go off the
25        record, and let's get him --
```

```
 1              MR. FRISCH:  Yeah.
 2              (Break taken from 10:18 a.m. to
 3         10:21 a.m.)
 4    BY MR. FRISCH:
 5         Q.   As I think I was saying, please
 6    speak up your answers so the court reporter can
 7    hear you, and be aware that you're under oath;
 8    and even though you're in a videoconference,
 9    it's the same as testifying in court.
10              Is there anyone in the room with you
11    right now?
12         A.   No.
13         Q.   Nobody's allowed -- you're not
14    allowed to communicate with anybody in regard
15    to answering the questions.  No texting.  Even
16    your counsel is not allowed to (indiscernible)
17    questions.
18         A.   Understood.
19              (Stenographer requests
20         clarification.)
21              (Comments off the record.)
22    BY MR. FRISCH:
23         Q.   Nobody can assist you in answering
24    the questions.  You have to answer them
25    yourselves.
```

1          If you need a break, just ask.  As

2  long as there's no pending question, we're

3  happy to take a break for whatever you need.

4  Just answer whatever question is pending.

5          Other than with your attorney, have

6  you discussed your testimony today with any

7  individual?

8      A.   I had a discussion with my COO and

9  my attorney yesterday.

10     Q.   Okay.  Was the discussion with your

11 COO with your attorney present --

12     A.   Yes.

13     Q.   -- or was that --

14     A.   Yes.

15     Q.   Did you review any documents for

16 today?

17     A.   Yes, we did.

18     Q.   What documents did you review?

19     A.   The complaint, some bank statements,

20 some purchase orders.

21     Q.   Right.  And all those have been

22 given to us by your attorney?

23     A.   He could answer that.  I'm not sure.

24     Q.   Okay.  Are you currently taking any

25 medications or on other substances that would

1  affect your ability to testify truthfully

2  today?

3        A.    No.

4        Q.    All right.  Let's just go through

5  your background.

6              What's your highest level of

7  education?

8        A.    Highest level, I did an executive

9  MBA at Harvard Business School.

10       Q.    Okay.  When did you graduate from

11  there?

12       A.    2011 or '12.

13       Q.    Where did you go to college?

14       A.    I went to San Diego State for a

15  little bit, but I didn't ever complete it.

16       Q.    Where did you graduate from high

17  school?

18       A.    Saint Mary's Orchard Lake.

19       Q.    Where is that?

20       A.    West Bloomfield, Michigan.

21       Q.    Is that how you know Mr. Gilling?

22       A.    Yeah.  We're -- we've known each

23  other from Michigan for decades.

24       Q.    Okay.  Since 2011, when you

25  graduated from the Harvard Business School

1    program, what is your employment history?

2        A.    My employment history?  I'm

3    self-employed.

4        Q.    And what businesses have you been

5    in?

6        A.    Merchant Hub, my payment processing

7    company; Rock Fintek; and a holding company

8    that just varied with different sort of

9    reconciling accounts.

10       Q.    Okay.  What's the name of the

11   holding company?

12       A.    MHub Holdings and MHub Miami LLC.

13       Q.    And did you begin these activities

14   prior to your attendance at Harvard Business

15   School?

16       A.    Yes, some of them.

17       Q.    When did you form Rock Fintek LLC?

18       A.    I believe it was in 2018.

19       Q.    And at that time what was the

20   purpose of that entity?

21       A.    To buy and sell goods from China to

22   the US.

23       Q.    Was it specifically personal

24   protective equipment or anything?

25       A.    No.  No.  Anything.

1      Q.      What state did you form it in?

2      A.      Delaware.

3      Q.      Who are the members of Rock Fintek

4  LLC?

5      A.      Only me.

6      Q.      Has that always been the case?

7      A.      Yes.

8      Q.      Is Rock Fintek LLC authorized to do

9  business in the state of New York?

10      A.      I believe so.

11      Q.      Do you know when it became so

12  authorized?

13      A.      No, I don't.

14      Q.      Is the entity currently in good

15  standing in the state of Delaware?

16      A.      I believe it is.

17      Q.      Do you know what business you

18  conduct in New York state?

19      A.      I was selling PPE to the City of

20  New York and buying from Adorama.

21          (Stenographer requests

22      clarification.)

23  BY MR. FRISCH:

24      Q.      All right.  Did you also pick up and

25  deliver goods in New York?

```
 1              MR. RAKHUNOV:  Objection.
 2              THE WITNESS:  I believe we did.
 3              (Stenographer requests
 4         clarification.)
 5              THE WITNESS:  I believe we did.  I'm
 6         not positive.  I would have to ask my COO,
 7         but I believe we did in New York.
 8    BY MR. FRISCH:
 9         Q.   Did you have sales -- did you have
10    sales representatives working in New York?
11         A.   No.
12              MR. RAKHUNOV:  Objection.
13              (Stenographer requests
14         clarification.)
15              (Comments off the record.)
16    BY MR. FRISCH:
17         Q.   What about Alex King and the Dimerco
18    company?  Were they based in New York?
19              MR. RAKHUNOV:  Objection.
20              THE WITNESS:  I'm not sure where
21         they're based.
22    BY MR. FRISCH:
23         Q.   Do you know where they -- where Alex
24    King works out of?
25         A.   I'm not sure.
```

1       Q.     Okay.

2              MR. RAKHUNOV:  I just want to make

3       sure.  Rhonda, you did hear my objection --

4       right? -- to the question of where is

5       Dimerco based out of?

6              CERTIFIED STENOGRAPHER:  Yes, I did

7       hear that one.

8              MR. RAKHUNOV:  Okay.  Good.  I

9       wanted to make sure.

10  BY MR. FRISCH:

11      Q.     When did you first begin being

12  engaged in the sale of personal protective

13  equipment?  Or as I will -- I will abbreviate

14  it PPE going forward, if that's okay with you.

15      A.     Yes, it is.  2020.

16      Q.     During COVID -- at the beginning of

17  COVID or before COVID?

18      A.     At the beginning of COVID.

19      Q.     Okay.  Did you use any other

20  entities in that business?

21      A.     I don't think I did, no.

22      Q.     Okay.  Is there a Rock Fintek LLC

23  currently existing in the state of -- that was

24  formed in the state of Florida?

25      A.     Yes, there is.

1      Q.    What is -- what was the purpose of

2  that LLC?

3      A.    When we opened up the bank account,

4  the bank said they needed a Florida entity.

5  Instead of registering it with Sunbiz.org or

6  something, my office just went ahead and formed

7  a new entity.

8      Q.    Okay.  And which is the entity

9  currently operating?  Is it the Delaware or the

10  Florida?

11      A.    It was always the Delaware.

12      Q.    Okay.  So the entity that conducted

13  business with JNS was the Delaware entity?

14      A.    Was the what?

15      Q.    The Delaware entity?

16      A.    Yes, it was.

17      Q.    And the one that did business with

18  Kitchen Winners and Adorama was the Delaware

19  entity?

20      A.    Yes.

21      Q.    And the business that -- the

22  business that was done with Ascension was done

23  through the Delaware entity?

24      A.    Correct.

25      Q.    We are going to go to our first

1  exhibit.  I'm just trying to figure out which

2  one it was.  Oh, there it is.  Okay.

3         Can you see the exhibit I just

4  shared?

5      A.    It's very small.

6      Q.    Okay.  I think you can control

7  the -- I think you can zoom in on the --

8  there's a zoom-in button.  I'm going to stamp

9  this as -- I'm going to define it as JNS

10 Exhibit A.  We'll make ours red. Hold on.  I

11 didn't do it right.  So let me do that again.

12 JNS Exhibit A.

13         (Exhibit Number JNS A, Letter from

14     Winthrop B. Reed, III, to Tommy Kato d/b/a

15     Rock Fintek, dated 3/16/22, Bates-stamped

16     RF_001153 - 1154, was marked for

17     identification.)

18 BY MR. FRISCH:

19     Q.    Okay.  Can you see it now?

20     A.    Yeah.  I'm trying to zoom it in.

21     Q.    Okay.  I'm going to direct you to

22 the Footnote 1.

23     A.    Hold on.  I'm trying to --

24     Q.    At the bottom of the first page.  So

25 when you have a chance -- you should be able to

1  scroll independently.

2       A.    So at the very bottom you're telling

3  me to look?

4       Q.    Yes, where it says, "It is our

5  understanding."

6       A.    Okay.  "It is our understanding."

7       Q.    Yeah.  Can you -- you can read that

8  to yourself, and then I'll ask my question on

9  it.

10      A.    (Reviewing document.)

11            Okay.

12      Q.    Why did Ascension believe they were

13  doing business with the Miami LLC that was

14  formed in May 2021?

15            MR. RAKHUNOV:  Objection.

16            THE WITNESS:  I don't believe they

17      did.

18  BY MR. FRISCH:

19      Q.    So do you -- why did they believe

20  that Rock Fintek LLC was only formed on

21  May 1st, 2021?

22            MR. RAKHUNOV:  Objection.

23            THE WITNESS:  I don't know why

24      they -- you think they might think that or

25      if they think that.

```
 1   BY MR. FRISCH:
 2        Q.    Okay.  Do you know of any reason --
 3   anything you may have communicated to them in
 4   regard to the name or formation of the LLC that
 5   would have led them to that understanding?
 6        A.    Absolutely not.
 7              MR. RAKHUNOV:  Objection.
 8   BY MR. FRISCH:
 9        Q.    And as far as you're concerned, it
10   was the Delaware LLC that was doing business
11   with Ascension all along?
12        A.    Correct.
13        Q.    And that LLC had been formed prior
14   to May 1st, 2021?
15        A.    Correct.
16        Q.    Okay.
17              MR. RAKHUNOV:  Sorry, Avi.  Before
18         you go next, as a matter of -- is it
19         possible to pop out the exhibit into a
20         separate browser?  Is that functionality
21         available?
22              MR. FRISCH:  I don't know.
23              MR. RAKHUNOV:  Okay.  Well, we can
24         -- maybe we'll ask during a break.
25              MR. FRISCH:  I know there is
```

```
 1        somebody -- you know, I know you can -- you
 2        can ask somebody.  So I don't know if it --
 3        if you make your screen bigger -- I think
 4        you can make the panel bigger or something.
 5        I don't know.
 6             MR. RAKHUNOV:  You can make the
 7        witness face pop out but not the --
 8             MR. FRISCH:  Okay.  I don't know.
 9        There is a download button, but it doesn't
10        seem to be enabled.  I'm trying to figure
11        it out.  I don't know.
12             Like I said, this is my first time
13        using this.  I just -- you know, anyway,
14        we're done with it for the moment.  So we
15        can --
16             MR. RAKHUNOV:  We're fine.
17   BY MR. FRISCH:
18        Q.    Okay.  Prior to getting into the PPE
19   business, what -- did you have any experience
20   selling PPE?
21        A.    No.
22        Q.    So what made you get into -- into
23   selling PPE?
24        A.    I started selling products for --
25   other products, and then when COVID hit, the
```

1   demand for those products weren't working.  And

2   I had relationships -- strong relationships in

3   China that I could buy products from; so I

4   wanted to see if anybody needed those products.

5        Q.   So did you -- how did you -- how did

6   you get -- strike that.

7             You say you had relationships for

8   products.  Were those PPE products you had

9   relationships for at the beginning of COVID?

10       A.   A lot of the warehouses that were

11  selling other products started manufacturing

12  masks and other products.

13       Q.   And you -- you had direct sources of

14  supply from China on those items?

15       A.   Yes.

16       Q.   Did you ever have a direct source of

17  supply for nitrile gloves?

18       A.   I don't know what "direct" means.  I

19  mean --

20       Q.   Direct from the manufacturer.

21       A.   I never bought anything directly

22  from any manufacturers.  It was always

23  intermediaries involved.

24       Q.   How about directly from China?

25            (Stenographer requests

```
 1        clarification.)

 2             THE WITNESS:  You don't -- I never

 3        spoke with the manufacturer when I was

 4        buying a product from them.

 5   BY MR. FRISCH:

 6        Q.    What about directly from a warehouse

 7   in China?  Did you have any source of nitrile

 8   gloves?

 9             MR. RAKHUNOV:  Object.

10             THE WITNESS:  I don't believe so.

11   BY MR. FRISCH:

12        Q.    How did you get introduced to

13   Ascension?

14        A.    I got introduced from an

15   acquaintance in St. Louis who I believe did

16   real estate for them, the group did.  I'm not

17   sure of the person's name.

18             They asked me, "Do you have any

19   connections with any type of this product in

20   China?"

21             I said I can ask people I was buying

22   other products from if they have it.  I asked.

23   They did, and then they -- that was it.

24        Q.    And why did they think you would

25   have connections to this type of material in
```

1  China?

2       A.    Well, they knew I was selling other

3  products from China.

4       Q.    Got it.

5             Was Ascension your first PPE

6  customer, or were there others products before

7  Ascension?

8       A.    Ascension, I believe, was the first.

9       Q.    What other companies did you have --

10  what other customers did you have for PPE

11  products?

12      A.    City of New York, Prisma Health,

13  Delta Airlines, sheriff's department.  I think

14  Bell Tire.  Next level was a couple dental

15  distributors.

16      Q.    Did any of those customers buy

17  nitrile gloves from you?

18      A.    I don't believe so.

19      Q.    Are any of those currently your

20  customer, any of those entities?

21      A.    No.

22      Q.    Why not?

23      A.    Because I was too busy trying to

24  salvage or clean up the mess with Ascension.

25      Q.    All right.  When you say "the mess

1    with Ascension," what are you referring to?

2         A.    I am referring to the fake gloves

3    that I sold them.

4         Q.    So you went out of business because

5    you had a problem with Ascension?  Is that your

6    testimony?

7              MR. RAKHUNOV:  Objection.

8              THE WITNESS:  We went out of

9         business -- I think it's a -- multiple

10        reasons, but all to do with the gloves we

11        purchased from Adorama.

12   BY MR. FRISCH:

13        Q.    Can you explain that in detail, all

14   the reasons.

15        A.    All the reasons.  I -- I bought

16   products which I believed were real, sold them

17   to a company who I sold other product to and

18   believed I was selling real products, and then

19   they said they were fake products, and that was

20   it.

21              So I'm trying to mitigate damages

22   and not -- don't have the funds nor the other

23   clients to sell products to.

24        Q.    When did those other clients stop

25   buying product from you?

1        A.    Stopped soliciting other customers

2   around the time of the summer, when all those

3   problems happened with Ascension.

4        Q.    So around July 2021?  Is that your

5   testimony?

6        A.    I would say July or August, yes.

7        Q.    And you stopped soliciting customers

8   because?

9        A.    I was trying to do damage control

10  with Ascension.

11       Q.    Was Ascension's contract with you

12  substantially larger than all the other ones?

13       A.    Yes, I'd say it was.

14       Q.    Did the end of COVID have any impact

15  on your business?

16       A.    The end of COVID would have made the

17  business even stronger.

18       Q.    How so?

19       A.    We were making our own test kits to

20  sell to Ascension and to other hospital

21  systems.  And without anything from Ascension,

22  then dealing with the fraud, we had to stop

23  everything.

24       Q.    Can you explain what test kits

25  you're referring to?

```
 1       A.    Test kits to see if you have COVID,
 2  the ones you buy in the pharmacy.
 3       Q.    And you were manufacturing those?
 4       A.    I was going to manufacture them as a
 5  partner with a manufacturer in China.
 6       Q.    And were those approved by the FDA?
 7       A.    We hired FDA attorneys who were
 8  speaking to the FDA to get them approved.
 9       Q.    And why didn't you continue with
10  that business?
11       A.    Because I had to deal with the fraud
12  with Adorama.  So I didn't have time or the
13  resources to do it.
14       Q.    And so you -- you're saying that you
15  no longer had time because of what happened
16  with the gloves at issue in this case?  You no
17  longer had time to --
18       A.    I'm saying I gave all my time to try
19  to resolve or mitigate the problem for
20  Ascension Health.
21       Q.    Did Rock Fintek ever return to its
22  other pre-COVID businesses?
23       A.    Rock Fintek went out of business
24  after this.  It didn't have the opportunity.
25       Q.    And how do you make a living today,
```

1    sir?

2         A.    My payment processing company called

3    Merchant Hub.  It's been around for 15 years.

4         Q.    Is there a reason why Ascension

5    referred to you on many of their correspondence

6    as MHub?

7              MR. RAKHUNOV:  Objection.

8              THE WITNESS:  I have an email

9         address that says MHub on it.  So sometimes

10        they say MHub.  Sometimes I responded with

11        a Rock Fintek email.  But --

12   BY MR. FRISCH:

13        Q.    Okay.  But did they know you as MHub

14   when they started dealing with you?

15        A.    They knew I had two companies, and

16   MHub was not the company that was working with

17   them.  So they said MHub a couple times, and I

18   said, "It's Rock Fintek."

19        Q.    Okay.  When did you first purchase

20   gloves from JNS?

21        A.    I'm not exactly sure of the date,

22   but it was, I believe, December of 2020 or

23   January of 2021.

24        Q.    Okay.  And how were you introduced

25   to JNS?

1        A.      I believe it was a broker.

2        Q.      Do you recall the name of the

3   broker?

4        A.      I'm not positive, but it might be

5   Ms. Lee.

6        Q.      And Ms. Lee was working for you?

7        A.      No.  She was a broker.  She was an

8   outside party that -- I'm not sure exactly how

9   we came to meet her.  I'd have to ask Bradley

10  Gilling.

11       Q.      And --

12       A.      But she just got compensated for --

13  as a broker for whatever sales she did.

14       Q.      Did she find you any other deals

15  over the course of time?

16       A.      I don't think we did any other

17  business since then.

18       Q.      Okay.  Is there a reason for that?

19       A.      Again, because of -- stopped doing

20  business with everything else, just trying to

21  deal with Ascension.

22       Q.      Do you know how Ms. Lee knew JNS?

23       A.      No.

24       Q.      Do you know if you purchased MedCare

25  gloves from any other vendor?

1      A.    I believe it was JNS and

2  Kitchen Winners and Adorama, which I think are

3  the same.  I don't believe we got any from

4  anybody else.  I would have to ask Bradley

5  Gilling, again.

6      Q.    Now, so you know -- you got gloves

7  from JNS and you got gloves from

8  Adorama/Kitchen Winners, as you described them.

9            How did you keep track of which

10  gloves were from whom?

11      A.    Actually, I also bought gloves from

12  Joel Stern directly himself.  Sometimes he used

13  his business; sometimes he used his personal

14  name to sell me gloves.

15      Q.    When did he sell you gloves

16  personally?

17      A.    I'm not sure.  Somewhere in the same

18  time, within that time frame, I bought products

19  from him.

20      Q.    Do you know of any purchase orders

21  or other documents that show you purchasing

22  directly from Mr. Stern?

23      A.    My lawyer might have some documents.

24      Q.    Can you tell me where I'd find

25  those?

 1        A.    You could ask him.

 2        Q.    I'm asking you.

 3        A.    I don't know where he would have

 4   them.

 5        Q.    Do you know what the document --

 6   what document -- what the document said?

 7        A.    I know some of the documents might

 8   be from Medline that came from Joel Stern.

 9   This other guy, David Horowitz or something, it

10   had his name on there with some deliveries.

11   And bank accounts, I would have to ask Brad

12   Gilling on that maybe.

13        Q.    Okay.  Well, I mean, I would -- I

14   don't think I've seen any such documents.

15   So --

16        A.    Okay.

17        Q.    -- I'm going to ask them to be

18   produced.

19        A.    Okay.

20        Q.    I'm going to take a note.

21              Do you know if there was any

22   purchase orders directed to Mr. Stern

23   personally?

24        A.    Possibly, but not off the top of my

25   head.  I would have to ask Brad.

```
 1          Q.    Do you know if Mr. Stern --

 2                (Simultaneous speaking.)

 3    BY MR. FRISCH:

 4          Q.    I'm sorry?  You can finish.

 5          A.    What was that?

 6          Q.    I think you -- I talked over you by

 7    accident.  So you can just repeat what you

 8    said.

 9                MR. RAKHUNOV:  It sounded like

10          feedback.

11                THE WITNESS:  I said I could ask

12          Brad Gilling.  I'm not positive who

13          was COO.

14    BY MR. FRISCH:

15          Q.    Do you know if Mr. Stern personally

16    issued any invoices to you or if JNS issued the

17    invoices?

18                MR. RAKHUNOV:  Objection.

19                THE WITNESS:  He may have.  I'm not

20          positive.  I would have to ask.

21    BY MR. FRISCH:

22          Q.    All right.  Well, I'll call for

23    production of any such invoices, because I

24    don't -- do not have them.

25                Okay.  And your testimony is that
```

1  you didn't purchase any MedCare gloves from any

2  other vendors; is that correct?

3         A.    Right.  That's correct.

4         Q.    Did you purchase any other gloves

5  from any other vendors?

6         A.    Yes.

7         Q.    What gloves were those?

8         A.    We purchased Ingco gloves, and I

9  believe we purchased -- I'm not sure what the

10  other brands were called.  Maybe Safeko.  I

11  have to check.  I would have to ask Bradley

12  Gilling.

13         Q.    So when you entered into the

14  contract with Ascension to provide them gloves,

15  did you have gloves sourced to fulfill that

16  contract?

17         A.    Did we have gloves sourced?  I told

18  them we would procure the gloves for them.

19         Q.    But at the time that you entered

20  into the contract, you did not have any gloves?

21         A.    No.  Only dialogue.

22         Q.    And your contract with Ascension

23  called for providing how many gloves?

24         A.    Two -- 150 to 200 million.

25         Q.    And the gloves you purchased from

1  JNS or that you allege you purchased from

2  Mr. Stern, were those used to satisfy that

3  contract in part?

4       A.    Yes, in part.

5       Q.    And were those gloves, in fact,

6  delivered to Ascension?

7       A.    They were delivered to Medline.

8       Q.    Who was -- who was processing them

9  and storing them on behalf of Ascension?

10      A.    Correct.

11      Q.    When you got the gloves from the

12 different vendors in this case, did you track

13 which gloves came from which entity?

14           MR. RAKHUNOV:  Objection.

15           THE WITNESS:  Medline kept a record

16      of who delivered what.  And when we paid

17      somebody, we had the payment of the

18      shipment and then the truck arriving within

19      days of that payment.

20 BY MR. FRISCH:

21      Q.    So do you -- could -- could you tell

22 me which glove and which warehouse was

23 delivered by JNS, for example?

24      A.    Yes.  If you get that report from

25 Medline, you can have it very accurately.

1      Q.    So Medline is the one that would

2  have that information?

3      A.    Correct.

4      Q.    Do you know if Medline stored all of

5  the MedCare gloves together?

6      A.    No, they did not.

7      Q.    Did you ever inspect the gloves that

8  you received?

9           MR. RAKHUNOV:  Objection.

10          THE WITNESS:  I -- I did not inspect

11     them before I purchased them.

12  BY MR. FRISCH:

13     Q.    Did you inspect them after you

14  purchased them?

15     A.    I inspected them after I was

16  notified that there was a problem with them.

17     Q.    So when was that?

18     A.    I was notified in July that there

19  was a problem with them.

20     Q.    Did you ever request Alex King to

21  have them inspected?

22     A.    Tried to.  They said he's not

23  allowed to -- his drivers are not allowed to

24  inspect the gloves, open the gloves, touch the

25  gloves or any of the product.

1      Q.    Did Medline do any inspections?

2            MR. RAKHUNOV:  Objection.

3            THE WITNESS:  I'm not sure what

4      Medline did or didn't do.

5  BY MR. FRISCH:

6      Q.    Do you know if Ascension did any

7  inspections?

8            MR. RAKHUNOV:  Objection.

9            THE WITNESS:  Ascension did, to

10     my -- I believe they did, from what I

11      recall.

12  BY MR. FRISCH:

13     Q.    Did anybody open the boxes when they

14  arrived to ensure that the contents of the

15  boxes were what was being claimed?

16     A.    I wouldn't know that.  I wasn't

17  allowed to be there.  I wasn't allowed to look

18  at them.  My drivers were not allowed to look

19  at them either.

20     Q.    All right.  You didn't have any

21  drivers.  The drivers were employed by Dimerco;

22  correct?

23            MR. RAKHUNOV:  Objection.

24            THE WITNESS:  Yeah.  The drivers

25      were -- I don't know who they were employed

1      by, but yes.

2    BY MR. FRISCH:

3      Q.    Dimerco arranged the drivers?

4      A.    Dimerco and -- yeah.

5      Q.    So you got hundreds of -- you know,

6    millions of gloves; right?  Nobody ever opened

7    a single box until there were problems to

8    determine that the gloves that came in those

9    boxes were the gloves that you expected to

10   receive?

11             MR. RAKHUNOV:  Objection.

12             THE WITNESS:  I believe so.

13   BY MR. FRISCH:

14     Q.    Did Medline not have a team to make

15   sure the items being delivered were the correct

16   item?

17     A.    You'd have to ask Medline that.

18     Q.    Do you know if the boxes -- the

19   exterior boxes indicate the contents of what's

20   inside the boxes?

21     A.    I would expect that the exterior of

22   the box would describe what's inside the

23   package of any product.

24     Q.    Did anybody check those markings to

25   see if they matched up with what was expected?

```
 1              MR. RAKHUNOV:  Objection.
 2              THE WITNESS:  I don't know what you
 3        mean by "markings."
 4   BY MR. FRISCH:
 5        Q.    If the boxes were marked
 6   "Examination Gloves," if the cartons that
 7   kept -- my understanding is that these were
 8   packed as follows.  Maybe I'm wrong.  Let's
 9   step back.  Okay?
10              My understanding is you would get it
11   in pallets with cartons -- you know, brown
12   cartons that included the individual boxes of
13   100 gloves inside them; is that correct?
14        A.    That's the general idea of how many
15   were supposed to be in there, yes.
16        Q.    Okay.  Now, did anybody check those
17   cartons to see what was indicated on them when
18   you received them?
19              MR. RAKHUNOV:  Objection.
20              THE WITNESS:  I don't know what
21        Medline did when they received them.
22   BY MR. FRISCH:
23        Q.    Now, how many of the gloves were
24   marked as protection gloves?
25              MR. RAKHUNOV:  Objection.
```

1              THE WITNESS:  I'm not sure of the

2        exact amount.  If I were to guess, I would

3        say half.

4    BY MR. FRISCH:

5        Q.    How do you know that?

6        A.    I went and visited warehouses with

7    Bradley Gilling, I think seven of them, and

8    from Medline walking us, showing us around,

9    about half of them were protection.

10       Q.    And how do you know that they were

11   protection?

12       A.    Has "protection" on the carton

13   outside or on the box itself.  The pallets

14   (indiscernible) --

15              (Stenographer requests

16        clarification.)

17              THE WITNESS:  The box itself, it

18        would say "Protection" or "Examination" or

19        some type of variation from examination so

20        you know there was a difference, or on the

21        carton itself.

22   BY MR. FRISCH:

23       Q.    And how many of those gloves that

24   said "Protection," according to you, came from

25   JNS or Mr. Stern?

1      A.    My lawyer should have that exact

2    amount.  I looked at the documents, but I don't

3    have a photographic memory.

4      Q.    So as far as you know, it could have

5    been zero?

6            MR. RAKHUNOV:  Objection.

7            THE WITNESS:  No.  Medline had told

8        us it was close to half.  They had given us

9        some sort of a report.

10   BY MR. FRISCH:

11     Q.    Do you know if Medline opened every

12   single carton to do that report?

13     A.    I'm not sure what Medline did.

14     Q.    Were they paid to -- were they --

15   were they paid to do this work?

16     A.    I did not pay Medline to do this.

17     Q.    Do you know the names of the

18   employees at Medline who did the counting?

19     A.    No.

20     Q.    Do you know how long the count took?

21     A.    No.

22     Q.    Do you know if they took the pallets

23   down off the racks and actually -- and actually

24   opened the pallets and ensured --

25     A.    No.

1        Q.    -- that their count was accurate?

2        A.    I don't know what Medline did.

3        Q.    Okay.  So you just know Medline told

4    you that it was close to 50 percent protection

5    gloves?

6        A.    Correct.

7        Q.    And that count was done at the

8    request of Ascension?

9        A.    I believe it was Ascension, and

10   maybe us too at the same time.

11       Q.    And were the other 50 percent of

12   gloves used by Ascension that were not

13   protection gloves?

14       A.    No, they were not.

15       Q.    Why not?

16       A.    Because none of the gloves had any

17   nitrile on them, or only small traces of

18   nitrile.  So they were not the specification of

19   glove that they asked for.

20       Q.    Meaning -- are you aware of whether

21   or not the gloves were sourced from MedCare?

22            MR. RAKHUNOV:  Objection.

23            THE WITNESS:  I believe they were

24       sourced from MedCare.  That's what I was

25       told.

1  BY MR. FRISCH:

2      Q.    So you're not alleging that my

3  clients or the Adorama parties sourced fake

4  gloves that were not purchased from MedCare; is

5  that correct?

6      A.    I'm not understanding the question.

7      Q.    My question is, is your allegation

8  that the gloves were not really MedCare, or are

9  the gloves MedCare and that MedCare shipped

10  gloves that were not up to spec?

11          MR. RAKHUNOV:  Objection.

12          THE WITNESS:  I don't know what

13      MedCare sent to Adorama, Kitchen Winners,

14      JNS, and Joel Stern.  I know that they told

15      me that they were dealing directly with

16      MedCare.  And if it's true or not true and

17      where they got them from, I can't -- I'm

18      not sure about that.

19  BY MR. FRISCH:

20      Q.    But you have no reason to believe,

21  sitting here today, that they were not dealing

22  directly with MedCare?

23      A.    No, I do not.

24      Q.    Did you have conversations with

25  MedCare?

1        A.    I had conversations with MedCare

2    after we had the problems with the gloves.

3        Q.    And when you had those conversations

4    with MedCare, what did they tell you?

5        A.    They said -- she had sent us testing

6    reports of everything that Adorama had bought

7    from them directly.  So it was JNS in lieu of

8    MedCare.  She said half of the products that

9    she sold to Adorama were protection gloves.

10        Q.    Do you know how many gloves she sold

11    to Adorama?

12        A.    No, I don't.

13        Q.    So you don't know how many gloves

14    would be half protection gloves, do you?

15        A.    I do not.

16        Q.    So there's no -- you have no basis

17    to conclude that Adorama did not have

18    sufficient examination gloves to fulfill your

19    contract with them; correct?

20            MR. RAKHUNOV:  Objection.

21            THE WITNESS:  I do not have exact

22        numbers of what Adorama purchased from

23        MedCare, but I'm sure we can request it.

24    BY MR. FRISCH:

25        Q.    From whom could you request it?

1      A.    Could request it from Adorama's

2  attorney.  Could request it from Adorama.  That

3  should give you an exact count of what they

4  purchased.

5      Q.    When you entered into the purchase

6  arrangement with JNS, did you have an attorney?

7      A.    I don't believe we used an attorney

8  to get into an agreement with them.

9      Q.    Okay.

10     A.    I'm not positive, though; so I would

11  have to go back to Brad Gilling and ask.

12             (Exhibit Number JNS B, Escrow

13         Agreement, Bates-stamped RF_000660 - 667,

14         was marked for identification.)

15  BY MR. FRISCH:

16     Q.    Do you recall the agreement I've

17  called up and labeled as JNS Exhibit B?

18     A.    I can't really see it.  So you're

19  going to have to try to play with the zoom

20  here.

21     Q.    You can zoom in.

22     A.    Yeah, I'm trying.  150 -- okay.

23  Escrow agreement.

24             Okay.  What about this agreement you

25  were asking?

1      Q.    Can you please scroll first to

2  page 7.

3      A.    7.  Okay.

4      Q.    Is that your signature over your

5  name?

6      A.    Yes.

7      Q.    So did you, in fact, sign this

8  agreement?

9      A.    Appears that I did.

10     Q.    Was Gunster Yoakley & Stewart

11  representing you in regard to this?

12            MR. RAKHUNOV:  Objection.

13            THE WITNESS:  Very possible.

14  BY MR. FRISCH:

15     Q.    Do you know if Gunster Yoakley &

16  Stewart ever executed this agreement?

17     A.    I'm not positive.

18     Q.    Did you ever fund the escrow account

19  contemplated under this agreement?

20     A.    What escrow account?  I'm not

21  positive on that.  I would have to ask Brad

22  Gilling.

23     Q.    So you don't recall, looking at this

24  agreement, whether or not this agreement was

25  ever acted upon?

1      A.    I looked at a lot of agreements, and

2   I don't have a photographic memory from two

3   years ago of what I signed and didn't sign and

4   what I funded and didn't fund or deposit.

5      Q.    But you have no reason, sitting here

6   today, to think that you didn't sign this

7   agreement?

8              MR. RAKHUNOV:  Objection.

9              THE WITNESS:  I don't think so, but

10       I -- I would have to ask my lawyer to look.

11       If he has the document and I signed it,

12       then I signed it.

13  BY MR. FRISCH:

14      Q.    Do you recall if you issued purchase

15  orders to Mr. Stern or JNS at that time when

16  you entered into an agreement?

17              MR. RAKHUNOV:  Objection.

18              THE WITNESS:  I'd have to refer to

19       Brad Gilling.

20              MR. FRISCH:  Okay.  Does this -- I

21       am going to now label this as JNS

22       Exhibit C.

23              (Exhibit Number JNS C, Irrevocable

24       Corporate Purchase Order from Rock Fintek

25       to JNS Capital, dated 2/2/21, was marked

1          for identification.)

2               THE WITNESS:  The signature didn't

3          look 100 percent like mine on that

4          document, also.

5     BY MR. FRISCH:

6          Q.    But do you recall this document?

7          A.    This document or the previous

8     document?  No.  This one, let me try to -- I've

9     got to zoom in on it.  Give me a moment.  Okay.

10              (Reviewing document.)

11              What about this document?

12         Q.    Do you recall signing this document?

13         A.    No, I do.

14         Q.    Is that your signature at the

15    bottom?

16         A.    Does not appear to be.

17         Q.    Is it possible that somebody else

18    who had authority signed your name on it?

19         A.    No.

20         Q.    Like Mr. Gilling?

21         A.    No.  He would have signed his own

22    name.

23         Q.    Do you recall issuing this type of

24    document, irrevocable corporate purchase order,

25    under the Rock Fintek letterhead?

```
 1        A.    No.
 2        Q.    Do you recall issuing any document
 3   to Mr. Stern or JNS ordering any product?
 4        A.    All the documents that I got that I
 5   had, I got them from Brad Gilling, sent them to
 6   our attorney, and he should have copies of
 7   them -- records of them and can send them to
 8   you.
 9        Q.    Okay.  So sitting here today, do you
10   believe this is not an accurate document, or
11   you think --
12        A.    It's not my signature.  That's for
13   sure.
14        Q.    Do you recall if there ever was a
15   document between you and JNS indicating the
16   quality of the gloves that you were purchasing?
17        A.    Phillip should have that if it
18   exists.  I don't -- again, I looked at a lot of
19   documents with Phillip yesterday.  I don't
20   recall all of them.
21        Q.    Okay.  Don't tell me what you
22   discussed with Phillip.
23             MR. RAKHUNOV:  Yeah, let's not go
24        there.
25             ///
```

```
 1   BY MR. FRISCH:

 2        Q.    But do you recall any document

 3   that -- with --

 4             MR. FRISCH:  Can you guys give me 30

 5        seconds?  Apparently my cleaning ladies are

 6        here.

 7             MR. RAKHUNOV:  You know, let's take

 8        just a quick two-minute break.

 9             MR. FRISCH:  Let's take a two-minute

10        break.

11             (Break taken from 11:03 a.m. to

12        11:09 a.m.)

13   BY MR. FRISCH:

14        Q.    How many agreements did you enter

15   into with Ascension?

16        A.    How many agreements did I enter into

17   with Ascension?  I had multiple agreements with

18   Ascension.  Well, with Resource Group.

19        Q.    And how many -- and what did those

20   agreements cover?

21        A.    Different products.  Nitrile gloves,

22   masks, gowns.

23        Q.    And how many of those -- how many

24   gloves -- when was the first time you entered

25   into a contract with Ascension for
```

1    (indiscernible) --

2              CERTIFIED STENOGRAPHER:  I'm sorry?

3              MR. RAKHUNOV:  Yeah, we lost you,

4       Avi.

5              (Comments off the record.)

6    BY MR. FRISCH:

7       Q.    All right.  How many -- I'm sorry.

8    I lost my train of thought.

9              How many contracts for nitrile

10   gloves did you have with Ascension?

11      A.    How many contracts?

12      Q.    Uh-huh.

13      A.    I believe I had two.

14      Q.    When was the first one?

15      A.    Around September 2020 or 2021.

16      Q.    And what gloves did you supply for

17   that contract?

18      A.    I don't remember the exact brand.

19      Q.    Was it MedCare?

20      A.    No.

21      Q.    And then the contract that led to

22   the purchases at issue in this case, when was

23   that executed?

24      A.    I believe that was executed in

25   December, same year.

1      Q.    And at that time were you planning

2  on supplying MedCare gloves, or was it any

3  nitrile examination gloves you could get your

4  hands on?

5      A.    No.  Nitrile gloves only.

6      Q.    But was it MedCare, or was it any

7  brand?

8      A.    It was any brand.

9      Q.    Is that when you entered into a

10  transaction with somebody in Thailand or

11  something where they stole your money and did

12  not provide gloves?

13      A.    That was one instance we tried to

14  procure some gloves, but we had also procured

15  other ones.

16      Q.    And you said it was January 2020

17  when you met -- when you were introduced to

18  JNS?

19      A.    I don't remember exactly when.  It

20  was toward the end of that year or the

21  beginning of 2020 -- 2021.

22      Q.    Did you request any financial

23  information from Mr. Stern or JNS when you

24  entered into the transaction with them?

25      A.    My lawyer, Scott Coffey, had started

1  working on some stuff for us with them, but I

2  don't think if we ever used any of those

3  documents to fund an escrow or to do anything.

4          (Stenographer requests

5      clarification.)

6          THE WITNESS:  To fund an escrow or

7      use the documents that he had produced.  I

8      don't believe we ended up using any of

9      them.  We just ended up paying him

10      directly.

11  BY MR. FRISCH:

12      Q.    Did you get any financial statements

13  from him?

14      A.    I don't believe I did.

15      Q.    Did you ask for them?

16      A.    I believe I asked about his company

17  and the strength of it, and that was about it.

18      Q.    And what were you told?

19      A.    He was an accountant and he was

20  working with some real estate guys that are

21  colleagues of his and they were able to secure

22  the gloves.

23      Q.    And that was sufficient for you to

24  do business with him?

25      A.    Yeah.  Yes, it was at the time.

1   Seemed like an honest man.

2        Q.    I agree.

3              How many gloves did you ultimately

4   purchase from JNS or Mr. Stern, as you allege?

5        A.    I don't remember exactly.  I'd have

6   to look at the document again.

7        Q.    Do you recall how much you paid him?

8        A.    I do not know off the top of my

9   mind.

10        Q.    Do you know offhand how many gloves

11   you purchased from Adorama or Kitchen Winners?

12        A.    I purchased over the 200 million

13   quantity I had a contract for.

14        Q.    How much did you pay JNS for the

15   gloves?

16        A.    I'd have to look at the contract,

17   and I can verify it.

18        Q.    And what price did you resell them

19   to Ascension at?

20        A.    I'd have to look at their contract

21   and then confirm it with you, what the exact

22   amount is.

23        Q.    Is it fair to say that you resold

24   them at a profit?

25        A.    I sold gloves at a loss in the

1  beginning that I purchased from him and

2  Adorama.

3       Q.    You sold the gloves for less than

4  you purchased them at?

5       A.    Correct.

6       Q.    But that isn't because of JNS; is

7  that correct?

8       A.    Has nothing to do with JNS.  It's

9  just what I was willing to pay, and I was

10  willing to take a loss.

11       Q.    Ultimately, how much did you collect

12  from Ascension for the nitrile gloves that you

13  sold them?

14       A.    Approximately 34, 35 million.

15       Q.    And how much -- these are the gloves

16  pursuant to the December 2020 or November 2020

17  contract?

18       A.    Pursuant to --

19       Q.    Or does that include the September

20  deliveries as well?

21       A.    No, it's for that contract, I

22  believe.

23       Q.    In total, how much did you pay to

24  JNS and Kitchen Winners and Adorama for the

25  gloves that you sold under that contract?

1      A.    Between them and logistics costs, I

2  believe I paid more than I received.

3      Q.    I didn't ask you about logistics

4  costs.  Just how much did you pay them?

5      A.    I don't have that number memorized.

6      Q.    Do you have an idea?

7      A.    No.  I could verify it.

8      Q.    How do you know that it was with

9  the -- well, how much did you pay the logistics

10  company?

11      A.    I believe logistics, it was around 7

12  million, 6 million, 5 million.  5 to 7 million.

13  Maybe 8.  So minus the difference of that,

14  minor operational cost.

15      Q.    Okay.  And did you -- you don't

16  recall how much you paid for the gloves to the

17  sellers of the gloves?

18      A.    I believe I paid Adorama 19 and a

19  half million.

20      Q.    Okay.

21      A.    And I'm not exactly sure the amount

22  that I paid JNS.  Just Adorama and

23  Kitchen Winners was around 19, 20 million.  I'm

24  not sure for JNS.

25      Q.    It was under $7 million; correct?

1      A.    I'd have to see a document to verify

2  it.

3      Q.    Was you it around two and a half

4  million?

5      A.    I don't have the number in my mind.

6  I'd need to look at something.

7      Q.    When did complaints begin about the

8  gloves?

9            MR. RAKHUNOV:  Objection.

10            THE WITNESS:  I believe the first

11      written notification we got was sometime in

12      July.

13  BY MR. FRISCH:

14      Q.    Did you have any oral notifications

15  prior to July?

16      A.    I don't recollect that, no.  First

17  time I believe hearing something was that.  The

18  only thing that happened before would have been

19  the LevMed situation, the wrong brand gloves

20  given.

21      Q.    I'm sure Alex will discuss LevMed

22  with you.  I don't think that has anything to

23  do with JNS; correct?

24      A.    Correct.

25      Q.    All right.  So sitting here today,

1    what damages were caused by JNS?

2         A.    The loss of my relationship and

3    goodwill that I built up with Ascension.

4         Q.    Well, what -- what did you -- what

5    further business were you expecting from

6    Ascension?

7         A.    I had an opportunity to bid on a

8    billion glove order with them and an

9    opportunity to sell them additional masks.  I

10   had a large opportunity to sell them testing

11   kits that would have been FDA-approved and we

12   would have manufactured and sold to them.

13        Q.    Now, those testing kits were

14   never -- you testified earlier, those testing

15   kits were never produced; correct?

16        A.    We started to make them.  We made

17   prototypes.

18        Q.    You never got them FDA-approved;

19   correct?

20        A.    We stopped the process that I spent

21   the legal funds on starting.

22        Q.    Okay.  But it never -- it never

23   actually happened?

24             MR. RAKHUNOV:  Objection.

25             THE WITNESS:  No, it did not happen.

 1  BY MR. FRISCH:

 2       Q.    When they -- when you say you had an

 3  opportunity to bid, who gave you that

 4  opportunity?

 5       A.    Resource Group said, "We'll give you

 6  an opportunity to bid."

 7       Q.    Who specifically at Resource Group?

 8       A.    Dewayne Rader.

 9       Q.    And who is Dewayne Rader?  What is

10  his position there?

11       A.    He's the vice president at Resource

12  Group.  I'm not sure of the exact title.

13       Q.    And the billion gloves was over what

14  period of time?

15       A.    Would have been annually.  Would

16  have been a two- or three-year contract.

17       Q.    And your profit on that contract

18  would have been what?

19       A.    I don't have the exact numbers

20  because we would have been buying the gloves

21  post-pandemic.  So it would have been -- the

22  margins would have been smaller, but it would

23  have been significant because of the quantity.

24       Q.    Were you the only bidder?

25       A.    No, I was not the only bidder.  I

1  would not have been the only bidder.  I can't

2  imagine that.

3        Q.    Ultimately, do you know who was

4  awarded that contract?

5        A.    No, I don't.

6        Q.    Did you ever submit a bid for that

7  contract?

8        A.    No.  I did not have the opportunity.

9        Q.    Well, did you ever prepare the bid

10  for that contract?

11        A.    We had discussions about it and had

12  a face-to-face meeting about it.

13        Q.    Do you know how many other bidders

14  there were?

15        A.    I do not.

16        Q.    So you have no idea how likely you

17  were or weren't to get that contract; correct?

18        A.    I was told that we delivered

19  everything on time, and they would want to

20  continue a relationship with us.

21        Q.    Do you know the criteria they were

22  using to review bids at that time?

23        A.    I -- what criteria they were using?

24  They were going with proven vendors, I believe,

25  but I'm not sure what their criteria is.  You'd

1   have to ask them.

2       Q.    Okay.  So you don't really know,

3   sitting here today, how likely you were or

4   weren't to actually get the contract?

5       A.    I believe I would have got it.  I

6   was already established with them.  Already did

7   60, $70 million in sales with them.  So I was

8   pretty optimistic about it.

9       Q.    And in terms of the test kit

10  business, how far along was that contract?

11      A.    They said, "If you have a test kit

12  that you're going to have it FDA-approved" --

13  which I could have used my own which I was

14  making, or I could have bought an existing one

15  and sold it to them that was already

16  approved -- they would be happy to buy it.

17          But when the gloves issue arose,

18  they didn't want to do any business at all with

19  us.

20      Q.    So what -- can you

21  (indiscernible) on the lost business that

22  you're claiming --

23          (Stenographer requests

24      clarification.)

25          ///

1  BY MR. FRISCH:

2      Q.    Can you put a number on the amount

3  of lost business you believe you had?

4      A.    I was selling -- if you go by the

5  past, I did about 70 million a year with them.

6  So if you take that for the next few years, I

7  don't know, 200 -- $200 million.

8      Q.    That's revenue.  What about your --

9  what would your profits have been?

10      A.    Out of 200 million?  I don't know.

11  You'd say at least 15, 20 percent.

12      Q.    But you told me that you lost money

13  on the $35 million that you had sold the gloves

14  to Ascension at.

15          That was your testimony a few

16  minutes ago; correct?

17          MR. RAKHUNOV:  Objection.

18          THE WITNESS:  We were buying the

19      gloves for more than we were selling them

20      for in the beginning.

21  BY MR. FRISCH:

22      Q.    So you told me you lost money on the

23  $35 million you were paid through Ascension.

24  Is that a correct understanding of your prior

25  testimony?

1          MR. RAKHUNOV:  Objection.

2          THE WITNESS:  I believe so.

3   BY MR. FRISCH:

4      Q.    Okay.  So what makes you think that

5   the future contracts would have been

6   profitable?

7      A.    Because the other $40 million I did

8   with them was profitable.

9      Q.    Now, how much of the loss -- of this

10  lost -- supposedly lost business is

11  apportionable to JNS?

12          MR. RAKHUNOV:  Objection.

13          THE WITNESS:  I don't know that

14      exact amount.  I'd have to look at the

15      documents I gave Phillip.

16  BY MR. FRISCH:

17      Q.    Approximately what -- I mean, JNS

18  sold you a much smaller share of gloves than

19  Adorama; correct?

20      A.    Yes.

21      Q.    So are you going to say the damages

22  from JNS are only, let's say, 10 percent of the

23  damages that Adorama caused, or how do you

24  calculate that?

25          MR. RAKHUNOV:  Objection.

1            THE WITNESS:  I believe whatever the

2       quantity is, you can see it, and then

3       that's -- however you want to calculate

4       loss.  I don't know.  I'd have to ask an

5       accountant.

6  BY MR. FRISCH:

7       Q.    Meaning -- I've been told by your

8  attorney that you are going to testify as an

9  expert in this case as to your lost profits.

10 So I think it is reasonable to ask you how you

11 tie particular profits to a particular

12 defendant here, and I'm asking if you have that

13 calculation.

14      A.    I --

15            MR. RAKHUNOV:  Hold on.  Hold on.

16       Just on the record --

17            THE WITNESS:  Hold on.  I've got to

18       get power for my computer.  So --

19            MR. FRISCH:  Okay.  We can take a

20       two-minute break.

21            THE WITNESS:  You can just leave it

22       on.  I've just got to get the power.

23            MR. RAKHUNOV:  Are we still on the

24       record?

25            MR. FRISCH:  Looks like we are, but

1  if you want to go on the off the record we

2  can go to a breakout room.

3       MR. RAKHUNOV:  Yeah, let's just go

4  off the record.  I'm not going to go

5  anywhere.

6       (Break taken from 11:24 a.m. to

7  11:25 p.m.)

8       THE WITNESS:  Okay.  All right.  I

9  have power on the computer.

10      MR. FRISCH:  All right.

11      MR. RAKHUNOV:  So let me -- let me

12  just put my objection on the record.

13      You know, this is the deposition --

14  it's a fact witness deposition of Mr. Kato

15  individually and as the corporate

16  representative.  We haven't had expert

17  disclosures yet, and we're not into expert

18  discovery.  If Mr. Kato is, in fact,

19  disclosed as an expert in the value of the

20  losses for Rock Fintek, he will be made

21  available for an expert deposition at that

22  time.

23      So feel free to ask him questions.

24  I just want to be clear that, you know,

25  this is not going -- he's not being

1   presented right now as an expert witness.

2   So, you know, this is without prejudice to

3   him providing complete expert testimony in

4   the future if he --

5          MR. FRISCH:  Well --

6          MR. RAKHUNOV:  -- if he does so.

7          MR. FRISCH:  Okay.  Well,

8   gamesmanship aside, he's here supposably

9   both on behalf of the company, and

10  supposedly he's going to be an expert in

11  what they've lost.  And, so far, I'm not

12  hearing any numbers, any basis for any of

13  these claims.

14         So you can put your objection, but I

15  don't -- I don't go in for gamesmanship, as

16  you know.  He's supposed to testify.

17         MR. RAKHUNOV:  There's no

18  gamesmanship here.  There is a different

19  procedure for expert testimony than there

20  is for fact witness.

21         So go ahead and ask your questions,

22  and we'll go from there.

23         MR. FRISCH:  Okay.  So let's go

24  back.

25         ///

1   BY MR. FRISCH:

2        Q.    I think I was trying to break down

3   with you how much of the loss you would

4   attribute to JNS.

5        A.    Well, I would say JNS torpedoed the

6   relationship.

7        Q.    How is that?

8        A.    By putting stickers on the gloves

9   saying that they were examination.

10       Q.    Well, how do you know JNS did that?

11       A.    He called me and he asked me -- or

12   wanted to sell me those exact gloves for half

13   the price, 4 or $5 less a box, or $6 less a

14   box, and I told him absolutely not.

15             He's like, "I can repackage them and

16   I can do that."

17             And he says, "No."  So -- and I

18   said, "No."

19             And then pallets -- when I visited

20   the pallets at Medline, those pallets had Joel

21   Stern's name written on them.

22             And then we took out the boxes.

23   There was a sticker of examination just as he

24   described on the box that I did not want to

25   purchase.  So it had Joel Stern, JNS, and David

1  Horowitz or somebody on the --

2      Q.    Do you know who put those labels on?

3      A.    Joel Stern had somebody put them on.

4  It came out exactly the way he described it.

5      Q.    So you don't know, meaning -- if he

6  was asking you to buy them at a lower price,

7  why would he just stick them on a truck for

8  you?

9          MR. RAKHUNOV:  Objection.

10          THE WITNESS:  Because he was -- I

11      don't know why he'd want to do something

12      criminal, but he did.

13  BY MR. FRISCH:

14      Q.    This, frankly, makes no sense;

15  right?  He was trying to sell them to you at a

16  different price, and now you're saying, "I

17  said, 'No.'  So he just stuck them on a truck."

18  That's your -- that's your allegation.  You

19  have no evidence of that allegation; correct?

20      A.    Yes, I do.

21      Q.    Yeah?  What's the evidence?

22      A.    His truck driver delivered to

23  Medline; Medline received those gloves.

24      Q.    How do you know it was his truck

25  driver who delivered those items?

1      A.    You can get the documentation from

2   Medline to back it up.

3      Q.    I'm asking you for how you link it

4   up, because you're saying that there's some

5   label on the boxes -- let me finish my

6   question.

7            You just said there was a label on

8   the boxes that said "JNS" or "Joel Stern";

9   right?  Who put that on the -- who put that on

10  the panel?

11     A.    His drivers must have.

12     Q.    So you don't know who put them on?

13     A.    I know Medline didn't do it.

14     Q.    How do you know that?

15     A.    Because Medline said that's the way

16  they received them.

17     Q.    Well, who at Medline told you that?

18     A.    Whoever were in the warehouse.

19     Q.    Okay.  So you don't know.  You

20  personally have no knowledge of who put that

21  label on the pallet; correct?

22     A.    I don't know who Joel Stern hired or

23  if he --

24     Q.    I'm not talking about the stickers.

25  I'm talking about the piece of paper that is on

```
 1   some of the pallets saying "Joel Stern," or

 2   some say "Kitchen Winners."

 3        A.    Medline --

 4        Q.    You don't know who put that on;

 5   correct?

 6        A.    I know Medline didn't put it on, and

 7   they arrived like that.

 8        Q.    But you don't know Medline didn't

 9   put it on.  You know Medline told you they

10   didn't.

11        A.    Medline told me they did not; so I

12   believe them.

13        Q.    Okay.  Well, if Joel Stern told you

14   he did not, would you believe him?

15        A.    No, I would not.

16        Q.    Why not?

17        A.    I don't believe the man.

18        Q.    Okay.

19        A.    Anymore.

20        Q.    Well, so you have no personal

21   knowledge of this fact either way; correct?

22              MR. RAKHUNOV:  Objection.

23   BY MR. FRISCH:

24        Q.    You can answer.

25        A.    He offered to sell gloves with a
```

1  description, which I turned down, and then they

2  arrived just as he described, the way I had

3  turned them down.

4       Q.    Except you don't know that he was

5  the one who sent them.

6       A.    You do know that he sent them

7  because you know when his trucks arrived.

8       Q.    But you don't know which gloves at

9  the warehouse are his.  You can't tell me --

10 you can't look at a spreadsheet today --

11      A.    They were shipped and received and

12 identified in the warehouse.

13      Q.    Can you tell me -- I happen to know

14 for a fact that Medline did not track it to the

15 level of detail that you're saying they did,

16 because I know Medline's told us.

17            MR. RAKHUNOV:  Objection.  Are you

18      testifying?

19            MR. FRISCH:  But -- I'm setting up

20      my question.  Right?  Because he keeps on

21      insisting that there is this information.

22 BY MR. FRISCH:

23      Q.    I don't have any information from

24 you guys as to how it would be tracked, which

25 pallet came from which seller.  So how would I

1  figure it out?  Like, show me a -- tell me

2  which document I look at and which piece of

3  information will tell me which gloves are those

4  gloves that you say have these stickers on

5  them -- right? -- and how --

6       A.    They arrived, and they were wrapped

7  with JNS or Joel Stern's name wrapped on them.

8  The trucks arrived when Joel Stern said his

9  trucks would be arriving.

10            If you go back to his messages and

11 when he was paid, it's the same time that

12 the -- those trucks arrived.  They were

13 wrapped.  There's no question that those

14 Arik Maimon boxes are from JNS, Joel Stern, or

15 David Horowitz, without a question.

16      Q.    If I go to the Grayslake

17 warehouse -- I don't even know if the gloves

18 are still there, but if they are still there --

19 right? --there's like 100 million gloves;

20 right?

21            How would I go and find that

22 pallet -- the question I've been asking from

23 the very beginning of this case:  How would I

24 go and find the pallets you are claiming have

25 these stickers?  How would I track that?

1      A.    You can just go around and look at
2   all their gloves.  You're going to see stickers
3   on most of the pallets.
4      Q.    I'm not -- I'm not asking you to --
5   meaning you're saying that all the gloves from
6   Joel Stern had these stickers?  I know that's
7   not true.  So I don't think that's what you're
8   saying.  Is it?
9      A.    The majority of them.  The majority
10  of them.  Not in the beginning.  Until --
11     Q.    How many gloves had the stickers on
12  them?  Let's get a straight answer.  How many
13  gloves have the stickers on them?
14     A.    I don't have the exact count.
15     Q.    Who would?
16     A.    You should probably have it in our
17  purchase order.  Joel would.  You can ask Joel.
18  He'll tell you how many he stickered.
19     Q.    I --
20     A.    He should know exactly how many he
21  stickered.  Maybe he's got --
22     Q.    Trust me, you don't -- he will not
23  give the same answer as you.
24          CERTIFIED STENOGRAPHER:  You guys
25       have got to stop talking at the same time,

1          because I can only take one of you at a

2          time.

3                    MR. FRISCH:  I'm sorry.  I'm sorry.

4                    THE WITNESS:  All right.  Well, just

5          ask clear questions.  I'm happy to give

6          clear answers.

7    BY MR. FRISCH:

8          Q.    The clear question is, to your

9    knowledge, you have been claiming all along

10   that you have gotten boxes with stickers from

11   Joel Stern.  How many boxes of gloves arrived

12   from Joel Stern with stickers on them?  I want

13   a number.  Not 50 percent, not 40 percent.  I

14   want a number.  I want an exact count of how

15   many boxes had those stickers on them.

16                   MR. RAKHUNOV:  Objection.

17                   MR. FRISCH:  He's here on behalf of

18         the company.  This is a crucial claim that

19         you've made.

20                   THE WITNESS:  I don't have a

21         photographic memory to answer that.

22   BY MR. FRISCH:

23         Q.    So who would have the answer?  Where

24   would I look to get the answer?  Was it marked

25   anywhere in your records?

1      A.    You can ask my lawyer if he as the

2  exact documents to get you that exact account.

3  I -- I would assume myself -- if I were to

4  throw a number out there, I would guess 9

5  million.

6      Q.    I'm not asking you -- I'm not asking

7  you to guess.

8      A.    If you want a number, I mean, that's

9  what -- that's --

10     Q.    No, I want the -- I want the

11 accurate number.

12     A.    That's all I have.  I have -- 9

13 million is my guess.  Guesstimate.

14     Q.    What's that guess based on?

15     A.    That's about how many I believe he

16 gave me, out of all the ones he sent.  That's

17 what Joel said he had.  That's the amount that

18 he was trying to sticker, and then he did it.

19 So that's the amount I would guess that was

20 stickered.  9 million.

21     Q.    So because Joel tried to sell you

22 something that he -- that you told him you

23 didn't want, that he says he never sold you,

24 now you're assuming that every glove of the --

25 but you've never gone and counted those

1    gloves -- correct? -- to check how many were

2    stickered?

3        A.    I believe I was -- when I was there,

4    I looked at the pallets, and we started

5    counting a lot of the pallets and how many of

6    them were, and I believe it was around 9

7    million.

8        Q.    You personally counted 9 million

9    boxes of gloves -- 9 million gloves?

10       A.    I believe I did.

11       Q.    How long were you in the warehouses

12   for?

13       A.    I was in the warehouses for almost a

14   week.

15       Q.    And did MedCare -- did Medline take

16   down every single pallet for you?

17       A.    The ones they didn't take down, they

18   pulled down at the time, and they said, "These

19   are all the same."

20             And then we saw them with the same

21   sticker; so a lot of them were brought down.

22       Q.    How would you see the stickers if

23   they didn't take them down?

24       A.    A lot of them, they brought down.

25   So maybe 9 million they brought down.

1      Q.    How many gloves did they bring down

2   for you in each warehouse?

3      A.    Maybe 9 million total.

4      Q.    Do you have a recollection of the

5   gloves they brought down?  How many warehouses

6   did you visit?

7      A.    Seven.

8      Q.    Which -- can you name them?

9      A.    No, I cannot.  Grayslake is one.

10  Jefferson, Romulus.  I don't know -- I can't

11  remember the names of the other ones.

12     Q.    Okay.  How many gloves in total were

13  stored in Grayslake?

14     A.    I don't know.

15     Q.    How many gloves in total did you

16  visit -- did you inspect personally in

17  Grayslake?

18     A.    I inspected millions of gloves

19  between the various warehouses.

20     Q.    And how many of those gloves have

21  these stickers on the boxes?

22     A.    Every one that was wrapped that said

23  "Joel Stern" or "JNS."

24     Q.    Every single box?  That's your

25  testimony?

1        A.    Approximately 9 million.

2        Q.    But you -- so you had access to

3    these pallets; correct?

4        A.    I had access to the pallets when I

5    was at Medline.

6        Q.    So you could have printed out the

7    paper that said "JNS" and put it on the pallet;

8    isn't that correct?

9            MR. RAKHUNOV:  Objection.

10           THE WITNESS:  No, I could not.

11   BY MR. FRISCH:

12       Q.    Yes, you could have.  You were

13   standing in front of a pallet, and you could

14   have put pieces of paper on them, could you not

15   have?

16           MR. RAKHUNOV:  Objection.

17           THE WITNESS:  No.  They were

18       shrinkwrapped.

19   BY MR. FRISCH:

20       Q.    So you could open the shrinkwrap and

21   reshrinkwrap them.

22       A.    No.  I was --

23           MR. RAKHUNOV:  Okay.  Okay.  Stop.

24           MR. FRISCH:  I'm accusing him of

25       lying to me because --

```
 1            MR. RAKHUNOV:  You're accusing him
 2      of --
 3            MR. FRISCH:  I'll let him answer --
 4            (Simultaneous speaking.)
 5            CERTIFIED STENOGRAPHER:  Excuse me.
 6      I am not getting this.
 7            MR. FRISCH:  Okay.  This is off --
 8      okay.  I am going to continue my
 9      questioning, and you're not going
10      to interrupt.
11            MR. RAKHUNOV:  You're not asking
12      questions.  You're accusing him of --
13            MR. FRISCH:  I am asking him a
14      question.
15 BY MR. FRISCH:
16      Q.    Was it not possible for you to take
17 these pieces of paper that said "JNS" on them,
18 print them up on your printer, and stick them
19 on the pallets?
20      A.    No, it's not possible.
21      Q.    Yes or no?
22      A.    Impossible.  No.
23      Q.    Why is it not possible?
24      A.    I didn't have access to a printer to
25 print them and put them on there, and I was
```

```
 1   being watched by Medline.  I would -- and I'm
 2   not a criminal to do that.  As I --
 3       Q.    Whether or not you're a criminal is
 4   a side question.
 5             You are saying that somebody -- that
 6   somehow -- the only person here who's ever had
 7   access to these pallets is you.
 8             MR. RAKHUNOV:  Objection.
 9   BY MR. FRISCH:
10       Q.    So isn't it most likely that you're
11   the one who labeled them?
12       A.    No, it's not.
13             MR. RAKHUNOV:  Objection.
14             THE WITNESS:  You do the math.  He
15        tried to sell them to me, and they showed
16        up exact way that he described.
17   BY MR. FRISCH:
18       Q.    Why -- okay.  So let me ask another
19   question.
20             Why would he try to sell them to you
21   that way --
22       A.    Because he was -- he said he was
23   going to --
24       Q.    I didn't finish my question.
25       A.    Okay.
```

1      Q.    Why would he try to sell them to you

2   at a discount when he could just fraudulently

3   put them on the truck and get them at twice the

4   price?

5      A.    Because he wanted to split the

6   profits without being --

7      Q.    With who?

8      A.    He wanted to split the profit

9   margins:  "I'll sell them to you for less now.

10  You'll make more profit.  I'll make more

11  profit."

12          I said, "Absolutely not."

13          And then he did it anyways, and he

14  kept 100 percent of the profit of the fake

15  gloves.

16     Q.    Okay.  So, again, you're claiming

17  there are 9 million fake gloves.  I want a

18  listing of every single one of them that you

19  counted, and I want to see -- I want to see how

20  you track those back to Joel Stern's trucks.

21          You keep saying that this

22  information exists.  We're now almost a year

23  and a half into this litigation, and nobody has

24  ever seen this level of detail that you're

25  claiming you have today.

1              So I'm asking you, where is that

2      detail?  Like, where is --

3              (Simultaneous speaking.)

4      BY MR. FRISCH:

5          Q.    Is there a file somewhere I can look

6      at?

7              MR. RAKHUNOV:  Objection.

8          Objection.

9              Counsel, this is -- I know this is

10         going to be a long day, but just to

11         shortcut some of this, as you know, there's

12         a statistician expert that's going to

13         testify.

14             MR. FRISCH:  This isn't a

15         statistician question.  That's the point.

16         I'm not asking you for a statistician.

17             MR. RAKHUNOV:  200 million gloves,

18         Avi --

19             MR. FRISCH:  You don't get to

20         interrupt my questions, Phil.  I get to ask

21         the questions I want.

22             MR. RAKHUNOV:  I get to interrupt

23         this harassment.

24             MR. FRISCH:  You don't get to answer

25         --

```
 1          CERTIFIED STENOGRAPHER:  Excuse me.
 2     Stop.
 3          MR. FRISCH:  This is off the record.
 4          Phil, you don't get to interrupt my
 5     questions --
 6          MR. RAKHUNOV:  No, no.  Please stay
 7     on the record.
 8          CERTIFIED STENOGRAPHER:  I can't
 9     stay on the record if you guys are talking
10     at the same time.  I can only hear one
11     person at once.
12          MR. RAKHUNOV:  All right.
13          Go ahead, Avi.
14          But please stay on the record.  I
15     want this all on the record.
16          MR. FRISCH:  There's nothing on the
17     record.  You don't have any right to be on
18     the record.  You don't have any right to
19     tell me to ask different questions.
20          So, no, you do not get to interrupt
21     my questions to say I should ask different
22     questions or that my theory of the case is
23     not the same as yours.  I don't care that
24     there are 200 million gloves.  For one
25     thing, my client didn't sell --
```

```
 1        THE WITNESS:  I'm going to get
 2   another coffee while you guys are arguing.
 3        MR. FRISCH:  We can go off the
 4   record.  What time is it?  11:40?  What
 5   time are we doing lunch?
 6        MR. RAKHUNOV:  That's really up to
 7   the court reporter.  I -- I don't think
 8   we're ready for lunch yet.
 9        MR. FRISCH:  No, take two minutes.
10   Go.
11        (Break taken from 11:40 a.m. to
12   11:46 a.m.)
13        MR. FRISCH:  For the record, Phil,
14   you don't get to short-circuit my
15   examination.  You're free to ask whatever
16   questions you want at the end and make any
17   objections, but you don't get to
18   short-circuit me and say it's taking too
19   long.  It's not your place, and I'm not
20   going to accept that.
21        MR. RAKHUNOV:  To --
22        MR. FRISCH:  I am going to -- go
23   ahead.
24        MR. RAKHUNOV:  No, no, no, I'm going
25   to respond to that, if you're making a
```

1        statement like that.

2               I'm not shortcutting your questions.

3        You're free to ask your questions, but at

4        some point when you start yelling at my

5        client and ranting about your theories of

6        the case on the record, I find that to be

7        unacceptable, and I'm going to object to

8        that and interrupt that.

9               So if you want to go on in a civil

10        way, you can ask whatever questions you

11        need to ask.

12               MR. FRISCH:  Okay.  Let's go on.

13   BY MR. FRISCH:

14        Q.    All right.  So when you did this

15   supposed review of the 9 million gloves you

16   claim you saw, is that 9 million in total or 9

17   million sold by Joel Stern and JNS?

18               MR. RAKHUNOV:  Objection.

19               THE WITNESS:  From JNS.

20   BY MR. FRISCH:

21        Q.    And how many gloves from Adorama did

22   you see on that review?

23        A.    With stickers on them?

24        Q.    How many gloves in total did you see

25   on that review from Adorama?

1        A.    What do you mean, "in that review"?

2        Q.    You said you went to seven

3    warehouses and spent a week.  How many gloves

4    did you personally see?

5        A.    Tens of millions.

6        Q.    Tens of millions.  Okay.

7              Did you keep any notes as to what

8    you saw?

9        A.    I took videos and photographs, and I

10   gave them to my attorney, who should have given

11   them to you.

12       Q.    Did you keep a spreadsheet of

13   every -- of every pallet of what you saw?

14       A.    I think we had some notes we wrote

15   down.  That's how we came up with the

16   quantities.

17       Q.    Who took those notes?

18       A.    Bradley and I.

19       Q.    Okay.  Were those handwritten notes

20   or computerized?

21       A.    Handwritten, I believe.

22       Q.    I have not seen those.  I'm going to

23   call for their production.

24             The -- I'll just take a -- and you

25   said you went to seven warehouses.  Do you have

1    it -- do you have it --

2        A.    I believe it was seven.  Maybe it

3    was six.

4        Q.    Do you have it written down

5    somewhere which warehouses you went to?

6        A.    No, I don't.

7        Q.    Do you know how many of them had

8    labels -- the white paper labels saying who

9    delivered them?

10       A.    Not all of them.

11       Q.    Do you know approximately how many?

12       A.    No.

13       Q.    Was it the majority or the minority

14   of them?

15       A.    I would say majority.

16       Q.    Now, when you took them down -- when

17   they were taken down for you, how did you go

18   about getting Medline to bring them down for

19   you?  Were they done in advance, or was it done

20   while you were sitting there?

21       A.    A lot of them were done in advance,

22   and some were done while we were there.

23       Q.    And was there any rhyme or reason to

24   which ones were selected to be brought down?

25       A.    No.  Just randomly picking them.

1    Q.    Did Medline choose to bring them

2    down, or did you choose which ones to bring

3    down?

4    A.    Medline pulled out whatever they

5    wanted to pull out before we arrived.

6    Q.    So you don't know who directed

7    Medline to pull those particular pallets that

8    they pulled?

9    A.    No.

10    Q.    Was it somebody at Ascension, by any

11    chance?

12    A.    I would not know who directed

13    Medline.

14    Q.    Did Ascension ever sue Rock Fintek

15    for the gloves that supposedly were not up to

16    contract?

17    A.    Not yet.

18    Q.    What are they waiting for, if you

19    know?

20    MR. RAKHUNOV:  Objection.

21    THE WITNESS:  I'm not sure.

22    BY MR. FRISCH:

23    Q.    Didn't you also promise to Anna at

24    Medline that they could make a huge profit on

25    the sale of 1 billion gloves to Ascension if

1  they helped you in this matter with protecting

2  them?

3          MR. RAKHUNOV:  Objection.  Anna at

4      Medline?

5          MR. FRISCH:  Anna at MedCare.

6          THE WITNESS:  The CEO of MedCare?

7  BY MR. FRISCH:

8      Q.    Yes.

9      A.    I told the CEO of MedCare that

10 there's an opportunity, if we correct the

11 wrong, to get awarded a billion-glove contract

12 for multi years, and she said she can make the

13 glove in any way -- any specifications they

14 like.  And I delivered that message to

15 Ascension, and Ascension was happy to hear

16 that.  However, we were not able to correct the

17 wrong.

18     Q.    Well, what have you done over the

19 past several years to supposedly mitigate the

20 damages?  You said that's what you've been

21 doing.  What have you done?  What steps have

22 you taken to mitigate the damages?

23     A.    One, I filed a lawsuit against the

24 criminals that caused these problems.  Two, I

25 put together all the documentation I could of

1  it and then went over it with my attorney.

2      Q.    Did you -- did you replace any of

3  the gloves?

4      A.    No, we did not replace the gloves.

5      Q.    Why not?

6      A.    There's no additional funds to

7  purchase more gloves.

8      Q.    When did you notify Ascension you

9  were not going to be able to replace the

10  gloves?

11      A.    When they asked for us to replace

12  the gloves.

13      Q.    When was that?

14      A.    I believe July or August of that

15  summer after they were delivered.

16      Q.    When Ascension began complaining

17  about the quality of the gloves, did you make

18  any -- did you attempt to push back that the

19  gloves --

20      A.    Yes, I did.

21      Q.    -- were not --

22            What did you tell them?

23      A.    I said, "I have all the

24  documentation and all the reports that I was

25  given from Adorama, JNS, Joel Stern, and

1  Kitchen Winners, and here it is.  These are
2  real gloves, real nitrile.  So you must be
3  mistaken."
4      Q.    And what was their response?
5      A.    "No.  You're mistaken."
6      Q.    And how did they prove that to you,
7  if they did?
8      A.    They sent videos from their nurses
9  or staff in some of their different hospitals
10 and a list of messages or emails from several
11 different people from different hospitals
12 talking about the poor quality of them and that
13 they can't be nitrile gloves.
14     Q.    When -- was JNS or Mr. Stern aware
15 of the existence of Ascension at any point in
16 time prior to this lawsuit?
17     A.    Was who?
18     Q.    Was Mr. Stern or JNS made aware of
19 the existence of Ascension as your customer
20 prior to this lawsuit?
21     A.    They were not made aware by me.
22 They found out themselves by asking their truck
23 driver to see who they delivered to and then
24 asking them who the client -- end client was,
25 is what they told me.

1         Q.      Who told you that?

2         A.      Joel Stern and Hershey Weiner --

3    Weiner.

4         Q.      So it's your testimony that they

5    told you they were aware of Ascension?

6         A.      They were aware of Ascension, and

7    they could try to sell to them directly and

8    without me, better we keep working together.

9         Q.      Did Mr. Stern have any basis to know

10   your potential for future business with

11   Ascension?

12        A.      He knew that there was an

13   opportunity for long-term contracts and selling

14   them other products.

15        Q.      How did he know that?

16        A.      I had told him.

17        Q.      You told him it was with Ascension?

18        A.      I told him it's one of the largest

19   hospital systems in the United States.

20        Q.      So he's supposed to know it's with

21   Ascension?

22            MR. RAKHUNOV:   Objection.

23            THE WITNESS:   He went ahead and

24        found out it was Ascension on his own.

25            ///

1  BY MR. FRISCH:

2      Q.    So you believe?

3      A.    So he told me.

4      Q.    And did -- was there -- when -- when

5  were you expecting to bid on the new contract?

6      A.    We would have bid on the new

7  contract probably that same year, whenever it

8  came up.  It was coming up that year or the

9  following year.  I think it was coming up that

10 year.  But more than that, it was also those

11 testing kits and the referral business.

12           They had referred us business to

13 Australia, which was sister group of Resource

14 Group, which I'm not claiming any lost revenue

15 from, but it did cost lost revenue and a lost

16 relationship in Australia.

17     Q.    I'm just trying to understand this;

18 right?

19           So you're saying that there was

20 lost -- that you had all these other

21 opportunities.  Why didn't you continue to

22 pursue them?

23     A.    Didn't have the funds anymore.  They

24 put us out of business.

25     Q.    Now, the testing kit business, was

1  that a bid also, or was that a contract that

2  had already been signed?

3          A.    That would have been a contract to

4  sign.  It was not a bid.  It would have been

5  just like ordering masks or gloves, not an RFP.

6          Q.    Okay.  So did they sign that

7  contract with you?

8          A.    No, they did not.

9          Q.    How do you know they would have?

10         A.    They had told me that we had built

11  up solid goodwill and delivered when a lot of

12  people couldn't deliver to them.

13         Q.    Okay.

14         A.    They said 2,000 people they

15  interviewed, 30 they bought products from, and

16  we were in the top three that delivered quality

17  product on time, until we purchased from JNS,

18  Joel Stern, Kitchen Winners, and Adorama.

19         Q.    Okay.  Have you filed a lawsuit in

20  Florida against the law firm that represented

21  you?

22              MR. RAKHUNOV:  Objection.

23              THE WITNESS:  Nope.

24              MR. RAKHUNOV:  I think there might

25      have been some confusion on the time.

```
 1          You're not talking about --
 2                THE WITNESS:  Gunster?
 3                MR. RAKHUNOV:  Yeah.  You're not
 4          talking about the law firm you talked about
 5          earlier today.
 6                MR. FRISCH:  No.
 7                MR. RAKHUNOV:  This is a new topic.
 8                THE WITNESS:  Oh, no.  Then I didn't
 9          file any lawsuit against Gunster.
10     BY MR. FRISCH:
11          Q.    Did you file a lawsuit against
12     anybody else?
13          A.    I filed a lawsuit against -- I
14     believe it's called Hunton Williams or
15     Hunton Andrew Kurth now.
16          Q.    Okay.  What's the basis of that
17     lawsuit?
18          A.    Wire fraud.  They had me sent
19     6.2 million to a company that really had no
20     assets, didn't exist.
21          Q.    Are you claiming in that lawsuit
22     that that firm is responsible for your loss of
23     business with Ascension?
24                MR. RAKHUNOV:  Objection.
25                THE WITNESS:  Am I claiming that I
```

1          have loss of business?  They triggered the

2          loss.  Then I had to go to the Adorama,

3          Joel Stern, JNS, and Kitchen Winners to

4          purchase gloves as -- just to try to find

5          an immediate solution.

6     BY MR. FRISCH:

7          Q.    So how do you apportion the damages

8     between now three groups of parties who

9     supposedly caused the loss of your business

10    with Ascension?

11              MR. RAKHUNOV:  Objection.

12              THE WITNESS:  I'll have to ask my

13         lawyer on the Hunton case that question.

14    BY MR. FRISCH:

15         Q.    Okay.  You want to report back to

16    us?

17              MR. RAKHUNOV:  Objection.

18              THE WITNESS:  So no.

19    BY MR. FRISCH:

20         Q.    But sitting here today, you don't

21    actually know how you would apportion the

22    various causes that you ascribe your loss --

23    the various causes that you claim caused the

24    loss of your business with Ascension?

25         A.    Well, I have 100 percent loss of

1    $6.2 million which I wired to --

2         Q.    I'm not asking about the

3    6.2 million.

4         A.    Well, that's -- that's -- you're

5    asking me how I would apportion it.

6              If I were to say something off the

7    top of my head, it's $6.2 million immediately.

8         Q.    Aside from the $6.2 million, aren't

9    you alleging in that case that they caused the

10   loss of business with Ascension?

11        A.    Yes, they did.

12        Q.    Okay.  So how much of the loss of

13   business with Ascension should be blamed on

14   them?

15        A.    As of now, 6.2 million of the money

16   I sent.  And the deterioration of the

17   relationship, I don't know.  You have to ask

18   the lawyer, maybe win the case.

19        Q.    Meaning -- now that COVID's ended,

20   why would Ascension continue to do business

21   with an intermediary like Rock Fintek?  Like,

22   what did you bring to the table that they

23   couldn't -- couldn't they just buy from Medline

24   directly?

25              MR. RAKHUNOV:  Objection.

```
1   BY MR. FRISCH:

2        Q.    Like, what are you --

3        A.    That's your opinion.

4             MR. RAKHUNOV:  Objection.  Which

5        question -- which question do you want him

6        to answer?

7             MR. FRISCH:  All of them.

8             MR. RAKHUNOV:  Objection.

9             THE WITNESS:  Resource Group was

10       happy to work with us because during a time

11       of unknown circumstances, they were able to

12       procure quality products on time from us.

13            And they said they would like to

14       keep a company like that working with them,

15       along with its current companies they

16       worked with, just in case something like

17       this happened again.

18  BY MR. FRISCH:

19       Q.    So your contract would have been

20  for --

21       A.    There's no contract.  Purchase

22  agreements.

23       Q.    Your agreements with them would have

24  been for something contingent on another sort

25  of worldwide pandemic?
```

1        A.    No.  There was the post-pandemic

2  testing kits, which they're still using now,

3  heavily.  The whole world is.

4        Q.    Do you know if Ascension ever used

5  any of the gloves that they -- any of the

6  MedCare gloves they purchased from you?

7        A.    I believe they might have used 10,

8  20 million of them.

9        Q.    And --

10        A.    Or at least distributed them.

11        Q.    And were they ever -- did they ever

12  tell you they were happy with those gloves?

13        A.    When they first got the order, they

14  said they were happy with them, and later they

15  said they stayed in the warehouse for three

16  months before they got out, and that's why they

17  told us later that they found out -- they got

18  reports from everybody about the quality.

19        Q.    But the first 10 or 20 million they

20  were happy with?

21        A.    No.  That's what they used.  You

22  said how many did they use.  I said I believe

23  they distributed 10 to 20 million of them.

24        Q.    Who -- who sold you the Yanimed

25  gloves in April 2021?

1      A.     I'm not sure.

2      Q.     Did you use those gloves to -- it

3   wasn't Mr. Stern; correct?

4      A.     I don't -- I'm not sure.  I don't

5   think so.

6      Q.     Do you know how you determined that

7   those gloves were fake?

8      A.     I'm not sure.

9      Q.     And didn't discovery of the fake

10  gloves cause you to run back to Mr. Stern for

11  more gloves?

12     A.     Discovery of fake gloves?

13     Q.     Of the fake Yanimed gloves in

14  April 2021.  You know which gloves I'm talking

15  about; correct?

16     A.     I remember the name, but I can't

17  remember the order.

18     Q.     Okay.  Can you recall any precise

19  statements Mr. Stern ever made to you about the

20  gloves?

21            MR. RAKHUNOV:  Objection.

22            THE WITNESS:  No.

23  BY MR. FRISCH:

24     Q.     Did he ever make any representations

25  to you about the quality of the gloves?

1      A.      About the quality?

2      Q.      Uh-huh.

3      A.      He said they were excellent.

4              (Stenographer requests

5      clarification.)

6  BY MR. FRISCH:

7      Q.      When did he say that?

8      A.      Multiple times.

9              And it was safe to buy gloves from

10 him.

11     Q.      When did he say that?

12     A.      Throughout the year that I was

13 purchasing.

14     Q.      Did he -- I'm sorry.  I think I'm

15 echoing for a second.

16             Did he ever represent to you that

17 the gloves were 510(k) certified?

18     A.      Yes.

19     Q.      When?

20     A.      Every time we made an order.  He

21 knows that's the only gloves that we were

22 purchasing.

23     Q.      I didn't ask if he knew that those

24 are the gloves you were purchasing.  I'm asking

25 if he ever told you they were 510(k) certified.

1       A.      Yes, he did.

2       Q.      Where did he say that?

3       A.      He said it on all the phone calls

4  that we had, or most of them.

5       Q.      Did he ever say it to you in

6  writing?

7       A.      I'd have to look at the purchase

8  order, see what he wrote down.

9       Q.      Did he ever say to you that they

10  were ASTM D6319?

11       A.      Yes, he did.

12       Q.      Where did he say that to you?

13       A.      On the phone and I'm sure on the

14  purchase orders too.

15       Q.      I already showed you one purchase

16  order.  In fact, it's still up on the screen.

17              Where does it say --

18       A.      That's not my signature on that

19  purchase order at all.

20       Q.      But he doesn't -- let me ask you

21  another question.

22       A.      That could be a document that he

23  forged and wrote some -- scribbled some

24  signature on, just like the last.  Both

25  signatures I looked at don't look like my

1  signature.

2      Q.    Okay.  Now, he doesn't issue

3  purchase orders to you; you issued purchase

4  orders to him, did you not?

5      A.    I'd have to ask Brad Gilling.

6      Q.    Okay.  So when you issued a purchase

7  order, did it include those terms that you say

8  you needed to have on every glove order?

9      A.    It should, yes.

10     Q.    So where is the document that

11 actually says that?

12             THE WITNESS:  Do you have it,

13     Phillip?

14             MR. RAKHUNOV:  No, no, no. I was

15     going to say if you want to show him a

16     document with --

17             MR. FRISCH:  Well, I don't think

18     such a document exists.  That's the

19     problem.  That's what I'm asking him for.

20     If he knows of a document, I would ask him

21     to point to it.  I have not found that

22     document.

23             Phillip, do you know of a document

24     that says something different?  I'm happy

25     to look at that too.

1   BY MR. FRISCH:

2       Q.    Okay.  Now, do you believe, sitting

3   here today, that Mr. Stern was aware of

4   whatever quality issues Ascension ultimately

5   found with the gloves?

6       A.    Is he aware of the -- of what?

7       Q.    Was he aware, when he sold you the

8   gloves, of whatever these quality issues were

9   that caused Ascension to be unhappy with the

10  gloves?

11      A.    Yes, he knew he was giving me fake

12  gloves.  They were not what they said on the

13  box.  He was well aware of it.

14      Q.    Why do you think he was well aware

15  of it?

16      A.    Because he asked me to buy them and

17  try to trick my client with them.  I refused.

18  Then he did it to me.

19      Q.    That's not actually what he said to

20  you, but is --

21      A.    It is exactly what he said to me.

22      Q.    All right.  Well, let's see what he

23  said to you.

24            (Exhibit Number JNS D, "NY Gloves"

25      Chat, Started 3/26/21, was marked for

```
 1        identification.)
 2   BY MR. FRISCH:
 3        Q.    All right.  This is the group chat
 4   you and Brad Gilling had with -- had with
 5   Mr. Stern.  You're free to scroll through this.
 6             Tell me where in here he told you to
 7   cheat your customer.
 8        A.    He said it on the phone multiple
 9   times, begging us to do it.
10        Q.    And tell me -- go through this chat
11   and tell me where he said it in this chat,
12   because this is discussed in the chat; correct?
13        A.    I'm not sure what chat you just put
14   up.  I'm going to read it now.
15        Q.    Okay.  It's 30 pages long.
16        A.    Well, then I need some time to read
17   it, if you want me to read it.
18        Q.    I don't -- I don't need you to read
19   every word of it.  I'm going to try to point --
20        A.    Highlight what you want me to read.
21        Q.    I'm going to point you to where I
22   want you to go.  Give me a second to find
23   exactly where I want you to go.
24             If you look at April 23rd -- it's
25   on -- it looks like -- I don't know what page
```

 1   it is.  It's April 23rd, '21.  There's a

 2   conversation between Joel -- it looks like you

 3   and Bradley are on it, starting at 3:08 p.m.

 4            Do you see that?

 5        A.   I'm scrolling to look for it.

 6        Q.   Thank you.

 7            MR. RAKHUNOV:  I think it's page 12

 8        of the exhibit document.

 9            MR. FRISCH:  Thank you.

10            THE WITNESS:  April 23rd when?

11   BY MR. FRISCH:

12        Q.   '21 at 3:08 p.m.

13        A.   JNS service -- "Hi."  Okay.

14            (Reviewing document.)

15            Okay.  What's the question?

16        Q.   All right.  So on that, does that

17   refresh your recollection about the discussion

18   of the boxes that were going to be remarked?

19        A.   That was some of it.  That

20   discussion -- the discussion was over the

21   phone.

22        Q.   Okay.  And there, he doesn't --

23   nobody talks there, at least in this writing,

24   about cheating anybody; is that correct?

25        A.   Nope.

1      Q.    And this is actually after he had

2  delivered gloves to you.  Isn't that also

3  correct?

4      A.    Other gloves, not the ones with the

5  stickers.

6      Q.    Well, how do you know when the ones

7  with the stickers were delivered?

8      A.    Those came out at a different time,

9  I think, when we went to Medline.

10     Q.    So when were those delivered?

11 That's what we're trying to get down to here.

12     A.    You'll have to ask Medline.  Medline

13 can give you the exact date, and you can

14 correlate it to this April 23 date.

15     Q.    Okay.

16     A.    Says right here, there's no

17 protection approved.

18     Q.    Okay.  So how do you know that he

19 sold them to you anyway?  Because you say so?

20     A.    Because they came wrapped with his

21 name on it.  I took photos and videos of it and

22 gave it to my attorney.  He said it on the

23 phone, and then he did exactly the way he

24 described they showed up.

25     Q.    Again, but isn't it illogical for

1   him to ask you about it if he was just going to

2   cheat you?

3          MR. RAKHUNOV:  Objection.

4          THE WITNESS:  You would think so.

5       But I'm not a criminal like him; so I don't

6       know.

7   BY MR. FRISCH:

8       Q.   All right.

9       A.   There's a clear record of trucks

10  that arrived and when they are -- and where

11  they are racked.  So it should correlate with

12  this message that you have here.

13          (Exhibit Number JNS E, First Amended

14      Counterclaim and Third-Party Complaint, was

15      marked for identification.)

16  BY MR. FRISCH:

17      Q.   All right.  I'm going to -- I'm

18  going to share now with you -- this is the --

19  this document is the -- I think the -- this

20  document is your amended counterclaim and

21  third-party complaint.  I'm going to direct you

22  to paragraph 53.

23      A.   What page is that on?

24      Q.   Should be page 14.

25      A.   I've got to zoom this.

1      Q.    Oh, no.  Page 13.  I'm sorry.

2      A.    Page 13.  Let's see.

3            Page 13, which paragraph?

4      Q.    Paragraph -- beginning of

5  paragraph 53.

6      A.    53.  Hold on.

7      Q.    I want you to read through

8  paragraph 55.

9      A.    Okay.  Give me a moment.

10     Q.    I'm just going to run to the men's

11 room while you read it.  I'll be right back.

12            MR. RAKHUNOV:  He said paragraph 55.

13            THE WITNESS:  (Reviewing document.)

14 BY MR. FRISCH:

15     Q.    Are you ready?

16     A.    No.  Still reading.

17            (Reviewing document.)

18            Okay.  I read it.

19     Q.    All right.  So here it says that the

20 supposedly fake gloves were delivered in -- on

21 April 16th.  You just told me that they were

22 delivered later.  Which one is it?

23     A.    I told you to check when they were

24 delivered with Medline.  It'll correlate

25 exactly where they were delivered and when.

1      Q.    But in your own complaint, it says

2  that they were sold on April 16th.  And then on

3  April 23rd, it says he kept calling you to sell

4  you more of them; is that correct?

5      A.    Maybe he shipped them and they

6  hadn't arrived yet and we haven't discovered he

7  was trying to ship us what we didn't want.

8      Q.    But if he already knew he could get

9  away with it by April 16th, why by April 23rd

10  would he be asking to give you a cheaper price

11  on it?

12          MR. RAKHUNOV:  Objection.

13          THE WITNESS:  I'm not sure if your

14      dates make sense.  Medline can identify

15      those dates, and then I can answer the

16      question.

17  BY MR. FRISCH:

18      Q.    It's not my dates.  It's your dates.

19      A.    It's not my dates.

20      Q.    These are dates you alleged in your

21  complaint.

22      A.    No.  No.  I don't know what day

23  those trucks arrived and when they were written

24  down and documented by Medline.

25          The ones that had the stickers on

1    them -- okay? -- they have it documented when

2    they came.

3              Even Adorama and Kitchen Winners

4    told me that Joel Stern is not selling me real

5    products.  Multiple times we were -- I was told

6    that.

7        Q.    When did they tell you that?

8        A.    Mendel and Hershey Weiner said that

9    to me, I believe, in April and May, and to be

10   careful the products we're purchasing from

11   Joel Stern because he's not getting all of them

12   from them.

13       Q.    Why would he -- you have to be

14   careful if he wasn't getting it from them?

15       A.    Because they are -- I think they

16   were onto what he was doing with the stickers.

17       Q.    So you think that.  They didn't tell

18   you that?

19       A.    They told me not to trust him.

20       Q.    Told you not to trust them.  Okay.

21   But you don't know why they told you not to

22   trust them.  Was it just to get you to buy

23   directly from them?

24             MR. RAKHUNOV:  Objection.

25             THE WITNESS:  I'm not sure why they

1          told me, but that's what they told me.

2     BY MR. FRISCH:

3          Q.    And isn't it true that they cut him

4     out, and you guys went direct to him to cut

5     Joel Stern out of the transaction?

6          A.    I'm buying gloves from whoever was

7     supplying them.  I was not cutting or not

8     cutting someone out.  If Medline cut him out

9     and he was buying from them -- I mean Adorama

10    and Kitchen Winners cut him out, that's

11    something between them two.

12         Q.    Okay.  Do you recall the dates of

13    those conversations?

14         A.    April or May, I believe.

15         Q.    How were those conversations held?

16         A.    Over the phone.

17         Q.    All right.  Who was on the phone?

18         A.    I was on the phone.  I believe

19    Hershey Weiner was on the phone.  Mendel was on

20    the phone.  Brad Gilling was probably on the

21    phone.  He heard it with me.

22         Q.    And why were you on the phone with

23    them?  What was the purpose of the phone call?

24         A.    I think we were just discussing a

25    current order.

1      Q.    So why was Mr. Stern being

2  discussed?

3      A.    Why was he being discussed?

4      Q.    Uh-huh.

5      A.    They wanted to warn me that he was a

6  criminal.

7      Q.    Did they use the words "a criminal"?

8      A.    Not to be trusted; we were going to

9  be getting product that's not reliable, and

10  fake.

11      Q.    So now you -- so are the only fake

12  gloves you got from Joel Stern, or did you also

13  get fake gloves from Hershey Weiner and Mendel

14  Banon?

15      A.    All the gloves we got are not

16  nitrile, not certified correct gloves.  None of

17  them.

18      Q.    So not a single glove was good is

19  your testimony?

20      A.    No, it was not.  Not to the

21  specifications of an expert.

22      Q.    Weren't, according to your own

23  count -- you said you had Medline conduct a

24  count; correct?  Weren't 50 percent of the

25  gloves at least nitrile examination gloves?

1          MR. RAKHUNOV:  Objection.

2          THE WITNESS:  No.  They said

3      "Examination" on the box is all.

4  BY MR. FRISCH:

5      Q.    Meaning, is there any requirement

6  that to be an examination glove it has to be

7  nitrile?

8      A.    It has to be nitrile.  There was a

9  specific specification that it has to follow.

10     Q.    Well, there's a specification for

11 nitrile examination gloves, but does that mean

12 that's the only type of examination glove?

13     A.    I'm not a glove expert; so I don't

14 know.

15     Q.    Didn't you write to Ascension about

16 how good the gloves -- how they liked the

17 gloves?

18     A.    Yes, I did.

19     Q.    Okay.

20          (Exhibit Number JNS F, Email from

21      Thomas Kato to Dewayne Rader, dated

22      9/10/21, Bates-stamped RF_001034 - 1035,

23      was marked for identification.)

24 BY MR. FRISCH:

25     Q.    Is this the email I'm calling up?

1  I've labeled this -- hold on.  Let me see what

2  we're up to.

3          MR. RAKHUNOV:  Did you mark the

4      complaint as an exhibit?

5          MR. FRISCH:  I did.  I think that

6      was E.  So now I'm up to F.

7  BY MR. FRISCH:

8      Q.    Okay.  So when Vince -- you wrote in

9  this email that Vince told you not to switch

10 the gloves:

11          "He said MedCare gloves are in all

12 the hospitals and they are very happy with

13 them, and it's more work to input a new

14 product?"

15          Do you recall saying that?

16     A.    I do.

17     Q.    When did that conversation with

18 Vince occur?

19     A.    If I were to guess I'd say March or

20 April.

21     Q.    Okay.  And who is Vince?

22     A.    Vince is part of the procurement

23 team.

24     Q.    So you -- when did you -- who else

25 did you buy MedCare gloves from in January?

1        A.    A few other -- they call them "spot

2   buys."

3        Q.    So you did buy from other parties?

4        A.    Not MedCare.

5        Q.    Okay.  But you had MedCare gloves by

6   January?

7        A.    We had MedCare gloves -- I'm not

8   exactly sure when the first MedCare gloves came

9   in, but we only bought MedCare from Joel Stern,

10  JNS, Adorama, and Kitchen Winners.

11       Q.    Okay.  So they were happy enough

12  with the gloves to tell you it wasn't worth the

13  effort of inputting new products into their

14  database; correct?

15       A.    Correct.

16       Q.    How many of the gloves that they got

17  were used when they were happy with them?

18       A.    I'm not sure.  I would guess around

19  20 million.  Maybe 20.

20            MR. RAKHUNOV:  No need to guess.

21            THE WITNESS:  I don't know that.  I

22       have no idea what Ascension does with their

23       hospitals and their gloves.

24  BY MR. FRISCH:

25       Q.    Okay.  But they were happy enough

1   that you were willing to sign the contract with

2   Adorama in April.  That's what you wrote to

3   Mr. Rader in September 2021; correct?

4         A.    Correct.

5         Q.    So I'm trying to understand here;

6   right?  You say all the gloves were bad, but at

7   some point Ascension was happy with the gloves.

8         A.    Yeah, they were happy with them in

9   the beginning.

10        Q.    Okay.  So we know that they were

11  happy with some of the gloves.

12        A.    No, they were not happy with any of

13  the gloves.  They were happy with the gloves in

14  the beginning.

15        Q.    Okay.  So how many gloves did they

16  use when they were happy with them?

17        A.    I don't believe they -- they said

18  they didn't use them.  They just had them

19  delivered to their hospitals and weren't being

20  used yet.  That's why there was a three-month

21  delay.

22        Q.    But that's not what you said here.

23  Here, it says they were all in the hospital and

24  that they were satisfied and approved.

25        A.    That's what I believed, and they

1    told me to the contrary.  They were not all in

2    the hospital.  They were all in --

3         Q.    "Vince told us not to.  He said

4    MedCare gloves are all in" -- "are in all the

5    hospitals, and they are very happy with them."

6         A.    That's what I was told, yes.

7         Q.    Okay.  That's what Vince told you?

8         A.    That's what Vince had told me.

9         Q.    Okay.  And you have no reason to

10   assume Vince wasn't telling the truth; correct?

11        A.    Correct.

12        Q.    So as far as you knew, at least some

13   of the MedCare gloves were satisfactory; is

14   that correct?

15        A.    No, they were not.  They were not.

16   They were tested later, and found out none of

17   them met the specifications, not a one.

18        Q.    But they didn't test every carton;

19   correct?

20        A.    Did a random test of them.

21        Q.    Well, if they used -- let's say the

22   first shipment from JNS, if those were used in

23   the hospital, they would not be available to

24   test at that point after their use; correct?

25        A.    There is lot numbers that they

1  documented them with, and with those lot

2  numbers, they did some random testing.  And we

3  did testing later.  None of the gloves meet

4  specifications.  Most of the gloves don't have

5  any nitrile in them.  And if they do, they have

6  very light traces of nitrile.

7      Q.    Were you aware that MedCare says

8  that there's a specific method to test their

9  gloves for its nitrogen composition?

10     A.    Yes.

11     Q.    And do you not believe that to be?

12     A.    I passed that information on.  And

13 as I went over it, I thought it could be true.

14 Found out it's not.  It's not a -- didn't meet

15 the specifications of a D6319.

16     Q.    All right.  So you're saying none of

17 the gloves were ever consumed in the hospital.

18           Is that your testimony?

19     A.    No, that's not what I said.

20     Q.    Okay.

21     A.    I said I presume -- was told they

22 delivered 10 to 20 million of them to the

23 hospital.

24     Q.    Okay.

25           (Exhibit Number JNS G, Email Chain,

```
 1        Bates-stamped RF_001345 - 1347, was marked
 2        for identification.)
 3   BY MR. FRISCH:
 4        Q.    I'm going to show you now -- I think
 5   we're up to Exhibit G.
 6        A.    Want to highlight what you want me
 7   to read?
 8        Q.    Here it says -- right at the top,
 9   Dewayne Rader writes, "We have deployed only 13
10   of 187 million," as of August --
11        A.    As I said, I don't see what you're
12   reading.
13        Q.    Right at the top.
14            MR. RAKHUNOV:  Can you control it,
15        the document, Thomas?
16            MR. FRISCH:  I cannot.
17            THE WITNESS:  Right here, where it
18        says, "Yep I get it, Brad"?
19   BY MR. FRISCH:
20        Q.    Yeah, that top email.
21        A.    What?
22            MR. RAKHUNOV:  Just read that whole
23        email, that email up top.
24   BY MR. FRISCH:
25        Q.    Read that top email.
```

1      A.      That email at the very top?  Okay.

2      Q.      Uh-huh.

3      A.      (Reviewing document.)

4              Okay.  So they said -- 10 to 20

5   million.  They said they deployed 13 million of

6   the 187 million.

7      Q.      All right.  Now, in the email from

8   Brad Gilling that is below there, do you know

9   who he was -- who's DMC?  Do you know?

10     A.      DMC would be the Detroit Medical

11  Center.

12     Q.      And you sold -- you sold them

13  gloves, or is that part of Ascension?

14     A.      I don't believe we sold them gloves.

15  "Concealed [sic] with Patterson, DMC" -- maybe

16  we sold them gloves.  I would have to ask.

17     Q.      The individual Brad Gilling -- do

18  you know the identity of the individual Brad

19  Gilling is referring to here?

20     A.      No.

21     Q.      But you see that Brad said, "We

22  reviewed multiple boxes with this individual

23  and lots of gloves, and he said that they were

24  as good as any other glove he uses"?

25     A.      Yep.  That's what Brad and I thought

1   too when we tried them and put them on.

2   Unfortunately, we're not glove experts.

3        Q.    No.  Neither are nurses in a

4   hospital, actually.

5        A.    I guess they have a better feel.

6        Q.    All right.  Let's go on.  Okay.

7             So did you speak to the testing lab

8   about MedCare's suggestions about how to test

9   the gloves?

10       A.    Did -- say that again.

11       Q.    We discussed MedCare told you that

12  to test their gloves, you needed a different

13  procedure; correct?

14       A.    Correct.

15       Q.    Did you discuss that with the

16  testing lab?

17       A.    Yes, we did.

18       Q.    And what did they tell you?

19       A.    It was nonsense.

20       Q.    It was nonsense.

21            Did you buy gloves from an

22  individual named Avi?

23       A.    Have I bought gloves from another

24  individual named Avi?  Yes.

25       Q.    Not from me.  I know that.

1              The -- and what type of gloves did

2    you buy from him?

3         A.    I believe they were called Medgluvs.

4         Q.    And what about an individual named

5    Ito?  Did you buy gloves from him?

6         A.    Yes.

7         Q.    And what gloves did you buy from

8    him?

9         A.    I believe Ingco.

10        Q.    Did either one of them sell you

11   MedCare gloves?

12        A.    No.

13        Q.    Go back to Exhibit A to look more at

14   the overall letter.  Did your purchase order

15   and documentation with Ascension specify 510(k)

16   M -- D639 -- D6319 ratings?

17        A.    Yes.

18        Q.    Why didn't you ensure that those

19   were in all your contracts when you purchased

20   the gloves?

21              MR. RAKHUNOV:  Objection.

22              THE WITNESS:  That's what we said we

23        needed.

24   BY MR. FRISCH:

25        Q.    But was it in any written contract

1  you've had?

2       A.    I'm sure it was.

3       Q.    Did you -- when Ascension sent you

4  various correspondence about the gloves, did

5  you object that they had waited too long to --

6       A.    Yes.

7       Q.    And what was their response to that?

8            MR. RAKHUNOV:  Objection.

9            THE WITNESS:  They had told me that

10       they don't distribute them for a few

11       months; so they started getting the calls

12       after they started doing the distribution.

13            (Stenographer requests

14       clarification.)

15            THE WITNESS:  They're getting them

16       every few months.

17  BY MR. FRISCH:

18       Q.    Now, he says that Ascension paid you

19  $37 million to provide 200 million gloves.  Did

20  they, in fact, pay you $37 million for the

21  gloves?

22            MR. RAKHUNOV:  Objection.

23            THE WITNESS:  I believe they paid

24       34, 35.

25            ///

```
 1    BY MR. FRISCH:

 2         Q.    So why does Mr. Reed think that they

 3    paid 37 million?

 4         A.    I'm not sure.

 5         Q.    How would I figure out what you paid

 6    to Ascension?

 7         A.    How would you what?

 8         Q.    How would I figure out exactly what

 9    you paid to Ascension?

10         A.    That I paid to Ascension?

11         Q.    What Ascension paid to you.  My

12    apologies.

13         A.    It's in the bank statements.

14         Q.    Okay.  Do we have complete copies of

15    all your bank statements?

16         A.    Yes, you do.

17         Q.    I don't believe that's true.  I

18    believe they were promised.

19              MR. RAKHUNOV:  I can tell you I've

20         gone back after our discussion, and I

21         believe you have complete bank statements

22         that involve any transactions at issue.

23              If there's something specific,

24         Counsel, that you think is missing, please

25         bring it to my attention.  I will look
```

```
 1        right away.  But as I've told you before,

 2        we're not just giving you all of

 3        Rock Fintek's bank statements but the ones

 4        that involved action relevant to this case.

 5   BY MR. FRISCH:

 6        Q.    Well, you said you made, like,

 7   another $40 million from Ascension; correct?

 8             MR. RAKHUNOV:  I'm not sure what

 9        that means.

10             MR. FRISCH:  Mr. Kato, I'm asking.

11             THE WITNESS:  Revenue.

12   BY MR. FRISCH:

13        Q.    You made another -- so when I look

14   at the bank statements, there's going to be way

15   more revenue than relates specifically to this

16   transaction.  How would I distinguish which

17   ones have to do with this transaction?

18             MR. RAKHUNOV:  I'm not sure --

19        objection.

20             THE WITNESS:  Yeah, I'm not sure how

21        you're going to do that.

22             MR. FRISCH:  Okay.

23             MR. RAKHUNOV:  I'm not sure I

24        understand the question because if -- if

25        it's a document-related question, we can
```

```
 1        talk about it off --
 2             MR. FRISCH:  No, no, no.  It's a
 3        question of -- he said I'm going to see it
 4        on the bank statement.  So I'm asking him,
 5        how do I distinguish between the
 6        transactions relevant to this case and the
 7        ones that have nothing to do with this
 8        case?  That's all.
 9             THE WITNESS:  Maybe to do with the
10        date.
11   BY MR. FRISCH:
12        Q.    Okay.  You're saying once this
13   contract started, there were no other payments
14   from Ascension?
15        A.    Correct.
16        Q.    Okay.  Did you maintain a general
17   ledger on behalf of Rock Fintek?
18        A.    Yes.  Anything that we maintained,
19   I've already given to my lawyer.
20        Q.    Okay.  So did you have, like, a
21   QuickBooks or anything like that?
22        A.    I think a spreadsheet.
23        Q.    So there's a spreadsheet showing
24   your profit and loss and account balances?
25        A.    Yes, it should have that.
```

1      Q.    Would that spreadsheet show

2  specifically what you sold to Rock Fintek and

3  what your profit was -- I'm sorry -- to

4  Ascension and your profit on that?

5      A.    It should, yes, or loss.

6      Q.    I don't think I've seen that

7  spreadsheet.  Do you know, is that -- was that

8  produced to us in Excel format?

9      A.    I'm not positive.

10          MR. FRISCH:  Phil, I'm going to ask

11      for that in its original format, if that

12      exists.

13          MR. RAKHUNOV:  I'll go back and --

14          MR. FRISCH:  Because I'm guessing

15      that, I need to be able to, you know,

16      manipulate.

17          MR. RAKHUNOV:  I'll have a

18      conversation with my client after we're

19      done.  I'm not sure --

20          MR. FRISCH:  Okay.

21          MR. RAKHUNOV:  -- exactly what he's

22      referring to, frankly.  So . . .

23          MR. FRISCH:  Me neither.  But if it

24      does exist, I would want it in Excel

25      format.

1              THE WITNESS:  I had everything that

2         I had sent over to Phillip.  So --

3    BY MR. FRISCH:

4         Q.    Okay.

5         A.    -- how they did it, I'm not sure.

6         Q.    That's fine.  Okay.

7              But Resource Group never -- never

8    made any -- never sued you, you said; right?

9         A.    Not yet, I said.

10        Q.    Right.

11             Do you have any agreements with them

12   going forward?  Like, are they going to get any

13   recovery that you get in this lawsuit?

14        A.    No.  Nope.

15        Q.    Did you ever give them any refunds

16   of the $37 million?

17        A.    No.

18             MR. RAKHUNOV:  Objection.

19   BY MR. FRISCH:

20        Q.    Did you ever formally respond to

21   this letter?

22        A.    I believe my attorney did.

23        Q.    Was that Attorney Phil or somebody

24   else?

25             THE WITNESS:  Phil, did you respond

1          to this letter?

2              MR. RAKHUNOV:  I believe there was a

3          response.  And, Counsel, I think it's been

4          produced.

5              MR. FRISCH:  It's possible.  You

6          know, there's a lot of stuff been produced

7          that's --

8              MR. RAKHUNOV:  I'm almost -- I mean,

9          look, things can fall through the cracks,

10         but I'm fairly certain that you have my

11         response to Ascension.

12    BY MR. FRISCH:

13         Q.    Meaning -- your testimony is that

14    other than these gloves, Ascension/Resource

15    Group was happy with your -- with your

16    services; is that correct?

17         A.    Yeah, they were extremely happy.

18             MR. FRISCH:  What number are we up

19         to?  I think we're up to G.

20             MR. RAKHUNOV:  H.

21             MR. FRISCH:  H or G?  What are we up

22         to?

23             MR. RAKHUNOV:  H.  G was another

24         email.

25             MR. FRISCH:  That's the only problem

```
 1          handling it myself.  I have to remember.
 2                  MR. RAKHUNOV:  There's a tab right
 3          next to that exhibit that actually shows.
 4                  MR. FRISCH:  I know, but it's --
 5          okay.  Yeah.
 6                  MR. RAKHUNOV:  I like that feature.
 7                  MR. FRISCH:  That's why I'm using
 8          this, because that way, when I dump
 9          something in my list in the middle like I
10          did, I can --
11                  MR. RAKHUNOV:  It would be nice if
12          we could pop it out into a new window.
13                  MR. FRISCH:  Yeah.  I'll let them
14          know.  Because I don't -- let me share
15          this.  Oh, no, no.  I just changed the -- I
16          messed that up.  Hold on.  I changed the
17          wrong one.  Give me a second.  This is
18          Exhibit G.  Now I'm going to close this one
19          and go to the other Exhibit G, and let me
20          stamp this one.  H.  Okay.
21                  (Exhibit Number JNS H, Email Chain,
22          Bates-stamped RF_001042 - 1044, was marked
23          for identification.)
24  BY MR. FRISCH:
25          Q.    Meaning, here's a -- an email from
```

```
 1   before you ever were involved with my clients.
 2            Do you recall the email that's on
 3   your screen?
 4        A.    I don't see anything.
 5            MR. RAKHUNOV:  There's nothing on
 6       the screen.
 7            MR. FRISCH:  Oh, I didn't share it
 8       yet.  I apologize.
 9   BY MR. FRISCH:
10        Q.    Now do you see it?
11        A.    You have to highlight what you want
12   me to look at.  It's very small.
13        Q.    I don't know if you can -- can you
14   see my highlighting?
15        A.    No.
16        Q.    Now you should be able to see it.
17   Can you see it now?
18        A.    Yeah.  The whole document, you
19   highlighted.
20            MR. RAKHUNOV:  Yeah, take your --
21       review this email, and I note for the
22       record it's a three-page document.  So --
23            MR. FRISCH:  We'll start with the
24       top one.
25            THE WITNESS:  (Reviewing document.)
```

1   BY MR. FRISCH:

2       Q.    Let me know when you're ready.

3       A.    I'm still reading it.

4             (Reviewing document.)

5             Okay.  I read the email.

6       Q.    All right.  Do you recall the

7   subject matter of this -- of this email?

8       A.    Yes, trying to sell the gowns.

9       Q.    Okay.  And they were upset that you

10  delivered the gowns without authorization; is

11  that correct?

12      A.    No, I don't think so.

13      Q.    So what were you apologizing for?

14      A.    What I was I apologizing for?  I

15  don't see anything to do with apologizing

16  for --

17      Q.    "Sorry if there was any

18  misunderstanding."

19      A.    Misunderstanding --

20      Q.    "Sorry for long email, but" --

21      A.    Highlight specifically where I'm

22  apologizing, and I'll read it again and answer

23  the question.

24      Q.    Sure.  What were you apologizing for

25  there?

1      A.     "Sorry if there was" -- okay.

2             (Reviewing document.)

3             I don't know what's the

4   misunderstanding about.

5      Q.     It was your email.  I was just

6   asking you if you know what it meant.

7             What did you mean by -- in this

8   paragraph?  I'm highlighting a paragraph for

9   your review here.

10            What did you mean by this?

11     A.     "The reason I bring this up is

12  because I believed Resource Group . . ."

13            What's the question?

14     Q.     What did you mean by that paragraph?

15  What were you expecting Resource Group to do

16  for you?

17     A.     To purchase those gowns.

18     Q.     Why would they purchase gowns they

19  didn't need?

20     A.     They wanted gowns.  They asked for

21  gowns.  I got the gowns.

22     Q.     So why were they upset about the

23  delivery of the gowns?

24     A.     Someone asked for them, and I think

25  Brad might have just shipped them to them

1  without them confirming that they wanted to

2  take them.

3        Q.    And then the next email that you --

4        A.    Do you want me to read something

5  else?

6        Q.    Sorry?

7        A.    Do you want me to read something

8  else?

9        Q.    I highlighted . . .

10        A.    (Reviewing document.)

11        Q.    How many times did you tell

12  Ascension you couldn't deliver?

13        A.    That I could not deliver?

14        Q.    Uh-huh.

15        A.    I never said that.

16        Q.    So why here did you say that you --

17  you say, "sorry I cannot deliver"?

18        A.    "I come through for all my clients a

19  lot of times when others cannot.  I

20  understand . . ."

21              (Reviewing document.)

22              I didn't say I can't deliver.  I

23  said I don't come back to you with excuses and

24  say I can't deliver.

25        Q.    That's how you read that?  Okay.

1          Now, finally --

2     A.    That's how I wrote it.

3     Q.    Sorry?

4     A.    That's how I wrote it, not how I

5  read it.

6     Q.    Well, we'll agree to disagree.

7          I was looking for one more, one here

8  that I want to ask you about.

9          Okay.  I highlighted another line

10  here:  "How many isolation gowns is MHub

11  attempting to ship to The Resource Group?"

12          Why did he believe MHub was shipping

13  to The Resource Group?

14     A.    Again, because sometimes they see my

15  emails, the long reply email, when I'm using

16  Rock Fintek.

17     Q.    Meaning, did you ever inform

18  Mr. Stern or anybody affiliated with JNS that

19  you were not able to inspect the gloves?

20     A.    They were aware of that.

21     Q.    I'm sorry?

22     A.    They were aware of that.

23     Q.    How were they aware of that?

24     A.    They knew we couldn't inspect them.

25  I told them.  They were also aware of it

```
 1   themselves.
 2        Q.    Why were they aware of it
 3   themselves?
 4        A.    The gloves that were delivered to
 5   Medline, the truck drivers couldn't get out of
 6   the trucks to examine them.  There was other
 7   trucks that would deliver to a warehouse in
 8   New York or New Jersey, and we purchased from a
 9   broker, Mrs. Lee from Joel Stern or JNS.  Those
10   gloves, Mrs. Lee was able to inspect.
11        Q.    Correct.  And was she satisfied with
12   them?
13        A.    What was that?
14        Q.    Was she satisfied with her
15   inspection of those gloves?
16        A.    Yes, she was.
17        Q.    Did she have any expertise to rely
18   on her inspection?
19        A.    No.
20        Q.    We have a video of her inspecting
21   them; correct?
22        A.    Yes.
23        Q.    And in that video, she stretches
24   them and they don't break?
25        A.    I believe so.
```

1        Q.    And it was on the basis of that

2    video that you bought the gloves, isn't it?

3        A.    Yes.

4        Q.    Mrs. Lee did not work for

5    Joel Stern; correct?

6              MR. RAKHUNOV:  Objection.

7              THE WITNESS:  I don't know who she

8        worked for.

9    BY MR. FRISCH:

10       Q.    Didn't you pay her for finding the

11   connection to Joel Stern?

12       A.    I paid her a commission.  I don't

13   know if he paid her a commission also.

14       Q.    Didn't Medline, in fact, inspect

15   some of the boxes?

16             MR. RAKHUNOV:  Objection.

17             THE WITNESS:  I don't know what

18       Medline did or did not do.

19   BY MR. FRISCH:

20       Q.    Weren't some boxes reported as

21   damaged?

22       A.    Yes.

23       Q.    Weren't there some boxes -- didn't

24   somebody open the boxes and determine the

25   counts of which types of gloves were shipped?

```
 1        A.     No.
 2        Q.     Didn't Mr. Gilling complain on
 3   several occasions to Mr. Stern about the number
 4   of -- the sizes of the gloves that were
 5   delivered and the counts of each size?
 6        A.     The sizes were incorrect, as we were
 7   told.  The sizes were incorrect in the boxes.
 8        Q.     How would you know, if you didn't
 9   inspect the boxes?
10        A.     The hospital told us.
11               (Stenographer requests
12          clarification.)
13   BY MR. FRISCH:
14        Q.     And how would the hospital know, if
15   they didn't inspect them?
16        A.     They were delivered to the hospital.
17   The hospital complained about them.
18        Q.     So the hospital did inspect them
19   shortly after they were delivered.  Is that not
20   correct?
21               MR. RAKHUNOV:  Objection.
22               THE WITNESS:  They were delivered to
23          Medline, then delivered to the hospital.
24   BY MR. FRISCH:
25        Q.     But the complaints about the sizing
```

1   happened within days of the delivery, did it

2   not?

3        A.     Somebody in the hospital looked at

4   them and said the sizing's wrong.

5        Q.     Okay.  So why couldn't they also

6   check to make sure the boxes didn't say

7   "Protection" on them?

8        A.     As you mentioned, they're not

9   experts.

10       Q.     Well, if the box says "Protection"

11  or "Examination," that seems to be something

12  that doesn't require experts.

13       A.     Yes, I do.  If I ask a random person

14  if it's a protection or examination box,

15  they're not going to know what that has to do

16  with anything.

17       Q.     I don't know what it is either, but

18  I know how to read.  I know how to read.  So

19  they just needed somebody who knows how to

20  read? is my question for you.

21            MR. RAKHUNOV:  Objection.

22            THE WITNESS:  They have somebody in

23       the hospital that knows how to read.

24  BY MR. FRISCH:

25       Q.     I would hope so.  So why couldn't

1  they go look at the boxes and see what was in

2  them?

3            MR. RAKHUNOV:  Objection.

4            THE WITNESS:  You can call the

5       hospital and ask the nurses why didn't they

6       go look at them.

7  BY MR. FRISCH:

8       Q.   I am asking you if you know why

9  Resource Group --

10      A.   I'm not psychic.  I am not psychic.

11  I don't know why.  I don't read minds.

12      Q.   All right.

13      A.   You can ask me did I know for

14  myself.  I'm happy to answer.

15      Q.   How many gloves did you test?

16            MR. RAKHUNOV:  Objection.

17            THE WITNESS:  I'm not positive how

18      many we tested.  I gave Phillip all the

19      documentation.

20  BY MR. FRISCH:

21      Q.   Okay.  And the ones you tested, were

22  they all gloves obtained from Mr. Stern and

23  Adorama, or were some of them obtained directly

24  from MedCare?

25      A.   They were obtained from Joel Stern,

1    JNS, Kitchen Winners, and Adorama only.

2        Q.    Didn't you obtain some directly from

3    MedCare for potential replacements and have

4    those tested?

5        A.    MedCare might have sent us a sample

6    box or case.

7            MR. RAKHUNOV:  Hold on.  Listen to

8        the question.

9            Sorry.  Are you asking about the

10       gloves that were actually sold, or are you

11       talking about potential replacements after?

12           MR. FRISCH:  I'm trying to get the

13       context of the testing and how many tests

14       were actually done.

15           THE WITNESS:  Testing, I'm talking

16       about MedCare sending in August after

17       everything, trying to replace the damaged

18       ones with a new product they could make to

19       get the billion-dollar-a-year order.

20   BY MR. FRISCH:

21       Q.    So meaning -- some of the complaints

22   the hospital made is more that they just didn't

23   like the gloves they purchased; isn't that

24   correct?

25       A.    I don't believe so.

1        Q.    Meaning, they ordered MedCare

2   nitrile gloves, but -- the boxes were bought

3   from MedCare, who delivered them directly to a

4   warehouse, and then they were picked up by

5   your -- by you -- by your shipping.

6        A.    With no -- with no -- not nitrile in

7   them.  No nitrile and not meeting the

8   specifications.

9        Q.    Okay.  But you keep claiming that

10  there's fraud on the part of Mr. Stern and

11  fraud on the part of Adorama; but, really,

12  these gloves came straight from MedCare, and

13  they are MedCare gloves.

14            Is that not correct?

15       A.    I bought gloves from Adorama,

16  Joel Stern, JNS, and Kitchen Winners only.

17       Q.    I understand who you purchased them

18  from, but I'm asking you -- you're alleging

19  fraud.  You keep saying you were -- they were

20  fake and that the gloves were fraudulent.

21       A.    Yes.  They committed fraud.

22       Q.    But it's only fraud if they misled

23  you intentionally; right?  And you keep saying

24  that --

25       A.    They did.

1      Q.    -- these gloves -- you don't

2  actually think that they bought gloves that

3  weren't from MedCare; you just don't like the

4  gloves that you got from MedCare.  Correct?

5            MR. RAKHUNOV:  Objection.

6       Objection.  That's -- there are, like,

7       legal elements in that question.  There

8       are -- there's a lot in there.  So --

9            MR. FRISCH:  I'll rephrase it.

10           MR. RAKHUNOV:  I think that would be

11      helpful.  Thank you.

12           MR. FRISCH:  I will rephrase it.

13  BY MR. FRISCH:

14      Q.    Which shipments of gloves do you

15  believe were fake gloves; i.e., not from

16  MedCare as a manufacturer, if any?

17      A.    All the gloves were fake.

18      Q.    That's not what I asked you.  I'll

19  define "fake" for you.  Fake is not

20  manufactured by MedCare.  Which gloves were not

21  manufactured by MedCare?

22           MR. RAKHUNOV:  Objection.  I'm going

23      to object to the definition of "fake," but

24      if you want to ask him whether he contends

25      that any of the gloves weren't labeled as

```
 1        MedCare gloves, that --
 2             MR. FRISCH:  That's not what I'm
 3        asking him.  I'm asking him under my
 4        definition of "fake."  He doesn't have to
 5        adopt my definition; he just has to answer
 6        it for the purposes of this question.
 7   BY MR. FRISCH:
 8        Q.    Which gloves do you believe were
 9   delivered to you as saying MedCare but were not
10   manufactured by MedCare?
11        A.    I purchased gloves from Adorama,
12   Kitchen Winners, Joel Stern, and JNS.  That's
13   what I did.  That's the people I purchased
14   from.  That's who I sent funds to.
15             Where they got them, I don't know
16   where they got them.  They manufactured them in
17   New Jersey.  Maybe they did that.  Now that I
18   know that they're all a bunch of fraudulent
19   gloves with no nitrile in them, I have no idea.
20        Q.    Okay.  So you did not answer the
21   question.  I'm asking you, because you --
22        A.    The only thing I believe that --
23        Q.    -- contend the gloves were not
24   manufactured by MedCare.  On what basis are you
25   making that claim?
```

1      A.    That there were or were not --

2      Q.    That they were not manufactured by

3   MedCare.

4          MR. RAKHUNOV:  I'm not sure we're

5      making that claim.  So just -- okay.

6          MR. FRISCH:  You have made that

7      claim.  That's what I'm trying to -- let me

8      find where you say it.  Give me a second.

9      I'm going to pull it up in your complaint.

10          MR. RAKHUNOV:  That actually would

11      be helpful.

12          MR. FRISCH:  Give me a second to

13      find it.  I just need to search because I

14      actually . . .

15          Right in paragraph 2, "certain

16      gloves were non-MedCare brand gloves but

17      fake knockoffs."

18          THE WITNESS:  So I believe when we

19      spoke to the CEO, Anna, at MedCare, we gave

20      her some of the lot numbers of the boxes at

21      Medline.  She said she never created those

22      lot numbers ever.  And those were the

23      Joel Stern/JNS boxes, I believe.

24   BY MR. FRISCH:

25      Q.    Okay.  Did she -- do you have a

1    listing of --

2        A.    Which was in alignment with Henry

3    [sic] Weiner telling me not to trust

4    Joel Stern.

5        Q.    Do you have a listing of the

6    supposed lot numbers that you asked her about?

7             THE WITNESS:  Phillip, do you have

8        that?

9             MR. RAKHUNOV:  It would be reflected

10        in the communications that have been

11        produced in this case.

12             MR. FRISCH:  Well, it's not

13        reflected in any communications I've seen.

14             THE WITNESS:  Should be in the

15        messages.

16    BY MR. FRISCH:

17        Q.    And do you -- that was in the text

18    messages, in the WhatsApps?

19        A.    Should be in the WhatsApp message

20    somewhere.

21        Q.    Okay.  And do you have -- do you

22    have that response from her?  Was that in

23    writing, or was that in a phone call?

24        A.    That response, then they have LevMed

25    gloves that she also responded that her MedCare

1  numbers and FDA numbers was used on a LevMed

2  box, Photoshopped.  She said that directly.

3        Q.    So your allegation in paragraph 84

4  and -- asking about -- I mean, I'm not even

5  going to try.  I'm going to highlight it for

6  you.  I'm not even going to try to pronounce

7  that.  Last time I got in a lot of trouble

8  trying to pronounce Chinese.

9        A.    What page?

10       Q.    It's paragraph 84.  It's on

11 page 20 -- 20.

12       A.    20.  Okay.  At the very bottom.

13             (Reviewing document.)

14             Okay.  What's the question?

15       Q.    Which shipments had those boxes on

16 it?

17       A.    Some of the shipments.

18       Q.    How will I find them?

19       A.    I don't know.  You can call Medline

20 and ask them.  They're there.

21       Q.    They're not easygoing about giving

22 us answers.  So that's why I'm asking you.

23 It's your claim.

24       A.    I had the --

25       Q.    How did you -- how did you find

1  these boxes that supposedly have this

2  manufacturer on them?

3       A.    I believe we took photos and videos

4  of them and gave them to Phillip of boxes we

5  found.  I believe these specifically had a

6  gentleman's name, David Horowitz, on the paper

7  that was labeled on there.

8       Q.    And who's David -- and who's David

9  Horowitz?

10      A.    From an email that I saw from the

11 discovery, it looks like it's someone that

12 Joel Stern was working with, asking to

13 repackage the boxes.

14      Q.    Which email was that?

15      A.    You'd have to ask Phillip that.  He

16 must have submitted it.

17           MR. RAKHUNOV:  You'll see it next

18      Friday.  I promise you.  I have plenty of

19      questions to Mr. Stern about that one.

20           MR. FRISCH:  Well, we'll worry about

21      that next Friday.

22 BY MR. FRISCH:

23      Q.    So how many -- I think I asked you.

24 How many gloves -- you don't recall how many

25 gloves you had tested?

1        A.    No.

2        Q.    Do you know what testing -- do you

3   know what testing you did?

4        A.    We sent them to Akron, the same

5   place that MedCare sent them -- I mean Resource

6   Sent them.

7        Q.    Okay.  And so --

8        A.    For nitrile.

9        Q.    Okay.  But some of them were tested

10  for nitrile; some of them were tested for other

11  things.  Correct?

12       A.    Everything was tested to be D6319,

13  and they failed all the testing.

14            (Stenographer requests

15       clarification.)

16            THE WITNESS:  There was zero to just

17       traces of nitrile in any of them that we

18       tested and that the hospital told us they

19       tested.

20  BY MR. FRISCH:

21       Q.    Paragraph 27 of the exhibit that's

22  up -- that's on page 7 --

23       A.    Do you have a question for me?

24       Q.    Yeah.  When did Stern tell you

25  what's alleged in paragraph 27?

1        A.    What page is that on?

2        Q.    Page 7 to 8.

3        A.    The pages don't move up as you click

4   on them.  I have to click them myself.

5        Q.    No, I understand.

6        A.    7 to 8, you want to highlight where

7   you're talking about or which paragraph?

8        Q.    I'll highlight it.

9              MR. RAKHUNOV:  Numbered

10        paragraph 27.

11   BY MR. FRISCH:

12        Q.    It's paragraph -- but the paragraphs

13   are numbered.  It's paragraph 27.

14        A.    27.  Okay.

15        Q.    I will highlight it for you.

16        A.    27, 28 -- okay.  Perfect.

17              Wait.  What's the question?

18        Q.    When did Mr. Stern tell you this?

19   Not somebody else.  When did Mr. Stern tell you

20   this?

21        A.    I'm not sure of the exact date.

22        Q.    And by what method did he tell you

23   this?

24        A.    Most of our conversations were on

25   the phone.  A lot of them messages, text, but

1  mostly phone.

2      Q.    Okay.  But these precise words, that

3  they "had a connection to a new nitrile glove

4  manufacturer in China that manufactured

5  'MedCare' brand medical grade nitrile

6  Examination gloves," when did he specifically

7  tell you this, if he did?

8      A.    I believe towards the beginning of

9  the year, when our relationship first was

10  getting started.

11      Q.    Okay.

12      A.    But I'm not positive.

13      Q.    Okay.  In paragraph 30 -- I'm going

14  to scroll down to paragraph 30.

15          What is the identity of the broker

16  referenced in that paragraph?

17      A.    (Reviewing document.)

18          So what's the question for this?

19      Q.    Who was the broker that's being

20  referred to in that paragraph 30?

21      A.    I believe this could be Miss Lee.

22      Q.    And how do you know Miss Lee -- if

23  she is the broker, how do you know that Stern

24  provided it to her?

25      A.    I don't know how -- communication

1  between themselves.  I'm not positive.

2      Q.    Okay.  So you allege something to

3  have happened, but you don't actually know if

4  it happened?

5      A.    So Miss Lee was in communication

6  with Joel Stern.  She told me she got this

7  information from Joel Stern.  She passed it on

8  to me, and that's how we started the

9  relationship.  She --

10     Q.    So Miss Lee got it, and she told

11 you.  Okay.

12     A.    Correct.

13     Q.    Now, the gloves that were delivered

14 in February 2021, how do you know that they

15 were, in fact, not compliant with the paperwork

16 that you received?

17     A.    None of the gloves were D6319

18 compliant.

19     Q.    But where -- how do you know that?

20     A.    Because I had them tested.  The

21 hospital had them tested.

22     Q.    How do you know that those gloves in

23 particular were tested?  That's the first

24 90,000 gloves you bought, supposedly.  So how

25 do you know that you had those gloves tested?

1      A.    They said everything was the same.

2   The lot numbers were similar to the gloves we

3   purchased.

4      Q.    Who said?

5      A.    Joel Stern, Kitchen Winners,

6   Adorama, and JNS.

7      Q.    So you don't -- you don't know.  Is

8   that your testimony?  You personally don't

9   know --

10     A.    I just told you.

11     Q.    -- which ones you tested?

12     A.    There's lot numbers.  So if you have

13  a lot number in February, you've got a lot

14  number in May.  It's the same lot number.

15     Q.    Who made the lot numbers?

16     A.    MedCare.

17     Q.    So how do you know what those lot

18  numbers mean?

19     A.    How do I know what they mean?

20     Q.    Yeah.

21     A.    They're to identify a batch of

22  gloves.

23     Q.    Okay.  But isn't it better to

24  identify a batch of gloves by the ones you

25  actually received and tested?  Just because

1  somebody put a number on a box, how do we know

2  which gloves you were testing?

3              MR. RAKHUNOV:  Objection.

4              THE WITNESS:  That's how they

5        identified them.

6  BY MR. FRISCH:

7        Q.    So you don't know if you test -- if

8  you tested a single glove from that initial

9  February shipment; is that correct?

10       A.    No, I do.  No, that's not correct.

11 I said I tested the same lot numbers February,

12 April, May.

13       Q.    So is your testimony that you went

14 to the shipment of gloves that was received in

15 February 2021 and tested one of those gloves,

16 or is your testimony that you tested similar

17 lot numbers that may or may not have been from

18 that shipment?

19       A.    Not similar lot numbers.  Exact.  We

20 have --

21       Q.    That may or may not have been from

22 that shipment.

23       A.    We have all lot numbers and when

24 they were delivered, when they were received.

25       Q.    Where are these lot numbers on the

1   boxes?

2        A.    Written on the box.

3        Q.    What format are they in?

4        A.    Numbers and letters.

5        Q.    Okay.  So -- whatever.  I think

6   we've beaten this to death, and I want to get

7   done.

8             Do you have any reason to assume

9   that the gloves labeled "Protection" were, in

10  fact, not just mislabeled but wrongly printed

11  boxes?

12       A.    Say that one more time, the

13  question.

14       Q.    Do you have any basis to assert --

15  your assertion that Mr. Stern's claim that the

16  boxes were simply misprinted and that the

17  gloves were the same gloves -- do you have any

18  basis to conclude that isn't true?

19       A.    The boxes have to say "Exam" on

20  them.  Same -- so if they don't say "Exam" --

21  or they should say "Non-Nitrile Glove."

22       Q.    Okay.  I don't really understand

23  what that answer is, but okay.  We'll just try

24  again.

25             Do you have any basis to conclude

1    that it wasn't an error in the printing of the

2    boxes by the manufacturer?

3        A.    No.  They need to say "Nitrile

4    Glove," and they have to test for it.

5        Q.    Okay.  So is it possible that the

6    manufacturer printed the wrong boxes and put

7    them in the wrong boxes?

8            MR. RAKHUNOV:  Objection.

9            THE WITNESS:  I don't believe so.

10   BY MR. FRISCH:

11       Q.    Why not?

12       A.    I believe Joel Stern did what he

13   said he was going to do to the gloves and the

14   boxes and --

15       Q.    That's not what I asked you.  I

16   asked you if it's possible.

17           MR. RAKHUNOV:  Objection.

18           THE WITNESS:  Possible I win the

19       lottery today also, but not probable.

20   BY MR. FRISCH:

21       Q.    Good luck.

22           Okay.  In paragraph 44, you state

23   that the purchases with Stern were between

24   April 16th and May 2nd.

25       A.    What page is it?

1        Q.     Page 11.

2        A.     Page 11, 44.  Okay.  What's the

3   question now?

4        Q.     Were -- are you not complaining

5   about the gloves delivered in February?

6        A.     I was complaining about all the

7   gloves delivered.

8        Q.     Okay.  So you're -- so it's an error

9   in the complaint.  Is that accurate?  I just

10  want to make sure I understand the scope of

11  what you're claiming.

12       A.     "Between on or about April . . ."

13              (Reviewing document.)

14              I'm not -- I'm not following the

15  error, what you're talking about is an error.

16       Q.     Wasn't the first purchase from

17  Mr. Stern in February?

18       A.     It was early in that year.

19       Q.     Yeah.  So why is it -- why is your

20  complaint only talking about the transactions

21  from April 16th and May 2nd?  That's what I'm

22  asking you.

23       A.     I think we should ask Phillip that.

24       Q.     Okay.  Paragraph 52, "Because of

25  Stern's shuffling between using various

1  entities, and directing payment to one entity

2  while purporting to operate under another

3  entity, Stern was simply using these entities

4  as his personal shells and commingling funds

5  among his entities and not observing corporate

6  formalities."

7          What is the basis of your

8  allegations here?  What is the factual basis

9  for those?

10     A.    He told me he was an accountant.  He

11  does accounting work.

12     Q.    Okay.

13     A.    He doesn't buy and sell products.

14     Q.    Okay.  How does that -- how does

15  that justify the claims made in paragraph 52?

16     A.    So he said, more or less, he was

17  acting as a straw man for his real estate

18  investors.  They were getting the lion's share

19  of it and putting up all the money for it.  He

20  was making a small part.

21     Q.    Do you have any evidence to sit --

22  to substantiate your claim that Mr. Stern

23  placed the stickers on the boxes?

24     A.    They were placed exactly as he

25  described and -- and wanted me to present them

1  to the hospital.

2        Q.    Did you present them to the

3  hospital?

4        A.    I had them -- they were delivered to

5  the hospital.

6        Q.    No, no.  I asked you, when he

7  proposed it to you, did you ask the hospital

8  about it?

9        A.    I don't understand the question.

10       Q.    Did you propose to the hospital that

11  you would sell them those gloves at a cheaper

12  price?

13       A.    No.  Absolutely -- I didn't even

14  offer it to the hospital.

15       Q.    Why not?

16       A.    Why would I offer to sell them fake

17  gloves with the --

18       Q.    Who said they were fake?

19       A.    He said he's putting a fake label on

20  top of a box, a real label on top of a fraud --

21       Q.    He said he was correcting the box.

22       A.    No, he didn't say --

23       Q.    That's what it says, correcting the

24  box.

25       A.    No.

1      Q.    Did you suggest to the hospital you

2  could get them cheaper gloves because of the

3  incorrectly printed boxes?

4      A.    No.  I said -- "No way" is what I

5  said.

6      Q.    Did Stern complain about Rock Fintek

7  to Adorama and Weiner?

8      A.    I don't know what he says to them.

9      Q.    Sorry?

10     A.    I don't know what he says to them

11  about --

12     Q.    Well, then, go to paragraph 90 on

13  page 22.

14     A.    Page what?

15     Q.    22.

16     A.    22.  What paragraph?  90?

17     Q.    Yeah.

18     A.    "Rock Fintek similarly reached out

19  to Stern in writing to notify him about the

20  discovery of the fake gloves and to seek . . ."

21            (Reviewing document.)

22            I don't -- what's the question?

23     Q.    How did you know about the complaint

24  of Stern to Adorama and Weiner that you allege

25  here?

1        A.      I'm not sure.

2        Q.      Okay.

3        A.      I don't recollect.

4        Q.      Okay.

5                MR. RAKHUNOV:  It's in the messages,

6        Avi.  It's there in writing.

7                MR. FRISCH:  I'm asking him.

8                MR. RAKHUNOV:  I know.  I'm --

9                THE WITNESS:  I don't have a

10       photographic memory.  So I don't have that.

11   BY MR. FRISCH:

12       Q.      We rely on that.

13               Did you stiff Alex King the lasting

14   $45,000 of his money?

15               MR. RAKHUNOV:  Objection.

16               THE WITNESS:  No.

17   BY MR. FRISCH:

18       Q.      So why didn't you pay him his final

19   bills?

20       A.      I believe he owes me money.

21       Q.      Why do you think that?

22       A.      Because he miscounted the

23   deliveries.

24       Q.      Did you sue him?

25       A.      Nope.

1      Q.    Why not?

2      A.    Why not?

3            MR. RAKHUNOV:  Objection.

4            THE WITNESS:  I'm going to sue the

5      criminals instead.

6            MR. RAKHUNOV:  To the extent that

7      anything you might answer involves

8      conversations with lawyers, I'm instructing

9      you not to answer.  But otherwise, you're

10     free to answer.

11           THE WITNESS:  I have not sued them

12     yet.

13  BY MR. FRISCH:

14     Q.    Okay.  Did you boast to Stern that

15  you had other suppliers for MedCare gloves?

16     A.    The supplier meaning Adorama,

17  Kitchen --

18     Q.    Other than Adorama and

19  Kitchen Winners.

20     A.    No, I don't believe so.

21     Q.    Well, then why did you say -- I

22  have -- I'm going to highlight it for you on

23  this thing.  I believe -- this exhibit's

24  already been marked.  This is the chats with

25  Joel Stern.  I'm going to highlight for you.

1          Tommy Kato:  "Your order has nothing
2    to do with them.  We have another Group" --
3          A.    What page?  I can't see.
4          Q.    Oh, that's right.  You can't see it.
5    The page number is 16.
6          I'm almost done.  I'm trying to get
7    finished so we can take a break before Alex
8    goes.
9          A.    I don't need a break.  I'm good.
10         Q.    Yeah, but I'm sure Rhonda does.
11              MR. RAKHUNOV:  The court reporter
12         will certainly need a break.
13              MR. FRISCH:  Yeah.
14              THE WITNESS:  Oh.
15              MR. FRISCH:  I think I'm five
16         minutes left though, five to ten minutes.
17              THE WITNESS:  (Reviewing document.)
18              Okay.  And the question was?
19    BY MR. FRISCH:
20         Q.    Who are the other people that you
21    are referring to there?
22         A.    Might be that David Horowitz that
23    Joel Stern was working with, I think.  He was
24    selling to another -- some other brokers out
25    there in California.

1      Q.      And who did you buy from before

2  Adorama?

3      A.      Joel Stern, JNS.

4      Q.      But that's not who you're referring

5  to here because you're talking to Joel Stern.

6  So who are you referring to when you say, "We

7  have other people that we bought from before

8  Adorama"?

9      A.      Avi, the gentleman you mentioned in

10  Miami.

11      Q.      Did you buy MedCare from him?

12      A.      No.  Didn't buy MedCare from anybody

13  else.

14      Q.      But you say "will buy LA MedCare

15  gloves."  So you're saying that this is not

16  referring to MedCare gloves; this is referring

17  to other gloves?

18      A.      I'm saying I did not buy MedCare

19  gloves from anybody else.

20      Q.      Despite your statements to the

21  contrary.  Got it.

22            MR. RAKHUNOV:  Objection.

23            THE WITNESS:  There's a broker in

24      LA.

25            (Simultaneous speaking.)

```
 1              CERTIFIED STENOGRAPHER:  Excuse me.
 2        You guys are both talking at the same time.
 3              MR. RAKHUNOV:  Thomas, you're being
 4        asked about the specific message, which I'm
 5        seeing two separate messages there, one
 6        about MedCare, the other about something
 7        else.  So . . .
 8  BY MR. FRISCH:
 9        Q.    All right.  Whatever you were just
10  saying, can you repeat it?
11        A.    There was brokers in LA that said
12  they had access to the same MedCare gloves, but
13  we never made any purchases to them -- from
14  them.
15        Q.    Thank you.
16              Did you have communications with
17  MedCare directly --
18        A.    They were never verified.
19        Q.    -- about the gloves?
20        A.    And they were never verified.
21        Q.    Did you -- did you have
22  communications with MedCare about the gloves?
23        A.    After the -- after we got the
24  complaints.
25        Q.    Did -- did you ask MedCare to
```

1   replace the gloves?

2       A.    Yes.

3       Q.    Did they offer to replace some

4   number of them?

5       A.    Yes.

6       Q.    Did they ever claim the gloves you

7   received were fake?

8       A.    I don't believe so.

9       Q.    Did MedCare ever tell you that their

10  protection and their examination gloves are the

11  same thing?

12      A.    They said they're different

13  completely.

14      Q.    Did MedCare ever tell you that they

15  were the same?

16      A.    I don't believe so.  I'd have to

17  check my communication.

18      Q.    Let me go to one more exhibit.  I

19  think this might actually be the last one I

20  use.

21          MR. FRISCH:  Anybody remember --

22      what are we up to?  The last one we did was

23      H.

24          (Exhibit Number JNS I, Chat Started

25      8/9/21, was marked for identification.)

```
 1   BY MR. FRISCH:
 2        Q.    Okay.  This chat is -- it's labeled
 3   in -- I have it as the -- your chats with --
 4   with MedCare, and it looks like you have it
 5   with an individual named Danny Lee China Man
 6   and Anna Grinwald [sic]  -- well, you write
 7   Geinwald, but I think it's Anna Grinwald,
 8   MedCare CEO; correct?
 9              Do you recognize these chats?
10        A.    You've got to tell me what page.
11        Q.    No, I'm just asking you if you
12   recognize this document.
13        A.    I don't see the document.
14        Q.    You don't see it on your screen?
15        A.    I just see the same 25-page
16   messages.  Or this is a new message?
17        Q.    Okay.  Yes.  So these -- in general.
18   This is a different set of messages.
19        A.    Okay.  I've got to zoom it up, look
20   at it.  MedCare messages . . .
21              (Reviewing document.)
22              So -- okay.  So what about these
23   messages?
24        Q.    I want to know, do you recall
25   this -- these conversations with Anna of
```

```
 1    MedCare and the other parts of the MedCare
 2    team?
 3         A.    Yeah.
 4         Q.    Can you go to page 13, please.  I'm
 5    going to highlight something for you.
 6         A.    Okay.
 7              MR. RAKHUNOV:  Sorry.  What page?
 8              MR. FRISCH:  13.  You should see it
 9         highlighted.  I have been deleting the
10         highlights after I show it to him.
11              MR. RAKHUNOV:  Okay.
12              MR. FRISCH:  So they don't stay on
13         the final exhibits.
14              THE WITNESS:  (Reviewing document.)
15    BY MR. FRISCH:
16         Q.    Have you read the highlighted
17    portion?
18         A.    Hold on.
19              (Reviewing document.)
20              Yes.
21         Q.    They also told you themselves that
22    they go through about 1 billion gloves a year
23    and would entertain letting you bid that
24    contract.
25              Is that MedCare would bid directly
```

1  to the hospital for the contract?

2      A.    MedCare would -- no.  We would -- we

3  would go through Rock Fintek.

4      Q.    And how much profits -- how much

5  would the profits have been on that contract?

6          MR. RAKHUNOV:  Objection.

7          THE WITNESS:  Maybe a billion

8      dollars.  I don't know.  I didn't get the

9      contract.  We didn't get into the numbers.

10  BY MR. FRISCH:

11     Q.    Okay.  Did you ever resell any of

12  the gloves?

13     A.    Nope.  We did not.

14     Q.    Did you ever get the three

15  containers MedCare promised you?

16     A.    Nope.

17     Q.    Does the spreadsheet you mentioned

18  earlier demonstrate how much Ascension

19  withheld?

20         MR. RAKHUNOV:  Objection.

21         THE WITNESS:  Does the spreadsheet

22     what?

23  BY MR. FRISCH:

24     Q.    You said you have a spreadsheet

25  ledger for the company; right?

1        A.    I said I gave all my documentation

2    to -- if I have a sheet, we produced a

3    spreadsheet and gave him a spreadsheet.  I

4    don't know in which fashion that it --

5        Q.    I don't really care what format it's

6    in.  I'll take that up with him afterwards.

7             But do you have any sort of ledger,

8    just general ledger --

9        A.    I'm not sure.

10        Q.    -- for the business?

11        A.    I'm not sure.  Whatever I gave

12    him -- whatever I have, I gave to Phillip.  I'm

13    not sure what it is, what ledger, what format.

14             MR. FRISCH:  Okay.  That's all I've

15        got.

16             THE WITNESS:  Okay.

17             MR. FRISCH:  So I would suggest we

18        take a lunch break until, like, 2:00, and

19        then come back and Alex will grill you.

20             THE WITNESS:  Sure.

21             (Luncheon recess from 1:26 p.m. to

22        2:04 p.m.)

23                    EXAMINATION

24    BY MR. SPERBER:

25        Q.    Good afternoon, Mr. Kato.  My name

1   is Alexander Sperber.  I am the attorney in

2   this matter for Kitchen Winners, for Adorama,

3   and for Joseph Mendlowitz.

4             I'm going to do my best to try and

5   not repeat too much of what Mr. Frisch went

6   over earlier, but let me just as a general

7   matter start off.

8             Do you understand that you're under

9   the same oath that you would be as if you were

10  in a courtroom?

11       A.    Yes, I am.

12       Q.    And you understand even though

13  you're testifying remotely today at a

14  deposition that the testimony you give under

15  oath here is subject to the same penalty of

16  perjury as though you were testifying in court

17  of law?

18       A.    Yes, I do.

19       Q.    Okay.  If you don't understand one

20  of my questions, please let me know.  Unless

21  you tell me otherwise, I'm going to assume that

22  you understood the question.

23             Is that all right?

24       A.    Correct.  Thank you.  Understood.

25       Q.    And, again, just as earlier, if you

1   need a break during the deposition, as long as

2   there's no question pending, we're happy to

3   accommodate.

4          A.    Sounds good.

5          Q.    All right.  Mr. Kato, am I correct

6   that you testified earlier that Rock Fintek was

7   formed in 2018?

8          A.    Yes.

9          Q.    I'm sorry?

10         A.    Yes.

11         Q.    And Rock Fintek got into the

12  personal protective equipment business around

13  2020?

14         A.    Correct.

15         Q.    Okay.  And if I refer to personal

16  protective equipment as "PPE," is that all

17  right?

18         A.    Yes, it is.

19         Q.    What was Rock Fintek doing between

20  2018 and 2020 when Rock Fintek got into the PPE

21  business?

22         A.    Selling other products.

23         Q.    What products?

24         A.    A variety of products, from pots and

25  pans to different types of plastic products,

1  USB sticks.  You know, the same person that we

2  started buying gloves from was a company called

3  Multilaser in Brazil, a publicly traded

4  company, and they had about 5,000 SKUs of

5  products we were selling.

6        Q.    Okay.

7        A.    So when COVID hit, nobody was buying

8  their products, and they were able to supply

9  PPE instead of the other products.

10       Q.    And what kind of PPE did you buy

11 from them?

12       A.    Masks.  Masks and -- I think just

13 masks.

14       Q.    Okay.  Do you know when you --

15       A.    I think we also bought some

16 bouffants and booties.

17             (Stenographer requests

18       clarification.)

19 BY MR. SPERBER:

20       Q.    Do you know when Rock Fintek first

21 came into contact with Ascension?

22       A.    I would say around March 2020,

23 February or March.  Probably March.

24       Q.    And who was -- who made that

25 connection?

1      A.    Who made the connection?  A

2  gentleman, Nick Sansone.

3      Q.    Okay.  And who did he connect you

4  with at Ascension?

5      A.    He connected me with a gentleman --

6  I believe it was Todd Adams, Dewayne Rader, and

7  a few people.  I'm not sure everybody that was

8  on the initial call.

9      Q.    And when you had that initial call

10  with Ascension, what did Ascension tell you

11  they were looking for, if anything?

12      A.    Masks.

13      Q.    Okay.  And were -- was Rock Fintek

14  able to procure masks for Ascension?

15      A.    Yes.

16      Q.    Okay.  And that was around, again,

17  February or March 2020?

18      A.    Or March, yes.

19      Q.    Did there come a time when

20  Rock Fintek -- excuse me -- when Ascension

21  asked Rock Fintek if it could procure gloves

22  for Ascension?

23      A.    Say that one more time.

24      Q.    Did there come a time when Ascension

25  asked Rock Fintek if it could procure gloves

1    for them?

2         A.    Yes.

3         Q.    And when was that?

4         A.    Around the fall of 2020.

5         Q.    When you were doing business with

6    Ascension, how did Ascension document its

7    agreements with Rock Fintek?

8         A.    There were just purchase orders.

9         Q.    So there was no contract beyond the

10   purchase order?

11        A.    No.

12        Q.    Okay.  I'm going to try and show you

13   an exhibit, and we'll see if this works.

14             Can you see a document in front of

15   you?

16        A.    I can see it.  I can enlarge it.

17   Okay.

18        Q.    I'm going to stamp this as --

19             MR. RAKHUNOV:  Tom, make sure you

20        can see the details of the document well

21        enough to read it, because there's a lot of

22        small text here.

23             (Exhibit Number KWA-Kato 1, Purchase

24        Order dated 8/13/20, Bates-stamped

25        RF_001166 - 1167, was marked for

1        identification.)

2   BY MR. SPERBER:

3        Q.    Mr. Kato, do you see a document in

4   front of you that I've marked as KWA-Kato A

5   [sic]?

6        A.    Where does it say that?

7        Q.    In the red box on the bottom

8   right-hand corner.

9        A.    Red box, bottom corner.

10       Q.    There's a stamp.

11       A.    Yes, I see it.

12       Q.    Okay.

13            MR. FRISCH:  Just so you know, you

14       can move the box over so it doesn't block

15       the -- it doesn't block the Bates number if

16       you want.

17            MR. SPERBER:  Okay.

18  BY MR. SPERBER:

19       Q.    The document appears to be labeled a

20  purchase order.  It's from Ascension, and it

21  seems, if I zoom in on the -- the top right

22  corner, it says it is dated August 13, 2020.

23       A.    Yes.

24       Q.    Do you see where I am?

25       A.    I see that.

1      Q.    Do you recognize this document?

2      A.    Let me review it.

3            (Reviewing document.)

4            I can't say I recognize it, but I

5    understand it.

6      Q.    What is this document?

7      A.    Seems to be a purchase order or the

8    reconciliation on it of what was paid and not

9    paid.

10     Q.    And was Rock Fintek selling gloves

11   to Ascension in August -- in or around

12   August 2020?

13     A.    Yes.  Or the fall, yeah.  That

14   August or September.

15     Q.    So do you recall -- which brand

16   gloves did Rock Fintek procure to meet this

17   purchase order?

18     A.    I believe we had Medgluv and Ingco,

19   maybe Safeko.  I'm not sure if I can remember

20   all the brands.

21     Q.    Okay.  Was one of the brands

22   MedCare?

23     A.    No.

24     Q.    And did Rock Fintek procure the

25   gloves for this purchase order from either

1  Kitchen Winners, Adorama, JNS, or Stern?

2       A.    No.

3       Q.    Okay.  Was Ascension happy with the

4  gloves that Rock Fintek procured pursuant to

5  that purchase order?

6       A.    They seemed to be.  They didn't --

7       Q.    Was there a reason why in the

8  future, when you were procuring additional

9  gloves for Ascension, that you did not go

10  forward with those suppliers?

11       A.    We had another supplier we found in

12  Thailand that Hunton vetted for us.  And it was

13  a slightly better price, about 15 percent, and

14  we went with that one.

15            By the time we wanted -- that one

16  fell through -- to go back to this supplier it

17  was more complicated, and then it seemed more

18  comfortable to deal with a US company instead

19  of an overseas company, after the mishap in

20  Thailand.

21       Q.    And your suppliers for the purchase

22  order in front of you, those were -- the

23  suppliers were overseas companies?

24       A.    Yes.

25       Q.    I'm going to share another document

1  with you which I'm going to stamp KWA --

2              (Exhibit Number KWA-Kato 2, Purchase

3        Order dated 8/13/20, Bates-stamped

4        RF_001171 - 1177, was marked for

5        identification.)

6  BY MR. SPERBER:

7        Q.    Okay.  Mr. Kato, do you see in front

8  of you a document that I stamped Exhibit

9  KWA-Kato 2?

10       A.    Yes.

11       Q.    All right.  It appears to be a

12 purchase order with a date of August 13, 2020.

13             You see where I am over there?

14       A.    Yes.

15       Q.    I can just tell you that the

16 previous purchase order ended -- the last two

17 digits on the purchase order were 83 -- oh, did

18 I do this twice?  The previous one ended on 82,

19 and this one ends 83.  So it appears that there

20 were two purchase orders.

21             Does this ring a bell with you?

22       A.    No.

23       Q.    Would this have been part of the

24 same transaction that you were discussing

25 earlier with Ascension?

1        A.    Correct.

2        Q.    Okay.  All right.  I'm going to

3    share with you another document.

4              (Exhibit Number KWA-Kato 3, Purchase

5        Order dated 12/7/20, Bates-stamped

6        RF_001284 - 1285, was marked for

7        identification.)

8    BY MR. SPERBER:

9        Q.    Okay.  I'm showing you a document

10   that I have labeled Exhibit KWA-Kato 3.

11       A.    Okay.

12       Q.    Do you see it in front of you?

13       A.    Yes, I do.

14       Q.    This is -- also appears to be a

15   purchase order with the date of December 7th,

16   2020.

17             Do you see where I am?

18       A.    Yes.

19       Q.    Do you recognize this document?

20       A.    Yeah.  Yes.

21       Q.    What is this document?

22       A.    It's a purchase order from

23   Ascension.

24       Q.    And how many gloves is this purchase

25   order for?

1      A.    I've got to see where it says it.

2  "Quantity, 15000 CSA [sic]."  Maybe it's 150

3  million.  It says 150, 15,000.  I don't know

4  how it's written.  This -- cases, cartons.  The

5  "CA" maybe stands for carton.  I'm not

6  positive.

7      Q.    Besides these three purchase orders

8  that we've looked at, did Ascension give any

9  other purchase orders to Rock Fintek for

10  gloves?

11      A.    I don't believe so.

12      Q.    Okay.

13      A.    But I recollected the number was 200

14  million total.

15      Q.    Okay.

16      A.    This 150, and the other one I

17  remember the number.

18      Q.    When you say "total," you mean

19  between all three purchase orders or for --

20      A.    Correct.

21      Q.    So when Rock Fintek claims that it

22  sold 200 million gloves to Ascension, the claim

23  is not that Rock Fintek was buying all those

24  gloves from Kitchen Winners, Adorama, JNS, and

25  Joel Stern; correct?

```
 1            MR. RAKHUNOV:  Objection.
 2            THE WITNESS:  We bought this last
 3       purchase order from them and a couple other
 4       suppliers, not the first one you showed me.
 5   BY MR. SPERBER:
 6       Q.    Okay.  How many total gloves did
 7   Rock Fintek purchase from JNS or Stern?
 8       A.    Between JNS and Stern versus
 9   Adorama, you mean, or --
10       Q.    Yeah.  How many gloves did
11   Rock Fintek purchase directly from JNS or
12   Stern?
13       A.    I don't remember off the top of my
14   head.  I looked at it, but I can't remember the
15   numbers.
16       Q.    What did Rock Fintek do with the
17   gloves that it purchased from JNS or Stern?
18       A.    They were all delivered to Medline
19   for -- to go to Ascension.
20       Q.    Okay.  How many gloves did -- did
21   Rock Fintek purchase from Adorama or
22   Kitchen Winners?
23       A.    I don't remember the exact amount.
24       Q.    Approximately.
25       A.    I would say 180 to 200 million.
```

1    Q.    Okay.  And what did Rock Fintek do

2  with those gloves?

3    A.    Delivered them all to Medline.

4    Q.    Okay.  Did Rock Fintek fulfill all

5  three of the purchase orders that it received

6  from Ascension?

7    A.    I don't believe it filled the first

8  two.  Actually, we ended up delivering more

9  than the quantity that they wanted.

10    Q.    Okay.  So you delivered more than

11  200 million gloves to Ascension?

12    A.    Yes.

13    Q.    Okay.

14    A.    Because of the miscount.

15    Q.    Did Ascension pay Rock Fintek the

16  full price for each of the purchase orders?

17    A.    No.

18    Q.    Okay.  Which -- which of the

19  purchase orders did it not fully pay for?

20    A.    The last one was not fully paid for.

21  The first one was not fully filled because they

22  wanted to make a larger order while they were

23  still being delivered.

24    Q.    Okay.  So this last purchase order,

25  how much did -- how much of the purchase price

1    did Rock Fintek -- did Ascension pay

2    Rock Fintek?

3         A.    They paid about 34 or 35 million.

4         Q.    Okay.  If I wanted to know the exact

5    number, where can I find that?

6         A.    Phillip should have it.

7         Q.    Which document (indiscernible) --

8              MR. RAKHUNOV:  Sorry.  You just cut

9         out.

10   BY MR. SPERBER:

11        Q.    Which documents could I look at to

12   figure that out?

13             MR. RAKHUNOV:  Sorry, Alex.  Can you

14        go back to your underlying question?

15             MR. SPERBER:  Yeah.

16   BY MR. SPERBER:

17        Q.    My question is if I want to figure

18   out how much Ascension paid Rock Fintek

19   pursuant to the purchase order ending in 0075

20   with a date of December 7, 2020, how would I go

21   about doing that?

22        A.    Are you asking me or Phillip?

23        Q.    I'm asking you, Mr. Kato.

24             MR. RAKHUNOV:  I'm not --

25             THE WITNESS:  I think -- can you

OCTOBER 03, 2023                     THOMAS KATO                          Page 188

1        repeat the question, please?

2   BY MR. SPERBER:

3        Q.    Yeah.  I want to figure out how much

4   money Ascension paid Rock Fintek pursuant to

5   purchase order ending 0075 with the date of

6   December 7, 2020.

7             How would I go about figuring that

8   out?

9        A.    I believe you can look at the bank

10  statements that came in, the funds that came

11  from Ascension.

12       Q.    How would I distinguish those funds

13  from other funds that Ascension paid to

14  Rock Fintek?

15       A.    Anything done December and on was

16  only for this order.

17       Q.    Okay.

18       A.    Is there a third lawyer here, Lauren

19  Riddle?

20            MS. RIDDLE:  Yeah.  That's me,

21       Thomas.

22            THE WITNESS:  Oh, okay.

23  BY MR. SPERBER:

24       Q.    How large of a deposit did -- did

25  Ascension give to Rock Fintek in connection

1  with the purchase order in front of you?

2      A.    Let's see.  Shows 2.75 million here,

3  and it says -- I don't know.  It's hard for me

4  to read this document.  I don't understand.

5      Q.    Did Ascension give you a deposit in

6  connection with this purchase order?

7      A.    Yes, they did.

8      Q.    Okay.  At the time that Ascension

9  gave you this purchase order, did Rock Fintek

10  have suppliers lined up to provide the gloves

11  it was going to be selling to Ascension?

12      A.    Yes.

13      Q.    Who were those -- who were those

14  suppliers?

15      A.    SkyMed.

16      Q.    I'm sorry?

17      A.    SkyMed.

18      Q.    Okay.  Anyone else?

19      A.    No.

20      Q.    Okay.  Did Ascension ultimately use

21  SkyMed to fulfill this purchase order?

22      A.    Rock Fintek did not ultimately use

23  SkyMed to fill the order, no.

24      Q.    Why not?

25      A.    SkyMed ended up being a fraudulent

1  company that didn't have any gloves.

2      Q.    Okay.  So what did Rock Fintek do

3  instead?

4      A.    It looked to source other gloves.

5      Q.    And where did it source gloves from?

6      A.    Adorama, Kitchen Winners,

7  Joel Stern, JNS, a container or two from this

8  gentleman in Miami, Avi.  Maybe -- that might

9  be it.

10     Q.    The gloves that Rock Fintek used to

11 fulfill this purchase order, were they all

12 MedCare gloves?

13     A.    Yes.

14     Q.    Okay.

15     A.    No.  We gave some LevMed gloves

16 also.

17     Q.    Okay.

18     A.    And I believe everything else was

19 MedCare.  We might have gave some Safeko or

20 Ingco gloves also.  I don't know if that was

21 before this purchase or after this purchase

22 agreement.

23     Q.    How would I figure that out?

24     A.    I'm not sure.  I'd have to . . .

25     Q.    Did Rock Fintek maintain

1  documentation about -- concerning the products

2  it was providing to Ascension?

3       A.    Yeah.  It provided that, you know,

4  D6319 510(k) ASTM gloves.

5       Q.    What I'm asking is did you keep a

6  ledger, for example, that would document how

7  many gloves you provided to Ascension and where

8  you got them from?

9       A.    We used more of the logistics

10  company they gave us or supported and

11  delivered, thought that to be accurate.

12            (Stenographer requests

13       clarification.)

14  BY MR. SPERBER:

15       Q.    What was that?

16       A.    We used what the logistics company

17  gave us for what was delivered, and we thought

18  that to be accurate.

19       Q.    And was it accurate?

20       A.    No.

21       Q.    Was that logistics company Dimerco?

22       A.    That was Dimerco.

23       Q.    Your contact over there was Alex

24  King?

25       A.    Yes.

1      Q.    How did you figure out that
2  Dimerco's records were not accurate?
3      A.    When Ascension did a count and told
4  us we delivered more gloves than they had
5  wanted and they weren't willing to pay for
6  them.
7      Q.    Let me back up a little bit.  You're
8  familiar with a company by the name of Adorama?
9      A.    I am now, yes.
10      Q.    Are you familiar with the name
11  Kitchen Winners NY Inc.?
12      A.    Yes.
13      Q.    How did you first become familiar
14  with those two companies?
15      A.    I believe I saw the name
16  Kitchen Winners on a purchase order that I got
17  from Miss Lee or Joel Stern.  Then I tried to
18  find them because the price we were paying for
19  the gloves was more than we were selling them
20  for, but I wanted just to at least keep
21  delivering gloves.
22            So, in the meantime, I was trying to
23  find more of the source to the MedCare gloves.
24      Q.    So you (indiscernible)?
25            (Stenographer requests

1          clarification.)

2    BY MR. SPERBER:

3          Q.    So you reached out to

4    Kitchen Winners?

5          A.    Yes.

6          Q.    Who at Kitchen Winners did you speak

7    with?

8          A.    Mendel Banon.

9          Q.    How did you find Mr. Banon's name?

10         A.    He was on a purchase -- oh, I just

11   looked up the company.

12         Q.    Online?

13         A.    Yeah, a simple Google Search.

14         Q.    So you reached out to Mr. Banon, and

15   what did you discuss with him?

16         A.    Told him I had purchased these

17   gloves already.  At the price I was buying

18   them, I wouldn't continue -- I wouldn't be able

19   to continue to buy them at a loss delivering to

20   my clients.  "I can buy larger quantities if

21   you can get me a better pricing."

22         Q.    And what did Mr. Banon tell you?

23         A.    "We can slowly do that."

24               So I kept -- so I started -- began

25   purchasing from him at a loss still.  But at a

1  less of a loss.

2      Q.    Okay.  Did there come a point in

3  time when you entered into a contract with

4  Kitchen Winners?

5      A.    I don't know if we ever had any

6  contract or just purchase agreements.  I don't

7  recollect.

8      Q.    Okay.  How about a company by the

9  name Adorama?  How did you first become aware

10 of them?

11     A.    From Mendel Banon.

12     Q.    What did Mr. Banon tell you?

13     A.    He said that he's their partner,

14 works with them in distribution.  They were in

15 charge of manufacturing or procuring.

16     Q.    Are you familiar with someone by the

17 name of Hershey Weiner?

18     A.    Yes, I am.

19     Q.    Okay.  Have you ever met Mr. Weiner?

20     A.    No.

21     Q.    Have you ever spoken with him?

22     A.    Yes.

23     Q.    How many times?

24     A.    Several.

25     Q.    That was by telephone?

1      A.    Correct.

2      Q.    Who was on those phone calls when

3    you had them?

4      A.    Multiple people.  Sometimes

5    Mendlowitz and sometimes Mendel Banon.

6    Sometimes Joel -- no, I don't think Joel Stern

7    was on there.  Brad Gilling for sure.

8            Various people that were involved in

9    whatever transactions.  Arik Maimon.

10     Q.    Is that Arik Maimon?

11     A.    Maimon.  Maimon, yeah.

12           (Stenographer requests

13     clarification.)

14   BY MR. SPERBER:

15     Q.    You mentioned Mendlowitz.  Is that

16   Joseph Mendlowitz?

17     A.    Yes.

18     Q.    Who is that?

19     A.    I believe he's the owner of Adorama.

20     Q.    Okay.  Have you ever spoken with

21   him?

22     A.    Couple times.

23     Q.    Have you ever met him?

24     A.    No.

25     Q.    Have you ever emailed him?

1        A.    I believe he's on emails that I'm

2   on, in the communication with some of them.

3        Q.    Did he ever email you?

4        A.    I don't recollect.

5        Q.    Did he ever text you?

6        A.    No.

7        Q.    Did he ever WhatsApp with you?

8        A.    I don't believe so.

9        Q.    Did he ever send emails to anyone

10  else at Rock Fintek?

11       A.    No, I don't believe so.

12       Q.    Did he ever text anyone else at

13  Rock Fintek?

14       A.    I don't believe so.

15       Q.    Did he ever -- was he ever involved

16  with WhatsApp communications with anyone else

17  at Rock Fintek?

18       A.    I don't believe so.  He might have

19  been.  I don't recollect, but I don't believe

20  so.

21       Q.    You mentioned that you were on

22  some -- some phone calls with him.  What did he

23  say on those phone calls, if anything?

24       A.    We were going to purchase -- make a

25  large purchase order with Adorama that had to

1    be directly with him at Adorama, their bank

2    account, their attorneys, and not via

3    Kitchen Winners, even though we were looking at

4    them as one and the same.  It was with Adorama.

5             I said, "We just got stung by a

6    company in Thailand who ended up being bogus.

7    So if we do a deal, we want to do a deal with a

8    company that's credible and can back the

9    product they're giving us."

10       Q.    Why did you believe Adorama was that

11   kind of a company?

12       A.    Did some research online.  They

13   seemed to be a legitimate large company, been

14   around since the '70s, at the first impression

15   when you look.

16       Q.    I thought you had said you reached

17   out to Kitchen Winners originally.  How did

18   Adorama get involved with this?

19       A.    I told you Mendel Banon introduced

20   us.

21       Q.    You were willing to do business with

22   Kitchen Winners; correct?

23       A.    Kitchen Winners -- I was willing to

24   do business with Kitchen Winners on a

25   truck-by-truck basis.  To do a large purchase

1  order, I was not going to send Kitchen Winners

2  any large amounts of money.

3       Q.    Okay.  At any point in time --

4       A.    Mendel Banon had a record of a

5  default and a judgment from a bank or a default

6  from a bank for one and a half million that he

7  was still trying to -- I don't know what was

8  going on with it.  So I was like, "I will not

9  send you any large number" -- "amounts of

10  funds."

11       Q.    At any point in time did -- during

12  the relationship between Rock Fintek,

13  Kitchen Winners, and Adorama, did -- did

14  Rock Fintek give a large prepayment in advance

15  of receiving goods?

16       A.    Did we give a large -- did

17  Rock Fintek give a large prepayment for goods?

18       Q.    Yeah.

19       A.    Yes, to Adorama.

20       Q.    What was the date of that?

21       A.    I don't know.  I don't recollect.

22       Q.    Who owns Kitchen Winners?

23       A.    Who what?

24            MR. RAKHUNOV:  Objection.

25            ///

```
 1   BY MR. SPERBER:

 2       Q.    Who owns Kitchen Winners?

 3       A.    I'm not sure the legal entity it was

 4   owned by.

 5       Q.    What is Mendel Banon's relationship

 6   with Kitchen Winners?

 7       A.    I believe he's a director, employee,

 8   member of the entity.

 9       Q.    Okay.  What is Mendel Banon's

10   relationship with Adorama?

11       A.    Partner, salesperson, employee.  I'm

12   not exactly sure.

13       Q.    What are you basing that on?

14       A.    Well, he said he was distribution

15   and they were procurement.  Sounds like

16   partners.

17       Q.    Okay.

18       A.    He said he gets all his products

19   from them.  He works exclusively with them.

20       Q.    Besides Joseph Mendlowitz, did you

21   ever speak with anyone else at Adorama?

22            MR. RAKHUNOV:  Objection.

23            THE WITNESS:  I don't believe so,

24       but if I did, it should be in my WhatsApp

25       or emails.
```

1  BY MR. SPERBER:

2      Q.    Okay.  How about, you know,

3  anyone -- did you ever communicate with anyone

4  else at Adorama?

5      A.    No, I don't believe so.

6      Q.    Did Mendlowitz ever tell you

7  anything about Adorama's relationship with

8  Banon?

9      A.    Besides on the phone call that time,

10  saying that they were working together or he's

11  going to get the gloves and he's distributing

12  them?  No.

13      Q.    Okay.

14      A.    I just made it really clear to him

15  that I won't send money if it wasn't to him and

16  his company that's been around since the '70s.

17      Q.    Was Arik Maimon on that phone call?

18      A.    He was on some phone calls.  Not all

19  the phone calls.

20      Q.    Who is Arik Maimon?  What's his

21  relationship to this transaction?

22      A.    Another broker.

23      Q.    Who hired him?

24      A.    I don't know.  That's hard to say.

25  He would have made a commission from us, but he

1  got paid, from what he told me, 200,000 from

2  Adorama as a loan for something else from a

3  company that he didn't seem to know before.  So

4  to me looked like he had a prepayment.

5       Q.    Was Arik Maimon on the phone calls

6  with Joseph Mendlowitz?

7       A.    I don't recall.  He was on a lot of

8  phone calls.  I don't know which ones he was

9  on.

10      Q.    Okay.  I'm going to show you a

11  document that was previously marked by

12  Mr. Frisch.

13      A.    By who?

14      Q.    Avi Frisch, the attorney who was

15  speaking to you earlier.

16            Can you see in front of you a

17  document that was marked Exhibit -- JNS

18  Exhibit E?

19      A.    Yes.

20      Q.    This, I believe, was the First

21  Amended Counterclaim and Third-Party Complaint

22  that Rock Fintek filed.

23      A.    I'm looking at page 1.

24      Q.    Okay.  If you can go to page 5.

25      A.    Okay.

1     Q.    Go to page 6.  Look at paragraph 19.

2  It says, "Kitchen Winners is an affiliate of

3  Adorama that Adorama formed, upon information

4  and belief, for the purpose of engaging in the

5  PPE business and shielding Adorama from

6  liability for fraudulent PPE transactions."

7           Do you see where I am?

8     A.    Yes.

9     Q.    Okay.  What information do you have

10 to support the allegations in that paragraph?

11    A.    Well, he told me they were partners.

12    Q.    Does that mean that Adorama formed

13 Kitchen Winners?

14    A.    I don't know the legal way that they

15 were formed.  You can ask that question to the

16 lawyer, this legality.  I just know he said

17 they were partners, and that's how we took it.

18 They're one and the same.

19    Q.    So you have no -- no information to

20 support the idea that Adorama actually formed

21 Kitchen Winners?

22    A.    I do not, no.

23    Q.    Okay.  If you go to paragraph 20, it

24 says, "Kitchen Winners is an alter ego of

25 Adorama."

1          Do you see where I am?

2     A.    Yes.

3     Q.    Okay.  What information do you have

4  to support that assertion?

5     A.    I don't know what that means.

6     Q.    Okay.  It goes on to say, "Adorama

7  and its principles dominate and control

8  Kitchen Winners for the purposes of engaging

9  fraudulent PPE transactions."

10          Do you see where I am over there?

11     A.    Yes.

12     Q.    What information do you have to

13  support that assertion?

14     A.    "Adorama and its principals dominate

15  and control" --

16          MR. RAKHUNOV:  Note my objection.

17          THE WITNESS:  I don't understand the

18     language written here.

19  BY MR. SPERBER:

20     Q.    Do you have any information to

21  support the idea that Adorama is in control of

22  Kitchen Winners?

23     A.    Yes.

24     Q.    What information do you have?

25     A.    Joseph was Mendel's boss.

```
1        Q.      Anything else?

2        A.      He had to make all the decisions for

3    them.  Him and Hershey had to run everything by

4    Joseph.  Nothing was done unless Joseph agreed.

5    They were not making any decisions on their

6    own.

7        Q.      What are you basing that on?

8        A.      Conversations, messages, "I'll get

9    back to you."

10               They had no authority to do anything

11   without his authorization.

12       Q.      When someone says, "I'll get back to

13   you," does that mean they don't have authority,

14   or could it just mean that they want to

15   consider it?

16       A.      They said, "Let me see if I can get

17   this approved."

18       Q.      Okay.  Do you know who they would

19   have asked?

20       A.      Joseph.

21       Q.      How do you know?

22       A.      They said it.

23       Q.      Is there any documentation of this

24   anywhere?

25       A.      My lawyer has all the text messages.
```

1  Might be in there somewhere or --

2        Q.    Okay.

3        A.    -- multiple times.  Should be

4  somewhere provided.

5        Q.    But you can't recall where?

6        A.    No, I can't recall where in hundreds

7  of pages of messages.

8        Q.    So we should just believe you, this

9  is what happened?

10             MR. RAKHUNOV:  Objection.

11             THE WITNESS:  That's exactly what

12       happened.

13  BY MR. SPERBER:

14       Q.    I'm sorry?

15       A.    Yes.  That's exactly what happened.

16       Q.    Okay.  It says in paragraph 20,

17  "Adorama and Kitchen Winners commingled funds."

18             What information do you have to

19  support that assertion?

20       A.    I don't know the legal terms of your

21  commingling.

22       Q.    Do they share bank accounts?

23       A.    They might.  I send money to

24  Adorama.  If they have a shared account, then

25  maybe they have it.  I don't know.

1      Q.    So you don't know?

2      A.    If they have an account with each

3   other, I'm not aware.

4      Q.    Do Adorama and Kitchen Winners have

5   the same officers?

6      A.    I'm not aware of the officers of

7   either company.

8      Q.    Do they have the same directors?

9      A.    I'm not aware of the directors of

10   either company.

11      Q.    Do they share office space?

12      A.    Yes.  He was in the Adorama office

13   all the time, him and Hershey Weiner.

14      Q.    Does that mean that have -- that

15   they don't have separate offices?

16      A.    They said that's where they worked

17   out of.  That's where they worked.  It was one

18   and the same.

19      Q.    Take a look at --

20      A.    Multiple calls or all the calls

21   originated from that office.

22      Q.    Take a look at paragraph 22.  Read

23   it to yourself.

24      A.    Okay.

25            (Reviewing document.)

```
 1              Okay.
 2       Q.    In what way did Mendlowitz provide
 3  Rock Fintek with the document referenced in
 4  paragraph 22 of the counterclaim?
 5       A.    You mean did he hand-deliver it,
 6  email it?
 7       Q.    Yeah.
 8       A.    I don't recollect.
 9       Q.    I think you mentioned earlier that
10  you didn't communicate with him -- he never
11  emailed you directly; correct?
12       A.    Joseph Mendlowitz?
13       Q.    Yeah.
14       A.    I don't believe so, but if you check
15  whatever we submitted, all the emails, if it's
16  on there, then he did.  But I don't recollect
17  him doing that.
18       Q.    So how did he provide this document
19  to you?
20              MR. RAKHUNOV:  Objection.
21              THE WITNESS:  I don't know.  It's
22        more legal terms.  I don't understand it.
23  BY MR. SPERBER:
24       Q.    So you don't know?
25       A.    (Reviewing document.)
```

1              I mean, this is a bunch of legal

2      mumbo-jumbo for me.  So I don't -- I don't

3      know.  If you ask me a clear question, I'll

4      answer it.

5          Q.    Did Mendlowitz provide a document to

6      Rock Fintek which said that Kitchen Winners is

7      authorized to act on Adorama's behalf to

8      procure nitrile gloves?

9          A.    I believe we may have a document

10     that came from him or saying that.

11         Q.    Did he -- again, did he give you a

12     document that said that?

13         A.    I don't know what email it came

14     from, it came from him or it came from who.

15     Maybe it did come from him.  Maybe I was cc'd

16     on it.  Maybe he was cc'd on it and Mendel sent

17     it on his behalf or he sent it.  I'm not sure.

18     I don't recollect.  It was two years ago.

19              I looked at the whole case yesterday

20     and a bunch of documents.  That's not one of

21     the documents I saw.

22         Q.    This is Rock Fintek's complaint;

23     correct?

24         A.    I saw the complaint.  I didn't see

25     that email.

1      Q.    Is it -- this allegation in

2  paragraph 22, is it true?

3              MR. RAKHUNOV:  Objection.

4              THE WITNESS:  If we put it there,

5       it's true.  It's a fact.

6  BY MR. SPERBER:

7      Q.    So I'm asking you for the -- to

8  explain to me.

9      A.    And it's a fact.

10      Q.    So how did -- how did Mendlowitz

11  provide you the document?

12      A.    I answered already.  I don't

13  recollect.

14      Q.    Well, to the extent that any

15  document exists showing how Mendlowitz provided

16  the document referenced in paragraph 22, I'm

17  calling for its production if it's not in the

18  existing production from Rock Fintek.

19              MR. RAKHUNOV:  It's in there.

20  BY MR. SPERBER:

21      Q.    Did Rock Fintek ever tell

22  Kitchen Winners who its customer was?

23      A.    No.

24      Q.    Did Rock Fintek ever tell --

25      A.    Well, after -- at the end, after all

1    the problems we had, yes.

2         Q.    But before that, it did not?

3         A.    No.  No.

4         Q.    Did Rock Fintek ever tell Adorama

5    who Rock Fintek's customer was?

6         A.    Did -- say that one more time.

7         Q.    Did Rock Fintek ever tell Adorama

8    who Rock Fintek's customer was?

9              MR. RAKHUNOV:  Objection.

10             THE WITNESS:  Not in the beginning,

11        until we had the problems.

12   BY MR. SPERBER:

13        Q.    Okay.  At the end when you started

14   to have problems, did -- did Rock Fintek ever

15   provide any kind of notice of breach to

16   Adorama?

17        A.    We might have emailed them.  We

18   definitely called and told them.

19        Q.    What date did you call and tell them

20   on?

21        A.    July, when we got notification from

22   the hospital.

23        Q.    Did -- did Rock Fintek ever provide

24   notice of breach to Joseph Mendlowitz?

25        A.    Yeah.  It would have been to

 1   everybody.

 2       Q.    So you would have emailed Joseph

 3   Mendlowitz?

 4           MR. RAKHUNOV:  Objection.  I don't

 5       understand the question.

 6   BY MR. SPERBER:

 7       Q.    Did Rock Fintek ever notify

 8   Mr. Mendlowitz that it was claiming that he had

 9   breached some sort of a warranty that he

10   provided to Rock Fintek?

11       A.    Yes.

12       Q.    Okay.  When was that?

13       A.    Adorama knew in July, July or

14   August.

15       Q.    Again --

16       A.    We called him, emailed them, to

17   return the gloves.

18       Q.    So there's an email out there from

19   Rock Fintek to Mr. Mendlowitz?

20       A.    There's an email out there to

21   Adorama and to Kitchen Winners and everyone in

22   the conversation that we want to return these

23   products.  They are not what we asked for.

24       Q.    Okay.  Well, I'm calling for the

25   production of that email.

1              MR. RAKHUNOV:  I think it's an email

2        from your client to Joseph Mendlowitz, but,

3        you know, you know that better than I do.

4              MR. SPERBER:  Again, your client

5        just testified that Rock Fintek sent an

6        email.  So I'm calling for its production.

7              THE WITNESS:  I said we called or

8        sent an email, one or the other.  I don't

9        recollect what we did two years ago exactly

10        to communicate it.

11   BY MR. SPERBER:

12        Q.    And you can't recall the date?

13        A.    It would be after I was contacted

14   from Ascension Health.

15        Q.    If it was a phone call, who would

16   have been on that phone call besides yourself?

17        A.    God could have been on the phone

18   call.  I don't know who could have been on the

19   phone call.  I don't remember.  If I knew, then

20   I'd tell you specifically.

21        Q.    Okay.

22        A.    Only -- most phone calls was Brad

23   Gilling and I.

24        Q.    How many boxes of MedCare gloves did

25   Rock Fintek purchase in total?

```
 1        A.    I think we had over 200 million

 2   gloves.  I don't know how you count it into

 3   boxes.  Maybe it's 2 million boxes plus or 2

 4   million cartons, million cartons.  I'm not

 5   sure.  We were always going by glove count

 6   mostly.  Around, like, 1.9 million.

 7        Q.    Explain to me how the relationship

 8   between Rock Fintek and Kitchen Winners or

 9   Adorama worked; meaning, how did Rock Fintek

10   get the gloves from either Adorama or

11   Kitchen Winners or both?

12        A.    I would wire them money.  We would

13   wire them funds, and then they would start the

14   delivery of a shipment of gloves.

15        Q.    How did delivery of a shipment work?

16        A.    They were delivered to Medline.

17   When Medline received them, they in turn gave

18   them to Ascension.  Ascension paid us, and we

19   paid them again for another shipment.

20        Q.    So you're saying that

21   Kitchen Winners and/or Adorama would send the

22   gloves to Medline?

23        A.    All the gloves were delivered to

24   Medline.

25        Q.    It was my understanding -- maybe I'm
```

1    wrong here -- that Dimerco arranged for

2    truckers to pick the gloves up from -- from the

3    warehouse where Kitchen Winners and/or Adorama

4    were housing them.

5              Is that not correct?

6         A.    Dimerco did some, and they delivered

7    some directly themselves because they said they

8    can do it cheaper.

9         Q.    Okay.  How many times did

10   Kitchen Winners and/or Adorama deliver the

11   gloves directly to Medline?

12        A.    I don't recollect the exact amount.

13        Q.    Which shipments did Kitchen Winners

14   and/or Adorama directly deliver to Medline?

15        A.    All the shipments.  Either they

16   delivered directly or Dimerco delivered, one or

17   the other.

18        Q.    Right.  So which ones did they

19   deliver themselves, not through Dimerco?

20        A.    I don't know.  We'd have to check

21   what was delivered to Medline, what dates and

22   who, go through the messages and emails.

23        Q.    Where would I get this?

24        A.    I wasn't in charge of shipping.  So

25   I don't know who delivered what and when

```
 1   exactly.

 2        Q.    Who was in charge?

 3        A.    Brad Gilling did a lot of the

 4   shipping, and -- I would say Brad Gilling and

 5   Dimerco.  And who else did shipping?  That's

 6   it.  And then -- then Mendel Banon or

 7   Hershey Weiner.  I don't know.  I don't know

 8   who -- I don't think Hershey was in charge of

 9   shipping.

10        Q.    You were not prepared to testify

11   today about the shipping between --

12             (Simultaneous speaking.)

13             CERTIFIED STENOGRAPHER:  Excuse me.

14        You guys were talking at the same time.

15        "Shipping between" . . .

16             MR. RAKHUNOV:  Let him finish the

17        question.

18   BY MR. SPERBER:

19        Q.    Kitchen Winners on the one hand and

20   Ascension on the other.

21        A.    I'm prepared to testify telling you

22   that the shipments were done between either

23   Dimerco or Adorama only.

24        Q.    Yeah, but I want to know which

25   ones -- you know, how --
```

1     A.    I don't know specifically out of

2  the -- I don't know how -- how many shipments

3  was each one.

4     Q.    Do you have invoices from Dimerco?

5     A.    Yes, we do.

6     Q.    Do you have invoices from the

7  shippers?

8     A.    Yes.

9     Q.    Have they been produced?

10          MR. RAKHUNOV:   Objection.

11          THE WITNESS:   Ask my lawyer that.

12  BY MR. SPERBER:

13     Q.    Okay.  Well, I'm going to call for

14  the production of all shipping invoices.

15          How much money did Rock Fintek spend

16  on shipping?

17     A.    We were supposed to get invoices

18  from Hershey Weiner.  He refused to give them

19  to us; so I don't have those invoices.  I can

20  -- I'm sure Phillip could get Dimerco's

21  invoices.

22          Because Hershey was supposed to be

23  getting them cheaper than we were shipping

24  them, and we were supposed to be saving money

25  there; hence, that never happened, and I never

1  got a copy of one invoice from any of his

2  shipments that he had delivered.

3        Q.    Yeah, but out of pocket, how much

4  money did Rock Fintek spend on shipping?

5        A.    I'd say approximately, if I were to

6  have a good guess, 6 to 7 million.

7              MR. RAKHUNOV:  Pretty good guess.

8              MR. SPERBER:  Sorry?

9              MR. RAKHUNOV:  I said that's a

10        pretty good guess.

11              MR. SPERBER:  Again, we're calling

12        for the production of every invoice that

13        documents those -- those numbers.

14              THE WITNESS:  Then your client

15        Hershey Weiner should give us the other

16        invoices because he never gave them to us,

17        and we still don't have them.  And I've

18        asked them for them multiple times.

19              MR. RAKHUNOV:  Yeah, your -- Tommy,

20        that's fine.  Yeah, Counsel, your request

21        is noted.  I mean, I think we can talk

22        about it later.  I'm pretty sure you have

23        that information, but we can -- we can talk

24        about it.

25              MR. SPERBER:  Okay.

1  BY MR. SPERBER:

2      Q.    I think you testified earlier that

3  Dimerco was not able to examine the shipment it

4  was picking up; is that correct?

5      A.    That's correct.

6      Q.    What prevented it from doing that?

7      A.    COVID.

8      Q.    Okay.  So if it weren't for COVID,

9  they would have allowed to look at -- you know,

10  open up the boxes and see what was inside?

11      A.    Correct.

12      Q.    Okay.  What about COVID stopped

13  them?

14      A.    They were not allowed to exit their

15  vehicles even when they were being unloaded or

16  loaded, the drivers.

17      Q.    Not allowed by what?

18      A.    What?

19      Q.    Not allowed by what?

20      A.    Because of COVID protocols.

21      Q.    Which protocols?

22      A.    Whatever COVID protocol that doesn't

23  allow other people to come in contact with each

24  other.  You can look up what happened during

25  COVID if you don't remember.

1              People were not allowed to really

2      meet with each other.  Drivers were not allowed

3      to go inside Medline and possibly contaminate

4      or kill somebody if they had COVID, with the

5      infection of COVID disease.  So they were --

6         Q.    So these are laws?

7         A.    I don't know if there were laws.

8      You're the lawyer.  You would know if there's

9      laws.

10        Q.    I'm trying to understand.

11        A.    I'm telling -- I answered your

12     question.  I gave you a fact.  You want to ask

13     it ten more times, go ahead.

14              They were not allowed to see the

15     product, period.  I told you because of COVID.

16     If you want to look into it, research it.

17        Q.    Was it keeping them from pulling the

18     truck over to the side of the road, going in

19     the back and looking at what they had?

20        A.    That would be illegal.

21        Q.    Under what law?

22        A.    I'm not sure what law, but they told

23     me they were not allowed to do that.

24        Q.    Okay.

25        A.    They were sealed by the loading

1  warehouse, and they were unsealed when they got

2  there.  So . . .

3       Q.    Okay.

4       A.    You're trying to talk about a

5  trucker.  I don't know what the rules are for

6  truckers opening shipments that they have in

7  the back or not.

8       Q.    When the gloves arrived at the

9  Medline warehouse, was someone there looking at

10  the gloves?

11       A.    I don't know what Medline did when

12  they got the gloves.

13       Q.    Was someone there counting the

14  gloves that were received?

15       A.    I don't know what Medline did when

16  they received the gloves.  You can ask Medline.

17       Q.    Was there a time when Adorama or

18  Kitchen Winners, or both, delivered to

19  Rock Fintek LevMed gloves instead of MedCare

20  gloves?

21       A.    Did they deliver LevMed instead of

22  MedCare?  Is that what you said?

23       Q.    Yes.

24       A.    Yes, they did.

25       Q.    How Rock Fintek learn that the

1  gloves were LevMed and not MedCare?

2      A.    I believe within some weeks later,

3  we got notified with photos of these LevMed

4  gloves.

5      Q.    Notified by whom?

6      A.    From Ascension.

7      Q.    So, presumably, someone at Ascension

8  was looking at the gloves that were coming in;

9  correct?

10      A.    They must have -- Medline must have

11  sent them to Ascension, and that's what

12  happened.

13      Q.    So, again, someone was looking at

14  the gloves; right?

15      A.    Well, Medline counted the cartons

16  that were arrived and delivered.  They don't

17  open up the boxes of the gloves and open up the

18  glove.

19      Q.    Can you tell by looking at the

20  outside of the carton what kind of gloves are

21  inside it?

22      A.    The carton?  Yeah.  It said "LevMed"

23  on the box or it says "MedCare," I believe.

24      Q.    Let me back up just to define my

25  terms here.

1          Rock Fintek was purchasing pallets
2    of gloves; correct?
3        A.    Correct.
4        Q.    And on the pallets, there were
5    cartons, and in the cartons there were boxes of
6    gloves.
7              Is that accurate?
8        A.    Correct.
9        Q.    Okay.  On the cartons, was it
10   labeled the kind of gloves that were being
11   contained therein?
12       A.    Yes.
13             MR. RAKHUNOV:  Objection.
14             THE WITNESS:  I believe so.
15   BY MR. SPERBER:
16       Q.    So you can tell by looking at the
17   carton what's inside, LevMed or MedCare?
18       A.    We have photos that we submitted of
19   the pictures that we got that were delivered to
20   us, and I don't remember if the box or the
21   carton both said LevMed.  I believe so, but
22   there's -- the photos will show you.
23       Q.    Can you see by looking at the carton
24   whether the gloves inside are protection or
25   examination?

1          MR. RAKHUNOV:  Objection.

2          THE WITNESS:  I don't recollect

3      that.

4   BY MR. SPERBER:

5      Q.    Okay.  How many LevMed gloves did

6   Adorama and/or Kitchen Winners provide to

7   Rock Fintek?

8      A.    I don't recollect the exact amount,

9   but I do recollect that they admitted sending

10  us LevMed gloves by accident.  They said they

11  were for another customer.

12          It's whatever was in one truck's

13  load.  So whatever one truckload, maybe it's

14  9,000, maybe 9 million, 9,000 cartons, 9

15  million gloves possibly.

16     Q.    Did -- did Rock Fintek pay Adorama

17  and/or Kitchen Winners for the LevMed gloves?

18     A.    We -- I believe they did pay us.  We

19  got paid for them, and then we paid them for

20  them, because we asked for supporting

21  documentation to give to the hospital about

22  them.  The hospital accepted the documentation,

23  which later we were told by MedCare that they

24  were fake documents using their old FDA

25  numbers.

1    Q.    Did Ascension ever complain to

2  Rock Fintek about the LevMed gloves?  Let me

3  rephrase.  About the quality of the LevMed

4  gloves.

5    A.    Did Ascension complain about the

6  quality?

7    Q.    Yeah.

8    A.    They complained about the quality

9  later.  The bigger problem is it delayed our

10  payments for delivering a product that they

11  didn't have the SKU for.

12    Q.    Okay.  Were there complaints that

13  the LevMed gloves were ripping?

14    A.    They're what?

15    Q.    Were there complaints that the

16  LevMed gloves were ripping or tearing?

17    A.    Yes.  Yes.  Yes.

18    Q.    Is that in writing somewhere?

19    A.    I'm sure it is.  I can't recollect

20  exactly, but they were complaining about it.

21    Q.    Okay.

22    A.    The LevMed were just as fake as the

23  other ones.

24    Q.    Am I correct that Adorama and/or

25  Kitchen Winners offered to take the LevMed

1    gloves back?

2         A.    I don't recollect.  Possibly.

3         Q.    I'm going to show you a document.

4    One second.  I'll mark this as KWA-Kato 4.

5              (Exhibit Number KWA-Kato 4, Email

6         Chain, Bates-stamped RF_000443 - 446, was

7         marked for identification.)

8    BY MR. SPERBER:

9         Q.    Do you see in front of you a

10   document, the top email that says it's from

11   Bradley Gilling to Thomas Kato with the date of

12   August 24, 2021?

13        A.    Yes.

14        Q.    Feel free to just scan through this

15   and confirm this is an email chain that you

16   were on.

17        A.    It wasn't a chain that I was already

18   on?

19        Q.    No.  I'm asking, do you recall this

20   email chain?

21             MR. RAKHUNOV:  Scroll through it.

22             THE WITNESS:  I've got a zoom that

23        goes in and out fast.  Let me . . .

24             (Reviewing document.)

25             Okay.  What was your question?

1   BY MR. SPERBER:

2        Q.    Do you recall this email chain?

3        A.    I do.

4        Q.    Okay.  Is this an accurate -- you

5   know, is this a real email chain that you were

6   on?

7        A.    I was -- I don't see myself on

8   there.  I see it being forwarded to me.

9        Q.    Okay.  Take a look at the bottom

10  right-hand corner of most of these pages.

11  You'll see a number, RF_, and then there are

12  some -- a bunch of digits.

13       A.    Where?

14       Q.    The bottom right-hand corner.  If

15  you go to page 2, for example, you'll see --

16       A.    Okay.

17       Q.    -- RF_000444.

18       A.    Yeah.

19       Q.    You see where I am?

20       A.    Yes.

21       Q.    This does indicate they came from

22  Rock Fintek's production.

23       A.    Okay.

24       Q.    Is this a real email that

25  Rock Fintek was part of?

1        A.    Yes.

2        Q.    If you'll scroll down, do you see

3   discussion in this email chain about LevMed

4   gloves?

5        A.    Yes, I do.

6        Q.    Do you see that Rock -- that

7   Kitchen Winners offered to take the gloves

8   back?

9        A.    I do.

10       Q.    Okay.  And what was the response

11  from Rock Fintek?

12       A.    Just says -- the email says if the

13  hospital will accept them, we'll counter part

14  of the order.  If they don't, we'll take them

15  back.

16       Q.    And did the hospital accept them?

17       A.    And after we gave them this

18  documentation, the hospital accepted it.  And

19  after we gave it to MedCare, she said this was

20  a fake documentation.  This delayed us at least

21  one or two weeks.

22       Q.    I'm going to show you a document.

23  I'm marking this document that's in front of

24  you, KWA-Kato 5.

25            (Exhibit Number KWA-Kato 5, Sales

1          and Purchase Agreement, was marked for

2          identification.)

3    BY MR. SPERBER:

4          Q.    Do you see a document in front of

5    you that's labeled "Sales and Purchase

6    Agreement"?

7          A.    Yes, I do.

8          Q.    Are you familiar with this document?

9          A.    Yes.

10         Q.    Did you answer?  I'm sorry.

11         A.    Yes, I said.

12         Q.    Oh, okay.

13               You've seen it -- you've seen this

14   before?

15         A.    Yes.  It looks like -- it looks like

16   our -- our purchase order.

17         Q.    Okay.  How many boxes of gloves did

18   Rock Fintek agree under this contract to

19   purchase from Kitchen Winners?

20         A.    It should say somewhere on the

21   agreement.  100 -- 1.5 million boxes.

22         Q.    Okay.  And how many boxes of gloves

23   did Rock Fintek actually take from

24   Kitchen Winners?

25         A.    About 1.7.

1      Q.    Okay.  What did Rock Fintek do with

2   those 200,000 boxes of gloves in excess of the

3   number on this contract?

4      A.    We delivered them to the hospital.

5      Q.    Okay.

6      A.    And didn't get paid for them.

7      Q.    For any -- for any of them?

8      A.    Didn't get paid for the overage.

9      Q.    What was the overage?

10     A.    200,000.

11     Q.    So you had a contract for 200

12  million gloves with Ascension; correct?

13     A.    Correct.

14     Q.    How many gloves did you get from JNS

15  or Stern?

16     A.    We were buying gloves from them

17  already before to fill the 500,000.

18     Q.    I'm sorry?

19     A.    Before, we were already buying

20  gloves to fill the 500,000 cap.

21     Q.    Okay.  So how many gloves had you

22  purchased before you went entered into this

23  contract on April 7, 2021?

24     A.    Maybe 30 million, 20 or 30, I

25  reckon.

1          Q.    Where would I go to find that out?

2          A.    Where can you go to find that out?

3    I guess Medline's reports will show you what we

4    had delivered.  They have all the quantities

5    and times.

6          Q.    So Rock Fintek has no documentation

7    that would tell me how many gloves it purchased

8    for its purchase order with Ascension prior to

9    April 7, 2021?

10         A.    You could look at JNS's invoices.

11   You can look at Adorama Kitchen Winners'

12   invoices.

13         Q.    Okay.  And that would come up with

14   the answer?

15         A.    Should.

16         Q.    But you don't know the answer?

17         A.    I don't recollect.

18         Q.    Why did Rock Fintek take more than

19   the number of gloves listed on the contract?

20              MR. RAKHUNOV:  Objection.

21              THE WITNESS:  Because Adorama,

22         Kitchen Winners, and JNS were always lying

23         to us about the quantity they were

24         delivering.

25              ///

1  BY MR. SPERBER:

2      Q.    Can you explain that?

3      A.    They were delivering gloves beyond

4  our contract just so they can keep getting more

5  checks, and they counted on COVID for us not to

6  be able to get there and get an accurate count

7  until after the fact.  They were delivered, and

8  Medline counted them.

9      Q.    I'm confused.  Rock Fintek have a

10  contract with Ascension for 200 million gloves;

11  correct?

12      A.    Correct.

13      Q.    And it was Rock Fintek's job to

14  procure those gloves for Ascension; right?

15      A.    Correct.

16      Q.    So didn't Rock Fintek know how many

17  gloves it was delivering to Ascension?

18      A.    We couldn't get a final exact count

19  until they were delivered, which was week one

20  to two weeks or so after.

21      Q.    So when you say that Adorama and

22  Kitchen Winners were lying to Rock Fintek, what

23  are you referring to specifically?

24      A.    The quantity of gloves that they

25  were sending us.  They were not exactly as we

1   were paying for.

2         Q.    How much were they off?

3         A.    I don't know exactly because Hershey

4   refused to give us any of the truckers'

5   invoices to contact anybody to check anything,

6   but I would guess about 20 million off, more.

7   20 million more.

8         Q.    What is that number based upon?

9         A.    The number that Ascension gave us,

10  that Medline gave to Ascension for what we

11  delivered.

12        Q.    If you go to paragraph 7 of this

13  contract, on page 2?

14        A.    Okay.

15        Q.    It says, "Seller shall be allowed a

16  variance in packing quantities of up to

17  10 percent."

18              Do you see that?

19        A.    No.  Where are you reading?

20        Q.    Paragraph 7.

21        A.    Do you want to highlight it?  I

22  don't know what you're reading.  I'm on page 2.

23              MR. RAKHUNOV:  Page 2, Number 7.

24  BY MR. SPERBER:

25        Q.    Can you see the highlight?

1        A.    Page 2, Number 7.  "Manufacturing

2    Variance"?

3        Q.    Yes.

4        A.    "Seller shall be allowed a variance

5    in packing quantities of up to 10 percent."

6             So 10 percent.

7        Q.    Do you know whether this variance

8    that you're referring to was greater or less

9    than 10 percent?

10       A.    It was above 10 percent.

11       Q.    Okay.  And, again, what documents

12   could I look at to figure that out?

13       A.    Medline has an accurate count.  You

14   can get the document from them on what they

15   received.

16       Q.    Okay.  But as I understand,

17   Rock Fintek was picking up these gloves from --

18       A.    Hershey Weiner delivered gloves

19   himself also with his own trucking company and

20   refused on multiple occasions to give us the

21   invoices for the trucking.

22             So the only -- because

23   Hershey Weiner refused to give us those

24   documents, if you want documents, you have to

25   ask Medline for the documents of what was

1  received in their warehouses.

2       Q.    Okay.

3       A.    You'll have an accurate count with

4  the date.

5       Q.    But, I mean, Medline hasn't given me

6  those documents yet; so that's why I'm asking

7  you.

8       A.    Hershey Weiner hasn't given me the

9  documents yet either.  So what can I tell you?

10      Q.    Again, Rock Fintek is suing my

11 clients here.

12      A.    If he gives them to me, I can give

13 them to you.  That's it.

14           MR. RAKHUNOV:  Just focus on the

15      questions, Thomas.

16           THE WITNESS:  Okay.

17 BY MR. SPERBER:

18      Q.    If I was standing in a Medline

19 warehouse looking at a pallet of gloves, how

20 would I know who sold those gloves to

21 Rock Fintek?

22           MR. RAKHUNOV:  Objection.

23           THE WITNESS:  You can ask Medline

24      that question, how they identify them.

25           ///

1    BY MR. SPERBER:

2         Q.    So you don't know?

3         A.    I don't operate their warehouse.  I

4    don't know how they -- what their system is.

5         Q.    So you're not aware of any way I

6    could, by looking at the pallet, figure out who

7    the seller was?

8         A.    They know exactly what pallet was

9    delivered when, where, and where it was moved

10   to.  And if it was moved to another rack, they

11   know it was moved to another rack.  Medline has

12   a very accurate reporting system of everything.

13   It's meticulous.

14        Q.    But you don't know?

15        A.    I don't know how they do it, no.

16   I'm not in their business.

17        Q.    Do you know how I'd figure out, by

18   looking at a pallet, when it was delivered to

19   Medline?

20        A.    No.

21        Q.    You said earlier there was a time

22   that you went to the Medline warehouses to look

23   at the gloves; is that correct?

24        A.    That I went to what?

25        Q.    Medline warehouses to look at the

1   gloves.

2        A.    Yes.  Yes, I did.

3        Q.    Was that before over after Medline

4   had done its count of the gloves?

5        A.    After.

6        Q.    When you got there, were -- the

7   cartons of gloves, had they all been opened?

8        A.    No.

9        Q.    So how did Medline count the gloves

10  if it hadn't opened the cartons?

11            MR. RAKHUNOV:  Objection.

12            THE WITNESS:  They had ten boxes in

13       a carton.

14  BY MR. SPERBER:

15       Q.    How do they know what's inside the

16  carton?

17       A.    Maybe they opened up one box.  I

18  don't know how Medline does it.  You can ask

19  them.

20       Q.    So you just don't know?

21       A.    I don't know how Medline does

22  things.  Anything you want to ask about

23  Medline, ask Medline.  I'm not going to guess

24  what Medline does and how they do it.

25       Q.    Is it your understanding that

1    Rock Fintek claims that it overpaid Adorama

2    and/or Kitchen Winners for 5,963 cartons of

3    gloves?

4         A.    Is it my understanding of this?

5         Q.    Is it -- is it -- is that correct?

6    Is that something that Rock Fintek is claiming?

7         A.    Is it in the complaint?

8         Q.    I'm asking you.  You're Rock Fintek.

9         A.    I looked at the complaint.  I think

10   I remember seeing that exact amount in the

11   complaint.  If that's the exact amount I read,

12   then yes, that's correct.

13        Q.    Okay.  What did Rock Fintek

14   ultimately do with those gloves that it

15   purchased?

16        A.    We delivered them all to Medline.

17        Q.    Okay.  And was it paid for them?

18        A.    We paid for them.

19        Q.    I'm sorry?

20        A.    Did we pay for the gloves?

21        Q.    No, no.  Did Rock Fintek get paid

22   for them?

23        A.    Did Rock Fintek pay for them?

24             MR. RAKHUNOV:  No, get paid for

25        them.

1    BY MR. SPERBER:

2          Q.    Did Rock Fintek get paid for them?

3          A.    Get paid for them?  Yes, we got paid

4    for them.

5          Q.    Okay.

6          A.    Not in full, but we got paid.

7          Q.    Okay.  So how much were you paid for

8    those gloves?

9          A.    34 or 35 million for all --

10         Q.    No, I'm talking about the --

11   Rock Fintek is claiming that it overpaid my

12   clients for 5,963 cartons of gloves.

13         A.    We did not get paid for those.

14         Q.    Okay.  So did it get those gloves

15   back from Medline?

16         A.    No, we did not.

17         Q.    Why not?

18         A.    Because they had discrepancies with

19   all the gloves and didn't want any of them.

20         Q.    You delivered gloves which they

21   didn't pay you for; correct?

22         A.    Correct.

23         Q.    So why didn't you take them back?

24         A.    Because the gloves -- all the gloves

25   we delivered did not meet the criteria of what

```
 1   they requested and what we purchased.  We tried
 2   to send them back all to Adorama and
 3   Kitchen Winners, and they refused.
 4        Q.    Why didn't you just return them?
 5              (Stenographer requests
 6        clarification.)
 7              THE WITNESS:  They refused to allow
 8        --
 9   BY MR. SPERBER:
10        Q.    Why didn't you just return them?
11        A.    We tried to.  They refused to take
12   them.
13        Q.    You didn't just put them on a truck
14   and bring them back?
15        A.    I don't know which warehouses they
16   came from.  Remember, Hershey never gave us any
17   of their trucking invoices.
18        Q.    You don't know where Adorama's
19   located at?  You can't go onto their website
20   and find an address?
21        A.    No, didn't do that.
22        Q.    Did you try and sell those gloves to
23   somebody else?
24        A.    Yes.
25        Q.    And?
```

1        A.    It was unsuccessful.

2        Q.    How many potential customers did you

3    approach?

4        A.    Dozens.

5        Q.    And what did they all -- why did --

6    no one wanted to buy gloves from you at any

7    price?

8        A.    They said, "These gloves are

9    horrible.  We're not buying them."

10            The quality was so bad that nobody

11   would buy them.  We couldn't even sell them for

12   $0.20.

13       Q.    Why did Rock Fintek buy them?

14       A.    Because we believed we were doing

15   business with a credible company, not somebody

16   giving us something that we didn't order.

17       Q.    Did Rock Fintek at any point in time

18   look at the gloves before it purchased them?

19       A.    No.  We could not.

20       Q.    You never took one box of gloves --

21   one carton of gloves to look at?

22       A.    We might have had a box given.  I

23   don't recollect, though, exactly.

24       Q.    Didn't Rock Fintek contractually

25   agree that it could look at the gloves before

1  it purchased them?

2         MR. RAKHUNOV:  Objection.

3         THE WITNESS:  I don't know about

4     that, but might have been given -- we might

5     have been given a couple boxes to look at

6     before.

7  BY MR. SPERBER:

8     Q.    Take a look at the top of page 2 of

9  the exhibit in front of you.

10    A.    Top of page 2.

11    Q.    It's paragraph 2.d., the first

12 paragraph on page 2.

13    A.    Okay.

14    Q.    It says, "Any payment of the

15 Purchase Price payable for each box of gloves

16 delivered shall be paid to Seller upon Buyer's

17 inspection of the products at Seller's

18 warehouse in Los Angeles, California, prior to

19 Buyer's collection of the delivered Products."

20         Do you see where I am over there?

21    A.    Yes.

22    Q.    Didn't Rock Fintek agree it was

23 going to inspect the gloves before it picked

24 them up?

25         MR. RAKHUNOV:  Objection.

1            THE WITNESS:  We weren't allowed to.

2        We weren't allowed to inspect anything.

3    BY MR. SPERBER:

4        Q.    Again, who was stopping you?

5            MR. RAKHUNOV:  Objection.

6            THE WITNESS:  The warehouse.

7        Everyone around.  Couldn't get on a plane

8        to get there.

9    BY MR. SPERBER:

10       Q.    Did Rock Fintek try to send someone

11   to the warehouse to look at the gloves?

12       A.    They said we're not allowed.

13       Q.    Who said that?

14       A.    The warehouse.  The same people.

15       Q.    Who at the warehouse told you that?

16       A.    I don't remember the exact names.

17   We're not allowed to look at anything.  We're

18   not allowed to enter these warehouses.

19       Q.    Do you have a document that says you

20   weren't allowed in?

21            MR. RAKHUNOV:  Objection.

22            THE WITNESS:  Hershey says we

23       weren't allowed.  Mendel says we're not

24       allowed.  They said it on the phone.

25            ///

1  BY MR. SPERBER:

2      Q.    I mean, didn't they put in their own

3  contract that you were going to do this?

4            MR. RAKHUNOV:  Objection.

5            THE WITNESS:  They put it, but then

6      it wasn't allowed.

7  BY MR. SPERBER:

8      Q.    Again, do you have anything anywhere

9  documenting that someone from either Adorama or

10 Kitchen Winners or the warehouse told you that

11 you were not allowed to go to the warehouse --

12            MR. RAKHUNOV:  Objection.

13 BY MR. SPERBER:

14     Q.    -- and look at the goods?

15     A.    Yes, on the phone, they told me

16 multiple times.

17     Q.    And that's it?

18     A.    Yes.

19     Q.    And you never said, "Well, in our

20 contract you agreed we could do this before we

21 pay you"?

22     A.    They lied about a lot of things.

23 This was just another.

24            (Exhibit Number KWA-Kato 6, Rock

25     Fintek LLC's Amended Initial Disclosures,

```
 1        was marked for identification.)
 2   BY MR. SPERBER:
 3        Q.    I'm showing you another document I'm
 4   labeling KWA-Kato 6.
 5             Do you see a document in front of
 6   you labeled "Rock Fintek LLC's Amended Initial
 7   Disclosures"?
 8        A.    Yes.
 9        Q.    Scroll down to page 3.
10        A.    Okay.
11        Q.    And the section that's involved, it
12   says "Unpaid Amounts by Ascension and Rebates
13   Owed by Adorama."
14             Do you see where I am?
15        A.    Yes.
16        Q.    Read that full paragraph at the
17   bottom of page 3.
18        A.    (Reviewing document.)
19             Okay.
20        Q.    Exactly how much money does
21   Ascension owe to Rock Fintek under the POs --
22   the purchase orders between the two of you?
23        A.    There's 2 million -- approximately
24   $2 million that was not paid.
25        Q.    I see where it says approximately,
```

1  but I want to figure out what's the exact

2  number.

3          A.    I don't know the exact number.

4          Q.    You see at the very end of that

5  paragraph where it refers to Rock Fintek's

6  invoice to Ascension?

7          A.    Okay.

8          Q.    Did Rock Fintek give invoices to

9  Ascension?

10         A.    It's like that order that you had

11  saw before.  They gave us one; we gave them

12  one.

13         Q.    So would you give invoices to them

14  contemporaneous with the purchase order, or

15  would you give invoice them when you delivered

16  gloves to them?

17         A.    I believe we gave them an invoice in

18  the beginning of the order.  And then we tried

19  to collect on this at the end, and that's where

20  they stopped paying us.

21         Q.    I mean, I'll just tell you, I've

22  gone through Rock Fintek's production.  I found

23  a couple invoices from Rock Fintek to

24  Ascension, but nothing in the amount of the,

25  you know, approximately $37 million that I

1   understood was the purchase price for the

2   200 million dollars [sic].

3              Can you shed some light to me on

4   what invoice I should be looking for here?

5       A.    I believe when we were closing this

6   order out, that's in July, and that's when they

7   started to complain about the gloves and they

8   weren't happy with the quality, and the 2

9   million was a moot point because they wanted to

10  return all the gloves.

11      Q.    I'm sorry.  I'm not following what

12  you're saying.  Can you repeat that?

13      A.    When they sent a complaint about the

14  gloves in July, that's around the time we

15  wanted to get paid in full and wrap this up,

16  and they, at the time, wanted to return all the

17  gloves.  So there was no discussion about

18  paying us 2 million.  They wanted to return

19  everything, and we did not pursue them to pay

20  us.

21             MR. RAKHUNOV:  Can we go off the

22       record -- can we go off the record for one

23       second?

24             MR. SPERBER:  Sure.

25             (Break taken from 3:29 p.m. to

```
 1          3:40 p.m.)
 2   BY MR. SPERBER:
 3       Q.    Okay.  I apologize, Mr. Kato.  I
 4   don't recall exactly where we left off, but let
 5   me do it this way.
 6            Okay.  Mr. Kato, I'm going to show
 7   you a document I'm going to mark as KWA-Kato 7.
 8              (Exhibit Number KWA-Kato 7, Rock
 9        Fintek Invoice 283299000000870083, was
10        marked for identification.)
11   BY MR. SPERBER:
12       Q.    Do you see an invoice in front of
13   you?
14       A.    Yes.
15       Q.    Is this an invoice that Rock Fintek
16   sent to Ascension?
17       A.    (Reviewing document.)
18              I believe so, yes.
19       Q.    Okay.  This invoice is dated
20   December 7, 2020; right?
21       A.    Correct.
22       Q.    Is that the same date as the
23   purchase order from Ascension?  I can show it
24   to you again, if you like.
25       A.    So where is the date on this one?
```

1  December 7.  Okay.

2       Q.    Let me -- can you see a PO in front

3  of you?  No, I've got to click "Share."

4            Do you see a purchase order in front

5  of you?

6       A.    Yes.  Looks like the same date.

7       Q.    Okay.  Can you explain to me, why

8  was Ascension -- excuse me.  Why was

9  Rock Fintek sending an invoice to Ascension on

10  the same date as the PO?

11       A.    For deposit.

12       Q.    So you were asking for a $37 million

13  deposit?

14       A.    No.  We were asking for a

15  $7-9 million deposit.  I believe it ended up

16  being nine, is what we agreed to.

17       Q.    Now, to go back to the invoice, it's

18  for the full amount; right?

19       A.    No.  It doesn't say full amount.

20       Q.    Here's the invoice again.  Why don't

21  you -- oh, I see.  Amount due upon order is

22  9,250,000?

23       A.    Correct.

24       Q.    Did Ascension send follow-up

25  invoices as it got paid for delivering gloves?

1        A.    I believe so, and I believe we

2   provided them.

3        Q.    Now, when Rock Fintek would deliver

4   gloves to Ascension, would Ascension provide

5   any documentation -- you know, receipts, for

6   example -- saying "gloves received"?

7        A.    Would Rock Fintek sent a closed

8   receipt.

9        Q.    I'm sorry.  Would Ascension provide

10  Rock Fintek with receipts of some sort?

11       A.    No.

12       Q.    They would just wire money to your

13  account?

14       A.    They would send something like this

15  document, like the document that --

16            MR. RAKHUNOV:  Objection.  This is

17       not an Ascension document.  You used a

18       previous exhibit; right?

19  BY MR. SPERBER:

20       Q.    Like the purchase order?

21       A.    Yes.  They would send us something

22  similar to this that they were paying, made a

23  payment.

24       Q.    To the extent those haven't been

25  produced, I'm going to call for them to be

 1   produced.

 2          Now, the invoice that we looked at a

 3   few minutes ago was for $37 million; correct?

 4   That was the total amount?

 5      A.    Correct.

 6      Q.    And that was for 200 million gloves?

 7      A.    Correct.

 8      Q.    I'll show it to you again just to be

 9   clear.  Right?  It's $37 million, and the total

10   quantity was 200 million?

11      A.    Correct.

12      Q.    Now, Ascension had sent a letter to

13   Rock Fintek when things started to fall apart.

14   I believe Avi showed it to you earlier.  I'm

15   going to display it now.  This was previously

16   marked as JNS Exhibit A.

17          Do you recall this letter?

18          MR. RAKHUNOV:  Just note my

19      objection to form.

20          THE WITNESS:  Yes, I remember the

21      letter.

22   BY MR. SPERBER:

23      Q.    If you go to page 2 at the very top,

24   they say, "Resource Group paid Supplier

25   approximately $37 million to provide 200

1    million nitrile ASTM FDA 510(k) D6319 rated

2    gloves."

3              Do you see that?

4        A.    Yes.

5        Q.    So they're saying here that they

6    paid you the $37 million, or approximately

7    $37 million.

8        A.    Correct.

9        Q.    So did they pay this purchase order

10   in full -- or this invoice in full?

11       A.    No.

12       Q.    So they're wrong, is your take?

13       A.    Oh, if you want to say

14   approximately.  I wouldn't say it's not in

15   full.  They held $2 million, which you could

16   see in the bank records also that you have.

17       Q.    Oh, I could if they weren't heavily

18   redacted.

19       A.    Everything that came in from

20   Ascension is on there.

21       Q.    Again, did Ascension ever return to

22   Rock Fintek the gloves for which it had been

23   paid?

24       A.    No, it did not.

25       Q.    Why not?

1          MR. RAKHUNOV:  Objection.  Let me --

2      before you answer that, I want to caution

3      you that if anything you might say comes

4      from discussions with me about what you

5      might think or what -- what I might think,

6      I don't want you to answer that.

7          But if you actually have a factual

8      answer that doesn't come from deliberations

9      of counsel, then you can go ahead.

10         THE WITNESS:  I don't know what

11     Ascension does and would do and not do and

12     why they would do or not do something.  I

13     can't say what their actions are going to

14     be.  I just speak of my own.

15 BY MR. SPERBER:

16     Q.    If I wanted to find those specific

17 gloves that Rock Fintek was not paid for, those

18 specific ones, where would I go and find them?

19     A.    I would look at the last shipments

20 that came in to Medline, ask them what rack or

21 pallet or shelf they put them on, and then you

22 can go look at them.

23     Q.    Do you know where they are?

24     A.    I do not know where Medline's

25 keeping them.

1    Q.    Have you tested those specific

2   gloves?

3    A.    I randomly went and took gloves from

4   various warehouses and various pallets, various

5   lots, and tested.

6    Q.    Do you specifically know if there

7   are any problems with the gloves that Ascension

8   did not pay Rock Fintek for?

9    A.    I believe they were all the same.

10    Q.    What do you base that upon?

11    A.    The testing report I got from Akron.

12    Q.    And that tells you that every glove

13   that was -- all 200 million gloves were exactly

14   the same?

15    A.    Every glove had almost no nitrile in

16   it.  If not, it had traces of nitrile.  That's

17   what we were told.

18    Q.    Uh-huh.

19    A.    And then when confronting the

20   manufacturer after the fact, tried to tell us a

21   different way to do testing, that everything

22   was consistent, all the same formula.

23    Q.    Is part of Rock Fintek's claim here

24   that some of the gloves were protection gloves

25   and some of them were examination gloves?

1      A.    Yes, it is.

2      Q.    So not all of those were the same;

3  correct?

4      A.    They were not the same.  It was half

5  and half, approximately.

6      Q.    Okay.  How do you know that?

7      A.    That's what we were told by Medline.

8      Q.    So you're relying upon Medline for

9  that?

10      A.    We relied on Medline for that.

11      Q.    Who at Medline made that

12  determination?

13      A.    Who at Medline?  I don't know who

14  made the determination, but -- one moment.

15  I've got to charge the computer again.

16            I don't know any specific person at

17  Medline that made that.

18      Q.    What is the difference between a

19  protection glove and an examination glove from

20  MedCare?

21            MR. RAKHUNOV:  Objection.

22            THE WITNESS:  I'm not an expert on

23      what the difference is.  I just know both

24      gloves didn't have any nitrile on them, and

25      both gloves are not D6319 like we ordered

```
 1        per our contract.
 2   BY MR. SPERBER:
 3        Q.    To your knowledge, is there a
 4   material difference between a MedCare
 5   examination glove and a MedCare protection
 6   glove?
 7        A.    Yes.
 8        Q.    Again, what is that difference?
 9        A.    Again, I'm not the expert in it,
10   what it would be, but there's significant lower
11   quality, not to be used for examination
12   protection.
13        Q.    And how do you know that?
14        A.    It's what I was told from Anna from
15   MedCare.
16        Q.    Okay.  Anything else?
17        A.    No.
18        Q.    How did -- how did MedCare figure
19   out which boxes contained protection gloves and
20   which ones contained examination gloves?
21        A.    I believe a lot of them are on the
22   outside of the carton.
23        Q.    And you're --
24        A.    Pallets came wrapped protection or
25   wrapped for examination.  So if you look at the
```

1  cartons and they're examination, that pallet's

2  examination.  Otherwise, that pallet's

3  protection.

4       Q.   And would that have been something

5  that you could see just looking at the pallet

6  when standing there?

7            MR. RAKHUNOV:  Objection.

8            THE WITNESS:  I believe so.  We took

9       a lot of photos, and we submitted them.  So

10      I guess you can look at the photos, and it

11      should show that.

12  BY MR. SPERBER:

13      Q.   So, presumably, Medline, when it

14  received these gloves, could see immediately

15  whether they were protection or examination

16  gloves; correct?

17            MR. RAKHUNOV:  Objection.

18            THE WITNESS:  Medline was doing a

19      count of gloves, boxes, cartons.

20  BY MR. SPERBER:

21      Q.   They noticed when you sent LevMed

22  gloves; right?

23      A.   Because it wasn't the name, MedCare.

24  But they didn't have the SKU number for it.  So

25  all the protection and examination all said

1  MedCare on them.  LevMed was a new SKU, new

2  name.

3        Q.    Who figured out there was an issue

4  with the examination or protection -- you know,

5  whether -- that they were mixed together?

6        A.    We identified that, Brad and I, when

7  we went to the warehouse.  We identified a

8  large quantity of protection on there.

9        Q.    So did Medline ever -- excuse me.

10 Did Ascension ever complain to you that you had

11 sold them protection gloves and not examination

12 gloves?

13       A.    They complained that they didn't get

14 D6319 510(k) gloves.

15       Q.    Did your contract with

16 Kitchen Winners and/or Adorama -- did it

17 require them to sell you gloves that conformed

18 with ASTM D6319?

19            MR. RAKHUNOV:  Objection.

20            Go ahead.

21            THE WITNESS:  Yes.

22 BY MR. SPERBER:

23       Q.    It did.  Okay.

24            Let me show you that contract again.

25            MR. SPERBER:  Off the record for a

1          second.

2                (Off the record from 3:54 p.m. to

3          3:55 p.m.)

4    BY MR. SPERBER:

5          Q.    Do you see in front of you

6    KWA-Kato 5?

7          A.    Yes.

8          Q.    The sales and purchase agreement?

9          A.    Yes.

10         Q.    Where in this document did Adorama

11   and/or Kitchen Winners agree to sell gloves

12   that met the requirements of ASTM D6319?

13         A.    It says right there, FDA 510(k)s.

14         Q.    Is that the same thing?

15         A.    I believe it's a very similar glove.

16         Q.    Does every 510(k) certified glove

17   comply with D6319?

18                MR. RAKHUNOV:  Objection.

19                THE WITNESS:  I'm not positive.  I

20         would have to ask an expert.

21   BY MR. SPERBER:

22         Q.    What does FDA 510(k) mean?

23                MR. RAKHUNOV:  Objection.

24                THE WITNESS:  Don't recall exactly.

25                ///

1   BY MR. SPERBER:

2       Q.    Okay.  Besides in this agreement,

3   was there somewhere else where Adorama and/or

4   Kitchen Winners agreed to provide gloves that

5   complied with the requirements of D6319?

6               MR. RAKHUNOV:  Objection.

7               THE WITNESS:  I would have to ask

8       Bradley, ask him.  That's what we talked

9       about the whole time.

10  BY MR. SPERBER:

11      Q.    All right.  Are you claiming that

12  the gloves here were not FDA 510(k) certified?

13      A.    I don't know what the definition of

14  that is, but I don't believe they are.

15      Q.    And what is (indiscernible) --

16              CERTIFIED STENOGRAPHER:  I'm sorry?

17              THE WITNESS:  There was no nitrile

18      on the glove.

19  BY MR. SPERBER:

20      Q.    Hold on.  Wait.  Let me back up.

21              The question was, and what was the

22  basis for that?

23      A.    You want me to find FDA 510(k), and

24  I'll tell you.

25      Q.    I believe you said earlier that

1    Kitchen Winners and/or Adorama delivered gloves

2    to Medline.

3              Was that correct?

4        A.    Yes.

5        Q.    Do you have any documentation to

6    back up that assertion?

7        A.    I told you earlier, Hershey Weiner

8    would not give me the documentation.  The only

9    thing he gave me was a schedule.  He didn't

10   give me the actual documentation of the

11   truckers.  He gave me a schedule, all of the

12   deliveries that they had made, but not

13   invoices.

14       Q.    So you don't have documentation to

15   show that Kitchen Winners delivered products to

16   Medline?

17       A.    I have a detailed report from

18   Hershey Weiner of what was delivered, which is

19   submitted into this complaint or into your

20   documents that you have somewhere.  I just do

21   not have his trucking reports.  But I have a

22   detailed report that he sent of what he

23   delivered and when he delivered it.

24       Q.    Did he say where he delivered it to?

25       A.    If you pull up the document, you'll

1   see it.

2        Q.    I'm asking you.  Did he tell you

3   where he delivered the gloves?

4        A.    I don't recollect.  Pull up the

5   document and read it.  You'll see where it is,

6   what it says.

7        Q.    So you have no independent

8   recollection as to whether or not --

9        A.    Pull up the document and I'll read

10  it and I'll tell you.

11            MR. RAKHUNOV:  Tommy, let him finish

12      the question.

13  BY MR. SPERBER:

14       Q.    Let me ask the question.

15       A.    I heard the question.

16       Q.    You have no independent recollection

17  as to whether or not Kitchen Winners and/or

18  Adorama delivered gloves to Medline; correct?

19       A.    They 100 percent delivered all the

20  gloves to Medline.

21       Q.    You told me earlier, Dimerco

22  delivered some of them.

23       A.    They delivered between Dimerco and

24  Adorama and Kitchen Winners and Joel Stern and

25  JNS.

1           Is that better?

2      Q.   I don't understand what you're

3   saying.  I'll be honest.

4      A.   JNS, Joel Stern, Adorama,

5   Kitchen Winners, delivered all the gloves

6   for -- to Medline.

7      Q.   So they're the ones who hired the

8   ship -- the trucking companies to deliver the

9   gloves to Medline?

10     A.   They delivered them or Dimerco

11  delivered them.  There's only two groups of

12  people:  everyone that gave me fraud stuff,

13  fake stuff, or not what I ordered; and then

14  this truck -- shipping company.  Two groups

15  delivered all the gloves.

16     Q.   So I'm asking, what evidence do you

17  have to support your assertion that Adorama or

18  Kitchen Winners delivered gloves to Medline?

19          And when I say "delivered," I mean

20  they are the ones who arranged the shipping as

21  to opposed to Dimerco or Rock Fintek arranging

22  the shipping.

23     A.   I'm sure there's messages with

24  Hershey Weiner and Mendel Banon with the

25  trucking companies they hired to deliver them.

1      Q.    You can't point me to any of them?

2      A.    He wouldn't give them to me.

3      Q.    So you don't have them?

4      A.    He wouldn't give them to me.  He

5 sent me a schedule of what he supplied.

6      Q.    You said earlier that Joseph

7 Mendlowitz was copied on emails to you; is that

8 correct?

9      A.    I believe he was on some emails,

10 yes.

11      Q.    I'm going to call for production of

12 those emails.

13            MR. RAKHUNOV:  Wait.  Say that --

14      sorry.  Repeat that.  What emails are

15      you asking for?

16            MR. SPERBER:  Emails from Adorama or

17      Kitchen Winners to Rock Fintek on which

18      Joseph Mendlowitz is copied.

19 BY MR. SPERBER:

20      Q.    Did Joseph Mendlowitz ever email you

21 directly or Rock Fintek directly?

22      A.    I don't believe so.

23      Q.    We discussed a little bit earlier

24 someone by the name Arik Maimon.  I just want

25 to go a little further in that direction.

```
 1            How did Mr. Maimon become involved
 2   in this transaction?
 3       A.   He said he could help broker the
 4   deal and make sure that we didn't get screwed,
 5   is what he said.
 6       Q.   You had testified earlier that you
 7   approached Kitchen Winners; right?
 8       A.   Correct.
 9       Q.   How did Arik Maimon get involved in
10   the whole thing?
11       A.   Arik Maimon said that he knew
12   somebody at Kitchen Winners or Adorama or on
13   the board or somebody that said we should have
14   him involved in the deal and have all
15   communication go through him to make sure
16   everything's going to be legitimate.
17       Q.   I'm going to share a document with
18   you.  I'm going to mark this as KWA-Kato 8.
19            (Exhibit Number KWA-Kato 8, Letter
20       of Intent, Bates-stamped RF_000962 - 963,
21       was marked for identification.)
22   BY MR. SPERBER:
23       Q.   Do you see a document in front of
24   you labeled "Letter of Intent"?
25       A.   Yes.
```

1      Q.    Have you ever seen this before?

2      A.    Let's see.

3            (Reviewing document.)

4            Yes.

5      Q.    Okay.  What is the nature of this

6  document?

7      A.    It's like a broker agreement with

8  Arik Maimon.

9      Q.    Would it be correct to say that

10  Rock Fintek was hiring Arik Maimon to act as a

11  broker?

12            MR. RAKHUNOV:  Objection.

13            THE WITNESS:  I don't know if you

14      want to say that, but he was paid by

15      Adorama, not by me.

16  BY MR. SPERBER:

17      Q.    Well, is that what it says here?

18      A.    It doesn't say here, but if you

19  check the bank accounts and records, I paid him

20  nothing.  They paid him 200,000.

21      Q.    When you say they paid him, I mean,

22  paid him for what?

23      A.    I don't know.  They loaned him money

24  for something else.  They gave him 200,000 as a

25  gift.  They sent him $200,000, when they never

1  knew who he was before.

2       Q.    How do you know they didn't know who

3  he was?

4       A.    Well, maybe they were cousins and

5  they grew up together.  I presume they didn't

6  know each other very well.

7       Q.    What do you base that on?

8       A.    What do I base it on?

9       Q.    Yep.

10            MR. RAKHUNOV:  Which part?

11            MR. SPERBER:  He just testified that

12       he presumes they didn't know each other; so

13       I'm just trying to understand where that

14       came from.

15            THE WITNESS:  I don't believe that

16       he ever spoke to them before.  I told him

17       who they were.

18  BY MR. SPERBER:

19       Q.    So why did Rock Fintek hire him to

20  act as a broker in this transaction if he

21  didn't even know them?

22       A.    He said he could help with the deal

23  and make sure it's going to be safe and secure.

24  And because we have a very large client and we

25  have a very delicate -- not delicate but strong

1    relationship with, we wanted to make sure

2    nothing went wrong with the relationship and

3    were willing to pay extra expenses to make sure

4    everything went smoothly.

5         Q.    So what services was he provided to

6    Rock Fintek?

7         A.    To make sure that there was no fraud

8    or any wrongdoing done to us from Adorama or

9    Kitchen Winners.

10        Q.    Again, what was he going to do?

11        A.    He was just going to be

12   communicating with them and making sure that we

13   got everything they said they were going to

14   give us.

15             And there was a lot of communication

16   problems.

17        Q.    That came around after you hired

18   him; right?

19        A.    That was to be safe.  And then

20   after, he ended up doing more communication,

21   actually, than safety control, I'd say.

22        Q.    What -- why didn't Rock Fintek pay

23   him?

24        A.    Because all the product we bought

25   was not the product we paid for.

1      Q.    Did -- did this letter of intent lay

2   out Rock Fintek's understanding of the

3   transaction with Adorama and Kitchen Winners?

4            MR. RAKHUNOV:  Objection.

5            THE WITNESS:  No.  This transaction

6        was made -- this document was made by Arik

7        Maimon and was given to us and he just

8        said, "Just sign it.  Just sign it so I

9        have something in writing."

10  BY MR. SPERBER:

11     Q.    So -- okay.  So Rock Fintek did sign

12  it?

13     A.    Yes.  It appears to be Bradley

14  Gilling's signature.

15     Q.    Okay.  When is the last time you

16  spoke with Mr. Maimon?

17     A.    Beginning of this year, last year.

18     Q.    What did you speak about?

19     A.    What was that?

20     Q.    What did you speak about?

21     A.    What did we speak about?

22     Q.    Yes.

23     A.    Getting together, having dinner,

24  starting to talk more.

25     Q.    You wanted to do business with him

1  again?

2      A.    Absolutely not.

3      Q.    So what was the purpose of getting

4  dinner?

5      A.    I bumped into him at a restaurant.

6  I didn't call him.  The conversation was,

7  "Let's get together and have dinner."  I said

8  no.

9      Q.    How do you know Arik Maimon?

10      A.    I met him through a dinner I was

11  invited to with him and his wife, with a group

12  of people -- with a large --

13      Q.    Have you ever done business with him

14  before?

15      A.    Nope.

16      Q.    This is the only transaction you

17  ever did business with him on?

18      A.    Correct.

19      Q.    When did you inform Adorama or

20  Kitchen Winners that Rock Fintek's

21  representatives were prohibited by COVID-19

22  protocols from physically inspecting the

23  products that it was purchasing?

24      A.    When did we inform Ascension?

25      Q.    When did you tell Adorama or

1  Kitchen Winners?

2       A.    Well, they knew we couldn't examine

3  the products.

4       Q.    Well, they had agreed in the

5  contract to let you inspect them before picking

6  them up.  So do --

7       A.    They wrote a lot of things in the

8  contract that they didn't follow.

9       Q.    So then why didn't you walk away

10 from the deal?

11      A.    I didn't realize that till later.

12      Q.    Wasn't it right there in the

13 contract, you had this right?

14      A.    Yeah, it was, but I didn't have much

15 choice but to buy gloves from them and trust

16 that they were giving me the proper gloves.

17      Q.    You bought, what, $20 million from

18 them, little less?

19      A.    Yes, sir.

20      Q.    And you never once thought to take a

21 look at what you were buying?

22      A.    We were not allowed to during COVID.

23 You don't -- do you remember what happened

24 during COVID?

25      Q.    Did you ever --

1        A.    People weren't allowed outside their

2    house.  They had to get a pass sometimes, in

3    some cities, just to walk the dog.  You don't

4    remember that?

5        Q.    Did Rock Fintek ever make a request

6    to Adorama or Kitchen Winners to let them look

7    at the gloves before picking them up?

8        A.    To look at the gloves?

9        Q.    Yes.

10        A.    We tried to, yes.  I think the one

11   time, we had a representative, Mrs. Lee,

12   examine them.  And then in LA at their

13   warehouse, I think we tried to get someone to

14   look at them.  I don't think we ever did.

15        Q.    Is there a request in writing

16   somewhere or email, for example, saying, "We

17   want to look at the gloves before we pick them

18   up"?

19        A.    I'm sure it's in -- it was on phone

20   calls.  Maybe it's on some documentation that

21   Phillip submitted, in text messages, SMSes.

22        Q.    Mrs. Lee examined whose gloves?

23   Kitchen Winners or JNS?

24        A.    I think it's only JNS.  I don't

25   think she examined any others, but they're all

1    MedCare.  They were all the same type of glove,

2    more or less, minus the ones with the stickered

3    boxes.

4         Q.    You're saying some of them were

5    protection and some were examination; right?

6         A.    Half the gloves came in were

7    protection.  Half were examination.

8         Q.    Wouldn't you have known that if

9    you --

10        A.    Nothing -- no, I would not have

11   known that.

12        Q.    Why not?

13        A.    Because I don't know what an

14   examination glove is going to look and feel

15   like.  I'm not a glove expert.

16        Q.    I think you said earlier, it says on

17   the box; right?

18        A.    It says on the box.  That doesn't

19   mean that's what's in the box, as you can look

20   up Adorama and all their lawsuits that they

21   have selling fake Nokia cameras, accused of all

22   those.  They sell things in boxes that are not

23   what's in the box.

24        Q.    So it's possible that inside the

25   protection boxes, they're actually examination

1  gloves?

2          MR. RAKHUNOV:  Objection.

3          THE WITNESS:  There was no

4      examination gloves in any of the boxes

5      where any of them were tested.  None of the

6      gloves had nitrile.

7  BY MR. SPERBER:

8      Q.    What kind of instructions did you

9  give the trucking companies regarding examining

10  the gloves when they were picking them up?

11  Anything?

12      A.    I asked them to count them, to check

13  them.  They said they're not allowed to.

14  Dimerco said no.  Hershey Weiner wouldn't give

15  me his trucking companies.

16      Q.    Did you ever think of arranging with

17  another warehouse midway, so to speak, where

18  you could access the gloves?

19      A.    You're not allowed to.  They were

20  sealed, and when they got -- they arrived, they

21  broke the seal.

22      Q.    Weren't you the buyer?

23      A.    I was buying them and delivering

24  them to somebody else.  I cannot break the

25  seal.

1      Q.    According to who?

2      A.    According to me.  I bought a glove

3  from somebody.  It's being delivered in seal to

4  somebody else.

5      Q.    You're saying you chose not to look

6  at the gloves?

7           MR. RAKHUNOV:  Objection.

8           THE WITNESS:  No.  I could not look

9      at the gloves because of COVID protocols.

10 BY MR. SPERBER:

11     Q.    What would -- again, what would have

12 stopped you from --

13     A.    COVID protocols.

14     Q.    -- having the truck deliver them to

15 an independent warehouse and looking at them --

16     A.    COVID protocols -- COVID

17 protocols -- you're asking the same question

18 100 times.

19           MR. RAKHUNOV:  Thomas, let him

20      finish the question, and I'll object.

21           THE WITNESS:  He's asking the same

22      stupid question.  We've only got two hours

23      and 20 minutes left.  So -- well, two hours

24      and 34 minutes left.  So if he wants to ask

25      the same stupid question over and over

1          again, that's fine.

2                  MR. RAKHUNOV:  All right.  Let's

3          take -- can we take a two-minute break?

4                  MR. SPERBER:  Sure.

5                  THE WITNESS:  I don't need a break.

6                  MR. RAKHUNOV:  No, no, no.  I do.

7                  THE WITNESS:  Fine.

8                  MR. RAKHUNOV:  I do.  Off the

9          record.

10                 (Break taken from 4:13 p.m. to

11         4:19 p.m.)

12                 MR. RAKHUNOV:  All right.  Let's

13         move on.

14                 MR. SPERBER:  Okay.  Back on the

15         record.

16    BY MR. SPERBER:

17         Q.    Mr. Kato, I'm showing you again what

18    was previously marked KWA-Kato 6, which are

19    Rock Fintek's amended disclosures.  Scroll down

20    to page 4 out of 5?

21         A.    Okay.

22         Q.    Read that top paragraph there.

23         A.    "The Adorama Parties"?

24         Q.    Yeah.

25         A.    (Reviewing document.)

1          Okay.

2          Q.    Can you explain to me Rock Fintek's

3    claim for a rebate?

4          A.    Because we purchased everything like

5    we said we were going to and make payments like

6    we said we were going to.

7          Q.    And that, you think, entitles you to

8    a rebate?

9          A.    Yes, per -- the price was originally

10   $11.  They switched it and added $0.50 to us

11   and said they'll give it back to us as a rebate

12   later.

13         Q.    I'm going to show you what was

14   previously marked as KWA-Kato 5, which is the

15   Sales and Purchase Agreement.

16              If you take a look on page 2 at the

17   bottom, the last paragraph is titled "Rebate."

18              Do you see where that is?

19         A.    Yes.

20         Q.    Can you just read through that to

21   yourself.

22         A.    (Reviewing document.)

23              Okay.

24         Q.    So am I correct that in order to be

25   entitled to a rebate, Rock Fintek had to make

1    the payments due under the contract timely?

2         A.    Correct.

3         Q.    Okay.  If you look on -- at the top

4    paragraph on that same page, starts with the

5    letter "d.," and then the last sentence over

6    there says, "Payments are considered timely if

7    wire confirmation is made within 48 hours

8    (excluding Saturday and Sunday) from product

9    availability at Seller's Los Angeles

10   warehouse."

11              Do you see where that is?

12        A.    Yes.

13        Q.    Did Rock Fintek make the payments

14   timely hereunder?

15        A.    Yes, it did.

16        Q.    Okay.

17        A.    Except when they gave us LevMed

18   gloves, which they gave us the wrong gloves,

19   which delayed our payments of accepting

20   payment, which we explained --

21        Q.    Rock Fintek --

22        A.    -- which we explained to them and

23   they accepted.

24        Q.    Rock Fintek agreed, though, that it

25   was going to count the LevMed gloves towards

1  the total in the contract; right?

2       A.    This was in the beginning of it, of

3  the order.  And when they sent us LevMed

4  gloves, we said, "Because of the LevMed, it's

5  delaying us from receiving a payment from our

6  hospital client, which in return, because of

7  your mistake, is causing a delay in this."

8       Q.    So if you look on page 1 under

9  "Payment Terms" -- you see where that is?

10      A.    Payment -- under 1?

11      Q.    Yeah.  Page 1, paragraph 2.

12      A.    Okay.

13      Q.    2.a. says:  "On the date hereof,

14 Buyer shall wire to an account designated by

15 Seller the sum of $1.25 million (the 'First

16 Deposit')"?

17      A.    Yes.

18      Q.    Did Rock Fintek do that?

19      A.    I have to check the dates when we

20 sent.

21      Q.    Then it says:  "On April 26, 2021,

22 and prior to the Shipment of any Products in

23 Tranche 3, Buyer shall wire to an account

24 designated by the Seller the sum of $600,000."

25            Did Rock Fintek do that?

1      A.    I would have to check the statements

2  on what dates we sent funds and exact amount.

3      Q.    That deposit, that was going to go

4  to the last 5.6 containers; right?  That's what

5  it says at the bottom of that paragraph?

6      A.    "The Deposit shall be applied as

7  payment in full for the last approximately 5.6

8  containers," correct.

9      Q.    So I'm going to show you -- I

10  created a chart.  This is my creation; so take

11  that for what it is, but it's going through

12  payments back and forth.  I'm going to share it

13  with you.

14            And what are we up to?  I think

15  we're on Number 9.  Make this KWA-Kato 9.

16            (Exhibit Number KWA-Kato 9, Chart

17      Created by Alexander Sperber, was marked

18      for identification.)

19  BY MR. SPERBER:

20      Q.    This is a chart that I created to

21  try and keep track of the balance.  And as far

22  as I can tell, Rock Fintek was routinely and,

23  you know, in a growing sense, behind on its

24  payments to Kitchen Winners and/or Adorama.

25            What am I missing here?

1      A.      Adorama delivered and

2  Kitchen Winners delivered LevMed gloves, which

3  delayed our entire process and all of our

4  orders.

5      Q.      If you look, the numbers in the

6  negative column keep growing; right?  You know,

7  May 26 you're, what, four and a half million

8  dollars behind?

9      A.      From your numbers, I owe them

10  2.2 million, if you look at the very bottom.

11          MR. RAKHUNOV:  Yeah, and, you know,

12      note my objection to -- obviously to the

13      use of this summary exhibit that, you know,

14      we haven't had a chance to vet or confirm

15      the accuracy of, but --

16          MR. SPERBER:  That's fine.  I just

17      want to say -- I'll be very upfront.  I

18      created this.

19          MR. RAKHUNOV:  No, understood.  I

20      appreciate that.  Go ahead.

21          MR. SPERBER:  Yeah.

22  BY MR. SPERBER:

23      Q.    So I'm not going to make you take my

24  numbers as anything because it's very

25  possible -- maybe I made a mistake.  So I'm not

1  going to tell you that you have to take this on

2  its face.

3          But let me ask you straight up,

4  would you agree that if Rock Fintek was not

5  timely in its payments, it was not entitled to

6  a rebate under the contract?

7          MR. RAKHUNOV:  Objection.

8          THE WITNESS:  If it was not timely

9     because of something that Adorama or

10    Kitchen Winners did, then, yes, I would

11    agree to that.

12 BY MR. SPERBER:

13    Q.   How do I know, you know, which of

14 your late payments are as a result of the

15 LevMed issue?

16    A.   We told them that this caused a

17 problem.

18    Q.   It delayed you?

19    A.   It delayed it significantly.

20    Q.   So how did that alter your cash

21 flow?

22    A.   Delayed us by weeks of collecting

23 payments.  And every shipment after that,

24 everything was delayed.

25    Q.   Okay.  But --

1        A.    Back up my order.

2        Q.    Weren't you paying Adorama and/or

3   Kitchen Winners when you were picking -- right

4   until you picked up gloves?

5        A.    I was paying them partial payment

6   and then getting other payment from Ascension

7   and paying them.

8        Q.    Is it true that the money that you

9   would owe to Adorama and Kitchen Winners, that

10  number would grow when you'd pick up more

11  gloves; correct?

12       A.    Correct.

13       Q.    Then it would decrease as you'd pay

14  for the gloves you picked up?

15       A.    Correct.

16       Q.    So your -- other than the deposits,

17  your responsibility to pay only kicked in when

18  you picked up gloves; right?

19       A.    I don't understand the question.

20       Q.    I'm trying to understand.  How did

21  the LevMed issue cause you to be behind on

22  payments?

23       A.    It delayed us collecting payments

24  from Ascension.

25       Q.    For which shipments?

1        A.    All of them.  All the following

2    shipments after that.

3        Q.    Why?  Explain that to me.

4        A.    Because they had the wrong product

5    with the wrong SKU, and they stopped paying us

6    for other shipments that were already on the

7    way that we already paid for.

8        Q.    So Ascension stopped paying you on

9    time --

10       A.    Correct.

11       Q.    -- forever --

12       A.    Until --

13       Q.    -- because he delivered the wrong

14   thing?

15       A.    Nope.  Until we got the

16   documentation, the LevMed documentation, and

17   they were going to accept or reject them

18   formally, then things continued.  But -- they

19   continued, but everything was behind.

20            If the LevMed incident didn't

21   happen, we would have never been late.

22       Q.    Oy any of the payments?

23       A.    On any of the payments.

24       Q.    You have to explain that to me.  I

25   don't understand how the LevMed incident caused

1   you to be late on entirely unrelated shipments.

2        A.    It delayed every shipment after that

3   we were sending.

4        Q.    Why did you pick up gloves if you

5   couldn't afford to pay for them on time?

6        A.    We picked up gloves and delivered

7   them.  As we delivered, we'd get paid.  As we'd

8   get paid, we'd pay them.

9        Q.    You had a contract where you agree

10  that you would pay within a certain amount of

11  time of picking up gloves; correct?

12       A.    We had a contract to pick up nitrile

13  gloves.  We got no nitrile gloves.  We had an

14  agreed contract for MedCare gloves, and we got

15  LevMed gloves.

16       Q.    Were you paying on time before the

17  LevMed issue?

18       A.    Before the LevMed issue, everything

19  was right on schedule.  It was right in the

20  beginning.

21       Q.    So you're saying you were on time

22  for the first -- I don't know -- five

23  shipments, let's say?

24       A.    What day does it say in your record

25  that I paid, and what day does it say we're

1  supposed to pay?  Then we can see what it says.

2  And everything in the very beginning was

3  discussed with Kitchen Winners and with

4  Adorama.  And it was accepted, and we were

5  still getting a rebate.

6       Q.    I'm sorry.  Could you explain that?

7       A.    Everything was discussed with

8  Adorama and Kitchen Winners from the incident

9  that happened, and we were still supposed to be

10  collecting a rebate.

11       Q.    Is that in writing somewhere?

12       A.    That's -- might be in some messages.

13  For sure was on several phone calls.

14       Q.    Can you point me to a document where

15  Adorama and/or Kitchen Winners agreed that even

16  though you were late in payments they would

17  still give you a rebate?

18       A.    Because of what they did with

19  LevMed.  They said this is what caused this,

20  and it was acceptable.

21       Q.    But you can't point me to a specific

22  document?

23       A.    No.  I don't have an exact document.

24       Q.    Who was on those calls?

25       A.    Brad Gilling and I.

1        Q.      And who else?

2        A.      Either Henry -- either Hershey

3   Weiner or Mendel.

4        Q.      Mendel Banon?

5        A.      Yeah, Mendel Banon.

6               MR. RAKHUNOV:  Before we keep going,

7        can -- I think Mr. Gilling's trying to get

8        in, and it's not letting him in.

9               MR. SPERBER:  Should we keep going,

10       or are we waiting?

11              MR. RAKHUNOV:  I just wanted to let

12       the court reporter know if -- I don't know

13       if there's something that needs to be done.

14              (Comments off the record.)

15              MR. RAKHUNOV:  Let's keep going.

16       I'll give -- I have the support number for

17       him.  He can do that himself.

18              MR. SPERBER:  Okay.

19   BY MR. SPERBER:

20       Q.      Was there ever a time when

21   Rock Fintek delivered gloves to Medline and

22   Medline refused to accept them?

23       A.      I don't think so.  They refused

24   to -- they refused one set of gloves, I believe

25   back in January, because they were damaged,

1  completely damaged.

2      Q.    How many of the pallets were labeled

3  with the name of the seller on it?

4      A.    How many?  Most of them had some

5  type of a sticker on them, sticker or piece of

6  paper on them.

7      Q.    But not all of them?

8      A.    I believe all of them had something

9  on them, some type of QR code or bar code with

10 the name on it.

11     Q.    That said the name of the seller?

12     A.    There was nothing that was just

13 wrapped in plastic without anything.

14     Q.    Sorry?

15     A.    There was nothing that was just

16 wrapped in plastic without anything on it.

17     Q.    So in -- when things started to fall

18 apart with Ascension, I think you were saying

19 earlier that was taking up all your time trying

20 to resolve the issue; is that correct?

21     A.    Yes.

22     Q.    So what were you spending your time

23 doing?

24     A.    Trying to get MedCare to replace the

25 gloves, trying to get Adorama and

1    Kitchen Winners to give us the specifications

2    for all the gloves.  They wouldn't give them to

3    us.

4        Q.    Let me back up.

5              What did you do to try and get

6    MedCare to replace the gloves?

7        A.    Asked MedCare to return the gloves.

8    These are for hospitals.  They need real

9    examination gloves with nitrile in them.

10             And they said they're not -- we're

11   not their customer.  Their customer was

12   Kitchen Winners/Adorama.  So we have to deal

13   with them.

14             But then later they said maybe

15   they'll help us and send us a container, which

16   they never did.

17       Q.    Okay.  And what did you do vis-à-vis

18   Adorama?

19       A.    What was that?

20       Q.    What did you do with -- you know,

21   with regard to Adorama after the thing fell

22   apart?

23       A.    What did I do with Adorama?

24       Q.    Yeah.  Did you reach out to them?

25       A.    Yeah.  I told them, "Return all the

 1  gloves.  I want to return all the gloves to

 2  you."

 3        Q.    Who did you tell that to?

 4        A.    I don't remember.  Hershey and

 5  Mendel.

 6        Q.    And what did they say in return?

 7        A.    I believe Hershey Weiner threatened

 8  to come kill Bradley or bury his body in his

 9  front lawn or something.  I don't remember the

10  words that he used, but it was a threat which

11  Brad took very serious.

12        Q.    Okay.

13        A.    He threatened his life.

14        Q.    Did anyone from Adorama make any

15  kind of demands like that or threats?

16        A.    Hershey was from Adorama.

17        Q.    Did anyone else besides Hershey?

18        A.    No.  I believe it was just Hershey

19  to Brad.  And, again, Brad was scared for his

20  life, said, "If something happens to me,

21  Hershey's threatening to do something, and now

22  I'm scared."

23        Q.    What makes you think that Hershey

24  worked for Adorama?

25        A.    He said he did.  He was out at the

1   office there all the time working there,

2   calling.

3       Q.    Did anyone from Adorama tell you he

4   worked for Adorama?

5       A.    He said -- yeah, like, he was a

6   salesman, broker, partner.  I don't know what

7   he was, but he represented himself as --

8       Q.    Did anyone else at Adorama tell you

9   that Hershey Weiner was a sales rep for them?

10      A.    The only people I spoke to was

11  Mendlowitz and Banon, and I didn't think he

12  could be -- you know, it is what it is.  A man

13  that works for Adorama, Adorama's saying

14  they're going to bury somebody in their own

15  front yard, you know, like a gangster.  Brad

16  said, "Maybe the guy's a real gangster.  He's

17  going to come bury me in my front lawn."

18      Q.    What specifically did Mendlowitz

19  tell you about Kitchen Winners?

20      A.    Mendlowitz said specifically?  I

21  believe it was they were a distribution; he was

22  a supplier and a source.  He said that the

23  money -- we would wire money.  We were doing

24  the deal directly with Adorama, and that was

25  pretty much it.

1      Q.    Did Mendlowitz ever make any kind of

2  written warranties about the gloves?

3      A.    Whatever warranties we had would be

4  from Adorama.  So I don't know if he's the one

5  that wrote them or who wrote them.

6      Q.    Which warranties did you get in

7  writing?

8      A.    The agreement we signed.

9      Q.    And outside the agreement, anything

10  else?

11      A.    No.  Numerous phone calls.

12      Q.    Okay.  So what kind of oral

13  warranties did Mendlowitz make to you about the

14  gloves?

15      A.    They're going to give us the proper

16  gloves that were requested for the hospitals

17  for examination.

18      Q.    Okay.  Anything else?

19      A.    No.

20      Q.    How did you know you were talking

21  with Mendlowitz?

22      A.    He said he was Mendlowitz.  Maybe he

23  lied.

24      Q.    How do you know it wasn't someone

25  else on the phone who said he was Mendlowitz?

1       A.    How do I know that for a fact?  I
2  don't know.  Maybe I wasn't talking to Hershey
3  Weiner or Mendel Banon either.
4       Q.    I'm just trying to say -- you're
5  suing Joseph Mendlowitz here.  I'm trying to
6  say, how do you know --
7       A.    If a man says he is who he is, then
8  I take it as his word.  How do I know who
9  Hershey Weiner is?
10      Q.    How do you know Hershey Weiner
11 wasn't on the phone saying his name was
12 Mendlowitz?
13           MR. RAKHUNOV:  Objection.
14           THE WITNESS:  I don't know.
15      Committed a fraud once.  Maybe they're
16      doing it again.  Possible.
17 BY MR. SPERBER:
18      Q.    Did you ever do a Zoom call with
19 either of these people?
20      A.    We might have had a Zoom call
21 together.  I'd have to ask Bradley.  I can't
22 remember.
23      Q.    When you had these calls, how did
24 you do it?  Was it a call-in number, or was
25 it --

1        A.      Did mostly WhatsApp.

2        Q.      WhatsApp.  Okay.

3                So if you were calling Mendlowitz,

4   you called him via WhatsApp?

5        A.      Or a voice call in our office on a

6   speaker box.

7        Q.      Who would you be calling?

8        A.      I'd be calling the Adorama office

9   and talking to Mendel, Weiner, and Mendlowitz.

10       Q.      Okay.  Were these calls on a cell

11  phone or a land line?

12       A.      Cell phone -- cell phone.  I believe

13  most of them are cell phone.

14       Q.      Okay.  What's your phone number that

15  you were using?

16       A.      My number was -- my mobile number?

17       Q.      Yeah.

18       A.      I don't want to have my mobile

19  number all over the Internet.

20       Q.      That's fine.  It's just -- it's not

21  going to -- look, I'm going to -- I'm going to

22  be subpoenaing your phone records.  So I want

23  to understand what's your phone number and

24  what's the -- what is the --

25       A.      No, no.  I don't remember what phone

1    I called him from.

2        Q.    So what are the options?

3        A.    Maybe it was a Zoom call or would

4    have been a WhatsApp call.  It was -- I'm not

5    sure.

6        Q.    So let's start with -- give me the

7    phone numbers that you might have been using.

8        A.    Zoom or WhatsApp.

9            MR. RAKHUNOV:  We're going to

10           designate this portion of the transcript as

11           confidential under the protective order.

12           MR. SPERBER:  You think his phone

13           numbers are confidential?

14           THE WITNESS:  Yeah.  I don't want my

15           number all over the Internet.

16           MR. RAKHUNOV:  His personal phone

17           number is confidential.

18           MR. SPERBER:  Well, at some point

19           I'll motion to the Court about that.  But

20           okay.  That's fine.  You can designate this

21           however you want, and we'll have to resolve

22           it later on.

23   BY MR. SPERBER:

24       Q.    What were the phone numbers that you

25   were using?

1        A.    I used WhatsApp or I used Zoom.

2   It's not my phone number.

3        Q.    It's not your phone number.  Okay.

4   So either WhatsApp or Zoom.

5              So if they were Zoom links, were you

6   sent the link via email?

7        A.    I would have sent it; they would

8   have sent it to us.

9              MR. SPERBER:  Okay.  So I'm going to

10        call for production of any Zoom links that

11        were sent to -- to or from Mr. Kato

12        concerning phone calls with Adorama.

13  BY MR. SPERBER:

14        Q.    And you said the rest of it would

15  have been via WhatsApp?

16        A.    Yes.

17        Q.    Okay.  And, again, any WhatsApp

18  records that reflect phone calls with

19  Mr. Mendlowitz or anyone else at Adorama.

20              Okay.  Let's move on.

21              You mentioned earlier that part of

22  the reason why Rock Fintek didn't get paid was

23  because it had oversupplied gloves to -- to

24  Ascension; is that correct?

25        A.    We didn't get paid because we didn't

1  get the correct gloves.

2      Q.    Okay.  So it's not true you

3  delivered more gloves than $200 million -- 200

4  million gloves in --

5      A.    We delivered more gloves, and the

6  gloves were not the correct gloves.

7      Q.    So would it be accurate to say that

8  part of the reason why you weren't paid for all

9  the gloves you delivered is because you

10  delivered more gloves than Ascension had agreed

11  to pay you for?

12      A.    No.  I would say it's because they

13  were not the gloves that they wanted.  I'm sure

14  they would have kept them and used them if they

15  were the right quality gloves.

16      Q.    How many gloves did you -- how many

17  MedCare gloves did you deliver to Ascension?

18      A.    Say about 1.9 million.

19            MR. RAKHUNOV:  Is that gloves or

20      boxes?

21  BY MR. SPERBER:

22      Q.    Cartons?

23      A.    Or cartons.  Sorry.  Maybe 190

24  million.

25            MR. SPERBER:  All right.  Let's go

1        off the record.  Let me just take a break.

2        I may be almost done here.

3                MR. RAKHUNOV:  Okay.

4                (Break taken from 4:45 p.m. to

5        4:51 p.m.)

6                MR. SPERBER:  Back on the record.

7    BY MR. SPERBER:

8        Q.    Okay.  Just a couple more things.

9    You had mentioned earlier that Kitchen Winners

10   would sometimes directly deliver gloves to

11   Medline.  When that happened, how did you know

12   how much to get paid by Ascension?

13       A.    We presumed whatever the order said

14   is what we were getting paid.

15       Q.    What order?

16       A.    Whatever that Adorama or

17   Kitchen Winners told us was being delivered, we

18   presumed that's what we were getting.

19       Q.    So you just trusted them.  You

20   didn't check yourself?

21       A.    No.  We couldn't check ourselves

22   because of COVID protocol.

23       Q.    And you trusted Medline to

24   accurately count and tell you the numbers?

25       A.    Yes.

1      Q.    Is it fair to say that you were

2  relying upon Medline in this whole thing to be

3  honest and accurate in their counts?

4      A.    Yes.

5      Q.    Was Medline doing a good job at the

6  time?

7      A.    They seemed to be.

8      Q.    They seemed on top of their game?

9      A.    They seemed very -- they seemed at

10  the top of their game in the industry.

11      Q.    Okay.  I'm showing you what I

12  previously showed you, which was an email chain

13  that we marked KWA-Kato 4 regarding LevMed.

14          Do you recall?

15      A.    Yeah.

16      Q.    If you scroll down, you see a

17  discussion of it here concerning LevMed

18  dated -- if you go to the very bottom, this

19  whole thing starts April 29th.

20          Is that when LevMed blew up?

21      A.    April -- I don't know.  I'd have to

22  look or talk to Bradley about it.  He was more

23  with the logistics.

24      Q.    It seems from that email chain --

25  and I looked through your production, and I

 1  don't see other things really concerning

 2  LevMed.  Not much, at least.  This is when it

 3  started.

 4          If you go back to the chart that I

 5  had created and I showed you and we marked

 6  KWA-Kato 9, which I'll show you right now, it

 7  appears that already by April 26 that

 8  Rock Fintek was behind on its payments.

 9          Can you explain that?

10      A.    When was the LevMed incident?

11      Q.    The 29th, at least according to the

12  emails that I had over there.

13      A.    Maybe that's when the emails

14  started.

15          MR. RAKHUNOV:  Let me just object to

16      that last comment.  It's -- the 29th is

17      just the date of the email from Mr. Gilling

18      to Adorama.  That doesn't mean it's the

19      date --

20          MR. SPERBER:  Okay.  Let me ask.

21  BY MR. SPERBER:

22      Q.    Do you have any independent

23  knowledge concerning when the LevMed thing

24  began?

25      A.    I know that our payment schedule was

1  thrown off because of the LevMed glove scandal.

2  I don't recollect two years ago from today what

3  the date -- exact date was in time.  But I know

4  what caused the problem was the LevMed.

5       Q.    Did you come here today prepared to

6  discuss your damage claims?

7       A.    I sure did.

8       Q.    So why don't you have this

9  information in your head to explain?

10            MR. RAKHUNOV:  Object.

11            THE WITNESS:  I went through this,

12       and I don't have a photographic memory.

13  BY MR. SPERBER:

14       Q.    Is there somewhere I could look to

15  figure out, you know, beyond the emails that I

16  have in your production already, when the

17  LevMed thing blew up?

18       A.    The LevMed thing blew up -- for the

19  exact day it blew up?  You have all of our

20  communications; so you should be able to see

21  everything.

22       Q.    So if it exists, it's in there;

23  correct?

24       A.    Yes.  If it exists, that exists

25  there, but --

```
 1                 MR. RAKHUNOV:  Objection.
 2                 THE WITNESS:  Maybe it is.  Maybe it
 3           isn't.
 4     BY MR. SPERBER:
 5           Q.    Do you have Mr. Weiner's phone
 6     number?
 7           A.    I don't know.  Would you like me to
 8     check?
 9           Q.    If your lawyer will let you check.
10     If not, I'll call for the production of it.
11                 MR. RAKHUNOV:  I'm not -- you know,
12           you can make a -- you can make a request.
13           I don't want the witness doing this on the
14           record.
15                 MR. SPERBER:  Okay.
16                 MR. RAKHUNOV:  Seems inappropriate.
17                 MR. SPERBER:  That's fine.
18                 THE WITNESS:  I 100 percent have
19           Mr. Banon's name.
20     BY MR. SPERBER:
21           Q.    Okay.  But you're not sure if you
22     have Mr. Weiner's number?
23           A.    I'm not positive, no.
24           Q.    Okay.  I'm going to call for the
25     production of Mr. Weiner's phone number or any
```

1    contact information on your phone for

2    Mr. Weiner.

3            MR. RAKHUNOV:  And, you know, just

4        to make this easier for everybody so we

5        don't have to -- you know, the witness

6        testified he doesn't have perfect memory of

7        every one of thousands of documents out

8        there, but I'm happy to direct your

9        attention to the WhatsApp chat with

10       Mr. King, who on April 26 sent a message

11       that "Jimmy from the warehouse just called

12       me and told me that Mendel instructed him

13       to load the trailer half and half with

14       LevMed and MedCare gloves."

15           So April 26 is the date that the

16       LevMed issue seems to have originated,

17       based on the record that you-all have, and

18       hopefully that helps you.  That actually

19       came up in Mr. King's deposition.  So . . .

20   BY MR. SPERBER:

21       Q.    Now, Mr. Kato, am I correct in

22   understanding that Rock Fintek agreed in

23   contract with Kitchen Winners that it would

24   pick up the gloves from Kitchen Winners' LA

25   warehouse?

1        A.    We agreed to pick them up?  I think

2    they were going to ship them to us, and we were

3    going to try to have Dimerco pick them up and

4    deliver them.

5        Q.    All right.  Well, let's take a look

6    at KWA-Kato 5.  That's the Sales and Purchase

7    Agreement.  If you go to page 2, the top

8    paragraph seems to indicate --

9        A.    Which part?  Which paragraph?

10        Q.    This is paragraph 2.d., which is the

11    top paragraph on page 2.

12        A.    Okay.

13        Q.    Seems to indicate that you'd be

14    picking up the gloves from Kitchen Winners'

15    warehouse.  No?

16            MR. RAKHUNOV:  Objection.

17            THE WITNESS:  Kitchen Winners and

18        Adorama didn't have a warehouse.  They said

19        they rented them, is what we were told.

20        And Dimerco picked up gloves from them and

21        delivered them to us, or they had their own

22        trucking company/freight company transport

23        them to us.

24    BY MR. SPERBER:

25        Q.    Take a look at paragraph 5,

```
 1    "Customs."

 2              "The Products shall be shipped by

 3    sea to the U.S. port of Long Beach.  Seller

 4    shall import the Product, clear customs and pay

 5    taxes and duties.  Buyer shall arrange for and

 6    pay the cost of ground transportation after

 7    customs clearance."

 8              Did Rock Fintek do that?

 9         A.   Did Adorama bring them in and ship

10    them by see to the U.S. ports?  I don't know

11    where they source their products from, if they

12    are --

13         Q.   What I'm asking is, did Rock Fintek

14    arrange for and pay the cost of ground

15    transportation after customs clearance?

16         A.   We said we'd pay the actual costs of

17    whatever the ground transportation cost, and

18    they never gave us an invoice.  They just gave

19    us numbers.  They would not release the

20    invoices to us.  Until this day, we still don't

21    have them.

22         Q.   Did you receive the invoices from a

23    trucking company called Tonersworld?

24              (Stenographer requests

25         clarification.)
```

```
 1              THE WITNESS:  Tonersworld.  I don't
 2       recollect an invoice from a Tonersworld.
 3       Possibly, but I don't recollect it.
 4  BY MR. SPERBER:
 5       Q.    How many employees does Rock Fintek
 6  have?
 7       A.    I don't understand the definition of
 8  "employee."
 9       Q.    Okay.  How many people are on
10  payroll at Rock Fintek?
11       A.    There's nobody on payroll.
12       Q.    Okay.  How many contract employees
13  does Rock Fintek have?
14       A.    Well, Brad Gilling --
15              MR. RAKHUNOV:  Now or when?
16  BY MR. SPERBER:
17       Q.    Let's say during the time when
18  Rock Fintek was engaged in these transactions.
19       A.    So we had Brad Gilling as chief
20  operations officer as a contractor and Anna as
21  bookkeeper/CFO at the time.
22       Q.    That's it?
23       A.    Yes.  No longer, but at the time.
24       Q.    So let's just back up.  What was
25  your role in regards to Rock Fintek?
```

1          A.    My role as Rock Fintek?  I was

2     trying to source products and find the clients

3     and build the sales team.

4          Q.    And on a day-to-day basis, what were

5     you doing in regard to these gloves

6     transactions?

7          A.    I would solicit -- with the gloves?

8          Q.    Yeah.

9          A.    Communicating with Arik Maimon or

10    Kitchen Winners or Adorama, status, shipments,

11    tracking things, and communicating with Brad

12    Gilling about the logistics and about what

13    payments were received, what payments were

14    going to be due.

15         Q.    Okay.  You know, how many hours a

16    day were you putting in when this was really,

17    you know, at its peak?

18         A.    How many hours at its peak?  18

19    hours a day.

20         Q.    Just for this?

21         A.    Just for this.

22         Q.    Doing -- what were you doing with

23    all that time?

24         A.    We were just making sure everything

25    was going to arrive on time, payments came on

1    time, payments were sent out correctly,

2    invoices were billed correctly.

3         Q.    What was Bradley Gilling's role in

4    all this?

5         A.    Mostly was logistics, but he's

6    operations.

7         Q.    Meaning what?

8         A.    Meaning he would manage and

9    coordinate the logistics.

10        Q.    When you say "logistics," what are

11   you referring to?

12        A.    Transportation.

13        Q.    So he was in charge of dealing with

14   Dimerco?

15        A.    Or Adorama Kitchen Winners for their

16   deliveries.

17        Q.    What were you paying Gilling for

18   this?

19        A.    He was making 10 percent of whatever

20   the company netted.

21        Q.    As of when?

22        A.    For the order.

23        Q.    Okay.  So did he make a -- did he

24   make any money off this?

25        A.    No.  We lost money.

1      Q.    Okay.  Let me -- so Rock Fintek paid

2  you, let's say for argument's sake,

3  $35 million, somewhere in that range?

4      A.    Yes -- Rock Fintek paid me?  No.

5      Q.    Ascension paid Rock Fintek somewhere

6  around $35 million?

7      A.    Correct.

8      Q.    For this PO?

9      A.    Correct.

10     Q.    And how much did Rock Fintek spent

11 on procuring the gloves?

12     A.    37 or 40.

13     Q.    Million?

14     A.    Yes.

15     Q.    So you -- you spent $15 million more

16 than -- so $37 million to buy the gloves?

17     A.    37 to 40 million.

18     Q.    $40 million to buy gloves for a

19 $37 million contract?

20     A.    Correct.

21     Q.    Where did you find the cash -- you

22 know the extra -- you know, several million

23 dollars in cash?

24     A.    From previous product we sold to

25 Ascension, the masks.

1        Q.    How much money did you pay to

2   Adorama and Kitchen Winners?

3        A.    Approximately 20 million, 19 --

4        Q.    How much money -- I'm sorry?

5        A.    19 and a half.

6        Q.    How much money did you pay to JNS or

7   Stern?

8        A.    I don't remember the amount I paid

9   to JNS and Stern.  I have to look.

10        Q.    Beyond that, what were your other

11   expenses?

12        A.    The bank statements will show

13   everything I paid everybody.

14        Q.    I'm sorry?

15        A.    The bank statements should show

16   everything.  So when I read it on the bank

17   statement, I didn't think I'd try to memorize

18   it ten times to give you the exact amount

19   because you have the statements.

20        Q.    What were your other major expenses?

21        A.    Major expenses?  Rent for the

22   office.  Insurance was pretty heavy.  Rent,

23   insurance.  Legal was pretty extensive.  So we

24   had, I'd say, 5 to 7 percent in operational

25   costs.

1      Q.      Okay.

2      A.      In rent.

3      Q.      Let's say rough numbers, $20 million

4  to Adorama, Kitchen Winners; right?  I don't

5  know -- let's say $3 million to Stern.  Is that

6  ballpark?

7      A.      I think it would be more, but you

8  can say three.

9      Q.      Let's say five.  Now we're talking

10 $25 million.  So where did the remaining --

11 what's that?  -- 12 million -- $12 million-ish

12 go?

13     A.      $6-7 million for freight.

14     Q.      That was Dimerco?

15     A.      Yeah.  6.2 million to Thailand.

16     Q.      How was Thailand related to this

17 transaction?

18     A.      It was part of the same purchase

19 order.

20     Q.      You didn't actually get any gloves;

21 right?  That was --

22     A.      That was when I lost the money.

23 Then I paid him for this order.

24     Q.      If you hadn't had the Thailand

25 situation, you would have made profit here?

```
 1        A.    If I hadn't had the -- if Thailand

 2   would have went through, I would have never

 3   met -- spoken or met or spoke with JNS,

 4   Joel Stern, Kitchen Winners, or Adorama.

 5   Correct.

 6              I had other reasons to try to work

 7   with them.

 8        Q.    I'm sorry?

 9        A.    They seemed to be honest people when

10   I met them.

11        Q.    Who?

12        A.    Kitchen Winners and Adorama.

13        Q.    When did you meet them?

14        A.    When we spoke earlier in the year.

15   Told me we could take everything on a

16   handshake, don't even need the contracts.

17        Q.    But you did have a contract; right?

18        A.    We had a contract, but they said

19   their golden handshake is stronger than a

20   contract and don't worry about the contract.  I

21   took them at their word.

22        Q.    How much money did you --

23        A.    On top of the contracts.

24              (Stenographer requests

25        clarification.)
```

```
1   BY MR. SPERBER:

2        Q.    So in total, did Rock Fintek as an

3   enterprise make money or lose money?

4        A.    It made money until we did this

5   transaction with Adorama and Kitchen Winners.

6        Q.    But you lost money really on the

7   Thailand deal; right?

8        A.    If they would have given us the

9   correct product and not taken the extra rebate,

10  Ascension would have paid us the extra and not

11  overshipped us, we would have been profitable,

12  or close to.  And we would have got -- been

13  able to sell our test kits and other products

14  to them, continue the relationship we had.

15       Q.    Let me show you again -- this is

16  KWA-Kato 6, the initial disclosures.  If you go

17  to the last page, there's a paragraph that

18  starts -- second-to-last paragraph.  Read

19  through that.  This is on page 4?

20       A.    "The Adorama Parties are also

21  liable"?

22       Q.    Yeah.

23       A.    (Reviewing document.)

24             Okay.

25       Q.    So could you explain to me what
```

1  you're asking for in this paragraph?

2       A.    The lawyer can explain that.  It's a

3  lot of legal words.

4       Q.    So you don't understand this?

5       A.    I don't understand all of it.  It

6  says figure detailed RF_ 0034- -- I don't know

7  what he's referring to in all this stuff.  So

8  you can ask him.

9       Q.    You say that "The Adorama Parties

10 are liable to Rock Fintek for 5,963 cartons of

11 gloves beyond the contractually called for

12 amount for which Rock Fintek overpaid."

13             Right?  You see that?

14      A.    Yep.

15      Q.    So could you explain -- what is this

16 referring to?

17      A.    Rock Fintek -- "The Adorama Parties

18 are also liable to Rock Fintek for . . . carton

19 of gloves beyond the contractually called for

20 amount" -- I don't know what he's -- they sent

21 us too many.  That's that it's -- the way it's

22 worded, like I said.

23      Q.    So your claim is that Adorama or

24 Kitchen Winners sent Rock Fintek approximately

25 6,000 too many cartons of gloves, which you

1    paid for, and now you want a refund for that;

2    is that right?

3         A.    They sent about -- yes, about 20

4    million extra gloves.  I don't know if it's 6

5    million or 20 million, but we had about 20

6    million too many.

7         Q.    And then the next line says, "The

8    amount owed together with associated logistics

9    costs is $2,034,070."

10              See that as well?

11        A.    Yeah.  My claim is that they ruined

12   my relationship with --

13        Q.    So are you asking for this money

14   back also, or is this something -- you're not

15   asking for this?

16        A.    From Ascension?

17        Q.    No, from Adorama and Kitchen Winners

18   and Joseph Mendlowitz.

19        A.    I wanted my rebate back and the

20   overpaid -- for the over amount of products

21   they gave me which I didn't want and they

22   refused to take back.

23        Q.    So what are the associated logistics

24   that you're referring to over here?

25        A.    They charged us for insurance and

1  shipping and office expenses that they had or

2  the trucking expenses.

3       Q.    And did you pay it on time?

4       A.    We paid them.  It was part of our

5  payments we made.  I just asked for invoices.

6  I don't have the invoices for -- for that.

7       Q.    So of the $2,034,070, how much is

8  logistics?

9       A.    If you have Hershey Weiner give me

10 the invoices, I'll tell you.  Or maybe it's on

11 those reports we're trying to put together.  I

12 don't know what they say.

13      Q.    When you paid those invoices that

14 you're talking about, did you know what you

15 were paying for?

16      A.    We paid --

17            MR. RAKHUNOV:  Objection.

18            THE WITNESS:  -- shipping for

19      Hershey and Dimerco.

20 BY MR. SPERBER:

21      Q.    I'm sorry?

22      A.    We aid for shipping to Dimerco, and

23 we paid Adorama and Kitchen Winners for gloves.

24 And --

25      Q.    And you're saying -- you're saying

1  Kitchen Winners sent you invoices that included

2  insurance and shipping and other things; is

3  that right?

4      A.    Yes.  They didn't --

5      Q.    And you paid those invoices?

6      A.    Yes.  They said the shipping cost X

7  for the trucks that they shipped.  He was

8  holding the gloves hostage unless we paid the

9  unverified shipping costs.

10     Q.    And you paid them?

11     A.    Otherwise I wouldn't get the gloves

12 delivered.

13     Q.    Okay.  And now you're saying you

14 weren't supposed to pay them?

15     A.    I was supposed to -- I agreed to pay

16 the freight cost directly what they were.  I

17 was not given those freight costs.

18     Q.    So how much extra did you pay that

19 you shouldn't have paid?

20     A.    It says $2 million right here.

21     Q.    How much of that is for the gloves

22 and how much of that is for the logistics that

23 you're talking about?

24     A.    I guess you have to look at the

25 detailed report, as noted there.

1      Q.    But you don't know off the top of

2   your head?

3      A.    I looked at these, and I don't have

4   a photographic memory.  I looked at them and

5   studied it yesterday with my attorney, and I

6   don't remember exactly it says.  I looked at a

7   lot of documents yesterday and before to

8   prepare for this.

9           MR. RAKHUNOV:  And I can just tell

10          you, Counsel, that the invoices from

11          Dimerco that have this information in

12          detail have been produced.  They're -- I

13          can even tell you they're in the WhatsApp

14          chats with Mr. King.  So -- among other

15          places.  So you have all that information.

16   BY MR. SPERBER:

17      Q.    All right.  Let's back up.  Are you

18   saying that Kitchen Winners or Adorama owes you

19   money because Dimerco -- you paid Dimerco money

20   to pick up gloves you didn't want?

21      A.    Dimerco did shipping, along with

22   Adorama, of gloves.

23      Q.    Are you saying that you want

24   Kitchen Winners and Adorama to reimburse you

25   for a portion of the Dimerco shipping fees you

1    got charged?

2        A.    I want them to reimburse me for the

3    overage of cartons and any expenses associated

4    with it.

5        Q.    What expenses?

6        A.    Whatever came across.

7              MR. RAKHUNOV:  Objection.

8    BY MR. SPERBER:

9        Q.    Name the expenses.

10       A.    Shipping.

11       Q.    Okay.

12       A.    Insurance.

13       Q.    If you pay someone to pick up gloves

14   from Adorama or Kitchen Winners --

15       A.    I didn't want those gloves.

16       Q.    Let me ask the question.

17             If you pay someone to pick up gloves

18   from Adorama or Kitchen Winners, then you

19   decide you don't want them, why are they at

20   fault?

21       A.    I didn't want the gloves.  They

22   snuck them on the truck.

23       Q.    How did they sneak them on the

24   truck?

25       A.    They gave me miss -- wrong counts.

1      Q.    You're saying the truck was already

2   there.

3      A.    They delivered --

4            (Simultaneous speaking.)

5            CERTIFIED STENOGRAPHER:  Excuse me.

6      Stop.  Wait until the question's finished,

7      please.

8            THE WITNESS:  Yes, ma'am.

9   BY MR. SPERBER:

10     Q.    Did you hear the question or no?

11     A.    No.

12     Q.    You're saying the truck was already

13  there and that they just snuck more gloves on

14  than you knew about?

15     A.    That's not what I said.  I said they

16  delivered more gloves than I paid for.

17     Q.    But you're also saying that you paid

18  Dimerco to pick those up; right?

19     A.    I paid for -- let me reword it.

20            I paid -- they gave me more gloves

21  than I contracted them to give me, and they did

22  not tell me the amount of gloves they were

23  supposed to give me.

24     Q.    But you picked them up from their

25  warehouse; right?

1          A.    I didn't pick them up.  Dimerco

2    picked them up.

3          Q.    Okay.  So why is it Adorama or

4    Kitchen Winners' responsibility to pay Dimerco

5    for your own screwup?

6          A.    Adorama --

7                MR. RAKHUNOV:  Objection.

8                THE WITNESS:  It was not my screwup.

9          If they didn't commit fraud, I wouldn't

10         have anything here.

11              Adorama and Kitchen Winners was

12         paying for freight and having products

13         delivered.  I'll answer the question ten

14         more times the same way.  Just keep asking

15         it.

16   BY MR. SPERBER:

17         Q.    I will, because I'm not getting an

18   answer.  I don't understand.

19         A.    Great.  Great.  Kitchen Winners and

20   Adorama sent us freight order, and they didn't

21   give me their invoices.  They sent me more

22   gloves than I wanted.

23         Q.    And you weren't keeping your own

24   records of how many gloves you picked up.  So

25   you had no idea; right?

1        A.    I would have to rely on the

2    transport companies of Adorama,

3    Kitchen Winners, Dimerco.

4        Q.    How did Dimerco know how many gloves

5    they were picking up?

6        A.    They gave them a sheet, I believe,

7    or something with a bill of lading or something

8    with the truck of what was supposed to be on

9    the truck.

10       Q.    And you were relying upon that?

11       A.    It was a sealed shipment.  Nobody's

12   allowed to look at it.

13       Q.    So Dimerco didn't really know; they

14   were just relying upon Adorama and

15   Kitchen Winners?

16       A.    Correct.

17       Q.    So you were just relying upon

18   Adorama or Kitchen Winners?

19       A.    Correct.

20       Q.    So how is it that you didn't know

21   how many gloves you had picked up if --

22   presumably Adorama or Kitchen Winners gives

23   that document to Dimerco when they picked the

24   stuff up; right?  You had that?

25       A.    The document wasn't accurate.

1        Q.    Okay.  We've been over that.  All

2   right.

3              Why didn't Rock Fintek sue Adorama

4   or Kitchen Winners earlier?

5              MR. RAKHUNOV:  All right.  Hold on.

6        Objection.

7              If -- I mean I'm just going to

8        instruct you not to answer that one because

9        I don't see how you can possibly answer

10       that question without revealing

11       attorney-client communications as far as

12       litigation strategy.

13             THE WITNESS:  There's your answer.

14   BY MR. SPERBER:

15       Q.    Well, litigation strategy is not

16   protected, only communications with counsel.

17   So if you have independent knowledge outside of

18   what your attorney told you, did Rock Fintek

19   make a decision on -- you know, as to when it

20   was going to sue?

21             MR. RAKHUNOV:  Objection.  Again,

22       if --

23             MR. SPERBER:  Phil, let me back up.

24             MR. RAKHUNOV:  Yeah.  I'm going to

25       instruct you not to answer that.  First of

1        all, litigation strategy's absolutely

2        protected as work product.  Second of all,

3        I still don't see how he can answer that

4        question without revealing communications

5        with me.

6              MR. SPERBER:  First of all, attorney

7        work product is protected, not client.

8    BY MR. SPERBER:

9        Q.    Mr. Kato, when did you hire

10   Mr. Rakhunov?

11             THE WITNESS:  When did I hire you,

12       Phil?

13             MR. RAKHUNOV:  I can't remember

14       right now.

15             THE WITNESS:  You're not a

16       professional, Phillip?  You can't remember

17       when I hired you?  I mean . . .

18             MR. RAKHUNOV:  I'm not under oath.

19             THE WITNESS:  I don't recollect

20       exactly when I hired Phillip.

21   BY MR. SPERBER:

22       Q.    Okay.  Was it before or after

23   Kitchen Winners and -- Kitchen Winners sued

24   Rock Fintek?

25       A.    Before or after?  I don't -- I'm not

```
 1   sure.
 2              MR. RAKHUNOV:  Objection.  I don't
 3         know if Mr. Kato remembers when
 4         Kitchen Winners filed its lawsuit, but I
 5         can tell you it was well before then.
 6   BY MR. SPERBER:
 7         Q.    How are you paying Mr. Rakhunov?  Is
 8   it on contingency fee, or is it hourly basis?
 9              MR. RAKHUNOV:  Objection.  Do not
10         answer that.  Come on.
11              MR. SPERBER:  What's the objection?
12              MR. RAKHUNOV:  That's absolutely
13         privileged.  My fee arrangement with my
14         client is privileged.
15              MR. SPERBER:  It's definitely not
16         privileged.
17              MR. RAKHUNOV:  File a motion.
18              MR. FRISCH:  It is 100 percent not
19         privileged.
20              MR. RAKHUNOV:  Okay.  File a motion.
21   BY MR. SPERBER:
22         Q.    You've alleged that Rock Fintek
23   required Adorama to be a party to the SPA and
24   to guarantee performance of Kitchen Winners.
25              Are there any documents that support
```

1  that assertion?

2         MR. RAKHUNOV:  Objection.

3         THE WITNESS:  Is that something I'm

4     supposed to be reading somewhere?

5  BY MR. SPERBER:

6     Q.    No.  It's a question I asked.

7     A.    Could you repeat the question?

8     Q.    You've alleged that Rock Fintek

9  required Adorama to be a party to the SPA and

10 to guarantee the performance of

11 Kitchen Winners.

12        Are there any documents that support

13 that assertion?

14        MR. RAKHUNOV:  Objection.

15        THE WITNESS:  Adorama and

16    Kitchen Winners to me are one and the same.

17    Hershey held himself out as Adorama.

18    Mendel Banon held himself out as

19    distribution for Adorama.

20        MR. SPERBER:  All right.  Let's take

21    a five-minute break.  I think I'm basically

22    done.  I just want to confirm.

23        MR. RAKHUNOV:  Sure.

24        MR. FRISCH:  I will have some

25    follow-up.

```
1              (Break taken from 5:25 p.m. to
2        5:31 p.m.)
3   BY MR. SPERBER:
4        Q.    Okay.  Mr. Kato --
5        A.    Yes.
6        Q.    -- you said earlier that you -- let
7   me ask it differently.
8              The gloves that you bought from
9   Stern and from Adorama, were these the best
10  prices you could find for gloves at the time?
11             MR. RAKHUNOV:  Objection.
12             THE WITNESS:  I believe we could
13        have bought some other gloves, but Adorama
14        seemed the most reliable company to work
15        with.
16  BY MR. SPERBER:
17       Q.    Were you aware at the time of
18  cheaper gloves that you could have purchased
19  that Ascension would have taken?
20             MR. RAKHUNOV:  Objection.
21             THE WITNESS:  When you say
22        "objection," that means I'm supposed to
23        answer or not supposed to answer?
24             MR. RAKHUNOV:  You can answer.
25             THE WITNESS:  I could have gotten
```

1          other gloves from other people.  The price

2          was fluctuating.  The delivery time would

3          have been slower.

4               Some of the prices were slower than

5          I was paying -- were lower than I was

6          paying with Adorama.

7     BY MR. SPERBER:

8          Q.   But the problem was -- you said you

9     couldn't deliver on time.

10         A.   They would take nine months or

11    something to deliver them.

12         Q.   Would that have been acceptable to

13    Ascension?

14              MR. RAKHUNOV:  Objection.

15              THE WITNESS:  After what happened

16         now, I'm sure it would have been very

17         acceptable.

18    BY MR. SPERBER:

19         Q.   They didn't need the gloves

20    immediately?

21         A.   They needed the gloves for the

22    schedule we made.

23         Q.   Would they have let you have

24    delivered the gloves -- you know, different

25    gloves nine months later?

```
 1              MR. RAKHUNOV:  Objection.
 2              THE WITNESS:  I don't know if they
 3        would have or not would have.
 4   BY MR. SPERBER:
 5        Q.    Would it be accurate to say that if
 6   you hadn't gone with the gloves from Stern,
 7   JNS, Adorama, Kitchen Winners, you would have
 8   had to pay more money to get gloves for -- to
 9   meet your contractual requirements with
10   Ascension on --
11        A.    No.
12        Q.    -- the timeline that Ascension would
13   have been happy with?
14              MR. RAKHUNOV:  Objection.
15              THE WITNESS:  No.  I said the
16        opposite just now.
17   BY MR. SPERBER:
18        Q.    What are you saying?
19        A.    I said in your previous question --
20   two questions ago, I could have got them for
21   less.  Maybe the time would have been longer,
22   the delivery time.
23        Q.    You told me earlier that Ascension
24   got very upset when the delivery times were
25   delayed by the LevMed gloves.
```

1    A.    Correct.  I don't know how happy

2  they would have been by me buying cheaper

3  gloves that take longer to get delivered.

4    Q.    So it's possible you would have lost

5  your customer?

6    A.    No.  I would have bought the guy's

7  whole allotment, and I'd probably still have my

8  customer because right now.  It would have been

9  real gloves, real examination gloves.

10    Q.    So if those were cheaper, why didn't

11  you buy them?

12    A.    I believed --

13        MR. RAKHUNOV:  Objection.

14        THE WITNESS:  -- Kitchen Winners and

15    Adorama, Kitchen Winners and JNS, to be

16    honest people.

17  BY MR. SPERBER:

18    Q.    Who was that seller who had cheaper

19  gloves for you at the time?

20    A.    There was a gentleman that we were

21  dealing with in Florida.

22    Q.    What was his name?

23    A.    I don't recall his name.

24    Q.    Do you have communications with him?

25    A.    Yeah.  I met -- I met him.

```
 1        Q.    Okay.  And, again, were those via
 2   email or WhatsApp?
 3        A.    No.  I met him face to face.
 4        Q.    You never had anything in writing
 5   with him?
 6        A.    No.  I didn't have anything in
 7   writing him I didn't move forward.
 8        Q.    You didn't have a formal offer from
 9   him?
10        A.    No.
11        Q.    How many gloves did he have
12   available to sell you?
13        A.    He had -- there was a variety of
14   different containers that would arrive every
15   single month.
16        Q.    What was his company's name?
17        A.    Medgluvs, I believe is the name of
18   the company.
19              (Stenographer requests
20        clarification.)
21   BY MR. SPERBER:
22        Q.    Did your PO with Ascension have a
23   expiration date on it?
24        A.    I don't believe so.
25        Q.    So you could have delivered the
```

1    gloves five years later and they would have

2    been fine with it?

3        A.    I'm sure -- no.  They wanted the

4    gloves immediately.

5        Q.    Do you have the phone number for

6    this person in Florida that you were dealing

7    with?

8        A.    No.  I don't recollect his name.

9        Q.    So you don't know his name, the

10   company's name --

11       A.    It was Medgluv.  And I went to

12   Medgluvs, in to the office somewhere in

13   southern Florida.  I drove there, and I walked

14   in the office and I spoke to him face to face.

15   Met him twice, two or three times.

16       Q.    Well, let me -- I'm going to show

17   you what's been previously marked as Exhibit

18   KWA-Kato 3.

19            Is this the PO you had with

20   Ascension?

21            MR. RAKHUNOV:  Objection.

22            THE WITNESS:  Is this the PO we had

23       with Ascension?  Okay.  Yes.

24   BY MR. SPERBER:

25       Q.    Is this the one that you were trying

1    to get gloves from Kitchen Winners and Adorama

2    and Stern and JNS to meet?

3         A.    I believe so.

4         Q.    Okay.  Is there a due date listed on

5    there?

6         A.    I'd have to read through it.  Do you

7    see a due date?

8         Q.    Take a look at the far right column.

9         A.    Due date, 12/14/20.  So one week

10   later.

11        Q.    Yeah.  I mean, very short timeline

12   to get these gloves.  Is there anything on here

13   that would have said you could deliver gloves

14   nine months later?

15             MR. RAKHUNOV:  Let me just note my

16        objection.  I don't know if -- what the due

17        date refers to.  I don't think you've laid

18        a foundation for that.

19             THE WITNESS:  I don't know what it

20        refers to.

21   BY MR. SPERBER:

22        Q.    Okay.

23        A.    I'm 100 percent positive they

24   weren't expecting me to deliver them in a week

25   from them signing.

1      Q.    All right.  In discovery in this

2  action, Rock Fintek has produced a number of

3  WhatsApp chats.

4            Are you familiar with what I'm

5  talking about?

6      A.    Yes.

7      Q.    Were you involved in providing those

8  documents to your attorney?

9      A.    The ones that I had?  Yes.

10      Q.    Okay.  Have you looked over all the

11  WhatsApp chats that were produced by

12  Rock Fintek in this lawsuit?

13      A.    I believe we went over most of them.

14  Not all of them.

15      Q.    To your knowledge, are those -- the

16  documents that Rock Fintek produced, are those

17  accurate transcriptions of WhatsApp

18  communications between Rock Fintek or its

19  employees and other individuals?

20      A.    Yes.

21      Q.    So each of those chats that were

22  produced by Rock Fintek, those are -- those

23  are, you know, accurate, real WhatsApp chats

24  that Rock Fintek or its employees were engaged

25  in?

```
 1                 MR. RAKHUNOV:  Objection.

 2                 But go ahead.

 3                 THE WITNESS:  I don't know the

 4         context of what the messages might say.

 5         "Jump off the roof" might not mean jump off

 6         the roof.  I don't know.

 7                 But, yes, those communications that

 8         we produced are communications.  It's clear

 9         who they're to and who they're from.

10   BY MR. SPERBER:

11         Q.    Okay.  I'm going to share with you a

12   document.  I think we're up to 10.  I'm going

13   to stamp this as KWA-Kato 10.

14                 (Exhibit Number KWA-Kato 10, Chat

15         started 3/4/21, was marked for

16         identification.)

17   BY MR. SPERBER:

18         Q.    Take a look, if you like.  Please

19   confirm that this is an accurate transcription

20   of the WhatsApp communication you were engaged

21   in.

22         A.    Let's see.

23                 MR. RAKHUNOV:  You're expecting him

24         to go through a 47-page transcript and tell

25         you --
```

```
1              THE WITNESS:  I've got time,
2         Phillip.  It's fine.
3              MR. RAKHUNOV:  No, but you're
4         expecting him to authenticate and confirm
5         that it's exactly accurate, given that
6         you're the one that printed it?  You could
7         have deleted things.  I mean --
8              MR. SPERBER:  That's fair.  Okay.
9         So let's just --
10             THE WITNESS:  Well, let me read it
11        first, and I'll tell you what I think.
12    BY MR. SPERBER:
13        Q.    No, that's all right.  I think Phil
14    makes a good point.
15        A.    Okay.
16             MR. RAKHUNOV:  By the way, your
17        client Mr. Banon has this -- or should have
18        this; so you can, you know, compare what we
19        produced to what he has.
20    BY MR. SPERBER:
21        Q.    One minute.  Let's go to page 21.
22    Are you there?
23        A.    I'm getting there.  Okay.
24        Q.    Just confirm this is an accurate
25    transcription of communications between
```

1    Rock Fintek and Mr. Banon?

2              MR. RAKHUNOV:  Same objection.

3    BY MR. SPERBER:

4         Q.    Just this page.

5         A.    (Reviewing document.)

6              Do you have a question for me?

7         Q.    Would you say this is an accurate

8    transcription of a WhatsApp communication that

9    you were involved in with Mendel Banon?

10        A.    From when, from where to where?

11        Q.    What you see on page 21 of this

12   document.

13        A.    Only 21?

14        Q.    Only 21.

15        A.    Okay.  Only 21.

16              (Reviewing document.)

17              Seems accurate.

18              MR. SPERBER:  Okay.  I have nothing

19        further.  Avi?

20              MR. FRISCH:  Yes, I have a few

21        follow-ups.

22                      EXAMINATION

23   BY MR. FRISCH:

24        Q.    First, just so I understand the math

25   on this issue with the 5,963 cartons that you

1    claim were over -- oversold, isn't that only

2    about 4 percent of the total purchase you made

3    from Kitchen Winners?

4        A.    Possibly.

5        Q.    So how is it over $2 million owed as

6    a refund?

7        A.    Those are rebates plus the overage.

8        Q.    Okay.  So the $2 million includes

9    the rebate and the overage?  I just -- I just

10   want to make sure that --

11            THE WITNESS:  Is that how you worded

12       it, Phillip?

13            (Stenographer requests

14       clarification.)

15            MR. RAKHUNOV:  Tommy, I don't know.

16       Just listen to the questions.

17   BY MR. FRISCH:

18       Q.    I'm curious about your math because

19   it doesn't seem to make much sense to me.

20   Okay.

21            All right.  Let's see.  Is this the

22   next one I wanted to show?  Let me share this

23   one next.  Let me -- let me see what we're up

24   to first.  JNS -- we're up to Exhibit I [sic],

25   it looks like.  Stamp this as JNS I.

```
 1              (Exhibit Number JNS Q, Photograph
 2         IMG_8428, was marked for identification.)
 3    BY MR. FRISCH:
 4         Q.    Do you see this sign?  This is from
 5    your photos that you produced in this action.
 6    Do you recall seeing this sign with the name
 7    David Dembitzer?
 8         A.    I think so, yes.
 9         Q.    Is that the person you were
10    referring to earlier?
11         A.    No.
12         Q.    Okay.  Do you know who David
13    Dembitzer is?
14         A.    No.
15         Q.    Do you know what that TCLU8010739
16    refers to?
17         A.    TCLU -- I'd probably have to ask
18    Bradley.
19              MR. RAKHUNOV:  No.  We'll have to
20         ask Mr. Stern.  He certainly knows what it
21         is, and so do I.  But anyway, that's for
22         next week.
23              THE WITNESS:  Okay.
24              MR. FRISCH:  Thanks for the
25         commentary.  I can't wait -- I think, Phil,
```

1          you may -- you seem to want to testify.
2          Should we depose you too?
3                MR. RAKHUNOV:  No.  I just can't
4          wait to actually talk to your clients.
5          That's all.  There's just a lot of stuff
6          you guys are asking, you know, Mr. Kato,
7          that both of your clients --
8                MR. FRISCH:  It literally is the
9          stupidest case left, but okay.  Stupid
10         case.  Should be gone after today.  All
11         right.  Let's see.  Let's see if we can get
12         rid of you.
13    BY MR. FRISCH:
14         Q.    So you said before that it was
15    impossible for these papers to have been
16    inserted by you; is that correct?
17         A.    That's correct.
18         Q.    And you said that's because it was
19    shrink-wrapped; isn't that correct?
20         A.    Shrink-wrapped.  I didn't come with
21    a paper printed.  Medline has cameras and would
22    have saw me place them in there if I did.  And
23    I said I didn't put the papers in there.
24                (Exhibit Number JNS J, Photograph
25          IMG_8429, was marked for identification.)

1    BY MR. FRISCH:

2         Q.    So now I'm looking at this photo

3    that you produced.  It's now marked JNS Exhibit

4    J.

5              Do you see the quality of the

6    shrink-wrap in this photo?

7         A.    Yes.

8         Q.    And the paper is about 2 inches

9    below the beginning of the shrink-wrap.  Isn't

10   it possible that anybody could have stuck a

11   paper in that pallet?

12             MR. RAKHUNOV:  Objection.

13             THE WITNESS:  Not with that same

14        information on it, I don't believe.

15   BY MR. FRISCH:

16        Q.    You don't know what the information

17   means; correct?

18        A.    I don't know what it means, but

19   Phillip seems to know what it means.

20        Q.    Well, Phillip's not testifying.  So

21   good luck to him.  He already said he doesn't

22   want to testify.

23             Let's go to another one.

24        A.    If I put the paper on there, then I

25   would be able to tell you what it is.  But

1  since I didn't put the paper in there, I don't

2  know what the purpose of --

3      Q.    These are your photos; right?

4      A.    I took photos.  I didn't make the

5  paper.  I didn't write the words on there and

6  the numbers.

7      Q.    Okay.  This one says -- has a JNS

8  with some numbers.  I guess these are the ones

9  with the stickers; right?  That's --

10     A.    I don't see it yet.

11     Q.    Oh, I didn't share it.  I'm sorry.

12           (Exhibit Number JNS K, Photograph

13           IMG_8369, was marked for identification.)

14  BY MR. FRISCH:

15     Q.    Do you see it now?

16     A.    Yes.

17     Q.    Again, the stickers on the boxes

18  were to replace -- it appears the boxes

19  originally were printed "Synthetic Nitrile

20  Gloves," and somebody put a sticker on to write

21  "Nitrile Examination Gloves"; is that correct?

22     A.    That's correct.

23     Q.    Do you have any idea -- do you have

24  any reason to assume it was Joel Stern who put

25  that sticker on?

```
 1              MR. RAKHUNOV:  Objection.  Asked and
 2         answered.
 3    BY MR. FRISCH:
 4         Q.    Okay.  Answer again.
 5         A.    He suggested -- he suggested doing
 6    it; so I presumed he did it after I didn't want
 7    to do it.
 8         Q.    Okay.  And you have no idea what the
 9    content of these boxes were; correct?
10         A.    What type of gloves?
11         Q.    Yes.
12         A.    I took samples, and I sent them
13    to -- for testing.
14         Q.    Okay.  Now again with the white
15    paper.  Since you said that it was impossible
16    for anybody to have placed them other than the
17    seller, again, there's no -- nothing on this
18    pallet preventing anybody from sticking a white
19    paper on; correct?
20         A.    I think Medline is a credible,
21    legitimate company and would have -- has no
22    motivation to put anything on anything.
23         Q.    I didn't say Medline put it on.  I
24    said you put it on.
25         A.    I didn't come in with any papers.
```

1    Q.    Okay.  I understand you're denying

2  you put it on, but you're just as likely to

3  have put it on -- you could have put this one

4  on, had you had the paper with you; correct?

5    A.    If I had the paper with me, then I

6  would have to know what these numbers and

7  letters mean.

8    Q.    Not necessarily.

9    A.    Phillip has a reason that means

10  something that I'm not privy to at the moment.

11    Q.    All right.  Next one.  I believe

12  we're up to L.

13        (Exhibit Number JNS L, Photograph

14    IMG_8348, was marked for identification.)

15  BY MR. FRISCH:

16    Q.    This is your photo; right?  That's

17  you in the photo; correct?  Oh, I didn't share

18  it yet.  I keep doing that.  Sorry.

19        Is that you in the photo?

20    A.    Yes, it is.

21    Q.    Now, here you found a box that says

22  "Protection Gloves"; is that correct?

23    A.    I've got to zoom on it.

24    Q.    By the way, I discovered if you hit

25  the little gear icon on the right, you can go

1   to full screen on the attachment -- on the

2   exhibit.

3        A.    That would have been good five hours

4   ago.

5        Q.    Yeah.

6             MR. RAKHUNOV:  Look at that.

7             MR. FRISCH:  I only discovered it 20

8        minutes ago.

9             MR. RAKHUNOV:  Look at that.

10            THE WITNESS:  Okay.  What was the

11       question with this box?

12  BY MR. FRISCH:

13       Q.    This box says "Protection Gloves" on

14  it; correct?

15       A.    Correct.

16       Q.    Now, do you know where that box came

17  out of, which pallet?

18       A.    Probably the one I'm standing in

19  front of.

20       Q.    Do you know any way to know that

21  that's the pallet it came out of?

22       A.    That's why I took the photo in front

23  of that box.  The other box is on top of it.

24       Q.    All right.  Now, how do you know --

25  do you know if anything on the boxes -- on

1   these boxes indicates that it's a box of

2   protection gloves?

3        A.    It says "Protection" on the box.

4        Q.    Where?

5        A.    Right where I'm pointing.

6        Q.    No, no, no.  On the cartons, on the

7   big brown cartons.

8        A.    Let me see.

9              MR. RAKHUNOV:  Objection.

10             THE WITNESS:  Protection -- it says

11        right there, under MedCare.  Protection.

12   BY MR. FRISCH:

13        Q.    That's the answer I thought you'd

14   give me.  Great.

15             (Exhibit Number JNS M, Photograph

16        IMG_0578, was marked for identification.)

17   BY MR. FRISCH:

18        Q.    The next one is Exhibit M.  These

19   also say "Protection," at least the ones I --

20   this may not be the one I wanted.

21        A.    Why are there two Hershey Weiners?

22   Is there somebody else on this deposition?

23        Q.    Hold on.  That wasn't the photo I

24   wanted.  Give me a second.

25             So it's your testimony that none of

1    the boxes were labeled "Examination Gloves" in

2    the photos but had that -- but had the word

3    "Protection" under the MedCare name on any of

4    the boxes?

5        A.    No.

6        Q.    Is that --

7        A.    I just read what those boxes said to

8    you.  Show me other pictures; I'll tell you

9    what I see.

10       Q.    Okay.  But you're saying the word

11   "protection" under "MedCare" means it's a box

12   of protection gloves?

13              MR. RAKHUNOV:  Objection.

14              THE WITNESS:  Yeah.

15   BY MR. FRISCH:

16       Q.    That's what I've asked you.  Is that

17   correct?  Is that accurate as -- I didn't pick

18   the right one.  I apologize.  I'm looking for

19   the right photo.

20              MR. RAKHUNOV:  I don't think he's

21         asking about this particular exhibit,

22         Thomas.

23   BY MR. FRISCH:

24       Q.    No, no, no. I'm not asking about

25   that because it's the wrong one.

1      A.    These say "Protection" on them.

2      Q.    But doesn't every single one of --

3  meaning -- not every single one, but a lot of

4  these boxes say "Protection," and then they say

5  "Examination Gloves" underneath them.

6      A.    The ones that don't have

7  "Examination" are only protection inside.

8      Q.    I definitely saw a video, but I

9  don't know how to share a video.  So let me see

10 if I can find the thing I'm looking for in a

11 photo.  Otherwise, we'll just go with that.

12 Give me one more second.  I apologize.

13          And you're saying when you went --

14 here.  This is the one I was looking for.  My

15 apologies.  This will be Exhibit N.

16          (Exhibit Number JNS N, Photograph

17      IMG_8201, was marked for identification.)

18 BY MR. FRISCH:

19     Q.    Now, do you see this box says

20 "MedCare Protection," and then underneath it,

21 it says "NBR Nitrile Examination Gloves."

22          You see that?

23     A.    Yeah.

24     Q.    So the word "Protection" under

25 "MedCare" does not necessarily indicate the

1  contents of the box; is that correct?

2      A.    When they add "Examination," then

3  you know the gloves inside have examination

4  too.  Has Joel Stern's name too, not JNS.

5      Q.    I don't know who put that sign

6  there.  So I don't know what that sign means.

7      A.    They did.  Those guys did.

8      Q.    That's your -- again, you don't know

9  that.  That's your assumption.

10      A.    I know Brad didn't do it.  I know I

11  didn't do it.

12      Q.    Well -- so when you look at all

13  these, were each of these -- when you said you

14  saw 9 million protection gloves with stickers

15  on them, did you open all these boxes and

16  actually look at the blue cartons?

17      A.    So we went through these pallets and

18  randomly opened up cartons inside most of all

19  those pallets you see everywhere in every one

20  of these photos.

21      Q.    Okay.  And some of them -- a lot of

22  them said "Examination," and some of them said

23  "Protection"?

24      A.    Everything that says "Protection"

25  without "Examination" on the outside of the box

 1  was only protection.

 2      Q.    Well, wait until you -- I hope when

 3  you come to trial you'll bring a whole pallet

 4  with you, and we can go through the whole box.

 5  But until then I'll have to take your word for

 6  it.

 7      A.    You can have them delivered from

 8  Medline to you guys.

 9      Q.    Medline doesn't want to answer us.

10  They're not interested.  So . . .

11          Okay.  All right.  I forgot to do

12  this one.  What am I up to?  All right.  I know

13  this one is tiny because I have it in a weird

14  format.

15          (Exhibit Number JNS O, Email from

16      Leah Lax to 9070854@gmail.com, was marked

17      for identification.)

18  BY MR. FRISCH:

19      Q.    I do apologize that this one is in a

20  -- sort of a screenshot.  So it came in a weird

21  format.

22          Have you ever seen this letter

23  before?

24      A.    I can't see that really.  Try to --

25          MR. RAKHUNOV:  And, Counsel, can you

1      just identify where this document is in --

2           MR. FRISCH:  This came in the

3      Joel Stern email production last week.

4           MR. RAKHUNOV:  Okay.

5           MR. FRISCH:  Where exactly?

6      Offhand, I can't tell you, but somewhere in

7      there.

8           MR. RAKHUNOV:  Fair enough.

9           THE WITNESS:  What was the question

10     again about this?

11  BY MR. FRISCH:

12      Q.   Have you ever seen this letter?

13      A.   I don't think so.

14      Q.   Okay.  Well, then I don't have any

15  questions about it.

16      A.   I might have.  I've seen the red

17  stamp before.

18      Q.   It looks to you like a letter that

19  may have --

20      A.   Yosi is Anna's son.  He's also their

21  engineer.

22      Q.   Okay.  Do you see them claiming that

23  the NBR, synthetic, examination, and protection

24  are all the same?

25      A.   That's what they're saying here.

1      Q.    Do you have any reason to doubt

2   that's true?

3      A.    They told us differently on the

4   phone.

5      Q.    They seem to say whatever needs to

6   be said to save themselves money.

7           Would you disagree with that?

8           MR. RAKHUNOV:  Objection.

9           THE WITNESS:  I'm not sure what they

10      say and why they say it.

11  BY MR. FRISCH:

12      Q.    Do you have any reason to believe

13  that MedCare was ever telling you the truth in

14  things they said to you?

15          MR. RAKHUNOV:  Objection.

16          THE WITNESS:  I believe people when

17      they first speak to me.  I give them the

18      benefit of the doubt.

19  BY MR. FRISCH:

20      Q.    Didn't they send you, like, 20

21  messages that they were sending you a free

22  container of gloves that never showed up?

23      A.    And I believed them.

24      Q.    But it never showed up; correct?

25      A.    Until the 20th message, and I

1    figured, you know, I had been taken again.

2        Q.    Maybe they're the ones who took you

3    the entire time.  Is that not possible?

4            MR. RAKHUNOV:  Objection.

5            THE WITNESS:  I didn't believe that.

6        I trusted an honest-sounding accountant.  I

7        trusted an honest-sounding person in

8        Hershey Weiner and Mendel Banon and

9        Mendlowitz with a company with credibility,

10        which I believed at the time.  They all

11        appeared to be gentlemen, and that's why I

12        started to work with them.

13            (Exhibit Number JNS P, Email Chain,

14        Bates-stamped RF_003483 - 3486, was marked

15        for identification.)

16    BY MR. FRISCH:

17        Q.    Manning -- here's another email that

18    you sent in regard to the earlier quality of

19    the gloves.  This email says, "There has to be

20    something with a small lot of them.  We have

21    emails and calls with Vince several months ago

22    on how people were happy with them.  Has to be

23    something that happened in May."

24            I don't think I've seen those

25    emails.  Do you know -- have you produced the

1    emails that Vince sent you saying people were

2    happy with the gloves?

3        A.    I gave Phillip all the emails that I

4    had in relation to this case.

5            MR. FRISCH:  Phillip, do you happen

6        to know where they are?

7            MR. RAKHUNOV:  Sorry.  Come again.

8            MR. FRISCH:  The emails he

9        references here, "emails and calls from

10        Vince several months ago on how people were

11        happy with them," I don't think I've seen

12        those emails from Vince.  So I'm wondering

13        if those emails -- if you happen to have

14        seen them in the production.

15            MR. RAKHUNOV:  I can go back and

16        take a look.  I --

17            MR. FRISCH:  I'd appreciate it.

18            MR. RAKHUNOV:  I don't know off the

19        top of my head.

20    BY MR. FRISCH:

21        Q.    How much money did you pay yourself

22    over the course of your dealings with Ascension

23    out of Rock Fintek?

24        A.    How much did I pay myself?

25        Q.    Uh-huh.

1        A.    Before the glove deal?

2        Q.    Before, during, after.

3        A.    Before --

4              MR. RAKHUNOV:  Objection.

5        That's . . .

6              THE WITNESS:  I'd say 3 million,

7        4 million, 5 million.

8   BY MR. FRISCH:

9        Q.    How did you pay it?  Was that

10   transferred by an ACH transfer, or was that

11   paid by check?

12       A.    It was paid ACH.

13       Q.    And all of Rock Fintek's banking was

14   done at Bank of America and Wells Fargo?

15       A.    Correct.

16       Q.    All right.  Is there some reason why

17   you redacted the vast, vast majority of the

18   bank statements?

19       A.    There was other clients.

20       Q.    But you're out of business; so what

21   difference does it make?

22             MR. RAKHUNOV:  Objection.

23   BY MR. FRISCH:

24       Q.    And you already told us who the

25   clients are.

```
 1              MR. RAKHUNOV:  Objection.
 2              THE WITNESS:  I'm giving you what
 3         was relevant to all the business I did with
 4         Ascension and with your clients.
 5    BY MR. FRISCH:
 6         Q.    Well, we'll have to serve subpoenas
 7    on the banks, I guess.
 8              (Simultaneous speaking.)
 9              THE WITNESS:  Clients who I paid,
10         who paid me.
11    BY MR. FRISCH:
12         Q.    So -- now, you've alleged that
13    Joel Stern defrauded you.  Is there any aspect
14    of your damages that arise from other --
15    anything other than delivering the wrong
16    gloves, in your opinion?
17         A.    If he would have given me proper
18    examination gloves?  No.  There would be no
19    damages.
20         Q.    So your damages arise from his
21    failure to fulfill the terms of the contract,
22    in your opinion; correct?
23         A.    Well, he committed fraud.  He
24    changed the label of the boxes.
25         Q.    Well, that's what you say.
```

```
 1              MR. RAKHUNOV:  That's what you're
 2         looking for -- right? -- is what he says.
 3   BY MR. FRISCH:
 4         Q.    But that being said, there were no
 5   additional damages that arose from that, were
 6   there?
 7         A.    Just losing my biggest client.
 8         Q.    Well, I'm not going to go back into
 9   that.
10         A.    I could have made testing kits, sold
11   them to them, to other hospitals.  I could have
12   kept working with the Australian health system,
13   who stopped working with me.  It caused a chain
14   reaction of problems.
15         Q.    Meaning at some point, the MedCare
16   gloves were satisfactory, and by your own -- by
17   your own writings at the time
18   contemporaneous -- and those gloves, by your
19   own testimony, came from Joel Stern and JNS,
20   did they not?
21         A.    I was told by Vince, the doctors and
22   the hospitals were happy with all the gloves at
23   the time.
24         Q.    Okay.
25         A.    Later I was told that they sent that
```

1  message and they were still sitting in the

2  warehouse and nobody got to see them yet till

3  three months later.  That's when they gave me a

4  different story about them and all the

5  investigation started.

6       Q.   Do you know when Vince -- do you

7  recall when Vince told you that, the precise

8  date?

9       A.   I don't remember exactly when, no.

10 I'm guessing around March.

11      Q.   So at least the initial shipment

12 from Mr. Stern and JNS was a good quality, is

13 your testimony?

14      A.   Say that again.

15      Q.   It's your testimony, then, that at

16 least the first shipment in February from

17 Mr. Stern was of good quality?

18      A.   My testimony is that I believed all

19 the gloves were in good quality, until -- until

20 later in July.

21      Q.   We also agree.  All gloves were of

22 good quality.

23           But if the gloves at some point --

24 if Vince at some point told you that the

25 doctors were happy with the gloves in March,

1  that means that at least 90,000 boxes that were

2  shipped in February were of good quality, does

3  it not?

4          MR. RAKHUNOV:  Objection.

5          THE WITNESS:  No.  That's not --

6      they changed what they said to us.

7  BY MR. FRISCH:

8      Q.    Well, shouldn't they have done some

9  investigation, some attempt to look at the

10  gloves beforehand?

11      A.    Yeah.  I wish they would have done

12  more.

13      Q.    So do we all.

14          But at some point, don't you have an

15  obligation to look at the things you're buying

16  and tell people if there's a problem?

17          MR. RAKHUNOV:  Objection.

18          THE WITNESS:  I couldn't look at

19      them.

20  BY MR. FRISCH:

21      Q.    I'm just going to ask the same

22  question.  I know you're not going to answer

23  it.

24          What is your fee arrangement with

25  Mr. Rakhunov?

```
 1                    MR. RAKHUNOV:  Objection.

 2                    Do not answer.

 3                    MR. FRISCH:  Yeah, but I just

 4          wanted -- so when we make the application

 5          to the judge, I can join in on it:  All

 6          right.  That's all I've got.

 7                    MR. SPERBER:  I just have one last

 8          follow-up on that.

 9                         EXAMINATION

10    BY MR. SPERBER:

11          Q.    You entered into a contract with --

12    with Kitchen Winners and Adorama in April -- on

13    April 7, 2021.

14                    Why were you still buying gloves

15    from Stern or JNS after that?

16          A.    We were trying to get as many gloves

17    as we could as fast as we could to the client.

18    They were pressing us to deliver as quick as

19    possible.

20          Q.    You said a few minutes ago it took

21    Ascension three months to look at the gloves

22    that JNS and Stern had sold you; is that

23    correct?

24          A.    That's what they said.

25          Q.    So it was a large (indiscernible)
```

 1  there between when you would sell them gloves

 2  and when they'd start to use them?

 3           CERTIFIED STENOGRAPHER:  I'm sorry.

 4      It was a large --

 5           MR. RAKHUNOV:  Same.  I couldn't --

 6  BY MR. SPERBER:

 7      Q.    So there was a large lag there

 8  between when they would sell you gloves and

 9  when you'd start to use them -- when they would

10  start to use them?

11           MR. RAKHUNOV:  Objection.

12  BY MR. SPERBER:

13      Q.    Let me rephrase that.

14      A.    I'm not aware of when they used

15  them.  I'm just aware -- I was told one story

16  and I'm told another story how they were; so I

17  just take them at their word for it.

18      Q.    Right.  No, I'm just trying

19  understand how that's reconciled with the

20  LevMed situation where you said that you first

21  learned it was a problem with LevMed when

22  Ascension complained to you, and that was --

23  seems like days after it was sold; right?

24      A.    I'm not following your question.

25      Q.    So with Stern, you were just saying

1  that he sold gloves to Rock Fintek, and

2  Rock Fintek delivered them to Ascension, and

3  then it took several months for Ascension to

4  realize there was a problem with them.  Is that

5  correct?  Is that your testimony?

6              MR. RAKHUNOV:  Objection.

7              THE WITNESS:  They didn't tell me

8      there was any problem with them until

9      mid-July.

10  BY MR. SPERBER:

11      Q.    So there was a lag between when you

12  delivered the gloves that you purchased from

13  Stern to Ascension and when -- and when they

14  told you there was a problem?

15      A.    Correct.

16      Q.    And up until then, they were saying

17  the gloves were good; correct?

18      A.    Correct.

19      Q.    And they told you the reason why

20  they said the gloves were good earlier, when

21  really they were bad, is because they hadn't

22  used them yet; is that right?

23      A.    I don't know why they said what they

24  said.

25      Q.    What I'm trying to understand is you

1  had said to me earlier that with the LevMed

2  gloves, you learned of the problem from

3  Ascension.  It seems like from the timeline,

4  that was only days after Adorama or

5  Kitchen Winners sold them to you.

6       A.    I believe that's because it was a

7  different SKU that it caught the attention or a

8  red flag from somewhere.  But the name LevMed

9  didn't have a SKU number; so Medline, I

10 believe, didn't know where to place them.  They

11 knew who they came in from, and they tracked it

12 to our shipment and then contacted us, said we

13 gave them a different type of product.

14      Q.    How much did you personally make off

15 of this transaction?

16      A.    I lost money.

17      Q.    I thought you said you took out

18 several million dollars from Rock Fintek.  Is

19 that not true?

20      A.    No, that -- the prior -- the year

21 before.

22      Q.    Oh, the year before?

23      A.    Yeah.  Not during this transaction.

24      Q.    So during this transaction?

25      A.    This transaction put Rock Fintek out

1   of business.  We put negative, killed and

2   depleted all cash flow, and we stopped

3   operating.  We cancelled the COVID testing

4   project.  We cancelled -- we couldn't do

5   anything.

6        Q.    So when this transaction lost

7   Rock Fintek money, you put money into the

8   company?

9        A.    I was putting money in that I had

10  made previously to keep buying and sending

11  gloves at a loss in the beginning, yes.

12       Q.    You produced records in discovery

13  documenting that?

14       A.    You have the bank statements.

15  You'll see what I got paid and you'll see what

16  I paid.

17       Q.    The money that was put in came from

18  you personally?

19       A.    It came from the company.

20       Q.    Which company?

21       A.    Rock Fintek.

22       Q.    You said you had infused - you had

23  to put additional money into Rock Fintek.

24  Where did that money come from?

25       A.    I had to use previous profits that

1  Rock Fintek made.

2       Q.    So this is money that Rock Fintek

3  already had in its accounts?

4       A.    Correct.

5       Q.    That -- so you weren't infusing

6  money in.  It was just other profits that were

7  sitting there got depleted?

8       A.    Yes.  That's exactly it.

9       Q.    So when did you take out the

10  $5 million?

11      A.    When the what?

12      Q.    When did you take out your

13  $3-5 million you were talking about earlier?

14      A.    No, I took out some money as profits

15  of the company.  Brad took some profit; I took

16  some profit out, before we had anything to do

17  with any of this, the previous year.

18      Q.    Is that also in the bank statements?

19      A.    Yes.  You have all transactions that

20  Ascension made and I made and got paid.  You

21  don't have profits that I made from the City of

22  New York, Delta Airlines, and all the other

23  clients.

24            And they were asking what the other

25  clients were.  They were asking what the other

1   dental practice distributors were because I

2   think they were trying to sell to them

3   directly.

4          Q.    Who was?

5          A.    I think Adorama, Kitchen Winners,

6   Joel Stern.

7          Q.    And you didn't tell them?

8          A.    I didn't tell them, but -- I didn't

9   tell them, no.  So they don't have that

10  information.  I don't believe I told them at

11  all.

12              MR. SPERBER:  All right.  I think

13         that's all I have.

14              MR. RAKHUNOV:  I actually have a

15         couple of really quick follow-up questions,

16         but if -- I don't know if Avi has anything

17         else.

18              MR. FRISCH:  No.  Go ahead.

19              MR. RAKHUNOV:  I don't know how

20         to -- how to do this, if I want to put up

21         an exhibit.

22              MR. FRISCH:  You have to upload it

23         first.

24              MR. RAKHUNOV:  Well, if it's one of

25         the -- no, it's something already used.

1          MR. FRISCH:  I think you just click

2      on it and share it.

3                    EXAMINATION

4   BY MR. RAKHUNOV:

5      Q.    Mr. Kato, do you see a Sales and

6   Purchase Agreement in front of you that was

7   previously marked as Kato 5?

8      A.    Yes, I do.

9      Q.    Okay.  So you remember you were

10  asked some questions earlier about

11  paragraph 2.d. that references seller's

12  warehouse in Los Angeles, and you were asked

13  some questions about paragraph 4 talking about

14  products arriving at the Port of Long Beach,

15  California.

16          Do you remember that earlier today?

17     A.    Yes, I do.

18     Q.    During the life of your transactions

19  with Kitchen Winners, Mr. Stern, Adorama, were

20  products always -- actually, strike that.

21          During the life of your transaction

22  with Adorama and Kitchen Winners, were products

23  always shipped to or from the Long Beach,

24  California, warehouse?

25     A.    No, they were shipped from Newark,

1    New York, Texas, all around the country.

2    Multiple cities.

3              MR. RAKHUNOV:  Okay.  Nothing else.

4              MR. FRISCH:  Thank you, all.

5              CERTIFIED STENOGRAPHER:  Does

6        anybody need copies of transcripts?

7              MR. FRISCH:  We will need them, yes.

8              MR. SPERBER:  Yes.

9              CERTIFIED STENOGRAPHER:  Ms. Riddle,

10       do you guys need a transcript?

11             MS. RIDDLE:  Yes.

12             (Concluded at 6:16 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF POLK

5

6            I, the undersigned authority,

7    certify that THOMAS KATO remotely appeared

8    before me and was duly sworn.

9            WITNESS my hand and official seal

10   this 17th day of October, 2023.

11

12

13

14   _____

15

16   Rhonda Hall-Breuwet, RDR, CRR, CSR, LCR, CCR, FPR

17   NCRA Realtime Systems Administrator

18   Notary Public - State of Florida

19   My Commission Expires:  9/28/27

20   Commission No. HH 414033

21

22

23

24

25

```
 1              CERTIFICATE OF STENOGRAPHER

 2   STATE OF FLORIDA:

 3

 4              I, RHONDA HALL-BREUWET, RDR, CRR,

 5   CSR, LCR, CCR, FPR, NCRA Realtime Systems

 6   Administrator, shorthand reporter, do hereby

 7   certify:

 8              That the witness whose deposition is

 9   hereinbefore set forth was duly sworn, and that

10   such deposition is a true record of the

11   testimony given by such witness.

12              I further certify that I am not

13   related to any of the parties to this action by

14   blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto

17   set my hand this 17th day of October, 2023.

18

19

20

21   _____

22   RHONDA HALL-BREUWET, RDR, CRR, CSR, LCR, CCR, FPR,

23   NCRA Realtime Systems Administrator

24   Shorthand Reporter

25
```

```
 1    ERRATA SHEET FOR THE TRANSCRIPT OF:

 2    Case Name: KITCHEN WINNERS NY INC. v. ROCK FINTEK LLC;
      ROCK FINTEK LLC v. KITCHEN WINNERS NY INC. and
 3    ADORAMA INC., HERSHEY WEINER, JOSEPH
      MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL
 4    STERN
      Dep. Date: October 3, 2023
 5    Deponent:  THOMAS KATO, as 30(b)(6)
      representative of Rock Fintek LLC
 6                      CORRECTIONS:

 7    Pg.   Ln.   Now Reads        Should Read      Reason

 8    ____  ____  _____     _____     _____

 9    ____  ____  _____     _____     _____

10    ____  ____  _____     _____     _____

11    ____  ____  _____     _____     _____

12    ____  ____  _____     _____     _____

13    ____  ____  _____     _____     _____

14    ____  ____  _____     _____     _____

15    ____  ____  _____     _____     _____

16    ____  ____  _____     _____     _____

17    ____  ____  _____     _____     _____

18

19                  _____

20                  Signature of Deponent

21    SUBSCRIBED AND SWORN BEFORE ME

22    THIS _____ DAY OF _____, 2023

23

24    _____

25    (Notary Public)  MY COMMISSION EXPIRES: _____
```