IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KITCHEN WINNERS NY INC.,

                *Plaintiff*,

-against-

ROCK FINTEK LLC,

                *Defendant.*

Civil Action No. 22-cv-05276-PAE

ROCK FINTEK LLC,

                *Counterclaim and Third-Party Plaintiff*,

-against-

KITCHEN WINNERS NY INC.,

                *Counterclaim Defendant*,

and

ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN

                *Third-Party Defendants.*

## **DECLARATION OF THOMAS KATO**

1.     I, Thomas Kato, am the sole member of Rock Fintek LLC, am over eighteen years-old and provide this declaration on my personal knowledge in support of Rock Fintek's opposition to the motions for summary judgment filed by Adorama Inc., Joseph Mendlowitz,

1

Kitchen Winners NY Inc. (sometimes collectively referred to as the "Adorama Sellers"), and JSN Capital and Joel Stern.

2. Rock Fintek began doing business with Ascension in or about March 2020.

3. After I was introduced to Ascension, I learned that I had a close family connection to one of Ascension's top executives, which uniquely positioned Rock Fintek to solidify a long-term relationship with Ascension. I viewed the Ascension relationship as an incredible business opportunity for Rock Fintek and critical to Rock Fintek's profitability and survival.

4. Besides the purchase order for the gloves at issue in this lawsuit, between March 2020 and April 2021, Rock Fintek had sold to Ascension approximately $25.9 million in other PPE, including masks, gloves and gowns.

5. Attached as Figure 1 is a summary of Rock Fintek's sales of PPE to Ascension other than the MedCare (and LevMed) gloves at issue in this lawsuit.

6. Contrary to Adorama Sellers' assertion, the payments made to Rock Fintek by Ascension on 01/13/21, 02/23/21, 02/25/21, 03/03/21, 03/19/21, 03/22/21, and 04/08/21, totaling $2,542,116.25 were *not* for the gloves at issue in this lawsuit but were for 3PLY Masks that Rock Fintek had sold to Ascension during this time frame. Certain invoices, purchase orders and emails that were produced in discovery reflecting these masks sales to Ascension are attached to my counsel's document transmittal declaration as Exhibit 9.

7. Rock Fintek's bank records reflect that Rock Fintek received approximately $36,318,177 from Ascension for the gloves at issue in this lawsuit. A summary of those payments is set forth in the attached Figure 2.

8. In total, Rock Fintek received approximately $62,242,293 in revenue from Ascension through purchase orders obtained between March 2020 and March 2021.

9. In addition to the Ascension business, between March 2020 and June 2021, Rock Fintek had sold PPE primarily to the following clients: City of New York, Prisma Health, Mejer Inc., Delta Airlines, Next Industries Inc., Patterson Companies Inc., and some other smaller customers. Image excerpts from Rock Fintek's bank records reflecting substantially all payments received by Rock Fintek from its non-Ascension PPE business are set forth in the attached Figure 3, totaling approximately $39.936 million.

10. In other words, between March 2020 and June 2021, Rock Fintek did more than $100 million of revenue in PPE business.

11. During that time frame, Rock Fintek sourced PPE primarily from the following suppliers: JNS Capital Holdings/Joel Stern, Adorama Sellers, INTCO, Bomgogo LTD, and Alit Group.

12. As reflected in Rock Fintek's banking records and in the summary judgment record before the Court, Rock Fintek paid approximately $3,327,215 to JNS/Stern; $20,648,435 to Adorama Sellers; and $19,451,332 to INTCO, Bomgogo LTD, and Alit Group combined.

13. In connection with its all or substantially all of its PPE business, Rock Fintek used logistics and trucking services provided by Dimerco and ACT Logistics.

14. As reflected in Rock Fintek's banking records and in the summary judgment record before the Court, Rock Fintek paid approximately $6.2 million to ACT Logistics and Dimerco in 2020 and 2021.

15. Based on these numbers, the average profit margin for Rock Fintek in connection with its PPE business in 2020 and 2021 was approximately 50%.

16. While the Ascension glove deal at issue in this lawsuit was less profitable than other Ascension transactions due to higher supply costs, Rock Fintek did not make a profit on the Ascension glove deal not because of the deal itself, but because of the theft of $6.2 million that it suffered from a purported glove supplier in Thailand. But for that theft, Rock Fintek would not have lost the $6.2 million out of pocket, would have paid lower costs for the 200 million gloves (between $7.90 and $10/box of 100 gloves) and would have made close to $10 million in profit on the Ascension purchase order at issue.

17. I have reviewed the Adorama Sellers' criticism of Rock Fintek's Second Amended Damages Disclosure and criticism of my deposition testimony in their motion papers and have undertaken a closer review of Rock Fintek's bank records in response. To be clear, at my deposition on damages issues, counsel who questioned me did not question me on Rock Fintek's bank records. If I had those records in front of me, I would have been able to testify with more precision about Rock Fintek's damages.

18. As Ascension testified in this case, other suppliers similarly situated to Rock Fintek were continuing doing business with Ascension through at least late 2023, which is business that Rock Fintek would have been a part of but for the bad gloves, earning at least two more years of revenue.

19. No one disputes that Rock Fintek did $62 million of business with Ascension on purchase orders placed between March 2020 and March 2021. Had Adorama Sellers and JNS/Stern delivered good gloves, I expect with certainty that Rock Fintek would have done at least the same amount of business with Ascension from July 2021 through November 2023 and beyond at similar profit margins of approximately 50%. In other words, Rock Fintek should be

allowed to argue to the jury that based on its track record with Ascension and overall average profit margins it would have earned upwards of $30 million a year in profits for three years.

20. The Adorama and JNS parties appear to focus in their papers on the potential longer term annual contract for $1 billion dollars of glove sales that I discussed with Ascension and Covid-19 test kits that Rock Fintek was developing for Ascension about which Mr. Gilling and I testified at our depositions. To be clear, while Rock Fintek did lose the opportunity to bid on that contract and to pursue the Covid-19 test kit sales because of the bad gloves, the existence (and loss) of that opportunity does not form the basis of Rock Fintek's lost profits claim but further demonstrates the strong commercial relationship that had developed between Rock Fintek and Ascension in 2020 and early 2021.

21. As I testified, based on my extensive experience as an entrepreneur, Rock Fintek would have done more revenue with Ascension and its affiliates going forward than it did in the past. For example, by April 2021, I had been connected by Ascension to St. John of God Health Care hospital in Australia, which described Rock Fintek as "a reliable supplier to Ascension's circa 200 hospitals" whom St. John's was "close" to using as a PPE supplier in Australia.

22. By late 2021, Rock Fintek had an order for 4 million masks from St. John of God, which was reduced, after the delivery of the bad gloves, to approximately 100,000 masks for a total payment of $95,290. Instead of buying 4 million masks, the April 14, 2022 wire transfer for $95,290.91 in Rock Fintek's bank records is the total amount of business that St. John did with Rock Fintek despite referring to us as a reliable supplier just months earlier.

23. After the discovery of the non-conforming gloves in July 2021, I continued to closely monitor prices, trends and demand in the PPE market, including as part of Rock Fintek's efforts to mitigate its damages, including finding a potential buyer for the MedCare gloves and to

5

find potential replacement gloves for Ascension. While PPE prices fluctuated and ultimately went down from the levels they were at in early 2021, the demand and profit margins for PPE sales remained steady and have remained steady through this day.

24. Rock Fintek bought the first tranches of MedCare brand gloves from Joel Stern/JNS, whom we met through Ms. Chunrong Li. Rock Fintek's CFO Braley Gilling and I routinely communicated with Stern primarily by telephone and via WhatsApp during the course of our business dealings.

25. In early discussions with Stern, I specifically told him that the glove were for our client, a large hospital group, that could only accept properly labelled FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 standards.

26. Before Rock Fintek started buying gloves from Kitchen Winners/Adorama, I had numerous telephone calls, WhatsApp calls, and video calls with Mendel Banon, and even hosted Banon in person for lunch. During those discussions and meetings, Banon consistently held himself out as a duly authorized representative of Kitchen Winners and Adorama, using those names interchangeably. During discussions and meetings with Banon, I told Banon very clearly and repeatedly that Rock Fintek was not the end user of the gloves but was purchasing them for its client – a large hospital group that could only accept properly labelled FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications.

27. Arik Maimon, who was a personal acquaintance of mine, sought to insert himself into Rock Fintek's PPE business and held himself out as having the ability to protect Rock Fintek's interests with respect to the transactions with Adorama and Kitchen Winners, insisting to me that his cultural and religious similarities with the Adorama Sellers put him in a unique

6

position to protect Rock Fintek in Rock Fintek's business dealings with Adorama and Kitchen Winners.

28. Maimon communicated with the Adorama Sellers on behalf of Rock Fintek during the transactions at issue and knew at all times – because I told him – that the gloves being bought by Rock Fintek were immediately being resold to Ascension Health. Maimon undertook to protect Rock Fintek in transactions with the Adorama Sellers but betrayed Rock Fintek.

29. Similarly, prior to entering into the SPA, I participated in numerous telephone calls with Joseph "Hershey" Weiner during which calls I told Weiner very clearly that the large glove order contemplated under the SPA was for Rock Fintek's hospital client that could only accept properly labelled FDA 510(k) approved nitrile medical examination gloves meeting ASTM D-6319 specifications.

30. Rock Fintek **_never_** authorized Arik Maimon – in writing or orally – to accept gloves labelled as "Protection" or as anything other than FDA 510(k) MedCare Nitrile/NBR *Examination* Gloves.

31. In my early conversations with Stern, Banon and Weiner, I did not disclose the name of Ascension but told each of them that the end buyer of the gloves was an important hospital client of Rock Fintek – the second largest hospital systems in the United States – that had placed a purchase order for a large quantity of gloves and was likely to continue buying significant amounts of gloves and other PPE through Rock Fintek with a potential for significant profit for all parties involved if Rock Fintek delivered good products. Having recently been a victim of a fraudulent transaction in Thailand, I also specifically discussed with Stern, Banon and Weiner (in multiple separate conversations) that the money that was stolen in Thailand was a part of the large deposit made by this same hospital client and that Rock Fintek was pursuing

claims against the Thailand supplier to the full extent of the law, including through civil and criminal actions. I told each of the sellers that delivering fake or non-conforming products to our client, particularly after the $6.2 million theft of my client's deposit, would be devastating to Rock Fintek's business and would expose Rock Fintek and everyone involved in the deal to significant liability to the fullest extent of the law. I wanted to impress on the sellers both the potential upside of the glove deal and the potential serious consequences should my client's funds and Rock Fintek's relationship be compromised in this deal.

32. In fact, during the ongoing business relationship, Mr. Gilling and I expressly discussed with Weiner, Arik Maimon and Banon the potential next large order of gloves for Ascension. When the relationship broke down, the sellers actually tried to use the information learned in those discussions to try and extort Rock Fintek to buy an additional 2 million boxes of gloves even though Ascension no longer wanted to do business with Rock Fintek.

33. As I testified at my deposition, I would not have done the large deal with Kitchen Winners if Adorama was not a party to the transaction as a seller. To that end, prior to executing the Sales and Purchase Agreement (SPA) with Adorama and Kitchen Winners, I had one or two telephone conversations on which Joseph Mendlowitz from Adorama was present to discuss the proposed transaction.

34. As I also testified, I could not recall the exact means by which my conversations with Mendlowitz took place – whether via a conference call, a group call initiated by one of the participants, or whether those conversations took place via a WhatsApp voice call. During that time period, I was taking and making hundreds of phone calls a week via various means in connection with efforts to develop Rock Fintek's PPE business and my other businesses. Contrary to the suggestion of the Adorama Parties in their summary judgment papers, I did not

8

change my testimony to purportedly avoid a subpoena on my telephone records. My phone number is in the WhatsApp chats. Had the Adorama Parties wanted to subpoena my telephone records (as they subpoenaed Rock Fintek's bank records), they could have done so.

35. During negotiations of the SPA, I understood that the SPA was drafted by counsel for Adorama and Kitchen Winners.

36. Rock Fintek did not have counsel directly involved in negotiating or reviewing the SPA or the transactions with Stern.

37. After we were notified by Ascension Health in July 2021 that there were problems with the MedCare gloves, I and Rock Fintek's COO Brad Gilling visited numerous Medline warehouses where gloves were stored to inspect and examine the gloves that Adorama Sellers and JNS/Stern sold to Rock Fintek.

38. During those visits, Mr. Gilling and I took various photographs and videos of the gloves, which were produced in this lawsuit. A selection of true and accurate copies of the photographs taken from warehouse visits in July 2021 is attached by my counsel's declaration as Exhibits 52, 53 and 59.

39. During those visits, Gilling and I compiled a hand-written spreadsheet of Lot numbers printed on various boxes of gloves, which was produced in discovery as RF_004279 through RF_004281.

40. Boxes from one of the Lots of gloves – T4 – had stickers placed on the boxes that said "Synthetic Nitrile Examination Gloves." When I peeled those stickers off with my fingernail, the actual box under the sticker was labelled "Synthetic Nitrile Gloves." Rock Fintek collected samples of T4 boxes and continues to preserve those samples for the jury. As contemporaneous photos show, many of the pallets of these stickered boxes of gloves that I saw

9

at warehouses had printed sheets of paper on them with a number and the name "Joel Stern" or "JNS." Neither I nor Mr. Gilling placed those sheets of paper on the pallets.

41. Certain other pallets had similar printed sheets of paper with a number and the name "Kitchen Winners" on them. At the time I did not know what the number referred to but have now learned through discovery in this case that the numbers on the sheets of paper correspond to container numbers of gloves that sellers received from China and sold to Rock Fintek.

42. Following the discovery of problems with the gloves, Mr. Gilling and I established direct contact with Anna Grinvald and Yosi Atias of Global Tooling Services LTD, the purported manufacturer in China of MedCare brand gloves. Among other things, GTS provided us with samples of potential replacement MedCare brand gloves based on a purported new formula. The boxes of those potential replacement gloves had the Lot number ZYMD01202103 printed on them.

43. On or about July 26, 2021, GTS provided Rock Fintek with copies of testing reports concerning the various lots of gloves that GTS claimed in sold to Rock Fintek. Most of these reports either identify particular Lot numbers of gloves to which they pertain or include photographs of gloves boxes displaying the Lot numbers. These reports were produced in discovery. The Lot numbers on the reports provided by GTS match up with Lot numbers that Mr. Gilling and I observed on boxes at Medline warehouses.

44. Since discovery by Ascension of the bad gloves, Ascension would no longer do business with Rock Fintek and threatened legal action. On March 16, 2022, Rock Fintek received a formal demand letter from Ascension Health seeking the return of the close to $37 million paid by Ascension to Rock Fintek, among other damages, related to the gloves at issue in this lawsuit.

45. Although Ascension has not sued Rock Fintek as of this date, Ascension has not given Rock Fintek any releases or assurances, and I view the exposure to Ascension as an ongoing serious and significant claim potentially worth tens of millions of dollars that, among other things, has caused Rock Fintek to go out of business.

46. In April 2023, Rock Fintek filed a lawsuit in Florida Circuit Court against Hunton Andrews Kurth LLP, the law firm that did the due diligence in connection with the theft in Thailand of $6.2 million. In that lawsuit Rock Fintek did not blame Hunton for the destruction of any business but rather claimed that the alleged conduct in that case led Rock Fintek to doing business with the Adorama Sellers and JNS/Stern, which is the actual cause of the destruction of the Ascension relationship and exposure to Ascension for tens of millions of dollars for the bad gloves. The case against Hunton has settled confidentially.

47. When questioned at my deposition about the amount of damage attributable to JNS and Stern, I did not disagree with counsel that Stern's liability could be reasonably apportioned by the percentage of gloves that Stern/JNS sold to Rock Fintek. To be clear, Rock Fintek's loss of business here was caused by the totality of the bad gloves delivered to Ascension, who did not care whether the bad gloves came from Stern or Kitchen Winners. In other words, there is no question that Stern delivered non-conforming gloves (many of which originated with Kitchen Winners/Adorama) and the jury should decide how to apportion the harm to Rock Fintek among the defendants.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 15TH DAY OF MARCH 2024:

_____
Thomas Kato

11

**FIGURE 1. Summary of Ascension Payments for Non-MedCare (and LevMed) PPE Products:**

| Ascension Payments to Rock Fintek for Non-MedCare Glove Products | | | |
|---|---|---|---|
| **BANK** | **ACCOUNT** | **Payment Date** | **Amount** |
| Wells Fargo | ******7633 | 03/23/20 | $1,625,000.00 |
| Wells Fargo | ******7633 | 03/23/20 | $2,150,000.00 |
| Wells Fargo | ******7633 | 03/24/20 | $4,000,000.00 |
| Wells Fargo | ******7633 | 04/22/20 | $1,625,000.00 |
| Wells Fargo | ******7633 | 04/22/20 | $2,150,000.00 |
| Wells Fargo | ******7633 | 05/08/20 | $397,660.00 |
| Wells Fargo | ******7633 | 05/11/20 | $1,244,900.00 |
| Wells Fargo | ******7633 | 05/12/20 | $945,180.00 |
| Wells Fargo | ******7633 | 05/13/20 | $741,760.00 |
| Wells Fargo | ******7633 | 05/15/20 | $3,374,000.00 |
| Wells Fargo | ******7633 | 05/21/20 | $626,000.00 |
| Wells Fargo | ******7633 | 06/15/20 | $825,000.00 |
| Wells Fargo | ******7633 | 06/22/20 | $825,000.00 |
| Wells Fargo | ******7633 | 07/14/20 | $445,500.00 |
| Wells Fargo | ******7633 | 08/18/20 | $1,575,000.00 |
| Wells Fargo | ******7633 | 09/02/20 | $82,000.00 |
| Wells Fargo | ******7633 | 11/10/20 | $750,000.00 |
| Wells Fargo | ******7633 | 01/13/21 | $17,685.00 |
| Wells Fargo | ******7633 | 02/23/21 | $295,260.00 |
| Bank of America | ******** 9205 | 02/25/21 | $422,771.25 |
| Bank of America | ******** 9205 | 03/03/21 | $406,400.00 |
| Bank of America | ******** 9205 | 03/19/21 | $800,000.00 |
| Bank of America | ******** 9205 | 03/22/21 | $200,000.00 |
| Bank of America | ******** 9205 | 04/08/21 | $400,000.00 |
| | | **Total** | **$25,924,116.25** |

**FIGURE 2: Summary of Ascension Payments for MedCare (and LevMed) Gloves**

| Ascension Payments to Rock Fintek for MedCare and LevMed Gloves ||||
|---|---|---|---|
| BANK | ACCOUNT | Payment Date | Amount |
| Wells Fargo | ******7633 | 12/08/20 | $9,250,000.00 |
| Bank of America | ******** 9205 | 03/05/21 | $357,975.00 |
| Bank of America | ******** 9205 | 03/09/21 | $393,600.00 |
| Bank of America | ******** 9205 | 03/18/21 | $589,548.75 |
| Bank of America | ******** 9205 | 03/25/21 | $360,750.00 |
| Bank of America | ******** 9205 | 03/29/21 | $331,890.00 |
| Bank of America | ******** 9205 | 04/07/21 | $141,276.25 |
| Bank of America | ******** 9205 | 04/26/21 | $716,643.75 |
| Bank of America | ******** 9205 | 04/27/21 | $444,693.75 |
| Bank of America | ******** 9205 | 04/28/21 | $346,042.50 |
| Bank of America | ******** 9205 | 04/30/21 | $812,103.75 |
| Bank of America | ******** 9205 | 05/04/21 | $388,500.00 |
| Bank of America | ******** 9205 | 05/05/21 | $807,525.00 |
| Bank of America | ******** 9205 | 05/06/21 | $414,168.75 |
| Bank of America | ******** 9205 | 05/07/21 | $413,475.00 |
| Bank of America | ******** 9205 | 05/10/21 | $804,611.25 |
| Bank of America | ******** 9205 | 05/11/21 | $831,667.50 |
| Bank of America | ******** 9205 | 05/12/21 | $1,169,801.25 |
| Bank of America | ******** 9205 | 05/18/21 | $1,643,910.00 |
| Bank of America | ******** 9205 | 05/21/21 | $808,357.50 |
| Bank of America | ******** 9205 | 05/24/21 | $2,837,298.75 |
| Bank of America | ******** 9205 | 05/25/21 | $767,426.25 |
| Bank of America | ******** 9205 | 05/27/21 | $3,638,580.00 |
| Bank of America | ******** 9205 | 05/28/21 | $800,171.00 |
| Bank of America | ******** 9205 | 06/01/21 | $1,606,308.75 |
| Bank of America | ******** 9205 | 06/03/21 | $1,614,495.00 |
| Bank of America | ******** 9205 | 06/08/21 | $1,211,148.75 |
| Bank of America | ******** 9205 | 06/10/21 | $752,441.25 |
| Bank of America | ******** 9205 | 06/15/21 | $394,743.75 |
| Bank of America | ******** 9205 | 06/16/21 | $456,348.75 |
| Bank of America | ******** 9205 | 06/18/21 | $1,212,675.00 |
| | | **Total** | **$36,318,177.25** |

**FIGURE 3: Excerpts from Rock Fintek Bank Records Reflecting PPE Sales to Clients other than Ascension:**

**Year 2020**

| Date | Description | Amount | Balance |
|---|---|---:|---:|
| 3/31 | WT Seq256613 Prisma Health-Upstate /Org=Prisma Health Upstate Srf# Ec20033185313439 Trn#200331256613 Rfb# Uaofed001270 | 2,925,000.00 | |
| 3/31 | Wire Trans Svc Charge - Sequence: 200331024541 Srf# | | 30.00 |
| 4/8 | Meijer EDI/ACH xxxxx0000 Trn*1*000472990\ | 2,636,120.00 | |
| 4/9 | Wire Trans Svc Charge - Sequence: 200409104285 Srf# | | 30.00 |
| 4/9 | WT Fed#03782 Bank of America, N /Org=Meijer Inc Srf# 2020040900289629 Trn#200409029823 Rfb# 2000012352 | 2,636,120.00 | |
| 4/21 | WT Fed#04788 Bank of America, N /Org=Next Industries Inc Srf# 2020042100314808 Trn#200421062049 Rfb# 295754586 | 43,952.00 | |
| 4/22 | WT Fed#09033 Bank of America, N /Org=Meijer Inc Srf# 2020042200479184 Trn#200422094136 Rfb# 2000014673 | 950,630.00 | |
| 4/27 | WT Fed#03492 Bank of America, N /Org=Next Industries Inc Srf# 2020042700594029 Trn#200427164887 Rfb# Trafdtnx8 | 3,300,000.00 | |
| 4/27 | WT Fed#04501 Bank of America, N /Org=Next Industries Inc Srf# 2020042700662092 Trn#200427182972 Rfb# 296366086 | 174,000.00 | |
| 4/27 | Wire Trans Svc Charge - Sequence: 200427068154 Srf# | | |
| 5/7 | WT Fed#02552 US Bank, NA /Org=Patterson Companies Inc Srf# 200507028760 Trn#200507122035 Rfb# 200507028760 | 1,200,000.00 | |
| 5/11 | WT Fed#02590 Bank of America, N /Org=Next Industries Inc Srf# 2020051100591936 Trn#200511157281 Rfb# Gpztn7Uzh | 635,200.00 | |
| 5/14 | WT Fed#05636 Bank of America, N /Org=Meijer Inc Srf# 2020051400342258 Trn#200514044744 Rfb# 2000013256 | 783,272.00 | |
| 5/22 | WT Fed#00132 Citibank N.A. /Org=Dcas Srf# D0301430986201 Trn#200522142085 Rfb# | 7,658,604.80 | |
| 5/29 | WT Fed#06010 Citibank N.A. /Org=City of New York - Dcas Srf# D0301500294301 Trn#200529072632 Rfb# | 6,953,839.20 | |
| 6/16 | WT Fed#03504 US Bank, NA /Org=Patterson Companies Inc Srf# 200616033334 Trn#200616145151 Rfb# 200616033334 | 1,200,000.00 | |
| 6/19 | Delta Air Lines, Payments 200619 001002000144768 Rock Fintek | 1,180,000.00 | 3,192,161.82 |

| 7/17 | Greenville Healt EDI Pymnts 96244<br>000000097\Ge*1*1\lea*1*029446131\ | 3,459,430.18 |
|---|---|---|

## YEAR 2022

| 04/14/22 | WIRE TYPE:FX IN DATE:220414 TIME:0450 ET TRN:2022041400093362 FX:AUD 185328.00 0.7289 ORIG:HEALTH DEPT WA OPERATING ID:06604013300018 ORIG BK:COMMONWEALTH BANK OF AUSTRALI ID:CTBAAU2S/ AU06204 PMT DET:DO NOT CONVERT INV-0003 PO 4370159 | 135,085.58 |
|---|---|---|
| 04/14/22 | WIRE TYPE:FX IN DATE:220414 TIME:0432 ET TRN:2022041400023934 FX:AUD 131472.00 0.7248 ORIG:ST JOHN GOD HEALTH CARE N ID:036001195350 ORIG BK:WESTPAC BANKING CORPORATION ID:WPACAU2S PMT DET:SJOG INV0002 | 95,290.91 |