# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KITCHEN WINNERS NY INC., <br><br> Plaintiff, <br><br> v. <br><br> ROCK FINTEK LLC, <br><br> Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ROCK FINTEK LLC, <br><br> Counterclaim and Third-Party Plaintiff, <br><br> v. <br><br> KITCHEN WINNERS NY INC, <br><br> Counterclaim Defendant, <br><br> and <br><br> ADORAMA INC., HERSHEY WEINER, JOSEPH MENDLOWITZ, JNS CAPITAL HOLDINGS LLC and JOEL STERN, <br><br> Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 22-cv-05276-PAE

## ROCK FINTEK LLC'S OPPOSITION TO KITCHEN WINNERS NY INC.'S AND ADORAMA, INC.'S OMNIBUS MOTION *IN LIMINE*

Defendant and third-party/counterclaim plaintiff Rock Fintek LLC respectfully submits this opposition to the omnibus motion *in limine* filed by Kitchen Winners NY Inc. ("Kitchen Winners") and Adorama, Inc. ("Adorama").

In support hereof, Rock Fintek states as follows:

## Argument

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984); *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996). Evidence should be excluded on a motion *in limine* **only** when the evidence is clearly inadmissible on all potential grounds. *Dais v. Lane Bryant, Inc.*, No. 97CIV2011PKLRLE, 2001 WL 1285329, at *1 (S.D.N.Y. Oct. 22, 2001). Indeed, courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context. *Id.*

## I. MESSAGES AND EMAILS BY MENDEL BANON ARE ADMISSIBLE AS ADMISSIONS OF A PARTY OPPONENT, AS ADOPTIVE ADMISSIONS AND FOR NON-HEARSAY PURPOSES.

Adorama and Kitchen Winners filed a vague sweeping motion *in limine* seeking to exclude unidentified statements by Mended Banon – their broker and representative in connection with the gloves transactions at issue in this lawsuit. As an initial matter, the motion regarding Banon is not reasonably susceptible to a ruling *in limine* because Kitchen Winners and Adorama have not identified any specific statements by Banon in the voluminous evidentiary record, consisting of more than dozens of emails with Banon and voluminous chats with Rock Fintek's representatives that they contend constitutes inadmissible hearsay, particularly where a vast majority of his statements are plainly admissible as adoptive admissions and statements by a party opponent, and many others fall within numerous hearsay exceptions. *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* No. 94 Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential damages claim because the motion was too sweeping in scope to be considered prior to trial).

To the extent that Banon does **not** testify at trial (he is identified as a trial witness by Rock Fintek), any hearsay objections should be resolved on a statement-by-statement basis at trial, and

not in a wholesale sweeping manner as Adorama and Kitchen Winners request.

Adorama and Kitchen Winners take an unduly narrow and disingenuous view of Banon's role in the underlying transactions based on the existing evidentiary record and evidence expected to be adduced at trial. By their motion, Adorama and Kitchen Winners seek to exclude statements by *the point person for nearly all of the glove transactions on behalf of Kitchen Winners and Adorama* who acted as the broker and representative of Kitchen Winners and Adorama in connection with the gloves transactions with Rock Fintek. *See, e.g.,* Exhibit A (Weiner Tr. Day I a.m.) at 33:20-34:14 (Weiner's testimony that he communicated with Rock Fintek's representatives "through Mendel [Banon]"); 61:8-11 ("What is Mendel Banon's role with respect to Kitchen Winners? A. He was a broker."); Exhibit B (Gilling Tr.) at 48:11-15 & 53:6-13 ("Mendel Bannon held himself out as a representative of Kitchen Winners and associated with Adorama."); Exhibit C (AKW_004957) (Bannon writing to Rock Fintek: "As per our call with Hershey and Arik we will release five today and we will get paid 8 to 9 loads on Tuesday…").

In fact, Banon was the originator of the relationship between Kitchen Winners/Adorama and Anna Grinvald, the CEO and owner of Global Tooling Services, Inc. ("GTS"), the purported manufacturer of the MedCare brand gloves and provided Rock Fintek with documentation regarding the gloves. Exhibit A at 87:4-16. Adorama and Kitchen Winners simply ignore that Hersey Weiner, Kitchen Winners' principal, was copied on most or all email communications with Banon. Indeed, Adorama and Kitchen Winners would be hard pressed to find communications concerning glove transactions in the record on which Banon was not either a sender or a recipient.

As Adorama and Kitchen Winners concede in their motion, statements by Banon are plainly admissible under Fed. R. Evid. 801(d)(2), if Banon is deemed to have acted as their agent or representative in connection with the glove transactions. Rule 801(d)(2) carves out from the

definition of hearsay party admissions, statements made, adopted, or made by an agent for the party, when those statements are offered against the party. Included in this carve out from the hearsay rule are "statement[s] by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). *See Calderera v. Chandris*, S.A., No. 91 Civ. 8181, 1993 WL 362406, at *1 (S.D.N.Y. Sept. 13, 1993); *United States v. Pilarinos*, 864 F.2d 253, 257 (2d Cir. 1988) (statements by a businessman who acted as defendant's agent in negotiations between defendant and an IRS agent constituted admissions under 801(d)(2)(D)); *Dais v. Lane Bryant, Inc.*, No. 97CIV2011PKLRLE, 2001 WL 1285329, at *2 (S.D.N.Y. Oct. 22, 2001); *Rishmawy v. Vergara*, 540 F. Supp. 3d 1246, 1265 (S.D. Ga. 2021) (emails by agent attributable to principal under Fed. R. Evid. 801(d)(2)).

In addition, statements by Banon in the course of transactions on which Weiner and others at Kitchen Winners and Adorama are copied, and pursuant to which they engaged in the underlying transactions, are admissible as non-hearsay because those statements were adopted by Ktichen Winners and Adorama. *See Cow Bay Sprinkler Corp. v. Houston Cas. Co.*, No. 19CIV5854LDHVMS, 2020 WL 9812929, at *7 (E.D.N.Y. Feb. 1, 2020) (explaining how a broker's letter for coverage is an adoptive admission by the principal); *see also* Fed. R. Evid. 801(d)(2)(B) advisory committee's note ("Adoption or acquiescence may be manifested in any appropriate manner."); 4 Wigmore, *Evidence* § 1073, at 129 (Chadbourn rev. 1972) ("written statements of a <u>third person</u> may be so dealt with <u>by the party</u> that his assent to the correctness of the statements may be inferred, and they would thus by adoption become his own statements" (emphasis in original)); *id.* at 138 ("The party's <u>use of a document</u> made by a third person will frequently amount to an approval of its statements as correct, and thus it may be received against

him as an admission by adoption." (emphasis in original)); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 239 (2d Cir. 1999); *see also AL Infinity, LLC v. Crown Cell, Inc.*, No. 20 CIV. 4813 (NRB), 2023 WL 5097979, at *8 (S.D.N.Y. Aug. 9, 2023) (explaining that when a party accepts and acts upon evidence it is deemed to have adopted it for hearsay purposes) (citing *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998)). Here, Kitchen Winners and Adorama unquestionably adopted Banon's various statements in the context of the gloves transactions where they acted on those statements by engaging in the transactions.

Kitchen Winners' and Adorama's argument that Banon was an "independent broker" whatever that means, does not carry the day. Whether Banon's statements are properly attributable to his principals does not depend on his title but must be evaluated in light of his actual role in the transaction and his relationship to Kitchen Winners and Adorama, including the degree of control they exercised over his performance. *See, e.g., SK Networks Co. Ltd. v. Bentley Forbes Holdings, LLC*, No. CV1208997MMMSHX, 2013 WL 12131715, at *2 (C.D. Cal. Nov. 7, 2013) (statements by a third-party broker regarding creditworthiness properly attributable to principal, because "[a]n agent need not be an employee of the principal."); *Doctors' Co. v. Superior Court*, 49 Cal.3d 39, 46 n. 4 (1989) (holding that independent contractors were an insurer's agents).

The cases on which Adorama and Kitchen Winners rely are inapposite. In *Tartaglione v. Shaw's Exp., Inc.*, 790 F. Supp. 438, 441 (S.D.N.Y. 1992), the Court did not address any hearsay or evidentiary issues but addressed whether a transportation broker could be held liable for an independent contractor truck driver's car accident. The Court explained that the "relation between a transportation broker and the owner and driver of a truck as that of independent contractors and not agents because the owner and driver had a choice of routes and furnished their own gas and oil" and, therefore the driver vehicle owner was not an agent of the transportation broker. Here,

the circumstances are nothing like *Tartaglione*, because in the pertinent transactions Banon acted only on behalf of Kitchen Winners and Adorama, who supplied the gloves and received the payments from Rock Fintek. *See also Boren v. Sable*, 887 F.2d 1032, 1040 (10th Cir. 1989) ("mere occupation of a subordinate position in the corporate chain of command" held insufficient to establish an "agency relationship" for the purpose of admission under Rule 801(d)(2)(D)); *Condus v. Howard Sav. Bank*, 986 F. Supp. 914, 916 (D.N.J. 1997) (distinguishing between "agent independent contractors or non-agent independent contractors" and ruling that statements by an "outside company" brought in to "to make an independent assessment of the quality of Howard's credit administration process" were not attributable to the principal). In other words, even if Banon is deemed to have the title of an independent broker or contractor, his function was much more like an *agent* independent contractor since he was indisputably facilitating a transaction under complete control of Adorama and Kitchen Winners.

In addition, many of the numerous statements by Banon regarding the gloves transactions and the nature of gloves at issue could be admitted for various non-hearsay purposes but Rock Fintek is unable to meaningfully argue this point given that Adorama and Kitchen Winners have no actually identified any statements by Banon that they seek to exclude.

Finally, Adorama and Kitchen Winners omit from their papers the fact that Banon, who is represented by the same counsel as Adorama and Kitchen Winners, strung Rock Fintek along in discovery promising to make himself available for deposition in response to a validly served subpoena yet managed to successfully evade complying with a subpoena in this case despite making commitments to comply. *See* Exhibit D (excerpts of communications with counsel regarding Banon). It would be patently unfair to exclude Banon's statements made on behalf of his constituents from trial, particularly given his evasive maneuvers. In addition, Rock Fintek has

identified Banon as a witness on its trial witness list and intends on issuing and pursuing a trial subpoena for Banon.

For those reasons, the motion *in limine* concerning statements by Banon should be denied.

## II.    THE RESULTS OF THE MEDLINE LABEL AUDIT ARE PLAINLY ADMISSIBLE AS BUSINESS RECORDS UNDER RULE 803(6).

In seeking to exclude the results of Medline's label audit of the entire inventory of gloves that Kitchen Winners and Adorama sold to Rock Fintek, Kitchen Winners and Adorama mischaracterize Medline's testimony and ignore the liberal standards for admission of a document as a business record. Medline, through a corporate representative, testified in pertinent part that:

Q. Okay. Are you aware that at some point in time Medline performed an audit of some or all of the gloves that it was holding on behalf of Ascension or the Resource Group?

A. Yes, I am aware.

***Q. Were you personally involved in that?***

***A. Yes, I was involved.***

Q. Can you explain to me what exactly was done by Medline?

* * *

A. Yes. It was requested ***by the customer*** to do a label audit for their goods at the direction of the customer at our DCs that stored the products in question.

Q.  When you say DCs, what does that mean?

A. Distribution center or warehouse.

Q. Okay. You said you were involved in that. What was your role in that audit?

A. Once we received direction from the customer on what they wanted checked, I helped coordinate with our warehouse directors on a call and then a follow-up e-mail with details on how the audit should be completed.

Q. Okay. And so what did Ascension specifically ask you to do?

A. Ascension identified specific labels they wanted to be identified within their product. They sent us the information with the labels they want identified, ***and we completed the***

*audit to help them identify those labels*.

Q. What labels were they interested in?

A. I would have to refer to one of the documents, but I believe it said synthetic nitrile gloves.

Q. How did you or other Medline employees go about performing this audit?

A. Under the direction of the customer, *we went to each slot that the product was stored in. We removed one random case. We opened the case and removed one random box within that case and inspected it for the label that was identified by Ascension*.

\* \* \*

Q. Does Medline ordinarily conduct these kinds of audits on behalf of Ascension?

A. I wouldn't say ordinarily. *It's when requested*.

Q. How many other audits has Medline conducted *on behalf of Ascension* in the last let's say five years?

\* \* \*

A. Maybe one or two that I can recall.

\* \* \*

Q. Let me rephrase the question. Does Medline routinely conduct audits on behalf of customers unless specifically asked to do so?

A. We do not routinely. *We do upon request*.

Q. So you were just asked if Medline routinely conducts audits for customers when not asked to do so, and I just want the record to be clear. *Medline conducts audits for its customers routinely when asked to do so. Is that fair?*

A. *Yes. When Medline is asked to complete an audit, we do so*.

Q. And you were just -- there was a reference made to a document that I believe was Bates labeled Medline 35.

\* \* \*

Q. Okay. And on the first page of the document, the last in time e-mail, do you see a chart there?

8

A. Yes.

Q. And does that chart reflect the results of the audit that Medline conducted for Ascension?

A. Yes, it does.

Q. Okay. And I believe you were asked a question earlier as to the type of labels that Ascension had asked Medline to audit, and I'm not sure that I heard clearly, so I apologize if I'm asking you again, but did I -- is it correct that Medline I'm sorry -- *Ascension asked Medline to count the boxes that were labeled as NBR examination gloves versus those that were labeled protection gloves?*

A. I would have to refer to the document on the specifics of what were requested for the audit.

Q. Please feel free to do so, if you don't mind.

A. Looks like it says *product can be identified by the text synthetic nitrile protection glove listed on the box unit measure inside the case.*

Q. And those were the items that the audit focused on, correct?

A. Correct.

Q. So the chart on page labeled 35, *does that accurately and fairly represent the results of the audit that Medline conducted for Ascension*?

A. *Yes*.

* * *

Q. So is it your testimony that the results of Medline's audit as listed in this document are accurate?

A. Correct.

Q. What are you basing that upon?

A. Going back to what was stated earlier. The instruction from the customer was to go to each slot across all DCs, pull one case of the product, then from that case pull one box to identify if it was listed, if it had the text listed synthetic nitrile protection gloves. If it did, that entire slot was then put on blocked or held inventory.

Q. Again, you testified earlier that you were not the one who conducted the entire audit

9

yourself, correct?

A. Correct.

Q. And you have not spoken with every individual Medline employee who was involved in conducting the audit, correct?

A. Correct.

Q. So how do you know that what they recorded was accurate?

A. Giving -- giving instruction to the directors of each one of these warehouses and then following up to make sure it was completed with them reporting what was put onto blocked inventory and left as unrestricted inventory while also providing the number of hours that were completed for me to confirm that the audit was completed.

Exhibit E (Medline Deposition excerpts) (all emphases added).

Kitchen Winners and Adorama seek to exclude Medline's audit results for three reasons, each of which falls apart upon a brief examination. *First*, Kitchen Winners and Adorama misconstrue the liberal standard for admission of a document under the business records exception of Rule 803(6). Rule 803(6) allows the introduction of a record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness ...; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

"Rule 803(6) favors the admission of evidence rather than its exclusion if it has any

probative value at all." *United States v. Mendlowitz*, No. S2 17 CR. 248 (VSB), 2019 WL 6977120, at \*11 (S.D.N.Y. Dec. 20, 2019), aff'd, No. 21-2049, 2023 WL 2317172 (2d Cir. Mar. 2, 2023) (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)). "The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Saks Intern., Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987). "To lay a proper foundation for such a record, a 'custodian or other qualified witness' must testify that the document was 'kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].'" *Williams*, 205 F.3d at 34.

The Second Circuit takes "a generous view" of the business-records exception, construing it to favor admission over exclusion of evidence with "any probative value at all," including with respect to audit reports. *See Mason Tenders Dist. Council v. Aurash Const. Corp.*, No. 04 Civ. 2427(RCC), 2005 WL 2875333, \*2 (S.D.N.Y., Oct. 31, 2005) (admitting audit reports of payroll records as business records where such reports were routinely "ordered" by outside auditing firms so as to determine if employers are deficient in certain contributions); *Northgate Lincoln-Mercury Inc. v. Ford Motor Co.*, 507 F. Supp. 3d 940, 951 (S.D. Ohio 2020) (admitting audit reports); *United States v. Frazier*, 53 F.3d 1105, 1110 (10th Cir. 1995) (audit reports admissible)

Kitchen Winners and Adorama appear to argue that the audit results at issue do not meet the "regularly conducted" prong of Rule 803(6) analysis because of the quantity of such audits that Medline had performed for *Ascension* (i.e. one client) over the past 5 years. That, however, is not the proper analysis under Rule 803(6) and Kitchen Winners and Adorama do not cite to any authority for exclusion of evidence on those grounds. Instead, courts have explained that "frequency need not be the only consideration when analyzing the meaning of 'routinely' and 'in

the regular course of business.'" *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1047 (9th Cir. 1999) (construing meaning of "routinely" for purposes of Rule 803(6) without regard to frequency). As the Ninth Circuit explained in *Sana*, "although regular can mean recurring at fixed or uniform intervals, it can also mean usual or ordinary." *Id.* at 966 (internal editing and quotation marks omitted).

Here, as detailed above, Medline's testimony was clear that they perform such audits routinely upon a customer's request. The fact that Medline performed at least two such audits for Ascension in the past 5 years actually demonstrates that such audits are a regular part of Medline's business and supports the admission of the audit report as a business record under Rule 803(6).[1]

*Second*, Adorama and Kitchen Winners appear to contend that Medline's audit is inadmissible under Rule 803(6) because it involves some type of complex analysis not contemplated by the business records exception. That argument, however, misconstrues what Medline actually did and ignores the overwhelming authority, including cases cited above, of courts admitting audit reports as business records under Rule 803(6). As detailed above, Medline's audit involved a simple counting of boxes of gloves from each pallet bearing a certain label. The fact that it took Medline employees over a hundred hours to conduct this audit is not a reflection of the complexity of the task but simply a reflection of the fact that Kitchen Winners and Adorama sold Rock Fintek millions of boxes non-conforming gloves that Medline had to count.

The authorities on which Adorama and Kitchen Winners rely are easily distinguishable from the Medline audit report at issue. *See Abascal v. Fleckenstein*, 820 F.3d 561, 565 (2d Cir.

---

[1] The sole case that Adorama and Kitchen Winners cite in its motion is inapposite and involves sporadic one-off emails and *not* audit performed at a customer's request. *See New World Trading Co. v. 2 Feet Prods., Inc.*, No. 11 CIV. 6219 SAS, 2014 WL 988475, at *1 (S.D.N.Y. Mar. 13, 2014) (excluding random emails).

2016) (excluding a report analyzing conditions at correctional facility because it was not made timely, did not contain information recorded by someone with personal knowledge of that information, and involved "interpreting survey results and inmate interviews and then creating a summary of the findings"); *Grant v. Lockett*, No. 19-1558, 2021 WL 5816245, at *2 (2d Cir. Dec. 8, 2021) (same); *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 633 (2d Cir. 1994) (affirming exclusion of a summary analysis of data where proponent of evidence had refused to produce in discovery data underlying the summary, which therefore lacked indicia of reliability, and where the summary was attorney work product prepared for the purposes of litigation).

Here, far from any kind of complicated analysis of data or subjective summaries, the Medline audit constitutes precisely the type of readily observable information – a counting of the labels on boxes of gloves during a routine audit – that is contemplated by Rule 803(6).

*Third,* Adorama and Kitchen Winners' assertion that the Medline audit is inadmissible because it was created for the purposes of litigation is factually unsupported. As Medline's testimony detailed above makes clear, the audit was performed long before the beginning of this litigation at the request of and paid for by Medline's customer non-party *Ascension*, and not at the request of Rock Fintek. Adorama and Kitchen Winners cannot point to any testimony or evidence – because none exists – that the audit was prepared for the purposes of litigation. Adorama and Kitchen Winners are simply not entitled to the inference that they seek about the Medline audit on this motion, particularly in light of the Second Circuit's instruction to construe evidence in favor of admission over exclusion under Rule 803(6).

Based on the foregoing, the Medline audit should be admitted into evidence at trial.

III. **THE DEPOSITION TESTIMONY OF THOMAS KATO ON VARIOUS TOPICS MAY BE USED ON CROSS-EXAMINATION BUT DOES NOT WARRANT EXCLUSION OF RELEVANT DOCUMENTARY EVIDENCE.**

Adorama and Kitchen Winners oddly move to exclude evidence that they contend

contradicts Mr. Kato's deposition testimony regarding the nature of the payments by Ascension to Rock Fintek identified in Rock Fintek's bank records and other materials produced in discovery. Adorama and Kitchen Winners appear to complain that they did not think to ask follow-up questions at deposition or to conduct follow-up discovery regarding the fact that certain payments from Ascension identified in Rock Fintek's bank records were *not* for the gloves at issue but were for other products that Rock Fintek sold to Ascension, namely masks. What Adorama and Kitchen Winners fail to acknowledge in their motion, however, is that *all of the evidence* that Rock Fintek seeks to introduce to support its version of the transaction history was produced in discovery prior to Mr. Kato's deposition, yet parties chose not to question Mr. Kato about those documents. Indeed, the opposing parties did not even introduce Rock Fintek's bank records as an exhibit at Mr. Kato's Rule 30(b)(6) deposition and chose not to question him or Brad Gilling about the specific payments from Ascension to Rock Fintek, or the Ascension purchase orders regarding non-gloves transactions. As the Rule 30(b)(6) designee, Mr. Kato was not required to memorize the contents of the voluminous bank records produced in discovery. The fact that his testimony understandably may have varied from the detailed entries in the bank records is neither surprising nor grounds for exclusion. To the extent that Adorama and Kitchen Winners perceive inconsistencies between documents and testimony that they believe supports their case, they may cross-examine witnesses at trial on those issues but may not exclude evidence timely produced in discovery simply because they did not think of pursuing follow up discovery on that evidence or because it contradicts other evidence.

Adorama and Kitchen Winners' odd contention with respect to evidence of the number of LevMed gloves sold is similarly improper on a motion *in limine*. Adorama and Kitchen Winners appear to contend that Rock Fintek should be bound by its *allegation* in its amended complaint,

before any discovery, that they sold Rock Fintek approximately 3 million mis-branded LevMed gloves. While the precise numbers of LevMed gloves can (and will) be debated at trial, some of the record demonstrates that Medline warehouses entered the 2,495 cartons (2,495,000 gloves) of LevMed gloves as MedCare gloves when they arrived and shelved those gloves as MedCare gloves. In other words, the total amount of gloves is a disputed question of fact for the jury and not a proper topic on a motion *in limine*.

Accordingly, the motion *in limine* seeking to preclude contested evidence should be denied.

## IV.    JOINT STATEMENT OF FACTS IS NOT ADMISSIBLE AS AN EXHIBIT.

Finally, Adorama and Kitchen Winners appear to seek to admit the parties' Joint Statement of Undisputed Facts ("JSUF") (ECF No. 135) as a trial exhibit. That document is, however, by definition incomplete as it contains only limited aversions to which the parties agreed for the purposes of summary judgment, and should not be presented to a jury in its current form. Adorama and Kitchen Winners have not identified any specific statements in the JSUF that they believe should be read to the jury and that Rock Fintek resists. Adorama and Kitchen Winners' suggestion that Rock Fintek plans to "walk back" any of the stipulated facts is inaccurate and misconstrues Rock Fintek's position.

On its face, the JSUF contains many aversions that, while not disputed, are not "facts" that may properly be introduced at trial. For example, in connection with summary judgment motion practice, other parties included statements in the JSUF that reflected status of discovery issues, and contentions and statements as how a party or a non-party *testified*, not that such testimony was true. *See, e.g.,* JSUF, ¶ 20 (statement in the negative that Rock Fintek has not produced certain text messages or communications); ¶¶ 73, 74, 76, 81, 87 ("Ascension testified that …."). Without a proper context and foundation, simply admitting such snippets as an exhibit or stipulated "facts"

would be confusing to the jury and prejudicial.

Furthermore, in light of the Court's summary judgment rulings regarding damages theories and the fact that Rock Fintek has settled its claims with JNS and Stern, many of the stipulations set forth in the JSUF are no longer relevant for trial.

Rock Fintek remains willing to consider any properly framed stipulation of facts to be presented to the jury but objects to the jury being provided a limited and often confusing form of the JSUF.

### Conclusion

Based on the foregoing, Rock Fintek respectfully requests that the Court deny Adorama and Kitchen Winners' motion *in limine*.

Dated:   November 27, 2024                   Respectfully submitted,

/s/Phillip Rakhunov
Phillip Rakhunov
Lauren Riddle (*pro hac vice*)
POLLACK SOLOMON DUFFY LLP
48 Wall Street, 31st Floor
New York, NY 10005
Telephone: (212) 493-3100
Facsimile: (212) 434-0109
prakhunov@psdfirm.com
lriddle@psdfirm.com

## **Certificate of Service**

The undersigned certifies that this document is being served on counsel on all parties via ECF on November 27, 2024.

/s/ Phillip Rakhunov