```
 1              UNITED STATES DISTRICT COURT

 2          SOUTHERN DISTRICT OF NEW YORK

 3   KITCHEN WINNERS NY INC.,        ) Case No.
                                     ) 22-cv-05276
 4            Plaintiff,             ) (PAE)
                  vs.                )
 5   ROCK FINTEK, LLC,               )
                                     )
 6            Defendant.             )
     ----------------------------    )
 7   ROCK FINTEK, LLC,               )
                                     )
 8      Counterclaim and            )
        Third-Party Plaintiff,      )
 9            vs.                    )
                                     )
10   KITCHEN WINNERS NY INC.,        )
                                     )
11      Counterclaim Defendant,     )
                  and                )
12                                   )
     ADORAMA INC., HERSHEY           )
13   WEINER, JOSEPH Mendlowits,      )
     JNS CAPITAL HOLDINGS LLC and    )
14   JOEL STERN,                     )
                                     )
15      Third-Party Defendants.     )
     --------------------------------)
16

17                 VOLUME 2

18       VIDEOCONFERENCE DEPOSITION OF

19                HERSHEY WEINER

20            New York, New York

21         Thursday, November 16, 2023

22


23


24   Reported by:
     TAMI H. TAKAHASHI, RPR, CSR
25   JOB NO. 30129
```

1                        November 16, 2023

2                        9:11 a.m.

3

4             Volume 2 Videoconference Deposition

5     of HERSHEY WEINER, held via Zoom remote

6     videoconferencing software, pursuant to

7     Notice, before TAMI H. TAKAHASHI, a

8     Registered Professional Reporter and Notary

9     Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2     (All parties appearing remotely)

 3

 4    Representing the Plaintiff:

 5        LIPSIUS BENHAIM LAW

 6            80-02 Kew Gardens Road, Suite 1030

 7            Kew Gardens, New York 11415

 8            212.981.8440

 9    BY:   ALEXANDER SPERBER, ESQ.

10            asperber@lipsiuslaw.com

11

12

13    Representing the Defendant and Third-Party

14    Plaintiff Rock Fintek:

15        POLLACK SOLOMON DUFFY LLP

16            31 St. James Avenue, Suite 940

17            Boston, Massachusetts  02116

18            617.439.9800

19    BY:   PHILLIP RAKHUNOV, ESQ.

20            prakhunov@psdfirm.com

21            LAUREN RIDDLE, ESQ.

22            lriddle@psdfirm.com

23

24

25
```

```
 1    A P P E A R A N C E S:

 2     (All parties appearing remotely)

 3

 4    Representing the Defendants JNS Capital

 5    Holdings LLC and Joel Stern:

 6         THE LAW OFFICE OF AVRAM E. FRISCH LLC

 7              1 University Plaza, Suite 119

 8              Hackensack, New Jersey 07601

 9              201.289.5352

10       BY:    AVRAM E. FRISCH, ESQ.

11              frischa@avifrischlaw.com

12

13

14    ALSO PRESENT:

15         BRADLEY GILLING

16

17

18

19

20

21

22

23

24

25
```

```
 1   ----------------- I N D E X ----------------

 2   WITNESS              EXAMINATION BY        PAGE

 3   HERSHEY WEINER   MR. RAKHUNOV               8

 4

 5   ------------ INFORMATION REQUESTS -----------

 6   DIRECTIONS:  (None)

 7   RULINGS:  (None)

 8   TO BE FURNISHED:  (None)

 9   REQUESTS:  69

10   MOTIONS:  (None)

11   ------------------ EXHIBITS ----------------

12   DEFENDANT'S                          FOR ID.

13   Exhibit 15  Affidavit of Anna Roxana    18

14               Grinvald

15   Exhibit 16  Email dated September 25,    21

16               2021, from Anna Grinvald to

17               Bradley Gilling, et al.

18   Exhibit 17  UL Test Report              25

19   Exhibit 18  Email dated Jun 1, 2021,    29

20               from Joseph Mendlowits to

21               Joseph Weiner

22   Exhibit 19  Email dated Apr 27, 2021,   43

23               from Mendel Banon to Luis

24               Navarro, et al.

25
```

```
 1   ------------------- EXHIBITS ----------------

 2   DEFENDANT'S                          FOR ID.

 3   Exhibit 20   Excel spreadsheet AKW005297   59

 4   Exhibit 21   Email dated Jul 14, 2021,     80

 5                from Joseph Weiner to Thomas

 6                Kato, et al.

 7   Exhibit 22   Photographs                   84

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          IT IS HEREBY STIPULATED AND AGREED

2     by and between the attorneys for the

3     respective parties herein, that filing

4     and sealing be and the same are hereby

5     waived.

6          IT IS FURTHER STIPULATED AND AGREED

7     that all objections, except as to the

8     form of the question, shall be reserved

9     to the time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11     that the within deposition may be signed

12     and sworn to before any officer

13     authorized to administer an oath, with

14     the same force  and effect as if signed

15     and sworn to before the Court.

16

17

18

19

20                    -O-

21

22

23

24

25

```
 1              STENOGRAPHIC REPORTER:  Good
 2         morning.  This is Tami Takahashi.  I'm a
 3         Registered Professional Reporter and New
 4         York State notary public.  This
 5         deposition is being held via
 6         videoconference.  The witness and I are
 7         not in the same room.  The witness will
 8         be sworn in remotely, and the parties
 9         stipulate that the testimony is being
10         given as if the witness was sworn in
11         person.
12    H E R S H E Y   W E I N E R,   called as a
13         witness, having been duly sworn by a
14         Notary Public, was examined and testified
15         as follows:
16                   EXAMINATION
17    BY MR. RAKHUNOV:
18         Q.   Good morning, or afternoon,
19    Mr. Weiner.  Jump right into it.
20              Kitchen Winners New York, Inc. is
21    still an active corporation?
22         A.   Yes.
23         Q.   Does it do any business other than
24    participate in litigations that we've
25    discussed earlier?
```

```
 1        A.    Little bit.

 2        Q.    What kind of business is it still

 3   involved in?

 4        A.    Wheeling/dealing.

 5        Q.    I'm sorry?

 6        A.    Wheeling and dealing.

 7        Q.    Okay.  And what kind of products

 8   are wheeling and dealing in?

 9        A.    Whatever we can get our hands on to

10   make a sale.

11        Q.    Are you still involved in selling

12   any personal protective equipment?

13        A.    Not recently, no.

14        Q.    Are you still doing any business

15   with Medcare?

16        A.    No.

17        Q.    When was the last time you were

18   doing any business with Medcare?

19              MR. SPERBER:  Objection to the

20        form.

21        A.    Don't remember.

22   BY MR. RAKHUNOV:

23        Q.    Do you own any other businesses?

24   Do you, Hershey Weiner, other than Kitchen

25   Winners, of which I understand your wife is a
```

```
 1    shareholder of?
 2         A.   Do I own any other businesses?
 3         Q.   Yes.
 4         A.   Right now, no.
 5         Q.   Okay.  Was there a business called,
 6    like, Yes Trading or Yes We Trade, something
 7    to that effect, that you were involved with?
 8         A.   Yes.
 9         Q.   What was the name of that company?
10         A.   Yes -- Yes Trading.
11         Q.   Okay.  Is that company, Yes
12    Trading, has it ever engaged in any sales of
13    personal protective equipment?
14         A.   Don't remember.
15         Q.   Okay.  Is that company active
16    today?
17         A.   Yes.
18         Q.   Okay.  Has that company bought or
19    sold any Medcare brand gloves ever?
20         A.   Don't remember.
21         Q.   Okay.  Would that be in the
22    corporate records of Yes Trading?
23         A.   Don't know.  I will have to check.
24         Q.   Okay.  Who are the shareholders of
25    Yes Trading?
```

```
 1        A.    Only me.

 2        Q.    Okay.  Your wife's not a

 3   shareholder of that company?

 4        A.    Not that I recall.

 5        Q.    Okay.  Do you know who Joel

 6   Lefkowitz is, L-E-F-K-O-W-I-T-Z?

 7        A.    Joel Lefkowitz?  I know a lot of

 8   Joe Lefkowitz, so I don't know which one

 9   you're talking about.

10        Q.    Is there a Joel Lefkowitz who was

11   involved with buying or selling Medcare

12   gloves?

13        A.    Buying and selling Medcare?  Don't

14   recall.

15        Q.    Does Joel Lefkowitz have any

16   brokerage or commercial relationship with

17   Kitchen Winners?

18        A.    Trying to remember.  Joel

19   Lefkowitz?  Might have been.  I have to

20   check.

21        Q.    Do you obtain any gloves from

22   Mr. Lefkowitz that you sold to Rock Fintek?

23        A.    No, I just bought it from Anna

24   Grinvald.

25        Q.    So since this litigation started,
```

1    have you discussed this case with Anna

2    Grinvald?

3        A.    Sure.

4        Q.    Okay.  When is the last time you

5    spoke with Ms. Grinvald?

6        A.    I speak to her, like, 10 days ago.

7        Q.    What did you talk to her about 10

8    days ago?

9        A.    Business stuff.

10       Q.    Okay.  I thought you just said you

11   don't have any ongoing business relationship

12   with Medcare?

13       A.    Well, again, I can discuss

14   business.  Do I have business ongoing, no.

15   Discussing is not --

16       Q.    What kind --

17       A.    One second.  Discussing is not

18   called business.

19       Q.    What kind of business --

20             (Crosstalk.)

21       Q.    Please listen to my question,

22   Mr. Weiner.  Please --

23             MR. SPERBER:  Phil, actually let

24        him answer the question the way he wants

25        to answer the question.

1      MR. RAKHUNOV:  He's not answering

2   the question.  We have limited time.

3      THE WITNESS:  I don't have time for

4   this.  Alex, I don't have time.  I'm

5   overseas.  I don't give my time for

6   somebody's going to comment --

7      MR. RAKHUNOV:  Mr. Weiner --

8      THE WITNESS:  You can ask questions

9   and I can answer.  You said you're not

10  going to interrupt me and I shouldn't

11  interrupt you.  But every question, the

12  last five questions, you interrupted me.

13     So if you want to ask questions and

14  cut her off, then don't ask a question

15  to begin with.

16     MR. RAKHUNOV:  For the record --

17     THE WITNESS:  I can get up and go

18  and you can talk with my lawyer.  I

19  don't have a problem.  I gave enough

20  time yesterday.

21     MR. RAKHUNOV:  Mr. Weiner, you

22  brought this lawsuit initially.  You're

23  now facing counterclaims.  You're a

24  pretty important witness --

25     THE WITNESS:  No problem.

1           MR. RAKHUNOV:  You're a pretty

2      important witness in this case.  I ask

3      questions.  Your job is to answer them,

4      not to go off on -- you know, telling me

5      what the difference -- I didn't ask you

6      what the difference was between

7      conducting business and discussing

8      business.  So please listen to my

9      questions and we'll be done in the time

10     that we have allotted.

11          MR. SPERBER:  To be clear, you did

12     ask him because you questioned the

13     veracity of his answer when he said he

14     was not doing business with Medcare.  So

15     you raised the issue.

16   BY MR. RAKHUNOV:

17     **Q.   So what business did you discuss**

18   **with Ms. Grinvald 10 days ago?**

19     A.   Don't recall exactly.

20     **Q.   Okay.  How about generally?**

21     A.   We talked about Israel and if we

22   can do some protective equipment for Israel

23   war.

24     **Q.   Does it involve gloves?**

25     A.   In general, protective equipment.

1    We didn't go into details.
2         Q.    Okay.  Did you discuss your
3    deposition testimony with her at all?
4         A.    No.
5         Q.    Have you obtained any statements or
6    affidavits or declarations from Ms. Grinvald
7    relating to this case?
8         A.    I would have to ask my counsel to
9    answer that.
10        Q.    We haven't been provided any
11   specifically related to this case, so I'm
12   asking you if you know.
13        A.    Ask my counsel, please.
14        Q.    Have you obtained any promises from
15   Ms. Grinvald to provide any testimony at a
16   trial in this case?
17        A.    I have to discuss that together
18   with my counsel.  I don't -- I don't know --
19   if I don't know, I don't -- I don't know if
20   I'm at liberty to discuss that, if I have to
21   discuss that.
22        Q.    You do have to discuss that.  You
23   don't have to discuss anything you talked
24   about with your lawyer, but you certainly
25   have to discuss anything that you discussed

1   with Ms. Grinvald or that she discussed with

2   your lawyer.  Nothing between her and your

3   lawyer is privileged.

4            MR. SPERBER:  You can answer his

5        question.

6        A.   I did discuss with her that, if we

7   need her to get -- anything I need from her

8   regarding the case, she would be available to

9   give it to -- everything to my lawyer or be

10  available for the case.

11  BY MR. RAKHUNOV:

12       Q.   Do you know if Ms. Grinvald has

13  provided your lawyer with any information

14  such as documents or descriptions of what

15  happened or anything to that effect?

16            MR. SPERBER:  Objection to the

17       form.

18       A.   I don't recall.  And I would have

19  to go back and look at everything.  I do

20  know, on numerous occasions, she gave

21  information for my lawyer.

22  BY MR. RAKHUNOV:

23       Q.   Do you have any agreements with

24  Ms. Grinvald, whether in writing or oral,

25  that you would continue doing business with

```
 1    her in exchange for her providing cooperation
 2    in this case?
 3         A.   No.
 4         Q.   Does Kitchen Winners owe Medcare or
 5    Ms. Grinvald any money as of today for any
 6    prior business dealings?
 7         A.   No.
 8         Q.   Okay.  Does she owe you any or
 9    Kitchen Winners any money?
10         A.   I have to check my records.
11         Q.   So you don't remember one way or
12    the other at this point?
13         A.   I didn't say that.  I said I don't
14    owe her, for sure, money.
15         Q.   Okay.  What about does Medcare
16    or -- does Medcare owe Kitchen Winners any
17    money?
18         A.   I would have to check my records.
19              MR. RAKHUNOV:  Okay.  Mr. Weiner,
20         would it be easier for me to share a
21         screen or put a document in the chat box
22         to show you an exhibit?  What do you
23         prefer?
24              THE WITNESS:  Share screen with me
25         would be better.
```

```
 1              MR. RAKHUNOV:  Okay.  I'll still
 2         put it in the chat box so others could
 3         download it.  But we're putting in
 4         Exhibit 15.  Let's see if we can share
 5         the screen.  Hold on.
 6              (Defendant's Exhibit 15, Affidavit
 7         of Anna Roxana Grinvald, marked for
 8         identification as of this date.)
 9    BY MR. RAKHUNOV:
10         Q.   Do you see a document on the screen
11    that has a caption of Silver Wing Medical
12    versus Adorama, Inc. and Kitchen Winners
13    New York, Inc.?  It's an affidavit of Anna
14    Grinvald.  Do you see that?
15         A.   Yes.
16         Q.   Okay.  Great.  I'm going to scroll
17    down to -- this is a two-page document.  It
18    was produced to us by your counsel.
19              Do you see Anna Grinvald's name
20    above a signature line on the bottom right?
21    Do you see that?
22         A.   Yes.
23         Q.   Okay.  And do you see on the
24    left-hand side there's a space for a notary
25    public?
```

```
 1        A.   Yes.
 2        Q.   Have you ever seen a notarized copy
 3   of this document?
 4        A.   I don't recall.
 5        Q.   Okay.  And -- okay.  And do you
 6   know why -- well, so is your understanding
 7   and testimony that Anna Grinvald provided
 8   this document and signed this document?
 9        A.   I don't -- I don't recall.  I don't
10   know when this was.  I don't recall what this
11   is.  This is in 2021.  I don't recall
12   exactly.
13        Q.   Okay.  Have you ever read this
14   document?
15        A.   No.
16        Q.   Okay.
17        A.   Not that I recall.
18        Q.   Okay.  Do you see in paragraph 6,
19   Anna Grinvald writes, "In response to Kitchen
20   Winners" -- or let me -- withdrawn.  Let me
21   ask it again.
22             Paragraph 6 -- well, do you know
23   who actually drafted this document, like who
24   typed it up?
25        A.   I don't know.
```

1      Q.    Okay.  So paragraph 6 of this

2   document says, "In response to Kitchen

3   Winners New York Inc.'s request that I

4   investigate the discrepancy apparent in the

5   difference in spelling of the ZhongHong

6   corporate name from one document to the next

7   I speculate that considering the numerous

8   factories that operate under the umbrella of

9   the corporate entity 'ZhongHong Pulin Medical

10  Products Co. Ltd.,' when translating the name

11  of a corporate entity into English, the

12  particular factory of ZhongHong Pulin might

13  not be specific as to the spelling of the

14  translated form."

15            I read that correctly?

16      A.    Again, I told you yesterday I have

17  dyslexia.  If that's what it says, that's

18  what it says.

19      Q.    Do you have -- do you have any

20  recollection as to why Kitchen Winners

21  New York made a request for Ms. Grinvald to

22  investigate the discrepancy in the spelling

23  of the names?

24      A.    Not offhand, not at the moment.

25      Q.    So do you recall any investigations

```
 1    or being informed of any investigations by

 2    any testing agency regarding reports --

 3    testing reports of LevMed gloves sold by

 4    Kitchen Winners?

 5        A.   Again, can you -- can you repeat

 6    that question.

 7        Q.   Sure.  Are you aware -- do you

 8    recall being made aware of any investigations

 9    concerning authenticity of testing reports

10    for LevMed gloves?

11        A.   No.

12             MR. SPERBER:  Objection to the

13        form.

14        A.   Not aware of it.

15    BY MR. RAKHUNOV:

16        Q.   Okay.

17             MR. RAKHUNOV:  Exhibit 16.

18             (Defendant's Exhibit 16, Email

19        dated September 25, 2021, from Anna

20        Grinvald to Bradley Gilling, et al.,

21        marked for identification as of this

22        date.)

23    BY MR. RAKHUNOV:

24        Q.   I'll do the same thing with the

25    screen share.
```

```
 1        A.    Perfect, I can see you better.
 2        Q.    Great.  So Exhibit 16 is an email
 3   chain where you see at the top, on September
 4   25, 2021, Ms. Grinvald forwards an email
 5   chain to Bradley Gilling and copies
 6   yosi@gtsgroup.  Do you see that at the top?
 7        A.    No, I have to zoom in.  I can't see
 8   it.
 9        Q.    Sure.
10        A.    Hello?
11        Q.    Yeah.  Can you see the document?
12        A.    Yes.
13        Q.    Okay.  So do you see -- so that's a
14   forward from Anna Grinvald to Bradley
15   Gilling.  And the email in the middle on page
16   1 is from her to Mendel Banon and to you and
17   to someone kipodsagi@gGmail.com.
18             Do you know who that is, kipodsagi?
19        A.    No.
20        Q.    Is there someone that -- do you
21   refer to Mendel Banon as "Sagi" from time to
22   time, S-A-G-I?
23        A.    Never.
24        Q.    Do you know that name -- do you
25   know that name at all?
```

1     A.    Sagi?  I don't recall this name.

2     Q.    Okay.  If we had more time, I would

3  show you an email where you've used it, but

4  we can move on for now.

5     A.    I don't recall.  I don't say I

6  don't know.  I don't recall.

7     Q.    No, I understand.

8           Okay.  So you -- can you see -- I

9  just can't tell what you see on your screen,

10  Mr. Weiner.

11          Do you see Ms. Grinvald writes to

12  you and to Mendel that she received the

13  report from a laboratory regarding certain

14  changes made to a Medcare original report.

15  Do you see that?

16     A.    Yeah.

17     Q.    Okay.  Do you remember receiving

18  this email from Ms. Grinvald?

19     A.    No, don't recall it.

20     Q.    Do you see where Ms. Grinvald

21  writes, "Mean while, I had to replay to the

22  email that this is a fake report and they" --

23  it's misspelled -- "they can start

24  investigating who changed the report."

25          Do you see that?

1      A.    I see.  I think it's something

2   about a UL report.  It says in the next line.

3   I remember something, subject "UL" report

4   something.

5      Q.    Okay.  What do you recall about an

6   investigation, if anything, being conducted

7   into a changed or fake UL report?

8      A.    I don't recall the details of it.

9   There was somebody that made a UL report.  I

10  don't know it was somebody took a Medcare

11  report, a UL report and made it into a -- to

12  a -- to a different report.  And she notified

13  us about it.  I don't remember the details of

14  it.

15     Q.    Okay.  Well, that somebody, was

16  that -- was that you or Mr. Banon, to your

17  knowledge, who made that change?

18     A.    Not that I recall.

19     Q.    Okay.  Did you and -- or Mr. Banon

20  circulate the fake UL report in connection

21  with selling LevMed or any other gloves?

22     A.    I never gave a fake UL report.

23     Q.    Have you ever seen any results from

24  an investigation conducted by UL into this

25  report?

```
 1        A.   Not that I know.
 2        Q.   Do you recall -- do you know that
 3   we sent out a subpoena to UL in this
 4   litigation; do you know that?  You don't have
 5   to tell me anything you learned from your
 6   counsel.  But, just generally, are you aware
 7   that UL was subpoenaed in this case?
 8        A.   I don't -- I don't know.
 9        Q.   Okay.
10             MR. RAKHUNOV:  Exhibit 17.  I'm
11        putting on Exhibit 17.  It's a document
12        we received via a subpoena from UL, also
13        known as Universal Laboratories.  It's
14        Bates-labeled UL1 through 9.
15             (Defendant's Exhibit 17, UL Test
16        Report, marked for identification as of
17        this date.)
18   BY MR. RAKHUNOV:
19        Q.   Have you -- do you recognize at
20   least the first page of the document?  And
21   I'm happy to scroll through it.
22        A.   No.
23        Q.   You've never seen this before?
24        A.   Not that I recall.
25        Q.   Okay.  Do you see this says
```

1    "Reported by John Boyles"?   I'm just

2    highlighting this so you can see it on the

3    document.   Do you see that, sir?

4         A.   I see the name John Boyles.

5         Q.   Okay.  Do you see the date

6    "Occurred Between" and it starts April 21,

7    2021 and it doesn't have an end date here.

8    But do you see that date?

9         A.   I can't see it.  I see numbers, but

10   I don't see a date.

11        Q.   Do you see 2021/04/21?

12        A.   I see -- yeah, that's what I see

13   now, yeah.

14        Q.   And you were doing business with

15   Rock Fintek during this time around April of

16   2021, correct?

17        A.   Yes.

18        Q.   Okay.  And I'm not going to read

19   this entire document, as there's a little bit

20   of dense text here.  But let me see if I can

21   highlight it to make this easier.

22             Towards the bottom of the first

23   page, this report states, "John Boyles

24   provided the source of the fake report:  Via

25   an email from Mendel Banon to Hershey Weiner.

1    MS did not know whether this incident related

2    to any shipment in U.S. Customs.  The roles

3    of the 2 men are unknown."

4            Do you see that?

5        A.   Again, I don't see it.

6        Q.   Okay.  Do you remember anything

7    about Mr. Banon emailing you a fake UL

8    report?

9        A.   Not that I recall.  And I don't

10   recall this whole thing.

11       Q.   Okay.  And in the beginning of the

12   report, do you see -- I'll just read this

13   into the record.  I know you've asked me to

14   read things to make it easier for you.

15           "On April 21, 2021, an inquirer

16   sent the UL test report to MS for checking

17   authenticity, based on the inquirer

18   information, the fake UL test reports came

19   from Kitchen Winners, Hershey Weiner.  They

20   have been importing millions of these gloves

21   into the U.S. and declaring them as medical

22   devices and cheating the U.S. government by

23   not paying duties by using this fraudulent UL

24   report."

25           Do you see that, at least

1    allegation, written in this report?

2        A.    I hear what you're reading.  But I

3    never gave any UL report to the clear

4    customs, so I don't know where this is coming

5    from.

6        Q.    Okay.  Have you ever been under --

7    I'm sorry.  Are you finished?  I didn't want

8    to interrupt you.

9        A.    Obviously, you did interrupt me so

10   I don't --

11       Q.    Okay.

12       A.    It's okay.

13       Q.    Have you been involved with any

14   customs investigations or any investigations

15   in connection with any alleged customs

16   violations by using --

17       A.    No.

18       Q.    -- any -- okay.

19             All right.  We can just move on.

20       A.    You didn't need to give a UL report

21   for customs.

22       Q.    Okay.  What kind of information did

23   you need to give to customs for -- for glove

24   shipment to -- let's just focus specifically

25   on the Medcare gloves sold to Rock Fintek.

```
 1        A.   Don't recall.  You have to ask my

 2   customs agent.

 3        Q.   Okay.  But you know that the UL

 4   report was not one of those documents?

 5        A.   For sure not, because I never gave

 6   a UL report.

 7        Q.   Okay.  Well, let's -- let's take a

 8   look at something else.  I know I asked you a

 9   couple of questions yesterday about a data

10   sheet for Medcare gloves.  And that was

11   pasted into an email.  And you said there was

12   more -- more to it.  And we, obviously, ran

13   out of time.  So let me put Exhibit -- what

14   are we up to -- sorry -- 17 now?

15             STENOGRAPHIC REPORTER:  We're up to

16        18.

17             MR. RAKHUNOV:  Okay.  This is 18

18        now.

19             (Defendant's Exhibit 18, Email

20        dated Jun 1, 2021, from Joseph

21        Mendlowits to Joseph Weiner, marked for

22        identification as of this date.)

23   BY MR. RAKHUNOV:

24        Q.   Okay.  So Exhibit 18 is 10-page

25   document produced by your counsel in this
```

 1  case.  The first page is Bates numbered 647.

 2            So do you see the first page is an

 3  email from Joseph Mendlowits at Adorama to

 4  you and copying himself, and the subject is

 5  "1.725 rock fintek."

 6            Do you see that?

 7     A.   Yeah.

 8     Q.   Okay.  So I'm going to scroll -- I

 9  don't have any questions about this page.

10  Then there's another email that -- apparently

11  in this chain that has a reference to a wire

12  coming in from Rock Fintek.  And as we

13  understand, these were some of the

14  attachments to this email.

15            So I'm going to first scroll slowly

16  so you can see all the pages.  If at any time

17  you want to just download the document so you

18  can scroll through it, you can do that.

19            So are you able to see every page

20  of the document as I'm scrolling through it?

21     A.   I don't see the words but I see

22  "SGS."

23     Q.   Well, you see -- we can do this

24  more slowly.  I just want you to generally

25  see what every page looks like.

1              Do you recognize this document,

2    this compilation of documents, that starts

3    with the first page having some specs on

4    Medcare gloves, data sheet and then a

5    photograph of a box?

6        A.    I remember something like this with

7    the spec sheets.

8        Q.    Okay.  Is this the document that

9    you provided to either clients or potential

10   clients to describe the Medcare gloves that

11   you would be selling to them?

12       A.    I don't know.  I would have to

13   check one by one and match it up with what I

14   have on file.  I -- maybe you took this and

15   somebody took this and changed out.  I don't

16   know.  I have to check.  I know there was a

17   whole folder -- I know there was a file that

18   I had, and this is what I provided.

19       Q.    So I can represent to you that this

20   is -- this is what you provided to us.  I did

21   not change anything.

22       A.    I don't think -- I don't think that

23   I provided anything for you.  Again, you may

24   be my discovery, but I'm talking to the

25   customer.

1    Q.   Okay.  So is -- did you have in

2    your course of business a packet of -- you

3    know, a spec packet that you provided to

4    clients when they were asked -- when they

5    would ask you about Medcare gloves?

6    A.   That was Mendel's job.

7    Q.   Okay.  So Mendel would do it but

8    it's fair to say that sometimes the email

9    would go from you and not from Mendel?

10   A.   I'm not so sure.

11   Q.   Okay.  So -- and I think you

12   answered a question that I was about to ask

13   you.

14        So Mendel was the one who compiled

15   the spec sheet and the data for Medcare

16   gloves?

17   A.   I'm not so good in reading English,

18   and that's where he came in, to part of

19   helping me out a little bit on the brokerage

20   side, that he should provide those and put it

21   together and --

22   Q.   Did you -- I'm sorry.  Go ahead.

23   A.   And give it to the customers.  It

24   was -- but I don't know on Medcare.  It was a

25   package that -- Medcare gave to -- Medcare

```
 1   prepared it for us.  And I would have to

 2   match that up.

 3             So I can't go and randomly scroll

 4   down and ask you -- and then you're going to

 5   tell me and ask me questions that this is not

 6   right package.  I don't know.

 7        Q.   Well, let me ask you to -- I

 8   understand your disclaimer.  But let me just

 9   ask you to assume that this is the right

10   package.  And assuming this is the right

11   package that -- do you see this box has

12   "Nitra Force Russ Examination Gloves NBR

13   Nitrile" listed on it?  Do you agree that

14   that's what this box has on it, correct?

15        A.   I don't do assumptions.

16        Q.   Do you agree that this data spec

17   sheet describes an examination NBR Nitrile

18   glove?

19        A.   Correct.

20        Q.   Okay.  And the data sheet on the

21   left-hand side has certain product

22   specifications and physical properties

23   described, correct?

24        A.   I can't see it.  It's very -- it's

25   very small.
```

1      Q.   So can you -- you know, can I ask

2  you -- I'm going to stop screen sharing.  Can

3  I ask you to download it, please, because it

4  worked pretty well yesterday and it -- the

5  screen share can be awkward because then --

6      A.   That's one of the problems when I

7  screen like this, I don't see you and I don't

8  know --

9      Q.   We did fine yesterday.  I think we

10  did okay.

11      A.   Okay.  So what are you -- what do

12  you -- I'm zoomed in, yeah.

13      Q.   Okay.  So do you see on the

14  left-hand side, there are physical properties

15  listed for the gloves, including tensile

16  strength, elongation at break percentage; do

17  you see that?

18      A.   I see that, yeah.

19      Q.   Okay.  And this type -- this is the

20  type of information that customers wanted to

21  know about a glove before buying it, correct?

22      A.   No.

23      Q.   No?  They didn't want to know

24  physical properties of a medical examination

25  glove?

```
 1        A.   Every customer wanted something
 2   else.  I don't know.  This was a package that
 3   they gave me.  And this is what I gave my
 4   customer.  I don't -- you're asking me
 5   what -- you're asking me what they wanted to
 6   know.  I don't know.  Everybody looked at
 7   something else.
 8        Q.   Fair enough.  But it's a package
 9   that you would give to your customers?
10        A.   Correct.
11        Q.   Okay.  And can you please turn to
12   the last page, the very last page of this
13   document.  And it has some photographs of the
14   top of the box and it has a photograph of a
15   brown carton.  Do you see that?
16        A.   Correct.
17        Q.   And the brown carton just says
18   "Medcare Protection" on it, correct?
19        A.   Yes.
20        Q.   Do you see that?  That doesn't have
21   the word "examination" on the brown carton,
22   at least not in this photograph, correct?
23        A.   I don't know.  You have to see --
24   this is one side of the box.  You have to
25   see.
```