1      Q.    I'm saying just -- just in this

2    photograph.  I understand --

3      A.    Okay.

4      Q.    Okay.  But then the box says -- the

5    three tissue size boxes do say "Nitrile

6    Examination Glove" on them, correct?

7      A.    Yeah.

8      Q.    Okay.  Then scroll up one page to

9    page 9 of the PDF.  And do you see it looks

10   like it's a "Department of Health and Human

11   Services Indications For Use" form?

12     A.    No, I don't see.

13     Q.    You don't see the second to last

14   page?

15     A.    I see the second to last page.  I

16   don't see Department of --

17     Q.    It's at the top left --

18     A.    Okay.

19     Q.    -- of the page.

20           Okay.  And then on the right-hand

21   side, there are some specifications and

22   different testing standards that are listed

23   in the table.  Do you see that?

24     A.    I don't know how to read this.

25     Q.    Okay.  And I'm not asking -- I

1   understand you've testified you're not an

2   expert in this, so I'm not asking you to

3   interpret it.  I'm just asking you:  Do you

4   see different standards listed, including

5   ASTM D6319?  It's listed here, correct?

6        A.    I don't know what --

7             MR. SPERBER:  Objection to the

8        form.

9        A.    I don't know what this means.

10  BY MR. RAKHUNOV:

11       Q.    Okay.  So whatever -- understood.

12  And I didn't ask you what it meant.

13             But you were -- when you provided

14  this information from Medcare to your

15  customers, you would expect that if -- that

16  the customer would rely on it; is that fair?

17       A.    I don't know.  As I told you, every

18  customer relied on something else.  I don't

19  think that I ever gave this to Rock Fintek.

20  They knew what they buying.  This is what --

21  they came to me.  They knew what they're

22  buying.  They knew what they wanted.  This is

23  what they wanted.  They know exactly what

24  they're buying.  They didn't tell me this

25  spec, that spec.  They didn't tell me nothing

1   as of that.

2        Q.   Do you know if Mendel Banon gave

3   this information to Rock Fintek before they

4   kept trying to -- before they came to you?

5        A.   I don't know.  I don't -- I don't

6   recall and I don't know.  You'd have to ask

7   him.

8        Q.   Okay.

9        A.   As you heard from the whole case,

10  they came to Mendel Banon.  I don't think

11  Mendel Banon went to them.  We were not

12  looking to deal with them.

13       Q.   Understood.  So, but when they came

14  to you through Mendel Banon, they were

15  looking for specific product, correct?

16       A.   They were looking for Medcare.

17       Q.   Yeah, they were looking for Medcare

18  Nitrile Examination Gloves with an FDA 510-K

19  certification, correct?

20       A.   They never told me this.  They told

21  me they're looking for Medcare glove.

22       Q.   Well, we looked -- we looked at the

23  purchase -- sales and purchase agreement

24  yesterday.  Do you remember that?

25       A.   I don't want to go into that

 1  because we're going to argue, and let's not
 2  argue.  That's what --
 3      Q.   Well --
 4      A.   I don't want to argue.  But you're
 5  cutting me off again when I'm talking.
 6  That's a fact.  The fact is I was -- I wasn't
 7  looking to deal with them.  They came to me.
 8  They knew that I have Medcare products.
 9  Somehow -- I don't know how they knew.  I
10  don't -- I'm not interested to knowing how
11  they knew.
12          And I told you they were trying to
13  make pregnant Mendel.  I didn't get pregnant
14  at all.  He got very pregnant and excited
15  like a candy -- a guy that's getting a whole
16  bag of candy -- jar of candy.
17          We spoke about this yesterday.  And
18  I clearly explained it to you.  I didn't even
19  want to deal with those people.  Arik Maimon
20  pushed us with all his connections and all
21  his chair people and all those people that he
22  has connections in places that I know, pushed
23  us and put a lot of pressure that we should
24  sell them.
25      Q.   Okay.  You did enter into a

1    contract with Rock Fintek, and they paid you

2    more than $19 million for gloves; you agree

3    with me on that, right?

4         A.   Discuss this with my lawyer,

5    Counsel.  I don't know.  Yes, they paid me.

6    They got --

7         Q.   You said --

8         A.   I was in the middle --

9              They picked up merchandise and paid

10   me for what they picked up.

11        Q.   Okay.

12        A.   I know when I go to the grocery to

13   buy a bottle of milk, I go to the register

14   and I pay.  This is how it works.  Somebody

15   comes to me, picks up merchandise and picks

16   up and pays.

17             If they would not pick up the

18   goods, that's a different story.  They picked

19   up the goods from me and they paid.  Whatever

20   they -- some of them, they picked up and they

21   didn't pay.  That's what I'm -- you asked I

22   started a claim, yes, I started a claim for

23   money that I didn't get paid.

24        Q.   You're not denying that you signed

25   the contract, are you?

1      A.   I never -- did I -- did I say that

2   any given time?  I said -- the questions that

3   you have on the contract, I don't want to

4   discuss.  You can ask my lawyer.

5      Q.   Okay.

6      A.   I'm totally -- I totally say that

7   they didn't buy -- I'm disagreeing.  My

8   lawyer is -- I said they never bought -- they

9   bought Medcare brand examination gloves.  I

10   didn't even have to put on the boxes

11   "examination gloves."

12           But, again, this is with you, my

13   lawyer, and you guys can hash it out.  They

14   asked me for an examination glove.  That's

15   what -- that's what I bought from

16   Anna Grinvald, and gave them an examination

17   glove.  And this is what I know about.

18   That's it.

19      Q.   You testified yesterday that it was

20   your position that every glove you sold to

21   Rock Fintek under the sales and purchase

22   agreement was labeled "Examination" on the

23   box, correct?

24      A.   Correct.

25      Q.   And you testified that the gloves

1    that came from Prestige and MM2020, those

2    gloves predated the sales and purchase

3    agreement; do I remember that correctly?

4         A.   Again, please repeat the question.

5         Q.   Sure.  I think you testified

6    yesterday -- or you can correct me if I'm

7    wrong -- that there are some gloves that you

8    sold to Rock Fintek that came from Prestige,

9    correct?

10        A.   Right.

11        Q.   But that was before the big

12   contract, correct?

13        A.   Before the contract at all.  I

14   didn't have two contracts.  You make it like

15   I have big contract and small contract.  That

16   was before my contract.

17        Q.   It was before the contract, okay.

18        A.   Correct.

19        Q.   And, again, correct me if I

20   misheard your testimony.  I think you

21   testified that you did not take any inventory

22   from JNS or Joel Stern to fulfill any portion

23   of the contract with Rock Fintek?

24        A.   Correct, the best of my knowledge.

25             MR. RAKHUNOV:  Okay.  So maybe

1          let's take a look at an email.  I just
2          put Exhibit 19 into the chat box.
3               (Defendant's Exhibit 19, Email
4          dated Apr 27, 2021, from Mendel Banon to
5          Luis Navarro, et al., marked for
6          identification as of this date.)
7     BY MR. RAKHUNOV:
8          Q.   This is an email.  It's a five-page
9     email chain, again, produced to us in this
10    litigation by your counsel.  The top email is
11    April 27th from Mendel Banon to Luis Navarro
12    at md3pl, copying David Dembitzer at md3pl,
13    Jim Esparza at md3pl and you.
14               So we already talked about
15    Mr. Esparza.  David Dembitzer, is that
16    someone else you worked -- who worked at your
17    logistics company on the glove orders?
18         A.   Correct.
19         Q.   Okay.  And same with Luis Navarro,
20    correct?
21         A.   I don't recall Luis's name.  But
22    David Dembitzer, I recall.
23         Q.   Okay.  I just want to direct your
24    attention first to the very bottom, the last
25    page of the document, the first in time email

1    exchange.  Let's start there.

2             This is an email from you on April

3    19, 2021.  And you write, "Hi, I will try to

4    make it the easiest possible.

5             "The following container number

6    loads we are selling to a customer of ours

7    which will come down to inspect and pick up."

8             Are you referring to Rock Fintek at

9    this time?

10        A.    No.

11        Q.    Okay.  Who are you referring to?

12        A.    If I remember correctly, it's a

13   different customer.

14        Q.    Okay.  Well, let's just clear that

15   up.  Can you go up to -- up one page to an

16   April 26, 2021 email from you.  And you

17   write -- this is a week later.  You write,

18   "Good morning David and Jimmy."  And you're

19   responding to the same email chain.  And you

20   write, "Last week Rock Fintek picked up 2

21   containers of the below.  Today they are

22   picking up another 2 containers, you can go

23   ahead and release it to them."

24             Does reading that refresh your

25   recollection that the customer you reference

1    is Rock Fintek?

2         A.    First of all, I -- I don't see

3    where you're at.  But if -- you said go up

4    one page and I don't see nothing, so I have

5    to find it.

6         Q.    Sure.  Take your time.  It's

7    AKW_3371 just for the record, is the page I'm

8    referring to.

9              In the -- towards the top third of

10   the page, you write on Monday, April 26, 2021

11   at 11:20 a.m., "Good morning David and Jimmy.

12   Last week Rock Fintek picked up 2 containers

13   of the below.  Today they are picking up

14   another 2 containers, you can go ahead and

15   release it to them."

16             Are you with me now?

17        A.    Yes.

18        Q.    Okay, so you see that.

19             So does that -- I know this --

20   these are events from, you know, three and a

21   half years -- two and a half years ago.

22             So does this refresh your memory

23   that the first email in time was referring to

24   Rock Fintek as the customer?

25        A.    No.

1    Q.    Okay.

2    A.    I remember at the same time -- I

3    remember that in the same time when Rock

4    Fintek was supposed to pick up, there was

5    other customer also pick up.  And I remember

6    clearly that me and JNS was supposed to make

7    a deal with a different guy.  So I don't know

8    where -- or this got confused or mixed up.

9          But could be sometimes because of

10   my English and my not separating subjects or

11   those kinds of stuff, this got mixed up.  But

12   clearly this has -- this is two different

13   customers.  Because I remember that we had an

14   issue with a different customer who wanted to

15   sell some stuff.  And we were trying -- and

16   he was supposed to come down and inspect

17   stuff.

18   Q.    Who was that customer?

19   A.    What?  What did you ask?

20   Q.    Who was the customer you're

21   referring to?

22   A.    I don't remember his company name.

23   It's Klein.

24   Q.    Sorry.  Can you spell that.  I just

25   didn't catch it.

```
 1        A.    Klein.  Klein.

 2        Q.    Okay, Klein, I got it.

 3              Okay.  But regardless -- okay.

 4   Well, let's go down to the last page again

 5   and let me ask you a few more questions.

 6              So then you go on to write, "Now

 7   the goods are currently not assigned to me,

 8   they are under JNS and Prestige Sales.  But,

 9   I am having them release it to me, so I can

10   sell it further."

11              Do you see you wrote that?

12        A.    Yeah.

13        Q.    Okay.  And then there are three

14   containers from JNS with numbers underneath

15   them.  One container from MM2020 with a

16   number and two containers from Prestige.  Do

17   you see that?

18        A.    Correct.

19        Q.    Okay.  And then you write, "Once

20   all is released and ready to load on trucks,

21   please make sure that the JNS goods are the

22   ones accessible to inspect, and they are the

23   ones loaded on the track last.

24              On every load there should be some

25   JNS goods mixed in, so you should have what
```

1    to put last on the truck.

2              "In other words, we want them

3    rather to see those goods if they inspect."

4              Do you see you wrote that?

5        A.    Yes.

6        Q.    What did you mean by wanting the

7    customer, whoever that is, to see --

8        A.    Every customer had their own -- I

9    would say -- I'm going to call it

10   "specifications," but it's not specification

11   because.   Its own instructions.   This

12   customer had this -- we showed him all the

13   mixed -- we were supposed to sell them, like,

14   a mix.  And on a cheap deal, you should take

15   a different mix from three different things.

16   And it was a mix between MM2020 -- not

17   everything was even Medcare.

18              And he asked us -- this is the way

19   he wanted the load should be loaded.  I don't

20   know who was his customer, and I wasn't

21   involved.

22              The same as Rock Fintek would ask

23   me to load 10404010.  I don't get involved

24   with that part.  Whatever the customers tells

25   me to do, this is what they tell me to do.

1      Q.   So it's your testimony that when

2   you wrote "we wanted them rather to see those

3   goods if they inspect," the "we" is

4   referring --

5      A.   I'm referring to regarding what the

6   customer sold to his customer.  You have to

7   understand, there's four -- there's a lot of

8   different parties.  I sold it to Mr. Klein.

9   Mr. Klein had another customer, that he had

10  another customer.  I don't know if you know

11  how this worked in this PP products.  There

12  was a lot of brokers involved.  Sometimes

13  there were 25 brokers involved --

14     Q.   Okay.

15     A.   So --

16     Q.   So let --

17     A.   -- I can't tell you what -- I'm

18  just trying to figure out.  I'm trying to

19  think what -- what it is.  But I do know that

20  there is sometimes -- there's a lot of

21  brokers involved in deals.  This is

22  instructions that my client gave me.  This is

23  what I do.

24     Q.   Okay.  So let's keep going up in

25  the email chain.  So I already asked you

1   about the April 26th email where you wrote,

2   "Last week Rock Fintek picked up 2 containers

3   of the below."

4           So when you're referring to last

5   week Rock Fintek picking it up, it's

6   something separate from what you're writing

7   about on the 19th; is that your testimony?

8       A.   Yes.

9       Q.   Okay.

10      A.   Yes.

11      Q.   Okay.  So then let's go to --

12      A.   Again -- again, I know -- I

13  remember separately that there was a deal

14  with JNS and M20 and all of us involved

15  through Mr. Klein.

16          I don't recall because, again,

17  you're picking on an email which I don't

18  recall this email.  So I -- and -- and --

19  and -- and this, I would have to go look all

20  the front and backwards.  I definitely know

21  that there was -- I didn't separate -- it was

22  more conversations on the telephone.

23      Q.   Okay.  You have the email.  You can

24  look at every line of it.  But let me -- and

25  actually that's what I'm trying to do as

```
 1   well.

 2            So then let's go up to the page --

 3   it's the third page of the document.  And it

 4   has AKW_3370.  And this is now April 27,

 5   2021.  You write, "Hi, You can release a load

 6   for Rock Fintek as below."

 7            And you provide size breakdowns.

 8   And then you write, "Once this is out, please

 9   confirm what is the balance of the 6

10   containers prepared last week."

11            Do you see you wrote that, correct?

12       A.   Yeah.

13       Q.   Okay.  And then -- and then if you

14   go up one email, David Dembitzer asks,

15   "Please clarify what brand and what

16   containers to pull from if you need

17   specific."

18            Do you see that?

19       A.   No.

20       Q.   This is --

21       A.   Yes.

22       Q.   You see that?  Okay.

23       A.   "What brand and what containers to

24   pull from."

25       Q.   Okay.
```

1      A.    You see, so what brand and what

2   containers, because it was a lot of different

3   things.

4      Q.    Sure.  So let's -- let's keep going

5   up to see how you responded to Mr. Dembitzer.

6   Your response starts at the very bottom of

7   page 1, is where the email header is.  And

8   you write, "These are Medcare, please make

9   sure only Medcare is being loaded, and send

10  picture before loading."

11          Do you see that?

12     A.    Where again?

13     Q.    So --

14     A.    No.

15     Q.    It starts at the bottom of page 1,

16  is the email header.  It says from Joseph

17  Weiner, Tuesday --

18     A.    "These are Medcare, please make

19  sure only Medcare is being loading, and send

20  pictures before loading."

21     Q.    So, first of all, if -- if

22  Mr. Dembitzer or Esparza sent you pictures,

23  how would they send the pictures?  Would it

24  be by email, would it be by --

25     A.    No, they called me.  Then it --

1    because I was -- I was didn't have WhatsApp,

2    so it was very complicated.  So I called them

3    by -- by FaceTime, the same way I called

4    today my attorney.  And I was -- I was

5    verifying looking myself at everything.

6        Q.    Okay.  And then you write, "look

7    back at the emails, I copied it here."  And

8    then just below italicized, you put the same

9    instructions that you gave in the bottom of

10   the email for Rock Fintek, "3 containers from

11   JNS, 1 container from MM2020 and 2 contains

12   from Prestige."  Do you see that?

13       A.    "3 containers from Medcare, 1

14   container...  2 containers of Rock Fintek" --

15   where?  "2 containers from Prestige," yeah.

16       Q.    Yeah.  So do you agree with me that

17   you are instructing mdpl to fulfill Rock

18   Fintek's order with the breakdown in this

19   email, 3 containers from a JNS, 2 containers

20   from MM2020 and 1 from Prestige?

21       A.    No, it's two separate dates.

22   They're two separate emails.  It's confusing,

23   but it's two separate emails.

24       Q.    All right.  I agree with you

25   that I'm not going to argue with you about

1   this.  But I'm just trying to understand what

2   your view of this email is.

3        A.   Very confusing -- very confusing

4   with my English is not the best and my typing

5   is not.  And I'm send a voice note --  -- a

6   voice.  And this is very confusing.  But I

7   did not -- I didn't do -- take from 2020 and

8   this.  I picked up -- all the containers came

9   in from the port and was designated for them.

10       Q.   Okay.  And if you go to page 1 of

11  this email, the response -- the response from

12  Luis Navarro to -- he writes to Mendel Banon,

13  who is copied on the email below and he says,

14  "Mendel, As discussed we only have the

15  following left of NBR.

16            "The rest of the quantities will be

17  filled with the synthetic gloves using the

18  provided break down."

19            Do you understand what's -- what

20  the difference is between "synthetic gloves"

21  and "NBR" that Mr. Navarro mentions in this

22  email?

23       A.   No.  But I was -- I don't -- I do

24  know that originally some boxes had synthetic

25  nitrile exam and then some boxes had NBR

```
 1   nitrile exam.  But I don't know what the
 2   difference.
 3        Q.   Okay.  So is it -- okay.  If you
 4   don't know, you don't know.
 5             Mr. Banon, in any event, replies,
 6   "Ok, thanks," right?
 7        A.   Not that I see.
 8        Q.   At the very top.
 9        A.   Yes.  "Ok, thanks," yeah.
10        Q.   And you're copied, right?
11        A.   I'm copied?  Yes.
12        Q.   You were copied?  Okay.
13        A.   Yeah, yeah.
14        Q.   Okay.  Do you know of an entity
15   called Wenzy, Inc., W-E-N-Z-Y?
16        A.   Yes.
17        Q.   Okay.  What is that?
18        A.   My wife's -- my wife's company.
19        Q.   What does that company do?
20        A.   O think -- I think, at the moment,
21   nothing.
22        Q.   Okay.  What did it do at the time
23   that the Rock Fintek was buying gloves from
24   you?
25        A.   I don't recall.  I would have to
```

1    check.

2         Q.    Does Wenzy do any -- provide any

3    trucking services?

4         A.    I don't recall.

5         Q.    Has Wenzy, Inc. ever provided

6    trucking services?

7         A.    Not that I recall -- I don't

8    recall.

9         Q.    Have you ever billed Rock Fintek

10   for trucking services in the name of Wenzy,

11   Inc.?

12        A.    I never billed -- Wenzy originally

13   is -- there's two Wenzy, Inc.s.  I don't know

14   which one you're talking about.  The trucking

15   company, Wenzy Limited, is somebody -- Mr. --

16   Mr. Wertzberger, and I think his name is --

17   the company is owned by his wife, Mrs. Weiss.

18            I would have to exactly -- there's

19   a different company that I dealt with.  His

20   name is Wenzy, but similar to our company but

21   it's a trucking company.

22        Q.    Do you know if the trucking

23   company, Wenzy, Inc., provided any trucking

24   services in connection with Rock Fintek's

25   business?

```
 1        A.    Again, I'm not -- I'm not -- one
 2   second.  Let me go out.  I can't see you.
 3             I know there's a trucking company
 4   by -- owned by -- I don't know -- he's -- his
 5   name that I dealt with Mr. Wertzberger out
 6   of -- and I don't know the corporation
 7   exactly, if it's spelled the same, so you
 8   would have to check.
 9             STENOGRAPHIC REPORTER:  I'm so
10        sorry, he cut out a second.
11        A.    Two corporations cannot be the
12   same, so I don't know.  But it's very similar
13   names.
14             MR. RAKHUNOV:  All right.  Let's
15        look at -- let's look at another
16        document here.  This one I might put on
17        the screen.
18             So I'm putting -- this would be 19?
19             STENOGRAPHIC REPORTER:  This is 20.
20             MR. RAKHUNOV:  Sorry.  20.
21   BY MR. RAKHUNOV:
22        Q.    Well, you know, before -- actually,
23   before we go there, do you know what the
24   address of 7 Springs Road in Monroe, New York
25   is?
```

```
 1        A.    That's where the trucking company
 2   is located, 7 Spring?  I don't know.  I know
 3   it's Monroe, New York, the trucking company.
 4        Q.    Okay.  So if that's where Wenzy in
 5   Monroe, New York, that would be the trucking
 6   company?
 7        A.    That's my recollection.
 8        Q.    Do you know if it's still
 9   operational?
10        A.    I don't know.  I don't use -- I
11   didn't use trucking for a very long time.
12        Q.    And you said the name of the person
13   that you dealt with was Wertzberger; did I
14   hear correctly?
15        A.    Wertzberger, yeah.
16        Q.    And, I'm sorry, could you spell
17   that so the court reporter has it correctly,
18   if you know.
19             THE WITNESS:  Alex, if you can give
20        the spelling.  It's Wertzberger.  I
21        don't know.
22             MR. SPERBER:  I don't know.
23        Wertzberger.  I would guess
24        W-E-R-T-Z-B-E-R-G-E-R.
25   BY MR. RAKHUNOV:
```

1     Q.    Okay.  Do you still keep in touch

2     with Mr.  Wertzberger?

3     A.    I didn't talk to him for a long

4     time.  He recently called me.  I didn't

5     respond to his call.

6     Q.    Did he leave you a message?

7     A.    No.

8     Q.    You don't know if he was calling

9     you about a subpoena that was attempted to be

10    served on him in this case?

11    A.    Not that I know of.  Because he

12    didn't leave me no messages, and I don't

13    know.

14         MR. RAKHUNOV:  Okay.  All right.

15         So I'm putting Exhibit 20 into the chat

16         box, but I'll put it up on the screen to

17         try to make it more efficient here.

18         It's an Excel spreadsheet produced to us

19         by your attorney in this case.  And

20         described as a general ledger for the

21         transactions with Rock Fintek.

22              (Defendant's Exhibit 20, Excel

23         spreadsheet AKW005297, marked for

24         identification as of this date.)

25    BY MR. RAKHUNOV:

1      Q.    Let me know when you see it on your
2    screen.
3      A.    Yes, I see it.
4      Q.    Okay.  So the -- and I'll just
5    scroll through it first so you can see the
6    totality of it.  So the invoices that are
7    listed in this document, do they reflect all
8    of the invoices sent from you to Rock Fintek
9    for glove transactions?
10     A.    Don't recall.  I have to go check.
11     Q.    Do you know who prepared this
12   general ledger?
13     A.    No.  I asked somebody -- I
14   definitely couldn't do it.  I most probably
15   asked somebody should come in to -- and put
16   it together.
17     Q.    Who would that be, like?
18     A.    Don't remember.  I use constantly
19   different people that are in the Jewish
20   community that they help out people.
21     Q.    So it would be somebody with some
22   accounting experience; is that -- or
23   bookkeeping?
24     A.    I don't know.  I didn't ask them
25   for accounting or bookkeeping experience.  I

1  asked them if they can do an Excel

2  spreadsheet and put together everything so I

3  have a good understanding at a time where --

4  where I'm up to, what's going on.

5      **Q.  So you don't know if this document**

6  **accurately represents all of the invoices and**

7  **payments by Rock Fintek?**

8      A.  This should represent all the

9  invoices -- the invoices and all the payments

10 of Rock Fintek, yeah.

11     **Q.  Okay.  So looking at the very**

12 **bottom, I don't know if you can see me**

13 **highlighting the cells.  Can you see me**

14 **highlighting the cells?**

15     A.  No, because I don't see at all.

16 That's why I overlap sometimes talking you

17 because I'm index cell sheets and --

18     **Q.  Wait, wait, wait, wait, wait.  Do**

19 **you see --**

20     A.  Okay.

21     **Q.  Okay.  Do you see where it says,**

22 **"Shipped, Paid, Balance, Trucking,**

23 **Insurance" --**

24     A.  Yes.

25     **Q.  -- and then there are some numbers?**

1    Okay.

2              So with respect to trucking, what

3    does that number of $192,625 refer to?

4         A.    As I told you in the beginning,

5    there was a lot of trauma.  If you want, I'll

6    give you more the details of the whole story.

7    They had -- then they didn't have to --

8              STENOGRAPHIC REPORTER:  I'm sorry.

9         He's cutting out.  I didn't hear the

10        whole answer.

11             MR. RAKHUNOV:  Can you start again,

12        please.

13        A.    Our deal with them was to pick up

14   the containers from the port.  Then they

15   didn't have the money on a timely manner, so

16   I had to take it into a warehouse and -- and

17   hold it in the warehouse to keep it as

18   storage.

19             After that -- I'm going to cut to a

20   lot of chase that not interested.  After

21   that -- at a certain point, you saw the

22   contract, they had thresholds.  They

23   couldn't -- they couldn't keep up the

24   thresholds because it took them to deliver

25   from California to the customer -- that's

1  what they were explaining to me -- let's

2  assume seven to eight days to truck it down

3  to their customer.

4        So they asked me to do them a favor

5  and go take it down to two other --

6        STENOGRAPHIC REPORTER:  He cut out

7     again.

8        MR. RAKHUNOV:  He froze for a

9     second.  Okay.  Now, your back yeah.

10     A.   I'm sorry.  They asked me -- one

11  second.  Something -- hello?

12        MR. SPERBER:  We're here.

13        MR. RAKHUNOV:  We're here.

14        STENOGRAPHIC REPORTER:  He looks

15     frozen.

16        MR. RAKHUNOV:  Yeah.

17        THE WITNESS:  Hello, do you hear

18     me?  Hello?

19        MR. RAKHUNOV:  Let me take the

20     share down.  Maybe it's -- no, no, it's

21     him.

22        STENOGRAPHIC REPORTER:  Now he's

23     gone.

24        MR. RAKHUNOV:  Now we have lost the

25     video.  For the record, it's 10:21.

 1    We've lost the witness's video.

 2        STENOGRAPHIC REPORTER:  It seems

 3    like he had Internet issues.

 4        THE WITNESS:  Hello?  Hello?

 5    Hello?

 6        MR. RAKHUNOV:  We see you.  Can you

 7    see us?

 8        MR. SPERBER:  Can you see us?

 9        STENOGRAPHIC REPORTER:  He's frozen

10    again.

11        THE WITNESS:  Hello?

12        MR. SPERBER:  Can you see us?

13        THE WITNESS:  I can see you, Alex.

14    I just heard you but I can't -- I can't

15    hear Phil and I don't hear the court

16    reporter.  Hello?

17        MR. RAKHUNOV:  Yeah, I'm here,

18    Mr. Weiner.  I want to make sure you're

19    actually back.  Can you here hear me?

20    Can you hear me?

21        THE WITNESS:  I can hear you but

22    everybody's, like, for a second frozen.

23    Something is wrong with my Internet.

24        MR. RAKHUNOV:  Yeah, do you want to

25    just log out and log back in?

```
 1              THE WITNESS:  I'll do it.  But,
 2         Alex, you have to help me out with the
 3         ID, if anything.  So call me, Alex.  If
 4         I get -- I don't want keep everybody
 5         waiting, okay?
 6              MR. SPERBER:  Okay.
 7              THE WITNESS:  Hello, Alex?
 8              MR. SPERBER:  Okay, I will.  I will
 9         call you.
10              THE WITNESS:  Call my cell.
11              MR. RAKHUNOV:  Might as well take a
12         two-minute break, 10:22.
13              (Recess taken.)
14              MR. SPERBER:  Just on the record,
15         because I want to be clear it's 10:26 --
16         it's 10:26 a.m.  We're ready to go
17         again.
18    BY MR. RAKHUNOV:
19         Q.   Okay.  Mr. Weiner, the trucking
20    invoice --
21         A.   So let's go -- let's go back to
22    explaining you what that 140 -- $192,000 is.
23    The $192,000 is -- I explained it to you
24    yesterday, that they didn't have the money in
25    a time till they got that merchandise to
```

1    their customer.  It took them longer than

2    expected.

3              So they asked me to take it out --

4    take down merchandise to other warehouse

5    and -- and -- and closer to their customer so

6    they can have the turnaround time faster.

7              I did that on behalf of that -- on

8    behalf of them, and the agreement was that

9    all the trucking bills that has to be paid

10   from trucking it down from California to

11   wherever I -- as I told you, I don't remember

12   where the warehouses was.  One was next to

13   Chicago.  Another one, I don't recall.  I

14   have to check.  Those trucking bills, that

15   was supposed to be paid by them.

16       Q.   Do you remember what trucking

17   companies you used to provide -- to ship the

18   products from California to these other

19   warehouses?

20       A.   I don't recall.  I remember that --

21       Q.   Do you remember --

22       A.   I remember that Mr. Wertzberger

23   took care of it.

24       Q.   So that would -- is that Wenzy?

25       A.   I have to check.  I don't remember.

1        Q.    Okay.  Did the -- did whoever took

2    care of it send you invoices for those

3    services?

4        A.    Correct.

5        Q.    Do you remember Rock Fintek

6    requesting those invoices in support for the

7    $192,000 charges?

8        A.    I remember giving it to them, and

9    they said that this is not a trucking

10   invoice.  And I told them that this is the

11   invoice, the trucking company that gave it to

12   me, and this is how you -- he invoices.

13            And then they went on --

14   Mr. Bradley said that this is not a trucking

15   invoice.  I told him, "This is a trucking

16   invoice.  If you want, you can contact them

17   today, I don't have a problem with that.  I

18   don't have make money on that and I'm not

19   involved in that."

20            And I -- I asked him to give me a

21   different trucking company's invoice so I can

22   show it to the company, if you want a

23   different layout.  I don't -- I don't make

24   the trucking invoices and I don't make

25   them -- how to make them invoices.  And I

1   don't tell and I don't dictate my vendor how

2   to make an invoice.

3       Q.   Did you actually pay the $192,625

4   to the trucking companies for those services

5   that you billed Rock Fintek for?

6       A.   I actually paid much more.

7       Q.   Okay.  Have you provided proof of

8   that payment to your lawyer to be produced in

9   this case?

10      A.   Should be my production.

11          MR. SPERBER:  I'll just note for

12      the record that we did produce shipping

13      and storage invoices.

14          MR. RAKHUNOV:  Okay.  Have you

15      produced -- and this is a question for,

16      Alex.  If you point me to it, then I

17      don't have any further issue to the

18      actual proof that Kitchen Winners paid

19      this amount to any trucking company.

20          MR. SPERBER:  I'm sorry.  Say it

21      again.

22          MR. RAKHUNOV:  Have you produced

23      any actual evidence of Kitchen Winners

24      having paid this amount to the trucking

25      companies?  I understand you produced

```
 1          the same invoices that were given to

 2          Rock Fintek in the ordinary course that

 3          my client wasn't satisfied with, but --

 4               MR. SPERBER:  I can look.  I'm not

 5          sure.  Mr. Weiner is here.  He can

 6          testify as to whether it was paid or not

 7          is.

 8               MR. RAKHUNOV:  Okay.  Well, I'm

 9          making --

10          A.   It was paid for.

11  RQ           MR. RAKHUNOV:  I'm making a request

12          for any invoices from the trucking

13          companies to Kitchen Winners and any

14          proof of that payment.  And we'll follow

15          up right after this deposition in

16          writing.

17  BY MR. RAKHUNOV:

18          Q.   So, Mr. Weiner, next line item was

19      $65,000 worth of insurance.  What does that

20      refer to?

21          A.   When they didn't have money to pay

22      me, they came up with an idea and saying

23      that -- that JNS had sold them merchandise

24      and gave them credit based on -- on insurance

25      company guaranteeing the money.  If I would
```

```
 1   be opposed to use JNS's insurance for them,
 2   something -- they were trying -- they were
 3   trying to figure out, scrambling that I
 4   should give them more credits.
 5            And I spoke -- I think -- I don't
 6   remember if I spoke to Joel Stern about it or
 7   he recommended me.  And Rock Fintek team said
 8   that they're -- they're very -- again, they
 9   were trying to impress that they're -- they
10   get insurance or credit from other things and
11   they -- I can trust them and bam, bam, bam,
12   and the company can get credits.
13            So I think I spoke to Joel Stern
14   about this once or twice.  And Joel Stern
15   gave me a guy, like, by the name of Eli
16   Weiner, that Eli Weiner said that he can
17   assure to get insurance for up to a million
18   dollars, if I recall, or $2 million.  I don't
19   recall.  And it would cost us a certain
20   amount of money.
21            And that amount of money then was
22   circulated to Rock Fintek because it wasn't
23   in part of our contract.  And it was
24   circulated in conversation with Arik Maimon
25   or whoever.
```