**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK, LLC., ET AL.**
**Hershey Weiner on 11/16/2023**                                    Page 71

```
1              THE WITNESS:  Hold on a second.
2         Just one second.  My family is calling
3         me that I have to come to dinner.  So
4         I'll tell them to wait another few
5         minutes.
6              (Brief interruption.)
7              THE WITNESS:  Sorry.  The family is
8         looking for me, as I told you.  They're
9         going to do prayers before the dinner so
10        they wanted me to come.  So I said I'm
11        still trying to stretch it out.
12        A.   At that time, Rock Fintek said, "Go
13   ahead, bill us for the insurance, and we will
14   pay for what it cost."  And, like, this week
15   he had the credit line.  So that's what we
16   did.
17        Q.   Who told you that?  Who told you
18   that from Rock Fintek?
19        A.   Don't recall.
20        Q.   Was there anything in writing that
21   you recall of Rock Fintek agreeing to pay for
22   $65,000 of insurance for Mr. Eli Weiner?
23        A.   I don't know if it was in writing,
24   but you'll ask Arik Maimon.  He was the
25   negotiator constantly, as I today you.  I
```

1    wouldn't sell them.  And Arik Maimon was the

2    negotiator, I should give credit.

3              I would not give them credit, and I

4    didn't give nobody credit.  I didn't buy for

5    none of my customers insurance.  I didn't

6    know what this insurance is.  I never dealt

7    with such insurance company.  I was

8    introduced by Eli Weiner through Rock Fintek.

9    And I went ahead -- and Eli Weiner can

10   testify on that.  You can put Eli Weiner on

11   the stand.  I was not introduced by me coming

12   to Eli Weiner.  I was introduced when I

13   called him.  He knew exactly.  And he was in

14   touch with Tommy Kato.

15             And I don't know --

16             (Reporter clarification.)

17        A.   He was in touch with Tommy Kato and

18   all that to get that done because I couldn't

19   get that done.  It had to be financials

20   from -- from Rock Fintek.  And I would

21   never -- and look at this, Phil, yeah.  Look

22   at the bottom line.  In my contract -- you're

23   looking at the contract.  My contract says

24   very clearly that they have to pay the gross

25   for picking up.  I did not give them credit,

```
 1   and I didn't want to give them credit.

 2           Whatever credit I gave them is on

 3   behalf of Arik Maimon.  And I had the

 4   insurance as a -- and that's what I was

 5   careful about.

 6       Q.   Your contract also required a

 7   $750,000 rebate upon completion of the

 8   transaction, correct?

 9       A.   If payments get paid up in timely

10   manner or -- or if everything is done on

11   their behalf on a timely manner.  They never

12   found the second deposit.

13       Q.   Is it your position that Rock

14   Fintek -- that you're not required to pay the

15   rebate because Rock Fintek did not make the

16   timely payments; just is that your position?

17       A.   There is more than that.  There's a

18   couple different -- this.  But a rebate

19   works -- if you go buy a rebate on a dryer --

20   on a washing machine or something, it has

21   specifics into it when you fill out the paper

22   that you have to abide by.  This rebate

23   had -- had specific, I think -- I don't know

24   if it says in the contract or not, but I

25   would check with my lawyer.
```

1           But it had a lot of -- a lot of

2     triggers in order to get that rebate.  They

3     never -- they never followed through on the

4     triggers.

5           Q.   Okay.  Again, I'm going to skip

6     **some things to try to get this done, trying.**

7           **You remember having discussions --**

8     **at some point, Rock Fintek brought to your**

9     **attention that you Ascension Health was not**

10    **satisfied with the gloves that were delivered**

11    **that they bought from you, right?  You**

12    **realized at some point there was a problem in**

13    **July of 2021?**

14          A.   Some point -- at some point in

15    July, they mentioned to me that Ascension --

16    they didn't say "Ascension" -- their

17    customer.  There's always talk.  I don't

18    know -- I didn't know Ascension is their

19    customer.  That their customer is having

20    issues with the -- with certain things with

21    the gloves.

22          **Q.   You knew the customer was a**

23    **hospital, though, right?**

24          A.   No, I didn't know.

25          Q.   Okay.

1        A.   By me saying "I didn't know," let

2    me clarify.  Everybody wanted to get a fair

3    price or a good deal, came to me.  I had a

4    lot of customers and a lot of different

5    brokers come to me.  At one point, I had at

6    my house a line of 20 people waiting

7    standing, waiting for me to come.

8            And everybody came with the same

9    story:  I'm dealing with a reputable hospital

10   and hospital group buying, blah, blah, blah,

11   blah, blah, give you a lot of spiels.  If you

12   want to listen to it, and I don't want to

13   waste your time but.  I had more -- multiple

14   people standing by my house when I come home

15   from the office and waiting for me.

16           At one point, we made a party every

17   Thursday night.  And I said, "Listen, guys, I

18   don't have time to waste every day for you."

19   Every Thursday night, I had 30 people in my

20   house and sitting.  And we were all sitting

21   in a conference table and discussing.  And

22   everybody had hospitals and buying groups and

23   groups of hospitals.  So the same spiel I

24   heard from everybody.

25       Q.   Okay.  So you had discussions in

1    July with -- directly with Thomas Kato and

2    Bradley Gilling and Arik Maimon and -- on the

3    line to try to resolve your difference; is

4    that fair?

5         A.   I don't remember if I spoke to

6    Tommy, because I think Tommy said that he's

7    getting married and he's tied up with the

8    wedding and he can't handle -- and he can't

9    deal with this.  But I remember with Arik and

10   Bradley speaking several times.

11        Q.   Okay.  So you remember having phone

12   calls with Arik and Bradley on the line,

13   correct?

14        A.   After -- after July, yes, I

15   remember.

16        Q.   After July.  And some of those

17   phone calls got contentious?

18        A.   Please explain to me what means

19   "contentious."

20        Q.   You -- you got into arguments on

21   those phone calls; fair to say?

22        A.   More Arik Maimon than me, because I

23   kept it pretty -- tried to keep myself in

24   line.  Arik Maimon, I don't know if you saw

25   on this, they had a lot of -- at one point,

 1   Arik didn't want to talk to Bradley.  There
 2   was more between Arik and Bradley getting
 3   heated up and -- and -- and arguing and this.
 4          I -- I did -- I did have heated
 5   conversations with Bradley, but not in -- not
 6   that -- to -- just in discussion like me and
 7   you are arguing something.  But not -- not
 8   getting out of hand, that I can remember.
 9        Q.   You see an allegation that you made
10   a threatening statement to him in this
11   lawsuit, right?
12        A.   I --
13        Q.   I'm just asking you if you've
14   seen --
15        A.   One second.  One second.  Did you
16   ask me a question?  And I'm -- I'm answering
17   you.  You're cutting me off.  I can make
18   tomorrow allegation that you told me that
19   you're going to shoot me.  And I told -- and
20   you told me that you're going to take away
21   one of my kids and -- allegation is nothing.
22          If he has allegation on such a
23   thing, let's pan it out and if he'll -- and
24   let him bring witness.  I never threatened
25   nobody in my life.  And I don't threaten

1    people.  I don't have nothing to threaten.

2    There's law and order.

3              Opposite, I don't get threatened.

4    I don't get scared.  Everything is law and

5    order.  In the United States, we live in a

6    very, very good country, United States of

7    America.  And law and order is very, very top

8    of the system.  I don't get -- I don't

9    threaten and I don't get threatened.  If

10   somebody threatens me, I know what to do.

11   And if -- and I wouldn't threaten nobody

12   because there's no -- no threat.

13             The whole Gambino family is out of

14   context in the 2000s, so there's no threats

15   over here.

16        Q.   You made a settlement proposal in

17   writing in July of 2021.  Do you remember

18   that?

19        A.   Again, yes, I remember.  They were

20   trying to convince me to do a few different

21   settlements.  That came with a lot of

22   gimmicks.  And they're very -- but today,

23   like I tell you, that me and Arik share --

24   Maimon share a lot of information of each

25   other's pain.

1            They're very good in persuading and

2    they came to me that I should do this and I

3    should do that because they're going to give

4    me a 2 million box contract, another

5    contract, 2 million boxes.

6            But now I know that was full of not

7    air.  But, again, by the time then I was in

8    la la land because I was excited that there's

9    another 2 million boxes coming down the line,

10   yes.  And, like you said, the fact is we made

11   business.

12           And it was already -- it was

13   already -- COVID almost over and everybody is

14   getting gloves.  And, oh, there's another

15   guy -- the guy is coming back.  He's going to

16   bring me another contract of 2 million boxes.

17   By the time -- now I know it was only to how

18   you scam me out of the money.  But I don't

19   know if there was any backing on it.

20           But this is -- was all

21   conversations on the phone with Arik, that

22   they're going to give me another contract so

23   we should try to make some kind of an

24   agreement.  And every day they had a

25   different number and different agreements.

1        Q.    Okay.  So let me just -- just to

2    move this along.  Do you see I highlighted in

3    the middle of the page paragraph 2 in your

4    email --

5              MR. RAKHUNOV:  This is Exhibit, I

6         think, 21 now.  It's titled, "Settlement

7         Proposal Fintek Kitchen Winners."  And

8         it's an email from you to Thomas Kato,

9         Bradley Gilling, Arik Maimon and copying

10        you at your other email address.

11             (Defendant's Exhibit 21, Email

12        dated Jul 14, 2021, from Joseph Weiner

13        to Thomas Kato, et al., marked for

14        identification as of this date.)

15   BY MR. RAKHUNOV:

16        Q.    And you write in paragraph 2 that

17   "Rock Fintek shall deliver to Kitchen Winners

18   and enter into a contract with Kitchen

19   Winners and fund the deposit for the purchase

20   of 2 Million boxes of Medcare nitrile

21   gloves," and so forth.

22             So I think I heard you testify a

23   moment ago that that concept came from Arik

24   Maimon.  But I want the record to be clear:

25   Who made the proposal or who proposed that

```
 1   Rock Fintek would buy 2 million more boxes of

 2   gloves as a condition of this settlement

 3   proposal?

 4            MR. SPERBER:  Objection to the

 5        form.

 6        A.   Bradley and Thomas Kato.

 7   BY MR. RAKHUNOV:

 8        Q.   Okay.  How did they make that --

 9   did they tell you that directly or did it

10   come from Arik Maimon or something else?

11        A.   No.  On the contract, for sure,

12   Bradley.  I don't remember Thomas because I

13   told you I think Thomas was only once or

14   twice on the phone call.  And he was trying

15   to get -- to not handle this.  He was trying

16   to sit back and be the backseat.  So he came

17   up with an answer that it would take -- I

18   think that he's busy with his wedding.  And

19   all respect -- everybody respect somebody

20   that gets married.  And we should give him

21   his space.

22            But definitely this came from

23   Brad -- Bradley was on the line and proposing

24   that they're going give us a new contract in

25   order to settle the old one.
```

1      Q.    What did Bradley say -- tell me

2   everything you remember about what Bradley

3   said about buying 2 million more boxes of

4   Medcare Nitrile gloves as part of the

5   resolution here.

6      A.    He said that, since he picked up

7   more than the -- the original contract, that

8   he wanted -- he wanted to try that the gloves

9   that he picked up on the original contract

10  should go on the second contract, on the

11  2 million boxes contract.

12          And it should be started counting

13  from there and we should negotiate new

14  pricing.  So every day -- again, this is --

15  it's very confusing because there was a lot

16  of different conversations.  And every day he

17  came up with another idea, a deal like and a

18  deal like that to settle it like this and to

19  settle like that.

20          He was constantly -- and I was

21  always trying to write it down and send it to

22  him in an email because he didn't send me

23  emails.  And -- and -- and -- and tell him to

24  clear it up or -- or give me -- if this is

25  not the standing, if we can settle it like

```
 1   this.
 2          But it was always a conversation
 3   that he's going to give me another contract.
 4   And based on that contract, we'll clean out
 5   the whole -- the whole -- the whole -- how
 6   you call it by us -- in the whole pectal
 7   that's out there that he owes me the
 8   amount -- the amount of money.
 9      Q.   And did Mr. Gilling or anything
10   tell you who Rock Fintek would sell those
11   additional 2 million boxes to?
12      A.   He didn't tell me at the beginning
13   who his customer is, so I don't know what --
14   I would never ask his -- it's unethical for
15   me to ask who his customer is.
16      Q.   Okay.  Okay.  Anything else that
17   you recall about what Mr. Gilling or Mr. Kato
18   or Mr. Maimon said to you about the proposed
19   $2 million -- 2 million boxes of gloves?  I
20   just want to make that you're telling me
21   everything you remember on that topic.
22      A.   Just as I said, they're going to
23   give me a 2 million contract, and I should
24   work with them on better pricing.  First we
25   talked about pricing $10, then 9.50, then $9.
```

```
 1   And then it went down to, once in our
 2   conversation, maybe to 8.90 or -- it was back
 3   and forth and back -- this is going on and on
 4   and on and on and on.  I don't recall, and I
 5   don't remember.
 6        Q.   Okay.
 7             MR. RAKHUNOV:  I put Exhibit 22
 8        into chat box.  This is -- this is a
 9        long document consisting of photographs
10        that your counsel produced just
11        recently.
12             (Defendant's Exhibit 22,
13        Photographs, marked for identification
14        as of this date.)
15   BY MR. RAKHUNOV:
16        Q.   So who took these photographs?  and
17   you can -- I put it in the chat box and it's
18   on the screen.  I think I know where these
19   are.
20             Are these photographs that were
21   taken during the inspection of the gloves
22   during this litigation at a Medline
23   warehouse?
24        A.   It looks similar to the pictures.
25   I don't know from where you got it or how you
```

```
 1   got it.  And -- and I would have to review
 2   it.  But it's -- it looks like in the
 3   Medcare's warehouse.
 4        Q.   Okay.  And you see --
 5        A.   I don't know.
 6        Q.   I will tell you I got them from
 7   your lawyer.  Your lawyer gave them to me --
 8        A.   Fine.
 9        Q.   -- so they look --
10             Okay.  So you remember visiting
11   Medline warehouses during this litigation and
12   looking at gloves, right?  I think you and I
13   met during one of those visits; do you
14   remember that?
15        A.   I remember -- I remember once --
16   yeah, I think I remember that I met you one
17   of the -- on the first warehouse that we
18   went, no?
19        Q.   Grayslake, Illinois, no?
20        A.   I don't remember.
21        Q.   Okay.
22        A.   I don't remember -- I don't
23   remember an address and I don't remember
24   where but I remember I met you the first -- I
25   think you were in the first time when I went
```

```
 1   somewhere.  Am I right?
 2        Q.   That's -- I believe so.
 3             So, wait, wait.  Who -- who is this
 4   individual in -- in this photograph?
 5        A.   Tzali Gombo.
 6        Q.   Okay.  And he's the -- he's the
 7   person you referenced earlier as an
 8   industry -- as someone experienced in the
 9   industry that you consulted about these
10   gloves, correct?
11        A.   Correct.
12             STENOGRAPHIC REPORTER:  I'm sorry.
13        Can you spell his name.
14             MR. RAKHUNOV:  We can give you that
15        later.  We'll give you that later.  I
16        just want to move on.
17   BY MR. RAKHUNOV:
18        Q.   Okay.  So you took samples of the
19   gloves that you saw at the Medline
20   warehouses, correct?
21        A.   Correct.
22        Q.   And did -- and I don't know if your
23   lawyer will be okay with this question.  But
24   did you have those gloves tested for ASTM
25   standards compliance or for their chemical
```

```
 1    qualities since you obtained those gloves?

 2        A.    No.

 3        Q.    Okay.  Now, you saw that -- would

 4    you agree with me -- just to move this

 5    along -- that the pallets were pulled from

 6    the Medline warehouse storage locations based

 7    on a spreadsheet that your lawyer and me and

 8    Mr. Frisch together agreed upon to have a

 9    random selection of gloves; would you agree

10    with that?

11            MR. SPERBER:  Objection to the

12        form.

13        A.    No.  Honestly, I was very upset

14    with my lawyer and we had a lot of arguments

15    about that.

16            MR. SPERBER:  I'm going to direct

17        Mr. Weiner not to discuss any

18        communications you may have had with

19        counsel.

20    BY MR. RAKHUNOV:

21        Q.    Okay.  Would you agree with me

22    though, that a significant portion of the

23    gloves that were made available to the

24    parties to inspect at the Medline warehouses

25    that were visited were labeled "protection"
```

1    on the boxes?

2        A.    Please -- again, please, re --

3    resend me again -- tell me again the question

4    because --

5        Q.    Sure.  So, you know, we had an

6    opportunity to look at a number of gloves,

7    right, that were -- that were pulled down

8    from the various -- you know, from the

9    storage locations, right?  That's an easy

10   one, right?

11       A.    You want me to answer?  I don't

12   understand.

13       Q.    Well, yeah, yeah.  We -- we had

14   Medline pull a whole bunch of gloves down.

15   And you were there, I was there at the first

16   warehouse.  There were other folks at

17   different warehouses, correct?

18       A.    I don't believe that they pulled it

19   down, and I don't believe a lot of things.

20   So I don't want to go into conversation on

21   that because it's privileged between me and

22   my lawyer that I spoke to him.  But I cannot

23   answer this question.

24       Q.    Well, okay.  I don't want to know

25   anything you spoke with your lawyer about.

```
 1              But I can put it back up on the

 2    screen.  It's fair that Medline pulled

 3    gloves; they pulled, I think, 30 pallets at

 4    each warehouse approximately.

 5         A.   It's fair to say that I went into a

 6    Medline warehouse, there was 30 pallets of

 7    gloves.  Not pulled.

 8         Q.   Okay.

 9         A.   Don't -- don't put things in my

10    mouth.  Not pulled.  Again, I'm going to

11    repeat.  Not pulled, not Medline's warehouse.

12    It was when I came to Medline's warehouse,

13    there was 30 pallets sitting on the floor to

14    inspect.

15         Q.   Okay.  I will agree with you that

16    that is -- that was there.

17              And you personally opened some of

18    the cartons and pulled boxes out and looked

19    at the gloves, correct?

20         A.   No, I never looked at -- took

21    pictures.  I didn't even look at the thing

22    because I was always on a tight leash of

23    getting -- report -- took pictures -- tons of

24    pictures.  My --

25              STENOGRAPHIC REPORTER:  I'm sorry,
```

```
 1        you're cutting out.
 2   BY MR. RAKHUNOV:
 3        Q.   You never took any tissue boxes of
 4   gloves with you?
 5        A.   I'm in the middle of telling you.
 6             MR. RAKHUNOV:  Well, you cut out.
 7             STENOGRAPHIC REPORTER:  You both
 8        cut out.
 9             MR. RAKHUNOV:  You cut out.  We
10        just couldn't hear you.
11             THE WITNESS:  Okay.  Now you hear
12        me?
13             STENOGRAPHIC REPORTER:  Yes.
14        A.   Okay.  I went down to the place.  I
15   took samples.  The first -- the first
16   warehouse, I took a lot of samples.  I think
17   I took from every pallet, one.  Then I -- we
18   had problems of going back to the -- to
19   New York with it.  It was too big of a
20   schlep.
21             I think on the second warehouse --
22   second, third and fourth and whatever, I
23   don't remember, the other warehouses, I took
24   randomly only from each size.  Not from every
25   pallet.  All those pictures and -- by my
```

1  lawyer and you can look at everything that --

2  pictures.  But I didn't even focus on

3  looking -- I didn't open -- never boxes for

4  the inside of the glove to touch.  I never

5  opened up individual tissue box.

6          I just opened up the boxes and took

7  out tissue box and put it in a box and

8  brought it back to New York.  The rest, you

9  have to ask my lawyer.

10     **Q.   And did you see -- well, you looked**

11  **at some -- a lot of the tissue boxes, right?**

12  **You didn't put your eyes on them?**

13     A.   I didn't put -- only the outside

14  box.  By chance, I didn't put the eyes on the

15  tissue box.  I didn't have enough time.  I

16  was very crunched on time.

17          If you remember the first time when

18  you came, they didn't -- you wasted an hour

19  to get into each premises.  You wasted an

20  hour to get in.  Usually I try to get back

21  home on the same time.  They had to make

22  phone calls that came down from top and

23  beginning.  It always was a -- it was a

24  little bit of hassle until you got into the

25  place.  It was always a waste, between an

1    hour or 30 minutes or 45 minutes.

2              So I was focusing to get in, take

3    pictures, like my lawyer told me, advised me,

4    take as much pictures you can, and the

5    close-up pictures and far pictures.  And I

6    tried to get up on the -- on the high low to

7    get a picture from view of the top.  If you

8    see my lawyer most probably said --

9              MR. SPERBER:  Don't discuss

10         anything that I may have said to you or

11         you may have said to me.

12         A.   I -- I don't know my -- if my

13   lawyer shared with you the pictures.  You'll

14   see I took a lot, a lot of pictures that he

15   should be able to have.  And I took pieces --

16   like you said, the first warehouse I took

17   each pallet.  After that, I started taking

18   only from -- I think by size, two medium, two

19   large -- three medium or three -- I don't

20   recall -- pieces of each size.

21         **Q.   Okay.  All right.**

22             MR. SPERBER:  I just want to note,

23         Phil, you asked me earlier about the

24         invoices in our production.  The

25         invoices are in our fourth production

1  starting, I believe, at Bates number

2  2051.  Those are the shipping and the

3  storage invoices.

4      THE WITNESS:  Okay.  Guys, it's

5  really -- it's now 4:57.

6      MR. RAKHUNOV:  Yeah.  We'll --

7  we'll take a look at that.  That's fine,

8  Mr. Weiner, have a good night.

9      THE WITNESS:  Thank you.  I'm

10 sorry, Phil, I tried my best.  Bye.

11     MR. RAKHUNOV:  Okay.

12     MR. SPERBER:  Any questions on

13 spelling.

14     MR. RAKHUNOV:  Yeah, Alex, can you

15 actually -- I'm sorry.  Before you do

16 that, can you just repeat that Bates

17 number again.

18     MR. SPERBER:  I'm sorry.  Hold on.

19 I believe starting at Bates number 2051.

20     MR. RAKHUNOV:  I'll take a look.

21     MR. SPERBER:  These were the

22 documents that we initially re-called

23 because they were attached to our

24 privilege email.  They were re-produced

25 subsequently in our fourth production.

**KITCHEN WINNERS NY INC., ET AL. vs ROCK FINTEK, LLC., ET AL.**
Hershey Weiner on 11/16/2023                                      Page 94

```
 1        MR. RAKHUNOV:  Okay, Tami, what can
 2   I do for you?
 3        STENOGRAPHIC REPORTER:
 4   Mr. Sperber, are you ordering a copy of
 5   the transcript?
 6        MR. SPERBER:  I believe so.
 7        STENOGRAPHIC REPORTER:  Okay.  And,
 8   Mr. Frisch, are you ordering a copy of
 9   the transcript?
10        (Continued on next page to include
11   jurat.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              MR. FRISCH:  No, I'm not.

2              MR. SPERBER:  I do want to just

3        note for the record we do want read and

4        sign.

5              STENOGRAPHIC REPORTER:  Okay.

6              (Time noted:  11:00 a.m.)

7

8

9                    _____

10                   HERSHEY WEINER

11

12    Subscribed and sworn to before me

13    this_____ day of _____, 2023.

14

15    _____

16

17

18

19

20

21

22

23

24

25