NOVEMBER 13, 2023                                               MICHAEL ELSTRO

```
                                                                    Page 1
         UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
    - - - - - - - - - - - - x
KITCHEN WINNERS NY INC.,          :
         PLAINTIFF,               :
    v.                            : CIVIL ACTION
ROCK FINTEK LLC,                  : NO.
         DEFENDANT.               : 22-cv-05276-PAE
ROCK FINTEK LLC,
         COUNTERCLAIM AND
         THIRD-PARTY PLAINTIFF,
    v.
KITCHEN WINNERS NY INC,
         COUNTERCLAIM DEFENDANT
    and
ADORAMA INC., HERSHEY WEINER,
JOSEPH MENDLOWITZ, JNS CAPITAL
HOLDINGS LLC AND JOEL STERN,
         THIRD-PARTY DEFENDANTS.
    - - - - - - - - - - - - x
         REMOTELY CONDUCTED DEPOSITION OF
                 MICHAEL ELSTRO
             MONDAY, NOVEMBER 13, 2023
                 9:06 A.M. CST
    REPORTED BY: KARISA EKENSEAIR, MO CCR RMR #1507
```

```
                                                                    Page 2
1    DEPOSITION OF MICHAEL ELSTRO, CONDUCTED VIA
2    ZOOM VIDEOCONFERENCE WITH THE WITNESS LOCATED IN
3    MISSOURI.
4
5
6
7
8
9
10
11        Pursuant to notice, before Karisa J.
12   Ekenseair, Certified Shorthand Reporter in and for
13   the State Missouri; National Registered
14   Professional Reporter; National Registered Merit
15   Reporter; Notary Public in and for the State of
16   Arkansas.
17
...
25
```

```
                                                                    Page 3
1           A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF KITCHEN WINNERS AND
3    THIRD-PARTY DEFENDANTS ADORAMA INC., HERSHEY
4    WEINER, AND JOSEPH MENDLOWITZ (VIA ZOOM):
5         ALEXANDER SPERBER, ESQUIRE
6         KIPSIUS BENHAIM LAW
7         80-02 KEW GARDENS ROAD, SUITE 1030
8         KEW GARDENS, NEW YORK 11415
9         212-981-8440
10        ASPERBER@LIPSIUSLAW.COM
11
12   ON BEHALF OF THE DEFENDANT ROCK FINTEK LLC (VIA
13   ZOOM):
14        PHILLIP RAKHUNOV, ESQUIRE
15        LAUREN RIDDLE, ESQUIRE
16        POLLACK SOLOMON DUFFY LLP
17        485 MADISON AVENUE, SUITE 1301
18        NEW YORK, NEW YORK 10022
19        212-493-3100
20        PRAKHUNOV@PSDFIRM.COM
```

```
                                                                    Page 4
1      A P P E A R A N C E S   C O N T I N U E D
2    ON BEHALF OF THIRD-PARTY DEFENDANTS JNS CAPITAL
3    LLC AND JOEL STERN (VIA ZOOM):
4         AVRAM FRISCH, ESQUIRE
5         THE LAW OFFICE OF AVRAM E. FRISCH LLC
6         1 UNIVERSITY PLAZA DRIVE, SUITE 119
7         HACKENSACK, NEW JERSEY 07601
8         201-289-5352
9         FRISCHA@AVIFRISCHLAW.COM
10
11   ON BEHALF OF THE RESOURCE GROUP AND THE
12   DEPONENT (VIA ZOOM):
13        TAYLOR MATTHEWS, ESQUIRE
14        LEWIS RICE LLC
15        600 WASHINGTON AVENUE, SUITE 2500
16        ST. LOUIS, MISSOURI 63101
17        314-444-7600
18        TMATTHEWS@LEWISRICE.COM
19
20   ALSO PRESENT:
21        THOMAS KATO
22        HERSHEY WEINER
23        SEPIDEH KHANSARI, THE RESOURCE GROUP
```

Page 5

```
 1         T A B L E   O F   C O N T E N T S
 2                                              PAGE
 3   STYLE AND NUMBER........................    1
 4   APPEARANCES.............................    3
 5
 6   WITNESS:   MIKE ELSTRO
 7   EXAMINATION BY MR. FRISCH..............    7
 8   EXAMINATION BY MR. SPERBER.............   56
 9   EXAMINATION BY MR. RAKHUNOV............   63
10
11   CERTIFICATE OF REPORTER................   68
12
13                    EXHIBITS
14   NUMBER      DESCRIPTION                    PAGE
15   EXHIBIT 1   E-MAIL CHAIN RE [EXTERNAL] FW:
16               200M NITRILE GLOVES, BATES
17               NUMBER TRG00000019 THROUGH 21,
18               CONFIDENTIAL..................   42
19   EXHIBIT 2   E-MAIL CHAIN RE [EXTERNAL] FW:
20               QUOTATION #1121-107405 FROM
21               AKRON RUBBER DEVELOPMENT
22               LABORATORY, INC., BATES NUMBER
23               TRG00001268 THROUGH 1270,
24               CONFIDENTIAL..................   45
25
```

Page 6

```
 1                    EXHIBITS
 2   NUMBER      DESCRIPTION                    PAGE
 3   EXHIBIT 3   E-MAIL CHAIN RE [EXTERNAL] INV
 4               200M NITRILE GLOVES REVISED,
 5               BATES NUMBER TRG00000066
 6               THROUGH 67, CONFIDENTIAL......   46
 7   EXHIBIT 4   E-MAIL CHAIN RE [EXTERNAL] RE:
 8               MEDCARE EXAM GLOVE - QA
 9               INSPECTION, BATES NUMBER
10               TRG00000542 THROUGH 543,
11               CONFIDENTIAL..................   47
12   EXHIBIT 5   E-MAIL CHAIN RE !! MEDCARE
13               BRAND GLOVES !!, BATES NUMBER
14               TRG00000261 THROUGH 263,
15               CONFIDENTIAL..................   49
16   EXHIBIT 6   E-MAIL CHAIN RE MEDCARE 3PL
17               GLOVES, BATES NUMBER
18               TRG00000087 THROUGH 88,
19               CONFIDENTIAL..................   53
20
21
22
23
24
25
```

Page 7

```
 1              P R O C E E D I N G S
 2                   MIKE ELSTRO
 3   of lawful age, being first duly sworn, deposes and
 4   says in reply to the questions propounded as
 5   follows:
 6                   EXAMINATION
 7   BY MR. FRISCH:
 8       Q  Good morning, sir.  My name is Avram
 9   Frisch.  I'm the attorney for third-party
10   defendants Joel Stern and JNS Capital Holdings
11   LLC.  And I'm going to be asking you questions
12   here today regarding the litigation between Rock
13   Fintek LLC, my clients, and the clients of
14   Mr. Sperber who is the plaintiff in this action,
15   and some of the other third-party defendants.
16           Can you state your name and address for
17   the record, please?  Your business address is
18   fine.
19       A  Yes.  My name is Michael Elstro.  My
20   business address would be 2554 West Port Center
21   Drive, St. Louis, Missouri.
22       Q  Thank you.  Have you ever testified at a
23   deposition before?
24       A  No, sir.  I have not.
25       Q  All right.  So let me explain to what you
```

Page 8

```
 1   this is about.
 2           During the course of the deposition, I and
 3   my colleagues in the case will be asking you
 4   questions about issues in the case.  We've
 5   negotiated with your counsel to limit the issues
 6   to specific items, which I'm sure he'll remind me
 7   when I stray beyond that.
 8           You're answering under oath, as you know.
 9   And you know, this is to be treated as the same as
10   if you were in a courtroom, right.  Tell the truth
11   and, you know, and you cannot discuss the
12   questions and answers directly with your counsel
13   as they're ongoing.
14           If you need a break, please let me know.
15   As long as no question is pending, we'll be happy
16   to take a break whenever you need it.
17           If you don't understand a question, please
18   let me know and I'll repeat it or rephrase it.
19   Please speak your answers aloud so that the
20   stenographer can record all of your responses.
21   Please also don't do uh-huhs, yes, no, head -- not
22   yes -- I mean, uh-huh, yeah, something like that.
23   Use full words and no head nods so that the court
24   reporter can take it down.
25           Other than with your attorney, have you
```

Page 25

1  put the gloves so that would have been at least a
2  way to use them up?
3      MR. MATTHEWS: Object to the form; beyond
4  the scope of the deposition topics.
5      But you may answer, if you know.
6      THE WITNESS: So healthcare providers
7  depend upon PPE, right. It is their livelihood,
8  right, to protect them from bodily fluids, waste.
9  And when that comes into question, we can't take
10 that risk. You're putting people's lives at
11 potential risk by utilizing product that is
12 counterfeit and ineffective.
13 BY MR. FRISCH:
14     Q Well, let's ask that: What makes you say
15 that the gloves were counterfeit?
16     A I would say that the gloves were
17 counterfeit because they did not meet the
18 specifications and representations that The
19 Resource Group was provided. It clear articulates
20 on our purchase orders that the gloves should be
21 ASTM D6319-rated, that they should be nitrile
22 gloves, they should be FDA approved.
23     And based upon the representations that
24 were provided to us from Rock Fintek and had
25 Kitchen Winners name on it, I mean, the boxes

Page 26

1  state -- even the outside of the boxes state
2  nitrile on them, the outer box and the inner box,
3  and that is not the case.
4      Q Well, you -- you had two boxes examined,
5  right, for whether or not they were nitrile; isn't
6  that correct?
7      MR. RAKHUNOV: Avi, I'm sorry, can you
8  just please speak up a little? You trail off at
9  the end of your question.
10 BY MR. FRISCH:
11     Q I said you had two boxes examined to
12 determine if they were nitrile; is that correct?
13     A So that's not what I said. I said the
14 gloves were not ASTM D6319-rated. The gloves did
15 not pass elongation and tensile testing.
16 Therefore, they're not -- they did not meet the
17 requirement to be an ASTM D6319 nitrile glove.
18     Q Would it surprise you to learn that the
19 contract between Rock Fintek and JNS and Joel
20 Stern did not -- did not reference ASTM D6319?
21     MR. MATTHEWS: I'm going to object to the
22 form. I'm going to object that it's beyond the
23 scope of the deposition topics. And I will object
24 based upon foundation, or lack thereof.
25     Subject to that, you may answer, Mike.

Page 27

1      MR. RAKHUNOV: Yeah. Note my objection to
2  form as well.
3      THE WITNESS: The Resource Group and
4  Ascension don't care what the contract says
5  between Rock Fintek and Kitchen Winners or JNS
6  Capital. Our contract stated that there should be
7  ASTM D6319-rated nitrile gloves, FDA approved, and
8  the gloves are not.
9  BY MR. FRISCH:
10     Q Did you -- were you ever in communication
11 with Medcare directly?
12     A I was part of one conference call with
13 individuals that were, I'm told, part of Medcare.
14 I've met them one time on a conference call.
15     Q Because you said they were counterfeit
16 gloves, do you have any reason to believe that
17 these gloves were not shipped by Medcare and not
18 manufactured by Medcare?
19     MR. MATTHEWS: Object to form; beyond the
20 scope of the topics.
21     But you may answer, if you know.
22     THE WITNESS: I can't speculate on that.
23 BY MR. FRISCH:
24     Q Were there any gloves that were good
25 in -- in the 200 million gloves, did you figure

Page 28

1  out if there was any that were usable?
2      A I don't know if any of the gloves were
3  good. What I do know is that we cannot trust that
4  the 200 million gloves or 196 million that we
5  received some are good and some are not. We can't
6  put that on a healthcare provider to send gloves
7  in and say open the box and see if you think these
8  are good enough. They don't have time to do that.
9      If you're ever in a healthcare setting,
10 folks are running to grab gloves sometimes to take
11 care of their patients. We cannot put that burden
12 on healthcare providers.
13     Q Once you discovered the issues with the
14 gloves, did you request that Rock Fintek give you
15 a replacement?
16     A The Resource Group has asked that Rock
17 Fintek make us whole on the situation. I believe
18 there's a Lewis & Rice letter that was sent to
19 Rock Fintek in March of 2022 that lays out our
20 requests or demands of Rock Fintek, that we be
21 made whole on the order that was received, so the
22 196 million gloves, close to $37 million; not to
23 mention the fact that we have well north of
24 $2 million in holding costs for these gloves at
25 this point in time and that continues to grow, and

Page 29

1  other damages.
2     Q  And what was their response to that?
3     A  I do not know.
4     Q  I'm going to call up the letter.  Did it
5  pop up?  That was labeled at, I think, Mr. Kato's
6  deposition as JNS A -- Exhibit A.
7        Is this the letter you were referring to?
8        MR. MATTHEWS:  Mike, are you able to click
9  through it?
10        THE WITNESS.  Yes, sir.
11        That looks like the letter.  I'm just --
12  sorry, I'm just trying to make -- blow it up and
13  just make sure that --
14  BY MR. FRISCH:
15     Q  You can -- you can control --
16     A  Yes.
17     Q  -- the size and the scrolling --
18     A  Yes.
19     Q  -- on your own screen.
20     A  Yep.  Yes, sir.  I understand.
21        Yes.  That is the letter.
22     Q  Do you happen to know why your attorney
23  believed that Rock Fintek LLC was not formed until
24  May 1st, 2021?
25        MR. MATTHEWS:  Object to form; and calls

Page 30

1  for a disclosure of attorney-client
2  communications.
3        So I will instruct the witness not to
4  answer as to what his knowledge of his attorney's
5  belief is.
6        MR. FRISCH:  Okay.  Let me rephrase that
7  without reference.
8  BY MR. FRISCH:
9     Q  Do you know, without reference to any
10  conversations with any of your attorneys, if Rock
11  Fintek LLC was not formed until May 1st, 2021?
12     A  I'm sorry, can you repeat the last part of
13  your question?  You've asked -- I'm having issues
14  hearing you at the end.
15     Q  Sorry.  I'll get a little closer to the
16  screen.
17        Do you know, without reference to
18  conversations with your attorneys which I don't
19  want to know about, do you know if Rock Fintek LLC
20  was only formed on May 1, 2021, as noted in the
21  footnote in this letter?
22     A  I'm not aware.
23     Q  Okay. Did Rock Fintek ever offer you
24  another brand of gloves during the period, let's
25  say around April 2021, in -- in lieu of the

Page 31

1  Medcare gloves?
2     A  I don't recall specifically.  Although, I
3  do recall we had -- we had multiple conversations
4  with Rock Fintek when they thought that they had
5  found a provider that could fulfill the order, but
6  I don't recall all those different brands of
7  gloves.
8     Q  Okay.  What -- when you first discovered
9  the gloves were bad, did -- when did you first ask
10  Rock Fintek to replace the gloves or to make you
11  whole?
12     A  We brought it to their attention in July
13  of '21, that the gloves were bad and we needed to
14  find resolution and find replacement gloves.
15     Q  And what was -- what was their response in
16  July of 2021?
17        MR. RAKHUNOV:  Objection.  Go ahead.
18        THE WITNESS:  We had -- we had multiple
19  conversations with Rock Fintek.  I think at first
20  they believed that we had received good gloves.
21  But as time went on in the conversation and they
22  went out and they started looking at the gloves at
23  the Medline warehouses, they understood that we
24  had a situation on our hands.
25  BY MR. FRISCH:

Page 32

1     Q  Another document, this had also previously
2  been marked at Mr. Kato's deposition as JNS
3  Exhibit F.
4        And here, Mr. Kato writes -- I'm trying to
5  find the line I want you to look at.  In -- if
6  you -- well, just read through this -- this
7  e-mail.  I know you're not copied on it, but maybe
8  you're familiar with it anyway.
9        Just read through it quickly and then I'll
10  ask my question.
11     A  Okay.  Please give me just a couple of
12  minutes.
13        (Off-the-record discussion.)
14        MR. FRISCH:  All right.  Are we back on
15  the record?
16  BY MR. FRISCH:
17     Q  Michael, you ready?  You read it or
18  you still --
19     A  I did.  I was having problems trying to
20  read it when you guys were talking --
21     Q  Oh, sorry --
22     A  -- so if you guys can give me a couple
23  minutes of silence --
24     Q  Sure.
25     A  -- I'd appreciate it.  Thank you.

Page 33

1  THE REPORTER: Would we like to go off the
2  record?
3  MR. RAKHUNOV: Yeah. Let's go off the
4  record for two minutes.
5  (Whereupon a break was had.)
6  BY MR. FRISCH:
7  Q  Have you ever seen this document before?
8  A  No, sir. I have not.
9  Q  In the middle, it says in -- later in
10  February and March, we were able to secure
11  pre-pandemic brand gloves like Kimberly Clark,
12  Intco, and others. These name brands would have
13  cost us less to purchase but we did not. Vince
14  told us not to. He said Medcare gloves are in all
15  the hospitals and they are very happy with them
16  and it's more work to input a new product.
17  Were you aware of this conversation that
18  Mr. Kato says occurred?
19  MR. MATTHEWS: Objection to the form;
20  beyond the scope of the deposition notice.
21  But you may answer, if you know.
22  THE WITNESS: I'm not aware of that.
23  BY MR. FRISCH:
24  Q  Are you aware of any -- if I told you
25  Vince said this, is that -- would that have

Page 34

1  been -- strike that.
2  I guess, just to be clear, are you -- do
3  you think there's any truth to Mr. Kato's
4  statement here?
5  MR. MATTHEWS: Object to the form; beyond
6  the scope of the deposition notice; calls for
7  speculation.
8  Subject to that, you may answer.
9  MR. RAKHUNOV: Objection.
10  THE WITNESS: We bought -- we bought
11  gloves from the other providers listed. And when
12  I say from them, not from them, but from middle --
13  middlemen, right, that were selling those gloves.
14  We had Kimberly Clark, Intco. We had multiple
15  brands of gloves we purchased during COVID-19.
16  And I can tell you the going rate for
17  gloves was very high. We buy gloves
18  two-and-a-half, $0.03 a day. Gloves were going
19  for 15 to close to $0.20 a glove during COVID-19.
20  BY MR. FRISCH:
21  Q  Do you happen to recall if Kimberly Clark
22  gloves were more or less expensive than the
23  Medcare gloves you brought from Rock Fintek at
24  that point in time?
25  MR. MATTHEWS: Object to the form; beyond

Page 35

1  the scope of the deposition notice.
2  But subject to that, you may answer, if
3  you know.
4  THE WITNESS: Unfortunately, I don't
5  remember the cost of every glove that we purchased
6  during COVID-19. As I stated, they were -- they
7  were ranging from 15 to $0.20 a glove.
8  BY MR. FRISCH:
9  Q  Did Rock Fintek ever replace a single
10  glove?
11  A  To my knowledge, Rock Fintek has not
12  replaced any of the 196 million-ish gloves that
13  we -- we, The Resource Group, have received.
14  Q  Did Rock Fintek refund any money?
15  A  To my knowledge, we have not received any
16  reimbursement refunds of the close to $37 million
17  plus the holding costs and other damages as part
18  of this.
19  Q  Did Rock Fintek do anything to make the
20  situation better on your end?
21  MR. RAKHUNOV: Objection.
22  THE WITNESS: The situation is unresolved
23  on our end. We still have purchased 196 million
24  gloves, close to $37 million, holding costs, and
25  other damages. And we have not recouped any of

Page 36

1  that today.
2  BY MR. FRISCH:
3  Q  And you testified you're still holding
4  them at the Medline distribution center?
5  MR. MATTHEWS: Object to the form. That's
6  beyond the scope of this deposition notice.
7  Subject to that, if you have personal
8  knowledge, you may answer.
9  THE WITNESS: I'm not -- so my day-to-day
10  role, I'm not directly tied into, like, the
11  holding of the gloves and distributing them. I do
12  know that Ascension, so the parent organization of
13  The Resource Group, has donated a good number of
14  the gloves, but we are still holding a substantial
15  amount, over half of the order, at Medline
16  distribution centers.
17  BY MR. FRISCH:
18  Q  Do you know how much you paid Rock Fintek
19  in total for the Medcare gloves?
20  A  It was -- we paid Rock Fintek what we had
21  been invoiced for, so it was close to 100 -- 196
22  million at the 18-and-a-half cents per glove.
23  They invoiced us -- every time that we received an
24  order, Medline checked it, sent us a notice it was
25  received. Rock Fintek would send us an individual

Page 37

1  invoice and we would pay it.
2     Q  But you're not aware of the total sitting
3  here today?
4     A  I don't know the exact total.  As I said,
5  it's close to $37 million.
6     Q  What -- had these gloves be acceptable,
7  what is the likelihood that Rock Fintek would have
8  gotten another contract from The Resource Group?
9     A  I -- so I'll -- I'll answer, but it's kind
10  of speculative at this point in time, like, what
11  it would have been.  And I'll address it from two
12  different angles.  So I'll approach it from a
13  short-term and long-term perspective.
14        So short term, while we were in the midst
15  of COVID-19, I think it's highly likely that we
16  would have continued to engage with Rock Fintek in
17  additional business opportunities.  There were
18  other needs that came up.  It was like playing
19  Whac-A-Mole, right.  You didn't know day-to-day,
20  week-to-week, what our medical supply needs would
21  be.
22        So you know, it was gloves when we made
23  the glove purchase.  But, you know, there was a
24  run where people were having issues getting bent
25  metal, things like wheelchairs and walkers,

Page 38

1  crutches and canes, right.
2        We reached out to the suppliers that we
3  had been dealing with during COVID-19 and said,
4  can you source any of these.  So an opportunity
5  like that is something like Rock Fintek would have
6  missed out upon.  Because once we received the
7  counterfeit gloves, we did not reach out to them
8  to do any more additional business.
9     Q  Okay.  Was there any -- who was your --
10  your regular provider of gloves prior to the
11  pandemic?
12        MR. MATTHEWS:  Object to form; beyond the
13  scope of the deposition notice.
14        Subject to that, you may answer, if you
15  know.
16        THE WITNESS:  So prior to COVID-19, we
17  were utilizing Medline for the vast majority of
18  our nitrile exam gloves business.
19  BY MR. FRISCH:
20     Q  And have you returned to Medline at this
21  point in time?
22        MR. MATTHEWS:  Object to the form; beyond
23  the scope of the notice.
24        But subject to that, you may answer.
25        THE WITNESS:  I'd state that we never left

Page 39

1  Medline, that we continued to buy during COVID-19
2  and we continue today.
3  BY MR. FRISCH:
4     Q  Was there any effort -- was there ever a
5  time where somebody would have told Thomas Kato
6  that he would have the ability to bid for a
7  contract for gloves in the future?
8        MR. MATTHEWS:  Avi, can you repeat that?
9  I'm sorry, we're having a hard time listening --
10        MR. FRISCH:  Sorry.  Every time I sit
11  back, it's a little bit --
12        MR. MATTHEWS:  That's okay.
13        MR. FRISCH:  Sorry about that.
14  BY MR. FRISCH:
15     Q  Was there ever a time where Mr. Kato would
16  have told by somebody at The Resource Group to
17  your knowledge that he was able to bid on a
18  contract for gloves going forward?
19     A  So I talked about the short-term potential
20  business earlier.  The long-term potential
21  business was a conversation that Rock Fintek had
22  brought forward to The Resource Group.  Obviously,
23  they wanted to continue a business relationship,
24  potentially get into the medical supplies
25  business.

Page 40

1        I don't recall directly having those
2  conversations with Tommy Kato or -- or Brad, but I
3  can tell you that I know Todd Adams who was at the
4  time our chief operating officer and Dewayne Rader
5  who is our vice president for -- for supply chain,
6  both individuals had conversations with Tommy and
7  they -- and told me that they had conversations
8  with Tommy about that.
9        The conversations really were around the
10  fact of if they would -- they need to clear some
11  major hurdles to do that, we would have
12  discussions with them, just like we would other
13  suppliers.  But to get into that medical space,
14  supply space, Todd and Dwayne let Rock Fintek
15  know, one, you've got to go through all the FDA
16  approvals, right.  And that is no small hurdle.
17        And two, you're also dealing with -- when
18  you talk about gloves and PPE and masks, you're
19  talking about some ginormous companies and
20  organizations that they would have to get very
21  competitive on price.
22        So there were a couple of big hurdles
23  there, but if they were willing to clear those,
24  then we would certainly talk to them.  But they
25  would have to look at winning the business.  It