FEBRUARY 01, 2024                                             THOMAS KATO

```
                                            Page 1
              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
                        -oOo-
  KITCHEN WINNERS NY INC.,      )
                                )
          Plaintiff,            )
  v.                            ) Case No. :
                                ) 1:22-cv-05276-PAE
  ROCK FINTEK LLC,              )
                                )
          Defendant._____ )
  ROCK FINTEK LLC,              )
                                )
       Counterclaimant and      )
       Third-Party Plaintiff,   )
  v.                            )
                                )
  KITCHEN WINNERS NY INC.,      )
                                )
       Counter-Defendant,       )
                                )
  and                           )
                                )
  ADORAMA INC., HERSHEY WEINER, )
  JOSEPH MENDLOWITZ, JNS        )
  CAPITAL HOLDINGS LLC and      )
  JOEL STERN,                   )
                                )
       Third-Party Defendants.__)
                    DEPOSITION OF
         NON-RETAINED EXPERT WITNESS ON BEHALF OF
                    ROCK FINTEK LLC
                      THOMAS KATO
                   FEBRUARY 1, 2024


  STENOGRAPHICALLY REPORTED REMOTELY BY:
  MONIQUE K. GENTRY, RPR, CSR No. 12354

  Job No. 1994
```

```
                                            Page 2
 1           UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      -oOo-
    KITCHEN WINNERS NY INC.,      )
 4                                )
            Plaintiff,            )
 5  v.                            ) Case No. :
                                  ) 1:22-cv-05276-PAE
 6  ROCK FINTEK LLC,              )
                                  )
 7          Defendant._____ )
    ROCK FINTEK LLC,              )
 8                                )
         Counterclaimant and      )
 9       Third-Party Plaintiff,   )
    v.                            )
10                                )
    KITCHEN WINNERS NY INC.,      )
11                                )
         Counter-Defendant,       )
12                                )
    and                           )
13                                )
    ADORAMA INC., HERSHEY WEINER, )
14  JOSEPH MENDLOWITZ, JNS        )
    CAPITAL HOLDINGS LLC and      )
15  JOEL STERN,                   )
                                  )
16       Third-Party Defendants.__)
17
18      Zoom videoconference deposition of THOMAS KATO,
19  Non-Retained Expert Witness on behalf of Rock Fintek LLC,
20  commencing at 1:28 p.m., Eastern, Thursday, February 1, 2024,
21  before  Monique Kathleen Gentry, Registered Professional
22  Reporter, California Certified Shorthand Reporter No. 12354
23  and Notary.
24
25
```

```
                                            Page 3
 1            A P P E A R A N C E S:
 2        (All appearances remotely via
                 videoconference):
 3
 4  ATTORNEY FOR ROCK FINTEK LLC:
 5       PHILLIP RAKHUNOV, ESQ.
         Pollack Solomon Duffy LLP
 6       43 West 43rd Street, Suite 174
         New York, New York 10036
 7       (617)960-3118
         prakhunov@psdfirm.com
 8
 9  ATTORNEY FOR KITCHEN WINNERS NY, ADORAMA, INC., AND
    JOSEPH MENDLOWITZ:
10
         ALEXANDER J. SPERBER, ESQ.
11       Lipsius-Benhaim Law, LLP
         80-02 Kew Gardens Road, Suite 1030
12       Kew Gardens, New York 11415
         (212)981-8449
13       asperber@lipsiuslaw.com
14
15  ATTORNEY FOR JNS CAPITAL HOLDINGS LLC AND JOEL STERN:
16       AVRAM E. FRISCH, ESQ.
         Avram E. Frisch LLC
17       1372 Milford Terrace
         Teaneck, New Jersey 07666
18       (201)289-5352
         frischa@avifrischlaw.com
19
20
21     Also Present:  Jamie Jordan, Notary
                      Hershey Weiner
22                    Brad Gilling
23
24
25
```

```
                                            Page 4
 1                 I N D E X
 2  WITNESS: THOMAS KATO
 3  EXAMINATION                                  PAGE
 4  BY ATTORNEY SPERBER                             5
    BY ATTORNEY FRISCH                             52
 5
 6
                      E X H I B I T S
 7
    NUMBER              DESCRIPTION              PAGE
 8
 9  Kato Expert 1    Rock Fintek Expert Disclosure    9
10  Kato Expert 2    Michael Elstro deposition
                     transcript taken November 13, 2023   21
```

*Intrepid Deposition | 858.284.4140*
*11622 El Camino Real, Suite 100, San Diego, California 92130, United States*

FEBRUARY 01, 2024                                    THOMAS KATO                                    Pages 9..12

Page 9

1  Australia?
2     A   I don't -- I don't believe we did, and I don't think
3  anybody asked me about it during my deposition, about the lost
4  business or other relationships.
5     ATTORNEY SPERBER: Okay. I'm going to show you a
6  document. We will mark this -- let me see. Off the record
7  for just a minute until I figure out how to share a document
8  with you.
9  BY ATTORNEY SPERBER:
10    Q   Mr. Kato, can you see a document in front of you
11 titled Rock Fintek LLC's Expert Witness Disclosure?
12    A   Yes, I do.
13    ATTORNEY SPERBER: Okay. And just for the record, I've
14 marked this exhibit as Exhibit Kato Expert 1.
15       (Exhibit Kato Expert 1 was marked for
16        identification.)
17 BY ATTORNEY SPERBER:
18    Q   Are you familiar with this document?
19    A   Hold on. I've got to zoom it a little bit more.
20 Yes.
21    Q   Does this document reflect -- at least in the
22 section titled Non-retained Expert, does that reflect the
23 testimony or the scope of testimony that you will be
24 presenting as an expert in this matter?
25    A   Yes.

Page 10

1     ATTORNEY RAKHUNOV: And, Counsel, I apologize for
2  interrupting, but just since you raised it, I do just want to
3  put on the record that there have been documents produced in
4  this case concerning the Australian affiliate of Ascension
5  Health, and I would just refer to Bates No. RF003489. It's
6  one example that I could pull up quickly just so there's no
7  confusion.
8     ATTORNEY SPERBER: Okay.
9  BY ATTORNEY SPERBER:
10    Q   If you look at the paragraph that begins, "Mr. Kato
11 is expected to testify," do you see where I'm referring to?
12    A   Yes, I do.
13    Q   So the second sentence there, "Mr. Kato expects to
14 testify that Rock Fintek would have earned but has lost at
15 least approximately $36 million per year in profits for at
16 least three years that it had been earning from its
17 relationship with Ascension and had reasonably expected to
18 continue earning for the foreseeable future."
19    Is that a correct statement of your expert opinion in
20 this matter?
21    A   Yes.
22    Q   Can you explain to me how you reached the number of
23 $36 million in profits per year for three years?
24    A   Based on what I had previously done with them, the
25 amount of revenue we did and the amount of business that we

Page 11

1  were contracting to do with them going forward.
2     Q   When you say the amount of revenue you had done, can
3  you be more specific?
4     A   Yeah. I think it's down here in -- further down.
5  We did $32 million in sales previously with them, and then
6  another $37 million, so $70 million. And on top of that, we
7  were making a COVID test to give them, and we were talking
8  about other products along with bidding on a glove contract
9  that would be three years.
10    Q   So I think you're referring to a line here where it
11 says that, "Mr. Kato expects to further base his opinion on
12 the fact that between March 2020 and February 2021, Rock
13 Fintek sold to Ascension Health various personal protection
14 equipment including gloves, gowns and masks in the amount of
15 approximately $32 million as unrelated to any of the Medcare
16 glove transactions at issue in this lawsuit."
17    Is that what you are referring to?
18    A   Correct.
19    Q   Okay. Now, just to begin with, the $32 million that
20 you refer to there, is that revenue or profits?
21    A   Revenue.
22    Q   So I assume Rock Fintek had expenses as well,
23 correct?
24    A   Minimal expenses.
25    Q   Okay. So you're saying that you had $32 million in

Page 12

1  profits as well?
2     A   No. No.
3     Q   So what -- over that time period, what were Rock
4  Fintek's profits?
5     A   I looked at the financials. I don't recall exactly
6  what those profits were.
7     Q   Okay.
8     A   I would have to look at them again.
9     Q   Now, that $32 million, does that include
10 approximately $9.25 million given by Ascension Health as a
11 down payment in connection with the purchase order at issue in
12 this lawsuit?
13    A   No. I don't believe so.
14    Q   It does not. Okay. Well, it says over here that
15 between March 2020 and February 2021 -- that's the timeframe
16 you're referring to, right?
17    A   Let me see what you're talking -- March 20th to
18 February Mr. Kato --
19    ATTORNEY RAKHUNOV: It goes over from page 2 to page 3 of
20 the document.
21    THE WITNESS: Yeah.
22    ATTORNEY RAKHUNOV: It's hard to --
23    THE WITNESS: Yeah. I see it.
24 BY ATTORNEY SPERBER:
25    Q   Now, did you reach this $32 million number by adding

Page 13

1  up all the payments from Ascension Health?
2      A   I believe when we went -- when I went through the
3  numbers and added them up, I added everything up and excluded
4  the amount of funds that Ascension Health paid me for their
5  gloves.  It may or may not have included that part of it.
6      Q   So is it your testimony that if I were to go back
7  through Rock Fintek's bank statements, it did not include the
8  $9.25 million down payment provided by Ascension Health on
9  December 8th, I would still reach $32 million in revenue that
10 Rock Fintek received from Ascension Health in that timeframe?
11 Is that your testimony?
12     A   You may or may not.  If it's in the bank statements,
13 then it happened.  If it's not, then it did not.
14     Q   Well, I want to understand.  You --
15     A   I believe maybe it's included, but I'm not for
16 certain, and I don't want to say I'm for certain on it.
17     Q   Well, you are here testifying as an expert
18 concerning Rock Fintek's lost profits, correct?
19     A   That's four years ago you're talking about.
20 Numbers, I looked at, but four years ago of lost profits.
21     Q   Okay.
22     A   The total amount -- total revenue is -- you have it
23 at $32 million plus the $37 million, so --
24     Q   So you're saying $37 million is on top of this;
25 meaning that the $9.25 million is not included in the

Page 14

1  $32 million?  Is that your testimony?
2      A   It might be included.
3          THE WITNESS:  Phillip, is it included or not?
4          ATTORNEY RAKHUNOV:  Well, I would -- I'm not here to
5  testify, but I would just say I'm not sure why folks aren't
6  just looking at the document that's on the screen because --
7          ATTORNEY SPERBER:  Look.  I'm here to ask Mr. Kato.  He
8  is testifying as an expert in Rock Fintek's lost business.  I
9  want to understand the nature of his opinion here.
10         THE WITNESS:  Okay.  I will just read the document.
11 "Mr. Kato expects to further base his opinion on the fact that
12 between March '20 and February '21, Rock Fintek sold to
13 Ascension various personal protection equipment and clothes,
14 gowns, masks, in the amount of $32 million that is unrelated
15 to any Medcare glove transactions at issues in the lawsuit."
16     So, yes.  It was included.
17 BY ATTORNEY SPERBER:
18     Q   What's included?
19     A   The $9 million deposit.
20     Q   It says that this $32 dollars includes gloves that
21 were not part of the Medcare glove transaction, right?  It
22 says unrelated to any of the Medcare glove transaction at
23 issue in this lawsuit.
24     A   Correct.
25     Q   What other gloves did Rock Fintek sell to Ascension

Page 15

1  Health?
2      A   We sold several other products, Intco -- Medgluv,
3  Intco, Lyfemed.  There might have been two other ones.  I have
4  to remember the names of the companies.
5      Q   So, again, I'm trying to understand your opinion
6  that Rock Fintek would have made $36 million per year in
7  profits for at least three years.
8      Now, you say that in -- between March 2020 and
9  February 2021, Rock Fintek had revenue of $32 million, and
10 you're not sure of the exact amount of the profits that Rock
11 Fintek had, so how are you projecting from that revenue to
12 profits in subsequent years?
13     A   How did I project that revenue into profit?  Based
14 on the relationship and the communication we had with
15 Ascension and based on their deposition and their testimony
16 saying very likely they would still be working with us as of
17 today even, then I believe we would be doing the same amount
18 of sales if not more.  And the profit from just the testing
19 kits alone was -- we were making them around $1.50, $1.20, and
20 they were going to be retailed around $5 or $6.  We also were
21 selling them other masks, other gowns, other products.
22     Q   So, let me -- let's go -- okay.  Let's focus on that
23 aspect of things.  So am I correct that Ascension testified
24 they were not interested in purchasing additional gloves from
25 Rock Fintek even before they realized there were issues with

Page 16

1  the gloves that had already been provided?
2          ATTORNEY RAKHUNOV:  Objection.  Form.  It
3  mischaracterizes testimony.
4  BY ATTORNEY SPERBER:
5      Q   You can answer.
6      A   I'm still on the payment side of your question
7  before you rolled -- I didn't answer that question about the
8  payments and how I was going to come up with the profit.
9      Q   Well, okay.  Was there a formula you used to reach
10 that number of $36 million per year in profits?
11     A   Yeah.  I came up with the total revenue I brought
12 into them was around approximately $62 million.  Payments to
13 my suppliers were approximately $19.4 million.  Payments for
14 my logistics was approximately $6 million, and my profit was
15 approximately $36 million.
16     Q   Let's -- I want to break this up.
17     A   Okay.
18     Q   So you previously testified that Rock Fintek lost
19 money on the $37 million purchase order for gloves at issue in
20 this lawsuit.
21     A   Correct.
22     Q   So any profits that Rock Fintek made were prior to
23 that, correct?
24     A   Correct.
25     Q   So what -- if Rock Fintek had continued doing

FEBRUARY 01, 2024                    THOMAS KATO                        Pages 17..20

Page 17
1  business with Ascension, after the 200 million purchase order
2  had been fulfilled --
3     A   Yeah.
4     Q   -- what specific products would it have been selling
5  to Ascension?
6     A   We would have been selling -- hopefully, in my
7  opinion, testing kits.  We would have been selling them more
8  gloves.  We would have been selling them more masks, gowns.
9  They talked about butterfly straps.  They talked about other
10 products that they also needed, IV bags, the lines for the IV
11 bags; you know, the -- just whatever came up that they were
12 having a hard time with.
13    Q   How do you know --
14    A   They sent us a whole list, "These are all the items
15 that we could use."  And we are not glove experts, but we are
16 experts in procuring items that are difficult to get.
17    Q   How do you know how many of these items Ascension
18 would have purchased from Rock Fintek?
19    A   I believe Ascension had told us on the glove side,
20 it was about a billion gloves a year they were purchasing, and
21 they have a three-year contract which was going to come up for
22 RFP, and we could bid on it obviously if everything went well.
23 And we talked to them about the testing kits, and they told us
24 in an e-mail that, "We'll take X amount of these testing kits
25 if they are FDA approved and done."

Page 18
1  So we hired FDA attorneys.  We started making the testing
2  kits to be able to sell them which were much higher margins
3  than we were making on anything else.  Any product on their
4  list, we could get they would buy.  They gave us a whole list.
5     Q   You're sitting here testifying -- again, you put a
6  number on this.  You said, "At least $36 million per year in
7  profits."
8     So, first, do you acknowledge that would be far more
9  profits than, you know, on an annual basis than Rock Fintek
10 had made from Ascension in prior years?
11    A   No.
12    Q   You don't agree with that?
13    A   No.
14    Q   What were the profits that Rock Fintek made from
15 Ascension between March 2020 and February 2021?
16    A   In February 2021?
17    Q   Yeah.
18    A   We made approximately -- like I said, we brought in
19 approximately $62 million.  Made payments to suppliers at
20 $14.5 million approximately, and paid logistics approximately
21 $6.1 million, and then we went ahead and deducted that and
22 came out $36 million in profit.
23    Q   Up to February 2021?
24    A   Correct.  I don't know if it's up -- it might be
25 after February 2021.  I'm not sure of the exact date it ended.

Page 19
1  It's right there.  It says, "Approximately $32 million from
2  Medcare."
3     Q   We are talking about revenue, correct?
4     A   What's that?
5     Q   You said the $32 million is unrelated to Medcare,
6  right?
7     A   Only $32 million -- yeah.  It's unrelated.
8     Q   And that's revenue?
9     A   Correct.
10    Q   How was Rock Fintek's profit higher than that
11 revenue?
12    A   Probably maybe the referrals that they gave us and
13 some of the other business.
14    Q   So you're not talking specifically about business
15 with Ascension?
16    A   I'm talking about when everything collapsed with
17 Ascension, we lost all of our cashflow to continue to do
18 business and provide anything to anybody else because we were
19 trying to fix the damage for about a year and a half with
20 Ascension.  Essentially, it put Rock Fintek out of business
21 trying just to damage control the relationship with Ascension.
22    Q   Didn't we establish at the very beginning of this
23 deposition that your testimony was concerning the value of
24 Rock Fintek's lost business with Ascension?
25    A   My lost business with Ascension is related to lost

Page 20
1  business to other people I was doing business with.  If
2  Ascension had been successful and I had the correct gloves,
3  all the other business would have kept going with the other
4  clients.
5     Q   So specifically with Ascension, just Ascension, what
6  was the profits that Rock Fintek made between March 2020 and
7  the time it entered into --
8     A   The entire time --
9        (Simultaneous colloquy.)
10    THE WITNESS:  The entire time -- the entire profit was
11 $36 million.  I don't know up to February.  The entire time
12 was $36 million.  That's your answer.  You're going to ask it
13 10 more times, I'm going to give you the same answer the same
14 way.  It's $36 million.
15 BY ATTORNEY SPERBER:
16    Q   You did testify that you lost money on the PO for
17 the 200 million gloves, correct?
18    A   I did what?
19    Q   You lost money -- Rock Fintek lost money on the
20 purchase order for 200 million gloves, correct?
21    A   Correct.
22    Q   So clearly there was no profit on that aspect of
23 Rock Fintek's business, correct?
24    A   Correct, loss.  We had about 40 percent of our
25 margin including about 40 percent of the truck and supply

FEBRUARY 01, 2024          THOMAS KATO          Pages 21..24

Page 21
1  costs.
2  Q   So any profits Rock Fintek made were prior to that,
3  correct?
4  A   Yeah, and legal -- yeah.
5  Q   And am I correct that Rock Fintek had approximately
6  $20 -- $24 million in revenue with Ascension prior to that
7  purchase order at issue in this --
8  A   $24 million --
9      ATTORNEY RAKHUNOV:  So I don't know if that was just me.
10 I just didn't hear the last two words you said, Alex.
11     BY ATTORNEY SPERBER:
12 Q   Am I correct that Rock Fintek had approximately
13 $24 million in revenue with Ascension prior to the purchase
14 order at issue in this lawsuit?
15 A   "$24 million"?  We had $32 million unrelated.
16     ATTORNEY SPERBER:  Okay.  Let me show you -- I will mark
17 this as Kato Expert 2.
18     (Exhibit Kato Expert 2 was marked for
19     identification.)
20     BY ATTORNEY SPERBER:
21 Q   Do you see in front of you a deposition transcript
22 of Michael Elstro, dated November 13, 2023?
23 A   Yes.
24 Q   You testified earlier that you reviewed this
25 testimony -- this deposition transcript prior to today's

Page 22
1  deposition, correct?
2  A   Correct.
3  Q   Turn to page 13 of Mr. Elstro's deposition
4  transcript.  Page 13, line 10, I will read you the testimony
5  I'm looking at here.  This is a question by Mr. Frisch.
6  "Q  Prior to the -- the purchase order for the gloves in
7  question here, how much business had you had done with Rock
8  Fintek?
9  "A  During the term of our engagement with Rock Fintek,
10 we ordered and received close to $24 million in other medical
11 products, the 3-ply masks, KN-95 and isolation gowns."
12     Do you see where I am over there?
13 A   Yes, I do.
14 Q   So am I correct in understanding that prior to the
15 purchase order for 200 million gloves at issue in this
16 lawsuit, Rock Fintek had only actually done $24 million in
17 revenue from Ascension?
18 A   No.
19 Q   "No"?
20 A   No.  Mr. Elstro is not an expert in accounting at
21 Ascension.  He doesn't work in accounting.  Sonya does, and
22 Sonya knows exactly the amounts that came in and out, not
23 Mr. Elstro.
24     The accounting department would.  So, Mr. Elstro is not
25 in accounting.  I don't know what numbers he has or doesn't

Page 23
1  have, but he's not the accounting department at Ascension, so
2  this --
3  Q   So are you telling me that if I were to go through
4  Rock Fintek's bank statements and add up the payments it
5  received prior to entering into the purchase order in this
6  lawsuit, I would find an excess of $24 million in revenue from
7  Ascension?
8  A   That's what I believe.
9  Q   I can tell you I've done that, and I did not find an
10 excess of $24 million in revenue from Ascension.
11     ATTORNEY RAKHUNOV:  Objection.
12     BY ATTORNEY SPERBER:
13 Q   You are testifying today as an expert in Rock
14 Fintek's business, correct?
15 A   Yes, I am.
16 Q   And you claim to have reviewed Rock Fintek's
17 finances and business records in preparing your expert
18 opinion?
19 A   Yes, I did.
20 Q   So how is it that you don't know how much revenue
21 Rock Fintek was bringing in relation to its business with
22 Ascension?
23 A   I reviewed hundreds of pages of documents.  So if
24 you want to refer to a document, then I can tell you what it
25 says.  I don't have a photographic memory.  I'm not claiming

Page 24
1  to have a photographic memory either.  So show me the
2  document, I can tell you.  I reviewed them.  Yes.  Expert in
3  Rock Fintek's business, Rock Fintek had to stop all other work
4  with all other clients and not give any attention to anybody
5  else to focus on mitigating the damages that was caused by
6  Ascension by giving them the wrong products, fake products.
7  That's where all -- the whole business collapsed.
8  Q   Well, when you're projecting $36 million per year in
9  profits for three years from Rock Fintek's business with
10 Ascension, which products would those profits have arisen
11 from?
12     ATTORNEY RAKHUNOV:  Objection.  Asked and answered.
13     You can answer.
14     THE WITNESS:  Okay.  So gloves, masks, gowns, testing
15 kits we were working on, and the business we were doing in
16 Australia with the hospital, their sister hospital there and
17 UA Health.
18     BY ATTORNEY SPERBER:
19 Q   You're aware, correct, that Rock Fintek{sic}
20 testified that as of June 2021 it had no need for additional
21 gloves from Rock Fintek in the short term?
22     ATTORNEY RAKHUNOV:  Objection.
23     THE WITNESS:  They had no need for additional gloves
24 because the gloves we gave them were fake, and they wanted to
25 return them.  That's why.

FEBRUARY 01, 2024　　　　　　　　　　THOMAS KATO　　　　　　　　　　Pages 33..36

Page 33

1  the test kits.  They were happy to see them if they were FDA
2  approved.  We found other test kits that were also already FDA
3  approved that we could have just sold and resold at very large
4  margins -- probably 80 percent profit margins because we were
5  going to buy them for similar costs.  We had -- we would have
6  had even similar margins.  We just wanted to make our own to
7  control it, so that part of the business was going to happen.
8      Q    Is it your testimony there is no documentation
9  concerning COVID-19 test kits?
10     A    Of course there's documentation.  We have lawyers --
11          (Simultaneous colloquy.)
12          (Reporter clarification.)
13 BY ATTORNEY SPERBER:
14     Q    Since it was not produced, it's my understanding
15 that's not part of Rock Fintek's damages.  So my question for
16 you then is --
17     ATTORNEY RAKHUNOV:  Objection to the comments.
18     You don't have to respond to counsel's comments.  Just
19 wait for a question.
20 BY ATTORNEY SPERBER:
21     Q    What percent of the $36 million per year in
22 projected profits for three years was made up of these
23 COVID-19 test kit sales?
24     A    Going forward?
25     Q    For the three years that you -- for which you're

Page 34

1  claiming lost profits?
2      A    The COVID test kits, they were in the hundreds or
3  thousands or millions, so --
4      Q    Of kits?
5      A    As of the number we gave you now, we were just
6  talking about existing product that we have already sold to
7  them.  That would have been on top of that number, the test
8  kits.
9      Q    I'm sorry.  I did not understand your answer.  Could
10 you explain?
11     A    The test kits' profitability is not in the numbers
12 that we gave you -- that I gave you.  It's on top of it.
13     Q    Okay.  So in the numbers that you gave me which
14 specific products were -- was Rock Fintek projected to be
15 selling to Ascension over the next three years?
16     A    Gowns, masks, gloves.
17     Q    Okay.  We've already been over the glove issue.  Do
18 you know that Rock Fintek -- that Ascension needed additional
19 gowns from -- that was willing to purchase from Ascension{sic}
20 over the next three years?
21     A    Say that one more time.
22     Q    Do you know or is there any evidence that would
23 support your assertion that Rock Fintek could have sold
24 additional gowns to Ascension in the next three years?
25     A    I'm sure they would have bought it, but our primary

Page 35

1  focus was not the gowns or the masks.  It was the gloves.
2  That's our primary focus in the growth.  That profit that I'm
3  talking about is coming from gloves.  That is not coming from
4  anything else.
5      Q    So the $36 million a year in profits, that's solely
6  based upon a projection of glove sales to Ascension?
7      A    I sold them three products.  I'm saying the lion's
8  share of the projection is coming from gloves.  And then on
9  top of it, which is not in that number, would have been the
10 test kits and not -- what else is not in it is the business
11 that we lost in Australia selling them masks.
12          We sold them KN-95s, 3-ply mask, gowns and gloves.  That
13 was it.  The test kits was a future product that we were
14 looking to do that's outside of these numbers.
15     Q    And, again, can you walk me through the formula for
16 your projected future profits based upon glove sales from
17 Ascension?  Let's start at the beginning.  How many gloves did
18 Rock Fintek expect to sell to Ascension in the second half of
19 2021?
20     ATTORNEY RAKHUNOV:  Objection.
21     THE WITNESS:  "Second half of 2021"?  I believe minimum
22 200 million, same order.
23 BY ATTORNEY SPERBER:
24     Q    What's that based upon?
25     A    If we delivered gloves, the masks -- the gloves

Page 36

1  satisfactory, they were interested in continuing with us.  As
2  their supply ran down, they would want more.
3      Q    Okay.  And how about -- how many gloves was Rock
4  Fintek projecting to sell to Ascension in 2022?
5      A    In 2022, we would have had the opportunity to sell
6  1 billion.
7      Q    I'm sorry?
8      A    One billion gloves.
9      Q    One billion with a "B"?
10     A    Yeah, with a "B."  200 million, so it's -- we
11 already supplied one-fifth of that.
12     Q    Okay.  And how many gloves was Rock Fintek
13 projecting to sell to Ascension in 2022?
14     A    One billion.
15     Q    And same question for 2024?
16     A    Yes.
17     Q    How many gloves --
18     A    And if you wanted to give a conservative estimate
19 that's how I gave the calculation of the profitability, then
20 it would be only 200 million a year -- each year.
21     Q    Okay.
22     A    The same amount that I already did.  Optimistically,
23 we would have done a billion.  Conservatively, we would have
24 reached our 200 million.
25     Q    Okay.  That is based upon your expectation that you

FEBRUARY 01, 2024　　　　　　　　　　THOMAS KATO　　　　　　　　　　Pages 37..40

Page 37

1  would have won a bid for the contracts with Ascension; is that
2  correct?
3  　A　 The billion would have been a bid.  The 200 million
4  would have just been another order like we placed already;
5  that we have proven ourselves, that we delivered when other
6  people couldn't deliver.  We delivered on time, and we
7  delivered quality products.  So the 200 million would not have
8  been a bid that we would have had to win.  The billion would
9  have been a bid that we had to win.
10 　Q　 And you're making this projection for the
11 200 million in the second half of 2021 even though Mr. Elstro
12 testified that Ascension was not interested in purchasing
13 additional gloves at that time?
14 　A　 I don't think Ascension was interested in doing
15 anything with Rock Fintek come June/July of 2021 after what
16 happened.  We became a very sour note in their minds so they
17 were not interested in really doing anything with us.
18 　Q　 Okay.  And, then again, in 2022, this is the
19 1 billion gloves that based upon this bid that you were hoping
20 to win, and same thing for 2023?
21 　A　 So we would have got the 200 million gloves.  We
22 would presume we would match the same amount that we did the
23 previous year at 200 million, and with the hope to get the
24 1 billion glove order on top of it.
25 　Q　 Now, again, just to understand your profit

Page 38

1  projections -- so the 200 million gloves Rock Fintek delivered
2  up until June of 2021, Rock Fintek lost money, correct?
3  　A　 Repeat that.
4  　Q　 On the 200 million gloves that Rock Fintek delivered
5  pursuant to the purchase order at issue in this lawsuit, Rock
6  Fintek lost money.  You said that earlier, correct?
7  　A　 Yes, correct.
8  　Q　 So we would project further losses for the second
9  half of 2021?
10 　ATTORNEY RAKHUNOV:  Objection.
11 　THE WITNESS:  No, I would not have.  Because if I didn't
12 have fraudulent gloves, I would have been extremely
13 profitable.
14 BY ATTORNEY SPERBER:
15 　Q　 Can you explain that?
16 　A　 We have would have made -- the profit that I wrote
17 in the letter is how much profit we would have made each year
18 for the next three years if we had not received fraudulent
19 gloves.  This was catastrophic.  You've got to understand that
20 you couldn't get gloves.  They were struggling with supply
21 with normal channel chains, and we earned the opportunity to
22 deliver to them.
23 　Q　 So how much money would Rock Fintek have made in
24 profits on the 200 million gloves for the second half of 2021?
25 　A　 The second have of 2021 how much profit?  Similar to

Page 39

1  what we would have made in 2020.
2  　Q　 I'm sorry?  How much?
3  　A　 Similar number at the 40 percent margin.
4  　Q　 What are you referring to?  I'm sorry?
5  　A　 If you go back to that page where it told you how
6  much profit that we lost --
7  　Q　 You're talking about the Kato Expert Exhibit 1?
8  　A　 I don't see it yet.
9  　Q　 Hold on.
10 　ATTORNEY RAKHUNOV:  The first document we looked at?
11 　ATTORNEY SPERBER:  Yes.
12 　THE WITNESS:  Okay.  So minus some of the losses that we
13 got with Skymed with the original order.
14 BY ATTORNEY SPERBER:
15 　Q　 For the record now, I'm showing you what was
16 previously marked as Kato Expert 1.
17 　A　 Yes.  So, let me scroll -- there you go,
18 "$36 million."  So some of the losses came from us sending the
19 deposit -- large amount of money to Skymed so that was part of
20 the loss.
21 　Q　 So, again, what -- give me a dollar amount.  How
22 much money in profits would Rock Fintek have made in the
23 second half of 2021?
24 　ATTORNEY RAKHUNOV:  Objection to form.  I don't know what
25 that means.

Page 40

1  THE WITNESS:  We would have made -- let me see --
2  $36 million is what we calculated.  Well, I gotta zoom this
3  the right way.
4  　ATTORNEY RAKHUNOV:  Don't think out loud, Thomas, because
5  then the court reporter has to take that down.
6  　THE WITNESS:  Sorry about that.
7  There you go, "Mr. Kato expects Rock Fintek would have
8  lost at least approximately $36 million per year in profits
9  for at least three years."
10 BY ATTORNEY SPERBER:
11 　Q　 So how did Rock Fintek expect to generate
12 $36 million in profits selling those 200 million gloves if
13 that's what you are testifying to?
14 　A　 We also sold them masks.  We also sold them other
15 products.
16 　Q　 Right, but I'm asking specifically about the gloves.
17 　A　 From our good name and ability to deliver, they were
18 willing to pay a premium to us because of our good name and
19 past history with them.
20 　Q　 Well, for the 200 million gloves at issue, you know,
21 in this lawsuit, Rock Fintek was paid by Ascension
22 approximately $37 million, correct?
23 　A　 Yes.
24 　Q　 So would it have been paid a similar amount for the
25 next 200 million gloves?  Is that what you're testifying to?

FEBRUARY 01, 2024     THOMAS KATO     Pages 41..44

Page 41
1  A  In 2020?
2  Q  2021.
3  A  In 2021, everything was already done.  Dead.
4  Q  Oh, so -- Rock Fintek was not --
5  A  After we got the fake gloves, everything died in
6  2021.  The whole relationship died, so -- any profits were
7  dead.  Relationship was dead.
8  Q  You're claiming lost profits here, right?
9  A  I'm claiming if I had sold gloves that weren't
10 fraudulent and I had not lost anything, then yes.
11 Q  So my question is:  How much money would Rock Fintek
12 have made in the second half of 2021 had it not sold to
13 Ascension what you're claiming were fraudulent gloves?
14 A  How much it would have made total?
15 Q  Yes.
16 A  With Ascension?  The contract, at least $36 million.
17 Q  In revenue or profits?
18 A  Profits.
19 Q  Where is that number coming from?
20 A  I explained that to you already.
21 Q  But I -- I can't --
22 A  $62 million in payments, $19 million in suppliers,
23 $6 million in trucking/logistics.  Profit left is $36 million.
24 Q  So you're saying for the second -- so in business
25 year 2021, Rock Fintek would have made an additional

Page 42
1  $36 million in profits had --
2  A  Starting in --
3     (Simultaneous colloquy.)
4  ATTORNEY RAKHUNOV:  Thomas, let him finish because
5  otherwise --
6  THE WITNESS:  Okay.
7  ATTORNEY RAKHUNOV:  -- it's just going to be a mess.
8  BY ATTORNEY SPERBER:
9  Q  Sorry.  Go ahead.
10 A  Starting in 2022?
11 Q  No.  No.  Again --
12 A  I'm saying starting in 2022.
13 Q  Okay.  So your testimony is that Rock Fintek made
14 all the money it was going to make from Ascension in 2021?
15 A  Yes.
16 Q  Okay.  Fine.  So there is no lost business profits
17 for 2021?
18 A  We lost masks and other products, not gloves.
19 Q  Okay.  How much money would you have made on those
20 masks and other products?
21 A  Approximately on the masks and other products, I
22 believe close to $10 million.
23 Q  You say you believe that.  Do you have any
24 documentation to support that assertion?
25 A  Yes.

Page 43
1  Q  Which specific documentation?
2  A  We have gloves, masks that we were procuring from
3  the price we were buying, price they're willing to sell them,
4  we were going to continue selling them products that we had in
5  the past.
6  Q  Do you have any evidence that Ascension was willing
7  to purchase those products from you in 2021?
8  A  Yeah.  Banks records from the past history.
9  Q  That was prior purchases.  I'm talking about future
10 purchases.
11 A  Well, they wanted to keep working with us.  Every
12 time they ordered, they ordered the same product with us over
13 and over again.  It wasn't a one time order of masks or gowns.
14 It was multiple times.
15 Q  Again, do you have any purchase orders that --
16 A  Yes.
17 Q  -- that --
18 A  Yes.
19    (Simultaneous colloquy.)
20 ATTORNEY RAKHUNOV:  One at a time.
21 THE WITNESS:  Yes, I do.  They bought it in 2021.  They
22 bought masks in 2021.  It's in the bank records.
23 BY ATTORNEY SPERBER:
24 Q  Again, were there any purchase orders that Rock
25 Fintek withdrew because of the dispute you had in June 2021?

Page 44
1  A  Say that again.
2  Q  Were there any existing purchase orders for gloves
3  or anything else that Rock Fintek withdrew?
4  A  No.
5  Q  "No"?
6  A  No.  We did not make purchase orders in advance with
7  them.  We would talk to them on a daily or weekly basis.  And
8  whatever would be short that week or throughout that week,
9  they would tell us, "We need this product," or "Here's a list
10 of products we need the next few days, the next week, the next
11 two weeks."  It varied from when they needed them.
12    And Adorama torched our relationship with Ascension.
13 After that, they didn't want to talk to us about any other
14 products again even though we had the same products we sold to
15 them multiple times previous.  And none of the previous orders
16 were purchase orders.  The purchase order was made on the day
17 of the order.  It wasn't in advance, "Let me give this to you
18 in two months' notice."  It was like, "We need this now."  I
19 said, "Okay." Specific products and specific times.  They send
20 us a list of products.  Those lists stopped coming to us, and
21 they didn't want to give us any list and didn't want to
22 procure any other items from us.
23 Q  Okay.  But, again, this is all about your opinion
24 testimony as an expert concerning lost profits.  That's what
25 I'm trying to get my arms around here.