OCCLKitC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   KITCHEN WINNERS NY INC.,
3
           Plaintiff,
4
           v.                            22 Civ. 5276 (PAE)
5
   ROCK FINTEK LLC,
6
           Defendant.                    Conference
7  ------------------------------x
   ROCK FINTEK LLC,                      New York, N.Y.
8                                        December 12, 2024
           Counterclaim and             3:00 p.m.
9          Third-Party Plaintiff,
10         v.
11 KITCHEN WINNERS NY INC.,
12         Counterclaim Defendant,
13         and
14 ADORAMA INC., HERSHEY WEINER,
   JOSEPH MENDLOWITZ, JNS CAPITAL
15 HOLDINGS LLC and JOEL STERN,
16         Third-Party Defendants.
17 ------------------------------x
   Before:
18                 HON. PAUL A. ENGELMAYER,
19                                         District Judge
20                      APPEARANCES
21 LIPSIUS-BENHAIM LAW, LLP
        Attorneys for Plaintiff/Counterdefendants
22 BY:  ALEXANDER SPERBER
        YISROEL STEINBERG
23
   POLLACK SOLOMON DUFFY LLP
24      Attorneys for Defendant/Third-Party Plaintiff
   BY:  PHILLIP RAKHUNOV
25      JOHN YOKOW

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OCCLKitC

1          (Case called)

2          MR. SPERBER:  Good afternoon, your Honor.  Alexander

3     Sperber and Yisroel Steinberg of the law firm of

4     Lipsius-BenHaim Law on behalf of plaintiff Kitchen Winners

5     New York, Inc., as well as third-party defendant Adorama Inc.

6          THE COURT:  Very good.  Good afternoon, Mr. Sperber.

7     Good afternoon, Mr. Steinberg.

8          Mr. Sperber, will you be taking the lead today?

9          MR. SPERBER:  Yes, your Honor.

10          THE COURT:  Very good.  Be seated.

11          MR. RAKHUNOV:  Good afternoon, your Honor.  Phillip

12     Rakhunov of Pollack Solomon Duffy LLP.  I am here with my

13     colleague, John Yokow.  We are here for Rock Fintek, defendant,

14     counterclaim and third-party plaintiff.

15          THE COURT:  All right.  Very good.  Good afternoon,

16     Mr. Rakhunov.

17          Good afternoon, Mr. Yokow.  Like Ono?

18          MR. YOKOW:  Like Ono.

19          THE COURT:  Very good.  Be seated.

20          First of all, it's nice to see each other in person.

21     The case has been with us for awhile, but given the

22     post-pandemic appetite everyone has had for remote conferences

23     and stuff, have we met in person?

24          MR. RAKHUNOV:  Once, your Honor, at the presummary

25     judgment hearing.

OCCLKitC

1          THE COURT:  Of course.  That's right.  All right.

2    Very good.  Nice to see you all.

3          So let me give you a sense of what I propose to

4    accomplish today.  It should be a lot.

5          First of all, thank you for the briefing on the

6    motions in limine.  I have a bench ruling that should resolve

7    all of them, subject, in a few instances, to allowing limited

8    follow-on briefing within some parameters I have set.  But

9    basically, the bench ruling I am about to give should resolve

10   the motions in limine.  And because I think there probably are

11   some rulings in there that are important to you, and others

12   that are more less so, that also may help bring you together a

13   little bit in valuing the case, as they say.

14         After that, what I want to do is go through the joint

15   pretrial order with you in anticipation of a prompt trial, and

16   understand a little bit more about what this trial looks like

17   and get a more realistic estimate of its length based on that

18   conversation, based on the motion in limine rulings, and also

19   just go through some of my trial procedures as it relates to

20   things like deposition designations and the like.

21         I have a bunch of other smaller topics to take up, but

22   we will get to an estimate after all of that of the length of

23   the trial, and then I propose to set a trial date.  And so I

24   have got a few menu options in February and March that work,

25   and I want to take that up with you, but I would like to get

OCCLKitC

1    this tried.  So after we have gone through all these other

2    hoops, I want to talk about a trial date.

3             Then I will spend a little time with you just talking

4    about my process for voir dire, for jury selection, including a

5    proposed summary of the case that I would give to the venire

6    for purposes of helping people determine whether there is

7    anything about the nature of the case that would prevent them

8    from serving.

9             And then finally, after all that, I expect I will set

10   a next and final pretrial conference, because even with all the

11   topics we are going to go through, there are, doubtless, going

12   to be other things that come up.  And one thing I haven't had

13   an opportunity to do is to review with care your proposed

14   request to charge, and I want to make sure we have a full

15   opportunity before we are in here and rolling with the jury to

16   talk through all that stuff.

17            I suppose the final thing I forgot to add to my list

18   is, I just want to take stock of where you are in trying to

19   settle the case, and get a sense of whether, after the rulings

20   today, to the extent that settlement efforts haven't succeeded,

21   the additional information you have gotten from the rulings

22   might push you in that direction.

23            So that's an ambitious agenda.  We will take a break

24   at some point, I expect, in middle.

25            All right.  Everyone ready?  All right.

OCCLKitC

1          I am about to resolve a series of motions in limine

2     filed by Kitchen Winners and Rock Fintek.  In resolving these

3     motions, I have considered the parties' helpful memoranda of

4     law, which are docketed at Dockets 169 to 70 and 172 to 73, and

5     the parties' responses docketed at Dockets 178 and 179.  For

6     the record, I will not be issuing a written decision.  Instead,

7     I will simply issue a bottom-line order reporting the fact that

8     the motions were resolved on the record today.  So if you are

9     interested in the reasoning underlying the decision or

10    particulars of the decision, as I expect you will be insofar as

11    some of these rulings will set ground rules for trial, you will

12    need to order the transcript.

13          An additional reason you might want to order the

14    transcript is that I am going to be setting a tight period of

15    time for follow-on letters as to a couple of particulars here.

16    And so you would do well for somebody at each table to be

17    taking notes so that you are not waiting necessarily for the

18    final transcript to guide you.

19          All right.  I am going to begin with a motion by

20    Kitchen Winners relating to Mendel Banon, a person purportedly

21    working as a broker on behalf of Kitchen Winners and what I

22    understand to be its funding source, Adorama.  Kitchen Winners

23    seeks to exclude all e-mail and text messages involving Banon,

24    and to preclude testimony from other witnesses about statements

25    that Banon allegedly made to them.  Banon, I note, is on Rock

OCCLKitC

1  Fintek's witness list, although not on Kitchen Winners's

2  witness list.

3      The central issue here is one of agency.  Federal Rule

4  of Evidence 801(d)(2)(D) makes an exception to the general rule

5  against hearsay for statements made by a party's agent within

6  the scope of the agency relationship.  Kitchen Winners claims

7  that, quote, "There is no admissible evidence that Banon was an

8  agent of either Kitchen Winners or Adorama," closed quote.  It

9  argues that Banon operated as an independent broker outside the

10  custody or control of Kitchen Winners or Adorama.

11      The Court denies Kitchen Winners's motion to exclude

12  Banon's statements or to limit the purposes for which the

13  statements can be received.

14      Under Rule 801(d)(2)(D), statements made, quote, "by

15  the party's agent or employee on a matter within the scope of

16  that relationship and while it existed," closed quote, are

17  admissible as non-hearsay.  No formal employment or contractual

18  relationship is required to bring a person within the scope of

19  that rule.  Rather, as the Second Circuit has explained, a

20  declarant, quote, "need only be an advisor or other significant

21  participant in the decision-making process that is the subject

22  matter of the statement," closed quote, for the statement to be

23  deemed within the scope of his agency.  *United States v. Rioux*,

24  97 F. 3d 648, 661 (2d Cir. 1996).

25      Here, the circumstantial evidence that has been

OCCLKitC

1   mustered overwhelming supports that Banon operated as a

2   principal point person -- by that I don't mean a principal, but

3   a main point person -- on behalf of Kitchen Winners in

4   connection with the glove transactions with Rock Fintek.

5   Kitchen Winners relies on deposition testimony from its

6   corporate representative Joseph "Hershey" Weiner, whom the

7   parties jointly describe as someone who, quote, "runs the

8   day-to-day operations of Kitchen Winners," closed quote.

9   Weiner's testimony, Kitchen Winners argues, shows that Banon

10  operated as, quote, "an independent broker and not an agent of

11  Kitchen Winners," closed quote.  Docket 170 at page 3.  Kitchen

12  Winners also notes that an Adorama executive, Joseph

13  Mendlowitz, testified that Banon was a "self-employed" broker.

14  But legally, the question whether Banon operated as an agent

15  for Kitchen Winners per Rule 801(d)(2)(D) does not turn on

16  Banon's formal title.  Under the case law, it turns on what his

17  function for the company was.  See, for example, *Weaver v.*

18  *Bloomberg L.P.*, 717 F. Supp. 3d 372, 389 n. 7 (S.D.N.Y. 2024).

19  And here, when asked at his deposition about the nature of

20  Banon's work for Kitchen Winners, Joseph Weiner, Kitchen

21  Winners's own 30(b)(6) witness, attested that Banon, quote,

22  "was a broker," closed quote, for Kitchen Winners.  And Weiner

23  proceeded to describe in detail the broker services that Banon

24  provided Kitchen Winners with respect to the Rock Fintek

25  business.  Docket 170, Exhibit A at 61.  Consistent with

OCCLKitC

1    Banon's acting on Kitchen Winners's behalf with its consent, as

2    opposed to freelancing on his own initiative, exhibits in the

3    form of e-mail exchanges that Rock Fintek has adduced reflect

4    that Banon repeatedly held himself out as the Kitchen Winners's

5    representative authorized to handle dealings with Rock Fintek.

6    So, for example, on May 28, 2021, Banon wrote to Rock Fintek

7    that, quote, "As per our call with Hershey [Weiner]...we will

8    release five today and we will get paid 8 to 9 loads on

9    Tuesday.  Please confirm," closed quote.  Docket 178, Exhibit

10   C.  And Thomas Kato, Rock Fintek's 30(b)(6) witness, testified

11   that he found Mr. Banon's name through, quote, "a simple Google

12   search," closed quote, of Kitchen Winners, indicating that the

13   company publicly held out Banon as an authorized agent.  Docket

14   170, Exhibit 8.  Kato further attested that, quote, "Before

15   Rock Fintek started buying gloves from Kitchen Winners/Adorama,

16   I had numerous telephone calls, WhatsApp calls, and video calls

17   with Mendel Banon, and even hosted Banon in person for lunch.

18   During those discussions and meetings, Banon consistently held

19   himself out as a duly authorized representative of Kitchen

20   Winners and Adorama, using those names interchangeably."

21   Docket 170, Exhibit 9.

22          By contrast, Kitchen Winners has come forward with no

23   evidence, zero, contravening this conclusion.  It has not, for

24   example, adduced testimony from Kitchen Winners's principals to

25   the effect that Banon was acting on his own and without Kitchen

OCCLKitC

1    Winners's authorization in dealing with Rock Fintek.  It has

2    not adduced any evidence that Banon was off on some frolic or

3    detour without Kitchen Winners's permission or knowledge.

4    Instead, Kitchen Winners's bid to exclude this evidence appears

5    to be based solely on the legally incorrect notion that the

6    formality that Banon was self-employed carries the day under

7    Rule 801(d)(2)(D).  It does not.

8        All told, the circumstantial evidence very strongly

9    supports that Banon functioned as a significant participant in

10   the decision-making process for glove transactions on behalf of

11   Kitchen Winners.  It supports that, with Kitchen Winners's

12   knowledge and consent, he held himself out as the broker and

13   Kitchen Winners's representative in the company's transactions

14   with Rock Fintek.  And further proof is that Kitchen Winners's

15   ensuing actions in implementing the arrangements negotiated on

16   its behalf by Banon were consistent with Banon's having served

17   as its representative.  The Court, therefore, denies Kitchen

18   Winners's motion to preclude Banon's statements from being

19   admitted for the truth of the matters asserted.

20       And to state the obvious, Banon's statements during

21   the transactions, such as to representatives of Rock Fintek,

22   may separately be received for non-hearsay purposes.  For

23   example, statements he made to Rock Fintek personnel in the

24   process of negotiating or arranging the glove transactions are

25   admissible because such statements, independent of the

OCCLKitC

1  truthfulness of any embedded representations, were part and

2  parcel of the contracting process.  Kitchen Winners's motion in

3  limine, which was based solely on the hearsay rules, overlooks

4  the very considerable degree to which Banon's statements are

5  admissible for non-hearsay purposes.

6          There is a limited caveat to the ruling that Banon's

7  statements are admissible for the truth of the matter asserted

8  on an agency theory.  Kitchen Winners's motion in limine

9  claiming inadmissible hearsay unhelpfully did not identify any

10  particular statement or statements by Banon that it sought to

11  exclude as hearsay.  It instead painted with a very broad

12  brush.  Unhelpfully, it sweepingly sought the exclusion as

13  purported inadmissible hearsay of all statements by Banon in

14  his dealings with Rock Fintek, whether made over WhatsApp chat,

15  text, or e-mail.  It is theoretically possible then, even

16  though Banon in general was acting as an authorized agent of

17  Kitchen Winners in connection with the arranging and

18  negotiation of the glove transactions, that as to a particular

19  statement or two that Rock Fintek seeks to admit, that Banon

20  was speaking outside his authorized agency; for example, on

21  some entirely extrinsic subject.  Kitchen Winners has not given

22  the Court any reason to believe that any statement of that

23  nature is at issue.  Nonetheless, in the event that there are

24  particular statements at issue that Kitchen Winners, it

25  contends, are outside the scope of Banon's agency -- and by

OCCLKitC

1    that I mean outside the discussions and negotiations about

2    gloves as to which Banon was clearly authorized to act for

3    Kitchen Winners -- I will permit Kitchen Winners to submit a

4    letter motion identifying particular such statements by Banon.

5    But again, counsel, these need to be outside the scope of the

6    authorization, the agency to negotiate glove transactions.

7    That letter is due and must be filed on ECF no later than one

8    week from today, Thursday, December 19, 2024.  Any response by

9    Rock Fintek, in light of the holidays, will be due two weeks

10   later, Thursday, January 2, 2025.  I do not authorize a reply.

11           On the same point, I note that Adorama denies that

12   Banon was acting as its agent.  But the joint brief by Kitchen

13   Winners and Adorama did not develop any point specific to

14   Adorama.  Instead, as to both of those parties, it made the

15   argument, which I have rejected, that Banon's being a, quote,

16   "independent broker," closed quote, means that he could not

17   have been an agent within the meaning of the hearsay rule.

18   Also unhelpfully, the joint brief did not identify any

19   statements by Banon that purport to be uniquely on Adorama's

20   behalf.  Given the Court's ruling that Banon was an agent for

21   Kitchen Winners as to the glove transactions, Banon's

22   statements in that capacity will be received for the truth of

23   the matter asserted.  It's theoretically possible, albeit

24   unlikely, that there is a statement or two by Banon that was

25   made solely on behalf of Adorama and not on behalf of Kitchen

OCCLKitC

1    Winners and which would be offered for the truth of the matter

2    asserted.  If so, the issue would then arise whether Banon was

3    acting as an agent for Adorama, and it would be necessary to

4    resolve that issue to determine whether that sort of statement

5    could come in for the truth of the matter asserted.  So I will

6    permit Kitchen Winners and Adorama in the same letter due next

7    Thursday to identify such statements, if any, and to explain

8    why they are attributable uniquely to Adorama and not Kitchen

9    Winners, and to explain why the evidence supports that Banon,

10   although an agent of Kitchen Winners, was not an agent of

11   Adorama, its funding source for the glove transactions.  The

12   opposition to this letter again is due January 2, 2025.  Again,

13   no reply is invited.  That ends the first ruling.

14          Second, Kitchen Winners next seeks to exclude the

15   record of an audit conducted by a third party, Medline

16   Industries.  The audit was requested by one of Rock Fintek's

17   clients, a company called Ascension.  It was to audit the total

18   inventory of gloves that Kitchen Winners and Adorama sold to

19   Rock Fintek.  The audit record is filed at Docket 170,

20   Exhibit 4.

21          Here, the parties dispute whether the audit falls

22   within Federal Rule of Evidence 803(6), which creates a

23   business record exception to the rule against hearsay.  The

24   rule permits the receipt of a record of, quote, "an act, event,

25   condition, opinion, or diagnosis, if, A, the record was made at

OCCLKitC

or near the time by, or from information transmitted by,

someone with knowledge; B, the record was kept in the course of

a regularly conducted activity of a business, organization,

occupation or calling, whether or not for profit; C, making the

record was a regular practice of that activity; D, all these

conditions are shown by the testimony of the custodian or

another qualified witness, or by a certification that complies

with Rule 902(11) or (12) or with a statute permitting

certification; and, E, neither the opponent does not show that

the source of information nor the method or circumstances of

preparation indicate a lack of trustworthiness," closed quote.

The, quote, "principal precondition," closed quote, to

admission of documents under Rule 803(6) is that, quote, "the

records have sufficient indicia of trustworthiness to be

considered reliable," closed quote. *Saks International Inc. v.*

*M/V Export Champion*, 817 F .2d 1011, 1013 (2d Cir. 1987). The

Second Circuit has, quote, "taken a generous view of the rule,

construing it to favor the admission of evidence rather than

its exclusion if it has any probative value at all," closed

quote. *United States v. Freidin*, 849 F .2d 716, 722 (2d Cir.

1988).

Here, Kitchen Winners argues that the Medline audit

report is not admissible as a business record for three

reasons: First, the audit, it says, was not conducted in the

regular course of business; second, it says, the business

OCCLKitC

records exception was not intended to apply beyond, quote, "the simple act of recording observable information," closed quote; and third, it says, the audit was generated in anticipation of litigation.  None of Kitchen Winners's arguments is persuasive.

Kitchen Winners first claims that the audit was not conducted in Medline's regular course of business because during the last five years, Medline has conducted only two audits on behalf of Ascension and performed the audit only upon Ascension's request.  But that is the wrong inquiry under Rule 803(6).  The relevant question is not whether Medline conducts audits on behalf of a particular customer on a regular basis; it is whether Medline regularly conducts audits for customers in general, as part of its regular business activities.  See, for example, *Mason Tenders District Council v. Aurash Construction Corp.*, 2005 WL 2875333, at *3 (S.D.N.Y. Oct. 31, 2005).  And here, the evidence adduced supports that one of Medline's core business functions is to perform auditing services.  Indeed, the company was sought out by Ascension for that very purpose.  It is immaterial whether Ascension was a sporadic or regular audit customer of Medline's.

Kitchen Winners next argues that the business record exception applies only to the, quote, "very simple act of recording observable information," closed quote, not to what it terms the, quote, "interpretation of data and then creating a summary of the findings," closed quote.  That argument is

OCCLKitC

faulty for two reasons.  First, based on the Court's review of
the audit report, again, filed at Docket 170, Exhibit 4, the
audit report falls into the category that Kitchen Winners
concedes is within the scope of the exception.  Far from being
a subjective or interpretive document, the audit report
essentially supplies a raw count of the gloves inventory that
Kitchen Winners and Adorama sold to Rock Fintek.  It thus
compiles precisely the type of readily, quote, "observable
information," closed quote, that Kitchen Winners agrees the
business records exception covers.  Second, the case law on
which Kitchen Winners relies for its argument that the
exception does not reach the "interpretation of data" are
inapposite to the context of audits.  Courts instead routinely
admit audit records under the business records exception.  See,
for example, *Accely v. Consolidated Edison Company of New York,
Inc.*, 2023 WL 3045795 at *4 n. 5 (S.D.N.Y. Apr. 20, 2023),
which collects cases.

        Kitchen Winners's third argument is that this audit
was generated in anticipation of litigation.  But that argument
is an *ipse dixit*.  It is unsupported by evidence.  The sole
argument Kitchen Winners makes toward this conclusion is that
the Medline audit was completed in November 2021, quote,
"approximately four months after the onset of the dispute,"
closed quote.  But no party to this dispute commissioned the
audit.  Instead, a third-party customer of Rock Fintek's,

OCCLKitC

Ascension, requested the Medline audit.  Kitchen Winners has

not adduced any evidence that Ascension was aware of the

dispute between it and Rock Fintek, let alone that litigation

was impending and that Ascension appreciated it.  The complaint

in this case was not filed until June 2022, several months

after the audit had been completed.

The Court therefore denies Kitchen Winners's motion to

exclude the audit report.  That said, to state the obvious,

Rock Fintek, to secure receipt in evidence of the audit report

under the business records exception, will need to offer a

witness who is knowledgeable about Medline's record creation

and recordkeeping practices so as to lay the proper foundation

for the document's admission.  Rule 803(6)(D) requires that.

In denying the motion in limine, the Court assumes that a

witness capable of attesting to the relevant record creation

and recordkeeping practices of the company will be called, and

who will be able to knowledgeably explain and authenticate,

consistent with the business records exception, the audit

report that Rock Fintek seeks to admit.  Although Rock Fintek

may call a witness who personally participated in the audit,

such participation is not required for the business records

exception to apply.  See, for example, *Saks International Inc.*

*v. M/V Export Champion*, 817 F .2d 1011, 1013 (2d Cir. 1987).

Kitchen Winners next moves to preclude Rock Fintek

from offering certain evidence that would contradict admissions

OCCLKitC

1    made in deposition testimony by its 30(b)(6) witness, Thomas

2    Kato.   In relevant part, during his 30(b)(6) deposition, Kato

3    testified that all of the payments received from Ascension

4    after December 2020 were for the gloves at issue in this

5    lawsuit.   That testimony is important for obvious reasons.

6    Rock Fintek claims that it overpaid Kitchen Winners for gloves

7    for which it was not repaid by its customer, Ascension.   To the

8    extent that Rock Fintek received payment from Ascension for the

9    gloves at issue, it cannot pursue damages based on a theory of

10   nonpayment.   Later, however, during summary judgment briefing,

11   Kato submitted a sworn affidavit on behalf of Rock Fintek

12   stating the contrary.   Kato now attested that, in fact, some of

13   the payments during that period, quote, "were not for the

14   gloves at issue in this lawsuit, but were for 3PLY masks that

15   Rock Fintek had sold to Ascension during this time frame,"

16   closed quote.   And again, after the close of discovery, Rock

17   Fintek identified particular invoices reflecting the payments

18   that it now contended were not for the gloves at issue.   These

19   invoices appear to total over $2.5 million.

20         Kitchen Winners thus seeks to preclude, one, Kato's

21   testimony in his affidavit that contradicts his sworn

22   deposition testimony and, two, any documentary evidence that

23   Rock Fintek proposes to offer that would likewise contradict

24   Kato's 30(b)(6) testimony.   The Court grants Kitchen Winners's

25   motion, which is clearly meritorious.

OCCLKitC

1            It is black letter law that testimony of a Rule

2       30(b)(6) witness is binding on the party that designated the

3       witness.  See, for example, 8A Charles A. Wright, Arthur R.

4       Miller, and Richard L. Marcus, Federal Practice and Procedure

5       Section 2103 (2d edition 1984).  In elaborating on this rule,

6       the Second Circuit has stated that, quote, "Rule 30(b)(6)

7       testimony is not binding in the sense that it precludes the

8       deponent from correcting, explaining, or supplementing its

9       statements, closed quote."  *Keepers, Inc. v. City of Milford*,

10      807 F. 3d 24, 34 (2d Cir. 2015).  The Second Circuit has thus

11      upheld permitting a witness to offer testimony that, quote,

12      "did not contradict [the 30(b)(6) witness's] earlier testimony

13      but instead filled in its gaps," closed quote.  The Court

14      acknowledged a distinction between a party's capacity to,

15      quote, "supplement or amend legal interpretations," closed

16      quote, offered by a designated witness as opposed to, quote,

17      "factual conclusions," closed quote, that would bind an

18      organization and its organizational deponent.  Although the

19      Court permitted a corporation there to supplement the 30(b)(6)

20      witness's testimony with, quote, "contrary evidence that

21      contradicts legal interpretations offered during a deposition,"

22      closed quote, the Court, the Circuit, expressed doubt that the

23      rule would apply with the same force to factual conclusions.

24      *Id*. at *35.

25           Here, Kitchen Winners seeks to preclude testimony

OCCLKitC

1    offered by Rock Fintek that was received -- and this is

2    important -- after the close of discovery and which does not

3    simply fill in gaps created by its Rule 30(b)(6) deponent.  The

4    testimony at issue would flatly contradict statements to whose

5    accuracy Rock Fintek unconditionally committed via its

6    deponent's sworn testimony during the discovery period.  And

7    the statements at issue are quintessentially factual as opposed

8    to legal.  Whereas Rock Fintek, via Kato, originally identified

9    certain payments for Ascension as being for the gloves at

10    issue, Rock Fintek now proposes to say the exact opposite.

11         In these circumstances, Kitchen Winners is on strong

12    ground in asking the Court to bind Rock Fintek to the factual

13    representations made by its Rule 30(b)(6) deponent.  Those

14    representations are exactly the sorts of representations on

15    which an opposing party relies in determining, among other

16    things, what discovery to take.

17         Now, Rock Fintek counters that the documents at issue

18    which it proposes to offer to support its new version of events

19    was produced prior to Kato's deposition.  Therefore, Rock

20    Fintek argues, Kitchen Winners could have examined Kato about

21    those documents.  That is a lame argument.  It is totally

22    unconvincing.  The question that was put to Kato in his

23    deposition was intended to elicit Rock Fintek's answer as to

24    whether the payments for Ascension were for the gloves at

25    issue.  Kitchen Winners was entitled to take Kato and Rock

OCCLKitC

Fintek at Kato's word that the payments were for the gloves at issue.  Kitchen Winners had no reason independently to try to disprove, to Rock Fintek's benefit, its admission that all of the payments it received from Ascension effectively offset its damages.  The exercise of testing the invoices underlying these payments to see if maybe Kato had been wrong and the payments were for other things, was an exercise that Rock Fintek and Rock Fintek's counsel should have undertaken.  Kitchen Winners had no reason to waste its counsel's time and money trying to impeach a helpful and ironclad admission that Rock Fintek's corporate representative had made to the benefit of Kitchen Winners.  The very purpose of Rule 30(b)(6), after all, is to obligate corporations to prepare designees to give, quote, "knowledgeable and binding answers for the corporation," closed quote. *Twentieth Century Fox Film Corp. v. Marvel Enterprises,* 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002).

And Rock Fintek had an obvious remedy if it were to turn out that Kato misspoke or simply got things wrong.  Rock Fintek could have, within the fact discovery period, sought to correct any misimpressions made by its own Rule 30(b)(6) designee.  It could have done so while Kitchen Winners still had the opportunity during fact discovery to depose representatives of Rock Fintek and Ascension on this point. And had Kitchen Winners protested Rock Fintek's attempt to correct the 30(b)(6) testimony during the fact discovery

OCCLKitC

 1   period, Rock Fintek could have raised the issue with the Court,

 2   but Rock Fintek did not do so.  It sat on its hands.  It stayed

 3   silent on this very material point.  And by the time Rock

 4   Fintek surfaced to claim the contrary during summary judgment

 5   briefing, fact discovery was long since over.  Rock Fintek's

 6   belated attempt to repudiate its own prior testimony on which

 7   Kitchen Winners relied is not well taken.  It is, in the

 8   Court's view, improper.  The Court therefore will preclude Rock

 9   Fintek from offering testimony contradicting Kato's admission

10   as a 30(b)(6) designee.  And the Court will correspondingly

11   preclude Rock Fintek from offering documents such as the

12   invoice that would purportedly contradict that admission or

13   from making arguments at trial contradicting that admission.

14   The Court grants Kitchen Winners's motion.

15           Kitchen Winners next moves to preclude Rock Fintek

16   from disputing statements made in the parties' joint

17   stipulations of fact or JSF.  Rock Fintek opposes that motion.

18           Counsel for Rock Fintek, this should not be a serious

19   dispute.  The parties are bound by their factual stipulations

20   in the JSF, period, full stop.  That is what a factual

21   stipulation is.  I could not have been more clear with you on

22   that point.  As I stated during the December 20, 2023 premotion

23   conference discussing the upcoming summary judgment briefing

24   process, and I am quoting, "It's your stipulation that

25   establishes that that fact is true...you're bound by the

OCCLKitC

1    stipulations all the way through.  If we wind up going to

2    trial, and you've stipulated that the following document is the

3    parties' agreement, you can't get up in front of the jury and

4    say there was no such document or it's not the agreement,"

5    closed quote.

6         I'm citing the transcript of the December 20, 2023

7    hearing at pages 18 to 19.

8         Of course, that does not mean that every fact you

9    stipulated to is admissible.  Just because a fact is true, as

10   stipulated here, does not mean that it's admissible.  There may

11   be stipulated facts that are irrelevant.  There may be

12   stipulated facts that are excludable under Rule 403, or for

13   other reasons.  There may be factual stipulations that, as

14   formulated, are too confusing or hazy or argumentative to be

15   properly received.  Thus, of course, the entire JSF cannot be

16   offered in evidence en masse.  I don't think that's in dispute.

17   It's pretty obvious.  The admissibility of the many facts

18   stipulated to in the JSF is not a question that rises or falls

19   together.  Counsel, if one of you wants a fact to which the

20   parties have stipulated in the JSF to be received, you should

21   confer in good faith.  You can prepare stipulations for

22   individual facts within the JSF or sets of facts.  And if there

23   is a dispute about whether a stipulated fact or set of

24   stipulated facts is admissible under the Rules of Evidence, I

25   will resolve it.  But to the extent that Kitchen Winners's

OCCLKitC

1    motion merely seeks to hold Rock Fintek to its factual

2    stipulations, that motion is granted.

3            Now, I understand that one part of the JSF at issue is

4    the factual stipulation contained in paragraph 75 of the JSF,

5    which in turn synopsized a claim in Rock Fintek's complaint.

6    It reads, quote, "Rock Fintek claims that it delivered

7    approximately 3 million LevMed brand gloves to Ascension,"

8    closed quote.  I understand that Kitchen Winners apparently

9    would like that stipulation to be received into evidence.  But

10    that stipulation -- counsel, now I am referring to counsel for

11    Kitchen Winners -- that's not a stipulation as to a fact.

12    Instead, it describes an aspect of a party's litigation

13    position.  It's not by any means clear to me why a stipulation

14    as to that could be properly received as evidence at trial.

15            Kitchen Winners, if you want to make an argument as to

16    why that summary of an aspect of a litigation position is

17    admissible in evidence, although I'm very skeptical of that

18    point, I'll put in place the same letter briefing schedule as I

19    set earlier.  Your letter on that point is due next Thursday,

20    December 19, 2024.  Any opposition by Rock Fintek is due

21    January 2, 2025.  And reply is not invited.  In the event I do

22    not receive a letter from Kitchen Winners on that point, a

23    stipulation with respect to paragraph 75 of the JSF will not be

24    received at trial.

25            All right.  That concludes my discussion of Kitchen

OCCLKitC

1    Winners's motion in limine.  I am about to turn to Rock

2    Fintek's motions in limine.

3            All right.  Rock Fintek seeks to preclude all evidence

4    of what it terms, quote, "unrelated transactions," closed

5    quote; that is, Rock Fintek's transactions with Joel Stern and

6    Stern's company, JNS Capital Holdings LLC.  As background, Rock

7    Fintek settled all claims it brought in this litigation against

8    Joel Stern and JNS in connection with defective gloves that JNS

9    purportedly sold to Rock Fintek.  Rock Fintek argues that its

10   dealings with JNS and Stern are irrelevant to any issue to be

11   tried in this case.  Kitchen Winners has said in general the

12   same.  It acknowledges that Rock Fintek's dealings with JNS and

13   Stern are not relevant to the claims remaining in this lawsuit.

14   In its motion, Rock Fintek anticipates that Kitchen Winners

15   will seek to offer evidence of Rock Fintek's dealings with JNS

16   and Stern as, effectively, negative character evidence.  It

17   fears that Kitchen Winners would attempt to paint Rock Fintek

18   as habitually derelict or irresponsible with respect to its

19   contractual obligations and, therefore, more likely to have

20   breached contract here.

21           Kitchen Winners, however, argues that evidence about

22   JNS and Stern may be received for two other rather narrow and

23   discreet reasons.  First, it argues, the quantity of Medcare

24   brand gloves that Rock Fintek received from JNS and Stern is

25   relevant, because it helps establish the quantity of gloves

OCCLKitC

```
 1      that Kitchen Winners sold to Rock Fintek.  That is because Rock
 2      Fintek has acknowledged receiving such gloves only from Kitchen
 3      Winners and JNS and Stern, and, therefore, if the aggregate
 4      quantity of such gloves that Rock Fintek received is unknown,
 5      the quantity that it received from JNS and Stern can help the
 6      finder of fact derive, I guess by subtraction, the number
 7      received from Kitchen Winners, which is apparently a disputed
 8      fact.  Second, Kitchen Winners argues, evidence about JNS and
 9      Stern may help establish the extent to which any faulty gloves
10      came from JNS and Stern rather than Kitchen Winners.  According
11      to Kitchen Winners, quote, "to the extent that Rock Fintek and
12      Ascension had complaints regarding the quality of the gloves,
13      Defendants can seek to establish that the faulty gloves, if
14      any, came from Joel Stern and not from Kitchen Winners," closed
15      quote.
16              Applying Rule 403, I find that limited evidence may be
17      received for these limited discreet purposes.  The question of
18      how many gloves Kitchen Winners sold to Rock Fintek is at issue
19      in this case, and the extent to which Rock Fintek's Medcare
20      overall glove supply came from JNS and Stern as opposed to the
21      other contender, Kitchen Winners, potentially can help resolve
22      that issue.  Likewise, the extent to which faulty gloves came
23      from Kitchen Winners is relevant.  If Kitchen Winners has
24      admissible evidence that the faulty gloves came from JNS and
25      Stern, that is relevant to disproving that such gloves came
```

OCCLKitC

1    from Kitchen Winners.

2            That said, to state the obvious -- and I am directing

3    this to counsel for Kitchen Winners -- there is to be no

4    evidence, zero evidence and zero questioning, about the fact

5    that claims were ever made in this lawsuit or anywhere else

6    involving JNS and Stern.  And there is to be no evidence, zero

7    evidence and zero questioning about any settlement by any party

8    with JNS and Stern.  That is categorically out, and that is a

9    court order.  There is also to be no mention of timeliness of

10   payment issues.  That's irrelevant.  There is to be no mention

11   of alleged contract breaches involving JNS and Stern.

12           All that Kitchen Winners may elicit is briefly

13   elicited factual evidence tending to establish the two discreet

14   factual propositions at issue:  The quantity of Medcare gloves

15   that JNS and Stern provided to Rock Fintek and the faulty

16   quality of the gloves received from JNS and Stern.  The

17   testimony to that effect is to be short and sweet.  And, to

18   avoid any misunderstanding or mischief, of which I perceive a

19   real possibility, I will expect a concrete and specific

20   preview, an offer of proof, from Kitchen Winners of the

21   evidence you intend to offer to this effect.  It is to be

22   provided to the Court outside the presence of the jury no later

23   than the day before it is to be offered at trial.  That is to

24   make sure that we are on the same page and that the actual

25   evidence Kitchen Winners intends to offer on this point is

OCCLKitC

1    compatible with Rule 403.

2            Finally, Rock Fintek seeks to preclude invoices,

3    documents, and testimony from a company called Wenzy,

4    Incorporated.  Wenzy is purportedly a trucking company that

5    Kitchen Winners hired to transport and store the gloves at

6    issue in this case.  Part of the damages Kitchen Winners seeks

7    to collect from Rock Fintek are storage expenses it paid to

8    Wenzy to transport and store the gloves.  According to Rock

9    Fintek, Kitchen Winners, quote, "failed to produce in discovery

10   any documents substantiating the exorbitant trucking costs

11   reflected in the Wenzy invoices, including any support for

12   Kitchen Winners's contention that it actually paid those

13   invoices," closed quote, and failed to comply with its Rule 26

14   obligation to identify witnesses associated with Wenzy.  The

15   parties have stipulated to the authenticity of the Wenzy

16   invoices, see JSF paragraphs 98 and 103, but Rock Fintek

17   suggests that Wenzy may not be a real trucking company, and it

18   states that the invoices from Wenzy that Kitchen Winners

19   proposes to offer, quote, "look nothing like invoices provided

20   by other (legitimate) trucking companies."

21           This issue requires the Court to enforce the Rules of

22   Evidence regarding receipt of business records.  As the Court

23   stated in its August 6, 2024 summary judgment opinion filed at

24   Docket 164, the invoices are inadmissible hearsay unless

25   received as business records.  Under 803(6), for a business

OCCLKitC

record to be authenticated as such, each requirement of the

rule must be established via the testimony of the custodian or

another qualified witness.  The custodian must show that he or

she is, quote, "familiar with the record-keeping system of the

business in question and knows how the records were created,"

closed quote.  Citing *Kasper Global Collection & Brokers, Inc.*

*v. Global Cabinets & Furniture Manufacturers Inc.,* 952 F. Supp.

2d 542, 572 (S.D.N.Y. 2013).  In *Kasper*, the district court

found that certain invoices could not be considered at summary

judgment and were likely inadmissible at trial, where there was

not testimony from a qualified witness, familiar with the

business's recordkeeping and record creation system as to when

and how the invoices were maintained.

        The same issue is presented here.  Unlike in *Kasper*,

there is a factual stipulation in paragraphs 98 and 103 of the

JSF.  It is to the effect that the invoices which are filed at

Docket 173, Exhibit B, are true and correct copies of invoices

received from Wenzy.  But that, of course, does not solve the

business records problem.  As Rock Fintek rightly points out,

Wenzy could be a front company.  It could be a front for an

affiliate or relative or friend of the principals of Kitchen

Winners.  It may not perform storage services at all.  The fact

that Kitchen Winners, in fact, received this document from

somebody calling itself Wenzy doesn't prove that the company

provided real storage services to Kitchen Winners, let alone of

OCCLKitC

1    the sort for which Kitchen Winners seeks recompense.  That's

2    the purpose of the business records foundation.  If Kitchen

3    Winners intends to prove up its payment of money to a third

4    party called Wenzy for storage services via these invoices, it

5    needs to authenticate the invoices as business records of an

6    authentic company called Wenzy.  And Kitchen Winners,

7    notwithstanding the Court's August 2024 decision commenting on

8    this point, has not done so.

9            I will permit Kitchen Winners in a letter, again, due

10   one week from today, that is, December 19, 2024, to identify

11   the name of a Wenzy custodian of records who is qualified to

12   speak to each Rule 803(6) element with respect to these

13   invoices.  The letter should set forth concretely the bases on

14   which that person is qualified to authenticate the invoices as

15   business records.  And it should address whether and, if so,

16   how as to that evidence, Kitchen Winners complied with its

17   disclosure obligations.  Rock Fintek's response is due

18   January 2, 2025.  Again, no reply is invited.

19           All right.  That concludes my rulings on the parties'

20   motions in limine.  Having taken care of that, I think I saw,

21   Mr. Rakhunov, you were rising.

22           MR. RAKHUNOV:  Yes, your Honor.  I was wondering if

23   your Honor is willing to entertain any further argument or

24   would hear the parties any further on any of the rulings that

25   the Court has made.

OCCLKitC

| | |
|---|---|
| 1 | THE COURT: You seemed to rise on the ruling about the |
| 2 | 30(b)(6) testimony. I mean, you briefed the point and you |
| 3 | lost. What's new? |
| 4 | MR. RAKHUNOV: Well -- |
| 5 | THE COURT: I am not hearing reconsideration. I mean, |
| 6 | we went through this exercise. Is there something -- |
| 7 | MR. RAKHUNOV: Yes, your Honor. To the point that |
| 8 | your Honor made in your ruling of a further correction of the |
| 9 | issue in discovery during the discovery period, so Rock Fintek |
| 10 | did make a supplemental damages disclosure well before |
| 11 | discovery closed, where that area of damages was -- similar |
| 12 | area -- |
| 13 | THE COURT: But that's different. I mean, you |
| 14 | didn't -- the issue here involves what the Ascension payments |
| 15 | are for, not your broader theory of damages. I don't know if |
| 16 | there's some other way you could get there. But this was on a |
| 17 | specific factual proposition: Do the payments received from |
| 18 | Ascension to Rock Fintek reflect the gloves at issue? |
| 19 | Did you correct that before the end of the discovery |
| 20 | period? |
| 21 | MR. RAKHUNOV: So the answer to that, your Honor, is |
| 22 | not that exact issue, I don't believe, was corrected. I will |
| 23 | go back to the record. But there is other evidence that speaks |
| 24 | to that issue, and my concern is the evidence that was |
| 25 | disclosed, that was disclosed in our damages, and my concern is |

OCCLKitC

that, your Honor, by the ruling where a 30(b)(6) witness who

wasn't shown this evidence during his deposition testimony,

that evidence that was disclosed timely in discovery, that we

are essentially being precluded from trying our case.

THE COURT:  No, you are being precluded from proving

up your damages based on the character of the payments from

Ascension.  I have no idea.  I don't know the case more

broadly, whether there is some other way you can get to damages

here, but at the end of the day, the witness categorically gave

that testimony, and there was plenty of time for counsel to

correct it.  And to say the witness got it wrong, and to merely

say broadly, We contend our damages are a bigger number,

without correcting that testimony, doesn't correct the

testimony.  And for it to pop up during summary judgment, I

mean, think about it.  You are basically saying in summary

judgment, during summary judgment, We actually would like to

prove that various invoices from Ascension were for extrinsic

purposes.  Well, P.S., that's what discovery is for.

Had your witness said that or had you corrected it

timely, then Kitchen Winners would say, Well, we would like to

have the 30(b)(6) witness back -- can't just change it without

bringing him back -- and then we would like to have discovery

of Ascension to test the point.  You didn't do that.  And I

think what you are now telling me may make it worse, which is,

you appear to be acknowledging that you knew the witness made a

OCCLKitC

1    false statement and didn't correct it.

2              MR. RAKHUNOV:  Well, no, I am certainly not saying

3    that, your Honor.  And at the time, I believe -- I will say,

4    this was a complicated set of facts.  The bank records were

5    difficult to digest.

6              I can now tell the Court that the records of the

7    invoices from Ascension were produced in discovery timely.

8              THE COURT:  Right.  Sorry, I covered this.  This is

9    why I am reluctant to invite going over this.  I just covered

10   this in the ruling.  The fact that a mid, whatever, truck load

11   or multi-box load, or however, of discovery included some

12   invoices is not the test here, because that was the whole

13   purpose of the inquiry at the 30(b)(6), so that Kitchen Winners

14   could understand and shape its investigation and further

15   discovery accordingly.

16             Once Rock Fintek said Ascension has -- all the

17   payments by Ascension after a particular date are attributable

18   to Kitchen Winners gloves, effectively, there is no reason for

19   Kitchen Winners to try to challenge that.  Why would it ever do

20   that?  Why would it waste its time to say, "Rock Fintek, you

21   might have made a mistake.  Your provable damages may be higher

22   than you are saying"?  That was your responsibility.  And it's

23   not well taken now, for the second time, both in the written

24   argument as well as today, to throw it on your adversary.

25             Off the record.

OCCLKitC

```
 1              (Discussion off the record)
 2              MR. RAKHUNOV:  I don't have anything further on this
 3    point, your Honor, except that I do ask if -- there was a
 4    subsequent deposition testimony of Mr. Kato.  If there is
 5    additional factual testimony by him that I have overlooked in
 6    presenting the opposition to that motion, may we be given the
 7    same leave, a week from today, to present something new?
 8              THE COURT:  If you can point to something in a
 9    subsequent -- subsequently testified to by Kato during the Rule
10    30(b)(6) deposition that takes back the quoted statement at
11    issue, yes.  Although, it would be mystifying to me why, given
12    that this issue was just litigated, you didn't catch that.
13    Yes.
14              But I take it, it's not that you think that happened;
15    you are just looking in case you can.
16              MR. RAKHUNOV:  I would like to take a look, your
17    Honor.
18              THE COURT:  I invite you to do that, and that's fine.
19    Look, I mean, I don't like to be -- I don't like my rulings to
20    be unwelcome, but the nature of rulings is somebody is going to
21    win and somebody is going to lose.  And at the end of the day,
22    had you during the discovery period said, "The client misspoke
23    or misremembered, but we, the company, we, outside counsel,
24    have checked his work and, in fact, what he said was incorrect;
25    the payments for Ascension were for extrinsic materials and,
```

OCCLKitC

```
1    therefore, shouldn't be accountable in thinking about damages

2    here," I have every reason to think that I would have permitted

3    you to take that back.

4            The remedy during the discovery period would almost

5    certainly have been a reopening of the 30(b)(6) deposition.  If

6    Ascension's testimony had already been taken on other points,

7    or something, I don't know, I might have -- I would have

8    permitted that to be reopened.  I almost certainly would have

9    shifted fees and costs to the extent that duplicative work on

10   Kitchen Winners's counsel's behalf was being required to be

11   done on account of the switch-up by Kato.  But had it been done

12   during the fact discovery period, I have every reason to think

13   I would have allowed it.  I am in the truth-seeking business.

14   The problem is, we are now here at motions in limine.  I have

15   done a summary judgment decision.  It's way too late for that.

16   And so, you know, I regret that you are in that situation.  You

17   are welcome to prove up your damages by other means, but not by

18   taking back the admission that the receipts from Ascension

19   represented payments for the gloves at issue.

20           MR. RAKHUNOV:  Understood, your Honor.

21           THE COURT:  Sorry.  I mean, again, this is my least

22   favorite part of my job.

23           MR. RAKHUNOV:  And if I may make just -- it's a

24   question --

25           THE COURT:  OK.
```

OCCLKitC

1          MR. RAKHUNOV:  -- about the Wenzy ruling.

2          THE COURT:  Go ahead.

3          MR. RAKHUNOV:  I think your Honor just identified it

4     in the ruling, that they have a week from today to identify a

5     witness, and -- to identify a specific individual who might be

6     able to --

7          THE COURT:  Right.

8          MR. RAKHUNOV:  I just have a question, because that

9     doesn't -- I am not sure if that solves the problem of the fact

10    that they never did so.

11         THE COURT:  That's why I also said they need to show

12    that they complied with whatever the disclosure rules here are.

13    I don't know who said what to whom about a Wenzy witness, and I

14    don't know, candidly, what the consequence would mean if, in

15    effect, what Kitchen Winners did was not to mention somebody by

16    name, but to say, in substance, "A custodian of records at

17    Wenzy."  Hypothetically, had they done that, that might well,

18    but might not, satisfy the pretrial disclosure obligations.

19         Kitchen Winners may have a separate argument, which is

20    that, "All we are talking about is offering a document.  The

21    case law is implicit that a records custodian is, effectively,

22    identified or not."  That hasn't been briefed for me.  And so

23    all I was trying to do there was to say -- to recognize the

24    unresolved issue of, if you are now going to identify who the

25    human being is for Wenzy that's going to get up here in court

OCCLKitC

and explain the regularity of the records creation and the

regularity of the records-keeping, consistent with 803(6), you

need also to explain why whatever was done or not done with

respect to that exhibit and the witness complies, in Kitchen

Winners's view.  And you, in your letter, you will say the

opposite; doesn't comply.  I am reserving on that just because

it hasn't been briefed and I haven't had occasion to think

about it.

So your point is well taken that if they come forward

and say, "Jane Smith is our witness," you may be able to say,

"A, You are at fault for not naming her; B, even if you didn't

have to name her, you are at fault for not saying a records

custodian, period."  And they may come forward and say,

"Neither of those things are required, or, "We met those

things, if they are required," or they may say identifying a

business record of Wenzy's is, under the case law, tantamount

to saying the custodian of records -- it's a little bit like,

you know, at a trial saying, We are going to call the AmEx

credit cards record -- we are introducing the defendant's

American Express records; we don't need to say the custodian of

records.  It's whoever the factotum is at AmEx who ordinarily

does that.  So I am reserving on that.

May I ask you, as to that point, if the sole point

here is, you know -- I mean, it may be that what you are saying

is -- well, let me ask you.  Just as to those, was this a point

OCCLKitC

1    of issue during discovery?  It was identified, I take it, as an

2    ostensible evidence of -- an aspect of Kitchen Winners's

3    damages, these storage costs, or whatever.

4           MR. RAKHUNOV:  It's *the*.  It's probably 50 percent or

5    more of the damages Kitchen Winners seeks.  And I think we

6    explain in our papers -- I am happy to elaborate -- we sought

7    the information in discovery.  Beyond any discovery requests,

8    they had Rule 26 obligations to produce that information.  The

9    invoices, the actual invoices that looked just like Kitchen

10   Winners's invoices, almost identical, we agree those were

11   authentic.  And maybe --

12          THE COURT:  Authentic?

13          MR. RAKHUNOV:  Meaning we got them.  They sent them to

14   us during the course of business.

15          THE COURT:  But I assumed you meant authentic like

16   this document existed in real-time.

17          MR. RAKHUNOV:  It existed in real-time, and Hershey

18   Weiner e-mailed it to Thomas Kato.

19          THE COURT:  Right.

20          MR. RAKHUNOV:  In that sense.

21          Are they authentic in a sense that they were created

22   by a trucking company called Wenzy?  Absolutely not.

23          THE COURT:  Right.  And then the question is, if those

24   were produced to you during discovery, was there an attempt

25   during discovery to test that proposition, the reality or not

OCCLKitC

1    of this Wenzy outfit?

2              MR. RAKHUNOV:  They were produced as -- in a sense

3    that -- I think we produced them, probably, and they produced

4    them because they were exchanged among the parties during the

5    course of business, so we had them in our clients' e-mail

6    accounts.  We attempted to take discovery from Wenzy.  We went

7    not only to the Secretary of State website, but we also looked

8    at the address on those invoices, which is, I believe, what

9    their motion -- their opposition contended we should have done.

10   We did.  And we were -- we found an empty house.  So there was

11   no Wenzy.

12             THE COURT:  Like a residential house?

13             MR. RAKHUNOV:  It was a residential house with nobody

14   living in it.  And we attached that to our motion.

15             That issue came up during Mr. Weiner's deposition, and

16   only after that deposition, which was literally the day after

17   close of discovery, we received screen shots from someone's

18   phone of some pay stubs that I don't even know what those

19   documents are, that they are claiming is proof of payment.

20             So we are not disputing that these documents were sent

21   to us, but even during the business relationship, our client

22   questioned these invoices.  They look nothing like trucking

23   invoices.  The numbers in them were way higher than --

24             THE COURT:  I take it -- look, no matter what, you

25   will have the argument at trial that says, for the reasons you

OCCLKitC

<div style="margin-left:2em">

1  have just given, the empty house, the circumstantial look and

2  feel of the document and how it looks like Kitchen Winners's

3  documents, that this is fraud, this is bogus.  You have got

4  that available.  You are trying to make the broader point, you

5  don't even want to go down that road because, from your

6  perspective, even if somebody can come forward now and say, "I

7  am from Wenzy, I am the custodian of records, and here is why

8  the business records ingredients are satisfied," you are

9  contending that Kitchen Winners was required to, but didn't do

10 something by way of pretrial disclosure.  And that's what I

11 welcome letter briefing on.

12       MR. RAKHUNOV:  Yes.  And I believe -- and we are happy

13 to address any arguments they raise.

14       THE COURT:  Right.  And you will go second, so you

15 will have a chance to do that.  I am absolutely open season on

16 that.  Just as with respect to these Ascension invoices, I am

17 holding you to the rules, kitchen Winners will be held to

18 the -- my application of the Rules of Evidence.  It's a

19 different rule and it's a different -- and I am not

20 foreshadowing who wins or loses on it.  You know, the fact that

21 the Wenzy invoices were produced may be enough for them to

22 clear the bar of putting you on disclosure notice that this

23 would be an issue.  We will see.

24       MR. RAKHUNOV:  And just to be clear, the fact that

25 they did not identify -- so had they put the Wenzy witness on

</div>

OCCLKitC

1    their Rule 26 disclosure list would have told me that there is

2    a Wenzy person that exists and they have some kind of access to

3    them.  We made our independent efforts to find Wenzy, and what

4    our process server learned only suggested to us that it's a

5    fraud, given the invoices look like --

6         THE COURT:  Keep in mind that if the invoices are not

7    receivable as a business record, they still may be receivable

8    not for the truth of the matter asserted, right, in the sense

9    that this Weiner, whoever, for Kitchen Winners, can say -- how

10   much money is allegedly paid to Wenzy, ball park?

11        MR. SPERBER:  $800,000.

12        THE COURT:  Look, then he could say, "We paid $800,000

13   to Wenzy after receiving the following invoice," and he could

14   authenticate it.  The jury would be told, "You can't take

15   anything on the face of this invoice," whatever representations

16   there are on the truth of the matter asserted.  He can testify

17   that he received it.  If he got a pizza box saying it, with

18   800,000 written on it, he could offer that too.  But you,

19   obviously, then have open season because at that point you are

20   able to, say, introduce the evidence of how suspicious it

21   looks, that it looks like the Kitchen Winners's stuff,

22   introduce your evidence about your investigator going to the

23   haunted house, you know, and argue from -- you know, that it's

24   telling that they have been unable to call somebody from Wenzy.

25   And if it turns out that they are precluded from doing so based

OCCLKitC

1   on what they will contend -- what you will contend to have been

2   a discovery violation, that's the lot they are stuck with.

3   That's the consequence to them.

4          It's a little bit like you and the Rule 30(b)(6).  You

5   prove up your damages by some other means, not by the means

6   with respect to those invoices.  Likewise here, you know, they

7   can try to prove up that they paid for authentic storage costs

8   to a third party, but not by authenticating that document,

9   again, if your premise is right.  Understood?

10          MR. RAKHUNOV:  Understood, your Honor.

11          One more question, and I'm sorry.  So on your ruling

12  on the Medline audit.

13          THE COURT:  Yes.

14          MR. RAKHUNOV:  Your Honor ruled that --

15          THE COURT:  That was for you.

16          MR. RAKHUNOV:  Yes.

17          THE COURT:  Why are we going back to that?

18          MR. RAKHUNOV:  Clarification.  Your Honor ruled that

19  we would need to present some testimony to establish a business

20  record.  My only question is, is your Honor suggesting in any

21  way whether that testimony comes in by way of depositions or a

22  live witness?

23          THE COURT:  We will get to deposition versus live

24  witness.  Either one is going to be fine.  I will talk to you

25  about the mechanics at a trial of that.  Look, you know, you

OCCLKitC

```
1    can get a certification, obviously, of a business record.  The
2    rule permits that as an alternative to live testimony.  That's
3    also out there as a conceptual matter.  But if not, it would
4    have to be a human being.
5              MR. RAKHUNOV:  Thank you.
6              THE COURT:  All right.  So do you all -- just bring
7    out the joint pretrial order, if you don't mind.  Did you all
8    bring a copy of the joint pretrial order?
9              MR. RAKHUNOV:  I have it in front of me, your Honor.
10             THE COURT:  Look, what I would like to do is just go
11   to the -- let's just talk conceptually about deposition
12   designations versus live witness, and then talk about the
13   people individually.
14             Here is how I prefer to do things, and I think it
15   works.  You are at liberty to call a person as a live witness.
16   You are at liberty to have deposition designations of that
17   person be offered in lieu of live testimony.  What I don't
18   like, though, is having a live witness testify for half an hour
19   and then everyone shoves in a bunch of deposition designations
20   as to that person.  The problem with that becomes, each of you
21   is infusing the deposition designations with whatever content
22   or interpretation or spin you want, and the witness is off the
23   stand at the time you are making these arguments.  So what I
24   ask is, if a person is testifying live, ask all the live
25   questions that matter to you.  And in the event the witness
```

OCCLKitC

1    goes south or deviates from something in a deposition

2    designation, you know how -- we can review this, if you want,

3    but you know how to bring them back via the prior testimony.

4    But the idea should be that, I am not receptive to having a

5    witness testify and then shoveling in a bunch of separate

6    deposition designations.  Use the deposition designations to

7    control the witness to the extent they go south.  But, in

8    effect, the jury should be hearing while the witness is on the

9    stand the entirety of their testimony.  Understood?

10         So, therefore, you have a handful of witnesses here

11   where, understandably -- and I should probably clarify this in

12   my individual rules, but it works fine for me to do it this

13   way -- where one or both proponents seem to intend some live

14   testimony and some shoveling in of deposition testimony.  Don't

15   do it that way.

16         Now, as to a witness who is not going to testify in

17   person, what I ask you to do is as follows:  I don't want to

18   have call and response where, Plaintiff, you say as to Witness

19   Smith, here are 15 excerpts, and then later on in your case,

20   the defense says, and here are our 12, 15 excerpts from Witness

21   Smith.  It makes more sense for each of you to identify within

22   the scope of Witness Smith's deposition testimony the material

23   you would like to bring to bear.  Work together because it's a

24   dynamic process.  And if Mr. Rakhunov adds something, that may

25   cause Mr. Sperber to add something back.  But basically come up

OCCLKitC

1    with the full subset of the Smith depo testimony that contains

2    an item that either of you would like to include.

3        Now, regrettably, there often are objections to bits

4    and pieces on account of foundation, hearsay, you know, form,

5    argumentative, whatever. And to the extent I need to resolve

6    that, there will be time to do that, and I will do that. But

7    the idea should be ultimately, when we get to trial, when the

8    time comes for, let us say, the plaintiff to call Ms. Smith, I

9    will turn to the jury and explain what a deposition is and that

10   Ms. Smith testified in the deposition, and, What you are going

11   to hear now are excerpts of the deposition that one party or

12   the other, or both, wanted to put before you, and then you

13   literally will do that.

14       Usually what I prefer to do is to have somebody, a

15   paralegal, the other lawyer, sit in the witness box and in a

16   neutral tone question -- just go through call and response the

17   Q and A from the depo transcript, because it makes it come

18   alive, or it becomes a little less dead than sticking a

19   transcript before the jury. And it's also a little more fair.

20   I think if it's not done live, you have this rather odd

21   situation in closing argument where counsel suddenly, you know,

22   sort of spring the "aha" moment from the depo testimony, and it

23   reads like the second to last page of an O. Henry novel where

24   there is a surprise ending, and it's not fair to anybody.

25   Let's have it aerated through a call and response in court.

OCCLKitC

1       Clear?

2       MR. SPERBER:  Yes.

3       THE COURT:  So given that, let's turn to the witness

4    list in the joint pretrial order.  And by the way, the other

5    germane point here is, I strongly don't want people to be

6    called to testify twice.  Once in awhile it's legitimate, but

7    in this case, there are quite a number of witnesses who would

8    be called by each side.  In the event that something after the

9    witness testified that happened unexpectedly with another

10   witness requires the witness to be recalled, either later in

11   the plaintiff's case or a person who testified in the

12   plaintiff's case, you know, recalled in the defense case, I am

13   conceptually open to that.  That's not impermissible, but

14   barring something unexpected, I expect the witness to get up

15   and testify once.

16       And so that means, just hypothetically, let's suppose

17   Plaintiff calls Hershey Weiner -- sounds like a combination of

18   a sweet and savory food -- but in any event, it calls Hershey

19   Weiner, and he testifies on Topics A, B, and C.  Defense

20   counsel, if your intention had been to cross him on those

21   items, but also to address a completely separate subject called

22   D, you are at liberty to do that.  You are at liberty to go

23   beyond the scope on your cross, the goal being to get him done.

24   And then on redirect, Plaintiff, the scope of your redirect is

25   governed by the scope of cross.  But the whole point is, just

OCCLKitC

1       let's get Mr. Weiner on and off the stand once.

2                   So with that predicate, let's go through this.  And I

3       am not holding you to it, but I am just trying to get a

4       realistic estimate so that when we turn shortly to the length

5       of trial, we are all in the same ball park.  So I am not

6       holding you to your estimates here; I just want an honest

7       estimate.

8                   Mr. Sperber, I will start with you.  As to Weiner,

9       what do you expect on direct?

10                  MR. SPERBER:  You mean topically?

11                  THE COURT:  Length of time.

12                  MR. SPERBER:  Time-wise.  Mr. Weiner --

13                  THE COURT:  You can be seated.

14                  MR. SPERBER:  -- is the witness with the longest

15      testimony.  I am going to -- I would guess probably a half day.

16                  THE COURT:  OK.  So a half day is about three

17      testimony hours.  We have about six hours of testimony in.  I

18      work a full day from 9:00 to 5:00, but there's lunch and

19      breaks.  So call it about three hours of live testimony?

20                  MR. SPERBER:  Yes, your Honor.

21                  THE COURT:  And Mr. Rakhunov, approximate cross?

22                  MR. RAKHUNOV:  Probably four hours, your Honor.  He is

23      a key witness.

24                  THE COURT:  No fault.  I am just asking.

25                  All right.  Let me pause before we get to Mendlowitz

OCCLKitC

```
1   because one of the next issues I have got on my list -- might
2   as well take it up now -- is Adorama.  Adorama is not a
3   plaintiff at all.  Adorama is just a defendant.
4           May I ask you, Mr. Rakhunov -- I am not precluding
5   anything, but it's a little mystifying to me what work Adorama
6   as a defendant does for you in this case.
7           MR. RAKHUNOV:  I'm sorry?
8           THE COURT:  What benefit is there -- this is really
9   about Kitchen Winners and Rock Fintek back and forth.  Just
10  explain to me, because I haven't focused uniquely on Adorama,
11  what the independent claim is against Adorama.
12          MR. RAKHUNOV:  Sure.  Adorama is a seller of the
13  gloves under the purchase and sale agreement.
14          THE COURT:  In other words, just because they are a
15  party to the agreement?
16          MR. RAKHUNOV:  They are a party to the agreement.
17  They are a party to the transactions.  In fact, my client --
18  this has been an important part of the case and the
19  transactions -- they would never have entered into this -- into
20  this business relationship if Adorama were not a party to it.
21  Kitchen Winners is an unknown --
22          THE COURT:  I see.
23          MR. RAKHUNOV:  -- entity.  Adorama was, you know --
24  Mendel Banon sort of held Adorama out as, We have this big
25  company, they are in electronics and other trading company in
```

OCCLKitC

Manhattan; they have these gloves.  Adorama has been an

important part of this case.  They are the reason why Fintek

entered into this deal.

THE COURT:  I see.

MR. RAKHUNOV:  And I know this is disputed, but our

position is that, you know, we had a phone call on which

Mr. Mendlowitz was a party to at the very outset of the

agreement.  That was the premise on which Rock Fintek entered

into this --

THE COURT:  Fine.  And is Adorama being held liable

just on the -- what is it called -- SPA, or whatever -- the

written agreement, or the prior one-offs?

MR. RAKHUNOV:  Just the SPA.

THE COURT:  So essentially, it's being held liable on

account of its contractual status as alongside Kitchen Winners,

a seller, and that's fine.  That explains it completely.

Is there separate evidence unique to Adorama that is a

basis for the theory of breach, or is it more that if there is

a breach here, it definitionally runs to both sellers?

MR. RAKHUNOV:  Exactly, your Honor.

THE COURT:  OK.  That's helpful.  All right.  Thanks.

That answers that.

MR. SPERBER:  Briefly, your Honor.  Obviously, we

dispute a lot of that.  But just to note that I believe there

are three, you might call them, transactions here.  There are

OCCLKitC

1    the precontract one-offs, there is the SPA, then the overages

2    afterwards.  And at least to my understanding, the claim, at

3    least by Rock Fintek, is that Adorama was a party to the SPA

4    but not the noncontractual --

5            THE COURT:  Mr. Rakhunov just said that they are not

6    holding -- seeking to hold Adorama liable for the pre-SPA

7    agreement.  He is seeking to hold Adorama liable for the SPA.

8    You are saying there's something thereafter?

9            MR. SPERBER:  Yes.  The parties have called overages,

10   meaning, the contract was for 150 million gloves, and then

11   additional gloves thereafter were also provided.

12           THE COURT:  I see.  So the dispute is whether, if that

13   happened, Adorama is taggable with that, or it's just Kitchen

14   Winners.

15           MR. SPERBER:  I suppose that would be a question --

16           THE COURT:  We don't need to sort that out today.

17           MR. RAKHUNOV:  I am happy to address that.

18           THE COURT:  It's not necessary.  Where I was going

19   here was, one of my agenda items today was just to explore

20   whether there is a need for Adorama to be at the table.

21           Now, you have given me, Mr. Rakhunov, a great reason

22   to be.  I would note simply the following:  If it were the case

23   that the only theory of liability for Adorama was that if

24   Kitchen Winners is liable as a seller under the SPA, so is

25   Adorama for breach, if that's all we are talking about here,

OCCLKitC

1   you could also simply agree and put on the record that if

2   Kitchen Winners was found liable for breach of the SPA, you

3   would agree that judgment would commensurately be needed to

4   enter against Adorama.  That spares the jury a little bit of

5   work here.  We will cross that bridge.  That's for you all to

6   talk about.  I don't need to referee that.

7           I am just saying, I have seen that sort of thing -- we

8   see that happen a lot in cases where there is a claim under the

9   Fair Labor Standards Act, New York Labor Law, and everyone

10  agrees it's in the context presented by the case coextensive,

11  and so we don't send both issues to the jury.  Everybody agrees

12  that the outcome on the FLSA claim controls the New York Labor

13  Law, and so I would enter a judgment after the trial that

14  simply carries over from the FLSA to the New York Labor Law.

15  One, in theory, might do that on the SPA claim, whichever

16  direction it comes out.  I am only going to do that if you

17  agree to that.  I am not forcing it on anybody.  It may be that

18  there is wisdom to it.

19          My goal, in part, is when I have a jury in a case like

20  this that has a good degree of complexity and a low degree of

21  interest value, to streamline as much as I can because I want

22  them laser focused on what matters.  And to the extent we have

23  a bunch of stray things that are sort of hanging out there,

24  there is just a little more risk of detaining everybody for

25  needless time during the trial or complicating their

OCCLKitC

1    understanding or their deliberations.

2            So I will invite you offline to think about whether

3    there is a way of getting any Adorama determinations out of the

4    presence of the jury without any prejudice to the defense's

5    ability to hold Adorama liable.

6            I take it, Mr. Sperber, Adorama is represented by same

7    counsel as Kitchen Winners.

8            MR. SPERBER:  That's correct, but Adorama maintains

9    it's not a party to the contract.  This is one of the disputes

10    at issue, is whether or not, I guess -- I guess they are a

11    party.  The question is whether they are a seller under the

12    contract.  That's one of the issues between the parties.

13            THE COURT:  If you can't agree on something, I am not

14    forcing it on you.

15            Is Adorama related in some way to Kitchen Winners?

16            MR. SPERBER:  No.

17            THE COURT:  If you are able to explain, if Adorama has

18    an interest in separating itself from kitchen Winners in the

19    agreement, how come it's represented by the same counsel here?

20            MR. SPERBER:  It was a decision just based upon --

21            THE COURT:  Money?

22            MR. SPERBER:  Money, basically.

23            THE COURT:  I have seen that before.

24            OK.  Very good.  Let's go back then to the list of

25    witnesses.

OCCLKitC

1          Mendlowitz.  Mr. Sperber, approximately how long on

2     direct?

3          MR. SPERBER:  I think probably an hour tops.

4          THE COURT:  And you, Mr. Rakhunov?

5          MR. RAKHUNOV:  Same.  Maybe less.  No more than an

6     hour.

7          THE COURT:  OK.  The third is Eric Maimon.  Just,

8     because I understand the other two people, Weiner and

9     Mendlowitz, just in a couple of sentences, Mr. Sperber, explain

10    Maimon.  Who is Maimon?

11         MR. SPERBER:  Mr. Maimon, he was an individual

12    working, I don't want to characterize too much, but basically

13    on behalf of Rock Fintek in this transaction, as some version

14    of, I guess, maybe a broker, you would say.  So he was directly

15    involved.

16         We are not sure if he will show up at trial.  He lives

17    in Florida.  But we put him on our witness list, and we are

18    going to try and obtain him, if possible.

19         THE COURT:  All right.  Assuming he makes an

20    appearance, how long would his direct be?

21         MR. SPERBER:  Probably about an hour and a half.

22         THE COURT:  OK.  And Mr. Rakhunov?

23         MR. RAKHUNOV:  Your Honor, it's really difficult to

24    predict with Mr. Maimon.  He is one of those figures who was

25    deeply involved in the transactions, has played, I would say,

OCCLKitC

1  both sides of the transactions in some ways and has evaded both

2  of our efforts.

3          THE COURT:  He has not been deposed.

4          MR. RAKHUNOV:  He's not been deposed.  I have no idea

5  what he would say.  It could be a half hour.  It could be three

6  hours.

7          THE COURT:  All right.  So I will write half to three,

8  and we will see.  But it sounds like he's -- whether he joins

9  us is very much up in the air.

10          MR. SPERBER:  That's correct, your Honor.

11          THE COURT:  All right.  Next up, Joel Stern.  Given my

12  ruling, Mr. Sperber, some of what you are proposing to talk

13  about here is clearly off limits.  Would he still even be

14  called?

15          MR. SPERBER:  Yes, your Honor.  We do want him for the

16  two topics we mentioned.

17          THE COURT:  Why is Rock Fintek's history of payments

18  possibly relevant?  I thought I just excluded all that.

19          MR. SPERBER:  Not the timing of the payments, your

20  Honor, but the amount of the payments.

21          THE COURT:  I didn't talk about that.  I didn't allow

22  that.  What I thought I allowed is the quantum and quality of

23  gloves.

24          MR. SPERBER:  That's correct, your Honor.  So the

25  dollar amount versus the cost, and you can do the math to

OCCLKitC

1   figure out the number.

2           THE COURT:  He can't testify about the gloves without

3   having to go into payments?

4           MR. SPERBER:  My understanding is that he doesn't know

5   the exact number, but he knows how much he was paid and how

6   much he charged per box, so you can do the math.

7           THE COURT:  Is there going to be anything about this

8   that's going to imply in any way, shape, or form anything

9   disobedient or breaching by Rock Fintek?

10          MR. SPERBER:  By Rock Fintek?  No.

11          THE COURT:  So essentially Stern is going to show up

12  and authenticate some records of dollar amounts and give the

13  jury the factor, or whatever, that allows you to derive from

14  the dollar amounts the quantity of gloves.

15          MR. SPERBER:  That's correct.  And then also the other

16  issue is --

17          THE COURT:  The quality.

18          MR. SPERBER:  The quality.

19          THE COURT:  He should be up and down in 15 minutes,

20  right?

21          MR. SPERBER:  I assume so, your Honor.

22          THE COURT:  OK.  Because I have really -- the idea of

23  that whole narrative being part of the case is not well taken.

24  It wasn't obvious to me, although the ruling is technically

25  right as I gave it, it wasn't obvious to me that you need Joel

OCCLKitC

1    Stern to establish these points, but if you feel you need him,

2    I am not precluding it, but be real careful here because that

3    is a narrative that is out of the case otherwise.

4            MR. SPERBER:  We were never intending to go down that

5    direction.  We wanted him specifically for these points as to

6    the quantity and the quality of the gloves.

7            THE COURT:  Is it really the case that those points

8    need the subtraction effort involving JNS and Stern to get to

9    the answer for you?

10           MR. SPERBER:  There is quite a bit of dispute over the

11   documentation here, the number of gloves that were sold.  And I

12   think the simplest way to do it is take -- basically subtract

13   out what he sold, and you will get the number that my client

14   sold.  I realize it's a little bit backwards, but --

15           THE COURT:  One would hope that it could be done more

16   efficiently without him, but in any event, 15 minutes.

17           Mr. Rakhunov?

18           MR. RAKHUNOV:  So Mr. Stern is on our witness list as

19   well but for very different reasons.

20           THE COURT:  What -- is there a proper reason he is on?

21           MR. RAKHUNOV:  Mr. Stern is a party to communications

22   with Mr. Weiner regard -- quality of gloves.  Quality of

23   gloves.

24           THE COURT:  Within the context of what I permitted.

25           MR. RAKHUNOV:  Nothing to do with numbers or -- it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OCCLKitC

```
 1    to distinguish -- one of the proofs that we will have is that
 2    these sellers had container numbers of gloves, and the
 3    container numbers had a corresponding description of gloves,
 4    and they knowingly sold us gloves that did not conform to what
 5    the contract required, and Mr. Stern and Mr. Weiner were
 6    involved in transactions where -- let me back up.
 7         THE COURT:  Is this testimony about gloves from
 8    Kitchen Winners?
 9         MR. RAKHUNOV:  And this is what we know now.  At the
10    time, my client didn't know this.  All of the gloves that
11    Mr. Stern sold to Rock Fintek he got from Kitchen Winners.  At
12    the same time, Kitchen Winners was selling gloves directly to
13    Rock Fintek.  So all of the gloves ultimately actually came
14    from Kitchen Winners.  Some came through Mr. Stern.
15         THE COURT:  And the ones that come through Mr. Stern
16    are not at issue in this case, but you are contending that to
17    enable the jury to quantify relevant things about the ones that
18    actually are at issue, you need to bring to bear the Stern --
19         MR. RAKHUNOV:  Not so much to quantify.  Mr. Stern was
20    much more forthcoming in his testimony about what certain
21    labels on boxes of gloves meant, and so I think his
22    testimony -- and it would be brief -- would be informative for
23    the jury to understand what these packing slips and the
24    documents actually explaining what -- the same gloves, what
25    they are.
```

OCCLKitC

1          THE COURT:  In effect, though, what you are talking

2     about are topics within the scope of the limited topics I

3     authorized?

4          MR. RAKHUNOV:  Oh, yes.

5          THE COURT:  OK.  So how long would he be on the stand?

6          MR. RAKHUNOV:  About an hour.

7          THE COURT:  All right.  Look, I am not here to hector

8     you, but given the rather finite, defined, narrow topics here,

9     isn't there a way of getting him on and off way sooner than an

10    hour?

11         MR. RAKHUNOV:  I am taking into account having to

12    cross whatever may come out of -- your Honor, if I were calling

13    him first, I would say 30 minutes.

14         THE COURT:  All right.  OK.  Fair enough.  In other

15    words, that's for both cross and the direct purposes.

16         All right.  Then we have principal of Wenzy.  Put

17    aside issue of admissibility.  Assuming that the Wenzy person

18    is testifying, Mr. Sperber?

19         MR. SPERBER:  I would say 15 minutes, your Honor.

20         THE COURT:  And same, Mr. Rakhunov?

21         MR. RAKHUNOV:  Fifteen, 20 minutes.

22         THE COURT:  OK.  All right.

23         A principal of ACL America.  What is that,

24    Mr. Sperber?

25         MR. SPERBER:  Again, this was a storage vendor, so

OCCLKitC

1    again, just to authenticate documents.

2              THE COURT:  Fifteen minutes?

3              MR. SPERBER:  Fifteen minutes.

4              THE COURT:  OK.  And the same, Mr. Rakhunov?

5              MR. RAKHUNOV:  Yes, your Honor.

6              THE COURT:  OK.  So then number 7 is the principal of

7    MD 3PL.  I take it that's 3PLY.

8              MR. SPERBER:  Yes.  Maybe to speed things up, MD 3PL

9    and Del Express, those are vendors who would authenticate

10   invoices.

11             THE COURT:  Fifteen minutes for each on direct?

12             MR. SPERBER:  Correct.

13             THE COURT:  Same on cross, ball park, Mr. Rakhunov?

14             MR. RAKHUNOV:  Yes, your Honor.

15             THE COURT:  OK.  Helpful.

16             All right.  Michael Elstro, that's just a deposition

17   testimony, correct, Mr. Sperber?

18             MR. SPERBER:  That's correct.

19             THE COURT:  And again, making just reasonable

20   assumptions, how long is it going to take us to orate the depo

21   testimony?

22             MR. SPERBER:  I would think a half hour, thereabouts.

23             THE COURT:  And same with -- is that inclusive of what

24   you expect would be relevant to the defense or not?

25             MR. SPERBER:  I believe so.

OCCLKitC

```
 1              THE COURT:  Is that a roughly -- we don't need to be
 2    precise here.
 3              Mr. Rakhunov, is a half hour for depo reading about
 4    right?
 5              MR. RAKHUNOV:  I think that's right, your Honor.
 6              THE COURT:  William Huber, who is he, Mr. Sperber?
 7              MR. SPERBER:  I think you skipped Mr. Jaeger.
 8              THE COURT:  I'm sorry, yes.  Jaeger.  Yes.  He is a
 9    depo witness as well.  Mr. Jaeger, how long?
10              MR. SPERBER:  And I would say 15 minutes.
11              THE COURT:  OK.  And I am not holding you to it.  I am
12    just trying to make a guesstimate here.
13              MR. RAKHUNOV:  I am not sure if Mr. Sperber is taking
14    all of the designations into account.
15              THE COURT:  I am trying to get the entirety of what
16    you think in the depo transcript is likely to be germane to
17    either of you.
18              MR. RAKHUNOV:  Yes.  With your Honor's permission, I
19    would like to go back and just give a little bit more thought,
20    because Mr. Jaeger is the Medline representative.
21              THE COURT:  I am not holding you to anything.  I am
22    just trying to get a sense of the length of the trial.  What's
23    your ball park?
24              MR. RAKHUNOV:  I would say 30 minutes max.
25              THE COURT:  Fair enough.
```

OCCLKitC

1         William Huber, what's that, Mr. Sperber?

2         MR. SPERBER:  Mr. Huber is an expert on statistics who

3    opines regarding the adequacy of -- excuse me, the statistical

4    adequacy of Rock Fintek's testing of the gloves.  I will be

5    honest, I am not sure we are going to call Mr. Huber, but if he

6    does testify, I would think about a half hour of testimony.

7         THE COURT:  And defense, if he testifies?

8         MR. RAKHUNOV:  Same.

9         THE COURT:  Just pause on that for a moment.  This

10   didn't feel to me like an expert case, but is the idea that he

11   could help prove up the adequacy of the gloves that were

12   sold -- provided or -- I am not sure I am following.

13        MR. SPERBER:  So one of Rock Fintek's claims is that

14   the gloves that my clients -- that Kitchen Winners sold to it

15   did not meet the contractual specifications; they weren't

16   Nitrile gloves or they didn't meet certain other statistical --

17   so they had the gloves tested.  They only had, of the

18   200 million gloves, I believe -- I don't want to hold myself to

19   this number -- I think it was 14 gloves they tested.  And they

20   had a statistician of their own as well, who they have not

21   included on their list, who gave a model of what they would

22   have to test to say with a reasonable degree of statistical

23   probability that, you know, the gloves you are testing are an

24   adequate sample of the gloves that are out there.  So Mr. Huber

25   was our response to that, saying that they have not tested

OCCLKitC

1    enough gloves to say anything about the entire group that's out

2    there.

3                THE COURT:  Thanks.  I was just curious.  Thank you.

4                Mr. Poulton, deposition -- I'm sorry.

5                Mr. Carson, deposition.  Overall, how much,

6    Mr. Sperber?

7                MR. SPERBER:  Probably 15 minutes.  I know

8    Mr. Rakhunov designated a portion of his transcript.  I don't

9    recall honestly how large that was.  Maybe a half hour.

10               THE COURT:  Is that a fair estimate, Mr. Rakhunov?

11               MR. RAKHUNOV:  Yes, your Honor.

12               THE COURT:  All right.  Then there is Jason Poulton.

13   Length there?

14               MR. SPERBER:  Yes, your Honor.  Again, he is Rock

15   Fintek's expert regarding the adequacy of the gloves, and I

16   would guess, again, a half hour.

17               THE COURT:  Are you really going to be calling Rock

18   Fintek's expert?  That doesn't usually work that way.

19               MR. SPERBER:  It was basically a counter-designation.

20   So if they are using his testimony, we want to make sure

21   certain parts --

22               THE COURT:  Understood.  So a half hour did you say?

23               MR. SPERBER:  Yes.

24               THE COURT:  Fair estimate, Mr. Rakhunov?

25               MR. RAKHUNOV:  Yes.

OCCLKitC

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | THE COURT:  Then we come back to Kato.  And again, per                   |
| 2   | my point before, talking the deposition -- only use those as             |
| 3   | you need to control the witness.  The estimate here ought to be          |
| 4   | live testimony.                                                          |
| 5   | How long on direct for Kato?                                            |
| 6   | MR. RAKHUNOV:  That's a question for me?                                |
| 7   | THE COURT:  I'm sorry.                                                   |
| 8   | MR. RAKHUNOV:  Well --                                                  |
| 9   | THE COURT:  Who is direct?  You both have him.                         |
| 10  | MR. RAKHUNOV:  He is my client, but he is certainly                    |
| 11  | entitled to call him --                                                |
| 12  | THE COURT:  Of course.                                                  |
| 13  | You've got him on your list, so you go first.                          |
| 14  | MR. SPERBER:  In terms of my case, I am going to guess                 |
| 15  | an hour, thereabouts.                                                   |
| 16  | THE COURT:  All right.  And Mr. Rakhunov?                              |
| 17  | MR. RAKHUNOV:  Three to four hours.                                    |
| 18  | THE COURT:  So basically it looks like Weiner and Kato                 |
| 19  | are probably the biggest ones here.                                    |
| 20  | And then we have got Bradley Gilling, live witness.                   |
| 21  | Mr. Sperber?                                                            |
| 22  | MR. SPERBER:  Probably about a half hour, your Honor.                  |
| 23  | THE COURT:  And Mr. Rakhunov?                                          |
| 24  | MR. RAKHUNOV:  It's about a two-hour witness.  He's                    |
| 25  | another Rock Fintek individual.                                        |

OCCLKitC

```
 1              THE COURT:  All right.  Now, looking at Rock Fintek,
 2     the question is, who here wasn't included?  I see -- the first
 3     one I think that is of that nature is Alex King.  Mr. Rakhunov?
 4              MR. RAKHUNOV:  Yes, your Honor.  He is another
 5     logistics provider, and this would be deposition testimony.
 6              THE COURT:  Oh, depo.
 7              MR. RAKHUNOV:  Fifteen, 20 minutes.
 8              THE COURT:  Is that a fair estimate overall?
 9              MR. SPERBER:  Yes, your Honor.  Although, I believe
10     Mr. King resides within the Court's jurisdiction, so I don't
11     know if he is eligible for -- to testify via deposition.
12              THE COURT:  Look, I am trying to make this easy on
13     people.  If nobody wants to call him live, I am delighted to do
14     this by depo designation.  I am not trying to inconvenience
15     people in this case of all cases.
16              MR. SPERBER:  Understood, your Honor.
17              THE COURT:  OK.  Then Ascension.  Mr. Rakhunov.
18              MR. RAKHUNOV:  So --
19              THE COURT:  If you want to call him live, we will call
20     him live, but if nobody is pushing the point, I just as soon --
21              MR. RAKHUNOV:  We are happy to have him live.
22              THE COURT:  Look, if somebody wants him live, you are
23     entitled to do that, but I am offering -- very often where it's
24     a secondary figure, counsel are happy to proceed by depo
25     designation.  Go ahead.
```

OCCLKitC

1          MR. RAKHUNOV:  So Ascension, they are not within the

2     jurisdiction, so I don't know if we can get them live, and I

3     don't know what their level of cooperation will be at this

4     point, but I am exploring whether we can get them live.

5     Otherwise, they would appear by deposition, and I think 30 to

6     45 minutes is what it would take.

7          THE COURT:  Mr. Sperber, is that consistent with your

8     estimate?

9          MR. SPERBER:  Yes.  Just to be clear, Mr. Elstro, who

10    is on my list, that's the same person who testified --

11         THE COURT:  Oh, I see.  OK.  So that's the same.  OK.

12         And then Medline, did we already take care of Medline?

13         MR. RAKHUNOV:  That is Mr. Jaeger.

14         THE COURT:  Mr. Jaeger.  Yes, right.  OK.  So that's

15    covered.

16         And then we have got -- I think the next one is Banon.

17    Mr. Rakhunov.

18         MR. RAKHUNOV:  In light of your Honor's rulings today

19    on the motion in limine, I don't know that we will call

20    Mr. Banon.

21         THE COURT:  Because?

22         MR. RAKHUNOV:  Because we can rely on the written --

23    on the statements in his e-mails and text messages that we

24    believe would be -- it would be duplicative to call him.

25         THE COURT:  It's not that he has -- it's not that we

OCCLKitC

1    are talking about unrecorded statements that he would be

2    testifying to.  He would really more be narrating the process

3    of events, as reflected in contemporaneous writings?

4            MR. RAKHUNOV:  We would be -- to move the trial along,

5    we would be satisfied relying on his statements in written

6    documents.

7            THE COURT:  Which are either -- whose receipt will be

8    authenticated by means other than Banon?

9            MR. RAKHUNOV:  Yes.

10           THE COURT:  OK.  Was he deposed?

11           MR. RAKHUNOV:  No, your Honor.

12           THE COURT:  OK.  You have got Anna Grinvald,

13   Mr. Rakhunov.

14           MR. RAKHUNOV:  I wish I could get her, and I am still

15   trying, but she is either in China or Europe and is not making

16   herself available.

17           THE COURT:  I hate it when that happens.  But she is

18   not likely to be called?

19           MR. RAKHUNOV:  She is not likely to appear.  If she

20   were to appear, probably an hour tops.

21           THE COURT:  Sounds like no.  All right.

22           Mr. Schwartz you have got as depo testimony.  How long

23   will that take, Mr. Rakhunov?

24           MR. RAKHUNOV:  Thirty minutes or less.

25           THE COURT:  Is that a fair statement to you?

OCCLKitC

1          MR. SPERBER:  Yes, your Honor.

2          THE COURT:  And then Gombo, Tzali Gombo.

3          MR. RAKHUNOV:  Ten minutes.

4          MR. SPERBER:  Yes, your Honor.

5          THE COURT:  All right.  Good.  Give me just one

6    second.

7          All right.  Sort of ball park here, it looks as if the

8    amount of testimony would take us, although it's hard to

9    believe that a case like this merits it, I have got, seat of

10   the pants, around-ish 26 hours, something like that, making

11   some rough assumptions.  It may be that it winds up being

12   considerably shorter.  That would not be the first time.  But

13   given all that, it looks to me like we need a solid four days

14   for the receipt of evidence.  Then you have got jury selection,

15   opening and closing arguments, and instructions.  I think,

16   therefore, I need to, reluctant though I am, advertise this to

17   the jury as a six to seven-day trial.

18         Does that sound right to counsel?

19         MR. RAKHUNOV:  I have spoken to Mr. Rakhunov

20   beforehand.  We thought a five-day trial was in the range, but

21   that sounds --

22         THE COURT:  We will start each day at 9:30.  We will

23   end at 5:00.  We will start each day with evidence at 9:30 and

24   end at 5:00.  The jury will get an hour lunch break, then a

25   short break in the middle of the day.  You knock off an hour

OCCLKitC

and a half for that, you end up with six hours on the clock.
If you are right that, even if you cut the -- if you assume 24
hours, not 26 -- and I think it should be a lot shorter, but I
have to be careful to be accurate to our venire -- that's four
days right then and there for just the evidentiary part of the
trial.  Jury selection will be short in a case like this.
Opening statements will be short.  Closings could be longer.

I have not studied your requested charge.  We will do
that at the final pretrial conference, but depending on the
degree to which there are claims broken out by, you know, the
distinct series of contracts here as opposed to just an
aggregated breach of contract claim on each side, you wind up
with a situation where there could be a good number of
determinations which the jury has to make, which in turn makes
for a need to be rather distinct in closing arguments,
instructions.  I think we have to be careful here.

So think I think in advertising it to them, I think I
am stuck with saying that you and I are -- counsel and I are
confident it will be done in six to seven days.  I wish I could
tell them five, but the last thing I ever want to do is
undersell it and have people inconvenienced.

All right.  I am going to take now a five-minute
comfort break.  When we come back, I have a handful of other
issues, but we should be relatively brief.

(Recess)

OCCLKitC

```
 1              THE COURT:  Be seated.

 2              All right.  Look, I am now assuming, just for

 3      argument's sake, we need to set aside approximately seven days

 4      for the trial, which is, by the way, what you said in the joint

 5      pretrial order.  It wouldn't shock me if it came in

 6      considerably shorter, but to play it safe.

 7              So with that, I would like to try this in the first

 8      quarter.  I have a large availability in March and several

 9      different seven or eight-day periods essentially beginning on

10      the weeks of March 3, March 10, and March 17.  I could also try

11      this, plus or minus, around the beginning around February 10.

12      Open for discussion whether I would sit five days or four days

13      during a week.

14              Beginning with the plaintiff's table, do you have any

15      view about any of that?

16              MR. SPERBER:  Your Honor, I am largely available in

17      March.  I am checking right now, but I believe I am very

18      flexible.

19              THE COURT:  Any of those sounds like they work for the

20      plaintiff.  Do you know about the February dates?

21              MR. SPERBER:  Can you repeat them again.

22              THE COURT:  The other option, it's subject to a guilty

23      plea occurring in a criminal case, but we have been advised

24      that that's going to happen.  So if so, I would become free the

25      week of February 10 through 19.  Just yes or no.  That may be
```

OCCLKitC

1    President's Day week or something.

2            MR. SPERBER:  Yes.  I know Mr. Rakhunov, he told me he

3    has conflicts.

4            THE COURT:  I am going to get to him in a minute.  I

5    am just checking your availability.

6            MR. SPERBER:  I am available.

7            THE COURT:  You are available any of those dates.

8            Mr. Rakhunov, how about you?

9            MR. RAKHUNOV:  So your Honor, unfortunately, my first

10    quarter of 2025 sounds very different.  We start evidence in

11    the District of Maine in a RICO case scheduled to go at least

12    four weeks.

13            THE COURT:  What do you mean, evidence?

14            MR. RAKHUNOV:  We pick a jury on January 6, and then

15    the Court starts the trial.  So I guess opening statements on

16    January 21 in the District of Maine.  The Court has set aside

17    four weeks.  We have a final trial conference in that case on

18    Tuesday, in a few days.  My client has a motion to sever.  We

19    have a notion to sever my client from that case.  If we were to

20    win that motion, then my February becomes wide open.

21    Otherwise, I am sitting in a courtroom in Portland until at

22    least February 18.  And then that is a school vacation week, so

23    I would hope to spend a few days with my kids if that trial is

24    over.

25            THE COURT:  I am never going to get in the way of time

OCCLKitC

1   with your kids.

2           MR. RAKHUNOV:  And then beginning of March becomes

3   really challenging because I am on trial the whole week --

4           THE COURT:  I know, but -- look, of course, I will

5   respect the conflict you presently have in -- Maine?

6           MR. RAKHUNOV:  District of Maine.

7           THE COURT:  And, of course, I respect the -- when I

8   took this job, I told myself I was going to be more friendly to

9   counsels' vacations that I had necessarily seen when I was at

10  counsel table so, yes, of course.

11          That being said, it seems to me -- and I appreciate

12  coming out of a trial, there is a little bit of a need to take

13  stock of the rest of your docket.  That being said, I am

14  offering up three different weeks here.  And you have the

15  benefit of an adversary who seems to be quite flexible.

16          You know, could we do it the last of those weeks?

17          MR. RAKHUNOV:  So I conferred with Mr. Kato and

18  Mr. Gilling in advance of this.  They both have young families

19  as well.  The second two weeks in March and the first week of

20  April, they are both out of the country.  And then I,

21  unfortunately, have another trial in May in a significant case

22  in Richmond, Virginia.

23          THE COURT:  Why don't we do it the first week of

24  March, because the first week of March, you will get your

25  clients' testimony in.  It will be before they go away, and we

OCCLKitC

1    are not going to run into stuff.  Otherwise, we are going to be

2    blowing -- we are pushing this well into the second quarter.

3            MR. RAKHUNOV:  So your Honor, what I would

4    respectfully suggest -- and we did confer in advance of this,

5    and the second half of June seems to work great.

6            THE COURT:  Not to my murder defendant.

7            MR. RAKHUNOV:  I'm sorry?

8            THE COURT:  Not to my murder defendant.  A criminal

9    case takes precedence.  I have got wide open, then starting

10    in -- I have got a couple of back-to-back significant murder

11    cases, so I am trying to get this done sooner rather than

12    later.

13            MR. RAKHUNOV:  Is there any availability in May?

14    Beginning of May?  The first couple of weeks?

15            THE COURT:  No.  I mean, a murder trial in June, I was

16    notified at the sidebar a couple of days ago, may be moving

17    earlier to accommodate a personal need of one of the counsel.

18            So why can't we do it the week of March 3?

19            MR. RAKHUNOV:  Your Honor, I will just be asking you

20    for the understanding that I will literally have just finished

21    a four-week trial, with a pile of other cases.  And I

22    understand this case is as important as every other case, but I

23    also want to give my clients adequate preparation time.  They

24    will be away for school vacation week at the end of February.

25    It will be incredibly difficult to prepare them for their

OCCLKitC

1    testimony.

2            THE COURT:  They are going to be away the end of

3    February, and then the last -- then the last two weeks of

4    March?  What school do these kids go to?

5            That was a rhetorical question.

6            The beauty of a civil case where there have been

7    depositions taken and where the script is largely known to you

8    all is that you ought to be able to prep this, you know, with

9    some visibility into what's going to happen.  Look, I am

10   working with you here, but you have knocked out the whole first

11   quarter here, and it's one side who is doing it.  The other

12   side is pretty much open to anything.  And you are not offering

13   anything in the whole first quarter.

14           MR. RAKHUNOV:  I understand, your Honor.  And your

15   Honor, look, if on Tuesday, this coming Tuesday, I win a motion

16   to sever the claims against my client in the District of Maine,

17   I would be happy to try this in the beginning of February.

18           THE COURT:  What are the odds that you are going to

19   win that?

20           MR. RAKHUNOV:  I will not go on the record saying

21   anything but 100 percent in favor of my client, but I don't

22   know, your Honor.

23           THE COURT:  OK.  Fair enough.  You are right.

24           Well, look, I mean, one way to do this is to -- it

25   looks to me as if the one window here which is not precluded by

OCCLKitC

1    a conflict that presently exists would be the week of March 3.

2    We could put it down for that, with the understanding that if

3    your schedule frees up in February, I would ask everyone to

4    hold that week of the 10th.

5         MR. RAKHUNOV:  What about the week of March 10?

6         THE COURT:  I offered that.

7         MR. RAKHUNOV:  I'm sorry.  If we had to do March, I

8    would prefer the week of March 10.

9         THE COURT:  That works.  I thought that was one of

10   your clients' unavailable weeks, but perhaps that's not.

11        MR. RAKHUNOV:  No, March 17.

12        THE COURT:  Fine.  Then why don't we do that.  Let's

13   put this down for March 10, and if it turns out you are free to

14   do this in February, you will alert us promptly.  Alert us no

15   matter what once the decision is made in your Maine case about

16   severance, if only because everyone can free up their March.

17        MR. RAKHUNOV:  I understand.  My colleague is just

18   saying March 10, seven days would go into March 17.

19        THE COURT:  I think -- look, I will insist that

20   Plaintiff accommodate, and I am sure they will, taking your

21   clients -- making sure their testimony is done by the end of

22   that week.  I could sit five days.  Save the optician's

23   checkup, I am wide open the entire week.

24        MR. RAKHUNOV:  Perhaps we could even do jury selection

25   on a Friday -- no, OK.

OCCLKitC

```
1            THE COURT:  Doesn't work that way in this district.
2            MR. RAKHUNOV:  Your Honor, I am confident that we
3    could get this done in five days or less.
4            THE COURT:  My point is, the issue for you after the
5    week of March 10 is solely your two principals, and we can
6    arrange for them to testify Wednesday, Thursday or take people
7    out of order.  The depo designations, for example, can be
8    backloaded almost in their entirety.  Those can be moved around
9    to fill spots, right?
10           MR. RAKHUNOV:  I think they would like to be here for
11   the jury's decision.  So we will do our best.
12           THE COURT:  Look, you know, sorry, but, I mean, if --
13   I am working with you.  I am trying to come up with a date that
14   is consistent with your needs.  That sounds not ideal, but if
15   you are getting off of trial around February 18, you have got
16   two and a half, three weeks in between, in a case that plenty
17   of discovery, very clear pretrial rulings, like them or not,
18   the ground rules are reasonably clearly set out.  I explained
19   my preference for depo designations.  You all should be able to
20   get a lot of this accomplished beforehand.  And you'll have, I
21   take it, a trial partner.
22           MR. RAKHUNOV:  Yes, either Mr. Yokow or Ms. Lauren
23   Riddle.  I will have some help.
24           THE COURT:  Let's put this down for March the 10th.
25           Now, let me just schedule a next conference at which,
```

OCCLKitC

1   to the extent that there is anything stirred up by the next

2   round of letter-writing, to the extent that there are issues

3   that I am having in looking at requests to charge, I would like

4   to meet with you.  I think it's best to do that closer to trial

5   because in the case that the case settles beforehand, I don't

6   want to waste everyone's time.

7           Can we meet the week before trial, like, say around --

8   how about the afternoon of Monday, March 3 as a final pretrial

9   conference, 2:00 p.m.?

10          MR. SPERBER:  Yes, your Honor.

11          MR. RAKHUNOV:  Yes, your Honor.

12          THE COURT:  We will meet then.  I expect at that

13  conference -- that will be truly the last pretrial conference.

14  At that point, my law clerk and I will be all over the

15  potential charge and questions it raises so that we can be

16  preparing our material the rest of that week.

17          I am going to turn to voir dire in a moment.  Let me

18  ask the question about settlement.  I do not want to hear

19  anybody's positions, but remind me, have you had a mediator, a

20  settler in this case?

21          MR. SPERBER:  We have not had a mediator, your Honor.

22  We have discussed informally, to date unsuccessfully,

23  obviously.

24          THE COURT:  OK.  If there is a joint request for me to

25  refer this to the magistrate judge for the purposes of

OCCLKitC

1    settlement, I am delighted to do it.  It may also be that

2    that's ultimately unsuccessful -- unnecessary.  Either you are

3    going to get there or not on your own.

4            Is there an interest in that, or is that really not

5    where the debate is?

6            MR. SPERBER:  I think my clients are open to it, your

7    Honor.

8            THE COURT:  Do you think it would help?

9            MR. SPERBER:  I have to go back and talk to them after

10   today's rulings to see where everything is at.

11           MR. RAKHUNOV:  My sense is magistrates in this

12   courthouse have been actually very helpful in other cases, and

13   I would welcome that.

14           THE COURT:  Look, I am not hearing objection from the

15   plaintiff, and I am trying to shake things up.  Let me refer

16   this to the MJ.

17           Off the record.

18           (Discussion off the record)

19           THE COURT:  Magistrate Judge Robert Lehrburger, who

20   has been enormously successful among other types of cases in

21   settling commercial disputes in front of me.  Indeed, he was a

22   commercial trial lawyer at, I think, the Patterson Belknap

23   firm.  So he will be a sophisticated audience for you.  I will

24   refer this to him and will privately encourage him to

25   prioritize it.  You should reach out to him right away with

OCCLKitC

1    your availability to talk settlement.

2            Look, I take it, for better or worse, that some of the

3    rulings here may have had some implications for counsel.  I

4    obviously understood from the defense table the negative

5    implication of the Ascension payments one, but it may be that

6    some of the other rulings having to do with Banon and whatnot

7    have a bearing on the plaintiff's side.  Regardless, one of the

8    virtues of resolving motions in limine early is precisely, for

9    better or worse, to give you a more common sense of the range

10   of outcomes and the likelihood of outcomes in the case.

11           I hope you will speak with your clients promptly to

12   renew the discussion of settlement.  And, you know, as soon as

13   it becomes clear that using a magistrate judge would be useful,

14   I want you to get on the phone with the magistrate judge to

15   schedule a settlement conference.  I will typically write, and

16   I will do that here, just as a default mode for myself, on the

17   referral order, I put it on Plaintiff's counsel to be your

18   joint scheduling agent only, which is to say, once you have

19   agreed on a time to speak, somebody has to call him up to

20   arrange a time, unless you both want to be on the phone.  It's

21   on Mr. Sperber to do that, but only when you both have agreed

22   that you are ready to speak to the magistrate judge and have

23   dates of availability.

24           OK.  Let's talk about voir dire.  I will explain in a

25   few minutes the mechanics of jury selection, unless you would

OCCLKitC

1   like me to push that off to the next conference.  But one thing

2   I do want to do is read to you the summary I have prepared with

3   my law clerk of the case that I would be reading to the venire.

4   Remember, this is not a charge to the jury, and it's not even

5   an instruction to an assembled jury of what the case is about

6   to be about.  This is purely to flag a top-line description so

7   that if somebody has some experience in this industry or knows

8   something or other that would make them a problematic juror,

9   they can alert to it.  So here is the short description of the

10  case.  The beginning and the end are formulaic things I say in

11  civil cases, and the big paragraph in the middle is what is

12  specific to this case.  And I will be saying this to the venire

13  of -- I am guessing we will probably have a third -- probably

14  have nine jurors in the case.  There aren't alternates, as you

15  probably know, in civil cases, but the constitutional minimum

16  is six.  Just given that Covid is still a little bit afoot, I

17  will probably have three extras just so that if we have

18  something that sweeps the city, we are not going to have to

19  retry this thing.

20          So you would have, I don't know, 20 jurors sitting out

21  there, of which nine of them -- 25 of them, nine of them are

22  destined to be our jury.  But in any event, I would be saying

23  to the 25 the following, so take notes.  Let me know if there

24  is anything inaccurate or problematic.

25          "So you can understand the reason for the questions I

OCCLKitC

1   will be asking you shortly, I will now tell you briefly about

2   the case.  I want you to understand that nothing I say today

3   regarding the description of the case is evidence.  The

4   evidence you will consider, if selected as a juror, will come

5   from the trial testimony of witnesses and from exhibits that

6   are admitted into evidence.

7           "As I have explained, this is a civil case.  It is

8   entitled Kitchen Winners New York Inc. v. Rock Fintek LLC.  The

9   case mostly involves claims of breaches of contract.  After the

10  Covid-19 pandemic began, the two companies I mentioned, which I

11  will call Kitchen Winners and Rock Fintek, got into the

12  business of distributing personal protective equipment.  That

13  includes gloves to protect against the spread of the virus.

14  Agreements were entered into under which Kitchen Winners was to

15  supply Rock Fintek with millions of gloves.  Each party claims

16  that the other did not carry out its obligations under the

17  contract.  Kitchen Winners mainly claims that Rock Fintek did

18  not pay it for gloves that Kitchen Winners supplied and which

19  Rock Fintek resold to its customers.  Rock Fintek mainly claims

20  that some of the gloves that Kitchen Winners were supplied were

21  substandard, that they were not of the quality that the

22  contract required.  Rock Fintek also brings claims against

23  another company, Adorama Inc., which was working with Kitchen

24  Winners on the glove transaction.

25          "This is a civil case and not a criminal case, and no

OCCLKitC

1    one will go to prison as a result of the verdict in this case.

2    The parties are seeking money damages as compensation for their

3    alleged losses.  To win on any claim, each side will have the

4    burden at trial of proving that claim by what is called a

5    preponderance of the evidence.  This means that the party

6    bringing the claim must produce evidence that, considered in

7    light of all of the facts, leads you to believe that their

8    claim is more likely true than not."

9            That's what I would propose to tell them, just to

10    sensitize them to the big picture.

11            Mr. Sperber, is that OK with you?

12            MR. SPERBER:  I think so, your Honor.

13            THE COURT:  Mr. Rakhunov?

14            MR. RAKHUNOV:  We are satisfied with that, your Honor.

15            THE COURT:  I mean, look, I have left out unjust

16    enrichment and, I am sure, some other theories of breach or

17    some other, you know -- what I wanted to do was in case

18    somebody operates in that space or knows something.

19            MR. RAKHUNOV:  And I wanted to bring this up, your

20    Honor.  There are a couple of theories that, after your summary

21    judgment ruling, there are only nominal damages available, and

22    I am discussing this with my client, but we may just drop

23    those.

24            THE COURT:  Great.  In fact, if you wouldn't mind, if

25    you do that, let the other side know and then write a letter to

OCCLKitC

 1    me because, not now, but in advance of the final pretrial

 2    conference my law clerk and I will be spending a bunch of time

 3    trying to rationalize the claims and think about a

 4    user-friendly way to present this.

 5         One of the challenges in a case like this is, with a

 6    series of different agreements, of different formats, how to

 7    break out the claims in a way that isn't repetitive and that

 8    is, sort of, maximally clear.  Bless you, Mr. Rakhunov.  To the

 9    extent you are able to prune the case of things that really

10    don't matter, that would be great.  OK.  Thank you.

11         Look, I will take a minute or two, just while we are

12    here, so you understand how jury selection works.

13    Particularly, perhaps, useful to you, Mr. Rakhunov, if your

14    contact with your client is, maybe, limited in that week

15    before, here is a chance so everyone knows.

16         I will need to know who is going to be at the table

17    for each of you.  And my law clerk and I will prepare a written

18    questionnaire which will be handed out to the members of the

19    venire, each question of which is answerable yes or no, and it

20    is the yes questions that prompt a follow-up.  And what will

21    happen is, the venire will come in, and Mr. Smallman and I,

22    based on a randomized list that will be generated by the

23    Clerk's Office, will call the first nine jurors, and they will

24    sit in seats one through nine here in the jury box.  And I will

25    begin by, with Juror No. 1, going through the questionnaire

OCCLKitC

1    with my reading aloud each question, but I will have notified

2    everybody in the room to follow along, Jurors 2 through 9, and

3    everyone else, and to circle the yes -- any question number to

4    which they have a yes answer.  And the questions will be

5    predictable ones that will involve general propositions of law

6    and making sure they are good with all that.  They will involve

7    the nature of the case and whether that presents any issues.  I

8    will identify every witness or name to be mentioned.  My law

9    clerk will be reaching out to you closer to the event to make

10   sure we have a comprehensive list of all of that.  It's not

11   just witnesses, but it's names that are going to come up in

12   testimony.

13          I have to look more at your requested charge, but

14   there will be, no doubt, some case-specific concepts, PPE,

15   Covid, who knows what, that may -- heaven forbid somebody has a

16   relative who died and they blame the gloves, or whatever.  I

17   need to smoke that stuff out.  So there will be a bunch of

18   categories like that.  I will go through all those questions

19   with witness No. 1, and to the extent I need to follow up --

20   with Juror No. 1.  To the extent I need to follow up with yes

21   answers, I will do so, if necessary, at the sidebar.  And as I

22   said, some of that will also involve identifying trial

23   personnel, meaning each of the people at the table.  When the

24   time comes, I will have each of you rise and silently face the

25   jury box and the venire just so they can take a look at you and

OCCLKitC

1    make sure they don't, you know, know you, and that will include

2    not just you all, but if your clients are present, if a

3    paralegal is present, all that.  If not, we will just have the

4    names, and that will be fine.

5            After that, I go down the row, but instead of reading

6    all the questions, I just say to Juror No. 2, "Do you have any

7    yes answers?"  And if Juror No. 2 says, "Yes, questions 3, 18,

8    and 19," I zip over, deal with those, and then move on to Juror

9    No. 3, and right down the line.  And so the beauty of this, I

10   deal with each juror in that respect just once.

11           Having done all that, it may be that over the course

12   of that process one or two people has a problem.  Somebody, for

13   example, might have difficulty reading English, or they might

14   be on some medication that is problematic.  The brevity of the

15   trial ought not give rise to problems, but once in awhile you

16   will have somebody who has childcare at 3:00 o'clock, and they

17   probably shouldn't be here, but since I sit until 5:00, that

18   will be an issue.

19           In any event, to the extent I am required to excuse

20   somebody, Mr. Smallman will go down the next one on the

21   randomized list, and that person will fill the seat that was

22   vacated.  So if you are creating juror sheets with the usual

23   Post-Its, nobody is ever going to be in a separate seat.  If

24   you are Juror No. 7, you are always Juror No. 7 for the

25   purposes of jury selection.  If that person gets struck, peel

OCCLKitC

1    off your Pose-It and write down the new name.

2            Once we are done clearing nine people for cause, the

3    last page of the questionnaire is a biographical questionnaire:

4    Have you always lived in the United States?  What part of the

5    city do you live in?  Education you have received, employment,

6    employment of members of people in your household, military

7    service, reading habits; a whole host of predictable things.

8    You will obviously all get a copy of this.

9            The very last question is:  Please name a famous

10   person you admire, and briefly say why.  I will tell you that

11   lawyers consistently tell me that that is a valuable

12   attitudinal question, probably more relevant in cases that have

13   higher emotional valence than this, like criminal cases, but

14   you never know.

15           In any event, each of them -- I will essentially give

16   them my short-form answers to the questionnaire with a modified

17   version of my biography so they will have a sense of tone and

18   level of detail.  Then Mr. Smallman will give a handheld mic to

19   each of them, and each of them, using the questionnaire, will

20   give you their bio.

21           With that, we will be done with the

22   information-seeking part of jury selection.  I will give each

23   table five minutes to figure out how many strikes you are

24   using.  If memory serves, with that number I think you each get

25   three strikes.  So I think what that means is -- you know what,

OCCLKitC

1  I misspoke here.  I said there will be nine jurors.  We will

2  have nine plus the number of strikes.  So if I am right, it

3  would be 15 jurors, I suppose.  When I said one through nine,

4  strike that.  It will be one through 15.  Each of you will have

5  three strikes.  The way we will do it is plaintiff one, defense

6  one, plaintiff one, defense one, plaintiff one, defense one.

7  All of that will be in my robing room over here.  And the nine

8  people who survive will be our jury.  In the event one of you

9  waives or foregoes a challenge, it will be the first nine

10  people who will be our jury.  So that's the mechanics of jury

11  selection.

12       After that, I will have a very brief instruction to

13  them as to mechanics of jury selection, note-taking, the

14  sequence of events.  Mr. Smallman will acquaint them with the

15  jury room.  They will have a comfort break.  Then we will bring

16  them out, and I will give them ten minutes of opening

17  instructions.  We will go right into opening statements.

18       In terms of my trial schedule, just so you know, I

19  work a long day.  I expect counsel here at 9:00, in part to

20  anticipate issues during the day.  And I ask counsel, to the

21  extent that issues are likely to arise the next day to flag

22  them for me before we leave the day before.  I love getting

23  letters from counsel flagging issues, but at a minimum, I want

24  you to raise stuff beforehand.  Juries hate sidebars, and I am

25  not far behind them.  So what I try to do is resolve issues

OCCLKitC

1    beforehand, as I have today, so that all of you, for better or

2    worse, know what the guardrails and ground rules are and you

3    know how to measure your witness sheets and your examinations

4    and objections and the like, and your opening statements.  And

5    so I, you know, very much value people raising issues.

6           I bring out the jury at 9:30.  We work until 5:00.  We

7    take about an hour-long break at lunchtime, which loosely

8    starts at 12:45 or 1:00, but I am looking for a natural break.

9    And we will take a ten-minute comfort break in the morning and

10   the afternoon.  The jury gets caffeine and treats at the

11   afternoon break just to keep them awake, which I suspect will

12   be useful here.

13          So I expect you always to have a next witness ready.

14   Now, in a case like this, where we appear to have a bunch of

15   deposition designations, as long as you have got that ready to

16   fill the hole.  If we end at 4:40 one day and there is no live

17   witness, as long as you can fill it up until 5:00 o'clock with

18   deposition designations, that's fine, but I want to make use of

19   all of our time with the jury.  I try to model that we are

20   respectful of their time.  My experience is that juries would

21   rather work long days and fewer of them than have the baton

22   death march of a trial of working until 2:30 or something.  So

23   that's the way I choose to go.  It means having a full day, so

24   you need to prioritize getting ready for trial beforehand

25   because when it gets going, it moves fast.

OCCLKitC

1          At our final conference we will take up any issues of

2   trial technology.

3          May I just ask you, as to the depositions, were these

4   done the old-fashioned way on paper or video?

5          MR. SPERBER:  I believe these were all by -- all on

6   paper, your Honor.

7          THE COURT:  No video?

8          MR. RAKHUNOV:  No.

9          THE COURT:  Fine.  Then what I envisioned earlier of

10  the responsive call and response reading works.  Had it been by

11  video, we would have done it a different way.  But that makes

12  it easier.

13         And is all the evidence that's going to be received in

14  this case good old-fashioned documents?  I mean, there's not

15  audiotapes or something, right?

16         MR. RAKHUNOV:  I don't think so, but there are -- I am

17  just trying to remember.  No.  There will be some photographs

18  though.

19         THE COURT:  And there will be some gloves?

20         MR. RAKHUNOV:  I'm sorry?

21         THE COURT:  Some gloves?

22         MR. RAKHUNOV:  And there will be gloves.  So that is

23  the most old-fashioned evidence.  But your Honor -- and I

24  mentioned this to counsel in advance.  In the recent few trials

25  that we have had, we have had a really good track record of

OCCLKitC

1   putting documents on screens in front of juries rather than

2   handing them paper.

3       THE COURT:  Totally.  Yes.  You will see each of my

4   jurors here shares a screen, so that works beautifully.  It's a

5   medium size, small size TV screen.  You can look at it later.

6   But they share that.

7       So the key will be at the last conference just to set

8   a time with Mr. Smallman to make sure that you are ready for

9   prime time, which will mean whoever is running tech at your

10  table is well coordinated in knowing how to work the

11  technology.  I prefer you do that rather than using the

12  old-fashioned elmo, which is in a drawer in the lectern over

13  there, where, you know, you are basically slopping the document

14  on an old-fashioned, in effect, projector.  That doesn't work

15  so well, and it always comes up sort of oblong.  It's better

16  for you to do it this way.  I get the same document here.

17      Look, as it relates to documents, I noted a rather

18  formidable set of documents each of you has.  Some of my

19  rulings today may or may not have narrowed some of it.  I don't

20  know.  But I have -- as you know from my individual rules --

21  and you complied with this in the joint pretrial order -- you

22  know documents marked by one star are ones that there is no

23  dispute as to authenticity, and two, there's no dispute at all

24  as to receipt.  I couldn't tell one way or the other what the

25  nature is of the documents where there is a substantive

OCCLKitC

1    objection, or whatever, but I sure would like to resolve all of

2    that so we are not doing that needlessly in front of the jury.

3         May I ask you, to start with you, Mr. Sperber, are

4    there meaningful objections here to the receipt of documentary

5    evidence?  I would like to hope that we can, sort of, sort that

6    out beforehand.

7         MR. SPERBER:  If I recall correctly, your Honor, most

8    of our objections are to hearsay that are contained within some

9    of the documents.

10        THE COURT:  But was that resolved by my ruling adverse

11   to you on Banon?

12        MR. SPERBER:  I do not believe so.

13        THE COURT:  So what's a paradigm of the hearsay issue?

14        MR. SPERBER:  I don't recall off the top of my head.

15   I would have to go back and look.

16        THE COURT:  Look, what I would like to do is put

17   myself in a position where, if there are disputes about the

18   admissibility of documents, I would like to resolve them at the

19   final pretrial conference.

20        Can I suggest the following?  The easiest way to do

21   this would be for you all to put your heads together as to any

22   documents where there really is a dispute, and write me a joint

23   letter which basically attaches the documents with respect to

24   the exhibits, use the same numbering you do in the joint

25   pretrial order, and set out in a paragraph each of your

OCCLKitC

```
1    respective views in the letter.  That way, using that with the

2    document attached, the exhibit attached, I will be able to rule

3    for you at the final pretrial conference, and that way, going

4    into the trial, you all know exactly what the script of this

5    play looks like.  Can you do that?

6              MR. SPERBER:  Yes, your Honor.

7              THE COURT:  So Mr. Rakhunov?

8              MR. RAKHUNOV:  I'm sorry, I didn't hear if your Honor

9    set a deadline for that.

10             THE COURT:  No, I didn't.  I am --

11             MR. RAKHUNOV:  The procedure, we agree.

12             THE COURT:  I am just trying to be user friendly.

13   Lawyers hate judges who just sort of wake up in the middle of

14   trial and say, That's out, that's in.  You would rather have my

15   answer and have me have time to think about it.  It avoids

16   unforced errors by me and gives you clarity.

17             So how about the week before that conference?  If our

18   final conference is the 3rd, I think that would be on the 24th.

19   Can we say on February 24, just a joint letter that attaches

20   any evidence -- any exhibits whose admissibility is in dispute

21   and sets out by exhibit your respective views?

22             The idea here would be just, you know, simply, you

23   know, "Exhibit 10 is an invoice from ABC News.  Plaintiff seeks

24   to admit it.  Defense argues that" -- that sort of thing.

25   However you want to do it.  But just short and sweet so that I
```

OCCLKitC

1    can make a smart judgment.

2            MR. SPERBER:  Yes, your Honor.

3            MR. RAKHUNOV:  That works for us, your Honor.

4            THE COURT:  Good.  Wonderful.  I will issue an order

5    that sets out that conference date of March 3 and that date --

6    deadline a week before.

7            OK.  With that, I have now exhausted the rather

8    formidable set of stuff I came here to speak with you about.

9    Let me go around the horn to see if there is any other way I

10   can be useful to you.

11           Mr. Sperber?

12           MR. SPERBER:  No, your Honor.  I think you covered a

13   lot of ground, and we appreciate that.

14           THE COURT:  Mr. Rakhunov?

15           MR. RAKHUNOV:  No, your Honor.  We have quite a bit to

16   digest.

17           THE COURT:  Do speak with your clients about

18   settlement here.  And, look, Mr. Rakhunov, on the issue that

19   you, I think, reacted most strongly to, which involved the

20   invoices, I gave a lot of hard thought to that.  I really did.

21   If there is genuinely someplace in which, contrary to the

22   ruling, there was pre-fact discovery end date notice of this, I

23   am open to hearing what you have to say.  But, if not, I think

24   you have to take it as decided.  It is what it is.

25           All right.  Very well.  Have a good holiday,

OCCLKitC

1    everybody.  I look forward to hearing from you down the road.

2    I will alert Judge Lehrburger as soon as the order referring

3    the case for settlement purposes to him issues tomorrow what

4    our trial date is, and that as soon as he hears from you, I

5    hope that he can schedule it.

6              What I would say is our magistrate judges are

7    fantastic and very busy, and so the sooner you can get on his

8    dance card, the better; no doubt better for your clients, too,

9    to the extent there are expenditures being made in advance of

10   trial.  And so, you know, what you might want to do is touch

11   base in the next workday or two just to see if this is going to

12   settle without the MJ and, if not, be reaching out to him early

13   to mid next week to get on his dance card for early January, or

14   something.

15             Be well.  Have a good holiday.

16             (Adjourned)

17

18

19

20

21

22

23

24

25