FEBRUARY 01, 2024                                THOMAS KATO

```
                                                    Page 1
         UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
                    -oOo-
KITCHEN WINNERS NY INC.,    )
                            )
        Plaintiff,          )
v.                          ) Case No. :
                            ) 1:22-cv-05276-PAE
ROCK FINTEK LLC,            )
                            )
        Defendant._____)
ROCK FINTEK LLC,            )
                            )
    Counterclaimant and     )
    Third-Party Plaintiff,  )
v.                          )
                            )
KITCHEN WINNERS NY INC.,    )
                            )
    Counter-Defendant,      )
                            )
and                         )
                            )
ADORAMA INC., HERSHEY WEINER,)
JOSEPH MENDLOWITZ, JNS      )
CAPITAL HOLDINGS LLC and    )
JOEL STERN,                 )
                            )
    Third-Party Defendants._)
              DEPOSITION OF
    NON-RETAINED EXPERT WITNESS ON BEHALF OF
              ROCK FINTEK LLC
                THOMAS KATO
             FEBRUARY 1, 2024


STENOGRAPHICALLY REPORTED REMOTELY BY:
MONIQUE K. GENTRY, RPR, CSR No. 12354

Job No. 1994
```

```
                                                    Page 2
 1          UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                    -oOo-
    KITCHEN WINNERS NY INC.,    )
 4                              )
            Plaintiff,          )
 5  v.                          ) Case No. :
                                ) 1:22-cv-05276-PAE
 6  ROCK FINTEK LLC,            )
                                )
 7          Defendant._____)
    ROCK FINTEK LLC,            )
 8                              )
        Counterclaimant and     )
 9      Third-Party Plaintiff,  )
    v.                          )
10                              )
    KITCHEN WINNERS NY INC.,    )
11                              )
        Counter-Defendant,      )
12                              )
    and                         )
13                              )
    ADORAMA INC., HERSHEY WEINER,)
14  JOSEPH MENDLOWITZ, JNS      )
    CAPITAL HOLDINGS LLC and    )
15  JOEL STERN,                 )
                                )
16      Third-Party Defendants._)
17
18      Zoom videoconference deposition of THOMAS KATO,
19  Non-Retained Expert Witness on behalf of Rock Fintek LLC,
20  commencing at 1:28 p.m., Eastern, Thursday, February 1, 2024,
21  before  Monique Kathleen Gentry, Registered Professional
22  Reporter, California Certified Shorthand Reporter No. 12354
23  and Notary.
24
25
```

```
                                                    Page 3
 1            A P P E A R A N C E S :
 2         (All appearances remotely via
                videoconference):
 3
 4  ATTORNEY FOR ROCK FINTEK LLC:
 5      PHILLIP RAKHUNOV, ESQ.
        Pollack Solomon Duffy LLP
 6      43 West 43rd Street, Suite 174
        New York, New York 10036
 7      (617)960-3118
        prakhunov@psdfirm.com
 8
 9  ATTORNEY FOR KITCHEN WINNERS NY, ADORAMA, INC., AND
    JOSEPH MENDLOWITZ:
10
        ALEXANDER J. SPERBER, ESQ.
11      Lipsius-Benhaim Law, LLP
        80-02 Kew Gardens Road, Suite 1030
12      Kew Gardens, New York 11415
        (212)981-8449
13      asperber@lipsiuslaw.com
14
15  ATTORNEY FOR JNS CAPITAL HOLDINGS LLC AND JOEL STERN:
16      AVRAM E. FRISCH, ESQ.
        Avram E. Frisch LLC
17      1372 Milford Terrace
        Teaneck, New Jersey 07666
18      (201)289-5352
        frischa@avifrischlaw.com
19
20
21      Also Present:  Jamie Jordan, Notary
                       Hershey Weiner
22                     Brad Gilling
23
24
25
```

```
                                                    Page 4
 1              I N D E X
 2  WITNESS: THOMAS KATO
 3  EXAMINATION                                      PAGE
 4  BY ATTORNEY SPERBER                                 5
    BY ATTORNEY FRISCH                                 52
 5
 6
            E X H I B I T S
 7
    NUMBER           DESCRIPTION                     PAGE
 8
 9  Kato Expert 1    Rock Fintek Expert Disclosure      9
10  Kato Expert 2    Michael Elstro deposition
                     transcript taken November 13, 2023  21
11
12
...
25
```

Page 5

1   THURSDAY, FEBRUARY 1, 2024; 1:28 P.M., EASTERN
2            REMOTE PROCEEDINGS
3   THE NOTARY: Mr. Kato, if you could raise your right hand
4   for me.
5   Do you solemnly swear or affirm to tell the truth, the
6   whole truth and nothing but the truth so help you God?
7   THE WITNESS: Yes, I do.
8   THE NOTARY: Thank you.
9           *  *  *  *  *
10              THOMAS KATO,
11   having been first duly sworn, testified as follows:
12              EXAMINATION
13  BY ATTORNEY SPERBER:
14     Q   Good afternoon. My name is Alexander Sperber. We
15  met at your prior deposition, but I am one of the attorneys
16  for Kitchen Winners, Adorama, and Joseph Mendlowitz. I know
17  you testified under oath at your prior deposition, but let me
18  just review the rules just so that everyone is on the same
19  page.
20     Do you understand that you are under the same oath today
21  that you would be in a courtroom?
22     A   Yes, I do.
23     Q   And do you understand that even though you're
24  testifying at a deposition today that the testimony you give
25  under oath here is subject to the same penalty of perjury as

Page 6

1   though you were testifying in a court of law?
2      A   Yes, I do.
3      Q   If you don't understand one of my questions, please
4   let me know. Unless you tell me otherwise, I'm going to
5   assume you understood the question. Okay?
6      A   Sounds good. Understood.
7      Q   Is there anything that would prevent you from
8   thinking clearly or testifying truthfully today?
9      A   No, there is not.
10     Q   Okay. If you need time to take a break during the
11  deposition, just let me know. As long as there is no question
12  pending, we are happy to take a break at your convenience.
13     A   Sounds good.
14     Q   In preparing for today's deposition, did you review
15  any documents?
16     A   Yes, I did.
17     Q   Which documents did you review?
18     A   I went over the past depositions and some of the
19  company papers, financials, what I had previously said in my
20  other deposition. I went through what Bradley said. I went
21  through a little bit of what your clients said in their
22  depositions. I went through some e-mails with Ascension
23  Health I reviewed.
24     Q   You said you went over some company papers. Which
25  company papers were those?

Page 7

1      A   Like, e-mails -- e-mails with Ascension.
2      Q   Anything else?
3      A   No. Just, you know, the bank statements of what
4   came in, what went out, what -- you know, what we made, what
5   we didn't.
6      ATTORNEY RAKHUNOV: And, Counsel, just before -- I'm
7   sorry to interrupt. I just want to put on the record at the
8   beginning that Mr. Kato is appearing at today's deposition not
9   as a fact witness, which that deposition concluded the last go
10  round, but he's appearing as a non-retained expert witness to
11  testify regarding the value of Rock Fintek's lost business
12  with Ascension. I know we all know that, but I want the
13  record to reflect that clearly.
14     ATTORNEY SPERBER: That's fine.
15  BY ATTORNEY SPERBER:
16     Q   And I guess my first real substantive question here
17  is going to be: Mr. Kato, am I correct that the scope of your
18  expert testimony concerns the value of Rock Fintek's lost
19  business with Ascension?
20     A   Yeah, and everything that it sort of touches, and
21  it's my opinion like Phillip said not factual.
22     Q   I'm sorry?
23     A   It will be my opinion also.
24     Q   Right. But you said everything that sort of touches
25  on that. Could you be more specific?

Page 8

1      A   Ascension Health has a sister company in Australia
2   called St. Johns{sic} Healthcare System. It's about a
3   120-year-old system, and they referred us to them, and we sold
4   them some masks. We got into an order of 4 million of them.
5   We did a deal with the government, Western Australia Health,
6   with St. Paul's Health so that sort of was affected by this.
7      What else could be affected? Just some -- that's pretty
8   much it. I would say that, one, the referrals and things like
9   that are affected. Like, they gave us Delta Airlines. They
10  wanted to work with us. Now, they don't. And then some stuff
11  with Prisma Health that we were working with that our
12  salespeople are now selling to them directly not through us,
13  so somewhat related, but not.
14     Q   Okay. You said "Prism Health" -- "Prism Health"?
15  Excuse me?
16     A   Prism Health Systems -- Prisma. Prisma?
17     Q   You mentioned "Delta"?
18     A   Delta Airlines. Ascension referred them to us.
19     Q   Okay. Did Rock Fintek produce in this lawsuit any
20  documents concerning its business with Delta Airlines?
21     A   I don't believe so.
22     Q   Did Rock Fintek produce in this lawsuit any
23  documentation concerning its business with Prism Health{sic}?
24     A   I don't believe so.
25     Q   How about with the entity you discussed in

Page 9

1  Australia?
2      A    I don't -- I don't believe we did, and I don't think
3  anybody asked me about it during my deposition, about the lost
4  business or other relationships.
5      ATTORNEY SPERBER:  Okay.  I'm going to show you a
6  document.  We will mark this -- let me see.  Off the record
7  for just a minute until I figure out how to share a document
8  with you.
9  BY ATTORNEY SPERBER:
10     Q    Mr. Kato, can you see a document in front of you
11 titled Rock Fintek LLC's Expert Witness Disclosure?
12     A    Yes, I do.
13     ATTORNEY SPERBER:  Okay.  And just for the record, I've
14 marked this exhibit as Exhibit Kato Expert 1.
15         (Exhibit Kato Expert 1 was marked for
16          identification.)
17 BY ATTORNEY SPERBER:
18     Q    Are you familiar with this document?
19     A    Hold on.  I've got to zoom it a little bit more.
20 Yes.
21     Q    Does this document reflect -- at least in the
22 section titled Non-retained Expert, does that reflect the
23 testimony or the scope of testimony that you will be
24 presenting as an expert in this matter?
25     A    Yes.

Page 10

1      ATTORNEY RAKHUNOV:  And, Counsel, I apologize for
2  interrupting, but just since you raised it, I do just want to
3  put on the record that there have been documents produced in
4  this case concerning the Australian affiliate of Ascension
5  Health, and I would just refer to Bates No. RF003489.  It's
6  one example that I could pull up quickly just so there's no
7  confusion.
8      ATTORNEY SPERBER:  Okay.
9  BY ATTORNEY SPERBER:
10     Q    If you look at the paragraph that begins, "Mr. Kato
11 is expected to testify," do you see where I'm referring to?
12     A    Yes, I do.
13     Q    So the second sentence there, "Mr. Kato expects to
14 testify that Rock Fintek would have earned but has lost at
15 least approximately $36 million per year in profits for at
16 least three years that it had been earning from its
17 relationship with Ascension and had reasonably expected to
18 continue earning for the foreseeable future."
19     Is that a correct statement of your expert opinion in
20 this matter?
21     A    Yes.
22     Q    Can you explain to me how you reached the number of
23 $36 million in profits per year for three years?
24     A    Based on what I had previously done with them, the
25 amount of revenue we did and the amount of business that we

Page 11

1  were contracting to do with them going forward.
2      Q    When you say the amount of revenue you had done, can
3  you be more specific?
4      A    Yeah.  I think it's down here in -- further down.
5  We did $32 million in sales previously with them, and then
6  another $37 million, so $70 million.  And on top of that, we
7  were making a COVID test to give them, and we were talking
8  about other products along with bidding on a glove contract
9  that would be three years.
10     Q    So I think you're referring to a line here where it
11 says that, "Mr. Kato expects to further base his opinion on
12 the fact that between March 2020 and February 2021, Rock
13 Fintek sold to Ascension Health various personal protection
14 equipment including gloves, gowns and masks in the amount of
15 approximately $32 million as unrelated to any of the Medcare
16 glove transactions at issue in this lawsuit."
17     Is that what you are referring to?
18     A    Correct.
19     Q    Okay.  Now, just to begin with, the $32 million that
20 you refer to there, is that revenue or profits?
21     A    Revenue.
22     Q    So I assume Rock Fintek had expenses as well,
23 correct?
24     A    Minimal expenses.
25     Q    Okay.  So you're saying that you had $32 million in

Page 12

1  profits as well?
2      A    No.  No.
3      Q    So what -- over that time period, what were Rock
4  Fintek's profits?
5      A    I looked at the financials.  I don't recall exactly
6  what those profits were.
7      Q    Okay.
8      A    I would have to look at them again.
9      Q    Now, that $32 million, does that include
10 approximately $9.25 million given by Ascension Health as a
11 down payment in connection with the purchase order at issue in
12 this lawsuit?
13     A    No.  I don't believe so.
14     Q    It does not.  Okay.  Well, it says over here that
15 between March 2020 and February 2021 -- that's the timeframe
16 you're referring to, right?
17     A    Let me see what you're talking -- March 20th to
18 February Mr. Kato --
19     ATTORNEY RAKHUNOV:  It goes over from page 2 to page 3 of
20 the document.
21     THE WITNESS:  Yeah.
22     ATTORNEY RAKHUNOV:  It's hard to --
23     THE WITNESS:  Yeah.  I see it.
24 BY ATTORNEY SPERBER:
25     Q    Now, did you reach this $32 million number by adding

FEBRUARY 01, 2024                                    THOMAS KATO                                    Pages 13..16

Page 13

1  up all the payments from Ascension Health?
2      A   I believe when we went -- when I went through the
3  numbers and added them up, I added everything up and excluded
4  the amount of funds that Ascension Health paid me for their
5  gloves.  It may or may not have included that part of it.
6      Q   So is it your testimony that if I were to go back
7  through Rock Fintek's bank statements, it did not include the
8  $9.25 million down payment provided by Ascension Health on
9  December 8th, I would still reach $32 million in revenue that
10 Rock Fintek received from Ascension Health in that timeframe?
11 Is that your testimony?
12     A   You may or may not.  If it's in the bank statements,
13 then it happened.  If it's not, then it did not.
14     Q   Well, I want to understand.  You --
15     A   I believe maybe it's included, but I'm not for
16 certain, and I don't want to say I'm for certain on it.
17     Q   Well, you are here testifying as an expert
18 concerning Rock Fintek's lost profits, correct?
19     A   That's four years ago you're talking about.
20 Numbers, I looked at, but four years ago of lost profits.
21     Q   Okay.
22     A   The total amount -- total revenue is -- you have it
23 at $32 million plus the $37 million, so --
24     Q   So you're saying $37 million is on top of this;
25 meaning that the $9.25 million is not included in the

Page 14

1  $32 million?  Is that your testimony?
2      A   It might be included.
3          THE WITNESS:  Phillip, is it included or not?
4          ATTORNEY RAKHUNOV:  Well, I would -- I'm not here to
5  testify, but I would just say I'm not sure why folks aren't
6  just looking at the document that's on the screen because --
7          ATTORNEY SPERBER:  Look.  I'm here to ask Mr. Kato.  He
8  is testifying as an expert in Rock Fintek's lost business.  I
9  want to understand the nature of his opinion here.
10         THE WITNESS:  Okay.  I will just read the document.
11 "Mr. Kato expects to further base his opinion on the fact that
12 between March '20 and February '21, Rock Fintek sold to
13 Ascension various personal protection equipment and clothes,
14 gowns, masks, in the amount of $32 million that is unrelated
15 to any Medcare glove transactions at issues in the lawsuit."
16         So, yes.  It was included.
17 BY ATTORNEY SPERBER:
18     Q   What's included?
19     A   The $9 million deposit.
20     Q   It says that this $32 dollars includes gloves that
21 were not part of the Medcare glove transaction, right?  It
22 says unrelated to any of the Medcare glove transaction at
23 issue in this lawsuit.
24     A   Correct.
25     Q   What other gloves did Rock Fintek sell to Ascension

Page 15

1  Health?
2      A   We sold several other products, Intco -- Medgluv,
3  Intco, Lyfemed.  There might have been two other ones.  I have
4  to remember the names of the companies.
5      Q   So, again, I'm trying to understand your opinion
6  that Rock Fintek would have made $36 million per year in
7  profits for at least three years.
8          Now, you say that in -- between March 2020 and
9  February 2021, Rock Fintek had revenue of $32 million, and
10 you're not sure of the exact amount of the profits that Rock
11 Fintek had, so how are you projecting from that revenue to
12 profits in subsequent years?
13     A   How did I project that revenue into profit?  Based
14 on the relationship and the communication we had with
15 Ascension and based on their deposition and their testimony
16 saying very likely they would still be working with us as of
17 today even, then I believe we would be doing the same amount
18 of sales if not more.  And the profit from just the testing
19 kits alone was -- we were making them around $1.50, $1.20, and
20 they were going to be retailed around $5 or $6.  We also were
21 selling them other masks, other gowns, other products.
22     Q   So, let me -- let's go -- okay.  Let's focus on that
23 aspect of things.  So am I correct that Ascension testified
24 they were not interested in purchasing additional gloves from
25 Rock Fintek even before they realized there were issues with

Page 16

1  the gloves that had already been provided?
2          ATTORNEY RAKHUNOV:  Objection.  Form.  It
3  mischaracterizes testimony.
4  BY ATTORNEY SPERBER:
5      Q   You can answer.
6      A   I'm still on the payment side of your question
7  before you rolled -- I didn't answer that question about the
8  payments and how I was going to come up with the profit.
9      Q   Well, okay.  Was there a formula you used to reach
10 that number of $36 million per year in profits?
11     A   Yeah.  I came up with the total revenue I brought
12 into them was around approximately $62 million.  Payments to
13 my suppliers were approximately $19.4 million.  Payments for
14 my logistics was approximately $6 million, and my profit was
15 approximately $36 million.
16     Q   Let's -- I want to break this up.
17     A   Okay.
18     Q   So you previously testified that Rock Fintek lost
19 money on the $37 million purchase order for gloves at issue in
20 this lawsuit.
21     A   Correct.
22     Q   So any profits that Rock Fintek made were prior to
23 that, correct?
24     A   Correct.
25     Q   So what -- if Rock Fintek had continued doing

FEBRUARY 01, 2024                THOMAS KATO                 Pages 17..20

Page 17

1  business with Ascension, after the 200 million purchase order
2  had been fulfilled --
3     A    Yeah.
4     Q    -- what specific products would it have been selling
5  to Ascension?
6     A    We would have been selling -- hopefully, in my
7  opinion, testing kits.  We would have been selling them more
8  gloves.  We would have been selling them more masks, gowns.
9  They talked about butterfly straps.  They talked about other
10 products that they also needed, IV bags, the lines for the IV
11 bags; you know, the -- just whatever came up that they were
12 having a hard time with.
13    Q    How do you know --
14    A    They sent us a whole list, "These are all the items
15 that we could use."  And we are not glove experts, but we are
16 experts in procuring items that are difficult to get.
17    Q    How do you know how many of these items Ascension
18 would have purchased from Rock Fintek?
19    A    I believe Ascension had told us on the glove side,
20 it was about a billion gloves a year they were purchasing, and
21 they have a three-year contract which was going to come up for
22 RFP, and we could bid on it obviously if everything went well.
23 And we talked to them about the testing kits, and they told us
24 in an e-mail that, "We'll take X amount of these testing kits
25 if they are FDA approved and done."

Page 18

1  So we hired FDA attorneys.  We started making the testing
2  kits to be able to sell them which were much higher margins
3  than we were making on anything else.  Any product on their
4  list, we could get they would buy.  They gave us a whole list.
5     Q    You're sitting here testifying -- again, you put a
6  number on this.  You said, "At least $36 million per year in
7  profits."
8     So, first, do you acknowledge that would be far more
9  profits than, you know, on an annual basis than Rock Fintek
10 had made from Ascension in prior years?
11    A    No.
12    Q    You don't agree with that?
13    A    No.
14    Q    What were the profits that Rock Fintek made from
15 Ascension between March 2020 and February 2021?
16    A    In February 2021?
17    Q    Yeah.
18    A    We made approximately -- like I said, we brought in
19 approximately $62 million.  Made payments to suppliers at
20 $14.5 million approximately, and paid logistics approximately
21 $6.1 million, and then we went ahead and deducted that and
22 came out $36 million in profit.
23    Q    Up to February 2021?
24    A    Correct.  I don't know if it's up -- it might be
25 after February 2021.  I'm not sure of the exact date it ended.

Page 19

1  It's right there.  It says, "Approximately $32 million from
2  Medcare."
3     Q    We are talking about revenue, correct?
4     A    What's that?
5     Q    You said the $32 million is unrelated to Medcare,
6  right?
7     A    Only $32 million -- yeah.  It's unrelated.
8     Q    And that's revenue?
9     A    Correct.
10    Q    How was Rock Fintek's profit higher than that
11 revenue?
12    A    Probably maybe the referrals that they gave us and
13 some of the other business.
14    Q    So you're not talking specifically about business
15 with Ascension?
16    A    I'm talking about when everything collapsed with
17 Ascension, we lost all of our cashflow to continue to do
18 business and provide anything to anybody else because we were
19 trying to fix the damage for about a year and a half with
20 Ascension.  Essentially, it put Rock Fintek out of business
21 trying just to damage control the relationship with Ascension.
22    Q    Didn't we establish at the very beginning of this
23 deposition that your testimony was concerning the value of
24 Rock Fintek's lost business with Ascension?
25    A    My lost business with Ascension is related to lost

Page 20

1  business to other people I was doing business with.  If
2  Ascension had been successful and I had the correct gloves,
3  all the other business would have kept going with the other
4  clients.
5     Q    So specifically with Ascension, just Ascension, what
6  was the profits that Rock Fintek made between March 2020 and
7  the time it entered into --
8     A    The entire time --
9          (Simultaneous colloquy.)
10    THE WITNESS:  The entire time -- the entire profit was
11 $36 million.  I don't know up to February.  The entire time
12 was $36 million.  That's your answer.  You're going to ask it
13 10 more times, I'm going to give you the same answer the same
14 way.  It's $36 million.
15 BY ATTORNEY SPERBER:
16    Q    You did testify that you lost money on the PO for
17 the 200 million gloves, correct?
18    A    I did what?
19    Q    You lost money -- Rock Fintek lost money on the
20 purchase order for 200 million gloves, correct?
21    A    Correct.
22    Q    So clearly there was no profit on that aspect of
23 Rock Fintek's business, correct?
24    A    Correct, loss.  We had about 40 percent of our
25 margin including about 40 percent of the truck and supply

FEBRUARY 01, 2024　　　　　　　　　THOMAS KATO　　　　　　　　　Pages 21..24

Page 21
1  costs.
2  　Q　So any profits Rock Fintek made were prior to that,
3  correct?
4  　A　Yeah, and legal -- yeah.
5  　Q　And am I correct that Rock Fintek had approximately
6  $20 -- $24 million in revenue with Ascension prior to that
7  purchase order at issue in this --
8  　A　$24 million --
9  　ATTORNEY RAKHUNOV:  So I don't know if that was just me.
10 I just didn't hear the last two words you said, Alex.
11 BY ATTORNEY SPERBER:
12 　Q　Am I correct that Rock Fintek had approximately
13 $24 million in revenue with Ascension prior to the purchase
14 order at issue in this lawsuit?
15 　A　"$24 million"?  We had $32 million unrelated.
16 　ATTORNEY SPERBER:  Okay.  Let me show you -- I will mark
17 this as Kato Expert 2.
18 　　(Exhibit Kato Expert 2 was marked for
19 　　identification.)
20 BY ATTORNEY SPERBER:
21 　Q　Do you see in front of you a deposition transcript
22 of Michael Elstro, dated November 13, 2023?
23 　A　Yes.
24 　Q　You testified earlier that you reviewed this
25 testimony -- this deposition transcript prior to today's

Page 22
1  deposition, correct?
2  　A　Correct.
3  　Q　Turn to page 13 of Mr. Elstro's deposition
4  transcript.  Page 13, line 10, I will read you the testimony
5  I'm looking at here.  This is a question by Mr. Frisch.
6  　"Q　Prior to the -- the purchase order for the gloves in
7  question here, how much business had you had done with Rock
8  Fintek?
9  　"A　During the term of our engagement with Rock Fintek,
10 we ordered and received close to $24 million in other medical
11 products, the 3-ply masks, KN-95 and isolation gowns."
12 　Do you see where I am over there?
13 　A　Yes, I do.
14 　Q　So am I correct in understanding that prior to the
15 purchase order for 200 million gloves at issue in this
16 lawsuit, Rock Fintek had only actually done $24 million in
17 revenue from Ascension?
18 　A　No.
19 　Q　"No"?
20 　A　No.  Mr. Elstro is not an expert in accounting at
21 Ascension.  He doesn't work in accounting.  Sonya does, and
22 Sonya knows exactly the amounts that came in and out, not
23 Mr. Elstro.
24 　　The accounting department would.  So, Mr. Elstro is not
25 in accounting.  I don't know what numbers he has or doesn't

Page 23
1  have, but he's not the accounting department at Ascension, so
2  this --
3  　Q　So are you telling me that if I were to go through
4  Rock Fintek's bank statements and add up the payments it
5  received prior to entering into the purchase order in this
6  lawsuit, I would find an excess of $24 million in revenue from
7  Ascension?
8  　A　That's what I believe.
9  　Q　I can tell you I've done that, and I did not find an
10 excess of $24 million in revenue from Ascension.
11 　ATTORNEY RAKHUNOV:  Objection.
12 BY ATTORNEY SPERBER:
13 　Q　You are testifying today as an expert in Rock
14 Fintek's business, correct?
15 　A　Yes, I am.
16 　Q　And you claim to have reviewed Rock Fintek's
17 finances and business records in preparing your expert
18 opinion?
19 　A　Yes, I did.
20 　Q　So how is it that you don't know how much revenue
21 Rock Fintek was bringing in relation to its business with
22 Ascension?
23 　A　I reviewed hundreds of pages of documents.  So if
24 you want to refer to a document, then I can tell you what it
25 says.  I don't have a photographic memory.  I'm not claiming

Page 24
1  to have a photographic memory either.  So show me the
2  document, I can tell you.  I reviewed them.  Yes.  Expert in
3  Rock Fintek's business, Rock Fintek had to stop all other work
4  with all other clients and not give any attention to anybody
5  else to focus on mitigating the damages that was caused by
6  Ascension by giving them the wrong products, fake products.
7  That's where all -- the whole business collapsed.
8  　Q　Well, when you're projecting $36 million per year in
9  profits for three years from Rock Fintek's business with
10 Ascension, which products would those profits have arisen
11 from?
12 　ATTORNEY RAKHUNOV:  Objection.  Asked and answered.
13 　　You can answer.
14 　THE WITNESS:  Okay.  So gloves, masks, gowns, testing
15 kits we were working on, and the business we were doing in
16 Australia with the hospital, their sister hospital there and
17 UA Health.
18 BY ATTORNEY SPERBER:
19 　Q　You're aware, correct, that Rock Fintek{sic}
20 testified that as of June 2021 it had no need for additional
21 gloves from Rock Fintek in the short term?
22 　ATTORNEY RAKHUNOV:  Objection.
23 　THE WITNESS:  They had no need for additional gloves
24 because the gloves we gave them were fake, and they wanted to
25 return them.  That's why.

FEBRUARY 01, 2024 — THOMAS KATO — Pages 25..28

Page 25

1  BY ATTORNEY SPERBER:
2  Q   Well, if we go and look on page 55 of Mr. Elstro's
3  deposition transcript --
4  A   Page what?
5  Q   55.
6  A   Okay.
7  Q   Look at --
8  A   Hold on.  Rock Fintek --
9  Q   -- line 18, "Were you interested in continuing to
10 buy Medcare gloves?"
11     There is an objection.
12     And then the witness on line 23 answers, "I would say
13 that in June of 2021 after receiving close to 200 million
14 gloves, we weren't thinking about purchasing additional gloves
15 at that very moment.  I believe the 200 million gloves would
16 be well north of six months for usage for our provider base.
17 We were good with that based upon pandemic stock need to build
18 that up."
19     Do you see where I am there?
20 A   Yes.
21 Q   So, again, this is a document that you testified
22 earlier you relied upon in your projections for Rock Fintek's
23 future profit --
24 A   Because he said this here, and at the same time,
25 they're telling us we can bid on a contract that's one billion

Page 26

1  gloves a year for three years.
2  Q   Is that -- is that what they told you?
3  A   Yes.  They said we can bid on it.  If everything
4  went well with what we were delivering, I see no reason why we
5  wouldn't be able to do it, that was Dewayne Rader at Ascension
6  Health that said that.
7  Q   Now, how do you know that if Rock Fintek had bid on
8  that contract it would have gotten the purchase order?
9  A   Because Rock Fintek did a lot of good stuff to keep
10 goodwill with Ascension.  For example, we sent them a million
11 dollars worth of masks.  And then two months later, we sent
12 another million dollars worth of masks, except some -- they
13 didn't like two months later what the label said on the box.
14 It didn't comply with what they needed as PPE had evolved, and
15 they said now they need to be more compliant to what it says
16 on the box.  So to keep the relationship with them we said,
17 "You can just keep the gloves, the masks, and we are going to
18 donate them."
19    Same thing happened with the protection gloves.  Same
20 thing happened with gowns.  We gave them discounts, and we let
21 them keep millions of dollars of goods just to build the
22 goodwill with them.  They appreciated it, the goodwill, and it
23 kept the relationship going.  That's where I came up with
24 that.
25 Q   Again, according to your own recollection, all Rock

Page 27

1  Fintek was allowed to do was bid.  They weren't guaranteed a
2  contract, correct?
3  A   Based on the amount of business they gave us
4  already -- they interviewed 2,000 companies.  We were one of
5  30.  And then out of the 30, they told us we were probably the
6  top three companies that were able to deliver to them, so they
7  were very happy to keep us.  And in case another pandemic or
8  virus D-X came along later, they would have someone who was
9  outside of their normal chain of suppliers that they're
10 continuing to do business with that they can rely on.
11 Q   Again, they never guaranteed Rock Fintek a contract,
12 correct?
13 A   No.  There is no guarantee.  They said we can go
14 ahead and bid on it if everything goes well.  As Mike Elstro
15 testified, he believes that he -- very likely they will still
16 be doing business with us as of today.
17    So if you want to take $62 million that I did in about a
18 year with them and then take that over from 2020 to 2024,
19 that's -- it's a large number.  And I believe from my track
20 record with business, we've just been growing so the number
21 wouldn't have been lower.  It would have been much higher.
22 Q   In order to have a chance at winning that bid, would
23 Rock Fintek had to put together a very competitive offer?
24 A   Well, yeah.  We actually won the $200 million
25 contract -- 200 million glove contract, which was the highest

Page 28

1  contract that they -- one of the highest contracts they
2  awarded outside the company that's -- they didn't start using.
3  So we were -- we already proved that we won one.  So if we can
4  win 200 million, why wouldn't we bin a billion?
5  Q   Am I correct in understanding that in order to put
6  together a competitive offer, Rock Fintek would have had
7  to lower its profit margins on the gloves it was selling,
8  correct?
9  A   If we signed a long-term contract, we would have
10 been able to make a decent margin.
11 Q   What was that?
12 A   We would have been able to -- I believe to be at
13 least at 30 percent.
14 Q   How do you know that?
15 A   Because I know what the purchase price of the gloves
16 were going to be and what the sale price of the gloves were
17 going to be.
18 Q   Really?  When you were sitting there in -- when they
19 told you this bid offer -- this bid offer opportunity was
20 open, how did you know what the purchase price was going to
21 be?
22 A   They were going pre-pandemic costs of gloves.
23 Q   You do realize that the testimony you're giving
24 right now is not in alignment with the testimony of
25 Mr. Elstro, correct?

Page 29

1  ATTORNEY RAKHUNOV:  Objection.
2     THE WITNESS:  Mr. Elstro said he would -- he says very
3  likely that he would be doing business with us still, so --
4  BY ATTORNEY SPERBER:
5     Q  And you think --
6     A  I don't understand what you think that he would be
7  doing -- that most likely be doing business with us in what if
8  it's not products that we previously sold them?
9     Q  He said that talking about the short-term, correct?
10    A  No.  He said they were still doing business with
11 other companies and would most likely still being doing
12 business with us, and they told us that they would like to
13 keep us in the relationship working with them on an ongoing
14 basis.  This was told to me.  It's not my opinion, and he
15 testified to it.
16    And from my experience as an entrepreneur, I believe that
17 I would have done much more revenue with them going forward
18 than I did in the past, and I believe it would have branched
19 out to Australia and continued instead of getting a 4 million
20 mask canceled order.  They took 100,000 masks instead of the
21 4 million they wanted.  That's -- in that business, we were
22 the first vendor for Australia to supply a public health
23 system with a private health system a product that they
24 jointly bought and procured together, and then that was ended
25 immediately when they started getting those e-mails from

Page 30

1  Ascension that we gave them bad products.  So I believe we
2  would have been much higher than the $62 million in revenue.
3     Q  You believe?
4     A  I believe that Australia alone could have been
5  $62 million.
6     Q  That's not with Fintek, right -- that's not
7  Ascension, correct?
8     A  That's Ascension's sister company.  That's who
9  referred us.  That's how we got the business, and that's how
10 the business stopped was from Ascension.
11    We secured all the gloves, procured them, put deposits --
12 the masks, and then they canceled the order after we have all
13 the stuff going on with Ascension with fake gloves that we
14 gave them.  We went from 4 million to 100,000.
15    Q  If you can turn to page 41 on Mr. Elstro's
16 testimony.  Please let me know when you're there.
17    A  And the billion-dollar -- the billion supplied
18 gloves, we've been talking to Intco to supply them to us at
19 very, very good prices that would have been -- would have met
20 those profitability margins that I told you with pre-COVID
21 prices.
22    What page did you say?
23    Q  41.
24    A  "41."
25    Q  Starting at line 2 and going through line 9 where

Page 31

1  **Mr. Elstro testifies specifically that Ascension or the**
2  **Resource Group "never talked to them" referring to Rock Fintek**
3  **"about a specific, like, long-term contract or bidding on a**
4  **long-term nitrile glove business for the organization."**
5     **Do you see that?**
6     A  I had a conversation with Dewayne Rader, with
7  Bradley Gilling, with two other people from Ascension at the
8  hospital -- at one of their hospitals -- maybe in Tennessee --
9  I believe we met them and pulled up on the computer, he showed
10 us the contract, "This is what you can go ahead and bid on."
11    We went behind Dewayne Rader's desk in looking at the
12 numbers and looking at the products that they have ongoing
13 contracts with, and says, "Yes.  If everything is good with
14 your product, I see no reason why we wouldn't let you give us
15 a bid on this."
16    And my opinion as an entrepreneur, when I deliver
17 200 million gloves successfully, why not deliver 400 million
18 or a billion?  There is no -- there's no reason not to get the
19 bid.  And with the prices we had secured from Intco, we had
20 good profit margin pre-COVID prices so we would have been very
21 competitive.  Let them have a savings and gave them a reliable
22 glove that they were already familiar with.  He showed us the
23 entire glove buy.
24    Q  You testified earlier that Rock Fintek was planning
25 to sell COVID test kits to Ascension; is that correct?

Page 32

1     A  Yes, and two others, not just -- not just Ascension.
2     Q  Am I correct in understanding that Rock Fintek never
3  got those COVID test kits FDA approved?
4     A  Rock Fintek had to stop and didn't have the funds
5  anymore after we got the fraudulent gloves, and we had to do
6  damage control and stop trying to even think about selling any
7  other products or get other products approved.  We started
8  them.  We made the product.  We had made tests of them.  We
9  contacted the FDA attorneys to get them approved.  We started
10 working on it.
11    When all the fraud happened, we had to stop everything
12 because we couldn't afford to continue.  All our time and
13 energy was trying to return the gloves, sell the gloves to
14 somebody else and save the relationship which ended up
15 failing.
16    Q  Now, I asked in discovery for documentation
17 concerning the COVID-19 test kits, and the response I got
18 was -- would only be produced if they related to Rock Fintek
19 damage claim, and they were not produced.
20    So it's my understanding that Rock Fintek did not premise
21 its damage claim upon the COVID-19 test kits, and so --
22    A  We are not?
23    ATTORNEY RAKHUNOV:  Objection.
24    THE WITNESS:  I'm telling you we are.  We started doing
25 test kits.  We talked about it with Ascension about supplying

Page 33

1  the test kits. They were happy to see them if they were FDA
2  approved. We found other test kits that were also already FDA
3  approved that we could have just sold and resold at very large
4  margins -- probably 80 percent profit margins because we were
5  going to buy them for similar costs. We had -- we would have
6  had even similar margins. We just wanted to make our own to
7  control it, so that part of the business was going to happen.
8      Q   Is it your testimony there is no documentation
9  concerning COVID-19 test kits?
10     A   Of course there's documentation. We have lawyers --
11         (Simultaneous colloquy.)
12         (Reporter clarification.)
13 BY ATTORNEY SPERBER:
14     Q   Since it was not produced, it's my understanding
15 that's not part of Rock Fintek's damages. So my question for
16 you then is --
17         ATTORNEY RAKHUNOV: Objection to the comments.
18     You don't have to respond to counsel's comments. Just
19 wait for a question.
20 BY ATTORNEY SPERBER:
21     Q   What percent of the $36 million per year in
22 projected profits for three years was made up of these
23 COVID-19 test kit sales?
24     A   Going forward?
25     Q   For the three years that you -- for which you're

Page 34

1  claiming lost profits?
2      A   The COVID test kits, they were in the hundreds or
3  thousands or millions, so --
4      Q   Of kits?
5      A   As of the number we gave you now, we were just
6  talking about existing product that we have already sold to
7  them. That would have been on top of that number, the test
8  kits.
9      Q   I'm sorry. I did not understand your answer. Could
10 you explain?
11     A   The test kits' profitability is not in the numbers
12 that we gave you -- that I gave you. It's on top of it.
13     Q   Okay. So in the numbers that you gave me which
14 specific products were -- was Rock Fintek projected to be
15 selling to Ascension over the next three years?
16     A   Gowns, masks, gloves.
17     Q   Okay. We've already been over the glove issue. Do
18 you know that Rock Fintek -- that Ascension needed additional
19 gowns from -- that was willing to purchase from Ascension{sic}
20 over the next three years?
21     A   Say that one more time.
22     Q   Do you know or is there any evidence that would
23 support your assertion that Rock Fintek could have sold
24 additional gowns to Ascension in the next three years?
25     A   I'm sure they would have bought it, but our primary

Page 35

1  focus was not the gowns or the masks. It was the gloves.
2  That's our primary focus in the growth. That profit that I'm
3  talking about is coming from gloves. That is not coming from
4  anything else.
5      Q   So the $36 million a year in profits, that's solely
6  based upon a projection of glove sales to Ascension?
7      A   I sold them three products. I'm saying the lion's
8  share of the projection is coming from gloves. And then on
9  top of it, which is not in that number, would have been the
10 test kits and not -- what else is not in it is the business
11 that we lost in Australia selling them masks.
12         We sold them KN-95s, 3-ply mask, gowns and gloves. That
13 was it. The test kits was a future product that we were
14 looking to do that's outside of these numbers.
15     Q   And, again, can you walk me through the formula for
16 your projected future profits based upon glove sales from
17 Ascension? Let's start at the beginning. How many gloves did
18 Rock Fintek expect to sell to Ascension in the second half of
19 2021?
20         ATTORNEY RAKHUNOV: Objection.
21         THE WITNESS: "Second half of 2021"? I believe minimum
22 200 million, same order.
23 BY ATTORNEY SPERBER:
24     Q   What's that based upon?
25     A   If we delivered gloves, the masks -- the gloves

Page 36

1  satisfactory, they were interested in continuing with us. As
2  their supply ran down, they would want more.
3      Q   Okay. And how about -- how many gloves was Rock
4  Fintek projecting to sell to Ascension in 2022?
5      A   In 2022, we would have had the opportunity to sell
6  1 billion.
7      Q   I'm sorry?
8      A   One billion gloves.
9      Q   One billion with a "B"?
10     A   Yeah, with a "B." 200 million, so it's -- we
11 already supplied one-fifth of that.
12     Q   Okay. And how many gloves was Rock Fintek
13 projecting to sell to Ascension in 2022?
14     A   One billion.
15     Q   And same question for 2024?
16     A   Yes.
17     Q   How many gloves --
18     A   And if you wanted to give a conservative estimate
19 that's how I gave the calculation of the profitability, then
20 it would be only 200 million a year -- each year.
21     Q   Okay.
22     A   The same amount that I already did. Optimistically,
23 we would have done a billion. Conservatively, we would have
24 reached our 200 million.
25     Q   Okay. That is based upon your expectation that you

Page 37

1  would have won a bid for the contracts with Ascension; is that
2  correct?
3    A   The billion would have been a bid.  The 200 million
4  would have just been another order like we placed already;
5  that we have proven ourselves, that we delivered when other
6  people couldn't deliver.  We delivered on time, and we
7  delivered quality products.  So the 200 million would not have
8  been a bid that we would have had to win.  The billion would
9  have been a bid that we had to win.
10   Q   And you're making this projection for the
11 200 million in the second half of 2021 even though Mr. Elstro
12 testified that Ascension was not interested in purchasing
13 additional gloves at that time?
14   A   I don't think Ascension was interested in doing
15 anything with Rock Fintek come June/July of 2021 after what
16 happened.  We became a very sour note in their minds so they
17 were not interested in really doing anything with us.
18   Q   Okay.  And, then again, in 2022, this is the
19 1 billion gloves that based upon this bid that you were hoping
20 to win, and same thing for 2023?
21   A   So we would have got the 200 million gloves.  We
22 would presume we would match the same amount that we did the
23 previous year at 200 million, and with the hope to get the
24 1 billion glove order on top of it.
25   Q   Now, again, just to understand your profit

Page 38

1  projections -- so the 200 million gloves Rock Fintek delivered
2  up until June of 2021, Rock Fintek lost money, correct?
3    A   Repeat that.
4    Q   On the 200 million gloves that Rock Fintek delivered
5  pursuant to the purchase order at issue in this lawsuit, Rock
6  Fintek lost money.  You said that earlier, correct?
7    A   Yes, correct.
8    Q   So we would project further losses for the second
9  half of 2021?
10   ATTORNEY RAKHUNOV:  Objection.
11   THE WITNESS:  No, I would not have.  Because if I didn't
12 have fraudulent gloves, I would have been extremely
13 profitable.
14 BY ATTORNEY SPERBER:
15   Q   Can you explain that?
16   A   We have would have made -- the profit that I wrote
17 in the letter is how much profit we would have made each year
18 for the next three years if we had not received fraudulent
19 gloves.  This was catastrophic.  You've got to understand that
20 you couldn't get gloves.  They were struggling with supply
21 with normal channel chains, and we earned the opportunity to
22 deliver to them.
23   Q   So how much money would Rock Fintek have made in
24 profits on the 200 million gloves for the second half of 2021?
25   A   The second have of 2021 how much profit?  Similar to

Page 39

1  what we would have made in 2020.
2    Q   I'm sorry?  How much?
3    A   Similar number at the 40 percent margin.
4    Q   What are you referring to?  I'm sorry?
5    A   If you go back to that page where it told you how
6  much profit that we lost --
7    Q   You're talking about the Kato Expert Exhibit 1?
8    A   I don't see it yet.
9    Q   Hold on.
10   ATTORNEY RAKHUNOV:  The first document we looked at?
11   ATTORNEY SPERBER:  Yes.
12   THE WITNESS:  Okay.  So minus some of the losses that we
13 got with Skymed with the original order.
14 BY ATTORNEY SPERBER:
15   Q   For the record now, I'm showing you what was
16 previously marked as Kato Expert 1.
17   A   Yes.  So, let me scroll -- there you go,
18 "$36 million."  So some of the losses came from us sending the
19 deposit -- large amount of money to Skymed so that was part of
20 the loss.
21   Q   So, again, what -- give me a dollar amount.  How
22 much money in profits would Rock Fintek have made in the
23 second half of 2021?
24   ATTORNEY RAKHUNOV:  Objection to form.  I don't know what
25 that means.

Page 40

1  THE WITNESS:  We would have made -- let me see --
2  $36 million is what we calculated.  Well, I gotta zoom this
3  the right way.
4  ATTORNEY RAKHUNOV:  Don't think out loud, Thomas, because
5  then the court reporter has to take that down.
6  THE WITNESS:  Sorry about that.
7  There you go, "Mr. Kato expects Rock Fintek would have
8  lost at least approximately $36 million per year in profits
9  for at least three years."
10 BY ATTORNEY SPERBER:
11   Q   So how did Rock Fintek expect to generate
12 $36 million in profits selling those 200 million gloves if
13 that's what you are testifying to?
14   A   We also sold them masks.  We also sold them other
15 products.
16   Q   Right, but I'm asking specifically about the gloves.
17   A   From our good name and ability to deliver, they were
18 willing to pay a premium to us because of our good name and
19 past history with them.
20   Q   Well, for the 200 million gloves at issue, you know,
21 in this lawsuit, Rock Fintek was paid by Ascension
22 approximately $37 million, correct?
23   A   Yes.
24   Q   So would it have been paid a similar amount for the
25 next 200 million gloves?  Is that what you're testifying to?

Page 41

1  A   In 2020?
2  Q   2021.
3  A   In 2021, everything was already done.  Dead.
4  Q   Oh, so -- Rock Fintek was not --
5  A   After we got the fake gloves, everything died in
6  2021.  The whole relationship died, so -- any profits were
7  dead.  Relationship was dead.
8  Q   You're claiming lost profits here, right?
9  A   I'm claiming if I had sold gloves that weren't
10 fraudulent and I had not lost anything, then yes.
11 Q   So my question is:  How much money would Rock Fintek
12 have made in the second half of 2021 had it not sold to
13 Ascension what you're claiming were fraudulent gloves?
14 A   How much it would have made total?
15 Q   Yes.
16 A   With Ascension?  The contract, at least $36 million.
17 Q   In revenue or profits?
18 A   Profits.
19 Q   Where is that number coming from?
20 A   I explained that to you already.
21 Q   But I -- I can't --
22 A   $62 million in payments, $19 million in suppliers,
23 $6 million in trucking/logistics.  Profit left is $36 million.
24 Q   So you're saying for the second -- so in business
25 year 2021, Rock Fintek would have made an additional

Page 42

1  $36 million in profits had --
2  A   Starting in --
3      (Simultaneous colloquy.)
4  ATTORNEY RAKHUNOV:  Thomas, let him finish because
5  otherwise --
6  THE WITNESS:  Okay.
7  ATTORNEY RAKHUNOV:  -- it's just going to be a mess.
8  BY ATTORNEY SPERBER:
9  Q   Sorry.  Go ahead.
10 A   Starting in 2022?
11 Q   No.  No.  Again --
12 A   I'm saying starting in 2022.
13 Q   Okay.  So your testimony is that Rock Fintek made
14 all the money it was going to make from Ascension in 2021?
15 A   Yes.
16 Q   Okay.  Fine.  So there is no lost business profits
17 for 2021?
18 A   We lost masks and other products, not gloves.
19 Q   Okay.  How much money would you have made on those
20 masks and other products?
21 A   Approximately on the masks and other products, I
22 believe close to $10 million.
23 Q   You say you believe that.  Do you have any
24 documentation to support that assertion?
25 A   Yes.

Page 43

1  Q   Which specific documentation?
2  A   We have gloves, masks that we were procuring from
3  the price we were buying, price they're willing to sell them,
4  we were going to continue selling them products that we had in
5  the past.
6  Q   Do you have any evidence that Ascension was willing
7  to purchase those products from you in 2021?
8  A   Yeah.  Banks records from the past history.
9  Q   That was prior purchases.  I'm talking about future
10 purchases.
11 A   Well, they wanted to keep working with us.  Every
12 time they ordered, they ordered the same product with us over
13 and over again.  It wasn't a one time order of masks or gowns.
14 It was multiple times.
15 Q   Again, do you have any purchase orders that --
16 A   Yes.
17 Q   -- that --
18 A   Yes.
19     (Simultaneous colloquy.)
20 ATTORNEY RAKHUNOV:  One at a time.
21 THE WITNESS:  Yes, I do.  They bought it in 2021.  They
22 bought masks in 2021.  It's in the bank records.
23 BY ATTORNEY SPERBER:
24 Q   Again, were there any purchase orders that Rock
25 Fintek withdrew because of the dispute you had in June 2021?

Page 44

1  A   Say that again.
2  Q   Were there any existing purchase orders for gloves
3  or anything else that Rock Fintek withdrew?
4  A   No.
5  Q   "No"?
6  A   No.  We did not make purchase orders in advance with
7  them.  We would talk to them on a daily or weekly basis.  And
8  whatever would be short that week or throughout that week,
9  they would tell us, "We need this product," or "Here's a list
10 of products we need the next few days, the next week, the next
11 two weeks."  It varied from when they needed them.
12     And Adorama torched our relationship with Ascension.
13 After that, they didn't want to talk to us about any other
14 products again even though we had the same products we sold to
15 them multiple times previous.  And none of the previous orders
16 were purchase orders.  The purchase order was made on the day
17 of the order.  It wasn't in advance, "Let me give this to you
18 in two months' notice."  It was like, "We need this now."  I
19 said, "Okay."  Specific products and specific times.  They send
20 us a list of products.  Those lists stopped coming to us, and
21 they didn't want to give us any list and didn't want to
22 procure any other items from us.
23 Q   Okay.  But, again, this is all about your opinion
24 testimony as an expert concerning lost profits.  That's what
25 I'm trying to get my arms around here.

Page 45

1  A   I told you.  I believe our lost products would have
2  been $36 million a year starting 2022.  Each year after that
3  following, conservatively I believe we could have made much
4  more with the other relationships we had and of the products
5  that we were going to sell them.  We talked about needles.  We
6  talked about a syringe deal.  We talked about the testing
7  kits.  We were a company that was delivering product when they
8  asked us in a time when people were not delivering.  Until
9  that Adorama debacle, that's when it really crushed the
10 relationship and the company.
11     Q   Mr. Kato, we went over this last time, but what is
12 your highest level of education?
13     A   I am alumni from Harvard Business School.
14     Q   Okay.  At Harvard Business School did you take any
15 coursework in finance?
16     A   We did some.  Yes.
17     Q   Are you qualified to look at a business' books and
18 records and project future profits?
19     A   I believe my experience as an entrepreneur -- a
20 successful entrepreneur over the decades does qualify me for
21 that.  Not as an accountant, but what it takes to buy and sell
22 products and to make a profit.
23     Q   You're saying -- referring to successful experience
24 as an entrepreneur; is that correct?
25     A   Correct.

Page 46

1     Q   So that came from your experience in the business
2  world, not your experience necessarily at Harvard?
3     A   Harvard helped a lot, but mostly from my experience
4  in the business world.
5     Q   And --
6     A   I built all of my businesses with relationships.  I
7  kept my word.  I did what I said I was going to do, and that's
8  how I built my business.  Offer long-term relationships, and I
9  understand the value of a relationship.  So like I gave
10 Ascension, they wanted a million dollars worth of masks that
11 they didn't want because they didn't like what it said on the
12 box, I'm like, "That's my client.  Client is always right.
13 You can keep them.  Donate them.  Don't pay me for those."
14    I had multiple products like that, and I believe you show
15 goodwill to a customer, a client, they're going to reciprocate
16 and give it back to you.
17     Q   Okay.  And that's the basis of your expert testimony
18 today, correct?
19     ATTORNEY RAKHUNOV:  Objection.
20     THE WITNESS:  The basis?  I don't know if it's the basis
21 of it, but my expertise is that I had a relationship with
22 Ascension Hospitals, and I had built up enough goodwill and
23 delivered on every product previously that they wanted before
24 I gave them the gloves.  And if it would went the same, that
25 relationship I believe would have flourished much more than

Page 47

1  the $36 million per year going forward.
2     ATTORNEY SPERBER:  Could we take a five-minute break?
3     ATTORNEY RAKHUNOV:  Yes.
4     THE WITNESS:  Okay.
5       (Off the record.)
6  BY ATTORNEY SPERBER:
7     Q   I only have a couple more questions.
8     For 2023 and onwards, you were asserting that Rock Fintek
9  would be able to sell approximately a billion gloves to
10 Ascension each year based upon a bid that it would be
11 submitting or attempting to win a contract.  If that were a
12 closed bid, how do you know what price Rock Fintek could have
13 sold gloves to Ascension at?
14     ATTORNEY RAKHUNOV:  You're muted.
15     THE WITNESS:  I believe that -- and what I said is that
16 we could have bid on the RFP.  We may or may not have won it.
17 I believe we would have won it, but that's optimistically.
18 Conservatively, we would have just got awarded the contract
19 for 200 million more gloves as we did previously.  We would
20 have sold it to them for less, but we would have bought them
21 for less.  So at least I would have done the same amount of
22 volume, and I probably would have done the same or more in
23 masks.
24    We even had spent money to brand our own masks to give
25 them specifically for the hospital.  We made Rock Fintek masks

Page 48

1  for the hospital which we still have some.
2  BY ATTORNEY SPERBER:
3     Q   Do you know if Ascension post-pandemic was buying
4  gloves from suppliers outside of its bid system?
5     ATTORNEY RAKHUNOV:  Objection.
6     THE WITNESS:  From what I understand, Mike Elstro said
7  they are still buying from vendors/suppliers like us 'til
8  today.
9  BY ATTORNEY SPERBER:
10    Q   So is that through the bid system or not through the
11 bid system?
12    A   No, not through the bid system.
13    Q   What are you basing that upon?
14    A   From what Mike Elstro said.
15    Q   At his deposition?
16    A   Correct.  He said, "We are most highly likely" --
17 right on this line on page 2 here.
18    Q   I'm sorry?
19    A   Mike Elstro said it would be highly likely that he
20 would still be doing business with us.  All the business they
21 had done was not on a bid system.
22    Q   He said that short-term, correct?
23    A   That was in -- the entire relationship we had with
24 them was not on RFP or bid system.  They sent us a list of
25 products.  We gave them the prices.  They said yes or no, and

Page 49

1  then we procured them.  The bid was -- Dewayne Rader showed
2  us, "This is the three-year contract.  We can bid on a billion
3  gloves a year.  If you're going to deliver 200 million good
4  quality gloves on time, then we are going to give you the
5  others."  They were buying from us.  There was no
6  short-term/long-term.  It was just we were one of their
7  buyers, and they would still be buying from us today.
8      Q   If you're basing your opinions upon the deposition
9  testimony of Mike Elstro, how is it that you're not aware of
10 what he actually testified to?
11     ATTORNEY RAKHUNOV:  Objection.
12     THE WITNESS:  Mike Elstro said that they were satisfied
13 with the gloves that they have 'til the end of the year.
14 Dewayne Rader who did not testify on Ascension took Bradley
15 and I behind his desk at one of their hospitals, showed us a
16 bid contract.  You know, "You deliver the goods on those
17 gloves, you can bid on this if everything goes well."
18     Our existing business and other products that we were
19 already buying from, they would still give us a list of
20 products that they needed, and we would supply those things.
21 And all of those came from a non-bid system that we had won,
22 so all that revenue came from non-bid.
23 BY ATTORNEY SPERBER:
24     Q   All these assertions you're making about what
25 someone told you, that's all hearsay.  What I want to

Page 50

1  understand is which evidence beyond that?  You know, which
2  evidence has been produced in this lawsuit do you believe
3  supports what you're claiming are these lost future profits?
4      A   Mike Elstro told you that he believes that it would
5  be highly likely that they will still be doing business with
6  us today.  This is 2024 right now.
7      Q   That is not what he said.
8      A   That is what he said.
9      Q   Let's go to the --
10     ATTORNEY RAKHUNOV:  Look.  The transcript says what it
11 says.  I don't know that it's productive for us to argue about
12 it.
13     THE WITNESS:  Okay.  Maybe I don't have the exact words.
14 I'm saying the essence of what he said.
15 BY ATTORNEY SPERBER:
16     Q   And that -- according to what -- according to your
17 testimony, that's the basis of your expert opinion?
18     ATTORNEY RAKHUNOV:  Objection.
19     THE WITNESS:  My expert opinion is Dewayne Rader who were
20 dealing with primarily to procure items would send us a list
21 is the person.  We had both Dewayne Rader, Elstro and Vince.
22 Three people there that we dealt with.
23 BY ATTORNEY SPERBER:
24     Q   Again, just to be clear, your expert opinion is
25 based upon a conversation you had supposedly with Dewayne

Page 51

1  Rader and others at Ascension?
2      A   No.  Mine is based on products that I sold them in
3  the past.
4      Q   Okay.  So that's it?  Just products you sold in the
5  past?
6      A   Whatever I did in the past, I believe I was going to
7  at least do the same in the future if not more, and I believe
8  I would have done much more.
9      Q   What is the basis for your expert opinion that Rock
10 Fintek would have continued selling those products to
11 Ascension for the next three years?
12     A   I believe it would have been 10 years.  Three years
13 is being conservative.
14     Q   Again, what is the basis for your opinion?
15     A   They were happy with our products.  They kept
16 calling us and asking us for other products.  We continued
17 giving products they wanted to purchase from us.
18     Q   That's it?
19     A   They were consistently since we started the
20 relationship ordering products from us.
21     Q   Anything else?
22     A   It ended after that.
23     Q   Anything else?
24     A   No.
25     ATTORNEY SPERBER:  Okay.  That's all I have for the

Page 52

1  moment.  I think Mr. Firsch has some questions for you as
2  well.
3      ATTORNEY FIRSCH:  Yes, I do.  Thank you, sir.
4                    EXAMINATION
5  BY ATTORNEY FIRSCH:
6      Q   How long did you attend Harvard Business School for?
7      A   Three years.
8      Q   And what degree did you receive from Harvard
9  Business School?
10     A   I received an OPM.
11     Q   What does that stand for?
12     A   Owner President Managers.
13     Q   And what is that degree?  What coursework is
14 required for that degree?
15     A   From what we were told, we were doing the same
16 coursework as the two-year MBA students were doing; all the
17 same cases, just at a faster speed.
18     Q   And you -- so this was the executive MBA program?
19     A   They call it OPM at Harvard Business School.
20     Q   This is not a -- this is just, you pay you get in?
21 Is there any competitive application --
22     A   No.  Yeah, there is.  You have to be referred, and
23 you have to be accepted.  There is no you pay you get in.
24     Q   Okay.  And where did you complete your undergraduate
25 studies?

FEBRUARY 01, 2024　　　　　　　　THOMAS KATO　　　　　　　　Pages 53..56

Page 53

1  A   I started at San Diego State, and then I did not
2  finish.
3  Q   So you dropped out of college?
4  A   I didn't continue at San Diego, no.
5  Q   Okay. And can you tell us in your business
6  experience as an entrepreneur when have you ever made
7  projections -- what experience do you have making projections
8  as to future profits?
9  A   Most of the business is being able to gauge where we
10 are going to be.
11 Q   Okay. Did you ever formally make such projections
12 in any of your businesses?
13     ATTORNEY RAKHUNOV: Objection.
14     THE WITNESS: Yes.
15 BY ATTORNEY FIRSCH:
16 Q   And did you ever spend time reviewing your
17 projections subsequently to check how accurate they were?
18 A   Yes.
19 Q   And were they, in fact, accurate?
20 A   They were conservative. I exceeded most of the
21 projections.
22 Q   Can you tell us the name of these businesses and
23 some details as to your experience making profit projections?
24 A   I had a construction company. It was doing TIs in
25 the beginning.

Page 54

1  Q   What are TIs?
2  A   Tentative improvements and building buildings,
3  commercial buildings, drug stores, gas stations, building them
4  ground up, doing developments where you do a hundred 3-story
5  townhomes, drugstore, bank, retail center. So I went from
6  construction and TI, tenant improvements, to about 300 -- from
7  just doing some in Michigan to growing to doing them -- about
8  300 of them across 11 states in eight years.
9      Then, I evolved into building -- I evolved into building
10 and owning and being the landlord for those people I was
11 building for.
12     I also started another company called Merchant Hub which
13 is a credit card processing company which is based in the UK
14 which has grown 20 percent, I'd say the last -- a year in the
15 last 15 years, and, you know, sometimes exceeding my
16 expectations.
17 Q   For Merchant Hub, had you been -- do you have any
18 written records of your projections of your expectations?
19 A   I did -- do. Yeah.
20 Q   And for 2024, what are your projections for Merchant
21 Hub?
22 A   I didn't review Merchant Hub before I came on this
23 call -- projections. I prepared for this with the documents
24 you provided.
25 Q   I'm just trying to understand what your expertise

Page 55

1  really is.
2  A   I would have look at them. I don't have it with me.
3  Q   All right. Now, as you stated, you're an expert,
4  right, in the damages that were caused by the parties in your
5  mind here. So you understand that JNS and Kitchen Winners are
6  different parties, correct?
7      ATTORNEY RAKHUNOV: Objection.
8      THE WITNESS: Yes. I believe they are all different.
9  BY ATTORNEY FIRSCH:
10 Q   So what share of the damages, in your expert
11 opinion, were caused by JNS' alleged breach of the contract?
12     ATTORNEY RAKHUNOV: Objection. Beyond the scope.
13     THE WITNESS: Yeah. That's more of a legal question. I
14 don't know how to answer that.
15 BY ATTORNEY SPERBER:
16 Q   Well, I'm asking you in your expert opinion --
17 you're testifying as an expert that the damages caused by the
18 breaches that you've alleged against JNS caused a certain
19 amount of damages. You should be able to break it down
20 between the damages caused by JNS and the separate breach of
21 Kitchen Winners. Can you?
22     ATTORNEY RAKHUNOV: Objection. Beyond the scope.
23     ATTORNEY FIRSCH: No, it's not. It's precisely the
24 scope. If he can't break this down, he can't testify.
25     THE WITNESS: I would just take -- if you want to do it

Page 56

1  by percentage, take it by what percentage we bought from JNS,
2  from Kitchen Winners, from Adorama.
3  BY ATTORNEY FIRSCH:
4  Q   So what percentage of the gloves were purchased from
5  JNS?
6  A   I didn't review that part.
7  Q   So I would say it's about 10 percent. Is that a
8  reasonable guesstimate?
9  A   Sounds reasonable. Sounds --
10     ATTORNEY RAKHUNOV: Objection.
11 BY ATTORNEY FIRSCH:
12 Q   Okay. Let's just take it as an assumption for now.
13 Now, if 10 percent of the gloves had been bad, would Ascension
14 have canceled your contract --
15     ATTORNEY RAKHUNOV: Objection.
16 BY ATTORNEY FIRSCH:
17 Q   -- in your expert opinion?
18 A   It would probably be more like 15 percent, but --
19 Q   Okay.
20 A   -- if --
21 Q   Say, 15 percent --
22 A   -- yeah. If I had --
23 Q   If 15 percent of the gloves would have been bad,
24 would Ascension have canceled the relationship?
25 A   I --

| FEBRUARY 01, 2024 | THOMAS KATO | Pages 57..60 |

Page 57

1  ATTORNEY RAKHUNOV:  Objection.
2  THE WITNESS:  -- I believe they would have canceled
3  because that would have put a big dent in our relationship
4  with them by giving them a product -- and JNS' product in
5  particular had stickers on the boxes which they were outraged
6  about like we were trying to fool them.  So even though it was
7  a small portion, I believe that was something that really got
8  them fired up.
9  BY ATTORNEY FIRSCH:
10  Q  Okay.  What evidence do you have -- because you said
11  that they were really fired up about it, what evidence do you
12  have that they were so fired up about it because I haven't
13  seen anything that they complained about it?  I see you
14  complained about it.  I don't see anything that Ascension
15  complained about it.  Tell me -- point to one piece of
16  evidence that indicates that they complained about that
17  problem.
18  A  They told us when we -- they had us go examine the
19  gloves, and then we went with their nurses.  They go, "Why is
20  there stickers" -- the nurses in hospital -- "Why is there
21  sticker over the gloves?"
22  And we had a meeting with the head of nursing, and he
23  pulled one of the gloves on.  And after that broke immediately
24  in his hand, he looked at the front of the box and pulled the
25  sticker off and said, "What is this?  Why is this on here?"

Page 58

1  And I said, "I don't know why it's on there.  I don't know
2  where it came from."
3  Q  And at that point you said you didn't know where it
4  came from, so today do you know --
5  A  I don't know where -- I don't know where the sticker
6  came from.  I told them at that time.  Then after we looked at
7  it and we saw the numbers that came in, we saw that those
8  boxes came from JNS.  They were delivered from JNS.
9  Q  All right.  So now let's move on since -- so you're
10  saying that they would have canceled the entire contract just
11  on the basis of your alleged breach by JNS, correct?
12  A  I don't know if they would have canceled the entire
13  order, but it would have made us look pretty bad.
14  Q  Okay.  So you're saying you have no damages from
15  Kitchen Winners because JNS delivered first, and they
16  breached, so that would have been enough to cancel your whole
17  relationship?  So you have no damages from Kitchen Winners at
18  all?
19  ATTORNEY RAKHUNOV:  Objection.
20  THE WITNESS:  I believe we purchased from Adorama, not
21  Kitchen Winners.  Unless we bought some from Mendel before we
22  entered into a contract with Adorama that would be a very
23  small amount.
24  BY ATTORNEY FIRSCH:
25  Q  All right.  I will just use your name, Adorama,

Page 59

1  right?  Okay.  To me, Adorama and Kitchen Winners are a
2  grouping.  I'm not distinguishing between them.
3  So you're saying that Adorama and Kitchen Winners did not
4  breach the -- did not cause any damages?
5  A  I believe that we lost trust with Ascension
6  Hospitals delivering Medcare gloves with stickers on them.
7  All bad gloves were discovered at the same time.  So Kitchen
8  Winners', Adorama's, JNS' were all discovered at the same
9  time.
10  Q  So you can't breakdown who damaged you and who
11  didn't?  Is that your testimony?  You can only do it by this
12  group --
13  A  They all did.
14  Q  What about the attorney in Florida?  How much damage
15  did he cause you that you alleged -- when you alleged that the
16  attorney in Florida caused them to cancel the contract?
17  ATTORNEY RAKHUNOV:  Objection.  Who?
18  ATTORNEY FIRSCH:  I think it was Hunton and Williams Law
19  Firm.
20  ATTORNEY RAKHUNOV:  Oh.
21  BY ATTORNEY FIRSCH:
22  Q  Didn't you allege in your lawsuit there that they
23  also caused the exact same damages?
24  A  No.
25  Q  How much --

Page 60

1  A  -- not the same.
2  Q  -- how much of the damages did they cause?
3  A  I don't agree.  No.  It's not the same.
4  Q  Meaning you don't agree, but your attorney, not
5  Phil, some other attorney on your behalf, pleaded this in a
6  lawsuit down there, did they not?
7  A  He pleaded -- no.  No.  No, he didn't.
8  Q  Just how much did you settle the lawsuit in Florida
9  for?
10  ATTORNEY RAKHUNOV:  Oh, objection.  Hold on there --
11  ATTORNEY FIRSCH:  It goes directly to damages.  It
12  relates to the same claims.
13  ATTORNEY RAKHUNOV:  No.  No.  No.  So, first of all, I
14  don't know if there are confidentiality issues there.  I am
15  not going to let --
16  THE WITNESS:  There are.
17  ATTORNEY RAKHUNOV:  Yeah.  So I'm not a lawyer in that
18  case, but I'm not even going to let Mr. Kato answer that
19  question without talking to the lawyer in that case, and --
20  and I will just have to put on the record because I -- to the
21  extent this comes up later, the damages theory alleged in the
22  Hunton case in no way conflicts with the damages theory here.
23  I'm not going to --
24  ATTORNEY FIRSCH:  Phil, we don't need your testimony.  It
25  is what it is.

Page 61

1  ATTORNEY RAKHUNOV: And that's -- yes. So I will just
2  leave it at that, but I'm going to instruct Mr. Kato not to --
3  until confidentiality issues are sorted out, he should not
4  disclose that information.
5  ATTORNEY FIRSCH: All right. Maybe we can -- maybe we
6  can leave a gap in the record, and you can find out if it is
7  confidential, and he could fill it in when -- if it is, in
8  fact, not confidential.
9  ATTORNEY SPERBER: I do note we do have a confidentiality
10 order in place, I believe, in this lawsuit.
11 ATTORNEY RAKHUNOV: And it's not my place to, you know,
12 invade other cases or to -- you know, without having
13 consultation with the other lawyers --
14 ATTORNEY SPERBER: I will also note that Mr. Kato is
15 under a legal obligation to answer these questions and that
16 generally confidentiality provisions do have an exception for
17 that situation.
18 (Simultaneous colloquy.)
19 THE WITNESS: No. They told me when I had it, I'm not
20 allowed to answer -- talk about it.
21 ATTORNEY RAKHUNOV: And --
22 THE WITNESS: That was part of the settlement and --
23 ATTORNEY RAKHUNOV: Thomas. Thomas, hold on.
24 I also note that there are typically provisions that you
25 have to give notice to the other party and give them an

Page 62

1  opportunity to object to disclosure.
2  So, again, I'm not suggesting you never get that
3  information, but certainly not prepared to go there now so we
4  can follow up, but we can look into it, but I --
5  ATTORNEY FIRSCH: All right. I don't want to spend any
6  more time on it.
7  ATTORNEY RAKHUNOV: Yeah.
8  ATTORNEY FIRSCH: You made your position clear. Let's
9  move it along.
10 BY ATTORNEY FIRSCH:
11 Q  I'm just trying to break it down. There's multiple
12 parties who have alleged to have caused you damages and the
13 damages seem to be all the same pot. Is that accurate?
14 A  Yeah. All the damaged gloves came in at one time.
15 They were recognized -- not came in at one time. They were
16 recognized at one time.
17 Q  Now, you talked about that you were going to sell
18 them Intco gloves, correct, in the future? That was your
19 intention.
20 A  We sold them Intco gloves in the past, and we were
21 talking about making a custom Medcare glove which we were
22 going to make whichever way they liked it to look and feel --
23 Q  Okay.
24 A  -- for them.
25 Q  So the gloves that you were planning on selling them

Page 63

1  in the future, did you have a price on those at that point?
2  A  We didn't get into the price -- let's see. Did we
3  talk about price?
4  ATTORNEY RAKHUNOV: What's the timeframe? I'm sorry. I
5  didn't hear. When are you asking about?
6  ATTORNEY FIRSCH: I'm talking about the Intco contract
7  that he referenced earlier today.
8  THE WITNESS: For 2023?
9  ATTORNEY FIRSCH: Yes, the gloves that he was going to
10 sell into the future.
11 BY ATTORNEY FIRSCH:
12 Q  Did you have a price -- a purchase price that you
13 were going to pay to buy those gloves?
14 A  No. We were just going to work on our profit margin
15 around 40 percent.
16 Q  So you were going to ask for a 40 percent profit
17 margin?
18 A  30 to 40 percent.
19 Q  Okay. Now, did you ever discuss that with
20 Ascension, that margin?
21 A  They don't ask me what our margins are.
22 Q  Did you ever discuss a price to sell to Ascension
23 at?
24 A  We discussed that we can be competitive at the time.
25 Q  Okay. Now, isn't it correct that if your margin is

Page 64

1  based on a percentage in dollar terms it goes down when the
2  price of the underlying item goes down?
3  A  Supply and demand of the underlying item goes up and
4  down also so -- yes.
5  Q  But the prices of gloves are substantially down from
6  what they were in 2021 --
7  A  And --
8  Q  -- correct?
9  A  -- and the cost of purchasing nitrile to make the
10 gloves and materials are essentially down also, so everything
11 balances back out. The profit margins --
12 Q  A 30 percent margin -- if you pay $10 a box, a 30
13 percent margin is equal to how much?
14 A  Rock Fintek doesn't have the overhead the --
15 Q  Answer my question.
16 A  Yes. We will make 30 to 40 percent profit.
17 Q  Okay. Now, if you sell -- so if you buy a box for
18 $10 and make a 30 percent profit, how much money do you make?
19 A  Say that again.
20 Q  If you buy a box for $10, and you make a 30 percent
21 margin reselling it, how much money did you make?
22 A  $3.
23 Q  If you buy a box for $1 and make a 30 percent margin
24 when you resell it, how much money have you made?
25 A  $.30.

Page 65

1  Q   Correct. So when you were reselling at a regular
2  price, your 30 to 40 percent margin would result in lower
3  profits even if you had the same margin, would it not?
4  A   Correct.
5  Q   Okay. So you can't just copy over what your -- what
6  your profits were from prior years into the future. You have
7  to calculate it based on actual numbers, don't you?
8  A   If we went off actual numbers and all the products
9  that we stopped selling in 2021, I believe we would have sold
10 a lot more masks in 2021 also, and I believe in 2022, they
11 would have had us for masks and the gloves the same quantities
12 at least. Maybe the masks would have been significantly more
13 also.
14 Q   Now --
15 A   So the volume would have been more, and then the
16 profit would have been around the same.
17 Q   Okay.
18 A   We had built a name and -- with Ascension Health.
19 Q   In terms of -- just so I can understand this, right,
20 in terms of selling other products, isn't it true that
21 Ascension did not buy a single other product from you after
22 December 2020 even long before they discovered issues with the
23 Medcare gloves?
24 A   No.
25     ATTORNEY RAKHUNOV: Objection.

Page 66

1     THE WITNESS: No. No. We were -- the order we had and
2  were focusing on was filling up the glove order. We were
3  talking about other products, but we were -- we were focusing
4  on trying to deliver the gloves.
5  BY ATTORNEY FIRSCH:
6  Q   But you had no other orders in that time, correct?
7  A   No, because that's all we were focusing on was the
8  gloves. We had issues with it.
9  Q   You're saying you couldn't fulfill any other orders
10 at that time?
11 A   We could have, but we wanted to make sure that this
12 was done correctly.
13 Q   So when you --
14 A   We lost the 3-ply contract that we would have had a
15 lot of 3-ply masks with them, so we couldn't -- we tried
16 talking to them about it, and they didn't want to do it. So
17 we had sold 20 million 3-ply masks previously, and they didn't
18 want to buy anymore until they saw how the orders came out.
19 Q   So --
20 A   20 million during the glove order, so we only sold
21 20 million during our glove order with them.
22 Q   Now, what makes you think that Rock Fintek could
23 have beaten out Medline bidding for their main glove contract?
24 A   I believe Medline has a lot more overhead than us.
25 So since we were leaner and we were buying essentially from

Page 67

1  the same places in China -- similar places in China, our
2  operational costs are less, so we would be -- we would be able
3  to beat them.
4  Q   Didn't Mike Elstro testify that you would have
5  needed FDA approval and --
6  A   We --
7  Q   -- you didn't have it?
8  A   We had multiple FDA attorneys on retainer that we
9  were already working with.
10 Q   And didn't he suggest that beating out Medline on
11 price would be a very hard task?
12    ATTORNEY RAKHUNOV: Objection.
13    THE WITNESS: I don't remember if he did or didn't. If
14 he did, he did. If he didn't, he didn't. Dewayne Rader told
15 us -- took us behind the desk. He said, "Look at this. You
16 can do it." Mike Elstro also was ordering a lot of stuff from
17 us. Vince Scott was ordering a lot of things from us.
18 Everybody was constantly ordering products.
19 BY ATTORNEY FIRSCH:
20 Q   Can you -- let me see how to do this.
21 A   Oh -- and we had FDA approval under the company Rock
22 Fintek. We had a registration number and everything with the
23 FDA.
24 Q   All right. Now, if you could go to page 40 of the
25 exhibit I just pulled back up, the Mike Elstro deposition.

Page 68

1  Page 40 at line 17, and he said, "And, two, you're
2  dealing with when you talk about gloves and PPE and masks,
3  you're talking about some ginormous companies and
4  organizations that they would have to get very competitive on
5  price, so there were a couple of big hurdles there. But if
6  they were willing to clear those, then we would certainly talk
7  to them, but they would have look at winning the business."
8     Does that sound to you like you were assured of winning
9  the glove bid or that a bid would have been a very challenging
10 thing to win here?
11 A   No. We cleared every hurdle to get to it. Proven
12 ourselves. Delivered on time. Products they couldn't get
13 from anybody else. So, no. We -- it would have been an easy
14 hurdle to clear.
15 Q   Now, we've seen in discovery in the case that Rock
16 Fintek failed to include in its contract -- in fact, it's
17 included in your pleadings even -- in your complaint, right,
18 that Rock Fintek failed to ensure that compliance with
19 ASTM D6319 was included in the contracts for the gloves that
20 were purchased.
21    Do you know what share of the damages or the result of
22 Rock Fintek's failure to ensure that the gloves it was buying
23 contractually had to meet the standards that Ascension needed?
24    ATTORNEY RAKHUNOV: Objection. I -- I'm not sure I even
25 understand that question, but --

Page 69

1  ATTORNEY FIRSCH: Okay, but he should answer it anyway --
2  ATTORNEY RAKHUNOV: Well --
3  ATTORNEY FIRSCH: -- because I'm sure he does.
4  THE WITNESS: I don't understand.
5  BY ATTORNEY FIRSCH:
6  Q  Like I said, you've got all the answers, so let's
7  take it one step at a time.
8  Isn't it correct that in your pleadings you acknowledge
9  in this case that you did not contract to purchase ASTM D3619
10 certified gloves?
11  ATTORNEY RAKHUNOV: Objection. And objection -- you know
12 what?  You are now going well beyond the scope of any of this.
13 We are now getting --
14  ATTORNEY FIRSCH: Yeah. Yeah, only because he refused to
15 answer the question when asked to answer it. This is not
16 beyond the scope. This is about the damages calculation, and
17 I'm asking him to apportion blame to himself, but he doesn't
18 want to apportion any blame to himself. I get that. That
19 doesn't mean he doesn't have to answer the question.
20  ATTORNEY RAKHUNOV: So putting aside counsel's commentary
21 and closing arguments, I am going to object to that question.
22 This has nothing to do with Rock Fintek's anticipated business
23 from Ascension, and Mr. Kato's certainly not appearing as an
24 industry expert on gloves.
25  THE WITNESS: Not at all.

Page 70

1  ATTORNEY FIRSCH: You mean -- he's appearing as an expert
2  in your damages calculations so I'm asking questions about how
3  he calculated the damages.
4  THE WITNESS: I'm procuring products.
5  BY ATTORNEY FIRSCH:
6  Q  So, again -- so, even better. When you procured the
7  products from my client and failed to request they meet the
8  standard in your purchase order, do you not take any of the
9  blame that any of the damages stem from your failure to
10 include the term ASTM D6319 in the purchase order that you
11 submitted to JNS?  That was exactly what I was asking. Thank
12 you for clarifying.
13  A  They had to meet the standard.
14  Q  It was not in the purchase order, was it, correct?
15  A  They had to meet a standard. I specifically asked.
16  Q  You did not specifically ask JNS --
17  A  I specifically --
18  Q  You never spoke to JNS.
19  A  -- I specifically asked. It was implied and told
20 them. I also told them the value of the relationship. I
21 said, "This is one of the largest hospital systems in the
22 country. We cannot have anything going wrong with this." I
23 said that multiple times. I testified to it, and they were
24 having nitrile examination 510(k) gloves. Period. So --
25  Q  Okay. Which is what you got.

Page 71

1  A  I got fraudulent gloves that have no nitrile in them
2  that are not examination gloves.
3  Q  Says you, but -- okay. You mentioned RF granted --
4  Rock Fintek --
5  A  It doesn't say me. I think you would just ask the
6  expert -- the glove expert what we got and what we didn't get.
7  Q  We already know what we think of the glove expert.
8  We will -- you're not the glove expert. I'm not asking --
9  (Simultaneous colloquy.)
10 THE WITNESS: No. I'm not. You can ask them. 510(k)
11 equals D6319. So ask the glove expert what he believes that
12 we got.
13 BY ATTORNEY FIRSCH:
14  Q  Now, you brought up earlier in this deposition that
15 Ascension -- that you were making Rock Fintek-branded masks
16 for Ascension. Did Ascension ever request Rock Fintek-branded
17 masks?
18  A  We told them we can get them. They said they didn't
19 really care about which brand they want. I said, "We can make
20 custom masks the way you like them. The elastic to be the way
21 you want them. So we will make Rock Fintek masks for you that
22 are more comfortable and the size appropriate that you want
23 because we want to take care of our customer," and we made
24 them.
25  Q  Now, maybe I -- I'm still a little confused on your

Page 72

1  margins here. On the $37 million glove deal, the 200 million
2  gloves that are the subject of this action, what was your
3  margin per box on the resale to Ascension? How much money did
4  you make per box?
5  A  How much money did -- we were losing money because
6  we were selling them -- we were buying some at much higher
7  than we were selling them for.
8  Q  So what --
9  A  We were doing that to keep the relationship. There
10 were some -- some gloves we were buying at $16/$17 a box.
11  Q  From whom did you buy them at $16/$17 a box?
12  A  We bought from multiple people. I believe the most
13 we paid JNS might have been $15 or $16.
14  Q  Okay. So what was the margin on the $15 box?  You
15 were reselling for $18.50 a box.
16  A  And we had already lost the funds that we already
17 paid for the first order through Skymed.
18  Q  Okay. But that doesn't have anything to do with
19 JNS --
20  A  It says -- it has everything to do with -- we are
21 buying at a loss. We had to take that number out of what we
22 can pay. So now they are no longer paying us $18.50. We are
23 getting much less than that, so we are losing $2/$3 every box
24 we delivered just to keep the relationship.
25  Q  Okay. So because of your loss, right? You lost the

Page 73

1  money which is why we were trying to get into how much of that
2  money you recovered from Hunton and Williams, but you don't
3  want to tell us -- so when you say you lost money, you only
4  lost money because you had previously wired money to some
5  crook outside the country, correct?
6      A   That was one way we lost money.  We had other ways
7  to secure the gloves.  We had other companies to buy them
8  from.  We believed Adorama, JNS and Kitchen Winners so we went
9  ahead and purchased from them instead of other credible
10 sources that we had purchased from in the past which we should
11 not have done.
12     Q   All right.  So what was your margin -- counting for
13 that loss of $6 million, what was your margin?  What was
14 your -- what was your price per box at that point?
15     A   I don't have the exact number, but I believe it was
16 dollars less a box -- several dollars less of what were
17 paying.
18     Q   All right.  I think that's all.
19     A   But that had nothing to do with the 150 million
20 gloves.  That was a different contract, a different price.
21     ATTORNEY FIRSCH:  I think that's all I have.
22     Alex, I don't know if you have anything to follow up.
23     ATTORNEY SPERBER:  Just give me two minutes.
24     ATTORNEY FIRSCH:  Let me take one quick look.  I made
25 some notes on here also.

Page 74

1      ATTORNEY SPERBER:  That's all I have as well.
2      ATTORNEY FIRSCH:  Yes.  Thank you for your time.  Best
3  wishes for your daughter.
4      THE WITNESS:  I appreciate that.  Thank you.
5          (Proceedings concluded at 3:17 p.m.)

Page 75

CERTIFICATE OF WITNESS

     I, the undersigned, declare under penalty of perjury that
I have read the foregoing transcript, and I have made any
corrections, additions or deletions that I was desirous of
making; that the foregoing is a true and correct transcript
of my testimony contained therein.
     EXECUTED THIS ____ day of _____, 2024,
at _____, _____.


                         _____
                              THOMAS KATO

Page 76

REPORTER CERTIFICATE

     I, MONIQUE K. GENTRY, do hereby certify that I am
a Registered Professional Reporter, California Certified
Shorthand Reporter, and Notary Public; that previous to the
commencement of the examination, the deponent was duly sworn
to testify to the truth.
     I further certify that this deposition was taken in
shorthand by me at the time and place herein set forth, that
it was thereafter reduced to typewritten form, and that the
foregoing constitutes a true and correct transcript.
     I further certify that I am not related to, employed by,
nor of counsel for any of the parties or attorneys herein, nor
otherwise interested in the result of the within action.
     IN WITNESS WHEREOF, I have hereunto set my hand this
9th day of February, 2024.

                         _____
                         Monique K. Gentry, RPR, CSR 12354

     My commission expires:
     October 23, 2024

```
                                            Page 77
 1                 ERRATA SHEET
 2   Name of Case:  Kitchen Winners, et al., v. Rock Fintek LLC
 3   Deposition of:  Thomas Kato
 4   Proceeding date:  February 1, 2024
 5   The deponent wishes to make the following changes in the
     testimony as originally given:
 6
 7   PAGE   LINE              CHANGE                 REASON
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   Signature of Deponent: _____
19   Subscribed and sworn to before me this ____ day of
20   _____, 2024.
21          _____
                   NOTARY PUBLIC
22            Address_____
              _____
23
              My Commission Expires _____
24
25
```